**ORIGINAL**

Approved: _Russell Capone_
KAN M. NAWADAY / MARTIN S. BELL / RUSSELL CAPONE
Assistant United States Attorneys

Before:  HONORABLE BARBARA MOSES
United States Magistrate Judge
Southern District of New York

**16 MAG 3919**

- - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

       - v. -

JAMES GRANT,
  a/k/a "Jimmy Grant,"
MICHAEL HARRINGTON, and
JEREMY REICHBERG,
  a/k/a "Jeremiah Reichberg,"
  a/k/a "Yermy Reichberg,"

     Defendants.

- - - - - - - - - - - - - - -x,

:
:
:
:
:
:
:

SEALED COMPLAINT

Violations of
18 U.S.C. §§ 1343, 1346,
1349

County of Offense:
New York

SOUTHERN DISTRICT OF NEW YORK, ss.:

      BLAIRE TOLEMAN, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

### COUNT ONE

### (Conspiracy to Commit Honest Services Wire Fraud)

      1.  From in or about 2012, up to and including in or about 2015, in the Southern District of New York and elsewhere, JAMES GRANT, a/k/a "Jimmy Grant," MICHAEL HARRINGTON, and JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1343 and 1346.



2.    It was a part and an object of the conspiracy that JAMES GRANT, a/k/a "Jimmy Grant," MICHAEL HARRINGTON, and JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the New York City Police Department ("NYPD") and the people of the City of New York of their intangible right to the honest services of HARRINGTON and GRANT, who were high-ranking NYPD officials, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, REICHBERG and a co-conspirator not named herein provided personal and financial benefits, including through the use of interstate wires, worth tens of thousands of dollars to GRANT and HARRINGTON in exchange for official action taken by GRANT, HARRINGTON, and other members of the NYPD at GRANT and HARRINGTON's direction.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

3.    I have been a Special Agent with the FBI for approximately 4 years.  I am currently assigned to a public corruption squad in the FBI's New York Field Office.  As a Special Agent, I have participated in investigations involving the bribing of public officials, law enforcement officers, and others.

4.    Since at least in or about 2014, I have been involved in an investigation being conducted jointly by the FBI and the Internal Affairs Bureau ("IAB") of the NYPD into, among other things, allegations of misconduct by high-ranking NYPD officials and other law enforcement and public officials.

5.    The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents.  Because this affidavit is prepared for limited purposes, I have not set forth each and every fact I have learned in connection with this investigation.  Where conversations and events are referred to herein, they are related in substance and in part.

## Relevant Entities and Individuals

6.    Based on my review of information provided by the NYPD, I am aware of the following:

a.    MICHAEL HARRINGTON, the defendant, has been a member of the NYPD since 1986.  Between October 2012 and May 2013, HARRINGTON was an Inspector assigned to Patrol Borough Brooklyn North.  Between May 2013 and November 2014, HARRINGTON was a Deputy Chief assigned as the Executive Officer in the Chief of Department's Office, and in that capacity was second-in-command in that office, which was located at NYPD headquarters at One Police Plaza in downtown Manhattan.  The Chief of Department's Office supervises all uniformed police officers at the NYPD and is responsible for all uniformed operations, having oversight over other bureaus such as community affairs, patrol, transportation, housing, transit, and detectives.  As Executive Officer, HARRINGTON's responsibilities, according to the NYPD's Patrol Guide, included assuming command and performance functions for the Chief of Department in his absence; supervising the performance of administrative functions; training, planning, and personnel; and adjudicating disciplinary issues.  Between November 2014 and April 2016, HARRINGTON was a Deputy Chief assigned to the NYPD's Housing Bureau, where he had oversight of, among other things, policing of the City's public housing units, including crime reduction and quality of life issues.

b.    JAMES GRANT, a/k/a "Jimmy Grant," the defendant, has been a member of the NYPD since 1996.  For most of his career until 2014, GRANT was assigned to various posts in Brooklyn, New York, including, from December 2011 through June 2014, as a Captain and the Commanding Officer of the 72nd Precinct.  From June 2014 through April 2015, GRANT was a Deputy Inspector and the Commanding Officer of the 19th Precinct on the Upper East Side of Manhattan.  In that position, GRANT was the highest ranking NYPD official in the 19th Precinct and supervised approximately 240 NYPD officers.

c.    JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendant, resides in Borough Park, Brooklyn, and has described himself in meetings with the NYPD and others, as set forth below, as a "community liaison" to the NYPD.

7.    CW-1 is a businessman in the real estate industry who is a cooperating witness for the Government.  CW-1 has pleaded guilty to conspiring to commit honest services fraud in connection

with, among other conduct, the honest services wire fraud scheme
described herein, and is providing information to the Government
in the hope of obtaining leniency when he is sentenced.
Information provided by CW-1 has been reliable and corroborated by
independent evidence.  Based on discussions with CW-1, I am aware
that JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy
Reichberg, the defendant, introduced CW-1 to high-ranking
officials at the NYPD, including GRANT and HARRINGTON.

