AO 106 (SDNY Rev. 01/17) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

35 Electronic Devices, Known and Described in Attachment A

**17 MAG 9331**

Case No.  16 Cr. 468

)
)
)
)
)
)

## APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ Southern _____ District of _____ New York _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attached Affidavit and its Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section(s) | Offense Description(s) |
|---|---|
| 18 U.S.C. Sections 666, 1343, 1346, 1349, and 1512 | Bribery, Wire Fraud, Honest Services Fraud, Honest Services Fraud Conspiracy, and Obstruction of Justice |

The application is based on these facts:

See Attached Affidavit and its Attachment A

☑ Continued on the attached sheet.

☐ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joseph Downs, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12-15-17

_____
*Judge's signature*

City and state:  New York, NY

Hon. Katharine H. Parker, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States Of America for a Search Warrant for 35 Electronic Devices, Known and Described in Attachment A | **TO BE FILED UNDER SEAL**<br><br>**Agent Affidavit in Support of Application for Search Warrant** |

STATE OF NEW YORK       )
NEW YORK COUNTY        ) ss. :
SOUTHERN DISTRICT OF NEW YORK  )

JOSEPH M. DOWNS, being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately 12 years.  I am assigned to a squad in the FBI's New York Field Office that focuses on public corruption matters. I have participated in numerous search warrants of residences, businesses, and electronic devices, including cellphones and computers.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the electronic devices specified below (the "Subject Devices") for the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of cellphones and computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions,

2

statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

      3.     As set forth below, each of the Subject Devices was seized pursuant to previously-obtained premises search warrants (the "Prior Warrants").  Following the seizure of the Subject Devices pursuant to the Prior Warrants, I make this application for renewed authorization to search the contents of the Subject Devices for evidence, fruits, and instrumentalities of the Subject Offenses committed by JEREMY REICHBERG, MICHAEL HARRINGTON, JAMES GRANT, and others known and unknown (the "Target Subjects").

**B.  The Subject Devices**

      4.     The Subject Devices are particularly described as follows and include all existing forensic copies of the particularized devices:

| | |
|---|---|
| Subject Device-1 | LG Cellphone bearing Serial Number 209KPJP0849724 |
| Subject Device-2 | iPhone bearing International Mobile Equipment Identifier ("IMEI") 990002269393011 |
| Subject Device-3 | iPhone bearing IMEI 359301060262234 |
| Subject Device-4 | iPhone bearing IMEI 9900002285376507 |
| Subject Device-5 | Samsung flip phone bearing Mobile Equipment Identifier ("MEID") HEX A00000173F5FOB |
| Subject Device-6 | (2) Toshiba 16GB USB Drives |
| Subject Device-7 | (2) SanDisk USB Drives |
| Subject Device-8 | (1) ADATA 32GB USB Drive |
| Subject Device-9 | (1) Verbatim USB Drive thumbdrives and compact disk |
| Subject Device-10 | Apple Mac Desktop bearing Serial Number C02K2RU1DNCV |
| Subject Device-11 | HP Protect Smart Computer bearing Serial Number CND8480R9Z |
| Subject Device-12 | Dell Laptop bearing Service Tag 1RJNJ91 |

| Subject Device-13 | Dell Inspiron Computer bearing Service Tag 4XTT6P1 |
|---|---|
| Subject Device-14 | Canon 32GB SD Card |
| Subject Device-15 | Dell Vastro 200 Desktop S/N: CNOYR413693617A92119 |
| Subject Device-16 | Seagate Hard Drive bearing Serial Number NA7RLSCJ |
| Subject Device-17 | Dell Laptop bearing Service Tag 9M2MZM1 |
| Subject Device-18 | HP Desktop ID #X13-04657 |
| Subject Device-19 | iPhone FCC BCG-E2946A |
| Subject Device-20 | Apple iPad Mini bearing Serial Number F4KJW2QPF19D |
| Subject Device-21 | Apple iPad bearing Serial Number DLXH843ADNQV |
| Subject Device-22 | Apple iPad bearing Serial Number DMPLJ0FJF4YG |
| Subject Device-23 | Apple iPad bearing Serial Number DKVM7013DKPM |
| Subject Device-24 | Apple iPad bearing Serial Number DMPLM4EHFKYC |
| Subject Device-25 | Samsung Tablet bearing Serial Number NSCT06513C1 |
| Subject Device-26 | Motorola i830 Cell Phone, bearing Serial Number 364YENB0ZJ |
| Subject Device-27 | Sprint Blackberry model 9630 bearing MEID HEX # A000001C27AC7C |
| Subject Device-28 | Sprint Blackberry model 9650, bearing MEID HEX # A000001CE58F77 |
| Subject Device-29 | Sprint Blackberry Tour model, bearing MEID HEX # A000001C6EB68B |
| Subject Device-30 | Motorola Cell Phone, bearing Mobile Serial Number ("MSN") C68WHA7MSN |
| Subject Device-31 | AT&T Blackberry model 9000, bearing IMEI 359614024641024 |
| Subject Device-32 | AT&T Cell Phone bearing Serial Number Q4V7NB11C1305599 |
| Subject Device-33 | Blackberry bearing IMEI 352921050215678 |
| Subject Device-34 | Apple iPhone 4S, Model A1431 |
| Subject Device-35 | Apple iPhone Model A1387 |

5.      Each of the Subject Devices is currently located and secured by the FBI within the

Southern District of New York.

### C.  The Subject Offenses

6.      For the reasons detailed below, there is probable cause to believe that the Subject

Devices contain evidence, fruits, and instrumentalities of violations of Title 18, United States

Code, Section 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest

service fraud conspiracy); and 1512 (obstruction of justice) (the "Subject Offenses").

## II.  Probable Cause for a Renewed Warrant

### A.  Background on Status of the Case and Prior Warrants

7.      Since at least in or about 2014, I have been involved in an investigation being

conducted jointly by the FBI and the Internal Affairs Bureau ("IAB") of the NYPD into, among

other things, allegations of misconduct by high-ranking NYPD officials and other law enforcement

and public officials.

8.      JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," a

Target Subject of the investigation, resides in Borough Park, Brooklyn, and has described himself

in meetings with the NYPD and others, as set forth below, as a "community liaison" to the NYPD.

9.      On or about June 17, 2016, the Honorable Vera M. Scanlon, United States

Magistrate Judge for the Eastern District of New York, signed a warrant to search, among other

things, the premises located at 1252 56th Street, Brooklyn, New York 11219 (the "Original

Warrant" and the "Reichberg Residence," respectively), which is the home of Target Subject

JEREMY REICHBERG.  A copy of the Original Warrant, and affidavit seeking the search warrant

(the "Original Affidavit"), is annexed hereto as Exhibit A, and both the Original Affidavit and the

Original Warrant are incorporated fully by reference herein.  REICHBERG was arrested at the

Reichberg Residence on or about June 20, 2016 pursuant to a complaint signed by the Honorable Barbara Moses, United States Magistrate Judge for the Southern District of New York. A copy of the complaint is annexed hereto as Exhibit B and is incorporated fully herein by reference.

10.     As set forth in the Complaint in Paragraph 8(a), over the course of several years, REICHBERG, cultivated close relationships with numerous members of the NYPD, including JAMES GRANT and MICHAEL HARRINGTON, by providing them with substantial bribes in the form of personal and financial benefits, including paying for uniforms, jewelry, business cards, expensive meals, and other luxury items. In exchange, REICHBERG has repeatedly called upon his connections in the NYPD for official action, as opportunities arise, both for himself and for members of his community, particularly in Borough Park, Brooklyn. REICHBERG's bribery of high-ranking members of the NYPD enabled him not only to obtain such official benefits on an as-needed basis, but also gave him considerable influence over internal NYPD affairs, including personnel decisions such as the promotion of certain favored NYPD officers.

11.     Following REICHBERG's arrest, on or about June 20, 2016, Magistrate Judge Scanlon issued a supplemental warrant for the Reichberg Residence to cover, among other things, the search and seizure of electronic devices, and evidence of the Subject Offenses insofar as they relate to another potential bribery scheme involving the Westchester County Executive's Office and Westchester County Police Department, in addition to REICHBERG's bribery scheme described above involving the New York City Police Department (the "Supplemental Warrant"). A copy of the Supplemental Warrant and its supporting affidavit (the "Supplemental Affidavit") are attached hereto as Exhibit C and incorporated fully herein by reference. The Original Warrant and Supplemental Warrant are referred to herein collectively as the "Prior Warrants."

12.     The Subject Devices were each seized at the 56th Street Residence pursuant to the Prior Warrants, within the time frames set forth in the Prior Warrants. The Prior Warrants further granted law enforcement the authority to seize and copy any computer devices or storage media "for later review," and authorized law enforcement personnel "to review ESI contained therein for information responsive to the warrant." *See, e.g.,* Ex. C, Warrant Section II.B-C.  No time limitation was placed upon this review.  Furthermore, law enforcement personnel were explicitly authorized "to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant." *Id.*

13.     As noted above, REICHBERG was arrested on the day the Prior Warrants were executed in June 2016. On or about July 7, 2016, REICHBERG and two co-defendants – Target Subjects JAMES GRANT and MICHAEL HARRINGTON – were indicted in *United States* v. *Grant, et al.*, 16 Cr. 468 (GHW) (the "Grant Case").

14.     Pursuant to the Prior Warrants, forensic copies of any Subject Devices that could be accessed were made by law enforcement and produced in their entirety to the defendants in the Grant Case, including REICHBERG.  Efforts to access and review the contents of these devices have been ongoing since the execution of the Prior Warrants, commencing on June 20, 2016. Most of these devices were submitted to the FBI's Computer Analysis Response Team ("CART") for examination on a rolling basis within several months of their physical seizure pursuant to the warrants.  The contents for the majority of the devices were retrieved and promptly produced, without delay for the Government's review, to all defendants by approximately May 2017.

15.     The authority granted by the Prior Warrants to allow law enforcement the latitude to conduct later copying, processing, and review was necessary to address the limitations of law enforcement resources and the occasionally unique challenges presented by ever-changing

technology.  For example, based on my conversations with CART personnel and my review of FBI records, I am aware that law enforcement technicians were only recently able to access one device, Subject Device-22.  Subject Device-22 was seized on or about June 20, 2016, submitted for forensic copying and analysis by September 2016, but due to encryption barriers, had to be submitted to FBI headquarters for further review.  The device was only be fully accessed by the FBI starting in late October 2017.  A forensic copy was obtained and produced to REICHBERG by early December 2017.  Law enforcement has not yet had an opportunity to search the contents of Subject Device-22 for data responsive to the Prior Warrants.

16.     In addition, the contents of a small number of the Subject Devices have not yet been accessed due to encryption issues.  For example, Subject Device-34, an Apple iPhone 4S, was submitted to CART on or about August 18, 2016, within approximately two months of its physical seizure pursuant to the Prior Warrants, and as of November 2017, law enforcement technicians have reported that they are still unable to access the contents of Subject Device-34.

17.     For the Subject Devices that were able to be accessed and forensically imaged, a total of hundreds of gigabytes of data were uncovered that require review.  For example, the preliminary review of just one Apple computer, Subject Device-10, containing approximately 2.1 gigabytes of data (a relatively smaller quantity compared to the seized cellphones, which typically held between 16 and 32 gigabytes) for the single search term "NYPD" yielded more than 36,000 hits across approximately 6,469 different files.

18.     Pursuant to the authority granted by the Prior Warrants, and despite these challenges, law enforcement agents and the prosecution team otherwise commenced review of the Subject Devices that could be accessed starting in or around the early winter of 2017, and began to identify certain information in response to the Prior Warrants.  However, given the number of

the Subject Devices, the vast quantity of data retrieved, encryption hurdles and resource limitations, the review has not yet been completed.

19.     On or about November 13, 2017, REICHBERG filed a motion (the "Reichberg Motion") seeking suppression of evidence obtained from the Subject Devices that were seized from the Reichberg Residence, principally on the grounds that in light of dicta in *United States* v. *Wey*, 15 Cr. 611 (AJN), the Government should have specifically identified a subset of material in the Subject Devices responsive to the warrant in advance of trial, among other things, and argues that the time period to do so has already passed. *See* Reichberg Motion, 16 Cr. 468 (GHW), Docket No. 95 at 55-56.

20.     Given the extraordinary volume of data found on the Subject Devices, the time necessary to obtain the contents of the Subject Devices from CART and technical personnel, and limited law enforcement resources, law enforcement agents have not been able to complete a comprehensive review of the Subject Devices for information responsive to the Prior Warrants to date.   Nonetheless, the contents of the Subject Devices were produced in their entirety to the defendants in discovery, allowing the defendants access to all of the available information without delay pending this review.   The Government also plans to begin identifying the specific material within the Subject Devices that was previously deemed responsive to the Prior Warrants shortly.

21.     In order to complete this review, and in an abundance of caution, the Government seeks renewed authorization to resume its search of the contents of the Subject Devices for evidence in response to parameters similar to those set forth in the Prior Warrants.

**B.  Probable Cause Regarding Subjects' Commission of the Subject Offenses**

22.     As detailed Paragraphs 5-19 of the Original Affidavit, there is probable cause to believe that the Target Subjects committed the Subject Offenses, and that the Subject Devices contain evidence of the Subject Offenses.   Specifically, as reflected in the indictment in the Grant

Case, there is probable cause to believe that JEREMY REICHBERG and a businessman identified in the Original Affidavit as CW-2 – since publicly identified as JONA RECHNITZ – cultivated close relationships with numerous members of the New York City Police Department ("NYPD"), including JAMES GRANT and MICHAEL HARRINGTON, over the course of several years, by providing them with substantial bribes in the form of personal and financial benefits worth tens of thousands of dollars, including paying for uniforms, jewelry, business cards, expensive meals, and other luxury items.  In exchange, REICHBERG has repeatedly called upon his connections in the NYPD for official action, as opportunities arise, both for himself and for members of his community, particularly in Borough Park, Brooklyn.  REICHBERG's bribery of high-ranking members of NYPD enabled him not only to obtain such official benefits on an as-needed basis, but also gave him considerable influence over internal NYPD affairs, including personnel decisions such as the promotion of certain favored NYPD officers.

23.     Further, as set forth in the Supplemental Affidavit at Paragraph 13, on or about June 20, 2016, while effecting the arrest of REICHBERG on the aforementioned criminal complaint at the 56th Street Residence, I know that the following happened, based on my conversations with other FBI agents present for the arrest and search:

    a.   By all indications, it appeared that REICHBERG knew that the police were coming that morning.  REICHBERG's attorney was on speakerphone on a telephone within the residence shortly after the agents arrived.  Among the other individuals present was a person who identified himself as REICHBERG's brother ("Reichberg's Brother").

    b.   Reichberg's Brother got dressed in one of the bedrooms at the 56th Street Residence and attempted to leave the premises.  One of the FBI agents ("Agent-1") asked Reichberg's Brother, in some and substance, whether he was carrying anything from the 56th Street

Residence with him.  Reichberg's Brother stated that he did have some things.  Reichberg's Brother, upon further questioning, produced from his person (1) seven smart phones, (2) one digital flip phone, (3) eight compact discs, (4) six "thumb" drives, (5) a SIM card, (6) a patch bearing the emblem "Chief of Transportation," (7) an NYPD placard stating that the bearer, a named individual whom I know to be JEREMY REICHBERG's wife, was a family member of Philip Banks III, former NYPD Chief of Department and MICHAEL HARRINGTON's former superior officer, and (8) several hundred business cards, many of which identified REICHBERG as the Police Chaplain for Floral Park but which listed a personal Gmail account rather than an account with an immediately apparent government e-mail address.

        c.  Upon being questioned by Agent-1 about these items, Reichberg's Brother told Agent-1 the following:

                i.  Reichberg's Brother had arrived at REICHBERG's house around 10 p.m. the previous night.

                ii.  REICHBERG asked him to take the items he had on his person with him upon leaving the 56th Street Residence.

                iii.  Of the items, only one of the phones, the flip phone, was Reichberg's Brother's.  The rest were REICHBERG's.

        d.  FBI agents observed numerous other electronic devices capable of retaining data in the Reichberg Residence during the search, including but not limited to several open and used Apple iPad tablet devices and two desktop computers, and a fax machine.  These items were not only in the home office area of the Reichberg Residence, but also REICHBERG's bedroom and other areas of the house.

24.     I know from my debriefing of RECHNITZ that RECHNITZ has frequently observed REICHBERG tending to business matters using an iPad device.  The referenced business matters consist largely of REICHBERG using his contacts within local government and law enforcement to expedite government and law enforcement matters for paying clients.

25.     Based upon my participation in the review to date of the Subject Devices, as noted above, I know that the Subject Devices contain evidence concerning REICHBERG's contacts with HARRINGTON, other NYPD officers, and other government officials that have not yet been fully reviewed by law enforcement agents in connection with this investigation.

26.     Based on my training and experience, I know that individuals who engage in serial bribery and honest services fraud schemes commonly use computers to keep track of contact information, correspondence, and of transactions past.  As a result, they often store data on their computers related to their illegal activity, which can include email correspondence, electronic ledgers, and contacts with government and law enforcement personnel.

27.     Based on my training and experience, I also know that, where cellphones, computers, and similar electronic devices are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred.  This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools.  When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer.  Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages.  Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on

a particular user's operating system, storage capacity, and computer habits.

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data. In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

28.     In addition to there being probable cause to believe that the Subject Devices contain evidence of the Subject Offenses, there is also probable cause to believe that the Subject Devices constitute instrumentalities of the Subject Offenses, which is to say that they were used to communicate with law enforcement or government officials in order to carry out services, or to keep track of transactions involved in the scheme.

29.     Based on the foregoing, I respectfully submit there is probable cause to believe that JEREMY REICHBERG was engaged in bribery and honest services fraud related offenses, and that evidence of this criminal activity is likely to be found on the Subject Devices.

## C.  Evidence, Fruits and Instrumentalities

30.     Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Subject Devices will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II.A of Attachment A to the proposed warrants.

31.     In particular, I believe the Subject Devices are likely to contain the following information:

1.  Documents concerning payments, gifts, or services provided to NYPD law enforcement personnel by JEREMY REICHBERG, JONA RECHNITZ or persons associated with them.

2.  Documents concerning actions performed by NYPD law enforcement personnel or potentially sought from NYPD law enforcement personnel, including the provision of escort services, deployment of NYPD units, and other official actions or uses of government resources, for the benefit of

REICHBERG, RECHNITZ, or persons associated with them.

3.     Business records, notes, vouchers, invoices, bank, accounting or financial records, receipts, or other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money;

4.     Documents, communications, and records demonstrating indicia of any relationship between JEREMY REICHBERG, JONA RECHNITZ, or their associates on the one hand and on the other hand, JAMES GRANT, MICHAEL HARRINGTON, and/or other NYPD personnel, including but not limited to correspondence, pictures, records of financial transactions and travel, any documents related to NYPD or other law enforcement chaplain or civilian positions;

5.     Location of other evidence, such as emails reflecting registration of other online accounts potentially containing relevant evidence;

6.     Evidence indicating the identity of the user of the Subject Device.

## III. Procedures for Searching ESI

### A. Execution of Warrant for ESI

32.     Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests renewed authorization to review the contents of the Subject Devices, and forensic copies thereof, which were previously seized and transported to an appropriate law enforcement facility for review pursuant to the Prior Warrants. These steps are typically necessary for a number of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

## B. Review of ESI

33.     Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

34.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[1]; and

---

[1] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

35.     Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.   Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

## C.   Return of ESI

36.     If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

---

subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

## IV.  Conclusion and Ancillary Provisions

37.    Based on the foregoing, I respectfully request the court to issue a warrant to seize

the items and information specified in Attachment A to this affidavit and to the Search and Seizure

Warrant.

JOSEPH DOWNS
Special Agent
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me on
December 15, 2017

HON. KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

## Attachment A

### I.  **Subject Devices to be Searched—Subject Devices**

The Subject Devices are particularly described as the following and any forensic copy images thereof:

| | |
|---|---|
| Subject Device-1 | LG Cellphone bearing Serial Number 209KPJP0849724 |
| Subject Device-2 | iPhone bearing International Mobile Equipment Identifier ("IMEI") 990002269393011 |
| Subject Device-3 | iPhone bearing IMEI 359301060262234 |
| Subject Device-4 | iPhone bearing IMEI 9900002285376507 |
| Subject Device-5 | Samsung flip phone bearing Mobile Equipment Identifier ("MEID") HEX A00000173F5F0B |
| Subject Device-6 | (2) Toshiba 16GB USB Drives |
| Subject Device-7 | (2) SanDisk USB Drives |
| Subject Device-8 | (1) ADATA 32GB USB Drive |
| Subject Device-9 | (1) Verbatim USB Drive thumbdrives and compact disk |
| Subject Device-10 | Apple Mac Desktop bearing Serial Number C02K2RU1DNCV |
| Subject Device-11 | HP Protect Smart Computer bearing Serial Number CND8480R9Z |
| Subject Device-12 | Dell Laptop bearing Service Tag 1RJNJ91 |
| Subject Device-13 | Dell Inspiron Computer bearing Service Tag 4XTT6P1 |
| Subject Device-14 | Canon 32GB SD Card |
| Subject Device-15 | Dell Vastro 200 Desktop S/N: CNOYR413693617A92119 |
| Subject Device-16 | Seagate Hard Drive bearing Serial Number NA7RLSCJ |
| Subject Device-17 | Dell Laptop bearing Service Tag 9M2MZM1 |
| Subject Device-18 | HP Desktop ID #X13-04657 |
| Subject Device-19 | iPhone FCC BCG-E2946A |

| Subject Device-20 | Apple iPad Mini bearing Serial Number F4KJW2QPF19D |
| --- | --- |
| Subject Device-21 | Apple iPad bearing Serial Number DLXH843ADNQV |
| Subject Device-22 | Apple iPad bearing Serial Number DMPLJ0FJF4YG |
| Subject Device-23 | Apple iPad bearing Serial Number DKVM7013DKPM |
| Subject Device-24 | Apple iPad bearing Serial NumberDMPLM4EHFKYC |
| Subject Device-25 | Samsung Tablet bearing Serial Number NSCT06513C1 |
| Subject Device-26 | Motorola i830 Cell Phone, bearing Serial Number 364YENB0ZJ |
| Subject Device-27 | Sprint Blackberry model 9630 bearing MEID HEX # A000001C27AC7C |
| Subject Device-28 | Sprint Blackberry model 9650, bearing MEID HEX # A000001CE58F77 |
| Subject Device-29 | Sprint Blackberry Tour model, bearing MEID HEX # A000001C6EB68B |
| Subject Device-30 | Motorola Cell Phone, bearing Mobile Serial Number ("MSN") C68WHA7MSN |
| Subject Device-31 | AT&T Blackberry model 9000, bearing IMEI 359614024641024 |
| Subject Device-32 | AT&T Cell Phone bearing Serial Number Q4V7NB11C1305599 |
| Subject Device-33 | Blackberry bearing IMEI 352921050215678 |
| Subject Device-34 | Apple iPhone 4S, Model A1431 |
| Subject Device-35 | Apple iPhone Model A1387 |

## II. Items to Be Seized

### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Devices include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy); and 1512 (obstruction of justice) (the "Subject Offenses"):

1. Documents concerning payments, gifts, or services provided to NYPD law enforcement personnel by JEREMY REICHBERG, JONA RECHNITZ or

persons associated with them.

2. Documents concerning actions performed by NYPD law enforcement personnel or potentially sought from NYPD law enforcement personnel, including the provision of escort services, deployment of NYPD units, and other official actions or uses of government resources, for the benefit of REICHBERG, RECHNITZ, or persons associated with them.

3. Business records, notes, vouchers, invoices, bank, accounting or financial records, receipts, or other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money;

4. Documents, communications, and records demonstrating indicia of any relationship between JEREMY REICHBERG, JONA RECHNITZ, or their associates on the one hand and on the other hand, JAMES GRANT, MICHAEL HARRINGTON, and/or other NYPD personnel, including but not limited to correspondence, pictures, records of financial transactions and travel, any documents related to NYPD or other law enforcement chaplain or civilian positions;

5. Location of other evidence, such as emails reflecting registration of other online accounts potentially containing relevant evidence;

6. Evidence indicating the identity of the user of the Subject Device.

**B.  Review of ESI**

Law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the Subject Devices and all electronically stored information ("ESI") contained within for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section II.A of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

# EXHIBIT A

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of New York

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. **16M 592** |
| 1252 56th Street, Brooklyn, New York 11219 | ) | |
| | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ New York _____
*(identify the person or describe the property to be searched and give its location):*

1252 56th Street, Brooklyn, New York 11219

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attchment A

**YOU ARE COMMANDED** to execute this warrant on or before   July 1, 2016   *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   Duty Magistrate Judge   .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   6/17/16  6.5 pm   _____
                                                          *Judge's signature*

City and state:   Brooklyn, New York   _____        Hon. Vera M. Scanlon, USMJ
                                                                    *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**Attachment A: 1252 56th Street, Brooklyn, New York 11219**

## I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein:

**1252 56th Street, Brooklyn, New York 11219**

A three story brick home with a one-car garage at ground level and a front door on the right side (viewed facing the building) at the end of a flight of eight steps. There are multiple security cameras affixed to the front of the residence.

## II. Items to Be Seized

### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy) (the "Subject Offenses"):

Communications concerning payments made to or favors performed by NYPD law enforcement personnel, including the provision of gun licenses, escort services, deployment of NYPD units, and others; ledgers; business records; notes; vouchers; invoices; bank, accounting or financial records; receipts; other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; gun license application materials for Jeremy Reichberg or his associates, communications with NYPD personnel, indicia of relationship between Jeremy Reichberg and James Grant and/or Michael Harrington and/or other NYPD personnel, including correspondence, pictures, records of financial transactions and travel.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

In the Matter of the Application of the United
States Of America for a Search Warrant for the
Premises Known and Described as 1252 56th
Street, Brooklyn, NY, 11219; and 14-30 149th
Street, Whitestone, NY 11357; and Any Closed
Containers/Items   Contained   Within   the
Aforementioned Premises

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of
Application for Search Warrant**

STATE OF NEW YORK
COUNTY OF KINGS                           : ss. :
EASTERN DISTRICT OF NEW YORK)

16M592

JENNIFER M. RANUCCI, being duly sworn, deposes and says:

**I. Introduction**

**A. Affiant**

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for
approximately 14 years. For approximately 1.5 years, I have been assigned to a squad in the
FBI's New York Field Office that focuses on public corruption matters. I have participated in
numerous search warrants of residences and businesses.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the
Federal Rules of Criminal Procedure for a warrant to search the premises specified below (the
"Subject Premises") for the items and information described in Attachment A. This affidavit is
based upon my personal knowledge; my review of documents and other evidence; my
conversations with other law enforcement personnel. Because this affidavit is being submitted
for the limited purpose of establishing probable cause, it does not include all the facts that I have
learned during the course of my investigation. Where the contents of documents and the actions,

2

statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## B. The Subject Premises

3. The Subject Premises are particularly described as follows:

   a. 1252 56th Street, Brooklyn, New York 11219 (the "56th Street Residence") is a three story brick home with a one-car garage at ground level and a front door on the right side (viewed facing the building) at the end of a flight of eight steps. There are multiple security cameras affixed to the front of the residence.

   b. 14-30 149th Street, Whitestone, New York 11357 ("the Whitestone Business") is a business occupying the first floor of a two-story building in Whitestone, Queens. The first floor bears signage identifying the business within as "Gunsmoke Too Inc." and advertising premium cigars and law enforcement equipment such as handcuffs, Kevlar gloves, and "pistol license services." The first floor is accessed via a front door beneath a brown awning with "GUNSMOKE TOO Inc." written on it. (The 56th Street Residence and the Whitestone Business are hereinafter referred to together as the "Subject Premises.")

