I5I8GRAC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4               v.                      16 Cr. 468 (GHW)

5  JAMES GRANT and
   JEREMY REICHBERG,
6
                   Defendants.
7
   ------------------------------x

8
                                    May 18, 2018
9                                   10:30 a.m.

10 Before:

11                  HON. GREGORY H. WOODS,

12                                  District Judge

13                 APPEARANCES

14 GEOFFREY S. BERMAN
        United States Attorney for the
15      Southern District of New York
   KIMBERLY RAVENER
16 JESSICA LONERGAN
   MARTIN S. BELL
17      Assistant United States Attorneys

18 JOHN MERINGOLO
   ANJELICA CAPPELLINO
19      Attorneys for Defendant Grant

20 SUSAN R. NECHELES
   KATHLEEN CASSIDY
21      Attorneys for Defendant Reichberg

22

23

24

25

I5I8GRAC

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Counsel, please state your names

 3    for the record.

 4              MS. RAVENER:  Kimberly Ravener, Jessica Lonergan, and

 5    Martin Bell for the government.

 6              THE COURT:  Good morning.

 7              MS. NECHELES:  Good morning, your Honor.  Susan

 8    Necheles and Kate Cassidy for Mr. Reichberg, who is here in

 9    court.

10              MR. MERINGOLO:  Good morning, your Honor.  John

11    Meringolo and Anjelica Cappellino for Mr. Grant, to my right.

12              THE COURT:  Thank you very much.

13              Good morning.

14              Thank you all for being here.  There are a number of

15    things on my agenda for the conference today which I would like

16    to review with you now.

17              The principal thing that I want to talk about is the

18    government's ongoing efforts to unravel the mystery that was

19    surfaced by counsel for defendants regarding failure to

20    disclose wiretaps.

21              I would like to hear about where we are with respect

22    to that and to talk about where we will go from here based on

23    the information that you are going to provide.

