

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 5, 2018

**VIA ECF AND ELECTRONIC MAIL**

The Honorable Gregory H. Woods
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *United States* v. *Michael Harrington*,
        16 Cr. 468 (GHW)

Dear Judge Woods,

Sentencing in this matter is scheduled for June 11, 2018 at 4:00 p.m.  The Government respectfully submits this letter in connection with that sentencing and in response to the defendant's sentencing memorandum of May 29, 2018 (Dkt. No. 289 (hereinafter "Harrington Submission")).  In particular, the Government sets forth below its position on the facts, and further argues that Harrington should receive a sentence within the Guidelines range of zero to six months' imprisonment that reflects the full nature and circumstances of the offense and its severity.

However, as a threshold matter, and notwithstanding the arguments and facts discussed herein, the Government respectfully submits that the Court should adjourn Harrington's sentencing until after the trial of Jeremy Reichberg and James Grant.  Following Harrington's guilty plea, the Government has named Harrington as a co-conspirator and included numerous specific acts involving him among the items that it intends to prove at that trial.  Accordingly, after the trial, the Court will have a deeper understanding of the circumstances of Harrington's conduct, and will be better equipped to resolve any disputes between the parties regarding the nature and scope of Harrington's offense of conviction – *i.e.,* the misapplication of New York City Police Department ("NYPD") property for the personal benefit of former co-defendant Jeremy Reichberg, a private citizen, and Reichberg's friends, associates, and clients.[1]  Such a full understanding of the facts of this case is even more important where, as here, (1) Harrington's sentencing submission attempts to recast his admitted misconduct as "largely legitimate if not

---

[1] Harrington's sentencing originally was scheduled to take place after the trial, and that it is now set to occur prior to trial only because of the lengthy adjournment.

commendable;" and (2) Harrington has objected to the bulk of the description of his conduct as set forth by the United States Probation Office in its Presentence Report ("PSR").

## The Defendant and the Offense Conduct

Michael Harrington was, for much of the time of the offense conduct, among the most powerful officials within the NYPD. By mid-2013, Harrington had become the Executive Officer in the Office of Chief of Department Philip Banks, the highest-ranking uniformed officer within the NYPD. That office supervises all uniformed police officers at the NYPD and is responsible for all uniformed operations, having oversight over such bureaus as community affairs, patrol, transportation, housing, transit, and detectives. Prior to that assignment, Harrington had attained the rank of Inspector and oversaw Patrol Borough Brooklyn North. At the tail end of the alleged conduct, after Banks had resigned from the NYPD, Harrington was a Deputy Chief assigned to the NYPD's Housing Bureau.

The Government takes no issue with much of what Harrington's sentencing submission focuses on – the quality and depth of Harrington's service to the NYPD in the decades prior to his criminal conduct. Indeed, it is that once-exemplary record that makes Harrington's decisions with respect to Reichberg and his associates both jarring and ultimately tragic. Harrington leveraged the power and goodwill he amassed within the Department over decades of service and channeled them toward the personal benefit of a private individual outside of the Department. He did so in violation not only of the NYPD's policies, but also of the law.

Harrington deployed NYPD personnel and vehicles to personally benefit Reichberg and Reichberg's associates, including a real estate businessman named Jona Rechnitz.[2] Beginning in 2013, Reichberg and Rechnitz began to lavish particular attention on Harrington and a small subset of other officers, including Banks, including through numerous gifts. In a development that was likely not lost on Harrington, the personal gifts from Reichberg and Rechnitz escalated in 2013 just as Harrington's career peaked, even though Harrington had known Reichberg for many years and Rechnitz since at least 2012. Reichberg, assisted by Rechnitz, provided Harrington with:

(1) Tens of thousands of dollars in work for a private security company run by Harrington's family members and which Harrington unofficially helped manage (the "Security Company").[3] (*See* PSR ¶¶ 60-63).

---

[2] Although the Superseding Information references Reichberg and his friends and associates, Rechnitz was clearly the most prominent of these other persons who benefitted, directly and indirectly, from Harrington's misapplication at Reichberg's direction.

[3] Wiretapped recordings from Jeremy Reichberg's cell phone line between January and April of 2015 contain literally dozens of recorded conversations between Reichberg and Harrington regarding the security company, which was known as "Blue Guardian."

(2) Thousands of dollars in meals, on a weekly-to-biweekly basis, between May 2013 and November 2014, at a cost of approximately $100 per person each time.  (*See* PSR ¶¶ 53-54).

(3) Tickets to sporting events, on at least two occasions, with the tickets having a face value of hundreds of dollars each.  (*See* PSR ¶¶ 53-54).

