# Hafetz & Necheles LLP

ATTORNEYS AT LAW

10 East 40th Street, 48th Floor

NEW YORK, N.Y. 10016

TELEPHONE: (212) 997-7400

TELECOPIER. (212) 997-7646

November 18, 2018

**VIA EMAIL – EX PARTE**
Honorable Gregory H. Woods
United States District Judge
United States District Court
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Grant and Reichberg*, 16-cr-468 (GHW)

Dear Judge Woods:

We write in response to the government's November 1, 2018, motion *in limine* (MIL), Dkt. #376, to preclude certain proposed defense exhibits, as well as certain areas of cross-examination of the government's cooperating witness Jona Rechnitz.

Generally speaking, the government's objections are not to targeted exhibits but to broad categories of exhibits. These objections are often based on a basic misunderstanding of the reason we seek to introduce these exhibits. In this letter, therefore, we try to provide the Court with a broad overview of our defense theory and planned cross-examination of Rechnitz.

We note, however, that until Rechnitz has completed his direct testimony we cannot know exactly what we will ask him on cross. *Cf. Alford v. United States*, 282 U.S. 687, 692 (1931) ("Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination."). Moreover, as was true of the government's exhibit list, we will not ultimately seek to introduce every exhibit we have marked as a defense exhibit. For that reason, we do not address the admissibility of each exhibit in this letter. As the trial progresses, and as it becomes clearer which exhibits we will seek to introduce, we will address any targeted objections to individual exhibits from the government.

## I. Legal Standard

Many of the proffered exhibits will be introduced to impeach Rechnitz's testimony. As the government wrongly claims that doing so would violate F.R.E. 608(b), MIL at 13–14, we first address the limited scope of 608(b) and why it does

1

not prevent the introduction of extrinsic evidence to impeach Rechnitz for, among other things, bias and motive to lie.

Rule 608(b) does not prevent the use of extrinsic evidence for all impeachment purposes. Rather, by its express terms, it is limited to the use of extrinsic evidence to "attack … the witness's character for truthfulness." "[T]he admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity)" is left "to Rules 402 and 403." Committee Notes on the Federal Rules of Evidence—2003 Amendment. *See also United States v. Beverly,* 5 F.3d 633, 639 (2d Cir. 1993) ("The government's questioning arose in the form of impeachment of specific falsehoods, not as an attack on his general character for truthfulness."). For the same reason, the 608(b) limits on extrinsic evidence do not apply to impeachment by contradiction. *See United States v. Ramirez,* 609 F.3d 495, 499 (2d Cir. 2010) ("impeachment by contradiction … operates as a limited exception to Rule 608(b)"); *United States v. Ingram*, 490 F. App'x 363, 366 (2d Cir. 2012) ("This claim has no merit because the license application was admitted to impeach [the witness] by contradiction, whereas Rule 608(b) addresses extrinsic evidence admitted to impeach by demonstrating character for untruthfulness."). *See also United States v. Winchenbach*, 197 F.3d 548, 558 (1st Cir. 1999); *United States v. Fleming*, 19 F.3d 1325 (10th Cir. 1994).

In addition, although we do not seek to introduce our proffered exhibits to show Rechnitz's character for untruthfulness, we note that Rule 608(b) does not create a *per se* rule against such use. The Rule expressly grants the trial judge the discretion to allow an attorney to use extrinsic evidence on cross if it is "probative of the character for truthfulness or untruthfulness of the witness." And, in exercising that discretion, the court must "give wide latitude to a defendant in a criminal case to cross-examine government witnesses." *United States v. Cedeño*, 644 F.3d 79, 82 (2d Cir. 2011) (internal quotation marks omitted).

Finally, the ability of a criminal defendant to impeach a government witness is not merely a question of the rules of the evidence. Rather, it goes to the very heart of the defendant's Confrontation Clause rights. *United States v. Abel*, 469 U.S. 45, 50 (1984) (holding that "the Confrontation Clause of the Sixth Amendment requires a defendant to have some opportunity to show bias on the part of a prosecution witness"); *Henry v. Speckard*, 22 F.3d 1209, 1214 (2d Cir. 1994) ("The motivation of a witness in testifying, including her possible self-interest and any bias or prejudice against the defendant, is one of the principal subjects for cross-examination."). In fact, because of its constitutional underpinnings, the "Supreme Court has held that impeachment for bias is admissible under Rule 402 even when the impeachment material is not independently admissible under Rule 608." *United States v. Figueroa*, 548 F.3d 222, 229 (2d Cir. 2008).

