# HAFETZ & NECHELES LLP
ATTORNEYS AT LAW

10 EAST 40TH STREET, 48TH FLOOR
NEW YORK, N.Y. 10016
TELEPHONE: (212) 997-7400
TELECOPIER. (212) 997-7646

November 26, 2018

**VIA EMAIL—EX PARTE**
Honorable Gregory H. Woods
United States District Judge
United States District Court
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Grant and Reichberg*, 16-cr-468 (GHW)

Dear Judge Woods:

    We write to further address the relevancy and admissibility of certain defense exhibits that we plan to use during our cross-examination of Jona Rechnitz. For the reasons discussed in our motion to file our previous letter *ex parte*, *see* Dkt. 426, we respectfully request that the Court maintain this letter under seal until Rechnitz completes his direct testimony.

    We believe that some of the exhibits we address below will be introduced into evidence by the government. Nevertheless, because we cannot be sure which exhibits the government will, in fact, offer into evidence, we address the defense exhibits which we believe the basis for admissibility is not obvious. We address them, by category, below.

    Finally, we note, given Rechnitz's central role in the government's case, that our cross-examination of him will necessarily be extensive. *See United States v. Barrentine*, 591 F.2d 1069, 1081 (5th Cir. 1979) ("When the witness is the star witness, or was an accomplice or participant in the crime for which the defendant is being prosecuted, the importance of full cross-examination to disclose possible bias is necessarily increased."). We beg the Court's indulgence and stress that we will attempt, to the extent possible in line with our ethical obligations to Mr. Reichberg, not to unnecessarily belabor any area of cross.

I.    <u>Campaign Contributions to Mayor de Blasio</u>

    Rechnitz is expected to testify that the campaign contributions he and Mr. Reichberg gave to the Mayor were intended as bribes. During our cross, we intend to introduce numerous exhibits to show that Rechnitz received no favors or benefits

HAFETZ & NECHELES LLP

from the Mayor and that his testimony that he did is false. We will also attempt to show that the reason Rechnitz sought a relationship with the Mayor was to appear like a big shot. Below we address the individual exhibits we will seek to introduce for these purposes.

  1.  JR 2006–2044

These exhibits include various emails, of which we will only seek to introduce some, showing that Rechnitz asked to be on the Mayor's Transition Committee. Rechnitz will admit that he was not offered a position on that committee but instead was only offered a position on the Inauguration Committee. Nonetheless, and notwithstanding his disappointment, Rechnitz gave another $100,000 to de Blasio.

These emails are admissible, under F.R.E. 803(3), to prove Rechnitz's state of mind when he made the $100,000 campaign contribution, a contribution that Rechnitz has testified was a bribe. The fact that his previous requests from the Mayor had not been fulfilled is probative evidence that he did not intend this contribution as a bribe. The emails are also admissible to prove what was said, *i.e.*, that Rechnitz asked to be on the Transition Committee.

  2.  JR 2046

This is an email where Messrs. Reichberg and Rechnitz recommend to de Blasio that he appoint Philip Banks as Police Commissioner.

We seek to introduce this email not for its truth (*i.e.*, that Banks was a "CRIME FIGHTER," or would accept the position of Police Commissioner), but to show that Rechnitz was asking that Banks be appointed Police Commissioner. This is another Rechnitz request that went unfulfilled by the Mayor.

  3.  JR 2048–50

In response to Rechnitz's above email, JR 2046, de Blasio's responded: "Thanks very much." JR 2048. In JR 2049, Rechnitz forwards that response to Reichberg. Rechnitz subsequently doctored that response from de Blasio to make it appear as if de Blasio had responded: "Thanks very much I will take this advice seriously and consider you a close advisor if (sic) mine." JR 2050.

We do not seek to introduce these emails for the truth—in fact, JR 2050 is clearly a made-up statement. Rather, we will use them to show that Rechnitz's motivation in donating to the Mayor was not, as he now claims, to receive something in return but to appear important and politically connected. In fact,

2

HAFETZ & NECHELES LLP

Rechnitz has already testified that he sought political connection to appear as "a big shot." *See, e.g.*, Nov. 20, 2018, Tr. 2392.

    4.    JR 2051–54

These are another batch of doctored emails from the Mayor. Rechnitz changed the Mayor's response to his Thanksgiving greeting from "Thanks! And to you and your family!" to "Thanks! And to you and your family! Please call me when you can. Important!"

These too are not offered for the truth but to show Rechnitz's actual motivation for donating to the Mayor and his desire to appear as a political heavyweight.

