1  already gave it 10,000, so an additional 15,000 would make it
2  25.
3  Q.  Am I correct in a previous proceeding, you testified that
4  there was never an explicit *quid pro quo* with police officers?
5  A.  Yes, ma'am.
6  Q.  Sir, you testified, am I correct, that you never had an
7  explicit verbal agreement to bribe a police officer, right?
8  A.  That's right.
9  Q.  Sir, but you're saying you had an explicit verbal agreement
10 here; am I correct?
11 A.  No, I am not.
12 Q.  But it was an explicit agreement that you had to give money
13 and in return you would get something done by the police,
14 right?
15 A.  I had been requested by Jeremy to give money to the
16 football team; and Mr. McAllister also told me he can take care
17 of the issue.  It did not happen the way you're suggesting
18 where I hypothetically would have said to Mr. McAllister, can
19 you take care of the protesters, where he would say, sure I can
20 but I need $25,000.  That never happened.
21 Q.  In fact, the two things were linked in your mind, you said
22 on direct?
23 A.  Yes.
24 Q.  So you understood that you had to give the money in order
25 to get the benefit, right?

1  A.  Right.
2  Q.  And you testified also on your direct examination that
3  there were times that Mr. Reichberg would tell you, oh, Jimmy
4  Grant wants something.  And you understood that in order to get
5  something in the future or to get police benefits, you had to
6  give what Jimmy Grant wants.  That was your testimony, right?
7  A.  Yes.
8  Q.  So in your mind, those things were linked, right?
9  A.  That's right.
10 Q.  And that's pretty explicit, right?
11 A.  No.  I think it's explicit is when somebody says fix the
12 railing on my home and I will give you a police escort.  That
13 never did happen.  There was never a verbal exchange like that.
14 Q.  But in your mind, you understood that these things were
15 linked, is what you are saying?  The supposed conversation that
16 you had with Mr. Reichberg where he supposedly told you that
17 Mr. Grant gave, you understood, that those were things were
18 linked, supposedly, right?
19 A.  Yes.
20 Q.  But sir --
21          MS. NECHELES:  One minute, your Honor.
22          THE COURT:  That's fine.  Take your time.
23 Q.  Sir, but previously you said there was no explicit *quid pro*
24 *quo*, right?
25 A.  No.  What I said was there was no verbal agreement between

1  me and the cops.
2  Q.  And when you say "there was no verbal agreement," when you
3  testified under oath that there was no verbal agreement, you
4  were leaving Mr. Reichberg out of it?
5           MR. BELL:  Objection.
6           THE WITNESS:  I'm not sure I understand your question.
7           THE COURT:  Thank you.  Can you please rephrase,
8  counsel.
9           MS. NECHELES:  Yes, I will do that.  Your Honor,
10  Mr. Rechnitz --
11  Q.  Mr. Rechnitz, am I correct that you testified that you were
12  asked when you had testified previously about whether you
13  corrected the police officers, and you said, no, why did you
14  say that?  And you answered, because there was never an
15  explicit verbal agreement to that example.  I never said I will
16  give you this if you give me that.  I gave them gifts, I
17  expected future favors in return.  I never expected to hear a
18  no if favors were done, but it was never an explicit verbal
19  agreement, right?
20  A.  Right.
21  Q.  Now, and you didn't say explicit verbal agreement where I
22  had a conversation with a police officer, right?
23  A.  That's as I understood the question I was answering, right.
24  Q.  But that wasn't what you said, right?
25  A.  Again, the way I understood the question was how I answered

1  it.  I'm not conflicting with what I said earlier.  The fact
2  is, there was never a specific verbal agreement per scenario.
3  So I was never told give me this and I'll give that you in
4  return.  This was an ongoing relationship where many things
5  were done on both sides of the spectrum.
6  Q.  But when you testified previously -- withdrawn.
7        But in this case, you have said you were explicitly
8  told that if you didn't give -- that in order to get help on
9  the protest, you needed to give money to football team?
10 A.  Again --
11 Q.  Sir, that's my question.  Was that what you say you were
12 explicitly told?
13 A.  By Jeremy, yes.
14 Q.  And that's an explicit agreement, an explicit agreement
15 that was said verbally, so an explicit verbal agreement, right?
16 A.  No, that was not between me and a cop.  That was something
17 that Jeremy had told me, just like when he told me just I had
18 to give cops other things.
19        THE COURT:  Thank you.  You can proceed now, counsel.
20 The.
21 Q.  Sir, in addition, you say there were many times that
22 Mr. Reichberg told you that Jimmy Grant, to get money in order
23 to keep doing stuff for you, and is it your testimony here that
24 that was not an explicit verbal agreement?
25 A.  Yes.

1  Q.  Isn't it true, sir, that you have you have changed your
2  story?
3  A.  No, it is not true.
4  Q.  And in that other proceeding where you were testifying, you
5  were discussing Mr. Reichberg in there also, right?
6  A.  When asked the question about him, I gave an answer about
7  him.
8  Q.  In fact, when you were asked in that other proceeding
9  whether you had corrupted police officers and you said no,
10 right?
11 A.  That's correct.
12 Q.  And now it's your testimony that in that other proceeding
13 which occurred in 2017, you didn't know what corruption meant,
14 right?
15 A.  No, ma'am.  The other day you asked me the same thing and
16 as I explained, the way I understood corruption at the time was
17 wrong.  My actions did not change and our conduct did not
18 change.  I've been very consistent about our conduct and
19 actions.  It was my understanding that the legal definition of
20 the word corruption that has since evolved.
21 Q.  Sir, do you recall that in the other proceeding, you were
22 being asked by Mr. Bell about whether -- about questions about
23 you and Mr. Reichberg and how they -- to how you knew Jimmy
24 Grant and who knew him first.
25          Do you recall that?

