IB6KGRA1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                    New York, N.Y.

4              v.                                  16 CR 468 (GHW)

5    JAMES GRANT and JEREMY
     REICHBERG,
6
                   Defendants.
7
     ------------------------------x
8
                                                  November 6, 2018
9                                                 9:10 a.m.

10
     Before:
11
                        HON. GREGORY H. WOODS,
12
                                                  District Judge
13

14                           APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  JESSICA R. LONERGAN
17        KIMBERLY J. RAVENER
          MARTIN BELL
18        Assistant United States Attorneys

19   HAFETZ & NECHELES, LLP
          Attorneys for Defendant Reichberg
20   BY:  SUSAN R. NECHELES

21   MERINGOLO & ASSOCIATES
          Attorneys for Defendant Grant
22   BY:  JOHN MERINGOLO
          ANJELICA CAPPELLINO
23

24

25

IB6KGRA1

1         (Trial resumed)

2         THE COURT:  First, thank you, all, for being here.

3    Welcome.

4         Before we begin, are there any issues that any party

5    would like to raise with the Court?  The first issue that I

6    have on the agenda for this morning is to discuss the

7    application related to the admissibility of the testimony of

8    Special Agent Massey responding to the Bruton issues that were

9    brought to my attention very, very early Friday morning and

10   which were briefed by the government during the course of

11   yesterday's proceedings.

12        Is there anything else that any party would like to

13   raise before we begin?

14        Yes, counsel.

15        MR. BELL:  Your Honor, in addition to the Massey and

16   Bruton issues, we do want to raise the state of play with

17   respect to the potential de Blasio issues, because having

18   conferred with defense counsel, we think that they bear a

19   little bit on openings.  So we want to touch on those briefly.

20        A fourth very narrow issue is this:  We expect to

21   begin playing stipulated-in wiretapped conversations this

22   morning, and the question we have for the Court is whether, for

23   expediency's sake, it makes sense to leave binders beneath the

24   jurors' seats in a sort of Oprah, "you get a car, everybody

25   gets a car" style, or whether to hand those out later on.

IB6KGRA1

1          THE COURT:  Thank you.

2          Counsel for defendants, let me ask you what your view

3    is regarding the binders.  My concern about leaving the binders

4    early is that they will be tempted to thumb through them

5    prematurely, but I invite the comments of the defense.

6          MS. NECHELES:  Your Honor, we were planning on giving

7    binders as well.  I have no objection to that.  In the past, I

8    think that in cases that I have been in, the Court has just

9    instructed jurors not to look ahead, and I think that the

10   jurors follow those instructions.  And sometimes you can see

11   them not following them, and the Court has reminded jurors that

12   they should not look ahead.

13         I will just comment on the stipulation:  The

14   stipulation does not stipulate into evidence any of the tapes.

15   It just stipulates that they are taped and that these are

16   transcripts of the tapes.  So we will be -- I don't know if any

17   of them will be coming up today, but there are some tapes that

18   we will be objecting to that the government has said they

19   wanted to introduce.  We'll be objecting to them as hearsay

20   statements by noncoconspirators.

21         THE COURT:  Thank you.

22         Please proceed.

23         MR. BELL:  What we may do, your Honor, is try to, at

24   least on a going-forward basis, flag for the defense sometime

25   before what wire calls we intend to play on a given day, so

IB6KGRA1

1     that we can nip the bud on any potential objections before it

2     takes up the jury's time.  We'll try to give them a list

3     forthwith, so we can deal with that today as we go.

4             The related question, I suppose, tied into that first

5     question is whether your Honor, as is I think generally okay

6     with most judges in this district, is all right with playing

7     admitted wiretapped conversations for the jury; that is,

8     publishing them without a witness actually on the stand.  A

9     number of the tapes are in just for what the tapes say --

10    there's not much that a witness would add -- and it allows us

11    to, I think, sprinkle those in liberally throughout the

12    presentation without, essentially, numbing the jury with a

13    whole bunch of tapes all at once.  But we wanted to clear that

14    procedure with your Honor since we realize that not every judge

15    in the district is of the same mind on that.

16            THE COURT:  Thank you.

17            Have the parties agreed as to the admissibility of

18    those recordings?

19            MR. BELL:  Not as yet, your Honor.  I think that what

20    we would try to do is resolve issues beforehand, including even

21    the night before or the day of before your Honor to the extent

22    things are disputed.  Once they are agreed to, the hope would

23    be to be able to play them in the fashion I described.

24            THE COURT:  Thank you.

25            Counsel for defendants?

IB6KGRA1

1      MS. NECHELES:  We have no objection.  We have asked

2  that the entire transcripts, or at least what we have noted,

3  that the entire tapes be played at the same time.  And we

4  would, of course, be doing the same on cross or when we're

5  cross-examining, playing transcripts or playing them in our

6  direct case, also, and would be informing the government in the

7  morning of what tapes we will be playing.

8      MR. BELL:  We do not intend to chop up in any way the

9  tapes as they have been -- as the transcripts have been given

10  to the defense and to the Court and the accompanying T

11  exhibits.  So that's all fine by us.

12      THE COURT:  Fine.  Thank you.

13      I have no concerns about either set of parties playing

14  tapes that the parties agree are properly admitted into

15  evidence without a witness on the stand.  You'll need to

16  establish that predicate, however.

17      MS. NECHELES:  Your Honor, there's another issue I

18  wanted to raise.

19      THE COURT:  Please.

20      MS. NECHELES:  Maybe it's just on the list.  I don't

21  know what order your Honor wants to deal with this.

22      Your Honor had ruled that the government could put in

23  two rules from the police guide, the patrol guide, and now the

24  government has marked as exhibits many, many, many more rules,

25  rules about not lying, rules about what kind of conduct there

IB6KGRA1

1    has to be at parades, all sorts of rules, and I would submit

2    that it goes way beyond your Honor's ruling, what was

3    admissible, and that it is unduly prejudicial.  It will cause

4    confusion with the jury.  They are clearly intending to argue

5    that the police officers were doing things wrong because they

6    were not complying with police department rules.

7              So we would ask to preclude any rules beyond that

8    which were not raised with your Honor in the motions in limine

9    that your Honor spent a lot of time with.  I would say I do

10   understand that there is one rule with respect to desk

11   appearance tickets, which is a process in state court, that

12   either someone can go through the whole system, get arrested,

13   go through the whole system, or they can be given a desk

14   appearance ticket, which is for misdemeanors and violations and

15   saves the government a lot of money and a lot of time, and

16   there are rules about when that can be done.  And I understand

17   that they will be putting those rules in, and I understand why,

18   because there is an issue with respect to whether people --

19   whether Jeremy Reichberg got police officers to do something

20   that violated the rules.  But other than that, I believe that

21   the other rules, which are, for example, rules about parades,

22   rules about performance on duty general, prohibited conduct,

23   making false statements, public conduct, prohibited conduct --

24   those rules, your Honor, I submit, should all be precluded.

25             THE COURT:  Thank you.  Good.

IB6KGRA1

1         Counsel for the United States, any response?

2         MS. LONERGAN:  Yes, your Honor.  When we briefed the

3    patrol guide issue a number of months back, I'm fairly certain

4    that we, in the motion, focused on -- I think Ms. Necheles is

5    right -- two specific rules, but reserved the right to offer

6    additional ones.  And I remember that it led to a series of

7    litigation about the fact that defense counsel wanted us to

8    provide them with the entire patrol guide.  It was difficult to

9    do, but we nevertheless did it.  And part of the reason they

10   said they wanted the entire patrol guide was to go through and

11   look at whether they wanted to offer various rules.

12        Yes, it is true that we have identified additional

13   portions of the patrol guide, but they all go to the same core

14   issue that this Court has already ruled is permissible, which

15   is to show that there were, and are, guides of conduct for

16   police officers in the patrol guide that Grant and other

17   officers in this case, that their conduct violated the patrol

18   guide, and that that goes to their state of mind or their

19   intent in committing the crime at issue.

20        We were very, very clear that any admission of the

21   patrol guide in evidence in this trial would require a very

22   particular limiting instruction, which I think we had worked on

23   with the Court.  We are happy for the Court to give that

24   limiting instruction whenever a portion of the patrol guide

25   comes into evidence, after all the portions of the patrol guide

IB6KGRA1

come into evidence, in the Court's charge to the jury.  We are

not going to be arguing in any sense that a violation of the

patrol guide is the crime in this case, but as our case has

developed over the past six months, we have found that there

are additional portions of the patrol guide that match up with

the conduct charged in this case and that match up with

testimony.  In particular, many of the portions may come in

through another witness who the Court has ruled is relevant and

admissible on this purpose, which is Sergeant Cox, who will

talk about training at the academy.  And as part of his

training, he will talk about police science, and as part of

police science, new recruits are taught about, essentially,

much of the patrol guide.  And so that is the context in which

we are offering these sections.  Most of these sections of the

patrol guide is what are the rules that police officers

understand guide their conduct.

Again, yes, we agree that we have expanded the number

of sections, but it is still probably less than a dozen

sections, and they all go to the similar point that we

initially raised with the Court six months ago.

THE COURT:  Thank you.  Fine.

Counselor, is there any other issue that -- I'll come

back to this issue.  Is there any other issue that we should

talk about that will affect, potentially, the parties' opening

statements?  I'd like to hear about what counsel for the United

IB6KGRA1

1   States has referred to as the de Blasio issue before we turn to

2   the Bruton issue.

3        MR. BELL:  I don't think there is another issue, your

4   Honor.  I will merely note that I just handed counsel for both

5   defendants a list of wired calls that we intend to play today,

6   I have another list for the Court if it's helpful, but we may

7   not need to start our court exhibit count quite that quickly if

8   there aren't any objections.

9        THE COURT:  Thank you.

10       What did the parties resolve with respect to the

11  government's proposal regarding proposed limitations on the

12  testimony of Mr. Rechnitz regarding his and Mr. Reichberg's

13  alleged bribery of public officials?

14       MR. BELL:  Your Honor, we discussed this with counsel

15  for both defendants, and it seems that we were able to get

16  sign-on from one, but not both defendants.  So, unfortunately,

17  we don't have a resolution.  What we would propose, your Honor,

18  and thus tee up for a ruling, is that within the realm of a 403

19  calculus that your Honor mentioned that this is situated in, we

20  would move for the following:  Essentially for your Honor to

21  endorse that proposal even if one of the parties is not, which

22  is to say, we will excise from the case -- and we would ask the

23  Court to excise from the case -- the de Blasio quid pro quo

24  activity.  And I am being precise with that because there are

25  more benign ways in which Mr. De Blasio may be a part of the

IB6KGRA1

1    case, such as the email conduct that Mr. Meringolo made

2    reference to late yesterday, but we would propose that that be

3    excised, that as part of that excision, that Mr. Rechnitz not

4    be cross-examined concerning the quid pro quo activities

5    involving Mr. De Blasio and the de Blasio campaign.  And that,

6    in light of that, it would -- we would also, of course, your

7    Honor, seek permission to redact the cooperation agreement of

8    Mr. Rechnitz accordingly, and as part of that, we would like

9    to, at the very least, make sure that the parties do not open

10   on something that would be -- that would not ultimately

11   materialize in the case as, presumably, under the 403 calculus

12   that your Honor alluded to earlier.  Not only Mr. de Blasio,

13   but, presumably, Mr. Offinger would no longer have admissible

14   testimony to offer.

15            THE COURT:  Thank you.

16            So, as I understand it, the proposal is that

17   Mr. Rechnitz will not testify that he or Mr. Reichberg engaged

18   in what you've described as the de Blasio quid pro quo

19   activity, so that's something that would not be part of the

20   case as to either Rechnitz or Mr. Reichberg?

21            MR. BELL:  That's correct, your Honor.

22            There is a part of the story in which I think

23   Mr. Rechnitz would testify that he raised money for

24   Mr. de Blasio.  He would not discuss, I believe, under this

25   proposal, anything that he solicited or expected in return.

1          There is, I suppose, a peripheral, but related matter

2     of a portion of Mr. Rechnitz's Giglio that concerns straw

3     donation activity that he took part in, and I think your Honor

4     is familiar with it, but I don't think we need to clarify the

5     sort of ragged edges of that ruling right now, not for purposes

6     of openings.  I think the heart of this would be that the

7     quid pro quo stuff, at its core, the "I am giving to the

8     de Blasio campaign with the expectation of action from the city

9     in return," would be out on all fours.

10          THE COURT:  Thank you.

11          Let me just ask one question, counsel:  With respect

12     to the evidence that would come in regarding the fact of

13     political donations; i.e., Rechnitz made political donations as

14     part of the campaign, the defense had requested earlier that to

15     the extent that that comes in, that I instruct the jurors

16     generally that campaign contributions, in and of themselves,

17     are not illegal.  What's your view regarding such an additional

18     comment?

19          I should say that was two versions ago of the

20     defendants' position on this issue, but what's your view

21     regarding such a potential instruction, given the excision of

22     the quid pro quo aspect?

23          MR. BELL:  Can you give us a moment to confer, please?

24          THE COURT:  Please.  Take your time.

25          MS. NECHELES:  Can I comment on this, your Honor?

IB6KGRA1

1          THE COURT:  Thank you.  Give the government just one

2    moment, so we keep our thread intact.

3          MR. BELL:  Your Honor, with respect to Mr. Rechnitz's

4    bundling -- and Mr. Rechnitz, I should say, and Mr. Reichberg's

5    bundling donations for the mayor, that activity on its own is

6    obviously not illegal, and so such an instruction would be

7    accurate, although I don't believe that it would necessarily be

8    required or necessary.  I think that people tend to get that

9    raising money, engaging in the campaign fundraising process, is

10   not itself a violation of law.  Any such instruction, of

11   course, would not, presumably, apply to the straw donation

12   component of this, because utilizing straw donations is, among

13   other things, a violation of New York's election law.

14         So obviously we would need to be cautious with that

15   insofar as that still is part of Mr. Rechnitz's Giglio.

16         THE COURT:  Thank you.

17         Can I ask about that?

18         MR. BELL:  Sure.

19         THE COURT:  Why, as part of the government's proposal,

20   is that set of straw donations still something that the

21   government wants to put in front of the jury?

22         MR. BELL:  I think that we've cut around that largely

23   because the driver of this conversation was Ms. Necheles'

24   raising the issue -- which we don't credit, but Ms. Necheles'

25   raising the issue that she did not believe that the actual

IB6KGRA1

1   quid pro quo activity was a violation of the law.  The

2   fundraising -- the straw donation activity is a violation of

3   the law.  If what you're proposing is that we excise the straw

4   donation activity as well, then I'd ask a moment to just confer

5   with my colleagues about that.

6           THE COURT:  Thank you.

7           To be clear, I'm not proposing anything; I'm just

8   inquiring.  The reason why I inquire is, in part, because one

9   of the issues that came up as part of our discussion of the 403

10  balancing analysis was whether if the government puts in

11  evidence that Mr. Rechnitz committed crimes with Mr. Reichberg,

12  the defendants will, therefore, need to/be entitled to put in

13  evidence that that conduct was not illegal or that it did not

14  occur.

15          MR. BELL:  That's true, your Honor.  But, certainly,

16  the straw donation activity would not be alone in that category

17  of activity that remains.  Reichberg and Grant -- I should say

18  attorneys for Reichberg have not taken the same exception to

19  any number of presumably illegal things that the two are

20  alleged to have participated in together - the Seabrook

21  activity, the Astorino political quid pro quo, Mr. Reichberg's

22  paying to -- presumably paying to get people out of jury duty,

23  and Mr. Rechnitz's referring people to him for that purpose.

24          So the purpose here wasn't to excise every possible

25  such issue, because I don't think that attorneys for Reichberg

IB6KGRA1

1    have raised issue with every possible such issue.

2              THE COURT:  Thank you.  Good.  That's helpful.

3              Counsel for Mr. Reichberg, can I hear from you,

4    please?

5              MS. NECHELES:  So, your Honor, part of my problem in

6    dealing --

7              THE COURT:  Can I ask you to move closer to the

8    microphone, if you wouldn't mind?

9              MS. NECHELES:  Sure.

10             Part of my problem in dealing with all of this is that

11   the government did not communicate with me about what the scope

12   of this is.  I was in my office until very late last night.  I

13   didn't hear from them about what the scope of this, what they

14   are proposing to leave out.  So I don't know.  And if any of

15   the mayor stuff is coming in, it's all coming in from my

16   perspective.

17             THE COURT:  Thank you.

18             MS. NECHELES:  And so because of that, I need to open

19   on it, because I cannot be seen by the jury as having gotten up

20   there, and talked about one thing, and be hiding from this

21   other evidence that's going to be coming in to court.  The

22   government has never said I'm not putting in --

23             THE COURT:  Thank you.  Let me just pause you, if you

24   don't mind.

25             I appreciate the concern, the phrases that we're

IB6KGRA1

1    using, the government said the de Blasio -- quote, the

2    de Blasio, quote, quid pro quo activity, and you've referred to

3    it as the mayor stuff, and we know that there is also the

4    question of the emails that I had confused on my part

5    conversation with Mr. Meringolo about yesterday, just because I

6    don't know the facts as well as all of you do.  I think it is

7    very important for us all to be speaking about the same set of

8    language, so mayor stuff and de Blasio quid pro quo activity

9    may not be sufficiently precise for these purposes.

10           MS. NECHELES:  So, for example, your Honor, there will

11   be evidence in this case that --

12           THE COURT:  Oh, can I ask, Ms. Necheles, if this would

13   be reasonable for you:  Can I ask the government to tell me

14   what they mean by the de Blasio quid pro quo activity that they

15   propose to --

16           MS. NECHELES:  Sure.

17           THE COURT:  -- excise?

18           MS. NECHELES:  And can I ask you, your Honor, if we

19   could just hear, what de Blasio stuff, or stuff was City Hall,

20   or getting favors for City Hall, what do they intend to put

21   into evidence?  What will they be putting into evidence as

22   people contacting de Blasio or trying to get favors from

23   de Blasio?  Because it's all part of one thing.

24           MR. BELL:  Sure.

25           I think that the last question Ms. Necheles asked is

IB6KGRA1

1    relatively easy to answer.  That stuff would all be out.  But

2    let's begin from your Honor's question.

3            Your Honor asked us to define what the de Blasio

4    quid pro quo will be.  Here, we are talking about testimony

5    from Mr. Rechnitz that he, Mr. Reichberg, and another

6    individual met with the mayor's chief fundraiser, Ross

7    Offinger, and offered to bundle money for the 2013 mayoral

8    campaign, and in that conversation, made it clear that those

9    fundraising and donation efforts were premised on Mr. de Blasio

10   and the future de Blasio City Hall being responsive with action

11   to their requests in return.

12           Also excised as part of this would be whatever efforts

13   Mr. Rechnitz made in order to get actions pursuant to that

14   understanding once Mayor de Blasio was elected and

15   Mr. Rechnitz's knowledge of what efforts Mr. Reichberg made to

16   get action from City Hall pursuant to that same understanding.

17           Given the categorical nature of the testimony being

18   excised, I'm actually not sure that there is a need to go into

19   what precisely Mr. Rechnitz says that he would have gotten

20   pursuant to that understanding because it would be excised.

21           THE COURT:  Thank you.

22           Counsel for defendants, any questions from you

23   regarding what it is that the government is offering here?

24           MS. NECHELES:  So, your Honor, yes, because later in

25   the case, when we start talking about favors for the police --

IB6KGRA1

         1    I mean, for example, the government has on its exhibit list

         2    emails to de Blasio about Banks, and Banks be made the chief of

         3    the police, and there are conversations where there is

         4    reference to, you know, we're going to ask de Blasio for calls.

         5    So is that coming into the case.

         6            In addition, your Honor, we intend to show that

         7    Rechnitz's lying about the favors that he got from de Blasio,

         8    and that none of this was as a bribe scheme, and that is

         9    relevant as to the Astorino.  That is how we are showing the

        10    Astorino stuff is not relevant.  So if the Astorino bribe,

        11    supposed bribe, stuff is coming in, we have to show that this

        12    is all part of how Rechnitz deals with the world.  Rechnitz is

        13    the one giving hundreds of thousands of dollars, literally over

        14    a hundred thousand dollars, to Mayor de Blasio, and Reichberg

        15    is giving zero.  And that evidence -- and that's the same

        16    pattern that is true for Astorino.  So I need to show that, if

        17    the Astorino stuff is coming in, that this is just the pattern

        18    of how Rechnitz behaved.  He has a pattern of activity in his

        19    life of throwing around money, and that will be a lot of our

        20    proof, that nobody thinks that this is bribes, because that's

        21    how he acts all the time.  He's always throwing around money,

        22    everybody sees it, he's not getting any results on anything, so

        23    nobody would think that what he is doing is bribes.

        24            I cannot deal with the Astorino stuff without also

        25    dealing with how he has a pattern in his entire life of

IB6KGRA1

1    throwing around money for political contributions, massive

2    amount of monies, not connected to anything.

3             So when the government says, well, we didn't object to

4    the Astorino stuff, we didn't -- we did object to it, your

5    Honor ruled on it, we've moved on like we're supposed to do.

6    We did object to all of this other-act evidence coming in, but

7    I certainly don't understand how Astorino comes in if the mayor

8    stuff is staying out, and I also don't understand the state of

9    mind relevant or what the 404(b) purpose is for evidence about

10   straw donors.  That does not at all seem to go to the purposes

11   that the government was talking about before to show it was a

12   pattern of activity.  So that's our problem.  It's all

13   intertwined in that way.

14            If all of this were being kept out, then it would be a

15   clean case, and we could deal with it that way, but that's not

16   at all what the government is proposing.

17            THE COURT:  Thank you.  Understood.

18            Counsel for Mr. Grant, do you have any comments on

19   this issue?

20            MR. MERINGOLO:  We would not consent to exclude

21   anything whatsoever with Mayor de Blasio.  We want to open on

22   it, we want to close on it, we want to cross on it, we want to

23   put witnesses on it.  Mr. Rechnitz pled guilty to bribing

24   de Blasio pursuant to a cooperation agreement with the best

25   U.S. Attorneys in the country.  We can't just make that go

IB6KGRA1

1    away.

2              THE COURT:   Thank you.

3              Counsel for the United States, I'd like to ask you to

4    respond to this, but I'd also like to hear a comment on what I

5    remember as one of the quotes presented to me in the

6    submissions.  And I apologize, I'm going to paraphrase this

7    statement inaccurately from Mr. Rechnitz's prior testimony.

8    The essence of that testimony was, if I recall correctly,

9    first, NYPD, then the city, then the world -- I don't think

10   "the world" was in there -- but how would excising this set of

11   testimony affect such testimony from Mr. Rechnitz about what

12   I'll call the long-term plan, which I had understood the

13   government to want to introduce, in part, to contradict what I

14   expect to be the defendants' arguments -- what have been the

15   defendants' arguments here that this was just action to protect

16   a particular community?

17             MR. BELL:   Your Honor appreciates the contemplated

18   import of that testimony correctly.  And, to be clear, we

19   believe that there are other somewhat vaguer, frankly, ways to

20   get at the same sentiment.  We lose some of the power of that

21   statement, your Honor, that is true.  That is a sacrifice that

22   we were willing to make in the spirit of compromise and in the

23   spirit of avoiding the potential 403 sideshow related to the

24   mayor's Office.

25             But as far as how that statement might come in,

IB6KGRA1

whether there is a quid pro quo aspect to it or not, it is

clear that, through a combination of -- I'll back up.

In 2013, Mr. Rechnitz and Mr. Reichberg entered the

political realm.  I expect Mr. Rechnitz's testimony to be that

before they set their sights on Mayor de Blasio, they bet on

mother mayoral candidate, Bill Thompson, and lost.  I do not

understand there to be any illegal quid pro quo aspect to their

involvement in the Thompson campaign.  But they will say, at

that point, that they did want to get to a place where they

could get in good with City Hall, ambiguously, and they wanted

to get in good with politicians generally, and they had a

general understanding, the two of them and the third person who

they dealt with as part of their team, that they just wanted to

generally become big shots, so that they could do big-shot

things.

So, in a not necessarily illegal way, that was of a

piece with the clearly illegal behavior concerning the police.

I'll say, your Honor, with respect to Ms. Necheles'

earlier points, the following:

One, with respect to the straw donations, I actually

don't think it's that hard to excise the quid pro quo component

of this and maintain the straw donations, but if your Honor

wants to rule out the straw donations on a similar 403

calculus, we're not going to fight it that hard.  These are the

types of calls, as I mentioned before, that can be made at the

IB6KGRA1

1    margins of a ruling by your Honor, that the de Blasio

2    quid pro quo activity, as I defined it before, comes out for

3    403 reasons.  And, your Honor, we would happily abide by that

4    ruling if it simplifies the world.

5            With respect to Rob Astorino, Ms. Necheles has

6    suggested that there is not a way for Mr. Rechnitz to testify

7    about their Astorino activities without talking about their

8    de Blasio activities.  I don't think that that's been supported

9    by the argument that's been presented to your Honor so far.

10           The concern here is fundamentally one of whether we

11   are going to tee up issues that prompt the spectacle of

12   bringing the current mayor of New York, or his chief

13   fundraiser, in here to testify.  The Astorino issue doesn't

14   implicate all of that.  Mr. Astorino is no longer in office.

15   And there is no reason why, in testifying that they talked to

16   Rob Astorino about raising money and getting a chaplain seize

17   in return, that it necessarily has to implicate this whole long

18   laundry list of things involving the mayor.

19           THE COURT:  Good.  Thank you.  Understood.

20           Let me say the following about the de Blasio issue --

21   and I'm sorry, counsel for the United States, I want to ask one

22   other question -- what I've heard is, as I understand it, and

23   counsel for defendants will correct me, is that neither

24   defendant endorses this approach.  I had understood from your

25   introductory remarks that one of the defendants had endorsed

IB6KGRA1

1    it.  I just wanted to come back to make sure that I'm

2    appreciating the positions of the parties.

3            My understanding is that both defendants disagree with

4    this proposal.

5            MR. BELL:  That's what we understand, having heard

6    argument this morning, your Honor.  I think that Defendant

7    Reichberg has been something of a moving target on that in a

8    fashion that might inspire some fondness from, say,

9    Schrodinger, but we understand there to be an opposition from

10   both defendants at this point, and we think that your Honor

11   should craft a ruling that resolves this over that objection

12   from a 403 standpoint.  It's the right thing to do.

13           THE COURT:  Thank you.  Fine.

14           MS. NECHELES:  Your Honor?

15           THE COURT:  I'm not going to impose that constraint on

16   the case at this point under the rubric of Rule 403.  I've

17   heard from both defendants that they believe that that

18   constraint on the scope of Mr. Rechnitz's testimony would

19   adversely affect their ability to impeach his credibility and

20   to attack the evidence that's being introduced through him, not

21   only with respect to what we've described here as the Mayor

22   de Blasio quid pro quo activity, but also in connection with

23   other conduct with which Mr. Rechnitz is expected to testify.

24           I don't have enough information now to believe that I

25   can excise that portion of Mr. Rechnitz's testimony without

IB6KGRA1

1    unduly affecting the ability of the defendants to question him

2    about his testimony.

3          Now, in declining to impose this constraint on the

4    scope of the testimony that will be elicited from Mr. Rechnitz,

5    however, please be clear that I am not now determining that I

6    will permit a potential sideshow with respect to potential

7    testimony by either Mayor de Blasio or Mr. Offinger.  I have

8    not made that determination at this point.  So, counsel, you

9    should not expect, as a right, that I will be permitting the

10   testimony of each of those people.  More importantly, of

11   Mr. de Blasio.  A motion to quash his appearance has been filed

12   with the Court.  I am not in a position to evaluate that

13   application at the time, and, therefore, I did not grant the

14   motion, nor have I denied it.  So, to the extent that the

15   parties are seeking to open with respect to this category of

16   evidence, I will remind you that the Court has not yet ruled on

17   the motion to quash the appearance of Mayor de Blasio in this

18   proceeding, and I would caution you that you may not wish to

19   open with respect to anticipated testimony that may not

20   manifest itself.  Once I have the opportunity to rule on that

21   motion to quash.

22          So that's what I want to say about the Mayor de Blasio

23   quid pro quo activity.

24          Any questions about that before I turn -- and I

25   apologize, I'm going to have to turn briefly to the Bruton

IB6KGRA1

1   issue given the hour.  Any questions about that?

2        MR. BELL:  Just one moment, your Honor?

3        THE COURT:  Please.  Take your time, counsel.

4        (Pause)

5        MR. BELL:  Thank you, your Honor.

6        Your Honor, we want to be clear on one thing.  We do

7   not intend to open on the de Blasio stuff, as earlier defined.

8        And, as such, we think that it would be appropriate,

9   if only because it certainly isn't going to be necessitated by

10  our opening, for the Court to counsel the defense not to open

11  on something that is inherently somewhat inflammatory and may

12  not materialize, pending a ruling that's going to require some

13  thought and real consideration.  To throw something like that

14  out there now is not merely, I think, acting at the defendants'

15  own peril, it's something that could presumably have a

16  substantial effect on the jury, should they hear it, whether

17  there is follow-through or not.

18        THE COURT:  Thank you.

19        Counsel, I assume you're referring to the prospect of

20  potential testimony by the mayor himself as opposed to a

21  commentary during the opening about the anticipated testimony

22  from Mr. Rechnitz?

23        MR. BELL:  Certainly most specifically concerning the

24  mayor appearing himself or Mr. Offinger appearing himself, but,

25  really, this goes to the whole area, if only because I think

IB6KGRA1

```
1    that some of the concerns about the inflammatory nature of this
2    are the same.  We mentioned that there's going to be testimony
3    about this subject matter, and it's the sort of thing that
4    almost involuntarily prompts a juror to go ooh, whether there's
5    follow-up or not.  So I think that it affects the entire map of
6    that subject matter.
7              THE COURT:  Thank you.
8              MR. BELL:  Being as this is a case about misconduct
9    involving the NYPD and about these defendants, it's not
10   necessary, your Honor.
11             THE COURT:  Thank you.  Fine.  Understood.
12             Counsel for defendants, any questions about my ruling
13   here?
14             You understand, of course, that you open on facts that
15   you do not expect necessarily to come into evidence at your
16   peril.
17             MR. MERINGOLO:  Right.  Your Honor, if we opened on
18   the emails between Rechnitz and de Blasio and the relationship
19   between Rechnitz and de Blasio, but didn't say de Blasio was
20   going to come testify, I mean, that would be suicide for the
21   defense to do that.
22             THE COURT:  Thank you.
23             Ms. Necheles?
24             MS. NECHELES:  I have no intention of saying that
25   Mr. de Blasio will testify or Mr. Offinger.  I'm not going to
```

IB6KGRA1

1    say that in my opening.

2              THE COURT:  Thank you.  So I'll leave it at that.

3              Counsel, the jurors are all here.  I'd like to bring

4    them in to show them that we can stay more or less on time.  I

5    have a relatively lengthy set of thoughts about the Bruton

6    issue that were briefed to the Court.  Because I want to start

7    timely, I will just give you my summary, and then I'll take the

8    opportunity during a break to read you how it is that I have

9    analyzed the issue.

10             My summary with respect to this issue is that I share

11   the defense's concerns about the procedural context in which

12   this issue arises.  That said, I believe that, substantively,

13   the government's position with respect to the issue is correct

14   as analyzed in their letter.  That is my summary of my position

15   with respect to the substantive issues.  I have more detailed

16   analysis regarding the issue.  As a result, I expect to permit

17   the introduction of those statements subject to an appropriate

18   limiting instruction.  I'm going to request that the parties

19   present a proposal to me, understanding that the defense does

20   not want that, but I would like to solicit the strongest

21   possible limiting instruction in light of my view.

22             MS. NECHELES:  Your Honor, I will then be crossing and

23   eliciting more of the statements to put the entire statement

24   into context, the other things that Jimmy Grant says that day

25   as well.  But just that day, limited to that day.  But I will

IB6KGRA1

1    be eliciting, so that the jury can have the whole picture of

2    what was said that day and what was not.

3                THE COURT:  Thank you.  We can talk about that

4    further.

5                Anything else we need to talk about before we bring in

6    the jury?

7                MS. LONERGAN:  Your Honor, may I ask very quickly?

8                THE COURT:  Please.

9                MS. LONERGAN:  It seems to me what would be the most

10   prudent, given the Court's ruling and what Ms. Necheles has

11   just said -- we were going to call this witness second -- is

12   not to do that, so that the parties have a chance to propose a

13   limiting instruction, for the Court to craft an appropriate

14   one, and, also, if there needs to be additional discussion

15   about the scope of the testimony outside of those four

16   statements.  And that's fine, we're happy to change our witness

17   order, but he's here, and I will let him go if we don't --

18               THE COURT:  Counsel, I'm flexible as to --

19               MR. MERINGOLO:  We don't need a limiting instruction

20   on behalf of Grant.  We're ready.

21               THE COURT:  Thank you.  Thank you.

22               I need to administer one to be very clear about the

23   purpose and use for which this statement can be made, so I must

24   administer a limiting instruction regarding this testimony.  I

25   do not believe that it will take a substantial amount of time

IB6KGRA1

```
 1    for us to craft a sufficiently forceful one.  So if the
 2    government believes that it can present a proposal to me in
 3    short order --
 4               MS. LONERGAN:  Sure.
 5               THE COURT:  -- I'd be happy to work with the parties.
 6               MS. LONERGAN:  We can move him to maybe after that
 7    short lunch break, and we'll still get him on today.
 8               THE COURT:  Good.  Thank you.
 9               Mr. Daniels is going to be bringing in the jury now.
10    Just a few comments:
11               We all stand as the jury enters and leaves the
12    courtroom.  I'll tell them that that's what we're doing.  Don't
13    sit until all the jurors are seated, just as a sign of respect
14    for them.
15               One other comment that I will tell you, counsel, and I
16    will tell the jurors when they get here, too:  I stand from
17    time to time during the course of the trial day.  Please don't
18    make anything of it.  I just don't like to sit all day.  So if
19    I'm distracting, I will try not to be, but please don't
20    hesitate to let me do that.
21               MR. BELL:  Yes, your Honor.
22               THE COURT:  Thank you.
23               MS. LONERGAN:  Your Honor?
24               THE COURT:  Yes.
25               MS. LONERGAN:  The government's now second witness is
```

IB6KGRA1

1       the witness to whom the newly raised patrol guide pertains, so

2       whether we could take a break before he gets on the stand?

3                   THE COURT:  Did you say second witness?

4                   MS. LONERGAN:  The second witness, your Honor.

5                   THE COURT:  That's fine.  We can talk about that

6       briefly.

7                   MS. NECHELES:  Your Honor, can I raise one other

8       issue?

9                   THE COURT:  Yes.

10                  MS. NECHELES:  I know the rule, in general, is that

11      witnesses would not be permitted in the courtroom before they

12      testify.  And, generally, there is an exception for agents, or

13      paralegals, or things.  Ms. Cassidy, who worked on this case a

14      long time with me, is a potential witness in this case, but I

15      ask she be allowed to attend.  She's here to hear the opening.

16                  THE COURT:  Thank you.

17                  Let me say I believe I took this up at our very early

18      pretrial conference.  I asked if the parties wished to have any

19      fact witness be excluded from the courtroom.  I expect that any

20      fact witness will be excluded from the courtroom until after

21      their testimony.

22                  Counsel for the United States, what's your view

23      regarding Ms. Cassidy?  Clearly, she is familiar with the facts

24      of this case.

25                  MR. BELL:  Your Honor, I think that we have no

IB6KGRA1

1    objection to Ms. Cassidy being able to come in.  She's in a

2    bizarre posture, frankly, but that bizarre posture is that

3    she's been a part of the case for two years, and I don't think

4    that she's going to learn anything, certainly in openings,

5    that's radically new to her.  So to the extent that the idea is

6    to have her for openings, we certainly don't object.

7              THE COURT:  Thank you.

8              Counsel for Mr. Grant?

9              MR. MERINGOLO:  We have no objection to having

10   Ms. Cassidy.

11             THE COURT:  Thank you.

12             MR. BELL:  We'll note, along those same lines, that we

13   do in fact have a case agent here.  It's nobody that we -- it's

14   Special Agent Joseph Downs.  We don't expect to follow --

15             MR. MERINGOLO:  We may call Mr. Downs, your Honor.

16             THE COURT:  Thank you.

17             Any concerns about his presence here?

18             MR. MERINGOLO:  No, not at all.  We want him here.

19             THE COURT:  Thank you.

20             (Continued on next page)

21

22

23

24

25

IB6KGRA1

1          (Jury present)

2          THE COURT:  All the jurors can be seated.  Thank you.

3          Ladies and gentlemen, you can be seated.  Thank you.

4          First, ladies and gentlemen, thank you, all, for being

5     here.  I know you were all here on time.  I very much

6     appreciate that.  I'd like to give you a few comments before we

7     begin.

8          First, as you just saw, every time you come in and out

9     of the courtroom, we will all rise.  You can sit as soon as you

10    get to your seat.  We're standing as a sign of respect for you,

11    given the importance of your role in this case.

12         Let me just give you a few comments before we begin

13    with opening arguments.

14         To begin, as all of you already know, you're here to

15    administer justice in this case according to the law and to the

16    evidence.  You are required to perform this task with complete

17    fairness and impartiality and without bias, prejudice, or

18    sympathy either for or against the government or the

19    defendants.

20         Now, let me tell you a few words about the roles that

21    we're going to be performing during the course of the trial,

22    you as the jury and me as the Court.  I am going to decide

23    which rules of law apply to this case.  I'm going to do that by

24    making legal rulings throughout the course of the presentation

25    of evidence, and, also, as I mentioned to you yesterday, as

IB6KGRA1

1    part of the final instructions that I will provide you

2    regarding the law that applies.  Those final instructions will

3    come in after the evidence and all arguments by the parties are

4    completed.

5         Now, in order for me to do my job, I may interrupt the

6    proceedings from time to time to confer with the lawyers about

7    the rules of law that should apply here.  And as you've seen,

8    and, as I mentioned earlier, sometimes we'll talk over here at

9    the bench outside of your hearing.  Some of those conversations

10   may take longer than others.  If that's the case, I expect that

11   I will try to excuse you from the courtroom.  I'm going to try

12   my hardest to avoid such interruptions as much as possible, but

13   please be patient and understand that the conferences are

14   necessary in order to ensure the fairness of the trial, and

15   they often have the effect of making the trial itself proceed

16   faster.

17        While I decide the law that applies to this case, it

18   is you, the ladies and gentlemen of the jury, who are the

19   triers of the facts in this case.  You will weigh the evidence

20   that's presented and decide whether the government has proven

21   that each of the defendants is guilty of the offenses charged

22   against him in the indictment.

23        You must pay close attention to all the evidence

24   that's presented here, and you must base your decisions solely

25   on the evidence that's presented here in this case and my

instructions about the law.

I say that you have to decide this case based on the evidence.  It raises the question:  What, then, is evidence?  Evidence consists only of the testimony of witnesses, documents, and other things that are admitted into evidence in the case and any facts that the lawyers agree upon, or stipulate to, or that I may instruct you to find.

Now, some of you have probably already heard the term "circumstantial evidence" or "direct evidence."  Let me say a few words about what each of those things are.

Direct evidence is direct proof of a fact, such as the testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer, or conclude, that some other fact exists.  The word "infer" or the words "to draw an inference" means to find that a fact exists from proof of another fact.  An inference is only to be drawn if it is logical and reasonable to do so, and not by speculation and not by guesswork.

Now, in deciding whether or not to draw an inference, you must look at and consider all the facts in light of reason, your common sense, and your experience.  Whether a given inference is to be drawn or not is entirely a matter for you, the jury, to decide.  Circumstantial evidence does not necessarily prove less than direct evidence, nor does it necessarily prove more.

IB6KGRA1

1            Let me give you a short example to help you think

2       about the distinction between direct evidence and

3       circumstantial evidence.  Now, assume -- and this is a mighty

4       assumption today -- assume that when you came into the

5       courthouse this morning, the sun was shining, and it was a nice

6       day outdoors.  Assume that the courthouse blinds were all

7       closed, and then, while you're sitting here, somebody walks

8       into the courthouse, into the courtroom, with an umbrella

9       that's dripping wet, and then a few minutes later, somebody

10      else walks into the courthouse with a raincoat that's also

11      dripping wet.

12           Now, because you could not look outside the courtroom,

13      and you could not see yourselves directly whether it was

14      raining, you would have no direct evidence of the fact that it

15      was raining, but on the combination of the facts that I have

16      just asked you to assume about the umbrella and the raincoat,

17      it would be reasonable and logical for you to conclude that it

18      was raining outside.  That's all there is to circumstantial

19      evidence - you infer on the basis of your reason, your

20      experience, and your common sense the existence or nonexistence

21      of one fact from some other fact that has been established.

22      And I am going to give you more instructions about direct and

23      circumstantial evidence at the end of the case, but keep in

24      mind that you are to consider all of the evidence that's

25      presented in this case, whether direct or circumstantial.

IB6KGRA1

Now, I've just told you or given you a sense of what kinds of things are evidence, but there are certain things that are not evidence and must not be considered by you.  Here's a list of some things that are not evidence:

First, statements and questions by the lawyers are not evidence, nor is any statement that I may make or any question that I may make of a witness.  Arguments by the lawyers are not evidence.

Second, objections to questions are not evidence.  You should all know that lawyers have an obligation to make objections when they believe that the evidence that's being offered is improper under the rules of evidence.  You should not be influenced by the objections or by my rulings on them. If the objection is sustained, or if I tell the lawyer please rephrase the question, just ignore the question and ignore any answer that may have been given in response to the question. If the objection is overruled, which I may say overruled or I may say you can proceed, then you can treat the answer like any other answer.  If I instruct you that a piece of evidence is received for a limited purpose only, you must follow that instruction and consider that piece of evidence only as I've instructed you.

Third, any testimony that I have excluded or told you to disregard is not evidence, and it must not be considered by you.

IB6KGRA1

And, fourth, anything that you may have seen or heard outside of the courtroom is not evidence, and it must be disregarded.  As I've told you many times already, you are to decide this case based solely on the evidence that's presented here in the courtroom.

(Continued on next page)

IB6TGRA2

1            THE COURT:  Now in deciding the facts of the case,

2     you'll have to decide on the credibility of the witnesses, that

3     is, how truthful and believable they are.

4            Let me say now that there is no formula to evaluating

5     evidence.  For now, suffice it to say that all of you bring

6     into this courtroom all of the experience and background of

7     your lives.  Do not leave your common sense outside of the

8     courtroom.  Same types of tests that each of you use in your

9     everyday lives are exactly the same types of tests that you

10    should use in deciding how much weight, if any, to give to the

11    evidence that's presented to you in this case.

12           The law doesn't require you to accept all of the

13    evidence admitted in trial.  In determining what evidence to

14    accept, you must make your own evaluation of the testimony from

15    each of the witnesses and all of the exhibits that are received

16    into evidence.  It's essential, however, as I told you

17    yesterday, that you keep an open mind until you have heard all

18    of the evidence in this case.  A case can only be presented

19    step by step, witness by witness.  And all of you know this

20    from your own experience.  You can hear one person give her

21    version of some events and you think it sounds very impressive

22    or even compelling, then yet, upon hearing another person's

23    versions of the same event, or here perhaps even the same

24    person cross-examined about that event, things may seem very

25    different.  In other words, there may be another side to any

witness's story.  You should use your common sense and good

judgment to evaluate each witness's testimony based on all of

the circumstances.  Again, I can't emphasize too strongly how

important it is that you all keep an open mind until the trial

is over.  You should not reach any conclusions about this case

until all of the evidence has been presented to you and is

before you.

         Now all of you know this is a criminal case, and as

such, the government has the burden of proving all of the

elements of each charge against each defendant beyond a

reasonable doubt.  Although each of the defendants here have

been indicted, you must remember that an indictment is only an

accusation, it is not evidence, and each of the defendants has

pleaded not guilty to that indictment.

         To convict a defendant, the burden is on the

prosecution to prove guilt beyond a reasonable doubt.  That

burden never shifts to a defendant for the sample reason that

the law never imposes upon a defendant in a criminal case the

burden or duty of calling any witnesses or producing any

evidence.  It's a cornerstone of our system of justice that

every person accused of a crime is presumed to be innocent

unless and until her guilt is established beyond a reasonable

doubt.

         I therefore instruct you that you are to presume that

each of the defendants, Mr. Grant and Mr. Reichberg, is

IB6TGRA2

innocent throughout this trial and your deliberations until

such time, if ever, that you as a jury are satisfied that the

government has proven that defendant guilty of a given charge

beyond a reasonable doubt.

The presumption of innocence is alone is enough to

acquit a defendant unless you as a jury are convinced of a

defendant's guilt after careful consideration of all the

evidence in this case.  A defendant never has the burden to

present any evidence or to prove that he or she is not guilty.

If the government fails to sustain its burden with respect to a

defendant, you must find that defendant to be not guilty.  The

presumption of innocence is with each of the defendants here

today as the trial begins, and it remains with each of them

throughout the trial and into your deliberations unless and

until you are convinced that the government has proven that

defendant's guilt beyond a reasonable doubt.

Now let me give you a few comments about the rules and

principles that are going to govern your conduct as jurors in

this case.  You have heard these things before.  I will try to

reduce these to shorthand going forward, but bear with me.

First, you must not talk to each other about this case

or about anyone who has anything to do with it until the end of

the case when you go into the jury room to talk about and

decide your verdict.  The reason for this requirement, as I

already told you, is you must not reach any conclusion about

the claims or the charges or the defenses in this case until

all of the evidence is in.  As I said, keep an open mind until

you retire to start your deliberations at the end of the case.

Second, do not communicate with anyone else about this

case or about anyone involved in it until the trial has ended

and you have been discharged as jurors.  When I say "anyone

else," I include members of your family, your friends.  As I

said yesterday, "no communicating" means no communicating on

Facebook, Twitter, blogs, whatever.  You can tell your family

and friends that you are seated as a juror in a criminal case

but please don't tell them anything else about it until you

have been discharged by me.  As I said yesterday, you can tell

them that you have been ordered by me not to discuss the case

with them.

Third, do not let anyone talk with you about the case

or anyone or anything that has anything to do with it.  If any

person should attempt to communicate with you about this case

at any time throughout the trial, either in the courthouse or

outside of the courthouse, you should immediately report that

to my deputy, Mr. Daniels, who you already met, and you should

not report it to anyone else.  When I say you shouldn't report

it to anyone else, don't even tell any of your fellow jurors

about it, just tell Mr. Daniels and we will work throughout to

deal with the issue together.

Now to minimize the possibility that that might

happen, it's important that, as you did today, you go straight

into the jury room, and as you did this morning, you remain in

the jury room throughout the course of the trial day.  There

are bathrooms in the jury room there, you should use them, not

the bathrooms in the public hallways.  You must not use the

cafeteria.  You should not use any public telephones here.

Given that our morning and afternoon breaks are going to be

short, it's probably best that you remain in the jury room if

you can.

        Fourth, do not do any research or investigation about

the case or anyone who has anything to do with it or anything

about the case generally.  Don't go to any of the places that

may be described.  Since this case involves some things that

happened in particular locations, you may be tempted to go

visit those locations yourselves.  Don't do that.

        Also, don't read or listen to or watch any news

reports about the case, if there are any.  Just avoid any such

stories.  And if you see something on the TV or in the paper,

just don't look at it.  Don't go on the internet or use

whatever digital or communications devices it is that you may

use to see what you can learn about the case to inform yourself

about it.

        Again, these are very important rules to comply with

for the very basic and important point that I have repeated

already, which is that the decision of the jury in this case

IB6TGRA2

must be based on the evidence presented here and on the law.
All that you will need to do in order to decide this case will
be presented to you here in open court by the very capable
lawyers who represent the parties in this case.  And I expect
you to inform me immediately, through Mr. Daniels, if you
become aware that a fellow juror violated these instructions.

Also, please let me know if any person you know comes
into the courtroom.  It's a public trial, so that could happen.
Anyone in the public is invited to come into this courtroom.
But it's important that you not hear from any person who may
know what may have happened here, if anything, outside of your
presence.  So if you see a friend or relative come into court,
please send me a note through Mr. Daniels, and again, we will
deal with it appropriately.

Now the last thing that I want to raise is notes.
Mr. Daniels has a bunch of paper for you, and I'm going to ask
you to let me know if you would like to take notes.  If so,
Mr. Daniels can give you a pad of paper and a pen.  If you do
decide to take notes, please begin writing on the second page
of the pad of paper, and what you should write on the first
page is just put your juror number.  So juror number one, if
you decide to take notes, you just write "One" on the first
page of the pad and then flip it over and start writing on the
second page of the pad.

It is important that only the juror taking the notes

IB6TGRA2

1     see that respective juror's notes.  So if you do take notes in

2     the way I described, do it only on the pads that Mr. Daniels is

3     about to give you.  Don't take your notes home with you.  You

4     should leave them in the jury room during your breaks and at

5     the end of each day.

6          Now while I give you the opportunity to take notes,

7     please let me tell you that you do not need to take notes.  As

8     you can see, we have a court reporter throughout the course of

9     these proceedings.  Notes are just an aid to your own

10    recollection.  And the fact that any particular juror takes

11    notes does not entitle that juror's views to any greater weight

12    than that of any other juror.  Remember that any notes that you

13    may choose to take are for your use only and are not to be

14    shown to any other juror.  It's your memory that controls.  And

15    if you do decide to take notes, please don't get so involved in

16    taking notes that you don't pay attention to what is happening

17    in the witness box and the evidence in the courtroom.

18         Now once you're in your deliberations, if there is a

19    disagreement between one juror's notes and another juror's

20    notes or between one juror's notes and another juror's

21    recollection, we can always ask the court reporter to read back

22    the testimony or have the relevant portion of the testimony

23    sent back to you in the jury room, because it's the official

24    court transcript that controls, not any particular juror's

25    notes.

IB6TGRA2

1          So Mr. Daniels will hand out notepads now to anyone

2      that wants one.  Just raise your hand and Mr. Daniels will give

3      you one.  You will have another opportunity to ask if you would

4      like later on.

5          As Mr. Daniels is doing that, let me tell you about

6      exhibits.  During the course of the trial exhibits are going to

7      be introduced into evidence here.  They will be marked by an

8      exhibit number.  If there's an exhibit that you are

9      particularly interested in seeing during your deliberations,

10     please feel free to mark that down.  At the end of the trial,

11     as you begin your deliberations, I expect to provide you with

12     substantially all of the exhibits in the jury room for your

13     review, but if there's something that you would like to see

14     that's not sent back, you can tell me what it is that you would

15     like to see.

16         So now we're going to begin the trial.  In this trial,

17     as I told you, we'll start every day at 9:15 and continue until

18     no later than 3:30, including breaks.  The presentation of

19     evidence is likely to proceed over a number of weeks, and I

20     will try to give you a sense of our schedule as the case

21     progresses so you have a sense of how we're doing.

22         It's important that you all be here on time.  You have

23     done wonderfully so far, so please just continue to do that.

24     If you are all on time then we'll be able to start on time.  If

25     any one of you is missing, then we'll lose a few minutes.  And

IB6TGRA2

1    none of us can start until all of you are here.  If we lose ten

2    or 20 minutes every day, we may not get the trial completed on

3    the schedule that I anticipated.  So please be here by no later

4    than 9:00.

5           Let me say a few words about the so-called structure

6    of the trial, the arc of the trial as you will see it progress

7    and give you a few words about what we'll be doing, the lawyers

8    for both the government and each of the defendants, and me.

9    After the trial, as I said earlier, I'm going to give you

10   detailed instructions, and those instructions will control your

11   deliberations in the case, but for now let me just simply

12   explain how it is that the trial will proceed.

13          The first step in the trial will be opening

14   statements.  First, the government will make an opening

15   statement, which is simply an outline to help you understand

16   the evidence as it's presented.  Remember, the opening

17   statement is not evidence, its purpose is only to help you

18   understand what the evidence will be and what the government

19   will try to prove.  Then each of the defendant's attorneys will

20   have the opportunity to make an opening statement.

21          Now as you remember from my list of what is not

22   evidence from earlier, at that point in the trial no evidence

23   will have been introduced by either side.  After the opening

24   statements, then the government will have the opportunity to

25   present its evidence.  The government's evidence I expect will

IB6TGRA2

1      consist of testimony of witnesses as well as documents and

2      other exhibits.  The government's lawyers will examine the

3      witnesses, and then each of the defendant's lawyers will have

4      the opportunity to cross-examine the witnesses.

5              Following the government's case, either defendant may

6      or may not present a case.  Remember that each of the

7      defendants is presumed innocent unless and until proven guilty,

8      and that each defendant has no obligation to present any

9      evidence to demonstrate his innocence.  Counsel for the

10     government many have the opportunity to cross-examine any

11     witnesses testifying for either defendant.

12             After the presentation of the evidence is completed,

13     the attorneys will deliver their closing arguments to summarize

14     and interpret the evidence.  And just as I just told you the

15     lawyers' opening statements are not evidence, their closing

16     arguments are not evidence either.

17             After the closing arguments I will turn to you to

18     instruct you regarding the law.  Then you will retire to

19     deliberate in the jury room on your verdict, which must be

20     unanimous and must be based on the evidence that that's

21     presented at trial.  Your deliberations will be secret.  You

22     will not have to explain your verdict to anyone.

23             Now we're going to begin with the initial stage of the

24     case which, as I told you, is opening statements, and we're

25     going to begin with the United States.

1          So at this time let me ask all of you to give your

2     undivided attention to each of the lawyers as they make their

3     opening statements.  Thank you.

4                Counsel for the United States.

5                MS. LONERGAN:  May I proceed, your Honor?

6                THE COURT:  You may.

7                MS. LONERGAN:  Every single officer in the New York

8     City Police Department is required to take an oath, an oath to

9     faithfully discharge the duties of the office of police officer

10    in the Police Department of the City of New York to the best of

11    his or her abilities.  Because to be a member of the New York

12    City Police Department is to hold a public trust, to swear an

13    oath to not only follow but enforce the law, to protect the

14    lives and property of all citizens of New York City by treating

15    every citizen with courtesy, professionalism and respect, and

16    to enforce the laws impartially.  That is how the New York City

17    Police Department is supposed to work, that police officers

18    make decisions based on integrity and how to best serve the

19    people of New York City.  And that is how tens of thousands of

20    members of the New York City Police Department conduct

21    themselves, with honor and integrity, day in and day out to

22    keep our city safe.

23          But that New York City Police Department, the New York

24    City Police Department where money and corruption have no

25    place, was not the New York City Police Department of these two

1   men, the defendants, Jeremy Reichberg and James Grant.

2          Grant, one of the city's highest ranking police

3   officers and Reichberg, a private citizen, had their own vision

4   of the NYPD.  They saw it as a tool to advance their own

5   interests.  Reichberg wanted things from the NYPD, things like

6   NYPD boats and helicopters at his private events, a license to

7   carry a gun, and special treatment for himself and his friends.

8   And he didn't want to have to go through normal channels to get

9   them.  So how did he make sure he could get the things that he

10  wanted?  By lining the pockets of police officers, including

11  James Grant.  Grant, for his part, took bribes worth thousands

12  of dollars, improvements to his house, jewelry, and a trip on a

13  private plane.  In return, he picked up the phone when

14  Reichberg called, and he used his official power within the

15  police department to get things done for Reichberg.

16         That is why we are here today.  Over the course of

17  years, these defendants exploited Grant's position within the

18  NYPD for their own personal gain.  They abused the trust that

19  the NYPD and the people of the City of New York placed in

20  Grant, one of the city's highest ranking police officers.  They

21  defrauded the city and its residents of Grant's honest services

22  as a police officer, and they broke the law.  For their

23  actions, they are each charged with fraud and bribery.

24         This is the government's opening statement.  This is

25  our opportunity to give you a sense of what the evidence

1    presented during the trial will show.  And I'm going to do that

2    in two parts:  First, I'm going to describe what the evidence

3    at trial will show; and second, I will explain how we're going

4    to prove it to you.

5             So what will the evidence show?  The evidence will

6    show that Reichberg, with the assistance of a wealthy

7    businessman, paid bribes worth tens of thousands of dollars to

8    grant and other NYPD officers.  And in exchange to those

9    bribes, Reichberg and his partner demanded and received police

10   action when they wanted it.

11            So what will you learn about a few of the key players

12   in this bribery scheme?  Let's start with James Grant.  You

13   will learn that Grant attended the police academy as a new

14   recruit in 1996.  After graduation, he rose swiftly through the

15   ranks.  By 2005 he was a lieutenant assigned to the 66

16   Precinct.  The 66 Precinct is in Brooklyn, it includes the

17   neighborhood of Borough Park where Jeremy Reichberg lives.

18            It was during Grant's time at the 66 Precinct that

19   Grant met Reichberg.  They became close and stayed in contact

20   as Grant continued to move up the ranks, to captain in 2006,

21   and eventually to deputy inspector in 2014, when Grant became

22   the commanding officer or CO of an entire precinct in

23   Manhattan.  In that position, Grant had over a hundred police

24   officers under his command.  He was their leader, setting an

25   example and making daily decisions about how they would perform

1    their jobs, setting priorities and deciding how to use

2    resources.

3            As his swift rise makes clear, Grant was well-liked

4    within the NYPD.  He was also well-liked by Reichberg, who

5    showered gifts on Grant because Grant could make things happen

6    at the NYPD.  And while you will learn that Grant and Reichberg

7    became friends over time, make no mistake, this was at its core

8    a business relationship.  Grant got expensive things, and in

9    exchange, Reichberg got assistance from the police department

10   when he wanted it.  This for that.  Quid pro quo.  You scratch

11   my back and I'll scratch yours.

12           And Jeremy Reichberg, you will learn that Reichberg

13   was a businessman and a self-styled liaison between the Borough

14   Park Jewish community and the NYPD.  Reichberg sought influence

15   in the NYPD to get police action for himself and for people he

16   knew, police escorts, access to police boats and helicopters,

17   assistance with arrests and tickets, help with gun licenses.

18   And how did he get these things?  Through corrupt relationships

19   with Grant and other police officers, giving them expensive

20   meals, luxurious trips, and other gifts.

21           Why do this?  Access to the NYPD, being able to get

22   police action for himself and his friends, made Reichberg

23   appear important in his community.

24           And it was also a way of making money.  You see,

25   Reichberg sometimes charged people for the police action he got

1    for them.  You will hear that Reichberg wasn't the only person

2    trying to buy cops and their services.  He had rivals, other

3    people who wanted the same power and were also willing to give

4    bribes to cops in exchange for police action, other people who

5    made money from their police connections by charging fees to

6    get police action.

7         And in part, because of this competition, you will

8    learn that Reichberg sought to have access to the highest

9    ranking officers possible.  Although Grant was a rising star,

10   Reichberg wanted to hedge his bets, especially since it's not

11   always easy to know who is going to get a promotion.  So

12   Reichberg provided lavish gifts to lots of officers, presiding

13   over large fancy dinners for high ranking NYPD officers, all

14   free of cost to the officers, of course.

15        And this strategy worked.  In 2013, two of the cops

16   Reichberg had been bribing rose even higher in the NYPD.  Now

17   Reichberg had even more access.  Over time, Reichberg's need

18   for action from Grant faded.  He still kept Grant close,

19   though, because Grant was young and had the potential to rise

20   in the NYPD.

21        But Reichberg was directed many of his bribes and

22   requests to people with even more power at the NYPD, and Grant

23   noticed.  In the past, Reichberg and his businessman friend had

24   bought expensive gifts for Grant's wife and children on

25   Christmas.  When Reichberg didn't come around with those gifts

1    in 2014, Grant wasn't happy about it.  You will hear this

2    yourself in a recorded phone call between Grant and Reichberg.

3    You will hear Grant complaining in his own words that, quote,

4    the two Jewish elves didn't come for Christmas, and that he

5    expected the bribes to keep coming his way.

6         Now how did Reichberg afford to pay for things for so

7    many police officers?  Reichberg was enterprising.  He didn't

8    pay for everything himself.  He had partners, including the

9    businessman I mentioned earlier.  His name was Jona Rechnitz.

10        Reichberg met Jona Rechnitz around 2008 when Jona

11   Rechnitz was a young, up and coming real estate businessman.

12   Reichberg introduced Jona Rechnitz to his roster of high

13   ranking NYPD connections, and Jona Rechnitz liked what he saw.

14   You see, Jona Rechnitz figured that the key to success in

15   business was to make as many connections with powerful people

16   as possible.  He wanted to be known as a guy who knew how to

17   make things happen, a guy who was well connected.  And

18   Reichberg was nothing if not connected.

19        You will learn that in around 2008, when Jona Rechnitz

20   wanted to start making connections in the NYPD, Reichberg

21   suggested that Jona Rechnitz make a donation to the NYPD

22   football team.  And Jona Rechnitz did, to the tune of thousands

23   of dollars.  A short time later, to impress his boss, Jona

24   Rechnitz wanted to make a big gesture, so he asked Reichberg to

25   help arrange a police escort through the Lincoln Tunnel from

IB6TGRA2                         Opening - Ms. Lonergan

1    New Jersey to Manhattan for the international head of Jona

2    Rechnitz's whole company, who had flown into New Jersey.

3              Reichberg reached out to his police connections, who

4    made it happen, and in no small way.  The police closed a lane

5    of the Lincoln Tunnel, providing an private escort for the

6    group into the city, and they were off and running.  You will

7    learn this continued for years, from 2008 through 2016,

8    Reichberg and Jona Rechnitz buying things for Grant and other

9    cops, and Reichberg and Jona Rechnitz getting police action

10   from those very same cops over and over again.  Quid pro quo.

11   This for that.  The cops got expensive gifts, and Reichberg and

12   Jona Rechnitz got police action when they wanted it.

13             Now these were rarely direct swaps:  You buy me an

14   expensive dinner, I will immediately arrange a police escort.

15   The defendants were far too savvy for that.  Instead, this was

16   a long-term relationship.  Reichberg and Jona Rechnitz were

17   making investments in Grant and other officers, regularly

18   providing gifts with the expectation that as opportunities

19   arose, if and when Reichberg or Jona Rechnitz ever wanted

20   anything from the police, they could pick up the phone, call

21   someone like Grant, and get the police action they wanted.  And

22   they did this again and again and again.

23             So I would like to give you a few examples of the

24   things that Reichberg and Jona Rechnitz gave the cops, what we

25   call quids, and then some example of the police action they got

1    in return, called the quos.

2                 So what were some of the ways in which Reichberg and

3    Jona Rechnitz bribed Grant and other cops?  Here are just a few

4    examples:  Home imprisonments.  You will learn that Reichberg

5    and Jona Rechnitz arranged and paid for upgrades at Grant's

6    house, new windows worth more than $5,000 and new railings.

7                 Family travel.  Jona Rechnitz paid for two nights in a

8    luxury hotel in Rome for Grant and his wife.

9                 More luxurious travel.  Reichberg and Jona Rechnitz

10   arranged and paid for a trip to Las Vegas to watch the 2013

11   Superbowl.  Reichberg, Jona Rechnitz, Grant and others flew

12   each way on a private jet with a prostitute on board.  They

13   stayed in a big suite in a high end hotel and they watched the

14   Superbowl in style.

15                Holiday gifts.  For Christmas in 2013, Reichberg and

16   Jona Rechnitz dressed as elves, brought jewelry for Grant's

17   wife and a Nintendo system for his kids.

18                And countless high end dinners.

19                Now these were just some of the bribes to Grant.  As I

20   mentioned earlier, there were also bribes for other high

21   ranking officers.

22                And what did Reichberg and Jona Rechnitz get in return

23   for these and other bribes?  They asked for police action, big

24   and small, and Grant and other officers did what they could to

25   satisfy those requests.  Here's a few examples:

IB6TGRA2                         Opening - Ms. Lonergan

1          Gun licenses.  When Reichberg wanted a license to

2     carry a gun in New York City, Grant made sure that Reichberg's

3     application was handled quickly, without a full background

4     investigation, and it was granted in two months.

5          Now a word on gun licenses.  You will learn that it

6     isn't easy to get a license to carry a gun in New York City,

7     and it's even more difficult to get what is called a full carry

8     or a business carry license, which allows the license holder to

9     carry a gun on his or her person 24 hours a day, seven days a

10    week.  You need to have a reason, a very good reason to get

11    that kind of license.  And that is the kind of license that

12    Reichberg wanted, and Jona Rechnitz, too.  So they needed a

13    cover store to explain why they qualified.  Who provided that

14    cover story?  Grant.  You will hear on a recorded phone call

15    Grant coaching Reichberg on exactly what reason, a false

16    reason, to put on Jona Rechnitz's gun license application.

17         Arrests.  You will learn that Reichberg received phone

18    calls when people in his core group were arrested.  What did

19    Reichberg do?  He contacted Grant, and Grant in his turn called

20    the NYPD officers handling those arrests to get special

21    treatment for Reichberg's friends.

22         NYPD vehicles.  In the summer of 2015 another officer

23    Reichberg was bribing arranged to have an NYPD boat and

24    helicopter make special trips to circle and fly over a private

25    dinner cruise where Reichberg was entertaining friends.  Just a

IB6TGRA2                          Opening - Ms. Lonergan

1    few months earlier, Grant tried to arrange a similar helicopter

2    flyover for Reichberg.

3            Some of the actions that Grant and other officers took

4    for Reichberg and Jona Rechnitz were extraordinary, others were

5    mundane.  Some wasted NYPD resources and he affected countless

6    others, like closing a lane of the Lincoln Tunnel, to help no

7    one but Jeremy Reichberg or Jona Rechnitz.

8            Some of the actions had the potential to benefit

9    others, like providing extra protection at synagogues.  But all

10   of this police action had one thing in common:  Grant was

11   acting because he had been bought and paid for, because he was

12   being bribed, and that's a crime.

13           So that's an overview of this years-long plan to buy

14   and sell the services of the NYPD, a plan that came to an end

15   in 2016 when Grant and Reichberg were both arrested by the FBI.

16   And what did Grant and Reichberg do when they figured out that

17   the jig was up, the game was over?  They took steps to cover up

18   their crimes because they knew that what they were doing was

19   wrong.

20           You will learn that before he was arrested, when Grant

21   was interviewed by the FBI in early 2016 about his relationship

22   to Reichberg, he lied, saying he had never gotten anything

23   improper from Reichberg, nothing for free.

24           You will also learn that the night before Reichberg

25   was arrested he gathered up a bunch cell phones, cell phones

IB6TGRA2                    Opening – Ms. Lonergan

1    that he used for his corrupt communications with Grant, Jona

2    Rechnitz and others, and dozens of NYPD and other law

3    enforcement business cards.  He gave all of these things to his

4    brother and asked his brother to hold them in the hopes that

5    they will never be found.

6            But the plan fell apart when his brother, rather than

7    leaving, fell asleep in one of Reichberg's spare bedrooms, and

8    when he woke up the next morning, FBI agents were already

9    searching the house.

10           The agents quickly found the items he was holding for

11   Reichberg, selfies filled with text message after text message

12   between Reichberg and Grant, Reichberg and other police

13   officers, and business cards, cards for Grant and cards for

14   member after high ranking member of the New York City Police

15   Department.

16           For attempting to conceal all of this evidence by

17   giving it to his brother, Reichberg alone is also charged with

18   obstruction of justice.  That is separate from the fraud and

19   bribery charges that both he and Grant face in this trial.

20           So that's what the evidence in this trial will show.

21   How are we going to prove that to you?  You will hear testimony

22   from many different witnesses.  You will hear from law

23   enforcement witnesses, like the FBI agent who searched

24   Reichberg's brother and the FBI agent who interviewed Grant.

25   You will hear from NYPD officers who were told by Grant and

1    others to actually do the things that Reichberg or Jona

2    Rechnitz requested.  These officers often had no idea what was

3    going on behind the scenes, that their services were in fact

4    being sold in exchange for bribes, like the officers who

5    piloted the NYPD boat arranged for Reichberg, and officers who

6    received a phone call asking them to give special treatment to

7    someone they had just arrested.

8         You will also hear from NYPD supervisors who will tell

9    you about the training at the NYPD academy and about the duties

10   and decisions entrusted to NYPD officers.  You will hear from

11   witnesses who provided some of the bribes, for example the

12   contractor who did work on Grant's home and the travel agent

13   who arranged Grant's hotel room in Rome.

14        You will see physical evidence, photos and videos.

15   You will see a stack of NYPD business cards seized from

16   Reichberg's brother on the day of Reichberg's arrest.  You will

17   also see photos and videos of Reichberg and Jona Rechnitz with

18   the police officers they bribed, including Grant, and photos of

19   the private plane they rented to fly with Grant to Las Vegas,

20   photos of the prostitute who accompanied them on the trip,

21   videos of Reichberg and Jona Rechnitz driving into a VIP

22   section of police headquarters, and a video of them dressed as

23   elves to deliver Christmas gifts to police officers.

24        You will also hear from some of the defendants'

25   partners in crime.  You will hear from corrupt police officers

IB6TGRA2                    Opening – Ms. Lonergan

1   who worked at the NYPD's gun license division and were

2   accepting bribes in exchange for gun licenses.  They will tell

3   you that they sped up Reichberg's gun license application

4   because Grant told them to.

5         And you will also hear a detailed account of this

6   years-long police bribery scheme from a man who worked closely

7   with the defendants, Jona Rechnitz.  He has pleaded guilty to

8   his crimes.  Jona Rechnitz will tell you about how it began,

9   when Reichberg suggested that Jona Rechnitz make a large

10  donation to the NYPD football team and how it grew from that

11  point.

12        He will tell you about how he and Reichberg formed a

13  corrupt relationship with Grant and other officers, buying them

14  meals and gifts and travel, so that they could call on these

15  officers whenever they wanted anything from the police.  And he

16  will tell you how they cashed in on these bribes, asking for

17  and receiving police action from Grant and others.

18        Now let's be clear about Jona Rechnitz and the corrupt

19  license division witnesses.  They all committed serious crimes.

20  Plain and simple.  They were caught, prosecuted, and pled

21  guilty to their crimes.  They will take the witness stand and

22  tell you about those crimes.  Jona Rechnitz will also tell you

23  that he didn't tell the whole truth about any of this the first

24  few times he was approached by law enforcement.  Beyond that,

25  he told lies to all manner of people in his private life, in

1    his business life, and in his circle of friends, often just to

2    make himself look like a big shot.

3         Jona Rechnitz will tell you he's testifying under what

4    is called a cooperation agreement, and that he is doing so in

5    the hopes of getting a lighter sentence.  The same goes for the

6    two corrupt officers from the NYPD licensing division I

7    mentioned earlier, the ones who helped Grant get a gun license

8    for Reichberg.  They, too, have pleaded guilty through

9    cooperation agreements.

10        I expect defense counsel will ask you to focus and

11   scrutinize these witnesses, especially Jona Rechnitz.  And you

12   should.  Evaluate Jona Rechnitz's testimony and the testimony

13   of the corrupt license division officers carefully and see if

14   it fits together with all of the other evidence that you will

15   see and hear in this case.  When you do that, you will find

16   that their testimony is backed up by everything else you will

17   see and hear at this trial; the other witnesses, the physical

18   exhibits, the photos and videos, and the other evidence you

19   will see and hear.

20        Finally, and powerfully, you will hear about the

21   crimes that the defendants committed through their own voices

22   and in their own words.  In 2015, the FBI, with court approval,

23   got a wiretap on the cell phones of Reichberg and Jona

24   Rechnitz.  Between those wiretapped phone calls, text messages

25   and emails, the FBI captured the defendants in real-time

1    talking about their bribery arrangement.

2            For example, you will hear and see clear as day

3    Reichberg and Jona Rechnitz asking Grant for police action,

4    asking other officers for police action.  And you will see the

5    officers' responses, assuring Reichberg and Jona Rechnitz that

6    they were being taken care of.  You will hear and see Reichberg

7    inviting the officers to dinners and the officers accepting

8    those invitations.  You will see messages between Reichberg and

9    Grant about Reichberg's Christmas visit to Grant's house.  You

10   will hear Grant demands that the contractor come back to his

11   house to fix leaks in the windows that Reichberg provided.  You

12   will hear Grant coaching Reichberg about Jona Rechnitz's gun

13   license application.  And you will hear Grant's frustration

14   after Reichberg and Jona Rechnitz focused their attention on

15   other officers, meaning that Grant isn't getting all the bribes

16   that he has come to expect.

17           While you are going to hear from a lot of witnesses

18   and see a lot of different types of evidence, this is, at its

19   core, a straightforward case:  Old-fashioned bribery.

20   Expensive gifts given to cops in return for the promise of

21   police action.

22           Jeremy Reichberg and Jona Rechnitz showered New York

23   City Police Department officials with tens of thousands of

24   dollars in illicit gifts so that they could pick up the phone

25   and get police action whenever they wanted it.  And James Grant

IB6TGRA2                    Opening – Ms. Necheles

1   let himself be bought.  He sold not only himself but the

2   services and the integrity of the New York City Police

3   Department.  And in the process, he betrayed the oath he swore

4   to faithfully discharge his duties as an officer of the New

5   York City Police Department, and he broke the law.

6          At the end of this trial we will have the chance to

7   speak with you again about the evidence that's been presented.

8   But between now and then I would like to ask you to do three

9   things:  First, pay close attention to evidence; second, follow

10  Judge Woods' instructions; third, use your common sense, the

11  same common sense that you use in your everyday lives as New

12  Yorkers.  If you do that, the defendants will get a fair trial,

13  the government will get a fair trial, and you will reach the

14  only verdict that is consistent with the facts and the law in

15  this case, that the defendants are guilty as charged.

16         THE COURT:  Thank you, counsel.

17         Counsel for Mr. Reichberg.

18         MS. NECHELES:  Thank you, your Honor.

19         Good morning.  My name is Susan Necheles, and along

20  with my assistant, Zachary Willis, we represent Mr. Reichberg

21  here.

22         The most important thing that you can hear this

23  morning has already been told to you by Judge Woods.  Judge

24  Woods explained to you, instructed you on the fundamental rules

25  of our system of criminal justice.  He told you two things, two

1   principles that I want to focus on here:  One, the defendants

2   are presumed innocent; and two, the government must prove their

3   guilt on each and every charge beyond a reasonable doubt.

4           These are bedrock principles of our system.  They are

5   what we as a people believe in.  The burden of proof sits right

6   here at this table right here with these people right here.

7   The government must prove each and every element of the crime

8   and they must prove it with evidence that you, the jurors,

9   believe in, that you trust, that you believe can be the basis

10  for an important decision that -- one of the most important

11  decisions.

12          And with that in mind, I want to talk to you about

13  what I expect the evidence here to show.  Jeremy Reichberg and

14  Jimmy Grant are friends.  They are friends.  They are a rare

15  breed of friends today, people from totally different

16  backgrounds, people who live totally different lives who have

17  reached across the divide to become true friends.

18          Jimmy Grant is not Jeremy Reichberg's only police

19  friend.  You will hear the names through the trial of Michael

20  Harrington, Steve McAllister, Mike Melici, many others.  They

21  are police officers who you will learn that Jeremy Reichberg

22  was friends with long before Jona Rechnitz, the government's

23  star witness, appeared on the screen.

24          Jeremy Reichberg was not going out to fancy

25  restaurants with these police officers.  That's not how he

1  became friends with them.  He was not taking them on fancy

2  trips.  You will see Jeremy Reichberg sitting around his

3  crowded dining room table in the small apartment that he had

4  when he first knew them celebrating the Jewish holiday of

5  Purim.  They were laughing and just hanging around with him and

6  his family.

7         You will see pictures of Jeremy Reichberg dancing,

8  dancing with Jimmy Grant at a Jewish bar mitzvah celebrating

9  the bar mitzvah of his son, and you will see how joyous they

10  are together.  You will see other police officers there, too,

11  celebrating this bar mitzvah, because that's the kind of thing

12  that friends do with other friends, they celebrate family

13  occasions together.

14         You will meet Jona Rechnitz, the government's star

15  witness.  In 2008 or so Jona Rechnitz met Jeremy.  Eventually

16  they began to spend time together with police officers.  But

17  even after Jona came into Jeremy's life and even after Jona

18  decided to dump the police officers as his friends, Jeremy

19  stayed friends with the police officers.  They are friends to

20  this day.  They are real friends.  When he was in the hospital,

21  they came to visit him.  They called his wife to make sure that

22  she was okay.  They continued to hang out.  They talked almost

23  daily on the phone, and you will hear these long conversations.

24         Now the government will introduce evidence that Jeremy

25  tried to get promotions or transfers for some of his friends

1    like Jimmy Grant, his good friend, by putting in a good word

2    with other police officers that he knew.  They will introduce

3    evidence that Jeremy tried to help another police officer

4    friend, Michael Harrington, get business for his family's

5    security company.

6         In other words, Jeremy Reichberg is charged with

7    trying to help his friends.  Well, he pleads guilty to that.

8    Yes, he tried to help his friends whenever he could.  He is not

9    ashamed that he cared for his friends and wanted to help them.

10   Friends try to help each other.  You know that from your own

11   life.  That's part of what it means to be good friends.  That

12   is not a crime.  And it is not a crime to be friends with a

13   police officer.

14        And yes, Jimmy Grant, Mike Harrington, Stephen

15   McAllister, and Jeremy's other police officer friends sometimes

16   helped Jeremy.  You will hear that the police helped -- police

17   officers help friends and family sometimes.  Jeremy would

18   sometimes do favors for them, they would it sometimes do favors

19   for Jeremy.

20        Now you heard the prosecutor describe what she thinks

21   the evidence will show about these favors, the so-called quo.

22   I do not expect that the evidence will come out the way that

23   she described it.  And you will decide for yourself.  You will

24   see.

25        And you are also going to hear the government take the

1    position at this trial that some of the favors violated police

2    department regulations.  That will be a matter of dispute at

3    the trial.  But whether or not the favors violated police

4    department regulations is not the issue in this case, even

5    though you will hear much testimony about it.

6          There is no crime charged of violating police

7    regulations.  The crime charged is bribery.  That's honest

8    service fraud.  It involves bribery.  Was there a quid pro quo?

9    Was that what was going on here?  And the evidence will show

10   there were no bribes here, Jeremy Reichberg and the police

11   officers were friends.

12         So why and how did Jeremy become friends with police

13   officers?  Several reasons you will hear about.  First, the

14   evidence will establish that many members of the Hasidic

15   community tried to form relationships with police officers, and

16   that that is something that the police department encourages.

17         You heard the prosecutor just talk about rivals and

18   other people who were trying to bribe the police.  There will

19   be no evidence, I will expect, no evidence.  What you will hear

20   is that other people in the Hasidic community also tried to

21   hang out with police officers, tried to have close

22   relationships.

23         Why?  The police department encourages this and the

24   Hasidic community wants to do it.  The police department wants

25   relationships with insular communities in New York.  And the

 1   Hasidic community is an insular community.  They're a community

 2   that keeps to themselves, that speak a different language

 3   often, that often are not comfortable in the community.

 4          And you will hear that the police department devotes a

 5   lot of money, millions of dollars in resources, to community

 6   affairs and community policing, attempting to develop

 7   relationships and connections to community members and inroads

 8   into insular communities.  It tries to develop these

 9   relationships in the Chinese community, the Spanish community,

10   the African-American community, and in religious communities

11   like the Muslim community and the Jewish community.

12          And it is not only the police who seek to develop

13   these relationships.  Members of minority groups who are

14   subjected to terror attacks often want to have close

15   relationships with the police.  You will learn that the Hasidic

16   community wants to have close relationships with the police

17   because Hasidic Jews are frequently subjected to hate crimes.

18   It's just an ugly fact of life.  And the Hasidic community has

19   responded to this ugly fact by cultivating relationships with

20   the police.

21          And we will introduce evidence that often Hasidic

22   rabbis would turn to Jeremy Reichberg seeking to ensure that

23   there was police protection in front of their synagogue,

24   particularly when terror attacks were going on around the

25   world.

1        And before the Jewish holidays, Jeremy Reichberg would

2   be invited to One Police Plaza to attend the briefings there

3   with the heads of the police department who would discuss with

4   community representatives that they had chosen to invite, like

5   Jeremy Reichberg, they would discuss the police plans to keep

6   the Jewish community safe over the holidays.

7        So part of the reason -- not the whole reason, part of

8   the reason that Jeremy started hanging out with the police and

9   part of what he continued to do over time grew out of the

10  community need.

11       But there was a second reason, which was a lot more

12  personal.  You will learn that Jeremy is a police buff, a

13  complete nerdy, geeky police buff.  You will hear that the FBI

14  searched his home, and among the items that were seized were a

15  crazy amount of police paraphernalia, including photos,

16  clothing, badges, police microphones, business cards.  You are

17  going to hear Jeremy talk on the phone with one police officer

18  after another, spending unbelievable amounts of time discussing

19  in great detail what is going on in the police department.

20       And by the way, part of what you will hear in the

21  recordings that the government made of Jeremy's telephone calls

22  is that Jeremy is not always truthful.  He brags and he says

23  things that are not always true.  It's just who he is.

24            (Continued on next page)

25

1          MS. NECHELES:  (Continuing)  He exaggerates things,

2     and sometimes, you will learn, that he can be a hot head, and

3     lose his temper, and act in a ridiculous, childish manner.  You

4     will see that happen, and you will hear evidence of him doing

5     it.  Jeremy is not a perfect person.  None of us, I submit,

6     are.

7          But there will be no doubt in your mind, listening to

8     the tapes and seeing the evidence, that Jeremy Reichberg loved

9     police, was a complete police buff, and that is part of what

10     led him to be friends with the police.

11          And the third reason that Jeremy became such close

12     friends with police officers is that Jeremy did not fit

13     completely in his community.  The Hasidic community is an

14     insular community with very strict rules about how the members

15     behave and live their lives.  People in the Hasidic community

16     believe that their lifestyle and the rules they follow about

17     how to dress, what to eat, how to socialize, and everything

18     else are rules that are set by God, as interpreted by the

19     rabbis.  They want to bring up children who will also follow

20     these rules and will stay true to their Hasidic traditions.

21     They do not want their children to assimilate and become like

22     the non-Hasidic community.

23          To protect against assimilation, most Hasids socialize

24     only with other Hasids.  Thank God, in America, people can

25     follow their own religious beliefs.  That is what America is

1    about, and that is what the Hasidic community does.

2          But Jeremy was different from many Hasids.  He liked

3    to know other people.  He liked to explore and find out about

4    other ways of life.  He liked to hang out with other guys,

5    smoke cigars, eat lots of food, tell dirty jokes, talk about

6    good looking women, gossip, and more, things that you may take

7    for granted, but things that he could not necessarily do in his

8    community.

9          Becoming friends with police officers gave Jeremy the

10   freedom to be different, to explore a whole different world.

11   You will see, Jeremy spent massive amounts of time hanging out

12   with police officers in person and chatting with them on the

13   phone, gossiping.  There's nothing wrong with any of that.

14         Now, in approximately 2008, Jona Rechnitz met Jeremy.

15   That is when the bribes supposedly began.  The government will

16   not have evidence of bribes, so-called bribes, before then.

17   And the government just characterized these bribes as follows:

18   Lining the pockets of police officers.  That's what you just

19   heard.

20         But they didn't tell you what the evidence about the

21   bribes will be.  The evidence about these so-called bribes were

22   that they were mainly meals and trips paid for by Jona

23   Rechnitz.  Not by Jeremy, Jona Rechnitz.  These were not things

24   that were going into people's pockets.  This was Jona Rechnitz

25   wanting to go out to fancy kosher restaurants and inviting

1   people to come hang out with him.  He paid for that.  This was

2   Jona Rechnitz, who pretended to own a private plane, saying,

3   come with me on my private plane for a two-day trip to the

4   Dominican Republic, come with me to Las Vegas on a trip where

5   I'm going to go gamble, and I'm going to be comped.  This was

6   Jona Rechnitz wanting people to hang out with him, and wanting

7   to look fancy, and wanting to look like he had contacts.

8           It was not money going into people's pockets.  That

9   was not lining people -- this was Jona Rechnitz.

10          And the government talked about home improvements to

11  Jimmy Grant.  That is what they say, Jimmy Grant -- you will

12  see, when you hear the evidence, that the government is wrong

13  on much of what they are saying here and wrong about this.

14          The government also characterized this and described

15  this as Jeremy Reichberg's scheme, that Jeremy Reichberg gave

16  the gifts, Jeremy Reichberg lined the police officers, and they

17  said at some point, Jeremy Reichberg recruited another person,

18  Jona Rechnitz, to come along with this.  Well, you will hear

19  the evidence, and you will see, this money was Jona Rechnitz.

20  This was all Jona Rechnitz.  And I ask you, when you listen to

21  that evidence, and you hear as it comes out, that this was all

22  Jona Rechnitz, ask yourself:  Why didn't the government tell

23  you that in the opening?  Why did they say, Jeremy, Jeremy,

24  Jeremy, when it was Jona Rechnitz, and you will see that it was

25  Jona Rechnitz?  Because Jona Rechnitz is the government's star

1    witness, and the entire case rests on his testimony.  There is

2    no other witness in this case who will say that the dinners,

3    and the trips, and the things that Jona was giving and that

4    Jona was paying for were bribes.

5          Jona Rechnitz will claim that when he paid for these

6    meals and trips for police officers, he had the specific intent

7    to bribe police officers.  And that is what this case is about:

8    Was Jona taking Jeremy and the police officers out to fancy

9    meals and fancy trips because he wanted to be friends with them

10   and hang out with them?  Was he trying to curry friendship, and

11   favor, and goodwill?  Or was he doing all of this with a

12   specific intent to bribe police officers?

13         Jona will admit to you, on the witness stand, that he

14   has said that there was never an explicit quid pro quo.  Never.

15   He never said to anyone -- to Jeremy or to the police -- I am

16   giving police officers these things, so that police officers

17   will commit an official act for me in the future.  But he is

18   going to say, everybody understood, everybody knew, that when I

19   took them to dinner, that was a bribe.  That's what I expect

20   Jona to say on his direct examination.

21         Jona Rechnitz will get up on the stand and testify,

22   and it will be a very scripted testimony.  This is a man, you

23   will learn, who has met with the prosecutors, either in person

24   or on the phone, more than 70 times preparing and rehearsing

25   his testimony.  But hold off any conclusions until you hear the

1   cross-examination.  After the government is done asking

2   questions, the defense attorneys will ask questions, and you

3   will see, Jona will have to admit lie after lie.  His entire

4   life was a lie.  He lied, and he conned people who he pretended

5   were his best friends.  He lied to investors.  He lied and

6   conned insurance companies and healthcare providers.  He lied

7   to the police when they came to his office to interview him.

8   He lied to everyone.

9          Jeremy Reichberg, Jimmy Grant, Michael Harrington,

10  Phil Banks, all of these police officers thought Jona Rechnitz

11  was their friend.  He sure acted like their friend.  But he's

12  going to tell you that he was only pretending, that he was

13  using them, that it was all a con.  Jona Rechnitz was a social

14  climber.  He was desperate to look important, for people to

15  think he was a big deal.  It was important to him to be seen

16  with people who were important.  It was important to him that

17  everyone think that he was rich.  Jona Rechnitz, you will hear,

18  had a rich daddy, and he wanted everyone to think that he

19  personally was a billionaire.  How did he do that?  First, he

20  threw around money.

21         The government only wants to show you the money that

22  Jona spent on dinner and police, and it was a lot of money, no

23  question, but we will put that into context.  We will show you

24  that Jona Rechnitz was conspicuously spending truly obscene

25  amounts of money to create the impression that he was filthy

1    rich.  And Jona also created the impression that he was filthy

2    rich by lying constantly about what he owned.  He bragged, and

3    bragged, and bragged.

4           But the crazy thing is a lot of times it was flat-out

5    lies.  He lied about owning major Manhattan office buildings

6    worth hundreds of thousands of dollars.  He lied about owning a

7    yacht and created an elaborate scheme to make people think he

8    owned this.  He lied about owning hotels.  He lied about

9    everything.  And the lies were all aimed at the same thing - he

10   wanted everybody to think he was a billionaire.

11          To be clear, the government charges, in this case,

12   that Jeremy Reichberg and Jona Rechnitz conspired together to

13   bribe police.  But it was only Jona who was throwing around

14   money, taking everyone out to dinner all the time, giving

15   hundreds of thousands of dollars in police contributions,

16   taking people on fancy trips, flying around on private planes,

17   taking overnight trips to Las Vegas and the Dominican Republic,

18   and gambling.  Jeremy Reichberg, you will learn, did not have

19   that kind of money.  He was not rich.  People, when he had

20   people over to dinner at his home, a few times, he paid for

21   people to go out, but it was Jona Rechnitz, undisputed, you

22   will see, that almost everything you will hear about in this

23   case -- the meals, the trips, the planes, the gifts --

24   everything was Jona Rechnitz.

25          But although virtually a hundred percent of the money

1    was Jona's, I expect that he will take the stand, and he will

2    claim this was all Jeremy's idea, Jeremy agreed with him to

3    bribe the police officers and to bribe, in addition, public

4    officials, including, I expect him to say, the mayor of

5    New York.  Because Jona doesn't want to just stop at police

6    officers.  Jona, I believe, will also say, the mayor of

7    New York was bribed and other politicians.

8            There is no charge in this case of bribing any

9    politicians, but because Jona is going to bring all of these

10   allegations into this case, I am going to have to spend time

11   unpacking it and showing you that Jona is lying, because he is,

12   and the evidence will show that.

13           At the end of this case, Jona's story that Jona and

14   Jeremy bribed the mayor, and bribed other politicians, and

15   bribed political officials will not match up with the other

16   evidence and will make no sense.  And Jona's motive and his

17   reasons for lying will be clear to you once you see and hear

18   the evidence.  And you will see Jona had a strong motive to

19   make up this bribery allegation.

20           There is one other charge in this case, one other

21   crime charged in this case against Jeremy, and that is

22   obstruction of justice and destruction of evidence.  You heard

23   the prosecutor just describe it, but you will see, the evidence

24   will not be at all what the government described.  You will see

25   that there were 35 electronic devices in Jeremy Reichberg's

1    home.  He did not try to destroy them.  He did not try to get

2    rid of them.  He knew, for months, and months, and months, that

3    the government was investigating him and intended to charge him

4    with a crime.  How did he know it?  It was all over the

5    newspapers.  And you will hear that during this time period,

6    Jona Rechnitz destroyed computers, destroyed evidence, got rid

7    of what he wanted to get rid of.  Jeremy Reichberg didn't.  And

8    how do you know that?  You're going to see.  I'm going to bring

9    into this courtroom all the things that were seized from his

10   house, all of the evidence that the government took - tons of

11   cards, PBA cards, cards of police officers, the kind of things

12   that his brother had a few of on him when he left the house.

13   There were hundreds left in the house.  Not exactly a scheme to

14   destroy evidence, not exactly a scheme to hide things.

15   Hundreds of pictures.  Everything that was on the drives that

16   the government claimed he tried to sneak out of the house were

17   also on his computers.  You will see that.  There was no

18   attempt by Jeremy Reichberg to obstruct or to hide anything.

19   That was Jona Rechnitz who did that, and who was not charged

20   with it.

21          So there's one final thing that I want to address

22   before I sit down, and it's a thing that I think is a

23   distraction, and I ask you, please, keep your eye on the ball,

24   do not be distracted by inflammatory evidence that I expect the

25   government to introduce in this case, because I expect that the

1   government will introduce evidence about prostitutes and may

2   elicit testimony -- may, I don't know -- from Jona, claiming

3   that Jeremy Reichberg slept with sex workers.

4           I am not going to cross-examine Jona or anyone else

5   about whether Jeremy Reichberg had sex with sex workers or

6   anyone else.  Jeremy Reichberg's sex life is none of my

7   business, and I submit that it's nobody's business except for

8   his wife and family.  But I am worried that because Jeremy is a

9   Hasidic Jew, who presents himself to the world as a religious

10  man, that you jurors will judge him more harshly than you would

11  judge a nonreligious person because you may think that he is a

12  hypocrite.

13          So I want to address that.

14          MS. LONERGAN:  Objection, your Honor.

15          THE COURT:  Thank you.

16          Can you please limit yourself to evidence.  You'll

17  have the opportunity to argue in closing arguments.

18          MS. NECHELES:  Okay.

19          You all will see Jeremy Reichberg is just a person

20  just like the rest of us, and in his community, what he wears

21  is a uniform.  There will be no evidence that he held himself

22  above others or that he acted in any way that he thought he was

23  better than others.  Do not let the uniform that Jeremy

24  wears --

25          MS. LONERGAN:  Objection, your Honor.

1          THE COURT:  Thank you.

2          You can proceed, counsel.

3          MS. NECHELES:  -- or irrelevant testimony about

4    whether he did anything with sex workers distract you from the

5    true issues in this case, because at the end of this trial, you

6    will be asked to determine whether the evidence proves beyond a

7    reasonable doubt that Jeremy Reichberg bribed police officers,

8    or conspired to do so, or whether he obstructed evidence, and I

9    submit that the reliable, truthful evidence in this case will

10   not prove these charges beyond a reasonable doubt.  And I will

11   ask you to return a verdict of not guilty on all the charges.

12         Thank you.

13         THE COURT:  Thank you, counsel.

14         Counsel for Mr. Grant.

15         MR. MERINGOLO:  With the Court's permission?

16         THE COURT:  Please proceed.

17         MR. MERINGOLO:  Good morning, ladies and gentlemen.

18         JURY MEMBERS:  Good morning.

19         MR. MERINGOLO:  My name is John Meringolo, and along

20   with Anjelica Cappellino, we represent Deputy Inspector James

21   Grant.  I'm not going to read from a script.  I was thinking

22   about what I was going to do over the last few days, and we've

23   been waiting for you for approximately two and a half years.

24   We've been waiting for two and a half years to discuss this

25   case with you, that the government has charged Deputy Inspector

1    Grant with bribery and honest services.  So what the government

2    is saying is that --

3              THE COURT:  I'm sorry, counsel.  Counsel, I'm sorry,

4    can I ask you to use the microphone?  There's an overflow of

5    courtroom.

6              MR. MERINGOLO:  Jeremy Reichberg --

7              I can't move, your Honor?

8              THE COURT:  Thank you.  Please stay at the microphone.

9              MR. MERINGOLO:  Jeremy Reichberg and Jimmy Grant

10   cannot be friends.  That's what the government is actually

11   saying, that an Irish Catholic guy from Coney Island, Brooklyn,

12   and a Jewish guy from Borough Park, Brooklyn, can't be friends,

13   because, ladies and gentlemen, if they're friends, you must

14   vote not guilty.  And that's that.  That's the case.

15             The government has said they're going to play tapes.

16   Thank God they're going to play tapes, because you're going to

17   listen to the tapes, and you're going to hear two friends,

18   specifically the government's tape that they reference in their

19   opening statement of which they said Grant and Jeremy were

20   doing some illicit things.  Grant gets on the phone, you may

21   hear the evidence will show, so you don't love me anymore?  And

22   he says, Jeremy says, the evidence will show, you're busy,

23   you're busy, you're busy, you're a comped stat.  And what is

24   comped stat?  That's something that the deputy inspector of the

25   police department would present for something with his

1    community.

2          And then it goes on, and I want you to really listen

3    to the tape, and then it goes on, and on, and on, and they say,

4    Jeremy says, you don't have time for me, you have new friends.

5    He's busting his chops, right?  We're from New York City, we

6    know what busting chops is, right?  This is no illicit thing.

7          You have new friends, I don't know who you're hanging

8    out with.  And then Jimmy Grant will say, the evidence will

9    show, I'll tell you, bro, I ain't hanging out with nobody.

10   Now, Jimmy Grant has a potty mouth when he's talking with

11   Jeremy Reichberg, so don't hold it against him.  And then the

12   government was going to want you to say -- they're going to

13   want to say this is the illicit conversation in this whole

14   case, the Jewish elves didn't come to Christmas.  The two

15   Jewish elves, they are bantering back and forth.  Listen to

16   that conversation.  Listen to it again, and again, and again.

17   They are friends talking.  He never brings up anything again.

18   It's just BS-ing, they're busting chops.  He's not saying, oh,

19   bro, if you don't give me any money tomorrow, I'm not going to

20   help you.  And then at the end of that conversation, he says,

21   what about the gun license that we're talking about?  What do

22   we have to do?  And Jimmy says, yo, I can only bring a horse to

23   water, I can't make him drink it.  You have to fill out the gun

24   license, you have to get a notarized copy, and submit it.

25          Well, ladies and gentlemen, if any one of you, or me,

1    or anyone here wants to get a gun license, if you go on

2    Google -- I'm not really a tech guy, but if you go on Google,

3    and you say how do I get a gun license from the NYPD --

4              MS. LONERGAN:  Objection, your Honor.

5              THE COURT:  Thank you.

6              Counsel, please limit yourself to the evidence.

7              MR. MERINGOLO:  The evidence will show that Jimmy

8    Grant is just reading of what anyone else could read off the

9    Internet to his friend Jeremy.  There's nothing improper with

10   that.

11             And then this Jona Rechnitz that my co-counsel spoke

12   about, right -- this guy, I mean, it's amazing when you see

13   him -- when he's on this cross-examination, it's going to be

14   amazing.  He cannot tell the truth for anything.  He bribed --

15   remember this?  He's bribing, Jona Rechnitz is bribing, the

16   evidence will show.  He's bribing everybody.  Jeremy, Jimmy,

17   this one, that one, de Blasio.  He wants a gun license, but

18   guess what he doesn't get?  The briber-in-chief doesn't get his

19   gun license that he wants.  What kind of scheme is this that

20   he's not getting what he wants?  Because it's not a scheme.

21             And then you'll hear conversations -- thank God this

22   wire was up.  Thank God from January 13th to May 12th, 2015,

23   the evidence will show, thank God that wire is up.  And then

24   what happens?  The FBI goes to Jimmy Grant's house, the

25   inspector of the 19th Precinct, the commander of the 19th

IB6KGRA3                    Opening – Mr. Meringolo

1    Precinct, on February 24th, 2016.  That's seven, eight, nine

2    months after all these conversations you're going to hear, that

3    the FBI has to monitor as they're happening.  They show up to

4    Jimmy Grant's house, and what happens?  What does he say?  They

5    ask him about Jeremy Reichberg.  And it's 6:00 in the morning,

6    they go to the deputy inspector's house with his wife and two

7    little kids, and what does he say?  He says Jeremy's my friend.

8    Now, we're from Brooklyn, that means a lot.  I know maybe some

9    of you guys are from the Bronx, but we're from Brooklyn, and

10   when we say you're our friend, we mean it, and it doesn't

11   matter what you look like.

12             So that's what the evidence is going to show here.

13   That's what the evidence is going to show.

14             So, they say Jimmy Grant is a deputy inspector

15   commanding the 19th Precinct.  Ladies and gentlemen, you know

16   where the 19th Precinct is?  The 19th Precinct is on the Upper

17   East Side.  So May 12th, the wire goes down.  There's Agent

18   Downs, he mounted the wire right there, Agent Downs, all the

19   conversations are in by May 12, 2015.

20             They show up at Jimmy Grant's house, he commands the

21   19th Precinct.  That's where the Pope stayed during this

22   interim, that's where President Obama stayed during the

23   interim, that's where President Netanyahu stayed, the number

24   one, the number two, and the number three terrorist targets in

25   the world.

1           MS. LONERGAN:  Objection.

2           THE COURT:  Counsel, I'm sorry, can I ask you to come

3    up.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  There's an objection, counsel?

3           MS. LONERGAN:  Your Honor, it's not at all clear how

4    this is going to come into evidence.

5           THE COURT:  Thank you.

6           Counsel, how is this going to come into evidence?

7           MR. MERINGOLO:  He's commander of the 19th Precinct.

8    Everybody knows what the commander of the 19th Precinct does.

9           THE COURT:  That wasn't the question.  The question

10   is:  How is the evidence about where Barack Obama, Netanyahu,

11   and the like stayed --

12          MR. MERINGOLO:  During Grant's --

13          THE COURT:  That's not the question.

14          MR. MERINGOLO:  The question is how is it going to

15   come in?

16          THE COURT:  Yes.

17          MR. MERINGOLO:  Through the FBI agents.

18          THE COURT:  Thank you.

19          You should be very mindful, counsel, I'm concerned

20   because you're testifying.  You cannot say what I think, what I

21   say in Brooklyn, that doesn't matter.

22          MR. MERINGOLO:  Okay.  I understand.

23          THE COURT:  Counsel, I expect you will be putting on

24   evidence about what a Google search will show.  You cannot

25   testify about what you found in a Google search.

IB6KGRA3                          Opening – Mr. Meringolo

1          MR. MERINGOLO:  Okay.

2          THE COURT:  I don't know what the basis is regarding

3     the contents of the Google search.

4          With respect to this evidence, again, to the extent

5     it's coming in, it's not a problem.

6          MR. MERINGOLO:  We'll put it in.

7          THE COURT:  But I'm just concerned that you may be

8     making statements that are not founded in the evidence, so I

9     just ask you to be mindful of that.

10         MR. MERINGOLO:  Of course.

11         MS. LONERGAN:  I also note for the record, there's

12    been no compliance with Touhy.  In fact, they tried to serve

13    the FBI through us.  We informed them we can't accept service

14    for the FBI agents through the government, and that they needed

15    to comply with Touhy, and that has not happened.

16         THE COURT:  Good.

17         MR. MERINGOLO:  Your Honor, there's four FBI agents on

18    their witness list.

19         THE COURT:  Thank you.  That's fine.

20         I'm sorry for interrupting.

21         MR. MERINGOLO:  That's fine, Judge.

22         THE COURT:  Thank you very much.

23         (Continued on next page)

24

25

IB6KGRA3                          Opening - Mr. Meringolo

1          (In open court)

2          THE COURT:  Thank you, counselor.  I'm sorry for the

3     interruption.  Please proceed.

4          MR. MERINGOLO:  No.

5          Ladies and gentlemen, what I say is not evidence.  You

6     have to see how the evidence comes out in the case.  But the

7     evidence will come out that the wire went down May 12th, 2015,

8     and then Jimmy Grant was indicted on a complaint on June 20,

9     2016.  The evidence may show he spent 19 years, 11 months, and

10    20 days on the job, and during that period of time, there was

11    not one complaint internally and not one complaint from any

12    citizen.

13         MS. LONERGAN:  Objection.

14         MR. MERINGOLO:  The evidence may show --

15         THE COURT:  Thank you.

16         You can proceed, counsel.

17         MR. MERINGOLO:  The evidence may show not one

18    complaint internally or one complaint from a citizen.

19         Now, the government said that Jimmy Grant, and Jeremy

20    Reichberg, and all these other people conspired to get Jimmy

21    Grant the 19th Precinct, and that he became a CO, that he

22    commanded the precinct.  The evidence may show that Jimmy Grant

23    was one of the top people in his 1996 class.  The evidence may

24    show that he was the first person from that class to be

25    promoted sergeant.  The evidence may show that he was the first

1    person from that class to be promoted lieutenant.  The evidence

2    may show that he was one of the first people to be promoted

3    captain.  The evidence may show that Jimmy Grant commanded the

4    Brooklyn South Task Force, which oversaw 13 precincts.  And

5    then the evidence will show that he became the commander of the

6    19th Precinct.

7            That's Jimmy Grant's career.  That's who Jimmy Grant

8    is.  And for the government to say that Jimmy Grant did not get

9    this promotion on his own merit -- you'll see.  I don't want to

10   say.  But for them to say that is -- it's not nice, as my

11   grandmother would say.  It's not nice, it's not nice.  But

12   that's what the evidence will show.

13           Now, we're going to see this Jona Rechnitz, but I

14   don't want to beat it to death because Jeremy's counsel really

15   did a great job.  But Jona Rechnitz pled guilty to a

16   cooperation agreement.  The evidence will show that he lied to

17   the FBI for 13 months before he decided to tell the truth.  He

18   lied to our New York FBI.  He lied to these prosecutors at this

19   table.  He lied to those agents in the back.  He lied to Agent

20   Downs there for 13 months.  And then, within three or four

21   meetings, the government desired to give him a cooperation

22   agreement.  And they have every right to.  So three or four

23   meetings, maybe four or five hours each meeting tops, after

24   lying to our New York FBI for 13 months, he gets his

25   cooperation agreement.  What does he plead guilty to?  He

1    pleads guilty to bribing Jimmy Grant and Jeremy Reichberg, but

2    he also pleads guilty to bribing Mayor de Blasio, because in

3    his mind, and the government was there when he pled guilty, in

4    their mind, Jona Rechnitz was bribing Mayor de Blasio.  The

5    evidence may show Mayor de Blasio is not indicted.  The

6    evidence shows that he's going to come in here and say he took

7    Jimmy Grant to the Super Bowl --

8              MS. LONERGAN:  Objection, your Honor.

9              THE COURT:  Thank you.

10             He referring to?

11             MR. MERINGOLO:  Jona Rechnitz, the deceitful witness,

12   will come here and say that he took Jimmy Grant on a private

13   jet to watch the Super Bowl -- I keep saying go to the Super

14   Bowl, so I apologize for that -- to watch the Super Bowl in

15   Vegas.  And the evidence will show, in this case, that

16   somebody -- Jona Rechnitz will testify that this was on the

17   front page of the paper, that Jimmy Grant slept with a

18   prostitute.  Okay?

19             The evidence will show that he's made that story up,

20   changed that story three, four times.  The evidence will show,

21   in this case -- and I hope it does, and I don't believe the

22   government was part and parcel with this -- but the evidence

23   will show that he made up that Jimmy Grant slept with a

24   prostitute.  The evidence will definitely show that he met the

25   prostitute prior to watching the Super Bowl.  The evidence will

show he was on the plane -- she was on the plane, she was at
the hotel room, and the evidence will show he met her after
that.  He used her sex services.  But now he wants to come in
and say Jimmy Grant, the father of two, he's the one who had
sex with the prostitute.

        Jona Rechnitz did get Jimmy Grant, and his wife, and
his kids a hotel room for two nights in Rome.  The evidence
will show that he said it was his hotel.  The evidence will
show that he said he owned 25 Wall Street, which is a two,
three hundred million dollar building.  The evidence will
show -- I believe, I may be wrong with the addresses -- but the
evidence will show 15 Broad Street, which is another two, three
hundred million dollar building.  And the evidence will show he
said, I own a hotel, Jimmy, why don't you go to the most
luxurious hotel in Rome the two nights with your family.

        The evidence will also show, ladies and gentlemen,
prior to that, Jimmy Grant paid for his own hotel, but Jona
said, take this two nights for free.  Jimmy Grant had no
intention, he's not mooching on anybody, there will be no
evidence of that.  The evidence will show, and the government
said in their opening, about windows, right?  Windows.  So the
evidence will show that in October of 2013, one year from
Hurricane Sandy, which was October 2012, Jimmy Grant's windows
were broken.  They're going to bring in the guy who put the
windows in.  And it's one of Jeremy Reichberg's construction

1    workers, he put the windows in for Jimmy Grant.  We're not

2    denying that.  The evidence is also going to show he put the

3    windows in -- and here's common sense, here's why I've been

4    waiting for you, ladies and gentlemen, for two and a half

5    years, here's why I've been waiting for you -- the evidence

6    will show he got the windows in October 2013.  The government

7    is going to play a tape in 2015, and Jimmy says, I'm painting

8    my windows every two weeks.  Respectfully, to the construction

9    worker, he did a terrible job and ruined Jimmy's basement and

10   his house, because it floods all the time.  That's what

11   happened.  That's what happened.  We're not denying it.

12          The evidence will also show that on June 20th, 2016,

13   the government said, Jimmy Grant got $6,000 railings.  They

14   arrested him on -- 19 years, 11 months, and 20 days, they

15   arrested him, and they said he got railings, $6,000.  The

16   evidence will show those railings were $2,500, and the evidence

17   will show Jimmy Grant paid for his own railings.

18          Back to Jona Rechnitz.  He's going to get on the

19   stand, and the evidence is going to show he stole tens of

20   millions of dollars.  The evidence is also going to show he

21   never paid taxes on that money.  So he's cooperating with the

22   government pursuant to a cooperation agreement, which is

23   lawful -- I believe it was signed on 6/6/16 -- and he still

24   hasn't paid taxes on his millions of dollars, ladies and

25   gentlemen.  I want you to take that into consideration when

IB6KGRA3                        Opening - Mr. Meringolo

1    you're reviewing this evidence.

2            And when you do review the evidence, the government

3    has to prove each and every element of each and every crime

4    beyond a reasonable doubt.  And if they don't do that, ladies

5    and gentlemen, you must vote not guilty.

6            Now, another aspect of this case -- I'm going to try

7    to defend Jimmy Grant to the best of my ability -- is that they

8    say in order to convict him, you have to say Jimmy Grant

9    provided official acts.  Okay?  The official acts that the

10   government is saying in this case are PBA cards.  Jimmy

11   Grant --

12           MS. LONERGAN:  Objection.

13           THE COURT:  Thank you.

14           Counsel, can I -- I'm sorry, I'd like to just ask you

15   to come up again.  I'm sorry.

16           MR. MERINGOLO:  This has been litigated for two, three

17   years.

18           THE COURT:  Come up, please.  Thank you.

19           (Continued on next page)

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Sorry.  Counsel, there's an objection?

3          MS. LONERGAN:  Yes, your Honor.

4          We are not, as we have explained, going to say that

5     the PBA cards are official action, and giving that this is a

6     confusing term, we think that it's very misleading to the jury

7     to state otherwise in opening.

8          THE COURT:  Thank you.

9          MS. LONERGAN:  The Court's instructions on the law

10    control with respect to official acts and everything.

11         THE COURT:  Thank you.

12         Let me just say this:  Part of the reason why I asked

13    you to come over -- I'll reserve some comments -- was about the

14    arguments about the law.  I said this during our, I'll call it,

15    pretrial conference previously.  I have not yet provided the

16    parties with proposed charges.  I'm concerned about arguments

17    about the law in the context of opening statements, where the

18    parties do not know what the charges are or are going to be.

19         So I just want to caution you, counsel, about arguing

20    the law, given that it hasn't been established here and that

21    that's not what we're doing in opening statements.

22         Just since we're here, in any event --

23         MR. MERINGOLO:  I'm done in five minutes, Judge.

24         THE COURT:  Thank you.  That's fine.

25         Just reminders:

1          You can't vouch, so you cannot say counsel did a great

2    job, you cannot comment on what you believe about the evidence,

3    such as I do not believe that the government was part and

4    parcel of this.  And I'd ask you to stop referring to the

5    amount of time that the defendants have been waiting for this.

6    I don't think that that's appropriate to put in front of the

7    jury.  In other words --

8          MS. NECHELES:  Judge, I will ask that at some point --

9    not right now, but at some point, that your Honor -- because

10   there will be all this evidence in this case about PBA cards

11   starting today, I will ask that your Honor instruct the jury

12   that it is not an official act to give PBA cards, and that they

13   are giving them, and people have not alleged to be something

14   wrong.

15         THE COURT:  Thank you.

16         I'm happy to talk about what the instructions are, and

17   I apologize again for bringing you over.

18         MR. MERINGOLO:  Don't worry about it, Judge.

19         THE COURT:  You are going into the law, and I was

20   concerned about that.

21         MR. MERINGOLO:  Judge, I'm a former fighter.  I can

22   take it.

23         THE COURT:  That's good.  Fine.  Thank you very much.

24         (Continued on next page)

25

IB6KGRA3                        Opening - Mr. Meringolo

1          (In open court)

2          THE COURT:  Counsel, I'm sorry.  I apologize again for

3     the interruption.  Thank you very much for your consideration.

4     Please proceed.

5          MR. MERINGOLO:  So we'll just talk about Jona

6     Rechnitz, and then we'll wrap it up.

7          Jona Rechnitz is a master manipulator -- lying to our

8     FBI, the evidence will show, for 13 months, trying to

9     manipulate Mayor de Blasio, saying he committed crimes with

10    him.  He also manipulated a man by the name of Benjamin

11    Brafman.  That's a big, big lawyer, the biggest lawyer in the

12    city.  He referred Hamlet Peralta -- and I know these are a lot

13    of names, ladies and gentlemen, maybe -- I ask you if you could

14    write things down when the evidence comes in -- and he also got

15    Hamlet Peralta a lawyer, which was Benjamin Brafman.  And he

16    got Philip Banks, who's the chief of the department -- he's

17    someone that Jeremy and Jona were very friendly with, he was

18    the chief of the department, but he was not friendly with Jimmy

19    Grant -- he got him a lawyer, also, which was Benjamin Brafman.

20    I will cross-examine him on conversations that he had with

21    Benjamin Brafman literally manipulating him.

22          I will also cross-examine him on conversations that he

23    had with his father.  And his father is a big, powerful man out

24    in L.A.  His father is very, very politically connected, and

25    his father, on tape, the evidence may show when he was

1  cross-examined, had said don't worry, we'll just go to D.C.,

2  and I will handle it.

3          MS. LONERGAN:  Objection, your Honor.

4          THE COURT:  Thank you.

5          You can proceed, counsel.

6          MR. MERINGOLO:  So what I'm trying to say here,

7  lastly, is that if you believe Jimmy Grant and Jeremy Reichberg

8  are friends, you must vote not guilty.  If you think --

9          MS. LONERGAN:  Objection, your Honor.

10          THE COURT:  Thank you.

11          You can proceed, counsel.

12          MR. MERINGOLO:  If you believe -- if you don't believe

13  Jona Rechnitz, and you believe he's lying, then I would

14  respectfully ask you to vote not guilty.  Whatever the official

15  acts are going to be proposed about the government in this

16  trial, if they don't meet their burden, I will ask you to vote

17  not guilty.

18          I thank you very much for giving me your attention

19  this morning.  Today is a great day.  You are jurors, which

20  is -- there are three things you can do for your country,

21  there's three major things:  One, first and foremost, the most

22  important, you can go to the military; second is you can vote;

23  and, third, a close third, is that you can swear an oath to be

24  a juror.  It's really the cornerstone of our country that

25  Mr. Grant, Jimmy Grant, he comes in here presumed innocent

IB6KGRA3

1       until all the evidence is in.  And what I said up here, and

2       whatever I did, and how emotional I got, I apologize if I

3       offended anybody, I really do, but don't take that against

4       Jimmy Grant.  Please don't.  It's the evidence that will

5       govern.  And when the evidence is in, and I come and close up

6       here, I believe that there will be no other verdict that we

7       could reach when we look at the law that Judge Woods is going

8       to instruct you and the evidence, it will be not guilty.

9               Thank you for your time.

10              THE COURT:  Good.  Thank you very much, counsel, all

11      of you, for your openings.

12              So, ladies and gentlemen of the jury, it is about

13      11:43.  I'm going to try to take a lunch break around this time

14      every day.  So I'm going to propose that we take our lunch

15      break now.  I think that you've got some food to eat.  I'd like

16      to keep this break relatively short.  There is some food

17      waiting for you in the jury room and some coffee.  If you need

18      to step out to get some more food, please do it very quickly,

19      so that we can plan to start back up in about half an hour from

20      now.  So we'll plan to start again at 12:15 with our very first

21      witness.  Remember, as I said earlier, at this point in the

22      case, you have not yet heard any evidence because the parties'

23      opening statements are not themselves evidence.

24              So, ladies and gentlemen, you're going to hear me say

25      this many times:  During this recess, do not discuss the case

IB6KGRA3

1    amongst yourselves, do not communicate about it with anyone

2    else, and do no research about the case or anyone involved in

3    it.  I'll see you after our lunch break.  Thank you, all.

4            (Luncheon recess)

IB6KGRA3

1           (Jury not present)

2           THE COURT:  Thank you.  You can be seated.

3           Thank you, counsel, again, for your opening

4    statements.  I appreciate the work that went into all of them.

5           I'd like to take our lunch break now.  It should be

6    relatively brief.  Counsel, as you heard me tell the jurors, I

7    expect to begin again with testimony at 12:15.  At that time, I

8    expect that the government will have its next witness available

9    to take the stand.  I'll ask you to call the witness, to

10   identify them, him or her, to the jury, so that he or she can

11   come forward in their presence, but please have your witness

12   ready.

13          There are, I believe, at least two issues that we

14   should discuss before the jury comes back in, if I recall

15   correctly.  First, I understand that the NYPD rules issue may

16   be something that we need to resolve before this witness.

17          I also will want to talk with you about the basis for

18   my decision on the Bruton issue, which I think will take about

19   five minutes or so.

20          Is there anything the parties would like to make sure

21   that we resolve prior to the jury's return?

22          MS. LONERGAN:  Your Honor, I hate cutting into the

23   lunch break, but I'm concerned that in his opening statement,

24   Mr. Meringolo, on multiple times, misstated the law in one

25   particular way, which was by saying that if the defendants were

IB6KGRA3

1    friends --

2              THE COURT:  Thank you.  I hate to interrupt you.  I

3    have a note as a follow-up to the friends issue.  I share the

4    concern.  We may need to include some kind of instruction to

5    the jury to counteract that argument.

6              This is why I advise the parties not to argue the law

7    in your opening statements.

8              MR. MERINGOLO:  Your Honor, I don't believe that the

9    jury will disregard your instructions to them prior to my

10   opening statement.

11             THE COURT:  Thank you.  That's fine.

12             I think that the concern that the government is

13   articulating, we can take up at a later date, unless the

14   parties believe we need to take this up now.

15             MS. LONERGAN:  Your Honor, we request a curative

16   instruction now, that this is a misstatement of the law, that

17   they can both be friends and have engaged in the charged

18   crimes.  We think otherwise it will impact how the jury views

19   the evidence, because we don't dispute there is, of course,

20   going to be evidence that they were friends.  But right now,

21   they have been left with the misimpression that if they find

22   that they're friends, then the verdict must be not guilty.

23             THE COURT:  Thank you.  That would be -- I look

24   forward to discussing this issue.  I understand the

25   government's concern.

IB6KGRA3

1          If there is a defense that consists of the following,

2      friends cannot be guilty of crimes committed together, I need

3      to see it.  I'm concerned because I hear that it may misstate

4      the law, and I appreciate the government's concern that the

5      argument that a friendship negates the possibility of

6      committing a crime with your friend is one that may contaminate

7      the jury's evaluation of the evidence.

8          I don't know what the basis is for that proposition,

9      as a matter of law, whether it's in connection with a political

10     corruption case that friends cannot bribe each other, or engage

11     in corrupt activity, or in the context of another crime, that a

12     conspirator selling crack cocaine cannot be guilty of selling

13     crack because they're friends.

14         So I'm going to need to ask for a proposed text for a

15     limiting instruction, which I'll review, and we'll evaluate

16     what it should say.  I'm not going to come up with something on

17     the fly.  I'll want to ask the government to propose something

18     to show it to the defendants, and I'll evaluate the product of

19     that.  I believe that the government has made a reasonable

20     argument that a bell has been struck that I should do something

21     to mute, but I would like to see what the proposal is before I

22     will take a step.  And I don't believe that this is of such a

23     vital nature, that I have to do it without the benefit of the

24     parties' feedback on the language.

25         MS. NECHELES:  Your Honor, we would object to that.

IB6KGRA3

```
 1     My whole opening was about friends, and, in effect, the
 2     government is asking for an instruction that that's wrong.  We
 3     are proposing an alternative.  We are not saying that friends
 4     cannot be -- Mr. Meringolo engaged in a bit of hyperbole, but
 5     he was -- I think everybody in the courtroom understood that
 6     he's saying they're friends, just like I specifically talked
 7     about they need specific intent to commit a bribe, the jury was
 8     told that, you told it to them, the government can't just ask
 9     for an instruction every time they don't like an argument.
10     They'll put on their evidence, we'll put on our evidence, and
11     the Court will instruct the jury.  I don't think anybody here
12     is going to think, or the jurors think, given what you've
13     already said and what the arguments have been, that just
14     because you're friends, you can't be --
15             THE COURT:  Thank you.  I understand.  And I, again,
16     will solicit a form of instruction on this issue.
17             The way that you made this argument, Ms. Necheles, was
18     meaningfully different in nature from the way in which it was
19     made by counsel for Defendant Grant.  You said that your
20     defendant pleads guilty to being friends.  That is not the same
21     as saying, if you are friends, you are not guilty, which is the
22     government's concern.
23             I will solicit a proposed instruction, I'll evaluate
24     that, and I'll solicit arguments before I provide the
25     instruction.  I understand the concern, and I do not want to
```

IB6KGRA3

1    unduly tremble what I believe is a reasonable argument by

2    defendants, but I also don't want to leave the jurors with the

3    misimpression that friendship is a defense to criminal conduct,

4    which, I'm afraid, is the reasonable connotation of the

5    argument made by counsel for Defendant Grant.

6             So, counsel, please propose a limiting instruction.

7    I'm not saying that I'm going to administer it, but I'm saying

8    that I will only do so after evaluating the proposal and

9    considering what adverse effect it might have on the defendants

10   and their respective cases.

11            Can I take up the other issue; namely, the rules

12   issue.  Is that an issue we need to decide before the next

13   witness comes to the stand?

14            MS. LONERGAN:  Not the very next witness, Judge.  We

15   expect that witness to be fairly short.  It will be the second

16   witness.  But we can take a break between the two witnesses to

17   discuss it.

18            THE COURT:  Thank you.  I think it would be better for

19   us to do it before these two witnesses, particularly since the

20   first witness will be relatively short.

21            MS. NECHELES:  Can we ask who the witnesses are, who

22   the order is?

23            MS. LONERGAN:  Your Honor, sorry, we need -- given the

24   Court's ruling this morning, we actually may slot Massey back

25   in, and in which case, this witness will be third.  We told

IB6KGRA3

1    them, in fact, the first three witnesses about a week ago, but

2    in some combination, we expect the first three witnesses will

3    be FBI Special Agent Chapel, potentially retired FBI Agent

4    Massey, and Police Sergeant Cox.

5              THE COURT:  Thank you.

6              MS. NECHELES:  Judge, my only concern is, and maybe

7    the government doesn't understand this, but as soon as they

8    finish the direct, they're going to expect me to get up and

9    cross, and so it's helpful for me to know what order the

10   witnesses will be in a day, so that I can be prepared.  I could

11   have gotten my stuff all together, and we don't have a delay.

12             So to be saying, you know, like, yes, they told us

13   these are the six, eight witnesses we will be calling, we would

14   like to know in the morning, at least, what's the order of

15   people that you're calling.  It's not so hard for us to be

16   asking that.

17             THE COURT:  Thank you.

18             Counsel for the United States?

19             MS. LONERGAN:  Your Honor, that's fine.  We'll do our

20   best.  Clearly, sometimes things come up, like the issue -- an

21   issue that came up today that has still left the government in

22   flux a little bit because we have to see who's here.  And

23   sometimes travel plans change.  For example, witnesses got

24   stuck in traffic this morning, which can also change things.

25   To the extent we can, we will do our best.  We are providing

IB6KGRA3

1    the defense with the witnesses we anticipate will take the

2    stand two days later, that is sufficient time, but we will do

3    our best in the morning, as much as we can, to give them the

4    order as well at least for the first few.

5         THE COURT:  Thank you.

6         Once you have had the opportunity to sort out the next

7    few witnesses, please inform the defendants of that.

8         Please provide me with a proposed limiting instruction

9    with respect to the Bruton issue related to the testimony by

10   Special Agent Massey.  I'd like to see the government's

11   proposal, and I'd like to receive the feedback by the

12   defendants with respect to that proposed language.

13        When I come back, I'll expect to have a short

14   conversation about the NYPD rules issue.  And I hope to see a

15   proposed instruction with respect to the Bruton issue, so we

16   can move promptly into Agent Massey's testimony, as he is the

17   second witness.

18        Anything else we should take up before we all take our

19   short break for the sake of eating something?

20        MS. LONERGAN:  Nothing from the government, your

21   Honor.

22        THE COURT:  Thank you.

23        Ms. Necheles?

24        MS. NECHELES:  No, your Honor.  Thank you.

25        THE COURT:  Thank you.

IB6KGRA3

1              Mr. Meringolo?

2              MR. MERINGOLO:  No, your Honor.  Thank you.

3              THE COURT:  Please come back around 12:10, so we can

4     take up these other issues.  Thank you.

5              (Luncheon recess)

6              (Continued on next page)

AFTERNOON SESSION

(12:15 p.m.)

THE COURT:  Thank you all for being back.  I would like to start as promptly as we can.

Counsel, first let's talk briefly about the New York patrol guide issue.  Counsel for the United States, could you make a brief proffer regarding each of the respective rules you expect to bring in in addition to the two that you identified in your motion?

MS. LONERGAN:  Of course, your Honor, one moment.

So there's one that's called performance on duty general, which essentially talks about the rules, general rules for police officers on duty.  One is performance on duty, prohibited conduct.  As the title is, it states what you're not allowed to do as a police officer on duty.  It's not an exclusive list, these are early in the parole guide as they start to lay out some rules of police officers' conduct, on and off duty.

There's two sections that go to financial restrictions, things that are prohibited for officers of the police department to do that have monetary restrictions, what they're allowed to invest in, businesses that have -- and how their duties as police officers affect them financially, which we also think is relevant here.

Then we have an introductory section, which is mission

IB6TGRA4

1    and values of the New York City Police Department, which is a

2    central statement that is taught to the new recruits,

3    essentially what they are taught about the mission and values

4    of the New York City Police Department, and that guides kind of

5    their whole conduct as police officers.

6            I believe that's all of them, but let me just confirm,

7    Judge.

8            THE COURT:  Thank you.  While counsel is confirming

9    this, Ms. Necheles apart from what I will describe as a

10   procedural issue, namely the government's failure to identify

11   these issues in their motion previously, why is the analysis

12   with respect to these portions of the rules any different than

13   what I engaged in with respect to the ones that were identified

14   timely?

15           MS. NECHELES:  I don't believe these are coming in for

16   state of mind.  I think that the government had also put as an

17   exhibit about activities at parades or wanting to wear a

18   uniform and the danger of confusion.  These are all rules which

19   the government will argue were broken, and they don't really go

20   to the issue of whether there was bribery.

21           I understand fully the rules about what gifts you are

22   allowed to accept, because that would go to the issue of

23   whether there was bribery, but other rules about were you --

24   should you have been wearing your uniform here when you were

25   there, what relevance does that have other than to say that

IB6TGRA4

1    they were doing something wrong in this case?

2              THE COURT:  Thank you.  Counsel for Mr. Grant?

3              MR. MERINGOLO:  Your Honor, we object to this just

4    because we think that it would really prejudice Mr. Grant

5    having continuous parole guide violations put in and be so

6    cumulative that the jury may infer that this was actually a

7    federal crime.  So we object based on that.

8              THE COURT:  Counsel for the United States, why is this

9    evidence to be introduced for the same reasons as the two rules

10   that you identified in your motion?

11             MS. LONERGAN:  Your Honor, let me also be clear,

12   there's also a couple of other patrol guide sections I think.

13   Ms. Necheles referred to one of them that goes to desk

14   appearance tickets and suspended licenses, those are issues

15   that will be issues of fact in this case.  There will be

16   evidence -- or we anticipate that there will be evidence that

17   Reichberg had new people who were arrested for suspended

18   license offenses and got other members of the police department

19   to request desk appearance tickets on their behalf.

20             So we think that the rules related to -- it helps

21   explain the officers' conduct also who acted in those instances

22   because they will say, for example, here is when you can and

23   can't issue -- here's my understanding of the rules of when you

24   can and can't issue desk appearance tickets.  Are those rules

25   written down anywhere?  Yes, they're written down in the patrol

1    guide.  And that will help to explain that the witness's own

2    conduct is that they believed that they were, for example, in

3    saying I'm not going to issue this person a desk appearance

4    ticket, despite requests to the contrary, that they were acting

5    in accordance with what they understood the rules to be of the

6    police department.

7         Again, we think all of this goes to -- this is not

8    about a violation of the patrol guide, and we're happy to have

9    as many limiting instructions at whatever time is necessary,

10   but the point is that when you're trying to think about --

11   because there's been all sorts of arguments in the opening --

12        THE COURT:  Thank you, I think I heard enough.  I

13   understand the nature and focus of this additional set of

14   rules, as does the defense.  I wish this information had been

15   highlighted in the original motion in limine with respect to

16   patrol guide evidence.  It's disappointing that it was not.

17   However, I believe that the analysis that I conducted in

18   connection with the prior motion in limine bears out, too, with

19   respect to this additional patrol guide evidence.

20        I won't restate all of the determinations that I made

21   in connection with the motion in limine regarding this patrol

22   guide evidence, namely my balancing of the relevant factors

23   under Rule 403.  There I held that given particular Mr. Grant's

24   expressed intent to present a defense that's premised in part

25   on the argument that the conduct -- that at least certain of

IB6TGRA4

1   the acts engaged in were customary police practices.  I believe

2   the evidence had particular significance with respect to

3   Mr. Grant's criminal intent.  I believe that the analysis of

4   the issue presented by the United States in its original motion

5   was persuasive, and the additional rules that are proposed to

6   be introduced here I believe are properly considered in light

7   of that same set of arguments.

8           Balancing the factors under Rule 403, I do not believe

9   that the possible prejudicial effect of this evidence will

10  overvalue its potential probative value.  As before, I believe

11  it's important for me to provide limiting instructions as it is

12  introduced and also at the close of evidence.  I don't believe

13  that I have seen a clear proposed instruction with respect to

14  this evidence.

15          Counsel, please correct me if I'm wrong.  I would be

16  happy to propose language now based on Judge Wood's limiting

17  instruction in *Skelos* with respect to similar evidence

18  regarding, I believe there, state ethics laws.

19          MS. LONERGAN:  Your Honor, I believe in the original

20  brief that we quoted the language from both *Fumo* and *Skelos* and

21  proposed that the Court adopt something along those lines.

22          THE COURT:  Thank you.  I propose to read the

23  following at each instance when the patrol guide evidence is

24  referenced, I would include a full instruction at the end of

25  the case.  The instruction would read as follows:

1              "You are about to hear testimony regarding the

2       provisions of the New York Patrol Guide that apply to members

3       of the New York Police Department.  Neither defendant is on

4       trial for any violation of the New York patrol guide.  It is

5       not a law; it is an internal guidance document used by the

6       NYPD.  You may not find either defendant guilty on any count in

7       this case merely because you believe that the defendant you are

8       considering may have acted in a way that was not consistent

9       with the New York patrol guide.  However, you may consider the

10      evidence regarding is the training Mr. Grant received with

11      respect to the New York patrol guide to extent that you find it

12      sheds light on whether or not Mr. Grant acted with fraudulent

13      or corrupt intent."

14              Does that capture the purpose for which the evidence

15      would be used?

16              MS. LONERGAN:  One moment, your Honor.

17              MS. NECHELES:  Sorry, could you just read that again?

18              THE COURT:  I would be happy to.

19              "You're about to hear testimony regarding the

20      provisions of the New York patrol guide that apply to members

21      of the New York Police Department.  Neither defendant is on

22      trial for any violation of the New York patrol guide.  It is

23      not a law; it is an internal guidance document used by the

24      NYPD.  You may not find either defendant guilty on any count in

25      this case merely because you believe that the defendant are you

considering may have acted in a way that was not consistent

with the New York patrol guide.  However, you may consider any

evidence regarding training Mr. Grant received with respect to

the New York patrol guide to the extent that you find it sheds

light on whether or not Mr. Grant acted with fraudulent or

corrupt intent."

          Counsel, your view regarding that proposed

instruction?

          MS. NECHELES:  Your Honor, I'm a little baffled on how

things like general principles or what you're allude to wear to

parade goes to Mr. Grant's corrupt intent.  And I also think

that to use that phrase, "corrupt intent," is to suggest that

this might be relevant to it.  I think that if your Honor is

inclined to give that instruction, I would ask that you just do

it with respect to his intent and not any sort of a suggestion

of corruption.

          I think, your Honor, also on behalf of Mr. Reichberg,

at this point there is proposed so much evidence that will come

in with special limiting instructions that I don't believe any

juror could keep it straight.

          So again, we object to this evidence that's just not

at all admissible against Mr. Reichberg, has nothing to do with

it, but I don't know how a jury would be able to keep all of

this stuff that is going to be coming in straight.

          THE COURT:  Thank you.  Do you have any comments

IB6TGRA4

1   regarding the proposed language, other than the particular

2   comment to change the end language, "to the extent you find it

3   sheds light on Mr. Grant's intent."

4           MS. NECHELES:  I have none.

5           THE COURT:  Thank you.

6           Mr. Grant, do you have any additional comments

7   regarding the proposed limiting instruction?

8           MR. MERINGOLO:  Your Honor, for the record, we object

9   in its entirety.

10          THE COURT:  Do you have any comments?

11          MR. MERINGOLO:  No comments.

12          THE COURT:  Fine.  Counsel for the United States, any

13  concerns regarding the proposed language?

14          MR. BELL:  Your Honor, I think it should be called the

15  New York City Police patrol guide.

16          THE COURT:  The New York State?

17          MS. LONERGAN:  New York City patrol guide or NYPD

18  patrol guide.  I think either of those things would be clearer,

19  because it just applied to New York City Police Department.

20  For example, it doesn't apply to the New York State Police or

21  other local police.

22          THE COURT:  So NYPD patrol guide.

23          MS. LONERGAN:  Yes, that would be helpful.  Thank you,

24  your Honor.

25          THE COURT:  Thank you.  Anything else?

IB6TGRA4

1          Counsel, would you tell me when you wish me to

2     administer this instruction?

3          MS. LONERGAN:  Your Honor, the first patrol guide

4     evidence will come in through I believe our third witness, who

5     is going to be Sergeant Cox.

6          THE COURT:  Counsel, I would like to proceed using an

7     amount of time here that I would like to be able to move along.

8          Anything else that we could talk about before we bring

9     in the jury?

10          MS. LONERGAN:  Your Honor, are we going to discuss the

11     limiting instruction with respect to the evidence from Massey

12     or are we going to wait?  Because he'll be second.

13          THE COURT:  If you could propose it to me, that would

14     be helpful.

15          MS. LONERGAN:  Your Honor, we're happy with as robust

16     a limiting instruction as the Court thinks is appropriate, but

17     what we propose is something along the lines of the evidence

18     that you are about to hear or that you just heard about the

19     statements that Grant made to Agent Massey are to be considered

20     only against defendant Grant.  You are not to consider those

21     statements for any reason against defendant Reichberg for any

22     reason or any purpose against defendant Reichberg.

23          THE COURT:  Thank you.  Do you have that proposed

24     language and have you reviewed it in hard copy and have you

25     reviewed it with counsel for defendants?

IB6TGRA4

1          MS. LONERGAN:  No, your Honor, I apologize.  By the

2     time we got out of the courtroom with the number of people and

3     got back down to our office and back up here, we didn't have

4     time to print it out, but we're happy to write it out if that

5     would be helpful.

6          THE COURT:  Thank you.  If you would, please do.  Or

7     if you could tell me again and I will type it as you say it.

8          MS. LONERGAN:  Whatever the Court prefers.

9          THE COURT:  Do you have a hard copy, and hand it

10    forward?

11         MS. LONERGAN:  I could handwrite it and hand it

12    forward.

13         THE COURT:  Counsel for each of the defendants, as

14    counsel is doing that, could I ask you what your view is

15    regarding the proposed language offered by the United States.

16         MS. NECHELES:  Your Honor, I think this is exactly

17    what the Supreme Court said that is impossible for jurors to

18    do.  So I object to this whole process.  I think that the

19    Supreme Court very clearly said that when a defendant's name is

20    in the statement that this is impossible for all the jurors to

21    put that out of mind.  This is not a false exculpatory that

22    they are putting in, it's statements that clearly inculpates

23    him.  So I think that this instruction is impossible, and I

24    will have to be cross-examining this witness on what else was

25    said and what really was said here.

IB6TGRA4

1      So for you to be saying to the jury you can't consider

2  it for any purpose, but at the same time I have to treat the

3  reality, which of course it's coming in, they're going to be

4  hearing that he said that something was improper with

5  Mr. Reichberg, I think that --

6          THE COURT:  I'm sorry, what are you referring to?  You

7  may be referring to a different set of comments than I believe

8  we're talking about.

9          MS. NECHELES:  Talking about the Massey.

10         THE COURT:  What's the improper statement?  You opened

11 on their friendship.  Statements one and two relate to their

12 friendship.  What's improper about that?

13         MS. NECHELES:  I'm not so worried about those, they're

14 cumulative.

15         THE COURT:  Counsel, those are the only two in which

16 his name is used.

17         MS. NECHELES:  No, the final statement also says --

18 his name is explicitly used, and there's four statements that

19 they are putting in.  On the fourth his name is also used, and

20 he says that -- according to him he says that Mr. Grant said

21 that he is aware if he accepted anything of value from

22 Reichberg without paying for it he would be in serious trouble

23 with the NYPD.

24         THE COURT:  Thank you very much.

25         MS. NECHELES:  And in saying that, he is saying that

IB6TGRA4

1    Mr. Grant said it was improper to accept things of value from

2    Mr. Reichberg.  And that is obviously at the heart of this case

3    and inculpatory and facially inculpatory.  So I will have to

4    cross-examine on this.

5         THE COURT:  Thank you.  I will, again, provide you

6    with a further analysis of that statement, but I do want to use

7    the jury's time efficiently.

8         Counsel for Mr. Reichberg, I take it that you don't

9    want to provide additional comments regarding the scope of the

10   limiting instruction.  I ruled on the issue, so the question

11   now is whether you want to rest on the argument that this is

12   clearly inculpatory and accord to the government's case, or if

13   you would like to participate in the process by suggesting

14   limiting instructions that may be more valuable.

15        So do I take it that you don't want to engage at all

16   in the process of framing a limiting instruction?

17        MS. NECHELES:  I think the government has been saying

18   that you cannot consider this at all with respect to

19   Mr. Reichberg, and that is the correct statement of the law,

20   although the Supreme Court said that's impossible for jurors to

21   do, but I guess that's the best that we can do since we're

22   allowing it in.

23        THE COURT:  Thank you.

24        MS. LONERGAN:  I also want to note we moved on four

25   statements and we were going to restrict what we did to those

IB6TGRA4

1    four statements.  To extent that defense counsel wants to cross

2    the witness on the entirety of the interview, we think it will

3    look like we are not being entirely truthful with the jury if

4    we don't elicit the entirety of the interview.  We were not

5    intending to, but if it's going to come in on cross we think

6    that we should be able to put in the entirety of the interview

7    on direct.  Again, I don't think that there's -- the statements

8    that we have -- we don't think there's any issues with respect

9    to any of the statements.  We're also happy to contain

10   ourselves with the four statements we briefed if we are not

11   going to go outside the scope of that on cross.

12          THE COURT:  Thank you.  I'm not going to comment on

13   the scope of the cross at this time, nor am I going to endorse

14   the government going beyond the scope of these four statements.

15   You will have the opportunity on redirect if you would like to

16   raise any additional issues.

17          The proposal here is, quote, "The evidence you just

18   heard about Grant's statements to Agent Massey may only be

19   considered by you as against defendant Grant.  It may not be

20   considered by you for any purpose against defendant Reichberg."

21          Counsel for defendants, is there any additional

22   language that you would like to propose that I add to this in

23   order to provide as clear a limiting instruction as I can in

24   this context?  Counsel for Mr. Reichberg?

25          MS. NECHELES:  No, your Honor.

IB6TGRA4

1        THE COURT:  Thank you.  Counsel for Mr. Grant?

2        MR. MERINGOLO:  No, your Honor.

3        THE COURT:  So let's begin.  I will administer this

4   statement and I will comment further on the Bruton evidence.

5        Counsel, we'll have a further conversation about this,

6   but I really do want to be more mindful of the jury's time

7   going forward, and we'll have to figure out a way to focus

8   ourselves during these breaks to make sure that we are as

9   efficient as possible.  I may ask you to come in earlier in the

10   mornings because the parties have a number of issues that they

11   want to entertain.

12        Good.  Is there anything else that we should take up

13   now before we bring back in the jury?

14        MR. BELL:  One moment, your Honor.

15        (Pause)

16        MS. LONERGAN:  Your Honor, I really don't want to

17   waste any more of the jury's time, but with respect to Agent

18   Massey, given the representations made by defense counsel, we

19   need to elicit the entirety of the interview otherwise it will

20   severely prejudice the government because it will look like we

21   are being less than fully candid with this witness.  And we do

22   not think that -- the interview is fairly short.  We do not

23   think that any statements raised raise any additional Bruton

24   concerns.  And if the Court is going to preclude us from doing

25   so, we just need to understand the basis for the Court's

IB6TGRA4

1   ruling.

2           THE COURT:  Thank you.  What's the basis for it to

3   come in at the outset, counsel?

4           MS. LONERGAN:  Your Honor, it's statements from the

5   defendant, so it's not the hearsay issue.  With respect to --

6   so those would be the reasons initially is they're all

7   statements from the defendant, so they come in on that ground.

8           And they're relevant, your Honor, because it's an

9   entire interview with the defendant.  We thought that we could

10  cut it to bring it to the most critical portion of that

11  interview, but again, we do not want this witness or the

12  government's presentation of evidence to look like we are being

13  less than fully candid with what happened in that interview.

14  And we are concerned by limiting our presentation on direct but

15  not similarly limiting cross-examination, that is exactly the

16  impression that will be formed in the jury.

17          THE COURT:  Thank you.  Counsel, can I say one thing

18  to the United States:  The fact that we are wasting the jury's

19  time right now is a consequence of your representation to the

20  Court and to the defendants at a prior conference where you

21  said that you would bring in no statements by co-defendants in

22  this case.  That was the representation made by the United

23  States.  It was very clear.  There is no reason for us to be

24  talking about this issue while the jury is in the jury room.

25  The reason why this is happening is because of that

representation by the United States, to be very clear.

So with respect to limitations on this testimony,
please understand that I have declined to take up the
procedural issue raised by defendants, namely the request that
I bar this testimony entirely as a result of the government's
profound failure to identify this issue earlier, and indeed,
the government's choice to make a representation to the Court
and the defendants that appears not to be fully correct.  The
government asserted to the Court and to the defendants that no
co-defendant statements would come in in this case.  That is
why I did not consider Bruton issues months ago in connection
with the early round of motions.

So I understand the government's consternation about
the difficulty that they do not know exactly what is going to
happen with respect to these issues at this time.  Frankly, at
the same time, that is why these issues are briefed and raised
earlier and why the Court and the defendants rely on the
government to provide truthful and complete statements
regarding their expectations regarding co-defendant statements
at the time.

So I apologize that this is not quite so orderly as it
might have been, but unfortunately, from my perspective, much
of this grows from the representation that Ms. Necheles quoted
from the earlier conference regarding the absence of
co-defendant statements in this case.

IB6TGRA4

|  | |
|---|---|
| 1 | MS. LONERGAN:  Your Honor, the question that the Court |
| 2 | posed that led to the government's answer at that conference |
| 3 | was whether there were going to be any post-arrest statements |
| 4 | by the defendants, which this is not. |
| 5 | And we produced -- |
| 6 | THE COURT:  Counsel, this is in the context of a |
| 7 | specific discussion about Bruton.  That was the context of the |
| 8 | defendant's motion for severance, not just post-arrest |
| 9 | statements, as I recall it.  I don't remember the defendants |
| 10 | asking to sever the trial because of the prospect of |
| 11 | post-arrest statements alone.  In any event, it's unfortunate |
| 12 | that we're doing this now. |
| 13 | Counsel for defendants, what is the -- is there any |
| 14 | concern regarding having the United States bring this |
| 15 | information out on direct examination rather than on redirect |
| 16 | following your cross? |
| 17 | MS. NECHELES:  Yes, your Honor, it's the same Bruton |
| 18 | issue, now they want to make it more of a Bruton issue.  The |
| 19 | only thing that I will be cross-examining -- probably I will |
| 20 | only be eliciting a small part of the additional part that I |
| 21 | think is misleading to have left out. |
| 22 | And in addition, I will be attacking the idea that |
| 23 | this was even said by Mr. Grant, because I don't believe that |
| 24 | that's true.  So that would be my cross, it will not be really |
| 25 | bringing out the whole statement. |

IB6TGRA4

1             THE COURT:  Thank you.

2             Counsel for Mr. Grant?

3             MR. MERINGOLO:  We concur with Ms. Necheles.

4             THE COURT:  Thank you.

5             Counsel for the United States, I'm sorry, I'm going to

6     ask you to limit yourselves to the issues that you identified

7     earlier.  Let me guide you, counsel, to consider, please,

8     providing the Court and your adversaries with complete

9     information earlier in the process in order for the process to

10    be streamlined and effective.

11            To the extent that this is an issue that we might have

12    come to a different conclusion had you chosen to provide full

13    information to defendants and the Court in an earlier stage,

14    that is something that we cannot recreate at this point.

15            Unfortunately, I cannot evaluate at this point what

16    every other statement in the Massey declaration is.  I have

17    looked at the four.  I made a decision regarding the four, and

18    I'm not prepared now to make a decision that everything else in

19    that statement is not problematic, which is what I think you're

20    asking me to do by asking me to endorse the introduction of

21    that entire statement at this point.

22            MS. LONERGAN:  Your Honor, we understand.  We will

23    abide by the Court's ruling.  We will endeavor, as the Court

24    said, to raise all the issues as expediently as possible so the

25    issues don't come up again.

IB6TGRA4

1          So with the Court's indulgence, I will need 30 seconds

2    to speak to the witness before we put him on the witness stand

3    just to make sure that he does not on direct examination go

4    outside the bounds of the Court's ruling.  Or we can call him

5    later in the order, whichever the Court would prefer.

6          THE COURT:  Thank you.  Let's begin.  Counsel, I'm

7    ready to bring in the jury.  Are you all prepared?

8          MR. BELL:  We are prepared, your Honor, I will note

9    that we handed your Honor a proposed curative instruction,

10   which I also shared with the defense.

11         THE COURT:  Good.  I will take a look at this.  I have

12   the proposed limiting instruction regarding "friendship."

13         MS. NECHELES:  I am actually inviting a slightly

14   different one.  They got it to me in the break as well.

15         I know your Honor doesn't want to take this up now,

16   but perhaps we could talk about the lunch break, which is very

17   difficult on the lawyers because I know we have very little

18   time.

19         THE COURT:  It would be easy if everything was done in

20   advance.  That's not happening here, and I need to corral the

21   parties.  That's something that I will take on going forward.

22         Anything else, Mr. Grant?

23         MR. MERINGOLO:  No.

24         THE COURT:  Thank you.  Let's proceed.

25         (Jury present)

1          THE COURT:  Thank you very much, ladies and gentlemen,

2    for coming back just after that break, and I will try to keep

3    them a little shorter going forward.  So thank you for your

4    patience.

5          Counsel for the United States, I would like to ask you

6    to please call your next witness.

7          MR. BELL:  Thank you, your Honor, the government calls

8    FBI Supervisory Special Agent Tim Chapel.

9          THE COURT:  Thank you.

10    TIMOTHY CHAPEL,

11         called as a witness by the Government,

12         having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MR. BELL:

15    Q.  Good afternoon, Special Agent Chapel.

16         Where do you work?

17    A.  Federal Bureau of Investigation.

18    Q.  How long have you been with the FBI?

19    A.  Approximately nine years.

20    Q.  What's your current job there?

21    A.  Supervisory special agent down in FBI headquarters.

22    Q.  And what do you do as a supervisory special agent at FBI

23    headquarters now?

24    A.  Currently assigned to weapons of mass destruction

25    directory, nuclear and radiological weapons.

1    Q.  How long have you had that job?

2    A.  Approximately 16 months.

3    Q.  Prior to your work as a supervisory special agent involved

4    with that subject matter, what did you do with the FBI?

5    A.  I was assigned to health care fraud in the New York field

6    office and white collar crimes unit.

7    Q.  What was your title at the time?

8    A.  Special agent.

9    Q.  What were your duties and responsibilities as a special

10   agent?

11   A.  I was responsible for investigating health care fraud,

12   crimes relating to Medicaid, Medicare, and doctors, pills,

13   stuff, anything associated with health care.

14   Q.  As a special agent with the New York field office, did you

15   participate in arrests?

16   A.  I did.

17   Q.  Did you also participate in the execution of authorized

18   searches?

19   A.  I did.

20   Q.  So I want to direct your attention to the morning of

21   June 20 of 2016.  Do you remember participating in a law

22   enforcement operation that day?

23   A.  I do.

24   Q.  And what was the nature of that operation?

25   A.  I was assigned to assist in the arrest of Jeremy Reichberg

1   and the search at his residence after the arrest.

2   Q.  You mentioned that this was supposed to happen at

3   Mr. Reichberg's residence.  Where generally was the residence

4   located?

5   A.  56th Street in Brooklyn.

6   Q.  Now about how many FBI agents were involved in this law

7   enforcement operation?

8   A.  There's approximately six for the arrest and then

9   approximately another 10 to 15 for the actual search of the

10  residence.

11  Q.  What did you understand your particular role to be that

12  morning, sir?

13  A.  My morning was I would be one of the agents assisting the

14  arrest team to go up to front door and make contact with

15  Mr. Reichberg, take him into custody, and then I would search

16  the residence for a protective sweep before the rest of the

17  agents came in to execute the search warrant.

18  Q.  What time did the operation begin?

19  A.  Approximately 6:00 a.m.

20  Q.  Why did it begin so early?

21  A.  Typically FBI federal law enforcement do that time for our

22  safety.  We typically catch people asleep.  It's not a

23  nighttime operation.  It also makes it easier for court process

24  as well.

25  Q.  Now directing your attention to that morning, what

1   happened, Special Agent Chapel, as you approached

2   Mr. Reichberg's home on 56th Street?

3   A.  As we approached the front door, the door opened, and

4   Mr. Reichberg greeted us at the front door fully dressed in his

5   clothing.  Just greeted us right at the front door, opened it

6   as soon as we kind of stepped on the front steps.

7   Q.  Were you surprised or concerned by this at all?

8              MS. NECHELES:  Objection.

9              THE COURT:  Thank you.  You can proceed.

10  A.  I was surprised.  Typically when we're coming up to a front

11  door at 6:00 a.m. we're not greeted by the subject that we're

12  going to arrest.

13  Q.  And what was Mr. Reichberg's demeanor upon your meeting him

14  at the door?

15             MS. NECHELES:  Objection.

16             THE COURT:  You can answer the question.

17  A.  He was not surprised.  I think I was more surprised than he

18  was.  He had a look that he was expecting us; wasn't surprised

19  to see the FBI many coming to his residence at 6:00 a.m.

20  Q.  You mentioned Mr. Reichberg was fully dressed.  Do you

21  recall how he was dressed?

22  A.  He was dressed in I would say his cultural clothing, full

23  jacket, ready to go outside for the day.

24  Q.  So what happened after you encountered Mr. Reichberg at the

25  door?

1    A.   Once he was taken into custody without incident, we

2    proceeded to go inside the residence and make a protective

3    sweep of the residence to make sure that other people in there

4    aren't there to -- they're aware that we're there and they're

5    not going to hurt us.

6    Q.   You mentioned something called a protective sweep.   What

7    does that involve?

8    A.   Basically going room to room, clearing each room to make

9    sure that no one is there; if they're asleep, they're not lying

10   in wait for us so that they won't surprise us so we can do our

11   job function that day.

12   Q.   Did you enter the house in order to do so?

13   A.   I did.

14   Q.   How would you describe the house?

15   A.   It was a large residence, multilevel.

16   Q.   You described the house as being multilevel.   Was there an

17   upstairs?

18   A.   There was.

19   Q.   Was there a basement?

20   A.   There was.

21   Q.   So what did you do once you entered the home as part of

22   that protective sweep?

23   A.   My responsibility was I cleared rooms on the first floor

24   and then proceeded up to the second floor living area.

25   Q.   When you got up to the second floor living area, where did

1   you go and what did you do?

2   A.  I went to a couple of different bedrooms, came in contact

3   with two gentleman who were asleep at the time, announced

4   myself and other agents, identified ourselves as law

5   enforcement, FBI, we were also wearing coats, advised them that

6   we're here, they need to wake up and get dressed and come

7   downstairs, we had a search warrant for the residence.

8   Q.  At the time that you met these two individuals -- perhaps

9   it makes sense to take them one at a time, but were they

10  dressed?

11  A.  They were not.

12  Q.  Now after you informed these gentlemen of your presence,

13  the reason for that presence, what did you do?

14  A.  Did a quick search of the room to make sure there was no

15  weapons that they had access to, allowed them to get dressed

16  within the rooms, and advised them to come downstairs.

17  Q.  What did you do after you concluded the part of protective

18  sweep that involved the second floor living area?

19  A.  I then proceeded downstairs to the main living area,

20  kitchen area, dining room of the residence.

21  Q.  Was there a time when you saw the two individuals whom you

22  had seen upstairs again?

23  A.  Yes.

24  Q.  About how far into the search would you say this was?

25  A.  Approximately 30 to 40 minutes after I entered the

1   residence.

2   Q.  And can you tell us under what circumstances you saw each

3   of these individuals, and where you were?

4   A.  I was in a separate room a little distance away from the

5   front entryway, I saw the older gentleman, I equate to a

6   potential grandfather, something, fully dressed, come down and

7   exit the residents.  There was other agents there that didn't

8   stop him.  I tried to get to him, knowing -- stop him and

9   search him before he was able to exit.  By the time I got to

10  the front of the house he had gone around the corner and I

11  didn't see him.

12  Q.  What would the purpose of stopping and searching the

13  individual have been?

14  A.  To make sure they're not taking anything related to the

15  search warrant or any contraband out from the residence that

16  they're not supposed to have.

17  Q.  How about the second individual?

18  A.  A short time after the subject came down the stairs and I

19  stopped him at the entryway and explained I needed to search

20  him before he could exit the residence.

21  Q.  You mentioned the first individual down the stairs was an

22  older, potentially grandfatherly gentleman.  How old did the

23  second gentleman appear to be?

24  A.  I would say he was in his mid-30s.

25  Q.  And how was he dressed when he came down the steps?

1    A.  He was dressed in his full cultural clothing, heavy jacket,

2    vest, hat, multiple layers of clothing.

3    Q.  Did you have an interaction with the second individual?

4    A.  I did.

5    Q.  And how did that interaction begin?

6    A.  I asked him if he had anything on him that related to the

7    search warrant, any items on him that I needed to know about.

8    He understood that I needed to search him but he didn't confirm

9    or deny that.  I then asked him more questions:

10               Do you have anything on you that I need to know about?

11               And he stated:  Just stuff.

12   Q.  How was his demeanor as you were engaging in this

13   interaction?

14   A.  He was extremely nervous.

15   Q.  How you could tell he was nervous?

16   A.  He was fidgety.  He started to put his hands in his

17   pockets.  I advised him to keep his hands out of his pockets,

18   not knowing what was in his pockets.

19               I continued question him:  What is on you?  What is on

20   your person?  He wouldn't answer me.

21               MS. NECHELES:  Objection, your Honor.

22               THE COURT:  Thank you.  You can continue.

23   Q.  Go ahead, sir.

24   A.  Continued to be fidgety, continued to put his hands in his

25   pockets when I asked him multiple times to take them out.

1    Q.  What happened then?

2    A.  For my officer safety and officer safety I didn't know what

3    was in his pockets, so I asked him to take his hands out of his

4    pockets and put them on top of his head.  I then conducted a

5    pat of his outer clothing to see what he was digging for in his

6    pocket.

7    Q.  Did the pat that you performed on the younger gentlemen's

8    exterior reveal anything?

9    A.  It did.

10   Q.  What did you find?

11   A.  I felt a large bulge in his pocket.  As I went in to

12   retrieve the item, I retrieved multiple items of business

13   cards, cell phones.  As I continued to go through, after

14   finding more things I found more items such as thumb drives,

15   CDs, more cell phones, documents, papers.

16   Q.  Did you have a discussion with the individual concerning

17   these items?

18   A.  I did.

19   Q.  What, if anything, did you ask him and what did he tell

20   you?

21   A.  I asked him --

22            MS. NECHELES:  Objection to hearsay.

23            THE COURT:  Thank you.  Sustained.

24            MR. BELL:  Your Honor, co-conspirator statements.

25            THE COURT:  Thank you.  Could you come up?

1              (At sidebar)

2              MS. NECHELES:  Your Honor, this is hearsay.  Now

3     they're saying it's a co-conspirator statement, but your Honor

4     instructed the government to give a list of co-conspirators and

5     this person is not on the list of co-conspirators.

6              THE COURT:  Thank you.  I have the bill of particulars

7     here.

8              MR. BELL:  Your Honor, you asked us to give a bill of

9     particulars with respect to the bribery and honest services

10    offenses, of which this does not relate.

11             I also say, in the alternative, this comes in as a

12    statement against penal interest.

13             MS. NECHELES:  I don't believe that's true.  It's a

14    false exculpatory statement, that's not a statement against

15    penal interest.  And in any case, it's an answer to police

16    interrogation and raises Crawford issues.

17             MR. BELL:  It's not a false exculpatory statement,

18    it's an inculpatory statement.  He says he has taken the things

19    because his brother him told him to.  At this point he's been

20    surrounded by the FBI, he's visibly nervous as a result of

21    that, which further undercuts the false exculpatory rationale.

22             MS. NECHELES:  They're calling this witness, let them

23    elicit from the witness what he said.

24             THE COURT:  Thank you.  I will sustain the objection

25    at this point.

IB6TGRA4                    Chapel - Direct

1          Counsel, a couple of questions, you say he's a

2     co-conspirator.  What is the basis for that?

3          MR. BELL:  The proffer I'm going to offer is that the

4     individual is Moshe Reichberg, Jeremy Reichberg's brother.  He

5     had been given these items hours earlier and told to hold them

6     by a nervous Jeremy Reichberg.  Jeremy Reichberg is then

7     arrested, the brother is aware that the FBI is there, and

8     there's an understanding at this point of why he has to take

9     these out, because they are here to search the place, which Tim

10    Chapel told them they're there to do.

11         MS. NECHELES:  And I also note it can't be in

12    furtherance of a conspiracy because he's already been caught.

13         THE COURT:  Thank you.

14         MR. BELL:  At bottom, your Honor, we're not offering

15    this for the truth, so is it's not a hearsay statement in any

16    event.

17         THE COURT:  What's the specific statement and why is

18    it not being offered for the truth?

19         MR. BELL:  One moment, please.

20         (Pause)

21         MR. BELL:  Fine, we won't do it, your Honor.

22         THE COURT:  Thank you.  Objection sustained.

23         (Continued on next page)

24

25

1          (In open court)

2              MR. BELL:  I may proceed, your Honor?

3              THE COURT:  Thank you.  Sorry for interrupting.

4      Please do.

5              MR. BELL:  Thank you very much.

6      BY MR. BELL:

7      Q.  Special Agent Chapel, without giving me an answer to this

8      question, what question, if any, did you ask Mr. -- the

9      individual there about the providence the origins of these

10     items?

11     A.  I asked him who they belonged to.

12     Q.  And without giving me an answer to that question, did

13     Mr. -- did the individual -- well, what was his demeanor when

14     you asked him?

15     A.  He was a little nervous, still very nervous about the

16     questioning.

17     Q.  Was there a point at which the individual identified

18     himself to you?

19     A.  Yes.

20     Q.  Who did he identify himself as?

21     A.  Moshe Reichberg.

22     Q.  Was there a point at which he identified his relationship

23     to Jeremy Reichberg?

24     A.  Yes.

25     Q.  How did he identify himself?

1    A.  He stated he was his brother.

2              MR. BELL:  One moment, please.

3              THE COURT:  Thank you, please take your time.

4    Q.  Now you mentioned that you recovered from Moshe Reichberg's

5    person a number of items.  Were these items all in one place on

6    his person or in several different places?

7    A.  Multiple pockets on his person.

8    Q.  You mentioned that you recovered business cards, electronic

9    devices and DVDs?

10   A.  Yes, sir.

11   Q.  What did you do with those various business cards, devices

12   and DVDs?

13   A.  They were collected for evidence.

14   Q.  So what I would like to do is show you a number of physical

15   exhibits, which I will hand up to you in a number of rounds.

16             What I would like to do first is bring you what's been

17   marked for identification as Government Exhibit 501 through

18   504, 533, and 1619A and 1620A.

19             May I approach, your Honor?

20             THE COURT:  Please do.

21             MR. BELL:  Thank you.

22   Q.  Mr. Chapel, are you familiar with these items?

23   A.  I am.

24   Q.  Have you gotten to review and look over these items prior

25   to your testimony today?

1    A.  Yes, I have.

2    Q.  How did you originally become familiar with these items?

3    A.  These are the items that were taken off of Moshe

4    Reichberg's person.

5    Q.  So what I would like to do, Special Agent Chapel, if you

6    will indulge me, as to each of 501, 502, 503, 504 and 533, is

7    it your testimony that each of those was a device removed from

8    the person of Moshe Reichberg by you?

9    A.  Yes, sir, it is.

10   Q.  I would now like to direct your attention to Government

11   Exhibits 1619A and 1620A.

12   A.  Yes, sir.

13   Q.  Special Agent Chapel, as to Government Exhibit 1619A and

14   1620A, are these also electronic devices recovered from

15   Mr. Reichberg's person by you?

16   A.  Yes, they were.

17   Q.  I now want to direct your attention to Government

18   Exhibit 1615A.  I will ask you to open this, please.

19            MR. BELL:  I will note for the record, with the

20   Court's permission, that Special Agent Chapel has opened the

21   labeled Redweld, which is the exhibit, and has removed a number

22   of discrete, what appear to be business cards.

23   Q.  Is it correct that those are business cards, Special Agent

24   Chapel?

25   A.  Yes, sir, they are.

1   Q.  And are these business cards that you yourself bagged

2   together?

3   A.  Yes, sir.

4   Q.  Have you gotten the opportunity to review those cards prior

5   to your testimony today?

6   A.  Yes, sir.

7   Q.  Are those business cards that you removed from the person

8   of Moshe Reichberg on the day of the Jeremy Reichberg arrest?

9   A.  Yes, sir, they are.

10          MR. BELL:  Your Honor, the government offers 1615A.

11          THE COURT:  Counsel?

12          MS. NECHELES:  I just haven't seen this, so I could

13   see it?  We did not get a copy of this.

14          THE COURT:  Thank you.  You can come up and look at

15   it.

16          MS. NECHELES:  We're fine.

17          THE COURT:  Counsel for Mr. Grant, any objection?

18          MR. MERINGOLO:  No objection.

19          THE COURT:  I am accepting Government Exhibit 1615A

20   into evidence, you can proceed.

21          (Government's Exhibit 1615A received in evidence)

22          MR. BELL:  Your Honor, Mr. Hamilton, our paralegal

23   specialist, could you put on the witness's screen 1615.

24          1615 is pictures of the various discrete business

25   cards which I think will come in without objection.

1              MS. NECHELES:  That's correct, your Honor, no

2      objection.

3              THE COURT:  Thank you.  Counsel for Mr. Grant?

4              MR. MERINGOLO:  No objection.

5              THE COURT:  Thank you I'm accepting into evidence

6      Government Exhibits 1615.

7              (Government's Exhibit 1615 received in evidence)

8      BY MR. BELL:

9      Q.  As a general matter, Special Agent Chapel, how would you

10     describe this composition of this stack of business cards based

11     on your prior review?  In other words, what kind of business

12     cards are these generally?

13     A.  These appear to be higher ups, command staff business

14     cards, multiple different names, different agencies, but higher

15     up; not a parole officer, much more supervisory business cards.

16     Q.  When you say from different agencies, what kind of agencies

17     are you talking about?

18     A.  New York City Police Department Westchester, some Floral

19     Park, multiple agencies and different types of business cards.

20     Q.  Now amongst the business cards that you have in front of

21     you, are there two that, rather than being made of paper,

22     appear to be made of metal?

23     A.  There are.

24             MR. BELL:  And so your Honor, with the Court's

25     permission, I would like to publish these by passing around to

1    the jury only two of the stack.

2                THE COURT:  Thank you.  You may proceed.

3                MR. BELL:  May I approach?

4                THE COURT:  You may.

5                MR. BELL:  I would ask that you pass these around

6    together so everyone could see them.  Thank you.

7                And we can display those two on the screen as pages 2

8    and 4 of Exhibit 1615.  Is there a way that we can split screen

9    those or do them individually?

10                Just to note what's on the screen, page 4 of

11   Exhibit 1615 is on the right, it states:  Family member, Police

12   Department, City of New York, Jeremy Reichberg.  The bearer of

13   this card is an immediate family member of a police officer of

14   the New York City Police Department.  Chief Philip Banks, III.

15                The one on the right, page 2 of that exhibit, says the

16   same thing but with respect to Rachel Reichberg.

17                Now Mr. Hamilton, could we direct everyone's attention

18   to page 1 of 1615.

19   BY MR. BELL:

20   Q.  Special Agent Chapel, can you just read off the name and

21   title of the individual listed on this business card?

22   A.  Michael J. Harrington, Deputy Chief.

23   Q.  And is there a second line to the title?

24   A.  Executive Officer, Chief of Department.

25   Q.  Thank you.

1                   MR. BELL:  Mr. Hamilton, could you now take us to page

2       3.

3       Q.  And can you read once again the name and title and the

4       extended title of the person on this card?

5       A.  Philip Banks, III, Chief, Chief of Department, New York

6       City Police Department.

7       Q.  And could we go to page 6.

8                   What is the name and title of the person listed on

9       this card?

10      A.  James Grant, Deputy Inspector Commanding Officer.

11      Q.  And in the bottom left corner there's information

12      concerning that post.  What does it say as far as the precinct

13      goes?

14      A.  19th Precinct.

15      Q.  Special Agent Chapel, after you retrieved these items from

16      Jeremy Reichberg's brother Moshe, did you continue on with the

17      operation?

18      A.  I did.

19      Q.  What other things did you do that day?

20      A.  I continued to assist in the search of rooms of the

21      residence.

22      Q.  Did you recover other items from the house?

23      A.  I did.

24      Q.  And did those other items include other business cards?

25      A.  They did.

1    Q.  So I would like to do --

2            MR. BELL:  First, may I approach, your Honor?

3            THE COURT:  You may.

4    Q.  I would like to show you Government Exhibit 1616A which

5    corresponds with 1616, I believe.

6            MR. BELL:  I will note, your Honor, Special Agent

7    Chapel is putting the previous evidence back in the bag,

8    including the two gold cards which have been retrieved from the

9    jury.

10           THE COURT:  Thank you.  So noted.

11   Q.  I will now ask you to take a look at 1616A.

12           What do we have in 1616A, Special Agent Chapel?

13   A.  More business cards, documents associated with

14   Mr. Reichberg.

15   Q.  Are these also items that you recovered from

16   Mr. Reichberg's house?

17   A.  Yes, they are.

18           MR. BELL:  I now would like to approach you with what

19   is marked for identification as Government Exhibit 1618A.

20           I will also ask, your Honor, the government would

21   offer 1618 without the A, which, like the previous exhibit, is

22   just the actual photographic rendering of the physical

23   evidence.

24           MS. NECHELES:  I think there's some confusion about

25   the exhibits, perhaps if you could show --

1           MR. MERINGOLO:  Is that the exhibit with the business

2     cards?

3           MR. BELL:  Your Honor, the government also offers

4     1616A, which is photos of 1616, I assume without objection.

5           THE COURT:  Thank you.  The government is offering

6     1616 and 1618.  Any objection by the defense?

7           MR. MERINGOLO:  No objection.

8           MR. BELL:  And the physical exhibits themselves.

9           MS. NECHELES:  I ask that we string this out, because

10    what we have marked is not being introduced in evidence.  So I

11    don't have an objection, but I don't know what is being

12    introduced.

13          THE COURT:  Thank you.  Please show Ms. Necheles.

14          MS. NECHELES:  He did, but if we could get a copy of

15    the actual items.  I'm concerned about the logistics of what is

16    going on.  I don't have actual --

17          THE COURT:  Thank you.  I will accept at this time

18    Exhibit 1616A and 1618A as well 1616 and 1618, I understand

19    without objection.

20          Counsel for United States, please provide the defense

21    with hard copies of each of those exhibits as you proceed.

22          MR. BELL:  Yes, your Honor.

23          THE COURT:  Thank you.

24          (Government's Exhibits 1616, 1616A, 1618 and 1618A

25    received in evidence)

1   BY MR. BELL:

2   Q.  Now finally, Special Agent Chapel, other than your

3   involvement in Reichberg's arrest and the search of the house,

4   were you otherwise involved in the investigation of Jeremy

5   Reichberg?

6   A.  I was not.

7            MR. BELL:  Thank you, Special Agent Chapel, I have no

8   further questions for you.

9            THE COURT:  Thank you very much.

10           Counsel for Mr. Reichberg.

11           MS. NECHELES:  Thank you, your Honor.  Perhaps if I

12   could get those exhibits.

13           MR. BELL:  Do you want them all, Ms. Necheles?

14           MS. NECHELES:  Yes, please.

15           THE COURT:  Thank you, counsel, you can proceed.

16   CROSS-EXAMINATION

17   BY MS. NECHELES:

18   Q.  So sir, on June 20, 2016, you were involved in the arrest

19   of Mr. Reichberg and the search of his home, is that correct?

20   That was your testimony?

21   A.  Yes, ma'am.

22   Q.  And before you went to the house you learned something

23   about this case, right?

24   A.  Yes, ma'am.

25   Q.  It was already -- it was a very high profile case at the

1   time?

2   A.  Yes, ma'am.

3   Q.  It had been in the newspapers a lot.

4   A.  Yes, ma'am.

5   Q.  There had been a lot of leaks about the investigation.

6           MR. BELL:  Objection.

7           THE COURT:  Thank you.

8           MS. NECHELES:  Withdrawn.  I will rephrase that

9   question.

10          THE COURT:  Please do.

11  Q.  There had been front page articles continuously reporting

12  that the FBI and the United States Attorney's Office was

13  investigating this case, is that correct?

14          MR. BELL:  Objection.

15          THE COURT:  Thank you.  You can answer the question.

16  A.  Yes, ma'am.

17  Q.  And pictures of Jeremy Reichberg and Jona Rechnitz in the

18  front page of many newspapers repeatedly?

19  A.  I'm guessing, ma'am, I'm not familiar.

20  Q.  I don't want you to guess.  So beforehand, before you went

21  to the office or to the home of Mr. Reichberg, you were aware

22  that the government had used various techniques investigative

23  techniques, is that correct?

24          MR. BELL:  Objection.

25          THE COURT:  Thank you.  You can answer the question.

1    A.  No, ma'am.

2    Q.  You didn't know what they had done?

3    A.  No.

4    Q.  And when you got to the house it was 6 o'clock, and you

5    testified that Mr. Reichberg opened the door and he came

6    outside, right?

7    A.  Yes, ma'am.

8    Q.  And am I correct that he didn't look surprised, right?

9    A.  No, ma'am.

10   Q.  And he told you that there had been a car parked in front

11   of the house all night that he thought was the FBI, right?

12          MR. BELL:  Objection.

13          THE COURT:  Thank you.  You can answer the question.

14   A.  I didn't have that conversation.

15   Q.  Did he tell you that he expected to be arrested that

16   morning?

17          MR. BELL:  Objection, hearsay.

18          THE COURT:  Thank you, you can answer the question.

19   A.  I do not know, ma'am, I did not have a conversation with

20   him.

21   Q.  You were there arresting -- I thought you were right there

22   with him.

23   A.  I did not put the handcuffs on him, ma'am.

24   Q.  But I thought you were standing right with him and saw him

25   come out the door and saw him be surprised.

1          MR. BELL:  Objection.

2          THE COURT:  You can answer the question.

3   A.  Yes, ma'am, I was.

4   Q.  But you didn't hear what he said?

5   A.  No, ma'am.

6   Q.  Did you hear him say that he was asking the FBI -- that he

7   knew he would be arrested but was asking that you not go in the

8   house because he had three young children there?

9          MR. BELL:  Objection.

10         THE COURT:  You can answer the question.

11  A.  Yes, ma'am, I did hear something about children inside the

12  residence.

13  Q.  And he came out of the house so that his children would not

14  be terrified by all of these FBI agents coming inside to arrest

15  him?

16         MR. BELL:  Objection, hearsay.

17         THE COURT:  Thank you.  You can answer the question.

18  A.  I don't recall that, I just remember somebody stating

19  "children," yes, ma'am.

20  Q.  And in fact, when you did the search of the house, I

21  think -- what did you call it when you went around to secure

22  the perimeter or something like that, you said?

23         THE COURT:  Counsel, could you come up?

24         MR. BELL:  Thank you, your Honor.

25         (Continued on next page)

1           (At sidebar)

2           THE COURT:  Counsel, there's an objection regarding

3   hearsay on these issues, and I think the basis for the

4   objection is that these are statements by the defendant that

5   you are eliciting for purposes of your case.  What's your

6   comment?

7           MS. NECHELES:  The government wants to -- is going to

8   argue, wants to argue that he had some sort of inside

9   information.  That is the only reason they elicited it.  This

10  is to show what actually occurred and what he said at the time;

11  not for the truth of it, but this is his explanation at this

12  time.

13          MR. BELL:  This is plainly inadmissible, regardless of

14  what the purpose is.  They can get that in in some other way,

15  but this is plainly inadmissible, and I move to strike that

16  entire line of answers.  It doesn't come in under the rules.

17          THE COURT:  Thank you.

18          MS. NECHELES:  He states that he was surprised --

19          THE COURT:  Thank you.

20          MS. NECHELES:  -- and I'm trying to explain why.

21          THE COURT:  I understand.  There's been an argument

22  about why this witness's testimony regarding Mr. Reichberg's

23  statements are not hearsay.  There's not a strong argument or a

24  good argument on that point.  I may grant the United States

25  request to strike that testimony.

IB6TGRA4                      Chapel - Cross

1            MS. NECHELES:  Your Honor, the testimony that he was

2      saying -- all we were eliciting is when they were describing

3      how he looked, and it was part of the whole thing, he said he

4      looked surprised.  They also have to hear what he said.  You

5      can't have half the story.  He looked surprised or he didn't

6      look surprised.  They should not have elicited half of it.

7            MR. BELL:  There is the rule of completeness, if

8      that's what the defense --

9            THE COURT:  Thank you, I think I heard enough.  I will

10     sustain the government's objection.  I think it was properly

11     interposed.  I should not have let the evidence in, and I am

12     willing to instruct the jury to disregard the responses

13     regarding statements made by Mr. Reichberg to this agent.

14           MS. NECHELES:  I would ask that your Honor instruct

15     the jury that it's not admitted for the truth of it, but as

16     parts of his response at the time.  Beside your Honor, there's

17     not even any evidence in, so tell did you the truth, there's

18     nothing to strike.  He said he didn't hear anything.

19           THE COURT:  Thank you.  But for the comments about the

20     children.

21           MS. NECHELES:  I think he said he didn't hear that.

22           MR. BELL:  He said he heard that.

23           MS. NECHELES:  He said he heard something about it.

24           MR. BELL:  To the extent that he testified about that,

25     it is not properly admitted.

IB6TGRA4                      Chapel - Cross

1             THE COURT:  Thank you very much.  I agree with the

2    government on this.  And we'll have the opportunity to discuss

3    this further, but I believe that the government is right.

4             MR. BELL:  Thank you, your Honor.

5             (Continued on next page)

1            THE COURT:  Ms. Necheles, I'm sorry for interrupting

2    earlier.

3            Ladies and gentlemen of the jury, just one comment:

4    I've told you that from time to time, I may instruct you to

5    disregard pieces of evidence in the case.  I'm going to do that

6    for the first time here now.

7            Please disregard, and do not consider, any testimony

8    by the special agent regarding statements that you may have

9    heard in Mr. Reichberg's case during the interaction that was

10   the subject of questioning earlier.

11           Please proceed.

12           MS. NECHELES:  Thank you, your Honor.

13   BY MS. NECHELES:

14   Q.  So, sir, when you entered the house, you testified that you

15   did a preliminary search of the house to determine whether

16   there were people in the house, right?

17   A.  That's correct, ma'am.

18   Q.  And there were, in fact, three young children in the house,

19   right?

20   A.  Yes, ma'am.

21   Q.  And they were sleeping, right?

22   A.  Yes, ma'am.

23   Q.  Were they scared?

24   A.  No, ma'am.

25   Q.  No?

1              And, sir, you also found Moshe Reichberg sleeping,

2      also, right?

3      A.  Yes, ma'am.

4      Q.  And you woke him up?

5      A.  Right.

6      Q.  So, Mr. Reichberg, Mr. Jeremy Reichberg, had not had an

7      opportunity to speak to Mr. Moshe Reichberg that morning before

8      Mr. Moshe Reichberg woke up, right?

9      A.  Not that I'm aware.

10             MR. BELL:  Objection.

11             THE COURT:  Thank you.

12             I accept the answer.

13     BY MS. NECHELES:

14     Q.  When he came downstairs, Mr. Moshe Reichberg attempted to

15     leave the house with items in his pocket, right?

16     A.  That's correct, ma'am.

17     Q.  When you were sort of looking around the house, did you

18     notice there were a lot of photographs around?

19     A.  Not in the areas I was, ma'am.

20     Q.  Okay.  When he came down, and he had some things in his

21     house, you found a large amount of business cards, that's what

22     you testified; am I correct?

23     A.  Yes, ma'am.

24     Q.  And you were aware that -- and you yourself seized other

25     business cards from other areas of the house, right?

1    A.  Yes, ma'am.

2    Q.  And there was a lot of stuff seized that day, right?

3    A.  Yes, ma'am.

4    Q.  In the a lot of stuff, there were a lot of other business

5    cards of police officers seized, right?

6    A.  Yes, ma'am.

7    Q.  Including high-ranking police officers, right?

8    A.  Yes, ma'am.

9    Q.  And some of those police officer items were seized by you,

10   right?

11   A.  Yes, ma'am.

12   Q.  And those included business cards that were no different

13   from the type of business cards that you found on Mr. Moshe

14   Reichberg, right?  Police cards from high-ranking police

15   officers, right?

16   A.  Yes, ma'am.

17              MR. BELL:  Objection.

18              THE COURT:  Thank you.

19              You can answer the question.  I accept the answer.

20   BY MS. NECHELES:

21   Q.  In addition, you seized a lot of PBA cards, too; am I

22   correct?

23   A.  Yes, ma'am.

24   Q.  Just referring to item 1615-A, this was items that you

25   seized from Mr. Moshe Reichberg, right?  And those are the

1    business cards and very few PBA cards, right?

2    A.   Yes, ma'am.

3    Q.   The other items -- do you recall which is the one that you

4    seized from the closet?  Do you recall the number?

5    A.   Yes, ma'am.

6    Q.   You seized a bunch of business cards from the closet,

7    right?

8    A.   Yes, ma'am.

9    Q.   And then in addition, you seized some -- from Mr. Moshe

10   Reichberg, he had seven electronic devices on him, right?

11   A.   Yes, ma'am.

12   Q.   And he told you that some of those devices belonged to

13   himself and his wife, right?

14           MR. BELL:  Objection.

15           MS. NECHELES:  Withdrawn.

16           THE COURT:  Thank you.

17   BY MS. NECHELES:

18   Q.   Did you come to learn that some of the devices belonged to

19   Mr. Moshe Reichberg, to Mr. Reichberg's wife, Rachel Reichberg,

20   and his daughter, Hannah Reichberg?

21           MR. BELL:  Objection; foundation.

22           THE COURT:  Thank you.  Sustained.

23   Q.   Were you involved in this case after the search?

24   A.   No, ma'am.

25   Q.   Have you ever reviewed any of the evidence?

1    A.  No, ma'am.

2    Q.  Well, that day, when there was the search -- so you don't

3    know whose devices were on him, you have no idea, right?

4    A.  No, ma'am, I do not.

5    Q.  Do you know if any of those devices were very old devices?

6            MR. BELL:  Objection; foundation.

7            THE COURT:  Thank you.

8            You can answer the question if you know.

9            THE WITNESS:  As far as old as in flip phones?  Or --

10   they all appeared to be working phones.

11   BY MS. NECHELES:

12   Q.  Well, do you know -- how many devices were seized from the

13   house that day, do you know?

14           MR. BELL:  Objection; foundation.

15           THE COURT:  Thank you.

16           You can answer the question.

17           THE WITNESS:  I do not, ma'am.

18   Q.  Didn't you participate in taking part in sort of writing up

19   an inventory of what was seized?

20   A.  No, ma'am.

21   Q.  Did you see other people packing things up?

22   A.  Yes, ma'am.

23   Q.  And did you see other people packing up computers, and

24   other phones, and iPads, and laptops that were around the

25   house?  Right?

1   A.  There was a lot of items, but I can't testify to what other

2   people packed, ma'am.

3   Q.  A lot of items that Mr. Moshe Reichberg was not trying to

4   take out of the house, right?

5   A.  No, ma'am.

6   Q.  "No, ma'am," meaning, no, he was not trying to take them

7   how of the house, right?

8   A.  Correct.

9   Q.  Did you ever -- one of these items that you have here,

10  1618-A, has multiple -- in it multiple thumb drives and disks

11  in it, computer disks with computer storage, correct?

12  A.  Yes, ma'am.

13  Q.  And that was not being taken out of the house, right?  That

14  was just sitting in the house in a closet, right?

15  A.  I believe that was on his person, ma'am.

16  Q.  1618-A?

17  A.  Without seeing it, I can't...

18  Q.  Okay.  This was on him, but there were other CDs and drives

19  in the house, correct?  And computers?

20  A.  Not that I seized, ma'am.

21  Q.  But other people seized?

22  A.  If --

23  Q.  You said before, there were a lot of devices around?

24  A.  Yes, ma'am.

25  Q.  Do you know whether everything that was on the devices that

1    you seized from Mr. Reichberg was also on other devices that

2    were still in the house?

3              MR. BELL:  Objection.

4    Q.  Do you know?

5              THE COURT:  Thank you.

6              You can answer the question.

7              THE WITNESS:  I do not, ma'am.

8    BY MS. NECHELES:

9    Q.  And in preparation for your testimony here today, did the

10   government discuss that at all with you?

11             MR. BELL:  Objection.

12             THE COURT:  Thank you.

13             Sustained.

14   Q.  Well, did you ask what was in the house that was not -- you

15   know, different than what was on Mr. Moshe Reichberg?

16             MR. BELL:  Objection; relevance, scope.

17             THE COURT:  Thank you.  Sustained.

18   Q.  In the house, were you also aware that as things were being

19   put together and being taken, there were a lot of photos

20   around?  Were you aware of that?

21             MR. BELL:  Objection; asked and answered.

22             THE COURT:  Thank you.

23             You can answer the question.

24             THE WITNESS:  Family photographs, ma'am?  Or what type

25   of photographs?

IB6KGRA5                          Chapel - Cross

1   BY MS. NECHELES:

2   Q.  A lot of photographs of police officers, right?

3   A.  Yes, ma'am.

4   Q.  And they were all over the place, there were framed

5   photographs and books of photographs of police officers, right?

6   A.  I don't recall where they were.

7   Q.  Well, you recall there being framed ones and also photo

8   albums, right?

9   A.  I recall photo albums, yes, ma'am.

10  Q.  And Mr. Moshe Reichberg was not trying to take those out of

11  the house, right?

12  A.  No, ma'am.

13  Q.  Do you know whether those were printouts of what was on the

14  CD that he was taking out of the house?

15  A.  I have no idea, ma'am.

16  Q.  Among the things that you took out, the USB drives and the

17  other things, did you ever listen to them --

18  A.  No, ma'am.

19  Q.  -- and look at them?

20          Do you know whether they had any relevance to the

21  charges in this case?

22          MR. BELL:  Objection.

23          THE COURT:  Thank you.

24          Sustained.

25  Q.  Among the things that were in the house, there were dozens

IB6KGRA5

1    of PBA cards that you also seized, right?

2              MR. BELL:  Objection; asked and answered.

3              THE COURT:  Thank you.

4              You can answer the question.

5              THE WITNESS:  Yes, ma'am.

6              MS. NECHELES:  I have no further questions.

7              THE COURT:  Thank you very much.

8              Counsel for Mr. Grant?

9              MR. MERINGOLO:  No questions.

10             THE COURT:  Thank you very much.

11             Counsel for the United States, any further questions

12   for this witness?

13             MR. BELL:  One moment, please.

14             THE COURT:  Thank you.  Please take your time.

15             MR. BELL:  Your Honor, thank you.  No further

16   questions for Special Agent Chapel.

17             THE COURT:  Thank you very much.

18             Thank you very much, Special Agent, for your

19   testimony.  You can step down.

20             THE WITNESS:  Thank you, sir.

21             THE COURT:  Thank you.

22             Counsel for the United States, would you please call

23   your next witness.

24             MS. LONERGAN:  Your Honor, can we confer with defense

25   counsel for one moment?

1          THE COURT:  Yes, you may.

2          (Counsel confer)

3          MS. LONERGAN:  Your Honor, the government calls Police

4     Officer Theresa Haley.

5          THE COURT:  Thank you very much.  Please bring her

6     forward.

7      THERESA HALEY,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10          THE DEPUTY CLERK:  Can you please state your full name

11     for the record and spell your last name slowly?

12          THE WITNESS:  Theresa Haley, H-a-l-e-y.

13          THE DEPUTY CLERK:  Thank you.

14          THE COURT:  Thank you.

15          Counsel, you can inquire.

16          MS. LONERGAN:  Thank you very much, your Honor.

17     DIRECT EXAMINATION

18     BY MS. LONERGAN:

19     Q.  Good afternoon.

20     A.  Good afternoon.

21     Q.  Can you state your title for the record?

22     A.  Police officer.

23     Q.  Officer Haley, where do you work?

24     A.  Highway Patrol Unit 2.

25     Q.  Is that part of the New York City Police Department?

 1   A.  Yes.

 2   Q.  When did you join the NYPD?

 3   A.  July 1st, 2003.

 4   Q.  Did you have any training after joining the NYPD?

 5   A.  Yes.

 6   Q.  Where?

 7   A.  The police academy.

 8   Q.  How long were you at the police academy?

 9   A.  For about six months.

10   Q.  Briefly, what types of subjects did you cover at the

11   academy?

12   A.  Law, police science, and I don't remember what else.

13   Q.  Officer Haley, I think you said you were assigned to

14   highway unit 2; is that correct?

15   A.  Correct.

16   Q.  Can you explain what you mean by highway unit 2?

17   A.  Highway unit 2 covers a part of the highway in Brooklyn.

18   Q.  In brief, what are some of your duties and responsibilities

19   as a police officer who's a member of highway unit 2?

20   A.  To respond to 911 calls of car accidents, enforce the

21   Vehicle and Traffic Law, and keep the roadway clear.

22   Q.  When did you join highway?

23   A.  November of 2013.

24   Q.  Officer Haley, are you familiar with a term "on the job"?

25   A.  Yes.

1    Q.  What does that mean?

2    A.  It's like a cop reference to one another to let us know

3    that they are another cop.

4    Q.  Can you use the term both when you are on duty and when

5    you're off duty?

6    A.  Yes.

7    Q.  Officer Haley, did you review any documents in connection

8    with your testimony here today?

9    A.  No.

10   Q.  You didn't look at -- you weren't asked to look at any

11   documents?

12   A.  Today?  No.

13   Q.  Oh, sorry.  My question was confusing.

14        Before taking the stand here, in the past few weeks,

15   did you review any documents in connection with your testimony?

16   A.  Yes.

17   Q.  What, in general, did you review?

18   A.  The arrest report.

19   Q.  So I'd like to direct your attention to January 18, 2015.

20        Were you working that day?

21   A.  Yes.

22   Q.  Where were you assigned in January of 2015?

23   A.  Highway Patrol Unit 2.

24   Q.  Did you arrest someone on January 18, 2015?

25   A.  Yes.

IB6KGRA5                         Haley - Direct

1   Q.  Who did you arrest?

2   A.  I believe it was Avi Zangi.

3   Q.  Where did you arrest Zangi?

4   A.  On the Belt Parkway.

5   Q.  Why were you at that location?

6   A.  That was my patrol area, was the Belt Parkway, and there

7   was two vehicles on the side of the road.

8   Q.  When you saw the two vehicles on the side of the road, what

9   did you do?

10  A.  I approached them to see why were they positioned on the

11  side of the road.

12  Q.  What, if anything, did you do with the identification for

13  the drivers of the two vehicles?

14  A.  I did a license check.

15  Q.  What's a license check?

16  A.  It's when you type in their name or their client ID

17  driver's license number to see if they're valid to drive or

18  suspended.  You get like a history of their driver's license.

19  Q.  Why did you do that?

20  A.  Because they were involved in a motor vehicle accident.

21  Q.  What did you learn from doing that license check?

22  A.  That one of the operators of the motor vehicles was

23  suspended.

24  Q.  Which one?  Which operator?

25  A.  Avi Zangi.

IB6KGRA5                         Haley - Direct

1   Q.   What does it mean to be suspended?

2   A.   You can't drive in the State of New York.

3   Q.   Is that also termed a suspended license?

4   A.   Yes.

5   Q.   What did you do after learning that Zangi had a suspended

6   license?

7   A.   I placed him under arrest.

8   Q.   Were you required to place him under arrest for driving

9   with a suspended license?

10  A.   Yes.

11  Q.   Approximately what time did you place Zangi under arrest?

12  A.   I don't remember.

13  Q.   Is there something I could show you that might help you --

14  in which you've written down the time of his arrest?

15  A.   Yeah.  The omniform or the arrest report.

16           MS. LONERGAN:  One moment, your Honor?

17           THE COURT:  Please take your time.

18           (Pause)

19           MS. LONERGAN:  Your Honor, may I approach?

20           THE COURT:  You may.

21  BY MS. LONERGAN:

22  Q.   Officer Haley, I'm going to hand you a document that's been

23  marked as 3550-04 for identification.  I'm going to ask you to

24  turn to page 2.

25           What's the document that starts -- do you recognize

1   the document that's on page 2 of 3550-04?

2   A.   Yes.

3   Q.   What is it?

4   A.   It's the New York City Police Department omniform system

5   for arrests.

6   Q.   Is that in connection with the arrest of Avi Zangi?

7   A.   Yes.

8   Q.   Who completed that arrest report?

9   A.   I did.

10  Q.   At the time that you completed the arrest report, did you

11  have firsthand knowledge of the time of the arrest?

12  A.   Some of it.

13  Q.   Sorry, let me just be very clear.  At the time you

14  completed the arrest report, did you have firsthand knowledge

15  of the time that you placed Mr. Zangi under arrest?

16  A.   Yes.

17  Q.   Did you take care to complete that accurately?

18  A.   Yes.

19  Q.   Why?

20  A.   It's an official police document.

21          MS. LONERGAN:  Your Honor, we ask that Officer Haley

22  be permitted to read the time of the arrest from her arrest

23  report as her past recollection recorded.

24          THE COURT:  Thank you.

25          Counsel?

1          MR. MERINGOLO:  No objection.

2          MS. NECHELES:  No objection, your Honor.

3          THE COURT:  Thank you.

4          Please proceed.

5    BY MS. LONERGAN:

6    Q.  Officer Haley, can you read from the arrest report the time

7    that you placed Zangi under arrest?

8    A.  1936.

9    Q.  For those of us who don't speak military time, can you

10   translate that for us?

11   A.  7:36 p.m.

12   Q.  Thank you.

13          What did you do next with Zangi?

14   A.  I proceeded to process the arrest.

15   Q.  So what does that mean, to process an arrest?

16   A.  Fill out all the paperwork that belongs to that violation

17   for which he was arrested and then fingerprinted.

18   Q.  Finish your answer.

19          So you fingerprinted him?

20   A.  Yeah, he was fingerprinted.

21   Q.  Where were you when you were processing Zangi?

22   A.  In the 63rd Precinct.

23   Q.  Did anything happen while you were processing Zangi?

24   A.  Yes.

25   Q.  What happened?

1    A.   The 63rd Precinct desk officer sergeant -- sergeant came

2    and approached me.

3    Q.   What did the sergeant say to you when he approached you?

4    A.   He asked me if Mr. Zangi was getting a desk appearance

5    ticket.

6    Q.   How did you respond to that question?

7    A.   I told him no.

8    Q.   So you just said "desk appearance ticket."  Is that also

9    referred to as a DAT?

10   A.   Yes.

11   Q.   What is a desk appearance ticket, or a DAT?

12   A.   It is like a court appearance ticket.  Instead of an

13   individual going to see the judge that night or the next

14   morning, they would get to see the judge maybe in a month from

15   then, they would get to go home.

16   Q.   Okay.  After an arrest, if someone doesn't get a desk

17   appearance ticket, what happens to that person?

18   A.   They will go to central booking, and then get processed,

19   and then stay with the other individuals who are arrested, and

20   then go see the judge.

21   Q.   If the person who's arrested does get a desk appearance

22   ticket, then what happens to that person?

23   A.   He would get to go home.

24   Q.   From the precinct?

25   A.   Yes.

1    Q.  What was the sergeant's reaction when you said that you

2    weren't giving Zangi a DAT?

3    A.  He was a bit shocked.

4    Q.  What, if anything, did you offer to do for the sergeant?

5    A.  Well, he received a phone call, so he approached me and

6    asked me if Mr. Zangi was getting a desk appearance ticket.  I

7    said:  "No."

8          He appeared shocked, and that's when I said -- he

9    didn't really want to speak to the person on the phone to tell

10   him the answer, so I said:  "Do you want me to go and speak to

11   him on the phone?"

12   Q.  How did the sergeant respond to your offer?

13   A.  He said:  "Can you?"

14   Q.  When the sergeant said that there was someone on the phone,

15   did the sergeant say anything about who the person was who was

16   on the phone?

17   A.  I believe he said it was an inspector.

18   Q.  When the sergeant stated there was an inspector on the

19   phone, what did you understand that to mean?

20   A.  A boss of the -- in the NYPD.

21   Q.  Are you familiar with the ranks in the NYPD?

22   A.  Yes.

23   Q.  And how are you familiar with those ranks?

24   A.  Well, you first learn that when you go to training in the

25   academy.

IB6KGRA5                        Haley - Direct

1   Q.  Can you walk us through the ranks in the NYPD, starting

2   with police officer?

3   A.  You have police officer.  You get an appointment to

4   detective, if you go that route.  You have to take a test to

5   become a sergeant, a test to become a lieutenant, and a test to

6   become a captain.  And then from captain and above, it will

7   become an appointed position where it will be deputy inspector,

8   an inspector, and then one-star chief, two-star chief,

9   three-star, and four-star.

10  Q.  How does the rank of deputy inspector or inspector compare

11  to the rank of police officer?

12  A.  Police officer is the lowest, and deputy inspector is

13  clearly a little bit more above than the police officer.

14  Q.  How does the rank of deputy inspector or inspector compare

15  to the rank of sergeant?

16  A.  It's the same thing.  Sergeant is one above from a police

17  officer if you take the test.  Being a deputy inspector and

18  inspector, you get appointed.  Those are not test-taking

19  positions.

20  Q.  Would you characterize those as high-ranking offices?

21  A.  Yes.

22  Q.  When you said that there was the term "inspector," can you

23  use that term to refer to either an inspector or a deputy

24  inspector?

25  A.  Yes.

1    Q.  Just to be clear, can you tell us how many ranks a deputy

2    inspector or an inspector is above a sergeant?

3    A.  Well, you next have lieutenant, and then a captain, then

4    you'd have deputy inspector, so that would be the third, and

5    the fourth would be inspector.

6    Q.  And then a sergeant is one above a police officer; is that

7    right?  That's what you testified?

8    A.  Yes.

9    Q.  So a deputy inspector would be four above a police officer;

10   is that correct?

11   A.  Four above a police officer, yes.

12   Q.  How can you tell what rank another officer is?

13   A.  For a sergeant, you can tell by his shirt, he has chevrons,

14   which is markings that go on the sleeves and a gold shield.  A

15   lieutenant would wear a white shirt, he would have a bar on his

16   collars.  And for a captain, he'd have two bars.  A deputy

17   inspector would have like an oak leaf, which looks like a

18   flower a little bit, and then an inspector would have an eagle.

19   Q.  What about chiefs?

20   A.  They would have stars.

21   Q.  What, if anything, are you supposed to do if an officer

22   ranked deputy inspector or above arrives in a location where

23   you're working?

24   A.  Well, you'd obviously have to address him, salute him.

25   Q.  How do you do that?  What's the process of saluting someone

1   of deputy inspector or above?

2   A.   You'd raise your right hand, and place it to your head, and

3   salute him.

4   Q.   Is everybody who's in that area supposed to do that?

5   A.   Anyone that he would approach.

6   Q.   If you're sitting, are you allowed to remain sitting, or do

7   you have to stand?

8   A.   No, you'd have to stand.

9   Q.   What is the reason that you stand and salute a deputy

10  inspector or a higher rank than that?

11  A.   It's a sign of respect.

12  Q.   Why do you have to show respect to officers of higher rank?

13  A.   We're a paramilitary organization.

14          MR. MERINGOLO:  Objection; irrelevant.

15          THE COURT:  Thank you.

16          You can answer the question.  I accept it.  Thank you.

17  Q.   What do you mean by "paramilitary organization"?

18  A.   We have rules to go by, we have to look a certain way, we

19  have to look professional.

20  Q.   Officer Haley, I'd like to return to the phone call when

21  you arrested Zangi.  You previously testified that you offered

22  to go to the phone because the sergeant appeared nervous.

23          Did the sergeant take you up on your offer?

24  A.   Yes.

25          MS. NECHELES:  Objection.  She didn't say nervous; she

IB6KGRA5                          Haley - Direct

1    said surprised.

2             THE COURT:  Thank you, counsel.

3             Can you rephrase the question?

4             MS. LONERGAN:  Sure.

5    BY MS. LONERGAN:

6    Q.  Because the sergeant appeared surprised.

7             So did you go to the phone?

8             MR. MERINGOLO:  Objection; leading.

9             THE COURT:  Thank you.

10            Can I ask you to rephrase the question, please,

11   counsel.

12            MS. LONERGAN:  Yes.

13   BY MS. LONERGAN:

14   Q.  After you offered to go to the phone for the sergeant --

15   that was your testimony -- what did the sergeant say when you

16   offered to answer the phone for him or speak on the phone for

17   him?

18   A.  "Can you?"

19   Q.  What did you do then?

20   A.  I walked over to the phone.

21   Q.  Who was the call from?

22   A.  It was from Inspector Grant.

23   Q.  Before this call, did you know who Grant was?

24   A.  Yes.

25   Q.  How did you know?

IB6KGRA5                     Haley - Direct

1   A.  At the time I used to work at the 76th Precinct, and

2   there's three precincts that are joined together, 72, 78, and

3   76, and he was the commanding officer of the 72 Precinct.

4   Q.  Officer Haley, I'd like you to look around the courtroom to

5   see if you see --

6           MR. MERINGOLO:  We'll stipulate this is Jimmy Grant.

7           THE COURT:  I'm sorry.  Please proceed, counsel.

8           MS. LONERGAN:  So let the record reflect --

9   BY MS. LONERGAN:

10  Q.  So defense counsel has just pointed to an individual named

11  Jimmy Grant.  Did you see that defense counsel did do that?

12  A.  I'm sorry?

13  Q.  Did you see defense counsel point to someone named -- yes,

14  is that the person that you're speaking about when you're

15  speaking about Inspector Grant?

16  A.  Yes.

17          MS. LONERGAN:  Let the record reflect that the witness

18  has identified the Defendant Grant.

19          THE COURT:  So noted.

20  BY MS. LONERGAN:

21  Q.  During that phone call about Zangi, what, if anything, did

22  Grant say to you?

23  A.  He inquired if Mr. Zangi was getting a desk appearance

24  ticket.

25  Q.  How did you respond?

1   A.  "No."

2   Q.  How did Grant respond when you said that you were not

3   giving Zangi a desk appearance ticket?

4   A.  Surprised.

5   Q.  What, if anything, did he say to you?

6   A.  I believe he -- my answer was "No," so it was like a

7   question back, like "No?"

8           MR. MERINGOLO:  Objection.

9           THE COURT:  Thank you.

10          You can answer the question.  Please proceed.  You can

11  go ahead.

12          THE WITNESS:  Oh.  He asked the question back, like

13  surprised, like "No?"

14  BY MS. LONERGAN:

15  Q.  How did you respond when Grant asked the question "No"?

16  A.  I told him, "No."

17  Q.  What was your impression after Grant asked you a second

18  time if Zangi was getting a desk appearance ticket?

19  A.  I'm sorry?

20  Q.  Sorry.  What was your impression of the fact that Grant

21  asked you twice --

22          MR. MERINGOLO:  Objection.

23          THE COURT:  Thank you.

24          You can answer the question.

25  Q.  -- if Zangi was getting a desk appearance ticket?

1    A.  I'm sorry, say that again?

2    Q.  Sure.

3         What was your impression after Grant asked you twice

4    if Zangi was getting a desk appearance ticket?

5    A.  That he wanted him to get a desk appearance ticket.

6    Q.  Did Inspector Grant order you to give Zangi a desk

7    appearance ticket?

8    A.  No.

9    Q.  Did you agree to give Zangi a desk appearance ticket?

10   A.  No.

11   Q.  Why not?

12   A.  He didn't qualify.

13   Q.  Why didn't Zangi qualify?

14   A.  Well, at the time, I don't know how I became aware of it,

15   but the Brooklyn attorney's office was stating that if two

16   individuals --

17         MS. NECHELES:  Objection.  Objection, your Honor.

18   This is hearsay.

19         THE COURT:  Thank you.

20         Counsel, can you please rephrase the question?

21         MS. LONERGAN:  Your Honor, may we approach?

22         THE COURT:  You may come on up.

23         (Continued on next page)

24

25

1              (At the sidebar)

2              THE COURT:  First, counsel, there is an objection?

3              MS. NECHELES:  The objection is she's about to elicit

4     hearsay.

5              THE COURT:  Thank you, counsel.

6              MS. LONERGAN:  Your Honor, we're not eliciting it for

7     the truth.  We're eliciting it to explain why she believed that

8     Zangi didn't qualify for a desk appearance ticket.  We actually

9     don't care if that was the rule or not.  It's just what she

10    understood the rule to be.

11             THE COURT:  Thank you.

12             Counsel, any argument?

13             MS. NECHELES:  Your Honor, it is coming in for the

14    truth of it.  This woman is saying she was reprimanded, and she

15    was told to do something improper because Jimmy Grant said.  In

16    fact, she did not do the right thing, she violated the rules,

17    and they want to bolster that she did something proper by

18    having the testimony about the Brooklyn DA's Office.  That's

19    improper.  She can go to the rules about what -- they put the

20    DAT rules in.

21             THE COURT:  Thank you.

22             What's the proffer that you are making regarding what

23    the testimony is going to be?

24             MS. LONERGAN:  I'm sorry, your Honor, are you asking

25    me?

1          THE COURT:  Yes.

2          MS. LONERGAN:  She's going to say that she had been --

3     she doesn't know the source of the information, but her

4     understanding was that the Brooklyn District Attorney's Office

5     said that you could not get a DAT if you had a suspended

6     license and were in an accident, that she had been told that.

7          THE COURT:  Thank you.

8          MS. NECHELES:  Your Honor, that's hearsay.

9          MR. MERINGOLO:  That's against the patrol guide.

10         MS. NECHELES:  Wait, wait, wait.  She's saying that

11    somebody told her that at some point?

12         MS. LONERGAN:  It's her state of mind.  It explains

13    her decision in this process, why she declined to give this

14    person a DAT.

15         THE COURT:  Thank you.

16         I understand that it's not being offered for the truth

17    of the matter, rather to explain, as counsel said, her state of

18    mind and why it is that she acted in the way that she did.  So

19    I'm going to overrule the objection.

20         Thank you.

21         (Continued on next page)

22

23

24

25

 1              (In open court)

 2     BY MS. LONERGAN:

 3     Q.  Officer Haley, I think the question that had been posed to

 4     you was:  Why did you make the decision not to offer Zangi a

 5     DAT, or desk appearance ticket?

 6     A.  He didn't qualify.

 7     Q.  Why did you say he didn't qualify?

 8     A.  Because at the time I became aware of the Brooklyn District

 9     Attorney's Office stating that if two individuals were involved

10     in a motor vehicle accident, and one --

11              MS. NECHELES:  Objection.  Can we have when she became

12     aware, how she became aware?

13              THE COURT:  Thank you.

14              Counsel, you'll have the opportunity to inquire

15     further.

16              Please proceed.  You can answer the question.

17     Q.  Go ahead, Officer Haley.  You said the Brooklyn District

18     Attorney's Office had a policy that?

19     A.  Yeah, I don't know -- I'm sorry, whose question am I --

20              THE COURT:  Thank you.

21              Counsel for the United States.

22     BY MS. LONERGAN:

23     Q.  Officer Haley, let me rephrase the question for you.

24              You were about to explain, I think, that you became

25     aware of a policy from the Brooklyn District Attorney's Office

1    that had influenced your decision.  Can you explain what

2    happened, and why you made the decision not to give Zangi a

3    DAT?

4    A.  Okay.  So I became aware that -- from the Brooklyn DA's

5    Office that if two individuals or multiple were involved in a

6    motor vehicle accident, and one or if more were involved -- had

7    a suspended license, they would not get a desk appearance

8    ticket.

9    Q.  So what happened after the phone call from Grant?

10   A.  I proceeded to process Mr. Zangi.

11   Q.  Was Zangi released from the precinct that evening?

12   A.  No.

13   Q.  Where did you take Zangi?

14   A.  To central booking.

15   Q.  What is central booking?

16   A.  That is the portion of the courthouse where individuals who

17   get arrested go, and then they go get processed there, and then

18   they go to see the judge.

19   Q.  Approximately what time did you arrive at Brooklyn central

20   booking with Zangi?

21   A.  I don't remember.

22   Q.  Is there something in which you've written down where --

23   the time that you had arrived at Brooklyn central booking?

24   A.  Yes.

25   Q.  What would that be?

1   A.  My memo book.

2           MS. LONERGAN:  Your Honor, may I approach?

3           THE COURT:  You may.

4   BY MS. LONERGAN:

5   Q.  Officer Haley, I'm going to hand you what's been marked as

6   3550-03 for identification.

7           Do you recognize that?

8   A.  Yes.

9   Q.  What is 3550-03?

10  A.  It's my memo book.

11  Q.  What is a memo book?

12  A.  It's something that every police officer must document, and

13  it's like a diary of what we do within the course of our day.

14  Q.  In your memo book, did you write down what time you arrived

15  at Brooklyn central booking with Zangi?

16          Don't read it, just -- yeah.

17  A.  Yes.

18  Q.  At the time that you wrote that down, did you have

19  firsthand knowledge of the time that you arrived at Brooklyn

20  central booking with Zangi?

21  A.  Yes.

22  Q.  Did you take care to write that information down

23  accurately?

24  A.  Yes.

25  Q.  Why?

1   A.  Because this is an official police document.

2           MS. LONERGAN:  Your Honor, we ask that Officer Haley

3   be permitted to read from her memo book as her past

4   recollection recorded.

5           THE COURT:  Thank you.

6           Counsel?

7           MR. MERINGOLO:  No objection.

8           THE COURT:  Counsel?

9           MS. NECHELES:  No objection.

10           THE COURT:  Thank you.

11           Please proceed.

12   BY MS. LONERGAN:

13   Q.  Officer Haley, can you turn to page 4 and see if you can

14   find the time when you arrived at Brooklyn central booking with

15   Zangi?

16   A.  2226.

17   Q.  Again, can you translate that for us?

18   A.  10:26 p.m.

19   Q.  Did anyone else from the NYPD speak to you about Zangi's

20   arrest?

21   A.  Yes.

22   Q.  Who?

23   A.  My CO.

24   Q.  What's a CO?

25   A.  It's a commanding officer.

1    Q.   What, if anything, did your CO ask you about Zangi?

2    A.   Why didn't he get a desk appearance ticket.

3    Q.   How did you respond?

4    A.   I proceeded to explain to him about what I became aware of

5    with the Brooklyn District Attorney's Office.

6    Q.   Did your answer appear to satisfy your CO?

7    A.   No.

8    Q.   What happened next in the conversation?

9    A.   Then I proceeded to explain to him that, again, in my old

10   precinct where I was stationed at in the 76 Precinct, behind

11   the desk, there was like a little -- like a sheet stating a

12   how-to process arrests of 511 arrests.

13   Q.   What do you mean?  What's a 511 arrest?

14   A.   It's the legal traffic code for an individual who's

15   suspended -- who has a suspended license.

16   Q.   After that conversation with your CO, what, if anything,

17   did your CO direct you to do?

18   A.   Told me to go get a copy of it.

19   Q.   "It" meaning what?

20   A.   That sheet that was at my old precinct.

21   Q.   Did you do that?

22   A.   Yes.

23   Q.   Officer Haley, separate from the case involving Zangi, are

24   you familiar with the process of deciding whether to issue a

25   desk appearance ticket?

1    A.   Yes.

2    Q.   Who is responsible for the decision about whether to issue

3    a DAT to someone who has been arrested?

4    A.   The arresting officer.

5    Q.   Are there any reasons why you may not issue someone a DAT?

6    A.   Yes.

7    Q.   Are those reasons written down anywhere?

8    A.   Yes.

9    Q.   Where?

10   A.   The NYPD has a patrol guide.

11   Q.   What's the patrol guide?

12   A.   It's a guide on how to address and to do certain things

13   within the police department for every interaction or incident

14   that you have.

15             MS. LONERGAN:   Your Honor, this may be a good time to

16   do what we previously discussed regarding the patrol guide?

17             THE COURT:   Thank you.   Thank you very much, counsel.

18             So, ladies and gentlemen, you're about to hear some

19   testimony regarding provisions of the NYPD patrol guide that

20   apply to members of the New York Police Department.   Now,

21   neither defendant is on trial for any violation of the NYPD

22   patrol guide.   It's not a law.   It is an internal guidance

23   document used by the NYPD.

24             You may not find either defendant guilty on any count

25   in this case merely because you believe that the defendant you

1    are considering may have acted in a way that was not consistent

2    with the NYPD patrol guide.  However, you may consider any

3    evidence regarding training Mr. Grant received with respect to

4    the NYPD patrol guide to the extent that you find it sheds

5    light on Mr. Grant's intent.

6              Thank you, counsel.  You can proceed.

7              MS. LONERGAN:  Thank you.

8              Mr. Hamilton, can we put up on the screen for the

9    Court, counsel, and the witness Government Exhibit 710.

10   BY MS. LONERGAN:

11   Q.  Officer Haley, do you recognize Government Exhibit 710?

12   A.  Yes.

13   Q.  What is it?

14   A.  It's the patrol guide procedure on how to do a desk

15   appearance ticket.

16   Q.  Is that Procedure Number 208-27?

17   A.  Yes.

18             MS. LONERGAN:  Your Honor, at this time, I also would

19   like to read a stipulation.  One moment?

20             (Pause)

21             MS. LONERGAN:  Your Honor, I'd like to read a

22   stipulation.  It's marked as Government Exhibit 1704.  The

23   stipulation says:

24             "Stipulation regarding New York City Police Department

25   and Columbia University:

1          "It is hereby stipulated and agreed by and between the

2     United States of America, by Geoffrey S. Berman, United States

3     Attorney for the Southern District of New York, Martin S. Bell,

4     Jessica Lonergan, and Kimberly J. Ravener, Assistant United

5     States Attorneys, Jeremy Reichberg, a/k/a Jeremiah Reichberg,

6     a/k/a Yermy Reichberg, the defendant, by his attorney, Susan R.

7     Necheles, Esq., and James Grant, a/k/a Jimmy Grant, the

8     defendant, by his attorneys, John Meringolo, Esq., and Anjelica

9     Cappellino, Esq., that:

10         "(1) If called as a witness, a qualified and

11    knowledgeable representative from the New York City Police

12    Department (NYPD) would testify as follows:

13         "(a) Documents marked with a controlled number within

14    the ranges of SDNY 743 through SDNY 744, SDNY 11991 through

15    SDNY 12030, SDNY 12036 through SDNY 12049, SDNY 12075 through

16    SDNY 12080, SDNY 16271 through SDNY 16481, SDNY 23096 through

17    SDNY 23112, SDNY 23642 through SDNY 23904, SDNY 23998 through

18    SDNY 23997, SDNY 24327 through SDNY 59148, SDNY 59292 through

19    SDNY 59427, SDNY 59435 through SDNY 59445, SDNY 59447 through

20    SDNY 59519, SDNY 59530 through SDNY 59720, SDNY 62711 through

21    SDNY 62819, SDNY 63338 through SDNY 63339, SDNY 65885 through

22    SDNY 66015, SDNY 77784 through SDNY 77789, SDNY 78924 through

23    SDNY 78929, SDNY 78988 through SDNY 79007, SDNY 10851 through

24    SDNY 10858, SDNY 110406 through SDNY 110417, and SDNY 110426

25    consist of true and correct copies of records kept by the NYPD,

1    the originals of which were made at or near the time of the

2    act, event, or condition recorded by or from information

3    transmitted by a person with knowledge that were kept in the

4    course of a regularly conducted activity of the NYPD and having

5    been the regular practice of the NYPD to make such records.

6         "(2) Documents marked with a control number within the

7    ranges of CU001 through CU037, SDNY 23642 through SDNY 23765,

8    and SDNY 59617 through SDNY 59720 consist of true and correct

9    copies of records kept by Columbia University, the originals of

10   which were made at or near the time of the act, event, or

11   condition recorded by, or from information transmitted by, a

12   person with knowledge that were kept in the course of a

13   regularly conducted activity of Columbia University, and having

14   been the regular practice of Columbia University to make such

15   records.

16        "It is further stipulated and agreed that the

17   documents marked with the control numbers set forth in

18   paragraphs 1 and 2 above consist of records that constitute

19   records of regularly conducted activity pursuant to Rule 803(6)

20   of the Federal Rules of Evidence.

21        "It is further stipulated and agreed that the

22   stipulation is admissible and may be received as a joint

23   exhibit at trial."

24        It's then dated New York, New York.  I'm going to date

25   it today's date, which is November 6th, 2018.  It's signed by

1   me, on behalf of the United States Attorney's Office, it's

2   signed by Ms. Necheles, on behalf of Mr. Reichberg, and it's

3   signed by Angelica Cappellino, on behalf of Mr. Grant.

4          So, at this point, the government offers Government

5   Exhibit 1704 in evidence.

6          THE COURT:  Thank you.

7          Any objection, counsel?

8          MS. NECHELES:  No, your Honor.

9          MR. MERINGOLO:  No objection.

10         THE COURT:  Thank you.

11         I'm accepting Exhibit 1704 into evidence.

12         (Government's Exhibit 1704 received in evidence)

13         THE COURT:  Counsel, I'm sorry to pause you briefly.

14  I'd like to take a short break just to let people stretch their

15  legs.  Would this be a reasonable time to do that?

16         MS. LONERGAN:  This is fine, your Honor.

17         THE COURT:  Thank you.

18         Ladies and gentlemen, I'd like to take about a

19  15-minute break just to give everybody a chance to stretch your

20  legs.  As always, don't discuss the case amongst yourselves,

21  don't communicate about it with anyone else, and don't do any

22  research about the case or anything involved in it.  I'll see

23  you back here shortly.

24         (Continued on next page)

25

IB6KGRA5

1           (Jury not present)

2           THE COURT:  Counsel, I'd like to start again with the

3     jury in 15 minutes, so I'd ask the witness to be back in the

4     witness box by then.

5           I do want to take the opportunity to let everybody

6     stretch their legs.

7           Anything that we need to take up now before we take

8     this short break?

9           MR. BELL:  For planning purposes, your Honor, does

10    your Honor intend to go the full way to 3:30 today?

11          THE COURT:  I think we should try to do that, if we

12    can, given that we lost a little bit of time over lunch.

13          MR. BELL:  We would agree.  Thank you, your Honor.

14          THE COURT:  Good.  Thank you.

15          Anything for Mr. Reichberg?

16          MS. NECHELES:  No, your Honor.

17          THE COURT:  Thank you.

18          Counsel?

19          MR. MERINGOLO:  No, your Honor.  Thank you.

20          THE COURT:  Good.  Thank you.

21          I'll see you all back here shortly.  Thank you.

22          (Recess)

23          THE COURT:  Thank you.

24          Counsel, please proceed.  United States.

25          MS. LONERGAN:  Yes, your Honor.

IB6KGRA5

```
 1              Sorry, our apologies.
 2              Right after this witness is when we're going to seek
 3    to play calls, so I just want to flag that for the Court
 4    whether we want to put the binders now or do it --
 5              THE COURT:  That would be fine.  I don't have a
 6    concern about that.
 7              MS. LONERGAN:  Okay.  You want us to put the binders
 8    under the chairs now?
 9              THE COURT:  Please do.
10              And I understand that there's no particular issue
11    about the recordings that the government seeks to play during
12    this next witness?
13              MS. NECHELES:  Your Honor, frankly, the problem is
14    that the government will be playing tapes that are not so clear
15    what the people are talking about, and there will be no witness
16    to question them about -- they have a witness on the stand who
17    is testifying about the arrest.  They will be playing tapes
18    that refer to the arrest.  Their witness just testified about
19    central booking.  And the tapes are referring to what's going
20    on at central booking.
21              MS. LONERGAN:  Your Honor --
22              THE COURT:  I'm sorry, what's the request?
23              MS. NECHELES:  I would ask they be played while the
24    witness is on the stand.
25              MS. LONERGAN:  Your Honor, this witness was not a
```

IB6KGRA5

1    participant in any of the telephone calls at issue.  In fact, I

2    think it would be improper to ask her to interpret phone calls

3    to which she was not a party to.  To the extent that the phone

4    calls are unclear, that's what argument is for.  I don't think

5    there's anything improper with the procedure that the

6    government has advanced.

7              THE COURT:  Thank you.

8              Counsel for defendant, are you suggesting that they

9    ask this officer about the construction of these recordings?

10             MS. NECHELES:  No.  I'm suggesting they can ask her

11   about the process that is going on here, but I'll ask the

12   witness about the process.

13             THE COURT:  Thank you.

14             Are we otherwise ready to bring in the jury?

15             Counsel for Mr. Grant, anything you'd like to raise?

16             MR. MERINGOLO:  No.

17             THE COURT:  Thank you.

18             Mr. Daniels, please bring in the jury.

19             (Pause)

20             THE COURT:  Mr. Daniels, will you please bring in the

21   jury.

22             THE DEPUTY CLERK:  Yes, Judge.

23             THE COURT:  Counsel, can you please bring forward the

24   witness.

25             (Continued on next page)

IB6KGRA5

1          (Jury present)

2          THE COURT:  Thank you, ladies and gentlemen.  You can

3   be seated.

4          First of all, welcome back, ladies and gentlemen of

5   the jury.  Thank you very much for indulging us in that break.

6          You'll see binders have been placed at your seats.

7   Please don't look at them yet.  I'll let you know when and what

8   you should look at in those binders.

9          Counsel for the United States, you can proceed.

10          MS. LONERGAN:  Thank you very much, your Honor.

11   BY MS. LONERGAN:

12   Q.  Officer Haley, I want to circle back to one thing we were

13   discussing earlier.

14          You said that you offered to take the phone call for

15   the sergeant.  Why did you make that offer?

16   A.  Well, my answer to him -- when he asked me if Mr. Zangi was

17   getting a desk appearance ticket, and my answer was "No," he

18   felt, like, intimidated or a little worried to tell whoever was

19   on the phone that answer.

20   Q.  Okay.  Let's return to where we were before the break.

21          MS. LONERGAN:  Mr. Hamilton, can you put up on the

22   screen for the parties, the Court, and the witness Government

23   Exhibit 710.

24   Q.  Officer Haley, I believe you identified this as the patrol

25   guide section relating to desk appearance tickets; is that

IB6KGRA5

1    correct?

2    A.   Correct.

3           MS. LONERGAN:   Your Honor, at this time, the

4    government offers Government Exhibit 710 into evidence.

5           THE COURT:   Thank you.

6           Counsel?

7           MS. NECHELES:   Your Honor, my understanding is you

8    already ruled on our objections.

9           THE COURT:   Thank you.

10          I'm accepting this exhibit into evidence.  You can

11   proceed.

12          (Government's Exhibit 710 received in evidence)

13          MS. LONERGAN:   Thank you.

14          Mr. Hamilton, can we publish this?

15   BY MS. LONERGAN:

16   Q.   Officer Haley, you should have the first page of this up on

17   your screen.  Can you read the purpose and then -- can you read

18   the purpose of this?

19   A.   "To issue a desk appearance ticket in lieu of detention."

20   Q.   And then under "Definitions," can you read the first part

21   of the definition, where it says, "Desk Appearance Ticket

22   (DAT)."

23   A.   "An appearance ticket issued in lieu of detention, at the

24   direction of a desk officer, for misdemeanors, violations, and

25   certain Class E felonies for hospitalized prisoners."

IB6KGRA5

1   Q.   Okay.  You said you testified earlier that there are

2   rules -- sorry, there are -- that the patrol guide contains

3   policies about when to issue desk appearance tickets.

4           Would that be in this section of the patrol guide?

5   A.  I'm not sure.

6           MS. LONERGAN:  Mr. Hamilton, can we flip forward to

7   page 6 of 11.

8   Q.  Officer Haley, can you -- you see it says in the middle of

9   the page "Desk Appearance Ticket Guidelines"?

10  A.  Yes.

11          MS. LONERGAN:  Mr. Hamilton, can we also split the

12  screen and bring up page 7 as well.

13  Q.  Officer Haley, you see there's a list there, it starts with

14  item (a), and then it goes all the way through item (u).

15          What is that list?

16  A.  Those are the reasons for not to give a desk appearance

17  ticket.

18  Q.  Okay.  And you're reading -- can you read right under where

19  it says "Desk Appearance Ticket Guidelines"?

20  A.  "The desk appearance ticket will not be issued in the

21  following circumstances."

22  Q.  Can you read section -- let's read Section (m), please.

23  Can you read what it says in Section (m)?

24  A.  "Aggravated unlicensed operation of a motor vehicle, second

25  degree, VTL 511" -- I'm not sure what you call those bars, but

IB6KGRA5

1     that would indicate to me Subdivision 2(a) misdemeanor and

2     first degree VTL 511 subdivision 3(a) felony."

3     Q.  I think you previously testified what a 511 is.

4             What's a 511?

5     A.  That's the Vehicle and Traffic Law for suspended licenses.

6     Q.  What does "aggravated unlicensed operation of a motor

7     vehicle" mean?

8     A.  That's what it's called in the Vehicle and Traffic Law.

9             MS. LONERGAN:  Mr. Hamilton, we can take this down.

10    Q.  Officer Haley, apart from Zangi, have you ever received

11    other phone calls from a high-ranking officer asking you about

12    whether you were giving someone a DAT?

13    A.  Not that I can recall.

14    Q.  Again, you've used the term 511, a 511 arrest.  Was the

15    arrest of Zangi a 511 arrest?

16    A.  Yes.

17    Q.  Separate from the case involving Zangi, are you familiar

18    with 511 or suspended license arrests?

19    A.  Yes.

20    Q.  Is there any NYPD guidance about how to handle 511 arrests?

21    A.  Yes.

22    Q.  Where is that?

23    A.  Again, in the patrol guide.

24            MS. LONERGAN:  Mr. Hamilton, can we put on the screens

25    for the Court, the witness, and the parties Government Exhibit

IB6KGRA5

1    711.

2    BY MS. LONERGAN:

3    Q.  Officer Haley, do you recognize Government Exhibit 711?

4    A.  Yes.

5    Q.  What is it?

6    A.  That's the patrol guide procedure of arrest processing,

7    aggravated unlicensed operation of a motor vehicle.

8    Q.  Is that section Procedure No. 208-53?

9    A.  Yes.

10        MS. LONERGAN:  Your Honor, the government offers

11   Government Exhibit 711 in evidence.

12        THE COURT:  Thank you.

13        Counsel?

14        MS. NECHELES:  Same objection as before.

15        THE COURT:  Thank you.

16        I'm accepting Government Exhibit 711 into evidence.

17        (Government's Exhibit 711 received in evidence)

18        THE COURT:  Counsel, you can proceed.

19        MS. LONERGAN:  Mr. Hamilton, can we publish page 1 for

20   the jury.

21   BY MS. LONERGAN:

22   Q.  Officer Haley, can you read the purpose?

23   A.  "To process arrests for operating a motor vehicle with a

24   suspended or revoked license."

25   Q.  Can you read the procedure, what it says under "Procedure."

IB6KGRA5

1   A.  "When a uniformed member of the service observes, or has

2   reasonable cause to believe, that a person operating a motor

3   vehicle has a suspended or revoked driver's license."

4   Q.  And then it says, "Uniformed member of the service," and

5   there's a number of steps.

6        What are those steps explaining?

7   A.  What to do when you have an arrest of a -- an aggravated

8   unlicensed operator of a motor vehicle.

9   Q.  And then let's read steps 1 through 4, if you can.

10  A.  Effect an arrest for a violation of any degree of

11  aggravated unlicensed operation of a motor vehicle:  (a) remove

12  prisoner to police facility for processing; (2) conduct a

13  license check (DALL) and name check via FINEST; (a) retain

14  printout and include in DAT or online arrest folders; step (3)

15  is comply with current department procedures regarding

16  issuances of a desk appearance ticket (PD260-121); and steps 5,

17  6, 7, and 8, and 9 below, if prisoner is charged with

18  aggravated unlicensed operation of a motor vehicle (AUO) third

19  degree and is otherwise eligible; step (4) is comply with all

20  pertinent arrest processing procedures.

21        MS. LONERGAN:  We can take that down.  Thank you.

22  You.

23  Q.  Officer Haley, based on your experience, would you describe

24  a 511 arrest as a minor offense or a major offense?

25  A.  Minor.

1                MS. NECHELES:  Objection.

2                THE COURT:  Thank you.

3                I accept the answer.

4    BY MS. LONERGAN:

5    Q.  Apart from Zangi, have you ever received other phone calls

6    from a high-ranking officer asking about a suspended license

7    arrest?

8    A.  None that I can remember.

9                MS. LONERGAN:  One moment, your Honor.

10               THE COURT:  Thank you.

11               Please take your time.

12               (Pause)

13               MS. LONERGAN:  Your Honor, no further questions.

14               THE COURT:  Thank you very much.

15               Counsel for Mr. Reichberg?

16               MS. NECHELES:  Thank you, your Honor.

17   CROSS-EXAMINATION

18   BY MS. NECHELES:

19   Q.  Good afternoon.

20   A.  Good afternoon.

21   Q.  You testified in your direct examination that the police

22   department is a paramilitary organization, correct?

23   A.  Correct.

24   Q.  By that, you were saying that you are required to show

25   respect to people above you, correct?

1   A.  Correct.

2   Q.  And, for example, you talked about that you have to stand

3   up -- you're taught to stand up if a captain, I think you said,

4   comes in a the room or anybody higher than that?

5   A.  Deputy inspector.

6   Q.  Deputy inspector?

7           And in addition to that, you testified that you --

8   being a paramilitary organization, you needed to follow orders,

9   right?

10  A.  Correct.

11  Q.  When you are told by a supervisor to do something, you have

12  to do that then, right?

13  A.  Correct.

14  Q.  And in addition to there being orders, there are also rules

15  that are set out for what a police officer should do, right?

16  A.  Guides.

17  Q.  Guides?

18  A.  Correct.

19  Q.  Which are rules, right?

20  A.  They're guides.

21  Q.  Well, you mean you don't have to follow them?

22  A.  You have to follow them, yes.

23  Q.  You don't have unchecked discretion on what you can do as a

24  police officer, right?

25  A.  I'm sorry?

1    Q.  Well, you would have a lot of power as a police officer,

2    right?

3    A.  In what way?

4    Q.  Well, you can arrest people, right?

5    A.  Yes.

6    Q.  And you can stop people on the street, correct?

7    A.  Correct.

8    Q.  And there are guides, or rules, about how you are supposed

9    to use that power, right?

10   A.  Correct.

11   Q.  And those guides and rules are, in part, contained in the

12   patrol guide, right?

13   A.  Right.

14   Q.  And there are also supervisors who supervise what police

15   officers do, to make sure that they do not act incorrectly and

16   beyond -- or abuse their power, right?

17   A.  Right.

18   Q.  When you arrested Zangi, Mr. Zangi, you charged him with

19   VTL 511(1)(a), correct?

20   A.  I'm not sure.

21          MS. NECHELES:  Your Honor, I would offer in evidence

22   the arrest, the complaint.  It's not for the truth of it, but

23   to show what was charged with.

24          MS. LONERGAN:  Your Honor, we have multiple objections

25   to this.  I don't know if you want to approach.

IB6KGRA5                          Haley - Cross

1              THE COURT:  Thank you.

2              You can come on up.  I'd be happy to hear from you.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Thank you.

3              There's an objection.  Please proceed.

4              MS. LONERGAN:  Yes, your Honor.

5              The first is that this is the state court complaint,

6    which may or may not contain the same charge as the arrest

7    report.  I'd have to check the arrest report to see if it's the

8    same charge.

9              Also, to the extent that she is asking what the charge

10   was at the time of arrest, I don't think she needs this entire

11   document, which contains all sorts of other facts, like what

12   the officers saw, and evidence.  We would have no objection to

13   her asking the witness to read a part of her arrest report into

14   the record as her past recollection recorded.  We've already, I

15   think, established the basis for that hearsay exception.

16             THE COURT:  Thank you.

17             Counsel, just a question, and I invite your comments,

18   Ms. Necheles, but why isn't it possible to refresh the witness'

19   recollection through normal witness recollection-refreshing or

20   using past recollection recorded, which the government went to

21   as a first step, in lieu of first asking whether or not there

22   is evidence that could refresh the witness' recollection?  Both

23   of those means appear to be available to you in response to her

24   failure of recollection here.  Why are you turning to the

25   complaint?

IB6KGRA5                        Haley - Cross

 1              MS. NECHELES:  Your Honor, I would like there to be in

 2       the jury room a document which shows exactly what this person

 3       was arrested for.  It's a little confusing.  There are three

 4       sections of 511.  Two of them are listed in the patrol guide as

 5       you should not give a DAT to.  That's what the government is

 6       just points out.  This section is not listed.  Nothing in this

 7       report is harmful to the government.  It's all just irrelevant

 8       to everything else.  This section is extremely relevant because

 9       she was supposed to give a DAT.  And the jury needs to be able

10       to look at that and see it.

11              I just want to prove my case in a way that's the most

12       effective.  I'm not putting in here anything that would be

13       about what happened at the scene of the arrest.  I just want

14       them to see what this person was arrested for, because she was

15       supposed to give a DAT, and it's in that patrol guide that they

16       just put in evidence.

17              THE COURT:  Thank you.

18              Counsel for the United States?

19              MS. LONERGAN:  Your Honor, if she wants to do that, I

20       (a) prefer the arrest report, because that's actually what this

21       officer drafted, and not this, which is what is the prosecutor

22       drafted; and if she wants it in for the statutes, then she can

23       put it in for that.

24              Can I check this for one second --

25              MS. NECHELES:  Your Honor --

1           MS. LONERGAN:   -- and see if I have any --

2           MS. NECHELES:   Wait.  Can I finish?

3      I don't think I should be told how to do it.  She

4  just --

5           THE COURT:   I'm sorry, one question is:  What's the

6  basis for bringing in the criminal complaint through this

7  witness?

8           MS. NECHELES:   I believe she ends up signing it.  Yes,

9  she signs it, Judge.

10          MS. LONERGAN:   But not for the decisions of what

11 crimes to charge.  That's not her decision.

12          MS. NECHELES:   She charges the same thing, puts the

13 same thing in her arrest report.  It's just a little less

14 clearly set out because it doesn't have the parentheses and the

15 subsection.

16          THE COURT:   Thank you.

17      What is the basis, then, for excluding the complaint,

18 United States?

19          MS. LONERGAN:   Sorry, your Honor.  One moment?

20          MS. NECHELES:   This is a misdemeanor.  This is the

21 only misdemeanor.

22          (Pause)

23          MS. LONERGAN:   Why don't you go through the steps to

24 establish what this is, and that she adopts the statements in

25 it, and she signed it, because, otherwise, this wasn't drafted

IB6KGRA5                      Haley - Cross

1  by her.

2              MS. NECHELES:  She signed it under oath and the

3  penalty of perjury.

4              MS. LONERGAN:  But you have --

5              MS. RAVENER:  Ms. Necheles, that makes it a prior

6  consistent statement with her testimony, and it doesn't meet

7  the hearsay exception.

8              MS. NECHELES:  I'm not putting it in for the hearsay.

9  It's not going in for the truth of it.  It's what this person

10  was charged.  I don't care what she says.

11             MS. RAVENER:  You still need to meet the rules.

12             MS. NECHELES:  You don't have to meet the hearsay

13  rules if you're not putting it in the truth of it.

14             THE COURT:  Thank you.

15             Counsel, I agree with the United States, that you have

16  to lay a foundation for the introduction of this --

17             MS. NECHELES:  Yes.

18             THE COURT:  -- document.

19             What do you proffer is going to be the basis for the

20  introduction of the record?

21             MS. NECHELES:  I'm going to ask her if that's the

22  complaint that she signed under oath, and was this what the

23  person was charged.

24             THE COURT:  Thank you.

25             MS. NECHELES:  I assume she will say yes, because she

IB6KGRA5                          Haley - Cross

1    did, and then I will offer it in evidence.  If they want, I

2    will also offer her arrest report, which also has the same

3    charge in it.

4                THE COURT:  Thank you.

5                Counsel?  United States.

6                MS. LONERGAN:  I think we should offer both documents.

7                THE COURT:  Fine.  Thank you.  Let's proceed.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Thank you.

3              Ms. Necheles, please proceed.

4              MS. NECHELES:  Thank you, your Honor.

5    BY MS. NECHELES:

6    Q.  So, to be clear, Officer, when you arrest somebody, you

7    fill out an arrest report; is that correct?

8    A.  Yes.

9              MS. NECHELES:  Sorry.

10             (Pause)

11   BY MS. NECHELES:

12   Q.  I'm showing you what has been marked, or what will be

13   marked, as Defendants' Exhibit JR9509.  That was the arrest

14   report, am I correct, that you filled out?  It should only be

15   for you to look at, and the Court, and counsel.

16             Do you see that in front of you, the arrest report on

17   Avi Zangi?

18   A.  Yes.

19             MS. NECHELES:  I offer that in evidence, your Honor.

20             Your Honor, I would offer that.

21             MS. LONERGAN:  No objection.

22             THE COURT:  Thank you.

23             I'm accepting Exhibit JR9509.

24             (Defendants' Exhibit JR9509 received in evidence)

25             THE COURT:  You can proceed.

1              MS. NECHELES:  If we can publish that to the jury.

2    BY MS. NECHELES:

3    Q.  That is the document that you filled out that had the

4    arrest time, that you testified about before, at 6:36, correct?

5    A.  No, incorrect.

6    Q.  1936?

7    A.  Correct.

8    Q.  Is that 6:36 in the afternoon?

9    A.  No.

10   Q.  What time is that?

11   A.  7:36.

12   Q.  Okay.  Thank you.

13             In there, when you look down and see where it says

14   charges --

15             MS. NECHELES:  If we could highlight that.

16             THE COURT:  I'm sorry, can you make the image a little

17   larger, please.  It would help me read it.

18             MS. NECHELES:  I think we could pop out that charges

19   part, if you could.

20   Q.  Do you see where it says that, the charges part?

21   A.  Yes.

22   Q.  Those are the charges that you thought that should be

23   brought against Mr. Zangi, right?

24   A.  Correct.

25   Q.  The process that goes on is, first, that you, as a police

IB6KGRA5                          Haley - Cross

1    officer, would write something up and then it would be sent

2    over to the DA's office, and they would decide on the actual

3    charges; is that correct?

4    A.  Correct.

5    Q.  And they might be the same or they might be different?

6    A.  Correct.

7    Q.  But the charges, the top charge that you thought should be

8    there was VTL 511-01, right?

9    A.  Right.

10   Q.  And that's subsection (1), right, of the VTL?

11   A.  Correct.

12   Q.  And that's a misdemeanor, right?

13   A.  Right.

14        MS. NECHELES:  If you could take that down.

15   Q.  I want to show you what has been marked as Defendants'

16   Exhibit JR9501.

17        Do you recognize that document to be the criminal

18   complaint in People v. Zangi?

19   A.  Yes.

20   Q.  If you go to the next page, you signed that document,

21   right?

22   A.  Yes.

23   Q.  Under oath?

24   A.  I'm sorry?

25   Q.  Under oath?

IB6KGRA5                          Haley - Cross

1    A.  Yes.

2              MS. NECHELES:  I offer that in evidence, your Honor.

3              THE COURT:  Thank you.

4              Can I see the first two pages of the document, please.

5              MS. NECHELES:  Your Honor, would you like me to hand

6    it up?

7              THE COURT:  Please do.  Thank you.

8              The exhibit is two pages in length?

9              MS. NECHELES:  Yes.

10             THE COURT:  Thank you.

11             Counsel for the United States, any objection?

12             MS. LONERGAN:  Your Honor, no; just clarifying, it's,

13   pages 3 and 4 of what's been handed up that will be the exhibit

14   and no objection to those two pages.

15             THE COURT:  Thank you very much.  These are the only

16   two pages that have been handed to me.  I am accepting

17   Exhibit JR9501 into evidence.

18             (Defendants' Exhibit JR9501 received in evidence)

19             (Continued on next page)

20

21

22

23

24

25

1          THE COURT:  Thank you, counsel.

2          MS. NECHELES:  Thank you, your Honor.

3          If we publish that to the jury.  If that could be --

4     if you focus on the portion that has the charges.

5     BY MS. NECHELES:

6     Q.  So the charges that were charged against the defendant were

7     VTL 511.1(a), right?

8     A.  Yes.

9     Q.  And that was the same charge that was in your arrest

10    complaint, right, the sub 1 section?

11    A.  Correct.

12    Q.  And that is the misdemeanor charge, right?

13    A.  Correct.

14    Q.  And when you looked at the patrol guide earlier that the

15    government showed you, which was Government Exhibit 710, that

16    had rules about when you give a desk appearance ticket, right?

17    A.  I don't remember the number that you said, but the desk

18    appearance ticket procedure, I remember that.

19          MS. NECHELES:  If we put that up instead.

20          THE COURT:  What are you asking to be put up, counsel?

21          MS. NECHELES:  It's in evidence, Government

22    Exhibit 710, the rules about the desk appearance ticket.

23          THE COURT:  Thank you.

24          MS. NECHELES:  If we publish that to the jury, your

25    Honor.

1              THE COURT:  You may.

2    Q.  So this is the rules about the patrol guide which contains

3    the rules about when you're supposed to issue a desk appearance

4    ticket, correct?

5    A.  It's the guide to do the procedure, yes.

6    Q.  And we said before, the guides contain rules, right?

7    A.  It's a guide, that's what it's called.  It's not a rule

8    book, it's called a guide.

9    Q.  So you think you can ignore the guide, that you don't have

10   to follow it as a police officer, is that your testimony?

11   A.  No, that's not what I am implying.  You continue to ask if

12   it's a rule.  It's a guide.

13   Q.  But guide means you're supposed to follow that, that's what

14   the patrol guide means, is that this directs what you -- how

15   you are supposed to behave as a police officer, right?

16   A.  Correct.

17   Q.  And the reason you're saying guide as opposed to rules is

18   because some of the things in this patrol guide are not

19   mandatory, right?

20   A.  That's not correct.

21   Q.  You think everything in it is mandatory?

22   A.  Correct, it should be followed.

23   Q.  So if you look at the definitions here --

24              MS. NECHELES:  If you could just pop that part out.

25   Q.  So you testified previously that a desk appearance ticket

1    means someone just goes home, right?  Is that what you said

2    before?

3    A.  Sorry, say again?

4    Q.  You testified previously a desk appearance ticket means

5    someone goes home.  Those were your words before.

6    A.  If one was to receive one.

7    Q.  But actually what it means it they don't go to jail that

8    night, but they go home and they come back to court to face

9    criminal case, right?

10   A.  Correct.

11   Q.  There's no -- the case is not dismissed just because you

12   get a desk appearance ticket, right?

13   A.  Correct.

14   Q.  It's just the person does not have to spend the night in

15   jail, right?

16   A.  Right.

17   Q.  And it saves the government, New York City Department of

18   Corrections, a lot of money to have people able to go home

19   instead of come to court, right?

20              MS. LONERGAN:  Objection.

21              THE COURT:  Thank you.  You can answer the question if

22   you know the answer.

23   A.  I wouldn't know that answer.

24   Q.  Well, isn't that part of what you are taught about the

25   reason that desk appearance tickets are given, that you are

1    taught that when you become a police officer?

2    A.   No, you asked the question about saving money and such, I'm

3    not aware of that.

4    Q.   Well, after you failed to comply with the rule, you were

5    sent for retraining, right?

6              MS. LONERGAN:   Objection.

7              THE COURT:   You can answer the question.

8    Q.   We'll get to that.   Withdrawn.

9              So here it says a desk appearance ticket is an

10   appearance ticket issued in lieu of detention at the direction

11   of a desk officer for misdemeanors, violations, and certain

12   class E felonies for hospitalized prisoners, right?

13   A.   Correct.

14   Q.   So when there is a misdemeanor or a violation, you're

15   supposed to issue a desk appearance ticket, right?

16   A.   Not in all cases.

17   Q.   Because there's rules in here about when you don't issue

18   it, but the starting off presumption is that the person should

19   get a desk appearance ticket, right?

20   A.   Correct.

21   Q.   And then if we go on, just one more thing, that says at the

22   direction of a desk officer, right?

23   A.   Yes.

24   Q.   And you were not a desk officer, were you?

25   A.   No.

1    Q.  The sergeant was the desk officer, right?

2    A.  Yes.

3    Q.  So when you testified on your direct examination and you

4    were asked who determines whether a DAT is given, and you said

5    the arresting officer, that was incorrect, right?

6    A.  When an individual is arrested, the arresting officer makes

7    the decision to give a desk appearance ticket.

8    Q.  That's not what this says, is it?

9    A.  It's stating at the direction.

10   Q.  All right.  So why don't we -- you think it's really

11   supposed to have been you get complete discretion to decide, is

12   that your testimony?

13   A.  Say again?

14   Q.  It's your testimony, am I correct, that the arresting

15   officer has complete discretion on whether or not to issue a

16   desk appearance ticket, is that your testimony?

17   A.  It's not discretion, there are things that have to happen

18   and be checked in order to give an individual the desk

19   appearance ticket.

20   Q.  But it's your testimony that the arresting officer is the

21   person who makes the decision to issue a DAT, is that correct?

22   A.  Correct.

23   Q.  And if you could turn to page 774 and the section under

24   accountability.

25               So we are now on page 774, which is page 8 of 11 on

1  the desk appearance ticket general procedures, and I want to

2  direct your attention to this part that says accountability,

3  and it says the decision to issue a DAT to an eligible prisoner

4  rests solely with the desk officer.  Right?

5  A.  Yes.

6  Q.  So your testimony just now that the decision to issue a DAT

7  rested with the arresting officer was wrong, right?

8  A.  No, correct.

9  Q.  It's not what the patrol guide says, is it?

10  A.  This states -- that's what that states, yes.

11  Q.  So the patrol guide is wrong?

12  A.  No.

13  Q.  The patrol guide is right, isn't it?

14  A.  According to this, this is what it states.

15  Q.  According to this, meaning you don't know, or you question

16  it?

17  A.  No, I do not question it.

18  Q.  So the decision to issue a DAT does not lie with the

19  arresting officer.  You were incorrect on your direct

20  testimony, right?

21  A.  It is the arresting officer's decision to give a desk

22  appearance ticket to an individual based on the circumstances

23  of the arrest.

24  Q.  So you disagree with this, right?

25          Let me ask you something, before you came in to court

1   today to testify about desk appearance tickets and how it

2   should be given out, did it occur to you to review the general

3   ticket general proceedings in the guidelines?

4   A.  No.

5   Q.  You didn't think that that would be something important to

6   know what the rules are or the guidelines are about issuing a

7   desk appearance ticket before you testified?

8           MS. LONERGAN:  Objection.

9           THE COURT:  You can answer the question.

10  A.  I'm sorry, you have to ask it again.

11  Q.  You didn't think it would be important for you to review

12  what the rules and guidelines are in the patrol guide about

13  issuing a desk appearance ticket before you testified about the

14  rules on a desk appearance ticket in a criminal case?  You

15  didn't think it was important to review that first?

16          MS. LONERGAN:  Objection, your Honor.

17          THE COURT:  Thank you.  You can answer the question.

18  A.  I wasn't sure if I could, but I didn't think to, no.

19  Q.  All right.  And you said that the sergeant was the desk

20  officer, right?

21  A.  Correct.

22  Q.  And the sergeant told you to issue a DAT.  That was your

23  testimony on direct, correct?

24  A.  It's not what I said.

25  Q.  What did you say?

1    A.  He asked me a question.

2    Q.  He asked you if you were issuing a DAT, right?

3    A.  Correct.

4    Q.  And he said you should issue a DAT, and when you said no,

5    he was surprised.  That was your testimony, right?

6    A.  That's not what I said.

7              MS. LONERGAN:  Objection.

8              THE COURT:  Counsel, could you rephrase?

9    Q.  Tell me:  Why was he surprised?

10   A.  Well, from what appeared to me is whoever was on the phone,

11   he didn't want to go back to tell that individual on the phone

12   the answer that I gave him.

13   Q.  Let's back up.  The sergeant came to you and he asked you

14   something and you said, when you said no, he was surprised,

15   right?

16             MS. LONERGAN:  Objection, your Honor.

17             THE COURT:  Counsel, could I ask you to rephrase.

18   Q.  Okay.  Do you recall testifying that you said no to the

19   sergeant?

20   A.  Yes.

21   Q.  And what did you say no in response to?

22   A.  When he asked me if Mr. Zangi was receiving a desk

23   appearance ticket.

24   Q.  You said no, you weren't going to give him one, right?

25   A.  Stated no.

1  Q.  And he said that he had someone on the phone who believed

2  you should be giving a desk appearance ticket, right?

3          MS. LONERGAN:  Objection.

4          THE COURT:  Thank you.  You can answer the question.

5  A.  That's not what he said.

6  Q.  What did he say?

7  A.  Again, his demeanor when I stated to him no, he said

8  someone is on the phone wanting to know if he's getting a desk

9  appearance ticket.

10 Q.  And the sergeant was surprised, am I correct, because he

11 was telling you you should be giving a desk appearance ticket,

12 right?

13         MS. LONERGAN:  Objection, your Honor.

14 A.  No.

15         THE COURT:  Sustained.  Rephrase it, please.

16 Q.  Am I right that the real thing that was going on was the

17 sergeant was telling you you should be giving a desk appearance

18 ticket here, no?

19         MS. LONERGAN:  Objection.

20 Q.  You can answer.

21 A.  No.

22 Q.  But then he said -- you said to him:  Well, I'll talk to

23 the person on the phone.  Right?

24 A.  No.

25 Q.  What did you say to him?

IB6TGRA6                         Haley - Cross

1    A.  Do you want me to?

2    Q.  Okay.  And he said:  Go ahead.  Right?

3    A.  He said:  Can you?

4    Q.  And then you got on the phone and Inspector Grant was

5    there, right?

6    A.  Correct.

7    Q.  And Inspector Grant asked why you weren't giving a desk

8    appearance ticket, right?

9    A.  No.

10   Q.  What did Inspector Grant ask you?

11   A.  Inquiring if he was getting one.

12   Q.  He was asking isn't he getting a desk appearance ticket,

13   right?  Isn't Zangi getting a desk appearance ticket, right?

14   A.  No.

15   Q.  What was he saying?

16   A.  He inquired to ask if he was getting one, not isn't he.

17   Q.  Okay.  Is he getting a desk appearance ticket, is that what

18   he said?

19   A.  I don't know the exact words, but he was inquiring.  It

20   wasn't an order or telling me to do anything.

21   Q.  He didn't order you to do it, right?

22   A.  No.

23   Q.  But he told you you're supposed to give a desk appearance

24   according to the patrol guide in this situation, right?

25   A.  That's not what he told me.

IB6TGRA6                          Haley - Cross

1  Q.  Isn't that why everybody was surprised that you wouldn't

2  give a desk appearance ticket is because you were required to

3  by the patrol guide, right?

4          MS. LONERGAN:  Objection.

5          THE COURT:  Sustained.

6  Q.  Let's look at the patrol guide.  We could turn back to the

7  first page.  So if we look down to the middle of the page, it

8  talks about the procedure, correct?  Do you see where it says

9  that?

10 A.  Yes.

11 Q.  And it says what when you are arresting a person charged

12 with a misdemeanor or a violation, you will comply with

13 appropriate arrest processing guidelines and you will bring

14 them to the facility, right, or bring them to the precinct of

15 arrest, right?

16 A.  Correct.  There's more to it, but yes.

17 Q.  Then after that, desk officer will tell the prisoner that

18 he or she may be issued a desk ticket -- a desk appearance

19 ticket if qualified, right?

20 A.  That's what this states, yes.

21 Q.  Then number three, you're supposed to check the defendant's

22 identity, right?

23 A.  Yes.

24 Q.  And then you have to take certain steps involving an

25 investigation, number four, correct?

IB6TGRA6                    Haley - Cross

1   A.  Correct.

2   Q.  If we turn to the next page, and there's a five-step

3   eligibility process, correct?

4   A.  Correct.

5   Q.  And then the desk officer is supposed to check -- the steps

6   five through nine are the desk officer checking to make sure

7   that certain processes work, that the fingerprints come back,

8   that the person does not have any history of not being around

9   and various things like that, right, no warrants out on this

10  person, correct?

11  A.  That's the desk officer's job.

12  Q.  And then if you turn to the next page, you look down at the

13  bottom, and then it says you are supposed to make the desk --

14  if all of those things work out all right, you are directed,

15  you have to make a desk appearance ticket returnable to

16  criminal court and deliver that -- then deliver that to the

17  courts, right?

18  A.  Correct.

19  Q.  That's the process that is supposed to be done, right?

20  A.  Correct.

21  Q.  And then there are certain exceptions.  Those are the

22  general process, but there are certain exceptions for when you

23  don't give a desk appearance ticket, right?

24  A.  Correct.

25  Q.  And those exceptions are set out on page 6 of 11, correct?

1    A.  Correct.

2    Q.  And in this case, he did not have any open warrants, he had

3    given -- he qualified in every other way for a desk appearance

4    ticket, right?

5    A.  According to the patrol guide.

6    Q.  Yes.  Well, he had no open warrants, right?

7    A.  I don't believe so.

8    Q.  And every other step that we have just talked about he

9    qualified under, right?

10   A.  According to the guide, yes.

11   Q.  So then on page -- the government directed your attention

12   to the exceptions to desk appearance.  So if you look at page 6

13   of 11 it says:  A desk appearance ticket will not be issued in

14   the following circumstances.  Right?

15   A.  Yes.

16   Q.  And so these now are about to list the exceptions.  Usually

17   if it's a misdemeanor or a violation, the person has no open

18   warrants and he's given ID and everything else has checked out,

19   then you must give a desk appearance except in the following

20   circumstances.  Right?

21   A.  According to the guide, yes.

22   Q.  And so if we turn to the next page, if you look on Section

23   M, which the government pointed out to you on direct

24   examination, right?

25   A.  Sorry?

1  Q.  That's the Section M right there, M like Mary, is

2  aggravated unlicensed operation of a motor vehicle second

3  degree, right?

4  A.  Correct.

5  Q.  And that's the section that the government pointed out to

6  you on its direct examination of when you don't give a desk

7  appearance ticket, right?

8  A.  Correct.

9  Q.  But that did not apply to the Zangi case, did it?

10  A.  According to the guide, no.

11  Q.  Right.  And it didn't apply because Zangi was charged on a

12  different section, right?

13  A.  Subdivision.

14  Q.  Different subdivision of the VTL 511, right?

15  A.  Yes.

16  Q.  There are three subdivisions, correct?

17  A.  Correct.

18  Q.  And this charge says that you do not give a DAT if it's

19  Subdivision 2 or if it's Subdivision 3, right?

20  A.  Correct.

21  Q.  But he was charged under Subdivision 1, correct?

22  A.  Correct.

23  Q.  And so you were required to give a DAT, correct?

24  A.  According to the guide.

25  Q.  So according to the guide, a person like that should not

1   have to spend the night in jail, right?

2   A.  Correct.

3   Q.  But you decided that you would not listen to your

4   supervisor, the sergeant, you would not listen to the Inspector

5   Jimmy Grant, and would put someone in jail for the night,

6   right?

7            MS. LONERGAN:  Objection.  Misstates the testimony.

8            THE COURT:  Counsel, rephrase please.

9   Q.  Well, people were suggesting to you, saying to you:  Why

10  aren't you giving a DAT?  Correct?

11  A.  No.

12  Q.  No, that wasn't what Jimmy Grant said on the phone?

13  A.  It wasn't a suggestion.

14  Q.  What was it?

15  A.  An inquiry.

16  Q.  Okay.  And you say that you made the decision to put this

17  person in jail overnight, even though it's against the patrol

18  guide, based on something that district attorney's office had

19  said?

20  A.  That, and from my prior experience of what was behind the

21  desk at my previous precinct.

22  Q.  Let's talk about something that you say that the district

23  attorney's office said.  Did they say -- did someone from the

24  district attorney's office say this directly to you?

25  A.  I don't remember.

IB6TGRA6                         Haley - Cross

1   Q.   So what do you remember?

2   A.   Hearing that two individuals or multiple individuals were

3   involved in a motor vehicle accident and one had a suspended

4   license, they were not to be issued a desk appearance ticket.

5   Q.   When did you hear that?

6   A.   Prior to this incident.

7   Q.   From whom?

8   A.   From someone from the district attorney's office.

9   Q.   They told it directly to you?

10  A.   I don't remember.

11  Q.   Aren't you just making this up as an excuse for why you did

12  something wrong?

13            MS. LONERGAN:  Objection, your Honor.

14            THE COURT:  Thank you.  Sustained.

15  Q.   You can't even remember the day when this supposed -- this

16  conversation supposedly took place, right?

17  A.   Which conversation?

18  Q.   The conversation you supposedly had with someone from the

19  DA's office, right?

20            MS. LONERGAN:  Objection, your Honor.

21            THE COURT:  Thank you.  You can answer the question.

22  A.   I'm sorry, say again?

23  Q.   You don't even remember the day when this supposed

24  conversation took place, right, the conversation you supposedly

25  had with someone from the DA's office?

1   A.  I don't remember it being a conversation, as I stated.

2   Q.  I thought you just said a minute ago that someone from the

3   DA's office told you that.

4   A.  You asked me if someone told me that.  I don't remember

5   that.

6   Q.  What do you remember?

7   A.  That I became aware of that by the Brooklyn District

8   Attorney's Office of that.

9   Q.  When you say you became aware, how did you become aware?

10  A.  I don't remember.

11  Q.  So you just have a vague idea in your mind that somehow you

12  heard this, right, that this was the Brooklyn DA's position,

13  right?

14  A.  Absolutely not.

15  Q.  What was it?  What kind of idea do you have?

16  A.  I don't understand what you're asking.

17  Q.  You say there was also -- you testified that there was a

18  piece of paper at your other precinct which you say had the

19  rule that under 511.1(a) you were required to give -- you were

20  not allowed to give a desk appearance ticket.  That's your

21  testimony, right?

22  A.  I don't believe it was under that subdivision, it was under

23  the VTL 511.

24  Q.  Under 511 sub 2 and sub 3, right?

25  A.  No.

1   Q.  Well, you say it just said in general under VTL 511 you

2   were not allowed to give a desk appearance ticket, is that your

3   testimony?

4   A.  Ask that again, I'm sorry.

5   Q.  You testified on direct examination that there was a piece

6   of paper in your prior precinct which said that under these

7   circumstances, the Zangi circumstances, you were not allowed to

8   give a desk appearance ticket.  That was your testimony on

9   direct examination, right?

10  A.  Correct.

11  Q.  So what did that piece of paper say?

12  A.  It stated that if someone failed to answer a summons, owed

13  monetary value, child support, I'm not sure of the other

14  choices, they were not to be issued a desk appearance ticket.

15  Q.  So you understand that failure to issue a summons can turn

16  a VTL sub 1 into a VTL sub 2 if it happens three times, if

17  someone fails to answer three summonses it becomes a VTL sub 2,

18  right?  You know that.

19  A.  It's three on three.

20  Q.  It turns into sub 3?

21  A.  No.

22  Q.  Tell me what three on three means.

23  A.  If means they have three summonses on three different

24  dates, that would make them sub 2.

25  Q.  Okay.  And there was not three different summonses here,

1    right?

2    A.   I don't remember.

3    Q.   Well, you want to look at the complaint that you swore out

4    which says there was one failure to answer a summons?

5    A.   No, under the complaint it would say 511.1.  I don't

6    remember how many times Mr. Zangi was suspended.  That would be

7    on his printout of his suspension.

8    Q.   Let's go back to the complaint that is now in evidence, the

9    criminal complaint.

10             THE COURT:  Counsel, could I see you all briefly up

11   here at sidebar.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  Counsel, I'm looking at the clock.  I

3   think you made very effective use of your time so far with this

4   witness, Ms. Necheles.  I want to let the jury out at 3:30, as

5   I said, and my preference would be to finish cross-examination

6   if we can before I do that.  Do you think that there's any

7   prospect we would be able to?

8           MS. NECHELES:  No, your Honor.  This is a bad cop and

9   we have to show that.  She's a bad cop and we need to show

10  that.

11          MS. LONERGAN:  Your Honor, I need to point out that's

12  ridiculous, but regardless, this officer is not available

13  tomorrow.  She has to attend a funeral.  So if there is this

14  massive amount of cross, it would have to be interrupted and

15  the officer will have to come back because she's not available

16  tomorrow.

17          MS. NECHELES:  It's not massive, but about 15 minutes.

18  I don't know if Mr. Meringolo --

19          MR. MERINGOLO:  I don't know, you're doing a good job.

20  I don't think I need it.

21          THE COURT:  I don't think I could keep the jurors

22  here, given my commitment to them, is the problem.

23          MS. NECHELES:  We could stop now and go when she comes

24  back, but I will ask that the government not speak to her.

25          THE COURT:  I will provide an instruction after

1    talking with the parties about this.

2             Counsel, is she unavailable later in the day tomorrow?

3    Does it make a difference when --

4             MS. LONERGAN:  Your Honor, my understanding is that

5    the funeral is mid-morning, so she wouldn't be able to come

6    here and then get to the funeral in the morning, and then that

7    would make her unavailable essentially for the rest of the day.

8             MR. BELL:  Is your Honor talking about the back end,

9    about the afternoon?

10            THE COURT:  Yes.

11            MS. RAVENER:  We're breaking tomorrow at 2:00

12   tomorrow, so I think that's the challenge.

13            THE COURT:  Fine.

14            MS. RAVENER:  And we want to be respectful of sure

15   funeral obligations.

16            THE COURT:  Unfortunately I apologize, I need to end

17   on time to at least keep that part of my commitment to jurors.

18   We can talk about what instructions I will provide her after I

19   allow the jury to step out.

20            MS. NECHELES:  Thank you.

21            MR. MERINGOLO:  Thank you, Judge.

22            (In open court)

23            THE COURT:  So ladies and gentlemen, I apologize for

24   the interruption, it's almost 3:30 now and I told you that I

25   would let you out every day no later than 3:30.  I'm going to

IB6TGRA6

1    live up to any commitment on that front today, so I'm going to

2    ask you to end for the day now.

3           During this window, as always, ladies and gentlemen,

4    please don't talk about the case amongst yourselves, don't

5    communicate about it with anyone else, and don't do any

6    research about the case or anything or anyone involved in it.

7    Please be here at 9:00 a.m. tomorrow.  I will try to bring you

8    in as promptly as possible so we can begin our work again

9    early.

10          One comment about tomorrow's schedule.  With

11   apologies, we need to end the trial day a little earlier than I

12   usually would like to.  We have to end around 2:00, so we can

13   plan to end tomorrow's testimony at 2:00.  This is something

14   that I had already contemplating when describing the schedule

15   as a whole to you.

16          If you haven't had the opportunity to vote yet, please

17   take the opportunity to do so.  I will see you tomorrow

18   morning.  Thank you.

19          (Jury not present)

20          THE COURT:  So first, counsel for the United States,

21   I'm prepared to provide an instruction to the witness that she

22   not discuss her testimony or any of the issues related to the

23   case with anyone between now and next time she's on the stand.

24   Any concerns regarding such an instruction?

25          MS. LONERGAN:  Your Honor, we're aware of that and

IB6TGRA6

1    that's the procedure that we follow with the witness on

2    cross-examination.

3                THE COURT:  Thank you very much.

4                So Officer, first, thank you very much for being here

5    today.  I am ordering you not to discuss this case, your

6    testimony today, or any of the issues related to your testimony

7    between now and the next time you'll be with us.  I understand

8    that you have a competing commitment tomorrow, and I don't

9    expect to call you back tomorrow.  We won't interfere with

10   that.  So I expect that we'll see you back here on the

11   following day, but it's very important that you not communicate

12   with anyone about the subject matter of your testimony between

13   now and then.  Is that clear?

14               THE WITNESS:  Yes, your Honor.

15               THE COURT:  Thank you very much.  You can step down.

16               MS. LONERGAN:  Your Honor, may I make one caveat, if

17   we have to get in touch with the officer for scheduling, it

18   would be limited to logistics and scheduling.

19               THE COURT:  That is a reasonable qualification.  You

20   can absolutely communicate with the United States or its

21   representatives about scheduling for you to appear here.  Thank

22   you very much.

23               So counsel, as the officer is stepping down and

24   walking out of the courtroom, let me ask if there's anything

25   that we can take up now.  I have a short list of things that

IB6TGRA6

1    have come up in the course of the day and I would be happy to

2    discuss those.  Counsel, is there anything that any of you

3    would like to put onto the list for discussion now?  As I say,

4    I have a number of issues that are on my list, I'm not sure

5    that we'll be able to resolve them all before we must recess

6    for the day, but I would like to make sure that we are all

7    working with the same universe of information.

8            I want to take the opportunity to hear more about the

9    what I will describe as the friendship limiting instruction.  I

10   know Ms. Necheles was working on something.  You have been in

11   the midst of trying the case, so I don't anticipate you have

12   had the opportunity to work on it more comprehensively.

13           Counsel for Mr. Reichberg and Mr. Grant, would you

14   like to propose something to me in writing after we close

15   today's trial date?

16           MS. NECHELES:  Sure, your Honor, we'll do that.  We'll

17   send you something.

18           THE COURT:  Thank you very much.  I will take up that

19   issue separately.  I will review the government's proposal, I

20   will review the defendant's proposal as well, and we'll try to

21   to Court tomorrow with a proposal regarding that.

22           Thank you, United States, for your proposed language.

23   I will comment on it tomorrow, and I look forward to discussing

24   what language will ultimately be put in front of the jury, if

25   any.

IB6TGRA6

1          MR. BELL:  May I note, your Honor -- I didn't want to

2     get into this before on the jury's time, but that you

3     instruction incorporates at its tail end dual intent

4     instruction that was given to the jury as recently as *United*

5     *States v. Adam and Dean Skelos*.  We just wanted to make sure

6     that your Honor was aware of that precedent that says you can

7     consider it.

8          THE COURT:  Thank you very much.  I appreciate that.

9     One of the things that I am thinking about is how to address

10    the reasonable concern that the United States has articulated

11    without prejudging too much what the ultimate conclusion will

12    be with our discussion of the ultimate charges.  In any event,

13    I look forward to seeing the defenses' submissions before I

14    make a determination about what we should say.

15          That's one issue on my list of issues to discuss.  I

16    need to read you the decision that I prepared with respect to

17    the Bruton issue that was taken up by the time that we spent

18    talking about the rules.

19          Counsel for Mr. Reichberg, would you like to

20    reconsider your position about bringing in the rules with

21    respect to the DATs?

22          MS. NECHELES:  Your Honor, as I said earlier, I

23    thought the DAT rule was one that was different than the others

24    because it went to whether Mr. Reichberg had actually caused

25    somebody to do something wrong in terms of releasing somebody,

IB6TGRA6

1    so I thought it was different.

2              THE COURT:  Thank you.  So I think that we also should

3    talk briefly about one issue that is raised in the United

4    States' letter from late Thursday night/early Friday morning,

5    and that relates to the sufficiency of the defense's expert

6    disclosures.  I don't believe that we can talk about all of the

7    issues raised in the government's letter, but I want to spend a

8    moment on that issue because it's one that may be one that we

9    can work on between now and the time, if any, that these

10   witnesses are called.

11             Counsel for the defense, is there anything that you

12   can offer at this time regarding the government's arguments

13   that the disclosures provided by you weren't adequate as to

14   these experts?

15             MS. NECHELES:  Your Honor, I have really not focused

16   on this just because we have been so busy.  I will take that up

17   with Mr. Meringolo after court today and see if we can give

18   further disclosure, whether there is something that we can lay

19   out better.

20             THE COURT:  Thank you, I appreciate that.  I will ask

21   you about it again tomorrow morning.  To extent that the issue

22   is one of disclosure, I think it's something that perhaps, with

23   investment of time, we could mitigate concerns.  In any event,

24   I will raise this tomorrow.

25             Let me say a couple of words about our schedule both

IB6TGRA6

1   for lunches and our breaks.  First, I am very conscientious of

2   using our jury's time well.  My philosophical belief is there

3   are relatively few places where citizens come in contact with

4   the functioning of our government, and I take seriously the

5   duty to show them that we can act effectively.

6         It's for that reason that I care deeply about making

7   sure that I abide by my commitments to the jury about when

8   we're going to do things and the time it takes to do things.  I

9   think that we should be able to do our short lunch schedules.

10   I think that the issue that we had today is very much a

11   consequence of I will call it the proliferation of issues that

12   have arisen late in the process of this trial, and my hope is

13   that those will burn off over time and we'll be able to use the

14   time in the morning effectively to resolve issues.

15         The other thing that I asked counsel is that you let

16   me know if you think that we need more time for something.  If

17   you do and you let me know about it I could let the jury know

18   about it and then I will not be disappointing them, instead I

19   will be telling them what I expect to do.  So please give me

20   feedback, counsel, so I can give them proper guidance.

21         When I told the jury that I expect to start after a

22   short recess in 15 minutes or so, my expectation is that we'll

23   have the jury back and walking in in 15 minutes.  So that

24   unfortunately means for me and for you, counsel and parties,

25   that you should be in your seats a minute or so before that so

IB6TGRA6

1    that they can come in after Anthony, Mr. Daniels, brings them

2    in.

3          I also want to thank you, counsel, for being compliant

4    with my general request not to make talking objections.  I

5    think that generally the parties did well with that.  I think

6    there are a couple of exceptions that came up during the course

7    of today's conference.  To the extent at any point, counsel,

8    you want to say more to the Court or to a party, just ask for a

9    short break or ask talk to about it out of earshot of the jury.

10   I would rather do that than have the complicated back and forth

11   that caused some laughter with the jury earlier today.  So I

12   would like to ask you, counsel, to adhere to my request that

13   you avoid talking objections, and to the extent that there are

14   issues that you can work out with your adversaries, that you do

15   it at a low tone out of the hearing of the jury or with the

16   Court at sidebar.

17         Is there anything else that we need to talk about now?

18   Counsel for the government?

19         MS. LONERGAN:  One moment, your Honor, if I may.

20         THE COURT:  Please, take your time.

21         (Pause)

22         MR. BELL:  Judge, before we continue, do you intend to

23   loop around to the items that you articulated, the friendship

24   instruction, the sufficiency issue, the other stuff that you

25   mentioned?

IB6TGRA6

1      THE COURT:  No.  With respect to the friendship

2  instruction, I'm going to give the defendants the opportunity

3  to consider their issue and to submit something to me.

4      MR. BELL:  Got it.

5      THE COURT:  I will come back with a better sense of

6  what the issues are later.

7      What was the second point that you raised?

8      MS. LONERGAN:  One moment, your Honor.

9      THE COURT:  Thank you.

10      MS. RAVENER:  Your Honor, thanks for giving us a

11  moment to confer.

12      THE COURT:  It's not a problem.

13      MS. RAVENER:  I want to make clear on the record that

14  we notified the defendants yesterday that we may be calling

15  sergeant -- excuse me, David Villanueva as soon as tomorrow,

16  depending upon scheduling.  And so I just want to ensure that

17  to the extent there's any further issues with respect to the

18  Lichtenstein evidence that the parties work together to vet

19  that and raise any determinations before the Court promptly.  I

20  don't expect that it will come -- we will necessarily get to

21  him tomorrow, given the pace that we took today, but I want to

22  make sure we deal with this efficiently.

23      I will note that we did review your Honor's ruling,

24  and it's the government's understanding that conversations that

25  Mr. Villanueva had with defendant Grant about Shaya

IB6TGRA6

1    Lichtenstein and their mutual relationship with Shaya

2    Lichtenstein and his dealings with the gun licensing division

3    of the NYPD are admissible to give background to that

4    relationship.

5            So again, the defense is in possession of the 3500 to

6    date with respect to Mr. Villanueva, and we would request that

7    to the extent that there's any issues that they foresee within

8    the scope of that that they raise them with us.  And if it is

9    material that we plan to intentionally elicit, we will raise it

10   with your Honor.  I think that would help us all move forward

11   efficiently without having any issues with the Court's ruling.

12           THE COURT:  Thank you very much.

13           MS. NECHELES:  Your Honor, I would like to say that is

14   not our understanding of what the ruling was at all, but I will

15   go back and look at it and have a discussion with them.

16           THE COURT:  Please.

17           MS. NECHELES:  Our problem, when the government says

18   we are in possession of his 3500 material, it's massive.  He

19   testified at a trial.  So I don't know what he's going to be

20   saying here.  It doesn't give me a clue of what they plan to

21   elicit.  So I thought it was rather narrow, just that your

22   Honor recognized it was extremely prejudicial to Mr. Reichberg,

23   who had initially granted a severance based on -- or suggested

24   maybe a severance would be appropriate.  I didn't mean to say

25   granted severance, I withdraw that.  That's not what happened.

IB6TGRA6

1      That it might be appropriate, but you recognized the severity

2      of this.  And I thought your Honor had made a rather narrow

3      ruling that a small amount could come in.

4              THE COURT:  Thank you.  Please do confer on this

5      overnight.  Please come prepared to talk about it in the

6      morning during that 9:00 a.m. to 9:15 window.  I will review

7      the record with respect to that issue as well.

8              I think in terms of our pacing generally, I encourage

9      the parties to have the kind of conversations that the

10     government has described and encourage you to bring to my

11     attention, as much as possible, issues that you anticipate

12     during the course of the day during that early morning window.

13     My hope is that that will help us avoid sidebars of any length.

14     I know they're all not always avoidable, but I think we can

15     help make the process a bit more efficient.

16             MS. NECHELES:  I feel like it could be more efficient

17     if we knew what witnesses the government intends to call

18     tomorrow and then Thursday as well.

19             THE COURT:  Thank you.  Counsel for the government?

20             MS. LONERGAN:  Your Honor, given the much, much slower

21     pace today than anticipated, we'll have to go back and regroup.

22             As the Court is aware from some of our comments, some

23     witnesses have scheduling issues, some witnesses we thought we

24     would got on today we did not.  So as we did last night, we're

25     happy to provide an email to defense counsel a little earlier

IB6TGRA6

1   than yesterday because we're ending earlier.  But we can't yet,

2   without looking at our schedule, figure out the four witnesses

3   who didn't get on the stand today and all the people who are on

4   our list for tomorrow exactly who will be called tomorrow or

5   Thursday until we do that work.

6          THE COURT:  Thank you.  I understand the government

7   will be providing that information to counsel for defense at

8   some point during the course of today.

9          MS. LONERGAN:  Of course, your Honor.  It's not worth

10  it for us to speculate now without -- it doesn't help for us to

11  guess right now.

12         THE COURT:  That's fine.  Thank you.

13         Anything else that we need to talk about now?

14  Otherwise I look forward to seeing the letter about the

15  friendship issue from the defense.  I'll plan to give you a

16  short recitation of my logic regarding the Bruton issue that

17  came up today.  And other than that, I look forward to seeing

18  you here in the morning promptly so that I can take the bench

19  at 9:00.

20         Anything else that we should talk about now, counsel

21  for the government?

22         MS. LONERGAN:  No, your Honor.

23         THE COURT:  Thank you.  Counsel for Mr. Reichberg?

24         MS. NECHELES:  No, your Honor.

25         THE COURT:  Counsel for Mr. Grant?

IB6TGRA6

1            MR. MERINGOLO:  No, your Honor.

2            THE COURT:  Thank you all very much.  This proceeding

3    is adjourned.  I will see you tomorrow morning.

4            (Adjourned to November 7, 2018, at 9:00 a.m.)

```
1                         INDEX OF EXAMINATION

2    Examination of:                            Page

3    TIMOTHY CHAPEL

4    Direct By Mr. Bell . . . . . . . . . . . . . 150

5    Cross By Ms. Necheles  . . . . . . . . . . . 170

6    THERESA HALEY

7    Direct By Ms. Lonergan . . . . . . . . . . . 186

8    Cross By Ms. Necheles  . . . . . . . . . . . 223

9                        GOVERNMENT EXHIBITS

10   Exhibit No.                              Received

11    1615A   . . . . . . . . . . . . . . . . . 164

12    1615   . . . . . . . . . . . . . . . . . . 165

13    1616, 1616A, 1618 and 1618A  . . . . . . . 169

14    1704   . . . . . . . . . . . . . . . . . . 213

15    710   . . . . . . . . . . . . . . . . . . . 218

16    711   . . . . . . . . . . . . . . . . . . . 221

17                        DEFENDANT EXHIBITS

18   Exhibit No.                              Received

19    JR9509   . . . . . . . . . . . . . . . . . 232

20    JR9501   . . . . . . . . . . . . . . . . . 235

21

22

23

24

25
```