IB7TGRA1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          16 Cr. 468(GHW)

 5   JAMES GRANT and JEREMY
     REICHBERG,
 6
                    Defendants.
 7
     ------------------------------x
 8
                                           November 7, 2018
 9                                         9:00 a.m.

10   Before:

11
                       HON. GREGORY H. WOODS,
12
                                           District Judge
13

14                           APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  JESSICA R. LONERGAN
17        KIMBERLY J. RAVENER
          MARTIN BELL
18        Assistant United States Attorneys

19   HAFETZ & NECHELES, LLP
          Attorneys for Defendant Reichberg
20   BY:  SUSAN NECHELES

21   MERINGOLO & ASSOCIATES
          Attorneys for Defendant Grant
22   BY:  JOHN MERINGOLO
          ANJELICA CAPPELLINO
23

24

25
```

IB7TGRA1

1          (In open court)

2          THE COURT:  First, thank you very much, counsel, for

3     being back here timely.  Let's begin.

4          Is there anything that the parties would like to bring

5     to my attention?  I have on my agenda this morning to talk

6     about the proposed limiting instruction to address the comment

7     made by counsel for Mr. Grant during opening statements

8     yesterday.  I would like to talk some more about the Bruton

9     issues informed by the government's submission overnight,

10     making it clear that they wish to introduce not the four

11     statements identified previously but the entirety of the

12     interview and all statements therein.

13          Those are the principal things that I want to make

14     sure that we address before we bring in the jury.  Is there

15     anything else that the parties want to make sure that we

16     address before that happens?

17          MS. NECHELES:  Your Honor, the second issue was?

18          THE COURT:  The Bruton issue.  The government

19     submitted a letter overnight asking in essence to be permitted

20     to introduce the entirety of the Massey --

21          MS. NECHELES:  I haven't seen it.

22          THE COURT:  Thank you.  The downside of having the

23     things come up late in the process, the government, in that

24     letter -- which I will ask someone from my Court staff to print

25     out for you if the government can't do it -- I will call it a

IB7TGRA1

summary of it is that they wish to introduce the entirety of
the interview between Agent Massey and Mr. Grant.  They take
the position they will be prejudiced if you are permitted to
introduce that in cross-examination.  They argue your doing so
would violate the hearsay rules, and they take the position in
response to the procedural, what I will describe as a gaff,
that they believe they provided adequate notice of their intent
to raise this testimony by embedding Agent Massey in the
witness list and providing the defense with his 3500 materials.

MS. NECHELES:  Your Honor, 3500 material, that would
be included whether or not he would be testifying about that.
That's just a kind of ridiculous argument.

THE COURT:  Thank you.  We need not take that up now.
I expect we'll have the opportunity to discuss it further.

MS. NECHELES:  But for Mr. Grant, I don't intend to
bring out anything.  On thinking about it, I agree, it's
hearsay.  I don't understand how I could get it in.  If I
could, I would be bringing it out, but I think this whole
argument is unnecessary.  If they had called me, they would
have known that.

THE COURT:  Thank you.  So the current position,
counsel for defense, as a understand it, and the United States,
is that the scope of the testimony from Agent Massey will be
limited to the four statements that were identified in the
government's -- I should the defense's letter that was

IB7TGRA1

1    responded to by the United States, is that correct, counsel for

2    the United States?

3            MS. LONERGAN:  Yes, your Honor.  If that's what we're

4    hearing from the defense, from both defense counsel, that they

5    intend to stay within those four proffered statements, then I

6    think the government's letter is moot and we can move on.

7            THE COURT:  Thank you.  Let me just inquire.  Counsel

8    for Mr. Reichberg, is that an accurate assessment?

9            MS. NECHELES:  Yes, your Honor.

10           THE COURT:  Counsel for Mr. Grant, is that an accurate

11   assessment?

12           MR. MERINGOLO:  Your Honor, I didn't hear because the

13   interpreter was sitting here.  Could I ask that he sit there?

14   I didn't hear because he was talking.

15           THE COURT:  I'm sorry?

16           MR. MERINGOLO:  I didn't hear what you said.

17           THE COURT:  We need to work out this issue with

18   respect to location of any interpreters.

19           First, a comment counsel, so you know why these

20   interpreters are here.  There's a group from a foreign

21   delegation that is monitoring today's proceeding, so the

22   interpreters are here to translate for that group.  I'm moving

23   the interpreters further away from counsel's table to ensure

24   they will not interfere with the trial.

25           MR. MERINGOLO:  Thank you very much.

IB7TGRA1

1          THE COURT:  And please let me know at any time,

2     counsel, if this is a distraction.  The most important thing is

3     the defendants' trial.

4          So Mr. Meringolo, I just wanted to ask for your

5     affirmation that the scope limitation regarding the testimony

6     of Agent Massey that we have just been discussing is also

7     acceptable to you.  In other words, it would be limited to the

8     four statements that were the subject of discussion previously.

9          MR. MERINGOLO:  Well, your Honor, I would like to ask

10    Agent Massey background on how he got to Mr. Grant's house, who

11    he went with, about handwritten notes and 302s and what the

12    process is.  I would not go into anything other than the four

13    statements for specific cross-examination, but there are

14    procedures to accomplish that.

15         THE COURT:  Thank you very much.

16         Counsel for the United States, any concern regarding

17    the scope of the anticipated cross-examination that's just been

18    described by counsel for Mr. Grant?

19         MS. LONERGAN:  There doesn't appear to be.  I just

20    want to make clear that we also think within the Court's ruling

21    would be questions, for example, how long was the interview,

22    because he's only going to testify about four statements.  So

23    if its elicited that the interview was, for example, two hours,

24    that would leave the same concern that the government had about

25    kind of that there's a lot of stuff that he omitted from that

IB7TGRA1

1    interview.

2             So we think, however, the process of note taking, how

3    notes become a 302, who's at the home, all of that is totally

4    within bounds, but just no cross-examination that suggests that

5    substantive portions of the interview are being omitted from

6    Agent Massey's testimony.

7             THE COURT:  Thank you.

8             Counsel for Mr. Reichberg?

9             MS. NECHELES:  Your Honor, the government wants to put

10   in something that's incredibly prejudicial and that limits what

11   we can cross on.  It all goes to the heart on why this

12   shouldn't be coming in.  They can't seek to put something in

13   and then complain that there's going to be a cross so they

14   should put more stuff in that's not allowable.  It's sort of

15   they're going backwards, they're squeezing things in and

16   cutting off the defense.

17            THE COURT:  Thank you, understood.  Let me ask counsel

18   about the specific comment made by counsel for the United

19   States, namely the request that I ask the parties not to

20   inquire regarding the duration of this interview.

21            MS. NECHELES:  The problem is I don't know what he's

22   going to say.  I don't know what is going to happen while he's

23   testifying.  They want to put limits on it but who knows what

24   he's going to answer.  This is not a situation where I have had

25   a deposition or I know what he's going to say.

IB7TGRA1

1          THE COURT:  Let me ask this way, assuming that the

2    information regarding duration of the interview does not come

3    out on direct, do you have a concern regarding that proposed

4    limitation?

5          MS. NECHELES:  Yes, because if I ask:  You didn't go

6    back and write this down right away; and he says:  Well, I

7    didn't have time, I may have to get into what -- this was a

8    short interview, right?  I don't know what is going to happen.

9          THE COURT:  Thank you, I appreciate that.

10          Counsel for Mr. Grant?

11          MR. MERINGOLO:  I don't think that I would go anything

12    with the amount of time.  I think I would be consistent with

13    how I proffered.  I could proffer further, Mr. Grant invited

14    you into his house and then you left his house and there was no

15    incident whatsoever.  I think if I proffer that to the

16    government, I don't think that's unreasonable.

17          THE COURT:  Thank you.  Good.  So I understand that

18    the defense does not intend to directly inquire about that,

19    that issue may come up during the course of the examination of

20    the type that counsel for Mr. Reichberg has suggested.  I can't

21    anticipate whether that will happen or not, but I do understand

22    that the defendants do not anticipate specifically eliciting

23    that piece of information that the government will not do so.

24    I think that's adequate from my perspective at this time to

25    address the concern that the government articulated.

IB7TGRA1

1              Let me turn briefly --

2              MS. LONERGAN:  Your Honor, may I raise one additional

3    thing on this?

4              THE COURT:  Yes.

5              MS. LONERGAN:  If we don't have a break before we

6    intend to call Mr. Massey, I would ask for an incredibly brief

7    break, three to five minutes, so I could instruct the witness

8    to make sure that he is going to stay within the bounds of the

9    Court's ruling.

10             THE COURT:  That's fine.  Thank you, I would be happy

11   to do that.

12             Let me just comment further -- I'm sorry, I want to

13   read you my full reasoning with respect to these four Bruton

14   statements, but I also want to start on time with the jury.

15             I'm proposing to modify the limiting instruction that

16   the government presented yesterday to make it a bit more robust

17   and consistent with the limiting instruction that I found over

18   the course of the evening yesterday.  The proposed instruction

19   would read as follows, "Ladies and gentlemen of the jury, let

20   me just interrupt to tell you about this testimony you have

21   just heard."

22             Although I should say I would be happy to deliver this

23   before the testimony if either party would prefer.

24             "The evidence of Mr. Grant's statements to Agent

25   Massey may not be considered or discussed by you in any way or

IB7TGRA1

1    for any purpose with respect to other defendant on trial,

2    Mr. Reichberg.  You may only consider that testimony as to

3    Mr. Grant.  That is to say, to the extent that you find the

4    testimony credible and worthy of weight, it can only be used in

5    your determination of whether or not Mr. Grant is guilty of any

6    of the crimes charged against him.  Again, you cannot use it in

7    any way in your consideration of the charges against

8    Mr. Reichberg."

9              So that's what I propose to do, a modification, slight

10   expansion, hopefully strengthening the proposed language that

11   was proffered by the United States yesterday.  I ask that each

12   of you be handed a version of that.  And that is happening now.

13             Also, with respect to the corrective instruction, I

14   have reviewed both the proposal by Mr. Reichberg's counsel and

15   also the proposal by the United States.  I do think it's

16   important for me to provide a corrective instruction.

17   Unfortunately, this statement by counsel was not legally

18   accurate, and I'm concerned that while it was just a small

19   point in time during the course of that opening statement, that

20   given the dramatic manner in which it was offered and also what

21   I will call the clarion call of the language that was used,

22   that it will improperly leave the jury with the impression that

23   friendship is a defense to the commission of these crimes.

24             I think I need to correct that misimpression.  I've

25   looked at the parties' proposals.  I'm going to put in front of

IB7TGRA1

1    you a proposed corrective instruction regarding that statement.

2    The version of the proposal is going to be handed to all of you

3    now, and I would like to talk about it during our next break.

4         So counsel, you'll have that during a short break, I

5    will hear your comments on it and then I expect to read

6    something to the jury.  I would like to start on time, though,

7    to the extent that we can today.  Anything else that we need to

8    discuss before we begin?

9         MR. BELL:  Just to flag one short thing regarding the

10    immediate presentation of evidence, we had informed the defense

11    that we were going to begin this morning by calling Marty Nat

12    and Boaz Gazit as our first two witnesses.  Mr. Nat is

13    essentially a document custodian for a building for which

14    Mr. Gazit arranged to get windows for Mr. Grant.  The essential

15    thrust of Mr. Nat's testimony is to get in one document as a

16    business record.

17         Mr. Nat checked in with our witness-wrangling agents

18    and he's on his way here from Penn Station.  He got here on

19    time yesterday.  He's currently at the mercy of the MTA.  So as

20    to not waste jury time, my plan is to call Mr. Gazit first,

21    assuming Mr. Nat is not outside, and admit that document

22    through Mr. Gazit, subject to connection such that we could

23    have Mr. Nat complete the loop if immediately after.

24         THE COURT:  Thank you.

25         MS. NECHELES:  Your Honor, we object to that.  We have

IB7TGRA1

1    questions with this document and there will be no foundation,

2    that's what the government is saying, so we will object to

3    that.  We think that there is -- it's not even Mr. Gazit's

4    business record.  I don't think he's ever seen this document.

5    It's a business record of someone else.  And if he has seen it,

6    I believe he has seen it because the government has shown it to

7    him, unless there's something that's not in the 3500 material.

8            THE COURT:  Thank you, counsel.

9            MR. BELL:  I believe Mr. Gazit has seen the document,

10   but more to the point, it seems to me that they will be able to

11   question Mr. Nat just as effectively later on.

12           THE COURT:  Thank you.  Could I ask for a brief

13   proffer about the anticipated testimony by Mr. Nat?

14           MR. BELL:  Mr. Nat is going to testify that he is one

15   of the folks that runs a business in New Jersey called Riviera

16   Windows & Doors, might be Doors & Windows, and that what's

17   marked for identification as Government Exhibit 927 is a

18   business record of that business.

19           THE COURT:  Thank you.  So you expect him to be able

20   to answer all the foundational questions in a way that's

21   appropriate?

22           MR. BELL:  I do, your Honor.

23           THE COURT:  Thank you.  I will allow the government to

24   proceed in the way that they described and the document will be

25   offered subject to connection.

IB7TGRA1

          1          MS. NECHELES:  To be clear, it's not just foundational

          2    questions, there's questions about how things are reflected on

          3    that document, and I will not be able to cross-examine this

          4    witness about it because I don't know the answers.  So the

          5    document will be coming in at a time where I don't have the

          6    basis to question.  It will be fundamentally unfair.  We will

          7    not be able to effectively cross-examine on that document

          8    because the person who created the document and the business

          9    who created it won't have testified about how the entries --

         10    what those entries mean on the document.

         11          So it's not like a telephone record which we have

         12    stipulated to, or bank records, which we have stipulated to,

         13    it's a document that's from a small business that has weird

         14    entries on it, and they want to put it in through a person who

         15    has no knowledge of how those entries got on to it.

         16          THE COURT:  Thank you.  Understood.

         17          Counsel for the United States, do you have a sense of

         18    the timing for Mr. Nat's arrival here?

         19          MR. BELL:  May I check in with our folks outside very

         20    briefly?

         21          THE COURT:  Yes.

         22          MS. NECHELES:  To be clear, your Honor, I offered

         23    yesterday, if he would let me speak to Mr. Nat, maybe it would

         24    answer my questions and I wouldn't have to ask these questions

         25    in front of the jury.

IB7TGRA1

1           THE COURT:  That's fine.  We are where we are at this

2     point.

3           MR. BELL:  I'm not even going to get into that, your

4     Honor, because Mr. Nat is apparently here, so it's all moot.

5           THE COURT:  Thank you.  Let's proceed.

6           Mr. Daniels, please brings in the jury.

7           (Jury present)

8           THE COURT:  Counsel for the United States, I'm going

9     to ask you to call your next witness.

10          As the government is doing so, first, ladies and

11    gentlemen, thank you very much for being on time this morning,

12    I really appreciate it.

13          Counsel for the United States.

14          MS. NECHELES:  Your Honor, could we approach for one

15    minute?

16          THE COURT:  You may.

17          (At sidebar)

18          MS. NECHELES:  Is your Honor going to tell the jury

19    that the other witness was instructed not to come today because

20    of scheduling concerns, and that she'll be back to finish the

21    cross?

22          THE COURT:  I will be happy to do exactly that.

23          MR. BELL:  Thank you, your Honor.

24          (In open court)

25          THE COURT:  So ladies and gentlemen, as the government

1    is finding their witness, you will see that the next witness in

2    the case is not going to be Officer Haley, Officer Haley had a

3    scheduling issue, so she will be back later to complete her

4    examination by each of the defendants and then any redirect by

5    the government.

6            So in order to accommodate that scheduling concern,

7    the United States is moving on to the next witness, but will

8    you hear more from Officer Haley at a subsequent day.  Thank

9    you.

10           MR. BELL:  Thank you, your Honor, the government calls

11   Martin Nat.

12    MARTIN ROBERT NAT,

13        called as a witness by the Government,

14        having been duly affirmed, testified as follows:

15   DIRECT EXAMINATION

16   BY MR. BELL:

17   Q.  Good morning, Mr. Nat.

18           Mr. Nat, what do you do for a living?

19   A.  I am a member of a limited liability corporation that sells

20   windows and doors in New Jersey.

21   Q.  What is the name of that corporation?

22   A.  Riviera Doors & Windows or Riviera Doorwalls LLC, which is

23   the legal entity.

24   Q.  And you mentioned that you are a member of that

25   corporation.  What does that mean?

IB7TGRA1                          Nat - Direct

1   A.  Yes, I am.  I am one of the partners, principals, whatever

2   you would want to call it.

3   Q.  How many partners or principals are there?

4   A.  Three of us.

5   Q.  How many people work for Riviera Doors & Windows as a

6   whole?

7   A.  Just the three partners.

8   Q.  So on a day-to-day basis, Mr. Nat, what are your duties and

9   responsibilities with respect to Riviera Doors & Windows?

10  A.  We pretty much all share the responsibilities.  We sell, we

11  buy, we meet with customers, we go out to job sites for

12  measurements, and we bill.

13  Q.  As a member of that corporation, about how many people do

14  you supervise?  How many people are working under you?

15  A.  None, just the three partners.

16  Q.  Now does Riviera keep track of its sales?

17  A.  Yes, we do.

18  Q.  How does Riviera keep track of its sales?

19  A.  We use Quickbooks.  We have sales orders, we deliver

20  material, and we invoice.

21  Q.  And how does invoicing work at Riviera Doors & Windows?

22  A.  After the delivery is made, the order is invoiced to the

23  customer.

24  Q.  And who usually handles the invoicing?

25  A.  Invoicing is usually handled by one of my other partners.

1   His name is David Lenkowsky, L-E-N-K-O-W-S-K-Y.

2   Q.   Notwithstanding that Mr. Lenkowsky generally handles that,

3   are you familiar with the invoicing process?

4   A.   Absolutely.

5   Q.   Are you familiar with the paperwork?

6   A.   Yes.

7   Q.   As a general matter, sir, are Riviera's invoices put

8   together at around the same time as the events described in the

9   invoice, that is, the sale, the payment, or the delivery?

10  A.   When the sale is made, a sales order is issued and sent to

11  the customer upon which we would get a deposit, 50 percent of

12  the sale.  After delivery, or usually after delivery the

13  invoice is printed, sent to the customer, and we receive

14  payment either upon delivery or we know the customer when he

15  sends us a check.

16  Q.   Does Riviera Doors & Windows also maintain or generate

17  payment receipts?

18  A.   No.  We receive checks.  We might credit the invoice, the

19  payment against the invoice, showing zero balance, and

20  there's -- generally, other than that, there's no receipt.

21  Q.   Does the invoice -- sorry, withdrawn.

22        Does Riviera nevertheless keep track of when it

23  receives payments?

24  A.   Absolutely.

25  Q.   And how is that documented?

1   A.  With using Quickbooks.  Payments are recorded in Quickbooks

2   and deposited in the bank.

3   Q.  So I want to show you what's been marked for identification

4   as Government Exhibit's Exhibit 927.

5         MR. BELL:  Mr. Hamilton, can you put that just on the

6   witness's screen, please.

7   Q.  Is your screen working, Mr. Nat?

8   A.  Yes.

9   Q.  I want to show you the document and go through each of the

10  pages briefly.

11        First, are you familiar with the type of document on

12  your screen currently?

13  A.  Yes.

14  Q.  What is that, sir?

15  A.  This is one of our invoices.

16  Q.  And again, these are the same invoices that you described a

17  moment ago?

18  A.  Yes, it is.

19  Q.  Does Riviera maintain copies of these documents in the

20  ordinary course of its business?

21  A.  Yes, we do.

22  Q.  I will note that there are a couple of dates there, one

23  invoice date and one date indicating a date of payment where it

24  says paid.  Are those marks kept or made at around the time

25  that those events take place?

IB7TGRA1                        Nat - Direct

1    A.  Yes.

2            MR. BELL:  Can we go to the second page, Mr. Hamilton.

3    Q.  Are you familiar with this type of document?

4    A.  Yes.

5    Q.  What is this type of document, sir?

6    A.  It says it's a payment received.

7    Q.  Is this also concerning Riviera Doors & Windows?

8    A.  Yes.

9    Q.  In this case there's a specific business there and a

10   specific date and a payment amount.  Are these types of

11   documents, too, maintained in the ordinary course of business

12   at Riviera Doors & Windows?

13   A.  Yes.

14           MR. BELL:  And finally I will ask you, Mr. Hamilton,

15   to go to the third page of the document, and we have another --

16   we have a similar document.

17   Q.  Is this, too, a type of document that we referenced just

18   before in reference to the second page?

19   A.  Yes, that's how the payments are kept track of in

20   Quickbooks.

21           MR. BELL:  Your Honor, the government offers 927 as a

22   business record.

23           THE COURT:  Thank you.  Counsel?

24           MS. NECHELES:  No objection.

25           THE COURT:  Counsel for Mr. Grant?

1        MR. MERINGOLO:  No objection.

2        THE COURT:  Thank you very much.  I'm accepting

3   Exhibit 927 into evidence.  You can proceed.

4        (Government's Exhibit 927 received in evidence)

5        MR. BELL:  Thank you, your Honor.

6        Mr. Hamilton, could we publish the first page to the

7   jury.

8   Q.  Mr. Nat, I want to direct your attention to 927 so we can

9   explore the particular order mentioned here.  I want to first

10  direct your attention to the invoice number in the upper

11  right-hand corner.  Can you highlight that?

12        What is the invoice number for this order?

13  A.  13-291.

14  Q.  And what is the date next to it?

15  A.  10/22.  October 22nd, 2013.

16  Q.  And what does that date signify on an invoice form of this

17  sort?

18  A.  That would be the date the invoice was printed.

19  Q.  And what event, if any, does that usually accompany?

20  A.  That's accompanied by the delivery of the windows or the

21  product to the customer.

22  Q.  There's also a stamp that says paid and a date under that.

23  Do you see that, Mr. Nat?

24  A.  Yes, I do.

25  Q.  What date is there?

IB7TGRA1                          Nat - Direct

1  A.  November 8, 2013.

2  Q.  And what event does this marking usually accompany?

3  A.  That would indicate that the last -- the final payment was

4  sent -- yes, it was sent -- let me further explain.  It is

5  possible we did not take a deposit and there was only one

6  payment paid, that I cannot be certain of.

7  Q.  Did you yourself handle this particular order, to your

8  recollection?

9  A.  I worked with my partner on it and we went out to the

10  house, it was replacements, replacement windows.  And my

11  partner took measurements, and then we sent a list of windows

12  to the contractor, Boaz Construction, and he confirmed it and

13  placed the order.

14  Q.  And so that takes us to the box labeled "bill to."

15          MR. BELL:  And could you highlight the information

16  below "bill to."

17  Q.  So you mentioned Boaz Construction.  Are you familiar with

18  that entity?

19  A.  Yes, I am.

20  Q.  Have you done business with Boaz Construction separate and

21  apart from this order?

22  A.  Absolutely.

23  Q.  Have you worked with a particular point person at Boaz

24  Construction?

25  A.  Yes.

1   Q.  Do you recall who?

2   A.  Yes, Boaz.

3   Q.  Thank you.  There's also a shipping box to the right of

4   that field.

5            MR. BELL:  Can you highlight the address within it?

6   Q.  What is the address listed there?

7   A.  That is the ship to address.  That is where the windows

8   were sent.

9   Q.  And do you recall what type of structure was at that

10  address?

11  A.  It was a single family house.

12  Q.  Now let's go now to the middle of the page.

13           Let's actually scroll back up.  My colleague reminds

14  me, can you read what the address itself actually is?

15  A.  120 Romona Avenue, Staten Island, New York.

16  Q.  Let's now go to description field below.  The description

17  field, does that refer to any particular product that Riviera

18  offered and installed?

19  A.  Yes, the description of these windows are for double hung,

20  which are windows that go up and down as opposed to being

21  cranked out, and the size of the windows or the openings in

22  this case.

23  Q.  So it says that these are Semco clad plastic bronze low --

24  A.  Low E.  It's a type of glass.

25  Q.  Understood.  There are some measurements and some

1    additional indicators.  Are these interior windows or exterior

2    windows?

3    A.  They are exterior windows.

4    Q.  Could say anything as to their quality?

5    A.  Yeah, they're one of the better windows on the market.

6    Q.  And how many windows were ordered here?

7    A.  According to this order, there were ten windows ordered.

8    Q.  And can you take us through the breakdown, is there

9    anything distinguishing them other than size?

10   A.  Well, the top window is actually two windows wide, it's a

11   twin window.  The others were single units.  According to this

12   order, four twins were ordered, four double hungs, four single

13   windows were ordered.

14   Q.  According to the invoice --

15   A.  Not four, actually more, six windows were ordered.

16   Q.  According to this, how much would the package of windows

17   cost all told?

18   A.  According to this, it was $5,388.88.

19   Q.  Thank you.  Can we go to the next page, please.

20          Now this is the document payment receipt one of two

21   that we mentioned before.

22          MR. BELL:  Actually, can you do a split of this,

23   Mr. Hamilton with the first page?  Can you highlight the

24   invoice number on the first page?

25   Q.  Now the invoice number on the first page was 13-291.  Is

IB7TGRA1                          Nat - Direct

1    there a matching number on the payment receipt on the right of

2    your screen?

3    A.  Yes.

4    Q.  Is that the entirety of the order?

5    A.  No, it is not, it was one payment.

6    Q.  Sorry?

7    A.  It was just -- well, the entire order was 5,388.  The

8    payment made against it on October 22nd was 2,916.82.

9              MR. BELL:  Can you highlight the middle?  The whole

10   line, please.

11             And highlight where it says payment method, check.

12   And the date received.  Can you also highlight that it was

13   received from Boaz Construction.

14             Thank you.  Can you now replace the page on the left

15   with page 3 of the same exhibit.

16             Thank you.

17   Q.  So we have slid the first page over.

18             Once again, Mr. Nat, referencing the 13-291 invoice,

19   is all or part of that -- does all or part of that comprise the

20   referenced item or items on the right side?

21             Let me ask a better question.  Withdrawn.

22             Do you see that invoice number on the document on the

23   right side?

24   A.  Yes, I do.

25   Q.  And where do you see it?

IB7TGRA1                        Nat - Direct

1    A.  Payment receipt dated 10/22/2013 for invoice 13-291 for

2    2,472.06.

3    Q.  What is the payment method listed on that page?

4    A.  Check.

5    Q.  And the date received?

6    A.  11/8/2013.

7    Q.  And the payment amount as a whole?

8    A.  I assume they add up to 5,388 and change.

9           MR. BELL:  You can take that down, Mr. Hamilton.

10   Q.  Now at this time of these transactions, were you doing

11   other business with Boaz Construction?

12   A.  Absolutely.

13   Q.  And you say absolutely, can you describe the volume of that

14   business at that time?

15   A.  It's hard to say.  In any given year it might be doing --

16   depending on what he's doing, it could be 30, 40, $50,000 a

17   year, $75,000 a year.  Without my records, I couldn't tell, but

18   certainly more than one job.

19          MR. BELL:  Thank you very much.  One moment, please.

20          We have no further questions for Mr. Nat.  Thank you.

21          THE COURT:  Thank you very much.

22          Counsel for Mr. Reichberg.

23          MS. NECHELES:  Thank you, your Honor.

24          (Continued on next page)

25

IB7TGRA1                          Nat - Cross

1   CROSS-EXAMINATION

2   BY MS. NECHELES:

3   Q.  Good morning, sir.  You do not know my client,

4   Mr. Reichberg, correct?

5   A.  No, I do not.

6   Q.  Never met him?

7   A.  Never.

8   Q.  And you and I have never spoken, right?

9   A.  Never.

10  Q.  So I want to ask you some questions about the document that

11  went into evidence, Government Exhibit 927.

12          MS. NECHELES:  Mr. Willis, if you could put that up,

13  with permission.

14          THE COURT:  You may.

15          MS. NECHELES:  For the jurors as well.

16  Q.  So sir, you testified on the first page here that the date

17  that is up on top under invoice in the upper right-hand corner

18  where it has that date 10/22/2013 is the date this invoice is

19  printed, is that correct?

20  A.  Yes.

21  Q.  But if you look on the bottom, there are payments made that

22  total the total amount of the invoice, right?

23  A.  Yes.

24  Q.  And those payments weren't made until after 10/22/2013,

25  right?

IB7TGRA1                          Nat - Cross

1    A.   That is possible.

2    Q.   Well, you just looked at the second and third page of this

3    exhibit, and the third page shows a payment being made to

4    separate payment -- or a check that is dated 11/8, if you look

5    up top, 11/8/2013, when it says date received in the middle,

6    11/8/2013, right?

7    A.   Yes.

8    Q.   So if you go back to the first page, that was not printed

9    on 10/22/2013, correct?

10   A.   The invoice wouldn't change if the money was applied.  If

11   the invoice was on 10/22, which I'm assuming it was, that would

12   remain constant.  The payments would be applied afterwards.

13   Q.   So if it -- this document was not printed on 10/22, right?

14   A.   Highly unlikely, or might have been, but would have shown a

15   balance, too.

16   Q.   A different document would have been printed.

17   A.   It would have shown a balance due, correct.

18   Q.   And this document, the first page of it shows that the

19   total amount was paid on 10/22/2013, and that is clearly

20   incorrect based on the second and third pages.

21            MR. BELL:  Objection.

22            THE COURT:  Counsel, could I ask you to rephrase the

23   question.

24            MS. NECHELES:  Yes, I withdraw that.

25   Q.   This document, which is dated 10/22/2013, shows no balance

1    due, but on 10/22/2013 in fact the total balance was due,

2    right?

3    A.  Either the total balance was due or there had been a

4    payment made prior, which there seems to have been, and at the

5    time the invoice had been printed and sent on to Boaz, which we

6    normally would do, it would have shown the balance due.

7    Q.  That would have been --

8    A.  So the date of invoice doesn't change because of a later

9    payment.  There might have been an invoice that showed a

10   balance due.

11   Q.  So if you look at the second page of this document, it says

12   date received, right there in the middle, 10/25/2013, right?

13   A.  Yes, it does.

14   Q.  So the first check that you applied against this invoice

15   was received three days after this invoice, right?

16   A.  That's possible, or before, it says 10/22 for the first

17   check.

18   Q.  Well, that's the date --

19   A.  I see what you're saying.  I don't know.  It might have

20   been received on the 22nd, it might have been received on the

21   25th, depends.  We might have held the check over the weekend

22   before we put it in the bank or something like that.  So

23   there's not necessarily an inconsistency.

24   Q.  Okay.  I'm just trying to clarify that the first invoice

25   was printed at a later date, that the date of the invoice was

IB7TGRA1                          Nat - Cross

1  clearly 10/22, but it was actually printed at some date later,

2  correct?

3  A.  Well, it could have been printed later, the payment could

4  have been put in the bank a few days later.  We don't go to the

5  bank necessarily every day.

6  Q.  But the final payment was not made until 11/8, according to

7  your records that you produced here?

8  A.  That's correct.

9  Q.  So this invoice had to have been printed at some point

10  after 11/8, right?

11  A.  The final invoice showing zero balance?

12  Q.  Yes.

13  A.  Probably the date we received the payment, which sounds

14  like 11/8.

15  Q.  So then in addition, let me just ask you, when you produced

16  this to the government, where did you get this document from?

17  A.  Well, my partner produced it.  He took it out of our

18  records.

19  Q.  Do you file these or print them off the computer?

20  A.  He took them off the computer because the paper product

21  would have been filed away in archives.  It's several years

22  old.

23  Q.  Whenever you print these from the computer, your computer

24  program just generates what is actually -- what you now have

25  listed as actually due, correct?

IB7TGRA1                        Nat - Cross

1    A.   Correct.

2    Q.   So how did that stamp of "paid" get on there if this was

3    printed from the computer program?

4    A.   Well, I assume -- well, actually I don't assume, I believe

5    the computer generates that once it's paid and it will show

6    paid in full with the date.

7    Q.   Are you sure that your partner didn't stamp that now?

8    A.   No, I'm not a hundred percent sure.

9    Q.   He could have stamped it now to produce it to the

10   government?

11   A.   Could have stamped it now?  No.

12   Q.   So turning to second and third pages of this exhibit, let

13   me turn to the second page, now you testified that you did a

14   lot of work with Boaz Construction, correct?

15   A.   Yes.

16   Q.   And Mr. Gazit -- it's Boaz Gazit, correct?

17   A.   Correct.

18   Q.   And Mr. Gazit had a -- was not a particularly timely payer?

19   A.   No, actually he was pretty good.

20   Q.   I see here that you have listed on page -- and on the

21   second page of this invoice, which has the date of 10/25/2013

22   for a date the check is received, there are three invoices that

23   the check is being applied against, right?

24   A.   I didn't understand the question.

25   Q.   Well, let's take a look at this.  You see on 10/25/2013

1  this document that we're looking at here, is a record of

2  printout from Quickbooks of what was -- what check was received

3  and what it was applied against on that date, correct?

4  A.  Correct.

5  Q.  And so on 10/25/2013 a check was received in the amount of

6  $4,000 and it was applied against three open invoices, right?

7  A.  Yes.

8  Q.  And were there other open invoices on that date?

9  A.  There might have been, sure, not necessarily with regard to

10 that particular house.

11 Q.  Right.  Because he did a lot of business with you, right?

12 A.  He did other business with us, yes.

13 Q.  How did you know what invoice to apply this against?

14 A.  He would tell us.

15 Q.  Who would tell you?

16 A.  Boaz.

17 Q.  And he would say apply $93 against this invoice --

18 A.  Either that or we had an open invoice for $93.15.

19 Q.  So the answer to my question of how did you know, you don't

20 really know the answer, right?

21 A.  No.  How could I?

22 Q.  That's fine.  If you don't know, you could just tell us

23 that.

24             MR. BELL:  Objection.

25             THE COURT:  Sustained.

1   Q.  So somebody decided to apply a check you received for

2   $4,000 against three open invoices, right?

3   A.  Yes.

4   Q.  And you don't know how that decision was made, just

5   somebody made that, right?

6   A.  Generally there would be an open amount for the exact

7   amount of the particular invoice and the payment would be

8   applied appropriately.

9   Q.  So what you're saying is generally when you receive a

10  check, it's for the exact and due on an open invoice, right?

11  A.  No, we could get a check for $10,000 and we would be told

12  apply it to five different invoices, or we had five different

13  invoices which were open to the sum of $10,000, in which case

14  the money would be applied in age descending order.

15  Q.  Well, if you look at the next page of this -- if you look

16  there, you have invoice 13-257, then 13-291 and 13-292,

17  correct?

18  A.  Yes.

19  Q.  And those are three open invoices, and you said there could

20  be more, right?

21  A.  Yes.

22  Q.  But this would only show what the check was applied

23  against, right?

24  A.  Yes.

25  Q.  And the check reference number is 1002, right?

IB7TGRA1                          Nat - Cross

1    A.  Yes.

2    Q.  How does that check reference number get in there?

3            What does that signify?

4    A.  When we receive a check, Quickbooks asks:  What is the

5    check number?

6    Q.  On the check itself?

7    A.  Quickbooks would ask the question when you receive a

8    payment:  What is the check number?  And we would put in the

9    check number.

10   Q.  The number that was written on the check?

11   A.  It's printed on the check.

12   Q.  So Mr. Gazit's check or Boaz Construction's check has the

13   number 1002, is that your testimony?

14   A.  Yes.

15   Q.  So that was for the amount of $4,000, right?

16   A.  That's what it says.

17   Q.  Turn to next page.  So you see the first here, it's a check

18   for -- on 11/8, correct?

19   A.  Yes.

20   Q.  And that previous check was 10/25, correct?

21   A.  Yes.

22   Q.  And check number 1003, right?

23   A.  That's what it says.

24   Q.  So do you believe that Mr. -- that Boaz Construction had

25   not written any other checks during that time period?

1   A.  I have no way of knowing that.

2   Q.  Doesn't it seem like maybe this check reference number

3   refers to something else?

4           MR. BELL:  Objection.

5           THE COURT:  Thank you.  Sustained.

6   Q.  Is it possible that that check reference number refers to

7   something other than the number that was on the check from Boaz

8   Construction?

9   A.  Anything is possible.  We could have made an error.  I

10  cannot answer that.

11  Q.  Is it possible that that was just the next check that you

12  received from Boaz Construction?

13  A.  Again, I don't understand the question you are asking.

14  About the check reference number?

15  Q.  Yes.

16  A.  If it is the check number in fact, it's out of order,

17  because the last check received previously was I believe 1025,

18  correct?

19  Q.  No, 1002.

20  A.  Oh, 1002.  Then yes, I assume that is the next check that

21  he sent us, and maybe he hadn't written any other checks.

22  Again, ask him.

23  Q.  Okay.  And on 11/8/2013 you received a check for 3,462.09,

24  correct?

25  A.  Correct.

1    Q.  That was a very specific number, right?

2            MR. BELL:  Objection.

3            THE COURT:  You can answer the question.

4    A.  It's a combination of the two payments.

5    Q.  What you attributed to these two payments, right?

6    A.  Yes.

7    Q.  And do you know whether there were still open invoices in

8    between or whether that first invoice was still open and not

9    paid in full?

10   A.  I have no way of knowing if there were other invoices open.

11   Based on the payment previously made I knew there was a balance

12   for that particular invoice of 13-291 for the amount indicated,

13   2,472.

14   Q.  But sir, you don't make sure that one invoice is totally

15   paid off before you apply something to another invoice, do you?

16   A.  Could you repeat the question?

17   Q.  You testified before that you thought you paid the oldest

18   invoice off first, you applied whatever check came in to the

19   oldest invoice?

20   A.  Not necessarily.  It would depend on the situation and the

21   amount of the check.  If we were told to apply a check to a

22   specific invoice or there was an invoice open for a particular

23   amount, we would do that, we would apply it that way.  If there

24   was nothing indicated, money, and even if the builder wanted

25   the money to be applied for a specific invoice, if he did not

IB7TGRA1                          Nat - Cross

1   say so, we might have done it inadvertently, just applied it to

2   the oldest invoice.  There are many times where we had to

3   change the way we applied money because we realized we made a

4   mistake.

5   Q.  And you did not actually handle this particular -- these

6   particular entries on the computer, right?

7   A.  I do not remember.  It could have been me, could have been

8   one of my other partners.

9   Q.  So you don't -- you clearly received this amount of

10  money --

11  A.  Yes.

12  Q.  -- from Boaz Construction, right?

13  A.  Yes.

14  Q.  But you say sometimes there are errors on how this amount

15  of money is applied, correct?

16  A.  It is possible.

17  Q.  And you don't know in fact -- you don't have personal

18  knowledge of how it was supposed to be applied here, do you?

19  A.  Not specifically.

20          MS. NECHELES:  Thank you.  I have no further

21  questions.

22          THE COURT:  Thank you.

23          Counsel for Mr. Grant?

24          MR. MERINGOLO:  Just a few questions, your Honor.

25          THE COURT:  Please proceed.

1                    (Continued on next page)

2      CROSS-EXAMINATION

3      BY MR. MERINGOLO:

4      Q.  Good morning, Mr. Nat.  My name is John Meringolo and I

5      represent Jimmy Grant.

6      A.  Good morning.

7      Q.  Just a few questions, Mr. Nat.  Did Boaz get a discount for

8      these windows?  Was there a discount ever given?

9      A.  I'm not following the question.  When we deal with any

10     customer, we will -- there's a list price for windows then a

11     discounted price for windows.

12     Q.  Would the discounted price be reflected in the exhibit that

13     we're discussing?

14     A.  Yes, that's the price that he was given for the products.

15     Q.  Okay.  And listen, it's your company, I'm not saying

16     anything bad, but if the windows were defective, how would the

17     process go for defective windows?

18                    MR. BELL:  Objection.

19                    THE COURT:  Counsel, could I ask you to rephrase the

20     question, please.

21     Q.  If the windows you gave to Boaz Construction were

22     defective, what would be the process of returning them?

23                    MR. BELL:  Objection.

24                    THE COURT:  Thank you.  You can answer the question.

25     A.  All windows are custom orders.  If there is an obvious

 1   defect in a window, we are notified of the defect, we inspect

 2   the window, if it can be repaired, we have the company, in this

 3   case Semco Windows, provides service that would go out and fix

 4   the windows.

 5   Q.  If Mr. Boaz paid you or paid your company -- I'm not saying

 6   that you did anything wrong -- if he paid you in cash, would

 7   that reflect in any invoice?

 8   A.  Yeah, it would be indicated as a cash payment as opposed to

 9   a check.

10           MR. MERINGOLO:  I have no further questions.  Thank

11   you very much, sir.

12           THE COURT:  Thank you, counsel.

13           Counsel for the United States?

14           MR. BELL:  Very brief, your Honor.

15           THE COURT:  Please proceed.

16   REDIRECT EXAMINATION

17   BY MR. BELL:

18   Q.  Hello again, Mr. Nat.  You were asked a number of questions

19   about how the information on this invoice was populated and how

20   reliable it is.

21           MS. NECHELES:  Objection.

22           THE COURT:  Thank you.  Sustained.  Counsel, can you

23   please proceed.

24           MR. BELL:  Sure thing.

25   Q.  Mr. Nat, have you any doubt as you sit here that you

IB7TGRA1                          Nat - Redirect

1    installed these windows at 120 Romona Avenue in 2013?

2              MR. MERINGOLO:  Objection, leading.

3              THE COURT:  You can answer the question.

4    A.   Absolutely no doubt.

5    Q.   Have you any doubt that you were paid for those windows?

6    A.   No doubt.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB7KGRA2                        Nat - Recross

1   BY MR. BELL:

2   Q.  Have you any doubt that you were paid for those windows by

3   Boaz Construction?

4   A.  I have no doubt.

5           MR. BELL:  Nothing further.

6           MS. NECHELES:  I have a few, your Honor.

7           THE COURT:  Please proceed.

8   RECROSS EXAMINATION

9   BY MS. NECHELES:

10  Q.  Sir, you testified a few minutes ago that you didn't know

11  whether the checks were properly allocated, that mistakes were

12  made, right?

13  A.  No, I didn't testify to that.

14          MR. BELL:  Objection.

15          THE COURT:  I accept the answer.  Please proceed.

16  Q.  You didn't say that?

17  A.  No.

18  Q.  You testified that there have been mistakes in your company

19  sometimes about how checks are allocated?

20          MR. BELL:  Objection; mischaracterizes testimony.

21          THE COURT:  Thank you.

22          You can answer the question.

23          THE WITNESS:  Monies are applied against open

24  invoices.  If there's an exact amount owing, and we receive a

25  check, it is applied to that particular invoice.

IB7KGRA2                          Nat - Recross

1          Now, occasionally errors are made?  Yes, occasionally

2     errors have been made, but generally not.

3     BY MS. NECHELES:

4     Q.  Okay.

5     A.  Monies are applied against -- if we were told that there

6     was a deposit on an order given against an order, it would be

7     applied to that order.

8     Q.  Okay.

9     A.  When we invoice, that is the first time that we will take

10    money that is already being held and apply it to an invoice.

11    So, in this case, if we had received a deposit of whatever the

12    amount was -- I don't remember exactly -- when we ordered the

13    windows, when we invoiced it, we would go to a box that says

14    apply payment, and we would apply it to that particular

15    invoice.  That's never an error.

16    Q.  Okay.  What you're saying is that your computers accurately

17    reflect the checks that you have received on behalf of a

18    certain client, correct?

19          MR. BELL:  Objection.

20          THE COURT:  Thank you.

21          Counsel, sustained.

22          MS. NECHELES:  Okay.

23    BY MS. NECHELES:

24    Q.  Do your computers accurately reflect the amount you

25    received on behalf of a particular client?

IB7KGRA2                         Nat - Recross

1                MR. BELL:  Objection.

2                THE COURT:  Thank you.

3                Sustained.

4     BY MS. NECHELES:

5     Q.  Well, sir, when you say -- are there open invoices today

6     from Mr. -- Boaz Construction?

7                MR. BELL:  Objection; scope.

8                THE COURT:  Sustained.

9                MS. NECHELES:  Your Honor, I'm trying to explore the

10    idea that he knows what was paid for.

11               MR. BELL:  Objection; speaking and scope.

12               THE COURT:  Thank you.  Thank you.

13               Sustained.

14    Q.  When you say -- at the time of these invoices, there were

15    other open invoices, correct?

16    A.  I can't say for sure.

17    Q.  Okay.

18    A.  I wouldn't know if there were or there weren't.  I do know

19    that if we had received a deposit, at the time we placed the

20    order for the windows, because they were custom ordered

21    windows, we would hold it until we invoiced, which was around

22    the October 22nd date, I believe.  When the invoice was printed

23    after delivery, the monies that were held -- we were holding

24    would have been applied.

25    Q.  Okay.  But what I'm asking you is something different.

IB7KGRA2                          Nat - Recross

1              I'm saying:  What you printed out here and brought to

2     court does not show all of your business that you had at that

3     time with Boaz Construction, correct?

4              MR. BELL:  Objection; scope.

5              THE COURT:  Thank you.

6              Sustained.

7              MS. NECHELES:  What's the basis?  I don't understand,

8     your Honor.

9              THE COURT:  Scope.  Scope of the --

10             MS. NECHELES:  Your Honor, can we approach because

11    this goes directly to the scope.

12             THE COURT:  Yes.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  There's an objection, counsel?

3           MS. NECHELES:  First --

4           THE COURT:  I'm sorry.  First state the basis for the

5     objection.

6           MR. BELL:  Yes.  The objection is scope.  I asked

7     three questions on redirect.  We know what they were.

8           MS. NECHELES:  Okay.  And on redirect, one of the

9     questions was there's no question that these windows were paid

10    for, and I believe that the record is that there were open

11    invoices.  So the payments that he allocated to these windows

12    may have been intended to be for other windows.  It goes

13    directly to the redirect.  He may disagree, Mr. Bell may

14    disagree, but it goes directly to the questions that were asked

15    on redirect, were these payments for those windows.  He said no

16    question, these payments were for those windows, and I don't

17    think he can say that.

18          MR. BELL:  This is some motion of directness with

19    which I'm not familiar.  We merely asked whether he was certain

20    that he was paid for these windows, that he put those windows

21    in, and this is several steps removed from that.

22          THE COURT:  Thank you.

23          I'm going to sustain the objection both for the reason

24    that's described herein, because I think that this testimony is

25    cumulative.  Counsel has had the opportunity to explore this

1    set of facts already, and I'm concerned that we're misusing at

2    this point the time of the jury.  These facts, I think, have

3    come in in your original set of cross-examination questions.

4               MS. NECHELES:  But he confused it on redirect.  I just

5    wanted to clear it up.  It would have been three questions if

6    we weren't sort of like saying it was beyond the scope.  It

7    goes directly to what he said.  I'm really not trying to

8    prolong this.

9               THE COURT:  Thank you.  I appreciate it.

10              I'm going to sustain the objection.  Is there anything

11   else that you want to ask this witness?

12              MS. NECHELES:  No.

13              THE COURT:  Thank you.

14              MR. MERINGOLO:  Judge, I have one or two questions

15   within the three questions that Mr. Bell asked.

16              THE COURT:  That's fine.

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MS. NECHELES:  I have no further questions.

3              THE COURT:  Thank you.  Thank you very much.

4              Counsel for Mr. Grant.

5    RECROSS EXAMINATION

6    BY MR. MERINGOLO:

7    Q.  Mr. Bell asked you on redirect examination if you installed

8    the windows at this particular property.  Did you?

9    A.  No.  We do not install windows.

10   Q.  You just measured it, correct?

11   A.  We measure, and we provide the contractor who's responsible

12   for the installation in 99 percent of the business that we do.

13   Q.  Do you -- if you don't, you don't.  Do you have any

14   documentation that you measured the windows for this particular

15   invoice?

16             MR. BELL:  Objection.

17             THE COURT:  Thank you.

18             Please answer the question.

19             THE WITNESS:  What type of documentation are you

20   talking about?

21   Q.  The day the individual went out and measured the windows.

22             MR. BELL:  Objection; scope.

23             THE COURT:  Thank you.

24             You can answer the question.

25             THE WITNESS:  I remember distinctly that my partner

1   and I -- and he is more responsible for the technical aspects

2   of measuring.  He measured the windows, brought back the

3   measurements.  We -- he put together a quote based on the

4   measurements that he took, submitted the quote to Boaz, who

5   approved it, and the windows were ordered, built.  We don't

6   keep scratch paper.  No, we do not.

7   BY MR. MERINGOLO:

8   Q.  Would any other documents for this particular job be in

9   your possession regarding your installation that you just

10  testified to?

11          MR. BELL:  Objection.

12          THE WITNESS:  I did not testify to installation.

13          THE COURT:  Thank you.

14          I'm sorry, let me sustain the objection.

15  Q.  You just testified that you had somebody measure this

16  particular property, correct?

17  A.  Yes.

18  Q.  Do you have any documentation or correspondence with

19  Mr. Boaz regarding this particular installment?

20  A.  Other than a sales order being issued showing him the sizes

21  that we measured, no.

22  Q.  Did you turn those over to the government?

23          MR. BELL:  Objection.

24          THE COURT:  Thank you.

25          Sustained.

1    BY MR. MERINGOLO:

2    Q.   Where is the quote that you gave Mr. Boaz?

3             MR. BELL:  Objection.

4             THE COURT:  Thank you.

5             Sustained.

6             Come on up.

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB7KGRA2                          Nat - Recross

1            (At the sidebar)

2            THE COURT:  So there's an objection?

3            MR. MERINGOLO:  Okay.

4            MR. BELL:  The objection is to quotes.  I believe that

5       the -- is to scope, rather.  Sorry.

6            The question, also, I think, assumes facts not in

7       evidence.

8            THE COURT:  Thank you, counsel.

9            MR. MERINGOLO:  Well, your Honor, yes, Mr. Bell asked

10      on redirect whether this particular individual did the

11      installation.  Whether he meant to say it or not, he said that,

12      in fact, he did.  I recrossed him on that installation.  He

13      said that he sent people to measure the property, and I would

14      like to know what the quote came back when his company went to

15      measure the property based on Mr. Bell's redirect examination.

16      Whether or not it was intended to be that way or not, it was.

17           MR. BELL:  Part of the problem here, your Honor, is

18      that Mr. Meringolo assumes -- and I think the jury can

19      reasonably assume listening to the question -- that Mr. Nat

20      failed to turn over documents that he was supposed to turn

21      over, which, A, is wrong; and, B, gets into a whole kettle of

22      fish that's prejudicial and isn't properly before the jury.

23           THE COURT:  Thank you.

24           Counsel?

25           MR. MERINGOLO:  This is the government's witness that

1       the government has talked to.  The government has not turned

2       over any 3500 material with respect to this witness with any

3       interviews or whatnot.  He comes this morning, he testifies,

4       and we want documents that relate to this particular case,

5       which is a specific charge in the case, the windows.

6                   THE COURT:  Thank you.

7                   I don't mind if you ask questions, counsel.  I've like

8       you to ask questions --

9                   MR. MERINGOLO:  Yes, your Honor.  And I thank you.

10                  THE COURT:  -- about those things.  But the questions

11      in particular about documents produced or not produced don't

12      appear to be within the scope, and I'm concerned about, I'll

13      call it, potentially prejudicial effect of suggesting that the

14      government did not produce records here that could have been,

15      and given the scope of the defendants' subpoenas, might have

16      been subpoenaed by the defense.

17                  MR. MERINGOLO:  We didn't know he was coming in until

18      yesterday or maybe the day before.

19                  THE COURT:  Thank you.

20                  MR. MERINGOLO:  And there was no 3500 turned over.

21                  MR. BELL:  Just to clarify the record, they have had

22      the Riviera receipt for months.  The only reason why there's no

23      3500 on Mr. Nat is because we thought he was going to

24      essentially function as a document custodian.  We thought this

25      would have been done quite some time ago.

IB7KGRA2                        Nat - Recross

1              THE COURT:  Thank you.

2              Let's see if we can wrap up this relatively short

3      witness.

4              MR. MERINGOLO:  Okay.  No more questions, but I'll

5      tell the jury.

6              THE COURT:  Good.  Thank you.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB7KGRA2                          Nat - Recross

 1              (In open court)

 2              THE COURT:  I'm sorry.  Counsel, please proceed.

 3              MR. MERINGOLO:  Thank you for your time.  No more

 4     questions.

 5              THE COURT:  Thank you.

 6              Counsel for the United States?

 7              MR. BELL:  No, your Honor.  Thank you.

 8              THE COURT:  Thank you very much for your testimony,

 9     Mr. Nat.  You can step down.

10              (Witness excused)

11              THE COURT:  Counsel for the United States, would you

12     please call your next witness.

13              MR. BELL:  Yes, your Honor.  The government calls Boaz

14     Gazit.

15      BOAZ GAZIT,

16          called as a witness by the Government,

17          having been duly sworn, testified as follows:

18              THE DEPUTY CLERK:  Can you please state your full name

19     for the record and spell both your first and last names?

20              THE WITNESS:  Boaz Gazit, B-o-a-z G-a-z-i-t.

21              THE COURT:  Thank you.  Thank you very much.

22              Counsel, you can inquire.

23              MR. BELL:  Thank you, your Honor.

24

25

IB7KGRA2                        Gazit - Direct

1    DIRECT EXAMINATION

2    BY MR. BELL:

3    Q.  Good morning, Mr. Gazit.

4             Where were you born?

5    A.  Israel.

6    Q.  And where do you live now?

7    A.  Brooklyn, New York.

8    Q.  How long have you lived in the United States?

9    A.  Thirty-eight years.

10   Q.  What is it that you do for a living?

11   A.  General contractor.

12   Q.  What is the nature of your general contracting work?

13   A.  Home improvement.

14   Q.  Do you do contracting out of a particular business?

15   A.  Yes.

16   Q.  And what is the current name of that business?

17   A.  Now, it's called Palace Housing Corp.

18   Q.  Who currently owns it?

19   A.  My son.

20   Q.  Did that change within the past few years?

21   A.  Yes.

22   Q.  Prior to it being called Palace and being owned by your

23   son, what was the name of the business?

24   A.  Before?

25   Q.  Yes, before.

IB7KGRA2                        Gazit - Direct

1    A.   Boaz Contractor, Inc.

2    Q.   Who owned it then?

3    A.   Me.

4    Q.   When did that change?

5    A.   Maybe it's like three or four years ago.

6    Q.   Now, where is your business located?

7    A.   Brooklyn, New York.

8    Q.   Was it located there back when it was Boaz Contracting?

9    A.   Same place.

10   Q.   Now, did there come a time when you met an individual named

11   Jeremy Reichberg?

12   A.   Yes.

13   Q.   How long ago did you meet Mr. Reichberg?

14   A.   A little bit more than five years.

15   Q.   Can you tell us how it was that you came to first meet

16   Mr. Reichberg?

17   A.   Some friend made a connection.

18   Q.   Do you recall the friend?

19   A.   I think his name is Moti.

20   Q.   Can you spell Moti, please?

21   A.   I don't know.  I think it's M-o-t-i, something like that.

22   Q.   And when Moti introduced you to Mr. Reichberg, what was the

23   nature of your initial communication with Mr. Reichberg?

24   A.   He asked me for a work permit he needs for some apartment.

25   Q.   I'm sorry, what was it that he asked you for?

1    A.  Work permit.

2    Q.  Did Mr. Reichberg give you a sense of why he needed the

3    work permit or why he was asking you?

4    A.  No.  I never ask, no.

5    Q.  Did you help him?

6    A.  I did.  I give him the tracking number, so he can get the

7    permit.

8    Q.  Why did you have a tracking number?

9    A.  Because I'm a licensed contractor.

10   Q.  When you met Mr. Reichberg, what was your understanding of

11   what business Mr. Reichberg was involved in?

12   A.  I think he's like a building consultant, something like

13   that.

14   Q.  Did you and Mr. Reichberg develop a relationship of any

15   sort after you helped him with this initial request?

16   A.  Yes.

17   Q.  What was the nature of that relationship early on?

18   A.  Become like friend.  He promises he can get me some

19   connection to big jobs.

20   Q.  And what sorts of big jobs did Mr. Reichberg promise he

21   could get you connected to?

22   A.  Like general contracting.

23   Q.  Did he give you a sense of what types of big jobs he might

24   be able to connect you with?

25   A.  All kind of jobs.  I mean, there's no specific.

1   Q.  And what, if anything, led you to believe that

2   Mr. Reichberg had the type of connections that could get you

3   big jobs?

4   A.  That was my friend told me, that he is connected.

5            MR. MERINGOLO:  Objection.

6            THE COURT:  Thank you.

7            Overruled.  I accept the answer.

8   BY MR. BELL:

9   Q.  Did you, early on in this relationship, do work for

10  Mr. Reichberg personally?

11  A.  Yeah, it's work in his house.  All kind of handyman things.

12  Q.  What sorts of work did you do for Mr. Reichberg?

13  A.  Fixing small things.

14  Q.  To be clear, when you say Mr. Reichberg's house, what house

15  are you talking about?  Where was that?

16  A.  The house in Borough Park, Brooklyn.

17  Q.  Now, were you always paid for your work?

18  A.  No.

19  Q.  How often did you do work for Mr. Reichberg without being

20  paid?

21  A.  I don't remember exact.  All kinds.  I can't remember.

22  Q.  Did it happen a lot or a little?

23  A.  It's a little, yeah.

24  Q.  Why did you do work for Mr. Reichberg without being paid

25  for it?

1    A.  Because I know he's going to get me some big jobs.

2    Q.  Now, in addition to -- let's go back to the friendship

3    component of your relationship with Mr. Reichberg.

4            How often did you and Mr. Reichberg speak after you

5    first came to know him?

6    A.  Sometimes like every day.  I can't recall it.  I can't

7    remember.

8    Q.  What, if anything, did Mr. Reichberg tell you about his

9    relationships with police officers?

10   A.  I know he know some policemen.  I know, yeah.

11   Q.  Did Mr. Reichberg give you a sense of how many police

12   officers or what kinds of police officers he knew?

13   A.  No.

14   Q.  What, if anything, did Mr. Reichberg actually tell you

15   about his relationships with police?

16   A.  I can't recall.  Friends.  I don't know, friendship.

17   Q.  Now, did there come a time where you came to know an

18   individual named James Grant or Jimmy Grant?

19   A.  Yes.

20   Q.  And who was Jimmy Grant?

21   A.  I think he was like the captain of the 72 Precinct.

22   Q.  How was it that you came to know Mr. Grant?

23   A.  Okay.  The first thing when I met Reichberg, he gave me the

24   PBA card.

25   Q.  And --

1  A.  And he called him, put him on speaker, and ask if he can

2  give permission to give me the cards.

3  Q.  Can you describe what these PBA cards were?

4  A.  It's a card that if they pull you over, and you show it,

5  they may let you go.

6  Q.  Where did you get that information from?

7  A.  What?

8  Q.  Where did you get that information concerning how PBA cards

9  are used?

10  A.  I know that.  Everybody almost everybody has it.

11  Q.  When you say "almost everybody" --

12  A.  In the car, yes.  Everybody knows policemen, so he's...

13  Q.  I'm sorry.  What did you say, sir?

14  A.  Every guy who knows a policeman or are friends, he know

15  he's getting it.

16  Q.  Understood.

17       Now, when you spoke on speaker with Mr. Grant, with

18  Mr. Reichberg present, what else, if anything, did you discuss?

19  A.  I think he mention if I can do his windows.

20  Q.  Who mentioned that initially?

21  A.  Jimmy, on the speaker.

22  Q.  Did Mr. Grant, Jimmy, give you an understanding of why his

23  windows needed work?

24  A.  Later on, I understand that they due to Hurricane Sandy,

25  they got very loose and shaking, so need to replace them.

1    Q.  So, when Mr. Grant asked you about the possibility of your

2    doing his windows, what, if anything, was your response?

3    A.  I said okay.  It's a job.

4    Q.  Did you discuss this further with Mr. Reichberg?

5    A.  Yeah, uh-huh.

6    Q.  What did you discuss with Mr. Reichberg about the

7    possibility of doing these windows for Mr. Grant?

8    A.  He asked me a couple of times when I'm going to do the

9    windows.  I said I need a deposit for the windows.

10   Q.  Who did you expect to get a deposit from?

11   A.  I don't know.  Either one.

12   Q.  When you say "Either one," what do you mean by that?

13   A.  I was dealing with Jeremy, so I don't know who's the guy

14   supposed to give me the deposit.

15   Q.  Did Mr. Reichberg give you the deposit you requested?

16   A.  No.

17   Q.  You said that you asked a number of times.  Over what

18   period of time did you ask?

19   A.  It's like between I met him until I did the windows, it was

20   six months.

21   Q.  Now, did there come a time -- when you got no deposit from

22   Mr. Reichberg, did you get a deposit from Mr. Grant?

23   A.  No.

24   Q.  At the time when you were getting a deposit --

25            MR. BELL:  One moment, please.

IB7KGRA2                          Gazit - Direct

```
 1              THE COURT:  Thank you.  Please take your time.
 2              (Pause)
 3    BY MR. BELL:
 4    Q.  You testified earlier that you were dealing with someone,
 5    and that you expected him to give you the deposit.
 6              MR. MERINGOLO:  Objection; leading.
 7              THE COURT:  Thank you.
 8              Can you ask the question again, please, counsel.
 9              MR. BELL:  Sure.
10              Your Honor, may I approach?  This is --
11              THE COURT:  Thank you.
12              Please inquire.
13              MR. BELL:  Okay.
14    BY MR. BELL:
15    Q.  Who were you dealing with concerning the possibility of
16    getting a deposit?
17    A.  Jeremy.  I was talking to Jeremy all the time.
18    Q.  Mr. Reichberg?
19    A.  Yes.
20    Q.  Now, at the time when no one was giving you a deposit, was
21    it your intention --
22              MR. MERINGOLO:  Objection; mischaracterization.
23              THE COURT:  Thank you.
24              Can you proceed, please, counsel?  Please rephrase the
25    question.
```

IB7KGRA2                        Gazit - Direct

1            MS. RAVENER:  Your Honor, if we may, we need to

2      approach due to a technical issue?

3            THE COURT:  Please, do.  Come on up.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  Thank you.

3           Counsel, I'm sorry.

4           MS. NECHELES:  I thought there was a rule that one

5   person would do the objections and --

6           MR. BELL:  There's a reason why.

7           THE COURT:  Thank you.

8           What's the nature of the issue?

9           MS. LONERGAN:  We're watching LiveNote, and the

10  witness is saying Jeremy, and it's coming up on the screen as

11  Jimmy, and it matters because, clearly, it's a big -- there are

12  two defendants, and one is Jeremy and one is Jimmy.

13          MR. BELL:  I don't have LiveNote.

14          MS. LONERGAN:  He doesn't have LiveNote, which is why

15  we're all pointing it out.  So the reason he had to go back to

16  that question again was because he said -- the witness said

17  Jeremy, which he then clarified to be Mr. Reichberg, but the

18  screen said Jimmy, and it happened again after he clarified.

19  And so we just need to figure out if the court reporter can't

20  tell if the witness is saying Jeremy or Jimmy.  We just need to

21  figure this out.

22          THE COURT:  Thank you.

23          MR. MERINGOLO:  Your Honor, I think we could read the

24  transcript overnight because the jury won't get the transcript

25  until --

1          MR. BELL:  We're not going to have Mr. Gazit

2    overnight, so we want to make sure we get this right now.

3          THE COURT:  Thank you.

4          MR. MERINGOLO:  It will be cleared up on the

5    transcript for the jury.  The jury heard what they heard.

6          THE COURT:  Thank you.

7          I'm happy to fix the transcript if the parties can

8    agree about what happened.  I believe it is appropriate to

9    phrase the question differently.  He's difficult to decipher.

10   I'd also be happy to ask him to refer to each of the defendants

11   by their last names, Mr. Reichberg and Mr. Grant, and I suggest

12   that we do that going forward.

13         MR. BELL:  I will try to do that, your Honor.  Having

14   prepped with Mr. Gazit, and having developed some understanding

15   of how language and testimony work with him, I have a feeling

16   he's going to default to Jeremy and Jimmy a lot, but we'll do

17   what we can.

18         I would ask for some leeway, only in the instances in

19   which this problem comes up, to potentially lead on this, again

20   purely for purification.

21         MS. NECHELES:  I would ask that he not lead.  I would

22   ask if he thinks there might be confusion, that he ask do you

23   mean Mr. Reichberg or Mr. Grant.

24         But if you can just ask the reporter whether he thinks

25   this was just something -- LiveNote is not always what comes up

1    later.

2                 (Discussion off the record)

3                 MR. BELL:  I'll do my part, your Honor.

4                 THE COURT:  Fine.  If the parties are amenable, I'd be

5    happy to instruct -- ask the witness to use -- refer to them by

6    their last names going forward.

7                 MS. NECHELES:  Right.  Or if you could just ask when

8    he gets confused -- I think he's nervous, and it's hard, and if

9    you can just ask him do you mean Mr. Grant or --

10                THE COURT:  Thank you.

11                I'll keep an eye on the screen more carefully going

12   forward as well.

13                MS. RAVENER:  Your Honor, I'm sorry, we need to

14   address this a little further.

15                MR. BELL:  So it sounds -- my colleagues tell me that

16   there are multiple references already in the record to Jeremy

17   as Jimmy, potentially vice versa.  I may want to backtrack a

18   little bit with this Reichberg/Grant last name emphasis

19   approach in mind.  I would ask for some leeway to do that.

20                MR. MERINGOLO:  Your Honor, thank God that the

21   prosecutors have caught this.  We can go over the transcript

22   together tomorrow.  The jury heard what the jury heard.

23                THE COURT:  I'm sorry, let me do this:  I understand

24   why this is difficult to transcribe, given his accent and the

25   similarity between the names.  I think I've been hearing him

1    correctly, so the jury has heard what they have heard.  I'm

2    happy to allow the government some leeway to cover this ground

3    again to make sure that the record is clear.  That's just a

4    little bit of extra time, and I think it's important.

5              MR. BELL:  I appreciate that.  Thank you, your Honor.

6              MS. NECHELES:  I don't have an objection to that, but

7    I just ask it not be done by leading, that he ask did you mean

8    Mr. Grant or Mr. Reichberg like that, and not say that is it --

9    so you were dealing with Mr. Reichberg.

10             THE COURT:  Thank you.

11             Let me suggest as we go, I may permit some limited

12   leading, given the issues with respect to this person's

13   English.

14             MR. BELL:  I will note, your Honor, an issue, as it

15   exists right now, is that I am not certain that Mr. Grant was

16   ever actually introduced to Boaz as Mr. Grant, which is to say

17   he may understand it from what we've picked up -- just picking

18   up on context now, but it would be somewhat artificial for him,

19   I suspect.

20             THE COURT:  Thank you.

21             Let's go back, and I'll let the government cover some

22   ground again just for clarity's sake.

23             (Continued on next page)

24

25

1          (In open court)

2          THE COURT:  First, thank you very much.  I apologize

3     for the interruption.

4          I'd like to just ask the witness to do one thing, if

5     you don't mind, going forward.  It would be helpful for me,

6     because as I'm listening to your testimony -- oh, no, please

7     stay.  Would you do me a favor and please, where you can, refer

8     to Mr. Grant by his last name, Mr. Grant, and Mr. Reichberg by

9     his last name, Mr. Reichberg, just because there are two first

10    names that sound sort of similar.

11         THE WITNESS:  Oh.

12         THE COURT:  And it would be easier for me if you said

13    Grant and Reichberg.

14         THE WITNESS:  No problem.

15         THE COURT:  So it can be clear.  Thank you.

16         MR. BELL:  Thank you, your Honor.  May I inquire?

17         THE COURT:  You may.

18    BY MR. BELL:

19    Q.  Mr. Gazit, when Jeremy Reichberg introduced Jimmy to you,

20    did you understand Jimmy's name to be Jimmy Grant?

21    A.  Yes.

22    Q.  So what I'm going to do, Mr. Gazit, wherever possible, is

23    refer to Jeremy as Jeremy Reichberg and Jimmy as Jimmy Grant,

24    and I would invite you to do the same, or at least include the

25    last names.  Is that all right, sir?

1    A.  Okay.  All right.

2    Q.  Thank you.

3         Now, at the time that you had discussed with Jimmy

4    Grant doing his windows, did you discuss getting an advance or

5    a deposit with Jimmy Grant?

6    A.  No.

7    Q.  Did you discuss getting an advance or a deposit from Jeremy

8    Reichberg?

9    A.  Me, yes.  I asked for a deposit at the beginning, yeah.

10   Q.  How many times did you ask for a deposit?

11   A.  Maybe twice.

12   Q.  And what, if anything, did Jeremy Reichberg say?

13   A.  He no respond.

14   Q.  At that point, had anyone given --

15        MR. MERINGOLO:  Your Honor, can we get a specific time

16   frame, not just generalization?

17        THE COURT:  Thank you.

18        Can you please rephrase the question, counsel.

19   BY MR. BELL:

20   Q.  Do you recall, roughly, at what point in your relationship

21   with Jeremy and Jimmy, Jeremy Reichberg and Jimmy Grant, you

22   asked Mr. Reichberg for a deposit?

23   A.  That was on the beginning, but asked me the first time --

24   Q.  About -- sorry.  Go ahead.

25   A.  It's beginning of 2013, if I'm not mistaken.

1   Q.  And how much time passed in between your initial

2   conversation with Jimmy Grant on the speakerphone and when you

3   asked Jeremy Reichberg for a deposit or an advance the first

4   time?

5   A.  I don't know.  It can be two weeks.  I don't remember.

6   Q.  And how much time passed before you asked Mr. Reichberg

7   again?

8   A.  I think he kept asking me a few times, and I don't remember

9   the time.  It's about five years ago.

10  Q.  At this point, Mr. Gazit, did you expect to do work on

11  Mr. Grant's house in the absence of a deposit?

12  A.  Yeah, and then I trusted him, so I said I'm going to order

13  the windows and do it.

14  Q.  In between your deciding to -- withdrawn.

15        In between your asking for a deposit and deciding to

16  do the order, did you ask Mr. Reichberg for help with anything

17  separate?

18        MR. MERINGOLO:  Objection; leading.

19        THE COURT:  Thank you.

20        You can answer the question.

21        THE WITNESS:  Yes, I did.

22  BY MR. BELL:

23  Q.  What did you ask Mr. Reichberg for help with?

24  A.  My son got in trouble, so I called him.  He got arrested,

25  so I called him to help me.

1   Q.  Did Mr. Reichberg provide you with help?

2   A.  Yeah.  He gave me lawyer.

3   Q.  And did you compensate Mr. Reichberg, to your knowledge,

4   for the help he gave you?

5   A.  Yeah.  I remember I paid the lawyer.

6   Q.  When you say you paid the lawyer, did you expect that all

7   of that money would be going to the lawyer?

8           MR. MERINGOLO:  Objection.

9           THE WITNESS:  I have no idea.

10          THE COURT:  Thank you.

11          You can answer the question.

12          THE WITNESS:  They were together, so I don't remember

13   who I paid.

14   BY MR. BELL:

15   Q.  Now, what effect did Mr. Reichberg's getting you a lawyer

16   have, if any, on your willingness to do the work for Mr. Grant?

17   A.  He got more trust.

18   Q.  Now, what, if anything, affected the timing of when you

19   ordered the windows once you decided to?

20   A.  I think it was like two -- two months after.

21   Q.  And why two months after?

22   A.  It takes five weeks to get the windows.

23   Q.  Did you order the windows on their own or with other

24   products?

25   A.  I didn't understand the question.

1    Q.  Sure.

2          Did you order the windows on their own, by themselves,

3    or did you order the windows with other products?

4    A.  I have some other products going in, yeah.

5    Q.  And why, if there is a reason, did you order the windows

6    with other products?

7    A.  To get some discount.

8    Q.  Did you discuss that discount with the folks you ordered

9    the windows from?

10   A.  No, but it's -- that's a routine.  You always get discount

11   when you order like...

12   Q.  When the windows were ordered, who paid for them?

13   A.  I did.

14   Q.  Do you recall approximately how much the windows were

15   worth?

16   A.  I think it's like 5300.

17   Q.  And from where did you purchase the windows?

18   A.  Riviera Doors.

19   Q.  I'm sorry, did you say Riviera Doors?

20   A.  Yeah, doors and windows.

21   Q.  Did you arrange, once you paid for them, for the windows to

22   be delivered anywhere in particular?

23          MR. MERINGOLO:  Objection; leading.

24          THE COURT:  Thank you.

25          You can answer the question.

1            THE WITNESS:  Yes.

2    BY MR. BELL:

3    Q.  And where did you arrange for the windows to be delivered?

4    A.  To Mr. Grant's residence.

5    Q.  And where did you understand Mr. Grant to live?

6    A.  I got the address.  I was few times, before that,

7    mentioned, and I know the address.

8    Q.  I'm asking generally.  Where was his house?

9    A.  Oh.  Staten Island, New York.

10   Q.  Now, at this point, did you discuss your having arranged

11   for the shipment of the windows with Mr. Reichberg?

12   A.  It could be.  I don't remember.

13   Q.  And to the best of your knowledge, did you discuss the

14   topic of payment with Mr. Reichberg again?

15   A.  No.

16           MS. NECHELES:  Your Honor, can I move to strike the

17   answer "It could be"?

18           THE COURT:  Thank you.

19           No.  Or, yes, you may move, but I decline to grant the

20   request.

21           MR. BELL:  Thank you, your Honor.

22   BY MR. BELL:

23   Q.  Now, at this point, why were you willing to pay for the

24   windows yourself?

25   A.  I thought I'm going to get some nice jobs, so it cover

1   the -- it's going to cover the cost of everything.

2   Q.  Other than --

3   A.  Or maybe they're going to pay me later.

4   Q.  Other than the jobs that you had been promised, did you

5   expect there to be payment in return?

6   A.  Yes.

7           MR. MERINGOLO:  Objection; leading.

8           THE COURT:  Thank you.

9           You can answer the question.

10          MR. BELL:  I'm sorry, I believe he did.

11          THE WITNESS:  Yeah, I expect to get paid.

12  BY MR. BELL:

13  Q.  Now, you mentioned that you were present for measurements

14  of the windows?

15          MR. BELL:  One moment, please?

16          (Pause)

17          THE COURT:  Thank you.

18          Please take your time.

19  Q.  You mentioned that you were present for measurements of the

20  windows?

21          MR. MERINGOLO:  Objection; leading.

22          THE COURT:  Thank you.

23          You can answer the question.

24  A.  Yeah.

25  Q.  When you were there, present at the house, for

1    measurements, did you speak to Mr. Grant about the windows?

2    A.   Maybe.  I don't remember.  Maybe small conversation.

3    Q.   Specifically, sir, did you speak to Mr. Grant about

4    payment?

5    A.   No.

6    Q.   Did Mr. Grant ever say that he was going to pay you?

7    A.   No.

8    Q.   You mentioned you were doing this, in part, because you

9    thought that you would get some nice jobs out of it?

10   A.   Yes.

11   Q.   From whom did you hope to get those nice jobs?

12   A.   Mr. Reichberg.

13   Q.   How did you expect Mr. Reichberg at this point to be able

14   to get you those nice jobs?

15   A.   He send me to see some jobs.  I was picking up a few jobs.

16   Q.   What, if anything, came of that?  In other words, what jobs

17   or referrals did you get?

18   A.   None.

19   Q.   I want to show you what's already in evidence as Government

20   Exhibit 927.

21            MR. BELL:  And I'd like to publish it with the Court's

22   permission?

23            THE COURT:  Thank you.

24            You may.

25            MR. BELL:  Just the first page, Mr. Hamilton.

IB7KGRA2                        Gazit - Direct

1   BY MR. BELL:

2   Q.   Now, Mr. Gazit, are you familiar with this document?

3   A.   Yes.

4   Q.   And how are you familiar with it?

5   A.   Uh-huh.

6   Q.   How are you familiar with this document, sir?

7   A.   I know I received that statement.

8   Q.   Does this pertain to a particular job or bit of work that

9   you did?

10  A.   Yeah.

11  Q.   Which job?

12  A.   That's installed by Mr. Grant's house.

13          MR. BELL:  One moment, please?

14          (Pause)

15  Q.   You mentioned, by the way, Mr. Gazit, that you yourself

16  paid for the windows.  Did anyone pay you for your labor?

17  A.   No.

18  Q.   Did you expect anybody to pay you for your labor?

19  A.   Yeah.  They didn't.

20  Q.   Who did you expect to pay you for your labor?

21  A.   I don't know.  Either one of them.

22  Q.   Had you discussed being paid for your labor with

23  Mr. Reichberg?

24  A.   No.

25  Q.   Had you discussed being paid for your labor with Mr. Grant?

IB7KGRA2                      Gazit - Direct

1    A.  No.

2             MR. BELL:  You can take that down, Mr. Hamilton.

3    Thank you.

4    BY MR. BELL:

5    Q.  Did Mr. Grant ever discuss the possibility of installing

6    siding on a separate project with you?

7             MR. MERINGOLO:  Objection; leading.

8             THE COURT:  Thank you.

9             You can answer the question.

10            THE WITNESS:  No, Mr. Grant never asked me that.

11   Q.  Did Mr. Reichberg?

12   A.  Yeah, he asked me -- he give me some address, so I think I

13   sent a siding contractor to that address.

14   Q.  Do you recall, generally speaking, where that address was?

15   A.  That was in Staten Island.  I don't remember the address.

16   Q.  A location in Staten Island separate from Mr. Grant's

17   house?

18   A.  Yes.

19   Q.  Do you know for whom you were sending the contractor to

20   explore that work?

21   A.  No.

22   Q.  And do you know whether anything came of it?

23   A.  No.  He didn't do the job, no.

24   Q.  Let's switch gears for a moment, Mr. Gazit.

25            Are you familiar with an individual named Avi Zangi?

1    A.   Yes.  My friend.

2    Q.   And how do you know Mr. Zangi?

3    A.   He's my friend.  He sells cabinets, and I work with him.

4    Q.   And how long have you known Mr. Zangi?

5    A.   Oh, many years.

6    Q.   Are you close?

7    A.   About 30 years.

8    Q.   Now, do you recall an occasion when Mr. Zangi was arrested?

9    A.   Yes.

10            MR. MERINGOLO:  Objection; leading.

11            THE COURT:  Thank you.

12            You can answer the question.

13   BY MR. BELL:

14   Q.   About how long ago did that happen?

15   A.   No idea.

16   Q.   How did you find out that it happened, Mr. Gazit?

17   A.   His brother call me, and he said Avi got arrested, if I can

18   call Jeremy -- Mr. Reichberg to help.

19            MR. MERINGOLO:  Objection; hearsay.

20            THE COURT:  Thank you.

21            You can answer the question.

22   A.   So I call --

23            MR. MERINGOLO:  Objection; hearsay.

24            THE COURT:  Thank you.

25            You can answer the question.

1           THE WITNESS:  So I call Mr. Reichberg.

2    BY MR. BELL:

3    Q.  When you called Mr. Reichberg, did you have an

4    understanding of why you were being asked to call

5    Mr. Reichberg?

6    A.  Yeah.  They know we are connected, and I was like can you

7    get him out, I don't know, somehow.

8           MS. NECHELES:  Objection, your Honor.

9           THE COURT:  Thank you.

10           He answered the question.  I accept it.

11           MS. NECHELES:  Your Honor, does he have an

12    understanding of why the other person was asking him?

13           THE COURT:  Thank you.

14           Thank you.  That wasn't what I understood the question

15    to be.

16           MR. BELL:  It wasn't, your Honor.  Thank you.

17           THE COURT:  Thank you.

18    BY MR. BELL:

19    Q.  You can answer, sir.

20           THE COURT:  Thank you.  Counsel, could you rephrase

21    just for assistance?

22           MR. BELL:  Sure.

23    Q.  At the time that you called Mr. Reichberg, what was your

24    understanding of why you were calling Mr. Reichberg about an

25    arrest?

1    A.  To get him out.

2    Q.  And why was it that you believed that Mr. Reichberg could

3    get Mr. Zangi out?

4              MR. MERINGOLO:  Objection.

5              THE COURT:  Thank you.

6              You can answer the question.

7              THE WITNESS:  That he is, like, connected.  He knows.

8    BY MR. BELL:

9    Q.  And where had you gotten the sense that Mr. Reichberg was

10   connected in a way that could get someone out of an arrest?

11             MR. MERINGOLO:  Objection.

12             THE COURT:  Thank you.

13             You can answer the question.

14             THE WITNESS:  He knows the cops.  He knows everybody.

15   Q.  How did you know that Mr. Reichberg knows the cops?

16   A.  Oh, I know that.

17   Q.  I'm asking you how you know.

18   A.  I have all those PBA cards, all that.

19   Q.  Did Mr. Reichberg tell you that he knew the cops?

20   A.  Yes.

21   Q.  Now, did you, in fact, speak to Mr. Reichberg about

22   Mr. Zangi's arrest?

23   A.  Yes.

24   Q.  How long after Mr. Zangi's brother had contacted you did

25   you speak to Mr. Reichberg about that arrest?

1   A.   It was a few minutes.  Like I call right away.

2   Q.   Generally speaking, what did you and Mr. Reichberg discuss

3   when you called him?

4   A.   I told him how he got arrested, and let's try to get him

5   out.

6   Q.   What, if anything, did Mr. Reichberg say?

7   A.   He said it's going to cost him 2500, and I can get him in

8   two hours.

9   Q.   Did you do anything with that information?

10  A.   Yeah.  I spoke to the brother, the one who called me.

11  Q.   Did you say that you were surprised?

12  A.   Yeah.  The guy said, listen, that's too much money.  That

13  was like argument on the price.

14  Q.   Did you relay that reaction to Mr. Reichberg?

15  A.   Yeah.

16  Q.   And what did Mr. Reichberg say when you told him that

17  Zangi's brother was balking at the price?

18  A.   Yeah, he said that's my price, I can do it or I cannot do

19  it.

20  Q.   Did you take that information back to Mr. Zangi?

21  A.   Yes.

22            MR. MERINGOLO:  Objection.

23            THE WITNESS:  Uh-huh.

24            THE COURT:  Thank you.

25            Overruled.

IB7KGRA2                     Gazit - Direct

1    BY MR. BELL:

2    Q.  I'm sorry, did you take that information back to Mr. Zangi?

3    A.  I did, yeah.

4    Q.  And what happened when you took that information back to

5    Mr. Zangi?

6    A.  Okay.  He said okay.

7    Q.  Now, did you have further conversations with Mr. Zangi and

8    Mr. Reichberg over the course of that day or night?

9    A.  No.  All I know, he got released the next day, the 9th.

10   Q.  That's a little bit different from the question I asked

11   you, sir, so I'll ask you more precisely.

12          Well, withdrawn.

13          Did there come a point when Mr. Zangi mentioned

14   another possibility for helping his brother?

15   A.  Yes.  He said there's a guy that can charge $500 that can

16   do the job, also.

17   Q.  Instead of $2,500?

18   A.  Yes.

19   Q.  Did you discuss that with Mr. Reichberg?

20   A.  Yes.

21   Q.  And what was the nature of your discussion with

22   Mr. Reichberg about the other guy who could do it for $500?

23   A.  He said the guy's a bullshit, he cannot do it.

24   Q.  Now, you mentioned that Mr. Zangi got out the next day?

25   A.  Right.

1    Q.  How did you learn that?

2    A.  I know.  He called me.

3              MR. MERINGOLO:  Your Honor, can we have clarification

4    when he got arrested?

5              THE COURT:  Thank you.

6              You'll have the opportunity to inquire, counsel, when

7    you have the opportunity to inquire of the witness.

8              MR. MERINGOLO:  Okay.

9              THE COURT:  Please proceed.

10             MR. BELL:  Thank you, your Honor.

11   BY MR. BELL:

12   Q.  I just want to make sure I understand, Mr. Gazit.  How did

13   you learn that Zangi got out the next day?

14   A.  Yeah, he called me, I spoke to him.  I seen him every day.

15   Q.  Did Mr. Reichberg tell you what specifically, if anything,

16   he had done with Mr. Zangi or for Mr. Zangi?

17   A.  He said he got him out fast.  I don't know.

18             MR. BELL:  One moment, please?

19             (Pause)

20   Q.  And, to your knowledge, did money change hands between the

21   Zangi family and Mr. Reichberg?

22             MR. MERINGOLO:  Objection.

23             THE WITNESS:  Yeah.

24             THE COURT:  Thank you.

25             I'm sorry.  You can answer the question.

1   BY MR. BELL:

2   Q.  How do you know that money changed hands between the Zangis

3   and Mr. Reichberg?

4   A.  Mr. Zangi give me the money to pass over to Mr. Reichberg.

5   Q.  In other words, you yourself paid Mr. Reichberg with

6   Mr. Zangi's money?

7   A.  Yeah.

8               MR. BELL:  One moment, please.

9               THE COURT:  Thank you.  Please take your time.

10              (Pause)

11  Q.  We're almost done here, Mr. Gazit.

12              Generally, for people who are not Jeremy Reichberg and

13  people who are not promising you big jobs, how much do you

14  typically charge to install windows?

15              MR. MERINGOLO:  Objection; vague.

16              THE WITNESS:  That particular job was about 8,000.

17              MR. BELL:  I think there's a pending objection.  I'm

18  sorry.

19              THE COURT:  Oh, was there?  I didn't hear it.

20              MR. MERINGOLO:  Objection; vague.

21              THE COURT:  Thank you.

22              Overruled.  Please proceed.

23  BY MR. BELL:

24  Q.  So I believe that you said $8,000?

25  A.  Yeah.

1  Q.  Is that what you would have ordinarily charged somebody for

2  a job on par with the Jimmy Grant job?

3          MR. MERINGOLO:  Objection; leading.

4          THE COURT:  Thank you.

5          Overruled.

6  BY MR. BELL:

7  Q.  I think you can answer -- let me ask you a slightly

8  different way.  If it hadn't been with Mr. Reichberg in mind,

9  how much would you have charged somebody for a job like the

10 Jimmy Grant job?

11 A.  I'm not doing those kind of job.  I'm doing like major,

12 so --

13 Q.  In other words, this was a job that you ordinarily wouldn't

14 even do?

15 A.  No.

16 Q.  And you say, no, you wouldn't ordinarily do it or, no, my

17 question is wrong?

18 A.  I wouldn't do it.

19         MR. BELL:  Nothing further for Mr. Gazit.  Thank you,

20 your Honor.

21         THE COURT:  Good.  Counsel for Mr. Reichberg?

22         MR. MERINGOLO:  Go, go, go.

23         MS. NECHELES:  Can we just approach for one minute,

24 your Honor?

25         THE COURT:  Please come up.

 1                (At the sidebar)

 2                THE COURT:  Go ahead.

 3                MS. NECHELES:  Your Honor, the conversations that

 4     Mr. Gazit just testified about having with Mr. Reichberg are

 5     all taped.  So I intend -- I thought the government was going

 6     to play them, they didn't.  So I intend to play them at this

 7     point with Mr. Gazit and ask him questions about those

 8     conversations.

 9                I may need a few minutes to set up.  I may be able to

10     play them directly, but I'm a little concerned about the

11     logistics.  I didn't expect to be doing this because I was sure

12     the government would be playing them with him since they're --

13                THE COURT:  Thank you.

14                MR. MERINGOLO:  If you want me to go and start, I can

15     start while you -- it's totally up --

16                MS. NECHELES:  It might make sense.

17                MR. MERINGOLO:  I won't be that long with him at all.

18                THE COURT:  Would that help you accomplish the goal?

19                MS. NECHELES:  It might, yes.  Thank you.

20                THE COURT:  Then I'm happy to proceed in that way.

21                I'm sorry.  One other quick thing:  I realize that I

22     have been calling on Ms. Necheles first simply because she's

23     sitting there --

24                MR. MERINGOLO:  That's fine.

25                THE COURT:  -- in that closer seat.  If the defense

 1   wants me to inquire of one of you -- say you instead of

 2   Ms. Necheles in the outset, please let me know.

 3            MR. MERINGOLO:  Judge, she's a better lawyer than me.

 4            MS. NECHELES:  No.

 5            MR. MERINGOLO:  Inquire of her first.

 6            MS. NECHELES:  We worked it out with each other.

 7            THE COURT:  You'll alert me.

 8            MS. NECHELES:  Yes.

 9            MR. BELL:  Can I note one thing that probably won't

10   obviate the need for all of this, but it will obviate the need

11   for some of this?  We do intend to play the calls.  We included

12   the calls on the list we gave you.  We just don't intend to

13   play them through the witness.  But we do think they will be

14   heard.  If it's simply a matter of getting them out there,

15   that's fine.  If you do want to cross him on this specifically,

16   then that's up to you, subject to the rules of evidence, as it

17   always has been.

18            THE COURT:  I understand the issue to be a technical

19   one of having your paralegal be ready to queue up the calls; is

20   that right?

21            MS. NECHELES:  Yes.

22            THE COURT:  Good.  Let's proceed.

23            MS. RAVENER:  One moment, your Honor?

24            (Pause)

25            MR. BELL:  Judge, we will make this even easier.

1           MS. NECHELES:  I can't play them now.  They finished

2      their testimony.

3           MR. BELL:  What I'd like to do is just offer the calls

4      and then yield.  I'm not going to play them; I'm just going to

5      offer them per the stipulation.

6           THE COURT:  Counsel?

7           MS. NECHELES:  We're just going to do it on our case.

8      I don't need the government to offer it.  It's been stipulated

9      in as a joint stipulation.  We'll offer them right now.

10     They're in his notebook, I'll use the government numbers, but

11     we will just -- it is a joint stipulation.  We'll just put it

12     in.  I don't understand -- they want to look like they're the

13     ones putting it in.  They'll have their government exhibit

14     numbers because they're in their notebook, but we'll just --

15          MR. BELL:  No, we want to abide by the rules of

16     evidence.  I don't think she can offer her client's statements,

17     so we're actually trying to do her a favor.

18          THE COURT:  Thank you.

19          Is there a concern about this approach, Ms. Necheles?

20          MS. NECHELES:  I don't care.

21          THE COURT:  It seems efficient.  Thank you.

22          MS. NECHELES:  It's not true that I can't offer my

23     client's statements.  I can under certain situations.

24          THE COURT:  Thank you.

25          (Continued on next page)

1                (In open court)

2                THE COURT:  Sorry.  Counsel for the United States, can

3       I turn to you, please?

4                MR. BELL:  Yes, your Honor.  Thank you.

5                Before we yield to cross-examination, we would like to

6       read a stipulation between the parties.  The stipulation

7       concerns certain wiretap records.  I'm going to skip the

8       legalese at the beginning, to save some of the jury's time, and

9       just note that:  It is hereby stipulated and agreed between the

10      parties that:

11               "If called as a witness, a representative of the

12      Federal Bureau of Investigation would testify as follows:

13               "From January 12, 2015, through May 12, 2015, law

14      enforcement officers from the FBI conducted judicially

15      authorized wiretap intercepts of communications over a cellular

16      telephone with call number (917)468-2400, used by Jeremy

17      Reichberg, the defendant."  And we'll refer to that phone line

18      as the Reichberg phone.  "The content of each intercepted

19      conversation was recorded at the time of the conversation,

20      along with the date and time of the conversation.  The

21      recording was then transferred to a computer system under the

22      custody and control of the FBI.

23               "From January 12, 2015, through May 12, 2015, law

24      enforcement officers of the FBI conducted judicially authorized

25      wiretap intercepts of communications over a cellular telephone

1    with call number (646)283-3283, used by Jona Rechnitz."  And

2    we'll refer to that as the Rechnitz phone.  "The content of

3    each intercepted conversation was recorded at the time of

4    conversation, along with the date and time of conversation.

5    The recording was then transferred to a computer system under

6    the custody and control of the FBI.

7            "Government Exhibit W-1 is a removable drive

8    containing audio recordings.  Each audio recording is a true

9    and correct audio recording of a call intercepted over the

10   Reichberg phone by the FBI, as described in paragraph 1(a),"

11   which I read, "and which were downloaded from the computer

12   system under the custody and control of the FBI.  Conversations

13   in those calls are conducted in multiple languages,

14   specifically English, Hebrew, and Yiddish."  And that concerns

15   the Reichberg phone.

16           "Government Exhibit W-100 is a compact disk containing

17   Government Exhibits W-00121 through W-10126, which are true and

18   correct audio recordings of excerpts of certain telephone

19   conversations that were intercepted over the Reichberg phone by

20   the FBI, as described earlier in paragraph 1(a), and which were

21   downloaded from the computer system under the custody and

22   control of the FBI.  Conversations in those calls are conducted

23   in multiple languages, specifically, English, Hebrew, and

24   Yiddish.

25           "Government Exhibit X-1 is a removable drive

containing audio recordings.  Each audio recording is a true

and correct audio recording of a call intercepted over the

Rechnitz phone by the FBI, as described earlier in paragraph

1(b), and which were downloaded from the computer system under

the custody and control of the FBI.  The conversations in those

calls are conducted in multiple languages, specifically

English, Hebrew, and Yiddish.

        "Government Exhibit X-100 is a compact disk containing

Government Exhibits X-00699 through X-03438, which are true and

correct audio recordings of excerpts of certain telephone

conversations that were intercepted over the Rechnitz phone by

the FBI, as described earlier in paragraph 1(b), and which were

downloaded from the computer system under the custody and

control of the FBI.  The conversations in those calls are

conducted in multiple languages, specifically English, Hebrew,

and Yiddish.

        "If called as a witness, a representative of the

United States Attorney's Office would testify as follows:

        "Government Exhibits W-00121-T through W-10126-T and

X-00699-T through X-03438-T are true and correct transcripts of

relevant portions of the recorded conversations contained in

Government Exhibits W-00121 through W-10126 and X-00699 through

X-03438 respectively.  The dates, times, telephone numbers, and

voice attributions reflected on Government Exhibits W-00121-T

through W-10126-T and X-00699-T through X-03438-T are accurate.

1   For example, the date, time, participants in the call, and

2   phone numbers used for Government Exhibit W-00121 are

3   accurately depicted in Government Exhibit W-00121-T.   The

4   transcripts contain true and accurate Hebrew-to-English and

5   Yiddish-to-English translations of the Hebrew and Yiddish

6   portions of the calls.

7          "Defense Exhibit JR-3000 is a compact disk containing

8   Defense Exhibits JR-3001 through JR-3022 and JR-3101 through

9   JR-3150, which are true and correct audio recordings of

10  excerpts of certain telephone conversations that were

11  intercepted over the Reichberg phone and Rechnitz phone by the

12  FBI, as described earlier in paragraphs 1(a) and 1(b), and

13  which were downloaded from the computer system under the

14  custody and control of the FBI.   The conversations in those

15  calls are conducted in multiple languages, specifically

16  English, Hebrew, and Yiddish.

17         "If called as a witness, a person who transcribed the

18  following would testify that:

19         "Defense Exhibits JR-3001-T through 3022-T and

20  JR-3101-T through 3150-T are true and accurate transcripts of

21  relevant portions of recorded conversations contained in

22  Defense Exhibits JR-3001 through JR-3022 and JR-3101 through

23  JR-3150 respectively.   The dates, times, telephone numbers, and

24  voice attributions reflected on Defense Exhibits JR-3001-T,

25  through JR-3022-T and JR-3101-T through JR-3150-T are accurate.

For example, the date, time, participants in the call, and

phone numbers used for Defense Exhibit JR-0301 are accurately

depicted in Defense Exhibit JR-3001-T.  The transcripts contain

true and accurate Hebrew-to-English and Yiddish-to-English

translations of the Hebrew and Yiddish portions of the calls.

        "Defense Exhibits 2100 is a compact disk containing

Defense Exhibits 2101 through 2324, which are true and correct

audio recordings of excerpts of certain telephone conversations

that were intercepted over the Reichberg phone and the Rechnitz

phone by the FBI, as described in paragraphs 1(a) and 1(b)

earlier, and which were downloaded from the computer system

under the custody and control of the FBI.  Conversations in

those calls are conducted in multiple languages, specifically

English, Hebrew, and Yiddish.

        "If called as a witness, a person who transcribed the

following would testify that:

        "Defense Exhibits 2101-T through 2324-T are true and

accurate transcripts of relevant portions of the recorded

conversations contained in Defense Exhibits 2101 through 2324

respectively.  The dates, times, telephone numbers, and voice

attributions reflected on Defense Exhibits 2101-T through

2324-T are accurate.  For example, the date, time, participants

in the call, and the phone numbers used for Defense Exhibit

2101 are accurately depicted in Defense Exhibit 2101-T.  The

transcripts contain true and accurate Hebrew-to-English and

1    Yiddish-to-English translations of the Hebrew and Yiddish

2    portions of the calls.

3              "It is further stipulated and agreed that this

4    stipulation may be received as a joint exhibit at trial."  I

5    will date it today, so it's November 7th, 2018.

6              Your Honor, the government offers the stipulation

7    itself, which is Government Exhibit 1700.  We also offer and --

8    we also offer the following calls:  Government Exhibits W-1152,

9    W-1153, W-1155, W-1156, W-1160, W-1165, W-1167, W-1170, W-1175,

10   W-1177, W-1192, W-1195, W-1222, W-5358, and the corresponding

11   transcripts, which is to say all of the numbers I just

12   mentioned with T at the end.

13             THE COURT:  Thank you.

14             Counsel for defendants?

15             MS. NECHELES:  My understanding is that the

16   transcripts are an aid to the jury.

17             THE COURT:  Thank you.

18             Counsel?

19             MR. BELL:  One moment, your Honor.

20             (Pause)

21             MR. BELL:  Your Honor, we offer the exhibits

22   themselves.  We understand that the transcripts --

23             THE COURT:  Thank you.

24             MR. BELL:  -- are an aid.

25             THE COURT:  Counsel for Mr. Grant?  I'm sorry, any

1   objection?

2           MR. MERINGOLO:  No objection.

3           THE COURT:  Thank you.

4           Counsel for Mr. Reichberg, any objection?

5           MS. NECHELES:  No objection.

6           THE COURT:  Thank you.

7           I'm accepting into evidence the government stipulation

8   1700 together with each of the W prefixed numbers that were

9   just read by Mr. Bell -- that's 1152, 1153, 1155, 1156, 1160,

10  1165, 1167, 1170, 1175, 1177, 1192, 1195, 1222 and 5358 -- into

11  evidence.

12          (Government's Exhibits 1700, W-1152, W-1153, W-1155,

13  W-1156, W-1160, W-1165, W-1167, W-1170, W-1175, W-1177, W-1192,

14  W-1195, W-1222, and W-5358 received in evidence)

15          THE COURT:  You can proceed.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

IB7TGRA3                          Gazit - Cross

1   CROSS-EXAMINATION

2   BY MR. MERINGOLO:

3   Q.  Good morning, Mr. Gazit.  My name is John Meringolo.  I

4   represent Jimmy Grant.

5          You testified on direct examination that Jimmy and

6   Jeremy were friends, correct?

7   A.  Yeah.

8   Q.  From your observation, you would determine that they were

9   friends, right?

10  A.  Mm-hmm.

11         THE COURT:  Sorry, is that a yes?

12         THE WITNESS:  Yes, yes.

13  Q.  How long have you known Jeremy Reichberg?

14  A.  Beginning of 2013.

15  Q.  Is that when he made the call to you about these windows?

16  A.  Yeah.

17  Q.  So that was -- to your knowledge, if you recall, Hurricane

18  Sandy was October of 2012?

19         MR. BELL:  Objection.

20         THE COURT:  Thank you.  You can answer the question.

21  A.  Yes, mm-hmm.

22  Q.  So October of 2012 was Hurricane Sandy, and then you met --

23  Jeremy put you on the phone with Jimmy in early of 2013,

24  correct?

25  A.  Right.

IB7TGRA3                          Gazit - Cross

1    Q.  And the reason was in the winter of 2013 Jimmy Grant's

2    windows were loose, right?

3    A.  Yes.

4    Q.  Then you said you asked for a deposit, right?

5    A.  Right.

6    Q.  So in the beginning of the winter of 2013 you asked for a

7    deposit from Jeremy Reichberg, right?

8    A.  Yes.

9    Q.  And now Jeremy Reichberg was someone that you met and was

10   hoping to do business with because he was a contractor, right?

11   A.  Right.

12   Q.  And he was the one who referred you to his friend Jimmy

13   Grant, right?

14   A.  Right.

15   Q.  And in your business or in your business practices, that is

16   common to get referrals for other people, right?

17   A.  Yes.

18   Q.  And sometimes the referrals that you get, from time to time

19   the individual that you are doing business with may pay you

20   instead of the other individual you may be doing the work for,

21   right, like a contractor, subcontractor?

22   A.  Yes, mm-hmm.

23   Q.  Now on direct examination you also said that, I believe,

24   you asked for another -- a deposit again at some period of time

25   that year, right?

1   A.  Yes.

2   Q.  Do you recall the next time you asked for a deposit?

3   A.  I can't recall the time, no.

4   Q.  But we can agree that you installed the windows or had the

5   windows installed in October of 2013, correct?

6   A.  Yeah.

7   Q.  And that would be for, the jury, one year after Hurricane

8   Sandy, right?

9   A.  Right.

10  Q.  And at that time you said you did not get a deposit at that

11  time at all, right?

12  A.  Right.

13  Q.  But in fact, didn't you get a discount on those windows

14  because you ordered a large amount of windows?

15  A.  Yeah, I get some discount.

16  Q.  Isn't it a fact you told the government that the discount

17  was to be approximately $3,000 for those windows?

18  A.  Something like that.

19  Q.  Well, I would like to make sure.  Do you recall speaking to

20  the government -- you spoke to them many times, right?

21  A.  Yes.

22  Q.  How many times?

23  A.  I don't remember.

24  Q.  Over five?  Under ten?  Over five or under five?

25  A.  No, no, few times.

1    Q.   But you went into their office, right?

2    A.   Yes.

3    Q.   Were you represented by a lawyer at that time?

4    A.   No.

5    Q.   And you went into their office and you spoke to them,

6    right?

7    A.   Right.

8    Q.   And there were Mr. Bell and other U.S. Attorneys were

9    there?

10   A.   Yes.

11   Q.   And special agents from the FBI?

12   A.   Right.

13   Q.   Special Agent Downs, if you could stand up and see if

14   that's Special Agent Downs.

15   A.   Yes.

16   Q.   And he was there.

17        And you told Special Agent Downs that the cost of the

18   windows was $5,388, but to you it was approximately $3,000

19   because you made a large purchase for the windows, is that

20   correct?

21   A.   Yeah, but it's overall, yeah.

22   Q.   But just to be clear for the jury that you told Agent Downs

23   that you paid $3,000 for those windows because they were

24   discounted.

25   A.   I get discount overall, all purchase, not specific for this

1   one.  I did pay, I did pay like 2,300 for this window, I paid

2   the full amount, then I get a discount overall.

3   Q.  Well, you didn't tell Agent Downs that the cost to --

4            And your initials would be BG?

5   A.  Pardon?

6   Q.  What are your initials?  BG, right?

7   A.  Yeah.

8   Q.  You didn't tell Agent Downs that it cost you approximately

9   $3,000?

10   A.  Yes, I did.

11   Q.  So just so the jury is clear, the invoice that we saw was

12   $5,388 but you get a discount and it was $3,000 for you,

13   correct?

14   A.  Yeah.

15   Q.  Okay.  Now --

16   A.  But not specifically.

17   Q.  Yes or no.

18   A.  Not specifically to this.

19            MR. BELL:  Objection.

20            THE COURT:  Sorry.  Sorry, counsel, let the witness

21   answer the question.

22            Thank you.  Go ahead.

23   A.  I get in general, not the specific for this one.

24   Q.  Well, if Agent Downs wrote that the cost to you was

25   approximately $3,000 because of a discount, that you got a

1  discount for a large purchase of windows, would that be

2  correct?

3  A.  Yes.

4  Q.  Okay.  So Agent Downs is correct.

5          MR. BELL:  Objection.

6          THE COURT:  Sustained, counsel.

7  Q.  So also I think you told Agent Downs, Martin Bell, and

8  other U.S. Attorneys and the FBI that Jeremy Reichberg paid

9  $3,000 for installation, correct?

10          MR. BELL:  Objection.

11          THE COURT:  Sustained.  Counsel, please --

12  A.  I didn't say that.

13          THE COURT:  I sustained the objection.

14          Counsel, please come up.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

IB7TGRA3                        Gazit - Cross

 1                 (At sidebar)

 2                 THE COURT:  So you're basically reading in the

 3     statements by the agent in his notes is what I understand you

 4     to be doing now.  Agent Downs is correct, you told Agent Downs

 5     this.

 6                 MR. MERINGOLO:  Okay.

 7                 THE COURT:  If you have questions --

 8                 MR. MERINGOLO:  I will say:  Did you tell Agent Downs?

 9                 THE COURT:  If you have questions about what it is

10     that this person did or said, I ask that you ask him those

11     questions, and to the extent that you need to show documents to

12     refresh him, I would then ask you to turn to appropriate

13     documents.

14                 MR. MERINGOLO:  Okay, thank you, Judge.

15                 THE COURT:  Any other comments?

16                 MR. BELL:  No, your Honor.

17                 MR. MERINGOLO:  Thank you, Judge.

18                 (Continued on next page)

19

20

21

22

23

24

25

```
 1                 (In open court)
 2                 THE COURT:  Sorry, counsel, please proceed.
 3     BY MR. MERINGOLO:
 4     Q.  Just to go back, the cost to you for those windows was
 5     $3,000, correct?
 6     A.  If you say -- you can look at it like that, yeah.
 7     Q.  And isn't it a fact that Jeremy Reichberg paid you --
 8     A.  No, you're wrong, you get ten percent, you get from that
 9     statement only ten percent.
10                 MS. NECHELES:  Your Honor, may I approach to see if
11     this refreshes his recollection?
12                 THE COURT:  Ask a question first.
13     Q.  We're going to go to Jeremy.  We'll strike that.
14                 Isn't it a fact that Jeremy paid you $3,000 for the
15     installation?
16     A.  No.
17     Q.  You met with the FBI and the U.S. Attorney, correct?
18     A.  Yes.
19     Q.  And you were talking to them, right?
20     A.  Right.
21     Q.  And you spoke to them truthfully, right?
22     A.  Right.
23     Q.  Because if you don't speak to them truthfully, you would
24     potentially have a crime, right?
25     A.  Yeah.
```

1              MR. BELL:  Objection.

2              THE COURT:  Thank you.

3              MR. MERINGOLO:  His understanding.

4              THE COURT:  Please proceed.

5    Q.  And when you spoke to them, there were people taking notes,

6    correct?

7    A.  Yeah.

8    Q.  And you were talking.  Do you recall, was it Agent Downs

9    taking these notes?

10   A.  I guess so.

11   Q.  Well, we don't want you to guess, sir.  But do you recall

12   telling the government that Jeremy Reichberg actually paid

13   $3,000 for the windows?

14   A.  No, I never say that.

15             MR. MERINGOLO:  Your Honor, if I may approach to try

16   to refresh the witness's recollection, I'm using 3509-2, page

17   2, three-quarters down the way.

18   Q.  Sir, you can read this whole document, but I would just

19   like you to read --

20             MR. MERINGOLO:  Your Honor, I think it's 01, not 02.

21             Your Honor, it's 03, 3509-03, page 2, three-quarters

22   down the way.

23   Q.  Sir, you can read this entire page, but I would like you to

24   read the place that I'm pointing to to see if that refreshes

25   your recollection that you told Agent Downs JR paid

1    approximately 3,000.

2              THE COURT:  Counsel.

3    Q.  Does that refresh your recollection that you told Agent

4    Downs or the U.S. Attorney's Office that Jeremy Reichberg paid

5    approximately $3,000 for the installation?

6    A.  No.

7    Q.  Do you recall telling Special Agent Downs or FBI agents or

8    any U.S. Attorneys that the payments were in cash increments

9    for those windows?

10             MR. BELL:  Objection.

11             THE COURT:  You can answer the question.

12   A.  No.

13   Q.  Do you recall telling the government -- I will use it as a

14   whole -- that you received small payments in cash for the

15   windows?

16   A.  No.

17             MR. BELL:  Objection.

18             THE COURT:  Thank you.  You can answer the question.

19   Q.  You don't recall telling anyone from the government that?

20   A.  No.

21   Q.  Do you recall telling the government that -- and you told

22   this jury that you received PBA cards, correct?

23   A.  Yes.

24   Q.  And isn't it true that you told the government that those

25   PBA cards are useless?

1    A.  Yes.

2    Q.  And why did you tell the government the PBA cards are

3    useless?

4    A.  We showed it, sometimes it doesn't help.  It's like you get

5    a ticket no matter what.

6    Q.  The PBA card didn't help --

7    A.  Right.

8    Q.  -- in your experience, correct?

9    A.  Yes.

10   Q.  Now you said that Jeremy Reichberg -- you never went to

11   Jeremy Reichberg's house for Purim, correct?

12           Purim parties, you never went to his house?

13           MR. BELL:  Objection.

14           THE COURT:  You can answer the question.

15   A.  I went to Jeremy's house, yeah.

16   Q.  And he invited you, right?

17   A.  Yes.

18   Q.  And when you were there, did you see Jimmy Grant?

19   A.  No.

20   Q.  Did you see other cops?

21   A.  Not that I remember.

22   Q.  When was this Purim party that he invited you to?

23   A.  I never been there.

24   Q.  You have never been there?

25   A.  No, I was never invited.

IB7TGRA3                      Gazit - Cross

1   Q.  I'm sorry, it's my fault.  Just for the jury, you were

2   never invited to Jeremy Reichberg's house for Purim parties?

3   A.  No.

4   Q.  Okay.

5   A.  Purim, not Purim.

6   Q.  Sorry, it's my fault.

7           Now how many times did you speak with Mr. Grant before

8   you went to his house?

9   A.  Maybe twice.

10  Q.  Maybe twice?

11  A.  Yeah.

12  Q.  Would it be possible that you spoke to him eleven times

13  before you went to his house, sir?

14  A.  Before I went to his house?

15  Q.  To do the windows.

16  A.  No.

17  Q.  Did the government ever show you phone records between you

18  and Mr. Grant?

19          MR. BELL:  Objection.

20          THE COURT:  Thank you.  You can answer the question.

21          THE WITNESS:  No.

22  Q.  Did they?

23  A.  No.

24  Q.  Now after you installed the windows --

25  A.  Yes.

1    Q.  -- did you speak to Mr. Grant?

2    A.  Never.

3    Q.  Your testimony for this jury is that you never spoke to

4    Mr. Grant after you installed these windows?

5    A.  Yeah, during the installation I spoke to him a couple of

6    times.  I seen him a couple of times.

7    Q.  And you were at his house, right?

8    A.  Mm-hmm.

9    Q.  You never asked for cash for payment?

10   A.  No.

11   Q.  Could you tell this jury what your phone number is?

12   A.  My phone?

13   Q.  Yeah, your cell phone.

14   A.  917-945-1684.

15   Q.  So were you aware that the windows you installed were

16   defective?

17          MR. BELL:  Objection.

18          THE COURT:  Thank you.  Can you ask the question

19   differently, counsel?

20   Q.  Were the windows you installed -- did you ever become aware

21   that the windows you installed were defective?

22          MR. BELL:  Objection.

23          THE COURT:  Thank you.  You can answer the question.

24   A.  No.

25   Q.  You installed the windows, right?

IB7TGRA3                    Gazit – Cross

1    A.   Yes.

2    Q.   And at any point were you sent a video or pictures

3    regarding defects in the windows, water coming down?

4    A.   Never.

5              MR. MERINGOLO:  Your Honor, may I approach and show

6    the witness something to maybe refresh his recollection?

7              THE COURT:  Thank you, yes.

8              MR. MERINGOLO:  I'm refreshing his recollection,

9    Judge.

10             THE COURT:  Come forward, please, counsel.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  Just for the record, counsel is

3     approaching the witness with his personal cell phone in hand.

4     I understand that he may have wished to show the witness an

5     image that resides on counsel's phone.  Can you tell me what it

6     is that you hope to show the witness?

7           MR. MERINGOLO:  It is a defect of the windows of

8     Mr. Grant's house.  I want to show the witness.  I do not want

9     to publish it to the jury.  It's specifically for refreshing

10    his recollection.  He could say yes, he was shown something

11    like this, or yes, he was aware of the defects.

12          THE COURT:  What is the basis for me to believe that

13    the document or image that you expect to show him has ever been

14    seen by this person before?

15          MR. MERINGOLO:  He was emailed multiple times over the

16    years -- not emailed, he was texted with pictures and videos of

17    what was going on at Mr. Grant's house.  However, that wasn't

18    turned over and this is all we have to try to refresh his

19    recollection.

20          MR. BELL:  Counsel, I don't believe we have ever seen

21    this.

22          MR. MERINGOLO:  No, they haven't.

23          MR. BELL:  Mr. Meringolo says that we didn't turn it

24    over, and as I stand here I do not know between whom these

25    texts supposedly took place.

 1              Mr. Meringolo also says that the image shows a defect.
 2     To be clear, what he has shown me over the two seconds we had
 3     back at counsel table was the side of a house in the rain.  I
 4     did not see a defect apparent.  I want to know what this is.
 5              MR. MERINGOLO:  It's a defect.  I will play it right
 6     here.
 7              You could see the water coming down from the window,
 8     going down Mr. Grant's house, which would go into his basement
 9     and go all over and then the side.
10              THE COURT:  When was this video taken?
11              MR. MERINGOLO:  This video was taken when we found out
12     Mr. Boaz was coming in.
13              THE COURT:  Has it ever -- sorry, this video is
14     nothing that he has seen?
15              MR. MERINGOLO:  This video in particular, no, but I
16     want to know if this refresh his recollection there was a
17     defect, and he may say no.
18              THE COURT:  I will not permit you to do that.  To
19     explain, this is a video that this witness has never seen, so
20     it's not a request to refresh his recollection, rather to put
21     evidence in front of him and to ask him to comment on it.  The
22     evidence otherwise has no foundation, so I'm going to have to
23     ask you not to do that.
24              MR. MERINGOLO:  Your Honor, just for the record, I
25     would like to put on just the Hornbook Law of refreshing

1    recollection that the Court knows better than I do.

2              THE COURT:  Yes, indeed, counsel.  To be clear,

3    refreshing recollection is reminding someone of something

4    that --

5              MR. MERINGOLO:  They have seen.

6              THE COURT:  -- they have seen.  The document that you

7    want to put in front of the witness you just said is something

8    that you took --

9              MR. MERINGOLO:  Right.

10             THE COURT:  -- recently, and therefore the witness has

11   never seen.

12             MR. MERINGOLO:  He has seen things similar to this and

13   it may refresh his recollection of the work that he's done.  He

14   did the shoddy work.

15             THE COURT:  Thank you.

16             MR. BELL:  We would reiterate our request for

17   appropriate discovery concerning things in this category.  This

18   is something that we haven't seen.  We can save a lot of time

19   later on down the road, the jury's time, I hope, and avoid

20   things like this from happening.

21             THE COURT:  Thank you.

22             MS. NECHELES:  Just standing here, I realized --

23             THE COURT:  Sorry, go ahead, counsel.

24             MS. NECHELES:  Standing here I realized that what we

25   are looking at on our computer shows up here on these screens.

IB7TGRA3                         Gazit - Cross

1    What the defense is looking at is showing up on these screens,

2    and I just wanted to know why.

3              THE COURT:  When you say these screens --

4              MS. NECHELES:  This screen here, and I think this

5    screen over there.

6              MR. BELL:  I don't think it shows up on ours.

7              MS. NECHELES:  I don't think so either, because I just

8    looked at yours.

9              THE COURT:  You, counsel, all control where it is that

10   the images that your paralegals are working with can be seen,

11   so to the extent that your paralegal has toggled it so the

12   documents could be reviewed by the Court, they can fix that.

13             MS. NECHELES:  I will see what is going on.

14             MR. BELL:  Thank you, your Honor.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1                (In open court)

2                THE COURT:  Counsel for Mr. Grant?

3     BY MR. MERINGOLO:

4     Q.  Now you measured the windows for Mr. Grant's house,

5     correct?

6     A.  Yes.

7     Q.  And when you measured the windows, you had to take a trip

8     to Staten Island?

9     A.  Yes.

10    Q.  Did you do it yourself?

11    A.  No, my guys, my workers.

12    Q.  Your workers?

13    A.  Yes.

14    Q.  Workers that you employ or contract, right?

15    A.  Right.

16    Q.  What type of construction do you do today, sir?

17    A.  General.

18    Q.  What type of jobs?

19    A.  Houses renovation.

20    Q.  You renovate bathrooms?

21    A.  I do major, extension, adding floors.

22    Q.  Where?

23    A.  Brooklyn.

24    Q.  And this is now your son's business, right?

25    A.  Yes.

1    Q.  And why did you close -- could you tell the jury why you

2    closed down your business?

3    A.  When I closed my business?

4    Q.  Yes, why did you close your business?

5    A.  I'm entitled to close a business.

6    Q.  Absolutely.  Why?

7    A.  Hmm?

8    Q.  Why?

9    A.  No reason.

10   Q.  Has your business been sued?

11              MR. BELL:  Objection.

12              THE COURT:  Thank you, you can answer the question.

13   A.  Yes.

14   Q.  How many times have you been sued; your business, not you

15   personally, but your business?

16              MR. BELL:  Objection.

17              THE COURT:  Sorry, counsel, come on up.

18              (Continued on next page)

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Counsel, there's an objection?

3          MR. BELL:  There is.  This would seem to -- I'll put

4     it this way:  The probative value of a lawsuit being filed is

5     nil.  I could file a lawsuit today.  It's not something that is

6     probative.  It is something, however, that tends to be

7     prejudicial because the impression being created is that Boaz

8     gets sued up and down all the time, which, by the way, we have

9     no knowledge of and it's not in any material that we have

10    conveyed.

11         THE COURT:  What's the nature of the litigation at

12    issue here, and does the nature of the litigation in particular

13    say anything about the credibility of this particular witness?

14         MS. NECHELES:  Yes.

15         THE COURT:  Thank you.  What's the nature of the

16    litigation and why is it that the nature of the litigation

17    shows something about his credibility?

18         MS. NECHELES:  Your Honor, he's sued repeatedly.  It's

19    in public records.  He is sued repeatedly for his business

20    disputes, him not paying his bills.  I think that goes to his

21    credibility, his honesty.  If you don't pay your bills, it goes

22    to credibility.

23         MR. BELL:  The fact of a lawsuit undoubtedly does not.

24    If they wanted to ask a more direct question about the

25    substance behind the lawsuit without referring to the lawsuit,

1    that's an entirely different question.  The fact of the lawsuit

2    means nothing.

3            THE COURT:  So I think I'm going to take our lunch

4    break now because this is something that will take a little

5    time to discuss.  The basic question here is whether or not --

6            MR. MERINGOLO:  It's not worth it, Judge, we'll move

7    on.

8            THE COURT:  How much more time --

9            MR. MERINGOLO:  Less than three minutes, if that.

10           MS. NECHELES:  Your Honor, I say this kind of routine

11   cross.  The government objects to everything, but this is

12   routine cross.

13           THE COURT:  I'm happy to hear about it.  I am

14   concerned because litigation, as we all know, by itself doesn't

15   necessarily mean anything.  The number of lawsuits is

16   prejudicial in a way that does not necessarily have any

17   probative value, which is why I inquired about the nature of

18   these cases.

19           MS. NECHELES:  One lawsuit doesn't mean much, but to

20   be continuously sued, there's something of an indication.

21           THE COURT:  So counsel for Mr. Grant will finish his

22   cross and we'll take our lunch.

23           MR. MERINGOLO:  Momentarily.

24           THE COURT:  Thank you.

25               (Continued on next page)

1              (In open court)

2              THE COURT:  Mr. Grant's counsel, you can proceed.

3              MR. MERINGOLO:  One second, Judge.  I'll look through

4     my notes to see if there's any other questions.

5              THE COURT:  Thank you, please take your time.

6              (Pause)

7     BY MR. MERINGOLO:

8     Q.  Do you recall being called in the spring of 2015 regarding

9     defective windows in Jimmy Grant's house --

10    A.  No.

11    Q.  -- by Jeremy Reichberg?

12    A.  No.

13    Q.  You do not recall that.

14             MR. MERINGOLO:  I have no further questions.

15             THE COURT:  Thank you.

16             I would like to suggest that we take a short lunch

17    break now.  It's 11:30, and I told you I would try to stop at

18    11:30.  I will do our best to start us off in maybe 30 minutes,

19    35 minutes.  So I will take this recess.

20             Ladies and gentlemen, during this break please don't

21    talk about the case amongst yourselves, don't communicate with

22    anyone else, and don't do any research.

23             Thank you very much for your attention this morning,

24    and I will see you in a bit.

25             (Jury not present)

IB7TGRA3                          Gazit – Cross

1          THE COURT:  Mr. Gazit, you can step down.  During this

2     recess I'm ordering you not to discuss your testimony or

3     anything related to this case with anyone.

4          THE WITNESS:  Okay.

5          THE COURT:  In particular, counsel for the United

6     States and any other representative of the United States.

7     Please be back here and in the witness box at noon, otherwise,

8     please step out.

9          So Mr. Gazit has stepped out.  I would like to finish

10    up our conversation at sidebar to the extent that this is an

11    issue that counsel for Mr. Reichberg wants to inquire into.

12    The objection was to questions about the number of lawsuits

13    that Mr. Gazit was exposed to.

14          Counsel for Mr. Grant eschewed further questioning on

15    the subject, and I did not rule on it, but I asked about a

16    further proffer regarding the nature of the underlying

17    litigation so I could evaluate what I understand to be a 403

18    objection to eliciting such testimony.  I will invite the

19    defendants to make a proffer regarding that potential testimony

20    so I can evaluate it.

21          The comment made by the United States at sidebar was,

22    in essence, that the fact of multiple lawsuits in and of itself

23    does not necessarily mean anything with respect to a person's

24    credibility, and therefore is prejudicial without necessarily

25    having any probative value.

1          So counsel, could I hear from you with respect to a

2    proffer on this issue if it's an issue that Mr. Reichberg

3    wishes to pursue with this witness?

4          MS. NECHELES:  I don't.  I'm not going to pursue it.

5          THE COURT:  Fine.  Thank you.

6          Anything else that counsel for the United States

7    wishes to raise on this issue?

8          MR. BELL:  Yes, your Honor.  I appreciate that

9    Mr. Reichberg isn't going to go through the same line of

10   inquiry.

11         I would, having sat through a number of

12   cross-examinations in this case now -- including not to pick on

13   him, but particularly Mr. Meringolos'.  There is perhaps a

14   particular utility to at some point in the proceedings, and

15   frankly at a point that is relatively subtle and in a fashion

16   that is relatively subtle, reminding the jury that questions

17   themselves are not evidence.

18         This is something that judges have done in the past

19   where there is a particular risk that the jury may take from a

20   line of questioning that is particularly suggestive, sometimes

21   in proper ways and honestly sometimes in ways that are

22   problematic but still convey the impression the idea there is

23   some evidentiary value for hinting at the lawsuits, hinting at

24   something on Mr. Meringolo's phone that he wasn't allowed to

25   show.  I think a very short reminder that a lawyer's questions

1    aren't themselves evidence would be useful, healthy, and is

2    warranted.

3             THE COURT:  Thank you.

4             MR. MERINGOLO:  Your Honor, we object to that.  We ask

5    Mr. Bell to direct us which judges do that, and we think the

6    jury will listen to your instructions because that's what they

7    have to abide by.

8             MR. BELL:  I saw such an instruction in *United States*

9    *v. Brian Coll* before Judge Preska in December 2017.

10            THE COURT:  I appreciate the comment.  It's

11   instructive for me to hear what my colleagues are doing, and I

12   take guidance from their good and wise conduct, but at the same

13   time it doesn't have precedential value for purposes of my

14   determinations here.

15            Counsel for Mr. Reichberg, any comment on the

16   government's request?

17            MS. NECHELES:  I don't think that there's anything

18   that was asked that suggested that there was evidence in the

19   question, except for, frankly, the questions about did you make

20   the prior statement to following, and we intend to call the FBI

21   agent to testify in our case that those statements were made.

22   So that evidence is coming in.

23            THE COURT:  Thank you.  So at this point I don't

24   believe I need to make that additional instruction for the

25   jury.  I just very recently advised them of what is and is not

1    evidence.  I told them that the questions by the lawyers are

2    not evidence.  It may be that there would be some salutary

3    effect of such an instruction later in the process, but it was

4    so recently that I told the jurors exactly the comment that

5    Mr. Bell suggested that I remind them of now.  I have trust

6    that they, at least at this point, have still clear in their

7    minds what I told them just a day ago.

8              So I will decline to instruct them in that way at this

9    time.  It may again be appropriate at a later stage in the case

10   when those instructions are less fresh in their minds, and I

11   invite you to let me know when you think that would be

12   appropriate.

13             I want to take our lunch break to allow counsel to eat

14   something.  Counsel, could I ask you to come back here just

15   shortly before the hour.  I would like to solicit your views

16   regarding the proposed corrective instruction, talk about any

17   other issues that you would like to discuss before we bring the

18   jury back in, but I to want to try to stay on schedule as much

19   as possible today.

20             Anything else to raise now?

21        MS. NECHELES:  Yes, your Honor.  We would ask for the

22   opportunity to be able to put a binder with our transcript in

23   the jury box with the same, of course, instruction as the

24   government, that they should not look at them until they're

25   directed to do so by the Court.  And we'll just need a little

1    time to get sort of set up and be able to play the transcript.

2              THE COURT:  Thank you.  Could I ask briefly, and I

3    apologize for not following this, were your transcripts also

4    subject to a stipulation?

5              MS. NECHELES:  Yes, they're part of that stipulation.

6              The stipulations, your Honor, do not stipulate that

7    the things are admissible, just that they're accurate.  We

8    intend to play for him one conversation that completes the

9    story of the government's and is part of the same transaction

10   where he is discussing with Mr. Reichberg this exact same

11   transaction.

12             THE COURT:  That's fine.  I don't take issue with

13   that.  I just wanted to make sure that I was clear that the

14   transcript at issue was subject to the stipulation of the

15   parties.

16             Anything else that we should talk about?

17             MS. LONERGAN:  Yes, your Honor.  I don't want to eat

18   into lunch, but on this point, I think we may have an

19   admissibility argument.

20             I don't know under what theory Ms. Necheles believes

21   that she can offer her client's own words in this call.  We

22   don't know what call it is.  And as we told defense counsel

23   multiple times, while we have stipulated to authenticity of the

24   calls and the transcripts, we may have admissibility

25   objections.  Just as we have been providing them with the calls

1    that we intend to play, it would be helpful and it would

2    conserve the jury's time if they would tell us the same.

3            And also, I don't --

4            THE COURT:  Let me pause you.  I appreciate that, and

5    agree that proceeding efficiently is beneficial.  I understood

6    that this recording was among the list of exhibits that I

7    accepted into evidence during Mr. Bell's comments, is that

8    correct?

9            MS. NECHELES:  Your Honor, what was accepted, the

10   stipulation identified exhibits but didn't put anything into

11   evidence.  This is one of the identified conversations.  The

12   tape or the transcript is 3007.  It's one of the conversations

13   that was among the conversations that were occurring that day.

14           This witness has testified that Mr. Reichberg said

15   certain things during these conversations.  I'm not saying he's

16   lying, these conversations took place a long time ago, but he's

17   not accurate about what was said.  So we want to play the

18   conversations themselves and ask him about what was actually

19   said.  This is the direct, he testified about these

20   conversations, these are exactly the conversations he testified

21   about, and we want the jury to hear the actual conversations

22   that he testified about and we want to ask him questions about

23   it.  That's all we're doing.

24           THE COURT:  Thank you.  I want to make sure that I

25   understand the scope of the exhibits that were introduced

1  earlier without objection.  Those are the ones that I listed

2  earlier.

3          I understood that the reason that the government was

4  moving those in and that I was accepting them in at that time

5  was that they helped to address the concern about the

6  introduction of these recordings by the defense.  What I now

7  understand is that there may be additional separate recordings

8  that were not part of the group that the United States moved

9  in, is that correct?

10         MS. NECHELES:  Your Honor, sorry, the government --

11 the stipulation doesn't move in anything into evidence.  The

12 government did move some in, and there's one additional

13 conversation, which is part of the same series, same night,

14 same people talking, the government just doesn't want to play

15 that one for some reason, I don't know why.  And that is what

16 we are offering, and it's Government Exhibit 3007 -- or I mean,

17 I'm sorry, defense exhibit, maybe it's the -- it's on

18 January 18, and --

19         THE COURT:  What's the W number associated with from

20 the stipulation?

21         MS. LONERGAN:  It doesn't have a W number, your Honor,

22 those are for government exhibits.

23         MS. NECHELES:  The defense have a JR, I believe, 3007.

24         THE COURT:  Thank you.

25         Counsel for the United States.

1            MS. LONERGAN:  Yes, your Honor, a couple of points.

2    First, as I just said, there may very well be admissibility

3    issues, unless counsel is advancing a rule of the completeness

4    argument, in which case we need to look at it and we'll have to

5    see.  The rule of completeness doesn't mean every recording

6    that was made on the same day is admissible into evidence.

7            Secondly, we object to the admission of defense

8    exhibits through our witnesses on cross-examination.  The court

9    has already addressed this with counsel for Mr. Grant when

10   counsel for Mr. Grant asked specifically this question on

11   cross-examination of government witnesses to refresh their

12   recollection whether the Court would permit recordings to be

13   played, and the Court very clearly said no, that the Court

14   would not permit recordings to be played.  If the point was to

15   refresh the witness's recollection, the witness could be shown

16   a transcript and asked proper questions about refreshing

17   recollection.  That's not my understanding of what Ms. Necheles

18   intends to do here.

19           And it is exactly this reason, your Honor, why we

20   briefed it, why we filed a brief about the proposed defense

21   exhibits was because we were concerned about the hearsay issues

22   and the ways in which they intended to use them.  And so if

23   they want to offer the call later at some other point we can

24   address it then or we can look at it now, but at least -- and I

25   have to go look at what the call is, but I don't understand the

1      hearsay objection that would allow them to offer statements by

2      their own client.

3                THE COURT:  Thank you.

4                MS. NECHELES:  I'm not offering it for the truth of

5      what is in it, I'm offering it to say what was said that night.

6      There were conversations back and forth between these

7      individuals.  I'm offering it on two reasons:  One, there's

8      going to be a series of tapes about what this witness said, and

9      I want to put this other one that goes along with the same

10     thing.

11               So it's rule of completeness, but number two, there's

12     no question it's part of the same series and they're discussing

13     the same topic, so I don't really understand what the objection

14     is.  But number two -- and I'm offering it in evidence, I'm not

15     asking to refresh his recollection, I want to the jury to have

16     this like they have the others.

17               Number two, I think that we're not offering this for

18     the truth.  There was a whole discussion about what was said

19     not for the truth of it, but what was said about paying money,

20     about connections, and this is part of that discussion.

21               THE COURT:  Thank you.

22               MS. NECHELES:  How was he getting them out of jail,

23     that's part of the discussion.

24               MS. LONERGAN:  Your Honor, that's exactly being

25     offered for the truth.

1           THE COURT:  Thank you.  Counsel, it would be helpful

2     for me if you could provide me with a copy of the transcript

3     for the call at issue.  During our short break I will review

4     that, as I'm sure the parties will.  And counsel for the United

5     States and the defense, I will give you an opportunity to

6     present that argument to me.

7           The separate issue, in addition to the hearsay

8     question offered by the United States, is the question

9     presented regarding whether and to what extent the defense

10    should be permitted to introduce its evidence as part of its

11    case in chief during the government's case in chief, through

12    its witness.

13          What's your position regarding that question,

14    Ms. Necheles?  Why is it that the defense can present this now?

15          MS. NECHELES:  I never heard of such a rule, Judge.

16    It's not their witness, it's a witness here to tell the truth,

17    and we're putting in evidence.  We don't have to wait until the

18    defense's case is put in evidence, there's no rule like that

19    anywhere.

20          It's customary to put in evidence.  And in fact, your

21    Honor instructed us to give to the government whatever exhibits

22    we intended to be putting in during their case and our case,

23    and we have given them.  We have given them this exhibit.

24          There are other exhibits, as they come up, we put in

25    exhibits yesterday, it's customary to put in exhibits with the

1    witness on the stand.  Otherwise, you would always be doubling

2    the length of the trial.  I would have to call this witness

3    back to testify about the exact same thing he is testifying to

4    now to put this in evidence.

5           And your Honor, I would say something else, too.  What

6    the government is suggesting is a very odd proposition.  It

7    would be -- it's so odd that it's hard to believe that they

8    think that this would cause justice.  That the government could

9    pick and choose between tape recordings and that the defense

10   wouldn't have the right to show other things that were said on

11   other calls to complete the picture, or that the government

12   could have a witness on the stand and that the defense would

13   not have the right to put in other tapes that complete the

14   picture of what was said, or other exhibits, it is a rule that

15   would make no sense.  It would not lead to a just outcome, and

16   I never heard of it before.

17          There is no case I have tried in 35 years where any

18   judge ever ruled you cannot put in X exhibits in the

19   government's case.  It's not even a question of being beyond

20   the scope, which often the defense cross will go beyond the

21   scope and judges will permit it out of a reason to sort of

22   advance what is going on so we don't waste time recalling a

23   witness.  But this isn't even that, it's on directly what they

24   asked the witness questions about, they are saying I cannot use

25   tape recordings to complete the picture, that they should be

1    able to pick and choose, maybe in a misleading way, and I could

2    not complete the picture of what was said in that series of

3    conversations because of a hearsay rule?  I don't believe that

4    that's correct.

5            THE COURT:  Thank you.  There is a hearsay rule that

6    applies, and you will have the opportunity to brief it or to

7    discuss it with me further.  It would be helpful for me,

8    however, to have the transcript at issue so I could review the

9    question during the break.

10           MS. NECHELES:  Would your Honor like to see the whole

11   transcript so your Honor could see how it's part of the same

12   series?

13           MS. LONERGAN:  He has our transcripts.

14           THE COURT:  I have the government's transcripts.  If

15   there's an additional transcript, you could hand it to

16   Mr. Daniels.

17           So I will see you all back here in a relatively short

18   period of time so we could continue our discussion of this

19   issue.  I will see you back here.  Let's plan to be back

20   basically in about 15 minutes with the hope that we can finish

21   this conversation about this particular exhibit.

22           MS. NECHELES:  Will we be able to use the courtroom or

23   will it be locked?

24           THE COURT:  You can use the courtroom.

25           MS. NECHELES:  Thank you.

1          (Luncheon recess taken)

2                         AFTERNOON SESSION

3                         (12:05 p.m.)

4          THE COURT:  Counsel, thank you for being back timely.

5          I have a copy of the transcript that was handed to me

6     earlier.  Counsel for the United States, you've had the

7     opportunity to review this as well at this point.

8          What's your concern in particular with regard to the

9     potential admission of this recording?

10         MS. LONERGAN:  Your Honor, we have two.  The first is,

11    as we briefed to the Court on November 2nd, again, defense

12    counsel is not permitted to offer their client's own

13    statements.  There is some exception.  I believe the exception

14    to which she is referring is the rule of completeness, which is

15    Federal Rule of Evidence 106.

16         But the rule of completeness does not allow for the

17    admission of every single call that was made close in time,

18    every single text message that was made close in time.  The

19    rule of completeness permits an exception to the hearsay rule

20    only if the omitted recording is necessary to correct what

21    would otherwise be a misleading impression for what the

22    government is intending to produce, and that is not the case

23    here.

24         THE COURT:  Thank you.  Is the government introducing

25    all or part of the recording at issue here?

1           MS. LONERGAN:  No, your Honor, the government --

2      there's a series of recordings regarding an arrest, and this is

3      another one of them.  There are a series.  We have not included

4      this one.

5           One moment, your Honor.

6           (Pause)

7           MS. LONERGAN:  Your Honor, the general point is that

8      they cannot offer it under the rule of completeness.  However,

9      to facilitate this, we are happy to remark this as a government

10     exhibit, offer it, and then we could have the entire series in

11     evidence.

12          That said, there are only certain ways they can use

13     this call on cross-examination.  They cannot simply play the

14     call for the witness on cross-examination.  They can ask him

15     questions.  To the extent that his questions are inconsistent

16     with what is in this recording, they can play for him or have

17     him look at the transcript and say:  Does that refresh your

18     recollection that you in fact said X, which is inconsistent

19     with your testimony here today?

20          They can't simply just have a witness up on the stand,

21     play the recording, and ask him questions about it.

22          THE COURT:  Thank you.  Counsel for defendant, any

23     concern first about the proposition that the government will

24     permit the introduction of this exhibit under the heading of

25     the government exhibit number and that it would be in evidence?

1    Then we'll talk about any constraints on the scope and use of

2    it in cross-examination.

3              MS. NECHELES:  I think the fact that the government

4    suggested that it should be their exhibit shows the

5    gamesmanship that is going on here.  I don't even understand

6    that suggestion.

7              THE COURT:  Thank you.

8              MS. NECHELES:  So I don't even understand it.  They

9    are putting in some exhibits, we want to put something else on

10   the same topic.  The rule of completeness states -- Rule 106

11   does not say it has something that shows the untruth of the --

12             THE COURT:  Sorry, let me just divert you.  The

13   government is offering or is not objecting to the introduction

14   of this document into evidence.  Whether it has a government

15   exhibit or a defense exhibit is something that we can discuss.

16   So we don't need to talk about the scope of the rule of

17   completeness at this point, although I think that there's a

18   meaningful question regarding whether the introduction of one

19   recording in a series mandates under Rule 106 the introduction

20   of any other recording in that series.  It's not facially

21   apparent that that is mandated by the rule.

22             But I would like to step beyond that, because the

23   document is, I expect, something that could come in under the

24   proposal by the United States.  I would like to hear your view

25   regarding that question, then I would like to talk about the

1    constraints on cross-examination and use of this document

2    during the examination.

3         MS. NECHELES:  Your Honor, I believe that I am

4    entitled -- I think the case law is clear that I am entitled to

5    ask this witness about conversations that he is part of that

6    have been taped and that the government elicited the testimony

7    about those conversations on his direct examination.  So they

8    asked about it, so I just want to play the tapes that he's

9    actually discussing what he testified about and ask him

10   questions about what was said in those conversations.  I am not

11   doing this to refresh his recollection, I'm doing it to put the

12   substantive evidence before the jury of what actually was said

13   during those conversations.  It's directly on point.

14        There is case law, I believe there is a case recently,

15   *United States v. Coplan*, 703 F.3d 46, I think 85 (2d Cir.

16   2012), which cites another case which talks about the rule of

17   completeness being a hearsay exception, and that allowing

18   hearsay statements that would otherwise not be admissible.  So

19   yes, I can put my client's statements in under the rule of

20   completeness.  And it quotes *Phoenix Association*, which I do

21   not have the cite on, I'm trying do the research on my phone,

22   and *Phoenix Association* I believe states that you could do this

23   on cross-examination, that there is no rule against doing this

24   kind of thing on cross-examination.

25        There is no rule in the rules of federal evidence that

 1    says -- there's no rule that the government could cite to that
 2    says it.  These are now tapes in evidence.  The government put
 3    them in evidence.  So all I'm asking to do now is question the
 4    witness who is part of these tapes about that.  I really am
 5    baffled about why I wouldn't be able to do that, the
 6    government's suggestion that I wouldn't be able to ask a
 7    witness about evidence that they're putting in that the witness
 8    is talking on?
 9               THE COURT:  Counsel for the United States, could I ask
10    you to comment on the last piece of Ms. Necheles' commentary,
11    namely what the basis would be for constraints on her ability
12    to use the evidence, once introduced, during the scope of
13    cross.
14               MS. LONERGAN:  One moment, your Honor.
15               (Pause)
16               MS. LONERGAN:  Your Honor, here's the government's
17    ultimate position -- thank you for giving us the time to
18    confer.
19               THE COURT:  That's fine.
20               MS. LONERGAN:  The government's position is we
21    believe, to facilitate cross-examination and Ms. Necheles'
22    presentation of evidence, we are happy to offer this as a
23    government exhibit.  We do think that the distinction matters
24    because we maintain our position that the rule of completeness
25    does not permit what Ms. Necheles wants to do.  But presuming

1   that it comes in as a government exhibit, she can go ahead and

2   play it to the witness and discuss it with him.

3           THE COURT:  Thank you.

4           Counsel for Mr. Reichberg?

5           MS. NECHELES:  Judge, I don't want to spend more time

6   fighting about this.  I do want to discuss this further with

7   your Honor later, but I don't think it's productive at this

8   moment.

9           THE COURT:  That's fine.  What's the --

10          MS. NECHELES:  But my problem is I'm putting it in

11  right now, I want to show it to the jury, and it's in my

12  exhibit books with my exhibit number.  It's not in theirs.

13          THE COURT:  Thank you.  If the government could hand

14  me the W transcript --

15          MS. NECHELES:  There is none.  They don't have it.

16          THE COURT:  That's fine.  I don't think it's a problem

17  for you, as I understand it, to show them --

18          I'm sorry, could I ask:  Is this transcript among the

19  transcripts that were subject to the stipulation?

20          MS. NECHELES:  Yes.

21          THE COURT:  In which case I don't see a concern

22  allowing the jurors to see your version of the transcript.  We

23  can explain to them the discrepancy, as I will call it, between

24  the number and the government's number.

25          MS. NECHELES:  Why is it a problem to put it in as a

1     defense exhibit?  We're causing problems to what is in my book,

2     changing it.  Why is it a problem?  The government agreed to

3     put it in, agreed to everything.  They don't like it labeled as

4     a defense exhibit?

5               THE COURT:  Thank you.  Counsel, my understanding is

6     your concern is conceding to the defendant's interpretation of

7     the rule of completeness.  Is that the basis for the concern?

8     And if so, understanding that the government reserves its

9     position, is there any concern about labeling with a defense

10    exhibit for the sake of, I will call it efficiency?

11              MS. LONERGAN:  Yes, your Honor.  I don't want to get

12    too technical.  Yes, your Honor is correct on the first point.

13              The other point is I don't later want defense counsel

14    to be able to say this is the call the government didn't want

15    you to hear and we played it for you.  And they can do that if

16    it has a defense exhibit sticker on it.  And given that we are

17    conceding the admission and we are admitting it because they

18    want it in, we don't think that would be appropriate argument

19    later.  We're happy to go ahead right now with the transcript

20    with the defense exhibit sticker on it.  We will swap the

21    transcripts later.  We don't need to delay anything right now,

22    and we can later restamp the transcripts as government exhibits

23    and put them in a government transcript binder.  It will not

24    delay anything at this moment.

25              And also we're the moving party for this, so we think

1    it's appropriate that it have a government sticker.  But we're

2    not saying that we will do it now, we will do it later and

3    won't delay the presentation of evidence here.

4              THE COURT:  Thank you.

5              Defense counsel, are you concerned about that?

6              MS. NECHELES:  Your Honor, I will refer to it as a

7    defense exhibit.  I think it will get confusing later.  I think

8    at the end of the case there will be so much evidence --

9              THE COURT:  Thank you.  I agree there will be a lot of

10   evidence and I don't believe that this is meaningful.  We're

11   spending an undue amount of time talking about exhibit labels.

12   Substantively, the parties do not disagree on this issue.

13             The exhibit can come in, as I understand it, without

14   objection by any party.  The government has agreed to bring it

15   in, whether it's labeled with the JR number or government

16   number I think is relatively not important, rather the

17   important thing is that the evidence will come in.  Rather than

18   delaying this through further conversation about whether this

19   is labeled X or Y, I'm going to accept it under a government

20   exhibit number.

21             I understand the government will move it in now by

22   stipulation of the parties, and that we can begin with the

23   conversation of it when the jury returns.  We can point them to

24   reference in your transcript binder by JR number.  I do not

25   believe that would be complicated to say the transcript of this

1      call is in your binder under the heading JR whatever the number

2      is.  So I propose to proceed in that way.

3              Counsel for the government, what's the exhibit

4      reference for this call in the government's exhibit binder?

5              MS. LONERGAN:  Your Honor, it's not in the

6      government's exhibit binder.  It will be in the defense exhibit

7      binder.

8              THE COURT:  I'm referring to the call itself, the

9      recording.

10             MS. LONERGAN:  Your Honor, we don't have all the

11     calls.  We're not intending to offer the entire wire.  But we

12     will renumber this call as a government exhibit.  It will be

13     W1172, and then the corresponding transcript, when we resticker

14     it, will be W1172T, but for now, to make things easy, they can,

15     of course, refer to it in the -- they can say to the jurors:

16     Please turn to the call labeled JR3007.  But we do not want

17     them to refer to it as a defense exhibit because it's being

18     offered as a government exhibit.

19             THE COURT:  So the offer here is to offer this call,

20     which is the January 18, 2015 call at 11:10 p.m., into evidence

21     as Exhibit W1172.  I understand that the parties agree to the

22     admissibility of that piece of evidence, and you can stipulate

23     to that now and we can save time when the jury comes in.

24             Counsel, do we agree to the admissibility of W1172,

25     which is the call that I referred to earlier?  Counsel for the

IB7TGRA3                         Gazit - Cross

1    United States?

2              MS. LONERGAN:  Yes, your Honor.

3              THE COURT:  Counsel?

4              MS. NECHELES:  Yes, your Honor.

5              THE COURT:  Thank you.

6              Counsel?

7              MR. MERINGOLO:  We concur.

8              THE COURT:  Good.  So we'll let the jury know that

9    this is in by stipulation of the parties, counsel, and then you

10   can inquire.

11             Anything else to talk about before we bring them in?

12             MR. BELL:  No, your Honor.

13             THE COURT:  Ms. Necheles?

14             MS. NECHELES:  Your Honor, did you want to address the

15   instruction or do it later?

16             THE COURT:  I think we should do it later just because

17   the jury has been waiting some time.

18             Mr. Daniels, please bring them in.

19             Counsel for the United States, please bring in the

20   witness.

21             MR. BELL:  Yes.

22             (Continued on next page)

23

24

25

IB7TGRA3                        Gazit - Cross

```
 1                  (Jury present)
 2                  THE COURT:  Thank you very much, ladies and gentlemen,
 3      you can be seated.  Welcome back.
 4                  Counsel, your witness.
 5                  MS. NECHELES:  Thank you, your Honor.
 6      CROSS-EXAMINATION
 7      BY MS. NECHELES:
 8      Q.  Mr. Gazit, my name is Susan Necheles.  How are you?
 9      A.  Good.
10      Q.  I want to ask you some questions about your direct
11      examination.  You mentioned purim and purim holidays.  Do you
12      remember testifying about purim?
13      A.  I couldn't hear you.
14      Q.  Sorry.  You mentioned the parties on purim.  Do you recall
15      that?
16      A.  Yes.
17      Q.  Am I correct purim is a Jewish holiday?
18      A.  Correct.
19      Q.  It's a holiday where people celebrate, right?
20      A.  Right.
21      Q.  Celebrate that a person who wanted to massacre the Jews
22      many, many years ago did not succeed, right?
23      A.  Yes.
24                  MR. BELL:  Objection.
25                  THE COURT:  I accept the answer.
```

IB7TGRA3                          Gazit - Cross

```
 1   Q.  On that date people have big parties, right?

 2   A.  Yes.

 3   Q.  And with those parties people get pretty drunk, is that

 4   right?

 5   A.  Yeah.

 6   Q.  And have a meal, is that right?

 7   A.  Mm-hmm, yes.

 8   Q.  And you're aware that Mr. Reichberg used to have those

 9   parties, right?

10   A.  I didn't hear the question.

11   Q.  You're aware that Mr. Reichberg used to have a big purim

12   party?

13   A.  No.

14   Q.  He never invited you to a purim party, right?

15   A.  Yes.

16   Q.  And do you go to your own purim parties?

17   A.  Sometimes.

18   Q.  And you testified, I believe, that Mr. Reichberg was a

19   contractor, right?

20   A.  Yes.

21   Q.  And I think you referred to him earlier as a building

22   consultant?

23   A.  Yes.

24   Q.  It's not a business consultant, you said he was a building

25   consultant?
```

1    A.  Building consultant.

2    Q.  And when what he would do is he would work with other

3    people who were trying to build things?

4    A.  I have no idea what he used to do.

5    Q.  You are aware he came to you one time and he wanted help in

6    obtaining a permit for somebody, right?

7    A.  Yes.

8    Q.  And you helped to expedite that for him, is that correct?

9    A.  No, I gave him a tracking number.

10   Q.  Which is a way that or something that you need to help to

11   get a permit, right?

12   A.  Yes.

13   Q.  And did he tell you at that time when he asked you that

14   that he was an expediter?

15   A.  I don't remember.

16   Q.  But you were aware he was doing this for someone else, it

17   wasn't for himself?

18   A.  For himself.

19   Q.  Do you know what an expediter is?

20             MR. BELL:  Objection, scope.

21             THE COURT:  You can answer the question.

22   Q.  Can you explain that to the jury, what that term means?

23   A.  Expediter?

24   Q.  Can you explain to the jury what that term "expediter"

25   means?

```
 1    A.   An expediter does all the paperwork for the building
 2    department --
 3    Q.   On behalf --
 4    A.   -- for architects, contractors.
 5    Q.   And you were hoping to get some business from that, that
 6    Mr. Reichberg would refer business to you, correct?
 7    A.   Correct.
 8    Q.   And you said he knows a lot of people, he has a lot of
 9    contacts, correct?
10    A.   That's what I have been told.
11    Q.   And you believed that he had contacts in the building
12    world, right?
13    A.   Yes.
14    Q.   You're not talking about police contacts, right?
15    A.   Not at the time, no.
16    Q.   But you were talking about contacts in getting work in
17    building and construction, right?
18    A.   Yeah, mm-hmm.
19    Q.   And with respect to that business, he did in fact give you
20    a bunch of leads, right?
21    A.   No.  One connection.
22    Q.   He referred you to a big hotel place?
23    A.   It's something in the Bronx, I don't remember exactly.
24    Q.   It would have been a very big job for you, right?
25    A.   Yes.
```

IB7TGRA3                         Gazit - Cross

1    Q.  And you tried to get the job and you did not succeed,

2    right?

3    A.  Right.

4    Q.  And he also referred you to a big building in Manhattan,

5    the Apthorp, am I correct?

6    A.  No.

7    Q.  He didn't give you -- you didn't try to get the business

8    there?

9    A.  No.

10   Q.  Did you bid on that job?

11   A.  No.

12   Q.  He also referred you to some -- well, in the hotel, you put

13   in a bid?

14   A.  Yes, that's the one in the Bronx, yeah.

15   Q.  And he also referred you a siding job, the possibility, you

16   testified about that on direct?

17   A.  Yes.

18   Q.  And you didn't get that job, right?

19   A.  I didn't go.  It's not my job.  I don't do siding.

20   Q.  You referred it to someone else you knew?

21   A.  Right.

22   Q.  And do you recall whether there were other jobs that he

23   referred you to?

24   A.  Say again?

25   Q.  Do you recall whether there were other jobs that --

1    A.   No.

2    Q.   On those jobs that he was referring you to, you did not

3    expect him to pay for those jobs, right?

4    A.   What do you mean?

5    Q.   Well, if you had gotten the work, you wouldn't expect

6    Mr. Reichberg to pay.

7    A.   To pay for what?

8    Q.   For the windows or whatever job you were installing there,

9    whatever work you got.

10            MR. BELL:  Objection.

11            THE COURT:  Could you rephrase the question?

12   Q.   When he referred you a job you were hoping to get the work,

13   right?

14   A.   Yeah.

15   Q.   The hotel job.  If you had gotten the job, you would not

16   have thought it was Mr. Reichberg's responsibility to pay your

17   bill on that job, would you?

18   A.   Not on those big jobs, no.

19   Q.   And he also referred you to Jimmy Grant, right?

20   A.   Yeah.

21   Q.   And it was the same as he referred other jobs to you?

22   A.   No, not the same.

23   Q.   Why?

24   A.   It's different.

25   Q.   Because he was Mr. Grant's friend?

1   A.  Yeah.

2   Q.  But it was also a referral to job, right?

3   A.  Yes.

4   Q.  And he never said he was going to pay the bill on that, did

5   he?

6   A.  No, he never told me.

7   Q.  But you just felt that he should have some responsibility

8   because it was his friend, right?

9   A.  Yeah, of course.

10  Q.  But you never had any discussion like that, he never

11  promised to pay the bill to you, right?

12  A.  No.

13  Q.  And then afterwards, you said in fact when you asked him

14  for money, he said he wasn't going to give it to you, right?

15  A.  What do you mean?  Deposit?

16  Q.  Yeah.

17  A.  Yeah, I would ask him.

18  Q.  And he wouldn't give that to you?

19  A.  No, he didn't give it back to me, no.

20  Q.  And sir, with respect to Mr. Grant's job, with the

21  referral, you testified on your direct examination that you did

22  work on Mr. Reichberg's house that he sometimes didn't pay for?

23  A.  Yeah.

24          (Continued on next page)

25

1    BY MS. NECHELES:

2    Q.   Am I correct that when you did big jobs for Mr. Reichberg,

3    he would pay them for you, but sometimes, on small jobs, he

4    would not pay?

5    A.   Yeah.  I mean, it's the...

6    Q.   And you were doing that in the hope that he would do --

7    give you other jobs, right?

8    A.   Yeah.

9    Q.   At some point, he stopped referring any business to you,

10   correct?

11   A.   Yes.

12   Q.   And that was after you did Mr. Grant's windows, right?

13   A.   Yes.

14   Q.   With respect to Mr. Grant's windows, am I correct that

15   after they were installed, there were complaints that they were

16   installed improperly?

17   A.   Nobody complained.

18   Q.   You don't recall any conversations, is that your testimony?

19   A.   No.

20   Q.   That you didn't have conversations with Mr. Grant --

21   A.   Not at all.

22   Q.   -- or Mr. Reichberg discussing the windows and problems

23   with the windows?

24   A.   No.

25   Q.   Okay.  Specifically, do you recall conversations in

1    November of 2013 with Mr. Grant about the windows?

2    A.  No.

3    Q.  Would you have had anything else to discuss --

4    A.  No.

5    Q.  -- with Mr. Grant other than the windows?

6    A.  No.  If I know there's a problem, I would go back.

7    Q.  I'm asking you something different.

8            Did you ever have conversations with Mr. Grant about

9    anything other than windows?

10   A.  No.

11   Q.  I want to show you what has been marked --

12           MS. NECHELES:  What is it marked as?

13   Q.  -- what has been marked as Government Exhibit 183-A.

14           MS. NECHELES:  Your Honor, I want to offer this into

15   evidence pursuant to stipulation.

16           THE COURT:  I'm sorry, can you just display it for the

17   Court, please?

18           MS. NECHELES:  Yes.

19           Can we display it up for the Court, please?

20           THE COURT:  Thank you.

21           Counsel for the United States -- can you tell me the

22   relevant stipulations, counsel?

23           MS. NECHELES:  Your Honor, I have to pull it up.  I

24   think we have a stipulation with the government that would --

25   that stipulates that these are business records and what they

1    are.

2              MR. BELL:  I think that counsel would have to read the

3    stipulation.

4              THE COURT:  Thank you, counsel.

5              MS. NECHELES:  I can take a minute, and find it, and

6    read it, if the government has it handy, otherwise we can find

7    it.

8              MR. BELL:  One moment please, your Honor?

9              (Counsel confer)

10             MS. NECHELES:  Your Honor, the stipulation number is

11   Government Exhibit 1705.

12             THE COURT:  Thank you.

13             Counsel, you can proceed.

14             MS. NECHELES:  We offer this in evidence, your Honor.

15             THE COURT:  Thank you.

16             Did you have the stipulation?

17             MS. NECHELES:  Could we go back to the stipulation?

18             Your Honor, if I could read the stipulation?

19             THE COURT:  Please proceed.

20             MS. NECHELES:  The stipulation concerning telephone

21   records:

22             "It is hereby stipulated and agreed, by and between

23   the United States of America, by Geoffrey S. Berman, United

24   States Attorney for the Southern District of New York, Martin

25   Bell, Jessica Lonergan, and Kimberly Ravener, Assistant United

IB7KGRA4                          Gazit - Cross

1    States Attorneys, Jeremy Reichberg, the defendant, by his

2    attorney, Susan Necheles, and James Grant, the defendant, by

3    his attorneys, Thomas Meringolo and Angelica Cappellino, Esqs."

4    -- and then I will skip the part until we get to this exhibit,

5    but just that Government Exhibit 138-A -- is that what it is --

6    "130-A through 130-1 consists of call detail records, bill

7    summary records, and subscriber records for cellular telephone

8    number (646)523-9956, from March 3, 2013, through June 21,

9    2016.  During this time period, this phone was used by James

10   Grant."

11              THE COURT:  Thank you.

12              Counsel, you're offering Stipulation No. 1705 and

13   Exhibit 138-A into evidence?

14              MS. NECHELES:  130-A.

15              THE COURT:  130-A.  Thank you.

16              Counsel?

17              MS. NECHELES:  Good.

18              MR. BELL:  No objection to admitting this exhibit.

19   It's in the stipulation.

20              THE COURT:  Good.  Thank you.

21              Counsel for Mr. Grant, any objection?

22              MR. MERINGOLO:  No objection.

23              THE COURT:  Thank you.

24              I'm accepting into evidence Exhibit 1705 and

25   Exhibit 130-A into evidence.

1            (Government's Exhibits 1705 and 130-A received in

2   evidence)

3            THE COURT:  Counsel, you can proceed.

4            MS. NECHELES:  If we can show that on the screen, your

5   Honor?

6            THE COURT:  You may.

7   BY MS. NECHELES:

8   Q.  If you look at the top, it says this is the phone records

9   for Jimmy Grant.  That's what was just stipulated into

10  evidence.

11           And, sir, am I correct that your phone number is

12  (917)945-1684?  Is that what you testified to previously?

13  A.  Yeah, that's my number.

14  Q.  So you see that in November --

15           MS. NECHELES:  If you could go down and show what year

16  this is.  On the top.

17  Q.  -- November of 2013, this bill covered the period

18  November 26, 2013.  In November of 2013, you were speaking on

19  the phone with Mr. Grant, right?

20  A.  Yeah.  That's related to the windows.

21  Q.  Right.  That was after you had put the windows in, right?

22  A.  After I put the windows?

23  Q.  Well, the bill for the windows was in October, right?

24  A.  Yeah.

25  Q.  So you're speaking to him after you put the windows in,

1    right?

2    A.   After I put the windows?

3    Q.   Yes.

4    A.   Maybe.

5    Q.   And you had already put the windows in, right?

6    A.   What's the date?

7    Q.   November 2013.

8    A.   Oh, okay.

9    Q.   And he was complaining that the windows were leaking,

10   right?

11   A.   No.  No, nobody complained to me.

12   Q.   Okay.  And you say that you spoke to him -- we just looked

13   at you spoke to him on November 4th.  He calls you again on

14   November 5th; am I correct?

15   A.   It could be.

16          MS. NECHELES:  Can you highlight it?

17          THE WITNESS:  But there's an explanation to that.

18   Maybe it's the wrong number.

19   Q.   Okay.  It's the wrong number, you think?

20   A.   Yeah, because the guy I'm dealing in the lumber, he has the

21   same number.  Only one number, the last one, is a little

22   different.  So it could be by mistake.

23   Q.   So you think Mr. Grant called you by mistake, is that what

24   you're saying?

25   A.   Maybe I call by mistake.

1    Q.  You see that these are outgoing calls, that Mr. Grant is

2    calling you?

3              MR. BELL:  Objection.

4    Q.  You think --

5              THE COURT:  I'm sorry.  Sustained, counsel.

6    Q.  Withdrawn.

7              You think now that you called him twice by mistake,

8    November 4th and November 5th?

9    A.  It could be because it's only one number.  The last number,

10   it's a little bit different.  I think it's one number, one

11   digit, is different, so --

12   Q.  You think Mr. Grant's phone number is one digit different

13   from another person's phone number?

14   A.  The person that I'm dealing with, the guy from the lumber,

15   he has like one digit different, the last one.  It's like

16   following number.  It's -- yeah.

17   Q.  If you go down --

18             MS. NECHELES:  If we can go back to the November 4th

19   one.  And November 5th.

20   Q.  You called him November 5th again; is that correct?

21   A.  It's showing.  It could be a mistake.

22   Q.  Again, you think it's a mistake, that two-minute phone call

23   is a mistake?

24   A.  Yeah, it's only one number, only one digit.  What's the

25   number?  5-6, the other is 5-7.

```
 1   Q.  You called him again on November 8th?  Or there's a phone
 2   call again on November 8th; is that correct?
 3   A.  Sure, yeah.
 4   Q.  And, again, you called later again, November -- the same
 5   day, November 8th?
 6             MR. BELL:  Objection.
 7             THE COURT:  Thank you.
 8             Can you rephrase?
 9   BY MS. NECHELES:
10   Q.  You see on November -- if you look at November 8th for your
11   phone number, your phone call at 1:37, do you see that?
12             Do you see there are two phone calls right after each
13   other, 1:37 and 1:38, on November 8th, right?
14             At the bottom of the page.  Do you see that?  If you
15   look four lines from the bottom of the page, there's a phone
16   call to you --
17   A.  Yeah.
18   Q.  You see those two calls, right?
19   A.  Yeah.
20   Q.  If you look over the line, on the first call, you see that
21   it is an outgoing call, correct?  The one underneath is an
22   incoming call, the first one --
23             MR. BELL:  Objection.
24             THE COURT:  Thank you.
25             Counsel, can you please rephrase?
```

BY MS. NECHELES:

Q.   You see the record -- do you see that on November 8th, the second phone call from your number is labeled incoming, right? On this business record admitted in evidence, it says incoming, right?

A.   Yeah.

Q.   And that's incoming to Jimmy Grant's phone, this is his business record, right, his phone record.  So that was you calling him, the second one, right?

A.   It could be.

Q.   And the one above that is not labeled incoming, is it? Right?

A.   I'm saying it's only one digit that's different between that, 56, 57, so it could be --

Q.   I'm asking you something different now.

     The phone records show what's an incoming call and what's not an incoming call, correct?

     MR. BELL:  Objection.

     THE WITNESS:  Yeah.

     THE COURT:  Thank you.

     You can answer the question.

BY MS. NECHELES:

Q.   And there are two phone calls that involve your phone number there in a row, right?

A.   Yeah.

IB7KGRA4                          Gazit - Cross

1    Q.  And the second one says incoming, right?

2    A.  Yeah.

3    Q.  The one before that doesn't say incoming, right?

4    A.  No.

5    Q.  And the first phone call there that does not say incoming

6    is only one minute long, right?

7    A.  Okay.

8    Q.  And then the call right after that, one minute later, is

9    three minutes long, right?

10   A.  I don't remember those calls.

11   Q.  Well, I'm just asking you what the record says, right?

12       It's a three-minute call, right?

13   A.  Yeah, I can see, but...

14   Q.  Isn't it correct that Mr. Grant called you, and then you

15   called him right back?  Correct?

16       MR. BELL:  Objection.  Just --

17       THE COURT:  Thank you.

18       I'm sorry.

19       Counsel, can you rephrase?

20       MS. NECHELES:  I don't understand the objection.

21       THE COURT:  Thank you.

22       Please proceed.  Counsel, please inquire.

23   BY MS. NECHELES:

24   Q.  Well, am I correct that Mr. Grant called you, and then you

25   called him back?

1              MR. BELL:  Objection.

2              THE COURT:  Thank you.

3              You can answer the question.

4              THE WITNESS:  It could be, also, I make wrong call,

5    and he respond back.

6    BY MS. NECHELES:

7    Q.  Okay.  But the outgoing call was first, right, and then

8    there is the incoming call, right?

9              MR. BELL:  Objection.

10             THE COURT:  Thank you.

11             You can answer the question.

12   Q.  Correct, sir?

13   A.  Yeah.

14   Q.  And if you go to 11/14, there is, if you see, at 3:05 and

15   3:25 p.m.?

16   A.  But that's the time when I installed the windows.  That's

17   not after.

18   Q.  Sir, it took you one day to install the windows, right?

19   A.  Huh?

20   Q.  It took you one day to install the windows, right?

21   A.  We did it in stages.

22   Q.  You did it in stages?

23   A.  Yeah, yeah.  I did it like not full week.  I did one week,

24   then the next week.

25   Q.  So when did you install the windows?

1    A.   I think it's November.   That's what --

2    Q.   When in November, sir?

3    A.   That's what I say, I come like a week after or two weeks

4    after to install it on the day.   It's not --

5    Q.   So you believe that you did this a week after the receipt,

6    is that what you're saying?

7    A.   Yeah.   Even more.

8    Q.   Well, what day?   Do you think it was a week?

9    A.   I don't remember.

10   Q.   Two weeks?

11   A.   I don't remember.

12   Q.   You don't remember.

13   A.   But those calls because that's the installation time, yeah.

14   Q.   So you think it's a week or two weeks?

15   A.   Huh?

16   Q.   You think it's a week or two weeks?

17   A.   Yeah.   It wasn't like right away.

18   Q.   Previously you testified it was around the date of the

19   receipt, right?

20          And you're aware that the receipt was October 22nd,

21   2013?   Didn't you just see it again?

22   A.   Yes.

23   Q.   So these November calls are about three weeks after that

24   date, right?

25   A.   Yeah.   That's the time, yeah.

IB7KGRA4                         Gazit - Cross

1   Q.  So you're saying you still hadn't installed the windows?

2   A.  No.  It was like after two weeks, I think.

3   Q.  Okay.  But this is now three weeks, right, after --

4   A.  Yeah.

5   Q.  -- the date of the receipt, right?

6   A.  And then the installation, maybe like two stages.

7   Q.  Okay.  But Mr. Grant was still calling you at the end of

8   November, right?

9   A.  I don't remember.

10  Q.  Can we look at November 26th.  If you look at 9:33 --

11  09:23 a.m., I apologize, that's still Mr. Grant calling you,

12  right?

13  A.  It could be.

14  Q.  Well, it's your phone number there, right?

15  A.  Yeah.

16  Q.  So, sir, am I correct that Mr. Grant called you repeatedly

17  through the month?

18  A.  I don't recall it.

19  Q.  Am I correct that the reason he did not pay your bill is

20  because he believed that because these windows leaked?

21          MR. BELL:  Objection.

22          THE COURT:  Thank you.

23          I'm sorry, can you rephrase the question?

24  Q.  Sir, Mr. Grant did not pay your bill because the windows

25  you installed --

1   A.  I never dealt with Mr. Grant.

2   Q.  But you had repeated calls with him, right?

3   A.  No, I didn't.

4   Q.  You testified -- just one more thing:  Am I correct that

5   even though Mr. Reichberg attempted to refer business to you,

6   he never referred you to any other police officers, right?

7   A.  No.  I understand that he send me to do siding for other

8   guy.

9   Q.  Sir, on direct, you said you didn't know who the siding was

10  for, right?

11  A.  I didn't know at the time.

12  Q.  So you didn't know --

13  A.  No.

14  Q.  -- of any other police officers, right?

15  A.  Yeah.

16  Q.  After you did the work on Mr. Grant's house, he never

17  referred you any other work, right?

18  A.  No.  He did.

19  Q.  What did he refer you after that?

20  A.  At the same time, the big job.

21  Q.  That's the big job?

22  A.  Yeah.

23  Q.  Then following that, he didn't refer you any more work,

24  right?

25  A.  No.  He said he going to send me.

IB7KGRA4                              Gazit - Cross

1    Q.   Am I correct that the reason he didn't refer you more work

2    was because he was unhappy about the job you did for Mr. Grant?

3              MR. BELL:  Objection.

4              THE COURT:  Thank you.

5              Sustained.

6              MS. NECHELES:  Judge, I actually don't understand.

7              THE COURT:  Thank you.

8              Come on up.  I'd be happy to explain.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB7KGRA4                          Gazit - Cross

1                (At the sidebar)

2                THE COURT:  To paraphrase the question, the question

3      was:  Isn't it true that he didn't refer you because of this

4      reason?

5                MS. NECHELES:  Yes.

6                THE COURT:  He's not Mr. Reichberg.  So you're asking

7      him to testify what Mr. Reichberg was thinking.  That's why I'm

8      sustaining the objection.

9                MS. NECHELES:  All right.  I can ask if he understood

10     that.

11               THE COURT:  Thank you.

12               MS. NECHELES:  Sorry.

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (In open court)

 2                MS. NECHELES:  Thank you, your Honor.

 3                THE COURT:  Not a problem.  Thank you very much.  I'm

 4       sorry for the interruption.

 5       BY MS. NECHELES:

 6       Q.  Sir, your understanding, am I correct, was that the reason

 7       that Mr. Reichberg didn't send you any more work was because he

 8       was unhappy with the job that you did --

 9       A.  No.

10       Q.  -- with Mr. Grant?

11                MR. BELL:  Objection; foundation.

12                THE COURT:  Thank you.

13                You can answer the question.

14                THE WITNESS:  No, it's not true.

15       Q.  Okay.  Just to be clear, Mr. Reichberg also negotiated down

16       his own bills, he would negotiate with you and try to get a

17       lower price, right?

18       A.  No.

19       Q.  No, he never negotiated --

20       A.  Never negotiated.

21       Q.  Now, sir, you testified on direct that your son was

22       arrested one time?

23       A.  Yes.

24       Q.  You went to Mr. Reichberg for help, right?

25       A.  Right.
```

1    Q.  And Mr. Reichberg got a lawyer for your son, right?

2    A.  Right.

3    Q.  And you paid for the lawyer, right?

4    A.  Right.

5    Q.  And that was your understanding of what Mr. Reichberg would

6    do, was he would get lawyers for people, right?

7    A.  Yeah.

8    Q.  When people would come to him for help in getting someone

9    out of jail, he would get them a lawyer, right?

10   A.  Yeah.

11   Q.  He also helped with tickets, people with tickets sometimes?

12   A.  Not -- not to me.

13   Q.  Did you refer any speeding tickets to him, people with

14   speeding tickets?

15   A.  There's only one guy, we talk before, like --

16   Q.  That was Zangi, he was arrested, right?

17   A.  Yeah.

18   Q.  I want to play some tapes about your conversations with

19   Mr. Reichberg that night.  You testified about them on direct.

20        Do you recall about the conversations?

21   A.  Yeah.

22   Q.  Did the government play these tapes for you?

23   A.  What?

24   Q.  Did the government play for you, when you were preparing,

25   tapes of these conversations?

1              MR. BELL:  Objection.

2              THE COURT:  Thank you.

3              You can answer the question.

4              THE WITNESS:  I don't understand the question.

5    BY MS. NECHELES:

6    Q.  Did the government play for you tapes --

7    A.  Oh, okay.  Yes.

8    Q.  Yes, they did play for you.  So I want to play those here

9    now.

10             MR. BELL:  Objection.  It's misleading, your Honor.

11             THE COURT:  Thank you.

12             You'll have the opportunity to inquire further.

13             MS. NECHELES:  I think that's the first -- these are

14   the transcripts that the government put into evidence of tapes

15   at the end of their direct examination, and I would ask your

16   Honor if the jurors could look first at the government exhibits

17   that they have sitting by them with transcripts.

18             THE COURT:  Thank you.

19             So, ladies and gentlemen, you've all been provided

20   with binders that contain transcripts of certain of the

21   recordings that we'll be listening to here today.  I would ask

22   that you not look at anything in the binders other than the

23   specific transcript that counsel will point you to.  So don't

24   flip through the binders and look through everything.  Just

25   turn to the specific transcript for the particular exhibit.

1    Counsel will direct you to the appropriate transcript.

2              MS. NECHELES:  If I could just clarify.  Those are the

3    black binders, I think.  That's the -- you'll look at the white

4    one in a little while, your Honor, but the black binders.

5              THE COURT:  Thank you.

6              MS. NECHELES:  The first one we will be playing is

7    Exhibit W-011522-T, your Honor.  Maybe you want to just

8    instruct again about not looking ahead?

9              THE COURT:  Thank you.

10             Ladies and gentlemen of the jury, please look just to

11   the one transcript that she has described.

12             Counsel, can you please give the jurors the number

13   again?

14             MS. NECHELES:  Yes.  It is W-01152.

15             THE COURT:  Thank you.

16             Ladies and gentlemen, do you have that?  Good.

17             Counsel, you can proceed.

18             MS. NECHELES:  May we play that, your Honor?

19             THE COURT:  You may.

20             MS. NECHELES:  Just before we play it, I'll just say,

21   this is a tape on January 18, 2015, at 8:40 p.m., and the

22   participants reflected on the transcript are Jeremy Reichberg

23   and Boaz Gazit.

24             (Audio playback)

25             MS. NECHELES:  Your Honor, does the government have an

1      extra transcript that we could give to the witness?

2              If I can just hand this up to the witness, your Honor?

3              THE COURT:  Please do.

4              MS. NECHELES:  I've turned already to the correct

5      page.

6              THE COURT:  Thank you.

7              Counsel, you can proceed.

8              MS. NECHELES:  Thank you, your Honor.

9              (Audio playback)

10     BY MS. NECHELES:

11     Q.  Mr. Gazit, that was -- the friend that you were referring

12     to was Mr. Zangi, correct?

13     A.  Yeah, yeah.  That's the day that he call me to ask him to

14     help, what he's doing.

15     Q.  His family had called you?

16     A.  His family, yeah.

17             MS. NECHELES:  And if we could turn to the next

18     government exhibit, 1153, the transcript, and that is a call

19     the same day, at 8:50 p.m.

20             THE COURT:  Thank you.

21             Give the jurors a few seconds to pull up that

22     transcript.  1153.

23             Thank you, counsel.  You can proceed.

24             (Audio playback)

25             MS. NECHELES:  If we could play the next, your Honor.

IB7KGRA4                      Gazit - Cross

1    It's 1155.  It follows that conversation.  It's January 18,

2    2015, at 8:59 p.m., between Mr. Reichberg and Mr. Gazit.

3              THE COURT:  Thank you.

4              So that's 1155, ladies and gentlemen.  Thank you.

5              You can proceed.

6              (Audio playback)

7    BY MS. NECHELES:

8    Q.  Okay.  Sir, in that conversation, you refer to a Shuli

9    Doma, right?

10             You referred -- right at the beginning of the

11   conversation, you say:  "You know who's taking care of the

12   ticket?  Shuli Doma."  Right?

13   A.  That's the name I got.

14   Q.  What do you mean with "taking care of the ticket"?

15   A.  Who?

16   Q.  When you said there, "You know who's taking care of the

17   ticket?  Shuli Doma."

18   A.  That's the guy -- when he have the ticket, that's the guy

19   taking care.  He go to the court to dismiss it.

20   Q.  So you were referring there to a person who, if people got

21   tickets, they would call Shuli Doma, and he would help them --

22   A.  I don't know Shuli Doma.  They told me the name.  I don't

23   know this guy.

24   Q.  You don't know him, but that -- when you were saying that

25   to Mr. Reichberg, am I correct that what you were --

1   A.  That's --

2              THE COURT:  I'm sorry.  Please give her an opportunity

3   to complete the question.  Thank you.

4              Please go ahead, counsel.

5   Q.  What you were saying was that a person named Shuli Doma was

6   supposed to have taken care of a ticket on behalf of Mr. Zangi;

7   is that correct?

8   A.  Yes.

9   Q.  When you said taken care of, what you meant was he was

10  supposed to have gone to court and resolved the case, right?

11  A.  And try to dismiss it.

12  Q.  And try to get the case dismissed, right?

13  A.  Yeah.

14  Q.  And Mr. Doma was supposed to have hired a lawyer to do

15  that, right?

16  A.  I guess so.

17  Q.  And when you say in the middle -- if you look at line 12,

18  you say:  "He doesn't use the same lawyer."

19             You're referring to the lawyer that Mr. Doma was

20  supposed to have hired to handle this case, right?

21  A.  I don't remember.

22  Q.  Well, if you look right above --

23  A.  Yeah.

24  Q.  -- Mr. Reichberg had said, he doesn't -- you know, that

25  Doma doesn't take care of it, that he's full of shit."

1              And you said:  "I know that."  And you asked, "He

2       doesn't use the same lawyer," correct?  That was your

3       conversation?

4       A.  Yeah, I don't remember doesn't use the same lawyer.  I

5       don't understand what's --

6       Q.  Okay.  But you were asking whether Mr. Doma used the same

7       lawyer that Mr. Reichberg used to take care of tickets, right?

8       A.  Oh, maybe.

9       Q.  Because you were aware that Mr. Reichberg also would be

10      hired by people to take care of tickets, right?

11      A.  Right, yeah.

12      Q.  And you were aware that Mr. Reichberg would hire a lawyer

13      to do that, right?

14      A.  I believe so.

15      Q.  And you were asking isn't it the same lawyer who did both

16      work for Doma and for Mr. Reichberg, right?

17      A.  It could be.

18      Q.  And Mr. Reichberg said no, right?

19      A.  What do you mean, said no?

20      Q.  You see right under that, you asked:  "He doesn't use the

21      same lawyer?"

22              And he said:  "No.  Why would he?"

23      A.  Okay.

24      Q.  And then Mr. Reichberg said different lawyers, right?

25      A.  All right.

 1                  MS. NECHELES:  If we could play the next tape.

 2                  THE COURT:  Thank you.

 3                  Can you describe the exhibit number?

 4                  MS. NECHELES:  I'm sorry, yes.  It's 1156, and it's

 5      January 18, 2015, 9:02 p.m., and the participants are Jeremy

 6      Reichberg and Boaz Gazit.

 7      BY MS. NECHELES:

 8      Q.   Do you pronounce it Gazit?  Is that how you pronounce your

 9      name?

10      A.   What's that?

11      Q.   How do you pronounce your name?

12      A.   Boaz, B-o-a-z.

13      Q.   And your last name?

14      A.   Gazit, G-a-z-i-t.

15                  THE COURT:  Thank you.

16                  Ladies and gentlemen, you can go to that transcript.

17                  (Audio playback)

18      BY MS. NECHELES:

19      Q.   Sir, am I correct that the other guy he was referring to

20      was Shuli Doma?

21      A.   Yes.

22      Q.   Yes.

23                  And Mr. Doma also would get lawyers to handle a case

24      when someone was arrested, right?

25      A.   Yeah, yeah.

1   Q.  So he would do it both if someone had a parking or a

2   speeding ticket and also if someone got arrested, he would get

3   him a lawyer for something, right?

4   A.  Yeah.

5   Q.  And Mr. Reichberg was asking is he working on it or am I

6   going to be working on it, right?

7   A.  Right.

8   Q.  And Mr. Reichberg had just referred to money, correct,

9   2500?

10  A.  Yeah.

11  Q.  And you understood that that's to be money that would be

12  paid to Mr. Reichberg and the lawyer that he was going to be

13  hiring, correct?

14  A.  Right.

15  Q.  Was that your understanding?

16  A.  Yeah.

17  Q.  That was what had happened with your son?

18  A.  Yeah.

19  Q.  And so now I refer you to the next one, which is --

20          MS. NECHELES:  Your Honor, if we could play 1160,

21  transcript 1160?

22          THE COURT:  Thank you.

23          Ladies and gentlemen, you can turn to that transcript,

24  1160.

25          MS. NECHELES:  That's January 18, 2015, 9:33 p.m.,

 1    Jeremy Reichberg and Boaz Gazit.

 2                (Audio playback)

 3                MS. NECHELES:  Sorry, your Honor.  One minute.  We're

 4    having some technical difficulties.

 5                (Pause)

 6                MR. BELL:  Your Honor, to save some time --

 7                (Audio playback)

 8                MR. BELL:  If we're still having technical

 9    difficulties, we can play this.

10                THE COURT:  Thank you.

11                Counsel, any concerns with doing that, if that would

12    help?

13                MS. NECHELES:  I have no --

14                Are we having problems with it?

15                It might be easier.  I think --

16                THE COURT:  Thank you, counsel for the United States,

17    for your offer.  Please do.  I think we're at 1160.

18                MR. BELL:  Thank you, your Honor.

19                I guess we'll just play it from the beginning.

20                THE COURT:  Thank you.  Please do.

21                MR. BELL:  Thank you.

22                (Audio playback)

23    BY MS. NECHELES:

24    Q.   In this conversation, am I correct that Mr. Reichberg is

25    sort of belittling a competitor of his?  Is that correct?

1    A.  Say -- could you --

2    Q.  Am I correct that Mr. Reichberg is essentially belittling a

3    competitor of his?

4    A.  Yeah, I guess so.

5    Q.  He was another person who would charge money and get

6    lawyers to help people get traffic tickets and arrests, right?

7    A.  Yeah.

8    Q.  And Mr. Reichberg is saying that guy is no good, he doesn't

9    do a good job, right?

10   A.  Right.

11   Q.  In this conversation, when Mr. Reichberg talks about how

12   he's going to get the person out of jail, he's telling you he's

13   going to have a lawyer that he's going to supply, right?

14   A.  Yeah.

15   Q.  He does not say -- you testified on direct examination that

16   he said he would get the person out of jail in two hours,

17   right?

18   A.  Right.

19   Q.  And there's no mention of two hours on these calls, right?

20   A.  Tonight.  It was 9:30.

21   Q.  He says he's going to get him out tonight --

22   A.  The court closed at midnight.  So 9:30 is two hours.

23   Q.  He doesn't mention he's going to call any police or do

24   anything, reach out for any contacts or anything like that,

25   right?

1    A.   No.

2    Q.   He just says he's going to hire a private lawyer who will

3    come down and get that done, right?

4    A.   Yeah.

5              MR. BELL:  Objection.

6              THE COURT:  Thank you.

7              You can answer the question.

8    BY MS. NECHELES:

9    Q.   So I want to direct your attention now to 1165.

10             MS. NECHELES:  If we could turn to that, your Honor,

11   the next transcript, 1165?

12             THE COURT:  Thank you.

13             Yes, you may.

14             Ladies and gentlemen, it's 1165.

15             MS. NECHELES:  That is January 18, 2015, 10:36 p.m.,

16   between Mr. Reichberg and Boaz Gazit.

17             Maybe the government could play that next tape for me

18   as well, please.  Thank you.

19             (Audio playback)

20   BY MS. NECHELES:

21   Q.   All right.  Sir, if you turn back to the first page, right

22   at the beginning, line 6, Mr. Reichberg says:  "I'm working on

23   it.  Still at the 63 Precinct.  He's not at the" -- and then on

24   line 8, you say:  "No, no, they -- they took him."

25             And Mr. Reichberg says:  "I know they took him, but

1    they didn't take him.  When -- how long did they take him?"

2              The two of you are referring to central booking,

3    right?

4    A.  Yes.

5    Q.  Am I correct that what you were saying to Mr. Reichberg was

6    Mr. Zangi had been taken from the precinct to central booking,

7    right?

8    A.  Right.

9    Q.  And you had gone through this process before with your son,

10   correct?

11   A.  Yes.

12   Q.  So you had an understanding of how this process worked,

13   right?

14   A.  Yeah.

15   Q.  And your understanding was that the person would be first

16   at the precinct and then would be taken to central booking, if

17   they were not released on a DAT, correct?

18   A.  Yes.

19   Q.  And you were saying there that he had already been taken to

20   central booking, so could no longer get a DAT; is that correct?

21   A.  Uh-huh.

22              THE COURT:  Is that a yes?

23              THE WITNESS:  Yes.

24              THE COURT:  Thank you.

25   Q.  And then if you turn to the next page, then on line 4 and

1    on, you start discussing with Mr. Reichberg a lawyer named

2    Alan, correct?

3    A.  Yes.

4    Q.  And Alan was a lawyer who you had dealt with before, also,

5    right?

6    A.  Right.

7    Q.  And Alan was a lawyer who had dealt with another case of

8    your son's?

9    A.  No.  Like this --

10   Q.  He had dealt with when Mr. Reichberg had --

11   A.  Reichberg.

12   Q.  -- hired him.

13          Well, if you read line 11, you say:  "He doesn't know

14   Alan because he's the first-time with Alan and also suspended

15   license.  He got me, so I tell him 1600.  He got Alan to come.

16   They came around 12:00 o'clock, and because it was very slow,

17   so the judge left around 12:00 o'clock, so he stayed another

18   night."

19   A.  Right.

20   Q.  "He was like 30 hours."

21          So you talked about someone he who got Alan?

22   A.  No.  That was long time before.

23   Q.  Okay.  And that was another person had hired Alan --

24   A.  Right.

25   Q.  -- to handle your son's case, right?

1    A.   Right.

2    Q.   That was not Mr. Reichberg?

3    A.   No.

4    Q.   And when that had happened, the lawyer had showed up very

5    late, and so your son didn't get out of jail for 30 hours,

6    right?

7    A.   The next day, yeah.

8    Q.   That's what you said there, he was like 30 hours in?

9    A.   Yes.

10   Q.   And what you were referring to is your son sitting in jail

11   for 30 hours before he gets arraigned, before he's brought

12   before a judge, right?

13   A.   Right.

14   Q.   And then you agreed that it was a scam, that what happened

15   to you, you paid $1,600, and your son sat in jail for 30 hours,

16   correct?

17            And, sir, when you paid 1600, was that for the lawyer

18   to handle your son's entire case?

19            MR. BELL:  Objection.

20            THE COURT:  Thank you.

21            Counsel, I'm going to permit the witness to answer the

22   question.

23            Go ahead.

24            THE WITNESS:  I don't know about lawyers' rates.

25   Q.   You don't recall what it was, whether the 1600 covered the

1    whole case or just that evening?

2    A.  Just -- it was no -- no other case.  It was a collision

3    ticket.  The next day, he gets released.

4    Q.  He gets released, so your son --

5    A.  There's no session, there's no court session.  It's like

6    one night, yeah.

7    Q.  Okay.  He gets released on bail the next day, correct?

8    A.  Huh?

9    Q.  He was released on bail the next day?  He was arraigned --

10   A.  No.  Why bail?  No.

11              MS. NECHELES:  If we could turn now, your Honor, to

12   what is in the other notebook, the other binders that the

13   jurors have, the white binder, under the number JR-3007, and

14   it's in evidence as Government Exhibit --

15              THE COURT:  1172.

16              MS. NECHELES:  -- 1172.  Thank you, your Honor.

17              THE COURT:  Thank you.

18              Yes, ladies and gentlemen, you can look to that page

19   in your binder.  The recording itself is in evidence at W-1172.

20   BY MS. NECHELES:

21   Q.  This is under JR-3007.  Oh, it's tab --

22              MS. NECHELES:  I'm sorry, what is the tab?  Tab 7.

23              THE COURT:  Thank you.

24              So you can look at tab 7 in that binder.

25              Thank you.

1              Counsel, you can proceed.

2              MS. NECHELES:  If we can play that, your Honor?

3              THE COURT:  Please do.

4              (Audio playback)

5    BY MS. NECHELES:

6    Q.  Okay.  Sir, just turning back to the first page of that,

7    you see -- you recall you said to Mr. -- or Mr. Reichberg said

8    to you:  "But like I said, I have to take care of the guy who's

9    going to be there to meet me."

10             And you said:  "He's going to be there with the

11   money."

12             Do you recall that?  Do you see that in the

13   transcript, that that's what you said?

14   A.  Whatever, yeah.

15   Q.  When Mr. Reichberg was talking about the guy he was going

16   to meet and who he had to take care of, he was talking about

17   the lawyer, that was your understanding, right?

18   A.  Yes.

19   Q.  When you said he's going to be there with the money,

20   Mr. Zangi's family was coming, right?

21   A.  Yeah.

22   Q.  They lived on Long Island; am I correct?

23   A.  Yeah.

24   Q.  And they were going to come in to meet him at central

25   booking, and the lawyer was going to be there, right?

1    A.  Yes.

2    Q.  On the next page, when you talk about a guy named Yakov,

3    that was yet another person who also helped get speeding

4    tickets resolved?

5    A.  A lawyer that take care of traffic violation tickets.

6    Q.  Yakov was a lawyer you had hired many times in the past,

7    you said?

8    A.  Yeah.

9    Q.  And what Yakov would do as he would go into court and get

10   postponement after postponement until the case was eventually

11   dismissed; is that --

12   A.  Yes.

13   Q.  And that had happened to you many times, right?

14   A.  Yeah.

15   Q.  And that was your understanding what Mr. Reichberg would

16   arrange for when he took care of tickets, right?

17   A.  Yeah.

18   Q.  And that was what the other person was supposed to have

19   done with Zangi's ticket, right?

20   A.  Yeah.

21   Q.  But that had not happened, he had gotten the case --

22   instead, the case had been -- Mr. Zangi's license had ended up

23   suspended; am I correct?

24   A.  Right.

25            MS. NECHELES:  I have no further questions, your

1   Honor.

2           MR. BELL:  Redirect, your Honor?

3           THE COURT:  Thank you very much.

4           Yes, please proceed.

5   REDIRECT EXAMINATION

6   BY MR. BELL:

7   Q.  Hello again, Mr. Gazit.

8   A.  Hi.

9   Q.  Mr. Gazit, who was Shuli Dov?

10  A.  He's another guy who does those, same like Mr. Reichberg.

11  Q.  Well, when you say "He's another guy who does those," those

12  what, Mr. Gazit?

13  A.  Take care of tickets and get out, try to get you out.

14  Q.  When you say taking care of tickets and trying to get you

15  out, do you just mean somebody who calls a lawyer for you?

16          MR. MERINGOLO:  Objection; leading.

17          THE COURT:  Thank you.

18          You can answer the question.

19          THE WITNESS:  The lawyer would have, yeah, you know,

20  anything to get you out.

21  BY MR. BELL:

22  Q.  When you say "anything to get you out," what other things,

23  other than calling a lawyer, did you expect people like Shuli

24  and Reichberg to do?

25  A.  I don't know.  Use their connections they have to get you

1    out in short time.

2            THE COURT:  Would you say that again, please,

3    Mr. Gazit?

4            THE WITNESS:  To use their connections, so they do it

5    like short, get you out in short time.

6    BY MR. BELL:

7    Q.  What sorts of connections did you expect people like Shuli

8    and Reichberg to use, other than lawyers, in order to get you

9    out?

10   A.  I don't -- connect with the system.  I don't know, cops.

11           MR. BELL:  So why don't we go back to the last

12   transcript we looked at, which the jurors have in their binders

13   as Defense Exhibit JR-3007, I believe, and which will

14   ultimately be marked as a government exhibit.

15   Q.  So that's JR-3007.  It's the last one you had.  Do you have

16   that?  In the white -- I'm sorry.  Tab 7 of the 3000

17   transcripts.

18           THE COURT:  I don't think the witness has a copy of

19   this transcript.

20           MR. BELL:  Can we provide him with one, please?

21           MS. NECHELES:  Yes.

22   BY MR. BELL:

23   Q.  Mr. Gazit, I'm handing you a transcript that has JR-3007 at

24   the bottom corner.  Do you see that, sir?

25   A.  Yeah.

1   Q.  Now, Ms. Necheles just asked you a couple of questions

2   about that transcript.  She did not ask you --

3              MS. NECHELES:  Objection.

4              THE COURT:  Thank you.

5              Counsel, can you please inquire?

6              MR. BELL:  Sure.

7   BY MR. BELL:

8   Q.  I want to direct your attention to the very beginning of

9   that column in which -- and the section about like five

10   lines -- four lines down in which Gazit says:  "You called."

11  that's you.

12             Reichberg asks:  "Are you sleeping?"

13             Gazit:  "No, I'm not."

14             Reichberg:  "Yeah.  So the wife called me.  I'm trying

15  to get this done.  I have to speak to the DA, I have to speak

16  to every department separately.  My question is, who's going to

17  meet me there?"

18             Do you see that?  Do you see that, Mr. Gazit?

19  A.  Yeah.

20  Q.  It's in the top half of the first page of the document I

21  showed you, the transcript I showed you.

22  A.  Yeah, yeah.

23  Q.  Okay.  Sorry.  I'll ask you to speak up just a little bit,

24  Mr. Gazit.

25             When Mr. Reichberg told you:  "I have to speak to the

1    DA, I have to speak to every department separately," what did

2    you understand him to mean by "every department separately,"

3    separate and apart from the DA?

4    A.  Police department?  I don't know.

5    Q.  And why did you believe that that was the police department

6    he was talking about?

7    A.  What else it mean?

8    Q.  Fair enough.

9            MR. MERINGOLO:  Objection; mischaracterization.  Move

10   to strike, your Honor.

11           THE COURT:  That's fine.  I agree.

12           I'll strike the comment.

13           Please proceed, counsel.

14           MR. BELL:  Yes, your Honor.

15   BY MR. BELL:

16   Q.  Now, over the course of the conversations that we just

17   listened to, is it fair for me to describe portions of them as

18   a conversation between you and Mr. Reichberg about one of

19   Mr. Reichberg's competitors?

20   A.  Okay.

21   Q.  Was there a price difference between what Mr. Reichberg was

22   asking for and what this Shuli Dov was asking for?

23   A.  Yeah, it is different.

24   Q.  How substantial a price difference was it?

25   A.  2,000.

1   Q.  And what did you understand Mr. Reichberg was offering for

2   a difference of $2,000, a difference of five times as much?

3

4           MR. MERINGOLO:  Objection; mischaracterization for the

5   times.

6           THE COURT:  Thank you.

7           You can answer the question.

8   A.  Get him out in two hours, same night.

9   Q.  What did you believe Mr. Reichberg could do to make that

10  result happen, that this Shuli Dov could not make happen for

11  $500?

12  A.  Better connection.

13  Q.  I'm sorry, did you say better connection?

14          MR. MERINGOLO:  Objection.

15          THE COURT:  Thank you.

16          MR. BELL:  I just couldn't hear, your Honor.

17          THE COURT:  Thank you.

18          Would you mind repeating the answer, Mr. Gazit.

19          THE WITNESS:  It's a better connection.

20          MR. BELL:  We can take that down.  Oh, it's not

21  actually up.  You won't need the binders for the next part.

22          THE COURT:  Thank you, ladies and gentlemen.  You can

23  put those down.

24  BY MR. BELL:

25  Q.  Ms. Necheles showed you a number of phone records during

1    your cross-examination.  Do you recall that?

2    A.  Yes.

3    Q.  Now, you've never seen those phone records before, right?

4    A.  No.

5    Q.  Do you have any idea of how they're compiled?

6    A.  No.

7    Q.  Do you have any idea, in particular, of how the column

8    referring to the duration of the call -- how long it was -- is

9    compiled?

10   A.  Already shown -- timewise?

11   Q.  Yes.  Do you have any outside knowledge of how that column

12   is compiled?

13   A.  No.

14   Q.  Now, do you have any knowledge, in particular, of how the

15   phone company depicts what happens when there is a missed call

16   or a voicemail, how the company represents how long that is?

17             MR. MERINGOLO:  Objection, your Honor.

18   Q.  Do you have any knowledge of that?

19             THE COURT:  Thank you.

20             You can answer the question.

21   A.  No idea.

22   Q.  So, Mr. Gazit, you don't happen to know whether, if there

23   is a missed call --

24             MS. NECHELES:  Objection.

25   Q.  -- or a voicemail, it depicts as one minute, zero minutes,

1    or something else entirely, do you?

2              MR. MERINGOLO:  Objection, your Honor; there are no

3    zero minutes.

4              THE COURT:  Thank you.

5              You can answer the question.

6    A.  I think it's like one minute show right away, it show one

7    minute, charge by minute.

8    Q.  What are you basing on that, sir?

9    A.  Knowledge; I don't know.

10   Q.  Do you have any other knowledge of this *** before today?

11   A.  They charge by minute, so...

12   Q.  Okay.  Did you see any zeros in that column while

13   Ms. Necheles showed it to you earlier?

14   A.  No.

15   Q.  Now, you were also asked a number of questions about

16   instances in which Mr. Reichberg referred you to other work,

17   for other work, correct?  Do you recall those questions?

18   A.  Yeah.

19   Q.  When Mr. Reichberg actually referred you out to other work,

20   did you expect to get paid for that work?

21   A.  Of course.

22             MR. MERINGOLO:  Objection; leading.

23             THE COURT:  Thank you.

24             You can answer the question.

25   A.  Yes.

IB7KGRA4                         Gazit - Redirect

1    Q.  Is that different from when Mr. Reichberg asked you to do

2    work for friends of his?

3              MR. MERINGOLO:  Objection; leading.

4              THE COURT:  Thank you.

5              You can answer the question.

6    A.  Yes.

7    Q.  And there were multiple -- withdrawn.

8              Were there other occasions, other than Jimmy Grant, in

9    which Mr. Reichberg asked you to do work for friends of his?

10             MR. MERINGOLO:  Objection.

11             THE COURT:  Thank you.

12             You can answer the question.

13   A.  Just siding -- siding things.  That's all.

14   Q.  Are you familiar, Mr. Gazit, with a woman named Tara?

15   A.  Yes.

16   Q.  And how do you know a woman named Tara?  Who is she?

17             MS. NECHELES:  Your Honor, this is beyond the scope.

18             THE COURT:  Thank you.

19             Counsel, can you come up.

20             MR. BELL:  Yes.

21             (Continued on next page)

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Counsel, there's an objection?

3              MS. NECHELES:  Yes.  It's beyond the scope.

4              THE COURT:  Thank you.

5         Counsel?

6              MR. BELL:  I'll offer a proffer, your Honor.

7              I expect -- the defense opened the door to this --

8    that Mr. Gazit is going to testify that this was another

9    individual, a contact and friend of Mr. Reichberg's, who he did

10   work for at Mr. Reichberg's behest, that he did not get paid

11   for that either.

12             I also expect subsequent information, to come through

13   subsequent evidence in the case, to show that this happened

14   after the timeline that the defense attempted to establish

15   through cross-examination.

16             So I would ask for some leeway to continue, your

17   Honor.

18             THE COURT:  Thank you.

19             Why is it within the scope?

20             MR. BELL:  Because they made it seem as though there

21   was a limit to what other work Mr. Gazit did at Mr. Reichberg's

22   behest, that this would tend to contradict.  The idea was also

23   that -- they offered some sort of alternate rationale for why

24   Jimmy Grant didn't pay this guy, which is that it was all

25   supposed to be business, and he just wasn't happy for the work.

1   This fits into the rationale that we established on direct

2   examination, and that that testimony was elicited to rebut, the

3   real reason is because Jeremy made this happen as a gift to

4   somebody that he knew.

5          THE COURT:  Thank you.

6          Counsel, any comment?

7          MS. NECHELES:  Judge, this person testified that he

8   expected to be paid on Jimmy Grant.  I know the government

9   would like to make it something else, but that was his

10  testimony repeatedly.  He expected to be paid.  He didn't do

11  this for free, and he testified that he repeatedly asked for

12  money and he didn't get it.  We gave an explanation of why that

13  was.

14         The government now wants to put in evidence that

15  essentially this person did some minor work, which is what he

16  said in the 3500 material, for a person who the government

17  believes was Jeremy Reichberg's girlfriend.  So one has nothing

18  to do with the other.  The fact that he is doing work for a

19  girlfriend has nothing to do with whether he did work for free

20  for police officers.

21         In addition, he already said he did minor work for

22  free for Jeremy Reichberg in the hopes that he would get

23  more -- so this is just the same thing that he's already

24  admitted.

25         THE COURT:  Thank you.

1            MR. BELL:  For starters, this, he testified, was minor

2     work, but he also testified that he hoped to get paid for it

3     but did it anyway because of the looming promise of this big

4     job.

5            Your Honor -- I don't know if you need to hear more

6     from me -- this is clearly relevant, and I'd ask to be able to

7     elicit it.  It's clearly within the scope.

8            THE COURT:  Thank you.

9            I'll permit this inquiry.

10            I do want to keep an eye on the time, however,

11     counsel, so I'd ask that you keep this relatively short.  The

12     information has come in that he's done small jobs in the past,

13     so I don't think that this should require a lot of time, and I

14     want to be able to finish this witness today before we have to

15     break.

16            MR. BELL:  It shouldn't, your Honor, and I expect that

17     we will.

18            MS. NECHELES:  I will have to cross on this area.  I

19     didn't go into it because --

20            THE COURT:  That's fine, understood.  Thank you.

21            (Continued on next page)

22

23

24

25

1              (In open court)

2              MR. BELL:  May I proceed, your Honor?

3              THE COURT:  Thank you.

4              I apologize for the interruption.

5              Please do proceed.

6    BY MR. BELL:

7    Q.  I believe, Mr. Gazit, prior to the interruption you were

8    asked whether you knew a person named Tara and who she was.

9    Who's Tara?

10   A.  It was like his nurse while he was in, like, operation.

11   Q.  When you say "his nurse," whose nurse?

12   A.  Mr. Reichberg's nurse.

13   Q.  Did you get to meet Tara yourself?

14   A.  Yes.

15   Q.  How?

16   A.  I was asked to go do some work for her.

17   Q.  And who asked you to do work for Tara?

18   A.  Mr. Reichberg.

19   Q.  What was the nature of the work that you were asked to do?

20   A.  We did some, few, recess light, closet doors.

21   Q.  About how much would you say that work was worth?

22   A.  1500.

23   Q.  Did you get paid for that work?

24   A.  No.

25   Q.  Did you ask to get paid for that work?

1    A.   No.

2    Q.   Why not?

3    A.   It was the time that he refer me for the big job, so it was

4    like -- didn't ask for it, no.

5    Q.   Do you recall approximately when this happened?

6    A.   I don't know, sometime like 2014, 2015, I don't know.

7    Q.   Now, what did you understand the relationship between

8    Mr. Reichberg and Tara, the nurse, to be?

9              MS. NECHELES:  Objection, your Honor.

10   A.   Close friends.

11             MR. MERINGOLO:  Objection; relevance.

12             THE COURT:  Thank you.

13             You can answer the question.

14   A.   Very close friends.

15   Q.   When you say "very close friends," I want you to be

16   specific, Mr. Gazit:  What did you understand the relationship

17   between the them to be?

18             MR. MERINGOLO:  Objection; relevance.  Close

19   friends --

20             THE COURT:  Thank you.

21             I think he's answered the question.

22   Q.   Did you understand there to be a romantic relationship

23   between Mr. Reichberg and the nurse?

24             MR. MERINGOLO:  Objection, your Honor.  Ridiculous.

25             THE COURT:  Thank you.

1               Counsel, I've heard the objection.  Please limit

2      yourself to objections and not to outbursts or commentary

3      regarding the evidence or the questions.

4               MR. MERINGOLO:  Your Honor, he got his answer, and

5      he's trying to embarrass Mr. Reichberg.

6               THE COURT:  Counsel, counsel, thank you.  I'll see you

7      after we excuse the jury, Mr. Meringolo.

8               MR. MERINGOLO:  Okay.

9               THE COURT:  Good.  Counsel, you can proceed.

10     BY MR. BELL:

11     Q.  Mr. Gazit, did Mr. Grant ever pay you for the windows?

12     A.  Never.

13     Q.  Did he ever discuss paying you for the windows?

14     A.  No.

15     Q.  Did he ever promise you to pay you for the windows?

16     A.  No.

17               MR. BELL:  One moment, please?

18               (Pause)

19               MR. BELL:  No further questions, Mr. Gazit.  Thank you

20     for your time.

21               THE COURT:  Good.  Thank you.

22               Counsel for Mr. Grant?

23     RECROSS EXAMINATION

24     BY MR. MERINGOLO:

25     Q.  Sir, were you in fact paid for the windows?

1   A.  Yes.

2   Q.  You were paid for the windows, correct?

3   A.  Uh-huh.

4            MR. MERINGOLO:  No more questions.

5            THE COURT:  Thank you.

6            Counsel for Mr. Reichberg?

7   RECROSS EXAMINATION

8   BY MS. NECHELES:

9   Q.  Sir, you testified that you think that on Jimmy Grant's

10  telephone records, that he would be billed for a call that he

11  missed and nothing ever picked up?  Is that your testimony?

12           MR. BELL:  Objection.

13           THE COURT:  Thank you.

14           I'm sorry, I'm sorry, give me one moment.  Can you

15  rephrase the question, please, counsel.

16           MS. NECHELES:  Okay.

17  Q.  Sir, you were asked about calls that said one minute,

18  right?

19           And you said you thought if you missed a phone call,

20  that nobody picked up, it would be billed still for a minute?

21  A.  I think so.

22  Q.  You have no knowledge of that, right?

23           Do you think that if I called you and you didn't pick

24  up the phone, you would be billed for a minute of time?

25           MR. BELL:  Objection.

1            THE COURT:  Thank you.

2            You can answer the question.

3   A.  I think it's going to show that you called.

4   Q.  You think it would show on my telephone records or on your

5   telephone records, sir?

6            MR. BELL:  Objection.

7            THE COURT:  Thank you.

8            You can answer the question.

9   A.  I don't know.

10  Q.  Isn't it a fact that it doesn't make sense that I would be

11  billed for a phone call that I don't pick up?

12           MR. BELL:  Objection.

13           THE COURT:  Thank you.

14           Counsel, can you rephrase the question?

15  Q.  Well, sir, does that make sense to you, that you would be

16  billed for a phone call that you never picked up for?

17           MR. BELL:  Objection.

18           THE COURT:  Thank you.

19           I'm sorry, I'm going to sustain the objection.  Can

20  you please proceed.

21  BY MS. NECHELES:

22  Q.  And, sir, you testified about there was a price difference

23  between Mr. Reichberg and his competitor, right?

24  A.  Right.

25  Q.  You said it was because Mr. Reichberg had better

1   connections, right?

2   A.  Right.

3   Q.  Well, he also had better lawyer, right?

4   A.  Yeah.

5           MR. BELL:  Objection.

6           THE COURT:  I'm sorry.  I accept the answer.

7   Q.  When you said he would get the person out in two hours, in

8   fact, he didn't get Mr. Zangi out in two hours, did he?

9   A.  No.

10  Q.  Mr. Zangi spent overnight there, right?

11  A.  Right.

12  Q.  But the next morning he was got out right away, right?

13  A.  Uh-huh.

14  Q.  And --

15          THE COURT:  I'm sorry, is that a yes?

16          THE WITNESS:  Yes.

17  Q.  The other person had left your son sitting in jail for 30

18  hours, right?

19  A.  Right.

20  Q.  So Mr. Reichberg didn't use any magic connections to get

21  the person out in two hours, right?

22          MR. BELL:  Objection.

23          THE COURT:  Thank you.

24          Counsel, can you rephrase.

25          MS. NECHELES:  Okay.

1    BY MS. NECHELES:

2    Q.  Mr. Reichberg didn't use any connections with police to get

3    the person out in two hours, right?

4              MR. BELL:  Objection.

5              THE COURT:  Thank you.

6              Can you rephrase, counselor.

7              MR. BELL:  Foundation, your Honor.

8    Q.  To the best of your knowledge, did Mr. Reichberg use any

9    connections with police to get the person out in two hours?

10   A.  I don't know, I believe so.

11   Q.  You believe he got him out in two hours?

12   A.  No, he didn't get him out.

13   Q.  And, in fact, you know that when he went to court the next

14   morning, there was a lawyer there, right?

15   A.  Right.

16   Q.  Do you know whether sometimes what Mr. Reichberg would do

17   would be to call central booking himself and call the offices

18   to try to speed things along?

19   A.  I have no idea, I don't know.

20   Q.  You never heard him having those kind of conversations or

21   anything?

22   A.  No.

23   Q.  When he was talking to you on the phone right there in that

24   conversation, that was just referred to, the last exhibit, the

25   one he said he had to speak with the DA's office and other

```
 1   departments, do you know, was he telling you -- was it your

 2   understanding that he was telling you, I need to call these

 3   people to try to push this along?

 4            MR. BELL:  Objection.

 5   A.  That's what he said.

 6            THE COURT:  Thank you.

 7            You can answer the question.

 8   Q.  That's what he said, right?

 9   A.  Yeah.

10   Q.  He would try to call -- he would call the DA's office and,

11   to your understanding, you testified, the police department to

12   try to push along the process, right?

13   A.  I think so.

14   Q.  And it's your understanding that you have to -- that nobody

15   can be arraigned until all the paperwork gets to court?  Is

16   that your understanding?

17            MR. BELL:  Objection.

18            THE COURT:  Thank you.

19            You can answer the question.

20   A.  Yes.

21   Q.  Now, you were just asked some questions about Tara, who you

22   did some work for --

23   A.  Right.

24   Q.  -- correct?

25   A.  Uh-huh.
```

1    Q.   And Mr. Reichberg was in the hospital at one point at a

2    later time?

3    A.   Yeah.

4    Q.   And you were still friends with him, and you were aware of

5    that?

6    A.   Yes.

7    Q.   Did you visit him in the hospital?

8    A.   No.

9    Q.   In his home afterwards?

10   A.   At home.

11   Q.   At his home afterwards, right?

12   A.   Yes.

13   Q.   Lots of friends were visiting?

14   A.   Yeah.

15   Q.   And he had a nurse in his home with him at that point,

16   right?

17   A.   I didn't see that home.

18   Q.   After that, he asked you to do a job that involved fixing

19   some closet doors and putting some lights up in her house?

20   A.   Right.

21   Q.   And it was a small job; am I correct?

22   A.   Yeah.

23   Q.   You agreed to do that as a favor to him, right?

24   A.   Right.

25   Q.   And you were still hoping he would send you more business,

1   right?

2   A.   Yes.

3   Q.   And then am I correct that the nurse wanted more work and

4   you said no?

5   A.   Right.

6   Q.   And that was because, for anything that would involve

7   actually buying product or doing a bigger job, you wanted to

8   get paid, right?

9   A.   Correct.

10   Q.   You would sometimes do labor for free but you would not buy

11   any windows or put in anything for -- if it had to come out of

12   your pocket, you were not doing it for free for Mr. Reichberg,

13   right?

14   A.   Okay.

15   Q.   Is that correct?

16   A.   Yeah.

17   Q.   So when you were putting windows in at Mr. Grant's home,

18   you were not doing that for free, right?

19   A.   No, not supposed to be for free, no.

20   Q.   And you expected to get paid all along, right?

21   A.   I did pay for the windows.

22   Q.   You got paid for the windows?

23   A.   I didn't get paid for the windows, no.  I paid for the

24   windows.

25              MS. NECHELES:   Thank you.  No further questions, your

 1   Honor.

 2               THE COURT:  Thank you.

 3               Counsel for the United States?

 4               MR. BELL:  Roughly 90 seconds' worth of questions,

 5   your Honor.

 6               THE COURT:  Please proceed.

 7   REDIRECT EXAMINATION

 8   BY MR. BELL:

 9   Q.  Just for clarity's sake, Mr. Gazit, did you get paid by

10   Jimmy Grant for the windows?

11   A.  No.

12   Q.  Did Jeremy Reichberg give you some money?

13   A.  Give me very little but did not -- it's, for all the thing

14   I've done, very little.

15   Q.  Did the amount of money come close to the amount of money

16   that you yourself laid out for the windows?

17   A.  No.  It's approximately about 2,000.

18               MR. BELL:  Nothing further.  Thank you.

19               THE COURT:  Thank you.

20               Counsel for Mr. Grant?

21               MR. MERINGOLO:  No more questions, your Honor.

22               THE COURT:  Counsel, please proceed.

23   RECROSS EXAMINATION

24   BY MS. NECHELES:

25   Q.  So you just said Jeremy Reichberg gave you approximately

1    2,000; is that correct?

2    A.  Approximately, yeah.

3    Q.  And that was in cash, right?

4    A.  Some cash and one check first time was check.

5    Q.  Okay.  And it came over -- well, didn't you previously tell

6    the government it was $3,000 in cash?

7    A.  No, it's mistake.

8    Q.  And it came in small amounts over time, right?

9    A.  No, it was one check and one -- two times maybe.

10   Q.  Two times cash, right?

11   A.  Yeah -- no.  First time, I got check.

12   Q.  First time, it was a check; the second time, it was cash?

13   A.  Yeah.

14   Q.  Do you know where the cash came from?

15   A.  Huh?

16   Q.  What was the cash for?

17   A.  I collect it from someone, so he give it to me, he say keep

18   it.

19   Q.  He collected the money from someone to give it to you?

20   A.  Yeah.

21             MR. BELL:  Objection.

22             THE COURT:  Thank you.

23             I understood her to just be clarifying what she

24   understood the answer to be, for the sake of the record.

25             MS. NECHELES:  Yes, your Honor.  Thank you.

1                THE COURT:  Thank you.

2   Q.  That was the cash that he gave you, was money he got from

3   someone else; is that correct?

4   A.  Yeah, yeah.

5                MS. NECHELES:  I have no further questions.

6                THE COURT:  Thank you.

7                Counsel?

8                MR. BELL:  Very briefly, your Honor.

9                THE COURT:  Thank you.

10  REDIRECT EXAMINATION

11  BY MR. BELL:

12  Q.  Mr. Gazit, do you know where the money that Mr. Reichberg

13  gave you came from?

14  A.  The cash?  It was from someone that he also help him with

15  something.  I was collecting the money from him.

16  Q.  Do you have any reason to believe that that money came from

17  James Grant?

18  A.  No.

19               MR. BELL:  Thank you.  Nothing further.

20               THE COURT:  Thank you.

21               Counsel for Mr. Grant?

22               MR. MERINGOLO:  No, Judge.

23               THE COURT:  Thank you.

24               Counselor?

25               MS. NECHELES:  No.

IB7KGRA4

1          THE COURT:  Good.  Thank you very much.

2          Mr. Gazit, thank you very much for your testimony.

3     You can step down.  Thank you.

4          THE WITNESS:  Yes.

5          (Witness excused)

6          THE COURT:  So, ladies and gentlemen, as Mr. Gazit is

7     stepping out, let me remind you:  I told you yesterday that I

8     expected we'd have to leave a little early today, at 2:00.

9     It's now 2:00, so I'm going to excuse you for the day.  We're

10    going to try to start again right on time tomorrow morning.

11    You were wonderful this morning, so I'll ask you to do the same

12    thing again tomorrow.

13         Please, during this break don't discuss the case

14    amongst yourselves, don't do any research about the case or

15    anything involved in it, and don't communicate with anyone else

16    about the case.

17         With that, I look forward to seeing you all tomorrow.

18    Thank you.

19         (Continued on next page)

20

21

22

23

24

25

IB7KGRA4

```
 1              (Jury not present)
 2              THE COURT:  Thank you very much.  Ladies and
 3     gentlemen, you can be seated.
 4              First, with apologies, I do need to step out very
 5     quickly because of my commitment that requires me to leave
 6     early today, so there's not much take take up now.  I'll ask
 7     you to be here on time tomorrow morning.
 8              Is there anything that we need to talk about now?
 9              MR. MERINGOLO:  Just quickly, your Honor, I would like
10     to make a motion for a mistrial based on 403, the inappropriate
11     question beyond the scope and to embarrass Mr. Reichberg.
12              THE COURT:  Thank you.
13              Feel free to submit your written motion tonight.  I'll
14     look forward to seeing it.
15              MR. MERINGOLO:  If I can get to it, Judge.  It's
16     unlikely.
17              THE COURT:  It's either in my in-box tomorrow morning
18     or I understand it's not made.
19              I will comment on your eruption, counsel.  I
20     understand that you have strategic reasons for doing these
21     things --
22              MR. MERINGOLO:  None at all, your Honor.
23              THE COURT:  I'm sorry, counsel.  Please give me a
24     moment.
25              I understand that you have strategic reasons for doing
```

IB7KGRA4

1    these things, that there's a reason why you decided to comment

2    in that way.  The testimony that was elicited was that Tara was

3    a close friend of the person.  You decided to erupt and shout

4    that this was ridiculous.  And then after I asked you to please

5    be mindful, in summary, you decided to make comments about this

6    trying to brand the defendants in some way.

7           We had a conversation earlier about whether and to

8    what extent counsel's questions constitute evidence.  I assume

9    and I understand there to be some strategic reason why you

10   wanted to highlight the questions being asked by the United

11   States, in light of the very straightforward answer that was

12   received.  The only evidence received was that they were close

13   friends.  You decided to make those comments, and I assume that

14   you did so with the expectation that it would be beneficial to

15   your client.

16          MR. MERINGOLO:  No, actually, it wasn't my client,

17   Judge.  And we can't afford the transcript, so we won't have

18   it, but maybe I can look at Ms. Necheles' transcripts.  I

19   believe it was much different than what your Honor is

20   discussing, why I said that.  It may be when we are here in the

21   morning we can discuss that, when the public --

22          THE COURT:  That's fine.  I'd be happy to do that.

23          In the interim, let me just ask you, all counsel, to

24   please continue to limit your objections to "objection" and the

25   basis for it.  Ejaculations of outrage or other commentary

IB7KGRA4

embedded in comments during the course of trial are not

appropriate, and I will ask you to please avoid them going

forward.

Again, I'm happy to take sidebars to discuss any

issues of particular concern, but I believe that's the

appropriate place to do it.  I understand that counsel may have

strategic reasons to wish to behave in that fashions in front

of the jury.  Whether or not it's persuasive is something that

counsel can determine, in their own judgment, about what's in

the best interests of themselves and their client.  I

appreciate the strategic decisions being made by counsel with

respect to this here; I'd just like to advise you to please be

mindful of my guidance previously.

MR. MERINGOLO:  Yes, Judge.

MR. BELL:  I don't want to let the day go by without

noting one matter relating to decorum --

THE COURT:  Please.

MR. BELL:  -- that is mine.  One thing I realized

relatively soon within Mr. Gazit's cross-examination is that he

was a very rapid answerer, and it did not allow much time to

object.  For that reason, when there were objections, I

sometimes shouted them before standing up.  Obviously, I have

the utmost respect for the Court.  It was difficult to get the

objections in, and I just wanted to note that.  Obviously, I'm

going to stand for everything, but I did want to note that's

IB7KGRA4

1   why that happened.

2             THE COURT:  Thank you.  I appreciate that.

3             Good, I'm sorry for cutting us off now, early.  We'll

4   have the opportunity to discuss some issues in the morning.  I

5   apologize, I just can't be late for this other appointment.

6             MS. NECHELES:  Your Honor, I'll just say, I object to

7   them referring to this nurse as a romantic interest.  There's

8   no reason for that in this case.

9             THE COURT:  Thank you.  It didn't come in as evidence.

10            MS. NECHELES:  They intend to call the witness.  So I

11  would ask they not refer -- if they refer to close friendship,

12  I have no objection to that, but I don't think that there is

13  any reason for that.

14            THE COURT:  Thank you.

15            I apologize because I don't know the full context of

16  this.  I don't know anything about Mr. Reichberg personal

17  circumstances such that a girlfriend would be prejudicial.  I

18  would ask that the parties present to me the full facts so that

19  I can evaluate whether and to what extent it is prejudicial,

20  and unduly so.

21            MS. NECHELES:  Perhaps the government could make a

22  proffer why they think they --

23            THE COURT:  Thank you.

24            I'll take this up in the morning.  And to the extent

25  there's what I'll call a functional motion in limine on the

IB7KGRA4

1    topic, counsel for defense, I'd ask you to submit a short

2    letter akin to the one that was submitted yesterday by the

3    United States on the additional testimony by prostitute one.

4              Good.  Thank you, all.

5              (Adjourned to November 8, 2018 at 9:00 a.m.)

6                               * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                            Page

 3    MARTIN ROBERT NAT

 4    Direct By Mr. Bell . . . . . . . . . . . . 283

 5    Cross By Ms. Necheles  . . . . . . . . . . 294

 6    Cross By Mr. Meringolo . . . . . . . . . . 305

 7    Redirect By Mr. Bell . . . . . . . . . . . 306

 8    Recross By Ms. Necheles  . . . . . . . . . 308

 9    Recross By Mr. Meringolo . . . . . . . . . 314

10    BOAZ GAZIT

11    Direct By Mr. Bell . . . . . . . . . . . . 321

12    Cross By Mr. Meringolo . . . . . . . . . . 362

13    Cross By Ms. Necheles  . . . . . . . . . . 407

14    Redirect By Mr. Bell . . . . . . . . . . . 449

15    Recross By Mr. Meringolo . . . . . . . . . 462

16    Recross By Ms. Necheles  . . . . . . . . . 463

17    Redirect By Mr. Bell . . . . . . . . . . . 470

18    Recross By Ms. Necheles  . . . . . . . . . 470

19    Redirect By Mr. Bell . . . . . . . . . . . 472

20

21

22

23

24

25
```

```
1                          GOVERNMENT EXHIBITS

2     Exhibit No.                                    Received

3      927   . . . . . . . . . . . . . . . . . 288

4      1700, W-1152, W-1153, W-1155, W-1156, . . . . 361

5              W-1160, W-1165, W-1167,

6              W-1170, W-1175, W-1177,

7              W-1192, W-1195, W-1222, and

8              W-5358

9      1705 and 130-A  . . . . . . . . . . . . . . 418

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```