IBGKGRA1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          16 Cr. 468(GHW)

 5   JAMES GRANT and JEREMY
     REICHBERG,
 6
                  Defendants.
 7
     ------------------------------x
 8
                                           November 16, 2018
 9                                         9:23 a.m.

10
     Before:
11
                    HON. GREGORY H. WOODS,
12
                                           District Judge
13

14

15                        APPEARANCES

16   GEOFFREY S. BERMAN
17        United States Attorney for the
          Southern District of New York
18   BY:  JESSICA R. LONERGAN
          KIMBERLY J. RAVENER
19        MARTIN BELL
          Assistant United States Attorneys
20

21   HAFETZ & NECHELES, LLP
          Attorneys for Defendant Reichberg
22   BY:  SUSAN R. NECHELES

23   MERINGOLO & ASSOCIATES
          Attorneys for Defendant Grant
24   BY:  JOHN MERINGOLO
          ANJELICA CAPPELLINO
25
```

IBGKGRA1

1          (In open court; jury not present)

2          THE COURT:  Welcome back.  Thank you very much.  We're

3     starting a little bit later than I do.

4          I understood there was an issue with transit?

5          MS. NECHELES:  I apologize.  I had to take my kids to

6     school because we couldn't get a car this morning, and it was

7     all the way to the Upper West Side.  So I apologize.  It was

8     difficult to get back and --

9          THE COURT:  That's fine.  Thank you for the apology.

10    I appreciate that.  Give me one moment.

11          (Pause)

12          THE COURT:  Again, due to our delay, I'm not sure I'll

13    have the opportunity to give you the decision with respect to

14    the experts.  I'll put that aside.

15          I would like to talk about the proposed instruction

16    that was sent in by the government this morning.  Ms. Necheles,

17    I think I got it around 8:20-something a.m. this morning.  I

18    don't know if you had the opportunity to look at it.

19          MS. NECHELES:  I saw a draft of it last night.  I

20    think it's a little bit different this morning.  What I told

21    the government is, with respect to the line about credibility

22    of the witness, I don't believe that there is any authority for

23    that.  I asked the government if there was any authority, and I

24    did not hear back from them.

25          With respect to -- I just saw it on the phone.  Let me

IBGKGRA1

1   see if I can pull it up again, unless the government has a hard

2   copy for me.

3           THE COURT:  Thank you.

4           Let me see if I can speak to that.  I think I

5   understand the concept that the government may be getting at;

6   namely, to help the jury understand what this instruction

7   fundamentally means, what does admitted into evidence for their

8   truth mean.

9           MS. NECHELES:  But the problem is it's wrong, Judge.

10  I think it's wrong.

11          THE COURT:  Well, let me give you a sense.  My

12  proposal was going to be not to do that, and I've spent a

13  little bit of time while waiting for you to get here,

14  Ms. Necheles, thinking about whether or not an illustration of

15  this concept would instead be preferable to help the jury

16  understand what it is that we're talking about here.

17          Let me just give you a for instance, the kind of thing

18  I might say.  I'm reminded of the fact that as nonlawyers, some

19  of these concepts, like admitted into evidence for their truth,

20  may be less intuitive.

21          So here is something I could say, just as an example:

22  I'm going to provide you with an example of how this rule works

23  in practice.  If in one of the recordings, you heard the listed

24  people say, quote, it's raining outside," you can consider that

25  evidence for the truth of the statement asserted that it was,

IBGKGRA1

1    in fact, raining at that time.  However, if you heard any

2    person other than -- and I would list the names of people --

3    say "it's raining outside" on a recording, you could not

4    consider that statement for its truth.  In other words, it

5    would not be evidence that it was raining at the time in

6    question.  You could, however, use that statement to place

7    statements by a defendant in context, or to understand the

8    defendant's state of mind, or as evidence that someone said

9    it's raining outside.

10            So I'm just trying to come up with an example to help

11   them understand the concept, which I think may be what was

12   behind the credibility of the statement's comment.

13            MS. NECHELES:  I think that's helpful, your Honor.

14            MS. LONERGAN:  We agree, your Honor.  And I think --

15   and you've exactly laid out why we put that in, because we

16   don't want it to seem like -- we don't want it to appear that

17   the Court is opining on who is a truth-teller and who isn't.

18   And I think the Court's example could be constructive, but I

19   was wondering if you might be able to include one other thing.

20   I don't want to make this super long, but to the extent that

21   the Court's giving an example, because one of the things we

22   talk about is putting the defendant's statements in context or

23   as background, so on the raining example, maybe what the Court

24   could say is if one of the other listed speakers said it's

25   raining outside, you couldn't consider that for the truth of

IBGKGRA1

1   it, but if the defendant or one of the listed speakers then

2   said, yes, it is, that the other speaker's statement would

3   provide you context for understanding what it was that the

4   defendant was saying when the defendant said, yes, it is, and

5   that you could then use those two statements together to

6   understand that the defendant has said, yes, it is raining

7   outside.

8           And maybe -- I'm sure the Court can come up with

9   something more articulate, but, again, given the Court is

10  providing examples, we thought that might be a helpful example

11  of what it means to place a defendant's statement in context.

12          THE COURT:  Thank you.

13          I think that's a good idea.  It's getting lengthy.  I

14  may not include this, I'll call it, amplification in the

15  instruction in the future iterations of it.

16          Ms. Necheles, what's your view regarding that

17  proposal?

18          MS. NECHELES:  So, your Honor, perhaps you will give

19  us something typed up, and I can just look at it and be able to

20  respond.

21          THE COURT:  Thank you.

22          MS. NECHELES:  Thanks.

23          THE COURT:  I think that we're waiting for one juror.

24  Is there anything else that we should talk about now?

25          MS. LONERGAN:  Your Honor, just in that what we've

IBGKGRA1

1    just been discussing, in case it's helpful for the Court, I

2    provided it to defense counsel as well, I have a list of all of

3    the Title III recordings played to date and the ones we

4    anticipate playing today, and that's what this instruction, I

5    think, covers.

6              THE COURT:  Thank you.

7              MS. LONERGAN:  I can hand this up.

8              THE COURT:  Good.  Thank you.

9              I have those list of Title III recordings.  The

10   introduction to the statement that I will provide won't list

11   all of these.  I'll just refer to recordings that they have

12   heard to date and recordings that they expect to hear today.

13             MS. LONERGAN:  Yes, your Honor, that wasn't our

14   proposal.  This was more for the Court's information.  We don't

15   think it's helpful to read this whole list to the jury.

16             THE COURT:  Good.  Thank you very much.  I think this

17   is helpful.

18             Anything else that we should talk about, as I think

19   we're still waiting for one juror?

20             The jury actually is here now.  I'll see if I can

21   provide you with a quick typewritten version of the statement.

22             MS. NECHELES:  Thank you.

23             If we can know who the next witness is?  We know it's

24   one of three, but it would help us be organized here.

25             MS. LONERGAN:  Avi Goldstein after Richard -- Richard

IBGKGRA1

1    Ochetal, then we may play some calls, then Avi Goldstein.

2              MS. NECHELES:  Thank you.

3              THE COURT:  Any concerns about asking Mr. Ochetal to

4    come in now just to short-circuit that process step?

5              MR. BELL:  No, Judge.

6              THE COURT:  Great.

7              Can we please bring in Mr. Ochetal.

8              Counsel, can I have this typewritten instruction

9    handed to the parties during the testimony?

10             MS. NECHELES:  Thank you, your Honor.  That would

11   be --

12             MR. BELL:  Sure, your Honor.

13             THE COURT:  Good.  Thank you.  Let's proceed.

14             Mr. Daniels.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

IBGKGRA1                    Ochetal - Direct

1              (Jury present)

2              THE COURT:  Thank you, ladies and gentlemen.  You can

3     be seated.

4              So, ladies and gentlemen, thank you very much for

5     making it here through the snow and windy weather.  We're going

6     to start again.

7              Counsel for the United States, can you please bring

8     forth Mr. Ochetal?

9              MS. RAVENER:  Yes.  Thank you, your Honor.  We'll do

10    so.

11             THE COURT:  You can be seated.

12             Mr. Ochetal, let me remind you that you remain under

13    oath.

14             THE WITNESS:  Yes, sir.

15             THE COURT:  Thank you.

16             You can proceed, counsel.

17             MS. RAVENER:  Thank you very much, your Honor.

18     RICHARD OCHETAL, resumed.

19    DIRECT EXAMINATION CONTINUED

20    BY MS. RAVENER:

21    Q.  Good morning, Mr. Ochetal.

22    A.  Good morning.

23    Q.  Mr. Ochetal, when we left off yesterday, we were talking

24    about some of the essential requirements for certain kinds of

25    licenses at the license division.  Do you remember those

1  questions?

2  A.  Yes.

3  Q.  And we were specifically talking about the period when --

4  the first five years that you worked in the license division

5  prior to the time when you got involved with any kind of

6  bribery scheme.  Do you recall that?

7  A.  Yes.

8  Q.  We talked about some of those requirements, including a

9  letter of necessity; is that right?

10  A.  Yes.

11  Q.  And financial documents?

12  A.  Yes.

13  Q.  I believe you also mentioned utility bills; is that right?

14  A.  Yes.

15  Q.  Why would utility bills be required specifically for a

16  business carry or full carry license?

17  A.  Simply a utility bill is just to verify the business

18  address.

19  Q.  In the course of your duties, did you regularly gather all

20  of these kinds of documents when performing your job?

21  A.  Yes.

22  Q.  I believe we also talked about that interviews were had; is

23  that right?

24  A.  Yes.

25  Q.  What kind of gun licenses required an interview of the

1    applicant?

2    A.   Any type of license required an interview.

3    Q.   Again, during the time that you were performing your job,

4    following the rules for those five years, did you interview

5    applicants?

6    A.   Yes.  It was required.

7    Q.   Did you follow those rules?

8    A.   Yes.

9    Q.   Have you ever heard of a safeguard letter?

10   A.   Yes.

11   Q.   What is a safeguard letter?

12   A.   A safeguard letter is a letter from the applicant letting

13   the license division know if something should happen to the

14   applicant or licensee, who would take care of the firearm in

15   case they are sick, injured, deceased, or anything like that.

16   Q.   Under the rules, could you approve a gun license without a

17   safeguard letter?

18   A.   It was a requirement, so, no.

19   Q.   Have you heard of a cohabitant letter?

20   A.   I have.

21   Q.   What is a cohabitant letter?

22   A.   A cohabitant letter is a letter from any individual living

23   with the applicant who is over 18, who is going to have an

24   acknowledgment of the fact that there will be a firearm in the

25   home of the applicant.

1    Q.  In your understanding, what was the purpose of a cohabitant

2    letter?

3    A.  The purpose of that letter, in my understanding, was that

4    everybody in that household knew that there would be a firearm

5    in that house.  I believed it to be a safety issue for various

6    reasons.  One would be if police officers came to a location,

7    that everybody in that house would know that there was a

8    firearm in the confines of that location.

9    Q.  Are there forms for these things, the safeguard letter, the

10   cohabitant letter, and the like?

11   A.  Yes.

12   Q.  Where did people get those forms?

13   A.  They were part of the application that was available to

14   download and print online.

15   Q.  Under the rules, did you need a cohabitant letter before

16   you could approve a license?

17   A.  Yes.

18   Q.  Again, putting aside the times when you were taking bribes,

19   did you require these things before you approved a license?

20   A.  Yes.

21   Q.  In your experience, for applicants who were following the

22   rules, about how long did it take to get a full carry, or

23   business carry, license?

24   A.  Usually it took about six months, maybe a year.

25   Q.  Why did it take so long?

IBGKGRA1                        Ochetal - Direct

1   A.   It took a long time just based on the amount of time

2   invested into the investigation.  Like there was a lot of steps

3   to the investigation.

4   Q.   Specifically, had you ever handled an application before

5   for a full carry that had no connection to bribery or any other

6   kind of outside influence on your decision?

7   A.   Yes.

8   Q.   How many times had you done that?

9   A.   Handled just an application?

10  Q.   How many times have you handled applications for full

11  carries that had no connection whatsoever --

12            MS. NECHELES:  I object.

13  Q.   -- to bribery?

14            MS. NECHELES:  For form.

15            THE COURT:  Thank you.

16            Can you please rephrase the question?

17            MS. RAVENER:  Certainly, your Honor.

18  BY MS. RAVENER:

19  Q.   Approximately how many times had you handled applications

20  for full carries that were not part of any kind of bribery

21  scheme prior to the time when you started taking bribes?

22            MS. NECHELES:  Objection, your Honor.

23            THE COURT:  Thank you.

24            You can answer the question.

25            THE WITNESS:  Several times.  I mean, there were a

IBGKGRA1                    Ochetal - Direct

1    handful of applicants that applied for carry business licenses

2    or limited carry licenses.

3    BY MS. RAVENER:

4    Q.  During that time, about how many gun license applications

5    overall did you handle?

6    A.  You mean in that, like, five-year period?

7    Q.  Yes.

8            MR. MERINGOLO:  Objection.

9            THE COURT:  Thank you.

10           You can answer the question.

11           THE WITNESS:  Hundreds.

12   Q.  So is it fair to say there weren't that many full carry gun

13   license applications that you had to thoroughly vet because

14   there weren't that many applicants at all?

15           MS. NECHELES:  Objection.  He just said hundreds.

16           THE COURT:  Thank you.

17           Can you please rephrase the question?

18           MS. RAVENER:  Sure.

19   Q.  Out of the hundreds of applications that you handled during

20   those years, is it fair to say that only a small number were

21   full carry licenses?

22           MR. MERINGOLO:  Objection; leading.

23           THE COURT:  Thank you.

24           You can answer the question.

25           THE WITNESS:  Yes.

1   BY MS. RAVENER:

2   Q.  Of those, about how many do you remember approving

3   yourself?

4   A.  It might have been a couple, but offhand, I can probably

5   remember maybe one, if we're talking about that time period.

6   Q.  How long did it take you to work on that application?

7   A.  At least six months.

8   Q.  Why did it take so long?

9   A.  A couple of reasons.  One was the amount of time spent on

10  the investigation and also the amount of caseload we had.  So

11  it took a long time because we had to do an extensive

12  background check and extensive check on the background of the

13  business associated with the license that the applicant was

14  applying for.

15  Q.  Now, for this one that you approved, was it ultimately

16  approved overall by the license division?

17  A.  Ultimately, it was.

18  Q.  And what are some of the things you did to vet that

19  application before you approved it?

20  A.  Well, first and foremost, I had to do a criminal background

21  check, which goes with any license, so a fingerprint response

22  check, domestic violence check, order of protection, basically

23  find out any criminal history first.  Then moving on to the

24  business aspect associated with why they wanted this particular

25  license, we would require bank statements.  I would also

1    require utility bills, photos of the business, inside and out,

2    photos of the safe, letters, like contract letters of people

3    that they would conduct business with, tax returns, utility

4    bills, crimes against the business.  The letter of necessity

5    would need to be there, character reference letters, which was

6    also part of a regular license anyway.  That's kind of a

7    handful of documents I can remember that were required.

8    Q.  Did you work hard on the application?

9    A.  On this one?

10   Q.  Yes.

11   A.  Yeah.

12   Q.  What's the point of doing all that work?

13   A.  It was required.  It was just part of the investigation

14   process just to validate the proper cause.  You know, there

15   could be safety concerns, does this person really need access

16   to a firearm for a full carry for all day, all night.  So that

17   was part of the process of the investigation, to find out,

18   based on the documents they provided, why they really would

19   need that firearm.

20   Q.  At the time, did you know all of those rules for proper

21   cause well?

22   A.  Can you repeat that?

23   Q.  At the time you were working at the license division, did

24   you know all of the rules well?

25   A.  Very well.

1    Q.  And did you apply them, putting aside any bribery?

2    A.  Very well.

3    Q.  After you worked on, investigated, an application, did you

4    make a decision as to whether to approve or deny the gun

5    license at your level?

6    A.  Yes.

7    Q.  What would you do to reflect your decision?

8    A.  I would first do a writeup explaining why I approved the

9    license for the specific license they applied for.  After that,

10   going to our computer system and make my first approval for a

11   recommendation if I believed they were going to be approved.

12   Q.  You used the term "first approval."  What do you mean by

13   that?

14   A.  That's just my level of approval.  After I gather the

15   information, review it, make a determination of I think they

16   qualify for the specific license, it's reflected in my writeup,

17   and then I reflect it in the computer system, and then it's

18   forwarded to a supervisor to review it.

19   Q.  What was that computer system called, by the way?

20   A.  ALPS.

21   Q.  To be clear, when you made a first approval decision at

22   your level, was that a decision made by you as part of your job

23   as a police officer?

24   A.  Yes.

25   Q.  What would happen next after you made a first approval

IBGKGRA1                        Ochetal - Direct

1   decision?

2   A.  I would give the entire file to whoever at the time would

3   be my supervisor to review the case file, read my writeup and

4   my decision, review all the paperwork, and make their decision

5   if they agree with my decision or not.

6   Q.  In order to actually issue or print a license, did a

7   supervisor also have to make an approval?

8   A.  Yes.

9   Q.  And who were some of the supervisors in your chain of

10  command?  What were their positions?

11  A.  Sergeants and lieutenants, inspectors.

12  Q.  About how long did you work in the new application section

13  in the license division?

14  A.  About five or six years.  I worked in that section till

15  about 2015.  So from 2009 to 2015.

16  Q.  Around then, where did you go next?

17  A.  I went to the incidents section.

18  Q.  What is the incidents section?

19  A.  The incidents section is a unit in the license division

20  that handles any licensees that have gotten into any kind of

21  trouble.

22  Q.  What were your duties in the incidents section?

23  A.  My duties there were to review a case where a licensee got

24  into some sort of trouble, whether they got arrested, or

25  accused of domestic violence, or anything that was deemed

1    inappropriate conduct for a licensee.  We would review it and

2    make a determination on whether or not they should have their

3    license either returned to them, suspended, or revoked.

4    Q.  Who was your direct boss in the incidents section?

5    A.  Sergeant Villanueva.

6    Q.  About how long did you work in the incidents section?

7    A.  I'd say about a year.

8    Q.  So that's until sometime in 2016?

9    A.  About.

10   Q.  And what happened in 2016?

11   A.  Early on in 2016, I was transferred to the renewal section.

12   Q.  Was renewals still part of the license division?

13   A.  Yes.

14   Q.  Generally speaking, why were you transferred to renewals?

15   A.  At this point, I remember there being an email that was

16   sent to Inspector Endall and other high-ranking members --

17   Q.  And, Mr. Ochetal, let me pause you.  Without getting into

18   anything the email said, were there concerns at the license

19   division that caused your transfer to renewals?

20   A.  There were concerns, but this email sort of solidified

21   those concerns.

22   Q.  And, generally speaking, what were the concerns about?

23   A.  The concerns were about that there was consultants getting

24   help with applicants.

25   Q.  Were the consultants you referred to now the same people

1  who were paying bribes to you and others?

2  A.  Yes.

3  Q.  Mr. Ochetal, we talked about the way that you did your job

4  before you started taking bribes.

5       After you started taking bribes, did your work change?

6  A.  Yeah.

7  Q.  How so?

8  A.  I -- I would say I just didn't follow the rules to the T

9  like I used to be doing.

10  Q.  Did you do that for all the applications on your desk or

11  just the ones where you were taking bribes?

12  A.  I mean, just the ones at that point where I was taking

13  bribes from.

14  Q.  For the licenses where you took bribes, can you tell us

15  about some examples of how you bent the rules?

16  A.  Yeah.  Some of them would not have all the paperwork

17  necessary, so, you know, I would do my best to get it after the

18  fact of the license being issued, knowing who they were

19  associated with, obviously.  At times, I would let it be known

20  that, hey, the fingerprints aren't back yet, and a couple of

21  times it was, hey, we'll do a soft background check because we

22  had access to it, and we would do that.  So that was just a

23  couple of ways on how we did it.

24  Q.  And, in general, did you start approving licenses that

25  didn't have proper paperwork in exchange for bribes?

IBGKGRA1                    Ochetal - Direct

1    A.  Yes.

2    Q.  How did you come to meet Jeremy Reichberg?

3    A.  Just met him through my work in the license division.

4    Q.  Do you remember meeting him?

5    A.  Yes.

6    Q.  What happened that day when you met Jeremy Reichberg?  Did

7    you know he was coming?

8    A.  I was told he was coming.

9    Q.  By whom?

10   A.  I received a text message from Sergeant Villanueva.

11   Q.  In general, what information did you have before you met

12   Mr. Reichberg?

13   A.  I just received the text message from Dave that he said

14   Jimmy Grant's got a guy coming in, his name is Jeremy

15   Reichberg, you know, and take care of him.  So I was in the

16   office, and I waited for him to come in.

17   Q.  Let me pause you.  What does it mean to take care of

18   someone?

19   A.  I guess, in general, it would be the same way we took care

20   of consultants' clients.

21            MS. NECHELES:  Objection to the guess, your Honor.

22            THE COURT:  Thank you, counsel.

23            Can you reframe the question?

24   BY MS. RAVENER:

25   Q.  You used the phrase "take care of him."  What do you mean

1    by "take care of him"?

2              MS. NECHELES:  Your Honor, object to the form.

3              THE COURT:  Thank you.

4              You can answer the question.

5              MS. NECHELES:  What he understood then?

6              THE COURT:  Thank you.

7              You can answer the question, Mr. Ochetal.

8              THE WITNESS:  "Take care of" was kind of a term of red

9    carpet treatment that was known, just not make somebody wait to

10   be fingerprinted, you know, bring them in right away, that kind

11   of thing.

12   BY MS. RAVENER:

13   Q.  Where did you develop that understanding of what it meant

14   to take care of someone?

15   A.  I don't know.  It just kind of at some point when all of

16   this became common practice.

17   Q.  What do you mean by "all this"?

18   A.  At this time period we're discussing where consultants were

19   bringing people.  That was the time period I'm discussing.

20   Q.  You mentioned you were told Reichberg was Jimmy Grant's

21   guy, correct?

22   A.  Yes.

23   Q.  Who did you understand Jimmy Grant to be?

24   A.  I understood Jimmy Grant to be a high-ranking member of the

25   police department.

IBGKGRA1                        Ochetal - Direct

1   Q.  Had you met him before?

2   A.  I'd say a couple of times.

3   Q.  Where?

4   A.  Just working in the license division.

5   Q.  When you saw Jimmy Grant in the license division, what was

6   he typically doing, to your observations?

7   A.  Just talking to people.

8   Q.  Anyone in particular?

9   A.  I would have seen him talking to Sergeant Villanueva,

10  Inspector Endall, maybe others.  So he was just really there

11  conversing.

12  Q.  Did you know what they were talking about?

13  A.  No.

14  Q.  Did Jeremy Reichberg actually come into the license

15  division that day after you were told he was coming?

16  A.  Yes.

17  Q.  Was he alone?

18  A.  No.

19  Q.  Who was with him?

20  A.  He was with another guy.

21  Q.  Who was that other guy?

22  A.  A guy named Jona Rechnitz.

23  Q.  What did you do when Jeremy Reichberg and Jona Rechnitz

24  came to the license division that day?

25  A.  Met them out in the hallway and brought them in towards my

1    desk.

2    Q.  Did they wait on line?

3    A.  No.

4    Q.  What did you do when you got to your desk with Jeremy

5    Reichberg and Jona Rechnitz?

6    A.  I just remember them putting their -- or license

7    information into the computer on his application.

8    Q.  So did Jeremy Reichberg have an application at that point

9    in time?

10   A.  Yes, he had an application.

11   Q.  Did it contain certain information?

12   A.  Yes.

13   Q.  You said you put that information into the computer; is

14   that right?

15   A.  I did.

16   Q.  Where did you get the information that you put into the

17   computer?

18   A.  From what was ever on the application.

19   Q.  And who gave you that application?

20   A.  Mr. Reichberg.

21   Q.  What did Jeremy Reichberg say to you during this process?

22   A.  I mean, after I put his information in the computer, I did

23   remember him saying -- while I was fingerprinting him, because

24   that was the next step, he said he got -- that he had got Jimmy

25   Grant promoted, and he said to me that he was -- after this,

IBGKGRA1                          Ochetal - Direct

1    was going up to the chief of department's office and just

2    wanted to know if this would be done when he came back down.

3    Q.  Let me pause you there.  What does it mean to go to the

4    chief of department's office?

5    A.  I don't know.  I mean --

6    Q.  Let me ask you a different way.  Within the New York City

7    Police Department, who is the chief of department?  What does

8    that role mean?

9    A.  I mean, there's the commissioner, and then there's the

10   chief of the department, so I guess he's like second in command

11   or first in command, as far as wearing a uniform.

12   Q.  Do you remember who the chief of department was at the

13   time?

14   A.  At the time, it was Chief Banks.  He said he knew Chief

15   Banks, so when he said he was going up there, I -- you know, I

16   assumed that's where he was going.

17   Q.  When you say he knew Chief Banks, who are you talking

18   about?  Who told you that they knew Chief Banks?

19   A.  Mr. Reichberg.

20   Q.  Now, correct me if I get this wrong, but I believe you also

21   stated that Mr. Reichberg asked you whether this will be done

22   when he comes back?

23            MR. MERINGOLO:  Asked and answered.

24   Q.  Something along those lines?

25            THE COURT:  Thank you.

IBGKGRA1                    Ochetal - Direct

1            You can answer the question.

2            THE WITNESS:  Yes.

3   BY MS. RAVENER:

4   Q.  What did you understand that question to be asking you?

5   A.  I kind of thought at the time it meant his license would be

6   done.

7   Q.  How did you react to that?

8   A.  I mean, I was just surprised that he said it, seeing -- to

9   me, it just came off like -- I would use the word, like,

10  arrogant, but I also thought it meant -- like to me, it meant

11  he was a big shot because he's going up to -- I mean, I don't

12  go up there, so that's how it came off to me.

13  Q.  Had you ever had a person come in and ask for a gun license

14  on the same day as their application before?

15  A.  No, not that I remember.

16  Q.  What about for a full carry gun license?

17  A.  No.

18  Q.  Based on what you knew, did Mr. Reichberg have any

19  experience with owning a gun?

20  A.  No.

21  Q.  Based on what you knew, did Mr. Reichberg have any training

22  in owning a gun?

23            MR. MERINGOLO:  Objection.

24            THE COURT:  Thank you.

25            You can answer the question.

1              THE WITNESS:  I did not know him to have any training.

2    BY MS. RAVENER:

3    Q.  So how did you respond to Mr. Reichberg's request?

4    A.  Like I said, I was shocked that he said it, surprised that

5    he would say it, but I didn't, you know, fight back or

6    anything.  I just said, hey, all I know is that we need to get

7    your fingerprints back before anything.

8    Q.  You mentioned that Mr. Reichberg had brought an

9    application.  Do you remember whether he had any other

10   paperwork with him that day?

11   A.  I don't remember exactly what he had.

12   Q.  Based on what you can recall, had he brought all the

13   paperwork that was necessary for a full carry gun license?

14   A.  For a full carry license?  No.

15   Q.  What kind of license was he applying for?

16   A.  A carry business, or full carry.

17   Q.  Did you speak to Mr. Reichberg about the paperwork

18   required?

19   A.  I believe I did mention that he needed additional

20   paperwork, yes.

21   Q.  What was his reaction back to you?

22   A.  His reaction seemed poised, I guess, as if he would get it

23   and didn't seem bothered, I guess.

24   Q.  Did he take any notes about what was required?

25   A.  I don't remember him taking notes.

IBGKGRA1                          Ochetal - Direct

1    Q.  What impression did Mr. Reichberg's behavior give you?

2    A.   In totality, the impression I got was that -- like I said,

3    that he was some sort of a big shot.  I didn't know him on any

4    level, but -- so maybe he was, maybe he wasn't, but the

5    impression I got was he was somebody of some kind of

6    importance.

7    Q.  What happened next, after you had this conversation with

8    Mr. Reichberg in the license division?  Did he leave the

9    license division at that point, or did something else occur?

10   A.  Well, he left to go, I'm assuming, wherever he said he was

11   going to, and then eventually came back in to the license

12   division.

13   Q.  Was that the same day or a different day that he came back?

14   A.  That was on the same day.  I can't recall how much time had

15   elapsed.  He went where...

16   Q.  When he came back, where were you?

17   A.  I was at my desk.

18   Q.  What did you see Mr. Reichberg do when he returned to the

19   license division?

20   A.  I just saw him walking to Inspector Endall's office.

21   Q.  Can you remind us, who is Inspector Endall?

22   A.  He's pretty much the boss of the license division.

23   Q.  Where was your desk in relation to Inspector Endall's

24   office?

25   A.  I don't know.  I'd estimate maybe 60-some-odd feet away,

1  maybe more.

2  Q.  When Mr. Reichberg returned, did he walk by you in order to

3  go to Inspector Endall's office, or were you located somewhere

4  else?

5  A.  Well, he would have had to have passed me, yes.

6  Q.  Did you see him do that?

7  A.  Yes.

8  Q.  What happened next?

9  A.  After that, he was inside Inspector Endall's office.  I do

10  not remember how much time passed.  And eventually he came back

11  out.

12  Q.  Did you speak with Mr. Reichberg again that day?

13  A.  I would say so.  I think -- I'm sure he said bye.  I'm sure

14  he understood that he needed some kind of some additional

15  paperwork and, you know, eventually walked out.

16  Q.  Did you speak with Inspector Endall that day?

17  A.  Yes.  At some point, he came out of his office.  I believe

18  we both had an understanding that we needed fingerprints --

19          MS. NECHELES:  Objection, your Honor.

20          THE COURT:  Thank you.

21          You can continue.

22          THE WITNESS:  In the conversation I had with Inspector

23  Endall, we understood that we needed his fingerprints to come

24  back and additional paperwork.  I mean, I would say that was

25  the gist of the conversation.

IBGKGRA1                          Ochetal - Direct

1    Q.  I'd like to show you what's in evidence as Government

2    Exhibit 732.

3            Do you recognize this?

4    A.  Yes.

5    Q.  And what is it?

6    A.  It looks like an ALPS printout of an application.

7    Q.  What is the name on the application?

8    A.  The name is Jeremiah Reichberg.

9    Q.  What's the application date?

10   A.  It is 8/21/2014.

11   Q.  What's the application type?

12   A.  Business carry.

13   Q.  Do you know who entered this information into this record

14   or into the computer system that maintains this record?

15   A.  That would be me.

16   Q.  And where did you get that information from that we see

17   here?

18   A.  This information is received from the application of the

19   applicant.

20   Q.  Let's turn to the field marked "Business Address."  Do you

21   see that?

22   A.  I do.

23   Q.  And do you see corporate name or corp. name?

24   A.  Yes.

25   Q.  What does it say there?

IBGKGRA1                    Ochetal – Direct

1    A.  It says, "Taly Diamonds Ltd."

2    Q.  Do you see the field marked "Business Description"?

3    A.  It says, "wholesale diamonds."

4    Q.  Where did you get that information from?

5    A.  Just the same thing, on the application.

6    Q.  Who gave you that application?

7    A.  Mr. Reichberg.

8    Q.  In your dealings with Mr. Reichberg, did you speak with him

9    about what he did for a living?

10   A.  I remember him mentioning he was in the diamond business.

11   Q.  Would that matter for his application?

12   A.  I mean, anything would matter.  It just came down to

13   proving proper cause.  So it could matter.

14              (Continued on next page)

1  BY MS. RAVENER:

2  Q.  Does the business name matter when you're reviewing a gun

3  license application?

4  A.  The business name matters, it's just we use the business

5  name to verify the validity of it.

6  Q.  And does the kind of business matter when deciding whether

7  to approve a business carry or full carry gun license?

8  A.  It would.

9  Q.  Why?

10  A.  Because certain businesses are known to be targets of say

11  armed robbers.  Some businesses deal with high volumes of cash,

12  could even be jewelry, it could be anything that's of high

13  value, but it has to be some significance to what it is they're

14  doing in handling that makes them a target of why they need

15  protection.

16  Q.  So to be clear, would any kind of business of New York City

17  always qualify for a full carry gun license?

18  A.  No.

19  Q.  What are some of thing things you look for to decide if the

20  business does qualify?

21  A.  Well, you have to know -- could be the amount of locations,

22  the hours of operation, crimes against the business, obviously

23  we have to verify the business through several means, just some

24  of the factors.

25  Q.  For this application, did you ever verify whether

1    Mr. Reichberg's employment at this business was real?

2    A.   No.

3    Q.   Was it part of your job to do that?

4    A.   It should have been, yes.

5    Q.   Why didn't you do it?

6    A.   I understood it wasn't completely necessary.

7    Q.   Where did that understanding come from?

8    A.   Well, I knew that this applicant was in some way, shape or

9    form connected to James Grant, connected to Inspector Endall as

10   well, so I reached an understanding that what I was used to

11   wouldn't really come into play.

12   Q.   Was there ever a time that you asked for additional

13   paperwork on this license?

14   A.   I asked for some paperwork, yes.

15   Q.   And what happened?

16   A.   I believe I did receive some paperwork.

17   Q.   Do you believe that ultimately all the required paperwork

18   was supplied?

19   A.   Probably not all, no.

20   Q.   Why do you say that?

21   A.   I just knew that some paperwork was there, and as far as

22   how exactly legitimate it was to the business did not matter.

23   Q.   Why didn't it matter?

24   A.   Because I was under the assumption it was going to get

25   approved one way or another.

1    Q.  Where did you get that belief?

2    A.  Well, the belief was told to me when Inspector Endall told

3    me to wrap up the case.

4    Q.  So let's talk about that.  What decision did you ultimately

5    make about Reichberg's gun license application?

6    A.  Ultimately I approved it.

7    Q.  Why did you approve it?

8    A.  There was just a day where --

9         MS. NECHELES:  Your Honor, this has been asked and

10   answered.

11        THE COURT:  It's fine, counsel, you can proceed.

12        You can answer the question, Mr. Ochetal.

13   A.  There was just a day where Inspector Endall came out of his

14   office and instructed me on approving Jimmy Grant's guy,

15   Mr. Reichberg, for his license.

16   Q.  How do you recall Inspector Endall conveying that to you?

17   A.  He simply came out and said:  Wrap up Jimmy Grant's guy,

18   Mr. Reichberg.

19        And I was like:  No problem, boss.  It's going for a

20   full?

21        He said:  Yes, full.  Give it to Dave.

22        That's what I did.

23   Q.  Why did you ask Inspector Endall:  Is it for a full?

24   A.  Well, because I wanted to know what I was approving it for,

25   just based on prior experience dealing with applicants that

1   might have been brought in, and it just seemed like usually

2   they had limited carries, so I didn't want to make that

3   mistake.  So I verified with him what type of license he wanted

4   him to be approved for.

5   Q.  What did you understand "full" to mean?

6   A.  That it was for a carry business.

7   Q.  And what instruction did Inspector Endall give you in

8   response to your question:  Is it for a full?

9   A.  He said:  Yes, for a full.

10  Q.  And you mentioned Inspector Endall also instructed you give

11  it to Dave.  Am I getting that right?

12  A.  Yes.

13  Q.  What did you understand that to mean?

14  A.  That just meant at that point to give it to him to give it

15  a license number.

16  Q.  If you hadn't received that instruction, would you have

17  approved Jeremy Reichberg's gun license for a full carry at

18  that time?

19  A.  No, not at that time.

20  Q.  Why not?

21  A.  Not everything was there.  Just based on prior experiences

22  of people applying for full carry and getting them, if a review

23  process actually took place, it wouldn't have passed.

24  Q.  Based on your experience at the license division, if Jimmy

25  Grant was not involved, would you have approved Jeremy

1    Reichberg for a full carry?

2            MR. MERINGOLO:  Objection.

3            THE COURT:  Thank you.  You can answer the question.

4    A.  I mean I wouldn't.

5    Q.  Why not?

6    A.  I approved it based on Inspector Endall giving me

7    instructions of who it was, and so I did it.

8    Q.  Did Inspector Endall ask for your judgment as to whether

9    this license should be approved based on the merits?

10   A.  No, there was no actual review of the file, and I knew

11   that.

12   Q.  Let's go back to Government Exhibit 732 for a moment, if we

13   can.

14           If we could look at the area that says license permit

15   details, what does it say under type?

16   A.  Business carry.

17   Q.  What does it say under status?

18   A.  Approved.

19   Q.  What does it say under first issued date?

20   A.  10/29/2014.

21   Q.  What does first issued date mean in this kind of record?

22   A.  In this record it would be indicating when the license was

23   first issued or printed out.

24   Q.  And who had to approve the license before it could be

25   issued or printed out?

IBGTGRA2                         Ochetal - Direct

1   A.  Systematically at least two people.

2   Q.  Would you be one of those people?

3   A.  I would be the first.

4   Q.  And who else?

5   A.  Sergeant Villanueva or another supervisor.

6   Q.  Who were some of those supervisors at the time who could

7   have been involved in this?

8   A.  Either Lieutenant Paul Dean or Inspector Endall himself.

9   Q.  Now turning back to the application date --

10            MS. RAVENER:  Could we highlight that as well?

11  Q.  Do you see that?

12  A.  Yes.

13  Q.  So about how much time passed between the time Jeremy

14  Reichberg actually put in an application for this gun license

15  and the time that it was approved?

16  A.  About two months.

17  Q.  What was going on with this application over those two

18  months?

19  A.  Nothing much.  I don't know.

20  Q.  Why did it take two months?

21  A.  I believe mainly because we were waiting for a fingerprints

22  response to come back.

23  Q.  Why were you waiting for the fingerprint response to come

24  back?

25  A.  Just part of normal procedure.

1  Q.  And you didn't follow all of the normal required procedures

2  for this gun license, correct?

3  A.  No.

4  Q.  So why did you wait for the fingerprints?

5  A.  I don't really remember that.  I figured we at least needed

6  that.

7  Q.  Why would you at least need fingerprints?  What do they

8  show?

9  A.  Criminal history.

10  Q.  Now you testified that this application -- well, I'm sorry,

11  let me back up.  At the time of this application, do you

12  remember what was going on with the fingerprint systems at the

13  license division that you relied on?

14  A.  At that time and for a while there it was just a long wait

15  to get them back.  I guess -- I don't know the actual reason,

16  but we just weren't getting them back at a normal rate.

17  Q.  It was taking longer than it typically had, is that right?

18  A.  Yes.

19  Q.  And looking at Government Exhibit 732, you testified that

20  Mr. Reichberg's license was approved in about two months, is

21  that right?

22  A.  Yes.

23  Q.  Now how does that speed compare with the time it typically

24  takes to process a business carry license application?

25  A.  Typically at this point we're looking at six months,

IBGTGRA2                        Ochetal - Direct

1    minimum, to a year, a lot of times.  That also depended on

2    caseload as well.

3    Q.  Why did your approval of this license for Jeremy Reichberg

4    go faster than that?

5              MS. NECHELES:  Your Honor, asked and answered.

6              THE COURT:  Thank you.  You can answer the question.

7    A.  I was instructed to close it out, and I did.

8    Q.  And to be clear, who gave you the instruction to close it

9    out?

10   A.  Inspector Endall.

11   Q.  Now we talked about the required paperwork.  Do you know

12   whether this file had utility bills?

13   A.  Maybe, maybe not.  I don't remember.

14   Q.  Do you know whether it had bank statements?

15   A.  Possibly.  I don't remember exactly what was there.

16   Q.  Do you know whether it had tax returns?

17   A.  I don't remember.  Possible, but I don't remember.

18   Q.  Do you know whether it had safeguard letter?

19   A.  It's possible.

20   Q.  Do you know whether it had a cohabitant letter?

21   A.  That would also be possible.

22   Q.  Did it matter to you whether it had all the required

23   paperwork?

24   A.  No.

25   Q.  Why not?

1          MS. NECHELES:  Your Honor, this is asked and answered.

2          THE COURT:  Thank you.  It would be nice to move

3    along, but you can answer this question.

4    A.  Say it again?

5    Q.  Did you check whether this -- well, let me back up and ask

6    it a different way.

7          Based on your review, while you're not certain which

8    documents were in the file, do you know whether this file was

9    complete and had everything required?

10          MR. MERINGOLO:  Objection.

11          THE COURT:  You can answer the question.

12    A.  No.

13          MS. NECHELES:  Your Honor, I object.

14          THE COURT:  I accept the answer.  You can proceed.

15    Q.  At the time that you handled this application, do you know

16    what was in the file?  Had you been familiar with the file?

17    A.  No.

18    Q.  Why not?

19    A.  It didn't matter that much to me.

20    Q.  Why didn't it matter?

21          MS. NECHELES:  Your Honor, asked and answered.

22          THE COURT:  Sustained.

23    Q.  Let's turn to Government Exhibit 733, which I believe is

24    also in evidence.  If we could turn to the last page.

25          Mr. Ochetal, do you recognize this?

1    A.  Yes.

2    Q.  What is it?

3    A.  It's a photocopy of a business carry handgun license.

4    Q.  And what does it say at the top?

5    A.  Unrestricted concealed carry handgun license.

6    Q.  What does it say in bottom dark banner?

7    A.  Business carry.

8    Q.  What is the name on this license?

9    A.  Reichberg, Jeremiah.

10   Q.  What does it say on the date issued?

11   A.  11/11/2014.

12   Q.  What does it say underneath the address?

13   A.  Taly Diamond LTD, management.

14   Q.  Now we're seeing this on a photocopy, but what color would

15   this kind of license typically have been?

16   A.  The top and bottom where it's shaded in black would have

17   been red.

18   Q.  So you see there's a date where it says issued, and it says

19   11/11/2014, you see that?

20   A.  Yes, I do.

21        MS. RAVENER:  If we could pull up Government

22   Exhibit 732 next to it and highlight the first issued date.

23   Q.  Mr. Ochetal, looking at the first issued date of

24   October 29, 2014 and the issue date printed on the license

25   where it says 11/11, November 11, 2014, why are those two dates

1    different?  What's the difference between those kinds of

2    fields?

3    A.  The one that says 10/29/14 could be the date the license

4    was issued and printed, and then going back to the one on the

5    photograph of the license says 11/11/2014, that already has a

6    firearm attached to it, so it could have been reprinted and

7    that was the date it was reprinted with the firearm on it.

8    Q.  So what happens in the gun licensing process that would

9    cause you to reprint a license with a firearm on it?

10   A.  Initially you get a license and there is no firearm on it

11   until you buy one.

12   Q.  And what happens when you buy one, when you buy a firearm

13   in New York City?

14   A.  When you buy a firearm you bring it into police

15   headquarters to the license division, we inspect it, check the

16   serial number, we put it in the computer, update the file, and

17   then now when we reprint the license the license comes out with

18   the firearm and serial number printed on the back, because

19   initially it doesn't have it until you buy one.

20   Q.  And if we could keep both of these up but focus on

21   Government Exhibit 732 and highlight the field that says

22   purchase DT.

23   A.  Yes.

24   Q.  Do you see that?

25   A.  Yes.

1  Q.  What does it say there?

2  A.  10/20/2014.

3  Q.  What does that indicate to you?

4  A.  It would indicate the date the purchase order was issued.

5  Q.  What do you mean by the purchase order?

6  A.  The purchase order authorization is the form, pink, small

7  piece of paper that is given to the licensee with the license

8  to go to a gun dealer to purchase a firearm.  So on the form

9  you're supposed to write the dates by hand on the top and then

10  when they come back for the gun inspection they bring that form

11  in, enter it in the computer, you're supposed to enter the

12  purchase authorization date amongst other information,

13  including the serial number of the firearm, et cetera.

14  Q.  And are you supposed to issue a purchase order before you

15  approve a gun license?

16  A.  No.

17  Q.  In describing the first issued date, I believe you

18  explained that that's the date that the license was first

19  printed, is that right?

20  A.  That would be right.

21  Q.  Is it possible that you could have approved a gun license

22  each earlier than a first issued date when you printed the

23  license?

24  A.  Yeah, this doesn't -- none of this stuff tells me when it

25  was approved.

1  Q.  Well, can you tell whether you would have had to have

2  approved this license before or after the first issued date?

3  A.  It couldn't be after, it would be either on that date or

4  before.

5  Q.  Now in your experience in the license division Mr. Ochetal,

6  how common would it be for a first-time applicant to get a full

7  carry gun license in cases that had nothing to do with bribery?

8          MS. NECHELES:  Objection.

9          THE COURT:  Sustained.

10  Q.  How common would it be for a first time applicant to get a

11  full carry license when you were doing your job at the license

12  division?

13  A.  Pretty uncommon.

14  Q.  Now earlier you mentioned some named Jona Rechnitz, do you

15  remember that?

16  A.  Yes.

17  Q.  And how did you meet him?

18  A.  I remember him accompanied Jeremiah Reichberg into the

19  license division.

20  Q.  Do you know whether Jona Rechnitz came back to the license

21  division after that day?

22  A.  Eventually I found out he did.

23  Q.  How did you learn that?

24  A.  Because one day I received his file on my desk.

25  Q.  Let me direct to what is in evidence as Government

1    Exhibit 729.  Do you recognize this?

2              And it's a multi-page document.  If it's easier to

3    look in your binder before you, Mr. Ochetal, you can do that as

4    well.

5    A.  This is just an enclosure index.

6    Q.  If we could turn back to the second page, what kind of

7    document do we see here?

8    A.  This is just a checklist of items to check off as they are

9    received as required to be in this particular type of an

10   application.

11   Q.  And about how many things are checked off?

12   A.  Five.

13   Q.  And this is an index for a limited carry, is that correct?

14   A.  Yes.

15   Q.  Was there a similar kind of checklist for a full or

16   business carry?

17   A.  It would be very similar, yeah.

18   Q.  Let's turn next -- I believe to the next page, but let me

19   see, maybe a little further in.  If we could turn to SDNY 12010

20   which says handgun license application at the top.

21             Do you see that there?

22   A.  Yes.

23   Q.  What's the name here?

24   A.  Jona Rechnitz.

25   Q.  And can we skip down a little bit to the employment

1    information.

2          And do you see where it says type of business?

3    A.   Yes.

4    Q.   What does it say there?

5    A.   Type of business, it just says diamonds.

6    Q.   And what's the name of the business listed on this one?

7    A.   LTR Training LTD.

8    Q.   What does it say under business address?

9    A.   580 Fifth Avenue Number 800.

10   Q.   What does it say under occupation?

11   A.   Manager.

12   Q.   Let's turn to the next page, and the page after that, and

13   after that.

14         What does it say at the top of this page?

15   A.   It says all applicants for a carry license for use in

16   connection with a business or profession must the answer the

17   following questions in the space provided.  If additional space

18   is necessary, continue your letter on reverse side.  In all

19   cases the form provided must be used.

20         Number one, a detailed description of the applicant's

21   employment and an explanation of why the employment requires

22   the carrying of a concealed handgun.

23         MS. RAVENER:  Let's scroll down on this page to the

24   date.

25   Q.   Do you see that date and signature line?

1   A.  Yes.

2   Q.  And is there a signature here?

3   A.  Yes.

4   Q.  What does the date say next to that signature?

5   A.  11/11/2014.

6          MS. RAVENER:  Could we pull that up next to Government

7   Exhibit 732, last page.

8          733, last page.  I apologize, Mr. Hamilton.

9          Could we focus on the issued date there.

10  Q.  How does the date on Mr. Rechnitz's letter of necessity

11  compare to the issued date on Mr. Reichberg's license?

12  A.  They are the same date.

13  Q.  Turning back to Government Exhibit 729, and if we could

14  turn to page SDNY 12019, what is this kind of document we're

15  looking at here, Mr. Ochetal?

16  A.  That is a safeguard form.

17  Q.  What is the name of the applicant/licensee?

18  A.  That would be Jona Rechnitz.

19  Q.  And do you see that there is a date on this document

20  further down where it says signature of person agreeing to

21  safeguard firearms?  Do you see the date there?

22  A.  I do.

23  Q.  What does the date say?

24  A.  11/11/2014.

25  Q.  Do you see an area that says witness's name?

1    A.  Yes, I do.

2    Q.  What is printed where it says witness's name?

3    A.  Jeremiah Reichberg.

4    Q.  Let's turn to Government Exhibit 730, which is marked for

5    identification.

6              Do you recognize this?

7    A.  Yes, it's an ALPS printout.

8    Q.  And is this the same kind of ALPS printout that we were

9    looking at before that you dealt with in the course of your

10   duties in the license division?

11   A.  Yes, it's the same.

12   Q.  Is it for a different person?

13   A.  Yes.

14         MS. RAVENER:  Your Honor, the government offers

15   Government Exhibit 730, which is also offered pursuant to

16   stipulation 1704.

17         THE COURT:  Thank you.  Counsel?

18         MS. NECHELES:  No objection.

19         MR. MERINGOLO:  No objection.

20         THE COURT:  Thank you, I'm accepting Exhibit 730 into

21   evidence.

22         (Government's Exhibit 730 received in evidence)

23         THE COURT:  You can proceed.

24         MS. RAVENER:  If we could publish 730.

25   Q.  Mr. Ochetal, what is the name on this ALPS record?

1  A.  Jona Rechnitz.

2  Q.  What does it say next to application date?

3  A.  11/12/2014.

4  Q.  And what does it say under application type?

5  A.  Limited carry.

6  Q.  Do you know why Mr. Rechnitz was applying for a different

7  kind of license from Mr. Reichberg, a limited carry instead of

8  a business carry?

9  A.  I believe they were associated in the same business, so it

10  was common practice that if two people were in fact in the same

11  business not both would have a full carry.

12  Q.  And when you refer to common practice, what do you mean?

13  A.  By the rules, just there was no need to have two full

14  carries for the same exact business.

15  Q.  So if two people from the same business applied for a full

16  carry, what would you typically tell them?

17  A.  If one of them qualified for a full, there would only be

18  one, and then the other may get a limited carry, or both might

19  get the limited carry, it all depends.

20  Q.  How did you learn that Mr. Rechnitz and Mr. Reichberg

21  worked for the same business?

22  A.  When they came in together when Mr. Reichberg came in for

23  his license they said they were in the same business.

24  Q.  Were you assigned to handle Mr. Rechnitz's application at

25  some point?

1   A.  Yes.

2   Q.  To your understanding, why were you assigned that folder?

3   A.  I just understood that there was a relation between him and

4   Jeremiah Reichberg, so my understanding was to treat it the

5   same way and act on it when told to act on it.

6   Q.  Did you ever come to be told to act on Mr. Rechnitz's

7   application?

8   A.  No.

9   Q.  So did you approve it?

10  A.  No.

11  Q.  Now by 2015 was handling new applications part of your job?

12  A.  No.

13  Q.  Why not?

14  A.  At that point I was assigned to the incidents section.

15  Q.  And you had a different role than handling new applications

16  typically?

17  A.  I was supposed to, yes.

18          MS. RAVENER:  One moment, your Honor.

19          THE COURT:  That's fine.  Please take your time.

20          (Pause)

21  BY MS. RAVENER:

22  Q.  Mr. Ochetal, you testified that you personally pled guilty

23  to certain crimes, is that right?

24  A.  Yes.

25  Q.  Have you been sentenced yet?

1    A.  No.

2    Q.  What is your understanding of the maximum sentence you

3    could face, sir?

4    A.  Up to 15 years imprisonment.

5    Q.  After you surrendered yourself but before your guilty plea

6    did you begin to cooperate with the government?

7    A.  I did.

8    Q.  As part of your cooperation have you provided information

9    regarding your conduct and conduct of others?

10   A.  Yes.

11   Q.  And as part of your guilty plea did you enter into a

12   cooperation agreement with the government?

13   A.  Yes.

14   Q.  Let me show you what has been marked for identification as

15   Government Exhibit 3515-02.  And you should have this in front

16   of you in your binder as well, Mr. Ochetal, if you would like

17   to refer to it there.

18           Do you recognize Government Exhibit 3515-02?

19   A.  I don't even know where it is.

20   Q.  Hold on one moment while we try to pull it up on the screen

21   for you.

22           Mr. Ochetal, it's also now on your screen, if that

23   will help you.

24   A.  Yes.

25   Q.  Do you recognize this?

1    A.   Yes.

2    Q.   What is it?

3    A.   It's an agreement between me and the United States

4    government.

5    Q.   Is it your cooperation agreement?

6    A.   Yes.

7            MS. RAVENER:  Your Honor, the government would offer

8    3515-02 into evidence.

9            THE COURT:  Thank you.  Counsel?

10           MS. NECHELES:  No objection, your Honor.

11           MR. MERINGOLO:  No objection.

12           THE COURT:  Thank you.  I'm accepting 3515-02 into

13   evidence.

14           (Government's Exhibit 3515-02 received in evidence)

15           THE COURT:  You can proceed.

16   BY MS. RAVENER:

17   Q.   Mr. Ochetal, is this your entire agreement with the

18   government?

19   A.   Yes.

20   Q.   What is your understanding of your obligations under the

21   agreement?

22   A.   My understanding is that I was to provide truthful

23   information about criminal conduct and such by myself and that

24   of others.  My understanding was also to testify on behalf in

25   regards to this information when required to, and to not commit

1    any other crimes.

2    Q.  What is your understanding of what the government will do

3    if you comply with the agreement?

4    A.  My understanding is that they would supply a letter to the

5    Court known as a 5K letter.  My understanding of the letter is

6    that it is, in my estimation, a report card on my conduct,

7    negative and positive, prior and existing, and reflects any

8    bad, any good or whatever, that I have done.

9    Q.  Would it include the crimes you committed, an explanation

10   of the crimes you committed?

11   A.  Yes.

12   Q.  And will it also include steps you have taken since then?

13   A.  Yes.

14   Q.  And what's the purpose of the letter, to your

15   understanding?

16   A.  The purpose of the letter -- I just understood it to be,

17   like I said, like a report card, reflection upon my conduct on

18   both ends of the spectrum, and to be submitted to the Court at

19   the appropriate time.

20   Q.  Will the government make any recommendation about what

21   specific sentence you will receive?

22   A.  No.

23   Q.  Who determines what your sentence will be?

24   A.  The judge will.

25   Q.  If the government sends the letter, what is the maximum

1    sentence you will face?

2    A.  15 years in jail.

3    Q.  What do you hope to receive by cooperating with the

4    government?

5    A.  Just hope to receive as much leniency as possible.

6    Q.  Has anyone from the government or anyone else made any

7    promise to you about what your sentence will be?

8    A.  No.

9    Q.  If you violate the terms of your cooperation agreement,

10   what is your understand of whether the government will still

11   write the letter to the judge?

12   A.  They won't.

13   Q.  Mr. Ochetal, if you violate the terms of your cooperation

14   agreement, what is your understanding of whether you get to

15   take back your guilty plea?

16   A.  I can't.

17   Q.  If you lie during your testimony today, what is your

18   understanding of what can happen as a result?

19   A.  I believe I could be further charged with lying in court.

20   Q.  In total, during your time at the NYPD gun license

21   division, approximately how many full carry licenses did you

22   approve for first-time applicants?

23   A.  What period are you talking about?

24   Q.  The entire time, Mr. Ochetal, approximately how many times

25   did you approve full carry licenses for first-time applicants

1    who had no other license at all?

2    A.   Offhand I could definitely remember one.  There might have

3    been another here or there, but very few and far between.  I

4    can only recall really one.

5    Q.   Is that each when you were taking bribes?

6    A.   As far as I remember, yes.

7    Q.   So when you were taking bribes, what would you do instead?

8    A.   Instead the process was to issue limited carries at first

9    and then upgrade them.  "Limited carry" meant that they had

10   access to carry a firearm, I don't know, Monday, Tuesday and

11   Wednesday, other than that they couldn't.  Then they would get

12   upgraded to more days, more times, and eventually get upgraded

13   to a full carry.  So they wouldn't get the full carry off the

14   bat, but yes, they would eventually get it.

15   Q.   And that's something that you would do in exchange for

16   bribes, give limited carry and then upgrade it later, is that

17   right?

18   A.   Yes, that was part of the process.

19   Q.   About how many times did you approve a full carry gun

20   license that you viewed as entirely legitimate?

21           MS. NECHELES:  Objection.

22           MR. MERINGOLO:  Objection.

23           THE COURT:  Thank you, you can answer the question.

24   Q.   Did you hear the question, Mr. Ochetal?

25   A.   Yeah.  As far as I remember, definitely one time.

1  Q.  Was it Jeremy Reichberg's or someone else's?

2  A.  It was somebody else's, I don't remember his name.

3  Q.  And approximately how many full carry gun license

4  applications did you personally handle that took roughly two

5  months from start to finish?

6  A.  You said full carry licenses?

7  Q.  Yes.  For first time applicants --

8  A.  Uh-huh.

9  Q.  -- that you personally handled.

10       MR. MERINGOLO:  Objection, compound.

11       THE COURT:  Thank you, you can answer the question.

12  A.  First-time applicants personally handled the process was

13  about six months to more than that, it could be a year, but I

14  would always say on the safe part at least six months.

15       MS. RAVENER:  One moment, your Honor.

16       THE COURT:  That's fine.  Take your time.

17       (Pause)

18  Q.  Mr. Ochetal, do you know where Jeremy Reichberg's gun

19  license application file or folder is today?

20       MR. MERINGOLO:  Objection, leading.

21       THE COURT:  Thank you, you can answer the question.

22  A.  No.

23  Q.  When did you last see it?

24  A.  I'd say several months before Mr. Reichberg became an

25  incident.

IBGTGRA2                          Ochetal - Direct

1    Q.   Where was the file located the last time you saw it?

2    A.   The last time I saw it was in a black file cabinet in the

3    incident section.

4              MS. RAVENER:  One moment, your Honor.

5              (Pause)

6              THE COURT:  Do you mind if I ask one question?

7              Mr. Ochetal, what do you mean by "became an incident?"

8              THE WITNESS:  An incident -- I don't know if I brought

9    it up earlier, but an incident means someone who got in some

10   kind of trouble.  They have a license already, they either got

11   arrested, charged with domestic violence, violated an order of

12   protection; so basically had a license, they're in trouble, we

13   tell them hey, you need to surrender your license, voucher your

14   firearm, we need to investigate you to see if you're still

15   qualified to have that license.

16             THE COURT:  Thank you.  I understand.

17             MS. RAVENER:  No further questions from the government

18   at this time, your Honor.

19             THE COURT:  Thank you very much.

20             Counsel?

21             MS. NECHELES:  Could we take our morning break?

22             THE COURT:  I would like to see if we could keep going

23   until around lunchtime, unless you would like to take a short

24   break.

25             MS. NECHELES:  Yes.

1           THE COURT:  Ladies and gentlemen, let's take a short

2    break.  Please during this break, as always, don't discuss the

3    case amongst yourselves, don't discuss it with anyone else and

4    do no research about the case.

5           I will see you back here shortly.  Thank you.

6           (Jury not present)

7           THE COURT:  So we'll take a very short recess just

8    enough time to let everybody stretch their legs.

9           Mr. Ochetal, during this brief recess I would like to

10   ask you not to talk about this case or your testimony with

11   anyone, particularly counsel and representatives for the United

12   States.  Please be back in about five minutes.

13          Counsel, I hope to begin no later than ten minutes

14   from now.  So hopefully we'll be back and ready to proceed.

15   We'll get as much work done as we can and we'll take our lunch

16   break later than usually scheduled in order to accommodate this

17   break.

18          Anything that anyone wants to raise before I step

19   down?

20          Seeing none, I will see you shortly.

21          (Recess taken)

22          (Continued on next page)

23

24

25

1          THE COURT:  Thank you.  You can be seated.

2          Mr. Daniels, can you bring in the jury.

3          Counsel for the United States, can you please bring in

4    Mr. Ochetal?

5          MS. RAVENER:  Yes, your Honor.

6          (Jury present)

7          THE COURT:  Thank you.  Ladies and gentlemen, you can

8    be seated.

9          Ms. Necheles, you can proceed.

10         MS. NECHELES:  Thank you, your Honor.

11   CROSS-EXAMINATION

12   BY MS. NECHELES:

13   Q.  Good morning, sir.

14   A.  Good morning.

15   Q.  The bribe scheme that you have been testifying about, where

16   you were receiving bribes from people, there were a number of

17   people involved in that bribe scheme, right?

18   A.  Yes.

19   Q.  You talked about a Mr. Endall.  He was involved, he was

20   getting bribes?

21   A.  I don't know specifically of bribes he was getting.

22   Q.  Okay.  But you believed at the time, that he was getting

23   bribes, right?

24   A.  I might have assumed it, but I have no knowledge of it.

25   Q.  I'm asking about your belief.  You believed that at the

1  time that you were working at the police department, that he

2  was getting bribes, right?

3  A.  It would be a possibility.

4  Q.  Do you recall telling that to the government, that you

5  believed he was getting bribes?

6  A.  I believe I might have mentioned that something must have

7  been up.

8  Q.  You also believed that Mr. Dean was getting bribes, right?

9  A.  Yes.

10  Q.  You knew that Mr. Villanueva was getting bribes, right?

11  A.  Yes.

12  Q.  And those were all people in the licensing division, right?

13  A.  Yes.

14  Q.  Out of all those people, you were the low man on the totem

15  pole, right?

16  A.  Based on rank, yes.

17  Q.  In fact, you were the person who was, as I understand it,

18  in charge of filling out paperwork, right?

19  A.  Amongst many things, sure.

20  Q.  And you would be, on many of these bribe -- these files

21  involving expeditors who were paying bribes, you would be the

22  one who would be filling -- doing -- you were the inspector on

23  them, right?

24  A.  Yes.

25  Q.  And you were the one who would create paperwork, right?

1    A.  Sorry.  "Create"?

2    Q.  Yes.  Would you create documents for the file sometimes?

3    A.  I would be given documents and print out reports.

4    Q.  You say you started taking bribes in 2014, right?

5    A.  Sounds about right, yes.

6    Q.  When did you start working in the licensing division?

7    A.  2009.

8    Q.  So for the first five years, you were not taking any

9    bribes, right?

10   A.  No.

11   Q.  No, you were not taking bribes?

12   A.  No.

13   Q.  What does "No" mean?

14   A.  I was not taking bribes.

15   Q.  Okay.  But from the beginning, you were doing things

16   improperly in the licensing division, right?

17   A.  No, not from the beginning.

18   Q.  Well, isn't it true that from the beginning, early on, that

19   Paul Dean had you doing things for friends of his?

20   A.  Not early on.

21   Q.  Do you recall telling the government that from the

22   beginning, that Dean would have you move people to the top of

23   the pile who were his friends?

24   A.  Yes, at some point, he did.

25   Q.  Do you recall telling the government that that happened

IBGKGRA3                    Ochetal – Cross

1   from the beginning when you were working there?

2   A.  No, not at the very beginning.

3   Q.  Okay.  Directing your attention --

4           MS. NECHELES:  If we could just show him 3515-10.

5           Your Honor, if I could show something to the witness?

6           THE COURT:  Thank you.  Please proceed.

7   BY MS. NECHELES:

8   Q.  Do you recall telling the government -- see if this

9   refreshes your recollection.  I'm going to direct your

10  attention to the bottom paragraph on this.

11          Do you recall telling the government that when you

12  first got to the permit unit, you started with Lieutenant Paul

13  Dean, and he asked you to process things for friends of his and

14  move the application to the top of the pile?

15  A.  Yeah.  I'm not saying he didn't do that, no.

16  Q.  You said that this was just an example of what would go on,

17  right?

18  A.  Yes.

19  Q.  And, in fact, there were favors being done for police

20  officers, other police officers, right?

21  A.  Sure.

22  Q.  So even before you got involved in the bribery, there were

23  always favors being done for other police officers who wanted

24  to get a license or some sort of assistance from the licensing

25  department for friends or relatives, right?

1  A.  I would say that was –– at one point, that was common

2  practice, yes.

3  Q.  In fact, it was often that high-ranking police officers

4  frequently asked for licenses for their friends, right?

5  A.  Yes.

6  Q.  And it was a regular thing that you would do, to help

7  high-ranking officers get licenses for friends or relatives,

8  right?

9  A.  I was usually the go-to guy on a lot of that stuff, yes.

10  Q.  So you did it regularly, right?

11  A.  Whenever I was told to.  There was definitely several ––

12  several occasions of it, yes.

13  Q.  You recall telling the government that that was a regular

14  thing that you would do?

15  A.  I don't necessarily recall saying that, but it was common

16  practice that higher-ranking members came down and had a

17  friend, we would help them out.

18  Q.  Are you saying –– but, sir, I want to know whether that was

19  a regular thing that you were doing?

20  A.  It was part of what I was doing.  I was supposed to do a

21  lot of other things.  It was definitely part of what I was

22  doing.

23  Q.  I want to direct your attention, if I could, to 3515-23,

24  page 4.

25          Directing your attention to the top line, does that

IBGKGRA3                        Ochetal - Cross

1   refresh your recollection that you told the government that it

2   was a regular thing that you would do, to help high-ranking

3   police officers?

4   A.  If it's there --

5           THE COURT:  I'm sorry, just to be clear, she's not

6   asking you to read anything on the document.  The question is

7   if it refreshes your recollection about the issue.

8           THE WITNESS:  Oh.  Like I said, it's just, to me, a

9   matter of words.  There was a lot of things I regularly was

10  supposed to do.  So that might not necessarily be something I

11  was supposed to do, but I did it, and I did it often.

12  BY MS. NECHELES:

13  Q.  In fact, you told the government just last week that you

14  processed things for high-ranking officers all of the time,

15  right?

16  A.  As long as they would request it, yes.

17  Q.  Okay.  So it was all of the time that you were doing that,

18  right?

19  A.  Whenever they would ask.

20          MS. RAVENER:  Objection; asked and answered.

21          THE COURT:  Thank you.

22          I accept the answer.

23  Q.  And that went from -- back from the beginning of when you

24  were working in the licensing department, right?

25  A.  Not from the very beginning.  Early on, maybe, but I

1    believe it took some time for people to trust that I would do

2    what they would say without giving them backlash.  So if I got

3    there in early 2009, they weren't right away saying, oh, do

4    this, and do that –– they didn't know me from anything –– so it

5    did take some time.  It wasn't as soon as I walked in, I was

6    doing these things.

7    Q.  Okay.  But from very early on, right?

8    A.  Early on.

9    Q.  In the whole time –– so, then, starting in 2014, you

10   started taking bribes, right?

11   A.  Around 2014.  I mean, I presume it would be the end of

12   2014, but that would be the year.

13   Q.  Okay.  Out of the whole time that you were involved in this

14   bribe scheme and all of what you did, you got very little money

15   out of this, didn't you?

16   A.  As far as money?

17   Q.  Yes.

18   A.  I guess.

19   Q.  Well, didn't you tell the government you got less than

20   $1,000 out of all of this?

21   A.  I believe that was less than a thousand from Shaya.

22   Q.  Okay.

23   A.  And then there was at least 500 from Valastro, and then a

24   couple of hundred from Soohoo.

25   Q.  Okay.  And for Shaya Lichtenstein, you did over a

1    hundred -- you processed over a hundred applications, right?

2    A.  Correct.

3    Q.  You filled out paperwork on there, right?

4    A.  What do you mean, "fill out paperwork"?

5    Q.  Well, you would do something that was called fattening the

6    files, right?

7    A.  Yes.

8    Q.  You would call and try to get files -- paperwork sent in,

9    right?

10   A.  Yes.

11   Q.  And sometimes you would create paperwork if it wasn't in

12   the file, right?

13   A.  I don't know if I would create, but I would get stuff in

14   there that might not necessarily be exactly what should be in

15   there.  Maybe it's not as relevant to the applicant, but it was

16   what we termed fattening the file.

17   Q.  There was so much work that you were doing on

18   Lichtenstein's stuff, you sometimes had to take it home,

19   correct?

20   A.  Yes.

21   Q.  You would work on creating documents at home, right?

22   A.  At home, basically, what I did was organize the folders.

23   So what would happen is we'd get a bunch of paperwork, and the

24   folders needed to be put in a specific order, put in a binder,

25   hole-punched to make it look proper.  So I had -- I'm not

1    saying I had all the paperwork all the time, but what I did

2    have was out of order, shoved in there, not acceptable to go to

3    the file.  So I wasn't creating it, it had everything already.

4    What I was doing was putting it together.

5    Q.  Okay.  And, sir, on those Lichtenstein files that you took

6    home and worked on, those -- you never were paid directly by

7    Mr. Lichtenstein, right?

8    A.  No.

9    Q.  You got money, sometimes David Villanueva would give you

10   money on that, right?

11   A.  Yes.

12   Q.  And it was a tremendous amount of work you did, right?

13   A.  I think so.

14   Q.  I mean, it wasn't only full time at your job, it was time

15   at home as well, right?

16   A.  Sure.

17   Q.  And you were doing that for five years?

18   A.  No.

19   Q.  From 2009 -- I'm sorry, from 2014 to 2016, right?

20   A.  As far as doing the work with the files at home?

21   Q.  Or doing the work on Lichtenstein.

22   A.  Oh, work on Lichtenstein overall?  2014 into 2015.

23   Q.  Okay.  Those were being -- you were doing it because David

24   Villanueva asked you to do, right?

25   A.  Yes.

IBGKGRA3                         Ochetal - Cross

1   Q.  And you thought that David Villanueva was your friend,

2   right?

3   A.  I believed him to be my friend, yes.

4   Q.  And, in fact, you went away on trips with him, right?

5   A.  Yes.

6   Q.  You thought -- with your wives, both your wives, right?

7   A.  Yes.

8   Q.  And you used to socialize together?

9   A.  Yes.

10  Q.  So you did this mainly because he asked you to, right?

11  A.  He asked me to.  I was getting something out of it, not

12  just in compensation through Shaya, but the friendship with

13  Dave would, you know, help me out on days off.  Maybe I want to

14  take, you know, a weekend off.  You know, he was -- it came to

15  a point where he was my immediate supervisor, so the more I

16  helped him, that was beneficial to me just as much as getting a

17  bottle of booze from Shaya.

18  Q.  So you were getting very little money, maybe a bottle of

19  alcohol, but you were getting friendship from David Villanueva

20  and some help at work, right?

21  A.  Yes.

22  Q.  And then at some point, Shaya became persona non grata in

23  the office, right?

24  A.  That's correct.

25  Q.  How did that happen?

1    A.   It happened on -- one day there was an email sent to

2    Inspector Endall, and perhaps others -- I know Dave got wind of

3    the email or received the email -- and it just had specified

4    how much he was charging for pistol license applications, and

5    it raised a big red flag within the license division, and,

6    obviously, in my mind -- I'm sure, I don't know, but in Dave's

7    mind -- because he knew we were helping him.

8    Q.   After that, Shaya Lichtenstein was no longer allowed into

9    the licensing division, right?

10   A.   Right.

11   Q.   When that happened, Shaya stopped being friendly with you,

12   right?

13   A.   With?

14   Q.   I'm sorry, withdrawn.

15          Dave Villanueva stopped being friendly with you,

16   right?

17   A.   I wouldn't say Dave stopped being friendly with me.  He

18   just, perhaps, was a little more distant than normal.  It's not

19   like he stopped calling me or anything.

20   Q.   Well, once you stopped working on the Shaya stuff, you were

21   moved from the process -- the part of the licensing division

22   from processing to cancellations, right?

23   A.   Yes.  I was moved from the incidents section to the

24   renewals section.

25   Q.   And that's because most of what you had been doing was

1   Shaya's stuff, right, Shaya Lichtenstein stuff?

2   A.  Shaya Lichtenstein stuff.  I guess it wasn't known at the

3   time about Frank Soohoo's stuff.  So the assumption was, based

4   on the email, it was Shaya's stuff.

5   Q.  When you say it wasn't known, that means -- that's not why

6   you were transferred, is it?

7   A.  No.

8   Q.  It had nothing to do with Frank Soohoo's stuff, right?

9   A.  No.

10  Q.  It was because you had mainly been working on Shaya

11  Lichtenstein's stuff, right?

12  A.  Not mainly.  I did a lot of work on Frank Soohoo's stuff.

13  I just believed it wasn't known by anybody.

14  Q.  You mean none of your supervisors -- David Villanueva

15  didn't know about the Frank Soohoo stuff?

16  A.  Oh, Dave and I were in on that stuff, but nobody else

17  really knew to what extent me and Dave were involved.

18  Q.  Who knew you were doing all that work on Lichtenstein?

19  A.  Who knew?

20  Q.  Yes.

21  A.  Obviously, Sergeant Villanueva knew.  I assumed that

22  Lieutenant Paul Dean knew, and that Inspector Endall knew.

23  Q.  And you think that it was that email that caused you to be

24  moved?

25  A.  I would say I know it was that email that caused me to be

1    moved.

2    Q.  You knew that it was the email that caused you to be moved?

3    A.  I would say for the most part, that was the gist of why I

4    was moved, yes.

5    Q.  Then after that, you stopped doing so much with David

6    Villanueva, right?

7    A.  Yes.

8    Q.  He stopped socializing with you?

9    A.  Yes.

10   Q.  When he no longer had use of you?

11   A.  I never really thought of it that way, but, yeah, there

12   were times where I thought that, you know, he didn't need me as

13   much, so maybe he didn't call me as much.  But I tried not to

14   think about it that way.

15   Q.  And you also did some work during this time period, you

16   also worked on files that were for a person named John

17   Chambers, right, for clients of his?

18   A.  At times, yes.

19   Q.  And you would be asked to do that by Mr. Endall; is that

20   right?

21   A.  Several times.

22   Q.  Am I correct that you helped a person who had been arrested

23   for sexual assault get a gun license even though he shouldn't

24   have?

25   A.  I do not remember the specific example.

IBGKGRA3                    Ochetal - Cross

1   Q.  Do you recall telling that to the government?

2   A.  I might have.  I just don't know the specific example.

3   Q.  You also recall that you helped get -- process a file for

4   an Eli Rowe, who was a client of Chambers?

5   A.  Say the name again?

6           MS. RAVENER:  Objection.

7   Q.  Eli Rowe?

8           MS. RAVENER:  Compound.

9           THE COURT:  Thank you.

10          Can you ask the question again, please, counsel?

11          MS. NECHELES:  Sure.

12  BY MS. NECHELES:

13  Q.  Do you recall processing a file for Eli Rowe as well, a gun

14  file?

15  A.  I don't recall that name.

16  Q.  Did you tell the government that you had done that?

17  A.  I don't remember that name.

18  Q.  Do you remember looking through that file and saying that

19  it didn't have the right paperwork?

20  A.  I still don't remember the name.

21  Q.  But you did a couple of the files for Mr. -- that had

22  involved Chambers, Mr. Chambers, right, that he was the --

23  A.  Sure.

24  Q.  -- expeditor on, right?

25  A.  Yes.

IBGKGRA3                      Ochetal - Cross

1   Q.  Do you recall Chambers was an expeditor who was also a

2   lawyer, right?

3   A.  I did understand that.

4   Q.  You also did work and did some stuff helping a

5   Mr. Valastro, right?

6   A.  I did.

7   Q.  And there was not -- it was helping him get a permit to buy

8   guns, or is that what it was called, a pink slip?

9   A.  Pink slips or purchase authorization forms.

10  Q.  That he would use in his business for people who came to

11  buy --

12  A.  Firearms, yeah.

13  Q.  Right.  That didn't involve much workpaper work, did it?

14  A.  Not major paperwork, no.

15  Q.  You would just bring things over to him?

16  A.  Pretty much.

17  Q.  And he gave you discounted guns for that?

18  A.  Yes.  And cash.

19  Q.  And about $500 in cash --

20  A.  Yes.

21  Q.  -- during that time period?

22          And some alcohol, right?

23  A.  Yes, ma'am.

24  Q.  And those were all specific quid pro quos, right?  You

25  would get something in return for having given these things,

IBGKGRA3                        Ochetal - Cross

1   right?

2            MS. RAVENER:  Objection; legal conclusion.

3            THE COURT:  Thank you.

4            Counsel, can you please rephrase?

5            MS. NECHELES:  Okay.

6   BY MS. NECHELES:

7   Q.  Well, all those things that you testified now that you got

8   with respect to Lichtenstein, to Chambers, and to Mr. Valastro,

9   you understood, at the time that you were getting the money and

10  the alcohol, that that was being done in exchange for you

11  helping them in these areas, right?

12  A.  Yes.

13  Q.  I just want to direct your attention for a minute to

14  Government Exhibit -- to 3515-24 and see whether it refreshes

15  your recollection about Eli Rowe's application.

16           MS. NECHELES:  If we can show that to him on the

17  screen, your Honor?

18           THE COURT:  You may.

19  Q.  And directing your attention to the bottom, do you recall

20  discussing a special carry permit for Eli Rowe, who had a

21  license from Sullivan County, and that there was not the

22  paperwork in the file that would support that?

23  A.  Well, I still don't remember the name.  However, if I did

24  look at a file for anybody, I would be able to determine if it,

25  in fact, had proper paperwork for the specific license.  So

1    outside of the name, I could have opened a file, and examined

2    it, and saw whether or not there was sufficient paperwork.  I

3    just don't recall the actual name of the folder, but I do

4    recall looking at folders and seeing if there were

5    documentations missing or not.  I just don't know this person's

6    name.

7    Q.  You don't recall the name.

8             Do you recall looking at one --

9    A.  I've looked at -- I know I've looked through files to see

10   that there was proper documentation.

11   Q.  Do you recall looking at one for Sullivan County, in a

12   special carry?

13   A.  I don't remember.  Honestly, the name does not ring a bell

14   to me.

15   Q.  Okay.  It was easier to get a gun license, a pistol

16   license, in Sullivan County than in New York City, right?

17   A.  Sure.  Yes.

18   Q.  So that was what -- sometimes people would do that, and

19   then look to get a special carry in New York?

20   A.  That would happen.

21   Q.  And that was an easier way to go through the process,

22   right?

23   A.  Easier.  You just had to prove that you had a business

24   within the five boroughs, though.  So if you didn't have

25   business within the five boroughs, then, technically, you

1   wouldn't qualify.

2   Q.  Okay.  But not just business, a business that required you

3   to have protection, right?

4   A.  Sure, yeah.

5   Q.  And that means a business that either involved a lot of

6   cash, right?

7   A.  Right.

8   Q.  Or a business that involved carrying valuable jewelry?

9   A.  Sure.  Anything of value, yes.

10  Q.  Okay.  But something that was dangerous and required a

11  pistol license, right?

12  A.  Right.

13  Q.  Like being a lawyer doesn't qualify you for a pistol

14  license?

15  A.  Not being a lawyer, unless you did some type of threat

16  assessment letter.  There was ways about trying to obtain it,

17  but it wasn't -- it wasn't so simple.

18  Q.  All the work that you did, the money that you got, you

19  said, from Lichtenstein was for -- you understood that it was

20  for processing -- you understood, at the time you got that

21  money, that it was for processing applications, right?

22  A.  Right.

23  Q.  And you did a ton of work for Mr. Lichtenstein, right?

24  A.  Yes.

25  Q.  And the money that you got from Mr. Valastro and the other

IBGKGRA3                         Ochetal – Cross

1  things, you understood it was for you getting those pink slips

2  for Mr. Valastro that helped him in his business, right?

3  A.  Yes.

4  Q.  And that was also true, am I correct, for what you got --

5  Chambers, you never got anything, right?

6  A.  Nothing that I can recall from Chambers.

7  Q.  So now I want to talk about Mr. Soohoo.  Mr. Soohoo took

8  you on a lot of trips, right?

9  A.  Yes.

10  Q.  And he also got you meals, right?

11  A.  Yes.

12  Q.  And he paid for three trips for you; is that correct?

13  A.  Yes.

14  Q.  And for you and your wife, right?

15  A.  Yes.

16  Q.  And you went with David Villanueva, too, right?

17  A.  Yes.

18  Q.  Now, am I correct that at the time that you were taking

19  these trips, that you did not believe that they were a bribe?

20  A.  Well, the first trip that we took, which was to the

21  Bahamas, at the time, I didn't think that much of it.  It was

22  kind of a little early on in whatever relationship I had with

23  Frank Soohoo.

24  Q.  Am I correct, Mr. Soohoo was a --

25          MS. RAVENER:  Objection, your Honor.  Allow the

1    witness to finish.

2             MS. NECHELES:  Your Honor, I thought he did.

3             THE COURT:  Thank you.

4             I thought so as well, but, counsel, please go ahead

5    and inquire.

6             I'm sorry.  Mr. Ochetal, is there anything else that

7    you wanted to say?

8             THE WITNESS:  I was just elaborating on the first

9    trip.  It did seem -- it didn't appear to me that there was

10   necessarily a bribe at that time, so I didn't think nothing of

11   it on that trip until I got back from that trip.

12   BY MS. NECHELES:

13   Q.  Okay.  Just to be clear, Mr. Soohoo was what you've called

14   a police buff, right?

15   A.  Yes.

16   Q.  And some people love hanging out with police officers,

17   right?

18             MS. RAVENER:  Objection.

19             THE COURT:  Thank you.

20             You can answer the question, if you know the answer.

21             THE WITNESS:  Yes.

22   Q.  In the police department, there are people known as police

23   buffs who want to hang out with police officers, right?

24   A.  Yes.

25   Q.  In fact, the police academy allows civilians to take a

1    course with the police, right?

2              MS. RAVENER:  Objection; foundation.

3    Q.  Well, do you know that?

4              THE COURT:  Thank you.

5              You can answer the question.

6              THE WITNESS:  I'm not sure of that.

7    BY MS. NECHELES:

8    Q.  Well, didn't you tell the government that Mr. Soohoo had

9    gone to the police academy?

10   A.  I just knew Frank Soohoo was a police auxiliary officer.  I

11   don't know if they go through an academy or not.  I don't know

12   how that works.

13   Q.  Okay.  So that's -- you told the government he was someone

14   who had gone through an auxiliary training, right?

15             MS. RAVENER:  Objection; foundation.

16             THE COURT:  Thank you.

17             You can answer the question, if you have an answer.

18             THE WITNESS:  I just remember him being an auxiliary

19   police officer.  I'm not sure what the training is, though.

20   Q.  What does that mean, to be an auxiliary police officer?

21   A.  To be a volunteer police officer, help out in the

22   community.  They're unarmed, as far as I recall, and they

23   volunteer, I don't know, once a month to do community-type

24   work.  Kind of the gist of what I know about them.

25   Q.  That's a -- an auxiliary police officer, that's something

IBGKGRA3                        Ochetal - Cross

 1   that the police department works with those people and gives

 2   them a sort of quasiofficial status, right?

 3            MS. RAVENER:  Objection.

 4            THE COURT:  Thank you.

 5            MS. RAVENER:  Scope, foundation.

 6            THE COURT:  Thank you.

 7            If you know the answer to the question, you can

 8   answer.

 9            THE WITNESS:  I am not sure of their, like, official

10   status.  I don't know, like, can they make arrests or not.  I

11   don't know what they can do.

12            THE COURT:  Thank you.

13   BY MS. NECHELES:

14   Q.  Okay.  Isn't it true that you have told the government that

15   when you first went on these trips with him, or at the time

16   that you took these trips, that you were naive?  Am I correct?

17   A.  Yeah, I'd say I'd say early on, I was naive for sure.

18   Q.  And by that, what you mean is, you didn't see these as a

19   bribe, right?

20   A.  Not early on.

21   Q.  And it was only once you started trying to cooperate with

22   the government, that you started believing that these had been

23   bribes, right?

24   A.  I believed towards the end -- by the end, I mean our last

25   trip with Frank Soohoo -- that I realized the conundrum I was

1  in was that we would go on a trip, come back, and that day,

2  he's telling me he's got three guys coming in on Tuesday, four

3  guys coming in on Friday.  So towards the end, I started to

4  feel like, well, you're only taking me on these trips because

5  as soon as we get back, you want me to work.

6          So, yes, in the beginning, I was naive, I thought,

7  hey, this is great, but at the end, knowing that if I have to

8  do all this extra work and keep up with my own work, well, you

9  know, the only reason I was going on these vacations was

10  because when I came back, he had worked lined up for me.

11  Q.  So that didn't start at the beginning, right?

12  A.  At the beginning?  No.

13  Q.  And, in fact, Mr. Soohoo had gotten his own gun license and

14  didn't have any special favors or anything like that, right?

15  A.  No.  He had gotten his own gun license a while before the

16  consultation/bribery thing happened.

17  Q.  Okay.  So he didn't do -- there was nothing improper about

18  his license, right?

19  A.  Nothing I can really recall specifically.

20  Q.  How did you become friends with him at first?

21  A.  I just was introduced to him by Sergeant Villanueva.

22  Q.  When you started doing it, it wasn't for a while until he

23  started asking for favors with helping other people get gun

24  licenses, right?

25  A.  Well, it didn't seem that way, but I remember the first

1   time he told me, hey, I have a cousin coming in, can you help

2   him out.  I helped him out, that was that.  You know, then

3   after that, it was maybe another friend of a cousin.  So

4   eventually it got to the point where -- I mean, I might not be

5   the sharpest tool in the shed, you know, but you kind of figure

6   out how many cousins can you have, you know.  I guess he kind

7   of knew that, we all knew that, and just came to an

8   understanding that he started bringing people in for this

9   purpose.

10  Q.  When he first asked you -- when he said he had a cousin or

11  asked you to take care of someone's application, there was

12  nothing improper about the application, right?

13              MS. RAVENER:  Objection.

14              THE COURT:  Thank you.

15              Counsel, can you rephrase the question?

16              MS. NECHELES:  Okay.

17  BY MS. NECHELES:

18  Q.  Sir, am I correct that when he first asked you to take care

19  of an application or help someone get a license, he wasn't

20  asking you to do something other than to expedite it, right?

21              MS. RAVENER:  Objection.

22              THE COURT:  Thank you.

23              You can answer the question.

24              THE WITNESS:  Other than expedite?  I'm not sure.  I

25  remember doing anything else with that case.

1  Q.  And it was later that there was -- it was much later that

2  there was some incidents where he asked you to help people who

3  shouldn't get licenses get licenses, right?

4  A.  Yes.

5  Q.  On those cases, he offered you money, right?

6  A.  Yes.

7  Q.  In fact, he offered to split $15,000 between you and

8  Mr. Villanueva at one point?

9  A.  I'm not a hundred percent recalling the amount, but that

10  sounds about right.  It was supposed to be between -- I believe

11  Lieutenant Dean would have been involved in this partaking as

12  well, if I remember.

13  Q.  You didn't take any money on that?

14  A.  No.

15  Q.  You didn't get anything on that?

16  A.  No.

17  Q.  But you did help him out, right?

18  A.  No.

19  Q.  Well, were you told by Mr. Villanueva to process that?

20  A.  I was not there when this particular applicant came in to

21  get fingerprinted.

22  Q.  So someone else took care of that totally?

23  A.  I don't know about totally.  I know somebody else did the

24  intake.  All I ever know that happened with that was, at some

25  point, Sergeant Villanueva said that Lieutenant Dean was taking

1    care of it.  I really -- I didn't fingerprint the guy,

2    interview the guy, or anything like that.

3    Q.  So it is false -- it is not true that you got any money or

4    any benefits from that, right?

5    A.  From that specific --

6    Q.  Yes.

7    A.  -- client?

8    Q.  Yes.

9    A.  No.

10   Q.  There were other ones, though, where you did get specific

11   benefits from him, right?

12          At some point you started connecting some of the

13   applications that you were being asked to do with things that

14   Mr. Soohoo was giving you, right?

15   A.  Okay.

16   Q.  Am I correct?

17   A.  I'm not sure what you're asking.

18   Q.  Well, isn't it true that it's only now, thinking back, that

19   you thought that Soohoo was more like a business partner than a

20   friend?  Right?

21   A.  Yeah, thinking back, he was more of a business partner,

22   yes.

23   Q.  Okay.  Didn't you tell the government that it's only now,

24   thinking back, that you have come to realize this?

25   A.  I'm not sure exactly when I told them that, but I realized

1   that myself some time ago.

2   Q.  Well, am I correct that -- do you recall telling the

3   government just last week that it was only now, thinking back,

4   that you realized that Soohoo was more like a business partner

5   than a friend?

6   A.  I mean, yeah, thinking back, but that doesn't -- it doesn't

7   change what it really was, because, you know, I answered phone

8   calls from Frank from my house on numerous occasions about

9   licensees.  So I always understood it to be more than a

10  friendship.

11  Q.  Okay.  But didn't you tell the government that at the time,

12  you maybe convinced yourself that he was a friend, just a

13  friend?

14  A.  Early on, I thought he would have been a friend, sure.

15  Q.  Okay.  And that you believed that the only reason that you

16  were hanging out and doing things with him was you were a

17  friend of his?

18  A.  I wasn't hanging out with him because he was a friend, no.

19  Q.  Well, didn't you tell the government just last week that

20  you only now realized that if Soohoo hadn't paid for trips, you

21  probably wouldn't have traveled with him?

22  A.  No, I wouldn't have.

23  Q.  But you told the government that you only now realized

24  that, right?

25  A.  I said I realized it.  I don't -- you know, I might not

1  have meant just now, I woke up this morning and thought about

2  it, so --

3  Q.  Okay.  But when you discussed this with the government last

4  week, you were preparing for your testimony here, right?

5  A.  Sure.

6  Q.  And, sir, just to be clear, you have a cooperation

7  agreement with the government, right?

8  A.  Yes.

9  Q.  And you understand that you are going to jail on this case,

10  likely to go to jail, if you don't have that cooperation

11  agreement with the government, right?

12  A.  Sure.

13          MS. RAVENER:  Objection.

14  Q.  And there are sentencing guidelines, right?

15          THE COURT:  Thank you.

16          Thank you.  I accept that.

17          MS. NECHELES:  Beg your pardon?

18          THE COURT:  I accepted the response.

19  BY MS. NECHELES:

20  Q.  There are sentencing guidelines that govern what sentences

21  or that set forth recommended sentences, correct, in the

22  federal system?

23  A.  Yes.

24  Q.  Do you know what your sentencing guidelines are?

25          MS. RAVENER:  Objection, your Honor.

IBGKGRA3                          Ochetal — Cross

1               THE COURT:  Thank you.

2               Sustained.

3    Q.  Well, you understand that your sentencing guidelines would

4    mean there was a recommended sentence of years, right?

5               MS. RAVENER:  Objection, your Honor.

6               THE COURT:  Thank you.

7               Sustained.

8               MS. NECHELES:  Your Honor, can we approach on this?

9               THE COURT:  Please come on up.

10              (Continued on next page)

1              (At the sidebar)

2              THE COURT:  Sorry, I want to talk about scheduling,

3     too.

4              The government has elicited the potential exposure

5     here in terms of possible amount of time, years, based on the

6     maximum statutory penalty, so that's not a problem.

7              MS. NECHELES:  But there are sentencing guidelines.

8              THE COURT:  Thank you.

9              MS. NECHELES:  If he knows what they are, then that's

10    what he's afraid of getting for a sentence.  It's state of

11    mind.  I've never heard of an objection to this, your Honor.

12    Never.

13             THE COURT:  Thank you.

14             Counsel?

15             MS. RAVENER:  Your Honor, this witness pled guilty to

16    the same crimes that are on trial here.  This line of

17    cross-examination would go to inform the jury of the kind of

18    punishment that the defendants themselves could face.  It's not

19    appropriate.  It's not necessary.

20             THE COURT:  Thank you.

21             MS. NECHELES:  It's not the same crime.

22             THE COURT:  What, counsel, do you get from this that

23    you don't get from identifying that he is exposed to a

24    potential range?  I'm concerned about what the government has

25    said.  I'm also a bit concerned, given where we are post

IBGKGRA3                         Ochetal – Cross

1  Booker, in that those guidelines aren't mandatory.

2          MS. NECHELES:  I tried to phrase it very carefully,

3  that they were recommended sentences, your Honor.  They are

4  recommended sentences.  People in his situation know --

5          THE COURT:  Let me pause you briefly.

6          How much more time do you expect to have with this

7  witness?

8          MS. NECHELES:  Probably another hour, your Honor.

9          THE COURT:  Thank you.

10         Let's take a lunch break, then, and we can talk about

11 this outside of the presence of the jury.

12         MR. MERINGOLO:  Not much.  Fifteen, tops.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

IBGKGRA3                         Ochetal – Cross

1            (In open court)

2            THE COURT:  Ladies and gentlemen, I'm going to take

3    our lunch break now.  During this break, please don't discuss

4    the case amongst yourselves, don't communicate about it with

5    anyone else, and do no research about the case.  I'll see you

6    back here shortly.  It will be a little over 30 minutes.  See

7    you soon.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Thank you.  You can be seated.

3          Mr. Ochetal, during this recess, as before, let me

4     continue to ask you not to discuss your testimony with anyone,

5     including, in particular, the United States and its

6     representatives.  You can step down.  Please expect to begin

7     again around 12:30.  I expect you will be called back to the

8     witness box then.

9          THE WITNESS:  Okay.

10          THE COURT:  Thank you.

11          So, counsel, as Mr. Ochetal is making his way out,

12     first, thank you for the work that you've done.  We'll take our

13     lunch break after a short discussion of the issue that we're

14     taking up at sidebar.

15          Anything else that the parties would like to raise?

16          MS. LONERGAN:  Your Honor, before we take up that

17     issue, a brief scheduling thing:  Our next witness, who is

18     here, he's a civilian and took the day off from work to be

19     here.  I'd like to send him home now, in light of Ms. Necheles'

20     representations that she has another hour of cross-examination.

21     If we have extra time to fill, we'll play calls, but I'd like

22     to send him home.

23          THE COURT:  Thank you.

24          Ms. Necheles, is it correct that you expect that your

25     cross will last about an hour longer of Mr. Ochetal?

IBGKGRA3                      Ochetal - Cross

1            MS. NECHELES:  Your Honor, I think so, but I never

2   know.  It could be half an hour, but I think it's more likely

3   to be closer to an hour.

4            THE COURT:  Thank you.

5            Any objections to the government's proposal that we

6   fill in any necessary time today with the wire calls, so we can

7   permit the witness to leave for the day?

8            MS. NECHELES:  I have no objection.

9            THE COURT:  Thank you.

10           Counsel?

11           MR. MERINGOLO:  No objection.

12           THE COURT:  That's fine.

13           MS. LONERGAN:  Thank you very much, your Honor.  Our

14   representatives will let him know he is free to go.

15           THE COURT:  Thank you.

16           Let's talk further about the guidelines issue,

17   counsel.  Just to reframe it, the question that I posed was

18   what the guidelines information gives the jury beyond

19   information about his aggregate exposure.  The government

20   argued that they were concerned that this guidelines range is

21   too suggestive of what the potential punishment is that the

22   defendants here might face.

23           Let's continue the conversation.

24           MS. NECHELES:  Your Honor, I actually don't understand

25   that argument from the government.  Right now, he said he's

1   facing 15 years, I think, and if they think that this case is

2   the same, if they're arguing that the jury will think this case

3   is the same as that case, then the jury will think it's 15

4   years.  The guideline range is less.

5           So I don't understand what the government's -- they

6   would think these people are facing maybe 15 years.  The

7   guidelines range is going to be lower, so I really don't

8   understand the government's argument.

9           MS. RAVENER:  Your Honor, if I may?

10          THE COURT:  Please.

11          MS. RAVENER:  The defense can cross Mr. Ochetal on the

12  maximum sentence, and they can cross him, as well, on what he

13  hopes to receive.  I don't see any purpose to the numbers in

14  between, frankly, other than alerting the jury to what the

15  likely guidelines range sentence would be -- which they

16  described in their questions as a recommended guideline

17  sentence, to alert the jury to the kinds of punishments these

18  defendants may face if convicted.  I don't think that's

19  appropriate.  It doesn't seem necessary to the questions.

20          They can even question Mr. Ochetal if he hopes to

21  avoid prison altogether, but particularly in a post Booker

22  world, to elicit guidelines figures from this witness about the

23  very crimes on trial, I think, is particularly inappropriate.

24          THE COURT:  Thank you.

25          MS. RAVENER:  Your Honor, one moment?

1          THE COURT:  Please.  Go ahead.

2          MS. NECHELES:  While she's consulting, can I --

3          THE COURT:  Just give them one moment, if you don't

4   mind, just to make sure that the government can digest whatever

5   it is that you all say.

6          (Pause)

7          MS. RAVENER:  Your Honor, the other factor here is

8   that as the cooperation agreement, which is now in evidence,

9   makes clear, there is no guidelines range set forth in the

10  cooperation agreement.  So any inquiry along these lines

11  necessarily invades attorney-client privilege.  That

12  information would only come from Mr. Ochetal's conversations

13  with counsel.

14         THE COURT:  Thank you.

15         What is the genesis of the information that this

16  witness might have about the guidelines range?

17         MS. NECHELES:  Judge, I don't know, but I'm not going

18  to ask him that.  Just because you knew something in part

19  because you learned it from your attorney doesn't make it

20  privileged.  It's only when I ask about conversations, that

21  it's privileged.

22         THE COURT:  Thank you.

23         Can I ask, counsel, what is the basis for the numbers

24  that you propose to suggest to him in your inquiry, given the

25  lack of the calculation and the --

1            MS. NECHELES:  It's actually pretty vague, your Honor.

2       I was going to say, you understood that the guidelines range

3       was several years, right, and that you could be going to jail

4       for a number of years on this.  Here's what the problem is,

5       Judge:  The question is what's in his mind, what does he think

6       he's facing.  Everybody in the world knows, because of common

7       practice.  What -- everybody sees articles, if you're a read --

8       a person who reads the newspapers, that say the maximum

9       sentence is 150 years.  They know right now that there were two

10      different witnesses on the stand, one who was facing 50 years,

11      another 15 years, for essentially the same conduct.

12           THE COURT:  Thank you.

13           Can I ask --

14           MS. NECHELES:  It's what's in his mind.

15           THE COURT:  Can you get to the same point without

16      invoking the concern that the government has suggested?

17           MS. NECHELES:  Well, I don't know if I can do it.

18           THE COURT:  You can ask, for example, you've testified

19      that you're exposed to up to 15 years of imprisonment, you

20      don't think you're necessarily going to get 15 years, right,

21      but you think that you could get up to several years in prison,

22      right, without referencing the guidelines?

23           MS. NECHELES:  No.  He has to really think.  He has to

24      have a basis for thinking that.  And he's afraid because right

25      now, he knows what the guidelines are.  This is the real truth

1   of what the world is.  A person in his situation is afraid.  He

2   knows what the potential guidelines are.  He is aware of that

3   when he goes in to cooperate with the government, and when he

4   makes this deal, he's afraid.  That's what he wants to avoid.

5   That's his main motivation here.  So to suggest that I can't

6   ask this witness what he's really afraid of and why he's

7   cooperating with the government, it's taking reality out of

8   this.  That's the truth.  That's what he's afraid of.

9           And, Judge, it's not the same guidelines range.  I'm

10  not going to argue ever to the jury that this is what these

11  people are facing because I know that will be improper, and you

12  would stop me.

13          THE COURT:  Thank you.

14          Can I ask what the basis for any questions about this

15  witness' guidelines range would be, if it's several years, or a

16  year and a half, or anything?  I'm somewhat concerned about

17  anchoring any suggestion about the number of years of exposure

18  he may face to a guidelines range, which you know is calculated

19  based on a number of facts that are not known to me or to you.

20          MS. NECHELES:  I want to ask him what he thinks, what

21  he thinks it is.  It's not relevant if I calculate it.  I want

22  him to say what he thinks, like that he understands that it

23  would be several years.  And then what do you think it is.  I

24  just want him to say what is his state of mind.  And I'm not

25  going to ask him about conversations with attorneys, and he

1    might not be able to answer this.  I might go nowhere with this

2    because I don't know what he's going to say, but I should be

3    able to inquire what is his state of mind, what is he afraid

4    of.  Or he may give a totally inaccurate number.  I don't know,

5    Judge, it might be too low.  This is kind of a risky thing for

6    me to be asking, but I'm entitled to ask it, I believe.

7            MS. RAVENER:  Your Honor, it's exactly those risks and

8    that kind of speculation, rank speculation, that has no place

9    here.

10           As practitioners before the Court, and as the Court's

11   own experience reflects, I'm certain, there's no way that a lay

12   witness has any specific knowledge of what guidelines range

13   would apply to their given case without consultations with a

14   lawyer, and specifically with this defendant's lawyer.  This

15   necessarily, to the extent he even knows, would be privileged

16   information, and it's irrelevant here.  Counsel can continue to

17   make the point by cross-examining about the fact that, yes, he

18   believes he faces prison time, that prison time could be

19   extensive, that prison time could be as much as 15 years, he

20   hopes to avoid it by cooperating.  This gains nothing, and it

21   puts a deeply problematic set of argument and facts before the

22   jury that's not properly situated here, not properly known to

23   this witness through any source other than privilege.

24           THE COURT:  Thank you.

25           MS. NECHELES:  This is not speculation.  I'm asking

1    him not what his guidelines are, but what's in his mind, what

2    does he believe he is facing.  So it's absolutely not

3    speculation.  That's what I'm asking:  What do you think you're

4    facing here?

5              He may say I don't know what the guidelines --

6              THE COURT:  Thank you.

7              I'm sorry.  Are you proposing to ask the question --

8    just to make sure I understand as I contemplate this, are you

9    asking to pose the question without specific reference to the

10   guidelines; in other words, to pose the question substantially

11   as you just framed it?

12             MS. NECHELES:  Yes.  I would ask you understand that

13   there are recommended guidelines, correct?  And he might say,

14   no, I don't understand anything about that, but I think he will

15   say yes.  And if he says no, I'm kind of stuck with it because

16   I can't ask him didn't you have conversations with your lawyer

17   about it.  I understand that.  So I'll sort of be stuck with

18   that.  But if he says, yes, I'll say, and you understand that

19   the guidelines range are several years, you know, or more than

20   a couple years, and see what he says.  What do you understand

21   the guidelines range, what do you believe that you are facing

22   in this case?

23             THE COURT:  Thank you.

24             Let me ask one question before we leave for our lunch

25   break, just as a question to help me understand what the

1    defense would lose if I were to uphold the government's

2    objection:  Why is it better for the defense for the jury to

3    think that the witness is facing less time in jail should he

4    lie or that he is -- or may not be providing the government the

5    kind of substantial assistance, I expect you will argue, that

6    he should believe he is required to provide?  Why is it better

7    for the jury, in your view, to have them believe that the

8    consequences of that are that he will go to prison for, I'll

9    say, two years initially instead of 15?

10            MS. NECHELES:  Your Honor, it's not better.  Maybe --

11   I just don't think that anybody believes that he thinks he's

12   going to jail for 15 years.  But maybe I'll talk with my

13   co-counsel, who's very good at this stuff, over lunch and think

14   maybe I'm, like, making this is a foolish line of questioning.

15   Maybe it's not --

16            THE COURT:  Thank you.

17            I'll consider it as well and be prepared to rule on

18   it.

19            Counsel, please try to be back here with the

20   expectation that we'll start testimony at, let's call it,

21   12:40.  So I'd ask you to be back here 12:35, so about 20

22   minutes from now.  I'll see you back then.  Thank you, all.

23            MR. BELL:  Thank you, Judge.

24            (Luncheon recess)

25

                          AFTERNOON SESSION

1                           (12:40 p.m.)

2            THE COURT:  Counsel, is there anything else we should

3    discuss about the question we discussed just before the break,

4    Ms. Necheles?

5            MS. NECHELES:  Your Honor, I will go -- the only

6    problem would be if I ask him do you think you're facing 15

7    years and he says no, I don't.  But if he says yes, I do, then

8    I won't go further.  But if he says no, I don't, then I will

9    have go further on that.

10           THE COURT:  To ask what he thinks he may be facing?

11           MS. NECHELES:  What he believes and he understands.

12   There are recommended sentencing guidelines, but if he says

13   he's facing 15 years, I'm entitled to ask about state of mind,

14   motivation.  The Supreme Court held a defense attorney always

15   gets to ask about that, that it's reversible error to not be

16   able to ask about that.  That's what I'm trying do do.

17           THE COURT:  Understood.  My principal concern about

18   this line of inquiry is the lack of precision, I will call it,

19   about the question you originally proposed to ask in that we

20   don't know what his actual guidelines are.  Second, unraveling

21   what the guidelines are in light of *Booker*, it's the

22   recommended, but as you know, and I'm sure you'll argue, the

23   Court is not required to follow them.  I need to look at them

24   as the starting point, but they're not all the things that you

IBGTGRA4                      Ochetal - Cross

1   know they're not.

2              MS. NECHELES:  Hopefully I don't have to go there.

3   Hopefully I will get his state of mind out.  My co-counsel

4   suggested to me a different way of approaching this, so I will

5   try that and hopefully that will work.  But if it doesn't, I

6   will have to get into a little bit of what does he think and

7   why he thinks that.

8              And if he says the recommended sentence, I could say

9   the judge could sentence you to more than that, could sentence

10  you to less, but you could get sentenced to more, that's your

11  belief as you stand here.

12             THE COURT:  Thank you.  I don't have a fundamental

13  problem with that line of inquiry.  I think it does call for

14  some clarification regarding what the guidelines mean to the

15  extent that he talks about the guidelines.

16             So let's get started.

17             MS. NECHELES:  Do you want to hear my one comment?

18             THE COURT:  Please.

19             MS. NECHELES:  So your Honor, I would just ask that in

20  the second to last sentence where you're saying how you could

21  use the statement --

22             THE COURT:  In the second paragraph?

23             MS. NECHELES:  The third paragraph.

24             THE COURT:  Please go ahead.

25             MS. NECHELES:  So you start with:  But you can use

IBGTGRA4                        Ochetal – Cross

1    that statement to place other statements by defendant in

2    context or to understand the defendant's state of mind or as

3    evidence that someone said it's raining outside.

4           Your Honor, I would just say that that last part of

5    the example is unbelievably confusing.  Because while I

6    understand what you're saying, I do think like someone with

7    a -- like well, why would you need someone that -- someone said

8    it's raining outside, it sort of suggests you're taking it for

9    the truth, so I would ask that that be omitted.

10          THE COURT:  Thank you.

11          Counsel for the United States?

12          MS. LONERGAN:  Your Honor, so the thing is we actually

13   will be arguing that some of the statements that are hearsay.

14   we're not going to argue them for the truth but we will argue

15   them for the fact they were said or the fact that someone was

16   expressing their belief at the time.  Regardless of whether or

17   not that belief is true, so we can argue that another caller on

18   the call said X and that is what that caller thought, that's

19   not a truth, there's no truth value, we're not saying and then

20   the next argument would be and what the caller thought was

21   necessarily true.

22          MS. NECHELES:  No, your Honor, that would be improper.

23          MS. LONERGAN:  Right, that's the part that we do not

24   argue.

25          MS. NECHELES:  No, the first part the argument, that

1   the caller said something and they believed it was true would

2   be improper.

3           MS. LONERGAN:  I don't think that that is improper,

4   your Honor, I think that's whole purpose of what is means

5   something was said.

6           THE COURT:  I don't know that we need to do this now,

7   I would like to bring in the jury.

8           Is Mr. Ochetal ready to go?

9           Please bring him in.

10          As they're doing that, I'm going to ask a question,

11  what's the difference between saying that the speaker said this

12  because it was true as opposed to the speaker said this because

13  she thought it was true?

14          MS. LONERGAN:  Your Honor, I will use -- I think we're

15  kind of speaking in vagaries.  I will use an actual example

16  from this case.  I think that where a lot of this came from is

17  there is a call with a police officer around the time of the

18  Avi Zangi arrest.  It's not Theresa Haley but it's another

19  police officer.  And that police officer says this is the

20  policy of the Brooklyn DA's Office.

21          And the point is we will never use that statement to

22  argue that in fact that was the policy of the Brooklyn DA's

23  Office, but we do think it's appropriate to argue that at the

24  same that Theresa Haley believed that the Brooklyn DA's Office

25  had a certain policy, another police officer also believed that

IBGTGRA4                    Ochetal - Cross

1   the Brooklyn DA's Office had that policy.  We're not saying

2   that in fact was the policy of the Brooklyn DA's Office, but

3   they were trying to attack the officer's credibility by saying

4   you essentially made this up, and we have another officer at

5   exactly the same time saying --

6            THE COURT:  Thank you.  I think this is a broader

7   conversation, because that distinction is elucidative.

8            Let's begin.  Given the estimated time for

9   cross-examination, I think it makes sense for us to begin with

10   the trial now.

11            Mr. Daniels, can you please bring in the jury.

12            (Continued on next page)

1            (Jury present)

2                MS. NECHELES:  May I continue, your Honor?

3                THE COURT:  You may.  Please proceed.

4                MS. NECHELES:  Thank you.

5    BY MS. NECHELES:

6    Q.  Sir, we were talking before the break about your

7    cooperation with the government, correct?

8    A.  Yes.

9    Q.  And you believe -- you understand that you could get 15

10   years in jail for the crimes you committed, right?

11   A.  Yes.

12   Q.  And that's what you believe you're facing right now, right?

13   A.  Yes.

14   Q.  And so you -- because of that, you entered into the

15   cooperation agreement, right?

16   A.  I didn't know that specific sentence before I entered into

17   the cooperation agreement.  I entered into the cooperation

18   agreement because I understood I did wrong and illegal

19   activities and that's where that led to.  I did not know at the

20   time specifics of the sentence.

21   Q.  When you entered in the cooperation agreement, you had a

22   lawyer, right?

23   A.  Yes.

24   Q.  And you entered into the cooperation because you thought

25   you could go to jail, right?

1          You're saying you didn't know the specifics, but you

2     knew you could go to jail for what you had done.

3     A.  I could, sure.

4     Q.  And today, as you testify here today, you know that you

5     could get 15 years in jail for what you did, right?

6     A.  Yes.

7     Q.  And under the cooperation agreement you know that to get

8     the letter from the prosecutors that you have to give the

9     government substantial assistance, right?

10    A.  I understood that I needed to provide information about

11    myself and other individuals.  I don't know what "substantial"

12    is or isn't to them.  I mean that's written in there, sure, but

13    I can only speak on myself and whatever information I have, so

14    if that's considered substantial, then it is, if it's not, then

15    it is what it is.

16    Q.  So the agreement -- you're right, the agreement doesn't

17    define what "substantial assistance" means, right?

18    A.  The agreement just tells me to tell the truth about things

19    I've done and things I witnessed and things others have done,

20    and that's, as far as I know, what I'm supposed to do.

21    Q.  Well, I'm talking about what you're hoping to get out of

22    it, right?  I'm talking about what you're hoping to get.

23    You're hoping to get the letter from the government which you

24    hope will help you get no time in jail, right?

25    A.  I hope it would help, and nobody likes to go to jail, so

IBGTGRA4                        Ochetal - Cross

1    sure.

2    Q.  And to get that letter, you have to give substantial

3    assistance, and the letter doesn't -- and your cooperation

4    agreement doesn't define what substantial assistance means,

5    right?

6    A.  That's subject to interpretation.  I'm hoping that whatever

7    information I provide about myself and others is considered

8    substantial, but I don't know that.

9    Q.  And you understand that it's the government who decides

10   whether you gave substantial assistance, right?

11   A.  I know the government writes this letter and says what I

12   have done and information I provided, but I don't know for a

13   fact what they consider to be substantial.

14   Q.  Right.  And so as you sit here today, you know that if

15   don't please the government and make them think that you are

16   giving substantial assistance that you won't get that letter,

17   right?

18   A.  That's true.  I mean I don't know if what I say is good

19   enough or not, I'm just saying what I know.

20   Q.  And in order to give that substantial assistance, you have

21   met with the government 17, 18 times, is that correct?

22   A.  I've lost count, but numerous times.

23   Q.  And along the way you have tried to give --

24          And you haven't testified in any other case, right?

25   A.  At all, no.

IBGTGRA4                        Ochetal - Cross

1   Q.  And so it's what you have to say about these two gentlemen

2   that the government will decide whether -- in your mind, that's

3   what you understand, it's what you have to say about these two

4   gentlemen that will determine whether the government -- you

5   gave the government substantial assistance in prosecuting

6   someone else, right?

7   A.  I believe it's the totality of my work.

8   Q.  Now I want to just finish off with discussing Mr. Soohoo,

9   but to be clear, with respect to Mr. Soohoo, he used to take

10  you on trips, right?

11  A.  He did.

12  Q.  Then as time went on it started happening that after the

13  trips when you came back he would start to ask you for favors,

14  right?

15  A.  Plenty of them.

16  Q.  And in the beginning that didn't happen, right?

17  A.  It happened, but not at the high rate that it does later.

18  Q.  But at first when when you went on trips you thought he was

19  a friend taking you on a trip, right?

20  A.  At the very beginning.

21  Q.  So the fact that he was taking you on a trip at first

22  didn't seem like a bribe, right?

23  A.  Not in the beginning.

24  Q.  Because it wasn't linked to anything else, right?

25  A.  Not until he started asking me to do things in return.

1   Q.  And then at some point he started asking you -- after you

2   came back from a trip he would ask you for something, right?

3   A.  He did.

4   Q.  And that's when you say now you -- that's when it seemed

5   like it being a bribe that it was linked to favors that he was

6   asking for you, right?

7   A.  It was.

8   Q.  Correct.  That's when it became a bribe to you, right?

9   A.  Yes.

10  Q.  And it became clear that because of that specific link, it

11  wasn't just friendship, it was because he was bribing you,

12  right?

13  A.  He was.

14  Q.  Okay.  Now sir, I want to talk a little bit about

15  Mr. Grant.  And just directing your attention -- we have

16  already talked about how you regularly helped high ranking

17  officers with their friends' licenses, right?

18  A.  Yes.

19  Q.  And that was many people beyond Mr. Grant, right?

20  A.  There were definitely several others for sure.

21  Q.  Those are referred to as contracts, is that correct?

22  A.  Yes, that's a term that was used.

23  Q.  When an officer would ask you for a favor, it would be

24  called a contract, right?

25  A.  Yes.

IBGTGRA4                          Ochetal - Cross

1    Q.  And that was not because there was any bribe, right?

2                MS. RAVENER:  Objection.

3                THE COURT:  Thank you.  Can you rephrase the question,

4    counsel?

5    Q.  Sir, the term "contract" just referred to a police officer

6    asking you for something, right?

7    A.  If another officer or higher ranking officer asked me to

8    say X about a license, I had no idea of any other underlying

9    circumstances behind it, whatever that meant, I just knew that

10   hey, this is a high ranking official, I'm going to take care of

11   him and his friend.  Whatever the arrangement after that, I

12   didn't care, I didn't deal with, didn't know about.

13   Q.  That was what you referred to as contracts?

14   A.  Yes.

15   Q.  And sir, that was the culture in the licensing division,

16   right?

17   A.  That it was.

18   Q.  That you would just help out other officers get licenses or

19   push through the paperwork quickly for their friends, right?

20   A.  Yes, I would say so.

21   Q.  And one of the people you testified that you wanted to help

22   out and who asked for help on some occasions was Mr. Grant,

23   right?

24   A.  Sure.

25   Q.  And am I correct that you -- part of the reason you wanted

IBGTGRA4                    Ochetal - Cross

1   to help out Mr. Grant was because you liked him?

2   A.  I don't know if I like him per se.  I did not dislike him.

3   I thought he was a cool guy.

4   Q.  Am I correct that you previously told the government that

5   Mr. Grant was one of the boys, he was somebody that was very

6   well liked?

7           MS. RAVENER:  Objection.

8           THE COURT:  Thank you.  You can answer the question.

9   A.  I knew him to be well liked, yes.

10  Q.  And he was just like a real guy's guy, guys like him,

11  right?

12          MS. RAVENER:  Objection.

13          THE COURT:  Sustained.

14  Q.  Was that what you told government?

15          MS. RAVENER:  Objection.

16          THE COURT:  Thank you, sustained.

17  Q.  And so with respect to Mr. Reichberg, this was somebody

18  that you knew to be a friend of Jimmy Grant, right?

19          MS. RAVENER:  Objection, foundation.

20          THE COURT:  Thank you, you can answer the question.

21  A.  I knew him to be associated with Jimmy Grant, I don't know

22  what level.

23  Q.  When Mr. Reichberg came in, he told you he was really close

24  to Jimmy Grant, right?

25  A.  I don't know if the words "really close" came up, but yeah,

IBGTGRA4                          Ochetal - Cross

1    I would say they were close in some regard.

2    Q.  And so you believed at the time that he was a friend of

3    Mr. Grant's, right?

4    A.  Friend or associate.  I didn't think about making the

5    distinction between the two.  I was told Jimmy Grant had

6    someone to come in and take care of him, I didn't care if they

7    were friends or associates or anything, I did what I was told.

8    Q.  So first Mr. Villanueva had texted you that Jimmy Grant was

9    having someone come in that day?

10   A.  Yes.

11   Q.  In fact, it was both Mr. Reichberg and Mr. Rechnitz who

12   came in, Jona Rechnitz?

13   A.  They both came in but I don't remember the text message

14   messaging noting that Rechnitz was coming in, the text message

15   only mentioned Jeremiah Reichberg coming in.

16   Q.  Okay.  And when he came in, he actually came in with Jona

17   Rechnitz also, right?

18   A.  He did.

19   Q.  And when Mr. Reichberg came in, he kind of acted like a big

20   shot, right?

21   A.  Yeah.

22   Q.  He was kind of being a jerk, right?

23   A.  Arrogant.

24   Q.  He was arrogant and jerky, right?

25   A.  That's how I described it.

1   Q.  And am I correct that he really didn't understand the

2   licensing process at all, right?

3           MS. RAVENER:  Objection.

4           THE COURT:  Sustained.  Counsel, can you please

5   rephrase.

6   Q.  Well, you testified on direct that he asked -- he thought

7   he was going to get a gun license the same day, right?

8   A.  Yes.

9   Q.  And that was not the process, right?

10  A.  No.

11  Q.  No one got a license the same day, right?

12  A.  No.

13  Q.  He had to go through a whole process, right?

14  A.  Yes.

15  Q.  So was it your understanding that Mr. Reichberg didn't know

16  what he was talking about?

17          MS. RAVENER:  Objection.

18          THE COURT:  Thank you.  You can answer the question.

19  A.  I didn't give it any thought as far as what he was talking

20  about, it just wasn't my position.  When high-ranking people

21  tell me somebody is coming in, people can drop names all the

22  time, I don't pay it any mind, I just go about with what I got

23  to do, so I kind of left it at that.

24  Q.  But no one ever told you to give Mr. Reichberg a license

25  that day, right?

1   A.  On that day?

2   Q.  Yeah.

3   A.  No, he just simply requested it that day and it ended

4   there.

5   Q.  And you said no, that's not how it works, right?

6   A.  I did say that.

7   Q.  And you also testified on direct that he mentioned the

8   Chief of Police Phil Banks, right?

9   A.  Yes.

10   Q.  And he said he knew him, right?

11   A.  He said he knew him.

12   Q.  And to be clear, Mr. Banks never called you about anything

13   here, right?

14   A.  Mr. Banks never contacted me directly at any point.

15   Q.  Never told you you should do something for Jeremy, make

16   sure that Jeremy Reichberg gets this license, never called you

17   about that at all, right?

18   A.  I never spoke to Chief Banks once in my life.

19   Q.  So you did not think that Mr. Reichberg was saying well,

20   Chief Banks is saying I should get this license, right?

21   A.  He did not say that.

22   Q.  He was just bragging about being a big shot, right?

23   A.  He was bragging.

24   Q.  And bragging about knowing high-ranking officers, right?

25   A.  He did brag about that.

IBGTGRA4                        Ochetal - Cross

1   Q.  But then you told him you needed some documents, right?

2   A.  I did.

3   Q.  And he had brought in some documents with him, right?

4   A.  At the time or later?

5   Q.  On that date.

6   A.  I don't remember exactly what he brought in, but it was not

7   enough documentation.  Say for some oddball reason I wanted to

8   approve the license the same day, I didn't have the documents I

9   would need to approve the license that day.

10  Q.  He didn't bring in everything but he brought in some stuff?

11  A.  Some stuff, I guess.

12  Q.  Mr. Rechnitz, Jona Rechnitz, had not brought in any

13  documents, right?

14  A.  He had nothing with him that day, and that's why he applied

15  another day.

16  Q.  Because he had no documents you didn't even begin to

17  process his application, right?

18  A.  It's not possible.

19  Q.  You had said you have to come back with some documents,

20  right?

21  A.  At the very least an application.

22  Q.  And Mr. Reichberg had brought some documents in, right?

23  A.  I definitely remember him having an application for sure.

24  Q.  And he also had a letter of necessity with him, too, right?

25  A.  I'm not sure that he did.  It's entirely possible because

IBGTGRA4                        Ochetal - Cross

1    it is part of the downloadable application, so it's possible

2    that that was there, probably should be there.  I don't

3    remember it being there, but being that it could be downloaded

4    with the initial application, it's very possible it was there

5    with the application.

6    Q.  So to be clear, the application for gun license is on the

7    internet, you can go there and download it, right?

8    A.  Yes.

9    Q.  And along with that there is also the letter of necessity

10   that you can download, the form that needs to be filled out,

11   right?

12   A.  Yes.

13   Q.  And am I correct that that's what Mr. Reichberg had on that

14   first day, the stuff that was downloaded he brought in?

15   A.  Not a hundred percent sure, but if he had anything, it

16   definitely would be what was downloadable off the internet.

17   Q.  And that's why he was saying he thought he had the

18   paperwork and it should just go through that day, right?

19            MS. RAVENER:  Objection.

20            THE COURT:  Thank you.  Sustained.

21   Q.  Do you recall that that's what he said to you, that he had

22   the paperwork and he thought that's all he would need, right?

23   A.  I don't recall him saying hey, I got everything I need,

24   this should be done.  I don't recall that conversation.  If it

25   happened, it happened, but it wouldn't matter to me, it would

1    just go in one ear and out the other.  So it would make no

2    difference to me, it could have been anybody.

3    Q.  Because he was wrong, right, he needed more paperwork,

4    right?

5    A.  Yes.

6    Q.  And that's what you told him, right?

7    A.  I did.

8              MS. NECHELES:  I just want to look for a minute at the

9    application that we have in evidence, which is Mr. Reichberg's.

10   What exhibit is it?

11             Government Exhibit 732 in evidence, could I put on the

12   screen to show the jury and the witnesses, your Honor?

13             THE COURT:  Yes, you may.

14             MS. NECHELES:  Thank you.

15   BY MS. NECHELES:

16   Q.  Am I correct that this is what was kept on the computer

17   about Mr. Reichberg's application?

18   A.  On the computer, I would say yes, this is what would be on

19   the computer.

20   Q.  This is not the form that he filled out and brought in to

21   you that day, right?

22   A.  This is just information that I entered based on the form

23   he brought in to me.  This is not the actual form.

24   Q.  Just to be clear, his file is missing, right?

25   A.  It is.

1    Q.  So we don't know what was in the file, right?

2    A.  We do not.

3    Q.  But this is what was kept on the computer separate from the

4    file, right?

5    A.  This is just information in the computer system that can be

6    printed out on this page and that's it.

7    Q.  So when you look at what he says is the business address,

8    the corporation name is Taly Diamonds, Limited, right?

9    A.  Right.

10   Q.  And it does not say that he was the owner there, right?

11   A.  No, I don't see it saying that.

12   Q.  And am I correct that -- based on your work in the

13   licensing division, one of the people, one of the types of

14   people who would come in for a gun license, carry licenses,

15   carry business licenses, were people in the diamond industry,

16   right?

17   A.  There have been other individuals in the diamond industry,

18   yes.

19   Q.  And people in the diamond industry, sometimes they're

20   carrying extremely valuable diamonds on their person, right?

21   A.  I agree.

22   Q.  And they work in a location typically that is known to be

23   where people who have diamonds work, right?

24            MS. RAVENER:  Objection.

25            THE COURT:  Thank you.  Sustained.

1   Q.  Well, you talked on direct -- you were asked a lot of

2   questions about known risk factors about what kind of people

3   would get a carry license, business carry license, right?

4   A.  Yes.

5   Q.  Do you recall those questions?

6           And one of the things you testified about was that if

7   the business was known to be in a risky location, right?

8   A.  Yes.

9   Q.  And the diamond industry on 5th Avenue around 47th Street

10  is known to be the diamond -- where the diamond dealers are,

11  right?

12  A.  That's what it is, yes.

13  Q.  And diamond dealing -- people who are carrying around

14  diamonds and very valuable jewels like that are sometimes

15  targeted for robberies, right?

16  A.  Yes, they could be targeted.

17  Q.  So that's a known risky location or operation, right?

18          MS. RAVENER:  Objection.

19          THE COURT:  Thank you.  Sustained.  Can you please

20  rephrase?

21  Q.  In the course of your -- as something that would qualify as

22  a risk factor that would entitle someone to have a pistol

23  license, that would be the kind of thing, right?

24  A.  It would definitely be something that would be considered

25  for sure.

1  Q.  Because you said before people have to show cause to get a

2  gun permit, a carry permit, right?

3  A.  Well, for -- there's differentiation between limited and

4  full premise business, so it's -- I'm saying it's a little more

5  to it than that.

6  Q.  Right.  You have to show a risk factor, you have to show

7  risk factors, reasons that you would need a carry?

8  A.  A risk -- a 24/7 risk is what I kind of want to try to say,

9  if that makes sense.

10  Q.  Not just that your business location is dangerous, but

11  there's another risk at other times as well, is that what

12  you're saying?

13  A.  Yeah, different times you go from place to place, you're

14  picking up diamonds or cash or whatever valuables at midnight,

15  you know, not at 3 o'clock.  So that's why I was trying to

16  differentiate between several different types of carry

17  licenses.

18  Q.  And one thing that would establish that is if someone were

19  a diamond salesman, right?

20  A.  Yes.

21  Q.  And because they would be carrying diamonds around to

22  different locations, right?

23  A.  Sure, that could make them a risk.

24  Q.  And you're aware that in the diamond industry things are

25  given out on consignment often, right, diamonds are given out

1    on consignment?

2                MS. RAVENER:  Objection.

3                THE COURT:  Thank you.  You can answer the question if

4    you know the answer.

5    A.  I'm not sure what you mean.

6    Q.  Well, people, salesmen, would take diamonds from a place

7    like Taly Diamonds and take them somewhere else to show them to

8    potential clients, right?

9                MS. RAVENER:  Objection.

10               THE COURT:  Thank you.  Sustained.

11   Q.  Well, are you aware, is that one of the things that would

12   qualify someone to get a diamond -- or a carry gun permit?

13               MS. RAVENER:  Objection.

14               THE COURT:  Thank you.  You can answer that question.

15   A.  Again, it comes back to the type of permit you want to

16   issue.  Just because that exchange is happening, when is it

17   happening?  Is it happening on a Saturday?  Is it happening on

18   a Sunday?  Because a full carry you can come and go whenever,

19   whatever day, it's not restricted to like business hours.  So

20   it's hard to say.  I can't determine that.  It's just based on

21   like hyperbole, I guess, like I have to see when is this person

22   going in and doing these transactions.  So it would be a

23   case-by-case basis.

24   Q.  But that would be the type of thing that you would be

25   looking at?

IBGTGRA4                       Ochetal – Cross

1   A.   I would be looking at that.

2   Q.   And someone who established that they were a diamond

3   salesman and who were carrying around diamonds to different

4   locations and selling them at different locations, and that

5   would be factors that you would be considering, right?

6   A.   Yes, you could definitely consider those factors.

7   Q.   And am I correct that that is what Mr. Reichberg told you

8   that day that he was doing?

9   A.   I don't remember exactly what he told me as far as his

10  business practice goes.  He definitely did tell me he dealt

11  with wholesale diamonds within the diamond district.  I don't

12  recall his days and hours and such like that, but he did

13  explain that he was a diamond wholesaler in the diamond

14  district.

15  Q.   And he was selling diamonds to different people, is that

16  correct?

17  A.   Something to that extent.

18  Q.   And you don't remember the details of it, but you remember

19  him telling you that he was carrying around diamonds to

20  different locations?

21  A.   He did say that.

22  Q.   And that's why he said he needed a carry permit, right?

23  A.   That's why he said it.  I don't know if it was on his

24  letter of necessity because I don't have it, I don't remember

25  it, but he mentioned something about carrying diamonds.

IBGTGRA4                        Ochetal - Cross

1   Q.  And now that day when he -- he had only given you some of

2   the paperwork, am I correct you gave him a list of what other

3   paperwork was needed?

4   A.  I either verbally told him -- I'm not sure if he wrote it

5   down or I kind of gave him a checklist saying hey, give me this

6   stuff.  There was definitely a conversation about hey, you need

7   additional documents.

8   Q.  Well, let me show you what is in evidence as Government

9   Exhibit 536A.

10          MS. NECHELES:  Could we show that to him and the jury,

11  your Honor?

12          THE COURT:  You may.

13          MS. NECHELES:  Thank you.  And page 58.

14  Q.  If you look at line 51328.

15  A.  Yes.

16  Q.  You see there that David Villanueva texted you that he lost

17  the list of documents, you might have to call him.  Right?

18  A.  Okay.

19  Q.  And so does that refresh your recollection that you had

20  given him a list of what he needed to bring to you?

21  A.  I must have gave him a list as opposed to verbally telling

22  him.

23  Q.  And at the end you see 51332?

24  A.  Mm-hmm.

25  Q.  You said laughing out loud, he has diamonds in his head,

1    laughing out loud, is that correct?

2    A.   Yes.

3    Q.   And that's because he had been talking to you about the

4    diamond business and how he carried around diamonds, right?

5    A.   I would view that text message -- obviously it was known he

6    dealt with diamonds, and I think it was kind of a joke between

7    me and Dave saying he forgot because his head is all filled

8    with diamonds.  It was a joke, you know, that's what I'm taking

9    it as.

10   Q.   It was a joke?

11   A.   He forgot the documents.  How could he possibly forget my

12   list?  So I'm assuming I made a joke, he's got too many

13   diamonds to remember.

14   Q.   It was a joke, but in part based on that he had been

15   talking about diamonds with you, right, in his business, right?

16            MS. RAVENER:  Objection.

17            THE COURT:  Thank you, you can answer the question.

18   A.   He mentioned he was in the diamond business, so I had no

19   reason to not believe it.  I took it at face value that's what

20   he did.

21   Q.   Am I correct that when he first came in, part of what you

22   did was interview him, right?

23   A.   When he came in as I was putting information in the

24   computer, yeah.

25   Q.   You interviewed him about what his job responsibilities

IBGTGRA4                    Ochetal - Cross

1   were?

2   A.  Yeah.

3   Q.  That was your process, right?

4   A.  In this particular case.

5   Q.  And he was kind of a little flaky, right?

6          MS. RAVENER:  Objection.

7          THE COURT:  Counsel, can you rephrase the question?

8   Q.  Isn't part -- well, isn't part of what the joke was there

9   is that Mr. Reichberg was a little not organized?

10  A.  I would say not organized and vague as opposed to flaky.

11  Q.  All right.  And after this, am I correct that you were

12  tasked to contact Mr. Reichberg about getting more paperwork,

13  right?

14  A.  Yes.

15  Q.  Who tasked you with that?  Who told you to do that?

16  A.  It would have either been -- I'm only assuming, I don't

17  remember, Sergeant Villanueva or Jimmy Grant or Jimmy Grant

18  through Sergeant Villanueva, something to that effect, I don't

19  remember.

20  Q.  Would you have had that kind of discussion with Mr. Grant?

21          MS. RAVENER:  Objection.

22          THE COURT:  Thank you.  Can you rephrase the question,

23  please, counsel?

24  Q.  You say it might have been Mr. Grant, right?

25  A.  Might have been, I don't know.

IBGTGRA4                          Ochetal – Cross

1   Q.  Is that the kind of discussion that you used to have with

2   Mr. Grant?

3          MS. RAVENER:  Objection.

4          THE COURT:  Thank you.  You can answer the question.

5   A.  I wouldn't speak to Mr. Grant on a regular basis like that.

6   I mean obviously I knew who he was and all of that, but -- it's

7   possible I spoke to him.  I tend to lean on the side that I

8   spoke to Dave and Dave reached out to him, because I remember

9   Dave being closer to James Grant than I was.  He knew him

10  before I did.  So it could be either one, I don't remember.  If

11  I had to guess, I would tell Dave hey, tell Jimmy to tell

12  Mr. Reichberg he needs these documents, and that's how we get

13  them, or here's my email, however it came about, but it would

14  be either one.

15  Q.  To be clear, mainly you would tell things to Mr. Villanueva

16  but sometimes you would say things directly to Mr. Grant, is

17  that correct?

18  A.  It's possible.  I can't remember.

19  Q.  I'm not talking about the specific incident, I know you

20  don't remember, but you are saying sometimes you would tell

21  things to Mr. Grant but mainly you would tell things to

22  Mr. Villanueva about people that Mr. Grant was trying to help.

23  Is that a fair characterization of your testimony?

24  A.  I really don't know.  I would have to say I more likely

25  lean towards talking to Sergeant Villanueva first, but that

1  doesn't mean a hundred percent I never spoken to Jimmy Grant

2  about anything pertaining to license division stuff.  It's

3  possible even maybe while he was in the office or something

4  like that.  I honestly don't recall, but I would not rule it

5  out.

6  Q.  So just to be clear, the kinds of things you would either

7  be speaking to Mr. Villanueva for him to speak to Mr. Grant or

8  directly to Mr. Grant are saying what other documents or things

9  were needed to complete the application, right?

10          MS. RAVENER:  Objection.

11          THE COURT:  Thank you, you can answer the question.

12  A.  Can you repeat that?

13  Q.  The kinds of things that you would have been speaking to

14  Mr. Grant about or to Mr. Villanueva for him to speak to

15  Mr. Grant about are what other documents were needed to

16  complete the application, right?

17          MS. RAVENER:  Objection.

18          THE COURT:  Thank you, sustained.  Can you please

19  rephrase the question?

20  Q.  Sir, you were just testifying a minute ago that there were

21  occasions when you spoke to Mr. Villanueva to tell something to

22  Mr. Grant, and that was about people who Mr. Grant had asked

23  friends of his to get an application processed, right?

24  A.  Yes.

25  Q.  And sometimes you may have also spoken to Mr. Grant

1    directly, but you don't recall, right?

2            Is that your testimony?

3    A.  Yes.

4    Q.  And the kinds of things that those conversations would have

5    been about, am I correct, is about documents that were needed

6    for the applications that you were processing?

7            MS. RAVENER:  Objection.

8            THE COURT:  Thank you.  Can you rephrase the question.

9    Conversations with whom?

10   Q.  The conversations that you had with Mr. Villanueva giving

11   him information to pass to Mr. Grant would be about documents

12   that were needed to complete the applications, right?

13           MS. RAVENER:  Objection.

14           THE COURT:  You can answer the question.

15   A.  Yeah.

16   Q.  And that would be the kind of -- if you had those

17   conversations with Mr. Grant, that would be the same thing, the

18   kind of documents that would be needed, you would be explaining

19   to him what was needed, right?

20           MS. RAVENER:  Objection.

21           THE COURT:  Thank you, sustained.

22   Q.  Do you recall that -- well, you testified you may have

23   spoken to Mr. Grant about applications also, right?

24   A.  I may have.

25   Q.  And if you did, am I correct that your recollection is you

1    would be speaking to him about documents that were needed for

2    the files?

3              MS. RAVENER:  Objection.

4              THE COURT:  Thank you, sustained.

5    Q.  But here, anyway, what you recall is that you spoke to

6    someone about what other documents were needed for the files,

7    right?

8    A.  Yes.

9    Q.  When you say you -- and then you were tasked to call

10   Mr. Reichberg, right?

11   A.  I'm not sure I remember, but I might have or I might have

12   contacted him through email for this documentation.

13   Q.  Have you seen an email?

14   A.  Have I what?

15   Q.  Have you seen an email where you contacted him about this?

16   A.  No.

17   Q.  But you recall having reached out to Mr. Reichberg again to

18   tell him what other documents were needed, right?

19   A.  I would say I feel like I did.

20   Q.  And then you recall that you say you believe you did

21   receive something, right?

22   A.  I do recall receiving something.

23   Q.  And you said you either thought that you possibly had the

24   bank statements, correct?

25   A.  Possibly.

1    Q.  And you possibly had other documents that were required,

2    like the safeguard letter and the cohabitant letter, right?

3    A.  Yes, that was possibly there.

4    Q.  And sir, just to be clear, if someone –– there were very

5    specific things that were needed, correct?

6    A.  Yes.

7    Q.  And specific things that a letter of necessity would need

8    to state, right?

9    A.  Yes.

10   Q.  And would the letter of necessity be the letter you got

11   from the employer?

12   A.  The letter of necessity came from –– was supposed to come

13   from the owner of the business, because sometimes the owner of

14   the business wanted a carry license and sometimes the owner of

15   the business was endorsing an employee for that task of having

16   the firearm.

17   Q.  So to get a carry license or even a business carry license,

18   either a full or restricted one, the owner of the business

19   would have to say that the person was carrying diamonds or

20   engaged in diamonds and was in the diamond –– working for the

21   company, right?

22   A.  That would be part of it, yeah.

23   Q.  And maybe would have to say some other things, too, right?

24   A.  There usually was more to it than that.

25   Q.  And you were familiar with the process, you would know what

1   had to be said in that letter, right?

2           MS. RAVENER:  Objection.

3           THE COURT:  You can answer the question.

4   A.  If you were familiar with the process, you might be able to

5   explain yourself further.

6   Q.  And if somebody asked you when they were applying for the

7   license and you said to them you need a letter of necessity and

8   they asked you what does it need to say, you would explain to

9   them what it needed to say, right?

10          MS. RAVENER:  Objection.

11          THE COURT:  Could you rephrase the question, please.

12  Q.  It was your practice, sometimes would people ask you what

13  does the letter of the necessity need to say?

14  A.  I'm sure there were times where people would ask what does

15  this mean, what has to be in here, and I would explain to them

16  you need to show proper cause, you need to explain why you need

17  a carry license.  What differentiates you from every other

18  civilian in this city that does not have this privilege?

19  Q.  And if they were in the diamond industry, you would explain

20  what the owner needs to say about diamonds or carrying

21  diamonds?

22          MS. RAVENER:  Objection.

23          THE COURT:  Thank you.  Can you please rephrase the

24  question, counsel.

25  Q.  Do you recall talking to someone in the diamond industry

IBGTGRA4                         Ochetal – Cross

1   about that?

2   A.  I'm not sure as far as exactly what to say, I kind of would

3   assume on what I just said they would know what to say.

4   Q.  And by explaining to people what needed to be in that

5   letter, there was nothing improper to explain that to people,

6   right?

7           MS. RAVENER:  Objection, mischaracterizes the

8   testimony.

9           THE COURT:  Thank you.  Counsel, please rephrase.

10  Q.  Did you think that was proper to do, to explain to people

11  what needed to be in the letter of necessity?

12          MS. RAVENER:  Objection.

13          THE COURT:  Thank you.  You can answer the question.

14  A.  I never gave that any thought.  If they asked me about the

15  letter of necessity, I explained what needed to be in -- I mean

16  I don't think I gave specifics like dot per dot, I always

17  thought it to be kind of self-explanatory, but if someone had

18  an issue with it, I would kind of give them a guideline of not

19  exactly word for word what to say.

20  Q.  But guidelines of what kind of things they needed to say in

21  there?

22  A.  Yeah, so they had an understanding of what it meant.

23  Q.  I want to turn your attention to at some point

24  Mr. Reichberg's file disappeared, you said.

25  A.  Yes.

IBGTGRA4                         Ochetal – Cross

1    Q.  And in fact, you had looked -- went looking for the file,

2    right?

3    A.  Yes.

4    Q.  You had seen the file in a filing cabinet, right?

5    A.  Yes.

6    Q.  And at some point you became aware that there was an

7    investigation into Mr. Reichberg and Mr. Grant and others,

8    right?

9    A.  Yes.

10   Q.  And that was in the newspapers, right?

11   A.  Yes.

12   Q.  And at that point you were concerned about the file, right?

13   A.  Yes.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. NECHELES:

2    Q.  You were already concerned about what you had done in the

3    past, right?

4    A.  Not in this instance.  I wasn't so worried about this

5    particular file in this case.

6    Q.  Right, you weren't worried about Mr. Reichberg's file,

7    that's what you're saying, right?

8    A.  I knew he was in an incident, and I knew there was an

9    incident at the time, and the folder needed to be pulled.

10   Q.  Let me focus on what that means.  What you're saying is you

11   had no worries at that point about what you had done with

12   respect to Mr. Reichberg, right?

13   A.  I wouldn't say complete worries.  I knew things had been

14   done, but I also understood there were other people involved in

15   this file, so I kind of assumed that they knew about it and

16   were working on it or whatever.  I wouldn't say I was

17   completely unworried, but knowing there was other people

18   involved, I just knew what I had to do, and my first thing was

19   to pull the file.

20   Q.  So just stepping back for a minute, you were looking at the

21   file because -- you were looking for the file because you knew

22   that maybe his license had to be suspended at that point,

23   right?  Is that your testimony?

24   A.  No.  I was looking for the file because it's just protocol,

25   when somebody's in an incident, to pull the file.  And being

1  that there was an incident, it was part of my thing, you pulled

2  the file, you get the file, you get the information, you

3  contact the licensee, tell them to come down, surrender their

4  license, surrender their firearm, and it just goes on and on.

5  So it was just part of the process.

6  Q.  Okay.  So the incident that you're talking about was it was

7  in the newspapers that he was under investigation, right?

8  A.  Yes.

9  Q.  And that means that when someone is under investigation in

10  that way, you need to go through a process that leads to the

11  suspension of his license, right?

12  A.  Yes.

13  Q.  So that's why you went looking for the file, right?

14  A.  Yes.  It was part of what my job was at the time.

15  Q.  You did not think that there was something improper that

16  you had done with Mr. Reichberg, right?

17  A.  I didn't think it at the time.

18  Q.  Right.

19  A.  I mean, I know the file was rushed and all sorts of stuff,

20  but I didn't think it at the time.  I thought the first thing

21  was to do was just to get the file first.

22  Q.  So you went to get the file because you thought that you

23  had to go through a certain process, right?  Because you were

24  doing your job about the process that had to be done when

25  somebody -- you learn that somebody was under investigation,

1    right?

2    A.  Yes.

3    Q.  And you saw that -- you couldn't find the file at that

4    point; am I correct?

5    A.  I couldn't find it.  Coming into work, I kind of knew that

6    I should be the one to find it, so that's why as soon as I got

7    in, it was the first thing I did.  Because I dealt with it, so

8    I knew I should be the first one to find the file, and I didn't

9    find it.

10   Q.  You knew you should be the first one to find it because

11   that was your job at that time, right?

12   A.  Well, not only was it my job, it was my case.  So, I mean,

13   my name was on it, so...

14   Q.  So you wanted to make sure you did the proper thing there,

15   right?

16   A.  I wanted to make sure that I retrieved this file first

17   before anybody else did.

18   Q.  And that was because you were going to start the process,

19   and you were not concerned that this was Jimmy Grant's friend

20   that you were starting this process of suspension on, right?

21           MS. RAVENER:  Objection.

22           THE COURT:  Thank you.

23           Counsel, can you rephrase?

24   BY MS. NECHELES:

25   Q.  Well, when you made that decision, you weren't worried that

1    this was Jimmy Grant's friend that you were going to go forward

2    in the process that would lead to suspension of his license?

3              MS. RAVENER:  Objection.

4              THE COURT:  Thank you.

5              Sustained.

6    BY MS. NECHELES:

7    Q.  Okay.  Sir, what you were starting off to do was start a

8    process that would lead to suspension of Mr. Reichberg's

9    license, right?

10   A.  Yes.

11   Q.  And at the time that you started that process, you knew

12   that this was Mr. Grant's friend, right?

13             MS. RAVENER:  Objection.

14             THE COURT:  Thank you.

15             Sustained.

16   Q.  Well, you testified about that before, right?

17             MS. RAVENER:  Objection.

18             THE COURT:  Thank you.

19             Sustained.

20   Q.  Okay.  In your mind, you believed that Mr. Reichberg was

21   associated with Jimmy Grant, right?

22   A.  Yes.

23   Q.  And Mr. Grant had asked for -- had been the one who

24   introduced him to the licensing division, right?

25   A.  That's correct.

1   Q.  But you were not worried that Mr. Reichberg was associated

2   with Mr. Grant, right?

3   A.  The association wasn't what worried me.  I was just worried

4   because I handed in an incomplete file.

5   Q.  So you wanted to make sure you did the right thing now and

6   suspended it, right?

7           MS. RAVENER:  Objection.

8           THE COURT:  Thank you.

9           You can answer the question.

10          THE WITNESS:  It wasn't even really about suspending,

11  it was just about finding his folder and having it before

12  anybody else did, because I knew that, you know, whatever

13  shortcuts were taken were shortcuts that I contributed to, so

14  if somebody else finds it, they're going to look at me and be

15  like, oh, you didn't do your job, so...

16  Q.  At the time, am I correct that many files -- you found that

17  many files were missing then?

18  A.  There were several files that were missing.

19  Q.  When this occurred, when you went and looked for that file,

20  this was several months before the date on which Mr. Reichberg

21  sold his gun, right?

22  A.  When I last saw the file?

23  Q.  When you went to look for the file, and it was missing.

24  A.  When I looked for the file, it was on the day it became an

25  incident, is that what you're asking?

1   Q.  He had not sold his gun yet, right?

2   A.  No.

3   Q.  It was well before he sold his gun, right?

4           MS. RAVENER:  Objection; foundation.

5           THE COURT:  Thank you.

6           You can answer the question, if you know the answer.

7           THE WITNESS:  I don't know the timeline, how soon

8   after he became an incident because he turned his gun in.  I

9   wasn't...

10  BY MS. NECHELES:

11  Q.  You know when you went and looked at the file, it was

12  before he sold his gun, right?

13          MS. RAVENER:  Objection; foundation.

14          THE COURT:  Thank you.

15          You can answer the question.

16          THE WITNESS:  When I last saw the file, it was before

17  he was even an incident.

18  Q.  So you last saw the file -- do you remember when that was?

19  A.  A couple of months before he became an incident.

20  Q.  And then he became an incident at some point --

21  A.  Yes.

22  Q.  -- meaning he was in the newspapers as being under

23  investigation, right?

24  A.  Yes.

25  Q.  And when he first was in the newspapers being under

1   investigation, he had not sold his gun yet, right?

2          MS. RAVENER:  Objection.

3          THE COURT:  Thank you.

4          If you know the answer, you can respond.

5          THE WITNESS:  He sold his gun after that.  I don't

6   know when he sold his gun.  I wasn't...

7   BY MS. NECHELES:

8   Q.  Because after he became an incident, as you call it, then a

9   process was started to suspend his license, right?

10  A.  Yes.

11  Q.  And it was after that process was started, that he sold his

12  gun, right?

13         MS. RAVENER:  Again, objection, your Honor.

14         THE COURT:  Thank you.

15         You can answer the question, if you know the answer.

16         THE WITNESS:  Just repeat that.

17  Q.  It was after that process was started to suspend his

18  license, that he sold his gun, right?

19  A.  I still don't remember when he sold his gun, though.

20  Q.  Okay.  I'm just not asking the actual date.  I'm saying:

21  Do you recall that there was a process started that would lead

22  to the suspension of his license, and he was contacted?

23         MS. RAVENER:  Objection; asked and answered.

24         THE COURT:  Thank you.

25         You can answer the question.

1          MS. RAVENER:  Lack of foundation.

2          THE WITNESS:  I just don't remember that process.

3     When he became an incident, I didn't handle it.

4     BY MS. NECHELES:

5     Q.  Oh, you didn't handle it?  No?

6     A.  No.  I was tracking down the folder, never found the

7     folder, and at some point, I found out that he came in and

8     turned in his firearm.

9     Q.  Okay.  And it was some point thereafter; am I correct?

10    A.  Thereafter what?

11    Q.  Thereafter, after the date when you couldn't find the file?

12    A.  It was after a date when I couldn't find the file, that he

13    came in and surrendered his firearm.

14    Q.  And just as a matter of process, when there is an incident,

15    after that, an investigation is started that leads to a

16    suspension of the license?

17    A.  It's initially automatically suspended, and you turn your

18    license in, you turn your firearm in, and then you're suspended

19    until an investigation is done, and a review is done, and it's

20    determined if you get it back or not.

21    Q.  Okay.  So, first, there's the incident, and then after,

22    there is a process started, and someone's license is suspended.

23    That's how the process works, right?

24    A.  Yes.  I mean, technically, as soon as you're an incident,

25    your license is supposed to be suspended.  So, the same day, if

we get a report down from DCJS, let's just say, that an

applicant was arrested for anything, it's that day, they're an

incident that day, we try that day to contact them and get the

gun and license that day.

There's really never supposed to be a buffer because

once they're an incident, it's that day, like.  So if they're

an incident, and we wait on it, we don't get the gun or the

license for a month, and they go out and commit a crime with

the gun, it comes back to the New York City Police Department.

So we were always supposed to do our best to get it right away

if we got that report back from DCJS.  That didn't always

happen, but if that came down, we tried to get it as soon as

possible.

Q.  Okay.  So, then, what you just described was when you get

notice of an arrest, right?

A.  Right.

Q.  But that was not the incident that you talked about here,

right?

MS. RAVENER:  Objection.

THE COURT:  Thank you.

You can answer the question.

THE WITNESS:  There -- I'm sure there was a notice

that came down.  To be perfectly honest, I knew about it coming

into work because of the papers, but there obviously was

already a report generated from upstairs down to us.  So it was

1   already known before I even got in.

2   BY MS. NECHELES:

3   Q.  When you got in that day, it was already --

4   A.  It was already known.  People were talking about it, people

5   were going crazy, people were looking.  I came in, it was like,

6   hey, I'm going to try and find his file, so I thought, hey, I

7   know where it is, and it wasn't where I thought it was.  So it

8   was already known by -- I don't know.  I got in that day, I

9   don't know -- I normally got in around, whatever, 6:30; by

10  4:30, it was already known.  People were already in the office

11  talking about it.

12  Q.  And people were looking for the file; am I correct?

13  A.  Oh, yeah, people -- I'm sure people were already looking

14  for it.

15  Q.  And then I want to direct your attention to the document

16  relating to him surrendering the license, which is Government

17  Exhibit -- what's the number -- 733, if you could.

18          MS. NECHELES:  Your Honor, that's in evidence.  Can we

19  put that on the screen?

20          THE COURT:  You may.

21          MS. NECHELES:  Okay.

22  BY MS. NECHELES:

23  Q.  This was the request for permission to sell firearms,

24  right?

25  A.  Yes.

1    Q.  Am I correct that the date on that -- is the date 3/10 --

2    I'm sorry, that's not the date.  On the second page, it's

3    3/2/16; am I correct?

4    A.  That 3/2/2016 is the day that this particular gun dealer

5    bought a firearm.

6    Q.  Okay.  And this form, am I correct, is something that is

7    filled out by the gun dealer?

8    A.  Yes.

9    Q.  So the information on that form is put there by the gun

10   dealer, right?

11              MS. RAVENER:  Objection, your Honor; foundation,

12   speculation.

13              THE COURT:  Thank you.

14              Counsel, can you rephrase?

15   BY MS. NECHELES:

16   Q.  Well, sir, is it your understanding that a gun dealer fills

17   out this form?

18   A.  Yes.

19   Q.  The next page is the actual bill of sale from the gun

20   dealer, right?

21   A.  Yes.

22   Q.  If you look at the handwriting there, and we look back at

23   the prior page, it's the same handwriting, right?

24              MS. RAVENER:  Objection.

25              THE COURT:  Sustained.

IBGKGRA5                        Ochetal – Cross

1    BY MS. NECHELES:

2    Q.   To you, does that look like the same handwriting?

3              MS. RAVENER:  Objection, your Honor.

4              THE COURT:  Sustained.

5              MS. NECHELES:  Your Honor, can we approach on that?

6              THE COURT:  Please come on up.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  There's an objection.

3           MS. RAVENER:  Your Honor, this is improper argument.

4    This witness -- first of all, these are matters for the jury.

5    Second of all, there's no foundation that this witness knows

6    anything about this document.  He hasn't testified that he

7    dealt with it in any fashion.  He has explained that this is

8    not even the kind of document he would fill out or deal with.

9           For counsel to be seeking a lay opinion from this

10   witness about matching up handwriting is argument that counsel

11   is entitled to make in closing, but it's not properly a

12   question put to this witness.  That is for the jury to judge.

13          THE COURT:  Thank you.

14          MS. NECHELES:  Judge, two things.  They showed him

15   this document on direct examination, and they made a big point

16   about how it had inaccurate information.

17          MS. RAVENER:  Did not.

18          MS. NECHELES:  Or it says that he's a manager, and

19   they're going to argue that that was false information from

20   Mr. Reichberg.

21          Number two, the case law is very clear:  Anybody can

22   give an opinion.  You can ask a layperson about opinion on

23   handwriting.  There's case after case.  I don't have them right

24   here, but that is standard.  That is well-accepted law.  You

25   can ask a lay witness about handwriting.  You don't need a

1    handwriting expert.

2            THE COURT:  I'm sorry --

3            MS. NECHELES:  Does that appear to you to be the same

4    handwriting?  The jury is going to decide.  They'll look at it,

5    and they'll decide, but you're allowed to ask a lay witness,

6    does that appear to you to be the same handwriting because

7    normal people can make that guess or determination.

8            MS. RAVENER:  Which is why the jury can make that

9    determination, Ms. Necheles.

10           MS. NECHELES:  You're allowed to ask a lay witness.

11           MS. RAVENER:  To be clear, there's no basis to think

12   this witness has any familiarity with this particular

13   handwriting.

14           Furthermore, this portion of the document was not

15   shown to this witness.  The portion --

16           MS. NECHELES:  Judge, you can't --

17           THE COURT:  I'm sorry.

18           MS. NECHELES:  You're right.

19           THE COURT:  That's fine.

20           Go ahead.

21           MS. RAVENER:  The portion shown to the witness was the

22   actual copy of the license, which he testified he printed out.

23   So, in any event, I think Ms. Necheles has made the point,

24   laypeople can match up handwriting.  That is the province of

25   the jury.  This witness has no specialized knowledge to assist

1    them in that.

2                THE COURT:  Thank you.

3                Counsel, how much more time do you anticipate?

4                MS. NECHELES:  Probably about —— I'm going to try to

5    finish by the end, by 2:00, your Honor, and then I think

6    Mr. Meringolo has a little bit.

7                THE COURT:  Thank you.

8                Let's move on this.  I will invite you to write me

9    about the question of whether or not this is a witness that can

10   provide testimony.  As I understand it, he's not seen this

11   document before, so this is purely a request that he look at

12   handwriting on one page and compare it to the other.

13               It would be good if we could finish up at least on

14   cross-examination today.

15               MS. NECHELES:  And just leave that portion, leave the

16   cross open, so we can deal with that ——

17               THE COURT:  We can set that aside, that's fine, for

18   that one thing.

19               MS. NECHELES:  —— on Monday?

20               THE COURT:  Thank you.

21               MS. NECHELES:  Thanks.

22               (Continued on next page)

23

24

25

1              (In open court)

2              THE COURT:  Good.  Thank you.  Counsel, you can

3      proceed.  I'm sorry for the interruption.

4              MS. NECHELES:  Thank you, your Honor.

5      BY MS. NECHELES:

6      Q.  If you turn the page to the next page, just to be clear,

7      that document is the receipt from for the sale of the gun,

8      right?

9              MS. RAVENER:  Objection.

10             THE COURT:  You can answer the question if you can

11     respond.

12     A.  Yes, it looks like a receipt, sure.

13     Q.  Okay.  So when you testified --

14             MS. RAVENER:  Your Honor, move to strike.  This

15     witness is guessing about the contents.

16             THE COURT:  Thank you.

17             Can you rephrase the question, counsel.

18     Q.  All right.  Well, let me ask it this way:  Does this

19     refresh your recollection that your testimony on direct that

20     Mr. Reichberg brought -- surrendered his gun to the licensing

21     division was an error, that in fact --

22             MS. RAVENER:  Objection; mischaracterizes the

23     testimony.

24             THE COURT:  Thank you.

25             Counsel, can you rephrase.

1          MS. NECHELES:   Okay.  Maybe I'm mistaken.

2    Q.  Did you testify on direct that Mr. Reichberg surrendered

3    his gun to the licensing division?

4    A.  Yes.  And by surrendering, you have two options:  One, to

5    voucher it at a precinct, and another is to take it to an FFL

6    dealer and have it stored there.

7    Q.  Okay.  I understand now.

8          So it's not that he came in to the precinct and gave

9    over his gun --

10   A.  He's not supposed to.

11   Q.  He's not supposed to?

12         MS. RAVENER:  Objection; foundation.

13         THE COURT:  Thank you.  Sustained.

14   Q.  So what you meant by surrender his gun is that he sold his

15   gun; is that correct?

16         MS. RAVENER:  Objection; foundation.

17         THE COURT:  Thank you.

18         Counsel, can you rephrase.

19   Q.  Okay.  Sir, when you said surrender his gun, what did you

20   mean by that?

21   A.  Relinquished it.

22   Q.  One of the ways to relinquish that is to sell it; is that

23   correct?

24   A.  You are allowed to sell it.

25   Q.  And then you would have to -- when someone buys the gun,

IBGKGRA5                    Ochetal – Cross

1  they're required to give notice to the licensing division,

2  right?

3  A.  Well, anytime somebody buys a firearm, it has to be

4  noticed -- the person who buys the firearm needs a purchase

5  order anyway, so that's a different process in itself as far as

6  purchasing.

7  Q.  Okay.

8  A.  A dealer doesn't have the same guidelines.

9  Q.  A dealer has a different guideline than an individual,

10  correct?  Is that what you're saying?

11  A.  Yes.

12  Q.  But going back to the first page of this -- would this

13  document be filed by the individual or would it also be filed

14  by the dealer?  And just directing your attention to the middle

15  of this, it has a stamp.

16  A.  Well, the dealer would need a copy of it because of the --

17  they might not necessarily need this copy.  What they do need

18  is the log number.  At the bottom left there's a log number --

19  I can't see it.  It's 85/2016.  The dealer needs that log

20  number.

21  Q.  Let's go back to that.  That's the number you talked about,

22  right?

23  A.  Yes.

24  Q.  Where would he get that log number from?

25  A.  He would get that from the licensing division.

1   Q.  Okay.  So, going back --

2   A.  So a licensee needs permission to sell a firearm.

3   Q.  Okay.

4   A.  Once they get permission, a log number is generated.  The

5   dealer gets this log number.  The dealer should be getting this

6   form, but as long as the dealer has this log number, he can log

7   it into his book of inventory.  This way, he's legit for taking

8   in the firearm.

9   Q.  This document, you can see at the top, there is an

10  indication that it was faxed on April 28, 2014?

11  A.  You said April 28?

12          MS. RAVENER:  Objection.

13          THE COURT:  Thank you.

14          Counsel?

15          MS. NECHELES:  I don't understand the objection.

16          MS. RAVENER:  Your Honor, this is --

17          THE COURT:  Are you asking him to read what's in the

18  exhibit?

19          MS. NECHELES:  I'll withdraw that, your Honor.

20          MS. RAVENER:  The characterization is out --

21          MS. NECHELES:  I'll withdraw it.

22          THE COURT:  Thank you.

23  BY MS. NECHELES:

24  Q.  These documents, altogether, would notify the licensing

25  division that Mr. Reichberg had in fact surrendered his gun,

IBGKGRA5                          Ochetal - Cross

1    correct?

2    A.  Yes, it would let us know that he surrendered his gun.

3    Q.  And these documents, altogether, would be provided to the

4    licensing division, right?

5    A.  That, along with the proper receipts that he -- the

6    licensee disposed of the firearm is what we would need, either

7    that or a property clerk invoice.

8    Q.  Or, I'm sorry, what was the last part?

9    A.  If somebody turned the gun into a precinct rather than into

10   a dealership, there would be a voucher from the precinct.

11   Q.  Okay.  So now, there came a time, am I correct, when you

12   learned that Mr. Lichtenstein, Shaya Lichtenstein, who you've

13   testified about, was arrested, right?

14   A.  Yes.

15   Q.  Am I correct that when that occurred, Mr. Villanueva called

16   you?  Right?

17   A.  When it occurred?

18   Q.  After that, Mr. Villanueva called you to discuss that?

19   A.  He didn't call me to discuss it, no.

20   Q.  Well, he wanted to coordinate with you, right?

21   A.  No.  If it's the day you're referring to when the FBI

22   visited me at my residence and as well as Sergeant Villanueva,

23   later that day, in the afternoon, me and Dave exchanged a

24   couple of brief text messages.  Basically, I said to him, so

25   I'll see you upstairs?  He said, yeah.  I'm like, so we're in

1    the same boat.  Because after we got visited, we were also

2    visited by internal affairs and told that we would be on

3    modified assignment, and to report to, I don't know, the tenth

4    floor maybe, upstairs in the building.  So that's where I said,

5    so I guess I'll see you upstairs.

6            He said, yep, we're in the same boat.  And he said,

7    all Paul, and kind of left it at that.

8            MS. NECHELES:  Your Honor, I see that it's

9    2:00 o'clock.

10           THE COURT:  Yes.

11           MS. NECHELES:  I have a bit more.  I'm sorry.

12           THE COURT:  That's fine.

13           Is this a reasonable time for us to break, counsel?

14           MS. NECHELES:  Yes, your Honor.

15           THE COURT:  Good.  Thank you.

16           MS. RAVENER:  Your Honor, I would just ask that if

17   Ms. Necheles is close to wrapping up her questions --

18           MS. NECHELES:  I'm not, your Honor.

19           MS. RAVENER:  -- that she do so.

20           MS. NECHELES:  I'm not.

21           THE COURT:  Thank you.  Fine.

22           So, ladies and gentlemen, it's Friday afternoon, so

23   we're going to end a little bit early today.  During this

24   recess, over the weekend, please don't talk about the case with

25   anyone else -- that means with your family members or

IBGKGRA5                        Ochetal - Cross

1    friends -- about how the trial is going.  You can tell them,

2    again, that you're jurors in a criminal case, and that's about

3    it.  Don't talk about this with each other in the intervening

4    period, and don't do any research about the case, or if you

5    happen to come across any press that there may be about the

6    case, please don't look at it or read it.

7            With that, thank you very much for all your work this

8    week.  I'll see you Monday morning at the normal time,

9    9:00 a.m.  Thank you.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Thank you very much.  You can be seated.

3         So, Mr. Ochetal, thank you again.  I'd like to ask

4    you, as before, not to talk about this case or the subject

5    matter of your testimony, with anyone during this break.  I

6    emphasized it before, but that's particularly true with respect

7    to the United States.

8         I expect that we will be starting back up on Monday

9    morning, probably around 9:00, so please be ready to go at

10   9:00 here.

11        Now, when I say that you can't talk about the case

12   with government, the one limited exception to that is that you

13   can talk with one of the representatives about scheduling here,

14   to the extent that that's an issue, but you should just expect

15   we will be beginning here around 9:15 on Monday morning, so if

16   you could please be here by 9:00.

17             THE WITNESS:  No problem.

18             THE COURT:  Good.  Thank you very much.  Have a good

19   weekend.

20             THE WITNESS:  You too.

21             (Witness temporarily excused)

22             THE COURT:  Good.

23        So, counsel, I know that Mr. Reichberg needs to leave,

24   so I'd like to facilitate that.  Can we take our recess now?

25   Are there issues that we can or should take up outside of

IBGKGRA5                        Ochetal - Cross

1    Mr. Reichberg's presence?  That's completely up to you.

2              Counsel for the defendants?

3              MS. NECHELES:  Your Honor, I'm not sure there are

4    issues, but I guess maybe we can work out the language of the

5    instruction, unless you wanted to look at it more -- or the

6    government -- but he is certainly excused.

7              THE COURT:  Thank you.  That's fine.

8              Mr. Reichberg.

9              MS. NECHELES:  He waives his appearance.

10             THE COURT:  Mr. Reichberg, you're certainly excused.

11   Based on that, we will take up the very limited issues in your

12   absence.  Thank you.

13             MR. BELL:  We have no issues to take up, your Honor.

14             THE COURT:  Good.  Thank you.

15             Mr. Grant, anything you want to raise?

16             MR. MERINGOLO:  No, no, your Honor.

17             THE COURT:  Thank you.

18             I do need to read you this decision on the expert

19   testimony.  I think it's going to take about 15 or 20 minutes,

20   and I can probably do it in the morning before we start on

21   morning before we start, so I'll just do that.

22             Counsel, the issue related, that unfortunately my

23   example has sparked -- I'm happy it sparked it -- it's

24   something that we should resolve before closing arguments.  I

25   think that it's something the parties should talk about and

IBGKGRA5                        Ochetal - Cross

1    look at the law on.

2                I think that Ms. Necheles' comment is -- in essence,

3    taking the "it's raining outside" comment as the baseline for

4    this -- is that if the government can say to oppose a fact --

5    so, say, using this hypothetical, one of the alleged

6    coconspirators says, it's raining outside, that can be taken

7    for the truth of the matter.  The question is, can the

8    government then say, it's true that the alleged coconspirator

9    said it's raining outside but lots of other people who are not

10   coconspirators said it's not raining outside, and have those

11   other statements not introduced for the truth of the matter but

12   used as a counterbalance to the actual evidence.  I see that as

13   the baseline question and why it is that the existence of those

14   statements and the use of those statements in that way is

15   different from using them to establish the truth of the matter.

16               Is that a fair characterization of your concern,

17   Ms. Necheles?

18               MS. NECHELES:  Yes, using someone's belief to show

19   that it is true, which is the same as putting it in for the

20   truth.  I don't understand the difference.  If they're arguing,

21   yes -- well, they're saying, lots of people believed it.  I

22   haven't had the opportunity to cross-examine her, to say, did

23   you believe this, or, are you confused in what you're saying,

24   did you believe what the government is saying, or are you

25   confused about it?  And I should be able to cross-examine her,

1   because what she is saying is, I believed the following to be

2   true.  That's what her statement is.  And the government wants

3   to put that in for the truth of it, to argue that this person

4   believed it also, that that's true.

5          MR. BELL:  Your Honor, it's actually, I think, fairly

6   simple to express in argument.  The import that we are

7   suggesting, that other people were saying it, literally does

8   not change, or is no less successful, whether that statement

9   was true or false.  It is not being offered for its truth.

10         I think that we would be agreeable with something akin

11  to your Honor's formulation, which was just that it was said.

12  But to suggest that there is no nontruth purpose for that sort

13  of statement is incorrect.  It's incorrect as a practical

14  matter, it's incorrect as a matter of law.

15         THE COURT:  Thank you.  That's the question.  I think

16  I may benefit from briefing on it.  I'm using the "it's raining

17  outside" example just for illustrative purposes, but the

18  particular example that was raised earlier today might actually

19  be a better way to look at it, as you're considering how it is

20  that the issue is going to be presented here.  I don't think we

21  need to resolve it at this moment, but it is a relatively

22  fundamental evidentiary question, one about which both sets of

23  lawyers, whose views I respect, differ.  So I think it would be

24  beneficial for you, both sides, to look at the law on this and

25  tell me what you think the right answer is.

IBGKGRA5                          Ochetal – Cross

1          Can I see you all at sidebar just really briefly

2    before we end for the weekend.

3               (Pages 2045 – 2047 redacted by order of the Court)

IBGKGRA5                        Ochetal — Cross

1                 (In open court)

2                 THE COURT:   Thank you very much.   I'll see you Monday

3      morning.

4                 (Adjourned to November 19, 2018 at 9:00 a.m.)

5                                    *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                          Page

 3    RICHARD OCHETAL

 4   Direct By Ms. Ravener  . . . . . . . . . . .1893

 5   Cross By Ms. Necheles  . . . . . . . . . . .1943

 6                    GOVERNMENT EXHIBITS

 7   Exhibit No.                             Received

 8    730   . . . . . . . . . . . . . . . . . .1932

 9    3515-02   . . . . . . . . . . . . . . . .1936

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```