## Overview

8.   Based on the various sources described herein, I
have learned the following:

a.   Over the course of several years, JEREMY
REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg,"
the defendant, cultivated close relationships with numerous
members of the NYPD, including JAMES GRANT, a/k/a "Jimmy Grant,"
and MICHAEL HARRINGTON, the defendants, by providing them with
substantial bribes in the form of personal and financial benefits,
including paying for uniforms, jewelry, business cards, expensive
meals, and other luxury items.  In exchange, REICHBERG has
repeatedly called upon his connections in the NYPD for official
action, as opportunities arise, both for himself and for members
of his community, particularly in Borough Park, Brooklyn.
REICHBERG's bribery of high-ranking members of the NYPD enabled
him not only to obtain such official benefits on an as-needed
basis, but also gave him considerable influence over internal NYPD
affairs, including personnel decisions such as the promotion of
certain favored NYPD officers.

b.   In or around 2011-2012, REICHBERG began
spending significant time with CW-1, and introduced CW-1 to his
connections inside the NYPD, including GRANT and HARRINGTON.
Following these introductions, CW-1 began spending time with
GRANT, HARRINGTON, and other NYPD officials, and, along with
REICHBERG, CW-1 spent large sums of money paying for personal and
financial benefits for GRANT, HARRINGTON, and others, including
paying for flights, hotel rooms, prostitutes, expensive meals,
home improvements, and prime seats to sporting events, among other
things.  From in or about 2012 up through and including in or
about 2015, CW-1 and REICHBERG paid a total of well more than
$100,000 for the benefit of GRANT, HARRINGTON, and other NYPD
officers.

c.    In exchange for these benefits, REICHBERG and CW-1 were effectively able to have GRANT and HARRINGTON on call – ready and willing to use their official authority within the NYPD to provide assistance to REICHBERG and CW-1 on an as-needed basis. Among the official actions that GRANT and/or HARRINGTON took at the request of CW-1 and/or REICHBERG were police escorts for them and their friends, assistance with private disputes and investigations, police resources for security at religious sites and events, the ability to get out of tickets or other infractions, and special access to parades and other cultural events, among other official favors.

### REICHBERG and CW-1's Relationships with HARRINGTON, GRANT, and Other High-Ranking Members of the NYPD

9.    I have reviewed numerous e-mails and attachments from CW-1's e-mail account and the e-mail account of JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendant, obtained pursuant to search warrants on those accounts authorized by United States Magistrate Judges.  In addition, I have reviewed recorded phone calls between CW-1 and others, and between REICHBERG and others, during the time period of in or about January 2015 through on or about May 12, 2015, obtained pursuant to judicially-authorized wiretaps on their phones.  I also have participated in extensive debriefings of CW-1, and have reviewed reports of other agents' debriefings of CW-1. Based on these discussions and my review of these materials, information obtained from the NYPD, and my discussions with other witnesses, I have learned the following:

a.    CW-1 first met JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," in 2009 or 2010. At the time, a company for which CW-1 worked made a donation to an NYPD football team.  CW-1 met REICHBERG and other NYPD officials at a dinner for the team.  REICHBERG provided CW-1 with a business card stating that he was an "NYPD Liaison," and told CW-1 that he could help with traffic and moving violations, other police-related issues, and was, in sum and substance, a "fix it guy."

b.    CW-1 began spending more time with REICHBERG starting in or about 2012, including doing certain business with REICHBERG in the construction and real estate industries. REICHBERG used space at CW-1's office for a time around this time period.

c.     Through REICHBERG, CW-1 met and spent time with numerous high-ranking officials from the NYPD.  REICHBERG informed CW-1 that he (REICHBERG) used his connections in the NYPD to help him, among other things, handle personal disputes for himself and his associates.  For example, CW-1 has informed me that REICHBERG's connections in the NYPD sent officers to the vicinity of a jewelry business run by associates of REICHBERG to disperse individuals handing out advertisements for a rival business; that REICHBERG's connections in the NYPD sent officers to disperse protesters in front of another of his associates' businesses.  In addition, CW-1 has informed me that REICHBERG, using his connections in local law enforcement agencies, was able to arrange for the closure of a lane in the Lincoln Tunnel and a police escort down that lane for a businessman visiting the United States.

d.     Among the high-ranking NYPD officials to whom REICHBERG introduced CW-1 were JAMES GRANT, a/k/a "Jimmy Grant," and MICHAEL HARRINGTON, the defendants.  At the time, GRANT was the Commanding Officer of the 72nd Precinct in Brooklyn, and HARRINGTON was an Inspector assigned to Patrol Borough Brooklyn North.

e.     Beginning in or about the 2012-2013 time period, CW-1, working with REICHBERG, began providing GRANT, HARRINGTON, and other high-ranking officials with numerous valuable items, including free meals and travel, with the understanding that these officials, including GRANT and HARRINGTON, would be able to perform police-related favors for them.  CW-1 understood REICHBERG and other of his wealthy associates to have previously been engaged in this same conduct with members of the NYPD, and CW-1 was able to join in the scheme by himself paying for numerous benefits for GRANT and HARRINGTON.[1]

---

[1] GRANT and HARRINGTON accepted these personal and financial benefits and the others set forth below even though doing so constituted clear violations of NYPD rules.  In particular, I have reviewed portions of the NYPD's "Patrol Guide," which sets forth rules and regulations governing the conduct of NYPD Personnel.  The section of the Patrol Guide titled "Guidelines for Acceptance of Gifts and Other Compensation By Members of the Service" provides, in part, as follows: "It is the policy of the Department that members of the service may not accept any reward, gratuity, gift or other compensation for any service performed as a result of or in conjunction with their duties as public servants. . . . This policy applies regardless of whether the service was

   f. As REICHBERG and CW-1 provided personal and financial benefits to GRANT and HARRINGTON, they in turn assisted REICHBERG and CW-1 with official actions over time, such as police escorts for them and their associates; sending officers and using police resources to assist in civil disputes and other matters; sending patrol cars to religious sites upon request; VIP access to parades and other New York City events; as to GRANT, assisting with their applications for gun licenses from the NYPD; among other things, all as set forth in more detail below.

   g. As noted above, in or about June 2013, HARRINGTON was promoted to be the Executive Officer at the Chief of Department's Office, where he worked for the Chief of Department ("Chief-1").

   h. Through HARRINGTON, REICHBERG and CW-1 also began spending time with Chief-1. CW-1 understood that with the connection that he and REICHBERG had, through HARRINGTON, to the Chief of Department's Office, CW-1 and REICHBERG would have ready access to the highest levels at the NYPD, and would have a "one stop shop" for assistance rather than having to reach out to numerous individual members of the NYPD.

   i. During the time period that HARRINGTON was Executive Officer at the Chief of Department's Office, REICHBERG and CW-1 went to lunches and dinners on a regular basis with Chief-1 and HARRINGTON, including at expensive restaurants.  CW-1 paid the entire bill at these lunches and dinners and was not reimbursed.  During this time, HARRINGTON continued to assist REICHBERG and CW-1 with official actions.  Also during this time, as they expected, REICHBERG and CW-1 began making fewer requests of officials aside from HARRINGTON and GRANT, given their position senior to all other officials with whom REICHBERG and CW-1 dealt.

---

performed while said members of the Department were on or off duty.  Members of the service also shall not solicit any gift, gratuity, loan, present, fee or reward for personal gain. . . . Members of the service may be offered gifts, awards, and other things of value by private citizens, institutions, etc., in appreciation for their police service.  It is not unethical or illegal for a member of the service to accept gifts that are commonly offered as tokens of appreciation, *i.e.*, plaques, pen and pencil sets, etc.  However, cash rewards and personal gifts, such as wristwatches, etc., are strictly forbidden."

j.    Due to their relationship with GRANT, including the acts performed by GRANT on their behalf, in or about late 2013 or early 2014, REICHBERG and CW-1 recommended to Chief-1 that Chief-1 name GRANT to be the Commanding Officer of the 19th Precinct, a position that was opening up and which, as noted above, involved the supervision of the approximately 240 officers in the 19th Precinct.  Chief-1 ultimately appointed GRANT to that position, where he began in June 2014.  Chief-1 put REICHBERG and CW-1 on the phone with GRANT in order for REICHBERG and CW-1 to be able to tell GRANT that he was being promoted.

k.    In approximately March 2015, CW-1 was approached by law enforcement and questioned as to, among other matters, money that Chief-1 had provided to CW-1 to invest.  After this approach by law enforcement, CW-1 decided to limit significantly his contact with Chief-1, GRANT, HARRINGTON, and other members of the NYPD.

## Personal and Financial Benefits Provided to GRANT and Official Actions Taken By GRANT

10.    Based on my review of the e-mails discussed above; wiretapped phone calls discussed above; documents and information provided by vendors as detailed below; and discussions with CW-1 and review of reports of other agents' debriefings of CW-1, I have learned the following with respect to JAMES GRANT, a/k/a "Jimmy Grant," the defendant:

### Las Vegas Trip (2013)

a.    In or about January 2013, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," and CW-1 offered to take GRANT to Las Vegas for Super Bowl Weekend.  GRANT, as well as a Detective who was friends with GRANT ("Detective-1"), accepted the offer.

b.    CW-1 paid for a private jet to take REICHBERG, GRANT, Detective-1, CW-1 and two other individuals to and from Las Vegas.

c.    I have reviewed documentation provided by the private jet company that arranged this trip to Las Vegas, and learned that the aircraft departed on February 2, 2013 and returned on February 4, 2013, and that CW-1 was invoiced approximately $59,000 for the round trip. REICHBERG and CW-1 also arranged for a prostitute ("Prostitute-1") to come on the private

jet and spend the weekend with the group in Las Vegas.  While in Las Vegas, the prostitute stayed in GRANT's room.  I have spoken to law enforcement agents who have debriefed Prostitute-1, who confirmed, among other things, that Prostitute-1 was engaged to accompany the persons on the trip and that GRANT and others took advantage of her services during the trip.

         d.   I have also reviewed the flight invoice from the private jet company which shows that the passengers for the departing and returning trips were in fact CW-1, REICHBERG, GRANT, Detective-1, one male individual I know to be CW-1's associate, and Prostitute-1.

         e.   CW-1 obtained complimentary rooms for GRANT and Detective-1 at a hotel in Las Vegas, and paid for their meals.

         f.   CW-1 was not reimbursed for any of the expenses in connection with the Las Vegas trip.

*Rome Trip (2013)*

         g.   In August 2013, GRANT took a vacation to Rome with his family and others.  In advance of the trip, CW-1 told GRANT that he should stay at a particular hotel that was CW-1's favorite hotel in Rome, and offered to pay for the room.  GRANT accepted the offer, and CW-1 paid for a two-night stay in two rooms at the hotel during GRANT's trip.

         h.   I have seen an e-mail confirmation for the stay sent to CW-1, which CW-1 forwarded to GRANT, cc'ing REICHBERG and writing "Most luxurious hotel in Rome."  I also have seen an invoice for the hotel stay provided by the travel agency that CW-1 used to book the hotel stay (the "Travel Agency"), in the amount of $1,066.  The invoice is addressed to "GRANT JAMES," with CW-1's e-mail address, and CW-1's credit card.

         i.   GRANT did not reimburse CW-1 for the hotel room in Rome.

*Other Financial Benefits*

         j.   In or about 2013, REICHBERG and CW-1 also offered to pay for work on GRANT's house, and specifically to replace railings outside of GRANT's house.  GRANT accepted the offer, and REICHBERG found the contractor to do the work.  REICHBERG and CW-1 paid for the work, which CW-1 estimates cost

approximately $6,000.  To CW-1's knowledge, GRANT did not
reimburse him or REICHBERG.

        k.    In or about 2013, CW-1 offered to pay to
upgrade GRANT's watch to a more expensive brand.  GRANT accepted
CW-1's offer.  GRANT's new watch, paid for by CW-1 along with an
old watch turned in by GRANT, cost approximately $3,000.

        l.    On Christmas day in 2013, REICHBERG and CW-1
drove to GRANT's home in Staten Island, New York wearing Christmas
elf hats and gave GRANT a video game system for his children and a
piece of jewelry for his wife, worth approximately $1,000.  As set
forth below, I have reviewed a recorded call in which GRANT
complained that his two "elves" did not come for Christmas the
following year, 2014.

        m.    In or about 2014, REICHBERG also arranged to
have windows at GRANT's house replaced, at no cost to GRANT.
Another agent has spoken with the contractor who performed the
window work, who told that other agent that the work was arranged
by and paid for by REICHBERG, and cost approximately $6,000.

### Official Acts Provided by GRANT

        n.    As noted above, CW-1 understood and expected
that GRANT would perform official acts for REICHBERG and CW-1 due
to their having bestowed personal and financial benefits worth
tens of thousands of dollars on GRANT.  During the time period
that CW-1 was providing such benefits, GRANT in fact performed
numerous official acts for REICHBERG and CW-1.

        o.    For example, from in or about 2012 through in
or about 2014, GRANT regularly provided REICHBERG and CW-1 with
police escorts.  On many occasions, GRANT himself drove CW-1 to
locations, such as to and from the airport, using the lights and
sirens of a police car.  On other occasions, GRANT dispatched
junior officers to provide police escorts for CW-1.

        p.    On one occasion, GRANT sent officers to a
building in which CW-1 had an ownership interest to investigate a
trespasser.  On another occasion, GRANT sent officers to a
building in which CW-1 had an ownership interest to investigate a
theft.

        q.    On or about September 12, 2013, CW-1 received
an e-mail from a business associate who indicated that a colleague

had left his watch in a livery cab in Manhattan and was trying to track down the cab, and who wrote "This may be something for your boy Jeremy [REICHBERG]." CW-1 responded, cc'ing REICHBERG, "Yes Jeremy will have NYPD review cameras at that time and location but will cost Jeremy 10k. Should I proceed." The business associate wrote back that it did not make "economic sense" because the watch was worth approximately $50,000 and the NYPD camera review might not be successful. The business associate later wrote back that the CEO of the company had authorized a $5,000 payment. CW-1 responded, cc'ing REICHBERG, that "there are two guys [REICHBERG] needs to take care of to watch the footage. He said 10k is the price." Based on my discussions with CW-1, I learned that REICHBERG had told CW-1 that REICHBERG had raised this issue with GRANT, and GRANT had agreed to facilitate the review of street cameras, and REICHBERG indicated that REICHBERG would need money to take care of the officers who would help. Ultimately, the company did not proceed with CW-1 and REICHBERG's offer.

      r.   GRANT also escorted CW-1 and his friends beyond police barricades to prime locations at events such as parades, the New York City marathon, and the New Year's Eve celebration at Times Square, and provided them with "VIP treatment" that allowed them to go to special access areas not accessible to the general public.

      s.   From approximately 2012 through 2014, annually, GRANT provided CW-1 with NYPD cards for him and approximately 15 of his friends, bearing GRANT's name on one side, and the name of CW-1 or his friend on the other, which cards indicated, in substance, that a police officer should provide courtesies to the bearer of the card. CW-1 himself used his card on at least a couple of occasions when being pulled over while driving.

      t.   In 2015, when a family member was hospitalized at a hospital in the confines of GRANT's precinct, GRANT, at CW-1's request, went to the hospital to introduce himself to hospital staff as Commanding Officer of the precinct and to make sure that CW-1's relative was attended to properly.

      u.   GRANT helped REICHBERG and CW-1 in their efforts to obtain gun licenses from the NYPD. REICHBERG told CW-1 that GRANT was friendly with personnel in the Licensing Division of the NYPD, and asked CW-1 if he wanted a gun license. CW-1 responded that he did. REICHBERG and CW-1 then went to the

Licensing Division, filled out paperwork, and met GRANT's connections.

               v.    I have spoken to agents who debriefed an officer in the Licensing Division who reviewed REICHBERG and CW-1's application ("Officer-1"). Officer-1 has pleaded guilty to bribery-related charges, in connection with the receipt of financial benefits to help expedite gun license applications submitted by, among others, Alex Lichtenstein, a/k/a "Shaya," an expediter, on behalf of Lichtenstein's clients. Lichtenstein has been charged with bribery-related offenses in a case pending in this district. Officer-1 is aware that GRANT is friendly with Lichtenstein, and has been informed by a Sergeant in the Licensing Division ("Sergeant-1") that Lichtenstein paid for work on GRANT's house. Based on my debriefings of Officer-1, I have learned the following:

               i.    At a certain point in 2014, Officer-1 was informed by Sergeant-1 that GRANT was sending REICHBERG down to get a gun license, and that Officer-1 should expedite the approval of REICHBERG's license.

               ii.    Subsequently, REICHBERG showed up to the Licensing Division with CW-1, but CW-1 did not have any paperwork with him, so Officer-1 only processed REICHBERG's application for a full carry license, *i.e.*, a license to carry a concealed firearm anywhere in the state of New York. REICHBERG asked to receive his license within one day, and Officer-1 said that it would take longer, to which REICHBERG responded by boasting of his connection to Chief-1 and that he was responsible for getting GRANT his position as the Commanding Officer of the 19th Precinct.

               iii.    REICHBERG then met with the Commanding Officer of the Licensing Division, after which Officer-1 was told to "close out" and approve "Jimmy GRANT's guy."

               iv.    Based on my discussions with personnel at the Licensing Division, I am informed that the approval process for a full carry license typically takes at least six months and, in many instances, in excess of a year. Based on my review of information from the Licensing Division, I know that REICHBERG and CW-1 applied for their gun licenses on or about August 21, 2014, and REICHBERG was approved for a full carry license on or about October 29, 2014. CW-1 did not obtain his license, and his application was rejected in March 2016 because CW-1 had never followed up with necessary paperwork.

w.    On or about January 13, 2015, at approximately
10:13 in the morning, REICHBERG placed a call to GRANT, which was
captured on the judicially-authorized wiretap over REICHBERG's
phone.  During the call, as set forth below, REICHBERG and GRANT
appeared to discuss manufacturing a fake employment letter that
would enable CW-1 to obtain a full-carry gun license.
Specifically, GRANT told REICHBERG: "On that letter, it has to
state that [CW-1 is] part owner, and it shows that he's part owner
in that business, or the owner of the company has to give a
letter, that's notarized, saying that [CW-1] is his right hand
guy, does carry diamonds."  GRANT then said: "I gave you [Officer-
1's] number, [Officer-1] called you, just fuckin tell him,
whatever way you want to go they're gonna do it, but they have to
put something in the folder."  GRANT said that Sergeant-1 told him
that everything was on GRANT now, that "now they're ready to do
it," but that REICHBERG was "holding the ship up."  GRANT then
said to "have the owner, whether it's you or whoever it is, write
a notarized letter, saying that [CW-1] is employed . . . he does
frequently carry large amounts of diamonds worth, you know,
upwards of a million dollars, at all times, all days, and that
you're authorizing him to be able to carry . . . . a firearm. . . .
That's it, get that letter, get it to me, and I'll have it dropped
off."

x.    Based on my training, experience, and
participation in the investigation, and the fact that CW-1 is not
employed in the diamond industry, I believe that during this call,
GRANT was coaching REICHBERG on what needed to be put in a letter
regarding CW-1's nonexistent work transporting diamonds, and told
REICHBERG that his connections at the Licensing Division would
approve CW-1's application once the letter was received.

y.    On or about January 16, 2015, at approximately
9:36 a.m., GRANT called REICHBERG.  During the call, as set forth
below, GRANT complained to REICHBERG about not receiving certain
favors, and appeared to explicitly connect his receipt of favors
from REICHBERG with official actions he had taken at REICHBERG's
request.  Specifically, GRANT told REICHBERG on the call: "See you
don't love me anymore bro."  GRANT said that he heard REICHBERG
had invited another high-ranking official to the Super Bowl and
"you don't even invite me to the Super Bowl, what the fuck."
REICHBERG said that he was still deciding whether to go, and "if
we are you wanna come?"  GRANT responded "maybe, yeah."  REICHBERG
accused GRANT of being too busy for REICHBERG, to which GRANT
replied "No no no.  First of all, first of all, the two [] elves
didn't come for fucking Christmas number one, I got your fuckin

Westchester county cards, the cards you asked me to make up, you fucking broke my balls about [CW-1's application]." Based on my training, experience, and participation in the investigation, I believe that during this call, GRANT was complaining that REICHBERG and CW-1 did not invite him to come to Las Vegas for the Super Bowl and did not bring him Christmas gifts, even though GRANT had printed police liaison cards for REICHBERG and was helping REICHBERG and CW-1 with the gun license process.

       z.    Approximately two months later, on or about March 6, 2015, at approximately 4:37 p.m., REICHBERG called GRANT. During the call, as set forth below, GRANT complained that CW-1 was not treating him well despite everything GRANT had done for CW-1. Specifically, GRANT said that he had been reaching out to CW-1 and that "I can sense the ice . . . that's not right though." REICHBERG said "he never did anything for you, just relax, and you always did for him." GRANT responded: "I know he never did anything for me" and "I was good to him, because of you. Whatever I did for him was because of you." Based on my training, experience, and participation in the investigation, I believe that during this call, GRANT acknowledged that he had performed official favors for CW-1 but denied receiving "anything" from CW-1.

       aa.    On or about March 20, 2015, beginning at approximately 1:22 p.m., REICHBERG engaged in a series of phone calls that, as set forth below, appear to involve an effort by REICHBERG to use his connection to GRANT to fix or avoid a ticket for an associate of REICHBERG's. Specifically, REICHBERG received a call from an unknown male ("the UM"), which was captured over the judicially-authorized wiretap on REICHBERG's phone. During the call, the UM told REICHBERG he had been pulled over by the police in the 66th precinct. The UM said that he gave the officers "JIMMY GRANT's card," to which REICHBERG responded "That's fine, you'll be fine." REICHBERG asked the UM for the license plate number of the police car, which the UM provided. The UM said that the officers had taken his information and were back in their police car. After REICHBERG hung up the phone, he called an individual I believe to be a Deputy Inspector based, at the time, in Brooklyn ("DI-1"). REICHBERG told DI-1 that the police car bearing the license plate number provided by the UM "pulled somebody over, he gave them Jimmy's card." DI-1 responded, "yeah, I just got a call, he's driving like a fucking lunatic" into traffic and blowing red lights. REICHBERG told DI-1 that the UM had an emergency and that he was REICHBERG's friend. DI-1 responded: "All right, so you gave him Jimmy's card?" to

which REICHBERG responded in the affirmative.  DI-1 then said:
"All right I'll tell them he knows him," before hanging up.

bb.  Based on my training, experience, and
participation in the investigation, I believe that in this series
of calls, the UM, who is from REICHBERG's community and to whom
REICHBERG had given GRANT's card, told REICHBERG he had been
pulled over and had given the card to the officers.  REICHBERG
then called DI-1, who was aware of the incident.  The contact
agreed to have the UM let go – even though he was "driving like a
fucking maniac" – after confirming with REICHBERG that the UM was
a friend of REICHBERG's and that it was REICHBERG who had supplied
the UM with GRANT's card.

### Personal and Financial Benefits Provided to HARRINGTON and Official Actions Taken By HARRINGTON

11.  Based on my review of e-mails sent to and from CW-
1's e-mail account and the e-mail account of JEREMY REICHBERG,
a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the
defendant; recorded phone calls over the judicially-authorized
wiretaps discussed above; review of other materials as discussed
below; and discussions with CW-1, I have learned the following
with respect to MICHAEL HARRINGTON, the defendant:

a.  During the time period that HARRINGTON was the
Executive Officer for Chief-1, from May 2013 through November
2014, CW-1 took HARRINGTON and Chief-1 to dinner at least once or
twice a week, typically at expensive restaurants in Manhattan.
CW-1 paid for these dinners, without being reimbursed, and the
bill typically ran between $400 and $500.

b.  On or about January 14, 2015, another agent
conducted surveillance from within a restaurant on the Upper West
Side of Manhattan (the "Restaurant"), where CW-1, REICHBERG,
Chief-1 (who had by then resigned), and HARRINGTON were sitting at
a table.  The other agent sat at a table near them, and using FBI
equipment, recorded the conversation.  Based on my discussion with
the agent and review of the recording, I know that
during part of the conversation, REICHBERG and HARRINGTON
discussed a security company run by HARRINGTON's family, which is
referenced in more detail below.  During the time at the
Restaurant, only HARRINGTON ate dinner.  When the bill came to CW-
1, CW-1 looked at it and commented to the table, "This is the
cheapest bill we've ever had."

c.    During this same time period, CW-1 and
REICHBERG provided HARRINGTON with tickets to numerous sporting
events, sometimes to go with CW-1 and REICHBERG and sometimes
without them.  For example, in an e-mail dated January 10, 2014,
CW-1 sent HARRINGTON two Brooklyn Nets basketball tickets, with a
face value of $400 each.  In an e-mail dated May 24, 2014, CW-1
sent HARRINGTON two New York Rangers hockey tickets, with a face
value of $700 each.

d.    On or about April 7, 2013, another individual
sent an e-mail to REICHBERG attaching an image of a business card
for HARRINGTON.  Based on my training, experience, and
participation in the investigation, I believe that REICHBERG was
arranging to have business cards prepared for HARRINGTON.

e.    On Christmas day in 2013, on the same trip
that REICHBERG and CW-1 wore elf hats and provided a video game
system and jewelry to the family of JAMES GRANT, a/k/a "Jimmy
Grant," the defendant, REICHBERG and CW-1 drove to HARRINGTON's
home and gave HARRINGTON a video game system for his children.

*Chicago Trip (2014)*

f.    In 2014, HARRINGTON took a trip to Chicago
with his family members.  CW-1 offered to pay for the family's
hotel rooms in Chicago, which HARRINGTON accepted, and REICHBERG
helped coordinate the travel arrangements.  I have seen an e-mail
from May 14, 2014 from REICHBERG to CW-1 in which REICHBERG asked
CW-1 to "please confirm the hotel room in Downtown Chicago" for an
individual I know to be HARRINGTON's brother, and then specified
that three rooms would be needed for four nights, and one room
would be needed for two nights.  I also have seen an e-mail from
later the same day from a hotel in Chicago to CW-1 confirming the
four rooms that CW-1 had booked.  CW-1 forwarded that e-mail to
HARRINGTON, using HARRINGTON's private e-mail address.  I also
have seen an invoice from the Travel Agency to CW-1 for the hotel
rooms, in the amount of approximately $6,500.

g.    I have spoken to other agents who participated
in an interview of HARRINGTON at the United States Attorney's
Office for the Southern District of New York in March 2016, and
reviewed notes of that interview, which occurred at a time when it
was not publicly known that CW-1 was cooperating with the
Government.  During the interview, HARRINGTON made false
representations about the 2014 Chicago trip, including by claiming
that he had reimbursed CW-1 in cash after the trip was over.

According to CW-1, CW-1 never sought or received any reimbursement from HARRINGTON.

**Payments to HARRINGTON's Family's Security Company**

        h.   In addition to the benefits discussed above, REICHBERG obtained business, amounting to tens of thousands of dollars, for a private security company run in part by HARRINGTON's family and which HARRINGTON unofficially helped manage (the "Security Company"). Specifically, REICHBERG obtained work for the Security Company at a school in Manhattan affiliated with CW-1, and the Security Company was paid approximately $5,000 per month for that work.

        i.   The Security Company began working at the school in late 2014 or early 2015, and did so for a period of at least 15 months until the spring of 2016. At first, CW-1 paid the Security Company for the work, and after a few months the school began paying the Security Company directly. REICHBERG did not tell CW-1 that the Security Company was affiliated with HARRINGTON's family. Rather, CW-1 was provided with a particular contact, who was not a member of HARRINGTON's family, to be the point person for security (the "Security Guard").

        j.   I have listened to calls intercepted pursuant to the judicially-authorized wiretap on REICHBERG's phone, discussed above, in which REICHBERG and HARRINGTON discuss money owed by CW-1 and the school to HARRINGTON's family's Security Company.

        k.   For example, on or about January 20, 2015, at approximately 7:24 p.m., REICHBERG called HARRINGTON. During the call, REICHBERG said: "I spoke to [the Security Guard], I gave him a rundown," and further said that he "spoke to [CW-1], on Thursday we'll have the balance, $5,000." Based on my training, experience, and participation in the investigation, I believe that during this call, REICHBERG and HARRINGTON were discussing the school security job for the Security Company and an expected partial payment from CW-1 of $5,000 for the job.

        l.   As another example, on or about January 31, 2015, at approximately 8:40 p.m., REICHBERG called HARRINGTON. During the call, HARRINGTON stated that "[the Security Guard] has to work this final deal out with [CW-1] . . . are they going to continue this way, are they gonna do it to the end of the year? I got the impression [CW-1] wanted to punt it to the school to

handle . . . at some point I want [the Security Guard] to meet up with [CW-1] to finalize it, and my brother [] too." HARRINGTON also said that "ultimately, I figure [CW-1's] gonna figure this math out, that I'm involved. . . . I'm not involved, on paper everything is nothing to do with me." Based on my training, experience, and participation in this investigation, I believe that during this call, HARRINGTON was discussing with REICHBERG whether CW-1 would continue to make payments to his family's Security Company. HARRINGTON also confirmed that he was involved with the Security Company, and that CW-1 was not aware of HARRINGTON's involvement.

### Official Acts Provided by HARRINGTON

m.    As with JAMES GRANT, a/k/a "Jimmy Grant," the defendant, CW-1 understood and expected that HARRINGTON would perform official acts for REICHBERG and CW-1 due to their having bestowed financial and other benefits on HARRINGTON. During the time period that CW-1 was providing the above referenced benefits to HARRINGTON, HARRINGTON in fact performed numerous official acts for REICHBERG and CW-1.

n.    For example, in or about 2014, a jewelry business affiliated with REICHBERG was having a dispute with a neighboring jewelry business in the same building. The neighboring company hired a security guard who was an off-duty NYPD officer to stand near the business of REICHBERG's affiliate's company. HARRINGTON, at REICHBERG's request, investigated the off-duty officer and took steps to have him disciplined within the NYPD.

o.    Further, on at least one occasion, HARRINGTON agreed to facilitate an arrest for REICHBERG, by using the Security Company to surveil a suspected criminal and the NYPD to arrest him when he was found. Specifically, on or about January 23, 2015, at approximately 1:21 p.m., REICHBERG called HARRINGTON. The call was intercepted pursuant to the judicially-authorized wiretap on REICHBERG's phone. During the call, REICHBERG said: "All right I spoke to the guy, he wants from 12 to 7 every night starting Sunday. . . . [the Security Guard] should give him a call and basically get the details." HARRINGTON responded: "[the Security Guard] should probably see the video." REICHBERG responded: "right, so [the Security Guard] should tell him that. Listen, I want to come by, I want to see the video . . . this is what we gotta do, we're gotta lock him up, we catch him." HARRINGTON responded: "He's looking to lock him up, right?"

REICHBERG answered: "Absolutely."  REICHBERG and HARRINGTON also discussed that the money would need to be provided up front.

p.    Based on my training, experience, participation in the investigation, and my review of other intercepted calls, I believe that during this call, REICHBERG and HARRINGTON were arranging for HARRINGTON's Security Company to be paid to surveil a particular location and catch an individual vandalizing the location.  If the Security Company found the vandal, HARRINGTON would then arrange for the NYPD to make an arrest.  The person who would pay HARRINGTON's family's company had a video of the perpetrator previously vandalizing the location.

q.    HARRINGTON also has been involved in dispatching NYPD personnel to assist REICHBERG directly.  For example, on or about February 20, 2015, at approximately 12:29 p.m., REICHBERG called HARRINGTON, who said that he was in a meeting and asked to call REICHBERG back.  REICHBERG next called the Commanding Officer of a midtown precinct (the "CO"), and told the CO: "I need your help, very important. . . . We gave out a stone to some company in my building . . . it's a $250,000 diamond, he's been playing around games the last few days about giving it back, he's not buying it, he's giving it back . . . so we told him yesterday we want him back."  REICHBERG said: "I'm afraid we're gonna get hit on it, and before, if we can send somebody over, we need the stone back."  REICHBERG asked: "is there any way, before he scams us . . . if we can send somebody over?"  The CO said: "OK, I'll have [a Sergeant] come over." REICHBERG responded: "I really, really appreciate it, you're always to the rescue."  At approximately 12:33 pm., HARRINGTON called REICHBERG back.  REICHBERG said, "I called [the CO], [the CO's] gonna handle it."  REICHBERG then discussed the problem with the "$250,000 diamond" with HARRINGTON.  At approximately 2:35 p.m., REICHBERG again spoke to HARRINGTON, and told HARRINGTON that the CO helped get the diamond back.

r.    I have debriefed the CO, who recalled that on multiple occasions he dispatched NYPD personnel to settle diamond-related disputes for REICHBERG; that he sometimes did so as requested by HARRINGTON; and that, on other occasions, he did so in part because of REICHBERG's relationship with Chief-1 and HARRINGTON and with the expectation that if the CO declined to do so, REICHBERG would complain to Chief-1 or HARRINGTON.

s.   HARRINGTON also sent NYPD cars to religious sites as requested by REICHBERG and CW-1.  For example, in an e-mail dated January 15, 2015, an individual wrote to CW-1: "Given the events in paris the shul asked me if I can try and get a patrol car for the next few weeks to sit outside the shul Shabbos morning from 9-1."  CW-1 responded, cc'ing HARRINGTON: "I will make sure the HOW house of worship car has your shul in its route what's the address."

t.   On or about March 5, 2015, at approximately 10:18 a.m., REICHBERG called HARRINGTON.  During the call, REICHBERG said that he needed police at "42nd and 5th" because the rabbi over there "called me with a panic" and was "nervous" because "there's a lot of people over there . . . he has people from Paris."  HARRINGTON responded: "they can't be nervous all the time . . . this is all the time."  REICHBERG said, "I know, but," and HARRINGTON interrupted him and said: "All right, all right." At approximately 11:10 a.m., HARRINGTON called REICHBERG and said: "I spoke to [another NYPD official], gonna try and get somebody over there now, he'll definitely have somebody on the 4 to 12, and the day tour 4 to 12 tomorrow for Shabbos."

u.   In an e-mail dated October 2, 2015, REICHBERG asked HARRINGTON to "please see to have coverage" at a religious site in Midtown for a four-day period.

v.   HARRINGTON also has arranged for police escorts for REICHBERG, CW-1 and others.  As an example, on or about September 21, 2014, CW-1 sent an e-mail to another individual and wrote: "Head of local precinct will call you in 3 min and get you to your car and out if you don't hear from him in next 5 min email me."  Two minutes later, the individual wrote back: "Who was just on the phone," to which CW-1 responded "Chief Harrington."  Based on my training, experience, and participation in the investigation, I believe that during this exchange, HARRINGTON facilitated assistance for an associate of CW-1 to access his car in an area that had been blocked off by police.

w.   HARRINGTON also has assisted REICHBERG, CW-1, and their associates with VIP access to New York City events, such as parades.

### REICHBERG's Efforts to Continue His Influence Over the Police Department, Particularly in Brooklyn

12.   As noted above, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendant, along with CW-1, were involved in the promotion of JAMES GRANT, a/k/a "Jimmy Grant," the defendant, to become Commanding Officer of the 19th Precinct in Manhattan.

13.   I have reviewed numerous other calls over the wiretap on the cellphone belonging to JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendant, during the January-to-May 2015 time period, in which NYPD personnel solicited REICHBERG's advice, information and assistance in obtaining promotions.  REICHBERG's efforts in early 2015 – at a time when Chief-1 had retired from the NYPD and MICHAEL HARRINGTON, the defendant, was transferred from the Chief of Department's Office, leaving REICHBERG with minimal to no influence at the Chief of Department's Office – appeared to be focused on re-consolidating influence in Brooklyn.  For example, I have listed to the following calls, all captured pursuant to the judicially-authorized wiretap on REICHBERG's phone:

a.   On January 27, 2015, at approximately 4:18 p.m., REICHBERG called HARRINGTON.  During the call, REICHBERG and HARRINGTON discussed HARRINGTON's prospects for promotion to become the Commanding Officer of Brooklyn South, and who might be in a position to assist him.  REICHBERG told HARRINGTON: "you still have to get the Borough . . . we need you to get this Borough."  Based on my training, experience, and participation in the investigation, I believe that REICHBERG was attempting to facilitate the transfer and promotion of HARRINGTON to be one of the top NYPD officials in Brooklyn, REICHBERG's borough, in order to be able to make most use of HARRINGTON's assistance going forward.

b.   On January 30, 2015, at approximately 3:26 p.m. REICHBERG called an individual ("Individual-1") and told Individual-1, in substance, that REICHBERG wished to have MICHAEAL HARRINGTON, the defendant, become Commanding Officer of Brooklyn South.  Individual-1 said that he would raise the issue with another senior official at the NYPD.  REICHBERG responded: "That would be great.  If we could pull this through, that would be huge. . . I'm getting to work on this and hopefully we'll have, ah, a team in place very soon."  Ultimately, HARRINGTON did not become Commanding Officer of Brooklyn South.

          c.   On February 27, 2015, at approximately 12:42 p.m., REICHBERG received a call from DI-1.  During the call, DI-1 asked REICHBERG, in substance, about DI-1's prospects for promotion.  DI-1 asked REICHBERG: "Am I viewed as a nobody?" REICHBERG responded: "no, a good guy.  They like you.  The last regime they liked you a lot more."  REICHBERG also told DI-1 he would benefit from his connection with another deputy inspector to whom REICHBERG was close and that DI-1 would be fine.  REICHBERG then proceeded to ask DI-1 for assistance with a situation at REICHBERG's house, as REICHBERG believed someone had tried to break into his house.  DI-1 agreed to send police officers to help.

          d.   On March 6, 2015, at approximately 10:36 a.m., DI-1 called REICHBERG.  During the call, DI-1 told REICHBERG that DI-1 knew he was bothering REICHBERG, but that REICHBERG was "probably the only one that can help me."  DI-1 complained that it seemed like his transfer was "sideways" and that he was just being "dumped" into a position rather than headed in a "positive direction."  REICHBERG assured DI-1 that he had spoken to an unknown individual who had assured REICHBERG that the transfer was in a "positive direction."

WHEREFORE, the deponent prays that arrest warrants be issued for JAMES GRANT, a/k/a "Jimmy Grant," MICHAEL HARRINGTON, and JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendants, and that they be imprisoned or bailed, as the case may be.

_____
BLAIRE TOLEMAN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


Sworn to before me this
17th day of June, 2016

_____
THE HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

23