## C. The Subject Offenses

4. For the reasons detailed below, there is probable cause to believe that the Subject Premises contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy) among other statutes (the "Subject Offenses").

3

## II. Probable Cause

### A. Probable Cause Regarding Subjects' Commission of the Subject Offenses

5.     For the reasons detailed below, there is probable cause to believe that the Subject Premises contain evidence of two different schemes. In the first scheme (the "REICHBERG SCHEME"), an individual named JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," cultivated close relationships with numerous members of the New York City Police Department ("NYPD"), including JAMES GRANT and MICHAEL HARRINGTON, over the course of several years, by providing them with substantial bribes in the form of personal and financial benefits worth tens of thousands of dollars, including paying for uniforms, jewelry, business cards, expensive meals, and other luxury items.     In exchange, REICHBERG has repeatedly called upon his connections in the NYPD for official action, as opportunities arise, both for himself and for members of his community, particularly in Borough Park, Brooklyn.   REICHBERG's bribery of high-ranking members of NYPD enabled him not only to obtain such official benefits on an as-needed basis, but also gave him considerable influence over internal NYPD affairs, including personnel decisions such as the promotion of certain favored NYPD officers.

6.     In the second scheme (the "LICENSING SCHEME"), self-styled "expediters" named ALEX LICHTENSTEIN and FRANK SOOHOO were able to obtain gun licenses from the NYPD Licensing Division on an accelerated basis for their clients and was also able to obtain gun licenses for clients who were otherwise unlikely to obtain gun licenses because of their criminal or personal history.   LICHTENSTEIN and SOOHOO were able to provide these "expediting" services by bribing officers of the Licensing Division – namely DAVID VILLANUEVA and another officer identified herein as CW-1.   LICHTENSTEIN paid thousands of dollars in bribes to VILLANUEVA in exchange for VILLANUEVA's agreement to

4

expedite gun license applications for LICHTENSTEIN's clients. CW-1 assisted VILLANUEVA by conducting first level reviews of and approving these applications, and received a small portion of LICHTENSTEIN's bribe money from VILLANUEVA. In addition to these cash bribes, LICHTENSTEIN provided other benefits to VILLANUEVA and CW-1, including, for example, bottles of liquor; limousine rides for VILLANUEVA; and a limousine tour of wineries for VILLANUEVA, CW-1, another officer of the Licensing Division, and their significant others. FRANK SOOHOO bribed VILLANUEVA by providing him with, among other things: (i) multiple lunches per month at restaurants paid for by SOOHOO, and (ii) multiple all-expenses paid vacations, including international travel, for VILLANUEVA and a companion, the value of which was at least several thousand dollars.

## Background Information with Respect to the Reichberg Scheme

7. Based on my review of information provided by the NYPD, I am aware of the following:

   a. MICHAEL HARRINGTON has been a member of the NYPD since 1986. Between October 2012 and May 2013, HARRINGTON was an Inspector assigned to Patrol Borough Brooklyn North. Between May 2013 and November 2014, HARRINGTON was a Deputy Chief assigned as the Executive Officer in the Chief of Department's Office, and in that capacity was second-in-command in that office. HARRINGTON's office during this time period was located at NYPD headquarters at One Police Plaza in downtown Manhattan. Between November 2014 and April 2016, HARRINGTON was a Deputy Chief assigned to the NYPD's Housing Bureau.

5

b. JAMES GRANT has been a member of the NYPD since 1996. For most of his career until 2014, GRANT was assigned to various posts in Brooklyn, New York, including, from December 2011 through June 2014, as a Captain and the Commanding Officer of the 72nd Precinct. From June 2014 through April 2015, GRANT was a Deputy Inspector and the Commanding Officer of the 19th Precinct on the Upper East Side of Manhattan.

c. JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," resides in Borough Park, Brooklyn, and has described himself in meetings with the NYPD and others, as set forth below, as a "community liaison" to the NYPD.

d. "CW-2" is a businessman in the real estate industry who is a cooperating witness for the Government. CW-2 has pleaded guilty to conspiring to commit honest services fraud in connection with, among other conduct, the honest services wire fraud scheme described herein, and is providing information to the Government in the hope of obtaining leniency when he is sentenced. Information provided by CW-2 has been reliable and corroborated by independent evidence. Based on discussions with CW-2, I am aware that JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," introduced CW-2 to high-ranking officials at the NYPD, including GRANT and HARRINGTON.

**Background Information with Respect to the Licensing Scheme**

8.     Based on my review of information provided by the NYPD and by CW-1, I am aware of the following:

a. At all times relevant to this application, the New York City Police Department ("NYPD") Licensing Division, located at One Police Plaza in Manhattan, is the

6

entity within the NYPD responsible for approving or rejecting all applications ("Applications") for handgun licenses in New York City.

b. Among the types of handgun licenses issued by the NYPD Licensing Division are (i) a premises license, which permits its holder to have a handgun in the holder's home (a "Premises License"); (ii) a limited carry license, which permits its holder to have a handgun in the home or business and to carry the handgun for specified, limited purposes and at limited times (a "Limited Carry License"); and (iii) a full carry license, which permits its holder to carry a handgun anywhere in New York State at all times, but only for justified business purposes (a "Full Carry License").

c. The NYPD Licensing Division receives approximately 5,000 Applications for gun licenses a year. Limited and Full Carry Licenses are a small fraction of the licenses issued by the NYPD Licensing Division annually.

d. NYPD policies provide that after an Application is received, the NYPD Licensing Division must conduct an investigation of the applicant before electing to approve or reject the Application. Pursuant to NYPD policies, an investigation is to include (i) a review of the applicant's criminal history, including summonses, arrests, and convictions; (ii) a review of the applicant's mental health history; (iii) a verification of the details of the application; (iv) an in-person interview of the applicant; and (v) an investigation into the business need for Limited and Full Carry Licenses.

e. Certain findings, such as a prior felony conviction, result in the automatic rejection of an applicant.

7

f. Under New York State Law, the NYPD Licensing Division has discretion to reject gun license Applications for additional reasons, such as moral character, mental health issues, or substance abuse issues. On its website, the NYPD Licensing Division indicates that it may reject Applications if the investigation reveals a history of arrest, driving infractions, or domestic violence incidents, among other reasons.

g. Typically, the processing, investigation, and approval or rejection of an Application takes several months. For Limited and Full Carry Licenses, it can take even longer.

h. DAVID VILLANUEVA was an NYPD Sergeant assigned to the NYPD Licensing Division for more than a decade. VILLANUEVA had the authority to approve applications for gun licenses. In addition, VILLANUEVA was responsible for investigating existing gun license holders who were arrested, given summonses, or otherwise interacted with law enforcement to determine whether their licenses should be revoked or suspended pending further investigation.

i. "CW-1" is a cooperating witness for the Government and was, at all relevant times in this application, a member of the NYPD. CW-1 was assigned to the Licensing Division from in or about 2009 to in or about 2016, and was responsible for, among other things, investigating applications. At all relevant times to this application, CW-1 reported to DAVID VILLANUEVA. CW-1 has pleaded guilty to committing bribery and conspiracy to commit bribery connected to the scheme described herein and is cooperating with law enforcement in the

8

hope of obtaining a more lenient sentence. Information provided by CW-1 has been reliable and corroborated by independent evidence.

j. ALEX LICHTENSTEIN, a/k/a "Shaya," is a so-called "expediter" who charged clients a fee, typically thousands of dollars, to expedite a client's application for a gun license. As explained below, LICHTENSTEIN provided financial and other benefits to NYPD Officials, including DAVID VILLANUEVA, and CW-1, in exchange for expediting and approving gun permit applications for LICHTENSTEIN's clients.

k. FRANK SOOHOO is a so-called "expediter" who charged clients a fee, typically thousands of dollars, to expedite a client's application for a gun license. SOOHOO was also a Lieutenant in the New York City Auxiliary Police. The Auxiliary Police are volunteers who are recruited, trained, and equipped by the NYPD and perform uniformed patrol in the community. As explained below, SOOHOO provided benefits to NYPD Officials, including DAVID VILLANUEVA and CW-1, in exchange for expediting and approving gun permit applications for SOOHOO's clients.

## Probable Cause Regarding the Reichberg Scheme

9. Based on the various sources described herein, including interviews with CW-2, I have learned the following:

a. Over the course of several years, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," cultivated close relationships with numerous members of the NYPD, including JAMES GRANT and MICHAEL HARRINGTON, by providing them with substantial bribes in the form of

9

personal and financial benefits worth tens of thousands of dollars, including paying for uniforms, jewelry, business cards, expensive meals, and other luxury items.[1] In exchange, REICHBERG has repeatedly called upon his connections in the NYPD for official action, as opportunities arise, both for himself and for members of his community, particularly in Borough Park, Brooklyn. REICHBERG's bribery of high-ranking members of NYPD enabled him not only to obtain such official benefits on an as-needed basis, but also gave him considerable influence over internal NYPD affairs, including personnel decisions such as the promotion of certain favored NYPD officers.

b. In or around 2011-2012, REICHBERG began spending significant time with CW-2, and introduced CW-2 to his connections inside the NYPD, including GRANT and HARRINGTON. Following these introductions, CW-2 began spending time with GRANT, HARRINGTON, and other NYPD officials, and, along with REICHBERG, CW-2 spent large sums of money paying for personal and financial benefits for GRANT, HARRINGTON, and others, including paying for flights, hotel rooms, prostitutes, expensive meals, home improvements, and prime

---

[1] GRANT and HARRINGTON accepted these personal and financial benefits and the others set forth below even though doing so constituted clear violations of NYPD rules. In particular, I have reviewed portions of the NYPD's "Patrol Guide," which sets forth rules and regulations governing the conduct of NYPD Personnel. The section of the Patrol Guide titled "Guidelines for Acceptance of Gifts and Other Compensation By Members of the Service" provides, in part, as follows: "It is the policy of the Department that members of the service may not accept any reward, gratuity, gift or other compensation for any service performed as a result of or in conjunction with their duties as public servants. . . . This policy applies regardless of whether the service was performed while said members of the Department were on or off duty. Members of the service also shall not solicit any gift, gratuity, loan, present, fee or reward for personal gain. . . . Members of the service may be offered gifts, awards, and other things of value by private citizens, institutions, etc., in appreciation for their police service. It is not unethical or illegal for a member of the service to accept gifts that are commonly offered as tokens of appreciation, *i.e.*, plaques, pen and pencil sets, etc. However, cash rewards and personal gifts, such as wristwatches, etc., are strictly forbidden."

10

seats to sporting events, among other things. From in or about 2012 up through and including in or about 2015, CW-2 and REICHBERG paid a total of well more than \$100,000 for the benefit of GRANT and/or HARRINGTON, and paid additional sums for the benefit of other NYPD officers.

c. In exchange for these payments, CW-2 and REICHBERG were effectively able to have GRANT and HARRINGTON on call - ready and willing to use their official authority within the NYPD to provide assistance to CW-2 and REICHBERG on an as-needed basis. Among the official actions that GRANT and/or HARRINGTON took at the request of CW-2 and/or REICHBERG were police escorts for them and their friends, assistance with private disputes and investigations, police resources for security at religious sites and events, the ability to get out of tickets or other infractions, and special access to parades and other cultural events, among other things.

10. I have reviewed numerous e-mails and attachments from CW-2's e-mail account and the email account of JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," obtained pursuant to a search warrant on those accounts authorized by a United States District Judge. In addition, I have reviewed recorded phone calls between CW-2 and others and REICHBERG and others during the time period of in or about January 2015 through on or about May 12, 2015, obtained pursuant to judicially-authorized wiretaps on their phones. I have also participated in extensive debriefings of CW-2, and have reviewed reports of other agents' debriefings of CW-2. Based on these discussions and my review of these materials, information obtained from the NYPD, and my discussions with CW-2 and other witnesses, I have learned the following:

11

a. CW-2 first met JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," in 2009 or 2010. At the time, a company for which CW-2 worked made a donation to an NYPD football team. CW-2 met REICHBERG and other NYPD officials at a dinner for the team that was paid for, as CW-2 understood, by REICHBERG. REICHBERG provided CW-2 with a business card stating that he was an "NYPD Liaison," and told CW-2 that he could help with traffic and moving violations, other police-related issues, and was, in sum and substance, a "fix it guy."

b. CW-2 began spending more time with REICHBERG starting in or about 2012, including doing certain business with REICHBERG in the construction and real estate industries. REICHBERG used space at CW-2's office for a time around this time period.

c. Through REICHBERG, CW-2 met and spent time with numerous high-ranking officials from the NYPD. REICHBERG informed CW-2 that his connections in the NYPD helped REICHBERG, among other things, handle personal disputes for him and associates. For example, REICHBERG told CW-2 that REICHBERG's connections in the NYPD sent officers to the vicinity of his associates' jewelry business to disperse individuals handing out advertisements for a rival business, and that the NYPD connections were rewarded with jewelry from the business.

d. Among the high-ranking NYPD officials to whom REICHBERG introduced CW-2 were JAMES GRANT and MICHAEL HARRINGTON. At the time, GRANT was the Commanding Officer of the 72nd Precinct in Brooklyn, and HARRINGTON was an Inspector assigned to Patrol Borough Brooklyn North.

12

e. Beginning in or about the 2012-2013 time period, CW-2, working with REICHBERG, began providing GRANT, HARRINGTON, and other high-ranking officials with numerous valuable items, including free meals and travel, with the understanding that these officials, including GRANT and HARRINGTON, would be able to perform police-related favors for them. As noted above, CW-2 understood REICHBERG to have previously been engaged in this same conduct with GRANT, HARRINGTON, and other members of the NYPD, and CW-2 was able to join in the scheme by paying himself for numerous benefits for GRANT and HARRINGTON.

f. As CW-2 provided personal and financial benefits to GRANT and HARRINGTON, they in turn assisted CW-2 and REICHBERG with official actions over time, such as police escorts for them and their friends; sending officers and using police resources to assist in civil disputes and other matters; sending patrol cars to religious sites upon request; VIP access to parades and other New York City events; as to GRANT, assisting with their applications for gun licenses to the New York City Police Department; among other things, all as set forth in more detail below.

g. As noted above, in or about June 2013, HARRINGTON was promoted to be the Executive Officer at the Chief of Department's Office, where he worked for the Chief of Department ("Chief-1"). The Chief of Department's Office supervises all uniformed police officers at the NYPD and is responsible for all uniformed operations, having oversight over other bureaus such as Community Affairs, Patrol, Transportation, Housing, Transit, and Detectives. As an Executive

13

Officer, HARRINGTON's responsibilities, according to the NYPD's Patrol Guide, included assuming command and performance functions for the Chief of Department in his absence; supervising the performance of administrative functions; training, planning, and personnel; and adjudicating disciplinary issues.

h. Through HARRINGTON, CW-2 and REICHBERG also began spending time with Chief-1. CW-2 and REICHBERG understood that with this connection to the Chief of Department's Office, they would then have access to the highest levels at the NYPD, and would have a "one stop shop" for assistance rather than having to reach out to numerous individual members of the NYPD.

i. Over time, CW-2 and REICHBERG obtained access to NYPD Chief-1's "inner circle." CW-2 went to lunches and dinners on a regular basis with REICHBERG, Chief-1, and HARRINGTON, including at expensive restaurants. CW-2 paid the entire bill for these lunches and dinners. During this time, HARRINGTON continued to assist CW-2 and REICHBERG with official actions. Also during this time, as they expected, CW-2 and REICHBERG began dealing less with officials aside from HARRINGTON, GRANT, and Chief-1, given their position senior to all other officials with whom CW-2 and REICHBERG dealt.

j. Due to their relationship with GRANT, including the acts performed by GRANT on their behalf, in or about late 2013 or early 2014, CW-2 and REICHBERG recommended to Chief-1 that Chief-1 name GRANT to be the Commanding Officer of the 19th Precinct, a position that was opening up. Chief-1 ultimately appointed GRANT to that position, where he began in June 2014. Chief-1 put

14

CW-2 and REICHBERG on the phone with GRANT in order for CW-2 and REICHBERG to be able to tell GRANT that he was being promoted.

k.  Upon his promotion to become the Commanding Officer of the 19th Precinct, GRANT was vested with the responsibility of supervising the approximately 240 officers in that precinct. According to the NYPD's Patrol Guide, as the Commanding Officer, GRANT was responsible for, among other things, ensuring the proper performance of and disciplining personnel; ensuring proper neighborhood patrol; staffing and assignments; problem-solving and identifying "major crime" and "quality of life" problems in the precinct, and designing and implementing solutions for those problems; and instructing and testing his inferior officers regarding their knowledge of their duties and responsibilities.

l.  In approximately March 2015, CW-2 was approached by law enforcement and questioned as to, among other matters, money that Chief-1 had provided to CW-2 to invest. After this approach by law enforcement, CW-2 decided to limit significantly his contact with Chief-1, GRANT, HARRINGTON, and other members of the NYPD.

11.  Based on my review of the e-mails discussed above; wiretapped phone calls discussed above; documents and information provided by multiple vendors as detailed below; and discussions with CW-2 and review of reports of other agents' debriefings of CW-2, I have learned the following with respect to JAMES GRANT:

Las Vegas Trip (2013)

a.  In or about January 2013, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," and CW-2 offered to take GRANT to Las Vegas for

15

Super Bowl Weekend. GRANT, as well as a Detective from the 66th Precinct who was friends with GRANT ("Detective-1"), accepted the offer.

b. CW-2 paid for a private jet to take REICHBERG, GRANT, Detective-1, CW-2 and two other individuals to and from Las Vegas.

c. I have reviewed documentation provided by the private jet company that arranged this trip to Las Vegas, and learned that the aircraft departed on February 2, 2013 and returned on February 4, 2013, and that CW-2 was invoiced approximately $57,000 for the round trip. CW-2 and REICHBERG also arranged for a prostitute ("Prostitute-1") to come on the private jet and spend the weekend with the group in Las Vegas. While in Las Vegas, the prostitute stayed in GRANT's room. I have debriefed Prostitute-1, who confirmed, among other things, that Prostitute-1 was engaged to accompany the persons on the trip and that GRANT and others took advantage of her services during the trip.

d. I have also reviewed the flight invoice from the jet company which shows that the passengers for the departing and returning trips were in fact CW-2, REICHBERG, GRANT, Detective-1, one male individual I know to be CW-2's associate, and Prostitute-1.

e. CW-2 paid for all lodging and meal expenses for GRANT and Detective-1 in Las Vegas.

Rome Trip (2013)

f. In August 2013, GRANT took a vacation to Rome with his family and others. In advance of the trip, CW-2 told GRANT that he should stay at a particular hotel that was CW-2's favorite hotel in Rome, and offered to pay for the room.

16

GRANT accepted the offer, and CW-2 paid for a two-night stay in two rooms at the hotel during GRANT's trip.

g. I have seen an e-mail confirmation for the stay sent to CW-2, which CW-2 forwarded to GRANT, cc'ing REICHBERG and writing "Most luxurious hotel in Rome." I have also seen an invoice for the hotel stay provided by the travel agency that CW-2 used to book the hotel stay (the "Travel Agency"), in the amount of $1,066. The invoice is addressed to "GRANT JAMES," with CW-2's e-mail address, and CW-2's credit card.

Other Financial Benefits

h. In or about 2013, CW-2 also offered to pay for work on GRANT's house, and specifically to replace railings outside of GRANT's house. GRANT accepted CW-2's offer, and REICHBERG found the contractor to do the work. CW-2 paid for the work, which he estimates cost approximately $6,000.

i. In or about 2014, REICHBERG also arranged to have windows at GRANT's house replaced, at no cost to GRANT. Another agent has spoken with the contractor who performed the window work, who told that other agent that the work was arranged by and paid for by REICHBERG, and cost approximately $8,000.

j. In or about 2013, CW-2 offered to pay to upgrade GRANT's watch to a more expensive brand. GRANT accepted CW-2's offer. GRANT's new watch, paid for by CW-2 along with an old watch turned in by GRANT, cost approximately $3,000.

17

k.  On Christmas Day in 2013, CW-2 and REICHBERG drove to GRANT's home in
    Staten Island, New York wearing Christmas elf hats and gave GRANT a video
    game system for his children, and a piece of jewelry for his wife worth
    approximately $1,000. As set forth below, I have reviewed a recorded call in
    which GRANT complained that his "two Jewish elves" did not come for
    Christmas the following year, 2014.

l.  In or about 2013 and 2014, CW-2 regularly paid for meals for GRANT, including
    lunches and dinners at expensive restaurants in Manhattan.

Official Acts Provided by GRANT

m.  As noted above, CW-2 understood and expected that GRANT would perform
    official acts for him due to CW-2's having bestowed personal and financial
    benefits worth tens of thousands of dollars on GRANT. During the time period
    that CW-2 was providing such benefits, GRANT in fact performed numerous
    official acts for CW-2 and REICHBERG.

n.  For example, from in or about 2012 through in or about 2014, GRANT regularly
    provided CW-2 and REICHBERG with police escorts. On many occasions,
    GRANT himself drove CW-2 to locations, such as to and from the airport, using
    the lights and sirens of a police car. On other occasions, GRANT dispatched
    junior officers to provide police escorts for CW-2.

o.  On one occasion, GRANT sent officers to a building in which CW-2 had an
    ownership interest to investigate a trespasser. On another occasion, GRANT sent
    officers to a building in which CW-2 had an ownership interest to investigate a
    theft.

18

p. On or about September 12, 2013, CW-2 received an e-mail from a business associate who indicated that a colleague had left his watch in a livery cab in Manhattan and was trying to track down the cab, and who wrote "This may be something for your boy Jeremy [REICHBERG]." CW-2 responded, cc'ing REICHBERG, "Yes Jeremy will have NYPD review cameras at that time and location but will cost Jeremy 10k. Should I proceed." The business associate wrote back that it did not make "economic sense" because the watch was worth approximately $50,000 and the NYPD camera review might not be successful. The business associate later wrote back that the CEO of the company had authorized a $5,000 payment. CW-2 responded, cc'ing REICHBERG, that "there are two guys [REICHBERG] needs to take care of to watch the footage. He said 10k is the price." Based on my discussions with CW-2, I learned that REICHBERG had told CW-2 that REICHBERG had raised this issue with GRANT, and GRANT had agreed to facilitate the review of street cameras, and REICHBERG indicated that REICHBERG would need money to take care of the officers who would help. Ultimately, the company did not proceed with CW-2 and REICHBERG's offer.

q. GRANT also escorted CW-2 and his friends beyond police barricades to prime locations at events such as parades, the New York City marathon, and the New Year's Eve Celebration at Times Square, and provided them with "VIP treatment."

19

r.   On several occasions, when CW-2 himself was confronted by police officers, such as by being pulled over, he used GRANT's name and called GRANT in front of the officers, to avoid getting a ticket or summons.

s.   In 2015, when a family member was hospitalized at a hospital in the confines of GRANT's precinct, GRANT, at CW-2's request, went to the hospital to introduce himself to hospital staff as Commanding Officer of the precinct and to make sure that CW-2's relative was attended to properly.

t.   GRANT helped CW-2 and REICHBERG in their efforts to obtain gun licenses from the New York City Police Department. REICHBERG told CW-2 that GRANT was friendly with personnel in the Licensing Division of the NYPD, and asked CW-2 if he wanted a gun license.   CW-2 responded that he did. REICHBERG and CW-2 then went to the Licensing Division, filled out paperwork, and met GRANT's connections.

u.   I have debriefed CW-1, an officer in the Licensing Division who reviewed REICHBERG and CW-2's applications.   CW-1 has pleaded guilty to bribery-related charges, in connection with the receipt of financial benefits to help expedite gun license applications submitted by Alex Lichtentein, a/k/a "Shaya," an expediter, on behalf of Lichtenstein's clients, described in greater detail below. Lichtenstein has been charged with bribery-related charges in a case pending in the Southern District of New York. CW-1 is aware that GRANT is friendly with Lichtenstein, and has been informed by a VILLANUEVA that Lichtenstein paid for work on GRANT's house. Based on my debriefings of CW-1, I have learned the following:

[segment omitted]

i. At a certain point in 2014, CW-1 was informed by VILLANUEVA that GRANT was sending REICHBERG down to get a gun license, and that CW-1 should expedite the approval of REICHBERG's license.

ii. Subsequently, REICHBERG showed up to the Licensing Division with CW-2, but CW-2 did not have any paperwork with him, so CW-1 only processed REICHBERG's application for full carry license, i.e., a license to carry a concealed firearm anywhere in the state of New York. REICHBERG asked to receive his license within one day, and CW-1 said that it would take longer, to which REICHBERG responded by boasting of his connection to Chief-1 and that he was responsible for getting GRANT his position as the Commanding Officer of the 19th Precinct.

iii. REICHBERG then met with the Commanding Officer of the Licensing Division, after which either the Commanding Officer or VILLANUEVA told CW-1 to "close out" and approve "Jimmy GRANT's guy." Based on my discussions with personnel at the Licensing Division, I am informed that the approval process for a full carry license typically takes at least six months and, in many instances, in excess of a year.

v. Based on my review of information from the Licensing Division, I know that REICHBERG and CW-2 applied for their gun licenses on or about August 21, 2014, and REICHBERG was approved for a full carry license on or about October 29, 2014. CW-2 did not obtain his license, and his application was rejected in March 2016 because CW-2 had not followed up with necessary paperwork.

21

w. On or about January 13, 2015, at approximately 10:13 in the morning, REICHBERG placed a call to GRANT, which was captured on the wiretap over REICHBERG's phone. During the call, as set forth below, REICHBERG and GRANT appeared to discuss manufacturing a fake employment letter that would enable CW-2 to obtain a full-carry gun license. Specifically, GRANT told REICHBERG: "On that letter, it has to state that [CW-2 is] part owner, and it shows that he's part owner in that business, or the owner of the company has to give a letter, that's notarized, saying that [CW-2] is his right hand guy, does carry diamonds." GRANT then said: "I gave you [CW-1's] number, [CW-1] called you, just fuckin tell him, whatever way you want to go they're gonna do it, but they have to put something in the folder." GRANT said that VILLANUEVA told him that everything was on GRANT now, that "now they're ready to do it," but that REICHBERG was "holding shit up." GRANT then said to "have the owner, whether it's you or whoever it is, write a notarized letter, saying that [CW-2] is employed . . . he does frequently carry large amounts of diamonds worth, you know, upwards of a million dollars, at all times, all days, and that you're authorizing him to be carry . . . a firearm. . . . That's it, get that letter, get it to me, and I'll have it dropped off." CW-2 is not employed in the diamond industry.

x. Based on my training, experience, and participation in the investigation, I believe that during this call, GRANT was coaching REICHBERG on what needed to be put in a letter regarding CW-2's nonexistent work transporting diamonds, and told REICHBERG that his connections at the Licensing Division would approve CW-2's application once the letter was received.

22

y. On or about January 16, 2015, at approximately 9:36 a.m., GRANT called REICHBERG. During the call, as set forth below, GRANT complained to REICHBERG about not receiving certain favors, and appeared to explicitly connect his receipt of favors from REICHBERG with official actions he had taken at REICHBERG's request. Specifically, GRANT told REICHBERG on the call: "See you don't love me anymore bro." GRANT said that he heard REICHBERG had invited another high-ranking official to the Super Bowl and "you don't even invite me to the Super Bowl, what the fuck." REICHBERG said that he was still deciding whether to go, and "if we are you wanna come?" GRANT responded "maybe, yeah." REICHBERG accused GRANT of being too busy for REICHBERG, to which GRANT replied "No no no. First of all, first of all, the two Jewish elves didn't come for fucking Christmas number one, I got your fuckin Westchester county cards, the cards you asked me to make up, you fucking broke my balls about [CW-2's application.]" Based on my training, experience, and participation in the investigation, I believe that during this call, GRANT was complaining that REICHBERG and CW-2 did not invite him to come to Las Vegas for the Super Bowl and did not bring him Christmas gifts, even though GRANT had printed police liaison cards for REICHBERG and was helping REICHBERG and CW-2 with the gun license process.

z. Approximately two months later, on or about March 7, 2015, at approximately 4:37 p.m., REICHBERG called GRANT. During the call, as set forth below, GRANT complained that CW-2 appeared to have problems with GRANT and that GRANT had done favors for CW-2 in the past. Specifically, GRANT said that he

23

had been reaching out to CW-2 and that "I can sense the ice . . . that's not right though." REICHBERG said "he never did anything for you, just relax, and you always did for him." GRANT responded: "I know he never did anything for me" and "I was good to him, because of you. Whatever I did for him was because of you." GRANT said "he should be told that those guys are scumbags, and you know, and fuckin' [Chief-1] and them who gave him the go ahead are the one who fuckin' fucked up." Based on my training, experience, participation in the investigation, and discussions with CW-2, I believe that during this call, GRANT acknowledged the favors he did for CW-2 but denied the gifts provided by CW-2 to GRANT, as detailed above. GRANT also speculated that CW-2 should not have gotten involved with Chief-1 and MICHAEL HARRINGTON.

aa. On or about March 20, 2015, beginning at approximately 1:22 p.m., REICHBERG engaged in a series of phone calls that, as set forth below, appear to involve an effort by REICHBERG to use his connection to GRANT to fix or avoid a ticket for an associate of REICHBERG's. Specifically, REICHBERG received a call from an unknown male ("the UM") who told REICHBERG he had been pulled over by the police in the 66th precinct. The UM said that he gave the officers "JIMMY GRANT's card," to which REICHBERG responded "That's fine, you'll be fine." REICHBERG asked the UM for the license plate number of the police car, which the UM provided. The UM said that the officers had taken his information and were back in their police car. After REICHBERG hung up the phone, he called an unknown member of the NYPD who I believe, based on the substance of the call and my participation in the investigation, to be from the

24

66th precinct (the "Unknown Officer"). REICHBERG told the Unknown Officer that the police car bearing the license plate number provided by the UM "pulled somebody over, he gave them Jimmy's card." The Unknown Officer responded, "yeah, I just got a call, he's driving like a fucking maniac" into traffic and running red lights. REICHBERG told the Unknown Officer that the UM had an emergency and that he was REICHBERG's friend. The Unknown Officer responded "All right, so you gave him Jimmy's card?" to which REICHBERG responded in the affirmative. The Unknown Officer then said "All right I'll tell them he knows him," before hanging up.

bb. Based on my training, experience, and participation in the investigation, I believe that in this series of calls, the UM, an associate of REICHBERG's to whom REICHBERG had given GRANT's card, told REICHBERG he had been pulled over and had given the card to the officers. REICHBERG then called a contact in the local precinct, who was aware of the incident. The contact agreed to have the UM let go after confirming with REICHBERG that the UM was a friend of REICHBERG's and that it was REICHBERG who had supplied the UM with GRANT's card.

Personal and Financial Benefits Provided to HARRINGTON and Official Actions Taken by HARRINGTON

12.     Based on my review of e-mails sent to and from CW-2's e-mail account and the e-mail account of JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," recorded phone calls over the wiretaps discussed above; review of other materials as

25

discussed below; and discussions with CW-2, I have learned the following with respect to MICHAEL HARRINGTON:

- a. During the time period that HARRINGTON was the Executive Officer for Chief-1, from May 2013 through November 2014, CW-2 took HARRINGTON and Chief-1 to dinner at least one to two times a week, typically at expensive restaurants in Manhattan. CW-2 paid for these dinners.

- b. During this same time period, CW-2 and REICHBERG provided HARRINGTON with tickets to numerous sporting events, sometimes to go with CW-2 and REICHBERG and sometimes without them. For example, in an e-mail dated January 10, 2014, CW-2 sent HARRINGTON two Brooklyn Nets basketball tickets, with a face value of $400 each. In an e-mail dated May 24, 2014, CW-2 sent HARRINGTON two New York Rangers hockey tickets, with a face value of $700 each.

- c. On or about April 7, 2013, another individual sent an e-mail to REICHBERG attaching an image of a business card for HARRINGTON. Based on my training, experience, and participation in the investigation, I believe that REICHBERG was arranging to have business cards prepared for HARRINGTON.

- d. On Christmas Day in 2013, on the same trip during which CW-2 and REICHBERG wore elf hats and provided a video game system and jewelry to the family of JAMES GRANT, CW-2 and REICHBERG drove to HARRINGTON's home and gave HARRINGTON a video game system for his children.

- e. In or about 2014, a jewelry business affiliated with REICHBERG was having a dispute with a neighboring jewelry business in the same building. The

26

neighboring company hired a security guard who was an off-duty NYPD officer to stand near the business of REICHBERG's affiliate's company. HARRINGTON, at REICHBERG's request, investigated the off-duty officer and took steps to have him disciplined within the NYPD.

Chicago Trip (2014)

f. In 2014, HARRINGTON took a trip to Chicago with his family members. CW-2 offered to pay for the family's hotel rooms in Chicago, which HARRINGTON accepted, and REICHBERG helped coordinate the travel arrangements. I have seen an e-mail from May 14, 2014 from REICHBERG to CW-2 in which REICHBERG asked CW-2 to "please confirm the hotel room in Downtown Chicago" for an individual I know to be HARRINGTON's brother, and then specified that three rooms would be needed for four nights, and one room would be needed for two nights. I have also seen an e-mail from later the same day from a hotel in Chicago to CW-2 confirming the four rooms that CW-2 had booked. CW-2 forwarded that e-mail to HARRINGTON, using HARRINGTON's private e-mail address. I have also seen an invoice from the Travel Agency to CW-2 for the hotel rooms, in the amount of approximately $6,500.

g. In or about March 2016, agents participated in an interview of HARRINGTON at the United States Attorney's Office for the Southern District of New York. I've spoken to the agents and reviewed their notes. During the interview, HARRINGTON made false representations about the 2014 Chicago trip. While HARRINGTON admitted that CW-2 had paid hotel costs in Chicago, HARRINGTON claimed to have paid CW-2 back in cash after the trip. According

27

to CW-2, CW-2 never sought or received any reimbursement from HARRINGTON.

Engagement of and Assistance with HARRINGTON affiliated Security Company

h. In addition to the benefits discussed above, REICHBERG arranged for tens of thousands of dollars' worth of business for a private security company run in part by HARRINGTON's family and which HARRINGTON unofficially helped manage (the "Security Company"). Most prominently, CW-2 and administrators at CW-2's child's school wanted to arrange for private security, and REICHBERG connected the Security Company to CW-2 for this purpose. CW-2 was unaware, at the time, that the Security Company was affiliated with HARRINGTON's family. CW-2 was provided with a particular contact, who was not a member of HARRINGTON's family, to be the point person for security (the "Security Guard").

i. On or about January 14, 2015, members of the FBI conducted surveillance from within a restaurant on the Upper West Side of Manhattan (the "Restaurant"), where CW-1, REICHBERG, Chief-1 (who had, by then, resigned), and HARRINGTON were having dinner, and at which REICHBERG and HARRINGTON discussed the Security Company. The agents sat at a table near them, and using FBI equipment, recorded the conversation. Based on my conversations with individuals who were present, I know that at a certain point, CW-2 and Chief-1 left the table, at which point REICHBERG and HARRINGTON began discussing the Security Company, including its need for insurance. Shortly thereafter, CW-2 and Chief-1 returned to the table, and

28

HARRINGTON and REICHBERG stopped discussing the Security Company. HARRINGTON was the only individual to eat dinner during the dinner. After a time, CW-2 received and paid the bill for dinner, and remarked to HARRINGTON, in substance, that the bill was light "this time."

j. On or about January 20, 2015, at approximately 7:24 p.m., REICHBERG called HARRINGTON. During the call, REICHBERG said "I spoke to [the Security Guard], I gave him a rundown" and that REICHBERG "spoke to [CW-2], on Thursday we'll have the balance, $5,000." Based on my training, experience, and participation in the investigation, I believe that during this call, REICHBERG and HARRINGTON were discussing the school security job for HARRINGTON's family's company and an expected partial payment of $5,000 for the job.

k. On or about January 31, 2015, at approximately 8:40 p.m., REICHBERG called HARRINGTON. During the call, HARRINGTON stated that "[the Security Guard] has to work this final deal out with [CW-2] . . . are they going to continue this way, are they gonna do it to the end of the year? I got the impression [CW-2] wanted to punt it to the school to handle . . . at some point I want [the Security Guard] to meet up with [CW-2] to finalize it, and my brother [] too." HARRINGTON also said that "ultimately, I figure [CW-2's] gonna figure this math out, that I'm involved. . . . I'm not involved, on paper everything is nothing to do with me." Based on my training, experience, and participation in this investigation, I believe that during this call, HARRINGTON was further insisting that CW-2 and the Security Guard meet and work out further logistical and financial issues with respect to the school security job. HARRINGTON also

29

confirmed his involvement with the Security Company benefiting financially from the arrangement, and that CW-2 was not aware of HARRINGTON's involvement.

## Official Acts Provided by HARRINGTON

l. As with JAMES GRANT, CW-2 understood and expected that HARRINGTON would perform official acts for him due to CW-2's having bestowed gifts on HARRINGTON. During the time period that CW-2 was providing the above referenced gifts to HARRINGTON, HARRINGTON in fact performed numerous official acts for CW-2 and REICHBERG.

m. For example, in addition to benefiting from the engagement of his family's Security Company by REICHBERG and CW-2, HARRINGTON has also agreed to use the Security Company to make an arrest as requested by REICHBERG. On or about January 23, 2015, at approximately 1:21 p.m., REICHBERG called HARRINGTON. During the call, REICHBERG said "All right I spoke to the guy, he wants from 12 to 7 every night starting Sunday. . . . [the Security Guard] should give him a call and get the details." HARRINGTON responded "[the Security Guard] should probably see the video." REICHBERG responded "right, so [the Security Guard] should tell him that. Listen, I want to come by, I want to see the video . . . this is what we're going to do, we're going to lock him up, we catch him." HARRINGTON responded "He's looking to lock him up, right?" REICHBERG said "Absolutely." REICHBERG and CW-2 discussed that the money would need to be provided up front. REICHBERG and HARRINGTON then discussed the school security job, and HARRINGTON said that an individual

30

I know to be HARRINGTON's brother "is better off doing the business shit" because the Security Guard is "a trainwreck."

n. Based on my training, experience, participation in the investigation, and other intercepted calls, I believe that during this call, REICHBERG and HARRINGTON were arranging for HARRINGTON's security company to be paid to surveil a particular location and catch an individual vandalizing the location, who HARRINGTON would then arrange to be arrested by the NYPD. The person who would pay HARRINGTON's family's company had a video of the perpetrator previously vandalizing the location. The Security Company would need to be paid for a week's worth of work in advance. HARRINGTON then discussed that his brother, who is involved in the Security Company, is better equipped to handle business matters than the Security Guard.

o. HARRINGTON has also been involved in dispatching NYPD personnel to assist REICHBERG directly. For example, on or about February 20, 2015, at approximately 12:29 p.m., REICHBERG called HARRINGTON, who said that he was in a meeting and asked to call REICHBERG back. REICHBERG next called the Commanding Officer of a midtown precinct (the "CO"), and told the CO "I need your help, very important. . . . We gave out a stone to some company in my building . . . it's a $250,000 diamond, he's been playing around games the last few days about giving it back, he's not buying it, he's giving it back . . . so we told him yesterday we want him back." REICHBERG said "I'm afraid we're gonna get hit on it, and before, if we can send somebody over, we need the stone back." REICHBERG asked "is there any way, before he scams us . . . if we can

31

send somebody over?" The CO said "OK, I'll have [a Sergeant] come over." REICHBERG responded "I really, really appreciate it, you're always to the rescue." At approximately 12:34 pm., HARRINGTON called REICHBERG back. REICHBERG said, "I called [the CO], [the CO's] gonna handle it." REICHBERG then discussed the problem with the $250,000 stone with HARRINGTON. At approximately 1:36 p.m., REICHBERG again spoke to HARRINGTON, and told HARRINGTON that the CO helped get the stone back.

p. I have spoken to agents who debriefed the CO, who recalled that on multiple occasions he dispatched NYPD personnel to settle diamond-related disputes for REICHBERG; that he sometimes did so as requested by HARRINGTON; and that, other times, he did so in part because of REICHBERG's relationship with Chief-1 and HARRINGTON and with the expectation that if the CO declined to do so, REICHBERG would complain to Chief-1 or HARRINGTON.

q. HARRINGTON also sent NYPD cars to religious sites at CW-2 and REICHBERG's request. For example, in an e-mail dated January 15, 2015, an individual wrote to CW-2 "Given the events in paris the shul asked me if I can try and get a patrol car for the next few weeks to sit outside the shul Shabbos morning from 9-1." CW-2 responded, cc'ing HARRINGTON, "I will make sure the HOW house of worship car has your shul in its route what's the address."

r. On or about March 5, 2015, at approximately 10:18 a.m. REICHBERG called HARRINGTON. REICHBERG said that he needed police at "42nd and 5th" because the rabbi over there "called me in a panic" and was "nervous" because "there's a lot of people over there . . . he has people from Paris." HARRINGTON

32

responded "they can't be nervous all the time . . . this is all the time." REICHBERG said, "I know, but," and HARRINGTON interrupted him and said "All right, all right." At approximately 11:10 a.m., HARRINGTON called REICHBERG and said "I spoke to [another NYPD official], gonna try and get somebody over there now, he'll definitely have somebody on the 4 to 12, and the day tour 4 to 12 tomorrow for Shabbos."

s. In an e-mail in October 2, 2015, REICHBERG asked HARRINGTON to "please see to have coverage" at a religious site in Midtown for a four-day period.

t. According to CW-2, HARRINGTON has also arranged for police escorts for CW-2 and others. As an example, on or about September 21, 2014, CW-2 sent an e-mail to another individual and wrote "Head of local precinct will call you in 3 min and get you to your car and out if you don't hear from him in next 5 min email me." Two minutes later, the individual wrote back "Who was just on the phone," to which CW-2 responded "Chief Harrington." Based on my training, experience, and participation in the investigation, I believe that during this exchange, HARRINGTON facilitated assistance for an associate of CW-2 to access his car in an area that had been blocked off by police.

u. According to CW-2, HARRINGTON has also assisted with VIP access to New York City events, such as parades.

REICHBERG's Efforts to Continue His Influence Over the Police Department, Particularly in Brooklyn

13. As noted above, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," along with CW-2, were involved in the promotion of JAMES GRANT to

33

become commanding Officer of the 19th Precinct in Manhattan, and REICHBERG has taken credit for the promotion.

14.   I have reviewed numerous other calls over the wiretap on the cellphone belonging to JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," during the January-to-May 2015 time period, in which NYPD personnel solicited REICHBERG's advice, information and assistance in obtaining promotions. REICHBERG's efforts in early 2015 - at a time when Chief-1 had retired from the NYPD and MICHAEL HARRINGTON was transferred from the Chief of Department's Office, leaving REICHBERG with minimal to no influence at the Chief of Department's Office - appeared to be focused on re-consolidating influence in Brooklyn.

15.   For example, in a call to MICHAEL HARRINGTON on January 27, 2015, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," and HARRINGTON discussed HARRINGTON's prospects for the promotion and who might be in a position to assist him. REICHBERG told HARRINGTON "you still have to get the Borough . . . we need you to get this Borough." Based on my training, experience, and participation in the investigation, I believe that REICHBERG was attempting to facilitate the transfer and promotion of HARRINGTON to be one of the top NYPD officials in Brooklyn, REICHBERG's borough, in order to be able to make most use of HARRINGTON's assistance going forward.

16.   During another call on January 28, 2015 between JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," and a Deputy Inspector with the NYPD ("DI-1"), REICHBERG and DI-1 discussed the fact that DI-1 would likely be transferred to Brooklyn South, as well as other promotions within the NYPD. REICHBERG discussed pulling a "big card" with respect to promotions, and calling the "mayor." REICHBERG told DI-1 that

34

REICHBERG and CW-2 "need to put ourselves in a better position for calling better shots in the next regime."

17.     By way of another example, during one call on January 30, 2015, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," explained to another individual ("Individual-1"), in substance, that he had spoken to a person who was very senior within the NYPD (the "Senior Official"), as well as to another individual he believed to communicate regularly with the Commissioner of the NYPD, about promoting MICHAEL HARRINGTON to be commanding officer of Brooklyn South. Individual-1 said that he would be with the Senior Official for the Super Bowl and would mention it. REICHBERG responded, "That would be great. If we could pull this through, that would be huge. . . I'm getting to work on this and hopefully we'll have, ah, a team in place very soon."

18.     During a call with an unknown member of the NYPD on or about February 27, 2015 (the "Unknown Officer"), the Unknown Officer asked JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," in substance, about his prospects for promotion.      The Unknown Officer asked REICHBERG "Am I viewed as a nobody?" REICHBERG responded that "no, a good guy. They like you. The last regime they liked you a lot more." The Unknown Officer and REICHBERG then discussed that the Unknown Officer could benefit from the fact that DI-1 - one of REICHBERG's close connections - likes the Unknown Officer. REICHBERG told the Unknown Officer that the Unknown Officer would be fine. REICHBERG then proceeded to ask the Unknown Officer for assistance with a situation at REICHBERG's house, and specifically that REICHBERG believed someone had tried to break into his house. The Unknown Officer agreed to send police officers to help.

19.     During another call on March 6, 2016, a Deputy Inspector ("DI-2") called REICHBERG to discuss DI-2's impending transfer to a new assignment.   DI-2 told REICHBERG that DI-2 knew he was bothering REICHBERG, but that REICHBERG was "probably the only one that can help me." DI-2 complained that it seemed like his transfer was "sideways" and that he was just being "dumped" into a position rather than headed in a "positive direction." REICHBERG assured DI-2 that he had spoken to an unknown individual who had assured REICHBERG that the transfer was in a "positive direction."

### Probable Cause Regarding the Licensing Scheme

20.     Based on the various sources described herein, including interviews with CW-2 and former customers of ALEX LICHTENSTEIN, I have learned the following:

- a. At all times relevant to this application, ALEX LICHTENSTEIN, a/k/a "Shaya," and FRANK SOOHOO held themselves out as expediters who could, for a large fee, obtain gun licenses for persons seeking gun licenses from the Licensing Division.

- b. ALEX LICHTENSTEIN, a/k/a "Shaya," charged his clients as much as $18,000 per gun license. FRANK SOOHOO charged his clients as much as $15,000 per license.

- c. ALEX LICHTENSTEIN, a/k/a "Shaya," and FRANK SOOHOO were able to obtain gun licenses from the NYPD Licensing Division on an accelerated basis for their clients and were also able to obtain gun licenses for clients who were otherwise unlikely to obtain gun licenses because of their criminal or personal history. LICHTENSTEIN and SOOHOO were able to provide these "expediting"

36

services by bribing officers of the Licensing Division -- namely DAVID
VILLANUEVA and CW-1.

d. ALEX LICHTENSTEIN, a/k/a "Shaya," paid thousands of dollars in bribes to
DAVID VILLANUEVA in exchange for VILLANUEVA's agreement to expedite
gun license applications for LICHTENSTEIN's clients. CW-1 assisted
VILLANUEVA by conducting first level reviews of and approving these
applications, and received a small portion of LICHTENSTEIN's bribe money
from VILLANUEVA. In addition to these cash bribes, LICHTENSTEIN
provided other benefits to VILLANUEVA and CW-1, including, for example,
bottles of liquor; limousine rides for VILLANUEVA; and a limousine tour of
wineries for VILLANUEVA, CW-1, another officer of the Licensing Division,
and their significant others. FRANK SOOHOO bribed VILLANUEVA, by
providing him with, among other things: (i) multiple lunches per month at
restaurants paid for by SOOHOO, and (ii) multiple all-expenses paid vacations,
including international travel, for VILLANUEVA and a companion, the value of
which was at least several thousand dollars.[2]

e. As a part and in furtherance of the bribery scheme, and in exchange for the
financial and other benefits set forth above, the clients of ALEX
LICHTENSTEIN, a/k/a "Shaya," and FRANK SOOHOO were typically
processed in the following manner:

---

[2] In the event of one trip travel records indicate SOOHOO, CW-1, and VILLANUEVA took
together, there are bank and travel records indicating that CW-1 and VILLANUEVA may have
reimbursed SOOHOO. However, this trip was not among the trips CW-1 listed as compensation
for the bribery scheme in discussing the scheme with agents.

37

    i. LICHTENSTEIN or SOOHOO alerted DAVID VILLANUEVA that one
or more clients was coming to the Licensing Division to apply for a gun
license.

    ii. VILLANUEVA then alerted CW-1 that either a LICHTENSTEIN or a
SOOHOO client was coming to apply for a gun license. VILLANUEVA
typically assigned CW-1 the task of conducting the first level investigation
and review of Applications submitted by clients of LICHTENSTEIN or
SOOHOO.

    iii. When a client of LICHTENSTEIN or SOOHOO came to the Licensing
Division, often accompanied by LICHTENSTEIN or SOOHOO, either
VILLANEUVA or CW-1 processed the client's application in a
perfunctory fashion without conducting or completing the required due
diligence, in that they failed to (i) a complete review of the applicant's
criminal history; (ii) verify the details of the application; (iii) conduct an
in-person interview of the applicant; and/or (iv) investigate the business
need for Limited and Full Carry Licenses. On some occasions, these
protocols were followed, but only after the client was approved for a
license.

    iv. Soon after the Application of a LICHTENSTEIN or SOOHOO client was
submitted to the Licensing Division, VILLANUEVA typically told CW-1
to "close out" the file, meaning to enter CW-1's approval of the
Application in the Licensing Division computer system (the "Computer
System"). After CW-1 did so, VILLANUEVA entered his approval in the

Computer System, and a gun license would be issued for the client without further review. Entry of the approval of the first-level investigator, such as CW-1, and of a supervising officer, such as VILLANUEVA, in the Computer System was necessary before a gun license would be issued.

f. In addition to expediting and approving Applications of clients of ALEX LICHTENSTEIN, a/k/a "Shaya," and FRANK SOOHOO, DAVID VILLANUEVA, and CW-1 also at times upgraded the gun licenses of LICHTENSTEIN's and SOOHOO's clients. For example, VILLANUEVA and CW-1 at times upgraded such clients' gun licenses from Premises Carry to Limited Carry and from Limited Carry to Full Carry, without conducting further required investigation for such upgrades.

g. As part of the bribery scheme, not only were gun licenses for the clients of ALEX LICHTENSTEIN, a/k/a "Shaya," and FRANK SOOHOO approved or upgraded without the necessary protocols being followed or the necessary due diligence being conducted, but gun licenses were approved for LICHTENSTEIN and SOOHOO clients who, because of their criminal or personal history, would likely have been rejected as a matter of discretion by the Licensing Division. For example:

i. In or about February 2015, DAVID VILLANUEVA, approved the Limited Carry gun license for a LICHTENSTEIN client ("Client-1"). Client-1's Limited Carry gun license was approved even though Client-1 had been previously arrested for bribing a public official and for assault.

39

ii. In or about May 2015, DAVID VILLANUEVA, approved the Limited Carry gun license for a SOOHOO client ("Client-2"). Client-2's Limited Carry gun license was approved even though Client-2 had a prior arrest and conviction for attempted criminal possession of stolen property; a prior arrest for possession of a forged instrument; and multiple prior arrests for the unlicensed operation of a motor vehicle.

h. As a result of the bribes that were given by ALEX LICHTENSTEIN, a/k/a "Shaya," to and accepted by, DAVID VILLANUEVA, VILLANUEVA expedited, approved, and caused to be approved at least approximately 100 to 150 Applications submitted by LICHTENSTEIN for his clients.

i. As a result of the bribes that were given by FRANK SOOHOO, to and accepted by, DAVID VILLANUEVA, VILLANUEVA expedited, approved, and caused to be approved at least approximately 15 Applications submitted by SOOHOO for his clients.

21. From speaking to another NYPD officer not assigned to the licensing division ("Precinct Officer-1"), I have learned that in or around the early months of 2016, ALEX LICHTENSTEIN, a/k/a "Shaya," was banned by a commanding officer of the Licensing Division from obtaining assistance for his clients. As a result, in or about April 2016, in an attempt to establish an additional relationship within the NYPD to facilitate the expediting and approval of gun licenses for his clients, in exchange for bribes, LICHTENSTEIN approached and offered a bribe to Precinct Officer-1. Although Precinct Officer-1 did not work in or with the License Division, ALEX LICHTENSTEIN, a/k/a "Shaya," indicated that he was soliciting

40

Precinct Officer-1, as an NYPD officer with whom LICHTENSTEIN was familiar, for assistance.

22.     On or about April 13, 2016, Precinct Officer-1, acting at the direction of the Federal Bureau of Investigation (the "FBI") and the NYPD's Internal Affairs Bureau ("IAB"), met with ALEX LICHTENSTEIN, a/k/a "Shaya," in Borough Park, Brooklyn. Precinct Officer-1 was equipped with video- and audio-recording devices for the duration of the meeting, and the following occurred, among other things, during the meeting:

> a. At the beginning of the meeting, LICHTENSTEIN patted down Officer-1 in an attempt to detect whether Officer-1 was wearing a wire. Officer-1 stated that "you don't have to pat me down." LICHTENSTEIN responded that he would rather meet Officer-1 "in your underpants and your undershirt," which Officer-1 understood to mean that LICHTENSTEIN wanted to be sure that Officer-1 was not recording the meeting.
>
> b. As part of his effort to assist IAB and the FBI, Officer-1 told LICHTENSTEIN, in sum and in substance, that he was nervous about helping LICHTENSTEIN obtain gun licenses but could use the money, and that he (Officer-1) could not secure gun licenses on his own since he was not in the NYPD License Division, but that he knew a union delegate who was in the License Division and would be willing to help him.
>
> c. Officer-1 also asked LICHTENSTEIN how much money Officer-1 could make if Officer-1 obtained gun licenses for LICHTENSTEIN's customers, and LICHTENSTEIN responded: "I'll give you and [the union delegate] more than

41

you'll make in the police department." LICHTENSTEIN offered Officer-1 $6,000 per gun license that Officer-1 helped him obtain.

d. LICHTENSTEIN further told Officer-1: "I got so many license[s] in last year," and estimated that he had obtained 150 gun licenses through his connections in the NYPD License Division. LICHTENSTEIN then took out his calculator and multiplied 150 by $6,000, to demonstrate to Officer-1 how much money ($900,000) Officer-1 could make.

23. On or about April 18, 2016, FBI agents executed a judicially authorized search of LICHTENSTEIN's residence. During that search, they found numerous items tying him to the LICENSING SCHEME in a home office area within his residence, including actual NYPD gun license applications and pictures of LICHTENSTEIN with various NYPD personnel including GRANT.

**B. Additional Probable Cause Specifically Justifying Search of the Subject Premises**

24. According to information in databases available to law enforcement:

a. At all times relevant to this application, JEREMY REICHBERG lived in the 56th Street Residence. He lives there still.

b. At all times relevant to this application, the business located at the Whitestone Business was owned and operated by FRANK SOOHOO. He owns and operates it still.

25. From my conversations with CW-2, I have also learned that CW-2 has been to REICHBERG's home, which contains a home office area. CW-2 is familiar with REICHBERG's business, having let REICHBERG use space at his office before, and describes REICHBERG's business as largely consisting of assisting private individuals in getting favorable treatment from the City of New York, including the NYPD.

42

26.     FRANK SOOHOO's expediting business is located at the Whitestone Business, which advertises on its exterior signage, among other services, "pistol license services." Based on my conversations with members of the NYPD, and with other FBI agents who have discussed the matter with members of the NYPD, there is generally no requirement for a gun license that would require the services of a third party in order for the process evaluation and approval to run to completion.

27.     Based upon my training and experience, I know that individuals attempting to maintain an illegal business relationship may maintain documents evidencing that relationship within closed and/or locked cabinets, briefcases, storage lockers, safes, file cabinets, and other containers kept within their homes or places of business, particularly where such documents are evidence of a crime. I therefore ask authorization to open any closed items and containers so that they may be opened if tools or other implements are required.

28.     In addition, based on my training and experience, I know that persons engaged in bribery schemes (including the exchange of cash bribes for official actions) typically can keep records relating to their business and criminal activity in order to track the individuals making the payments, the official benefits obtained as a result of those payments, and the funds obtained as a result of the scheme. Such records may include, among other things, ledgers, rosters, billing, expense and financial records, and supporting documents that purport to authorize the official benefits conferred on the payor of the bribes by the bribe recipients.

29.     Based on my training and experience, and the facts above, I understand that the Subject Premises may contain evidence of the Subject Offenses. Among other things, it is possible that the Subject Premises may contain evidence of:

43

a. The Whitestone Business: Communications between and amongst co-conspirators concerning payments made to or favors performed by NYPD law enforcement personnel, including the provision of gun licenses, escort services, deployment of NYPD units, and others; ledgers; business records; notes; vouchers; invoices; bank, accounting or financial records; receipts; other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; business records pertaining to gun permit expediting services, contact information for NYPD Licensing Division personnel, correspondence with licensing division personnel, gun license expediting customer contact files, information, and correspondence; client logs; travel records.

b. The 56th Street Residence: Communications between and amongst co-conspirators concerning payments made to or favors performed by NYPD law enforcement personnel, including the provision of gun licenses, escort services, deployment of NYPD units, and others; ledgers; business records; notes; vouchers; invoices; bank, accounting or financial records; receipts; other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; gun license application materials for Jeremy Reichberg or his associates, communications with NYPD personnel, indicia of relationship between Jeremy Reichberg and James Grant and/or Michael Harrington and/or other NYPD personnel, including correspondence, pictures, records of financial transactions and travel.

44

## III. Conclusion and Ancillary Provisions

30.    Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

31.    In light of the confidential nature of a continuing investigation whose full scope is not yet public, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise. Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation, and the premature disclosure of the contents of this affidavit and related documents may jeopardize the effectiveness of the investigation.

JENNIFER M. RANUCCI
Special Agent
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me on
June 17, 2016

HON. VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

45

## Attachment A: 1252 56th Street, Brooklyn, New York 11219

### I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein:

### 1252 56th Street, Brooklyn, New York 11219

A three story brick home with a one-car garage at ground level and a front door on the right side (viewed facing the building) at the end of a flight of eight steps. There are multiple security cameras affixed to the front of the residence.

### II. Items to Be Seized

#### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy) (the "Subject Offenses"):

Communications concerning payments made to or favors performed by NYPD law enforcement personnel, including the provision of gun licenses, escort services, deployment of NYPD units, and others; ledgers; business records; notes; vouchers; invoices; bank, accounting or financial records; receipts; other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; gun license application materials for Jeremy Reichberg or his associates, communications with NYPD personnel, indicia of relationship between Jeremy Reichberg and James Grant and/or Michael Harrington and/or other NYPD personnel, including correspondence, pictures, records of financial transactions and travel.

## Attachment A: 14-30 149th Street, Whitestone, New York 11357

### I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein:

### 14-30 149th Street, Whitestone, New York 11357

A business occupying the first floor of a two-story building in Whitestone, Queens. The first floor bears signage identifying the business within as "Gunsmoke Too Inc." and advertising premium cigars and law enforcement equipment such as handcuffs, Kevlar gloves, and "pistol license services." The first floor is accessed via a front door beneath a brown awning with "GUNSMOKE TOO Inc." written on it.

### II. Items to Be Seized

#### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy) (the "Subject Offenses"):

Communications between and amongst co-conspirators concerning payments made to or favors performed by NYPD law enforcement personnel, including the provision of gun licenses, escort services, deployment of NYPD units, and others; ledgers; business records; notes; vouchers; invoices; bank, accounting or financial records; receipts; other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; business records pertaining to gun permit expediting services, contact information for NYPD Licensing Division personnel, correspondence with licensing division personnel, gun license expediting customer contact files, information, and correspondence; client logs; travel records.

2

# **EXHIBIT B**

Approved: _Russell Capone_
             KAN M. NAWADAY / MARTIN S. BELL / RUSSELL CAPONE
             Assistant United States Attorneys

Before:   HONORABLE BARBARA MOSES
          United States Magistrate Judge
          Southern District of New York **16 MAG 3919**

- - - - - - - - - - - - - - -x

| | |
|---|---|
| UNITED STATES OF AMERICA | SEALED COMPLAINT |
|     - v. - | Violations of 18 U.S.C. §§ 1343, 1346, 1349 |
| JAMES GRANT,<br>  a/k/a "Jimmy Grant,"<br>MICHAEL HARRINGTON, and<br>JEREMY REICHBERG,<br>  a/k/a "Jeremiah Reichberg,"<br>  a/k/a "Yermy Reichberg," | County of Offense:<br>New York |
|     Defendants. | |

- - - - - - - - - - - - - - -x,

SOUTHERN DISTRICT OF NEW YORK, ss.:

      BLAIRE TOLEMAN, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

## COUNT ONE

### (Conspiracy to Commit Honest Services Wire Fraud)

      1.    From in or about 2012, up to and including in or about 2015, in the Southern District of New York and elsewhere, JAMES GRANT, a/k/a "Jimmy Grant," MICHAEL HARRINGTON, and JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1343 and 1346.

2.    It was a part and an object of the conspiracy that
JAMES GRANT, a/k/a "Jimmy Grant," MICHAEL HARRINGTON, and JEREMY
REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg,"
the defendants, and others known and unknown, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and to deprive the New York City Police
Department ("NYPD") and the people of the City of New York of
their intangible right to the honest services of HARRINGTON and
GRANT, who were high-ranking NYPD officials, would and did
transmit and cause to be transmitted by means of wire
communication in interstate and foreign commerce, writings, signs,
signals, pictures, and sounds for the purpose of executing such
scheme and artifice, in violation of Title 18, United States Code,
Sections 1343 and 1346, to wit, REICHBERG and a co-conspirator not
named herein provided personal and financial benefits, including
through the use of interstate wires, worth tens of thousands of
dollars to GRANT and HARRINGTON in exchange for official action
taken by GRANT, HARRINGTON, and other members of the NYPD at GRANT
and HARRINGTON's direction.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and the foregoing charge are,
in part, as follows:

3.    I have been a Special Agent with the FBI for
approximately 4 years. I am currently assigned to a public
corruption squad in the FBI's New York Field Office. As a Special
Agent, I have participated in investigations involving the bribing
of public officials, law enforcement officers, and others.

4.    Since at least in or about 2014, I have been
involved in an investigation being conducted jointly by the FBI
and the Internal Affairs Bureau ("IAB") of the NYPD into, among
other things, allegations of misconduct by high-ranking NYPD
officials and other law enforcement and public officials.

5.    The information contained in this affidavit is
based upon my personal knowledge, as well as information obtained
during this investigation, directly or indirectly, from other
sources and agents. Because this affidavit is prepared for
limited purposes, I have not set forth each and every fact I have
learned in connection with this investigation. Where
conversations and events are referred to herein, they are related
in substance and in part.

2

## Relevant Entities and Individuals

6.   Based on my review of information provided by the NYPD, I am aware of the following:

a.   MICHAEL HARRINGTON, the defendant, has been a member of the NYPD since 1986.  Between October 2012 and May 2013, HARRINGTON was an Inspector assigned to Patrol Borough Brooklyn North.  Between May 2013 and November 2014, HARRINGTON was a Deputy Chief assigned as the Executive Officer in the Chief of Department's Office, and in that capacity was second-in-command in that office, which was located at NYPD headquarters at One Police Plaza in downtown Manhattan.  The Chief of Department's Office supervises all uniformed police officers at the NYPD and is responsible for all uniformed operations, having oversight over other bureaus such as community affairs, patrol, transportation, housing, transit, and detectives.  As Executive Officer, HARRINGTON's responsibilities, according to the NYPD's Patrol Guide, included assuming command and performance functions for the Chief of Department in his absence; supervising the performance of administrative functions; training, planning, and personnel; and adjudicating disciplinary issues.  Between November 2014 and April 2016, HARRINGTON was a Deputy Chief assigned to the NYPD's Housing Bureau, where he had oversight of, among other things, policing of the City's public housing units, including crime reduction and quality of life issues.

b.   JAMES GRANT, a/k/a "Jimmy Grant," the defendant, has been a member of the NYPD since 1996.  For most of his career until 2014, GRANT was assigned to various posts in Brooklyn, New York, including, from December 2011 through June 2014, as a Captain and the Commanding Officer of the 72nd Precinct.  From June 2014 through April 2015, GRANT was a Deputy Inspector and the Commanding Officer of the 19th Precinct on the Upper East Side of Manhattan.  In that position, GRANT was the highest ranking NYPD official in the 19th Precinct and supervised approximately 240 NYPD officers.

c.   JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendant, resides in Borough Park, Brooklyn, and has described himself in meetings with the NYPD and others, as set forth below, as a "community liaison" to the NYPD.

7.   CW-1 is a businessman in the real estate industry who is a cooperating witness for the Government.  CW-1 has pleaded guilty to conspiring to commit honest services fraud in connection

with, among other conduct, the honest services wire fraud scheme described herein, and is providing information to the Government in the hope of obtaining leniency when he is sentenced. Information provided by CW-1 has been reliable and corroborated by independent evidence.   Based on discussions with CW-1, I am aware that JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg, the defendant, introduced CW-1 to high-ranking officials at the NYPD, including GRANT and HARRINGTON.

### Overview

8.   Based on the various sources described herein, I have learned the following:

a.   Over the course of several years, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendant, cultivated close relationships with numerous members of the NYPD, including JAMES GRANT, a/k/a "Jimmy Grant," and MICHAEL HARRINGTON, the defendants, by providing them with substantial bribes in the form of personal and financial benefits, including paying for uniforms, jewelry, business cards, expensive meals, and other luxury items.   In exchange, REICHBERG has repeatedly called upon his connections in the NYPD for official action, as opportunities arise, both for himself and for members of his community, particularly in Borough Park, Brooklyn. REICHBERG's bribery of high-ranking members of the NYPD enabled him not only to obtain such official benefits on an as-needed basis, but also gave him considerable influence over internal NYPD affairs, including personnel decisions such as the promotion of certain favored NYPD officers.

b.   In or around 2011-2012, REICHBERG began spending significant time with CW-1, and introduced CW-1 to his connections inside the NYPD, including GRANT and HARRINGTON. Following these introductions, CW-1 began spending time with GRANT, HARRINGTON, and other NYPD officials and, along with REICHBERG, CW-1 spent large sums of money paying for personal and financial benefits for GRANT, HARRINGTON, and others, including paying for flights, hotel rooms, prostitutes, expensive meals, home improvements, and prime seats to sporting events, among other things.   From in or about 2012 up through and including in or about 2015, CW-1 and REICHBERG paid a total of well more than $100,000 for the benefit of GRANT, HARRINGTON, and other NYPD officers.

4

c.   In exchange for these benefits, REICHBERG and CW-1 were effectively able to have GRANT and HARRINGTON on call — ready and willing to use their official authority within the NYPD to provide assistance to REICHBERG and CW-1 on an as-needed basis. Among the official actions that GRANT and/or HARRINGTON took at the request of CW-1 and/or REICHBERG were police escorts for them and their friends, assistance with private disputes and investigations, police resources for security at religious sites and events, the ability to get out of tickets or other infractions, and special access to parades and other cultural events, among other official favors.

## REICHBERG and CW-1's Relationships with HARRINGTON, GRANT, and Other High-Ranking Members of the NYPD

9.   I have reviewed numerous e-mails and attachments from CW-1's e-mail account and the e-mail account of JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendant, obtained pursuant to search warrants on those accounts authorized by United States Magistrate Judges.   In addition, I have reviewed recorded phone calls between CW-1 and others, and between REICHBERG and others, during the time period of in or about January 2015 through on or about May 12, 2015, obtained pursuant to judicially-authorized wiretaps on their phones.   I also have participated in extensive debriefings of CW-1, and have reviewed reports of other agents' debriefings of CW-1. Based on these discussions and my review of these materials, information obtained from the NYPD, and my discussions with other witnesses, I have learned the following:

a.   CW-1 first met JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," in 2009 or 2010. At the time, a company for which CW-1 worked made a donation to an NYPD football team.   CW-1 met REICHBERG and other NYPD officials at a dinner for the team.   REICHBERG provided CW-1 with a business card stating that he was an "NYPD Liaison," and told CW-1 that he could help with traffic and moving violations, other police-related issues, and was, in sum and substance, a "fix it guy."

b.   CW-1 began spending more time with REICHBERG starting in or about 2012, including doing certain business with REICHBERG in the construction and real estate industries. REICHBERG used space at CW-1's office for a time around this time period.

c.    Through REICHBERG, CW-1 met and spent time
with numerous high-ranking officials from the NYPD.   REICHBERG
informed CW-1 that he (REICHBERG) used his connections in the NYPD
to help him, among other things, handle personal disputes for
himself and his associates.   For example, CW-1 has informed me
that REICHBERG's connections in the NYPD sent officers to the
vicinity of a jewelry business run by associates of REICHBERG to
disperse individuals handing out advertisements for a rival
business; that REICHBERG's connections in the NYPD sent officers
to disperse protesters in front of another of his associates'
businesses.   In addition, CW-1 has informed me that REICHBERG,
using his connections in local law enforcement agencies, was able
to arrange for the closure of a lane in the Lincoln Tunnel and a
police escort down that lane for a businessman visiting the United
States.

d.    Among the high-ranking NYPD officials to whom
REICHBERG introduced CW-1 were JAMES GRANT, a/k/a "Jimmy Grant,"
and MICHAEL HARRINGTON, the defendants.   At the time, GRANT was
the Commanding Officer of the 72nd Precinct in Brooklyn, and
HARRINGTON was an Inspector assigned to Patrol Borough Brooklyn
North.

e.    Beginning in or about the 2012-2013 time
period, CW-1, working with REICHBERG, began providing GRANT,
HARRINGTON, and other high-ranking officials with numerous
valuable items, including free meals and travel, with the
understanding that these officials, including GRANT and
HARRINGTON, would be able to perform police-related favors for
them.   CW-1 understood REICHBERG and other of his wealthy
associates to have previously been engaged in this same conduct
with members of the NYPD, and CW-1 was able to join in the scheme
by himself paying for numerous benefits for GRANT and HARRINGTON.[1]

---

[1] GRANT and HARRINGTON accepted these personal and financial
benefits and the others set forth below even though doing so
constituted clear violations of NYPD rules.   In particular, I have
reviewed portions of the NYPD's "Patrol Guide," which sets forth
rules and regulations governing the conduct of NYPD Personnel.
The section of the Patrol Guide titled "Guidelines for Acceptance
of Gifts and Other Compensation By Members of the Service"
provides, in part, as follows: "It is the policy of the Department
that members of the service may not accept any reward, gratuity,
gift or other compensation for any service performed as a result
of or in conjunction with their duties as public servants. . . .
This policy applies regardless of whether the service was

f.    As REICHBERG and CW-1 provided personal and
financial benefits to GRANT and HARRINGTON, they in turn assisted
REICHBERG and CW-1 with official actions over time, such as police
escorts for them and their associates; sending officers and using
police resources to assist in civil disputes and other matters;
sending patrol cars to religious sites upon request; VIP access to
parades and other New York City events; as to GRANT, assisting
with their applications for gun licenses from the NYPD; among
other things, all as set forth in more detail below.

g.    As noted above, in or about June 2013,
HARRINGTON was promoted to be the Executive Officer at the Chief
of Department's Office, where he worked for the Chief of
Department ("Chief-1").

h.    Through HARRINGTON, REICHBERG and CW-1 also
began spending time with Chief-1.   CW-1 understood that with the
connection that he and REICHBERG had, through HARRINGTON, to the
Chief of Department's Office, CW-1 and REICHBERG would have ready
access to the highest levels at the NYPD, and would have a "one
stop shop" for assistance rather than having to reach out to
numerous individual members of the NYPD.

i.    During the time period that HARRINGTON was
Executive Officer at the Chief of Department's Office, REICHBERG
and CW-1 went to lunches and dinners on a regular basis with
Chief-1 and HARRINGTON, including at expensive restaurants.   CW-1
paid the entire bill at these lunches and dinners and was not
reimbursed.   During this time, HARRINGTON continued to assist
REICHBERG and CW-1 with official actions.   Also during this time,
as they expected, REICHBERG and CW-1 began making fewer requests
of officials aside from HARRINGTON and GRANT, given their position
senior to all other officials with whom REICHBERG and CW-1 dealt.

---

performed while said members of the Department were on or off
duty.   Members of the service also shall not solicit any gift,
gratuity, loan, present, fee or reward for personal gain. . . .
Members of the service may be offered gifts, awards, and other
things of value by private citizens, institutions, etc., in
appreciation for their police service.   It is not unethical or
illegal for a member of the service to accept gifts that are
commonly offered as tokens of appreciation, i.e., plaques, pen and
pencil sets, etc.   However, cash rewards and personal gifts, such
as wristwatches, etc., are strictly forbidden."

.7

j. Due to their relationship with GRANT, including the acts performed by GRANT on their behalf, in or about late 2013 or early 2014, REICHBERG and CW-1 recommended to Chief-1 that Chief-1 name GRANT to be the Commanding Officer of the 19th Precinct, a position that was opening up and which, as noted above, involved the supervision of the approximately 240 officers in the 19th Precinct. Chief-1 ultimately appointed GRANT to that position, where he began in June 2014. Chief-1 put REICHBERG and CW-1 on the phone with GRANT in order for REICHBERG and CW-1 to be able to tell GRANT that he was being promoted.

k. In approximately March 2015, CW-1 was approached by law enforcement and questioned as to, among other matters, money that Chief-1 had provided to CW-1 to invest. After this approach by law enforcement, CW-1 decided to limit significantly his contact with Chief-1, GRANT, HARRINGTON, and other members of the NYPD.

## Personal and Financial Benefits Provided to GRANT and Official Actions Taken By GRANT

10. Based on my review of the e-mails discussed above; wiretapped phone calls discussed above; documents and information provided by vendors as detailed below; and discussions with CW-1 and review of reports of other agents' debriefings of CW-1, I have learned the following with respect to JAMES GRANT, a/k/a "Jimmy Grant," the defendant:

*Las Vegas Trip (2013)*

a. In or about January 2013, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," and CW-1 offered to take GRANT to Las Vegas for Super Bowl Weekend. GRANT, as well as a Detective who was friends with GRANT ("Detective-1"), accepted the offer.

b. CW-1 paid for a private jet to take REICHBERG, GRANT, Detective-1, CW-1 and two other individuals to and from Las Vegas.

c. I have reviewed documentation provided by the private jet company that arranged this trip to Las Vegas, and learned that the aircraft departed on February 2, 2013 and returned on February 4, 2013, and that CW-1 was invoiced approximately $59,000 for the round trip. REICHBERG and CW-1 also arranged for a prostitute ("Prostitute-1") to come on the private

jet and spend the weekend with the group in Las Vegas.  While in Las Vegas, the prostitute stayed in GRANT's room.  I have spoken to law enforcement agents who have debriefed Prostitute-1, who confirmed, among other things, that Prostitute-1 was engaged to accompany the persons on the trip and that GRANT and others took advantage of her services during the trip.

        d.   I have also reviewed the flight invoice from the private jet company which shows that the passengers for the departing and returning trips were in fact CW-1, REICHBERG, GRANT, Detective-1, one male individual I know to be CW-1's associate, and Prostitute-1.

        e.   CW-1 obtained complimentary rooms for GRANT and Detective-1 at a hotel in Las Vegas, and paid for their meals.

        f.   CW-1 was not reimbursed for any of the expenses in connection with the Las Vegas trip.

*Rome Trip (2013)*

        g.   In August 2013, GRANT took a vacation to Rome with his family and others.  In advance of the trip, CW-1 told GRANT that he should stay at a particular hotel that was CW-1's favorite hotel in Rome, and offered to pay for the room.  GRANT accepted the offer, and CW-1 paid for a two-night stay in two rooms at the hotel during GRANT's trip.

        h.   I have seen an e-mail confirmation for the stay sent to CW-1, which CW-1 forwarded to GRANT, cc'ing REICHBERG and writing "Most luxurious hotel in Rome."  I also have seen an invoice for the hotel stay provided by the travel agency that CW-1 used to book the hotel stay (the "Travel Agency"), in the amount of $1,066.  The invoice is addressed to "GRANT JAMES," with CW-1's e-mail address, and CW-1's credit card.

        i.   GRANT did not reimburse CW-1 for the hotel room in Rome.

*Other Financial Benefits*

        j.   In or about 2013, REICHBERG and CW-1 also offered to pay for work on GRANT's house, and specifically to replace railings outside of GRANT's house.  GRANT accepted the offer, and REICHBERG found the contractor to do the work. REICHBERG and CW-1 paid for the work, which CW-1 estimates cost

approximately $6,000.  To CW-1's knowledge, GRANT did not reimburse him or REICHBERG.

k.  In or about 2013, CW-1 offered to pay to upgrade GRANT's watch to a more expensive brand.  GRANT accepted CW-1's offer.  GRANT's new watch, paid for by CW-1 along with an old watch turned in by GRANT, cost approximately $3,000.

l.  On Christmas day in 2013, REICHBERG and CW-1 drove to GRANT's home in Staten Island, New York wearing Christmas elf hats and gave GRANT a video game system for his children and a piece of jewelry for his wife, worth approximately $1,000.  As set forth below, I have reviewed a recorded call in which GRANT complained that his two "elves" did not come for Christmas the following year, 2014.

m.  In or about 2014, REICHBERG also arranged to have windows at GRANT's house replaced, at no cost to GRANT. Another agent has spoken with the contractor who performed the window work, who told that other agent that the work was arranged by and paid for by REICHBERG, and cost approximately $6,000.

*Official Acts Provided by GRANT*

n.  As noted above, CW-1 understood and expected that GRANT would perform official acts for REICHBERG and CW-1 due to their having bestowed personal and financial benefits worth tens of thousands of dollars on GRANT.  During the time period that CW-1 was providing such benefits, GRANT in fact performed numerous official acts for REICHBERG and CW-1.

o.  For example, from in or about 2012 through in or about 2014, GRANT regularly provided REICHBERG and CW-1 with police escorts.  On many occasions, GRANT himself drove CW-1 to locations, such as to and from the airport, using the lights and sirens of a police car.  On other occasions, GRANT dispatched junior officers to provide police escorts for CW-1.

p.  On one occasion, GRANT sent officers to a building in which CW-1 had an ownership interest to investigate a trespasser.  On another occasion, GRANT sent officers to a building in which CW-1 had an ownership interest to investigate a theft.

q.  On or about September 12, 2013, CW-1 received an e-mail from a business associate who indicated that a colleague

had left his watch in a livery cab in Manhattan and was trying to
track down the cab, and who wrote "This may be something for your
boy Jeremy [REICHBERG]." CW-1 responded, cc'ing REICHBERG, "Yes
Jeremy will have NYPD review cameras at that time and location but
will cost Jeremy 10k.  Should I proceed." The business associate
wrote back that it did not make "economic sense" because the watch
was worth approximately $50,000 and the NYPD camera review might
not be successful.  The business associate later wrote back that
the CEO of the company had authorized a $5,000 payment.  CW-1
responded, cc'ing REICHBERG, that "there are two guys [REICHBERG]
needs to take care of to watch the footage.  He said 10k is the
price." Based on my discussions with CW-1, I learned that
REICHBERG had told CW-1 that REICHBERG had raised this issue with
GRANT, and GRANT had agreed to facilitate the review of street
cameras, and REICHBERG indicated that REICHBERG would need money
to take care of the officers who would help.  Ultimately, the
company did not proceed with CW-1 and REICHBERG's offer.

      r.   GRANT also escorted CW-1 and his friends
beyond police barricades to prime locations at events such as
parades, the New York City marathon, and the New Year's Eve
celebration at Times Square, and provided them with "VIP
treatment" that allowed them to go to special access areas not
accessible to the general public.

      s.   From approximately 2012 through 2014,
annually, GRANT provided CW-1 with NYPD cards for him and
approximately 15 of his friends, bearing GRANT's name on one side,
and the name of CW-1 or his friend on the other, which cards
indicated, in substance, that a police officer should provide
courtesies to the bearer of the card.  CW-1 himself used his card
on at least a couple of occasions when being pulled over while
driving.

      t.   In 2015, when a family member was hospitalized
at a hospital in the confines of GRANT's precinct, GRANT, at CW-
1's request, went to the hospital to introduce himself to hospital
staff as Commanding Officer of the precinct and to make sure that
CW-1's relative was attended to properly.

      u.   GRANT helped REICHBERG and CW-1 in their
efforts to obtain gun licenses from the NYPD.  REICHBERG told CW-1
that GRANT was friendly with personnel in the Licensing Division
of the NYPD, and asked CW-1 if he wanted a gun license.  CW-1
responded that he did.  REICHBERG and CW-1 then went to the

Licensing Division, filled out paperwork, and met GRANT's connections.

   v. I have spoken to agents who debriefed an officer in the Licensing Division who reviewed REICHBERG and CW-1's application ("Officer-1"). Officer-1 has pleaded guilty to bribery-related charges, in connection with the receipt of financial benefits to help expedite gun license applications submitted by, among others, Alex Lichtenstein, a/k/a "Shaya," an expediter, on behalf of Lichtenstein's clients. Lichtenstein has been charged with bribery-related offenses in a case pending in this district. Officer-1 is aware that GRANT is friendly with Lichtenstein, and has been informed by a Sergeant in the Licensing Division ("Sergeant-1") that Lichtenstein paid for work on GRANT's house. Based on my debriefings of Officer-1, I have learned the following:

   i. At a certain point in 2014, Officer-1 was informed by Sergeant-1 that GRANT was sending REICHBERG down to get a gun license, and that Officer-1 should expedite the approval of REICHBERG's license.

   ii. Subsequently, REICHBERG showed up to the Licensing Division with CW-1, but CW-1 did not have any paperwork with him, so Officer-1 only processed REICHBERG's application for a full carry license, i.e., a license to carry a concealed firearm anywhere in the state of New York. REICHBERG asked to receive his license within one day, and Officer-1 said that it would take longer, to which REICHBERG responded by boasting of his connection to Chief-1 and that he was responsible for getting GRANT his position as the Commanding Officer of the 19th Precinct.

   iii. REICHBERG then met with the Commanding Officer of the Licensing Division, after which Officer-1 was told to "close out" and approve "Jimmy GRANT's guy."

   iv. Based on my discussions with personnel at the Licensing Division, I am informed that the approval process for a full carry license typically takes at least six months and, in many instances, in excess of a year. Based on my review of information from the Licensing Division, I know that REICHBERG and CW-1 applied for their gun licenses on or about August 21, 2014, and REICHBERG was approved for a full carry license on or about October 29, 2014. CW-1 did not obtain his license, and his application was rejected in March 2016 because CW-1 had never followed up with necessary paperwork.

w.   On or about January 13, 2015, at approximately 10:13 in the morning, REICHBERG placed a call to GRANT, which was captured on the judicially-authorized wiretap over REICHBERG's phone.  During the call, as set forth below, REICHBERG and GRANT appeared to discuss manufacturing a fake employment letter that would enable CW-1 to obtain a full-carry gun license.  Specifically, GRANT told REICHBERG: "On that letter, it has to state that [CW-1 is] part owner, and it shows that he's part owner in that business, or the owner of the company has to give a letter, that's notarized, saying that [CW-1] is his right hand guy, does carry diamonds."  GRANT then said: "I gave you [Officer-1's] number, [Officer-1] called you, just fuckin tell him, whatever way you want to go they're gonna do it, but they have to put something in the folder."  GRANT said that Sergeant-1 told him that everything was on GRANT now, that "now they're ready to do it," but that REICHBERG was "holding the ship up."  GRANT then said to "have the owner, whether it's you or whoever it is, write a notarized letter, saying that [CW-1] is employed . . . he does frequently carry large amounts of diamonds worth, you know, upwards of a million dollars, at all times, all days, and that you're authorizing him to be able to carry . . . a firearm. . . . That's it, get that letter, get it to me, and I'll have it dropped off."

x.   Based on my training, experience, and participation in the investigation, and the fact that CW-1 is not employed in the diamond industry, I believe that during this call, GRANT was coaching REICHBERG on what needed to be put in a letter regarding CW-1's nonexistent work transporting diamonds, and told REICHBERG that his connections at the Licensing Division would approve CW-1's application once the letter was received.

y.   On or about January 16, 2015, at approximately 9:36 a.m., GRANT called REICHBERG.  During the call, as set forth below, GRANT complained to REICHBERG about not receiving certain favors, and appeared to explicitly connect his receipt of favors from REICHBERG with official actions he had taken at REICHBERG's request.  Specifically, GRANT told REICHBERG on the call: "See you don't love me anymore bro."  GRANT said that he heard REICHBERG had invited another high-ranking official to the Super Bowl and "you don't even invite me to the Super Bowl, what the fuck."  REICHBERG said that he was still deciding whether to go, and "if we are you wanna come?"  GRANT responded "maybe, yeah."  REICHBERG accused GRANT of being too busy for REICHBERG, to which GRANT replied "No no no.  First of all, first of all, the two [] elves didn't come for fucking Christmas number one, I got your fuckin

13

Westchester county cards, the cards you asked me to make up, you fucking broke my balls about [CW-1's application]." Based on my training, experience, and participation in the investigation, I believe that during this call, GRANT was complaining that REICHBERG and CW-1 did not invite him to come to Las Vegas for the Super Bowl and did not bring him Christmas gifts, even though GRANT had printed police liaison cards for REICHBERG and was helping REICHBERG and CW-1 with the gun license process.

z.   Approximately two months later, on or about March 6, 2015, at approximately 4:37 p.m., REICHBERG called GRANT. During the call, as set forth below, GRANT complained that CW-1 was not treating him well despite everything GRANT had done for CW-1. Specifically, GRANT said that he had been reaching out to CW-1 and that "I can sense the ice . . . that's not right though." REICHBERG said "he never did anything for you, just relax, and you always did for him." GRANT responded: "I know he never did anything for me" and "I was good to him, because of you. Whatever I did for him was because of you." Based on my training, experience, and participation in the investigation, I believe that during this call, GRANT acknowledged that he had performed official favors for CW-1 but denied receiving "anything" from CW-1.

aa.   On or about March 20, 2015, beginning at approximately 1:22 p.m., REICHBERG engaged in a series of phone calls that, as set forth below, appear to involve an effort by REICHBERG to use his connection to GRANT to fix or avoid a ticket for an associate of REICHBERG's. Specifically, REICHBERG received a call from an unknown male ("the UM"), which was captured over the judicially-authorized wiretap on REICHBERG's phone. During the call, the UM told REICHBERG he had been pulled over by the police in the 66th precinct. The UM said that he gave the officers "JIMMY GRANT's card," to which REICHBERG responded "That's fine, you'll be fine." REICHBERG asked the UM for the license plate number of the police car, which the UM provided. The UM said that the officers had taken his information and were back in their police car. After REICHBERG hung up the phone, he called an individual I believe to be a Deputy Inspector based, at the time, in Brooklyn ("DI-1"). REICHBERG told DI-1 that the police car bearing the license plate number provided by the UM "pulled somebody over, he gave them Jimmy's card." DI-1 responded, "yeah, I just got a call, he's driving like a fucking lunatic" into traffic and blowing red lights. REICHBERG told DI-1 that the UM had an emergency and that he was REICHBERG's friend. DI-1 responded: "All right, so you gave him Jimmy's card?" to

14

which REICHBERG responded in the affirmative.  DI-1 then said:
"All right I'll tell them he knows him," before hanging up.

bb.  Based on my training, experience, and
participation in the investigation, I believe that in this series
of calls, the UM, who is from REICHBERG's community and to whom
REICHBERG had given GRANT's card, told REICHBERG he had been
pulled over and had given the card to the officers.  REICHBERG
then called DI-1, who was aware of the incident.  The contact
agreed to have the UM let go – even though he was "driving like a
fucking maniac" – after confirming with REICHBERG that the UM was
a friend of REICHBERG's and that it was REICHBERG who had supplied
the UM with GRANT's card.

### Personal and Financial Benefits Provided to HARRINGTON and Official Actions Taken By HARRINGTON

11.  Based on my review of e-mails sent to and from CW-
1's e-mail account and the e-mail account of JEREMY REICHBERG,
a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the
defendant; recorded phone calls over the judicially-authorized
wiretaps discussed above; review of other materials as discussed
below; and discussions with CW-1, I have learned the following
with respect to MICHAEL HARRINGTON, the defendant:

a.  During the time period that HARRINGTON was the
Executive Officer for Chief-1, from May 2013 through November
2014, CW-1 took HARRINGTON and Chief-1 to dinner at least once or
twice a week, typically at expensive restaurants in Manhattan.
CW-1 paid for these dinners, without being reimbursed, and the
bill typically ran between $400 and $500.

b.  On or about January 14, 2015, another agent
conducted surveillance from within a restaurant on the Upper West
Side of Manhattan (the "Restaurant"), where CW-1, REICHBERG,
Chief-1 (who had by then resigned), and HARRINGTON were sitting at
a table.  The other agent sat at a table near them, and using FBI
equipment, recorded the conversation.  Based on my discussion with
the agent and review of the recording, I know that
during part of the conversation, REICHBERG and HARRINGTON
discussed a security company run by HARRINGTON's family, which is
referenced in more detail below.  During the time at the
Restaurant, only HARRINGTON ate dinner.  When the bill came to CW-
1, CW-1 looked at it and commented to the table, "This is the
cheapest bill we've ever had."

15

c.   During this same time period, CW-1 and REICHBERG provided HARRINGTON with tickets to numerous sporting events, sometimes to go with CW-1 and REICHBERG and sometimes without them.  For example, in an e-mail dated January 10, 2014, CW-1 sent HARRINGTON two Brooklyn Nets basketball tickets, with a face value of $400 each.  In an e-mail dated May 24, 2014, CW-1 sent HARRINGTON two New York Rangers hockey tickets, with a face value of $700 each.

d.   On or about April 7, 2013, another individual sent an e-mail to REICHBERG attaching an image of a business card for HARRINGTON.  Based on my training, experience, and participation in the investigation, I believe that REICHBERG was arranging to have business cards prepared for HARRINGTON.

e.   On Christmas day in 2013, on the same trip that REICHBERG and CW-1 wore elf hats and provided a video game system and jewelry to the family of JAMES GRANT, a/k/a "Jimmy Grant," the defendant, REICHBERG and CW-1 drove to HARRINGTON's home and gave HARRINGTON a video game system for his children.

*Chicago Trip (2014)*

f.   In 2014, HARRINGTON took a trip to Chicago with his family members.  CW-1 offered to pay for the family's hotel rooms in Chicago, which HARRINGTON accepted, and REICHBERG helped coordinate the travel arrangements.  I have seen an e-mail from May 14, 2014 from REICHBERG to CW-1 in which REICHBERG asked CW-1 to "please confirm the hotel room in Downtown Chicago" for an individual I know to be HARRINGTON's brother, and then specified that three rooms would be needed for four nights, and one room would be needed for two nights.  I also have seen an e-mail from later the same day from a hotel in Chicago to CW-1 confirming the four rooms that CW-1 had booked.  CW-1 forwarded that e-mail to HARRINGTON, using HARRINGTON's private e-mail address.  I also have seen an invoice from the Travel Agency to CW-1 for the hotel rooms, in the amount of approximately $6,500.

g.   I have spoken to other agents who participated in an interview of HARRINGTON at the United States Attorney's Office for the Southern District of New York in March 2016, and reviewed notes of that interview, which occurred at a time when it was not publicly known that CW-1 was cooperating with the Government.  During the interview, HARRINGTON made false representations about the 2014 Chicago trip, including by claiming that he had reimbursed CW-1 in cash after the trip was over.

16

According to CW-1, CW-1 never sought or received any reimbursement from HARRINGTON.

*Payments to HARRINGTON's Family's Security Company*

        h.   In addition to the benefits discussed above, REICHBERG obtained business, amounting to tens of thousands of dollars, for a private security company run in part by HARRINGTON's family and which HARRINGTON unofficially helped manage (the "Security Company"). Specifically, REICHBERG obtained work for the Security Company at a school in Manhattan affiliated with CW-1, and the Security Company was paid approximately $5,000 per month for that work.

        i.   The Security Company began working at the school in late 2014 or early 2015, and did so for a period of at least 15 months until the spring of 2016. At first, CW-1 paid the Security Company for the work, and after a few months the school began paying the Security Company directly. REICHBERG did not tell CW-1 that the Security Company was affiliated with HARRINGTON's family. Rather, CW-1 was provided with a particular contact, who was not a member of HARRINGTON's family, to be the point person for security (the "Security Guard").

        j.   I have listened to calls intercepted pursuant to the judicially-authorized wiretap on REICHBERG's phone, discussed above, in which REICHBERG and HARRINGTON discuss money owed by CW-1 and the school to HARRINGTON's family's Security Company.

        k.   For example, on or about January 20, 2015, at approximately 7:24 p.m., REICHBERG called HARRINGTON. During the call, REICHBERG said: "I spoke to [the Security Guard], I gave him a rundown," and further said that he "spoke to [CW-1], on Thursday we'll have the balance, $5,000." Based on my training, experience, and participation in the investigation, I believe that during this call, REICHBERG and HARRINGTON were discussing the school security job for the Security Company and an expected partial payment from CW-1 of $5,000 for the job.

        l.   As another example, on or about January 31, 2015, at approximately 8:40 p.m., REICHBERG called HARRINGTON. During the call, HARRINGTON stated that "[the Security Guard] has to work this final deal out with [CW-1] . . . are they going to continue this way, are they gonna do it to the end of the year? I got the impression [CW-1] wanted to punt it to the school to

handle . . . at some point I want [the Security Guard] to meet up with [CW-1] to finalize it, and my brother [] too." HARRINGTON also said that "ultimately, I figure [CW-1's] gonna figure this math out, that I'm involved. . . . I'm not involved, on paper everything is nothing to do with me." Based on my training, experience, and participation in this investigation, I believe that during this call, HARRINGTON was discussing with REICHBERG whether CW-1 would continue to make payments to his family's Security Company. HARRINGTON also confirmed that he was involved with the Security Company, and that CW-1 was not aware of HARRINGTON's involvement.

## Official Acts Provided by HARRINGTON

m.    As with JAMES GRANT, a/k/a "Jimmy Grant," the defendant, CW-1 understood and expected that HARRINGTON would perform official acts for REICHBERG and CW-1 due to their having bestowed financial and other benefits on HARRINGTON. During the time period that CW-1 was providing the above referenced benefits to HARRINGTON, HARRINGTON in fact performed numerous official acts for REICHBERG and CW-1.

n.    For example, in or about 2014, a jewelry business affiliated with REICHBERG was having a dispute with a neighboring jewelry business in the same building. The neighboring company hired a security guard who was an off-duty NYPD officer to stand near the business of REICHBERG's affiliate's company. HARRINGTON, at REICHBERG's request, investigated the off-duty officer and took steps to have him disciplined within the NYPD.

o.    Further, on at least one occasion, HARRINGTON agreed to facilitate an arrest for REICHBERG, by using the Security Company to surveil a suspected criminal and the NYPD to arrest him when he was found. Specifically, on or about January 23, 2015, at approximately 1:21 p.m., REICHBERG called HARRINGTON. The call was intercepted pursuant to the judicially-authorized wiretap on REICHBERG's phone. During the call, REICHBERG said: "All right I spoke to the guy, he wants from 12 to 7 every night starting Sunday. . . . [the Security Guard] should give him a call and basically get the details." HARRINGTON responded: "[the Security Guard] should probably see the video." REICHBERG responded: "right, so [the Security Guard] should tell him that. Listen, I want to come by, I want to see the video . . . this is what we gotta do, we're gotta lock him up, we catch him." HARRINGTON responded: "He's looking to lock him up, right?"

REICHBERG answered: "Absolutely."   REICHBERG and HARRINGTON also
discussed that the money would need to be provided up front.

        p.   Based on my training, experience,
participation in the investigation, and my review of other
intercepted calls, I believe that during this call, REICHBERG and
HARRINGTON were arranging for HARRINGTON's Security Company to be
paid to surveil a particular location and catch an individual
vandalizing the location.   If the Security Company found the
vandal, HARRINGTON would then arrange for the NYPD to make an
arrest.   The person who would pay HARRINGTON's family's company
had a video of the perpetrator previously vandalizing the
location.

        q.   HARRINGTON also has been involved in
dispatching NYPD personnel to assist REICHBERG directly.   For
example, on or about February 20, 2015, at approximately 12:29
p.m., REICHBERG called HARRINGTON, who said that he was in a
meeting and asked to call REICHBERG back.   REICHBERG next called
the Commanding Officer of a midtown precinct (the "CO"), and told
the CO: "I need your help, very important. . . . We gave out a
stone to some company in my building . . . it's a $250,000
diamond, he's been playing around games the last few days about
giving it back, he's not buying it, he's giving it back . . . so
we told him yesterday we want him back."   REICHBERG said: "I'm
afraid we're gonna get hit on it, and before, if we can send
somebody over, we need the stone back."   REICHBERG asked: "is
there any way, before he scams us . . . if we can send somebody
over?"   The CO said: "OK, I'll have [a Sergeant] come over."
REICHBERG responded: "I really, really appreciate it, you're
always to the rescue."   At approximately 12:33 pm, HARRINGTON
called REICHBERG back.   REICHBERG said, "I called [the CO], [the
CO's] gonna handle it."   REICHBERG then discussed the problem with
the "$250,000 diamond" with HARRINGTON.   At approximately 2:35
p.m., REICHBERG again spoke to HARRINGTON, and told HARRINGTON
that the CO helped get the diamond back.

        r.   I have debriefed the CO, who recalled that on
multiple occasions he dispatched NYPD personnel to settle diamond-
related disputes for REICHBERG; that he sometimes did so as
requested by HARRINGTON; and that, on other occasions, he did so
in part because of REICHBERG's relationship with Chief-1 and
HARRINGTON and with the expectation that if the CO declined to do
so, REICHBERG would complain to Chief-1 or HARRINGTON.

s.   HARRINGTON also sent NYPD cars to religious sites as requested by REICHBERG and CW-1. For example, in an e-mail dated January 15, 2015, an individual wrote to CW-1: "Given the events in paris the shul asked me if I can try and get a patrol car for the next few weeks to sit outside the shul Shabbos morning from 9-1." CW-1 responded, cc'ing HARRINGTON: "I will make sure the HOW house of worship car has your shul in its route what's the address."

t.   On or about March 5, 2015, at approximately 10:18 a.m., REICHBERG called HARRINGTON. During the call, REICHBERG said that he needed police at "42nd and 5th" because the rabbi over there "called me with a panic" and was "nervous" because "there's a lot of people over there . . . he has people from Paris." HARRINGTON responded: "they can't be nervous all the time . . . this is all the time." REICHBERG said, "I know, but," and HARRINGTON interrupted him and said: "All right, all right." At approximately 11:10 a.m., HARRINGTON called REICHBERG and said: "I spoke to [another NYPD official], gonna try and get somebody over there now, he'll definitely have somebody on the 4 to 12, and the day tour 4 to 12 tomorrow for Shabbos."

u.   In an e-mail dated October 2, 2015, REICHBERG asked HARRINGTON to "please see to have coverage" at a religious site in Midtown for a four-day period.

v.   HARRINGTON also has arranged for police escorts for REICHBERG, CW-1 and others. As an example, on or about September 21, 2014, CW-1 sent an e-mail to another individual and wrote: "Head of local precinct will call you in 3 min and get you to your car and out if you don't hear from him in next 5 min email me." Two minutes later, the individual wrote back: "Who was just on the phone," to which CW-1 responded "Chief Harrington." Based on my training, experience, and participation in the investigation, I believe that during this exchange, HARRINGTON facilitated assistance for an associate of CW-1 to access his car in an area that had been blocked off by police.

w.   HARRINGTON also has assisted REICHBERG, CW-1, and their associates with VIP access to New York City events, such as parades.

### REICHBERG's Efforts to Continue His Influence Over the Police Department, Particularly in Brooklyn

12.  As noted above, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendant, along with CW-1, were involved in the promotion of JAMES GRANT, a/k/a "Jimmy Grant," the defendant, to become Commanding Officer of the 19th Precinct in Manhattan.

13.  I have reviewed numerous other calls over the wiretap on the cellphone belonging to JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendant, during the January-to-May 2015 time period, in which NYPD personnel solicited REICHBERG's advice, information and assistance in obtaining promotions.  REICHBERG's efforts in early 2015 — at a time when Chief-1 had retired from the NYPD and MICHAEL HARRINGTON, the defendant, was transferred from the Chief of Department's Office, leaving REICHBERG with minimal to no influence at the Chief of Department's Office — appeared to be focused on re-consolidating influence in Brooklyn.  For example, I have listed to the following calls, all captured pursuant to the judicially-authorized wiretap on REICHBERG's phone:

a.  On January 27, 2015, at approximately 4:18 p.m., REICHBERG called HARRINGTON.  During the call, REICHBERG and HARRINGTON discussed HARRINGTON's prospects for promotion to become the Commanding Officer of Brooklyn South, and who might be in a position to assist him.  REICHBERG told HARRINGTON: "you still have to get the Borough . . . we need you to get this Borough."  Based on my training, experience, and participation in the investigation, I believe that REICHBERG was attempting to facilitate the transfer and promotion of HARRINGTON to be one of the top NYPD officials in Brooklyn, REICHBERG's borough, in order to be able to make most use of HARRINGTON's assistance going forward.

b.  On January 30, 2015, at approximately 3:26 p.m. REICHBERG called an individual ("Individual-1") and told Individual-1, in substance, that REICHBERG wished to have MICHAEAL HARRINGTON, the defendant, become Commanding Officer of Brooklyn South.  Individual-1 said that he would raise the issue with another senior official at the NYPD.  REICHBERG responded: "That would be great.  If we could pull this through, that would be huge. . . I'm getting to work on this and hopefully we'll have, ah, a team in place very soon."  Ultimately, HARRINGTON did not become Commanding Officer of Brooklyn South.

c.    On February 27, 2015, at approximately 12:42 p.m., REICHBERG received a call from DI-1.  During the call, DI-1 asked REICHBERG, in substance, about DI-1's prospects for promotion.  DI-1 asked REICHBERG: "Am I viewed as a nobody?" REICHBERG responded: "no, a good guy.  They like you.  The last regime they liked you a lot more."  REICHBERG also told DI-1 he would benefit from his connection with another deputy inspector to whom REICHBERG was close and that DI-1 would be fine.  REICHBERG then proceeded to ask DI-1 for assistance with a situation at REICHBERG's house, as REICHBERG believed someone had tried to break into his house.  DI-1 agreed to send police officers to help.

d.    On March 6, 2015, at approximately 10:36 a.m., DI-1 called REICHBERG.  During the call, DI-1 told REICHBERG that DI-1 knew he was bothering REICHBERG, but that REICHBERG was "probably the only one that can help me."  DI-1 complained that it seemed like his transfer was "sideways" and that he was just being "dumped" into a position rather than headed in a "positive direction."  REICHBERG assured DI-1 that he had spoken to an unknown individual who had assured REICHBERG that the transfer was in a "positive direction."

WHEREFORE, the deponent prays that arrest warrants be issued for JAMES GRANT, a/k/a "Jimmy Grant," MICHAEL HARRINGTON, and JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," the defendants, and that they be imprisoned or bailed, as the case may be.


BLAIRE TOLEMAN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


Sworn to before me this
17th day of June, 2016

s/ Barbara Moses

THE HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

23

# **EXHIBIT C**

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>1252 56th Street, Brooklyn, New York 11219 | )<br>)<br>)<br>)<br>)<br>) |

Case No.   16M 595

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ New York _____
*(identify the person or describe the property to be searched and give its location)*:

1252 56th Street, Brooklyn, New York 11219 (See Attachment A)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attchment A

**YOU ARE COMMANDED** to execute this warrant on or before   July 4 2016 *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   Duty Magistrate Judge
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   6/20/16 12:15pm         Vera M. Scanlon
                                                    *Judge's signature*

City and state:    Brooklyn, New York         Hon. Vera M. Scanlon, USMJ
                                              *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**Attachment A: 1252 56th Street, Brooklyn, New York 11219**

### I.  Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers and electronic devices found therein:

**1252 56th Street, Brooklyn, New York 11219**

A three story brick home with a one-car garage at ground level and a front door on the right side (viewed facing the building) at the end of a flight of eight steps. There are multiple security cameras affixed to the front of the residence.

### II.  Items to Be Seized

#### A.  Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy) (the "Subject Offenses"):

Communications concerning payments made to or favors performed by NYPD law enforcement personnel, including the provision of gun licenses, escort services, deployment of NYPD units, and others; ledgers, or Westchester County Executive Office personnel, including chaplain or advisory board appointments; business records; notes; vouchers; invoices; bank, accounting or financial records; receipts; other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; gun license application materials for Jeremy Reichberg or his associates, communications with NYPD personnel, indicia of relationship between Jeremy Reichberg and James Grant and/or Michael Harrington and/or other NYPD personnel or Westchester County Executive Rob Astorino or other Westchester County law enforcement personnel, including correspondence, pictures, records of financial transactions and travel, any documents related to NYPD or other law enforcement chaplain or civilian positions, all correspondence .

#### B.  Search and Seizure of Electronically Stored Information

The items to be seized from the Subject Premises also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, fax machines, and scanners.  In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be seized from the Subject Premises also include:

1.     Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.     Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.     Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## C. Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections I.A and I.B of this Attachment. However, law enforcement personnel are authorized to conduct

a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------

In the Matter of the Application of the United
States Of America for a Search Warrant for the
Premises Known and Described as 1252 56th
Street, Brooklyn, NY, 11219; Any Closed
Containers/Items Contained Within the
Aforementioned Premises; and Any Electronic
Devices Therein

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of
Application for Search Warrant**

------------------------------------------

STATE OF NEW YORK
COUNTY OF KINGS                    : ss. :
EASTERN DISTRICT OF NEW YORK)

JOSEPH M. DOWNS, being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1.    I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately 11 years. I am assigned to a squad in the FBI's New York Field Office that focuses on public corruption matters. I have participated in numerous search warrants of residences and businesses.

2.    I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises specified below (the "Subject Premises") for the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned

during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### B. The Subject Premises

    3.    The Subject Premises are particularly described as follows:

        a.    1252 56th Street, Brooklyn, New York 11219 (the "56th Street Residence") is a three story brick home with a one-car garage at ground level and a front door on the right side (viewed facing the building) at the end of a flight of eight steps. There are multiple security cameras affixed to the front of the residence.

### C. The Subject Offenses

    4.    For the reasons detailed below, there is probable cause to believe that the Subject Premises contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy); and 1512 (obstruction of justice) among other statutes (the "Subject Offenses").

## II. Probable Cause

    5.    On or about June 17, 2016, the Honorable Vera M. Scanlon, United States Magistrate Judge, signed a warrant to search, among other things, the Subject Premises (the "Original Warrant"), which is the home of Target Subject JEREMY REICHBERG. A copy of the Original Warrant, and affidavit seeking the search warrant (the "Original Affidavit"), is annexed hereto as Exhibit A, and both the Original Affidavit and the Original Warrant are incorporated fully by reference herein. REICHBERG was arrested at the Subject Premises this morning pursuant to a complaint signed by the Honorable Barbara Moses, United States Magistrate Judge for the Southern District of New York. A copy of the complaint is annexed

hereto as Exhibit B and is incorporated fully herein by reference.    The Original Warrant did not specify that agents were authorized to seize and search electronic devices.   However, as set forth herein, there is probable cause to believe that the Subject Premises contain electronic devices that contain evidence of the Subject Offenses.    In addition, the Original Warrant was for evidence of the Subject Offenses insofar as they related to a scheme involving REICHBERG and the New York City Police Department ("NYPD").   For the reasons discussed herein, there is probable cause to believe that the Subject Premises contain evidence of the Subject Offenses insofar as they relate to a related scheme involving the Westchester County Executive's Office and Westchester County Police Department.

### A.   Probable Cause Regarding Subjects' Commission of the Subject Offenses

6.      As detailed Paragraphs 5-19 of the Original Affidavit, there is probable cause to believe that the Subject Premises contain evidence of two different schemes.  In the first scheme (the "REICHBERG SCHEME"), an individual named JEREMY REICHBERG and a businessman identified in the Original Affidavit as CW-2 cultivated close relationships with numerous members of the New York City Police Department ("NYPD"), including JAMES GRANT and MICHAEL HARRINGTON, over the course of several years, by providing them with substantial bribes in the form of personal and financial benefits worth tens of thousands of dollars, including paying for uniforms, jewelry, business cards, expensive meals, and other luxury items.    In exchange, REICHBERG has repeatedly called upon his connections in the NYPD for official action, as opportunities arise, both for himself and for members of his community, particularly in Borough Park, Brooklyn.  REICHBERG's bribery of high-ranking members of NYPD enabled him not only to obtain such official benefits on an as-needed basis, but also gave him considerable influence over internal NYPD affairs, including personnel decisions such as the promotion of certain favored NYPD officers.

3

7.     As detailed in Paragraphs 20 through 23 of the Original Affidavit, in the second scheme (the "LICENSING SCHEME"), self-styled "expediters" named ALEX LICHTENSTEIN and FRANK SOOHOO were able to obtain gun licenses from the NYPD Licensing Division on an accelerated basis for their clients and was also able to obtain gun licenses for clients who were otherwise unlikely to obtain gun licenses because of their criminal or personal history. LICHTENSTEIN and SOOHOO were able to provide these "expediting" services by bribing officers of the Licensing Division – namely DAVID VILLANUEVA and another officer identified herein as CW-1.   LICHTENSTEIN paid thousands of dollars in bribes to VILLANUEVA in exchange for VILLANUEVA's agreement to expedite gun license applications for LICHTENSTEIN's clients. CW-1 assisted VILLANUEVA by conducting first level reviews of and approving these applications, and received a small portion of LICHTENSTEIN's bribe money from VILLANUEVA.   In addition to these cash bribes, LICHTENSTEIN provided other benefits to VILLANUEVA and CW-1, including, for example, bottles of liquor; limousine rides for VILLANUEVA; and a limousine tour of wineries for VILLANUEVA, CW-1, another officer of the Licensing Division, and their significant others. FRANK SOOHOO bribed VILLANUEVA by providing him with, among other things: (i) multiple lunches per month at restaurants paid for by SOOHOO, and (ii) multiple all-expenses paid vacations, including international travel, for VILLANUEVA and a companion, the value of which was at least several thousand dollars.   One of the individuals to have applied for a gun permit license through these illegal means was JEREMY REICHBERG.

4

**Additional Probable Cause With Respect to the Westchester County Executive,**

**Today's Search of the 56th Street Residence, and ESI Generally**

8.     Based on my review of publicly available information, I know that ROBERT
ASTORINO is the Westchester County Executive and has been since 2009. ASTORINO was
reelected in 2013.

9.     This investigation has relied, in part, on a cooperating witness for the
Government, identified in the Original Affidavit as CW-2. CW-2 has pleaded guilty pursuant to
a cooperation agreement with the Government to conspiracy to commit honest services fraud in
connection with providing gifts to, among others, members of law enforcement and public
officials in exchange for the promise of official action. Information provided by CW-2 has
proven reliable and has been corroborated by independent evidence. As discussed in more detail
below, CW-2 made substantial donations to ASTORINO's 2013 reelection campaign, and
solicited others for donations, in exchange for ASTORINO's agreement to have CW-2 and
JEREMY REICHBERG named Westchester County Police Chaplains, and to have another
individual, FERNANDO MATEO, named to the Westchester County Police Advisory Board.

10.     Based on my review of publicly available information and participation in the
investigation, I know that FERNANDO MATEO is the former President of the New York State
Federation of Taxi Drivers and the current president of Hispanics Across America, an
organization dedicated to issues affecting the Hispanic community around the county.

11.     Based on my debriefings of CW-2, I learned the following:

a.     In the spring of 2013, CW-2 and REICHBERG were introduced to ASTORINO
by MATEO. Specifically, ASTORINO attended a meeting at the CW's office in
June 2013 in Manhattan to solicit money from CW-2 for his reelection campaign

for Westchester County Executive.   REICHBERG and MATEO were at the meeting.

b. At the meeting in CW-2's office, CW-2 agreed to donate money to ASTORINO and solicit others to donate money.   CW-2 told ASTORINO, in the same conversation, that he and REICHBERG wished to be named Westchester County Police Chaplains, and that he wanted MATEO to be named to the Westchester County Police Advisory Board.   Neither CW-2 nor REICHBERG had any religious title.   ASTORINO agreed to arrange the appointments.   CW-2 then wrote two checks to ASTORINO's reelection campaign over the next couple weeks, and solicited others to make donations.

c. Around the same time as the meeting with ASTORINO, CW-2 and REICHBERG were contacted by the Sherriff of Westchester County (the "Sherriff").  The CW and REICHBERG went to the Sherriff's Office, filled out some paperwork, and were thereafter named Police Chaplains.  CW-2 is aware that MATEO was also named to the Police Advisory Board.

d. CW-2 wanted to become a chaplain to obtain the official parking placard that came with it, as well as credentials.  CW-2 used the placard to park in locations at will, and used the credentials when pulled over by the police, among other scenarios.  I am also aware, based on my review of summaries of calls over the judicial authorized wiretap on REICHBERG's cellphone referenced in the Original Affidavit, that REICHBERG frequently referred to himself as a chaplain with the Westchester County Police Department.

6

e. A short time after becoming police chaplain, CW-2 helped ASTORINO purchased a luxury watch. ASTORINO asked the CW-2, who had friends in the jewelry industry, to connect him to someone for the purpose of buying the watch. CW-2 did so, but ASTORINO could not afford the price of the watch, which was several thousand dollars. CW-2 offered to buy the watch for ASTORINO, who responded that ASTORINO needed to pay "something" for the watch. ASTORINO then paid approximately $1,000 for the watch on ASTORINO's credit card, with CW-2 paying the remainder of the cost, or several thousand dollars.

12. I have corroborated CW-2's account in the following ways:

a. Based on my review of documents provided by the Westchester County Executive's Office, I know that on or about June 4, 2013, ASTORINO, apparently using his government e-mail address, e-mailed his chief of staff "Let's discuss and appointment to the Police Board. There are expired terms."

b. Based on my review of CW-2's e-mails as obtained pursuant to a search warrant, I know that on June 11, 2013, MATEO e-mailed CW-2 and REICHBERG "Did u get my email confirming Tues 1 pm with Bob Astorino at [the CW's] office."

c. Based on my review of publicly available campaign finance data, I know that the CW-2's company wrote a $10,000 check to ASTORINO's reelection campaign on or about June 13, 2013, and another $5,000 check to ASTORINO's reelection campaign on or about June 24. 2013.

d. Based on my review of documents provided by the Westchester County Executive's Office, I know that on or about June 10 or June 16, 2013, CW-2 filled

out a personnel form to become Westchester County Police Chaplain. In filling out the education portion of the form, the CW did not note any religious training.

    e. Based on my review of documents provided by the Westchester County Executive's Office, I know that on or about June 25, 2013, the Sherriff appointed CW-2 and REICHBERG as Westchester County Police Chaplains, effective June 10, 2013.

    f. Based on my review of documents provided by the Westchester County Executive's Office, I know that on or about June 27, 2013, an assistant at the Westchester County Executive's Office sent an e-mail to two other members of the office stating "The CE [County Executive] has appointed Fernando Mateo to the Police Board," and attaching Mateo's resume and appointment letter.

    g. CW-2 has identified a photograph of ASTORINO in which he wore the watch he helped him obtain. I have viewed that photograph on the website for the Capital Region's Daily Gazette at www.dailygazette.com as recently as June 20, 2016. The photograph is dated April 28, 2014.

13. Earlier today, June 20, 2016, while effecting the arrest of REICHBERG on the aforementioned criminal complaint at the 56th Street Residence, I know that the following happened based on my conversations with other FBI agents present for the arrest and search:

    a. By all indications, it appeared that REICHBERG knew that the police were coming that morning. REICHBERG's attorney was on speakerphone on a telephone within the residence shortly after the agents arrived. Among the other individuals present was a person who identified himself as REICHBERG's brother ("Reichberg's Brother").

8

b. Reichberg's Brother got dressed in one of the bedrooms at the 56th Street Residence and attempted to leave the premises. One of the FBI agents ("Agent-1") asked Reichberg's Brother, in some and substance, whether he was carrying anything from the 56th Street Residence with him. Reichberg's Brother stated that he did have some things. Reichberg's Brother, upon further questioning, produced from his person (1) seven smart phones, (2) one digital flip phone, (3) eight compact discs, (4) six "thumb" drives, (5) a SIM card, (6) a patch bearing the emblem "Chief of Transportation," (7) an NYPD placard stating that the bearer, a named individual whom I know to be JEREMY REICHBERG's wife, was a family member of Philip Banks III, former NYPD Chief of Department and MICHAEL HARRINGTON's former superior officer, and (8) several hundred business cards, many of which identified REICHBERG as the Police Chaplain for Floral Park but which listed a personal Gmail account rather than an account with an immediately apparent government e-mail address.

c. Upon being questioned by Agent-1 about these items, Reichberg's Brother told Agent-1 the following:

   i. Reichberg's Brother had arrived at REICHBERG's house around 10 p.m. the previous night.

   ii. REICHBERG asked him to take the items he had on his person with him upon leaving the 56th Street Residence.

   iii. Of the items, only one of the phones, the flip phone, was Reichberg's Brother's. The rest were REICHBERG's.

9

d. FBI agents observed numerous other electronic devices capable of retaining data in the the 56th Street Residence during today's search, including but not limited to several open and used Apple iPad tablet devices and two desktop computers, and a fax machine. These items were not only in the home office area of the 56th Street Residence, but also REICHBERG's bedroom and other areas of the house.

14. I know from my debriefing of CW-2 that CW-2 has frequently observed REICHBERG tending to business matters using an iPad device. The referenced business matters consist largely of his using his contacts within local government and law enforcement to expedite government and law enforcement matters for paying clients.

15. Based on my training and experience, I know that individuals who engage in serial bribery and honest services fraud schemes commonly use computers to keep track of contact information, correspondence, and of transactions past. As a result, they often store data on their computers related to their illegal activity, which can include email correspondence, electronic ledgers, and contacts with government and law enforcement personnel.

16. Based on my training and experience, I also know that, where computers are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred. This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on

10

a particular user's operating system, storage capacity, and computer habits.

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data. In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

17.    In addition to there being probable cause to believe that computers and electronic devices will be found on the Subject Premises that contain evidence of the Subject Offenses, there is also probable cause to believe that these computers constitute instrumentalities of the Subject Offenses, which is to say that they were used to communicate with law enforcement or government officials in order to carry out services, or to keep track of transactions involved in the scheme.

18.    Based on the foregoing, I respectfully submit there is probable cause to believe that JEREMY REICHBERG is engaged in bribery and honest services fraud related offenses, and that evidence of this criminal activity is likely to be found in the Subject Premises and on computers and electronic media found in the Subject Premises.

## III.   Procedures for Searching ESI

### A.   Execution of Warrant for ESI

19.    Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

## B. Review of ESI

20.     Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

21.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

12

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[1]; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

22. Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

## C. Return of ESI

23. If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

## IV. Conclusion and Ancillary Provisions

24. Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

---

[1] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

25.     In light of the confidential nature of a continuing investigation whose full scope is not yet public, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.  Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation, and the premature disclosure of the contents of this affidavit and related documents may jeopardize the effectiveness of the investigation.  Although certain aspects of the investigation have become public with the arrests of REICHBERG and others today, the full scope of the investigation – including virtually all of the investigation as concerns the Westchester County Executive's Office – is not yet publicly known.

JOSEPH DOWNS
Special Agent
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me on
June 20, 2016

HON. VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**Attachment A: 1252 56th Street, Brooklyn, New York 11219**

## I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers and electronic devices found therein:

**1252 56th Street, Brooklyn, New York 11219**

A three story brick home with a one-car garage at ground level and a front door on the right side (viewed facing the building) at the end of a flight of eight steps. There are multiple security cameras affixed to the front of the residence.

## II. Items to Be Seized

### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy) (the "Subject Offenses"):

Communications concerning payments made to or favors performed by NYPD law enforcement personnel, including the provision of gun licenses, escort services, deployment of NYPD units, and others; ledgers, or Westchester County Executive Office personnel, including chaplain or advisory board appointments; business records; notes; vouchers; invoices; bank, accounting or financial records; receipts; other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; gun license application materials for Jeremy Reichberg or his associates, communications with NYPD personnel, indicia of relationship between Jeremy Reichberg and James Grant and/or Michael Harrington and/or other NYPD personnel or Westchester County Executive Rob Astorino or other Westchester County law enforcement personnel, including correspondence, pictures, records of financial transactions and travel, any documents related to NYPD or other law enforcement chaplain or civilian positions, all correspondence .

### B. Search and Seizure of Electronically Stored Information

The items to be seized from the Subject Premises also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, fax machines, and scanners. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be seized from the Subject Premises also include:

1.    Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.    Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.    Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## C.  Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections I.A and I.B of this Attachment.  However, law enforcement personnel are authorized to conduct

a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of New York

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. |
| 1252 56th Street, Brooklyn, New York 11219 | ) | 16M592 |
| | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ New York _____
*(identify the person or describe the property to be searched and give its location)*:

1252 56th Street, Brooklyn, New York 11219

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attchment A

**YOU ARE COMMANDED** to execute this warrant on or before _July 1, 2016_ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.  ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _Duty Magistrate Judge_ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____

Date and time issued:    6/17/16 6:5?pm            /s/ Vera Scanlon
                                                                          *Judge's signature*

City and state:    Brooklyn, New York            Hon. Vera M. Scanlon, USMJ
                                                                        *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____        _____
                                                    *Executing officer's signature*

                                             _____
                                                     *Printed name and title*

**Attachment A: 1252 56th Street, Brooklyn, New York 11219**

## I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein:

**1252 56th Street, Brooklyn, New York 11219**

A three story brick home with a one-car garage at ground level and a front door on the right side (viewed facing the building) at the end of a flight of eight steps. There are multiple security cameras affixed to the front of the residence.

## II. Items to Be Seized

### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy) (the "Subject Offenses"):

Communications concerning payments made to or favors performed by NYPD law enforcement personnel, including the provision of gun licenses, escort services, deployment of NYPD units, and others; ledgers; business records; notes; vouchers; invoices; bank, accounting or financial records; receipts; other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; gun license application materials for Jeremy Reichberg or his associates, communications with NYPD personnel, indicia of relationship between Jeremy Reichberg and James Grant and/or Michael Harrington and/or other NYPD personnel, including correspondence, pictures, records of financial transactions and travel.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

In the Matter of the Application of the United
States Of America for a Search Warrant for the
Premises Known and Described as 1252 56th
Street, Brooklyn, NY, 11219; and 14-30 149th
Street, Whitestone, NY 11357; and Any Closed
Containers/Items    Contained    Within    the
Aforementioned Premises

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of
Application for Search Warrant**

STATE OF NEW YORK
COUNTY OF KINGS                              : ss. :
EASTERN DISTRICT OF NEW YORK)

**16M598**

JENNIFER M. RANUCCI, being duly sworn, deposes and says:

**I. Introduction**

**A. Affiant**

1.     I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for

approximately 14 years. For approximately 1.5 years, I have been assigned to a squad in the

FBI's New York Field Office that focuses on public corruption matters. I have participated in

numerous search warrants of residences and businesses.

2.     I make this Affidavit in support of an application pursuant to Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the premises specified below (the

"Subject Premises") for the items and information described in Attachment A. This affidavit is

based upon my personal knowledge; my review of documents and other evidence; my

conversations with other law enforcement personnel. Because this affidavit is being submitted

for the limited purpose of establishing probable cause, it does not include all the facts that I have

learned during the course of my investigation. Where the contents of documents and the actions,

2

statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## B. The Subject Premises

3. The Subject Premises are particularly described as follows:

   a. 1252 56th Street, Brooklyn, New York 11219 (the "56th Street Residence") is a three story brick home with a one-car garage at ground level and a front door on the right side (viewed facing the building) at the end of a flight of eight steps. There are multiple security cameras affixed to the front of the residence.

   b. 14-30 149th Street, Whitestone, New York 11357 ("the Whitestone Business") is a business occupying the first floor of a two-story building in Whitestone, Queens. The first floor bears signage identifying the business within as "Gunsmoke Too Inc." and advertising premium cigars and law enforcement equipment such as handcuffs, Kevlar gloves, and "pistol license services." The first floor is accessed via a front door beneath a brown awning with "GUNSMOKE TOO Inc." written on it. (The 56th Street Residence and the Whitestone Business are hereinafter referred to together as the "Subject Premises.")

## C. The Subject Offenses

4. For the reasons detailed below, there is probable cause to believe that the Subject Premises contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy) among other statutes (the "Subject Offenses").

3

## II. Probable Cause

### A. Probable Cause Regarding Subjects' Commission of the Subject Offenses

5. For the reasons detailed below, there is probable cause to believe that the Subject Premises contain evidence of two different schemes. In the first scheme (the "REICHBERG SCHEME"), an individual named JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," cultivated close relationships with numerous members of the New York City Police Department ("NYPD"), including JAMES GRANT and MICHAEL HARRINGTON, over the course of several years, by providing them with substantial bribes in the form of personal and financial benefits worth tens of thousands of dollars, including paying for uniforms, jewelry, business cards, expensive meals, and other luxury items. In exchange, REICHBERG has repeatedly called upon his connections in the NYPD for official action, as opportunities arise, both for himself and for members of his community, particularly in Borough Park, Brooklyn. REICHBERG's bribery of high-ranking members of NYPD enabled him not only to obtain such official benefits on an as-needed basis, but also gave him considerable influence over internal NYPD affairs, including personnel decisions such as the promotion of certain favored NYPD officers.

6. In the second scheme (the "LICENSING SCHEME"), self-styled "expediters" named ALEX LICHTENSTEIN and FRANK SOOHOO were able to obtain gun licenses from the NYPD Licensing Division on an accelerated basis for their clients and was also able to obtain gun licenses for clients who were otherwise unlikely to obtain gun licenses because of their criminal or personal history. LICHTENSTEIN and SOOHOO were able to provide these "expediting" services by bribing officers of the Licensing Division – namely DAVID VILLANUEVA and another officer identified herein as CW-1. LICHTENSTEIN paid thousands of dollars in bribes to VILLANUEVA in exchange for VILLANUEVA's agreement to

4

expedite gun license applications for LICHTENSTEIN's clients. CW-1 assisted VILLANUEVA by conducting first level reviews of and approving these applications, and received a small portion of LICHTENSTEIN's bribe money from VILLANUEVA. In addition to these cash bribes, LICHTENSTEIN provided other benefits to VILLANUEVA and CW-1, including, for example, bottles of liquor; limousine rides for VILLANUEVA; and a limousine tour of wineries for VILLANUEVA, CW-1, another officer of the Licensing Division, and their significant others. FRANK SOOHOO bribed VILLANUEVA by providing him with, among other things: (i) multiple lunches per month at restaurants paid for by SOOHOO, and (ii) multiple all-expenses paid vacations, including international travel, for VILLANUEVA and a companion, the value of which was at least several thousand dollars.

### Background Information with Respect to the Reichberg Scheme

7.     Based on my review of information provided by the NYPD, I am aware of the following:

> a. MICHAEL HARRINGTON has been a member of the NYPD since 1986. Between October 2012 and May 2013, HARRINGTON was an Inspector assigned to Patrol Borough Brooklyn North. Between May 2013 and November 2014, HARRINGTON was a Deputy Chief assigned as the Executive Officer in the Chief of Department's Office, and in that capacity was second-in-command in that office. HARRINGTON's office during this time period was located at NYPD headquarters at One Police Plaza in downtown Manhattan. Between November 2014 and April 2016, HARRINGTON was a Deputy Chief assigned to the NYPD's Housing Bureau.

5

b. JAMES GRANT has been a member of the NYPD since 1996. For most of his career until 2014, GRANT was assigned to various posts in Brooklyn, New York, including, from December 2011 through June 2014, as a Captain and the Commanding Officer of the 72nd Precinct. From June 2014 through April 2015, GRANT was a Deputy Inspector and the Commanding Officer of the 19th Precinct on the Upper East Side of Manhattan.

c. JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," resides in Borough Park, Brooklyn, and has described himself in meetings with the NYPD and others, as set forth below, as a "community liaison" to the NYPD.

d. "CW-2" is a businessman in the real estate industry who is a cooperating witness for the Government. CW-2 has pleaded guilty to conspiring to commit honest services fraud in connection with, among other conduct, the honest services wire fraud scheme described herein, and is providing information to the Government in the hope of obtaining leniency when he is sentenced. Information provided by CW-2 has been reliable and corroborated by independent evidence. Based on discussions with CW-2, I am aware that JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," introduced CW-2 to high-ranking officials at the NYPD, including GRANT and HARRINGTON.

**Background Information with Respect to the Licensing Scheme**

8. Based on my review of information provided by the NYPD and by CW-1, I am aware of the following:

a. At all times relevant to this application, the New York City Police Department ("NYPD") Licensing Division, located at One Police Plaza in Manhattan, is the

6

entity within the NYPD responsible for approving or rejecting all applications ("Applications") for handgun licenses in New York City.

b. Among the types of handgun licenses issued by the NYPD Licensing Division are (i) a premises license, which permits its holder to have a handgun in the holder's home (a "Premises License"); (ii) a limited carry license, which permits its holder to have a handgun in the home or business and to carry the handgun for specified, limited purposes and at limited times (a "Limited Carry License"); and (iii) a full carry license, which permits its holder to carry a handgun anywhere in New York State at all times, but only for justified business purposes (a "Full Carry License").

c. The NYPD Licensing Division receives approximately 5,000 Applications for gun licenses a year. Limited and Full Carry Licenses are a small fraction of the licenses issued by the NYPD Licensing Division annually.

d. NYPD policies provide that after an Application is received, the NYPD Licensing Division must conduct an investigation of the applicant before electing to approve or reject the Application. Pursuant to NYPD policies, an investigation is to include (i) a review of the applicant's criminal history, including summonses, arrests, and convictions; (ii) a review of the applicant's mental health history; (iii) a verification of the details of the application; (iv) an in-person interview of the applicant; and (v) an investigation into the business need for Limited and Full Carry Licenses.

e. Certain findings, such as a prior felony conviction, result in the automatic rejection of an applicant.

7

f. Under New York State Law, the NYPD Licensing Division has discretion to reject gun license Applications for additional reasons, such as moral character, mental health issues, or substance abuse issues. On its website, the NYPD Licensing Division indicates that it may reject Applications if the investigation reveals a history of arrest, driving infractions, or domestic violence incidents, among other reasons.

g. Typically, the processing, investigation, and approval or rejection of an Application takes several months. For Limited and Full Carry Licenses, it can take even longer.

h. DAVID VILLANUEVA was an NYPD Sergeant assigned to the NYPD Licensing Division for more than a decade. VILLANUEVA had the authority to approve applications for gun licenses. In addition, VILLANUEVA was responsible for investigating existing gun license holders who were arrested, given summonses, or otherwise interacted with law enforcement to determine whether their licenses should be revoked or suspended pending further investigation.

i. "CW-1" is a cooperating witness for the Government and was, at all relevant times in this application, a member of the NYPD. CW-1 was assigned to the Licensing Division from in or about 2009 to in or about 2016, and was responsible for, among other things, investigating applications. At all relevant times to this application, CW-1 reported to DAVID VILLANUEVA. CW-1 has pleaded guilty to committing bribery and conspiracy to commit bribery connected to the scheme described herein and is cooperating with law enforcement in the

8

hope of obtaining a more lenient sentence. Information provided by CW-1 has been reliable and corroborated by independent evidence.

j. ALEX LICHTENSTEIN, a/k/a "Shaya," is a so-called "expediter" who charged clients a fee, typically thousands of dollars, to expedite a client's application for a gun license. As explained below, LICHTENSTEIN provided financial and other benefits to NYPD Officials, including DAVID VILLANUEVA, and CW-1, in exchange for expediting and approving gun permit applications for LICHTENSTEIN's clients.

k. FRANK SOOHOO is a so-called "expediter" who charged clients a fee, typically thousands of dollars, to expedite a client's application for a gun license. SOOHOO was also a Lieutenant in the New York City Auxiliary Police. The Auxiliary Police are volunteers who are recruited, trained, and equipped by the NYPD and perform uniformed patrol in the community. As explained below, SOOHOO provided benefits to NYPD Officials, including DAVID VILLANUEVA and CW-1, in exchange for expediting and approving gun permit applications for SOOHOO's clients.

## Probable Cause Regarding the Reichberg Scheme

9. Based on the various sources described herein, including interviews with CW-2, I have learned the following:

a. Over the course of several years, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," cultivated close relationships with numerous members of the NYPD, including JAMES GRANT and MICHAEL HARRINGTON, by providing them with substantial bribes in the form of

9

personal and financial benefits worth tens of thousands of dollars, including paying for uniforms, jewelry, business cards, expensive meals, and other luxury items.[1]  In exchange, REICHBERG has repeatedly called upon his connections in the NYPD for official action, as opportunities arise, both for himself and for members of his community, particularly in Borough Park, Brooklyn. REICHBERG's bribery of high-ranking members of NYPD enabled him not only to obtain such official benefits on an as-needed basis, but also gave him considerable influence over internal NYPD affairs, including personnel decisions such as the promotion of certain favored NYPD officers.

b.  In or around 2011-2012, REICHBERG began spending significant time with CW-2, and introduced CW-2 to his connections inside the NYPD, including GRANT and HARRINGTON.  Following these introductions, CW-2 began spending time with GRANT, HARRINGTON, and other NYPD officials, and, along with REICHBERG, CW-2 spent large sums of money paying for personal and financial benefits for GRANT, HARRINGTON, and others, including paying for flights, hotel rooms, prostitutes, expensive meals, home improvements, and prime

---

[1] GRANT and HARRINGTON accepted these personal and financial benefits and the others set forth below even though doing so constituted clear violations of NYPD rules.  In particular, I have reviewed portions of the NYPD's "Patrol Guide," which sets forth rules and regulations governing the conduct of NYPD Personnel.  The section of the Patrol Guide titled "Guidelines for Acceptance of Gifts and Other Compensation By Members of the Service" provides, in part, as follows: "It is the policy of the Department that members of the service may not accept any reward, gratuity, gift or other compensation for any service performed as a result of or in conjunction with their duties as public servants. . . .  This policy applies regardless of whether the service was performed while said members of the Department were on or off duty.  Members of the service also shall not solicit any gift, gratuity, loan, present, fee or reward for personal gain. . . .  Members of the service may be offered gifts, awards, and other things of value by private citizens, institutions, etc., in appreciation for their police service.  It is not unethical or illegal for a member of the service to accept gifts that are commonly offered as tokens of appreciation, *i.e.*, plaques, pen and pencil sets, etc.  However, cash rewards and personal gifts, such as wristwatches, etc., are strictly forbidden."

10

seats to sporting events, among other things. From in or about 2012 up through and including in or about 2015, CW-2 and REICHBERG paid a total of well more than \$100,000 for the benefit of GRANT and/or HARRINGTON, and paid additional sums for the benefit of other NYPD officers.

c. In exchange for these payments, CW-2 and REICHBERG were effectively able to have GRANT and HARRINGTON on call - ready and willing to use their official authority within the NYPD to provide assistance to CW-2 and REICHBERG on an as-needed basis. Among the official actions that GRANT and/or HARRINGTON took at the request of CW-2 and/or REICHBERG were police escorts for them and their friends, assistance with private disputes and investigations, police resources for security at religious sites and events, the ability to get out of tickets or other infractions, and special access to parades and other cultural events, among other things.

10. I have reviewed numerous e-mails and attachments from CW-2's e-mail account and the email account of JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," obtained pursuant to a search warrant on those accounts authorized by a United States District Judge. In addition, I have reviewed recorded phone calls between CW-2 and others and REICHBERG and others during the time period of in or about January 2015 through on or about May 12, 2015, obtained pursuant to judicially-authorized wiretaps on their phones. I have also participated in extensive debriefings of CW-2, and have reviewed reports of other agents' debriefings of CW-2. Based on these discussions and my review of these materials, information obtained from the NYPD, and my discussions with CW-2 and other witnesses, I have learned the following:

11

a. CW-2 first met JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," in 2009 or 2010. At the time, a company for which CW-2 worked made a donation to an NYPD football team. CW-2 met REICHBERG and other NYPD officials at a dinner for the team that was paid for, as CW-2 understood, by REICHBERG. REICHBERG provided CW-2 with a business card stating that he was an "NYPD Liaison," and told CW-2 that he could help with traffic and moving violations, other police-related issues, and was, in sum and substance, a "fix it guy."

b. CW-2 began spending more time with REICHBERG starting in or about 2012, including doing certain business with REICHBERG in the construction and real estate industries. REICHBERG used space at CW-2's office for a time around this time period.

c. Through REICHBERG, CW-2 met and spent time with numerous high-ranking officials from the NYPD. REICHBERG informed CW-2 that his connections in the NYPD helped REICHBERG, among other things, handle personal disputes for him and associates. For example, REICHBERG told CW-2 that REICHBERG's connections in the NYPD sent officers to the vicinity of his associates' jewelry business to disperse individuals handing out advertisements for a rival business, and that the NYPD connections were rewarded with jewelry from the business.

d. Among the high-ranking NYPD officials to whom REICHBERG introduced CW-2 were JAMES GRANT and MICHAEL HARRINGTON. At the time, GRANT was the Commanding Officer of the 72nd Precinct in Brooklyn, and HARRINGTON was an Inspector assigned to Patrol Borough Brooklyn North.

12

e. Beginning in or about the 2012-2013 time period, CW-2, working with REICHBERG, began providing GRANT, HARRINGTON, and other high-ranking officials with numerous valuable items, including free meals and travel, with the understanding that these officials, including GRANT and HARRINGTON, would be able to perform police-related favors for them. As noted above, CW-2 understood REICHBERG to have previously been engaged in this same conduct with GRANT, HARRINGTON, and other members of the NYPD, and CW-2 was able to join in the scheme by paying himself for numerous benefits for GRANT and HARRINGTON.

f. As CW-2 provided personal and financial benefits to GRANT and HARRINGTON, they in turn assisted CW-2 and REICHBERG with official actions over time, such as police escorts for them and their friends; sending officers and using police resources to assist in civil disputes and other matters; sending patrol cars to religious sites upon request; VIP access to parades and other New York City events; as to GRANT, assisting with their applications for gun licenses to the New York City Police Department; among other things, all as set forth in more detail below.

g. As noted above, in or about June 2013, HARRINGTON was promoted to be the Executive Officer at the Chief of Department's Office, where he worked for the Chief of Department ("Chief-1"). The Chief of Department's Office supervises all uniformed police officers at the NYPD and is responsible for all uniformed operations, having oversight over other bureaus such as Community Affairs, Patrol, Transportation, Housing, Transit, and Detectives. As an Executive

13

Officer, HARRINGTON's responsibilities, according to the NYPD's Patrol Guide, included assuming command and performance functions for the Chief of Department in his absence; supervising the performance of administrative functions; training, planning, and personnel; and adjudicating disciplinary issues.

h. Through HARRINGTON, CW-2 and REICHBERG also began spending time with Chief-1, CW-2 and REICHBERG understood that with this connection to the Chief of Department's Office, they would then have access to the highest levels at the NYPD, and would have a "one stop shop" for assistance rather than having to reach out to numerous individual members of the NYPD.

i. Over time, CW-2 and REICHBERG obtained access to NYPD Chief-1's "inner circle." CW-2 went to lunches and dinners on a regular basis with REICHBERG, Chief-1, and HARRINGTON, including at expensive restaurants. CW-2 paid the entire bill for these lunches and dinners. During this time, HARRINGTON continued to assist CW-2 and REICHBERG with official actions. Also during this time, as they expected, CW-2 and REICHBERG began dealing less with officials aside from HARRINGTON, GRANT, and Chief-1, given their position senior to all other officials with whom CW-2 and REICHBERG dealt.

j. Due to their relationship with GRANT, including the acts performed by GRANT on their behalf, in or about late 2013 or early 2014, CW-2 and REICHBERG recommended to Chief-1 that Chief-1 name GRANT to be the Commanding Officer of the 19th Precinct, a position that was opening up. Chief-1 ultimately appointed GRANT to that position, where he began in June 2014. Chief-1 put

14

CW-2 and REICHBERG on the phone with GRANT in order for CW-2 and REICHBERG to be able to tell GRANT that he was being promoted.

k. Upon his promotion to become the Commanding Officer of the 19th Precinct, GRANT was vested with the responsibility of supervising the approximately 240 officers in that precinct. According to the NYPD's Patrol Guide, as the Commanding Officer, GRANT was responsible for, among other things, ensuring the proper performance of and disciplining personnel; ensuring proper neighborhood patrol; staffing and assignments; problem-solving and identifying "major crime" and "quality of life" problems in the precinct, and designing and implementing solutions for those problems; and instructing and testing his inferior officers regarding their knowledge of their duties and responsibilities.

l. In approximately March 2015, CW-2 was approached by law enforcement and questioned as to, among other matters, money that Chief-1 had provided to CW-2 to invest. After this approach by law enforcement, CW-2 decided to limit significantly his contact with Chief-1, GRANT, HARRINGTON, and other members of the NYPD.

11. Based on my review of the e-mails discussed above; wiretapped phone calls discussed above; documents and information provided by multiple vendors as detailed below; and discussions with CW-2 and review of reports of other agents' debriefings of CW-2, I have learned the following with respect to JAMES GRANT:

Las Vegas Trip (2013)

a. In or about January 2013, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," and CW-2 offered to take GRANT to Las Vegas for

15

Super Bowl Weekend. GRANT, as well as a Detective from the 66th Precinct who was friends with GRANT ("Detective-1"), accepted the offer.

b. CW-2 paid for a private jet to take REICHBERG, GRANT, Detective-1, CW-2 and two other individuals to and from Las Vegas.

c. I have reviewed documentation provided by the private jet company that arranged this trip to Las Vegas, and learned that the aircraft departed on February 2, 2013 and returned on February 4, 2013, and that CW-2 was invoiced approximately $57,000 for the round trip. CW-2 and REICHBERG also arranged for a prostitute ("Prostitute-1") to come on the private jet and spend the weekend with the group in Las Vegas. While in Las Vegas, the prostitute stayed in GRANT's room. I have debriefed Prostitute-1, who confirmed, among other things, that Prostitute-1 was engaged to accompany the persons on the trip and that GRANT and others took advantage of her services during the trip.

d. I have also reviewed the flight invoice from the jet company which shows that the passengers for the departing and returning trips were in fact CW-2, REICHBERG, GRANT, Detective-1, one male individual I know to be CW-2's associate, and Prostitute-1.

e. CW-2 paid for all lodging and meal expenses for GRANT and Detective-1 in Las Vegas.

Rome Trip (2013)

f. In August 2013, GRANT took a vacation to Rome with his family and others. In advance of the trip, CW-2 told GRANT that he should stay at a particular hotel that was CW-2's favorite hotel in Rome, and offered to pay for the room.

16

GRANT accepted the offer, and CW-2 paid for a two-night stay in two rooms at the hotel during GRANT's trip.

g. I have seen an e-mail confirmation for the stay sent to CW-2, which CW-2 forwarded to GRANT, cc'ing REICHBERG and writing "Most luxurious hotel in Rome." I have also seen an invoice for the hotel stay provided by the travel agency that CW-2 used to book the hotel stay (the "Travel Agency"), in the amount of $1,066. The invoice is addressed to "GRANT JAMES," with CW-2's e-mail address, and CW-2's credit card.

Other Financial Benefits

h. In or about 2013, CW-2 also offered to pay for work on GRANT's house, and specifically to replace railings outside of GRANT's house. GRANT accepted CW-2's offer, and REICHBERG found the contractor to do the work. CW-2 paid for the work, which he estimates cost approximately $6,000.

i. In or about 2014, REICHBERG also arranged to have windows at GRANT's house replaced, at no cost to GRANT. Another agent has spoken with the contractor who performed the window work, who told that other agent that the work was arranged by and paid for by REICHBERG, and cost approximately $8,000.

j. In or about 2013, CW-2 offered to pay to upgrade GRANT's watch to a more expensive brand. GRANT accepted CW-2's offer. GRANT's new watch, paid for by CW-2 along with an old watch turned in by GRANT, cost approximately $3,000.

17

k. On Christmas Day in 2013, CW-2 and REICHBERG drove to GRANT's home in Staten Island, New York wearing Christmas elf hats and gave GRANT a video game system for his children, and a piece of jewelry for his wife worth approximately $1,000. As set forth below, I have reviewed a recorded call in which GRANT complained that his "two Jewish elves" did not come for Christmas the following year, 2014.

l. In or about 2013 and 2014, CW-2 regularly paid for meals for GRANT, including lunches and dinners at expensive restaurants in Manhattan,

#### Official Acts Provided by GRANT

m. As noted above, CW-2 understood and expected that GRANT would perform official acts for him due to CW-2's having bestowed personal and financial benefits worth tens of thousands of dollars on GRANT. During the time period that CW-2 was providing such benefits, GRANT in fact performed numerous official acts for CW-2 and REICHBERG.

n. For example, from in or about 2012 through in or about 2014, GRANT regularly provided CW-2 and REICHBERG with police escorts. On many occasions, GRANT himself drove CW-2 to locations, such as to and from the airport, using the lights and sirens of a police car. On other occasions, GRANT dispatched junior officers to provide police escorts for CW-2.

o. On one occasion, GRANT sent officers to a building in which CW-2 had an ownership interest to investigate a trespasser. On another occasion, GRANT sent officers to a building in which CW-2 had an ownership interest to investigate a theft.

18

p. On or about September 12, 2013, CW-2 received an e-mail from a business associate who indicated that a colleague had left his watch in a livery cab in Manhattan and was trying to track down the cab, and who wrote "This may be something for your boy Jeremy [REICHBERG]." CW-2 responded, cc'ing REICHBERG, "Yes Jeremy will have NYPD review cameras at that time and location but will cost Jeremy 10k. Should I proceed." The business associate wrote back that it did not make "economic sense" because the watch was worth approximately $50,000 and the NYPD camera review might not be successful. The business associate later wrote back that the CEO of the company had authorized a $5,000 payment. CW-2 responded, cc'ing REICHBERG, that "there are two guys [REICHBERG] needs to take care of to watch the footage. He said 10k is the price." Based on my discussions with CW-2, I learned that REICHBERG had told CW-2 that REICHBERG had raised this issue with GRANT, and GRANT had agreed to facilitate the review of street cameras, and REICHBERG indicated that REICHBERG would need money to take care of the officers who would help. Ultimately, the company did not proceed with CW-2 and REICHBERG's offer.

q. GRANT also escorted CW-2 and his friends beyond police barricades to prime locations at events such as parades, the New York City marathon, and the New Year's Eve Celebration at Times Square, and provided them with "VIP treatment."

19

r. On several occasions, when CW-2 himself was confronted by police officers, such as by being pulled over, he used GRANT's name and called GRANT in front of the officers, to avoid getting a ticket or summons.

s. In 2015, when a family member was hospitalized at a hospital in the confines of GRANT's precinct, GRANT, at CW-2's request, went to the hospital to introduce himself to hospital staff as Commanding Officer of the precinct and to make sure that CW-2's relative was attended to properly.

t. GRANT helped CW-2 and REICHBERG in their efforts to obtain gun licenses from the New York City Police Department. REICHBERG told CW-2 that GRANT was friendly with personnel in the Licensing Division of the NYPD, and asked CW-2 if he wanted a gun license. CW-2 responded that he did. REICHBERG and CW-2 then went to the Licensing Division, filled out paperwork, and met GRANT's connections.

u. I have debriefed CW-1, an officer in the Licensing Division who reviewed REICHBERG and CW-2's applications. CW-1 has pleaded guilty to bribery-related charges, in connection with the receipt of financial benefits to help expedite gun license applications submitted by Alex Lichtentein, a/k/a "Shaya," an expediter, on behalf of Lichtenstein's clients, described in greater detail below. Lichtenstein has been charged with bribery-related charges in a case pending in the Southern District of New York. CW-1 is aware that GRANT is friendly with Lichtenstein, and has been informed by a VILLANUEVA that Lichtenstein paid for work on GRANT's house. Based on my debriefings of CW-1, I have learned the following:

20

i. At a certain point in 2014, CW-1 was informed by VILLANUEVA that GRANT was sending REICHBERG down to get a gun license, and that CW-1 should expedite the approval of REICHBERG's license.

ii. Subsequently, REICHBERG showed up to the Licensing Division with CW-2, but CW-2 did not have any paperwork with him, so CW-1 only processed REICHBERG's application for full carry license, i.e., a license to carry a concealed firearm anywhere in the state of New York. REICHBERG asked to receive his license within one day, and CW-1 said that it would take longer, to which REICHBERG responded by boasting of his connection to Chief-1 and that he was responsible for getting GRANT his position as the Commanding Officer of the 19th Precinct.

iii. REICHBERG then met with the Commanding Officer of the Licensing Division, after which either the Commanding Officer or VILLANUEVA told CW-1 to "close out" and approve "Jimmy GRANT's guy." Based on my discussions with personnel at the Licensing Division, I am informed that the approval process for a full carry license typically takes at least six months and, in many instances, in excess of a year.

v. Based on my review of information from the Licensing Division, I know that REICHBERG and CW-2 applied for their gun licenses on or about August 21, 2014, and REICHBERG was approved for a full carry license on or about October 29, 2014. CW-2 did not obtain his license, and his application was rejected in March 2016 because CW-2 had not followed up with necessary paperwork.

21

w. On or about January 13, 2015, at approximately 10:13 in the morning, REICHBERG placed a call to GRANT, which was captured on the wiretap over REICHBERG's phone. During the call, as set forth below, REICHBERG and GRANT appeared to discuss manufacturing a fake employment letter that would enable CW-2 to obtain a full-carry gun license. Specifically, GRANT told REICHBERG: "On that letter, it has to state that [CW-2 is] part owner, and it shows that he's part owner in that business, or the owner of the company has to give a letter, that's notarized, saying that [CW-2] is his right hand guy, does carry diamonds." GRANT then said: "I gave you [CW-1's] number, [CW-1] called you, just fuckin tell him, whatever way you want to go they're gonna do it, but they have to put something in the folder." GRANT said that VILLANUEVA told him that everything was on GRANT now, that "now they're ready to do it," but that REICHBERG was "holding shit up." GRANT then said to "have the owner, whether it's you or whoever it is, write a notarized letter, saying that [CW-2] is employed . . . he does frequently carry large amounts of diamonds worth, you know, upwards of a million dollars, at all times, all days, and that you're authorizing him to be carry . . . a firearm. . . . That's it, get that letter, get it to me, and I'll have it dropped off." CW-2 is not employed in the diamond industry.

x. Based on my training, experience, and participation in the investigation, I believe that during this call, GRANT was coaching REICHBERG on what needed to be put in a letter regarding CW-2's nonexistent work transporting diamonds, and told REICHBERG that his connections at the Licensing Division would approve CW-2's application once the letter was received.

22

y.  On or about January 16, 2015, at approximately 9:36 a.m., GRANT called
REICHBERG. During the call, as set forth below, GRANT complained to
REICHBERG about not receiving certain favors, and appeared to explicitly
connect his receipt of favors from REICHBERG with official actions he had taken
at REICHBERG's request. Specifically, GRANT told REICHBERG on the call:
"See you don't love me anymore bro." GRANT said that he heard REICHBERG
had invited another high-ranking official to the Super Bowl and "you don't even
invite me to the Super Bowl, what the fuck." REICHBERG said that he was still
deciding whether to go, and "if we are you wanna come?" GRANT responded
"maybe, yeah." REICHBERG accused GRANT of being too busy for
REICHBERG, to which GRANT replied "No no no. First of all, first of all, the
two Jewish elves didn't come for fucking Christmas number one, I got your fuckin
Westchester county cards, the cards you asked me to make up, you fucking broke
my balls about [CW-2's application.]" Based on my training, experience, and
participation in the investigation, I believe that during this call, GRANT was
complaining that REICHBERG and CW-2 did not invite him to come to Las
Vegas for the Super Bowl and did not bring him Christmas gifts, even though
GRANT had printed police liaison cards for REICHBERG and was helping
REICHBERG and CW-2 with the gun license process.

z.  Approximately two months later, on or about March 7, 2015, at approximately
4:37 p.m., REICHBERG called GRANT. During the call, as set forth below,
GRANT complained that CW-2 appeared to have problems with GRANT and that
GRANT had done favors for CW-2 in the past. Specifically, GRANT said that he

23

had been reaching out to CW-2 and that "I can sense the ice . . . that's not right though." REICHBERG said "he never did anything for you, just relax, and you always did for him." GRANT responded: "I know he never did anything for me" and "I was good to him, because of you. Whatever I did for him was because of you." GRANT said "he should be told that those guys are scumbags, and you know, and fuckin' [Chief-1] and them who gave him the go ahead are the one who fuckin' fucked up." Based on my training, experience, participation in the investigation, and discussions with CW-2, I believe that during this call, GRANT acknowledged the favors he did for CW-2 but denied the gifts provided by CW-2 to GRANT, as detailed above. GRANT also speculated that CW-2 should not have gotten involved with Chief-1 and MICHAEL HARRINGTON.

aa. On or about March 20, 2015, beginning at approximately 1:22 p.m., REICHBERG engaged in a series of phone calls that, as set forth below, appear to involve an effort by REICHBERG to use his connection to GRANT to fix or avoid a ticket for an associate of REICHBERG's. Specifically, REICHBERG received a call from an unknown male ("the UM") who told REICHBERG he had been pulled over by the police in the 66th precinct. The UM said that he gave the officers "JIMMY GRANT's card," to which REICHBERG responded "That's fine, you'll be fine." REICHBERG asked the UM for the license plate number of the police car, which the UM provided. The UM said that the officers had taken his information and were back in their police car. After REICHBERG hung up the phone, he called an unknown member of the NYPD who I believe, based on the substance of the call and my participation in the investigation, to be from the

24

66th precinct (the "Unknown Officer"). REICHBERG told the Unknown Officer that the police car bearing the license plate number provided by the UM "pulled somebody over, he gave them Jimmy's card." The Unknown Officer responded, "yeah, I just got a call, he's driving like a fucking maniac" into traffic and running red lights. REICHBERG told the Unknown Officer that the UM had an emergency and that he was REICHBERG's friend. The Unknown Officer responded "All right, so you gave him Jimmy's card?" to which REICHBERG responded in the affirmative. The Unknown Officer then said "All right I'll tell them he knows him," before hanging up.

bb. Based on my training, experience, and participation in the investigation, I believe that in this series of calls, the UM, an associate of REICHBERG's to whom REICHBERG had given GRANT's card, told REICHBERG he had been pulled over and had given the card to the officers. REICHBERG then called a contact in the local precinct, who was aware of the incident. The contact agreed to have the UM let go after confirming with REICHBERG that the UM was a friend of REICHBERG's and that it was REICHBERG who had supplied the UM with GRANT's card.

Personal and Financial Benefits Provided to HARRINGTON and Official Actions Taken by HARRINGTON

12. Based on my review of e-mails sent to and from CW-2's e-mail account and the e-mail account of JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," recorded phone calls over the wiretaps discussed above; review of other materials as

25

discussed below; and discussions with CW-2, I have learned the following with respect to MICHAEL HARRINGTON:

a. During the time period that HARRINGTON was the Executive Officer for Chief-1, from May 2013 through November 2014, CW-2 took HARRINGTON and Chief-1 to dinner at least one to two times a week, typically at expensive restaurants in Manhattan. CW-2 paid for these dinners.

b. During this same time period, CW-2 and REICHBERG provided HARRINGTON with tickets to numerous sporting events, sometimes to go with CW-2 and REICHBERG and sometimes without them. For example, in an e-mail dated January 10, 2014, CW-2 sent HARRINGTON two Brooklyn Nets basketball tickets, with a face value of $400 each. In an e-mail dated May 24, 2014, CW-2 sent HARRINGTON two New York Rangers hockey tickets, with a face value of $700 each.

c. On or about April 7, 2013, another individual sent an e-mail to REICHBERG attaching an image of a business card for HARRINGTON. Based on my training, experience, and participation in the investigation, I believe that REICHBERG was arranging to have business cards prepared for HARRINGTON.

d. On Christmas Day in 2013, on the same trip during which CW-2 and REICHBERG wore elf hats and provided a video game system and jewelry to the family of JAMES GRANT, CW-2 and REICHBERG drove to HARRINGTON's home and gave HARRINGTON a video game system for his children.

e. In or about 2014, a jewelry business affiliated with REICHBERG was having a dispute with a neighboring jewelry business in the same building. The

26

neighboring company hired a security guard who was an off-duty NYPD officer to stand near the business of REICHBERG's affiliate's company. HARRINGTON, at REICHBERG's request, investigated the off-duty officer and took steps to have him disciplined within the NYPD.

Chicago Trip (2014)

f. In 2014, HARRINGTON took a trip to Chicago with his family members. CW-2 offered to pay for the family's hotel rooms in Chicago, which HARRINGTON accepted, and REICHBERG helped coordinate the travel arrangements. I have seen an e-mail from May 14, 2014 from REICHBERG to CW-2 in which REICHBERG asked CW-2 to "please confirm the hotel room in Downtown Chicago" for an individual I know to be HARRINGTON's brother, and then specified that three rooms would be needed for four nights, and one room would be needed for two nights. I have also seen an e-mail from later the same day from a hotel in Chicago to CW-2 confirming the four rooms that CW-2 had booked. CW-2 forwarded that e-mail to HARRINGTON, using HARRINGTON's private e-mail address. I have also seen an invoice from the Travel Agency to CW-2 for the hotel rooms, in the amount of approximately $6,500.

g. In or about March 2016, agents participated in an interview of HARRINGTON at the United States Attorney's Office for the Southern District of New York. I've spoken to the agents and reviewed their notes.   During the interview, HARRINGTON made false representations about the 2014 Chicago trip. While HARRINGTON admitted that CW-2 had paid hotel costs in Chicago, HARRINGTON claimed to have paid CW-2 back in cash after the trip. According

27

to CW-2, CW-2 never sought or received any reimbursement from HARRINGTON.

### Engagement of and Assistance with HARRINGTON affiliated Security Company

h. In addition to the benefits discussed above, REICHBERG arranged for tens of thousands of dollars' worth of business for a private security company run in part by HARRINGTON's family and which HARRINGTON unofficially helped manage (the "Security Company"). Most prominently, CW-2 and administrators at CW-2's child's school wanted to arrange for private security, and REICHBERG connected the Security Company to CW-2 for this purpose. CW-2 was unaware, at the time, that the Security Company was affiliated with HARRINGTON's family. CW-2 was provided with a particular contact, who was not a member of HARRINGTON's family, to be the point person for security (the "Security Guard").

i. On or about January 14, 2015, members of the FBI conducted surveillance from within a restaurant on the Upper West Side of Manhattan (the "Restaurant"), where CW-1, REICHBERG, Chief-1 (who had, by then, resigned), and HARRINGTON were having dinner, and at which REICHBERG and HARRINGTON discussed the Security Company. The agents sat at a table near them, and using FBI equipment, recorded the conversation. Based on my conversations with individuals who were present, I know that at a certain point, CW-2 and Chief-1 left the table, at which point REICHBERG and HARRINGTON began discussing the Security Company, including its need for insurance. Shortly thereafter, CW-2 and Chief-1 returned to the table, and

28

HARRINGTON and REICHBERG stopped discussing the Security Company. HARRINGTON was the only individual to eat dinner during the dinner. After a time, CW-2 received and paid the bill for dinner, and remarked to HARRINGTON, in substance, that the bill was light "this time."

j. On or about January 20, 2015, at approximately 7:24 p.m., REICHBERG called HARRINGTON. During the call, REICHBERG said "I spoke to [the Security Guard], I gave him a rundown" and that REICHBERG "spoke to [CW-2], on Thursday we'll have the balance, $5,000." Based on my training, experience, and participation in the investigation, I believe that during this call, REICHBERG and HARRINGTON were discussing the school security job for HARRINGTON's family's company and an expected partial payment of $5,000 for the job.

k. On or about January 31, 2015, at approximately 8:40 p.m., REICHBERG called HARRINGTON. During the call, HARRINGTON stated that "[the Security Guard] has to work this final deal out with [CW-2] . . . are they going to continue this way, are they gonna do it to the end of the year? I got the impression [CW-2] wanted to punt it to the school to handle . . . at some point I want [the Security Guard] to meet up with [CW-2] to finalize it, and my brother [] too." HARRINGTON also said that "ultimately, I figure [CW-2's] gonna figure this math out, that I'm involved. . . . I'm not involved, on paper everything is nothing to do with me." Based on my training, experience, and participation in this investigation, I believe that during this call, HARRINGTON was further insisting that CW-2 and the Security Guard meet and work out further logistical and financial issues with respect to the school security job. HARRINGTON also

29

confirmed his involvement with the Security Company benefiting financially from the arrangement, and that CW-2 was not aware of HARRINGTON's involvement.

## Official Acts Provided by HARRINGTON

1. As with JAMES GRANT, CW-2 understood and expected that HARRINGTON would perform official acts for him due to CW-2's having bestowed gifts on HARRINGTON. During the time period that CW-2 was providing the above referenced gifts to HARRINGTON, HARRINGTON in fact performed numerous official acts for CW-2 and REICHBERG.

m. For example, in addition to benefiting from the engagement of his family's Security Company by REICHBERG and CW-2, HARRINGTON has also agreed to use the Security Company to make an arrest as requested by REICHBERG. On or about January 23, 2015, at approximately 1:21 p.m., REICHBERG called HARRINGTON. During the call, REICHBERG said "All right I spoke to the guy, he wants from 12 to 7 every night starting Sunday. . . . [the Security Guard] should give him a call and get the details." HARRINGTON responded "[the Security Guard] should probably see the video." REICHBERG responded "right, so [the Security Guard] should tell him that. Listen, I want to come by, I want to see the video . . . this is what we're going to do, we're going to lock him up, we catch him." HARRINGTON responded "He's looking to lock him up, right?" REICHBERG said "Absolutely." REICHBERG and CW-2 discussed that the money would need to be provided up front. REICHBERG and HARRINGTON then discussed the school security job, and HARRINGTON said that an individual

30

I know to be HARRINGTON's brother "is better off doing the business shit" because the Security Guard is "a trainwreck."

n. Based on my training, experience, participation in the investigation, and other intercepted calls, I believe that during this call, REICHBERG and HARRINGTON were arranging for HARRINGTON's security company to be paid to surveil a particular location and catch an individual vandalizing the location, who HARRINGTON would then arrange to be arrested by the NYPD. The person who would pay HARRINGTON's family's company had a video of the perpetrator previously vandalizing the location. The Security Company would need to be paid for a week's worth of work in advance. HARRINGTON then discussed that his brother, who is involved in the Security Company, is better equipped to handle business matters than the Security Guard.

o. HARRINGTON has also been involved in dispatching NYPD personnel to assist REICHBERG directly.   For example, on or about February 20, 2015, at approximately 12:29 p.m., REICHBERG called HARRINGTON, who said that he was in a meeting and asked to call REICHBERG back. REICHBERG next called the Commanding Officer of a midtown precinct (the "CO"), and told the CO "I need your help, very important. . . . We gave out a stone to some company in my building . . . it's a $250,000 diamond, he's been playing around games the last few days about giving it back, he's not buying it, he's giving it back . . . so we told him yesterday we want him back." REICHBERG said "I'm afraid we're gonna get hit on it, and before, if we can send somebody over, we need the stone back." REICHBERG asked "is there any way, before he scams us . . . if we can

31

send somebody over?" The CO said "OK, I'll have [a Sergeant] come over." REICHBERG responded "I really, really appreciate it, you're always to the rescue." At approximately 12:34 pm., HARRINGTON called REICHBERG back. REICHBERG said, "I called [the CO], [the CO's] gonna handle it." REICHBERG then discussed the problem with the $250,000 stone with HARRINGTON. At approximately 1:36 p.m., REICHBERG again spoke to HARRINGTON, and told HARRINGTON that the CO helped get the stone back.

p. I have spoken to agents who debriefed the CO, who recalled that on multiple occasions he dispatched NYPD personnel to settle diamond-related disputes for REICHBERG; that he sometimes did so as requested by HARRINGTON; and that, other times, he did so in part because of REICHBERG's relationship with Chief-1 and HARRINGTON and with the expectation that if the CO declined to do so, REICHBERG would complain to Chief-1 or HARRINGTON.

q. HARRINGTON also sent NYPD cars to religious sites at CW-2 and REICHBERG's request. For example, in an e-mail dated January 15, 2015, an individual wrote to CW-2 "Given the events in paris the shul asked me if I can try and get a patrol car for the next few weeks to sit outside the shul Shabbos morning from 9-1." CW-2 responded, cc'ing HARRINGTON, "I will make sure the HOW house of worship car has your shul in its route what's the address."

r. On or about March 5, 2015, at approximately 10:18 a.m. REICHBERG called HARRINGTON. REICHBERG said that he needed police at "42nd and 5th" because the rabbi over there "called me in a panic" and was "nervous" because "there's a lot of people over there . . . he has people from Paris." HARRINGTON

32

responded "they can't be nervous all the time . . . this is all the time." REICHBERG said, "I know, but," and HARRINGTON interrupted him and said "All right, all right." At approximately 11:10 a.m., HARRINGTON called REICHBERG and said "I spoke to [another NYPD official], gonna try and get somebody over there now, he'll definitely have somebody on the 4 to 12, and the day tour 4 to 12 tomorrow for Shabbos."

s. In an e-mail in October 2, 2015, REICHBERG asked HARRINGTON to "please see to have coverage" at a religious site in Midtown for a four-day period.

t. According to CW-2, HARRINGTON has also arranged for police escorts for CW-2 and others. As an example, on or about September 21, 2014, CW-2 sent an e-mail to another individual and wrote "Head of local precinct will call you in 3 min and get you to your car and out if you don't hear from him in next 5 min email me." Two minutes later, the individual wrote back "Who was just on the phone," to which CW-2 responded "Chief Harrington." Based on my training, experience, and participation in the investigation, I believe that during this exchange, HARRINGTON facilitated assistance for an associate of CW-2 to access his car in an area that had been blocked off by police.

u. According to CW-2, HARRINGTON has also assisted with VIP access to New York City events, such as parades.

REICHBERG's Efforts to Continue His Influence Over the Police Department, Particularly in Brooklyn

13. As noted above, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," along with CW-2, were involved in the promotion of JAMES GRANT to

33

become commanding Officer of the 19th Precinct in Manhattan, and REICHBERG has taken credit for the promotion.

14.     I have reviewed numerous other calls over the wiretap on the cellphone belonging to JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," during the January-to-May 2015 time period, in which NYPD personnel solicited REICHBERG's advice, information and assistance in obtaining promotions. REICHBERG's efforts in early 2015 - at a time when Chief-1 had retired from the NYPD and MICHAEL HARRINGTON was transferred from the Chief of Department's Office, leaving REICHBERG with minimal to no influence at the Chief of Department's Office - appeared to be focused on re-consolidating influence in Brooklyn.

15.     For example, in a call to MICHAEL HARRINGTON on January 27, 2015, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," and HARRINGTON discussed HARRINGTON's prospects for the promotion and who might be in a position to assist him. REICHBERG told HARRINGTON "you still have to get the Borough . . . we need you to get this Borough." Based on my training, experience, and participation in the investigation, I believe that REICHBERG was attempting to facilitate the transfer and promotion of HARRINGTON to be one of the top NYPD officials in Brooklyn, REICHBERG's borough, in order to be able to make most use of HARRINGTON's assistance going forward.

16.     During another call on January 28, 2015 between JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," and a Deputy Inspector with the NYPD ("DI-1"), REICHBERG and DI-1 discussed the fact that DI-1 would likely be transferred to Brooklyn South, as well as other promotions within the NYPD. REICHBERG discussed pulling a "big card" with respect to promotions, and calling the "mayor." REICHBERG told DI-1 that

34

REICHBERG and CW-2 "need to put ourselves in a better position for calling better shots in the next regime."

17.     By way of another example, during one call on January 30, 2015, JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," explained to another individual ("Individual-1"), in substance, that he had spoken to a person who was very senior within the NYPD (the "Senior Official"), as well as to another individual he believed to communicate regularly with the Commissioner of the NYPD, about promoting MICHAEL HARRINGTON to be commanding officer of Brooklyn South. Individual-1 said that he would be with the Senior Official for the Super Bowl and would mention it. REICHBERG responded, "That would be great. If we could pull this through, that would be huge. . . I'm getting to work on this and hopefully we'll have, ah, a team in place very soon."

18.     During a call with an unknown member of the NYPD on or about February 27, 2015 (the "Unknown Officer"), the Unknown Officer asked JEREMY REICHBERG, a/k/a "Jeremiah Reichberg," a/k/a "Yermy Reichberg," in substance, about his prospects for promotion.     The Unknown Officer asked REICHBERG "Am I viewed as a nobody?" REICHBERG responded that "no, a good guy. They like you. The last regime they liked you a lot more." The Unknown Officer and REICHBERG then discussed that the Unknown Officer could benefit from the fact that DI-1 - one of REICHBERG's close connections - likes the Unknown Officer. REICHBERG told the Unknown Officer that the Unknown Officer would be fine. REICHBERG then proceeded to ask the Unknown Officer for assistance with a situation at REICHBERG's house, and specifically that REICHBERG believed someone had tried to break into his house. The Unknown Officer agreed to send police officers to help.

35

19.     During another call on March 6, 2016, a Deputy Inspector ("DI-2") called REICHBERG to discuss DI-2's impending transfer to a new assignment.     DI-2 told REICHBERG that DI-2 knew he was bothering REICHBERG, but that REICHBERG was "probably the only one that can help me." DI-2 complained that it seemed like his transfer was "sideways" and that he was just being "dumped" into a position rather than headed in a "positive direction." REICHBERG assured DI-2 that he had spoken to an unknown individual who had assured REICHBERG that the transfer was in a "positive direction."

### Probable Cause Regarding the Licensing Scheme

20.     Based on the various sources described herein, including interviews with CW-2 and former customers of ALEX LICHTENSTEIN, I have learned the following:

- a.  At all times relevant to this application, ALEX LICHTENSTEIN, a/k/a "Shaya," and FRANK SOOHOO held themselves out as expediters who could, for a large fee, obtain gun licenses for persons seeking gun licenses from the Licensing Division.

- b.  ALEX LICHTENSTEIN, a/k/a "Shaya," charged his clients as much as $18,000 per gun license. FRANK SOOHOO charged his clients as much as $15,000 per license.

- c.  ALEX LICHTENSTEIN, a/k/a "Shaya," and FRANK SOOHOO were able to obtain gun licenses from the NYPD Licensing Division on an accelerated basis for their clients and were also able to obtain gun licenses for clients who were otherwise unlikely to obtain gun licenses because of their criminal or personal history. LICHTENSTEIN and SOOHOO were able to provide these "expediting"

36

services by bribing officers of the Licensing Division -- namely DAVID
VILLANUEVA and CW-1.

d. ALEX LICHTENSTEIN, a/k/a "Shaya," paid thousands of dollars in bribes to
DAVID VILLANUEVA in exchange for VILLANUEVA's agreement to expedite
gun license applications for LICHTENSTEIN's clients.    CW-1 assisted
VILLANUEVA by conducting first level reviews of and approving these
applications, and received a small portion of LICHTENSTEIN's bribe money
from VILLANUEVA.    In addition to these cash bribes, LICHTENSTEIN
provided other benefits to VILLANUEVA and CW-1, including, for example,
bottles of liquor; limousine rides for VILLANUEVA; and a limousine tour of
wineries for VILLANUEVA, CW-1, another officer of the Licensing Division,
and their significant others.    FRANK SOOHOO bribed VILLANUEVA, by
providing him with, among other things: (i) multiple lunches per month at
restaurants paid for by SOOHOO, and (ii) multiple all-expenses paid vacations,
including international travel, for VILLANUEVA and a companion, the value of
which was at least several thousand dollars.[2]

e. As a part and in furtherance of the bribery scheme, and in exchange for the
financial and other benefits set forth above, the clients of ALEX
LICHTENSTEIN, a/k/a "Shaya," and FRANK SOOHOO were typically
processed in the following manner:

---

[2] In the event of one trip travel records indicate SOOHOO, CW-1, and VILLANUEVA took
together, there are bank and travel records indicating that CW-1 and VILLANUEVA may have
reimbursed SOOHOO. However, this trip was not among the trips CW-1 listed as compensation
for the bribery scheme in discussing the scheme with agents.

37

i. LICHTENSTEIN or SOOHOO alerted DAVID VILLANUEVA that one or more clients was coming to the Licensing Division to apply for a gun license.

ii. VILLANUEVA then alerted CW-1 that either a LICHTENSTEIN or a SOOHOO client was coming to apply for a gun license. VILLANUEVA typically assigned CW-1 the task of conducting the first level investigation and review of Applications submitted by clients of LICHTENSTEIN or SOOHOO.

iii. When a client of LICHTENSTEIN or SOOHOO came to the Licensing Division, often accompanied by LICHTENSTEIN or SOOHOO, either VILLANEUVA or CW-1 processed the client's application in a perfunctory fashion without conducting or completing the required due diligence, in that they failed to (i) a complete review of the applicant's criminal history; (ii) verify the details of the application; (iii) conduct an in-person interview of the applicant; and/or (iv) investigate the business need for Limited and Full Carry Licenses. On some occasions, these protocols were followed, but only after the client was approved for a license.

iv. Soon after the Application of a LICHTENSTEIN or SOOHOO client was submitted to the Licensing Division, VILLANUEVA typically told CW-1 to "close out" the file, meaning to enter CW-1's approval of the Application in the Licensing Division computer system (the "Computer System"). After CW-1 did so, VILLANUEVA entered his approval in the

38

Computer System, and a gun license would be issued for the client without further review. Entry of the approval of the first-level investigator, such as CW-1, and of a supervising officer, such as VILLANUEVA, in the Computer System was necessary before a gun license would be issued.

f. In addition to expediting and approving Applications of clients of ALEX LICHTENSTEIN, a/k/a "Shaya," and FRANK SOOHOO, DAVID VILLANUEVA, and CW-1 also at times upgraded the gun licenses of LICHTENSTEIN's and SOOHOO's clients. For example, VILLANUEVA and CW-1 at times upgraded such clients' gun licenses from Premises Carry to Limited Carry and from Limited Carry to Full Carry, without conducting further required investigation for such upgrades.

g. As part of the bribery scheme, not only were gun licenses for the clients of ALEX LICHTENSTEIN, a/k/a "Shaya," and FRANK SOOHOO approved or upgraded without the necessary protocols being followed or the necessary due diligence being conducted, but gun licenses were approved for LICHTENSTEIN and SOOHOO clients who, because of their criminal or personal history, would likely have been rejected as a matter of discretion by the Licensing Division. For example:

i. In or about February 2015, DAVID VILLANUEVA, approved the Limited Carry gun license for a LICHTENSTEIN client ("Client-1"). Client-1's Limited Carry gun license was approved even though Client-1 had been previously arrested for bribing a public official and for assault.

39

ii. In or about May 2015, DAVID VILLANUEVA, approved the Limited Carry gun license for a SOOHOO client ("Client-2"). Client-2's Limited Carry gun license was approved even though Client-2 had a prior arrest and conviction for attempted criminal possession of stolen property; a prior arrest for possession of a forged instrument; and multiple prior arrests for the unlicensed operation of a motor vehicle.

h. As a result of the bribes that were given by ALEX LICHTENSTEIN, a/k/a "Shaya," to and accepted by, DAVID VILLANUEVA, VILLANUEVA expedited, approved, and caused to be approved at least approximately 100 to 150 Applications submitted by LICHTENSTEIN for his clients.

i. As a result of the bribes that were given by FRANK SOOHOO, to and accepted by, DAVID VILLANUEVA, VILLANUEVA expedited, approved, and caused to be approved at least approximately 15 Applications submitted by SOOHOO for his clients.

21. From speaking to another NYPD officer not assigned to the licensing division ("Precinct Officer-1"), I have learned that in or around the early months of 2016, ALEX LICHTENSTEIN, a/k/a "Shaya," was banned by a commanding officer of the Licensing Division from obtaining assistance for his clients. As a result, in or about April 2016, in an attempt to establish an additional relationship within the NYPD to facilitate the expediting and approval of gun licenses for his clients, in exchange for bribes, LICHTENSTEIN approached and offered a bribe to Precinct Officer-1. Although Precinct Officer-1 did not work in or with the License Division, ALEX LICHTENSTEIN, a/k/a "Shaya," indicated that he was soliciting

40

Precinct Officer-1, as an NYPD officer with whom LICHTENSTEIN was familiar, for assistance.

22. On or about April 13, 2016, Precinct Officer-1, acting at the direction of the Federal Bureau of Investigation (the "FBI") and the NYPD's Internal Affairs Bureau ("IAB"), met with ALEX LICHTENSTEIN, a/k/a "Shaya," in Borough Park, Brooklyn. Precinct Officer-1 was equipped with video- and audio-recording devices for the duration of the meeting, and the following occurred, among other things, during the meeting:

> a. At the beginning of the meeting, LICHTENSTEIN patted down Officer-1 in an attempt to detect whether Officer-1 was wearing a wire. Officer-1 stated that "you don't have to pat me down." LICHTENSTEIN responded that he would rather meet Officer-1 "in your underpants and your undershirt," which Officer-1 understood to mean that LICHTENSTEIN wanted to be sure that Officer-1 was not recording the meeting.

> b. As part of his effort to assist IAB and the FBI, Officer-1 told LICHTENSTEIN, in sum and in substance, that he was nervous about helping LICHTENSTEIN obtain gun licenses but could use the money, and that he (Officer-1) could not secure gun licenses on his own since he was not in the NYPD License Division, but that he knew a union delegate who was in the License Division and would be willing to help him.

> c. Officer-1 also asked LICHTENSTEIN how much money Officer-1 could make if Officer-1 obtained gun licenses for LICHTENSTEIN's customers, and LICHTENSTEIN responded: "I'll give you and [the union delegate] more than

41

you'll make in the police department." LICHTENSTEIN offered Officer-1 $6,000 per gun license that Officer-1 helped him obtain.

d. LICHTENSTEIN further told Officer-1: "I got so many license[s] in last year," and estimated that he had obtained 150 gun licenses through his connections in the NYPD License Division. LICHTENSTEIN then took out his calculator and multiplied 150 by $6,000, to demonstrate to Officer-1 how much money ($900,000) Officer-1 could make.

23. On or about April 18, 2016, FBI agents executed a judicially authorized search of LICHTENSTEIN's residence. During that search, they found numerous items tying him to the LICENSING SCHEME in a home office area within his residence, including actual NYPD gun license applications and pictures of LICHTENSTEIN with various NYPD personnel including GRANT.

### B. Additional Probable Cause Specifically Justifying Search of the Subject Premises

24. According to information in databases available to law enforcement:

a. At all times relevant to this application, JEREMY REICHBERG lived in the 56th Street Residence. He lives there still.

b. At all times relevant to this application, the business located at the Whitestone Business was owned and operated by FRANK SOOHOO. He owns and operates it still.

25. From my conversations with CW-2, I have also learned that CW-2 has been to REICHBERG's home, which contains a home office area. CW-2 is familiar with REICHBERG's business, having let REICHBERG use space at his office before, and describes REICHBERG's business as largely consisting of assisting private individuals in getting favorable treatment from the City of New York, including the NYPD.

42

26. FRANK SOOHOO's expediting business is located at the Whitestone Business, which advertises on its exterior signage, among other services, "pistol license services." Based on my conversations with members of the NYPD, and with other FBI agents who have discussed the matter with members of the NYPD, there is generally no requirement for a gun license that would require the services of a third party in order for the process evaluation and approval to run to completion.

27. Based upon my training and experience, I know that individuals attempting to maintain an illegal business relationship may maintain documents evidencing that relationship within closed and/or locked cabinets, briefcases, storage lockers, safes, file cabinets, and other containers kept within their homes or places of business, particularly where such documents are evidence of a crime. I therefore ask authorization to open any closed items and containers so that they may be opened if tools or other implements are required.

28. In addition, based on my training and experience, I know that persons engaged in bribery schemes (including the exchange of cash bribes for official actions) typically can keep records relating to their business and criminal activity in order to track the individuals making the payments, the official benefits obtained as a result of those payments, and the funds obtained as a result of the scheme. Such records may include, among other things, ledgers, rosters, billing, expense and financial records, and supporting documents that purport to authorize the official benefits conferred on the payor of the bribes by the bribe recipients.

29. Based on my training and experience, and the facts above, I understand that the Subject Premises may contain evidence of the Subject Offenses. Among other things, it is possible that the Subject Premises may contain evidence of:

43

a. The Whitestone Business: Communications between and amongst co-conspirators concerning payments made to or favors performed by NYPD law enforcement personnel, including the provision of gun licenses, escort services, deployment of NYPD units, and others; ledgers; business records; notes; vouchers; invoices; bank, accounting or financial records; receipts; other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; business records pertaining to gun permit expediting services, contact information for NYPD Licensing Division personnel, correspondence with licensing division personnel, gun license expediting customer contact files, information, and correspondence; client logs; travel records.

b. The 56th Street Residence: Communications between and amongst co-conspirators concerning payments made to or favors performed by NYPD law enforcement personnel, including the provision of gun licenses, escort services, deployment of NYPD units, and others; ledgers; business records; notes; vouchers; invoices; bank, accounting or financial records; receipts; other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; gun license application materials for Jeremy Reichberg or his associates, communications with NYPD personnel, indicia of relationship between Jeremy Reichberg and James Grant and/or Michael Harrington and/or other NYPD personnel, including correspondence, pictures, records of financial transactions and travel.

44

**III. Conclusion and Ancillary Provisions**

30. Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

31. In light of the confidential nature of a continuing investigation whose full scope is not yet public, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise. Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation, and the premature disclosure of the contents of this affidavit and related documents may jeopardize the effectiveness of the investigation.

JENNIFER M. RANUCCI
Special Agent
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me on
June 17, 2016

HON. VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

45

## Attachment A: 1252 56th Street, Brooklyn, New York 11219

### I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein:

## 1252 56th Street, Brooklyn, New York 11219

A three story brick home with a one-car garage at ground level and a front door on the right side (viewed facing the building) at the end of a flight of eight steps. There are multiple security cameras affixed to the front of the residence.

### II. Items to Be Seized

#### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy) (the "Subject Offenses"):

Communications concerning payments made to or favors performed by NYPD law enforcement personnel, including the provision of gun licenses, escort services, deployment of NYPD units, and others; ledgers; business records; notes; vouchers; invoices; bank, accounting or financial records; receipts; other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; gun license application materials for Jeremy Reichberg or his associates, communications with NYPD personnel, indicia of relationship between Jeremy Reichberg and James Grant and/or Michael Harrington and/or other NYPD personnel, including correspondence, pictures, records of financial transactions and travel.

## Attachment A: 14-30 149th Street, Whitestone, New York 11357

### I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein:

### 14-30 149th Street, Whitestone, New York 11357

A business occupying the first floor of a two-story building in Whitestone, Queens. The first floor bears signage identifying the business within as "Gunsmoke Too Inc." and advertising premium cigars and law enforcement equipment such as handcuffs, Kevlar gloves, and "pistol license services." The first floor is accessed via a front door beneath a brown awning with "GUNSMOKE TOO Inc." written on it.

### II. Items to Be Seized

#### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy) (the "Subject Offenses"):

Communications between and amongst co-conspirators concerning payments made to or favors performed by NYPD law enforcement personnel, including the provision of gun licenses, escort services, deployment of NYPD units, and others; ledgers; business records; notes; vouchers; invoices; bank, accounting or financial records; receipts; other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; business records pertaining to gun permit expediting services, contact information for NYPD Licensing Division personnel, correspondence with licensing division personnel, gun license expediting customer contact files, information, and correspondence; client logs; travel records.

AO 93  (SDNY Rev. 01/17) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

**17 MAG 9331**

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| 35 Electronic Devices, Known and Described in Attachment A | ) |
| | ) |

Case No.   16 Cr. 468

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment A

The search and seizure are related to violation(s) of *(insert statutory citations)*:

Title 18, United States Code, Section 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud); and 1349 (honest service fraud conspiracy); and 1512 (obstruction of justice)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before     *12-29-17*
                                                                                                            *(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.    ☑ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court.
       ☐ Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court. _____
                                                                                                                                                            *USMJ Initials*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for    30    days *(not to exceed 30)*.
                                               ☐until, the facts justifying, the later specific date of _____.

Date and time issued:     *12-15-17* _____        _____Kathrin H Par_____
                                                                                                            *Judge's signature*

City and state:   New York, NY _____        Hon. Katharine H. Parker, U.S. Magistrate Judge
                                                                                                    *Printed name and title*

AO 93  (SDNY Rev. 01/17) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>16 Cr. 468 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**Attachment A**

## I. Subject Devices to be Searched—Subject Devices

The Subject Devices are particularly described as the following and any forensic copy images thereof:

| | |
|---|---|
| Subject Device-1 | LG Cellphone bearing Serial Number 209KPJP0849724 |
| Subject Device-2 | iPhone bearing International Mobile Equipment Identifier ("IMEI") 990002269393011 |
| Subject Device-3 | iPhone bearing IMEI 359301060262234 |
| Subject Device-4 | iPhone bearing IMEI 9900002285376507 |
| Subject Device-5 | Samsung flip phone bearing Mobile Equipment Identifier ("MEID") HEX A00000173F5FOB |
| Subject Device-6 | (2) Toshiba 16GB USB Drives |
| Subject Device-7 | (2) SanDisk USB Drives |
| Subject Device-8 | (1) ADATA 32GB USB Drive |
| Subject Device-9 | (1) Verbatim USB Drive thumbdrives and compact disk |
| Subject Device-10 | Apple Mac Desktop bearing Serial Number C02K2RU1DNCV |
| Subject Device-11 | HP Protect Smart Computer bearing Serial Number CND8480R9Z |
| Subject Device-12 | Dell Laptop bearing Service Tag 1RJNJ91 |
| Subject Device-13 | Dell Inspiron Computer bearing Service Tag 4XTT6P1 |
| Subject Device-14 | Canon 32GB SD Card |
| Subject Device-15 | Dell Vastro 200 Desktop S/N: CNOYR413693617A92119 |
| Subject Device-16 | Seagate Hard Drive bearing Serial Number NA7RLSCJ |
| Subject Device-17 | Dell Laptop bearing Service Tag 9M2MZM1 |
| Subject Device-18 | HP Desktop ID #X13-04657 |
| Subject Device-19 | iPhone FCC BCG-E2946A |

| | |
|---|---|
| Subject Device-20 | Apple iPad Mini bearing Serial Number F4KJW2QPF19D |
| Subject Device-21 | Apple iPad bearing Serial Number DLXH843ADNQV |
| Subject Device-22 | Apple iPad bearing Serial Number DMPLJ0FJF4YG |
| Subject Device-23 | Apple iPad bearing Serial Number DKVM7013DKPM |
| Subject Device-24 | Apple iPad bearing Serial NumberDMPLM4EHFKYC |
| Subject Device-25 | Samsung Tablet bearing Serial Number NSCT06513C1 |
| Subject Device-26 | Motorola i830 Cell Phone, bearing Serial Number 364YENB0ZJ |
| Subject Device-27 | Sprint Blackberry model 9630 bearing MEID HEX # A000001C27AC7C |
| Subject Device-28 | Sprint Blackberry model 9650, bearing MEID HEX # A000001CE58F77 |
| Subject Device-29 | Sprint Blackberry Tour model, bearing MEID HEX # A000001C6EB68B |
| Subject Device-30 | Motorola Cell Phone, bearing Mobile Serial Number ("MSN") C68WHA7MSN |
| Subject Device-31 | AT&T Blackberry model 9000, bearing IMEI 359614024641024 |
| Subject Device-32 | AT&T Cell Phone bearing Serial Number Q4V7NB11C1305599 |
| Subject Device-33 | Blackberry bearing IMEI 352921050215678 |
| Subject Device-34 | Apple iPhone 4S, Model A1431 |
| Subject Device-35 | Apple iPhone Model A1387 |

## II.  Items to Be Seized

### A.  Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Devices include the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 666 (bribery), 1343 (wire fraud); 1346 (honest services fraud), and 1349 (honest service fraud conspiracy); and 1512 (obstruction of justice) (the "Subject Offenses") *including the following but limited to the time period 1/2012 through 6/2016*

1.  Documents concerning payments, gifts, or services provided to NYPD law enforcement personnel by JEREMY REICHBERG, JONA RECHNITZ or

persons associated with them.

2. Documents concerning actions performed by NYPD law enforcement personnel or potentially sought from NYPD law enforcement personnel, including the provision of escort services, deployment of NYPD units, and other official actions or uses of government resources, for the benefit of REICHBERG, RECHNITZ, or persons associated with them.

3. Business records, notes, vouchers, invoices, bank, accounting or financial records, receipts, or other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; ) *related to the Subject Offenses*

4. Documents, communications, and records demonstrating indicia of any relationship between JEREMY REICHBERG, JONA RECHNITZ, or their associates on the one hand and on the other hand, JAMES GRANT, MICHAEL HARRINGTON, and/or other NYPD personnel, including but not limited to correspondence, pictures, records of financial transactions and travel, any documents related to NYPD or other law enforcement chaplain or civilian positions;

5. Location of other evidence, such as emails reflecting registration of other online accounts potentially containing relevant evidence;

6. Evidence indicating the identity of the user of the Subject Device*s*.

**B. Review of ESI**

Law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the Subject Devices and all electronically stored information ("ESI") contained within for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

   Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section II.A of this Attachment.   However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.