24              We also did not complete our discussion of the

25    subpoena for the accounting records.  I was also not able to
```

I5I8GRAC

1    talk about the Touhy regulation compliance issue.

2            Also, I think that we have the opportunity as a result

3    of the unfortunate adjournment to talk about the defense

4    exhibits issue with a little more focus.  And also I want to

5    talk about the prospect of using a questionnaire given the

6    unfortunate adjournment of our trial.  And also we may have the

7    opportunity to talk more about the motion in limine from

8    October 8 on Cox and Prostitute-1.

9            Everything other than the documents issue I will call

10   it subsidiary.  So I would like to start with that.  Is there

11   anything else that the parties would like to raise before we

12   begin?

13            First counsel for the United States.

14            MS. RAVENER:  No, your Honor.

15            THE COURT:  Counsel for Mr. Reichberg.

16            MS. NECHELES:  Did your Honor include deadlines?  Are

17   we going to talk about deadlines?

18            THE COURT:  We will come up with deadlines.  Let me

19   just make a comment about that.

20            We did have deadlines for discovery in the case at the

21   time that we had our early conferences.  The government as a

22   result of this issue that we are talking about now clearly did

23   not produce all of the documents by the deadlines that I

24   established.

25            We adjourned the trial in large part because of the

I5I8GRAC

1    option that I exclude this late disclosed set of evidence was

2    not viable.  I understood the proceeding to trial with this

3    evidence excluded wasn't viable because the defense strategy

4    was structured in part on the absence of certain calls and that

5    the unearthing of this evidence undermined that basic defense

6    strategy.

7              So we will set some deadlines today, I expect, but I

8    just wanted to comment that we had deadlines previously and the

9    reason why simple enforcement of those deadlines was not an

10   adequate remedy is that would have prevented our adjournment.

11             Counsel for Mr. Grant, anything else that you would

12   like to add?

13             MR. MERINGOLO:  Nothing else.

14             THE COURT:  Let's talk about what is happening with

15   the status of the government's investigation regarding the

16   nondisclosed wires.

17             Counsel for the United States.

18             MS. LONERGAN:  Yes, your Honor.  Earlier this week,

19   specifically on Tuesday, we produced to defense counsel the

20   entirety of the wiretap for both Reichberg and Rechnitz.  In

21   connection with that we provided a cover letter explaining the

22   number of breakdown, which I will put on the record now because

23   I think it will help the court understand some of the issues.

24             So with respect to the Reichberg wire, there is a

25   total of 10,677 sessions.  The line sheets that we provided had

I5I8GRAC

1    every session from 1 to 10,677.

2              We also produced 6,095 audio files.

3              THE COURT:  Can you say that number again?

4              MS. LONERGAN:  6,095.  And in explaining the gap,

5    here's the gap.  So there are five privileged audio files.  We

6    did not produce those.  We are working on getting the

7    privileged audio files to counsel for defendant Reichberg only.

8              There are 4,565 sessions with no audio content.

9              There's one corrupted audio file which we did not

10   produce because it was corrupted.

11             And there is one administrative or test audio file.

12   It is just a file that says something like hello.  And that was

13   also not produced.  They are testing the wire.

14             With respect to the Rechnitz wire, there is a total of

15   7,936 sessions.

16             We produced 5,032 audio files.

17             There are 79 privileged audio files and 2,825 sessions

18   with no audio content.

19             In addition, not on Tuesday but later this week, we

20   produced to defense counsel the line sheets in a spreadsheet

21   format, which is searchable and sortable.  It contains almost

22   every field that's on the line sheets.  The one field that it

23   does not contain is the field called content.  That's the

24   description of the call.  Because it couldn't be -- the way

25   that the spreadsheet is generated, we weren't able to pull

I5I8GRAC

1    that.  There is a content column.  What is in the content

2    column is a link, and that link goes to a Word document that

3    contains the content.  And we produced all of those Word

4    documents as well.

5           I want to be clear.  The numbers I just gave, that's

6    not all new.  That's the entirety of the wires.  So we thought

7    that what would simplify this whole process, given the

8    difficulties of production previously, was just to produce the

9    entirety of the wire, of each of these wires, in one so that,

10   for example, counsel could see the way we did that the line

11   sheets have every session from one to the final session of the

12   wire without any gaps.

13          THE COURT:  Thank you.

14          What is the explanation for the gap in the

15   government's prior production?

16          MS. LONERGAN:  Your Honor, just so I can be clear, are

17   we talking about the production of approximately two years ago

18   or the production within the last two weeks, or both?

19          THE COURT:  The production of approximately two years

20   ago, and to the extent there is a gap between what the

21   government more recently produced and what you just described,

22   I would be interested in hearing that too.

23          MS. LONERGAN:  With respect to what was produced two

24   years ago, as I think we have previously explained, so there

25   are a number of different classifications on each session.

I5I8GRAC

1    There are a classifications pertinent and nonpertinent and

2    privileged.  Then there are a number of other classifications,

3    such as voice mail, no content audio, and others.

4            The production two years ago produced only those

5    sessions and audio that had been classified either pertinent or

6    nonpertinent, and none of the other texts.  So that's the

7    explanation for the gap from two years ago.

8            It was based on a misunderstanding between the

9    government and the FBI about the existence of those tags

10   besides pertinent, nonpertinent and privileged.

11           Then with respect to approximately two weeks ago, when

12   we tried to remedy this situation, initially we thought it

13   might be simpler in terms of volume not to give defense

14   counsel --

15           THE COURT:  Can I just stop at this point.

16           How many of the 10,000 plus for Reichberg and 7,000

17   plus for Rechnitz, how many of those were not produced as part

18   of the government's initial disclosure?

19           MS. LONERGAN:  Your Honor, what I have are the numbers

20   of audio files that were not initially produced.  But as I was

21   about to explain, there was a gap.

22           So with respect to audio files on Reichberg's wire,

23   there was just over 2200.  And on Rechnitz' wire, the number of

24   audio files was just over 2100.

25           That includes audio files of any size, audio files,

I5I8GRAC

| 1 | many of which had almost no content.  It might be the voice |
| 2 | mail message got cut in half.  It might be just the phone |
| 3 | ringing.  It might be someone saying hello.  So that's all |
| 4 | audio files that were not produced initially. |
| 5 | THE COURT:  Can I just pause you on that. |
| 6 | During our last conference, Ms. Necheles raised a |
| 7 | question regarding the compliance by the government with any |
| 8 | minimization protocols.  How would you respond to that? |
| 9 | As I understand it, in addition to marking recordings |
| 10 | as pertinent and nonpertinent, there are other tabs.  Can you |
| 11 | tell me what those other tabs are and how they are used and how |
| 12 | that fits within the minimization protocol. |
| 13 | MS. LONERGAN:  Your Honor, so classification is |
| 14 | entirely separate from minimization.  I will give the court an |
| 15 | example. |
| 16 | A call could be classified as privileged and the |
| 17 | monitoring agent could still minimize it.  It wouldn't |
| 18 | necessarily make sense to do so, but again, the way that a call |
| 19 | or an incoming call is classified has nothing to do with |
| 20 | whether or not the agent can or can't minimize it. |
| 21 | So, for example, on the newly produced calls, we see |
| 22 | some that were minimized, despite the fact that they have the |
| 23 | classification unknown, and that means that the agents in |
| 24 | listening to them have determined that that was a call that |
| 25 | should be minimized. |

I5I8GRAC

1          So these things are in some ways -- they are not -- I

2     can understand why intellectually it seems like you should make

3     a determination and classify the call before determining

4     whether or not to minimize, and I am not in the FBI agent's

5     head so I don't want to do more than speculate.  But it seems

6     to me that a call that has not yet been classified but is

7     minimized, the agent has determined that was a call that should

8     be minimized despite the fact that the agent has not classified

9     that call by clicking a button to classify it.

10          THE COURT:  Do we know that an agent was present at

11     the time that each of these calls was recorded?

12          MS. LONERGAN:  Yes, your Honor.  So when they are not

13     in the room, the calls cannot be -- there is no audio

14     recording.

15          THE COURT:  Thank you.

16          Is this a common practice?  In other words, I

17     understand the government did not know in this case, the group

18     of experienced prosecutors did not know in this case that there

19     were tabs other than pertinent, nonpertinent, and privileged.

20     Is this a common practice by the FBI to use other designations?

21          MS. LONERGAN:  Your Honor, I can't speak to that.

22     That would have to be a question that we would have to ask of

23     the FBI.

24          THE COURT:  In this case I take it that the

25     government, meaning the prosecution team lawyers, only

I5I8GRAC

1    requested files that were marked pertinent, nonpertinent or

2    privileged?

3              MS. LONERGAN:  Your Honor, one moment.

4              THE COURT:  Please, take your time.

5              Ms. Necheles, as the government is conferring, do you

6    have a copy of the minimization protocol that was in place

7    here?

8              MS. NECHELES:  I don't know that I have an extra copy,

9    but perhaps there is someone who can make a copy.

10             THE COURT:  Can I just borrow it for purposes of this

11   conversation.  I will hand it back.

12             MS. NECHELES:  I am handing up two things.  One is the

13   order of interception, which I have tabbed, and actually marked

14   the minimization part of the order.

15             The other are the wiretap monitoring and minimization

16   instructions, which I understood the government had written up

17   for the people who were monitoring.

18             THE COURT:  Thank you.

19             Counsel for the United States, just let me know

20   whenever you're ready.

21             MS. LONERGAN:  Yes, your Honor.  So none of the

22   prosecutors sitting at this table were the prosecutors who

23   actually communicated with the FBI about the production of the

24   wire.  The first wire we produced in this series of related

25   cases was the Peralta wire, and that was the entirety of the

I5I8GRAC

1    wire.

2           As we mentioned, the wires for Reichberg and Rechnitz

3    with respect to discovery were run by a different agent and the

4    government was not aware that a different practice had been

5    done by the FBI in terms of running the wire for production.

6           THE COURT:  Thank you.

7           Thank you for that, counsel.  Please go on and tell me

8    more about the discrepancy, if any, between the more recent

9    production and two weeks ago production and the most recent one

10   produced by the government to the defense.

11          MS. LONERGAN:  Yes, your Honor.

12          I am trying to take something that's a little bit

13   complicated and break it down.

14          So there are two different fields that I want to talk

15   about in the line sheets.  One field is called classification

16   and the other is called content.

17          Classification is the field that, my understanding is,

18   the agents fill that out.  That's what we have been talking

19   about, pertinent, nonpertinent, etc.

20          Content is a field that's filled out by the computer.

21          In the classification field, one of the

22   classifications was no audio/content.  In the content field,

23   the computer either writes I think audio or none.

24          So when we produced what we believe to be the entirety

25   of the wire within the last two weeks before the most recent

I5I8GRAC

1    production, what we produced was all sessions associated with

2    audio files that had not previously been produced.  So that

3    means that what was filtered out was anything where the

4    computer has written Content:  None.

5          So if the classification was no audio but the computer

6    had a file there, that got produced.  If the content, the

7    computer said there was no audio file associated with that

8    session number, which happens, as the court can see, many

9    thousands of times, those were not produced in the recent

10   production before this one.

11         That is why I believe that when defense counsel

12   provided those spreadsheets to the court last week there were

13   still gaps.  Because what had not been filled in was session

14   numbers in which the computer said Content:  None.

15         THE COURT:  I may drill down on that further.

16         I would like to come back to pertinent, nonpertinent.

17   I am working at the wiretap monitoring minimization

18   instructions and I would just like to understand the

19   government's position on this further.

20         The version of the minimization instructions that I am

21   looking at is the set of instructions signed on January 10,

22   2015, by Assistant U.S. Attorneys Jacob and Bell.

23         The minimization instructions define pertinent

24   communications at Section B, that Section B of the order.

25         The order or instructions define pertinent

I5I8GRAC

1    communications as communications you may listen to.  So those

2    are what are pertinent communications.

3              Then there is a requirement that if, under (c)(1), in

4    the two-minute pertinent communication rule, it reads:  "You

5    should listen to the beginning of each communication only as

6    long as necessary to determine the nature of the communication

7    and in any event no longer than two minutes unless the

8    communication is 'pertinent.'  That is, a 'criminal

9    communication' within the scope of our authorization.  If you

10   determine that the communication is not a criminal

11   communication, turn the machine off (both the listening and

12   recording devices)."

13             So I want to understand what the government's view is

14   regarding these categories other than pertinent, because the

15   minimization instruction appears to state that pertinent

16   communications are those that the agents can listen to, and if

17   they are not determined to be pertinent, then the recording is

18   to be turned off.

19             So what are these other categories and how is it that

20   the recording of them complied with the minimization

21   instructions?

22             MS. LONERGAN:  Your Honor, one moment.

23             (Government counsel conferred)

24             THE COURT:  Ms. Necheles, while the government is

25   conferring, do you have a copy of the application that's

I5I8GRAC

1   associated with the order of interception?

2            MS. NECHELES:  Yes, your Honor.  One minute.

3            MS. LONERGAN:  Your Honor, if I may.

4            THE COURT:  Please do.

5            MS. LONERGAN:  Our understanding is that what the

6   statute requires is minimization.  The statute doesn't require

7   classification.  Classification is a tool that certainly helps

8   everyone in the process, but, for example, it's our position

9   that if no call was ever classified, no classification was ever

10  done, but that calls were properly minimized, that would not be

11  a violation of the statute.  Because the purpose of the statute

12  is to prevent as -- the case law is aware that there is going

13  to be interception and overhearing of some private

14  conversations.  The purpose of minimization is to try to reduce

15  that to the extent possible.

16            The instructions are a way to help the agents make

17  these realtime decisions about whether or not a call should be

18  minimized.

19            So, for example, the calls in the system, the default

20  is unknown.  If an agent is listening to a call, has not

21  classified it but has determined that it is pertinent, the

22  agent, our position would be, would be allowed to continue

23  listening to it because the point is whether or not the call is

24  actually related to the criminal activity, evidence of the

25  criminal activity.

I5I8GRAC

1          Similarly, if the agent has not tagged a call as

2     nonpertinent but the call is in fact nonpertinent, the agent

3     should be minimizing.

4          So our position is what is really at issue is

5     minimization, not classification.  Classification is a tool

6     that assists in minimization.

7          We have no reason at this point to believe -- as we

8     said, some of these calls that we are seeing on the newly

9     produced materials were in fact minimized, even though they

10    were tagged unknown.  So we have no reason to believe here that

11    the production failure, which is what I think happened here,

12    equates in any way to a problem with minimization.

13          THE COURT:  Thank you.

14          To be clear, as I understand it, the government's

15    position is that a recording can be pertinent and that an agent

16    can make a determination that a call is pertinent and therefore

17    continue to listen to it in compliance with the terms of the

18    minimization instructions even if they do not mark it as

19    pertinent.  They can mark it as anything other than

20    nonpertinent and it's still in compliance with the minimization

21    instructions.

22          MS. LONERGAN:  I think what we are speaking about is

23    compliance with the statute.  The minimizations instructions I

24    think are a way to help the agents in realtime comply with the

25    statutory requirements.  I have not seen -- the case law

I5I8GRAC

1    research we have done to date, the minimization instructions

2    are of course a relevant consideration to a court in

3    considering whether minimization was properly done, but what

4    the court is really looking at is whether there was compliance

5    with what the statute required rather than the instructions.

6             THE COURT:  Thank you.

7             Counsel, do you have the application?

8             MS. NECHELES:  I do, your Honor.  It's for the January

9    10, which I believe is what your Honor has.  I have the

10   affidavit in support of it as well.

11            THE COURT:  I understand why the government is focused

12   on the statute in the event that defense makes a motion with

13   respect to this.  I will focus on that separately as well.

14            Right now I am trying to get a sense of what in fact

15   happened and how that comports with the structure that is

16   outlined in the minimization instructions and may, as I am

17   about to assess, be embedded in the court's order to the extent

18   that the process is set forth in the government's application

19   for the order and the affidavit submitted in support of the

20   application.  The court orders interception to be conducted in

21   a manner as set forth in the government's application for the

22   order and the affidavit submitted in support of the

23   application.

24            So I am looking now to see whether or not the process

25   described in the wiretap monitoring minimization instructions

I5I8GRAC

 1    are also included in the application to see whether or not the

 2    government complied with the order of minimization.

 3            MS. LONERGAN:  Your Honor, to the extent that the

 4    court just said to determine what actually happened, I don't

 5    think that the right people to answer those questions are

 6    before the court today.  Although we are involved in

 7    communicating with the agents about how to monitor a wire, we

 8    are not the people who are in the wire room.  We are not the

 9    people who are making these decisions.  And we are not able to

10    speak with firsthand knowledge about minimization.

11            We can look at line sheets to determine whether calls

12    were in fact or not minimized.  That shows up on a line sheet.

13    But again, to the extent it's important to the court what

14    exactly was happening in the wire room, respectfully, we don't

15    feel comfortable representing the decisions that the agents

16    were making beyond what is on the wire sheet.

17            THE COURT:  Thank you.  I am not asking for that at

18    this point, although we may dig into it depending on whether or

19    not it's necessary, if it's the subject of an application by

20    the defense.

21            The thing I want to make sure I understand is what the

22    government understands its minimization instructions to

23    require.

24            This minimization instruction is executed by the

25    assistant U.S. attorneys involved.  I take it from your

I5I8GRAC

1    comments earlier that the government was not aware there were

2    markings other than pertinent communications that would

3    constitute evidence of illegal activities.  Those terms are

4    defined in (b)(1) of the minimization instructions to basically

5    be congruent.

6           So what I can ask the people who are here, who signed

7    the minimization instructions, is whether you understood that

8    there were -- are you expecting that conversations reflecting

9    illegal activities would be marked as pertinent pursuant to the

10   terms of the minimization instructions as opposed to something

11   else?

12          MR. BELL:  Your Honor, I am one of the undersigned

13   assistant U.S. attorneys.  Our understanding was that the

14   pertinent classification would be what your Honor just

15   described it as from the instructions, yes.  We did not have an

16   understanding of there being sort of a broader universe of

17   correspondence that would involve substantive communications,

18   including recordings potentially probative of illegal activity

19   articulated in the application.

20          THE COURT:  Thank you.  That makes sense based on the

21   language of the order, or the instructions.

22          Ms. Necheles, is there a fact that you wanted to bring

23   to my attention?

24          MS. NECHELES:  Yes, your Honor.  We have reviewed this

25   over the week and also did legal research, not a lot.  Your

I5I8GRAC

1    Honor, I am not an expert in wiretap.  It's been a while.  It's

2    about six years since I had a wiretap case that I made a motion

3    on.  I did make a new chart.  So if I could hand up to your

4    Honor and give to the government my new chart.  Two charts.

5         THE COURT:  Thank you.  Please do.

6         MS. NECHELES:  The one thing that we realized as we

7    were going through the data -- what I have handed up are two

8    charts.  One is with respect to Jeremy Reichberg's phone and

9    one is with respect to Jona Rechnitz's phone.  And the key, the

10   colors, are on the one that has multicolors.

11        So what we realized is that the categories have been

12   changing.  That since the time that these were initially

13   produced to us, these categories apparently have changed on the

14   line sheets.

15        THE COURT:  Give me one moment.  I am going to mark

16   the spreadsheet that you have handed to me, that is two pages

17   in length and has multiple color coding in the chart, as Court

18   Exhibit A for purposes of today's conference.

19        I am going to mark the one-page spreadsheet in which

20   everything is highlighted in yellow as Court Exhibit B for

21   purposes of this conference.

22        Please proceed.

23        MS. NECHELES:  So A is the one with the multiple

24   colors, your Honor?

25        THE COURT:  Yes.

I5I8GRAC

 1          MS. NECHELES:  So what we were told just a little

 2     while ago by the prosecutor is that initially -- and what we

 3     were told before as well -- is that initially everything gets

 4     marked unknown, or that's the default, and then other things

 5     get marked, gets marked pertinent, nonpertinent.  And I had

 6     understood from the minimization instructions, which you have

 7     before you, your Honor -- I am not positive, but I

 8     understood -- that at the end of every day, within 24 hours,

 9     whatever line sheets there were were produced to the assistant

10     who was monitoring the wire.  Because every ten days a

11     description had to be put into the report, ten-day report, to

12     keep the wire going.  So they needed to know what was going on

13     in this wire.  It was based on that description that they would

14     put together the report.  I understood that from the

15     minimization instructions.

16          THE COURT:  Thank you.  I'm sorry.  I have your copy

17     of it.  Do you recall the section to which you're referring?

18          MS. NECHELES:  No, I do not.  If you hand it to me, I

19     can try to locate it.

20          Page 13, item G3.

21          THE COURT:  Thank you.

22          Please proceed.

23          MS. NECHELES:  Based on that, I would have thought

24     that the assistants would have seen there was a pertinent and

25     nonpertinent.

I5I8GRAC

1          In addition, what the minimization instructions say,

2     and the order and, I believe, case law -- I went back and did

3     some research this week -- that the only thing that the

4     assistants and the investigative team are allowed to review are

5     the pertinent calls.  The nonpertinent calls, according to the

6     minimization instructions, are not to be disseminated, and I

7     think it's according to the order as well, are not to be

8     disseminated to the investigative team.  In fact, I have a

9     different order in front of me, but I think it's the same

10    format.

11         THE COURT:  The language of it is as follows.  I will

12    note or highlight as I read this the word choice.  It says:

13    "In particular, electronic communications that do not appear to

14    be criminal in nature and are marked as 'nonpertinent' messages

15    that appear to be privileged and are marked as privileged are

16    to be secured ..."

17         MS. LONERGAN:  Hopefully I can cut through this.

18    There is a difference, an incredibly important difference,

19    between wire calls and electronic communications.  The language

20    the court has read applies only to electronic communications

21    and not to wire calls.

22         THE COURT:  Thank you very much.

23         Please go ahead, Ms. Necheles.

24         MS. NECHELES:  I know that when I did a little

25    research what I seemed to see was a case that actually I had

I5I8GRAC

1   litigated a bunch of years ago and had forgotten about, and

2   what I think that it suggested was, if I could just refer the

3   court to it, was that, what the case suggested was that the

4   government should not be reviewing nonpertinent conversations.

5   And the case was United States v. -- my client's name was

6   Neuman, N-E-U-M-A-N.  I think the name of the case was

7   Liebowitz.  I do not have the citation here.  Yes, I do.

8   United States v. Liebowitz, 11 Cr. 134 (2012).  I have the

9   Lexis cite, which is 2012 U.S. Lexis 189705, at pages 52-58.

10          So I haven't done extensive research on it.  But it

11  certainly indicates in the minimization instructions that it

12  was important to mark things pertinent and nonpertinent and

13  that nonpertinent things would not to reviewed by the team.

14          In addition, if you go back to the chart, what this

15  chart shows, and let me start with A, everything that is

16  yellow -- what we have been told by the government is that the

17  only categories produced to the defense at first were pertinent

18  and nonpertinent documents or wiretaps.  But among the new

19  things that were produced to us are things that are marked

20  pertinent.  So when we look at this, we think, gee, I guess

21  that was changed, that category was changed.  So that's what we

22  have marked as yellow, not previously produced, that the

23  category on the line sheets that we have now received is

24  pertinent.

25          So taking the government at their word I am assuming

I5I8GRAC

1   that these were all were changed.

2           In addition, we can see that some of the line sheets

3   that were produced to us before, which were marked pertinent

4   before are now marked nonpertinent.  Those are the green ones.

5           And some of them that were marked pertinent before are

6   now marked no audio.  We haven't checked them.

7           And one of them that was marked before nonpertinent is

8   now marked pertinent.

9           In fact, I have with me that line sheet, and I only

10  have one copy.  I made a copy of the first version we got and

11  the second version that we received.  I will show it to

12  government and then ask to hand it up.  It's a line sheet for

13  session 10,407.

14          Can I hand this up now?

15          THE COURT:  Please do.

16          MS. NECHELES:  That is a conversation between, I

17  believe it was Mr. Reichberg and an individual named Murray

18  Huberfeld, who is a defendant in the companion case.

19          The first page of what I handed up to your Honor is

20  the original line sheet that we received which shows

21  nonpertinent.  The second page is the new line sheet where it's

22  marked pertinent.

23          THE COURT:  Thank you.  I see that there is a

24  parenthetical following the comments on the second version of

25  the line sheet.  It doesn't appear on the first page?

I5I8GRAC

 1             MS. NECHELES:  Yes, your Honor.

 2             THE COURT:  Thank you.

 3             Counsel for the United States, how do you respond to

 4      the charts that Ms. Necheles has presented?  I just will read

 5      the parenthetical which reads, "Discussion about Gilead

 6      post-analysis July 27, '17," with some initials which appear to

 7      be the initials of the user who prepared that line sheet, who

 8      is a different individual from the user who prepared the first

 9      line sheet.

10             How do you explain the modifications, which are

11      apparent here?  It doesn't fit into the construct that you gave

12      me earlier.

13             MS. LONERGAN:  Your Honor, I will respond to the

14      court's question, but then I want to make broader point.

15             As the court can see from the line sheet, the call was

16      in fact minimized.  That is what is appropriate.  There is no

17      impropriety.  The initial listener designated nonpertinent and

18      minimized it.  A case agent who was more familiar with the

19      facts then went back in, listened to it or looked at it and

20      determined that it was pertinent.  But even though it was

21      pertinent, we are not able to get back that minimized audio.

22             Again, what the agents are required to do is minimize

23      when they determine, based on their understanding of the case,

24      that a call is nonpertinent, and that was what was done here.

25             So, in fact, Ms. Necheles's example shows that the

I5I8GRAC

1    agents were complying with the minimization instructions.

2            THE COURT:  Can I ask about that, though.  And I have

3    handed back the copies of the materials to Ms. Necheles and her

4    colleagues.  I am not going to ask for them back.

5            Is it the government's understanding that documents

6    that are marked as nonpertinent and are minimized are available

7    for future review by members of the prosecution team?

8            MS. LONERGAN:  If they are wire calls, of course.  And

9    that what is clear in every iteration of minimization

10   instructions.

11           The reason, if I may, the reason that there is a

12   difference between wire calls and electronic communications is

13   as follows:  Wire calls, as the court is aware from this

14   discussion, spill over a period of time.  So there is a period

15   of time in which a case agent can make a pertinence

16   determination and then they can, if it seems nonpertinent, can

17   minimize and spot check, as is required in the minimization

18   instructions.

19           An electronic communication, however, like a text

20   message, just exists.  It just is.  You can't minimize a piece

21   of it and then go back.  It's just a text message.

22           So unlike with a wire call, there is no way to

23   minimize a portion of a text message to then go back and figure

24   out and check it again.  That's why they are treated

25   differently.  Because a text message, once seen, is just seen.

I5I8GRAC

1    But for a wire call, because it lasts for a period of time, it

2    can be minimized.

3            Your Honor, if I may make a broader point, which is

4    that we are committed to getting to the bottom of any issues

5    regarding this wire.  We have responded to the court's

6    questions.  We have responded to defense counsel's questions.

7            What is happening in these conferences is defense

8    counsel is doing good work and raising questions, but they are

9    giving them to the government in realtime.  We are not sitting

10   here with a copy of the wire and we can't answer these

11   questions in realtime.

12           We are happy to continue to engage in any process that

13   is necessary, but there is a couple of ways to do that.  One is

14   for defense counsel to pose questions to us, not in this court

15   setting in which we don't actually have any of the materials we

16   need to answer the questions.  And we will do our best to get

17   the information to them.

18           The other is if they believe that the wire was

19   monitored improperly, they should move on that and then we can

20   respond to their motion through an opposition brief and, if

21   necessary, engage in any further fact-finding.

22           But this process in which they continue to bring

23   charts before the court and then the government is put on the

24   spot to try to answer the questions, can't get answers to

25   anyone's satisfaction in the moment, and then we have to come

I5I8GRAC

1   back a week later, this seems at this point to be a

2   never-ending process.

3          THE COURT:  Thank you.  Just to make a editorial

4   comment on that.

5          I agree with you that this is not necessarily the best

6   forum for the parties to work together to find out what

7   happened.  And I agree that conversations outside of the

8   context of the court hearing may be productive.  But there is a

9   more fundamental issue here, which is the credibility of the

10  government with respect to these discovery issues.

11         The court and counsel relies on the thoroughness of

12  the United States Attorney's Office with respect to production

13  of things like Brady materials, with respect to things like

14  production of Title III line sheets, with respect to things

15  like 3500 materials.  The court and defense counsel rely on

16  this.

17         The protocol that you're describing in order to

18  resolve these issues is very reasonable.  At the same time, the

19  issue, in part, is that the government, I expect, will provide

20  complete and thorough answers and complete and thorough

21  discovery responses without the need for such intense scrutiny

22  by defense counsel.  Defense counsel should not need to do the

23  kind of work that they are doing here.  And the court should be

24  able to rely on the work done by the government.  And for

25  whatever else we can say about the process the defense is using

I5I8GRAC

1    to bring these to the court's attention, it does undermine the

2    faith in the adequacy of the government's productions.

3            So I hope that you appreciate that this is not a game

4    of gotcha.  The government has an obligation to the court and

5    to the parties to be complete and thorough in its reviews.

6    These issues should ideally not be surfaced by the defense

7    because they shouldn't exist.

8            So I don't take issue with the defense's work to bring

9    these gaps to my attention.  I think it will be more productive

10   if the parties have the conversation outside of court time.

11   But this is not an issue caused by the defense.  This is a gap

12   caused by the United States' failure to produce all of the

13   responsive documents and timely.

14           I think we need to keep this in the right frame.  And

15   I think the correct frame is to recognize this discovery snafu

16   is not a product of the defendants' inaction.  It's the

17   consequence of their trust in the government's prior production

18   and affirmations to them.

19           MS. LONERGAN:  We agree with the court wholeheartedly.

20   We take our obligations seriously and it should not have fallen

21   upon the defense to bring these to the government's attention.

22   Again, I don't know what else we can say about that except that

23   we agree that this was not the way that any of this should have

24   unfolded.

25           What we are saying now is, with every question that

I5I8GRAC

1   the defense is posing to us, we are doing our best to, as

2   quickly as possible, get to the bottom of it.  With respect to

3   these new charts, this is a question that we can discuss with

4   defense counsel, but we do not believe that the change in

5   classification of calls shows any sort of deficiency in the

6   wire or in the way that the wire as monitored.

7          Again, as the example that defense counsel handed up

8   to the court shows, the agents were acting completely in

9   compliance with the instructions.  So, again, this is something

10  that we agree there are things that -- it's not about the

11  defense bringing things to our attention.  That's not the way

12  the process is supposed to work.  But, for example, change in

13  classification is not necessarily something that we would

14  affirmatively raise with the defense counsel because we believe

15  that it is appropriate and proper for classifications to be

16  changed upon further review.

17         Again, if defense counsel calls us with questions,

18  that they are seeing something in the wires that they don't

19  understand or think is problematic, it is our intention to make

20  all efforts to answer those questions.

21         With the court's other comments with respect to Brady

22  material, 3500, Giglio, again, we do understand our

23  obligations.  We have gone back and forth.  There has been a

24  lot of discussion in the court.  The court is aware of the

25  volumes of materials that we have already produced.  To the

I5I8GRAC

1    extent that there are additional materials generated between

2    now and the newly scheduled date for trial, we will take the

3    same approach in producing everything we think falls under any

4    of those categories.  And we are going to do what we did

5    previously, which is in an abundance of caution produce

6    statements of every witness whether or not we intend to

7    actually call that person and with enough time for defense

8    counsel to make use of those statements.

9              THE COURT:  Thank you.

10             I appreciate those comments and I will just comment

11   briefly.

12             The government provided a number of witness statements

13   as, quote-unquote, 3500 materials to the defense.  As I

14   understand it from our prior conversations, those,

15   quote-unquote, 3500 materials related to statements made by

16   people who were not witnesses and therefore might not, strictly

17   speaking, be categorized properly as 3500 materials.

18             It may be in part because of that disconnect that the

19   defense is concerned that the government was not providing

20   information that they assert to be Brady materials.  In other

21   words, if these are not witness statements, why are you

22   providing them to us under the guise of 3500 materials?

23             You also understand that the defense has raised

24   concerns as a result of what I will characterize as the

25   overproduction of Mr. Reichberg's discovery.  So there are

I5I8GRAC

1    reasonable concerns that the defense has articulated regarding

2    the overproduction of information that is not, hate to say it,

3    pertinent, because it forces the defense to look for a needle

4    in the haystack instead of giving them the needle.

5             That's been a concern throughout the course of the

6    case and I think more cooperative communications between the

7    parties regarding what it is that the government is producing

8    and why and what the government thinks is being provided out of

9    abundance of caution as opposed to because you believe that

10   it's relevant to the charges in the case might be helpful to

11   avoid future controversy.

12            Good.  Let me ask, with respect to these issues, Ms.

13   Necheles, what else would you ask for the court to do at this

14   time?  I don't take issue with the fact that you're raising

15   these things now.  I recognize the court conferences frequently

16   generate activity on the part of the lawyers who are appearing

17   in court.  I also want to encourage the parties to continue to

18   work outside of court.

19            What is your proposal here?

20            MS. NECHELES:  I understand.  I want to be clear, your

21   Honor.  We asked specifically, and we have documents of this

22   and we had outside conversations with the prosecutors.  One of

23   the prosecutors that is here today was actively involved in the

24   production and in conversations and in writing letters about

25   what has been produced.  And these things weren't produced.

I5I8GRAC

1          We will be making a motion based on that.

2          We ask that the records not be changed anymore.  I

3    feel like I am stunned to see these changes in records.  What

4    it effectively means is there are all these line sheets that

5    are now characterized as pertinent which were never turned

6    over.  I don't even understand this process, how this could be

7    happening.

8          What we were originally told was that we had been

9    given originally all the pertinent stuff, they just didn't

10   gives us the other stuff that includes pertinent stuff.  Now it

11   turns out there are things that have since been marked as

12   pertinent.  When were they going to give that to us?  I don't

13   understand what has gone on in this case.

14         I have always understood the line sheets to be a

15   record of what the agents were noting then.  I am really

16   disturbed to see that they are changing over time and that they

17   have been changed over time.  I have spoken to a number of

18   people.  No one I know has ever heard of this happening before.

19   It is of great concern to me.

20         I am going to ask that an audit report be created to

21   see when things were changed.  I don't understand the

22   distinction that the prosecutor made in court today.  Maybe I

23   don't totally understand the law.  I am not an expert on

24   wiretap.  I believe, however, that there is an issue here with

25   respect to what was being marked, whether they were following

I5I8GRAC

1     the order.  I do not think that the prosecutors can just say

2     it's an answer that we are not required to do that by the

3     statute.

4              I think a process has been worked out, that courts

5     rely on those processes when they issue the orders, and one of

6     the reasons to suppress a wiretap is failure to follow the

7     order.  Not just the statute, but failure to follow the wiretap

8     order.  There seems to me there was a wholesale failure to

9     follow the wiretap order here and that we do still do not have

10    all of the answers to this.

11             I do feel at this point that I need to bring these

12    concerns to the court and put them on the record because

13    without that I feel like I don't get answers to these things.

14    We have asked for answers.  I don't understand how the

15    prosecutors can stand up here and say we don't have someone

16    here who knew what was going on when one of the assistants

17    sitting there is a person who was signing the minimization

18    order, putting in the things to the court, was the person who

19    represented to us that they had produced all of the wiretap

20    materials when we specifically asked for it back in, I believe,

21    2016.

22             THE COURT:  Thank you.

23             I am going to ask the government now about whether or

24    not there is a way for them to audit the modifications to the

25    line sheets that have been provided to the defense.  Then I am

I5I8GRAC

1    going to ask whether we can set a clear deadline for completion

2    of production of these inquiries.

3              I would like to put in place a meet-and-confer date

4    for the parties to talk about the government's disclosures and

5    then counsel for defense, to the extent there is a motion that

6    you want to bring, I would just ask you to write me about it

7    and I hope that we will be able to set a schedule for it based

8    on written correspondence without the need to bring the parties

9    back in.

10             MS. NECHELES:  Yes, your Honor.  Also, I think another

11   area we were going to get an answer to, and I haven't heard it,

12   is about the large number of calls that were never taped, even

13   though they should have been.

14             THE COURT:  Counsel for the United States, can I ask,

15   is there a way that you can provide the defense with a

16   comprehensive assessment or statement of where line sheets have

17   been modified after the date of the initial line sheet?  The

18   one that Ms. Necheles brought to my attention earlier, which I

19   should mark for purposes of this conference, and I will do so

20   now, as Court Exhibit C.

21             Ms. Necheles brought this one to my attention.  It's

22   clear there was a, quote, post-analysis with respect to this

23   line sheet by a separate agent that's noted on the line sheet.

24             Is there a way for you to audit that?

25             MS. LONERGAN:  We don't know, your Honor.  We will

I5I8GRAC

1   have to check with the FBI.  We don't know.

2            I know Ms. Necheles asked the court to order that the

3   agent stop changing their classifications.  We would oppose

4   that request.  The reality is at this point defense counsel has

5   the entirety of the wire.  Again, our position, and defense

6   counsel can clearly make whatever motion they think is

7   appropriate, but our position is really what is at issue is

8   minimization, which they can see has nothing to do with

9   classifications.  You can see that the calls will say minimized

10  and there will be a gap in the audio.  That is not going to

11  change.  There is no way to ex-post go back and unminimize

12  calls that were minimized.  When they are minimized, that audio

13  is just gone forever.

14           Again, as everyone, the investigative team's

15  understanding of this case evolves, which happens, this is in

16  realtime and we interview witnesses and we learn additional

17  things.  It may be that a call that previously appeared to be

18  nonpertinent is now determined to be pertinent.  That's not

19  what is at issue here.  What is at issue here, again, is

20  whether or not that call was in the first instance properly

21  minimized or not.

22           So in light of the fact that, as the government has

23  represented to the court this is an ongoing investigation,

24  there is a possibility we can interview a witness who is

25  intercepted on the wire.  All of the sudden we have a new

I5I8GRAC

1    understanding of a wire call.

2            Again, the defense now has the entirety of the wire

3    with the audio.  So to the extent that the government changes

4    its opinion about whether or not a call is pertinent, we can

5    let defense counsel know if we do that, but we don't think it's

6    appropriate to say that the calls can no longer be changed in

7    classification.

8            We also think in some ways that it doesn't actually

9    have any sort of real world implications in this way.  It's our

10   position that a call, whether marked pertinent or nonpertinent,

11   if it is in fact evidence of the crime and properly minimized,

12   can be played at trial.  So in that way the classification

13   doesn't necessarily have any bearing at this point.  Again, the

14   real issue is minimization.

15           THE COURT:  Understood.

16           Counsel for the United States, can you please write me

17   promptly, let's say by Tuesday of next week, the 22nd, to let

18   me know whether you can create an audit of the line sheets that

19   can be provided to the defense to show where and when it has

20   been that the line sheets have been modified.  I think that

21   that would be very useful for them, because as you have pointed

22   out, they were provided with the universe of documents almost

23   two years ago and that universe of documents may have changed

24   in terms of the classification between then and now in order to

25   allow them to efficiently process the discovery.  I think it's

I5I8GRAC

1     appropriate for the United States to provide that kind of an

2     audit trail to them.  They are obviously doing it sort of in a

3     reverse engineering way, as illustrated by Exhibits A and B,

4     but I think if the government has that information it would be

5     very valuable and efficient if you could produce it to the

6     defense.

7          So please let me know by Tuesday whether or not that's

8     possible.

9          I am not going to order that the government not make

10    future modifications to their categorization, but I will direct

11    that in the event that such a modification is going to be made

12    that the defense be informed of it.  Again, because the defense

13    is working with a set of line sheets and a particular

14    understanding of the categorization of these calls, to the

15    extent that the government is modifying them, I think it would

16    be valuable for that information to be made available to the

17    defense in order to assist in their review.

18         Yes.

19         MR. BELL:  Your Honor, just to flesh out a couple of

20    other quick things.

21         As I think your Honor appreciates at this time, the

22    government was under the impression that the entirety of wire

23    recordings had been produced well earlier over the course of

24    this litigation.

25         With that, with the production of that audio and with

I5I8GRAC

the production of those line sheets would come a preserved

record of how things were marked at the time.  And that too is

something that we understood had actually been, not only

produced but also in the running of the wire memorialized along

those lines.

In circumstances such, there is -- Ms. Lonergan I

think has already very eloquently explained why the

classification itself is of relatively little legal moment even

at the time its done.  If the classification changes later on

after that snapshot, if you will, of the wire and

classifications that were assigned at the time, it's of even

less legal moment.  The agents are making the adjustments that

they are largely for, I would imagine -- and we can check on

this -- internal organizational purposes.

Being able to, as Ms. Lonergan noted, establish as

time goes on whether a call that had been thought to have no

meaning now has meaning, this is particularly the case, your

Honor, in a suite of investigations that have sprung from this

core set of facts along the lines of what your Honor has I

think some appreciation of which happened here.  This started

out, the wire, as a relatively discrete inquiry into the

activities of Mr. Peralta and mushroomed to a degree into

investigations of multiple other categories of criminal

activity, each of which was complex in some way, and ultimately

manifested itself not only in the charging of this case but in

I5I8GRAC

1    the charging of Seabrook/Huberfeld case, charging of Hamlet

2    Peralta's case, and other cases that were less grounded in this

3    particular wire.

4            I note this in part because, at least in part, because

5    Ms. Necheles continues to return to the core, I guess what she

6    classifies as the core fact, that this is stuff that has been

7    asked for for several years or a couple of years which the

8    government has only made clear recently.  I hope it's clear at

9    this point that at the time we made the earlier productions we

10   thought that the wire had come out.

11           The versions of the wire that were, as it turns out,

12   not entirely complete were versions of the wire that the

13   government itself had received from the FBI, that we ourselves

14   had been working off of in preparing the road to trial.  I feel

15   compelled to say something about that on the record if only

16   because Ms. Necheles keeps referring to and I think on some

17   level not accurately characterizing what it is that actually

18   happened there.

19           THE COURT:  Understood.  Let me just say this and this

20   is more of an editorial comment than anything else.

21           Regardless of the legal consequences of what we are

22   talking about now, I hope that, to the extent that the FBI's

23   practices are inconsistent with the expectations of the

24   government lawyers who are working with them, that as a

25   practical matter that's an issue that will be worked on to

I5I8GRAC

smooth out any differences in terms of protocol and to ensure
that the writings presented to the court are consistent with a
common understanding.  If this is an issue that need not be
litigated in other cases, I would hope that the government is
taking appropriate steps, apart from the consequences in this
case, to ensure that this type of gap does not reappear.

          So that's separate and apart from this case.  So I
label it as dicta.

          MR. BELL:  We do appreciate that, your Honor.

          With that understanding in place, with the
representations that we have made accordingly, I would
reiterate Ms. Lonergan's point that going forward we feel that
the appropriate sort of two-track solution to this would be I
think as your Honor described it, which is for us to, now
mindful of what has happened and fully aware of what has
happened, respond to defense queries in the most comprehensive
and fulsome way that we are able to and then to respond to a
motion when it comes.

          We appreciate that this isn't a problem that the
defense is making, and we appreciate now that this was a -- we
also appreciate that this was something that we were not in the
best position to respond to ourselves because we didn't quite
appreciate what was going on from within the jar, as it were.

          But going forward, and now with the full universe out
there, and aware of what it is that has led us to this point,

I5I8GRAC

```
 1   we feel that we are in a position to adopt a procedure along
 2   the line of what was discussed earlier, but we do take your
 3   Honor's point.
 4               THE COURT:  I appreciate that.
 5               I expect a letter by Tuesday regarding the audit
 6   issue.
 7               Ms. Necheles raised a second question with respect to
 8   which she sought a response from the government.
 9               United States, can you respond to that?
10               MS. LONERGAN:  Yes, your Honor.  Our response is that
11   we provided the information that we have already provided with
12   respect to our conversations with Verizon Wireless.  Again, we
13   don't think that us speaking on behalf of Verizon Wireless in
14   this sort of informal nonhearing setting is really going to
15   assist in any kind of fact-finding.  It's a game of -- I don't
16   mean to make a pun, but it's a game of telephone, where we get
17   defense counsel's questions, we pose them to Verizon, Verizon
18   provides us with answers, we then provide them to the court and
19   we have additional questions.  That doesn't seem to be either
20   efficient or a real way to get at the truth here.
21               THE COURT:  Thank you.
22               Are you willing to consider a call with defense
23   counsel on the line to discuss these issues in realtime with a
24   Verizon representative?
25               MS. LONERGAN:  I think it would be helpful.  My
```

I5I8GRAC

1    understanding from having spoken to Verizon before is that they

2    will do what they can in the moment.  It might be something

3    where there are particular questions that it would be helpful

4    for everyone to pose them to the Verizon individuals in

5    advance, see if they can investigate, get answers, and then we

6    could do something along the lines that the court has

7    discussed.

8              But again, I don't think it's necessarily productive

9    to call them, say, here are the eight questions we have, and

10   expect them to be able to answer them in that moment.

11             THE COURT:  That sounds like a productive suggestion.

12             So, government, I expect to see your letter by

13   Tuesday.

14             I am going to ask that the parties confer regarding

15   the suggestion just made by Ms. Lonergan about how to put

16   questions to Verizon that the defense has regarding the process

17   that the government has described.  I think that laying the

18   groundwork with some written questions might be a fruitful way

19   to facilitate a substantive communication with Verizon if the

20   government is willing to host a call to give the defense an

21   opportunity to ask questions informally of the representative.

22             My hope in suggesting that protocol is that the

23   defense will be able to hear live the Verizon representative's

24   responses and will be able to make a decision regarding whether

25   or not additional formal steps are required in order to

I5I8GRAC

1    scrutinize those assertions.

2              So what I would like to do -- yes.

3              MS. NECHELES:  Can I just address that?

4              THE COURT:  Please do.

5              MS. NECHELES:  I just want to know what happened here.

6    I can't really write out questions.  I thought that the

7    government was going to come back with further answers.  That's

8    what they promised us last time.  We did have further questions

9    that we gave the government.

10             I could have Verizon on the phone and have my expert

11   with me and then start asking questions.  The next question

12   will depend on what their answer to anything is.  I need

13   somebody who knows what happened here, not just theoretical,

14   which is what we got last time -- it could be this or could be

15   that.  I need somebody from Verizon.  I don't need to do it in

16   a hearing in front of your Honor.  I understand that.  There

17   might be a more efficient way to do it.  But I can't get it all

18   written out beforehand, because my expert said I don't know how

19   this could have happened.  So I need to hear from Verizon and

20   then my expert be able to ask further questions of that person.

21             THE COURT:  Thank you.

22             Let me just add, I don't understand Ms. Lonergan's

23   proposal to necessarily be in the format of interrogatories

24   necessarily or only specific written questions.  But perhaps

25   enough in the way of --

I5I8GRAC

1         MS. NECHELES:  I just want to know what happened.  Can

2    we speak to someone who knows what happened on this wire.  And

3    if she puts someone on the phone, I can sit there with my

4    expert and ask them questions about what happened, how did this

5    happen that these calls didn't go through.  My expert will be

6    able to say that makes sense or no, that doesn't make sense.  I

7    don't have the technical expertise at all to be able to

8    evaluate or to write up questions.

9         I think probably the government has never seen this

10   before.  Everyone I speak to says how is it possible that this

11   happened.

12        THE COURT:  It might be a brief description of the

13   specific incidents of interest and a number of general

14   questions regarding the specific instances might be a useful

15   way for the Verizon representative to prepare for what would

16   then be a more open-ended call.  I am not going to dictate the

17   correct protocol.  I appreciate the government's willingness to

18   approach Verizon to host such a call.

19        What I will do is ask the government to provide me

20   with a letter regarding the audit question by Tuesday.  I would

21   like to have the parties, and direct the parties, to meet and

22   confer regarding these issues on a date certain.  I would like

23   to ask when you think would be a fruitful time to do that,

24   counsel, because I am going to direct that you do meet and

25   confer to discuss these issues sometime in the near future.

I5I8GRAC

That can be next week, it could be sometime other than next

week, but I would like to get a specific date so I can direct

you to do that.

         MS. NECHELES:  Your Honor, we had also written to the

government and asked, because we believe there is other

documentation about this wire that they have not produced to

us, such as sealing orders.  We asked them to check.  We see

that there are sealing orders we have not received.  I don't

think we have received any of the orders with respect to the

GPS.  So we have asked them to provide whatever they don't have

or haven't given to us, to go back and check to see what they

haven't given to us and give it to us.

         I haven't heard a date back.  I think if we could get

that date of when they would be producing those things and

after that we could have whatever meet and confer.

         THE COURT:  Thank you.

         United States.

         MS. LONERGAN:  Your Honor, just to be clear, this

request came from defense counsel late yesterday afternoon.

And we responded saying, we will get them to you.  Again, I

just want to make sure the court has the full picture, that we

are rapidly responding to the defense requests.  We cannot

respond them the second they come in.  It's not possible.

         THE COURT:  That's fine.

         MS. LONERGAN:  We are happy to do a meet and confer

I5I8GRAC

1    again.

2              THE COURT:  Can I ask before we come to that, can you

3    provide an estimate regarding the time by which the United

4    States will provide the sealing orders and orders associated

5    with the GPS information that was produced at the time of the

6    last conference?

7              MS. LONERGAN:  Your Honor, with respect to the sealing

8    orders, I hope later today or early next week.

9              With respect to the GPS orders, we need to look into

10   it more.  The wiretap orders themselves also provide for GPS

11   and they already have the wiretap applications.  To the extent

12   there are additional GPS and they haven't been provided with

13   that paperwork, I'm not aware of that, but we will look into it

14   and turn that around as quickly as possible.

15             Again, your Honor, I understand defense counsel's

16   general position that it's not possible to anticipate every

17   question in advance.  Of course that makes complete sense.

18   Nevertheless, for this meet-and-confer session to be fruitful,

19   we don't want to be in a position -- I understand it's

20   frustrating for everyone -- for defense counsel to raise

21   questions and we say we don't know, we have to go back and

22   confer with the FBI.

23             We would just request, to the extent we are trying to

24   make this productive, to the extent they can even provide us

25   with a list of topics or a list of concerns in advance, then we

I5I8GRAC

1    will do our due diligence to attempt to have answers.  Does

2    that mean they can't ask additional follow-up questions.  Of

3    course not.  But again, we think that will make all of this the

4    most efficient and most fruitful possible.

5              THE COURT:  That sounds like a very reasonable

6    proposal and I appreciate the government's willingness to

7    approach it in that way.

8              When would be an appropriate time given all of that

9    for the parties to discuss any remaining discovery issues?

10             I would like to set a date for a meet and confer and

11   then I would like to set a date for the parties to send me a

12   letter just to let me know where you are with respect to the

13   issues or to request a hearing or conference, I should say, to

14   the extent one is necessary.  To the extent that the defense is

15   anticipating the prospect of a motion, you could also alert me

16   to that fact in the letter that I am thinking of.

17             So first, when would you propose to have the meet and

18   confer?  And then I will set a date for another status update

19   letter based on that.

20             Counsel for United States.

21             MS. LONERGAN:  Your Honor, our request would be 48

22   hours after defense counsel sends us our general list of

23   topics.  That will give us hopefully enough time -- we are

24   prepared to do this as soon as possible but, again, we just

25   need a little bit of time to get answers to the questions that

I5I8GRAC

 1    they may have.

 2              THE COURT:  Thank you.

 3              That should happen also sometime after the government

 4    has completed its production of the sealing orders and

 5    completed its assessment of whether or not there are additional

 6    GPS orders as well as respond to the audit question.

 7              Sometime after Wednesday.

 8              MS. LONERGAN:  If I can make a proposal that defense

 9    counsel get us our list of topics and general questions

10    sometime next week and then we can do the meet and confer the

11    following week.

12              THE COURT:  Thank you.

13              Counsel for defense.

14              MS. NECHELES:  I think we told the government

15    everything we want.  What happens is we keep having new

16    questions because we keep discovering that things haven't been

17    turned over.  All of these sealing orders, they are required by

18    law to turn this over to us as soon as the case starts.  So for

19    me to now be discovering that they haven't turned it over --

20    when the government says we are doing it as quickly as

21    possible, I am sort of like stunned by that statement because I

22    shouldn't have to go through now and put everything in writing,

23    let me look, did they turn this over, and try to pick out what

24    it is they didn't turn over.

25              I am asking them to go back through all of their stuff

I5I8GRAC

1    and figure out what they haven't turned over.  Otherwise we are

2    going to keep doing this.  It's just not right.  We rely on

3    them following the law.  It is not right for them to keep

4    standing up and saying, well, the defense didn't tell us about

5    this.  I am not surprising anybody.  I am just saying I have

6    discovered you didn't follow the law again and again and again.

7           So I don't buy this statement we are doing it as

8    quickly, we are trying to get everything to the defense.  No.

9    They didn't do this quickly.  They didn't go back and check

10   when we asked them to go check.  So I don't really even know

11   what I am going to be giving them.  I will go back and try to

12   figure out what we have not gotten yet, what we think we

13   haven't gotten.  I am asking them to go back and check, did we

14   give everything we were required to give by the law here?

15          MR. BELL:  I'm sorry.  Is this about Verizon?

16          THE COURT:  No.  I think that was a broader comment.

17   I think Ms. Lonergan was just referring to specific questions

18   for Verizon.

19          MS. NECHELES:  My basic question for Verizon is, how

20   come you didn't make these calls.  They know as well as we do

21   which calls weren't there.  They are on the phone.  I have

22   charted some of it up.  They can make the same chart I made.

23   They have the phone records.  They have the logs.  They know

24   what calls were not made.  They said they were the ones in

25   California.  I think that's true.  I think they most likely are

I5I8GRAC

1    the ones the California that we have gone back and checked that

2    now.  I think that there are random calls missing elsewhere,

3    but it doesn't seem to be a pattern and they seem to be short

4    calls.  So I think it is true.

5              So the question is, who can we speak to at Verizon who

6    can start to explain this.  I don't know what questions I would

7    have that they can't see themselves from those records.  There

8    are calls there.  They are not being picked up.  Why is that?

9              THE COURT:  Understood.

10             I think it might be helpful, given the work that you

11   have already done, to provide a short letter or writing

12   describing the issues that you have identified and why it is

13   that you or the kinds of issues that you would like to begin a

14   discussion about.  I think that's what the United States is

15   suggesting would be helpful in order to frame the conversation

16   with Verizon.  I think that that is a reasonable request.  So I

17   would like to ask you to consider doing that, please, counsel

18   for defendant, just to focus the conversation with Verizon as

19   much as possible.

20             When do the parties believe that you can get together

21   to meet and confer on any remaining discovery issues, including

22   the topic of conversations with Verizon?  The United States has

23   just proposed the week after next.

24             Ms. Necheles, Mr. Meringolo, what is your view?

25             MR. MERINGOLO:  That's fine, your Honor.

I5I8GRAC

1        THE COURT:  Thank you.

2        Is the 29th a reasonable date for the parties?

3        MS. NECHELES:  Yes.  The 29th or the 30th is fine.

4        MR. MERINGOLO:  Yes, your Honor.

5        THE COURT:  Parties, I am going to direct you to meet

6   and confer in person regarding any outstanding issues on May

7   29th.  My hope is that that will be a very productive meeting

8   and that's going to in some ways require putting some of the

9   past in the past and working collaboratively to try to resolve

10  the issues that currently confront the parties.  So I hope that

11  the parties will meet and confer, discuss these issues

12  collaboratively on the 29th.

13        To the extent there are other issues you would like to

14  bring to my attention regarding those discovery issues, I am

15  going to ask that you send me a joint letter no later than the

16  end of that week, if you can do that, which is Friday, June

17  1st.

18        If you're making good progress, as I hope you will be,

19  I hope you will just let me know that.  If there are any issues

20  with respect to which the parties need court intervention,

21  please identify those as well and I will schedule a conference

22  for us to come together.  My hope is that will give us a clear

23  frame for resolving these issues.

24        Counsel for the United States, I take it that with the

25  exception of the things that we have discussed here that there

I5I8GRAC

 1   are no additional discovery-related documents that this

 2   prosecution team currently knows of or has that have not been

 3   turned over to the defense.  Is that fair?

 4              MS. LONERGAN:  One moment, your Honor.

 5              THE COURT:  Thank you.

 6              MS. LONERGAN:  Your Honor, we have been scouring our

 7   files, as Ms. Necheles suggested we do.  We have been engaged

 8   in that to determine if there is anything that should have or

 9   should be produced that has not been.  To the extent that we

10   identify anything, our goal is to produce all of that next

11   week.

12              THE COURT:  So the parties will have all of that

13   information, to the extent there is any at this point, in time

14   for your meet and confer.

15              I appreciate that, United States.

16              So I would like to talk about a few issues that don't

17   relate to the documents.  I don't think I am going to take up

18   every issue on my agenda.  I would like to talk about a few

19   issues, however, first.

20              MR. BELL:  Your Honor, may I ask you a personal

21   indulgence?  In 15 minutes or so I will need to ask to be

22   excused for the same medical appointment that I was going to

23   seek to be excused during trial.

24              I have amongst our team particular responsibility for

25   the Touhy issue.  So I wonder if there is any way we can

I5I8GRAC

1    address that first.

2                THE COURT:  I will be happy to take that up now.

3                I have reviewed the parties' submissions with respect

4    to the Touhy issue.  I am prepared to rule on that issue unless

5    the parties have additional arguments that you would like to

6    present.

7                Counsel, first for the United States.  Let me hear

8    from you.

9                MR. BELL:  Your Honor, I think that we are largely

10   content to rest on our submissions.  We sent a followup to Mr.

11   Meringolo's response regarding Sergeant Klausner, and I think

12   we sent that in actually the morning of our last conference.

13   So I want to make sure that that didn't get lost in the fray.

14               The major point that we wanted to underscore in that

15   submission was that even setting aside the employee prong,

16   which we feel covers Sergeant Klausner both from his

17   deputization forward, and frankly all the time that he was

18   supervised by the FBI, there is also a subject matter concern

19   here that's covered by another one of the Touhy prongs.

20               This is an FBI investigation.  This is investigative

21   material that belongs to the FBI.  The same concerns that

22   clearly motivate the entire statutory regime are in place

23   regardless of what Mr. Klausner's particular status was at the

24   time.  It's not meant to throw up a roadblock.  We would hope

25   that Mr. Meringolo could get a proper list of questions -- not

I5I8GRAC

1  questions but subject matter areas to the appropriate

2  representative at the FBI's counsel, and that they would be

3  able to relatively expeditiously filter back a position.

4       We expect that to the extent that the avenues of

5  inquiry are proper in the first place, there would not be an

6  issue.

7       THE COURT:  Let me ask about the scope issue because I

8  think that in addition to the employee issue, that is something

9  to focus on.

10       Mr. Meringolo's application notes that there is a

11  specific scope limitation regarding Sergeant Klausner's

12  deputization with respect to his work on the task force which

13  is relatively limited.  It's to monitor Title III intercepts

14  and to seek and execute arrest and search warrants.

15       Why is anything else, other than things within those

16  two scopes, within those two topic headings, I should say,

17  within the scope of his work?

18       MR. BELL:  Because Mr. Klausner, just as a matter of

19  fact, was supervised by the FBI vastly more than that.

20  Regardless of what the scope of his deputization on paper was,

21  Mr. Klausner was an active member of the investigative team in

22  the same way as the other members who actually did work with

23  the FBI.

24       THE COURT:  Let me just comment on that or to focus

25  the argument.

I5I8GRAC

```
1          There are a number of police officers who too were
2    working jointly on the investigation.  So they are not subject
3    to the Touhy regs.
4          MR. BELL:  I'm sorry.  I want to hear you again on
5    that, but I don't think that's accurate.
6          THE COURT:  I have heard multiple times that this is a
7    joint investigation by the Internal Affairs Office at the NYPD
8    as well as by the FBI.  Is that not correct?
9          MR. BELL:  It is correct, your Honor, but to a very
10   limited degree.  To be clear -- I think this has gotten
11   obscured somewhat in all of the rhetoric and argument
12   concerning disclosure of certain materials in the possession of
13   the NYPD.  So the government wishes to be clear here.
14          To the extent that the NYPD was involved as an initial
15   matter, it was only the Internal Affairs Bureau.  It was
16   primarily Sergeant Klausner.  And it was Sergeant Klausner's
17   involvement as essentially a member of the investigative team
18   in the function that an FBI person holds here.
19          THE COURT:  Sergeant Klausner is a member of the
20   Internal Affairs Bureau?
21          MR. BELL:  That is correct, your Honor.
22          THE COURT:  Thank you.
23          MR. BELL:  There was no participation beyond the
24   Internal Affairs Bureau.  And within the Internal Affairs
25   Bureau's participation in this investigation, Sergeant Klausner
```

I5I8GRAC

1    was effectively like the case agent who happened to also be

2    NYPD.

3          We have received additional assistance from really one

4    named person that I can -- maybe two that I can call to mind,

5    but none of those people were -- Sergeant Klausner was

6    essentially it.

7          So part of the concern I think that we have and part

8    of the concern that candidly I think the folks at the FBI

9    counsel have about this is what factual involvement Sergeant

10   Klausner has that would prompt an admissible line of inquiry in

11   the first instance.  Given that, he has essentially just the

12   case agent here.

13         But setting that aside, there has been all of this

14   talk about there being a joint investigation in the way that

15   suggested that the NYPD and that the FBI were equal partners in

16   this.  That's just not in any functional way accurate.

17         Sergeant Klausner was effectively deputized in

18   function and then deputized on paper with the document that

19   your Honor has seen from 2017.  But he worked under the

20   supervision of the squad leader at the FBI who supervised the

21   rest of the investigative team.

22         THE COURT:  Why should I ignore the scope limitation

23   in the deputization order?  If that was the case and there is a

24   desire to deputize him to act in a broader way, why not put

25   that into the deputization order?

I5I8GRAC

1           MR. BELL:  For starters, your Honor, Sergeant Klausner

2     wasn't deputized until 2017.  The bulk of what I think he would

3     have to say about the investigation, particularly given when

4     this case was charged, in 2016, doesn't revolve around the

5     scope of a deputization order that had not yet materialized

6     but, rather, what it was that Sergeant Klausner was actually

7     doing.

8           THE COURT:  Why does that help your argument?  To the

9     extent that the actions happened prior to the deputization

10     order, is there any argument that he was employed by the FBI

11     within that period?

12           MR. BELL:  Yes, your Honor.  And that argument comes

13     from an analysis of what the term employee actually means

14     within the scope of the Touhy regulations themselves.  This is

15     what we wrote about in our letter before last on this topic.

16           That's not a definition that hinges on any formal

17     deputization or any other particular process.  It's a matter of

18     what he does.  It's a matter of the subject matter with which

19     he works.  So we would respectfully submit, your Honor, that

20     the employee characterization fits and would have fit had

21     Sergeant Klausner never received a formal deputization, because

22     the definition of employee within the Touhy regulations

23     themselves covers him.  And beyond that there is the additional

24     layer of the subject matter and this being the FBI's

25     investigation, which we mentioned in part in our most recent

I5I8GRAC

1    correspondence with the court.

2                THE COURT:  Thank you.  I will comment on that.

3                Any additional argument from the defense on this?

4                MS. CAPPELLINO:  Yes, your Honor.  Very briefly.

5                Just to be clear, we would not seek to elicit any

6    testimony from Sergeant Klausner that went beyond the

7    investigation as it pertained to Mr. Grant.  Mr. Grant was

8    indicted in July 2016.  The investigation was about from 2014

9    through 2016.  Our questioning would have to do with Sergeant

10   Klausner's position in the Internal Affairs Bureau.  To the

11   extent the government argues that he is I think a de facto

12   employee outside of the scope of the deputization, that was on

13   July 31, 2017.

14               Again, your Honor, as you stated on record, the

15   document, one-page document, it very narrowly defines the scope

16   of Sergeant Klausner to Title III wiretap.  Again, we would

17   very respectfully elicit testimony only having to do with his

18   position as an Internal Affairs Bureau employee.  At that time

19   he was squarely acting in his capacity as an NYPD member at

20   that time, as well, as if you just look at the scope, the time

21   frame, this would be from 2014 up until 2016.  So that's why we

22   believe he would not fall under the Touhy regulations,

23   respectfully.

24               MR. BELL:  If that's the case, then what is required

25   here, I would think, in order for your Honor to make a

I5I8GRAC

1   determination is some level of fact-finding as to what Sergeant

2   Klausner's supervision actually was prior to the point of his

3   actual deputization.

4         THE COURT:  Can I just flag something for you?  I am

5   going to deny the government's motion and I will give you the

6   full analysis, but I will just respond in part before I come to

7   it in order to the argument that you are about to make.

8         Section 16.21, which is the genesis for this line of

9   argumentation, applies to "all officers and employees of the

10   United States ... subject to control of the Attorney General."

11         That provision of the regulation on which this

12   argument rests does not say all persons subject to his control.

13   So as I am about to conclude, the language that the government

14   points to modifies which employees are subject to the

15   regulations.  It does not define who is an employee.

16         So let me just provide you with a short overview of my

17   decision with respect to this issue.  In large part I agree

18   with the defense's arguments here.

19         On May 7, 2018, the United States wrote the court,

20   asking that I direct the defendants to comply with the Touhy

21   regulations in compliance with the subpoena issued to Sergeant

22   Klausner of the NYPD.  The government took the position that

23   his testimony was subject to the Touhy regulations for, at

24   first, unstated reasons.

25         After I provided them with the opportunity to bolster

I5I8GRAC

their arguments regarding the applicability of the Touhy

regulations to Sergeant Klausner, the government wrote on May 8

to explain why the Department believes that he is an "employee"

for purposes of the regulation.  They provided no further

explanation for their position that the Touhy regulations apply

in this situation.

        The United States argues that Sergeant Klausner became

an "employee" of the Department of Justice under the relevant

regulations by virtue of his July 31, 2017 special deputization

as a Special Deputy U.S. Marshal.  The special designation

describes the limited scope of his deputization as follows:

"To monitor Title III intercepts; to seek and execute arrest

and search warrants."

        Pursuant to the deputization, the sergeant agrees to

"faithfully execute all lawful orders issued under the

authority of the United States, directed to the United States

Marshal, the United States Marshal Service, or to an

appropriate federal officer."

        I cannot find that the Touhy regulations restrict the

proposed testimony by Sergeant Klausner.

        First, even assuming that Sergeant Klausner was an

employee of the Marshals' Service after the date of his

deputization, there is no basis for me to conclude that the

Touhy regulations restrict testimony regarding information that

he obtained prior to his deputization.

I5I8GRAC

1          Here is what the Touhy regulations state about their

2     scope:  "This subpart sets forth procedures to be followed with

3     respect to the production or disclosure of ... any information

4     acquired by any person while such person was an employee of the

5     Department as a part of the performance of that person's

6     official duties or because of that person's official status."

7     28 C.F.R. 16.21 (emphasis added).

8          Any information that Sergeant Klausner obtained prior

9     to his deputization in 2017 cannot have been acquired by him

10    while he was an employee of the United States Department of

11    Justice or as a result of his official status.  The United

12    States points to no law that supports the position that any

13    person, once employed by the DOJ, may not testify about any

14    matter that they learned of prior to their employment.

15         Moreover, the Touhy regulations only protect

16    information obtained by Department employees "as part of the

17    performance of that person's official duties or because of that

18    person's official status."

19         The only things that Sergeant Klausner has been

20    authorized to do pursuant his deputization is to review

21    wiretaps and seek and execute arrest and search warrants.  No

22    arguments before today have been presented by the United States

23    regarding how efforts taken outside of the scope of his

24    deputization -- in other words, anything other than Title III

25    wiretaps and search and arrest warrants pursuant his

I5I8GRAC

deputization -- could be subject to the Touhy regulations.
Perhaps there is a specific order made to him pursuant to the
deputization that could be covered within its scope, referring
to the original element of the scope that required him to
comply with orders, but if so, I am unaware of it.

        To the extent that the testimony relates to other
matters, it was not part of his official duties or because of
his official status.  Clearly then, testimony regarding
anything that he did prior to his deputization is not protected
by the Touhy regulations.  Based on the information available
to me now, I believe that the best position is that anything he
did outside of the scope of his limited deputization after its
entry is not protected either.

        These conclusions dispose of the issue.  But I want to
comment on the United States' arguments regarding whether or
not Sergeant Klausner is the Department's employee.  I am
referring now to the arguments in the written submissions to
the court.

        I will address the argument raised here at the end.

        Their argument rests exclusively on the definition of
"employee" in 28 C.F.R. 16.21, which reads:  "For purposes of
this subpart, the term employee of the Department includes all
officers and employees of the United States appointed by, or
subject to the supervision, jurisdiction, or control of the
Attorney General of the United States, including U.S.

I5I8GRAC

Attorneys, U.S. Marshals, U.S. Trustees and members of the

staffs of those officials."

The United States emphasizes the words "or subject to

the supervision, jurisdiction, or control of the Attorney

General of the United States" to argue that because Sergeant

Klausner has agreed to obey lawful orders issued under the

authority of the United States, he is an employee of the

Department of Justice.

First, as I just did, I want to note that Section

16.21 applies to "all officers and employees of the United

States ... subject to control of the Attorney General," not all

persons subject to his control.  So the language that the

government points to modifies which employees are subject to

the regulations, it does not define who is an employee.

Second, as Mr. Grant points out, the deputization

specifically states that the sergeant is not an employee.  It

states:  "This appointment does not constitute employment by

the ... United States Department of Justice or United States

government."  In the face of this text, and lacking any other

basis to conclude that the sergeant should, nonetheless, be

treated as an employee of the Department of Justice for

purposes of the Touhy regulations, I conclude that the United

States has failed to support the conclusion that he is an

employee of the United States Department of Justice.  The

defense need not comply with the Touhy regulations in order to

I5I8GRAC

1     obtain his testimony.

2              I want to comment briefly on the argument raised here

3     that some fact-finding may be appropriate to determine whether

4     or not he was employed prior to his deputization.  That was not

5     an argument presented previously.  I don't know what the basis

6     would be for that and I don't know what the standard would be

7     that would apply to determine whether or not he was an employee

8     of the government; if it's the common law test with respect to

9     whether or not someone an employee or otherwise.

10             I wonder if the government has considered what the

11    consequences would be if all persons working in conjunction

12    with the FBI are federal government employees under some

13    amorphous standard not driven by the Touhy regulations

14    themselves.

15             So based on the information that was presented to me

16    in connection with the letters, I am not persuaded by the

17    government's position.  To the extent this is an issue that

18    they want to address by deputizing people earlier and expanding

19    the scope of their deputization in order to enhance their

20    argument in the future, that is something they might do.

21             Before Mr. Bell leaves -- do you have to leave now?

22             MR. BELL:  Yes.

23             THE COURT:  Please go.

24             MR. BELL:  Thank you, your Honor.

25             One final point before I leave, I guess, on this.

I5I8GRAC

1        THE COURT:  Please.

2        MR. BELL:  Given what the statutes say about the
3   purpose of the Touhy regulations and the concerns that animate
4   them, I recognize your Honor's ruling and of course the
5   government respects that ruling.  I would nevertheless ask that
6   once the time comes, should defendant Grant wish to call
7   Sergeant Klausner that there be some sort of attorney proffer
8   required prior to that testimony so as to ascertain what it is
9   that he seeks to elicit to make sure that it's actually
10  admissible.

11       There is a sensitivity codified within the regulations
12  as to whether individuals who work under the supervision of the
13  folks that Sergeant Klausner worked under can elicit these
14  sorts of things.  I recognize that they are not being required
15  to go through Touhy, but we also struggle on some level to find
16  a basis on which Klausner is viable witness in any event.  We
17  would ask an attorney proffer be required prior to his
18  testimony so that we can filter things out on another basis if
19  one is appropriate.

20       THE COURT:  Thank you.  I appreciate that.  We will
21  discuss that.  Please hold that place.

22       I think I have already made comments about an
23  assertion in one of the Grant motions suggesting that there
24  would be an attack on this investigation as a whole.  To the
25  extent that that's the purpose of this, I think I have already

I5I8GRAC

1   articulated some concerns about the propriety of such testimony

2   under Rule 403.

3          MR. BELL:  We appreciate that.  Thank you.

4          THE COURT:  Thank you.  Good luck.

5          I would like to focus this, because I don't want to do

6   too much work without the benefit of Mr. Bell, I don't want to

7   deprive him of the opportunity to be here.

8          The only two issues that I think I need to talk about

9   with you all now are the issues of defense exhibits and my

10  proposal regarding the questionnaire.  I propose to take up

11  those topics alone and then to table the one other issue that

12  I -- two other issues which I think we have, which are my

13  assessment of the arguments regarding the subpoena for the

14  accounting records, which is in some ways not necessary at this

15  time, and then also my oral decision regarding the Cox and

16  Prostitute-1 issues.  I have already given you the bottom line

17  for the latter.

18          Is that reasonable counsel?  I would like to focus on

19  what we need to do to prepare for trial.

20          MS. RAVENER:  Certainly, your Honor.

21          THE COURT:  Is that acceptable to you, Ms. Necheles,

22  and, Mr. Meringolo?

23          MS. NECHELES:  Yes.

24          MR. MERINGOLO:  Yes, your Honor.

25          THE COURT:  With respect to the exhibits, there is one

I5I8GRAC

1    benefit of the fact that we have been required to push back the

2    trial, which is that I think that we could put in place a more,

3    I will call it reasonable approach regarding defense exhibits.

4    This is the subject of some litigation.

5          I don't think that there is a question regarding my

6    authority to ask the defense to provide exhibits that it

7    intends to introduce as substantive evidence as part of its

8    case in chief, whether that's during cross-examination of the

9    government's witnesses or otherwise.  Mr. Meringolo described a

10   reasonable protocol used in his case with Judge Sullivan.  The

11   problem we were presented with previously was because no

12   request had been made to me to build that into the schedule and

13   I did not think to do it independently, I had not set a

14   deadline for the defense to do that that would be workable

15   given our prior trial date.

16         Now the trial date is a long time away.  As a result

17   of the way in which these issues have erupted, the defense has

18   many months of time with the government's exhibits and 3500

19   materials between now the date of trial.  So I would like to

20   set a deadline for the defense to provide the exhibits that it

21   intends to introduce as substantive evidence as part of its

22   case in chief and would like to request proposals for that

23   deadline now.  I think that will very much streamline our

24   process as we approach trial.

25         Counsel for defendant, what is your proposal?

I5I8GRAC

1          Mr. Meringolo, you described a time period before

2     trial that you used in the case across the street.  What is the

3     defense's first suggestion regarding this?

4          MS. NECHELES:  Your Honor, if I could just back up and

5     tell your Honor a little bit of the problems and talk this

6     through with your Honor, because I understand what your concern

7     is.  I am handing up some notes, some 3500 material, that was

8     given to us by the government so that I could sort of discuss

9     what my problem is.

10          So as your Honor is aware, in a criminal case like

11     this we don't a deposition of any witness and we don't really

12     know what the witness will say.  We have 3500 material from the

13     witnesses.  But the main witness is Jona Rechnitz.  And there

14     has not been an FBI-302, which is a typewritten report, that

15     has been created for Mr. Rechnitz since 2017.  I think it

16     was -- there is one in October 2017.  But even before then they

17     become very sparse.

18          Instead what we have been given as the 3500 material

19     are notes like what I passed up to your Honor.  And we have a

20     lot of notes like that.  But you can't really tell from these

21     notes what his testimony will be.  In fact, as trial prep gets

22     closer, the notes get sparser and sparser.  There is very

23     little in the notes.

24          We all understand that that is done deliberately by

25     the government.  The government has always done this.  They do

I5I8GRAC

it in all cases and they are allowed to do this.  They do not
take good notes as it gets closer to trial.  I am not saying
they are doing anything wrong, but that is purposeful.  They do
not want to outline the direct examination for the defense to
have it and we don't know what the direct examination will be.

In addition, in this case, we do not know what the
acts are, the bribery acts, what the specific bribes will be or
what the benefits given or the official acts for the
actual -- that are not done by the co-conspirators, but
supposedly were done by Grant or Harrington.  The government
has never given us a bill of particulars for that.  There are a
few official acts listed in the bill of particulars -- in the
indictment.  But the government is free to put in anything and
we don't know.  We are guessing.  And I think we will be
surprised at trial of things they claim.  Every time we sort of
see new things that appear to be acts and we are sort of the
scrambling, and we are very much scrambling before the date and
think we will be scrambling again as things go along.

So given that it is hard for us, very hard for us to
say what will be in the -- what exhibits we will be putting in
evidence.

In addition, with respect to the exhibit list, we do
not have an exhibit list from the government.  I know that the
government has said they gave it to us, but we had a whole
discussion before about we do not have a list of exhibits of

I5I8GRAC

1    what they intend to introduce in evidence from any of the

2    seized devices.  So we have what they intend to introduce with

3    respect to telephone calls or wiretapped calls.  But with

4    respect to the seized exhibits, they had marked every document

5    or every item that was recovered or was pursuant to a search

6    warrant from the seized devices as an exhibit.

7          That cannot go in evidence, all of those items,

8    because they are not all relevant, they are not all admissible.

9    You can't just sort of dump tens of thousands of documents or

10   data into evidence without a question as to its admissibility.

11         So I assume what the government is doing is

12   identifying those, and then there will be other items that they

13   actually intend to introduce in evidence.

14         Shortly right before the previous trial date, they

15   gave us a list finally of some of the items from the seized

16   devices which they said they intended to introduce in evidence.

17   We wrote back saying we can't find these items.  There are no

18   Bates stamp numbers.  Please identify them.  Please give us a

19   copy of them so we can figure out what you're talking about.

20   We did not hear back from the government on that.

21         There will be big issues with respect to some of them

22   because some of them appear to be chats which, as we discussed

23   before, the way a chat is labeled it can be years long.  I

24   don't know what it is that the government is saying they want

25   to put into evidence with respect to these.

I5I8GRAC

1          So that makes it difficult, again, for us to determine

2     what it is that the government is actually alleging, what it is

3     that they intend to produce, and makes it extremely difficult

4     for us to be able to respond.

5          So that's just a logistic problem that I wanted to

6     outline, what our logistic problems are with respect to this.

7          Now, what we are able to do and will be able to do and

8     we will be able to sort of work on now is figuring out exactly

9     what transcripts, what wiretap conversations we may be using

10    and seeking to play at trial and getting the government a good

11    tape, a good transcript of those, which I think is probably the

12    logistically most difficult aspect for the government if we

13    were to give those to them at the last minute.

14         So we had started working on those and are going to

15    turn our attention back to working on those and hope to be able

16    to have a stipulation with the government that both sides have

17    stipulated to, now that we have time, we will be able to both

18    sides stipulate to the accuracy of each side's transcripts and

19    we will be able to give those transcripts to the government.

20    To the extent they think any of them should not be played at

21    trial, they will be able to make whatever motions there are

22    with respect to those.

23         Now, with respect to other documents, there are

24    documents that we have obtained from third sources that we may

25    seek to put into evidence.  But, frankly, here is what our

I5I8GRAC

1    problem is, and I am concerned about it.

2            Some of what we will be doing is seeking to show at

3    trial that the main witness for the government -- it is one

4    witness, your Honor, and it is critical for us to be able to

5    show the jury that he is a liar, that he has made up a story

6    here, and that he seeks to blame our clients, the defendants

7    here, for things maybe that he has done wrong, or just to make

8    up stories.  So we will be seeking to show the jury that he has

9    made up a story.

10            My fear is, and it's always a defense fear, is if I

11    give documents to the government which shows that he is a liar,

12    he will not testify about those things at trial.  So that will

13    make our job showing the jury how he has lied much more

14    difficult and how he has blamed the defendant.  And it will

15    make the trial longer.  Because what we will have to do is we

16    will have to elicit, you changed your story, right?  You had

17    previously said X and now you're saying Y.  And he may deny.  I

18    don't remember that I said X.

19            This witness, I have watched him testify and I have

20    never seen a better prepped witness.  He has spent hundreds and

21    hundreds of hours with the attorneys, with the government.  He

22    is a very prepped witness and totally understands if I say that

23    document doesn't refresh my recollection, that could put a end

24    to a cross.

25            He may say, and I saw him do this before, I don't

I5I8GRAC

1    remember saying that before.  Then we will have to call another

2    witness to say, yes, one of the agents who took his notes to

3    say yes, this witness said X before.  And then we will have to

4    show we gave a document to the government on Y date which made

5    him change his story.  So we will have to call another witness

6    because this witness won't know that we gave a document on what

7    date to the government, as opposed to be able to just confront

8    him with it and show to the jury that he is lying.

9            So that really is our problem on some of this stuff,

10   that traditionally those kind of materials the government is

11   the entitled to.  Traditionally what the courts have done is

12   allowed cross-examination to take place without requiring that

13   documents be given before the witness's testimony.

14           Well, what courts have done a lot of times is to allow

15   the -- to require the defense to give all of whatever is going

16   to be used in their cross-examination to the government perhaps

17   right before the end of their testimony.  And that means we can

18   show the jury how the person has lied without allowing him to

19   change his testimony before.

20           I know the government may find it frustrating.  They

21   may not agree with us that the witness is lying.  But that of

22   course is our job, to be able to show how he has lied.  And we

23   can either show it in a straightforward way before the jury or

24   we can show it in a very convoluted, time-consuming way that

25   will require at least three more witnesses to be called.

I5I8GRAC

1          So we would ask, to the extent we are using documents

2     to show on cross-examination that the witness is lying, that we

3     not be required to give those documents or to specify those

4     documents to the government until towards the end of the

5     witness's cross-examination so the witness cannot be prepped on

6     those documents and we are allowed to show the jury his

7     reaction to those.

8          That being said, there are other documents, such as

9     the tapes, or such as documents which go to the sort of broader

10    themes -- there are themes -- of the reasons why he is lying,

11    that we will endeavor to provide a list of what we intend to be

12    using.

13         THE COURT:  Thank you.

14         Counsel for the United States, how do you respond to

15    that proposal?  As I understand it, the defense will produce

16    exhibits related to exhibits with the exception of the

17    documents used for impeachment cross-examination which they

18    propose to provide at some point during the direct examination

19    of the witness.

20         MS. RAVENER:  One moment, your Honor.

21         THE COURT:  Please.

22         MS. RAVENER:  Your Honor, my concern from listening to

23    Ms. Necheles's presentation is that the exception would swallow

24    the rule.

25         What we are asking for is to the extent the defense

I5I8GRAC

intends to introduce a document or other record into evidence
in this case that they provide that to us in advance, and in
two ways.

First, Ms. Necheles has now admitted that the defense
has in their possession documents that they may use and seek to
introduce into evidence in this case that they have not turned
over as reciprocal discovery.  That is improper, your Honor.
We would ask that those items be disclosed to us as reciprocal
discovery.

Separately, we would ask that a deadline be imposed
for a defense exhibit list which would reflect items that they
intend to introduce into evidence.  We are not asking for all
possible impeachment material.  We are asking to the extent
that they know that they intend to use something as affirmative
evidence in this case that they provide us notice of that so we
can assess any issues.

I think it's outrageous, in the context of this case,
to suggest that the defense doesn't have ample notice.  We are
willing to do more to ensure that they have ample notice of our
exhibits, but we have made our exhibit list available to them
now in excess of a month.  They would have had it for six
months by the time this trial occurs, which is extraordinary.

They will have had 3500 material for Mr. Rechnitz
since the Seabrook trial, which would have occurred a year
prior to this trial, your Honor.

I5I8GRAC

1          This is truly a situation in which the defense has

2    access to more material, more Giglio material, 3500 material,

3    more discovery in so many respects of the government's case

4    than any other certainly that I have been a part of or heard of

5    frankly in this district at this point.

6          So I think given the delay, which we agree is

7    unfortunate and we take complete responsibility, your Honor,

8    for the issue that have arisen with respect to the wire and are

9    working diligently to address anything else that may arise, but

10   to suggest that the defense doesn't have time to develop and

11   respond to this request for an exhibit list in advance of this

12   trial, it doesn't make sense.

13         To the extent there is any confusion about the

14   government's exhibits, which we dispute, we have provided

15   answers to those questions.  We did provide a detailed list,

16   including with respect to the electronic evidence seized.  We

17   will go back through that, and we are willing to provide marked

18   exhibits to the defense well in advance of this trial to ensure

19   that there is no confusion about the government's case.

20         THE COURT:  Thank you.  Let me pause on that.

21         I understood the government was going to be going back

22   and looking at the exhibits to determine whether or not there

23   were subsets of certain of the exhibits that should be

24   designated specifically.

25         Has the United States done that or is that something

I5I8GRAC

1    that is still in process?

2                 MS. RAVENER:  I can tell you that we did do that.  We

3    provided a list to the defense.  That is the list Ms. Necheles

4    is saying is still inadequate.

5                 I can tell you, your Honor, there is a certain degree

6    to which -- and the defense is within their rights to do this.

7    There will be an issue raised about everything we do in this

8    case, and they may do that.  But that doesn't mean that all of

9    these issues are legitimate.

10                To the extent that a list doesn't give them enough

11   information, we will provide the documents.  I can tell you

12   that it's incredibly resource intensive for us to ensure that

13   we go through and comb and collate the right pieces of the

14   electronic device exhibits so that they are presented in a

15   reasonable manner to the jury.  We were in the process of

16   developing summary charts that we were intending to use at

17   trial and we halted that process in light of the adjournment.

18   We have slowed it down, but it doesn't mean it's stopped.

19                We have no problem completing that process in a

20   thorough manner and getting these exhibits to the defense.  I

21   would propose one month in advance of trial to ensure they can

22   see them, touch them, assess whether there are any issues, and

23   make sure that we have a smooth process here because this trial

24   should be about the merits.

25                THE COURT:  Can you tell me when you propose that the

I5I8GRAC

defense produce an exhibit list of substantive exhibits that

they intend to introduce as part of their case in chief,

whether it's part of cross-examination or otherwise.

MS. RAVENER:  I think at least two weeks would be more

than reasonable.

THE COURT:  Thank you.

MS. NECHELES:  Let me just note this is the time that

we specifically asked the government weeks ago for Bates

stamped numbers, identification, and have heard radio silence

from the government.  So we do try to raise these issues with

the government.  They don't necessarily get back to us on them.

We agree that after the government gives us their

list, a real list, we will be able to respond with a pretty

substantive list.  I will say at this point the government is

wrong.  There is not a document that I have in my possession

that I intend to introduce in evidence.  Because if the

government doesn't put anything in, I am putting zero in.  I am

totally reactive.  The government has the burden.  I am only

putting in stuff if they put it in.

So because I don't have the knowledge of what exactly

they are going to have their witness testify to, I have no

intention of introducing anything in evidence at this point.  I

have received materials from other sources, some of which are

very unhelpful to me.  So I would never be producing those.  I

will be producing to the government what I intend to introduce

I5I8GRAC

1    in evidence, but part of it depends on what their witness will

2    be testifying to and what will be on their witness list.

3              Your Honor, I would suggest that their witness list

4    get to me a month before trial because it would make it easier

5    for me to give them a witness list.

6              MS. RAVENER:  To be clear, they have our lists.  Those

7    are still our lists.  If we amend them, we will update them no

8    later than one month before the trial.

9              MS. NECHELES:  They are exhibit lists.  I am telling

10   you, I don't know what they are putting in from their --

11             THE COURT:  Let me do this.  Counsel for the United

12   States, I will ask that to the extent there is specific, I will

13   call it sub-elements of the productions from the electronic

14   devices, which I understand previously have been marked as

15   exhibits, that you intend to introduce as exhibits, that you

16   identify those with specificity to the defense no later than

17   five weeks prior to trial.  My hope is you will be able to mark

18   those as specific exhibits to the extent you intend to

19   introduce them.

20             I understand there may be also summary charts that the

21   government is planning to produce.  To the extent those are

22   also available on that time line, it will be helpful for you to

23   disclose them.

24             I am also going to direct the defense to provide the

25   government with the exhibits that it intends to introduce as

I5I8GRAC

 1   substantive evidence as part of its case in chief, whether

 2   that's during cross-examination of the government's witnesses

 3   or otherwise.  I think that will help the case proceed

 4   efficiently.  It will allow me to hear whatever evidentiary

 5   issues that may arise through motions or the like and therefore

 6   use the jury's time efficiently.

 7            I am going to direct that the defense provide those

 8   exhibits and your exhibit list no later than three weeks prior

 9   to the close of trial.

10            Good.  I will issue a separate order that requires

11   each of those things.

12            MS. RAVENER:  If we could just clarify.  Do you intend

13   to say the defense exhibit list will be three weeks prior to

14   trial?

15            THE COURT:  Yes.  If I didn't say that, that is what I

16   intend.

17            Now, I would like to talk --

18            MS. NECHELES:  With respect to the summary charts by

19   the government, those will also be five weeks?  I am concerned

20   about those.

21            THE COURT:  That is my expectation.

22            Now, as I said during our last conference, I would

23   like to revise the approach that we are planning to take

24   regarding the questionnaire.

25            Principally what I would like to do is to I think

I5I8GRAC

1   basically front load a lot of the voir dire with a more

2   substantive questionnaire.  I have been looking at other

3   exemplars of questionnaires.  Particularly I have been looking

4   at the questionnaire that Judge Caproni used in the recent

5   Silver trial.  In essence, what she did was include essentially

6   all of the substantive questions from the voir dire in the

7   questionnaire.  So the questionnaire was extensive.

8        What they did after providing that questionnaire to

9   prospective jurors was lawyers conferred regarding exercise of

10  challenges for cause, and then the only element of voir dire

11  that took place, I will call it, live were the questions for

12  individual jurors, that subset of questions together with any

13  follow-up questions for individual jurors who had not

14  previously been stricken for cause.

15       That allowed Judge Caproni to seat a jury in a day for

16  the Silver case, which is really amazing.

17       I don't think that this case has the same degree of

18  prominence, but I think that it would be very helpful for us to

19  do that here.  It would simplify the process.  And we have more

20  time to do it in that way.  I also think it will be beneficial

21  because we have the gap in the beginning part of that week and

22  my hope is that we can get the questionnaire reviewed by our

23  pool early in that week so that responses can be reviewed by

24  counsel prior to the Thursday.  So we can have a selected pool

25  of jurors for the voir dire later in the week.

I5I8GRAC

1          I haven't talked to the jury clerk about this

2     specifically, our Thursday start date, so I don't know all the

3     nuances yet.  But I would like for someone to work on creating

4     such a questionnaire.  My hope was that the United States might

5     have a helpful intern that could do that work at some point

6     over the summer.

7          Counsel for the United States.  First, what is your

8     view regarding the proposal generally and, secondly, can you

9     take on the laboring oar if it's acceptable?

10          MS. LONERGAN:  With respect to the first question,

11     yes.

12          Second question, one modification of the court's

13     proposal.  We think that there are some questions in the

14     proposed voir dire that are more sensitive.  I would include

15     off the top of my head questions such as interactions with

16     police.  I think feelings about the Hasidic community that we

17     think are actually not appropriately dealt with in a

18     questionnaire because most likely will require follow-up

19     questions from the jurors.

20          Our proposal would be to include many of the more

21     basic questions in such a questionnaire, but to perhaps omit,

22     and we can confer with defense counsel which questions we think

23     fall into this category, the questions that actually are likely

24     to require follow-up colloquy at a sidebar.  And although that

25     could delay things a little bit, we understanding the point is

I5I8GRAC

1    to get it done.

2              THE COURT:  Let me say, I think that proposal is

3    completely reasonable and I will just ask that you confer with

4    the defense regarding which questions you think should be moved

5    into the individual colloquy component of the voir dire.

6              I should say another benefit of the process that Judge

7    Caproni used was that, as I understand it, they called in

8    individual jurors individually to be questioned regarding those

9    individual questions, not at sidebar but in open court, while

10   the other jurors were in a different room.  I think that would

11   be beneficial.

12             I think that there is likely going to be press

13   interest in the process, among other things, and that allows us

14   to do the process in a way that's very transparent, and it

15   also, I hope, will streamline the process.  I haven't done it

16   before, but it sounds conceptually like a good approach.

17             So counsel for the United States, I would like to ask

18   you to please take the version of the voir dire questions that

19   we have now, modify them as you suggest, confer with the

20   defense and then provide me with a revised version of the

21   questionnaires.  There is no rush on this, but I would like to

22   set a deadline by which that will be worked through by the

23   parties.

24             What would you like to propose?

25             MS. LONERGAN:  We would propose four weeks before

I5I8GRAC

1    trial.

2              THE COURT:  Counsel for defendant, is that acceptable

3    to you?

4              MS. NECHELES:  It is acceptable.  I would prefer to do

5    it earlier just so it's out of the way.

6              THE COURT:  I agree.  Can we do it sooner, United

7    States?

8              MS. LONERGAN:  Sure.  That's fine.

9              THE COURT:  Tell me what you propose.

10             MS. LONERGAN:  Let's say mid-August.

11             THE COURT:  Fine.  I will set a date around mid-August

12   for you to present that to me.  Thank you very much for working

13   on this.  I in turn will talk to the jury clerk about these

14   issues.  There are a few issues that I need to rule on

15   subsequently, namely, the subpoena and motions in limine.  But

16   I will propose to take that up at a subsequent conference,

17   which I will schedule in the order setting the trial.

18             Anything else that we must discuss now?

19             Counsel for the United States.

20             MS. RAVENER:  No, your Honor.

21             THE COURT:  Counsel for Mr. Reichberg.

22             MR. MERINGOLO:  Nothing from Mr. Grant.

23             MS. NECHELES:  No, your Honor.

24             THE COURT:  Thank you, all.

25             (Adjourned)