(4) A video game system for Harrington's children, provided on Christmas Day of 2013. (*See* PSR ¶ 57).[4]

The Government anticipates that Rechnitz would testify, at trial, that Harrington did not benefit as much from Rechnitz and Reichberg's gifts as his co-defendant, James Grant, nor was he as brazen as Grant in giving special favors to Rechnitz and Reichberg.  For example, Harrington did not, as Grant did, actively solicit personal benefits from Reichberg and Rechnitz, such as thousands of dollars in home improvements.  Nor did Harrington participate in the now-infamous free private jet to Las Vegas provided to Grant and another NYPD detective, or help make NYPD approvals for gun licenses available to people who did not deserve them, as Grant did.  Accordingly, it is the Government's view that Harrington's relative culpability was lower than that of his co-defendant.

However, the context of the stream of gifts provides a clear window into Harrington's motive for misapplying thousands of dollars of NYPD property for the personal and private benefit of Reichberg and Rechnitz.  That motive was not, as Harrington suggests in his sentencing submission, purely or even predominantly an honorable one; rather, it was purely self-interested.  And it is against that relevant background that, during the period of Reichberg's heightened attention to Harrington, Harrington misapplied NYPD resources in the following ways, among others:

(1) Dispatched, in 2014, NYPD personnel to intervene in private disputes involving Reichberg's and Rechnitz's contacts in the diamond industry.  (*See* PSR ¶¶ 64-65, 67-68).

(2) Facilitated police escorts for Reichberg, Rechnitz, and others.  (*See* PSR ¶ 72).  Contrary to the example provided by Harrington in his sentencing submission, many of the escorts Harrington facilitated were not arranged for ostensibly noble purposes such as funeral processions.  By way of example, on one occasion, a member of the Chief of Department's office was sent to pick up a socialite friend of Rechnitz's – the spouse of a multi-millionaire businessman -- in order to get her from Gramercy Park to Madison Square Garden, purely for reasons of convenience.  In essence, these escorts generally served as an illicit taxi service with lights and sirens.

---

[4] The PSR refers to a 2014 trip to Chicago for which Rechnitz paid.  (*See* PSR ¶¶ 58-59).  We do not ask the Court to consider the value of this benefit in assessing the context of Harrington's offense.  Although Rechnitz paid for and arranged the hotel rooms for the trip, which Harrington accepted, and Rechnitz does not appear to have ever received payment for them, it is not clear whether Harrington and other individuals present on the trip pooled their funds and provided those funds to Reichberg to cover the contribution to their trip.  If they did pay Reichberg, he does not appear to have reimbursed Rechnitz.

Hon. Gregory H. Woods                                                                      Page 4
June 5, 2018

> (3) Facilitated an NYPD helicopter flyover above a private party Reichberg hosted on a boat on the East River.  (*See* Harrington Submission at 2-3).
> (4) Facilitated NYPD boat rides around the East River and New York Harbor for attendees of a private barbecue held in Sunset Park.  Although the event was styled as a "law enforcement barbecue," it was a private event held by Reichberg and others, to which he invited police officials and members of his community.
> (5) Ordered a high-ranking police officer stationed at a Midtown Manhattan precinct to respond favorably to any and all favors requested by Reichberg and Rechnitz.
> (6) Facilitated an NYPD helicopter and boat presence at an event for a charitable summer camp.  At trial, the Government would introduce testimony that among the board members of the camp was an individual whom Reichberg coveted as a potential business connection.[5]

Harrington also assisted Reichberg and Rechnitz with getting other officers promoted or transferred, as they desired.  This had the effect of not only putting other NYPD officers in positions where Reichberg and Rechnitz could go to them directly with requests, but also deepening a perception within the NYPD that Reichberg and Rechnitz held considerable power within the Department.  The wire recordings in this case contain numerous instances of Reichberg and Rechnitz discussing personnel moves with Harrington and hopeful officers.  The Court should consider this in assessing the conduct, as it speaks to Harrington's motive and intent.

The combined effect of these and other actions by Harrington and other officers of high rank was to provide Reichberg with his own private police force – an unusual ability to call upon high-level NYPD officials whenever he needed them to accomplish private, non-NYPD tasks. The evidence at Reichberg's trial or any required proceeding would show that Reichberg's principal use of his police connections was to monetize them by, among other things, charging other persons for favors that he could extract from NYPD officials or other public officials.  The same evidence would also demonstrate that both Reichberg and Rechnitz used their police connections to curry favor with potential business contacts.

Harrington's characterization of his actions as "largely legitimate if not commendable" – and the implicit point made by his cherry-picking of noble-seeming instances of misapplication in his allocution and sentencing submission – should be assessed in light of these more sobering facts.  The fact that that Harrington's actions may have benefitted some charitable endeavors and community events is of little relevance to these proceedings because these entities only benefitted because Reichberg benefitted.  Harrington did not divert police resources to assist certain charities – he was engaged in these activities to benefit *Reichberg* and people connected to him.  The benefit to a particular charity was purely happenstance.  This, and not some more

---

[5] For simplicity's sake, the Government does not request that the Court consider the deployment of NYPD cars to religious sites or houses of worship, or Harrington's having gotten Reichberg and his associates preferred treatment during the NYPD's supervision of traffic at parades and other New York City events.  (*See* PSR ¶¶ 69-71, 73).

Hon. Gregory H. Woods                                                                    Page 5
June 5, 2018

broad, noble aspiration was the tie that bound the flyover, the escorts, and the deployment of police to what might otherwise have been considered civil disputes.

For this reason, the Court should test the assertion that Reichberg's actions were "largely legitimate, if not commendable" in light of a simple question: Why Reichberg? What so distinguished this particular private citizen such that a decades-long veteran of the NYPD would misapply police resources to benefit his individual whims? The Court can determine – perhaps most ably after a fuller airing of the facts at Reichberg's trial – whether Harrington's motivation was wholly charitable or because, as the Government expects the evidence to show at Reichberg's trial, Reichberg was catering to Harrington's personal and business interests. In either case, this particular case of misapplication is particularly galling because, in the eyes of a vital government function like the NYPD, a well-connected person like Reichberg should not reasonably expect an entirely different set of benefits and protections from his local police department than every other citizen.

Further, Harrington cannot reasonably cast his misapplication conduct as a mere technical failure to "bypass Department protocol" and failure to fill out forms to receive approvals that he would have received anyway. The core of the misapplication statute – the conduct to which Harrington admitted when he stated that he "misapplied police property" during his plea allocution – is in his taking items meant to serve the NYPD's mission and deploying them to the private benefit of a connected person, Jeremy Reichberg. The purpose itself was impermissible. Harrington does not appear to deny this – the very Superseding Information to which he pled guilty specifically referenced his using resources intended for the NYPD's regular public service for Reichberg's personal benefit and that of his associates. But to now cast his misuse of NYPD resources as mere technical and administrative missteps both substantially minimizes the scope and the importance of the misconduct, and signals strongly a lack of genuine remorse for his actions.

### The Seriousness of the Offense and the Need for General Deterrence

Harrington's print and video components of his submission fail to address the seriousness of the offense to which he has pleaded guilty. As a public institution, the NYPD is premised on the notion that it treats all citizens equally. In order to effect its mission, NYPD's leaders and officers should make decisions based on how best to serve the people of New York City – not based on who happens to have connections to men and women in powerful positions within the Department.

Misapplying resources meant for the public – resources paid for by state and federal taxpayer dollars – to serve the private purposes of a connected individual erodes the integrity of the NYPD. That well-to-do private citizens may command a police helicopter flyover to their event or use a siren-equipped police car as a private mode of transportation because they happen to socialize with and/or provide gifts and benefits to an executive-level police officer is anathema to the NYPD's proper role in our City and to our citizens' trust in this important law enforcement agency. Such a corruption of the process is also deeply detrimental to law-abiding NYPD officers who must contend with the skepticism of the people they serve.

Hon. Gregory H. Woods                                                                                  Page 6
June 5, 2018

     To be clear, Harrington was not convicted of bribery or honest services fraud offenses. But the Court can and should consider the circumstances of his misapplication of NYPD resources.  If the relationship that motivated Harrington's funneling thousands of dollars' worth of man-hours and vehicles to the benefit of a private citizen had its genesis in that citizen's having conferred gifts and rewards on Harrington over time, it represents a stain on the honor of the Department, and an affront to the thousands of police officers whose integrity, honor, and efforts are above being bought by private money.  And it represents a sad betrayal from someone trusted with the power and privilege to command those very officers.

     In arguing against the need for specific deterrence, Harrington correctly notes that he is not capable of committing the same offense again, as he has retired.  But his sentencing submission, which seeks to minimize his misconduct to the point of calling it "commendable," evinces a serious inability to take full responsibility for his conduct, and is deserving of punishment.  Moreover, Harrington's conduct, along with that of his co-defendant Grant, highlights a need for more general deterrence for any NYPD officer contemplating similar conduct.  The Government asks that the Court sentence Harrington with that in mind.  Even short of bribery, police misconduct that chips away at the ideal of a New York City Police Department that treats everyone equally, regardless of their connection, cannot be abided.

### Conclusion

     We respectfully request that the Court impose a sentence reflective of the seriousness of this offense at sentencing.  We further request that, so as to best enable the Court's assessment of the offense, the Court delay sentencing until after the conclusion of the trial against Reichberg and Grant.  That way, any outstanding factual disputes regarding the full scope and context of Harrington's conduct can be resolved.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by:  _/s/_____
Martin S. Bell
Jessica Lonergan
Kimberly J. Ravener
Assistant United States Attorneys
(212) 637-2463/1038/2358

cc: All Counsel (via e-mail and ECF)