## II. Defense Exhibits

The government, in its letter, objected to five categories of our proposed exhibits, often due to a misconception of the reason we seek to introduce those exhibits. As discussed below, we will generally be offering those exhibits for one of two permissible purposes: (a) to impeach Rechnitz by showing his bias and motive to lie, and (b) as evidence that Rechnitz's actions at issue were not bribes. We address below each category of proposed exhibits which the government seeks to preclude.

### A. Evidence of Rechnitz Spending Money

The government has proffered that Rechnitz will testify that he paid for dinners, fancy trips, prostitutes, and other gifts for police officers, and that all of them were intended as bribes. Rechnitz will admit, however, that he never explicitly told any police officer that the reason that he was paying for those things was to get a benefit in return. Nonetheless, the government will argue, and the jury may assume, that the fact that many of the items paid for by Rechnitz were so expensive is proof, in part, that the items were given not out of friendship but as bribes. The government will seek to contrast what Rechnitz did with what the government will term "normal" friendship behavior. Thus, for example, the government elicited testimony from Richard Oetting that when he and Harington went out to eat by themselves, they went to simple restaurants and not expensive steakhouses. Nov. 9, 2018, Tr. 844–849. The government expressly argued that the purpose of this testimony was to contrast these meals with those paid for by Rechnitz. *Id.* at 847.

We seek to rebut that theory by showing that what was "normal" for Rechnitz was extraordinary expenditures of money. We will show that Rechnitz lavished expensive benefits on all sorts of people—most of whom were not government officials. *See, e.g.*, DX JR 4005–4006; 4011–4012.[1]

This is relevant for two reasons. First, in order to counter the government's argument that ordinary friends would not spend this amount of money out of mere friendship, the defense needs to introduce evidence that this was, in fact, normal and customary behavior for Rechnitz. The evidence which the government seeks to preclude will show that profligate spending, including taking people for rides on private jets, paying for fancy meals, and giving expensive gifts was simply Rechnitz's way of life. These exhibits are therefore critical evidence to put into context the expenditures at issue in this case and to show that they were not bribes.

---

[1] The government, in its motion *in limine*, appears to be using an older version of our marked exhibits. *See, e.g.*, MIL at 14. The defense exhibit numbers we cite in this Response are to the version of the Reichberg defense exhibits provided to the government on October 30 and to the Court on November 5.

Thus, just as the government introduced evidence to show what it contended was ordinary conduct among friends, *i.e.*, Oetting and Harrington's practice of going to inexpensive restaurants, the defense should be allowed to introduce evidence of what Rechnitz ordinarily spent on friends and other non-public officials, to show that Rechnitz's ordinary conduct was to spend lavish amounts of money on acquaintances and associates. In other words, there is a significant difference (or so the jury can conclude) between (a) a (self-described) billionaire who customarily treats his friends to rides on private jets, fancy cigars, and fancy meals who also treats public officials to the same things, and (b) an ordinary person who only treats other people to fancy meals and plane rides when the other persons are public officials from whom that ordinary person wants something in return. We do not dispute that the jury may infer that the fact that an expenditure is *unusually* lavish makes it more likely to be a bribe. Thus, evidence of Rechnitz's ordinary expenditures on, among other things, dinners, tickets for shows, plane rides, and cigars is relevant to the jury's determination of whether those things were intended as bribes or merely so that Rechnitz could appear as a big shot.

Second, evidence of the extraordinary amount of money Rechnitz routinely spent on other people is relevant to the defendants' state of mind. The government will argue that even though there was no explicit *quid pro quo* agreement between the parties, the defendants should have been aware, because of the expensive nature of the meals and trips, that these items were intended as bribes. Again, for the defense to rebut this argument, these gifts must be placed in context. If the defendants believed that Rechnitz was very wealthy, they would not necessarily conclude that the fancy meals or trips Rechnitz was paying for were such significant expenditures for him that they were likely to be bribes. Evidence that Rechnitz sought to portray himself as a billionaire, therefore, by pretending to own private yachts, private jets, and office buildings in Manhattan, and by seeking to publicize his gambling winnings and substantial charitable giving, is all relevant to the defendants' state of mind regarding whether they believed that Rechnitz's expenditures were intended as bribes.

Relatedly, we will seek to show that Rechnitz's desire to create relationships with important city officials (*e.g.,* Mayor de Blasio and Chief Banks) was not done so he could receive illegal benefits in return. Rather, it was so he would appear like a big shot, which Rechnitz believed would help him financially in the business world. In part, this aspiration was because Rechnitz comes from a wealthy California family and was desperate to create an independent name for himself.

Thus, the defense will introduce evidence to show that Rechnitz believed that rubbing shoulders with public officials would get him invited to various (charitable and other) events where wealthy people were present. And we will show that Rechnitz in fact succeeded in this plan by introducing pictures of Rechnitz at charity fundraisers with extremely wealthy individuals.

Moreover, part of how he attempted to create this image of importance was by flaunting his (supposed) wealth. So, for example, pictures of Rechnitz in courtside seats at basketball games[2] will be offered not to show Rechnitz's wealth but to show he wanted to always be in the public eye and to *appear* wealthy. Similarly, a picture of Rechnitz flashing bundles of cash, DX JR 4001, will be introduced not to show that he was wealthy but to show that he wanted people to *think* he was wealthy. These exhibits all go directly to his motive for spending money on the Mayor and various police officers.[3]

Thus, contrary to the government's argument, the defense does not "seek to introduce any of this evidence to embarrass Rechnitz," MIL at 15, and the government's reliance on *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006), is therefore misplaced. In fact, in *Quattrone* itself, the Second Circuit affirmed the district court's ruling admitting evidence of wealth—against the *defendant*—because it was relevant to his motive and was not unduly prejudicial. *Id. See also United States v. Weiss*, 914 F.2d 1514, 1523 (2d Cir. 1990) (affirming the introduction of tax returns to impeach the defendant because they were "relevant to the issue of credibility.").

Thus, the evidence of Rechnitz's wealth goes directly to at least two questions the jury must decide in this case: what was the purpose behind the benefits provided by Rechnitz to Grant and other NYPD officers and did the defendants have a reasonable reason to believe that these expenditures were not intended as bribes.

B. Platinum Partners Payments

The government also seeks to exclude documents which show payments from Platinum Partners to Rechnitz's company and to charities on his behalf. These are

---

[2] We do not intend to offer all of DX JR 4050–4072, (which are pictures of Rechnitz's courtside basketball seats and which the government introduced into evidence at the *Seabrook* trial), into evidence, but we will offer some of them. Not only, as discussed above, will these pictures show how Rechnitz publicly flaunted his wealth, but they are also relevant to show that Rechnitz routinely gave his tickets away when he could not use them, such as on Friday nights (*i.e.,* Shabbat.) The fact that Rechnitz routinely gave the tickets away, as reflected in these pictures, is relevant evidence to rebut the government's claim that when Rechnitz gave these tickets to Chief Banks on one occasion it was intended as a bribe.

[3] Defendants will seek to offer DX JR 4001–4004, in which Rechnitz is holding bundles of cash fanned out in his hand and related emails from Rechnitz to the press containing claims that the cash was gambling winnings that he intended to donate to charity. We are therefore baffled by the government's claim that these exhibits would be "embarrassing" to Rechnitz since he was the one who originally sent these images to the press. In short, these exhibits show how Rechnitz sought to create the impression that he was extremely wealthy and that he gave away hundreds of thousands of dollars to charity.

payments that Rechnitz has admitted were made either directly to his company or to charities on his behalf as a result of his participation in a bribe of Norman Seabrook resulting in the Platinum Partners hedge fund obtaining a $20 million investment from the Correction Officer's Union.

The government has proffered that Rechnitz will testify that Mr. Reichberg also participated in this alleged bribery scheme. We therefore seek to introduce these documents to show that there is documentary evidence that Rechnitz was rewarded for his participation in the bribery scheme. *See* DX JR 1301. We will contrast that evidence to the lack of any such documentation showing payments to either Mr. Reichberg or a charity on his behalf. As discussed above, such impeachment by contradiction is permitted under Rule 608(b).

C. <u>Evidence Which the Government Claims is Extrinsic Evidence of Other Bad Conduct</u>

The government has mischaracterized numerous emails related to specific issues in this trial as "extrinsic evidence of other conduct." MIL at 15–16. In fact, these exhibits all relate to specific issues in dispute at this trial.

For example, Rechnitz has testified that as part of a scheme to bribe the Mayor, Rechnitz and Mr. Reichberg were major fundraisers for de Blasio, that Mr. Reichberg wanted the two of them to be on de Blasio's Transition Committee, and that, as a result of bribing de Blasio, Rechnitz was offered a position on the Transition Committee. A number of the exhibits which the government claims are extrinsic evidence of other conduct are actually evidence which rebuts Rechnitz's claim that he and Mr. Reichberg conspired to bribe de Blasio. *See, e.g.*, DX JR 2006–2018. We will not know which of these exhibits we will introduce in evidence until we hear what Mr. Rechnitz has testified on direct regarding the alleged de Blasio bribery scheme.

In addition, there are numerous emails and recordings which the defense will use to cross-examine Rechnitz. We will seek to introduce these recordings and emails not to show other bad conduct by Rechnitz but to show that particular (anticipated) testimony on direct examination was a lie and his motivation for so lying.

D. <u>Reichberg Photographs and Rachel Reichberg Text Messages</u>

The government also objects to a wide variety of exhibits, claiming that they are being offered as evidence of "good character" or to garner "sympathy." The government is incorrect.

HAFETZ & NECHELES LLP

Included in this general objection are certain Reichberg photographs.[4] *See* MIL at 12 (objecting to DX JR 2203, 6203, 6208–6210, 6406–6410). The government raises a smorgasbord of objections. *See id.* at 21 (objecting under F.R.E. 401, 403, 404(a), and 405(b)). But, as is often the case, quantity of arguments is no replacement for quality of claims. These photographs all speak directly to Mr. Reichberg's friendship with Rechnitz and the police officers he is alleged to have conspired with. They thus go directly to his defense in this case: that whatever he provided to Grant and other police officers was done solely out of friendship. The Court has recognized that would be a defense to the charged counts in this case. *See* Nov. 9, 2018, Tr. 834.

The challenged pictures comprise two categories. The first are pictures of various police officers, as well as some of their wives, at Reichberg family celebrations. *See, e.g.*, DX JR 6201 (Mr. Reichberg and Grant dancing at the Reichbergs' son *bar mitzvah*); JR 6203 (Grant congratulating the Reichbergs' son at his *bar mitzvah*); JR 6208–6209 (Mrs. Reichberg with various wives of Mr. Reichberg's alleged co-conspirators at the same *bar mitzvah*). The government waives at an argument that these pictures somehow are intended to prove Mr. Reichberg's character (character for what, however, is unclear) but this is wrong. Rather, these pictures go directly to Mr. Reichberg's central defense.

The government also argues that there is no need for the defense to introduce evidence of Reichberg and Grant's friendship. MIL at 21. But the defense is entitled to put on its own case and need not rely on the fact that the government "will not dispute that Reichberg has close relationships with certain police officers." *Id.* Degrees of friendship vary and the jury may well credit a defense that these gifts were given out of friendship more if they believe that the co-defendants were very close friends than if they believe they were merely somewhat friendly. And these pictures are more probative evidence of that friendship than mere testimony. A picture is worth a thousand words, after all. Evidence that Mr. Reichberg's friendship with police officers extended to their spouses is particularly probative evidence of the level of true friendship between the alleged conspirators.

The second category of pictures the government objects to is a handful of pictures of Rechnitz and/or various police officers visiting Mr. Reichberg when he was recuperating after surgery. Some of these photographs speak to the level of friendship between Mr. Reichberg and members of the NYPD. *See* DX JR 6406 (Harrington, Rechnitz, and Banks in Mr. Reichberg's hospital room). Others, such as JR 6407–6409, speak to the friendship between Rechnitz and Mr. Reichberg. Similarly, JR 6410 and DX JR 2203 are pictures of Mr. Reichberg in his hospital room that Rechnitz took and sent to Mrs. Reichberg. (JR 2202, which the

---

[4] The government also objects to the introduction of all of the photographs as cumulative. MIL at 21–22. As we will not seek to introduce every one of the marked Reichberg photographs, we do not address this argument here.

7

government also objected to, are the text messages sending these two images to Mrs. Reichberg.) These too speak to what Mr. Reichberg believed to be the friendship relationship between him and Rechnitz. The government's objection that evidence of Mr. Reichberg's recuperation from surgery is unduly prejudicial under F.R.E. 403 is particularly misplaced given that the government itself will be eliciting evidence of Mr. Reichberg's surgery and recuperation from the nurse who cared for him.

Simply put, irrespective of what the government derisively calls these photographs, they are probative of a central issue in this case and are not unduly prejudicial.[5]

Finally, Rachel Reichberg's text messages with Grant, DX JR 2201, and Rechnitz, JR 2204, will further establish the friendship between Rechnitz, Grant, and Mr. Reichberg. We note that those text messages will not be offered for the truth of the statements therein, but merely to show that Mrs. Reichberg received the type of communications that a person would receive from friends.

### E. Evidence of Other Communal Acts by Reichberg

Mr. Reichberg will also seek to introduce evidence that he acted as a liaison between the NYPD and the Orthodox Jewish community by showing specific acts which he performed. *See, e.g.*, DX JR 3017–3022, JR 2085–2103. *Contra* the government, this evidence is not offered to show good character or other good acts by Mr. Reichberg. Rather, it directly relevant to this case for two reasons.

First, the government is planning on introducing tape-recorded conversations on which Mr. Reichberg discusses the years of effort he put into forming relationships with police officers, and his desire to form relationships with specific types of officers, such as the highway patrol. The government will argue that this is evidence that Mr. Reichberg is not associating with police officers simply out of friendship but because he is seeking to form relationships with certain types of officers so that he can receive official acts from them in return.

The evidence that Mr. Reichberg assists in community affairs is therefore relevant to rebut this argument and show why Mr. Reichberg was cultivating relationships with certain police officers. He desired these relationships so that when his members of community needed assistance from public officials, Mr. Reichberg would have the necessary connections with the NYPD to help provide

---

[5]Additionally, some of these photographs are also relevant to the charge of obstruction of justice. Some of these photographs were seized from Reichberg's home and will rebut the government's claim that he sought to obstruct justice by removing evidence of his association with police officers.

HAFETZ & NECHELES LLP

that assistance. The specific phone calls we seek to introduce show the types of things that Mr. Reichberg generally sought assistance with from the police, such as transporting a body to the airport to be buried in Israel or getting security for synagogues.

The proffered evidence will all fit within an exception to the hearsay rule. For example, some of the tapes fit within the present sense impression exception, because they are statements made by Mr. Reichberg describing an event "while or immediately after [he] perceived it." F.R.E. 803(1). Other recorded conversations will be admissible pursuant to F.R.E. 803(3) as indicative of Mr. Reichberg's then existing state of mind. Finally, we will seek to introduce some of the recordings to complete the story of conversations on the tapes the government introduced. Thus, for example, the government plans on introducing recordings showing that on January 12, 2015, between 10:30 and 11 p.m., Mr. Reichberg asked for an escort from upstate New York. *See* GX W00238; W00251. We seek to introduce, under R. 106, other recordings made at or around the same time period which show that the reason for the escort was that his mother had collapsed and was in an ambulance being transported to the hospital. *See* DX JR 3001 (January 12, 2015, 10:01 pm), JR 3002–3006 (January 12, 2015, 10:23–10:54 pm). (These recordings are also admissible as present sense impressions under F.R.E. 803(1)).

Second, this evidence also will serve to rebut the government's argument that Mr. Reichberg's motive for getting to know these police officers, and for bribing them, was so that he could charge people fees to assist them with police-related matters. *See* Nov. 6, 2018, Tr. 75-76 (AUSA Lonergan saying during her opening: "And it was also a way of making money. You see, Reichberg sometimes charged people for the police action he got for them."); *accord* Nov. 7, 2018, Tr. 347 (eliciting testimony from Boaz Gazit that Reichberg asked for $2,500 dollars to assist in getting someone out from jail). The government has also claimed that Mr. Reichberg had competitors for that business. *See* Nov. 6, 2018, Tr. 76 ("He had rivals, other people who wanted the same power and were also willing to give bribes to cops in exchange for police action, other people who made money from their police connections by charging fees to get police action."); *accord* Nov. 7, 2018, Tr. 440–441 (eliciting testimony about Mr. Reichberg's supposed competitors).

In order to rebut this claim as to Mr. Reichberg's motive, we seek to introduce evidence that he often assisted, at no charge, with community matters, in essence acting as a community liaison. This evidence will also tend to rebut the inference that Mr. Reichberg had no legitimate reason to spend so much time building relationships with high ranking members of the NYPD. Relatedly, the exhibits will provide background information so the jury can better understand Mr. Reichberg's relationship with various police officials and his motives in ingratiating himself to them.

HAFETZ & NECHELES LLP

The government has, through its opening and its elicitation of testimony, put Mr. Reichberg's motive in issue. The defense therefore has a right to put in evidence rebutting that supposed motive. See *Jones v. S.P.R.R.*, 962 F.2d 447, 450 (5th Cir. 1992) ("Of course, if the opposing party places a matter at issue on direct examination, fairness mandates that the other party can offer contradictory evidence even if the matter is collateral."); *accord Ramirez*, 609 F.3d at 499. This is particularly important in this case because the jury may well believe it more likely that someone would bribe a public officer if he had a financial motive than if his goal was altruistic or community minded. In fact, it is for this exact reason that the government had argued that Mr. Reichberg's motive was, at least in part, financial.

**CONCLUSION**

For the foregoing reasons, the government's motion to preclude certain of Mr. Reichberg's proposed defense exhibits should be denied.

Respectfully submitted,

_____/s/_____
By:   Hafetz & Necheles LLP
Susan R. Necheles
Gedalia M. Stern
10 East 40th Street, 48th Floor
New York, NY 10016
*Attorneys for Defendant*
*Jeremy Reichberg*