    5.    JR 2055–66

These are a group of emails where Rechnitz was trying to assist a friend (Penson) who was competing to receive a City contract to develop some property. Here too Rechnitz doctored his emails to make it seem like he was more powerful than he really was. *See* JR 2058.

These emails are relevant for two reasons. One, they again show Rechnitz's motivation for donating to the Mayor—to look powerful and influential. Second, they are another example of a Rechnitz request from the Mayor that went unfulfilled. Penson did not get the contract in question. They thus tend to show that Rechnitz's claim that he received official acts in return for his donations to the Mayor is false.

    6.    JR 2069–73; 2077–78

These emails show Rechnitz forwarding an email exchange he had with the Mayor to others, including his father and Mendy Chudaitov.

We seek to introduce these emails not for the truth (we are indifferent to the underlying discussion) but to show Rechnitz's need for others to think he was an important figure in the New York City political scene.

II.    <u>Tax Fraud with Jason Nissen</u>

Another topic we plan on crossing Rechnitz extensively about is his relationship with Jason Nissen. Our defense theory is that when Rechnitz was initially approached by the government, he was involved in both a tax and securities fraud conspiracy with Jason Nissen. In fact, Rechnitz was earning approximately $1 million per year through this scheme, on which he did not pay

**HAFETZ & NECHELES LLP**

taxes. We believe he desperately wanted to prevent the government from learning about this scheme and so he agreed to cooperate with the government and falsely admitted to other crimes. All of this was intended, we will show, to stop the government from continuing to investigate him and from reaching out to his investors. And, in fact, the government did stop investigating him. He was thus able to continue his tax fraud with Nissen for four months after he began cooperating, when the fraud was finally discovered.

Thus, evidence concerning the Nissen fraud will not be offered as evidence of Rechnitz's "character for untruthfulness," but to show Rechnitz's motive to concoct a fake bribery scheme. This evidence will also impeach Rechnitz's testimony that he decided to cooperate with the government because he wanted to "come clean in order to move ahead." Nov. 20, 2018, Tr. 2372; *accord* Tr. 2373. *See United States v. Ramirez,* 609 F.3d 495, 499 (2d Cir. 2010) ("impeachment by contradiction … operates as a limited exception to Rule 608(b)").

We will seek to introduce the following exhibits related to the Nissen scheme:

1.   JR 2001

An email and attached promissory note provided to Banks so that he would believe his money was being invested with Nissen. We will show that Rechnitz initially lied to the government regarding what he did with Banks' money. We will argue that he did so because he did not want the government to focus its investigation on his relationship with Nissen.

This email is not being offered for the truth. In fact, we do not know if Rechnitz ever actually invested Banks' money with Nissen. Rather, we seek to introduce it to shed light on Rechnitz's motive to concoct a bribery scheme.

2.   JR 2002, 2004–05

Emails discussing the return of Banks's investment. We seek to introduce these not for the truth but to show that Rechnitz created a fake paper trial to divert attention from Nissen.

3.   JR 2082-2084

These are emails in which Rechnitz is lying to a potential investor (Weinberger) to try to induce him to invest in a ticket fraud he is involved in.

We will not offer these emails for the truth but to support our contention that Rechnitz had a motive to lie to the authorities about bribing the Mayor and police

4

officers in order to divert the government's investigation from his ongoing violations of securities laws.

    4.    JR 2301

This is a group of texts from Nissen to Rechnitz forwarding electronic receipts of Nissen's payment of Rechnitz's credit card bills in November and December of 2016, after Rechnitz had already begun cooperating with the government. This unreported income is evidence of Rechnitz's ongoing participation in a tax fraud. It goes to the heart of our theory that Rechnitz agreed to cooperate with the government and confessed to made-up crimes so that he could divert the government's investigation of him and continue his lucrative criminal tax fraud.

This message is admissible to show Rechnitz's state of mind when he began cooperating, *i.e.*, that Rechnitz was lying and deceiving the government. These texts are also admissible to impeach Rechnitz's claims that (i) he admitted all of his criminal conduct to the government when he started cooperating and has not lied since that time, and (ii) he began to cooperate in order to "come clean" about his criminal conduct. In fact, he did not initially inform the government about this criminal conduct.

    5.    JR 3103-3104

These are two calls on which Rechnitz and Nissen discuss creating fake emails so they can lie to investors in order to get them to invest in their ticket buying scheme.

These calls, during which the participants discuss their future plans to defraud investors, are admissible to show that Nissin and Rechnitz "thereafter acted in accordance with the[ir] stated intent." *United States v. Persico*, 645 F.3d 85, 100 (2d Cir. 2011). As to relevancy, these calls go to Rechnitz's motive to lie about the alleged bribery scheme in order to cover up his other crimes.

III.    <u>IAB Investigation</u>

On direct, Rechnitz testified that he initially lied to IAB investigators because he was worried they would find about his bribes to police officers. Tr. 2368 ("Because I knew that I was involved in corruption of dirty cops, and I had a lot to hide."). On cross, we will confront Rechnitz with evidence that when he first learned of the IAB investigation he said he was not worried about anything he did in regard to police officers. *See, e.g.*, JR 3111 (Rechnitz saying he does not need to hire a lawyer regarding the IAB investigation because "I have nothing."). Rather, the wiretap calls show that he was worried an investigation would discover his tax and securities fraud.

5

HAFETZ & NECHELES LLP

To prove our above-mentioned theory, we will seek to introduce JR 3111–13, 3115–16, 3119, 3121–24, 3126–28, 3129–31, 3133–34, 3136–50. These are calls Rechnitz made after being approached by the IAB and on which he discusses the investigation, and what he was and was not concerned about.

This evidence is being introduced to prove Rechnitz's state of mind—*i.e.*, that he was concerned about the government speaking to his investors, and not concerned about the IAB's questions about police, as well as Rechnitz's motive to concoct a fake bribery scheme. Finally, it will also be used, as discussed above, to impeach his direct testimony. In addition, JR 3123 shows Rechnitz's bias against Mr. Reichberg ("Honestly, I hate Jeremy's guts").

IV.  Messrs. Reichberg and Rechnitz Pretending to Be Rabbis

The government contends that Messrs. Reichberg and Rechnitz obtained certain police benefits, such as expediting arrestees through central booking or getting police escorts, by bribing police officers. To rebut that contention, we seek to introduce wiretaps calls that show that they obtained these things by lying about the relevant facts, as well as by pretending to be police chaplains.

1.  JR 3106-3108

In JR 3106, a friend calls Rechnitz and asks for his help in taking care of a ticket he got for driving with an expired registration. Rechnitz agrees to help and calls the relevant police department in New Jersey. He then tells numerous lies in an attempt to get them to agree to allow his friend to pay his ticket online. JR 3107. JR 3108 makes clear that Rechnitz was unsuccessful and that his friend had to go down to pay the ticket himself.

2.  JR 3017-3022

These calls are part of an attempt by Mr. Reichberg to arrange a police escort from Teterboro to JFK for the body of a recently deceased person, so the body could be flown to Israel for a religious burial. The government has claimed that police escorts of these sort are some of the *quo*'s Mr. Reichberg received from the NYPD officers he was bribing. We seek to introduce these calls to show that in fact Mr. Reichberg arranged the escort by lying and claiming he was a police chaplain. *See* JR 3021. And, in fact, when Mr. Reichberg asked Harrington for help in arranging the escort, Harrington told Mr. Reichberg that he did not think he could help. JR 3019. Moreover, Mr. Reichberg was not at all sure he would be able to arrange the escort, *see* JR 3018, which tends to rebut the government's argument that Mr. Reichberg had a "retainer agreement" with the NYPD officers he was bribing.

**HAFETZ & NECHELES LLP**

We do not seek to introduce any of these calls for their truth (*e.g.,* that the deceased had died in Florida and that his family had rented a private jet to fly his body to Teterboro). Rather, we offer them to show Mr. Reichberg and Rechnitz had to lie in order to get things from police officers.

V.  <u>Evidence of Rechnitz Flaunting his Wealth</u>

As discussed at length in our prior *ex parte* letter, dated November 18, 2018, pp. 3–5, an essential aspect of our defense is that Rechnitz created the impression that he was extremely wealthy and, as a result, people believed that the things he was paying for were insignificant expenses to him. This evidence will counter the government's argument that normal friends do not pay for these types of extraordinary expenses for their friends.

In addition to some of the exhibits discussed in our prior letter (*e.g.*, JR 4001–04[1]; JR 4011–12; JR 4050–72), we will seek to introduce the following exhibits:

1.  JR 2081

This is an email where Rechnitz falsely claims to Norman Seabrook that he owns 23 Wall Street and 15 Broad street, and that he used to own 25 Broad Street.

We do no seek to introduce this email for the truth; in fact, Rechnitz's ownership claim was a lie. Rather, we seek to introduce it to show that Rechnitz would tell people he was extremely wealthy. Rechnitz's claim regarding his wealth to Seabrook is relevant because Seabrook was one of the participants on some of the trips the government claims were bribes to NYPD officers. The jury can infer that if Rechnitz overstated his wealth to one participant on the trip he did so to other participants as well. Moreover, Seabrook and Banks were friends, and the jury can infer that they discussed things Rechnitz told one of them with the other.

In addition to JR 2081, which we already provided to the government and the Court, we will seek to introduce JR 12102–04. These are pictures of 23 Wall Street, 15 Broad Street, and 25 Broad Street. These pictures are relevant to give the jury a sense of what it meant for Rechnitz to claim he owned these buildings.

---

[1] In addition to those exhibits about Rechnitz posing with stacks of cash and emails to the press discussing his stated intent to donate his gambling winnings to charity, we will also seek to offer new exhibits, JR 12602-04, on the same topic. These will not be offered for the truth (in fact, we think many of Rechnitz's claims to the press were false) but to show him publicly flaunting his wealth.

  2.  JR 2205

  This is a text conversation where Rechnitz tells Mr. Reichberg that he told Mrs. Bratton he would give $18K to charity if her husband (the police commissioner) would have lunch with him and Mr. Reichberg.

  We do not offer these texts for the truth. In fact, we have no idea if Rechnitz actually made this offer to Mrs. Bratton. Rather, we offer them to show that Rechnitz wanted to appear to his friends, including Mr. Reichberg, as a big-spender who had money to burn. They also show Rechnitz's desire to rub shoulders with the powerful.

  3.  JR 4101–96

  These are records of Rechnitz's gambling at various Las Vegas casinos and hotels, including records of comped rooms. The parties have stipulated that these are business records, and we thus offer them pursuant to Rule 803(6). We will not seek to introduce all of these exhibits, but we will seek to introduce some of them in order to show Rechnitz's wealth and that the luxurious rooms he put police up in were comped to him by the casinos—a fact which would have led Reichberg and the police to conclude that Rechnitz was someone wealthy enough to frequently gamble large sums of money. It is also relevant to show that Rechnitz did not pay for the alleged bribes to the officers.

  4.  In addition to our previously provided exhibits, we offer new defense exhibit JR 12201. JR 12201 is an email about Rechnitz having rented a yacht for a trip with Banks and Seabrook. The email includes an instruction that staff is to act as if Rechnitz owns the yacht. This is admissible to show that the staff acted in conformity with that directive. *See Persico*, 645 F.3d at 100. Moreover, the email is relevant to inform the jury as to the state of mind of Rechnitz—that he wanted people to believe he was extremely wealthy—as well as the state of mind of those who were invited onto the yacht. It shows that they believed that they were simply accepting a ride on a boat that Rechnitz owned, and not that he was spending money out-of-pocket for them.

  We will also seek to introduce two pictures of Banks and Seabrook on the yacht to show the type of yacht it was so the jury can appreciate what Rechnitz was conveying by claiming he owned the yacht.

**HAFETZ & NECHELES LLP**

VI.   Assorted Other Exhibits

    1.   JR 2079

This is an email from Rechnitz to Harrington with an invoice for the hotel rooms Rechnitz provided Harrington saying that the room was comped.

We will contrast JR 2079 with JR 12402, a new defense exhibit. JR 12402 is a confirmation email that Rechnitz received for the same booking. Unlike JR 2079, which Rechnitz forwarded to Harrington, this email contains a price for the hotel rooms in question.

We do not seek to introduce either of these emails for the truth (*i.e.,* how much the rooms actually cost). Rather, we introduce them only for the *difference* between the two invoices. In fact, this was a pattern of Rechnitz's—he would have invoices modified to appear as if the rooms he was providing to police officers had not cost him anything. Moreover, the invoice Harrington received is admissible to show his state of mind in accepting the hotel rooms from Rechnitz. These emails are thus directly relevant to the issue of whether these gifts were intended as, or understood to be, bribes.

    2.   JR 3109

This is a call between Philip Banks and Rechnitz months after Banks resigned from the NYPD. We offer it not for the truth of any of the assertions made during the call (*e.g.,* that Banks was speaking at Harvard and Yale). Rather, it is evidence that Banks considered Rechnitz a friend and assumed their friendship survived his resignation from the NYPD. *See id.* (Banks saying: "Good, I just wanted to check with you before Shabbos, see how you're doing."). In other words, we offer it as evidence that Banks did not view his relationship with Rechnitz as a purely transactional one that would have naturally terminated when he could no longer offer to perform official acts for Rechnitz.

    Respectfully submitted,

          /s/
By:  Hafetz & Necheles LLP
     Susan R. Necheles
     Gedalia M. Stern
     10 East 40th Street, 48th Floor
     New York, NY 10016
     *Attorneys for Defendant*
     *Jeremy Reichberg*