1  A.  Yes, I do.
2  Q.  And you were asked the same about who knew Mr. Harrington,
3  correct?
4  A.  Yes, ma'am.
5  Q.  And who knew Steve McAllister, correct?
6  A.  Yes.
7  Q.  And then about who knew Deputy Chief Colon first, right?
8  A.  Yes.
9  Q.  And then you were asked if Mr. Reichberg was involved with
10 this men and giving them things before you were involved,
11 right?
12 A.  Right.
13 Q.  And you said yes, you claimed he was giving him things
14 before you were involved, right?
15 A.  Right.
16 Q.  And then you were asked, what did you mean, the
17 term "corrupted" to mean when another lawyer had asked you
18 about that in that other proceeding, right?
19 A.  I'm sorry.  Can you repeat that.
20 Q.  Then you were asked immediately following those other
21 questions about Mr. Reichberg, you were asked, what did you
22 understand the term "corrupted" to mean, whether you had
23 corrupted police officers?  What did you understand that to
24 mean when another lawyer had asked about it, right?
25 A.  Yes.

1  Q. And you said, am I correct, like a *quid pro quo*, a bribe,
2  for example, I will give you a dollar if you give me a bottle
3  of water. That's what I understood corruption to mean, right?
4  A. Right.
5  Q. Then you were asked why did you say you had not corrupted
6  police officers, correct?
7  A. Right.
8  Q. The and you said because there was never an explicit verbal
9  agreement to that example. I never said I will give you this
10 if you gave me that. I gave them gifts, I expected favors in
11 return. I never expected to hear a no from them and favors
12 were done, but it was never an explicit verbal agreement. That
13 was your testimony previously, right?
14 A. Yes.
15 Q. So that was all dealing in the context of Mr. Reichberg,
16 right?
17 A. No, it was Reichberg and I did this together, so...
18 Q. And you said in the context of dealing with Mr. Reichberg
19 and the police, there was never an explicit agreement with the
20 police, right?
21 A. That's right.
22 Q. But now you say there were explicit discussions -- in this
23 trial, for the first time you claim there were explicit
24 discussions between Mr. Reichberg and Mr. Grant?
25          MR. BELL: Objection.

1              THE COURT:  Sustained.
2              You said Reichberg and Grant.
3              MS. NECHELES:  Yes.  I'll try again.
4      BY MS. NECHELES:
5      Q.  In this trial, you have said -- well, first, you testified
6      that there was an explicit discussion with -- between
7      Mr. Reichberg and Mr. McAllister, right?
8      A.  No, I did not.  No, I said that I had a meeting with
9      Stephen McAllister and Paul Raps and Jeremy Reichberg where he
10     said that he could help us with the protester issue and started
11     asking us questions about sound permits and other things.
12             Separately, Mr. Reichberg told me that we would have
13     to give more money to the football team, an additional $15,000,
14     totaling 25,000.  I never once said to Mr. McAllister, can you
15     take care of the protesters and he never once said, only if you
16     give me money.
17     Q.  So your story now is that Mr. Reichberg was the middleman,
18     so it doesn't contradict your prior testimony, is that what
19     you're testifying to now?
20             MR. BELL:  Objection.
21             THE COURT:  Sustained.
22     Q.  And with respect to Mr. Grant, you believe, your testimony
23     here that Mr. Grant supposedly used to ask Mr. Reichberg the
24     things and he would pass it along to you, and you understood
25     that it was an exchange for favors that you didn't understand

1  that to contradict your prior testimony?
2  A.  No, it does not contradict.  What happened was I was in the
3  car with Jeremy once and he picked up the phone on speaker and
4  Jimmy was saying, "Please to talk to Jona about the trip for
5  Rotem.  I got to get it done and get it book."  Jeremy many
6  times said, we got to take care of this for Jimmy.  Never once
7  did I have a conversation with Jimmy Grant, and never did I ask
8  Jimmy for do me a favor where he said, Jona, only if you do
9  this, that never happened.
10 Q.  In your prior proceeding, you were trying to be truthful
11 and honest and give complete answers, right?
12 A.  I'm required to tell the truth.  I'm under oath.  If I
13 didn't tell the truth, I'm at risk of losing my 5K agreement
14 and facing further charges of obstruction of justice.  So
15 everything under oath has been truthful.
16 Q.  When you say "there was no explicit verbal agreement,"
17 except that Mr. Reichberg used to say that the police had
18 explicitly asked for something, you didn't add that into the
19 prior proceeding, right?
20             MR. BELL:  Objection.
21             THE COURT:  Sustained.
22             Counsel, can you please rephrase.
23             MS. NECHELES:  Your Honor, I'll move on.
24             THE COURT:  Thank you.
25 BY MS. NECHELES: