IBJTGRA1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                New York, N.Y.

4              v.                             16 CR 468 (GHW)

5    JAMES GRANT and JEREMY
     REICHBERG,
6
                   Defendants.
7
     ------------------------------x
8
                                             November 19, 2018
9                                            9:04 a.m.

10   Before:

11
                       HON. GREGORY H. WOODS,
12
                                             District Judge
13

14                        APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  JESSICA R. LONERGAN
17        KIMBERLY J. RAVENER
          MARTIN BELL
18        Assistant United States Attorneys

19   HAFETZ & NECHELES, LLP
          Attorneys for Defendant Reichberg
20   BY:  SUSAN NECHELES

21   MERINGOLO & ASSOCIATES
          Attorneys for Defendant Grant
22   BY:  JOHN MERINGOLO
          ANJELICA CAPPELLINO
23

24

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

IBJTGRA1

 1              (Jury not present)

 2              THE COURT:  Good morning everyone.  Thank you for

 3      being here.  There's some issues that I want to talk about this

 4      morning before we get into the decision with respect to expert

 5      testimony.  Is there anything that the parties would like to

 6      raise with the Court before we get started?

 7              Counsel for the United States?

 8              MR. BELL:  No, your Honor.

 9              THE COURT:  Counsel for Mr. Reichberg?

10              MS. NECHELES:  No, your Honor.

11              THE COURT:  Thank you.  Counsel for Mr. Grant?

12              MR. MERINGOLO:  Just two matters.  One is juror number

13      seven, I know your Honor has been giving her water through your

14      deputy while she falls asleep.  She's been falling asleep

15      throughout the whole trial, but specifically through the

16      cross-examination and the direct of the government witnesses.

17      I know the trial is extremely boring for most of us, but I

18      think she's falling asleep and I would like to keep an eye on

19      her.

20              THE COURT:  Thank you.  I will keep an eye on her.  I

21      have noted her closing her eyes, and as you noted, I have been

22      asking Mr. Daniels to give her water or something when I have

23      seen that.  I am not totally sure that she's falling asleep as

24      opposed to being a person that sits around with her eyes

25      closed.  I haven't yet figured that out.

IBJTGRA1

1          When Mr. Daniels has gone over, she has responded

2     immediately.  I have jurors that you had to poke in order to

3     wake them up.  She's not there.  So I'm not completely sure

4     that she's sleeping as opposed to being a person that closes

5     her eyes, but I will keep an eye on her.

6          MR. MERINGOLO:  The next thing, Mr. Villanueva and

7     Mr. Ochetal have testified about these fingerprints coming back

8     in a month.  We have been requesting the files found in

9     Villanueva's locker.  I got -- someone dropped this off in my

10    mailbox, and it's one of the files, and the fingerprints have

11    come back in four days on this particular file that was not

12    turned to over, which I would think would be Brady,

13    exculpatory, Giglio; and maybe it's not the same thing or

14    somebody is trying to fool us, but this is one of the file

15    names that were given the other day, but we never received

16    these files.

17          And maybe the prosecutors weren't on the sister case

18    with the licensing division, but even if they weren't on the

19    sister case with the licensing division, that's no excuse not

20    to turn over these particular files where fingerprints are

21    coming back in four days after we're testimony that they're two

22    weeks, it's slow.  And this particular file, your Honor, the

23    individual went in the same day as Mr. Reichberg, the same day,

24    and his fingerprints came back four days later.

25          THE COURT:  Thank you.  Can I ask, you said the file

IBJTGRA1

1    was dropped off in your mailbox, who dropped it off?

2              MR. MERINGOLO:  I have no idea.  I have no idea.  I

3    know there's Bates stamps on it.  It looks like it's from the

4    other case.  I live in a private home in Dumbo.  You could put

5    anything in my mailbox.  Somebody may have read the transcript.

6              THE COURT:  It was dropped off at your home?

7              MR. MERINGOLO:  At the home, not even at the office.

8              THE COURT:  Have you shown the documents --

9              MR. MERINGOLO:  I just was looking at it this morning.

10   I can show this, and I hope this wasn't one of the ones that

11   were in there.

12             THE COURT:  Could you, please -- it would be helpful

13   for me to have a copy.

14             MR. MERINGOLO:  I have a copy for you.

15             I mean four days back after all this testimony is a

16   little bizarre.

17             MS. RAVENER:  Your Honor, if we could address this

18   briefly.

19             THE COURT:  Please.

20             MS. RAVENER:  First of all, I don't think it's

21   inconsistent with the testimony of the witnesses.  My

22   recollection of the testimony -- and of course defense counsel

23   is welcome to inquire into this -- is during the time that

24   Mr. --

25             THE COURT:  I'm happy to hear about the testimony but

IBJTGRA1

1    I would like to focus on the underlying question, which is
2    where did this document come from, was it in the government's
3    possession, if so, was it something that would have or should
4    have been turned over to the defense here?  It appears that
5    some helpful citizen has provided it to Mr. Meringolo.  So I
6    would like to focus on that question first.
7              MS. RAVENER:  Your Honor, this is the first we're
8    hearing about this document, so we have to check our records
9    and get back to the Court in order to be entirely accurate.
10             I can tell you that the defense did raise a request
11   for the names and files of the reference found in
12   Mr. Villanueva's locker, which, by the way, as the evidence has
13   shown, was found in a search approximately a year and a half to
14   two years after Mr. Reichberg's license application.
15             THE COURT:  And we did make as much of that available
16   to them immediately upon receiving that request.  We gave them
17   a list of the names, we gave them a list of every file we could
18   immediately locate that night.  So I don't know whether this
19   was included among those documents, we have to check our
20   records, but if you can give us a moment we'll do our best to
21   get back to you, your Honor, about that.
22             We have no problem continuing to provide anything that
23   the defense seeks, within reason, that we could reasonably
24   locate that is in our possession to the extent they make a
25   showing that it may be useful to their defense and qualify

IBJTGRA1

1    under the rules.

2              MS. NECHELES:  Your Honor, this is particularly

3    harmful because when the government says we can use it, I don't

4    know how we can use it now.  We don't have Mr. Villanueva on

5    the stand anymore.

6              So if it's true that -- we did ask for these files, we

7    did ask for the list because it was revealed -- we realized

8    that there was something that had been there that hadn't been

9    turned other.  It should have been turned over before, and

10   particularly if, as Mr. Meringolo -- I haven't even seen these

11   files, but if it only took that long for the fingerprints to

12   come back -- the government has repeatedly elicited from all

13   the witnesses that the reason it took so long is because there

14   was something wrong with fingerprints at this time, getting

15   them, and that's why it was so long for Mr. Reichberg, they

16   wasn't delaying it or stalling it, they were pushing it through

17   as quickly as possible.  This is exculpatory evidence.

18             MS. RAVENER:  Your Honor, if I could clarify one

19   point?

20             THE COURT:  Please.

21             MS. RAVENER:  We checked our records, and based on our

22   review right now we do not believe this record was part of the

23   records found in Mr. Villanueva's locker.  It does appear to be

24   some sort of record from the license division.  I can't right

25   now validate that it came from the government or its source, we

IBJTGRA1

         have to investigate that further.  As you know, there have been

         many cases that came out of the investigation at the license

         division that are wholly unrelated to this matter, but it was

         not one of the records found in Mr. Villanueva's locker based

         on our review.

                 THE COURT:  Thank you.  What's the Bates stamp

         reference at the bottom?  The document which has been handed to

         me, which I will just mark as Court Exhibit A for reference

         purposes, has a Bates stamp page number at the bottom of it

         that reads and confidential 022359, and looks as though it's

         sequential pages.

                 MS. RAVENER:  Your Honor, frankly we don't know, we

         have to check.  It's possible that it was produced by the

         government in connection with the John Chambers case.

                 THE COURT:  Is this the government's formatting for

         your Bates stamps?

                 MS. RAVENER:  Not necessarily, your Honor, but it may

         be.  We don't always use one consistent prefix.  So frankly, we

         would have to review this with the other teams who handled

         those cases and see if we can validate the document.  At this

         time, again, I think to the extent that the defense wants to

         inquire of the witness about the speed of fingerprints or

         anything along those lines during this time frame, I think

         that's all fair game, but I don't think that there's anything

         about this that is necessarily specifically tied to this matter

IBJTGRA1

1     or the testimony that we have heard so far.

2                THE COURT:  Thank you.  Someone out in the public

3     thinks that it is and took the initiative to send it to the

4     defense.  I don't know what drove this, but presumably someone

5     unknown to the defendants heard the testimony or was aware of

6     what was happening in this case and thought that this record

7     would be helpful for the defense.  I'm going to ask the

8     government to please find out where or whether this is a

9     document that was in the government's possession, and if you

10    can inquire whether this Bates stamp number is something that

11    the government produced.  I will ask you to fill me in on that,

12    if you can today, so that we can move forward with this.

13                Thank you very much, Mr. Meringolo, for drawing this

14    to my attention.

15                MR. MERINGOLO:  You're welcome.

16                THE COURT:  It's an unusual thing, to say the least.

17                We'll mark this as Court Exhibit A and Mr. Daniels

18    will keep a copy of it.

19                Counsel, I think that I told the jury that we would

20    try to start at 9:15 this morning.  The one issue that I think

21    that we need to capture this morning and then I can give the

22    rationale for my position with respect to the expert

23    disclosures data point, but I will do it today, is the

24    instructions with respect to the Title III recordings.

25                We have one objection to a component of that by

IBJTGRA1

1    Ms. Necheles which sparked a conversation what "for the truth

2    of the matter" means in the context of the hearsay rule.  Have

3    the parties had the opportunity to look at that issue further,

4    particularly United States, does it remain your view that in

5    this context using the "It is raining outside" statement by

6    someone else to show that someone else's statement that it is

7    not raining outside is not true or to bolster the statement by

8    someone else who said that it is raining outside is not being

9    used for the truth of the matter?

10            MS. LONERGAN:  Your Honor, so I will answer the

11   Court's question, but I think that the simpler answer is I

12   think that the instruction as it is is fine.  We may ask you to

13   look at one word.  The larger hearsay issue, which is not -- we

14   don't have to address at this moment, we may want to do

15   additional briefing later, but I think that that would more be

16   before closing arguments in terms of discussion of how these

17   statements in the calls that I think we are all agreeing don't

18   come in for the truth, how, if at all, we can use them in

19   closing.  But I don't think it actually impacts the language of

20   the Court's proposal, which we agree with, and that we think

21   this language is fine in terms of giving it now.

22            THE COURT:  Thank you.  Ms. Necheles suggested that we

23   take out from the second paragraph the clause whereas evidence

24   someone said "it was raining outside," because she thought it

25   was unduly confusing when used in that illustration.

IBJTGRA1

1          MS. LONERGAN:  Your Honor, in the third paragraph?

2          THE COURT:  Yes, if I said second I meant third.

3          MS. LONERGAN:  Your Honor, I think that is a correct

4    statement of the law, that the fact that something is said is

5    not hearsay, and so we do think that it is appropriate.

6          And we don't think here that the Court's language

7    necessarily gets into how the parties can argue from the fact

8    that something is said, but I do think that the fact that

9    something is said is non-hearsay.  And again, we think that we

10   can further brief this later, but there are two rules, so 801

11   talks about what things are non-hearsay, and then also 803(3)

12   is an exception for a present state of mind, also if we look at

13   the notes of decisions, also called someone's belief, and then

14   there's a hearsay exception for when someone has a present

15   state of -- essentially a present state of mind.

16         THE COURT:  I do want to debate this.

17         MS. LONERGAN:  I don't want to either.

18         THE COURT:  No, I do want to debate it.  I think it's

19   engaging and I'm interested in the topic, but let me draw your

20   attention to the last sentence of paragraph two where the basic

21   use of this evidence is described, that you can consider the

22   fact that a statement was made separate and apart from the

23   truth of the matter.

24         Ms. Necheles hasn't taken issue with that, simply the

25   use of this clause in the illustrative language in paragraph

IBJTGRA1

1    three.

2          MS. LONERGAN:  Your Honor, I think that in paragraph

3    three what the Court says is you cannot consider the statement

4    for its truth.  Your Honor, in fact, the Court in the third

5    paragraph I don't think gives an example of the last statement

6    of the second paragraph.

7          So the last statement of the second paragraph says:

8    In addition, you may consider the fact that the statements were

9    made separate and apart from the truth of the statements

10   themselves.  And then I think that the examples in the third

11   paragraph really focus more on what it means.  It says:  The

12   example is, but you can use that statement to place other

13   statements by a defendant in context or to understand a

14   defendant's state of mind, or as evidence that someone said it

15   is raining outside.

16         So we do think that's actually an accurate statement

17   of the law that you can use these non -- it's a non-hearsay,

18   does not come in for the truth used to consider that someone in

19   fact said it.  We think, again, that the further development of

20   exactly what -- how we argue that at closing is not something

21   that we need to take up the jury's time with this morning, that

22   this statement as the Court has set it forth is an accurate

23   statement of the law.

24         We don't think that it is confusing at this point to

25   the jury because it provides an explanation, and that this

IBJTGRA1

explanation of the law, which I think comes a lot from

essentially combining the government's and the defendant's

proposals with examples from the Court would suffice at this

moment, and that we could again not take up the jury's time

with essentially what follows from this instruction, but we do

believe that the instruction is an accurate statement of the

law.

THE COURT:  Thank you.  Is Mr. Ochetal ready to

proceed, just for my information?

MS. LONERGAN:  Yes, I think the answer is yes.

THE COURT:  Thank you.

Ms. Necheles?

MS. NECHELES:  Your Honor, I don't think it's a

correct statement of law.  I think your Honor is trying to give

examples of how you can use the statement separate and apart

from the truth of it, and you do give the two examples and the

standing alone.

But the fact that someone said something is not

significant, it's how can you use the fact that they said

something that you're trying to explain, and you give two

examples.  You could say -- if the government is concerned that

it seems like you're limiting the way, you could say but for

example, you could use that statement to place other statements

by the defendant in context or to understand a defendant's

state of mind.  But just the fact that someone said something

IBJTGRA1

1    is not evidence of anything, the question is how can you use

2    that statement.

3         THE COURT:  Thank you.  I appreciate the discussion on

4    this point and I think that we do need to examine it further.

5    There's clear law on this, I looked at the treatises, and I

6    think that it will inform how the parties view this, but I want

7    to give you the opportunity to explore it further.

8         I'm willing to and will propose now to adopt

9    Ms. Necheles' modification to that sentence by adding the "for

10   example," at the beginning of the illustration sentence.  That

11   makes it clear that I'm not being preclusive.  But I appreciate

12   the concern that Ms. Necheles is suggesting, namely that this

13   illustration of the concept embodied in the last sentence of

14   paragraph two may be unduly confusing in that I'm not

15   explaining to them how it is that they can use the evidence

16   that someone said it's raining outside as being something

17   separate and apart from speaking to the truth of that fact,

18   which I don't think we need to do for purposes of what is

19   really just supposed to be illustrations to help frame the more

20   important instructions in the first two paragraphs, which, as

21   counsel for the United States described earlier, is the

22   amalgamation of the proposals by the defense and the United

23   States.

24        MS. LONERGAN:  Your Honor, may we propose what is

25   hopefully one simple word change as well?

IBJTGRA1

1            THE COURT:  Please.

2            MS. LONERGAN:  In the third paragraph after the

3    first -- the second M dash, the Court, it says -- and lists a

4    series of names says if one of those people say it is raining

5    outside, you can consider that evidence for its truth, that is,

6    that it was in fact raining at that time.  And we would like to

7    change the second "that" to say that is whether it was in fact

8    raining at that time.  Because we're not telling the jury what

9    to conclude, we're just telling them that they could consider

10   it in trying to determine whether it was raining.

11           THE COURT:  Thank you.  I think that's a good point.

12   Counsel for the defendants?

13           MS. NECHELES:  No objection to that, your Honor.

14           MR. MERINGOLO:  No objection.

15           THE COURT:  Thank you.  I will make that change.

16           Counsel, could you please alert me to when it is that

17   you want me to administer this?  I will take your instructions

18   about your views about the appropriate timing.  I don't

19   understand this is pertinent to Mr. Ochetal, but I might do it

20   right after his testimony.  Is that appropriate?

21           MS. NECHELES:  That's fine, your Honor.  And I know

22   the government is planning on playing more tapes, so right

23   before they do it maybe you could say this applies to the prior

24   tapes and this tape as well.

25           THE COURT:  That's fine.  Counsel for the United

IBJTGRA1

1   States, is that acceptable to you?

2          MR. BELL:  We're going to play some tapes after

3   Ochetal, so I think everybody is zooming in on the same place.

4          THE COURT:  Good.  Thank you very much.

5          MS. NECHELES:  Your Honor, I ended the other day

6   arguing that I should be able to ask about handwriting, and I

7   just want to tell the Court that I was wrong in my argument,

8   that in fact the rule is a little different than I remembered

9   it.  So I will withdraw that.  You can argue it to the jury or

10  you could ask somebody if they recognize the handwriting, so I

11  withdraw that argument.

12         THE COURT:  Thank you.  Good.  Anything else?

13         Ladies and gentlemen, I think that we are still

14  missing two of our jurors.  Mr. Daniels is going to reach out

15  to one of them who we haven't heard from yet, the other I

16  understand is entering the building.

17         So let me take this time to try to begin with my view

18  regarding the expert testimony.

19         To the extent that I need to interrupt this in order

20  to have the trial begin, I will beg your indulgence.  I do want

21  to start as soon as the entire jury is here.

22         I apologize again if this becomes disjointed because I

23  expect to end right after the jury has assembled so we can

24  begin promptly, which I am pleased to say we can do today.

25         With respect to the motion regarding the defense

IBJTGRA1

1    experts, I'm going to grant the government's request to exclude

2    expert testimony from the two proposed experts identified by

3    Mr. Grant.

4            Before I begin, let me first say, to be clear, that

5    these witnesses may have relevant factual testimony from their

6    personal experience that they could testify about here.  I'm

7    reacting to the request that I qualify them as experts to

8    provide testimony on the topics identified.

9            I will provide a more substantive overview of the law

10   in a moment, but the Court's assignation of an "expert" label

11   to a witness invests them with a degree of authority and

12   expands the scope of their potential testimony.  As a result,

13   there are a number of steps that must be followed to introduce

14   the testimony of an expert, both with respect to the contest of

15   the disclosure and with respect to the Court's evaluation of

16   the basis for that opinion testimony.  Here, the disclosure

17   provided by Mr. Grant is tardy and inadequate, and because it

18   does not meet the necessary standards for the admission of this

19   testimony as expert testimony, I conclude that I should

20   preclude it.

21           As background, in a letter dated October 23, 2018,

22   counsel for Mr. Grant provided expert disclosures with respect

23   to two prospective expert witnesses.  October 23, 2018 was

24   eight business days prior to the commitment of this trial,

25   which, as the parties are well aware, was scheduled to have

IBJTGRA1

begun in early October but for a health issue of counsel's.  I

will describe that October 23 letter as the "defendant's

disclosure."

          The defendant's disclosure is short, approximately one

full page of text.  The two proposed experts are Mr. Thursland,

a police inspector, I believe, who also works as an adjunct

professor at John Jay College, and Rabbi Gluck, an activist and

community liaison based in Brooklyn who works as a liaison

between the New York Police Department and observant Jews in

that community.

          The October 23 disclosure describes the witness's

proposed testimony in very broad terms.  The description

provided is short enough to quote in full for each.  As to

Mr. Thursland, the disclosure states that he will "testify as

to internal NYPD procedures regarding an officer's

discretionary practices.  He will testify to procedures

regarding, among other things, giving out PBA cards, providing

police escorts, allowing access to parades and other free

events, as well as other community police practices."  As to

Rabbi Gluck, the notice states that is expected to testify

about the relationship between the NYPD and the Jewish

community, including the day-to-day security-related religious

and cultural concerns that are specific to this particular

community."  Defendant's disclosure.  While Rule 16(b)(1)(C)

requires that notice provided pursuant to it include "the bases

IBJTGRA1

and reasons" for an expert's conclusions, the disclosure

provides no information regarding the witness's bases and

reasons for the anticipated testimony.  It merely provides very

summary biographical information for each of the witnesses and

the summary of the testimony that I just quoted.

On November 1, 2018, just eight days after the date of

the letter, and only one business day before the trial, the

government filed a motion to exclude the expert testimony for a

variety of reasons.  I raised the issue now almost two weeks

ago during the trial with the hope that, given the arguments

presented in the letter, the defendant might choose to

supplement his disclosures to satisfy the deficiencies

identified in the November 1 letter.  I had hoped/anticipated

that, given that the government's letter identified clear

concerns with the adequacy of the disclosure, regarding the

completeness of the disclosure, regarding the scope of the

testimony, and that the letter pointed out that the defendant's

disclosure only attempted to satisfy two of the three

requirements of the relevant rule, that the defendant might

take the opportunity to supplement the disclosure to address

the identifying deficiencies.

Defendant Grant did not do so.  Instead, on November

12 he filed a letter brief arguing why the notice as provided

was adequate and that the evidence is properly admissible.  And

when I asked whether the defendant wanted to supplement the

IBJTGRA1

disclosure, counsel for Mr. Grant told me that no, instead they
wish to stand pat with the original disclosure.  I'm ruling on
that as a result.

        Applicable law.  In the interest of time, I am not
going to restate all of the relevant applicable law here.  The
government's articulation of the basic legal principles
applicable to the Court's analysis of this issue is capably set
forth on pages 7 and 8 of its November 1, 2018 letter.  I adopt
that here.  I would like to highlight some portions of that
discussion now and will amplify it briefly to help
contextualize my decision.

        In general, a defendant must "give to the government a
written summary of any testimony that the defendant intends to
use under Rule 702, 703 or 705 of the Federal Rules of Evidence
as evidence at trial."  Federal Rule of Criminal Procedure
16(b)(1)(C).  "This summary must describe the witness's
opinions, the bases and reasons for those opinions, and the
witness's qualifications."  Id.  "The purpose of the expert
disclosure requirement is to 'minimize surprise that often
results from unexpected expert testimony, reduce the need for
continuances, and to provide the opponent with a fair
opportunity to test the merit of the expert's testimony through
focused cross-examination.'  Indeed, 'with increased use of the
both scientific and non-scientific expert testimony, one of
counsel's most basic discovery needs is to learn that an expert

IBJTGRA1

is expected to testify.'"  *United States v. Ulbricht*, 858 F.3d

71, 114 (2d Cir. 2017), cert denied, 138 S. Ct. 2708 (2018)

(quoting Federal Rule of Criminal Procedure 16, advisory

committee's note to 1993 amendment)(internal citations

omitted).

Federal Rule of Evidence 702, which governs the

admissibility of expert testimony, provides:

"A witness who is qualified as an expert by knowledge,

skill, experience, training, or education may testify in the

form of an opinion or otherwise if: (a) the expert's

scientific, technical, or other specialized knowledge will help

the trier of fact understand the evidence or to determine a

fact in issue; (b) the testimony is based on sufficient facts

or data; (c) the testimony is the product of reliable

principles and methods; and (d) the expert has reliably applied

the principles and methods to the facts of the case."  Federal

Rule of Evidence 702.

The party that proffers the testimony bears the burden

of showing that it is admissible.  See *Bourjaily v. United

States*, 483 U.S. 171, 172-73 (1987).  In *Daubert v. Merrel Dow

Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court

explained that Rule 702 requires district courts to act as

gatekeepers by ensuring that expert scientific testimony or

other expert testimony "both rests on a reliable foundation and

is relevant to the task at hand."  Id at 597.  As such, the

IBJTGRA1

Court must make "a preliminary assessment of whether the
reasoning or methodology underlying the testimony is
scientifically valid and whether that reasoning or methodology
properly can be applied to the facts at issue."  Id at 592-93.

In short, the Court must "make certain that an expert,
whether basing testimony upon professional studies or personal
experience, employs in the courtroom the same level of
intellectual rigor that characterizes the practice of an expert
in the relevant field."  *Kumho Tire v. Carmichael*, 526 U.S.
137, 152 (1999).  In *Kumho Tire*, the Supreme Court held that a
district court's gatekeeping function applies to all expert
testimony, whether based on scientific, technical, or other
specialized knowledge.

*Daubert* set forth a non-exclusive list of factors that
district courts can consider in gauging the reliability of
scientific testimony.  "Whether some or all of these factors
apply in a particular case depends on the facts, the expert's
particular expertise, and the subject of his testimony."  *In re
Fosamax Products Liability Litig.*, 645 F.Supp. 2d 164, 173
(S.D.N.Y. 2009)(citing *Kumho Tire*, 526 U.S. at 138).

Let me pause because the jury has arrived.  I would
like to begin promptly.  I have about three more pages to get
through here, but I can do that at a later stage.

Counsel, are we ready to proceed?

Could we please bring in Mr. Ochetal.

IBJTGRA1

1          MS. RAVENER:  Yes, your Honor.

2          THE COURT:  Thank you.

3          (Continued on next page)

IBJTGRA1                         Ochetal - Cross

1        (Jury present)

2              THE COURT:  First, ladies and gentlemen, thank you

3    very much for being back here after the weekend.  I hope you

4    had a pleasant weekend.  I'm going to ask that we begin again

5    with the testimony of Mr. Ochetal.

6              Counsel, are you proceed prepared to proceed?

7              MS. NECHELES:  Yes, your Honor.

8              THE COURT:  Mr. Ochetal, let me remind you that remain

9    under oath.

10             THE WITNESS:  Understood, your Honor.

11             THE COURT:  Thank you, please proceed.

12             MS. NECHELES:  Thank you, your Honor.

13    RICHARD OCHETAL,  (Continued)

14        having been previously sworn, testified as follows:

15   CROSS-EXAMINATION

16   BY MS. NECHELES:

17   Q.  Good morning, Mr. Ochetal.

18   A.  Good morning.

19   Q.  Mr. Ochetal, I want to clarify one thing before we start.

20   One of the -- you've testified a lot about a business carry,

21   correct?

22   A.  Yes.

23   Q.  And you have said that that was the most strenuous type of

24   license to obtain, right?

25   A.  Yes.

IBJTGRA1                        Ochetal - Cross

```
 1   Q.  And there's also something called a special carry, right?
 2   A.  Yes.
 3   Q.  And a special carry is when you have a permit from out of
 4   town and you bring it in town to get -- you come here to New
 5   York City and you want to get a permit here, right?
 6   A.  Yes, from a county other than the New York City counties of
 7   the five boroughs.
 8   Q.  If you have a permit from outside of New York and you come
 9   here and you want to be able to carry a gun for business, you
10   have to establish everything that you would have to do for
11   business carry, right?
12   A.  Somewhat.  You would have to establish that you have a
13   business dealing within the five boroughs in conjunction with
14   your business dealing in the outside counties.
15   Q.  So you would have to show the same special need that you
16   would have to show to get a business carry, right?
17   A.  It would be a similar kind of need, yes.
18   Q.  Well, you would have to show danger, the same type of
19   thing, right?
20   A.  Sure.
21   Q.  And you would have to have all of the same kind of
22   documents that you would need for a business carry, right?
23   A.  The documents were a little different because you included
24   a county permit from the county you would initially got your
25   license from, and then you would have to show a business
```

1    location in the five boroughs of New York City of the same type

2    of business and with the same element of danger.

3    Q.  The same letter of the necessity you would need?

4    A.  The letter of necessity is always included in any kind of

5    carry license.

6    Q.  Same type of bank statements or tax returns or any of those

7    things that you would need for business carry you would need if

8    wanted a special carry for business here, right?

9    A.  Yes, you would need bank statements from here as well, yes.

10   Q.  So a special carry, if you want to get it for business, is

11   as difficult to get as a business carry, right?

12   A.  In my opinion or?

13            I would say not so much.

14   Q.  Why?

15   A.  Because they already had a permit to carry a firearm, so

16   it's -- it comes back to firearm experience, prior

17   investigation must have and should have been conducted in that

18   county.

19   Q.  But all the business things that you need to show that you

20   have a danger and a need for it here you need for a special

21   carry just like you need for a business carry, right?

22   A.  You would need to show that.

23   Q.  And those you often gave special carries, right?

24   A.  I don't recall the rate as far as often with special

25   carries, but they definitely were issued.

1    Q.  And sir, you testified that -- before you left we were

2    talking about that Mr. Villanueva called you after you were

3    both visited by internal affairs, do you recall that?

4    A.  We exchanged text messages right after we were both visited

5    by internal affairs.

6    Q.  And he wanted to coordinate with you?

7    A.  He never said coordinate, no.

8    Q.  What did he say?

9    A.  We exchanged text messages on that exact day.  The text

10   messages were basically that I will see you upstairs, upstairs

11   meaning the area of police headquarters where you go to become

12   modified, and I believe I'm the one who might have said we're

13   in the same boat, and he agreed, meaning we're under

14   investigation.  And I got a response of:  All Paul Dean.  And

15   that was that as far as those text messages I recall on that

16   date.

17   Q.  So he said to you it was all Paul Dean, is that correct?

18   A.  In that text he said all Paul, yes.

19   Q.  And what did you understand that to mean?

20   A.  At that point I paid it no mind.  I knew I was being

21   modified, that's just what he told me.

22   Q.  You came to understand that Mr. Villanueva was suggesting

23   you guys could blame everything on Paul Dean, right?

24   A.  I never thought about blaming anything on anybody, that's

25   just what he said.

IBJTGRA1                          Ochetal - Cross

1    Q.  But you knew Mr. Villanueva was looking to blame on other

2    people, right?

3              MS. RAVENER:  Objection.

4              THE COURT:  Thank you.  Can you please rephrase the

5    question?

6    Q.  Well, you understood from what Mr. Villanueva told you that

7    he was looking to blame this on other people, right?

8    A.  At the time I don't -- I don't remember at the time.  Maybe

9    I thought he might be.  I really don't -- I mean a lot was

10   going through my mind at the time.  Maybe he was working that

11   angle, it's possible.

12   Q.  Am I correct that you became nervous that he was looking to

13   blame things on you?

14   A.  I have heard that he was look to blame things on me,

15   Lieutenant Dean was looking to blame things on me, so at that

16   point it was what it was.  So that's why I didn't pay that as

17   much mind as maybe I might have or should have.

18   Q.  And at some point he left you a voice message, am I

19   correct?

20   A.  Yes.

21   Q.  When was that?

22   A.  The voice message might have been the day after or two days

23   after, I'm not sure, basically just it was:  Hey, bro, I'm

24   worried about you, haven't heard from you, give me a call.

25   Q.  Okay.  And this was after you were modified or after you

1   were arrested, after what?

2   A.   This was after I was modified.

3   Q.   And did you call him?

4   A.   No.

5   Q.   And at that time did you understand that he wanted to get

6   together to cook up a story together?

7   A.   In honesty that thought crossed my mind, but I believe at

8   that point, under advice of counsel, I should not contact him.

9   But I believe that was probably an option that he was looking

10  to do.  I don't know.  He could legitimately have been worried

11  about me, maybe he thought something happened to me, I don't

12  know, but -- so my head was in a lot of different places at the

13  time.

14  Q.   Did you bring that voice message to the government?

15  A.   I believe I mentioned the voice message.

16  Q.   And what happened with it, to that voice message?

17  A.   I don't know.

18  Q.   Now you testified that with respect to Mr. Reichberg's file

19  that it took a long time to get the fingerprints back, right?

20  A.   It took some time, yeah.

21  Q.   But am I correct that you also testified that on occasion

22  you didn't even require fingerprints, right?

23  A.   I think those occasions were happening after that time

24  period.

25  Q.   And that was you had just -- you said you would do a

1   summary background check and not even require fingerprints on

2   some occasion for people, right?

3   A.   It was after that that we had access to a softer background

4   check, and if we weren't getting the fingerprints responses

5   back quick enough we could do a softer background check.

6   Q.   What does that mean, softer background check?

7   A.   A non- -- I believe it to be a non-federal background

8   check.   It was kind of a like a New York State background check

9   based on like Social Security number, date of birth, but not

10  based on the fingerprints.

11  Q.   And that could be done immediately, right?

12  A.   Yes.

13  Q.   And am I correct that at times also you did a fingerprint

14  check that was done extremely rapidly, right, came back in a

15  day or two?

16  A.   That would be possible as long as the response came back

17  from Albany and we could access it.

18  Q.   But you did not do that for Mr. Reichberg, did you?

19  A.   No, these particular methods, as far as I remember, were

20  not available as of yet.

21  Q.   So it's your testimony, to be clear, that in 2014 you

22  couldn't get the fingerprints back that rapidly?

23  A.   You could only get the fingerprints backs as rapidly as

24  they were available in the system to pull them.   The easiest

25  way for me to explain it is we send the fingerprints to Albany,

1    if Albany is backlogged and they can't get to them -- they're

2    not in like our database to pull them out, but if Albany is

3    able to process it within days, week, whatever the time frame

4    would be, when they come back into our system we could pull

5    them out.  So it was a two-part system.  We depended on -- it

6    wasn't just the fact they were fingerprinted that day, we get

7    them back the next day; if Albany doesn't do their job of

8    processing the fingerprints, we can't get them back.

9    Q.  But you were able to put pressure to get things back

10   quicker, right?

11   A.  Not through Albany, no.

12   Q.  But you could get -- you had a process where you could get

13   fingerprints back in a day or two, right?

14   A.  If the fingerprints were back from Albany, we would get

15   them or we could say hey, can somebody pull them out of the

16   computer, but if Albany did not enter them, there was nothing

17   you could do about getting them back.  So we were dependent on

18   that part of it before we could even think about doing it.  It

19   was kind of a two-part system.

20   Q.  They had to come from Albany, but you were able to call

21   Albany and push things along, right?

22   A.  I don't believe I ever called Albany, no.

23   Q.  Okay.  Nobody told you just push this through without the

24   fingerprints, right?

25   A.  I don't understand.  Overall?

1   Q.   Yeah.   Nobody told you to process Mr. Reichberg's

2   application -- just give him an application without the

3   fingerprints, right coming back?

4   A.   No, nobody told me to put it through without fingerprints.

5   Q.   Now the day that -- withdrawn.

6        With respect to Mr. Rechnitz's application, he did not

7   have all the paperwork he needed, even when he came in in

8   November and submitted an application, right?

9   A.   On the date he submitted his application I wasn't there,

10  but afterwards I did have his file on my desk and I do not

11  remember all the paperwork being there.

12  Q.   And unlike Mr. Reichberg, Mr. Rechnitz never sent in any

13  more paperwork that was required, right?

14  A.   I don't believe he ever sent anything in, no.

15  Q.   And he did not get a gun license, right?

16  A.   No, he never did.

17  Q.   Now with respect to Mr. Reichberg's file, you testified

18  that at some point Mr. Endall told you to wrap it up and that's

19  why you closed the file, right?

20  A.   Yes.

21  Q.   But aren't I correct that you previously told the

22  government that you closed this file up or you went forward and

23  issued the license on your own?

24  A.   No, I would not issue it unless somebody of a higher rank

25  than me told me to do so.

IBJTGRA1                          Ochetal – Cross

Q.  Do you recall telling the government that you knew that you

should have required more paperwork but you didn't do so

because of Jimmy Grant's relationship?

         Do you recall saying that to the government?

A.  I did not require -- rather I did not completely review it

because of Jimmy Grant's relationship, but that was in

conjunction with the instruction from Inspector Endall stating

it was relative to Jimmy Grant's guy.

Q.  But at the time you told this to the government, you told

them that you probably should have required more paperwork but

you didn't require it because of Jimmy Grant, and that

essentially that it was your decision.  Do you recall telling

that?

A.  Well, I could have required more documentation, but I chose

not to knowing the outcome.

Q.  And at the time that you told this to the government, when

you said that you did it because of Jimmy Grant, you didn't say

it was Endall who told you to do that, right?

         MS. RAVENER:  Objection, asked and answered.

         THE COURT:  Thank you.  You can answer the question.

A.  I believe, to the best I can remember, I was told by

Inspector Endall to close this case out, Jimmy Grant's guy.

I'm not saying Jimmy Grant told me to do it, Inspector Endall

told me to close it out, and that's what I did.

         (Continued on next page)

IBJKGRA2                         Ochetal - Cross

1    BY MS. NECHELES:

2    Q.  Well, do you recall telling the government on 4/25/18 that

3    after Mr. Reichberg was fingerprinted, that's when Jimmy Grant

4    was promoted, and that no one ever said to you to finalize it,

5    you said basically -- or, I'm sorry, withdrawn -- that that's

6    when Jimmy Grant's promotion happened?

7              MS. RAVENER:  Objection, your Honor; compound, vague.

8              THE COURT:  Please rephrase.

9              MS. NECHELES:  Withdrawn.

10   Q.  Do you recall telling the government that it was around the

11   time that Mr. Reichberg was fingerprinted, that Jimmy Grant was

12   promoted?

13   A.  Around the time Mr. Reichberg was fingerprinted was around

14   the time that Jimmy Grant got promoted?  To me, that seems

15   about right, as I remember.

16   Q.  Weren't you saying that was why you wanted to give -- you

17   pushed this through?

18             MS. RAVENER:  Objection; asked and answered,

19   argumentative.

20             THE COURT:  Thank you.

21             Counsel, can you rephrase, please?

22             MS. NECHELES:  Okay.

23   Q.  Weren't you telling the government that the reason that you

24   went forward on this was because you liked Jimmy Grant and you

25   knew he had been promoted?

1           MS. RAVENER:  Objection; same grounds.

2           THE COURT:  Thank you.

3           You can answer the question.

4           THE WITNESS:  Can you just repeat that?

5    BY MS. NECHELES:

6    Q.  Well, sir, weren't you telling the government that the

7    reason that you decided to give the license and not keep

8    looking for further paperwork on Jeremy Reichberg's application

9    was because you knew Jimmy Grant had been promoted and you

10   liked Jimmy Grant?

11   A.  The promotion had nothing to do with that.  I did not

12   dislike Jimmy Grant, I had nothing against him, but he was a

13   high-ranking member.  I had nothing negative to say about him.

14   That had nothing to do with it.  As far as approving it, I was

15   just, again, told on a certain day came about, that this is

16   Jimmy Grant's guy, wrap it up, and that's what I did.  It

17   didn't come to me, oh, that this guy got Jimmy Grant promoted

18   and I liked Jimmy Grant, that's why I did it.  That wasn't why

19   I did it.  I just did it because Inspector Endall said it was

20   Jimmy Grant's guy.  Not that it's Jimmy Grant's guy who got him

21   promoted to do it, it was just that it was Jimmy Grant's guy,

22   and I didn't weigh into his promotion or it didn't have

23   anything to do with how I felt about Jimmy Grant.  I didn't

24   have anything to or against him.  It was just that's what

25   happened that day.

1   Q.  Okay.  But, sir, am I correct that you have met with the

2   government about 12 times to prepare for your testimony here?

3   A.  I have no idea how many times, but definitely several

4   times, sure.

5   Q.  Do you recall that it wasn't until -- all these events

6   happened in 2014, the events with respect to Mr. Reichberg

7   getting his gun license, right?

8   A.  Yes.

9   Q.  Do you recall telling the government in May of 2018 that

10  it's just now, thinking it over, that you were pretty sure

11  Endall said to wrap up Reichberg's application?

12  A.  Yes, I believe that's what I said.  I was always kind of

13  not sure of who made the call as far as wrapping it up, because

14  there was the aspect of Sergeant Villanueva saying, hey, Jimmy

15  Grant's guy is coming in to take care of him.  So it was hard

16  to determine for a while, I guess, who really said to wrap it

17  up.  And then I just needed to really think about who said to

18  wrap it up, whether it was one person or another that gave me

19  the instruction.

20  Q.  So am I correct that in April, you told the government that

21  you knew that you should have required more paperwork, but you

22  didn't require more because of Jimmy Grant's relationship,

23  right?

24  A.  Yes.

25  Q.  And in May of 2018, you said, well, actually, thinking it

1   over, I'm pretty sure now that it was Endall, Endall said to me

2   wrap it up, right?

3            MS. RAVENER:  Objection.

4            THE COURT:  Thank you.

5            Sustained.

6   BY MS. NECHELES:

7   Q.  Well, am I correct that a month later, you then said to the

8   government, thinking it over, I'm pretty sure that Endall said

9   to wrap up Jeremy Reichberg's application?

10  A.  For me, it was just a matter of determining -- I knew who

11  the relationship was with.  It was just a matter of determining

12  what supervisor said to me to wrap it up.

13  Q.  So, to be clear, four years after the event, after

14  thinking, and thinking, and thinking about it, that's when you

15  said, well, thinking it over, I'm pretty sure this is what

16  happened?

17           MS. RAVENER:  Objection, your Honor.

18           THE COURT:  Thank you.

19           Sustained.

20  Q.  Well, sir, is that what happened when you spoke to the

21  government, that four years after the event, you said, well,

22  I'm pretty sure now, thinking back, that it was -- Endall said

23  this to me, and that's why I wrapped this up?

24           MS. RAVENER:  Objection.

25           THE COURT:  Thank you.

1            Sustained.

2     BY MS. NECHELES:

3     Q.  Well, sir, four years after the event, you said to the

4     government, pretty sure that Endall said to wrap up Jeremy

5     Reichberg's application, right?

6            MS. RAVENER:  Objection.

7            THE COURT:  You can answer the question.

8            THE WITNESS:  Can you repeat that, please?

9     Q.  Well, four years after the events in question, and after

10    meeting the government numerous times, you said to the

11    government, well, I'm pretty sure that Endall said wrap up

12    Jeremy Reichberg's application, right?

13    A.  Yes.  Like I said, it just -- it was a matter of who told

14    me to wrap it up.  And for a while, it was hard to be sure who

15    it would have been because there were two people involved in

16    this case.

17    Q.  And, sir, is it that your memory got better?

18           MS. RAVENER:  Objection.

19           THE COURT:  Thank you.

20           Sustained.

21    Q.  Well, as you got closer to trial, then you remembered who

22    did this?

23           MS. RAVENER:  Objection.

24           THE COURT:  Thank you.

25           Sustained.

IBJKGRA2                        Ochetal - Cross

1    BY MS. NECHELES:

2    Q.  And thereafter, am I correct that in a later meeting with

3    the government, on -- oh, in the same meeting, you said for the

4    first time, I'm pretty sure Endall said to give him a full

5    permit?

6    A.  I don't know the first time it was that I said that, but

7    that's what was said.

8    Q.  And that's what you said -- you were getting ready to

9    testify at trial, right?

10            MS. RAVENER:  Objection, your Honor.

11            THE COURT:  Thank you.

12            You can answer the question.

13            THE WITNESS:  I mean, there's no denying I was getting

14   ready to testify for trial.

15   Q.  And that's when you made these statements, right?

16            MS. RAVENER:  Objection.

17            THE COURT:  Thank you.

18            You can answer the question.

19            THE WITNESS:  Just ideas, recollections, memories, a

20   lot had gone on, so a lot is not as easy to recall as people

21   may think.  And I didn't want to say Dave told me to wrap it

22   up, or Endall told me to wrap it up, until I was more certain

23   as who it was rather than just throwing a name out there.

24            MS. NECHELES:  I have no further questions.

25            THE COURT:  Thank you, counsel.

1            Counsel for Mr. Grant?

2    CROSS-EXAMINATION

3    BY MR. MERINGOLO:

4    Q.  Good morning, sir.

5    A.  Good morning, sir.

6    Q.  You did not plead to honest services fraud, correct?

7    A.  Excuse me.  Could you repeat?

8    Q.  You pled only to bribery, right?

9    A.  Bribery and conspiracy to commit bribery.

10   Q.  You didn't plead guilty to honest services fraud, correct?

11   A.  Yes.

12   Q.  Now, you said you worked in the licensing division from

13   2009?

14   A.  Yes.

15   Q.  When did you meet Mr. Villanueva?  In 2009?

16   A.  I'm sure I met him in 2009.

17   Q.  In 2009, were you aware he was involved in a bribery

18   scheme?

19   A.  No.

20   Q.  You worked in the licensing division from 2009 to

21   approximately 2016, right?

22   A.  Yes.

23   Q.  When was the first time you became aware that

24   Mr. Villanueva was involved in a bribery scheme?

25   A.  I mean, it's hard to recall the first time.  I mean, it

IBJKGRA2                    Ochetal - Cross

```
 1  wasn't years or years after that.
 2  Q.  Let me try:  You started in this bribery scheme
 3  approximately in 2014, right?
 4  A.  Yes.
 5  Q.  Were you aware prior to 2014 that Mr. Villanueva was
 6  involved in a bribery scheme?
 7  A.  No.
 8  Q.  So you first became aware that Mr. Villanueva was involved
 9  in a bribery scheme when you entered into the scheme, correct?
10  A.  Yeah, that would sound right.
11  Q.  At one point between 2009 and 2014, did you become friendly
12  with Mr. Villanueva?
13  A.  Yes.
14  Q.  You did.
15          Do you know when approximately?  What year?
16  A.  Maybe 2013.
17  Q.  Now, were you best man at his wedding?
18  A.  Yes.
19  Q.  And when was his wedding?
20  A.  I believe it was the end of two -- or close to the end of
21  2015.
22  Q.  So let me clear this up:  You weren't aware that he was
23  involved in a bribery scheme prior to 2014, and you were
24  friends during that period of time, correct?
25          MS. RAVENER:  Objection.
```

1           THE COURT:  Thank you.

2           You can answer the question.

3           THE WITNESS:  I'm not the best with dates and times.

4    I've said that to the government before.  Yes, I was friends

5    with David Villanueva.  When I first started becoming friends

6    with David Villanueva, I did not have any personal knowledge of

7    any type of bribery scheme at that point.

8    BY MR. MERINGOLO:

9    Q.  But then you became really good friends, and you were his

10   best man at his wedding, right?

11   A.  Later on, yes.

12   Q.  When you started in the bribery scheme, do you recall

13   processing applications from Mr. Petroske?  Petroske, I

14   believe.

15   A.  I'm not sure the name rings a bell.  Maybe.

16   Q.  Ben Petroske doesn't ring a bell?

17   A.  Yes.  It rings a bell, yes.

18   Q.  Was he an expeditor?

19   A.  My recollection of Ben Petroske was -- I believe he retired

20   from the license division.

21   Q.  And then he was doing expediting thereafter?

22   A.  I guess, looking back, you would consider it expediting.

23   Q.  And what is expediting, sir?

24   A.  I would say moving something at a faster pace than normal.

25   Q.  To your knowledge, individuals would hire expeditors to get

IBJKGRA2                          Ochetal - Cross

1    their gun license faster, correct?

2    A.  Yes.

3    Q.  But if someone didn't want to hire an expeditor, could they

4    go online and review what would be required to get a gun

5    license?

6    A.  I believe they could.

7    Q.  Do you remember -- I'm changing the topic now, just to let

8    you know.

9         Do you remember processing a license for a Peter

10   Castellano?

11   A.  Offhand, I don't remember the name.

12   Q.  Do you recall processing a license for someone who owned or

13   managed Western Beef, which was Peter Castellano?  Only if you

14   remember.

15        MS. RAVENER:  Objection to the form, your Honor.

16        THE COURT:  Thank you.

17        You can answer the question.

18        THE WITNESS:  I remember an applicant that was

19   associated with Western Beef.

20   BY MR. MERINGOLO:

21   Q.  Do you know if that was Mr. Villanueva's friend or part of

22   the conspiracy?

23   A.  I don't know if he was part of any conspiracy, but the only

24   reason I know of an applicant working at Western Beef was

25   through David Villanueva.

IBJKGRA2                          Ochetal - Cross

1   Q.   Okay.  Thank you very much for that.

2           Do you recall a gentleman by the name of Sal

3   Mistretta, who ran the licensing division in Nassau County?

4   A.   Yes.

5   Q.   Would you process licenses as a courtesy for Mr. Mistretta?

6   A.   I'm sure it's possible that I did.

7   Q.   He wasn't involved in the conspiracy with you, correct?

8   A.   Not to my knowledge.

9   Q.   But are you aware he was very friendly with Mr. Villanueva?

10  A.   I knew they had a friendly relationship.  Don't know to

11  what extent, but, yes.

12  Q.   I'm just going to move on to a different topic, sir.

13          Now, I believe that you helped process gun licenses

14  for individuals from the internal affairs office.

15          Do you recall telling the government that?

16  A.   It's definitely possible.  I've processed applications from

17  various people, entities in the police department.

18  Q.   Okay.  But specifically, do you remember processing a --

19  and you did nothing wrong, but do you remember processing an

20  internal affairs -- for an internal affairs deputy inspector?

21          MS. RAVENER:  Objection to the characterization.

22          THE COURT:  Thank you.

23          Can I ask you to rephrase the question?

24  BY MR. MERINGOLO:

25  Q.   Do you recall processing, for a deputy inspector from

1   internal affairs, a license for one of his friends?

2   A.  Right now, I don't recall.  It's possible.  I just don't

3   recall.

4   Q.  Okay.  That's fine.

5        Do you recall telling the government that you did

6   favors for the internal affairs through Michael Endall?

7   A.  I know I did favors for Michael Endall.  In regards to

8   internal affairs?  Again, it's possible.  It's just a lot is...

9   Q.  I understand.

10       I'm going to show you something that may refresh your

11   recollection.

12       MR. MERINGOLO:  Your Honor, may I approach?

13       THE COURT:  Please do.

14   BY MR. MERINGOLO:

15   Q.  It's 3519-27, page 10.  Page 10, third line down.  You can

16   read the whole thing, sir, but I just want you to read this one

17   line I pointed you to to see if it refreshes your recollection.

18   If it does, it does; if it doesn't, it doesn't.  Take your

19   time.

20       MS. RAVENER:  One moment?

21       Can I see that again?

22       (Pause)

23       MS. RAVENER:  Your Honor --

24       MR. MERINGOLO:  Hold on.

25       MS. RAVENER:  -- one moment?  One moment, your Honor?

1              THE COURT:  Please take your time.

2              MR. MERINGOLO:  All right.  I'll withdraw that.

3              THE COURT:  Thank you.

4    BY MR. MERINGOLO:

5    Q.  But you refer giving the red carpet treatment to people

6    from internal affairs?

7    A.  I did give red carpet treatment to many individuals.  Is it

8    possible they were from internal affairs?  Yes, but I don't...

9    Q.  Thank you.  Any high-ranking police officer that referred

10   someone to the licensing division, to your knowledge, that you

11   handled, you would give the red carpet treatment to, correct?

12   A.  Usually, if that was the case, I was instructed to do so,

13   and I chose to do so.

14   Q.  But that was common practice for high-ranking officials who

15   recommended people, correct?

16             MS. RAVENER:  Objection.

17             THE COURT:  Thank you.

18             You can answer the question.

19             THE WITNESS:  It -- yes, it would happen.

20   BY MR. MERINGOLO:

21   Q.  Just moving it along, Mr. Ochetal.

22             Do you believe Mr. Villanueva manipulated you into

23   this bribery scheme?

24             MS. RAVENER:  Objection.

25             THE COURT:  Thank you.

1          Can you please rephrase the question, counsel?

2     BY MR. MERINGOLO:

3     Q.  Do you feel that Mr. Villanueva is a truthful person?

4          MS. RAVENER:  Objection.

5          THE COURT:  Thank you.

6          Sustained.

7     Q.  Do you believe you were manipulated into this bribery

8     scheme?  Do you believe?

9          MS. RAVENER:  Objection.  Objection.

10         THE COURT:  Thank you.

11         Sustained.

12    Q.  Now, I want to talk to you about the gun application

13    itself, okay?

14         On each application, it refers to the penal law 400,

15    correct?

16    A.  Yes, that sounds right.

17    Q.  Isn't it true that you told the government that people

18    usually get their licenses within six months pursuant to the

19    penal law 400?

20    A.  The way that works, if I remember correctly, according to

21    penal law 400, is that the six months is -- as an investigator,

22    you are supposed to act on a particular case in that six-month

23    period, providing that there's nothing holding you back as far

24    as the city is concerned, meaning you have conducted an

25    interview, receipt of the paperwork, the fingerprints, the

1    mental health rec -- you have everything you need, the person

2    has done everything they could possibly do, that's when you

3    need to act on it within that time period.  However, if you do

4    not have certain documentation, then it can go on as long as it

5    takes for the city to get what they need to make a decision.

6    Q.  Well, maybe it's been a while, but do you recall telling

7    the government that penal law 400, a 400 permit, should be

8    within six months, whether it's approved or disapproved,

9    regardless of the permit?

10            MS. RAVENER:  Objection.

11            THE COURT:  Thank you.

12            You can answer the question.

13            THE WITNESS:  If you have all that is necessary and

14   required, then you could, and you should, but if you do not,

15   then you are not to do that.  In other words, if somebody

16   applied for a premise residence license where the guidelines

17   are a little less intense, so you don't need as many things,

18   you probably have all those things within three -- three

19   months, whatever time period it is, then you're supposed to act

20   on it because you have everything you need.  So it's when you

21   don't have everything you need, it can take longer than the

22   penal law code about the six months.

23            So I don't know if that clears it.

24   Q.  No, I'll try to do it right now.

25            But isn't it a fact that you have to, whether approve

IBJKGRA2                    Ochetal - Cross

or disapprove, within six months pursuant to the penal law 400?

             MS. RAVENER:  Objection.

             THE COURT:  Thank you.

             You can answer the question, if you can answer.

             THE WITNESS:  From my recollection, you cannot make

that decision if you don't have the documentation.  So we would

be told, hey, reach out to this guy, put it back -- the burden

back on the applicant, hey, you're missing, I don't know, a

utility bill, I can't approve you till you have this.  So if

you have all this, you're correct, that's what we should do.

Q.  So if you have all the paperwork, and the fingerprints came

back, pursuant to penal law 400, you can get your permit within

six months?

             MS. RAVENER:  Objection.

             THE COURT:  Thank you.

             Sustained.

BY MR. MERINGOLO:

Q.  If you have all your paperwork, you can get -- as soon as

all your paperwork is done and the fingerprints come back, you

can get a lawful business carry license, right?

             MS. RAVENER:  Objection.

             THE COURT:  Thank you.

             You can answer that question.

             THE WITNESS:  If within six months, you have all the

required paperwork, interviews conducted, background check

1   checks out, you can get it within that time period if you have,

2   and if you qualify, for the particular type, whether it's carry

3   business.  It could even go as down to a premise, because

4   sometimes you investigate a premise because they have a prior

5   arrest history or whatever, but based on information you are

6   given, because we require certain things for certain licenses,

7   if you get it all, and you believe they pass that

8   qualification, then that's when that comes into play.

9   BY MR. MERINGOLO:

10  Q.  So you can get your permit within six months as long as all

11  the paperwork is done correctly, right?

12  A.  And you qualify.  It's not just a matter --

13  Q.  Okay.  If you qualify --

14  A.  Yes.

15  Q.  -- and have all the paperwork, you can get, according to

16  the penal law, your permit within six months?

17          MS. RAVENER:  Objection.

18          THE COURT:  Thank you.

19          Sustained.

20  Q.  If you have all the paperwork and the fingerprints come

21  back correctly, you can get your license within six months,

22  correct?

23          MS. RAVENER:  Objection; asked and answered.

24          THE COURT:  Thank you.

25          You can answer the question.

IBJKGRA2                    Ochetal - Cross

1              THE WITNESS:  Fingerprints -- you still have to

2    qualify.

3    BY MR. MERINGOLO:

4    Q.  If you qualify, you can get your permit within six months,

5    correct?

6    A.  It's not impossible, no.  If you qualify, you could, yes.

7    Q.  Well, didn't you tell the government that it normally takes

8    six months to get -- normally about six months for a business

9    carry?

10   A.  Yes.

11   Q.  And six months, if you qualify, is not a year and a half,

12   right?

13   A.  No.

14              MR. MERINGOLO:  Just one moment, your Honor?

15              THE COURT:  That's fine.  Please take your time.

16              (Pause)

17              MR. MERINGOLO:  Could we pull up Government Exhibit

18   732.

19   Q.  Do you see that on your screen, Mr. Ochetal?

20   A.  Yes.

21   Q.  I'd like to show you the date when Mr. Reichberg bought his

22   gun that it says.

23              Now, what date does it say he purchased his firearm?

24   A.  Purchase date is 10/10/2014.

25   Q.  Do you know if that was a typo, sir?

IBJKGRA2                    Ochetal - Cross

```
 1   A.  I don't.
 2   Q.  Are there other typos in this purchase order?
 3          MS. RAVENER:  Objection.
 4   Q.  Are there typos in ALPS usually?
 5          MS. RAVENER:  Objection.
 6          THE COURT:  Thank you.
 7          Can I ask you to rephrase the question, please,
 8   counsel?
 9   BY MR. MERINGOLO:
10   Q.  In your experience being in the licensing division, have
11   you encountered many typos in the ALPS process?
12          MS. RAVENER:  Objection.
13          THE COURT:  Thank you.
14          You can answer the question.
15          THE WITNESS:  I assume there could be typos, yes.
16   Q.  I'm going to pull up the first page and show you the
17   personal address.  Do you see the zip code, sir?
18   A.  Yes.
19   Q.  And that would be a typo, correct?
20          MS. RAVENER:  Objection.
21          THE COURT:  Thank you.
22          Can I ask you to rephrase the question, please?
23   Q.  Well, that zip code has nine numbers, right?
24   A.  It has five.
25   Q.  Well, what's -- after the numbers, it has 0000?
```

IBJKGRA2                     Ochetal - Cross

1    A.  You enter a five-digit zip code, as far as I remember.

2    Q.  Does it usually have those four zeros thereafter?

3              MS. RAVENER:  Objection, your Honor.

4              THE COURT:  Thank you.

5              Sustained.

6    BY MR. MERINGOLO:

7    Q.  Now, the personal address zip code, if everybody can look

8    at it, has the same zip code as the business address, correct?

9    A.  Yes.

10   Q.  Now, if you look at the personal address, the street and

11   the city, it says 56 Street, Brooklyn, right?

12   A.  Yes.

13   Q.  And if you look at the business address, it says 580

14   New York, correct?

15   A.  Yep.

16   Q.  So is it safe to say that there is a typo in the zip code,

17   sir?

18   A.  It's either a typo or I am just typing what's on the

19   application.

20   Q.  But we could agree the same zip code in Brooklyn is not the

21   same zip code in New York, correct?

22   A.  Nope.

23   Q.  Did you check any documents to see the accuracy of the date

24   of the purchase of the gun, sir?

25   A.  Can you repeat that?

1  Q.  Did you check any documents to see the actual date of the

2  purchase of the gun?  If you just recall, I showed you the

3  purchase of the gun was October 10th, 2014.

4  A.  Yes.

5  Q.  Now, in order to put that in there, did you check any

6  documents to see the actual date of the purchase of the gun?

7  A.  Typically, what I think I would have, should have, done is,

8  based on a bill of sales, get the date on when the gun was

9  actually purchased.

10  Q.  So before you testified here today, did you check any

11  documents?  Did you go over any documents with the government?

12  A.  I mean, I've seen these documents.

13  Q.  Okay.  Before you testified, correct?

14  A.  Yes.

15  Q.  Did the government show you the documents of when

16  Mr. Reichberg purchased his gun, what date he purchased his

17  gun?

18  A.  The only documents I've seen are these.  There are no other

19  documents as far as bill of sale.

20         MR. MERINGOLO:  Your Honor, I believe there's a

21  stipulation that we have with respect to the credit cards of

22  Mr. Reichberg.

23         Pursuant to this stipulation, your Honor, I'd like to

24  offer the credit card.  Do you want me to read the stipulation

25  at this point?

1          MS. RAVENER:  Your Honor, if we could just ask to see

2    the document counsel is referring to?

3          MR. MERINGOLO:  Government Exhibit 1702.

4          MS. RAVENER:  That's not what I mean, your Honor.  If

5    I could have a moment to confer with counsel.

6          THE COURT:  Thank you.  Please take your time,

7    counsel.

8          MS. RAVENER:  Thank you.

9          (Pause)

10          MR. MERINGOLO:  Is it okay to read this?

11          THE COURT:  Thank you.

12          MS. RAVENER:  We have no problem with reading the

13    stipulation.

14          THE COURT:  Thank you.  Please proceed.

15          MR. MERINGOLO:  "It is hereby stipulated and agreed to

16    by and between the United States of America, Geoffrey Berman,

17    United States Attorney for the Southern District of New York,

18    Martin Bell, Jessica Lonergan, Kimberly J. Ravener, Assistant

19    U.S. Attorneys, Jeremy Reichberg, Jeremiah Reichberg, Yermy

20    Reichberg, the defendant, by his attorney, Susan Necheles,

21    Esq., and James Grant, Jimmy Grant, the defendant, by his

22    attorneys, John Meringolo and Anjelica Cappellino that if

23    called to testify, custodian of records from the following

24    financial institutions would testify that they are similar with

25    the recordkeeping practices of their respective institutions:

1    American Express, JP Morgan Chase, TD Bank, Citibank.

2              "Each of those custodians would further testify as to

3    the following government and defense exhibits associated with

4    each institution's collectively records.  The exhibits consist

5    of true and correct copies of records regularly conducted

6    activity made at or near the time of the activity by or from

7    information transmitted by a person with knowledge of the

8    matters set forth herein:  American Express, GX 201, 202, 213,

9    214, JR-1101, JR-1105, JPMC, JX 203 through 212, JR-1106

10   through JR-1109, and JR-1203; TD Bank, JX 215; and Citibank,

11   JR-1110, JR -- through JR-1115, and JR-1201.

12             "Each of the custodians would further testify as to

13   their respective records that those records were kept in the

14   course of a regularly conducted business activity and were

15   created as a regular practice of the business activity.

16             "It is further stipulated and agreed that the

17   Government Exhibits 201 through 215 and Defense Exhibits

18   JR-1101 through JR-1115, JR-1201, JR-1202 consist of records

19   that constitute business records pursuant to 803(b) of the

20   Federal Rules of Evidence."

21             MS. RAVENER:  Your Honor, can we ask for a very short

22   sidebar about this?

23             THE COURT:  Yes, please.  Come on up.

24             (Continued on next page)

25

IBJKGRA2                    Ochetal – Cross

 1              (At the sidebar)

 2              THE COURT:  I'm sorry, counsel, please proceed.

 3              MS. NECHELES:  Judge, we have --

 4              MS. RAVENER:  That's not what we have, Susan.

 5              Look, your Honor, if we may, our records reflect --

 6              THE COURT:  I'm sorry, can we first back up just for

 7    context.  There have been a couple of misreadings, small

 8    misreadings.

 9              MR. MERINGOLO:  That's my fault.  I can't control

10    that.

11              THE COURT:  I think that's fine.  So I'm not going to

12    say anything about it in front of the jury.

13              For context, can the parties tell me what document it

14    is that this is ultimately leading up to?

15              MS. NECHELES:  Judge, this is an American Express

16    record which shows that the gun was bought on a later date.  I

17    forgot to do this on my cross, which is why I've been asking

18    Mr. Meringolo to do this.  The government elicited on direct

19    the date that it has on this application for the gun purchase,

20    making it look like he purchased the gun and was allowed to

21    purchase a gun before he even got his gun license.  It's just

22    not right.  We have the American Express record.

23              Now --

24              THE COURT:  I'm sorry, what's the exhibit reference?

25              MS. NECHELES:  So in my -- in what I have in my

exhibits, the government had marked this particular American

Express record as 206-A.  I'm now hearing from the government

that that was an earlier marking, but when we stipulated,

that's what I thought was the record.

MS. RAVENER:  Your Honor, if we could be clear about

this.  That is not what our records reflect.  This document is

not part of the stipulation.

Now, the parties very well may be able to work this

out and enter into a new stipulation to permit the defense to

offer this document at an appropriate time, but we can't do

that on the fly here without having an opportunity to verify

the document.

Based on our records, this document is not part of the

stipulation.  I don't think it's material to the testimony of

this witness regardless.  The witness has already testified

that the figure may be a typographical error, he's not certain.

I don't think that we need to resolve this right this moment,

but, in any event, this document is not part of the existing

stipulation originally.

THE COURT:  Thank you.

MS. NECHELES:  Judge, the government exhibit, or the

stipulation, lists exhibits from one number to the next.  This

was part of what we understood.  So when the government says

they need to verify this document, this is a document they have

marked as an exhibit.

1              THE COURT:  Thank you.  Understood.

2              MS. LONERGAN:  Can I just bring this up.  If you

3    remember, there was another issue that was very similar, and

4    defense counsel got up and made representations to the Court,

5    which later turned out to be untrue, about what the government

6    had provided to her at the time she signed the stipulations.  I

7    just want to provide that as a context here, which is that I

8    think as that sequence of events made clear, we have been very

9    careful to make sure that when we provide stipulations, we

10   provide the correct underlying documents.  It is true that we

11   have updated our exhibits, but we have made it very clear to

12   defense counsel when we are updating our exhibits.

13             Again, I don't think -- as Ms. Ravener said, I don't

14   think this is going to be an issue because to the extent that

15   there's a bank record, we're going to stipulate that it's

16   authentic.  So that's not going to be an issue.  We just --

17   it's not covered in the stipulation as the stipulation is

18   currently drafted.

19             THE COURT:  That's fine.  Thank you.

20             Counsel, if that's the case, I think that we can take

21   this up separately.  As I understand it, this witness has never

22   seen this record, so the question is, I'll call it, one of

23   presentation; namely, whether you can make this dramatic claim

24   with this witness as opposed to later in argument.

25             MS. NECHELES:  To show the witness, yes, that, in

1    fact, this is an error.  I mean, the government elicited it on

2    direct and made a big deal about how he bought the gun

3    improperly before he got the license, and it's just not true.

4              THE COURT:  Thank you.  Understood.

5              MS. LONERGAN:  One moment, your Honor?

6              THE COURT:  Please.  Go ahead.

7              MS. NECHELES:  I'm not saying that this was the

8    document.  I'm saying that we understood it to be.  It's very

9    confusing.  The government does not give us copies with the

10   stipulation.  I have ten stipulations sitting on my desk.  We

11   give --

12             THE COURT:  Counsel for the United States, do you have

13   an alternative proposal?

14             MS. LONERGAN:  Your Honor, they can, without

15   describing the document, show it to the witness to refresh his

16   recollection and ask, is there anything about this document

17   that -- but I don't think it would refresh his recollection,

18   but I don't think it can come into evidence at this point

19   because there is no stipulation as to its authenticity.

20             THE COURT:  Thank you.

21             In the absence of a stipulation, I think that we need

22   to move on.  I understand that the government has offered to

23   work with the defense to craft a stipulation that would

24   encompass this document.  So, really, this is a question of

25   timing and when it is that defense will have the opportunity to

IBJKGRA2                         Ochetal - Cross

1    point out the inconsistency between this document and the

2    relevant record.  That need not happen right with this witness,

3    and I'd like to keep moving.

4              MS. RAVENER:  Thank you, your Honor.

5              THE COURT:  Thank you.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Thank you, counsel.

3           MR. MERINGOLO:  Not much longer with Mr. Ochetal.

4           THE COURT:  That's fine.  Take your time.  You can

5     proceed.

6     BY MR. MERINGOLO:

7     Q.  Mr. Ochetal, in your experience, how quickly have prints

8     come back for you during your tenure at the licensing division?

9     A.  I'd say it varied.  I was there for a while.  I've seen

10    them come back, it took months and months.  There was times

11    where it could have been four months we're waiting on prints,

12    and, at some point, they were coming back in, I don't know,

13    within weeks.  I think it was just part of maybe a staffing

14    issue at DCJS, but it varied.  There was a huge variation of

15    time frames.

16    Q.  Right.  Isn't it true that it could have come back within

17    days?

18    A.  If DCJS got the prints back, and it processed them, it

19    could come back in several days.

20    Q.  So it is possible that -- or it has happened that

21    fingerprints have come back in days, correct?

22    A.  I would say within a week is not a stretch.  After we had a

23    long process of them taking months, yeah, there was a time

24    where they were coming back, and getting them within a week

25    wouldn't be out of the realm.  Or at least two weeks, for sure.

IBJKGRA2                         Ochetal - Cross

 1   Q.  Okay.  You recall the date that Mr. Reichberg went to see
 2   you, correct?
 3   A.  Yes.
 4   Q.  To do his fingerprints, right?
 5   A.  Yes.
 6   Q.  You recall other people coming that day, other than -- were
 7   other people that day?
 8   A.  Yes, there were other applicants.
 9   Q.  Now, do you recall another applicant that came that day
10   that got his fingerprints back within four days?  Do you recall
11   that?
12   A.  No.
13   Q.  Okay.  You're very familiar with all this -- with this
14   process, right?
15   A.  I would say so.
16   Q.  So would I.
17             MR. MERINGOLO:  Judge, let me see if I can refresh his
18   recollection --
19             THE COURT:  Thank you.  Please proceed.
20             MR. MERINGOLO:  -- with this document.
21   BY MR. MERINGOLO:
22   Q.  Let me see if this refreshes your recollection regarding
23   what I just asked you.  You can read the whole thing, but I'm
24   referring you to that point.
25             THE COURT:  Thank you.

1          You're referring to Court Exhibit A?

2          MS. RAVENER:  And, your Honor, I would just like the

3    witness to be given the opportunity to review the whole

4    document.

5          MR. MERINGOLO:  He can read the whole thing.

6          THE COURT:  Thank you.

7          MR. MERINGOLO:  We'll mark it 1001, Judge.

8          (Pause)

9          THE WITNESS:  Okay.

10   BY MR. MERINGOLO:

11   Q.  Let me take it, and I will ask you a question.

12         Does that refresh your recollection, sir, regarding

13   those prints?

14   A.  It doesn't refresh my recollection of the individual.

15   Q.  But does that refresh your recollection that prints came

16   back within four days?

17   A.  They could have.  The only thing is, on some prints, which

18   it appeared that that one was --

19   Q.  We can't discuss this because it's not in evidence.  Sorry.

20   A.  All right.  All I'm trying to say is that what also could

21   happen to get prints back at a very fast pace is if somebody

22   applied for a limited carry license and already had a rifle or

23   shotgun permit or a premise residence license, the prints are

24   already in DCJS, they would automatically come back like the

25   next day.  So that's also a possibility as far as the speeding

IBJKGRA2                      Ochetal – Redirect

1    it along.

2    Q.  Okay.

3    A.  Not to say if we knew that, we might do that on our own.

4    If we knew somebody already had a permit, we knew we had the

5    prints right away, but that's one way of having the prints

6    readily accessible, if they had a prior license.

7              MR. MERINGOLO:  Thank you for your testimony.

8              THE WITNESS:  You're welcome.

9              MR. MERINGOLO:  No further questions.

10             THE COURT:  Thank you.

11             Counsel for the United States?

12             MS. RAVENER:  Yes, your Honor, briefly.

13             THE COURT:  Thank you.

14             Please take your time.

15   REDIRECT EXAMINATION

16   BY MS. RAVENER:

17   Q.  Good morning, Mr. Ochetal.

18   A.  Good morning.

19   Q.  Mr. Ochetal, what do you need to do to get a 5K letter?

20   A.  My understanding, to get a 5K letter, is to provide

21   truthful information about activities, criminal activities,

22   engaged in by myself, and then also provide information --

23   truthful information about any individuals I have information

24   about or associated with.  I am supposed to testify in court if

25   asked to do so.  And I am supposed to not get into any other

1   trouble, get arrested again.

2   Q.  Does anyone have to get convicted at this trial in order

3   for you to get a 5K letter?

4   A.  No.

5   Q.  Does anyone even have to get charged with a crime in order

6   for you to get a 5K letter?

7   A.  No.

8   Q.  Does your 5K letter, for your sentencing, depend at all on

9   the outcome of this case?

10  A.  No.

11  Q.  Mr. Ochetal, you were asked some questions about your

12  relationship with David Villanueva.  Do you recall those?

13  A.  Yes.

14  Q.  Now, how quickly did you begin cooperating with the

15  government after you were approached by the FBI?

16  A.  Pretty quickly.  I don't remember.  Days, a week.

17  Q.  From the very beginning, what did you tell the government

18  about Jeremy Reichberg's gun license?

19  A.  I just told them why it was approved.

20  Q.  And why was it approved, as you recall?

21  A.  I just recall that Inspector Endall told me to wrap up

22  Jimmy Grant's guy, and I obliged.

23  Q.  Did you ever, in any way, coordinate your testimony at this

24  trial with David Villanueva?

25              MR. MERINGOLO:  Objection.

```
 1                THE COURT:  Thank you.
 2                You can answer the question.
 3                THE WITNESS:  Outside of the text messages I discussed
 4     and the voicemail he left, he left me that voicemail, I never
 5     spoke to Dave since.
 6     BY MS. RAVENER:
 7     Q.  So is it fair to say it's been about two years since you
 8     even spoke to David Villanueva?
 9     A.  Yeah.
10     Q.  And even then, did you ever talk to him about your
11     testimony relating to Jeremy Reichberg or Jimmy Grant?
12     A.  No.
13     Q.  You were asked a number of questions about the number of
14     your meetings with the government.  Do you recall those
15     questions?
16     A.  Yes.
17     Q.  In those meetings with the government, did you provide
18     information only about Jimmy Grant and Jeremy Reichberg or also
19     about other people?
20     A.  No.  It was about myself and other people.
21     Q.  Mr. Ochetal, you were also asked some questions about the
22     kinds of things you accepted as bribes.  Do you remember that?
23     A.  Yes.
24     Q.  So let's be clear:  What kinds of things did you accept as
25     bribes?
```

IBJKGRA2                    Ochetal - Redirect

```
1    A.  Multiple paid vacations, some cash, free booze, free
2    firearms, and paraphernalia, meals, entertainment was all part
3    of it.
4    Q.  So was cash the only way that you were bribed, Mr. Ochetal?
5    A.  No.
6    Q.  You were also asked questions about an email at the license
7    division regarding how much Shaya Lichtenstein was charging for
8    pistol applications.  Do you remember questions about that
9    topic?
10   A.  Yes.
11   Q.  Sitting here today, do you remember exactly what that email
12   said?
13   A.  Not exactly.  It was just --
14           MR. MERINGOLO:  Objection.
15           THE COURT:  Thank you.
16           You can answer the question.
17           THE WITNESS:  -- basically just about how much money
18   he was charging for applications.
19   BY MS. RAVENER:
20   Q.  Why was the amount that Shaya Lichtenstein charged for
21   applications considered a problem at the license division at a
22   certain point?
23           MS. NECHELES:  Objection, your Honor.
24           THE COURT:  Thank you.
25           You can answer the question.
```

IBJKGRA2                    Ochetal - Redirect

1                MS. NECHELES:  His mind?

2                THE COURT:  Can you rephrase the question, counsel?

3                MS. NECHELES:  Your Honor, I don't believe there were

4      any questions about this on cross.

5                THE COURT:  Thank you.

6                I recall it.

7                You can proceed.  You can proceed.

8      BY MS. RAVENER:

9      Q.  Would it be helpful for me to ask the question again,

10     Mr. Ochetal?

11     A.  Yes.

12               THE COURT:  Please do, counsel.

13     Q.  Mr. Ochetal, why was the amount that Shaya Lichtenstein was

14     charging for pistol license applications considered a problem

15     at the license division, to your understanding?

16     A.  Well, to my understanding, there was some of us, including

17     myself, who knew or kind of knew what was going on and had a

18     hand in what was going on, and by having that email out there

19     specifying amounts of money he was charging, it would

20     ultimately confirm people's suspicions that something was going

21     on with him.

22     Q.  Why would that be an issue?  Why would the amount of money

23     charged confirm those suspicions, in your view?

24               MS. NECHELES:  Objection; asked and answered.

25               MR. MERINGOLO:  Objection.

1          THE COURT:  Thank you.

2          Can you rephrase the question, counsel?

3          MS. RAVENER:  Sure.

4    BY MS. RAVENER:

5    Q.  Let me see if I can just show you Government Exhibit 1001,

6    which has been marked for identification.  Take a moment and

7    read it to yourself.

8          (Pause)

9    Q.  So, Mr. Ochetal, let me ask you a couple of questions now

10   that you have had an opportunity to review it.

11         Around what time did this email about the amount Shaya

12   Lichtenstein was charging get circulated at the license

13   division?

14         MS. NECHELES:  Objection, your Honor.

15         THE COURT:  Thank you.

16         Can you come up.

17         (Continued on next page)

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Thank you.

3              I'm sorry, there's an objection?

4              MS. NECHELES:  Yes, your Honor.  She's just going to

5     read hearsay now, I think.  I don't understand where this is

6     going.  I don't understand -- I don't believe I asked about

7     what Shaya was charging for --

8              THE COURT:  Thank you.

9              Can I ask how this fits into the redirect; i.e., how

10    it fits into the scope of the cross and what the specific issue

11    that you're trying to get from this witness at this point is?

12             MS. RAVENER:  Your Honor, Ms. Necheles specifically

13    elicited a discussion of the circulation of this email on

14    cross-examination and made the point, in essence, that when it

15    was circulated, Mr. Lichtenstein was kicked out of the license

16    division.  I'd like to see if I can refresh the witness'

17    recollection to put a time frame on that, and I will be moving

18    on shortly.

19             MS. NECHELES:  Your Honor, I think all I asked was

20    trying to place a time when he left.  If that's all they're

21    asking is time -- but if they're going into the substance, I

22    didn't go into the substance of anything about Shaya, how much

23    he was making.  I think what I asked specifically was, was

24    there a time when he became persona non grata, and I actually

25    thought that he was going to be answering -- I thought that the

1   time was when the new person came in to take over, and he no

2   longer allowed expeditors in.  I wasn't referring to this

3   email.  I didn't bring up the email.  I talked about when he

4   became persona non grata.

5              THE COURT:  I understand.

6              Counsel for the United States, you're planning to

7   elicit from the witness the time frame, but not go further; is

8   that correct?

9              MS. RAVENER:  At this point, I think that's

10  sufficient.

11             THE COURT:  Fine.  Thank you.  You can proceed.

12             MS. RAVENER:  Thank you.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1                  (In open court)

 2                  THE COURT:  Thank you, counsel, you can proceed.

 3                  MS. RAVENER:  Thank you.

 4        BY MS. RAVENER:

 5        Q.  Mr. Ochetal, do you recall now approximately when this

 6        issue occurred at the license division when word got out about

 7        how much Shaya Lichtenstein was charging for pistol licenses?

 8        A.  At the end of the year 2015.

 9        Q.  Let's turn to Mr. Reichberg.

10                  Did Mr. Reichberg appear unsure of himself when you

11        met him?

12        A.  No.

13        Q.  Did Mr. Reichberg appear confused about the license

14        division's requirements?

15        A.  No.

16        Q.  Did you tell Mr. Reichberg that he needed more

17        documentation?

18        A.  At some point, yes.

19        Q.  Now in the course of your duties at the license division,

20        Mr. Ochetal, when you were doing your job, did you take the

21        applicants' word at face value or did you investigate what they

22        said?

23        A.  Well, after they submitted their application is when the

24        investigation process would start and you would investigate

25        business location, reasons for the application, so you would

1  look into what you were provided.

2  Q.  And how about in reviewing a letter of necessity, when you

3  were doing your job at the license division did you take what

4  they said at face value or did you investigate what an

5  applicant said in their letter of necessity?

6  A.  You would -- I would investigate in conjunction with the

7  documentation I would receive.

8  Q.  Did you investigate what Jeremy Reichberg told you about

9  himself?

10 A.  No, I didn't perform a full investigation into it.

11 Q.  Why not?

12 A.  I understood it not to be totally necessary and to take up

13 my time doing it.

14 Q.  Where did you get that understanding?

15 A.  I guess I first assumed that understanding when Sergeant

16 Villanueva texted me that Jimmy Grant's guy was coming in, take

17 care of him.  So that's I guess when I first got that

18 understanding and proceeded after that.

19 Q.  So is it fair to say that from the beginning you expected

20 this license would not be scrutinized?

21            MS. NECHELES:  Your Honor, I object to the leading.

22            THE COURT:  Counsel, could you ask the question again,

23 please.

24 Q.  Mr. Ochetal, did you treat this license application

25 differently than the other applications you handled when you

IBJTGRA3                    Ochetal - Redirect

1   were doing your job and not taking bribes?

2            MS. NECHELES:  Objection, there's no bribe

3   associated --

4            THE COURT:  Thank you.  Counsel, could you please

5   rephrase the question.

6   Q.  Mr. Ochetal, did you handle this gun license differently

7   than you normally would in the course of your duties?

8   A.  I just did not provide a full review of the application.

9   Q.  Why not?

10  A.  For the same understanding that I started out with.

11  Q.  Which was that?

12  A.  I started out knowing when Sergeant Villanueva told me that

13  the applicant Jeremy, Jimmy Grant's guy, was coming in, to take

14  care of him.  So I guess that's where I first got that idea in

15  my head that it would not be a full review, because I knew

16  after I was done with it nobody would check up or review it

17  after that.  And I mean I had a lot of other cases, so to tell

18  you the truth, I didn't really look at it like a big deal,

19  because I had other -- I had a lot of other work, and to me I

20  took it as if it's going to get done regardless.  Knowing the

21  workload that I usually do, I just accepted it for what it was.

22  Q.  Mr. Ochetal, based on your understandings at the time, did

23  you believe that your independent review of this application

24  mattered?

25  A.  No, because there wouldn't be a second review.

1   Q.  Why not?

2   A.  For the same reason, started with the initial introduction,

3   and then when I was just told to wrap it up by Inspector

4   Endall, I wasn't asked hey, let me see it and review it.  So I

5   already knew just put it together as it was and that would be

6   it.

7   Q.  You were also asked questions about the time when Jeremy

8   Reichberg's file became an incident.  Do you remember those?

9   A.  Yeah.

10  Q.  Mr. Ochetal, why weren't you personally worried when Jeremy

11  Reichberg's file became an incident?

12  A.  I guess I would say I wasn't worried because I didn't

13  really view it as my case.

14  Q.  Why?

15  A.  Because I didn't -- I didn't put the review, I didn't vet

16  it and then make my decision.  I feel like it was my fault.  So

17  I wasn't so worried because I wasn't -- didn't make the

18  ultimate decision on approving the file.

19  Q.  Well, you put your first approval into the system, right?

20  A.  That I did.

21  Q.  Why do you say it wasn't your decision when you did that?

22  A.  Well, the decision was instructed for me to do so, and yes,

23  I did do it, made the first approval because it was a necessary

24  step before a license number could even be generated on a

25  second level approval, so I -- in theory, I guess I had to do

1     it just for the sake of the process, and I was instructed to

2     approve it by Inspector Endall and for the specific type of

3     license and that's what I did.

4     Q.  You were also asked a number of questions about favors that

5     were done at the license division.  Do you remember that?

6     A.  Yes.

7     Q.  And some of those favors were done in exchange for money

8     and gifts, correct?

9     A.  Yep.

10    Q.  And some of those favors were done when high-ranking

11    officers exercised their influence, correct?

12    A.  Yes.

13    Q.  Other than Jeremy Reichberg's gun license, can you recall

14    any other time when you helped give a police officer's

15    associate a full carry --

16          MR. MERINGOLO:  Objection.

17    Q.  -- gun license without proper documentation?

18          MR. MERINGOLO:  Objection.

19          THE COURT:  You can answer the question.

20    A.  I don't remember a full carry.  I do know I helped plenty

21    of high-ranking members of the department help their associates

22    through the process and get -- help them get their license,

23    give them first approvals.  Off of top of my head I don't

24    remember any full carries right off -- right away.

25    Q.  So let me be clear, can you recall any other time other

IBJTGRA3                    Ochetal - Recross

1   than this case when you helped a police officer's associate get

2   a full carry license right off the bat --

3           MR. MERINGOLO:  Objection.

4   Q.  -- without requiring proper documentation?

5           MS. NECHELES:  Objection.  This was just asked and

6   answered.

7           THE COURT:  Thank you.  Sustained.

8   Q.  Can you recall any time when you helped give a police

9   officer's associate who was a first-time applicant a full carry

10  gun license within two months?

11          MS. NECHELES:  Objection, your Honor.

12          THE COURT:  Thank you.  You can answer the question.

13  A.  Not with a full carry being the initial license.

14  Q.  Why did you do that here?

15  A.  I did it, like I said, I was just -- Inspector Endall told

16  me to wrap up this case, and that's what I did.

17          MS. RAVENER:  One moment, your Honor.

18          THE COURT:  Please take your time.

19          (Pause)

20          MS. RAVENER:  No further questions.

21          THE COURT:  Thank you.

22          Counsel for Mr. Reichberg.

23  RECROSS EXAMINATION

24  BY MS. NECHELES:

25  Q.  Sir, you were just asked -- you said you did not coordinate

1   your testimony with Mr. Villanueva, right?

2   A.  No.

3   Q.  But he wanted to, right?

4          MS. RAVENER:  Objection.

5          THE COURT:  Thank you.  Can you rephrase, please.

6   Q.  It was your understanding he wanted to do that, right?

7   A.  In my head I thought that he might have wanted to do that.

8   I don't know for certain.

9   Q.  But that's what you believe -- that's the reason you

10  believed he was reaching out to you, right?

11         MS. RAVENER:  Objection.

12         THE COURT:  Thank you.  You can answer the question.

13  A.  It could have been one of them.  Part of it I thought he

14  didn't hear from me for a while so maybe he actually was

15  concerned, or he might have been seen what I was thinking and

16  what I knew.  But I didn't answer him and I didn't give it much

17  thought.  So he never said specifically in his message that he

18  needed to meet up with me and discuss things.  So I really

19  don't know.

20  Q.  And with respect to -- you were asked just now about

21  whether Mr. Reichberg appeared confused about the license

22  department requirements when he came in.  Do you recall those

23  questions just now by the prosecutor?

24  A.  Yes.

25  Q.  He came in and said ridiculous things, right,

IBJTGRA3                    Ochetal - Recross

1    Mr. Reichberg?

2              MS. RAVENER:  Objection.

3              THE COURT:  Can you rephrase?

4    Q.  When he came in he thought he was going to get his gun

5    license that day, right?

6    A.  Yes.

7    Q.  And that's unheard of, right?

8    A.  I hadn't heard of it before.

9    Q.  And it was obvious to you that he did not know how the

10   process worked, right?

11             MS. RAVENER:  Objection.

12             THE COURT:  Thank you.  You can answer the question.

13   A.  I assumed he didn't.

14             MS. RAVENER:  Objection, your Honor.

15             THE COURT:  Sustained.

16   Q.  You were just asked whether he was confused, but in fact

17   you knew, based on the things he said, that he had no idea how

18   the process worked, right?

19             MS. RAVENER:  Objection.

20             THE COURT:  Thank you.  Mr. Ochetal, you can answer

21   that question.

22   A.  I don't think -- nobody knows fully how the process works

23   to the T.

24   Q.  I'm not asking you that, I'm asking you about how

25   Mr. Reichberg appeared that day.  Do you understand that

IBJTGRA3                      Ochetal - Recross

1    question?

2             MS. RAVENER:  Objection.

3             THE COURT:  Thank you.  Counsel, no commentary,

4    please.  If there's a question, please ask it.

5    Q.  Sir, I'm asking you not in general, but I'm asking about

6    Mr. Reichberg that day made comments that made it clear to you

7    that he did not know how the licensing process worked, correct?

8             MS. RAVENER:  Objection.

9             THE COURT:  Thank you.  You can answer the question.

10   A.  I mentioned the comments he made to me, I just don't know

11   how to answer that.  I know what the comments were, I don't

12   know what is in somebody's thought process.

13   Q.  Well, you just answered the government when they asked you

14   whether he seemed confused, you had no problem answering the

15   government's question, right?

16            MS. RAVENER:  Objection.

17            THE COURT:  Thank you.  Sustained.

18   Q.  Sir, I'm asking the same question, whether his comments

19   indicated to you that he did not know how the process worked.

20            MS. RAVENER:  Objection.

21            THE COURT:  Thank you.  You can answer the question.

22   A.  I guess he didn't fully understand the entire process.

23   Q.  When you say "fully," he didn't have a clue, did he?

24            MS. RAVENER:  Objection.

25            THE COURT:  Thank you.  Sustained.

1   Q.  When you say "fully," he didn't know he couldn't get a

2   license that day, right?

3              MS. RAVENER:  Objection.

4              THE COURT:  Thank you.  Sustained.

5   Q.  Sir, you were asked some questions by the government about

6   whether you ever did a -- managed to get a full carry -- gave

7   someone a full carry in this time frame when you were not

8   bribed, right?  Do you recall those questions?

9   A.  Right.

10  Q.  To be clear, Mr. Reichberg never gave you a bribe, right?

11  A.  No, never.

12  Q.  Mr. Grant never gave you a bribe, right?

13  A.  Never.

14  Q.  There was no bribe involved in this, correct?

15             MS. RAVENER:  Objection.  Foundation.

16             THE COURT:  Thank you.  Sustained.

17  Q.  Well, there was no bribe given to you, correct?

18  A.  No, I did not receive any bribes.

19  Q.  To the best of your knowledge, Mr. Villanueva never

20  received a bribe with respect to this application, correct?

21             MS. RAVENER:  Objection, foundation.

22             THE COURT:  Thank you.  Sustained.

23  Q.  To your knowledge, did Mr. Villanueva receive a bribe with

24  respect to this?

25             MS. RAVENER:  Objection, foundation.

1          THE COURT:  You can answer the question.

2     A.  No, to my knowledge, Mr. Villanueva did not receive a

3     bribe.

4     Q.  But there was a practice in the licensing department of

5     expediting files for friends or family of police officers,

6     right?

7     A.  Yes.

8     Q.  And that's all that happened here, right?  Consistent with

9     that practice, this was expedited, right?

10          MS. RAVENER:  Objection, your Honor.

11          THE COURT:  Sustained.

12    Q.  Well, consistent with that practice, Mr. Reichberg's

13    license was expedited here, right?

14          MS. RAVENER:  Objection.

15          THE COURT:  Thank you.  Sustained.

16    Q.  Well, this was not unusual for you to expedite a file like

17    this, right?

18          MS. RAVENER:  Objection.

19          MS. NECHELES:  Your Honor, knowledge question about

20    unusual.

21          THE COURT:  You can answer the question.

22    A.  Can you please rerepeat that?

23    Q.  It was not unusual for you to expedite a file like this,

24    right?

25    A.  Expediting was not unusual.

IBJTGRA3                         Ochetal - Recross

1    Q.  And sir, you were asked some questions just now about why

2    you weren't worried when Mr. Reichberg's file became an

3    incident, correct?

4    A.  Yes.

5    Q.  And sir, am I correct you were not worried because this

6    didn't involve a bribe, right?

7            MS. RAVENER:  Objection.

8            THE COURT:  Thank you.  Sustained.

9            MS. NECHELES:  Judge --

10           THE COURT:  You can ask the question again.

11   Q.  Am I correct that your state of mind at the time was you

12   knew that this file did not -- there was no bribe that had been

13   given to you on this to expedite this, correct?

14   A.  I was not too worried.

15   Q.  If you could answer my question.

16   A.  Excuse me?

17   Q.  Do you understand my question?

18           MS. RAVENER:  Objection.

19           THE COURT:  Mr. Ochetal, please listen to question

20   that Ms. Necheles is asking and respond just to that.

21           Can you please ask the question again, Ms. Necheles.

22           MS. NECHELES:  Yes.  Thank you, your Honor.

23   Q.  You were not worried because no bribe had been given to you

24   to expedite this file, correct?

25   A.  In this file I was not worried.

1   Q.  Well, that was one of the reasons you were not worried,

2   right?

3   A.  The reason I wasn't worried was because I considered it

4   wasn't on my hands.

5   Q.  Well, you filled out the paperwork on this, right?

6   A.  Yep.

7   Q.  And if there wasn't sufficient paperwork, that was your

8   fault, right?

9           MS. RAVENER:  Objection.

10          THE COURT:  Thank you.  You can answer the question.

11  A.  To an extent it would be my fault up until it got reviewed,

12  which did not happen, and that was why I said I wasn't worried.

13  Q.  Sir, am I correct that you also were not worried because

14  Mr. Reichberg qualified for this license, right?

15  A.  I didn't say that I wasn't worried because he qualified.

16  Q.  Well, but I'm asking you that question.  He qualified for a

17  business carry, correct?

18  A.  Not in my opinion.

19  Q.  Well, he was carrying diamonds as a salesman around the

20  city as part of his job, right?

21          MS. RAVENER:  Objection, your Honor.

22          THE COURT:  Thank you.  Sustained.

23  Q.  Well, to the best of your knowledge, based on his

24  application, that's what he was doing, correct?

25          MS. RAVENER:  Objection.

IBJTGRA3                    Ochetal - Recross

1          THE COURT:  Thank you.  You can answer the question.

2     A.  Based on his application, yes.

3     Q.  And so based on his application, to the best of your

4     knowledge, he was carrying diamonds as a salesman, correct?

5     A.  Yes.

6     Q.  And am I correct that that is the type of thing that

7     qualifies someone for a business carry, right?

8     A.  Not all the time.

9     Q.  Okay.  Not all the time, but some of the time, right?

10    A.  If I would do a proper investigation and a write up and

11    review of what's being done as far as the occupation and how

12    often and stuff like that, I could make that determination.  So

13    I won't say no, but I never got the chance to do that.

14    Q.  Sir, so I'm not asking about process for a minute, right

15    now I'm just asking you about whether that type of person would

16    be qualified for a business carry, someone who was carrying

17    diamonds around to sell them.

18          MS. RAVENER:  Objection, your Honor.

19          THE COURT:  Thank you.  You can answer the question.

20    A.  I can't make that determination without an investigation.

21    Q.  Okay.  But you knew that if someone looked at the file,

22    they would not believe that Mr. Reichberg was not qualified,

23    right?

24          MS. RAVENER:  Objection.

25          THE COURT:  Thank you.  Sustained.

IBJTGRA3                          Ochetal - Recross

Q.  Well, wasn't that in your mind, wasn't that why you were
not worried is because you knew he was qualified?

        MS. RAVENER:  Objection.

        THE COURT:  Thank you.  You can answer the question.

A.  Like I said, the only reason I was not worried was because
of instructions I was given.  And it was one of those things
that I didn't fully review, and I gave it to a supervisor who
approved it, and they knew I didn't review it.  So that's why I
wasn't worried as I would be if I did review it.

Q.  Sir, wasn't the only thing you were worried about was that
the file might not have all the proper paperwork?

        MS. RAVENER:  Objection.  Asked and answered
repeatedly.

        THE COURT:  Thank you.  Sustained.

Q.  Sir, you were asked about your -- again, about whether you
gave anyone else a full carry within two months, right?

A.  Yes.

Q.  And you did give special carries within that time frame,
right?

A.  That's possible.

Q.  And those are the same as full carries, right?

A.  They're not the same, no.

Q.  Well, they allow someone to do exactly the same thing, to
carry a gun and around for business, right?

A.  Ultimately, yes.

IBJTGRA3                          Ochetal - Recross

```
1   Q.  And they require all the same proof of cause for someone to
2   get that, right?
3   A.  They do require proof of cause.
4   Q.  And you expedited those much more rapidly than this, right?
5   A.  I'm not sure, but if I did, the reason would have been
6   prior firearm experience, prior license, and prior background
7   check by an adjoining county.  So although they're similar, the
8   investigation is a little bit different.
9           I don't know if people understand the explanation.
10  Q.  Sir, you don't need firearm experience to get a gun license
11  in New York State, right?
12  A.  You don't need it, no.
13  Q.  It's nowhere in any of the regs, right, nowhere in any
14  regulations that you need prior firearm experience, right?
15          MS. RAVENER:  Objection.
16          THE COURT:  Thank you.  Sustained.
17  Q.  Sir, you were familiar with the regulations, right?
18  A.  Yes.
19  Q.  So when you mentioned prior firearm experience, that was
20  not a requirement to get a gun license, right?
21  A.  Not a requirement.
22  Q.  And there's not even anything in the regulations to have
23  prior training on guns, right?
24  A.  We ask for it when we could, even though it wasn't
25  required, it was just a public safety, that's all.
```

Q.  But if someone had a special carry and had it from

somewhere else, you don't know if they had firearm training,

right?

MS. RAVENER:  Objection.

THE COURT:  Thank you.  Sustained.

Q.  I want to ask, you testified just now about the government

asking you whether your 5K letter depends on the outcome of the

case.  Do you recall those questions?

A.  Yes.

Q.  Do you recall earlier you testified that you don't know

what substantial assistance means?

Do you recall that testimony, sir?

MS. RAVENER:  Objection, your Honor.

THE COURT:  Thank you.  You can answer the question.

A.  I don't.  I'm sure if you're saying, it was said, but to me

substantial is just, for me, is just recalling truthfully what

I can remember about a situation, nothing more, nothing less.

I'm not trying to take away or add anything, so --

Q.  But sir, you recall that your cooperation agreement

requires you to give substantial assistance as determined by

the government, and substantial assistance is not defined in

the cooperation agreement, right?

MS. RAVENER:  Objection, compound.

THE COURT:  Could I ask you to rephrase the question.

Q.  You recall that your cooperation agreement requires you to

IBJTGRA3                         Ochetal - Recross

1    give substantial assistance as determined by the government,

2    right?

3    A.  Sure.

4    Q.  And you pointed out before it doesn't define what

5    substantial assistance is, right?

6    A.  I don't know about that per se, I just -- I don't know what

7    one considers substantial and what another considers

8    substantial, I'm just saying what I remember and know.  I don't

9    know if it's substantial or not.

10   Q.  So it's up to the government to decide whether you helped

11   them or not, right?

12   A.  I suppose they know if I'm helping them, if I'm being

13   truthful and doing what I'm supposed to do.

14   Q.  You understand it's an additional requirement beyond being

15   helpful you also have to give substantial assistance.  You

16   understand that, don't you?

17              MS. RAVENER:  Objection, your Honor.

18              THE COURT:  Thank you.  You can answer the question.

19   A.  I am just considering what I'm doing to be substantial.  If

20   it's not defined and if it's not defined on their terms then

21   there's nothing I can do about that, I can only control what I

22   know and remember and that's it.

23   Q.  But you're trying your hardest to give the government

24   substantial assistance, aren't you?

25   A.  I'm just trying my hardest to remember what I can and

IBJTGRA3

1    provide information when asked.

2              MS. NECHELES:  I have no further questions, your

3    Honor.

4              THE COURT:  Thank you.  Counsel for Mr. Grant.

5    RECROSS EXAMINATION

6    BY MR. MERINGOLO:

7    Q.  Mr. Ochetal, are you aware that 65 percent of people who

8    apply for business carry get their gun license within four

9    months?

10             MS. RAVENER:  Objection.

11             THE COURT:  Thank you.  Sustained.

12   Q.  You worked in the gun licensing division from 2009 to 2016,

13   correct?

14   A.  Yes.

15   Q.  Are you aware during that period of time that 65 percent of

16   people get their business carry within four months?

17             MS. RAVENER:  Objection, scope.

18             THE COURT:  Thank you.  Sustained.

19             MR. MERINGOLO:  No questions.

20             THE COURT:  Counsel for the United States?

21             MS. RAVENER:  No further questions.

22             THE COURT:  Thank you very much.

23             Thank you, Mr. Ochetal, for your testimony.  You can

24   step down.

25             So ladies and gentlemen, it's about our lunch time, so

IBJTGRA3

```
 1   I'm going to propose that we take our break now.  During this
 2   break please don't discuss the case amongst yourselves, don't
 3   do any research on the case, don't communicate with anyone else
 4   about the case.  I will expect to see you back here in 30
 5   minutes.  Thank you.
 6              (Jury not present)
 7              THE COURT:  Thank you very much, counsel, you're doing
 8   well.  I understand the next thing that we're expecting is that
 9   recordings will be played.  I have the limiting instruction as
10   suggested by the defense, which I will propose to administer
11   just as the government begins the next set of recordings.
12              Are there any other issues that we should anticipate
13   now with respect to any subsequent witnesses that the
14   government is going to call today?
15              MR. BELL:  Yes, your Honor, the government anticipates
16   calling Avi Goldstein, Lieutenant Michael DeMartino, and should
17   time allow, an individual named Horace Norville.  I don't
18   anticipate any issues.  Life is surprising sometimes, but I
19   don't think there's anything that needs to be fronted.
20              THE COURT:  Counsel for Mr. Reichberg, anything that
21   you would like to raise before we take our lunch recess?
22              MS. NECHELES:  No, your Honor.  If there is anything
23   else, I will raise it right before.  I don't think there is.
24              MR. MERINGOLO:  No.
25              THE COURT:  Thank you very much.  I would like to see
```

IBJTGRA3

1   you back here -- I would like to begin just after noon with the

2   jury, so please be back here, counsel, at noon.  See you then.

3            (Luncheon recess taken)

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IBJKGRA4

1              (In open court; jury not present)

2              THE COURT:  Counsel, are you ready to proceed?  I'll

3    ask Mr. Daniels to bring in the jury.

4              MR. BELL:  Let me just make sure our next witness has

5    resurfaced after the short lunch.

6              THE COURT:  Please do.

7              MS. NECHELES:  Your Honor, I would just say that I

8    will be showing this witness a bunch of documents that were

9    subpoenaed from him and asking him to identify them as business

10   records, but I won't seek to put them in evidence today, your

11   Honor.  I'll just do that as a foundational matter, so that if

12   I seek to put them in evidence later, that they're already --

13   there is a foundation for that.

14             THE COURT:  Thank you.

15             Does he have the kind of role that would permit him to

16   provide the necessary foundational information?

17             MS. NECHELES:  We subpoenaed them from him, and he

18   provided them.

19             MS. LONERGAN:  Your Honor, we never received them.

20             MS. NECHELES:  I think we just -- you never received

21   them?

22             MS. LONERGAN:  No.

23             MS. NECHELES:  I don't think we marked -- I think some

24   of them you have, which were marked as exhibits.  I think you

25   have -- actually, I think we marked --

IBJKGRA4

1          MS. LONERGAN:  The production, we didn't receive, and

2     I'm pretty sure --

3          MS. NECHELES:  I'm just marking it all, and I am not

4     putting it in evidence today.  I think we've now asked that the

5     whole thing be sent to -- I think we emailed it to you.  You'll

6     have the whole package, but I'm not putting in any of it.

7          MS. LONERGAN:  Can we have it before the witness comes

8     on the stand, so we can take a look at it?

9          MS. NECHELES:  I'll give it to you now.

10          THE COURT:  Thank you.

11          Ms. Necheles, can you describe, as a general matter,

12     what the nature of the documents is that you subpoenaed?

13          MS. NECHELES:  They're records that we subpoenaed of

14     travel records and emails with Mr. Rechnitz from Luxury Travel.

15     This was his travel agent, essentially.  So they're just the

16     same kind of records, and most of them is what the government

17     has already put in evidence, but I think that there are -- or

18     gave to us.  We just subpoenaed everything from him.  The

19     government was aware of it.  I saw it in the notes that they

20     discuss --

21          THE COURT:  Thank you.

22          I understand the next witness is from this travel

23     agency.  I understand that the documents that you're referring

24     to, Ms. Necheles, are documents that were subpoenaed from the

25     witness, and that some subset of the documents that you are

IBJKGRA4

1      describing have already been presented to the defense by the

2      government.  Is that correct?

3              MS. NECHELES:  Yes, the vast majority.

4              THE COURT:  Thank you.

5              Can you identify which ones do not fit into the scope

6      of the ones that the government has already provided that may

7      help to focus the conversation?

8              MS. NECHELES:  Okay.  The ones that may have not been

9      provided are ones dated -- relate to travel in 2016 and 2017.

10     And, your Honor, I'm not saying I'm going to be putting these

11     in evidence, I just wanted to mark them at the time.

12             So this is about, I think, 20 -- 20 pages, 22 pages.

13             THE COURT:  Thank you.

14             Are you referring to a single document, or is it a

15     series of documents related to a particular calendar year?

16             MS. NECHELES:  It's a series of emails.  He would

17     email the invoices to Mr. Rechnitz for his travel.

18             THE COURT:  Thank you.

19             So these are emails with invoices?

20             MS. NECHELES:  That's correct.

21             THE COURT:  Is there any other substance in the

22     emails?

23             MS. NECHELES:  There might be some emails that refer

24     to their -- the plans or what Mr. Rechnitz was asking for,

25     although I think that those are mainly in the materials that

IBJKGRA4

1    the government sent to us previously where Mr. Rechnitz is

2    saying I want to get the following.  And he would respond,

3    okay, I'm looking into it, or I'm still trying to get those

4    together, but it all refers to travel plans of Mr. Rechnitz.

5              THE COURT:  Thank you.

6              Are you proposing to label each of the subsidiary

7    documents within each time span as an exhibit, or are you

8    proposing to mark the entirety of the documents for economy

9    here?

10             MS. NECHELES:  I was going to try to do it very quick.

11   I will just show it to him, do you recognize those as business

12   records of yours and the business records, but just make it one

13   document, he can look through it, and then I thought, your

14   Honor, we could deal with whatever objections there might be at

15   a later time outside of the presence of the jury, just so we

16   don't have to call him back to authenticate documents at a

17   later time.

18             THE COURT:  Thank you.

19             Counsel for the United States?

20             MS. LONERGAN:  One moment, your Honor?

21             THE COURT:  Thank you.

22             (Pause)

23             MS. LONERGAN:  Your Honor, a couple of things:  To the

24   extent that defense counsel wants to go outside the scope of

25   the direct on this point, we don't object, but we do want a

IBJKGRA4

1      couple of things:  We do reserve our objections to the

2      documents for a later time, and, also, we would like it to be

3      very clear, and even in the way the witness is questioned, that

4      there is nothing on the record about what the documents are,

5      that they relate to Mr. Rechnitz, the time frame.  Just if they

6      are shown to him in a very basic, do you recognize these, are

7      these business records, she can even lead on the business

8      records question, because we don't want a description in the

9      record that there are additional travel records related to

10     Mr. Rechnitz before any decision has been made about whether

11     those documents will, in fact, come into evidence.

12             THE COURT:  Thank you.

13             Counsel for Mr. Reichberg?

14             MS. NECHELES:  Well, your Honor, I think I would be

15     able to elicit that there were additional records without

16     showing him.  You know, just say the government has asked you

17     about some, shown you some, but he traveled a lot, right, and

18     you did all of that travel for him, and that was -- so ask that

19     kind of question.  I just don't want to have an insufficient

20     foundation, your Honor.  I want -- I'm really doing this for

21     foundational purposes to say, there are these other records,

22     business records, and these are all business records of yours

23     dealing with Mr. Rechnitz.

24             MS. LONERGAN:  Your Honor, I think that conflates two

25     issues.  One is the question about other travel with

IBJKGRA4

1    Mr. Rechnitz, which we think we may object to on relevance

2    grounds, but that's separate from what we're talking about

3    business records.  We're allowing Ms. Necheles to go beyond the

4    scope to put in the business records foundation as to these

5    documents.  We just don't see any reason why she needs to

6    describe the documents on the record here, given that later, we

7    may have an objection that the Court may sustain about the

8    relevance of these documents and whether they, in fact, are

9    coming into evidence.  If they're not coming into evidence, we

10   see no reason for them to have been described on the record

11   here today.

12       MS. NECHELES:  Your Honor, can I just make one point:

13   It's not going beyond the scope when he's called to testify

14   about travel records, and that he does have travel records --

15       THE COURT:  I don't think that is necessary.  What's

16   your view regarding -- because the government consents, in any

17   event, what is your view regarding the proposal that you focus

18   the questions --

19       MS. NECHELES:  I assume the government is waiving any

20   objection to foundation, that if I'm limiting the questions,

21   that they are not going to object to the foundation of the --

22   for any of these documents at a later date.

23       MS. LONERGAN:  Your Honor, I think she still needs to

24   ask foundational questions.  She just doesn't need to describe

25   the documents as part of those foundational questions.  She can

IBJKGRA4

say, I'm showing you what has been marked for identification as

Defense Exhibit X, do you recognize that, are those also -- are

those records of Luxury Connections?  That's why I'm saying she

can lead in that way, but she doesn't need to mention time

frame or Mr. Rechnitz to properly ask the foundational

questions.

MS. NECHELES:  No, your Honor, I need to ask, are

those all of the records during these time frame of trips that

you took or that Mr. Rechnitz -- all of the business records

that you have with respect to Mr. Rechnitz for travel?  That's

what I would be asking to establish what I need to establish

here for a later date.  It might come in, it might not come in.

I think that the government worries too much about what they

ask versus what I ask.  The trial is going to be six weeks

long.  The jury is going to know they ask some things, I ask

some things.  I don't really see this as such a big deal, that

the government gets upset every time I ask about something,

that I might be misleading the jury.  I don't think that's an

issue.  I think all I want to do is establish what these are,

and then we don't need to waste time today on it.  We'll just

deal with it later.

THE COURT:  Thank you.

I'll allow you to ask appropriate foundational

questions with respect to the documents at issue, and I'm not

imposing a particular constraint on you.  I do ask that you not

IBJKGRA4

1   identify the content of the documents in depth as part of your

2   foundational questions.  I don't understand that to be

3   necessary.

4           MS. NECHELES:  I will just ask that -- are those all

5   of the records of Mr. Rechnitz's travel with you?

6           MS. LONERGAN:  I don't think that's a proper or

7   necessary foundational question, your Honor.  I mean, I don't

8   know why she has to ask that to -- if she wants -- the point is

9   she cut a subpoena.  If she's concerned about his subpoena

10  compliance, that can be something that can be addressed outside

11  the presence of the jury.  I don't know why she needs to ask as

12  a foundational business record question, are those all of the

13  records related to Mr. Rechnitz.

14          THE COURT:  Thank you.

15          MS. NECHELES:  Because --

16          THE COURT:  I'm sorry.  I'm happy to allow counsel for

17  defendant to inquire in that way.

18          I have some questions, not having seen what all of the

19  component documents are of the large exhibit that you're

20  planning to show the witness, about whether or not the, I'll

21  call it, volume approach to the foundational questions will

22  work with respect to each of the component documents.  I don't

23  know the answer to that at this point.

24          MS. NECHELES:  Oh, but they will, your Honor, so we

25  don't waste time.

IBJKGRA4

 1              THE COURT:  Thank you.

 2              I will trust that you've analyzed that.  I just wanted

 3    to make it clear that I haven't made a determination on that

 4    issue at this point.

 5              MS. NECHELES:  If it doesn't, I'll have to slow it

 6    down, but I'm hoping I won't have to.

 7              THE COURT:  Thank you.

 8              Are we ready to proceed?

 9              MR. MERINGOLO:  One other thing, Judge?

10              THE COURT:  Please.

11              MR. MERINGOLO:  Do we know where the folders are from

12    Mr. Villanueva's locker and if that folder that I got this

13    morning was part of the government discovery, which none of it

14    has been turned over to us?

15              THE COURT:  Thank you.

16              Let's take that up after the jury is done for the day.

17              Mr. Daniels, can you please bring them in.

18              I will raise that issue again at the end of the trial

19    day.  Mr. Meringolo, thank you for raising that, and I hope

20    that during this time, someone in the background of the

21    government is inquiring about that question.

22              (Continued on next page)

23

24

25

1           (Jury present)

2           THE COURT:  Thank you.  Ladies and gentlemen, you can

3    be seated.  Welcome back, ladies and gentlemen of the jury.

4    Thank you.

5           Counsel for the United States, can I turn to you?

6           MS. LONERGAN:  Your Honor, the government calls Avi

7    Goldstein.

8           THE COURT:  Thank you.

9     AVI GOLDSTEIN,

10        called as a witness by the Government,

11        having been affirmed, testified as follows:

12          THE DEPUTY CLERK:  Can you please state your name for

13   the record and spell your first and last name slowly as well?

14          THE WITNESS:  Avi Goldstein, A-v-i G-o-l-d-s-t-e-i-n.

15          THE DEPUTY CLERK:  Thank you.

16          THE COURT:  Good.  Thank you.

17          Counsel for the United States, you can inquire.

18          MS. LONERGAN:  Thank you, your Honor.

19          THE COURT:  Thank you.

20   DIRECT EXAMINATION

21   BY MS. LONERGAN:

22   Q.  Good afternoon, Mr. Goldstein.

23   A.  Good afternoon.

24   Q.  Where do you work?

25   A.  Luxury Connections.

IBJKGRA4                    Goldstein - Direct

1   Q.   What is Luxury Connections?

2   A.   A concierge travel agency.

3   Q.   Can you briefly describe what you mean by "a concierge

4   travel agency"?

5   A.   We're discounted rates concierge services for our clients.

6   Q.   What kinds of things does Luxury Connections book for

7   clients?

8   A.   We book hotels.

9   Q.   What's your title?

10  A.   President/CEO.

11  Q.   How long have you been working at Luxury Connections?

12  A.   Over eight years.

13  Q.   Does Luxury Connections keep records of its business?

14  A.   Yes.

15  Q.   What, kind of records?

16  A.   Emails, text messages, booking confirmations.

17  Q.   Are these records saved?

18  A.   Yes.

19  Q.   What items are saved?

20  A.   Emails, text messages, booking confirmations.

21  Q.   When are they saved?

22  A.   When the booking takes place.

23  Q.   And why do you save these kinds of records?

24  A.   Transparency, continuing dialogue with clients, reference

25  to past bookings.

1    Q.  Mr. Goldstein, I'm going to show you a series of documents.

2    You have a binder on the witness stand.  We can also put them

3    on the screen.

4              MS. LONERGAN:  Mr. Hamilton, can we display for the

5    witness, the Court, and the parties first what's been marked

6    for identification as Government Exhibit 911.

7    Q.  Mr. Goldstein, after I show you a series of documents, I'm

8    going to ask you a question at the end of that about all of

9    them.  Okay?

10             Just for Government Exhibit 911, do you recognize this

11   document?

12   A.  Yes.

13             MS. LONERGAN:  Now can we put on for the witness, and

14   the Court, and parties what's been marked for identification as

15   Government Exhibit 914.

16   Q.  Mr. Goldstein, do you recognize this document?

17   A.  Yes.

18             MS. LONERGAN:  Now can we display for the witness, the

19   Court, and the parties Government Exhibit -- what's been marked

20   for identification as Government Exhibit 913.

21             Now, can we show what's been marked for identification

22   to the witness, the Court, and the parties as Government

23   Exhibit 1225.

24             Again, for the witness, the Court, and the parties,

25   Government Exhibit 912.

IBJKGRA4                          Goldstein - Direct

1    BY MS. LONERGAN:

2    Q.  Mr. Goldstein, did you recognize each one of those

3    documents?

4    A.  I did.

5    Q.  Is each one of these a record of Luxury Connections?

6    A.  Yes.

7    Q.  Were they made in the ordinary course of the business of

8    Luxury Connections?

9    A.  Yes.

10   Q.  Were they made at or near the time of the events reflected

11   in the records?

12   A.  Yes.

13   Q.  Were they saved in the ordinary course of the business of

14   Luxury Connections?

15   A.  Yes.

16   Q.  One of the documents I showed you had some text messages.

17   Were these text messages exchanged at or near the time of the

18   events in question?

19   A.  Yes.

20            MS. LONERGAN:  Your Honor, the government offers

21   Government Exhibits 911 through 914 and 1225.

22            THE COURT:  Thank you.

23            Counsel for defendants?

24            MS. NECHELES:  No objection, your Honor.

25            MR. MERINGOLO:  No objection.

1          THE COURT:  Thank you.

2          I'm accepting into evidence Exhibits 911, 912, 913,

3    914, and 1225.

4          (Government's Exhibits 911 through 914 and 1225

5    received in evidence)

6          THE COURT:  You can proceed.

7          MS. LONERGAN:  Thank you, your Honor.

8          Mr. Hamilton, can we publish Government Exhibit 912.

9    I think it's two pages.  Can we split it, so we can see both?

10   BY MS. LONERGAN:

11   Q.  So, Mr. Goldstein, do you see in front of you what is in

12   evidence as Government Exhibit 912?

13   A.  Yes.

14   Q.  And these appear to be text messages.  You said you

15   recognize them.  Who are these text messages with?

16   A.  It's between myself and Jona Rechnitz.

17   Q.  There are two different colors of bubbles.  There's gray

18   and blue.  Who is you, and who is Mr. Rechnitz?

19   A.  The light gray is Mr. Rechnitz, and then the blue is

20   myself.

21   Q.  So, Mr. Goldstein, what I'd like to do is I'd like to read

22   this text message conversation.  You can read your part, which

23   you said was blue, and I am going to read Mr. Rechnitz's part,

24   which are the gray, okay?

25   A.  Yes.

1    Q.  And then I'll ask you some questions about it at the end.

2            I'm going to read the date.  It says August 1st, 2013,

3    5:52 p.m.:  "Tried you today.  Need help.  I want to prepay for

4    a hotel in Rome for a friend."

5    A.  "My man, called you back.  Calling you shortly."

6    Q.  "August 15th and 16th, connecting rooms.  Decent hotel in

7    Rome for a cop, August 15 through 17."

8    A.  "Got it."

9    Q.  "James Grant."

10   A.  "Name of res?"

11   Q.  "James Madia."

12   A.  "Done.  June is calling you to confirm."

13   Q.  "Text me."

14   A.  "Will do."

15   Q.  And then August 5, 2013, 7:10 p.m.:  "Rome."

16           And then August 8th, 2013, 8:18 a.m.

17   A.  "Good morning.  Got good news from Rome.  Emailing around

18   noon today with the details."

19   Q.  August 8th, 2013, 11:58 a.m.?

20   A.  "Call me when you have a minute regarding room,

21   (718)730-6009."

22   Q.  Mr. Rechnitz wrote to you:  "Decent hotel in Rome."

23           What type of hotel did you book?

24   A.  A luxury hotel.

25   Q.  Why did you book a luxury hotel?

1   A.   Those are the hotels that Mr. Rechnitz would like to book.

2   Q.   On page 1, Mr. Rechnitz wrote "James Grant," and on page 2,

3   he wrote "James Madia."  What name was the reservation in?

4   A.   James Grant.

5   Q.   Do you, sitting here today, have any firsthand knowledge of

6   who James Grant is?

7   A.   I'm familiar from the press.

8   Q.   Okay.  So separate from anything you might have read, do

9   you have any knowledge, other than that, about who Mr. Grant

10  is?

11  A.   Not really.

12          MS. LONERGAN:  Mr. Hamilton, can we display what's in

13  evidence as Government Exhibit 914.

14  Q.   Mr. Goldstein, in general, what are we looking at in

15  Government Exhibit 914?

16  A.   I'm looking at a booking confirmation sent to Mr. Rechnitz

17  for the Hotel Regina Baglioni for James Grant.

18  Q.   So let's --

19          MS. LONERGAN:  Mr. Hamilton, can we zoom in on the top

20  of this document?  Thank you.

21  Q.   What's the date that this was sent?

22  A.   August 8, 2013.

23  Q.   Who sent it?

24  A.   Luxury Connections.

25  Q.   Is that you?

IBJKGRA4                    Goldstein - Direct

1    A.  Yes.

2    Q.  And who was it sent to?

3    A.  Jona Rechnitz.

4    Q.  Can you read the subject?

5    A.  "Thank you for your reservation at Hotel Regina Baglioni."

6            MS. LONERGAN:  Let's scroll down to where it has the

7    guest information.

8    Q.  What's the name of the guest?

9    A.  James Grant.

10   Q.  It says, "Grant James"?

11   A.  It actually says "Grant James."  It should have been James

12   Grant.

13   Q.  What is the email address associated with this reservation?

14   A.  Jona@jsrcap.com.

15   Q.  Can we look at the credit cart information.  Who is the

16   cardholder?

17   A.  Jona Rechnitz.

18   Q.  Now let's look at the reservation information.  What is the

19   name of the hotel?

20   A.  Hotel Regina Baglioni.

21   Q.  What is the date that you booked this?

22   A.  On August 8, 2013.

23   Q.  What are the dates of travel?

24   A.  August 15th, 2013 - August 17, 2013.

25   Q.  And that's for a total of how many nights?

IBJKGRA4                         Goldstein - Direct

1    A.  Two nights.

2    Q.  What's the average nightly rate for that room?

3    A.  $533.

4    Q.  And then what was the total charge?

5    A.  $1,066.

6    Q.  I think this has been clear, but who was this reservation

7    for?

8    A.  James Grant.

9    Q.  And who paid?

10   A.  Jona Rechnitz.

11          MS. LONERGAN:  Mr. Hamilton, can we go to page 5.

12   Q.  What are we looking at here, Mr. Goldstein?

13   A.  This is a merchant receipt from the credit card that was

14   charged to Mr. Rechnitz.

15   Q.  Does that mean that Mr. Rechnitz paid for this?

16   A.  Yes.

17          MS. LONERGAN:  Can we go to page 7 of this exhibit.

18   Q.  What are we looking at on page 7?

19   A.  Page 7 is an email from myself to Mr. Rechnitz:  "Hope to

20   have Rome confirmed by tomorrow, my man."

21          And Mr. Rechnitz responded:  "Thank you."

22   Q.  What is the date of your email?

23   A.  August 6th.

24   Q.  2013?

25   A.  2013.

IBJKGRA4                        Goldstein - Direct

1    Q.  Did you correspond with this hotel in Rome in connection

2    with the reservation?

3    A.  Yes.

4    Q.  How did you correspond with the hotel in Rome?

5    A.  Via email and via phone.

6    Q.  Do you know if anyone actually traveled to Rome and stayed

7    in the hotel?

8    A.  The answer is yes, because, if not, the hotel would have

9    informed us that the guest didn't arrive, and they would have

10   credited our account for the value of the booking that we paid

11   there.

12   Q.  Did that happen?  Did you get a credit from the hotel?

13   A.  We did not.

14   Q.  Do you know, one way or the other, whether the person who

15   stayed in the hotel was James Grant?

16   A.  I can't confirm that today.

17   Q.  Do you have any knowledge if Mr. Grant paid the money back

18   to Mr. Rechnitz?

19   A.  I don't know.

20            MS. LONERGAN:  Mr. Hamilton, can we take this down and

21   display Government Exhibit 911.  Let's zoom in on this a little

22   bit.

23   Q.  Can you tell me the date of this reservation -- sorry, the

24   date that you sent the email, Mr. Goldstein?

25   A.  June 5th, 2013.

IBJKGRA4                    Goldstein - Direct

1   Q.  And who is this email from?

2   A.  Luxury Connections.

3   Q.  And who is it to?

4   A.  Addressed to Jona Rechnitz, Jona@jsrcap.com.

5   Q.  What's the subject of this?

6   A.  "Thank you for your reservation at Royalton."

7   Q.  Let's go down to where it says guest information.  What is

8   the guest's name here?

9   A.  Laura Colon.

10   Q.  What is the email address associated with this reservation?

11   A.  Jona@jsrcap.com.

12   Q.  And on the credit card information, who is the cardholder?

13   A.  Jona Rechnitz.

14   Q.  Now let's look at the reservation information.  What is the

15   hotel name?

16   A.  The Royalton.

17   Q.  Do you know where that hotel is?

18   A.  In Manhattan.

19   Q.  What is the book date of this reservation?

20   A.  June 5, 2013.

21   Q.  What are the check-in and checkout dates?

22   A.  Check-in is August 6, 2013, and checkout is --

23   Q.  Sorry, is that -- let's try that again.  I think it might

24   be June.

25   A.  Oh, I'm sorry.  My apologies.

1    Q.  That's fine.

2    A.  It's been a long day.

3            June 8, 2013, and checkout is June 9, 2013.

4    Q.  So is that one night?

5    A.  That is one night.

6    Q.  What is the rate of that room for one night?

7    A.  $2,149.51.

8    Q.  So who was this reservation for?

9    A.  Laura Colon.

10   Q.  And who paid for it?

11   A.  Jona Rechnitz.

12           MS. LONERGAN:  Mr. Hamilton, can we go to page 5 of

13   this exhibit?

14   Q.  Again, what are we looking at here, Mr. Goldstein?

15   A.  This is the merchant receipt of the transaction of the

16   2,149.51 that was charged to Jona Rechnitz's credit card for

17   the Royalton Hotel booking reservation.

18           MS. LONERGAN:  Can we bring up page 7 of this exhibit.

19   Can we display the screen, so we can actually look at pages 7

20   and 8.

21   Q.  Mr. Goldstein, it says here that this email is a chain with

22   Eli Goldstein.  Who is Eli Goldstein?

23   A.  Eli is my brother.  He works for me.

24   Q.  I'm sorry?

25   A.  Eli is my brother, and he works with me at Luxury

1   Connections.

2   Q.   I'm sorry for mispronouncing your brother's name.

3   A.   No problem.

4   Q.   There is an email, and I think the top email is from

5   Mr. Rechnitz to your brother.  Can you read the date of that?

6   A.   June 7, 2013.

7   Q.   What's the subject of this?

8   A.   "Penthouse A confirmation."

9   Q.   What did Mr. Rechnitz write?

10   A.   "Great.  I forwarded it to Dave."

11   Q.   Do you know who Dave is?

12   A.   From what my recollection is, maybe --

13   Q.   I don't want you to guess unless -- if you don't know,

14   that's fine.

15   A.   Yeah, I'm not a hundred percent sure.

16   Q.   Okay.  Do you know why Mr. Rechnitz forwarded this email to

17   Dave?

18   A.   I believe Dave had a relationship with the Laura of the

19   reservation, and the hotel required -- if you scroll down in

20   the email, the hotel required that if you're booking a

21   penthouse, you have to sign a contract, the actual guest

22   staying in the penthouse.  So I believe Dave was somehow

23   affiliated with Laura, perhaps even the same last name,

24   according to my recollection, but I'm not a hundred percent

25   sure.

1    Q.  You said --

2            MS. LONERGAN:  If you go forward down in the email.

3    Mr. Hamilton, let's do that, let's display pages 9 and 10.

4    A.  Right.

5    Q.  So let's look at the page 9, which is on the left.  Is that

6    the contract you were discussing?

7    A.  That's right.

8            MS. LONERGAN:  We can take this down.

9            And, Mr. Hamilton, can we display Government Exhibit

10   1225.

11   Q.  First, what is this email?

12   A.  This email is the booking confirmation for the Royalton for

13   Laura Colon from our company to Jona Rechnitz.  Jona

14   responding:  "Thank you."

15           And then our company responding:  "Hi, Jona.  It is

16   our pleasure, and thank you for choosing Luxury Connections.

17   Wishing Ms. Colon a wonderful stay at the Royalton.  Best,

18   Luxury Connections team."

19   Q.  Do you know who Laura Colon is?

20   A.  I don't.

21   Q.  Do you have any knowledge of whether Laura Colon or anyone

22   else paid Mr. Rechnitz back for this reservation?

23   A.  I do not.

24           MS. LONERGAN:  One moment, your Honor?

25           THE COURT:  That's fine.  Please take your time.

IBJKGRA4                    Goldstein – Cross

 1            (Pause)

 2            MS. LONERGAN:  No further questions.

 3            THE COURT:  Thank you.

 4            Counsel for Mr. Reichberg?

 5   CROSS-EXAMINATION

 6   BY MS. NECHELES:

 7   Q.  Good afternoon, sir.

 8   A.  Good afternoon.

 9   Q.  How do you know Mr. Rechnitz?

10   A.  I know him for many years.

11   Q.  Do you know him through a charitable organization that

12   you're involved with, Simon Wiesenthal Center?

13   A.  I'm not so involved with that organization.

14   Q.  But you would go on a fundraising trip with him?

15   A.  I did.

16   Q.  And Mr. Rechnitz was involved with that organization?

17            MS. LONERGAN:  Objection; scope.

18            THE COURT:  Thank you.

19            You can answer the question.

20            THE WITNESS:  I went on a fundraising trip with

21   Mr. Rechnitz.

22   BY MS. NECHELES:

23   Q.  Am I correct, sir, that you did a lot of business with

24   Mr. Rechnitz, he did a lot of business with you?

25   A.  We've done business together.

1   Q.  Okay.  But I said a lot of business.  Correct?

2   A.  The only business I've done with Mr. Rechnitz was hotel

3   bookings.

4   Q.  Okay.  But there were a lot of hotel bookings, right?

5            MS. LONERGAN:  Objection, your Honor.

6            THE COURT:  You can answer the question.

7            THE WITNESS:  Yeah, there were definitely quite a few.

8   BY MS. NECHELES:

9   Q.  Was he one of your better customers?

10           MS. LONERGAN:  Objection, your Honor.

11           THE COURT:  You can answer the question.

12           THE WITNESS:  I value Mr. Rechnitz as a client.

13  Q.  Okay.  But I'm asking, was he one of your better customers

14  in terms of volume?

15           MS. LONERGAN:  Objection, your Honor.

16           THE COURT:  You can answer the question.

17           THE WITNESS:  He was definitely up there, yeah.

18  Q.  Okay.  I just want to show you what has been marked as

19  Defense Exhibit JR-9461.  I want to show you what has been

20  marked as that.

21           Do you recall responding to a subpoena from defense

22  counsel for -- asking you for documents?

23  A.  Yes.

24  Q.  I put in front of you some documents.  Do you recognize

25  those to be the documents that were provided?

1   A.  I do.

2   Q.  Am I correct that those are emails and invoices related to

3   Jona Rechnitz's travel from the years 2013 to 2016?

4          MS. LONERGAN:  Objection, your Honor, for the same

5   reasons stated.

6          THE COURT:  Thank you.

7          You can answer the question.

8          THE WITNESS:  Well, the subpoena asked us to provide

9   documents for all the bookings for Mr. Rechnitz, so that's what

10  we provided.  So I believe it was from 2013 until 2016, yes.

11  BY MS. NECHELES:

12  Q.  Were those documents made in the ordinary course of

13  business?

14  A.  Yes.

15  Q.  And were they made on or about the time of the events

16  captured therein?

17  A.  Yes.

18  Q.  Were they kept in the ordinary course of business?

19  A.  Yes.

20  Q.  The emails there were sent in the ordinary course of

21  business as well?

22  A.  Yes.

23  Q.  And kept in the ordinary course of business as well?

24  A.  Yes.

25  Q.  Sir, am I correct that Mr. Rechnitz always stayed in luxury

1   hotels?  Is that what you testified?

2   A.   I believe I was asked what a decent hotel meant, and I said

3   a decent hotel is a nice hotel.  That's what Mr. Rechnitz was

4   accustomed to.  So there are times where there were hotels in

5   the location, that there weren't such luxury hotels, so he

6   would stay in other hotels.

7   Q.   "He would stay in other hotels," meaning what?

8   A.   Instead of a five-star, maybe a four-star.

9   Q.   But he liked to stay in the nicest hotel, correct?

10  A.   He did.

11  Q.   And, sir, I want to direct your attention to one of the

12  exhibits that was shown to you by the government, which was a

13  text that --

14            MS. NECHELES:  Yes, if we could put that up.

15  Q.   In this text, am I correct that he told you that he was

16  booking the room for a police officer?  Right?

17            THE COURT:  Referring to Exhibit 912.

18            MS. NECHELES:  I'm sorry, your Honor.

19  BY MS. NECHELES:

20  Q.   Referring to Exhibit 912 on your screen, he told you he was

21  booking the room for a police officer?

22  A.   Yes.  He said for a cop, yep.

23  Q.   He didn't tell you to keep that a secret, did he?

24  A.   No.

25  Q.   And sometimes -- am I correct that sometimes you would go

```
 1    smoke cigars with Mr. Rechnitz?
 2              MS. LONERGAN:  Objection, your Honor; scope.
 3              THE COURT:  You can answer the question.
 4              THE WITNESS:  I had cigars with Mr. Rechnitz, yes.
 5    BY MS. NECHELES:
 6    Q.  You would go to a place called the Grand Havana Club?
 7              MS. LONERGAN:  Objection; scope.
 8              THE COURT:  Thank you.
 9              You can answer the question.
10              THE WITNESS:  I've been to the Grand Havana Club
11    having cigars.
12    Q.  With Mr. Rechnitz?
13    A.  It's possible on one occasion.
14    Q.  And there were police officers there as well with
15    Mr. Rechnitz?
16    A.  In the Grand Havana?  Nope.
17    Q.  Did you go other places with him where he was smoking
18    cigars with police officers there?
19    A.  Yes.
20    Q.  Where was that?
21    A.  It was in a rooftop at the Prime Bentley.
22    Q.  That was a public place?
23    A.  Yes.
24    Q.  He didn't keep it a secret, did he?
25    A.  He did not.
```

1   Q.  And, sir, I want to direct your attention to what the

2   government showed you as Government Exhibit 914.  That was an

3   invoice that you prepared, and it said "Dear Mr. Grant" on it,

4   correct?

5   A.  Correct.

6   Q.  But you sent it to Mr. Rechnitz, right?

7   A.  Correct.

8   Q.  You did not send that to Mr. Grant, did you?

9   A.  No.

10   Q.  And that was how it always worked, you would send it to

11   Mr. Rechnitz, right?

12   A.  If Mr. Rechnitz made a booking, the email confirmation

13   would go to Mr. Rechnitz.

14   Q.  Okay.  If you look at that, and the government highlighted,

15   it has on it the price of that room, right?

16   A.  Exhibit 914?

17   Q.  Yes.

18           MS. NECHELES:  Can you make it larger?

19   A.  Yeah, the price is 1,066.

20   Q.  Okay.  And that is how your invoices always looked, right?

21   A.  Yeah.

22   Q.  Did you ever send an invoice that did not have the price on

23   it?

24   A.  I don't recall.

25   Q.  But it was your custom to send invoices like this, with the

IBJKGRA4                          Goldstein - Cross

1    price, right?  This was the format of your invoices, right?

2    A.  Correct, this was the format of my invoices.

3              MS. NECHELES:  If we could take that down, and if we

4    could put up, just for the witness and the government -- or for

5    the government and the Court for a moment, if we could,

6    Government Exhibit 1085.

7              And, your Honor, I would offer this pursuant to a

8    stipulation between the government and the defense, and the

9    stipulation is Government Exhibit 1701.

10             THE COURT:  Thank you.

11             Counsel for the United States?

12             MS. LONERGAN:  Your Honor, may we approach?

13             THE COURT:  Please do.  Come on up.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            THE COURT:  I'm sorry.  Counsel for the United States,

3     go ahead.  What's the concern?

4            MS. LONERGAN:  Your Honor, hearsay.  It's a statement

5     of --

6            THE COURT:  I'm sorry.  Can you first give me the

7     context?  What is this document?

8            MS. LONERGAN:  This document appears to be an email

9     from Mr. Rechnitz to someone else, I'm not sure who.

10           MS. NECHELES:  It's Jimmy Grant.

11           MS. RAVENER:  Your Honor, it's a statement made in

12    furtherance of the conspiracy by Mr. Rechnitz.  We expect to

13    offer it in our case.  They cannot offer statements in

14    furtherance of the conspiracy.  This issue has come up before.

15    That's why we're raising the objection now.  As a technical

16    matter, the defense cannot admit it.

17           MS. NECHELES:  Judge, I'm not putting it in for its

18    truth.  What he does is Mr. Rechnitz takes the invoice, he

19    takes off the price, he takes off his credit card information,

20    and then he forwards it to Mr. Grant, so that it appears that

21    it was a free room.  I'm just putting it in to show what he

22    forwarded and the change that he made.  It's not for the truth

23    of anything said therein.

24           THE COURT:  Thank you.  Understood.

25           I'm going to sustain the objection.  I understand this

1    evidence is going to come in, and you will be able to draw the

2    line that you're discussing.  The technical issue that the

3    government is referencing, though, I think is correct.

4              MS. NECHELES:  No, I think it's absolutely wrong, your

5    Honor.  I think I am entitled to put this in.  There is nothing

6    in here for the truth of what's said.  He has forwarded an

7    invoice.  He is not saying I am doing this or I am -- he is

8    merely forwarding an invoice, and that is not being put in for

9    the truth of it.

10             THE COURT:  Thank you.

11             MS. NECHELES:  And, your Honor, I just want -- the

12   problem is that Mr. Rechnitz is going to go on for days, and I

13   want the jury to be able to focus on this and not get lost in

14   all the other stuff.  This is an important thing.  They claim

15   that this is a bribe to Mr. Grant, and what he did was he took

16   the price off.  This is a man that there will be testimony who

17   lied to people that he owned hotels, and that he had a pattern

18   of doing this.  It's critical to this case.  It's the heart of

19   this case.  It's one of the bribes.  And to show the difference

20   between the invoices that this person and what was done here --

21   and I want this person, this witness, to be able to say, that

22   was not the way I sent that invoice, that was not what my

23   invoice looked like.  And I won't be able to do that later if I

24   can't show him the invoice.

25             THE COURT:  Thank you.

1          MR. BELL:  Judge, we do, as your Honor noted, intend

2     to get that in.  Ms. Necheles' argument sounds like a component

3     of her dynamite argument to the jury, but we do intend to get

4     that in, and if things go smoothly with Mr. Rechnitz, we intend

5     to get that in on the earlier side of things.

6          THE COURT:  Thank you.

7          MR. BELL:  But I think -- but we take your Honor's

8     point, and there are, I think, technical limits as to what they

9     can do here.

10         THE COURT:  Counsel, I understand the additional point

11    that you want to get out, Ms. Necheles; namely, that this is

12    not his document.

13         MS. NECHELES:  It was altered.  He never sent it out

14    that way.

15         THE COURT:  I think that -- is it correct, rather,

16    that this witness has not seen the document that you're

17    referring to?

18         MS. NECHELES:  No, but it's been stipulated by the

19    government that it is what it is.

20         THE COURT:  Oh, I understand.

21         MS. NECHELES:  It's an email from -- so the only

22    question now is whether I can put it in evidence, and then show

23    it to the witness and say this is not -- now, certainly it's

24    all the foundational requirements are there.  The only question

25    is, am I putting it in for the truth of it.  And I am not.  I'm

1   putting it in to show how it was changed.  There's no --

2                THE COURT:  Thank you.

3                Can I see the record?

4                MS. NECHELES:  Yes.

5                MR. BELL:  Your Honor, while we're waiting --

6                MS. NECHELES:  Your Honor, I don't have a hard copy.

7   It's on the screen.

8                MS. RAVENER:  Your Honor, I think on opportunity --

9   one moment, your Honor?

10               (Pause)

11               THE COURT:  Go ahead.  Sorry.

12               MS. NECHELES:  So, your Honor, the only statement by

13  Mr. Rechnitz in there is most luxurious hotel in Rome.  That's

14  a lie.  I'm going -- I will show that it's not the most

15  luxurious.  He asked for a decent room.  But I don't care, I

16  can redact that for now, and just show the bottom part because

17  that's all I'm really interested in.  I would think that the

18  government wouldn't want me to redact it because it makes the

19  exhibit look a little bit misleading, but I'm not putting any

20  of this in for the truth of it.

21               THE COURT:  Thank you.

22               To be clear, I would have no problem, Ms. Necheles,

23  with you asking the witness if he has seen this document

24  before, is this your invoice, without necessarily

25  introducing --

1           MS. NECHELES:  And the jury can see it, Judge.

2           THE COURT:  The question is just that, and

3  Ms. Necheles has suggested that she redact the one statement in

4  the email that she asserts is hearsay.

5           Counsel for the government, what's your view?

6           MS. LONERGAN:  Your Honor, simply forwarding an email

7  from Mr. Rechnitz to Mr. Grant is also a statement in

8  furtherance of the conspiracy.  I mean, he's writing --

9  essentially writing something to Mr. Grant.

10          THE COURT:  Why is it for the truth?

11          MS. RAVENER:  It's for the truth, your Honor, that the

12  hotel was booked for him, for Mr. Grant.

13          MS. NECHELES:  It's --

14          MR. BELL:  The information embedded in the lower parts

15  of the invoice are still coming in.  Separate and apart from

16  the alterations, the real way to just get in the alterations

17  through this witness, and I'm not sure there is, then we'd be

18  speaking about something entirely different.  I take

19  Ms. Necheles' frustrations about not being able to throw this

20  out there first, but the fact of the matter is that it is

21  clearly in furtherance of the conspiracy.  Our mobility under

22  the rules -- under the rules of evidence is different in that

23  sense.  We're going to introduce this, and Ms. Necheles is

24  going to have every opportunity to argue from it before the

25  same jury that she wants to see this.

1            MS. NECHELES:  Judge, they don't get to choose how I

2      try my case.

3            MR. BELL:  You are putting on --

4            MS. NECHELES:  I get to do my case in there because

5      that's what the rules of evidence are.  I get to cross-examine,

6      and I get to bring out of witnesses that they have called to

7      show how things get altered, things that are important to us.

8      This is the bribe.

9            THE COURT:  Thank you.

10           MR. BELL:  Ms. Necheles can ask --

11           THE COURT:  I'm sorry for interrupting.  I'm going to

12     sustain the government's objection in part.  I don't see a

13     basis to bring in with this witnesses as of this time this as

14     direct evidence, but I do understand why it is, Ms. Necheles,

15     that you want to make a record that this document that he is

16     looking at is not his document; in other words, that this

17     exhibit is not his record.  I don't mind you asking that

18     question.

19           MS. NECHELES:  But I need the jury to see that.  I

20     need the evidence in front of the jury that this is not his

21     document.  I really think that this is really wrong, to not --

22     it's really erroneous not to permit the witness, for us, to be

23     able to cross-examine the witness that they called in a way to

24     show that he does not create the kind of documents -- he did

25     not create the document that gets sent to Jimmy Grant, because

1    I don't know what happens later.  And this witness is here

2    right now, and the jury should be able to see them because this

3    is critical to the defense of our case.  There is no rule that

4    does not permit me to do this.  This is not hearsay.  I am not

5    putting that invoice in for the truth of it.  They put that

6    invoice in.  I'm only putting it in to show the changes that

7    were made, and that is not a statement.  That is an action.  To

8    be able to show that this is not his document -- because who

9    knows what Jona Rechnitz will say later?  Who knows what he

10   will say because I do not know --

11            MR. BELL:  I do.

12            MS. NECHELES:  I'm not relying on the government, as I

13   should not have to rely on the government, to try my case or to

14   permit me to do something, as they keep saying, we're

15   permitting her to do this on cross.  They don't permit me to do

16   anything, Judge.  I have never heard prosecutors repeatedly say

17   that.  They don't set the rules of evidence.  I'm allowed --

18   this is his constitutional right, for us to be able to

19   cross-examine on exactly this kind of thing, your Honor.  This

20   goes to the heart of the case, to show that this person, Jimmy

21   Grant, did not believe that this was an expensive fancy thing,

22   that he did not believe -- he believed that this was a hotel

23   that Jona owned, and that was how Jona held himself out.  You

24   will hear testimony from --

25            MS. RAVENER:  Your Honor --

IBJKGRA4                    Goldstein - Cross

1          MS. NECHELES:  -- Jona that he did this repeatedly.

2          MR. BELL:  Judge, may we?  Because that was wrong.

3          THE COURT:  I think I've heard enough.  I'm going to

4   stay with my prior decision.  I think that the defense will be

5   able to establish through this witness that the document is not

6   his document, and, as I understand it, all of the facts that

7   you've just described have come out or will come out during the

8   course of Mr. Rechnitz's examination.  The government has

9   proffered and assured us that this record will come in, so the

10  opportunity to establish that the argument that you're

11  describing, Ms. Necheles, will be presented.  The question is

12  just can you highlight it through this witness.

13          MS. NECHELES:  But, your Honor, what I'm saying to you

14  is in the first place, the jury can't follow, they can't see --

15  it's so confusing.  But beyond that, what I'm saying, also, is

16  the government has put in all sorts of pictures.  They've put

17  in pictures of people who are on the stand, they put in all

18  sorts of documents, they will be putting in -- so to deprive

19  the defense of the ability to show the jury the critical

20  documents in the case, the critical documents that the

21  government will stand up in summation and say, it was a bribe,

22  to be deprive the defense of the opportunity to show it to the

23  jury and let them understand what's going on here, because

24  people understand better if they can see what we're talking

25  about, see how it's changed, look at one next to the other.  I

1    don't understand why I should not be able to ask that at this

2    point, because this is the witness who will say, no, I never

3    created a document like that.  If I can't show it to him -- if

4    I can't ask that and show it to him, the jury will never know

5    that.

6                THE COURT:  Thank you.

7                You are going to ask him that question and show it to

8    him.  The question is whether you introduce it into evidence at

9    this time, and that's the only question that I'm responding to.

10               MS. NECHELES:  So he's going to testify about a

11   document that's not in evidence?  Is that what you're going to

12   allow me to do, ask him lots of questions about what it says

13   and what it doesn't say when the document is not in evidence?

14               THE COURT:  No.  I understand that you're going to ask

15   him whether or not this document is one of his invoices.

16               MS. NECHELES:  No, it is his invoice.  It gets

17   changed.  He changes his -- I need to show that -- I need to go

18   to the specifics in that invoice.

19               THE COURT:  Okay.  We're going to take a break.  This

20   is very --

21               (Continued on next page)

22

23

24

25

IBJKGRA4                      Goldstein – Cross

 1              (In open court)

 2              THE COURT:  Ladies and gentlemen, we're going to take

 3      a short recess.  Please don't discuss the case amongst

 4      yourselves during this break, don't do any research about it,

 5      and don't communicate with anyone else about the case.

 6              With that, I'll bring you back shortly.

 7              (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Thank you.  You can be seated.

3           So, Mr. Goldstein, I ask you to step down briefly.

4    We're going to have a short conversation.  If you can step out

5    for a moment.

6           THE WITNESS:  Sure.

7           THE COURT:  And during this break, please don't

8    discuss the substance of your testimony or any issue here with

9    anyone.  I expect to bring you back in a short moment.

10           THE WITNESS:  Sure.

11           MR. MERINGOLO:  Judge, I'm going to run to the

12    bathroom.

13           THE COURT:  That's fine.  Thank you.  Ms. Cappellino

14    is present.

15           So, as the witness is making his way out, I'd like to

16    hear further argument on this issue.  My strong desire, to the

17    extent I haven't communicated it previously, is for the parties

18    to try to raise issues with the Court outside of the presence

19    of the jury that we may be able to discuss, so that we don't

20    take the jury's time.  This is an issue that resulted in a

21    substantial colloquy at sidebar, which is why I excused the

22    jury, so that we can take more time to discuss the issue

23    without obviously wasting the jury's time as opposed to simply

24    not using it wisely.

25           MS. NECHELES:  Judge, I actually am surprised by this

1    objection, because I think it's clearly wrong --

2              THE COURT:  I'm sorry, give me one moment.

3              (Pause)

4              THE COURT:  I now have a copy of the email in front of

5    me.  Give me a moment, please, while I read it.

6              (Pause)

7              MS. NECHELES:  Your Honor, are you looking at

8    Government Exhibit 1085?

9              THE COURT:  I am now.

10             MS. NECHELES:  Can I pass up 1227, also, so you can

11   see what the government did put in evidence?

12             THE COURT:  Please.

13             (Pause)

14             MS. NECHELES:  Your Honor, I will seek --

15             THE COURT:  I'm sorry, give me one more moment.

16             MS. NECHELES:  Yes.

17             (Pause)

18             THE COURT:  Thank you.

19             So, counsel for the United States, I've now had the

20   opportunity to review the exhibit that the defense is referring

21   to.  What is the hearsay objection with respect to this?  Apart

22   from the statement that this is the most luxurious hotel in

23   Rome, what here is it that you assert is hearsay?

24             MS. LONERGAN:  One moment, your Honor?

25             THE COURT:  Thank you.  I understand the purpose of

1    this is simply to show what appears to be a modification to the

2    forwarded invoice from Luxury Connections, which takes out

3    certain information, including the charge.

4              MR. BELL:  Your Honor -- and forgive us because I

5    don't know that you're going to hear much that we didn't try to

6    explain at sidebar -- the bottom part of the statement is a

7    booking reference.  It is a statement that represents, on its

8    face, that a certain booking was made by Mr. Rechnitz in the

9    name of Mr. Grant James, and that remains the case as

10   forwarded.  The truth here is that it is essentially the truth

11   of the booking, as would be the case for any such document.

12   When you have a business record, and you put the business

13   record in, if you don't clear the business exception rules'

14   hurdles --

15             THE COURT:  I'm sorry, can I just pause you?

16             MR. BELL:  Sure.

17             THE COURT:  Is it right that 1085 is subject to a

18   stipulation that does that?

19             MR. BELL:  As to authenticity.

20             THE COURT:  Thank you.  But not as to --

21             MR. BELL:  Not as to admissibility.

22             THE COURT:  But not also as to business records

23   exception?

24             MR. BELL:  No, your Honor.

25             (Continued on next page)

IBJTGRA5

1            MS. NECHELES:  Your Honor, could I comment on that?

2     If this witness had handed this document to Mr. Grant, I could

3     elicit:  Did you hand this document to Mr. Grant, and is this

4     the document that you handed to him?  It's conduct, it's not a

5     statement that I'm eliciting.  He emailed it.  It's not that --

6     it was emailed.

7            So I don't need Jona Rechnitz to testify that it's a

8     business record.  It's not a business record.  He's just -- all

9     he's doing by sending this is the same as handing it.  I could

10    get someone to testify he handed it.  The government has

11    essentially stipulated that Mr. -- and they have stipulated

12    that Mr. Rechnitz emailed this to Mr. Grant.  So that

13    stipulation is done.  The only question is:  Is there something

14    in what he handed or emailed that makes it a statement?  The

15    fact that you hand a document to someone doesn't make the

16    document that you hand to them a statement.  Just like here,

17    the fact that he emailed it doesn't make what he emailed to

18    Mr. Grant a statement.

19            MR. BELL:  I want to be clear, your Honor, we weren't

20    putting -- my allusion to a business record before wasn't to

21    suggest this is a business record, merely to point out to your

22    Honor's earlier question what the statement being put in as it

23    fits into the hearsay dimension that's been raised.

24            I will note just on the broader point that

25    Ms. Necheles raised, we're not trying to bar her from doing

1    anything, we don't -- we're not responsible for the rules of

2    evidence, they are what they are, we're merely trying to get

3    this in in a fashion that complies with them.

4            THE COURT:  Could I pause you again?  With respect to

5    the statement, what is it that the government asserts is

6    hearsay here?  Mr. Rechnitz is not -- it's not clear do me what

7    it is Mr. Rechnitz here is saying other than the most luxurious

8    hotel in Rome.  I think what Ms. Necheles is arguing is this is

9    about what Mr. Rechnitz did, namely deleting words from the

10   invoice that was originally presented.

11           MR. BELL:  So in effect, your Honor, Ms. Necheles is

12   looking to offer this in as a statement of Mr. -- there are a

13   couple of things here.

14           If it were only a matter of putting in the alteration

15   itself, as I said at sidebar, your Honor, that would seem to be

16   a different thing, but it's still the entirety of the statement

17   that's coming in.  And it's a statement -- the statement is

18   effectively:  This reservation has been made.  I made this

19   reservation for you.  That's what this is.  That is the truth

20   behind the statement of the email.  I'm not sure that there is

21   another way to communicate that clearly.

22           But that is effectively what invoices are, what

23   confirmations are, they are statements.  And the question is:

24   Well, okay, is that statement being offered for the truth or is

25   it not?  I think that if there were some way to limit this

IBJTGRA5

1    exclusively to the --

2              THE COURT:  I'm sorry, I don't understand the

3    government's point on this.  The fact of the making of the

4    reservation is established in 1227, so I understand that fact

5    to have been at least, if not established, supported by 1227.

6    So the distinction between 1085 and 1227 is the redaction of

7    the charging information.

8              MR. BELL:  I take it from what your Honor is

9    suggesting that if Ms. Necheles were to have -- if these were

10   put in in a different order then the hearsay ramifications

11   would be different.  I respectfully would disagree with this.

12   The documents either individually come in --

13             THE COURT:  Just to be clear, I don't see what the

14   hearsay statement is in the email itself.

15             MS. LONERGAN:  Your Honor, quickly, if I may, 1227 is

16   an email to Mr. Rechnitz with the reservation.  This email,

17   however, is a separate statement to Mr. Rechnitz saying to

18   Mr. Grant I made this reservation for you, essentially.  It's a

19   separate statement.  It's separate from the statement that's

20   in -- 1227 is a business record of -- is a record of

21   Mr. Rechnitz actually booking the hotel for Grant, but it is

22   separate, the fact that Mr. Rechnitz then tells Mr. Grant I

23   made this reservation for you, which is what he's doing by

24   forwarding it to him.

25             MR. BELL:  She effectively wants to put in the

1    statement to Jimmy Grant that the hotel had no price.

2              MS. NECHELES:  No, that's not --

3              MR. BELL:  Or rather she wants to put that statement

4    in so as to refute it.

5              I think that your Honor's original ruling was correct,

6    it's going to come in anyway.  And I certainly appreciate

7    Ms. Necheles' zealous advocacy, but I don't think that these

8    are concerns that we can sort of blow through through sheer

9    tyranny of will here.

10             MS. NECHELES:  Your Honor, if we went with the

11   government's theory, it's an action.  And yes, some actions

12   could be interpreted as a statement, but it's an action, it's

13   an email.  But if we went with the government's theory, that

14   would mean I can't ever put this in, even if they decide not

15   to.

16             If they decide to withhold this from the jury, what

17   they are saying is we wouldn't be able to put it in because

18   it's hearsay by us.  That's just not right.  I don't understand

19   it.  If they're saying they're going to put it in, why

20   shouldn't we put it in now, and it's relevant now, it goes to

21   this witness's testimony.  I need him to say:  I never did

22   this, that is not my invoice, it was changed, I never sent that

23   invoice.

24             It is -- there is no statement, it is not a -- yes,

25   many actions can be interpreted as statements.  By smacking

IBJTGRA5

Mr. Meringolo, I'm sort of making a statement that I'm mad at

him, but that doesn't mean it's not admissible.  Many actions

come in all the time.  That's what you do in a trial.  This is

an action by Mr. Rechnitz.  He sends a text or invoice to

Mr. Grant.  The government was planning on putting it in.  What

if they decide:  I don't want to.  Oh, my goodness, this is not

good for me so I'm not going to put it in.  I'm the government,

I'm not putting it in.

It can't possibly be true under the rules of evidence

that Mr. Grant cannot show that Mr. Rechnitz changed this and

that he sent it to -- that this was sent to Mr. Grant.  And it

comes in, your Honor, as an exhibit.  It's just that's all it

is.  It's not a statement by him, it's just an action.  He

emailed it, and the government stipulated to that action.  They

said yes, this is from the email, it's an authentic document

that was sent to Mr. Grant.

So I don't understand -- that part of it they have

already stipulated to.  So to the extent that they say that's a

statement, they already stipulated to that statement.  They put

it into the stipulation, yes, this is an authentic document, it

was sent.

So the heart of the case, your Honor, they just don't

want me to be able to cross-examine this witness and to show

the jury methodically:  Look at how this was changed.  It is

the heart of the case, it is the so-called bribe to Mr. Grant,

1    and we should be able to explore that issue with the jury.  I

2    don't understand why the government would be trying to stop

3    that.

4              MR. BELL:  Judge, co-conspirator statements as a

5    general matter can be called the heart of any conspirator case

6    with the same passion and with the same propriety that

7    Ms. Necheles just displayed.  At the same time, to extend the

8    logic behind Ms. Necheles' argument would vitiate the rule that

9    bars you from putting in co-conspirator statements on the

10   defense side.

11             THE COURT:  Thank you.  Let me ask, Ms. Necheles, with

12   respect to the substantive issue, namely your desire to show

13   the witness the modified invoice, counsel for the United

14   States, and I believe you as well, suggested earlier deleting

15   the statement, i.e., the most luxurious hotel in Rome.  Have

16   the parties considered redacting the entirety of the forwarding

17   email and just presenting this witness with a modified invoice?

18             MS. NECHELES:  Your Honor, I want to show that it was

19   forwarded from Rechnitz to Mr. Grant.  That's the heart of

20   this.  The exhibit is what it is.  But it just can't be

21   something floating out there.  It goes from Mr. Rechnitz.

22   That's the document.  That's the action.

23             MR. BELL:  If it's contingent on that, your Honor, it

24   goes to highlight the issues with having to put this in on

25   cross-examination through this witness who is unfamiliar with

IBJTGRA5

the forwarded part.

Ms. Necheles, to be clear, can ask questions about the document.  She can say loudly and clearly and for the record Government Exhibit 1085, as marked for identification, and then connect the dots later on.  That's what closing argument is for.

THE COURT:  Thank you.  Counsel for the United States and counsel for the defense, have you considered or should I -- I should say counsel for the defense, have you considered creating a defense exhibit which is just the forwarded message?

MS. NECHELES:  I don't know what you mean by just that, your Honor.  If I took out the most luxurious hotel in Rome, wouldn't that just be the forwarded message?

THE COURT:  No, the heading, i.e., to not do what the government is asserting is --

MS. NECHELES:  Your Honor, what if the government decides on their case that they don't want to put this in?  Do I not get to put this in?

THE COURT:  I think that's the government's going concern.

MS. NECHELES:  That's the question that your Honor is faced with.  Is it really possible that I don't get to show that what Rechnitz gave to Jimmy Grant was something that he had taken that made it look like it was a free room?

If that's the bribe, do I not get to show that because

IBJTGRA5

1      the government claims that's a statement?  I'm not putting that

2      statement in for the truth of it that it was a free room, I'm

3      putting it in to show what was said to Jimmy Grant, what was

4      given to Jimmy Grant, and that seems to be the heart of it.

5      It's not the truth of what was said, but the fact that it was

6      said.  This is what was given to him.

7              I really don't understand.  If I took off the top,

8      would I not -- under the government's logic, I could never put

9      this in, and government would not put it in because now they

10     see where I'm going.  Why would that be right in a case where

11     we're charged with this was what was given as a bribe to

12     Mr. Grant?  Don't I get to show that what was sent to Mr. Grant

13     about the invoice was basically a free room?

14             Now the government can argue that it means something

15     else, they could have Mr. Rechnitz testify it means something

16     else, but I need the jury to see what was he was told.  And

17     especially because there will be lots of testimony that

18     Mr. Rechnitz changes other documents and tells other people

19     that they're getting a free room, pretends to own hotels.  This

20     is critical to the case.  And it's not unfair to the government

21     in any way.  They're not saying it's unfair.  They're not

22     saying there's anything wrong with this other than they don't

23     want me to put my defense in.

24             MR. BELL:  Speaking as somebody who actually can speak

25     on behalf of the government on what they're going to put in, we

IBJTGRA5

1  hear Ms. Necheles.  We're not scared.  Believe me, we're

2  putting this in.

3          What I could say, your Honor, is that I think that

4  your Honor, in identifying the issues that you have with

5  respect to whether the defense has considered the redactions

6  that they have, has I think appreciated why this isn't properly

7  before this witness in this form right now.  I think it could

8  be shown to this witness.  I think the witness could be asked

9  about it subject to connection, and Ms. Necheles, who is very,

10  very skilled at this, can connect the dots later on.  But

11  extending the logic that Ms. Necheles is advancing right now

12  would basically mean that Ms. Necheles -- that any defense

13  counsel could put in any co-conspirator statement any time they

14  like on the theory that the government might decide they don't

15  want to do it.  That's not how it works.

16          MS. NECHELES:  Of course that's not what I'm arguing.

17  I'm arguing it's not going in for the truth.  This is not a

18  truthful statement.  I am putting it in to show he lied to

19  Mr. Grant.

20          THE COURT:  Thank you.  Understood.  I didn't

21  understand that this witness has any knowledge of what

22  Mr. Rechnitz did or didn't do.  I'm happy to allow the defense

23  to inquire regarding the, I will call it the substance of the

24  forwarded invoice, which appears to have been modified.  I

25  think that the government's objection to the introduction of

IBJTGRA5

1    the entirety of the exhibit at this time, however, is well

2    founded.

3              To the extent counsel for defense, if you would like

4    to have a graphic illustration to show the jury to illustrate

5    these modifications now, separate and apart from establishing

6    that these were sent by Mr. Rechnitz, a topic about which this

7    witness, as I understand it, has no particular knowledge, you

8    could create a separate exhibit which consists solely -- or you

9    might consider creating a separate exhibit which consists

10   solely of the underlying document within 1085, in other words,

11   the forwarded email.

12             I take no position on how you wish to approach that.

13   Again, as I said at sidebar, I have no concerns about you

14   asking questions about the substance of the modifications, the

15   question is whether you can establish through this witness that

16   Mr. Rechnitz communicated this to Mr. Grant, a topic about

17   which this witness has no personal knowledge, and as with

18   respect to which the government has raised reasoned objections.

19             MS. NECHELES:  Your Honor, I will do that if that's

20   what your Honor is permitting me to do, but I will just note

21   when I was putting it in before, it was a document that had

22   been stipulated to by the government because it was part of an

23   email, so I would seek to be able to still put it in under that

24   stipulation.  Because that's what it is, it's part of that

25   email, and I need to question this witness.  And the reason we

IBJTGRA5

1    entered into these stipulations was to allow each side to be

2    able to use these documents.

3            The stipulation, your Honor, to be clear, identifies

4    everything that was taken off of these computers and says that

5    everything that was taken off is authentic.  And then it

6    identifies a few exhibits as either defense exhibits or

7    government exhibits, but the agreement with the government was

8    that we could at a later date use anything if it became a part

9    of -- relevant to the trial.  We could use anything that was in

10   that database that had been stipulated as coming from that

11   computer, and this came from that computer.

12           MS. LONERGAN:  Your Honor, I just want to be very

13   clear about the stipulation.  Ms. Necheles is correct that the

14   stipulation does read that the entire emails are authentic.  We

15   did that to save everyone a lot of time calling custodians.

16   The stipulation, however, does not say that anybody can use

17   whatever they want, they say there are other hearsay

18   objections, there are many other objections.  Essentially what

19   the stipulation does is just get rid of the issue of

20   authenticity.  I think that was very clear in the way the

21   stipulations are drafted.  That was something that both parties

22   in fact wanted.  Both parties wanted to be able to continue to

23   raise other objections.

24           So we agree -- look, we agree that the bottom half of

25   this email is authentic.  We're not going to object on

IBJTGRA5

1    authenticity grounds.  I think that's the point.  But I wanted

2    to set the record straight as to what the stipulation does and

3    doesn't do.  It doesn't say any party can use anything for any

4    purpose.

5              THE COURT:  Understood.  From a practical perspective,

6    there are two possibilities here, either the defense could

7    propose a -- I'll call it separate exhibit which consists of

8    the subsection of Government Exhibit 1085 that you expect to

9    question the witness about.  An alternative might be to show a

10   redacted version of Government Exhibit 1085.  From a practical

11   perspective, I'm not sure which would be most efficient to help

12   us get some more work done during the course of trial day.

13             MS. NECHELES:  Your Honor, I have made an exhibit,

14   9463.  We can show that on the screen right now.  We created

15   that, and I can refer to it as a redacted version of Government

16   Exhibit 1085, offered by stipulation.

17             THE COURT:  Thank you.  Counsel, for the United

18   States, do you have a concern about that?

19             MR. BELL:  That seems fine, your Honor.  We won't

20   object on authenticity grounds because it's grandfathered in by

21   the stip.  Totally fine.

22             THE COURT:  Thank you.  I appreciate that.  And I

23   understand, Mr. Necheles, you will only be asking questions

24   about this portion of the document --

25             MS. NECHELES:  Yes.

IBJTGRA5

1            THE COURT:  -- and the connection will happen properly

2      during Mr. Rechnitz's testimony.

3            MS. NECHELES:  Yes, your Honor.

4            THE COURT:  Good.  Anything else that we should take

5      up before we bring the jury in?

6            MR. BELL:  No, your Honor, we're good.

7            THE COURT:  Ms. Necheles?

8            MS. NECHELES:  I'm fine.  Thank you, your Honor.

9            THE COURT:  Mr. Grant?

10           MR. MERINGOLO:  No, your Honor.

11           THE COURT:  Thank you.  Please bring the jury back in.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Thank you, ladies and gentlemen, for your

3    patience.

4              Ms. Necheles, you can proceed.

5              MS. NECHELES:  Thank you, your Honor.

6              Your Honor, at this time I offer in evidence

7    Defendant's Exhibit JR9463, which I offer, which is a redacted

8    version of Government Exhibit 1227.  I offer it pursuant to --

9    sorry, redacted version of Government Exhibit 1085, and I offer

10   it pursuant to the stipulation which is marked Government

11   Exhibit 1701.

12             THE COURT:  Thank you.  Counsel?

13             MS. LONERGAN:  No objection, your Honor.

14             MR. MERINGOLO:  No objection.

15             THE COURT:  Thank you.  I'm accepting JR9463 into

16   evidence.

17             (Defendant's Exhibit JR9463 received in evidence)

18             THE COURT:  Counsel, you may proceed.

19             MS. NECHELES:  If I put up two documents, JR9463 and

20   Government Exhibit 1227.

21             THE COURT:  You may.  Please proceed.

22             MS. NECHELES:  Thank you.

23   BY MS. NECHELES:

24   Q.  Sir, if you look on the right-hand side of your screen,

25   that is Government Exhibit 1227 which you testified about on

1    direct examination.  Do you recall that?

2    A.  I do.

3    Q.  And that was a business record of yours, right?

4    A.  Yes.

5    Q.  And so I want to look at that and look at JR9463.

6          So on the right-hand side there's that black box which

7    has Luxury Connections LC, Luxury Connections in the middle of

8    it, correct?

9    A.  Yes.

10   Q.  And you see on the left-hand side it's actually red,

11   correct?

12   A.  Correct.

13   Q.  That's the real color it's in?

14   A.  Red is the original, and I guess that was provided in

15   original format, and the black backsplash is the copy.

16   Q.  And right underneath that it has reservation confirmation

17   5102900, right?

18   A.  Yes.

19   Q.  And that's the same on both documents, right?

20   A.  Yes.

21   Q.  And then you see that there's a Dear Mr. Grant and a

22   paragraph that's the same on both documents, right?

23   A.  Yes.

24   Q.  And then right underneath that --

25          MS. NECHELES:  If you could highlight, Mr. Willis,

1   just on Government Exhibit 1227.

2   Q.  -- there is a box or a block that's guest information

3   credit card information.

4         Do you see that on Government Exhibit 1227?

5   A.  I do.

6   Q.  And that is missing from Defendant's Exhibit JR9463, right?

7   A.  Correct.

8   Q.  And then if you look underneath that block, on the

9   right-hand side there's a column charged, U.S. $1,066, right?

10  A.  Yes.

11  Q.  And at the bottom it says total charge $1,066, right?

12  A.  Correct.

13  Q.  And that is missing -- that is contained on Government

14  Exhibit 1227, right?

15  A.  Yes.

16  Q.  And it's missing from JR9463, right?

17  A.  Yes.

18  Q.  But if you look at what's on the left-hand side, it's

19  exactly the same as what is in your invoice from Government

20  Exhibit 1227, right?

21  A.  Yes.

22  Q.  And then -- and it's missing, am I correct that it is

23  missing also the -- one second.

24        It's also on Government Exhibit 1227, on what is not

25  highlighted there, there's a little line that says average

1    nightly rate.

2              MS. NECHELES:  If you highlight that, Mr. Willis.

3    Q.  It says $533?

4    A.  Yes.

5    Q.  And that is missing from Defendant's Exhibit JR9463, right?

6    A.  Yes.

7    Q.  And so Government Exhibit 1227 is your invoice, right?

8    A.  Yes.

9    Q.  And sir, did you create JR9436?  Is that your invoice?

10   A.  Yeah, it's the exact same reservation, same confirmation

11   number.  There were times where Mr. Rechnitz would request the

12   booking confirmation showing the rate that he paid for the

13   reservation as well as a confirmation without a rate.  So I

14   guess when he goes ahead and takes care of the reservation for

15   whoever he's taking care of, in this case Mr. James Grant, he

16   could tell Mr. Grant there's no payment for him to make.

17   Q.  So you would create this other document as well, right?

18   A.  Yes.

19   Q.  And on this second document you would take out all of the

20   information that was there with respect to any charge, right?

21   A.  That's correct.

22   Q.  And you did that at Mr. Rechnitz's request, right?

23   A.  Correct.

24   Q.  And you testified that the reason you did that was because

25   Mr. Rechnitz would say he didn't want the person who was

IBJTGRA5                    Goldstein - Cross

1   receiving the room to know he was paying for it, right?

2   A.  Correct.  I would assume that, yeah.

3            MS. NECHELES:  One minute, your Honor.

4            THE COURT:  That's fine, counsel, please take your

5   time.

6            (Pause)

7            MS. NECHELES:  I have no further questions, your

8   Honor.

9            THE COURT:  Thank you very much.

10           Counsel for Mr. Grant, Ms. Cappellino.

11  CROSS-EXAMINATION

12  BY MS. CAPPELLINO:

13  Q.  Good afternoon, Mr. Goldstein, I'm Anjelica Cappellino.

14  I'm one of the attorneys that represent James Grant.

15           How are you?

16  A.  How are you?

17  Q.  You testified that you have done a number of hotel bookings

18  through Luxury Connections for Mr. Rechnitz, is that correct?

19  A.  Yes.

20  Q.  And you have also done bookings on behalf of others for

21  Mr. Rechnitz, right?

22  A.  Yes.

23  Q.  And I believe you testified to one, an individual by the

24  name of Laura Colon, correct?

25  A.  Yes.

1  Q.  And that's one example of Mr. Rechnitz contacting you to

2  book a hotel for someone other than himself, right?

3  A.  Yes.

4  Q.  Now he also contacted you about my client, Mr. Grant,

5  right?

6  A.  Yes.

7  Q.  And that was first via text message on August 1st, 2013?

8  A.  It was a text message, I don't have it in front of me, so I

9  can't confirm the exact date.

10 Q.  We'll bring that up for you.

11 A.  August 1st, 2013, yep, that's the text message.

12 Q.  And he said he needs help, he wants to prepay for a hotel

13 in Rome for a friend?

14 A.  Yes.

15 Q.  And said get a decent hotel in Rome, right?

16 A.  Yes.

17 Q.  And you testified that by "decent," you thought that maybe

18 meant luxury, coming from Mr. Rechnitz?

19 A.  Correct.

20 Q.  But nowhere in this text does he say get me a luxurious

21 hotel, right?

22 A.  Correct.

23 Q.  So you just assumed?

24 A.  Yeah.

25 Q.  To be clear, you never met Mr. Grant at that point, right?

1   A.  I don't recall having met him at that point.

2   Q.  Did Mr. Grant ever come into the Luxury Connections office?

3   A.  No.

4   Q.  Did you ever meet him at any of these cigar bars I believe

5   you testified to on cross-examination?

6   A.  Yeah, I don't know if Mr. Grant was there that night.  I

7   can't recall that.

8   Q.  So at Mr. Rechnitz's request, you did book a room, you in

9   fact many booked a room at the Hotel Regina Baglioni, correct?

10  A.  Baglioni, yep.

11  Q.  And we're looking at Government Exhibit 914.  This is the

12  confirmation email for that booking, right?

13  A.  Yes.

14  Q.  And the date on that is August 8, 2013, right?

15  A.  Yes.

16  Q.  So in about -- well, in exactly a week since Mr. Rechnitz's

17  request, you processed that booking for him, right?

18  A.  Yes.

19  Q.  And this is for a hotel stay from August 15 to the 17th,

20  correct?

21  A.  Yes.

22  Q.  So you booked a stay approximately a week in advance,

23  right?

24  A.  Yes.

25  Q.  And then you forwarded this confirmation email to

1    Mr. Rechnitz, right?

2    A.   Yep.

3    Q.   And Mr. Grant is not on that email, correct --

4    A.   On the email --

5    Q.   -- on Government Exhibit --

6              THE COURT:  Please let her finish the question and

7    then you can have the opportunity to respond.

8              Please ask the question again.

9    Q.   On Government Exhibit 914, this email was forwarded to

10   Mr. Rechnitz, right?

11   A.   Yes.

12   Q.   It was not forwarded to Mr. Grant, right?

13   A.   Correct.

14   Q.   Because you had no correspondence with Mr. Grant, right?

15   A.   Correct.

16   Q.   You never phoned him about this reservation, right?

17   A.   Correct.

18   Q.   You never emailed?

19   A.   I never emailed Mr. Grant.

20   Q.   And you never met him in person to discuss this

21   reservation, right?

22   A.   Correct.

23             MS. CAPPELLINO:  One moment, please.

24             THE COURT:  Please take your time, counsel.

25             (Pause)

IBJTGRA5

| | |
|---|---|
| 1 | MS. CAPPELLINO:  No further questions, thank you. |
| 2 | THE COURT:  Thank you. |
| 3 | Counsel for the United States? |
| 4 | MS. LONERGAN:  Nothing further, your Honor. |
| 5 | THE COURT:  Thank you very much.  Thank you very much |
| 6 | for your testimony.  You can step down.  Thank you. |
| 7 | Counsel for the United States? |
| 8 | MR. BELL:  Your Honor, we'll call our next witness in |
| 9 | just a moment, but we would like to play a recording first. |
| 10 | And given it is the first recording that we have had in a |
| 11 | little while, it might be an appropriate place for the |
| 12 | instruction that the parties discussed earlier. |
| 13 | THE COURT:  Thank you very much. |
| 14 | So ladies and gentlemen, you've heard recordings |
| 15 | played into evidence so far at the trial and I understand that |
| 16 | you're about to hear more recordings today. |
| 17 | You should know that in certain instances evidence may |
| 18 | be admitted only for a particular purpose and not just |
| 19 | generally for all purposes.  I therefore instruct you that the |
| 20 | statements made on these recordings by people other than Jeremy |
| 21 | Reichberg, James Grant, Michael Harrington, Michael Andriano |
| 22 | and Michael Melici on the recordings you heard so far, and |
| 23 | those that you may hear today, are not admitted into evidence |
| 24 | for their truth.  The statements by speakers other than Jeremy |
| 25 | Reichberg, James Grant, Michael Harrington, Michael Andriano |

IBJTGRA5

and Michael Melici are admitted to place the defendants'
statements in context so you can understand their state of mind
during those conversations, and as background to help you
understand what the defendants meant by their statements.  In
addition, you may consider the fact that the statements were
made, separate and apart from the truth of the statements
themselves.

Let me give you an example of how this rule works in
practice.  I'm going to draw on an example that I gave you at
the outset of the trial.  Remember when I talked to you about
the umbrella and the raincoat?

So if on one of the recordings you hear Jeremy
Reichberg, James Grant, Michael Harrington, Michael Andriano or
Michael Melici say "It's raining outside," you can consider
that evidence for its truth, that is, whether it was in fact
raining at that time.  However, if you hear any person other
than Mr. Reichberg, Mr. Grant, Mr. Harrington, Mr. Andriano or
Mr. Melici say "It is raining outside" on a recording, you
cannot consider that statement for its truth.  In other words,
it would not be evidence that it was in fact raining at that
time.  But, for example, you can use that statement to place
other statements by a defendant in context or to understand a
defendant's state of mind.  For example, if, in response to a
statement that "It is raining outside," made by one of those
other people, a defendant said "Yes, it is," you could use the

IBJTGRA5

1    statement "It is raining outside" as context to understand what

2    he, the defendant, was referring to.

3            I hope that that's helpful.

4            Counsel for the United States, can you please begin

5    with your recordings?

6            MR. BELL:  Yes, your Honor.  With the Court's

7    permission, we would like to ask the jury to retrieve its black

8    binders and to turn to tab 923.  We will also have it up on

9    your screens.

10           Tab 923T corresponds with Government Exhibit W00923T,

11   which, your Honor, the government would presently offer

12   pursuant to the earlier wire stipulation I believe without

13   objection.

14           MS. NECHELES:  No objection.

15           MR. MERINGOLO:  No objection.

16           THE COURT:  Thank you.  I'm accepting Exhibit 923 into

17   evidence.

18           (Government's Exhibit 923 received in evidence)

19           MR. BELL:  I want to make sure everyone from the jury

20   found it.  Great.

21           So with the Court's permission, your Honor, the

22   government would like to play Government Exhibit 923, a

23   January 16, 2015 call at 9:30 a.m. between the defendants

24   Mr. Grant and Mr. Reichberg.

25           THE COURT:  Thank you.  You can proceed.

1          (Audio recording played)

2          MR. BELL:  Thank you, your Honor.

3          With that, the government calls Lieutenant Michael

4     DeMartino.

5      MICHAEL DeMARTINO,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8     DIRECT EXAMINATION

9     BY MR. BELL:

10    Q.  Good afternoon, Lieutenant DeMartino.

11    A.  Good afternoon.

12    Q.  Where do you work, sir?

13    A.  I'm a police lieutenant with the Port Authority Police

14    Department of New York and New Jersey.

15    Q.  What is the Port Authority Police Department of New York

16    and New Jersey?

17    A.  The Port Authority is a bistate police department which was

18    enacted by Congress to control all the property between New

19    York and New Jersey tunnels, bridges, airports, shipping ports,

20    bus terminals, and the Port Authority Police Department polices

21    that.

22    Q.  And so what kinds of specific responsibilities does the

23    Port Authority police have with respect to policing those

24    bridges, tunnels and other assets?

25    A.  The Port Authority Police Department, just like any other

1    police department, enforces vehicle and traffic law in the

2    states of New York and New Jersey, low level misdemeanor all

3    the way up to high level felony crimes that are committed in

4    each state and in or on the facilities in which we police.

5    Q.  Can you tell me about some of the specific facilities that

6    the Port Authority police has responsibility for?

7    A.  Yes, they are responsible for the Holland Tunnel, the

8    Lincoln Tunnel, the George Washington Bridge, the World Trade

9    Center, the bus terminal in Manhattan, the bus terminal in

10   Washington Heights, Newark Airport, JFK Airport, LaGuardia

11   Airport, the shipping terminals in Brooklyn, Holland Hook, Port

12   Newark, Port Elizabeth, the PATH train between New York and New

13   Jersey.  I'm probably forgetting a few.

14   Q.  How long have you been with the Port Authority police?

15   A.  I became a Port Authority police officer in 2002.

16   Q.  What jobs did you have prior to joining up with the Port

17   Authority Police Department?

18   A.  In 1992 I enlisted in the United States Marine Corps.  In

19   1998 I became a New York State trooper.  In 2001 I was a

20   detective with the Hudson County prosecutor's office in Jersey

21   City, New Jersey.  In 2002 I transferred to Port Authority.

22   Q.  Now you mentioned that you're a lieutenant with the Port

23   Authority police.  How long have you been a lieutenant?

24   A.  I obtained the rank of lieutenant approximately three and a

25   half years ago, so 2015, about.

1    Q.  And what are your specific duties and responsibilities as a

2    lieutenant, which is to say stemming from your rank?

3    A.  As a lieutenant I directly supervise police sergeants and

4    police officers.  I make sure that orders are given out at roll

5    calls.  I oversee arrests, make sure probable cause is there

6    when a police officer brings in an arrest.  I pay people their

7    time and their overtime.  I ensure that the command meets the

8    specifications needed and the patrol vehicles meet the

9    specifications needed in order for the police officers to

10   utilize them, and I check all their training and equipment

11   and -- their equipment and their vehicles and the training

12   before they go out on patrol.

13   Q.  I want to direct your attention, Lieutenant, to March of

14   2008.  What was your title with the Port Authority Police

15   Department at that point?

16   A.  In 2008 I was a police officer.

17   Q.  And as part of your responsibilities as a police officer,

18   did you participate in something called a police escort?

19   A.  Yes.

20   Q.  Within the context of the Port Authority police, what are

21   police escorts?

22   A.  Police escorts are when I would either escort a vehicle or

23   a person in a vehicle or a vehicle without a person, such as an

24   ambulance, to a designated point, from point A to and point B.

25   Q.  And under what circumstances might the Port Authority

1    police provide police escorts?

2    A.   A variety of different circumstances, some of them being

3    escorting a vehicle against traffic to get to a disabled

4    vehicle, to expediting ambulance, to a motor vehicle crash or

5    through the tunnel if say someone was in need of an emergency

6    situation and they need to expedite through, or special

7    dignitaries, foreign and domestic, that I was ordered to

8    perform from the sergeants and lieutenants.

9    Q.   What sorts of foreign dignitaries might you escort as part

10   of your job responsibilities?

11   A.   Foreign dignitaries, if UNGA was in or the UN was in

12   session, sometimes other foreign dignitaries would visit the

13   United States, and we would provide mutual aid for New York

14   City or for the Secret Service or whoever asked for us to

15   assist them in getting through the tunnel and bridges.

16   Q.   What sorts of vehicles would you use in order to provide

17   escorts?

18   A.   The only vehicle that I ever used to provide an escort was

19   a police car.

20   Q.   What role would a police car provide in making that escort

21   work?  What would the car actually do?

22   A.   I would use my car to facilitate the vehicle following me

23   or the convoy following me to get through traffic or to maybe

24   mitigate a traffic situation so they wouldn't be stagnant in

25   traffic.

1  Q.  As part of these particular tasks, would you radio ahead

2  and coordinate with other Port Authority personnel?

3  A.  Yes.

4  Q.  Can you give me an example of when that might fit into an

5  escort procedure?

6  A.  Yes.  Normally what would happen if I was providing an

7  escort, whether it would be from New York to New Jersey or New

8  Jersey to New York, it would pretty much have been go the same

9  way.  I would make other units in my precinct known to my

10  whereabouts as soon as I arrived at the point where I was

11  picking up the escort by radioing them over the radio,

12  obviously, and telling them that I'm at a certain point waiting

13  the arrival of the escort.

14      Once the escort was in sight or once the escort came

15  up to me, I would radio my other units to tell them I had the

16  escort in tow, and then I would proceed with the escort.  And

17  as I proceeded with the escort, I would advise everyone of how

18  close I was in proximity of getting to the tunnel or certain

19  points en route to the tunnel so that they could advise me in

20  return if there was an accident that came up or if there was

21  some type of traffic that I needed to go around to take a

22  different direction or route.

23      And then that would continue all the way to other

24  side, whether I was going to New York or New Jersey, and then I

25  would call the completion of the escort as soon as the escort

IBJTGRA5                          DeMartino - Direct

1   broke off, which means they go their own way.

2   Q.  So back in 2008, about how often would you say you assisted

3   in providing police escorts of this type?

4   A.  I couldn't answer that question without guessing.

5   Q.  I'm asking for an estimate.

6   A.  In 2008?

7   Q.  Sure.  About how many times a year around that point in

8   your career?

9   A.  I would say -- up until 2008 or just in 2008?

10  Q.  Just around 2008.

11  A.  I provided escorts maybe 40, 50.

12  Q.  Now as part of your job did you sometimes escort vehicles

13  through the Lincoln Tunnel?

14  A.  Yes, sir.

15  Q.  And with respect to escorts through the Lincoln Tunnel in

16  particular, procedurally, what would that involve --

17  A.  Procedurally to pick up --

18  Q.  -- in order to make the escort actually happen?

19  A.  Well, I would always receive orders from a superior officer

20  in order to provide an escort, I would never just do an escort

21  on my own.  So I would receive an order at roll call or

22  sometime during the tour from one of my supervisors, and then I

23  would complete paperwork or write in my memorandum book that

24  the escort took place.  Not always was the paperwork done, but

25  most of the time I tried to do what I was supposed to do.

Q.  What would you do in order to navigate the Lincoln Tunnel
properly?

A.  What I would do is I would ascertain information in order
to expeditiously get that escort through the tunnel.  I would
keep abreast of any traffic incidents that we had at that time
or any other escorts that were coming through or any problems
that I would anticipate having and I would make a determination
on which way to go.

Q.  Now in escort situations like the one that we have been
talking about, would you work with other law enforcement
agencies?

A.  Yes, sometimes.

Q.  And what sorts of law enforcement agencies would you find
yourself working with?

A.  It could be any law enforcement agency, but mainly it was
the secret service, the NYPD, the New Jersey State Police, New
York State Police, Department of State personnel, sometimes the
local municipalities would help, but it was mostly the federal
agencies, the New York City Police Department and the Port
Authority Police Department and the New Jersey State Police,
because we sometimes would hand it over to them on the
turnpike.

Q.  When you say handing over to another law enforcement
entity, what do you mean by that?

A.  Usually I would be given the task to provide the escort,

1    like I stated before, from point A to point B, but there was a

2    rare occasion where sometimes the supervisor would say, you

3    know, for an example, don't drop them off on the New Jersey

4    Turnpike, take them all the way to Teterboro Airport or to

5    Newark Airport or they would go a little beyond my jurisdiction

6    into another Port Authority facility jurisdiction.

7    Q.   Now generally, Lieutenant, where do requests for the Port

8    Authority Police to assist with escorts come from?

9          In other words, who makes those requests of the Port

10   Authority Police?

11   A.   The people who make the requests to the Port Authority

12   Police would be either a phone call or email from the Secret

13   Service or the NYPD or from another agency stating that they

14   need a request of mutual aid.

15   Q.   And generally would you communicate directly with the

16   people inside the escorted vehicle or vehicles?

17   A.   Very few incidents where that would happen.

18   Q.   Now in the case of escorting foreign dignitaries, did those

19   requests tend more to come from one law enforcement entity or

20   another?

21          Let me ask a better question.  In other words, when

22   the call came in for the Port Authority Police to assist

23   specifically with assisting a foreign dignitary moving, did

24   those requests tend to come from one or another law enforcement

25   entity more than others?

1          MS. NECHELES:  Your Honor, I object.

2          THE COURT:  Counsel, can you please rephrase the

3    question?

4          MR. BELL:  Sure.

5          MS. NECHELES:  To his knowledge, your Honor?

6          THE COURT:  Thank you.  Counsel, please proceed.

7          MR. BELL:  Sure.

8    BY MR. BELL:

9    Q.  Let's take a step back.  Lieutenant, you mentioned filling

10   out paperwork with respect to these escorts.  Did you fill out

11   paperwork to memorialize the escorts once you did them?

12   A.  I'm supposed to do that, but not -- I didn't always do

13   that.

14   Q.  What kinds of paperwork were you supposed to fill out?

15   A.  There's a Port Authority escort form.

16   Q.  What kinds of information was kept on the escort form?

17   A.  It's generic information, like where I picked up the

18   vehicle, where I dropped off the vehicle, the time I arrived,

19   the time I completed it, the total duration of the minutes, the

20   vehicles which may have been utilized by my departments or

21   other departments, agencies that assisted with the escort

22   besides my own department, other people that might have been

23   involved who I knew of at the time, whether they were

24   supervisors or other police officers, sometimes the name of the

25   dignitary or the ambulance number or whatever it was that I was

1    escorting, any type of details that would be in the escort.

2    Q.  And when would you fill these escort forms out relative to

3    when the escorts took place?

4    A.  They would always be filled out prior to completion of my

5    tour of the duty for the day.

6    Q.  And why was that?

7    A.  Because all of our reports are supposed to be submitted

8    promptly and by the completion of our tour of duty.

9    Q.  Once you filled out these forms by the conclusion of your

10   tour, what would you do with them?

11   A.  They would be placed in the sergeant's box or the

12   lieutenant's box for approval or to be reviewed and then put

13   into a staff command box to be filed.

14            MR. BELL:  So what I would like to do, with the

15   Court's permission, is have Mr. Hamilton place on the witness's

16   screen, that of the Court's and that of the parties', what has

17   been marked for identification as Government Exhibit 917.

18            THE COURT:  Please proceed.

19   BY MR. BELL:

20   Q.  So Lieutenant, are you familiar with -- well, first of all,

21   is there a document on your screen?

22   A.  Yes, there is.

23   Q.  Are you familiar with that document?

24   A.  Yes, sir.

25   Q.  And how are you familiar with that document, sir?

A.   This is the Port Authority Police escort form that we fill

out upon the completion of what I just testified to.

Q.   Is this a form that you yourself filled out?

A.   Yes.

Q.   To your knowledge, are these forms maintained by the Port

Authority Police in the ordinary course of business?

A.   Yes, they are.

          MR. BELL:  Your Honor, the government offers 917 as a

business record.

          MS. NECHELES:  No objection, your Honor.

          MR. MERINGOLO:  No objection.

          THE COURT:  Thank you.  I'm accepting Exhibit 917 into

evidence.

          (Government's Exhibit 917 received in evidence)

          THE COURT:  You may proceed.

          MR. BELL:  Thank you.  May we publish to the jury?

          THE COURT:  You may.

          MR. BELL:  Mr. Hamilton.

BY MR. BELL:

Q.   So I want to direct your attention to 917, and I will ask

you to, with Mr. Hamilton's assistance, walk me through the

form.

          I want to direct you first to the top line of

information where "VIP" is checked and where "escort" is

checked, and there are numbers there.  Mr. Hamilton has

IBJTGRA5                         DeMartino - Direct

1    highlighted them for us.  Do you see that, sir?

2    A.  I do.

3    Q.  And so what does that information tell us?

4    A.  VIP for very important person and escort for the escort

5    number that was entered into the blotter for that year.  Each

6    number annotates the next number in chronological order of

7    times that that particular duty was performed by a police

8    officer at the Lincoln Tunnel during the course of that year.

9              (Continued on next page)

1   BY MR. BELL:

2   Q.  So do I take it that that would be your tenth VIP escort

3   and eleventh VIP escort overall in 2008?

4   A.  According to this form, yes.

5   Q.  And further down, there is a Captain John Collins, and it

6   says from Police Officer DeMartino.  I imagine that Police

7   Officer DeMartino is you?

8   A.  Yes, it is.

9   Q.  Then immediately below that, there is a date.  What is the

10  date there?

11  A.  March 11, 2008.

12  Q.  What does that date signify, Lieutenant DeMartino?

13  A.  It signifies that I completed this report on that date.

14  Q.  Now, there is a box immediately below that checked, called

15  "Eastbound."  I'll come back to that in just a moment.  Then

16  immediately below that, there are -- it says, "Persons:

17  Israeli diplo," and some additional information that says,

18  "Route 3 W/B to NYC, 42nd and Dyer."

19          So let's start out with "Eastbound."  What does

20  "Eastbound" mean with respect to the Lincoln Tunnel?

21  A.  "Eastbound" means that the escort was going from New Jersey

22  into New York.

23  Q.  Mentioned under persons is "Israeli diplo."  What does that

24  mean?

25  A.  The reason that this escort was performed was, I was given

1    the information that it was for an Israeli diplomat, but I do

2    not know the name.

3    Q.  Now, on the other side of the slash, there is Route 3.

4    Perhaps for the uninitiated here, where is Route 3?

5    A.  Route 3 is a state road in New Jersey that links to 495 and

6    the New Jersey Turnpike, and it directly filters into the

7    Lincoln Tunnel going eastbound into New York City.

8    Q.  Do you have a sense, Lieutenant DeMartino, of how long it

9    would take one to get from the nearest point on Route 3 to the

10   mouth of the Lincoln Tunnel, say, if there were no traffic?

11          Let me ask perhaps a better question.  About how far

12   is it from Route 3, the closest point on Route 3 to the Lincoln

13   Tunnel, to the Lincoln Tunnel itself?

14   A.  Probably about four miles.

15   Q.  Now, then after Route 3, there is a "W/B."  Do you have an

16   understanding of what you wrote there for "W/B"?

17   A.  Yes.  That means Route 3 westbound.

18   Q.  What do you mean by Route 3 westbound?

19   A.  That is where the escort was to be picked up from, because

20   that's my starting point.

21   Q.  And then it says, "to NYC, 42nd," and I believe that is

22   Dyer, D-y-e-r?

23   A.  Yes.

24   Q.  Am I right in assuming that "NYC" is New York City?

25   A.  Yes, sir.

1   Q.  Do you have an understanding of where 42nd and Dyer is?

2   A.  Yes, I do.

3   Q.  Where is that intersection?

4   A.  When you come out of the south tunnel in New York City,

5   42nd and Dyer would be approximately a -- if a quarter mile up

6   north to the left of when you exit the tunnel.

7   Q.  You mentioned the south tunnel.  Are there, in fact,

8   different tunnels within the Lincoln Tunnel?

9   A.  There are.

10  Q.  About how many?

11  A.  There are three tunnels.

12  Q.  And what distinguishes the south tunnel from the others, if

13  anything?

14  A.  Well, if you're going to describe them from New York to --

15  from New Jersey to New York, it would be easiest.  The layout

16  of the nomenclature of the tunnels would be the tunnel to the

17  north of where you're standing would be the south tunnel, the

18  tunnel in the center would be the center tunnel, and the tunnel

19  on the left of you, which would be the south of you, would be

20  the north tunnel.

21  Q.  I want to direct your attention now to lower than the

22  person field, where we have "Tour included," and there is what

23  appears to be 3, the letter X, and 11.  What's that a reference

24  to, sir?

25  A.  That particular day, I was designated to work the 3:00 p.m.

IBJKGRA6                          DeMartino - Direct

1    to 11:00 p.m. tour of duty.

2    Q.   Right next to that, there's "Vehicles used."  What does the

3    number there refer to?

4    A.   That's the patrol vehicle that I used that day.  The marked

5    sector car, it's labeled 5134-1 on the side of it.

6    Q.   Immediately below that, there is a line that says "PA

7    police detail," and then there's a checkmark next to

8    "Superiors."  What does that refer to?

9    A.   That means there were superior officers that were involved

10   in my escort.

11   Q.   Then there is "Scheduled Time:  1610."  For those of us who

12   may not be conversant in military time, what's that in normal

13   folks' time?

14   A.   That would be 4:10 p.m.

15   Q.   What does "Scheduled Time" refer to?

16   A.   That's the -- that was the time that my superior officer

17   told me to go to that point to pick up the escort, so I would

18   be waiting at that time whether the escort was there or not.

19   Q.   Then there is "Arrival Time."  The arrival time listed is

20   1635 hours.  Am I right in saying that's 4:35 p.m.?

21   A.   Yes, you are.

22   Q.   So about 25 minutes after the scheduled time?

23   A.   Yes.

24   Q.   And the "Arrival Time" means what precisely?

25   A.   It's approximately the time that I picked up the escort at

1    the location I was waiting for it.

2    Q.  Right next to that, there's "Completion Time:  1648 hours."

3    Fair to say that's 4:48 p.m.?

4    A.  Yes, it is.

5    Q.  What does "Completion Time" refer to?

6    A.  That's the time that I would break off the escort at 42nd

7    and Dyer in New York City and either go on my own way or pass

8    it off to a waiting -- an awaiting unit in New York City.

9    Q.  So is it fair to say that, according to the information

10   here, you picked up the escort at Route 3 at around 4:35 p.m.,

11   and then completed the escort on the other side of the Lincoln

12   Tunnel at 4:48 p.m.?

13   A.  Yes.

14   Q.  So that would be about 13 minutes from one side of the

15   tunnel to the other plus whatever it took you to get to Route

16   3.  In your experience, Lieutenant, does that make it pretty

17   good time?

18   A.  For that time of day, yes.

19   Q.  Now, immediately below that, there is a series of boxes,

20   and it's labeled "All Agencies Involved."  The Port Authority

21   police are checked, and I'm guessing that's a reference to your

22   involvement?

23   A.  Yes, myself and my superiors and anybody else who assisted

24   me.

25   Q.  There are also a series of other options below, and of

1   these, one of them is checked.  That box is next to "NYPD."

2   What does that indicate, sir?

3   A.  That indicates that there was an NYPD unit, either marked

4   or unmarked, waiting on the other side of the tunnel for me

5   between the area of 40th and 42nd Street on Dyer Avenue

6   northbound in New York City.

7   Q.  So what is it that the NYPD would be waiting to do on the

8   other side of that escort?

9   A.  They would be waiting for me to come through with the

10  escort and take control of it.

11  Q.  Finally, under "Remarks" at the very bottom, there is some

12  handwriting here.  Is this your handwriting?

13  A.  Yes, it is.

14  Q.  And it says, "Used south tun near lane.  Nothing unusual to

15  report."  Now, when you say "Used south tun," I assume you're

16  referring to the south tunnel?

17  A.  Yes, I am.

18  Q.  When you say "Used south tunnel near lane," what do you

19  understand it is that that means with respect to the lane of

20  the south tunnel that you used?

21  A.  There are two lanes inside each of our tunnels.  There's a

22  near lane and a far lane.  The near lane is designated by being

23  the lane with the catwalk, and the far lane is the lane without

24  the catwalk, so I primarily utilized the near lane for this

25  particular escort.

1    Q.   Then in order to get through to the south tunnel, what is

2    your understanding of -- well, first of all, would you have

3    radioed ahead in this sort of call, the call described --

4    rather, the escort call described on this piece of paper?

5    A.   Could you ask that again?

6    Q.   Sure.

7         Would you have radioed ahead to colleagues as any part

8    of effecting this particular escort?

9    A.   Yes.   I would have 100 percent radioed ahead.

10   Q.   For what purpose?

11   A.   While I'm waiting there for the escort, I radio ahead to

12   make sure that traffic is still -- that I'm still able to pass

13   traffic at certain locations, and I'm going to let them know

14   that I have the escort in tow.

15   Q.   What, if anything, do your colleagues on the other side of

16   the radio do in order to maintain a clear lane until you get

17   there?

18         MS. NECHELES:   Your Honor, I object.   This is --

19         THE COURT:   Thank you.

20         Can you rephrase the question, please, counsel?

21   BY MR. BELL:

22   Q.   Do you have an understanding, Lieutenant, of what it is

23   that your colleagues would do in order to maintain the clarity

24   of the lane?

25         MS. NECHELES:   Objection.

1                  THE COURT:  Thank you.

2                  You can answer the question.

3                  MS. NECHELES:  Your Honor, I object to this general

4       procedure as opposed to what happened.

5                  THE COURT:  Thank you.

6                  Counsel, can you rephrase the question?

7                  MR. BELL:  I think that's admissible, your Honor.  I'd

8       like to ask it, if I can.

9                  THE COURT:  Thank you.

10                 Please rephrase the question.

11      BY MR. BELL:

12      Q.  Now, Lieutenant, do you recall this particular escort?

13      A.  No.

14      Q.  Do you, nevertheless, have an understanding of how you

15      would have done escorts of this sort at that time?

16      A.  Yes, I do.

17      Q.  And you testified a moment ago that you would have used the

18      radio in order to call ahead and make sure things were clear?

19      A.  Yes, I would.

20      Q.  What is your understanding of what the people on the other

21      side of that call would have done, if anything, in order to

22      keep the lane clear?

23                 MS. NECHELES:  Objection.

24                 THE COURT:  Thank you.

25                 You can answer the question.

1          THE WITNESS:  Well, what the people -- the people on

2     the other side won't necessarily do anything to keep the lane

3     clear because it's inside a tunnel, and it's over, you know, a

4     mile and a half of roadway, but what they do is they attempt to

5     sometimes divert traffic on the other side to alleviate the

6     congestion, so I can come through quicker.  But there's nothing

7     they can do physically inside the tunnel besides pull the

8     traffic out.

9     Q.  How did they accomplish the diversion of traffic that you

10    just alluded to?

11          MS. NECHELES:  Objection, your Honor.

12          THE COURT:  Thank you.

13          Can you rephrase the question, please, counsel?

14    BY MR. BELL:

15    Q.  You mentioned a moment ago that your colleagues would look

16    to divert traffic at the other end in order to keep the lane

17    clear?

18          MS. NECHELES:  Objection.  There were some times they

19    would do that.  There's no testimony --

20          THE COURT:  Thank you.

21          Counsel, can you rephrase the question, please?

22    Q.  On the occasions when your colleagues would look to divert

23    traffic, what is your understanding of how they did so?

24          MS. NECHELES:  Objection.

25          THE COURT:  Thank you.

1          You can answer the question.

2          THE WITNESS:  What they would do is they would put in

3     diversions and either push traffic northbound on Dyer or

4     southbound on Dyer to alleviate the traffic in either the near

5     lane or the far lane, whichever lane I would be utilizing.

6          In addition to that, sometimes they would hold one

7     lane of traffic while pulling another.

8     BY MR. BELL:

9     Q.  How does that work?

10    A.  The police officers on the other side utilizing either

11    their bodies or a marked police unit would place diversions in

12    to -- so that traffic could not flow past their body or past

13    the police car in a specific direction and deter it into

14    another direction, so that I can proceed with the escort

15    quicker through the tunnel.

16    Q.  Where would you be with respect to the escort while going

17    through the tunnel?

18         MS. NECHELES:  Objection, your Honor.  I object to

19    this whole line.

20         THE COURT:  Thank you.

21         You can answer the question.

22         THE WITNESS:  I would be utilizing my police car and

23    in front of the escort that was following me.

24    Q.  Thank you.

25         Now, other than what you have put down on this form,

1  Lieutenant, do you have any independent recollection of this

2  particular escort?

3  A.  No.

4  Q.  Do you have yourself any firsthand knowledge of how the

5  Port Authority police came to assist with this particular

6  escort?

7  A.  No.

8  Q.  Do you have any independent knowledge of whether the person

9  inside was, in fact, an Israeli diplomat?

10  A.  No.

11  Q.  Did you ever actually interact with the subjects -- that

12  is, the persons in the escorted vehicle -- on this occasion?

13  A.  No.

14  Q.  Did you ever meet, to your knowledge, an individual named

15  Jeremy Reichberg?

16  A.  No.

17  Q.  Jona Rechnitz?

18  A.  No.

19  Q.  Lev Leviev?

20  A.  No.

21  Q.  Rotem Rosen?

22  A.  No.

23  Q.  After you waived off investigators -- I'm sorry.  After you

24  were waved off by the NYPD, was it customary for you to take

25  any sort of follow-up measures with respect to the escort other

1    than filling out the paperwork?

2    A.   Just to tell the units at the Lincoln Tunnel that I

3    completed my escort over the radio and inform my supervisors.

4    Other than that, no.

5    Q.   Thank you.

6            MR. BELL:  One moment, please?

7            (Pause)

8            MR. BELL:  No further questions for Lieutenant

9    DeMartino.  Thank you.

10           THE COURT:  Thank you.

11           MS. NECHELES:  May I?

12           THE COURT:  Please do.  Proceed.

13           MS. NECHELES:   Thank you.

14   CROSS-EXAMINATION

15   BY MS. NECHELES:

16   Q.   Lieutenant DeMartino, you testified that -- can you explain

17   an escort again?

18   A.   Sure.

19           Generally, when you receive orders to get an escort or

20   to perform an escort -- we're talking about vehicle escorts,

21   right?

22   Q.   Yes, sir.

23   A.   -- you -- one of the superior officers would give me the

24   order, and I would arrive at point A and wait at that point

25   until I received my pickup of the escort.  And then I would

1    take that escort and proceed with that escort in a safely, but

2    effectively -- an effective manner through the Lincoln Tunnel,

3    and I would drop it off at a designated point on the other

4    side, whether it be New York or New Jersey.

5    Q.  Okay.  When you say receive a pickup, that doesn't mean

6    someone gets in your car, right?

7    A.  No.

8    Q.  An escort is when there's one police car in front and

9    someone else -- another car following behind; is that correct?

10   A.  Usually, yes.  There may have been one or two occasions

11   throughout my career where somebody may have gotten in my car.

12   Q.  Okay.  And that, you would also refer to as an escort or

13   just giving someone a ride in a car?

14   A.  For this particular purpose, that would be an escort.

15   Q.  For what particular purpose?

16   A.  To get them from point A to point B.  But we're talking

17   about an official capacity, like a governor or, you know,

18   someone with some type of -- someone usually with some type of

19   official business.

20   Q.  Okay.  So when you would pick up someone sometimes, there

21   are times when you would pick up someone to do this, right?

22   A.  Yes.

23   Q.  When you looked at the numbers before on Government Exhibit

24   917, about how many times had you done this that year?

25              You said that was with the form set, correct?

IBJKGRA6                         DeMartino – Cross

1              MR. BELL:  Objection.

2              THE COURT:  Thank you.

3              Counsel, can you rephrase?

4              MS. NECHELES:  Can we show Government Exhibit 917?

5     BY MS. NECHELES:

6     Q.   The numbers up there on the top, the VIP 10 and the Escort

7     11, those numbers might not be accurate, right?

8              MR. BELL:  Objection.

9              THE COURT:  Thank you.

10             You can answer the question.

11             THE WITNESS:  Most likely, those numbers are not

12    accurate.

13    Q.   Because you didn't always fill out the paperwork, that's

14    what you testified, right?

15    A.   Well, not just myself.  You know, we have lots of other

16    work to do, so even though we're supposed to fill out this

17    paperwork, we don't necessarily always get to the escort form.

18    Other things may take precedence over this even though we're

19    supposed to do it.

20    Q.   And, in fact, there were many, many escorts that you were

21    giving, right?

22    A.   Depending on the time of year, there are a good amount of

23    escorts.

24    Q.   It's a frequent occurrence, right, to give escorts,

25    correct?

IBJKGRA6                     DeMartino - Cross

1    A.  I don't know if -- it wouldn't -- I don't know the

2    definition of your frequency would be.

3    Q.  Well, do you recall being interviewed about this escort and

4    telling the person who interviewed you that you've given

5    hundreds of escorts in your career?

6    A.  I have.

7    Q.  And many hundreds, right?

8    A.  Probably at least 200, I would say, if not more.

9    Q.  Am I correct that you testified you used to be highway

10   patrol?

11   A.  I used to be a state trooper.

12   Q.  A state trooper?

13   A.  Yes.

14   Q.  You gave escorts, also, as a state trooper; am I correct?

15   A.  No, I don't believe I ever did one escort as a New York

16   State trooper.

17   Q.  It's always been through the Port Authority police?

18   A.  Yes, ma'am.

19   Q.  And one of the things you give escorts, I believe you said

20   on direct, is to expedite ambulances; is that correct?

21   A.  Well, that's one other type of escort, but there's many

22   different escorts that we give.

23   Q.  Am I also correct that sometimes you would give an escort

24   when a body needs to get to the airport quickly, correct?

25            MR. BELL:  Objection.

1                    THE COURT:  Thank you.

2                    You can answer the question.

3                    THE WITNESS:  What do you mean, a body?

4     BY MS. NECHELES:

5     Q.  Well, the body is being transported for a funeral and needs

6     to get to the airport quickly?

7                    MR. BELL:  Objection.

8                    THE COURT:  Thank you.

9                    You can answer the question.

10                    THE WITNESS:  The question is would I -- wait.  Can

11    you repeat?

12    Q.  Are escorts given for that as well, when a body needs to

13    get to the airport, do you know?  If you don't know --

14    A.  I have escorted soldiers, yes, that came back home that

15    were deceased.

16    Q.  And sometimes prominent people who are not diplomats or

17    otherwise also get escorts?

18    A.  Well, what do you mean by "prominent people"?

19    Q.  Well, is it your understanding that sometimes, for example,

20    if someone like the Pope came to town, he would get an escort?

21    A.  If I was given the order, then, yes.

22    Q.  Okay.  And orders are given for lots of different reasons

23    like that, right?

24    A.  Yes.

25                    MR. BELL:  Objection.

IBJKGRA6                       DeMartino - Cross

1          THE COURT:  Thank you.  I accept the answer.

2   BY MS. NECHELES:

3   Q.  It's a wide variety of reasons that people get escorts for,

4   correct?

5   A.  There are many different types of escorts, yes.

6   Q.  Now, you have no recollection of this incident, right?

7   A.  No.

8   Q.  When you testified before about -- you were asked some

9   questions about what would happen sometimes.  That had

10  nothing -- your answers had nothing to do with this incident,

11  right?

12  A.  I couldn't honestly answer that.  I don't know.  It could

13  have possibly.  The escorts are performed in such a manner,

14  that there's really not too much leeway in them.  I mean, I'm

15  going through a tunnel, and I usually drop them off in

16  approximately the same spot and pick them up in approximately

17  the same spot.  So, reasonably, I could assume that, yes, but

18  to be definite, no.

19  Q.  Okay.  But when you were asked questions about would

20  traffic be diverted one way or another, you have no

21  recollection of any traffic being diverted here, right?

22  A.  I could not say.

23  Q.  Meaning you have no recollection?

24  A.  Yeah, no recollection.

25  Q.  And, in fact, you were interviewed about this in 2016,

1    right?

2    A.  I was interviewed on numerous occasions.

3    Q.  Okay.  The first time, do you recall that that was around

4    2016?

5    A.  Possibly, yes.

6    Q.  You were interviewed by the Port Authority investigators?

7    A.  I believe it was the Port Authority and the FBI.

8    Q.  And, sir, am I correct that at that time, you said that

9    even in 2016, you had no recollection of this, correct?

10   A.  Yeah, it would be impossible for me to remember every

11   escort that I've accomplished or performed.

12   Q.  Am I correct that your general procedure -- well, in the

13   first place, the tunnel would never be shut down for an escort,

14   right?

15   A.  The tunnel is never shut.  I think in all my years there,

16   we might have shut it on two occasions, and that's for, like,

17   the President of The United States, and he very rarely travels

18   through the tunnel.

19   Q.  The only times it gets shut down is for the President of

20   The United States, right?

21   A.  Yeah.  Every other time, we like to stop traffic, but we

22   don't really hold traffic, not like we would for the president,

23   from different roadways and cause some type of delay.

24   Q.  When you say you like to stop traffic, am I correct that

25   what you mean is traffic is delayed while the escort slips in

1    in front of other traffic?

2    A.  It could be.  It could be like that, yes.

3    Q.  You don't even shut down a lane, right, in the tunnel?

4    A.  It depends what you mean by "shut down."

5    Q.  Well, you don't, like, completely clear a lane and make

6    sure that no other traffic is going through it, do you?

7    A.  We usually don't shut down a lane in the sense of letting

8    all the traffic bleed out through the tunnel, but we'll usually

9    hold it on one side and let traffic bleed about halfway

10   through, and then once it bleeds halfway through, and the

11   escort gets in front of the traffic that's being held, by the

12   time the escort travels at a moderate speed through the tunnel,

13   usually the other traffic is still proceeding in that

14   direction, and then the other traffic that's being held is

15   released.

16   Q.  So am I correct that the traffic is held for a couple of

17   minutes, so that the escort can go in and get ahead of the

18   other traffic?

19   A.  Traffic is definitely held, yes.

20   Q.  For a couple of minutes, correct, sir?

21   A.  Well, it depends on the time of the escort.  Every escort

22   would be different.

23   Q.  Okay.  Do you recall saying to investigators that the

24   tunnel would never be completely shut down during the process,

25   and that traffic would only be held briefly in order to create

1    some distance between the vehicle being escorted and the

2    traveling public?

3    A.  Yes.

4    Q.  Do you recall?

5    A.  Yes.

6    Q.  And that is, in fact, what the practice was back then,

7    right?

8    A.  The practice is the same today.

9    Q.  And, sir, there are logs that are kept of the traffic and

10   of unusual incidents in the Lincoln Tunnel, right?

11   A.  Logs of traffic?

12   Q.  Well, the Lincoln Tunnel tour manager logs, correct?

13   A.  I'm not a tour manager, so I don't know.

14   Q.  Do you know whether there are logs kept of all unusual

15   activities there?

16   A.  Well, you're talking about the civilian counterparts that

17   work at the Lincoln Tunnel, and I don't know what their

18   procedures are or what they do.  I just know the police aspect.

19   Q.  When you would do this escort, there would be only one lane

20   of traffic utilized, right?

21   A.  No.

22   Q.  For the escort?

23   A.  Yes.  Just because I wrote near lane on here, that's the

24   lane that I would use mostly during the escort, but that

25   doesn't mean that I didn't have to go into the far lane and

IBJKGRA6                    DeMartino - Cross

1    back into the near.  It just means that I mainly used the near

2    in this particular escort.

3    Q.  Well, do you recall telling -- when you were interviewed in

4    2016, do you recall telling investigators that when escorts

5    were provided, only one traffic lane would be utilized to

6    conduct the escort?

7    A.  I don't remember saying that, but if I did say that, that's

8    inaccurate.

9    Q.  That would have been inaccurate?

10   A.  That only one lane is used?

11   Q.  Yes.

12   A.  No.  Because what if I needed to switch lanes?

13   Q.  Oh, if you needed to switch lanes, you would switch lanes,

14   right?

15   A.  Yes.

16   Q.  But the traffic would not have been held in that other

17   lane, right?

18   A.  Well --

19           MR. BELL:  Objection, your Honor.

20           THE COURT:  Thank you.

21           Can you please rephrase the question, counsel?

22   BY MS. NECHELES:

23   Q.  Is that correct, the traffic would not have been held in

24   the other lane?

25           MR. BELL:  Objection.

1          THE COURT:  Sustained.

2     BY MS. NECHELES:

3     Q.  Well, sir, traffic maybe would have been held for a few

4     minutes briefly, you said, in one lane to let you go in?

5          MR. BELL:  Objection, your Honor.

6          THE COURT:  Thank you.

7     Q.  Well, was that your testimony before?

8          MR. BELL:  Objection, your Honor.

9          THE COURT:  Thank you.

10         Sustained.

11    Q.  Am I correct that you previously said that traffic would

12    only be held briefly in order to create some distance between

13    the vehicle being escorted and the traffic -- traveling public

14    when you would come into the tunnel; is that correct?

15    A.  Yes, traffic is held at the mouth -- at the entrance to the

16    tunnel.

17    Q.  But, in fact, all of this would have taken a few minutes,

18    right?

19    A.  Well, every escort is different.  You know, different times

20    of day, different times of year.  You know, if UNGA is in town

21    or if the president is in town, like I can't answer that

22    question.

23    Q.  You just testified a minute ago that you got through the

24    tunnel relatively quickly, right?

25    A.  For this particular escort -- for this time of day and this

IBJKGRA6                      DeMartino - Cross

1   particular escort we're talking about, yes.

2   Q.  Okay.  It was 13 minutes, right?

3   A.  Well, it's not 13 minutes through the tunnel.  It's 13

4   minutes from Route 3 in Secaucus, New Jersey, to 42nd Street

5   and Dyer in New York City.  Thirteen minutes for the whole

6   thing.

7   Q.  I see.  So for that whole way, it only took you 13 minutes,

8   right?

9   A.  According to what I wrote here, yes.  The times could be a

10  little off.

11  Q.  And traffic was not held anywhere else other than in the

12  tunnel, right?

13  A.  Yeah, I don't have the capacity to do that.

14  Q.  So it appears, from that timing, that traffic was

15  relatively light that day, wasn't it?

16          MR. BELL:  Objection.

17          THE COURT:  Thank you.

18          Can you rephrase the question, please, counsel?

19  BY MS. NECHELES:

20  Q.  Okay.  Well, sir, looking at that and based on your

21  experience, it appears that traffic was relatively light when

22  you got through -- from the airport to Manhattan relatively

23  quickly, right?

24  A.  Well, I didn't come from the airport.

25  Q.  Where did you come from?

1    A.   I came from Route 3 westbound in Secaucus, New Jersey,

2    which is probably most likely the Shell station.

3    Q.   Okay.

4    A.   And for that time of day, 410 hours, first, I would need to

5    know what was the day of the week 3/11 was in 2008.  Is that a

6    weekend or was that a weekday?

7    Q.   It was a weekday.

8    A.   All right.  If that was a weekday, then most likely traffic

9    is going to build.  You know, the usual traffic patterns for

10   this time -- this time of year on that day would probably build

11   no further out than a mile.  But I don't have to go in on that

12   road; I utilize local roads, and then the main area in which

13   the congestion is going to take place for that time of day, on

14   a weekday, is when you have all of 495 and all the traffic from

15   Hoboken, and Jersey City, and Weehawken all converging because

16   it's approximately like 18 lanes of traffic going into two.  I

17   circumvent all of that, and I go right to the front of the

18   tunnel.  That's where it's held.

19   Q.   That's right at the tunnel where all that traffic occurs,

20   right?

21   A.   Yes, ma'am.

22   Q.   And you can see from this form how you came, right?  You

23   came on Route 3?

24   A.   Yes.

25   Q.   So what you're saying is, you go around the traffic that's

1   lined up in front of the tunnel, right?

2   A.   Correct.

3   Q.   So it's not that all that traffic is being held, there is a

4   traffic jam usually anyway to get into the tunnel, right?

5            MR. BELL:   Objection, your Honor.

6            THE COURT:   Thank you.

7            Sustained.

8   BY MS. NECHELES:

9   Q.   Well, based on your experience, when you are saying -- when

10  you just testified about all those lanes merging into two

11  lanes, that's what occurs routinely every day, right?

12  A.   That is a routine every day.

13  Q.   And so when you are escorting someone, you go around all

14  those people, right?

15  A.   I do.

16  Q.   To the front of the line, right?

17  A.   I do.

18  Q.   And then that one lane is held up for a little while while

19  you go in, right?

20  A.   Both lanes are held.

21  Q.   Okay.   Both lanes are held for a little while while you go

22  in, right?

23  A.   Yeah.   It depends what you mean by a little while, but,

24  yes, they're both held.

25  Q.   To the best of your recollection, all that occurred here

1   that day, right?

2              MR. BELL:  Objection.

3   Q.  To the best of your recollection?

4              THE COURT:  Thank you.

5              MR. BELL:  Objection.  The witness has already

6   testified as to the limits of that.

7              THE COURT:  Thank you.

8              Counsel, can you rephrase, please?

9   BY MS. NECHELES:

10  Q.  Well, sir, do you recall, when you were interviewed, saying

11  that there was a procedure that was used for escorts through

12  the Lincoln Tunnel, you've been involved in hundreds of

13  escorts, and to the best of your recollection, this was exactly

14  the same as all the hundreds of times that you have done this?

15             MR. BELL:  Objection.

16             THE COURT:  Thank you.

17             You can answer the question.

18             THE WITNESS:  The only thing I can say is there was

19  nothing unusual to report.  So if there was something unusual

20  to report, I would have annotated it there, or at least not

21  written that line.  If I wrote that line, nothing unusual to

22  report, then nothing stood out to me on this particular escort

23  that was -- that unreasonably happened.

24  Q.  When you say you met this person -- you said probably at a

25  Shell station; is that correct?

IBJKGRA6                    DeMartino - Cross

A.   That's where the pickup of the escort would start.  The

commencement of the escort would start there, but I didn't

physically pick up a person.

Q.   Right, correct.

          And, sir, am I correct that there was -- the only

other authority that did an escort was the NYPD, right?

A.   Yes.  For this escort, yes.

Q.   So there was no escort up till the time when you met the

person?

A.   I don't understand that question.

Q.   Well, there was no escort in New Jersey then, right?  The

only escort was in New York?

          MR. BELL:  Objection, your Honor.

          THE COURT:  Thank you.

          Can you ask the question differently?

          MS. NECHELES:  Okay.

BY MS. NECHELES:

Q.   Well, looking at your form, when you say all agencies

involved, it's only Port Authority police and NYPD, right?

A.   For this escort, yes.

Q.   And the Port Authority police was you, right?

A.   Me and other people that were on the tour, yes.

Q.   Other people that were on the tour, meaning other people

who were -- who assigned this to you?

A.   Supervisors as well as officers on foot or in other cars

1    that I needed assistance to help me get where I needed to

2    navigate to.

3    Q.  You mean people you were talking to on the radio?  Is that

4    what you're referring to?

5    A.  Yes, my colleagues.

6    Q.  Okay.  And the Port Authority police just deal with the

7    tunnel, right?

8              MR. BELL:  Objection, your Honor.

9    Q.  Well, sir, looking at this report, am I correct that what

10   it indicates is that there was no New Jersey State Police

11   giving an escort here before you picked up?

12             MR. BELL:  Objection.

13             THE COURT:  Thank you.

14             You can answer the question.

15             THE WITNESS:  I don't know if New Jersey State Police

16   had an escort at this day at the tunnel prior to my escort.  I

17   can't answer that.

18   BY MS. NECHELES:

19   Q.  Okay.  But you didn't indicate it on your form, right?

20   That's what I'm asking you.

21   A.  Why would I?  It had nothing to do with my escort.

22   Q.  Okay.  Well, you indicate -- when it says "All agencies

23   involved," you indicated NYPD and you, right?

24   A.  Because those are the two agencies that were present for my

25   escort.  But you asked me if there was another escort that took

1    place with the New Jersey State Police on this day.

2    Q.  Up to meet you.

3    A.  Oh, for this particular escort?

4    Q.  Exactly.

5    A.  No.  The New Jersey State Police was not involved in this

6    escort.

7    Q.  So there was no escort bringing whoever you picked up to

8    you in New Jersey, right?

9    A.  No, there was nobody, according to this sheet, that took

10   the escort to me.

11            MS. NECHELES:  Thank you.  I have no further

12   questions.

13            THE COURT:  Thank you.

14            Counsel for Mr. Grant?

15            MR. MERINGOLO:  No questions.

16            THE COURT:  Thank you.

17            Counsel for the United States?

18            MR. BELL:  Briefly.

19            THE COURT:  Please proceed.

20   REDIRECT EXAMINATION

21   BY MR. BELL:

22   Q.  Lieutenant, you were asked a couple of questions concerning

23   how you would get from the Shell station to the area heading

24   into the Lincoln Tunnel on days when there might be more

25   traffic.

1          In addition to radioing and effecting the traffic in

2    that way, do you, within your car, have ways of moving traffic?

3    A.  I do.

4    Q.  What are those?

5    A.  I have the ability to use my lights and sirens.  I have

6    directionals that come up on the rear side of the car.  I also

7    could use my air horn.  And I am able to use verbal commands,

8    and sometimes I can use physical commands with people with my

9    hand, depending on how close they are.

10   Q.  Would using any of those means of expediting traffic have

11   been unusual, such that it would have gotten in the way of your

12   writing nothing unusual to report?

13   A.  No.

14   Q.  Finally, you mentioned that the Shell station by Route 3

15   was usually your pickup spot for these escorts.  Was that true

16   of both -- well, in what state would you usually meet the

17   escorted vehicles when you came to the Shell stop?

18   A.  In what state?

19   Q.  Not what state like New Jersey.  Where would they usually

20   be?  What would they be doing, the escorted vehicle?

21   A.  Well, remembering that every escort is different, what the

22   usual occurrence is is that someone is traveling -- if the

23   escort is coming from Route 3, which is the Shell station, that

24   means the escort is usually coming from West Jersey or North

25   Jersey and usually from Teterboro Airport.  If the escort is

 1    coming from that location, we usually wait for it at the Shell

 2    station in the shoulder on the south side of Route 3, and when

 3    I see the escort coming from my rearview mirror or my side

 4    mirror, what will happen is they come over the bridge by Giants

 5    Stadium, which is the Meadowlands bridge, it's over the

 6    Hackensack River, and they will usually flash their lights or

 7    have some type of emergency lights in their vehicle.  If they

 8    flip them on and off, then I usually know that that's my cue to

 9    start heading out, and I will meet that escort, or those

10    vehicles, or one vehicle in the left-hand lane, and when they

11    catch up to me -- and I'll go slow, and when they catch up to

12    me, then I'll pick up the escort at that particular point and

13    commence into New York City.

14    Q.  And you don't have any indication from this form of whether

15    that procedure was what took place on this day or not, do you?

16    A.  No, I don't.  But if I picked it up at Route 3 westbound, I

17    would say 90 percent of the time, that's what happens.

18              MR. BELL:  Thank you.  I have nothing further.

19              THE COURT:  Thank you.

20              Counsel for Mr. Reichberg?

21              MS. NECHELES:  No, nothing further.

22              MR. MERINGOLO:  Nothing.

23              THE COURT:  Good.  Thank you very much.

24              Lieutenant DeMartino, thank you very much for your

25    testimony.  You can step down.

IBJKGRA6

1            THE WITNESS:  Yes, sir.

2            (Witness excused)

3            THE COURT:  Counsel for the United States.

4            MR. BELL:  Your Honor, at this time, we have some

5    additional recordings to play.

6            THE COURT:  Thank you.

7            You can proceed.

8            MR. BELL:  Mr. Hamilton, can we take 917 down, please.

9            At this time, with the Court's permission, I ask the

10   jury to take up, once again, their black binders.  I would

11   direct their attention to -- why don't we do this this way and

12   just offer a couple of calls first, and we'll do this a step or

13   two at a time.

14           Your Honor, the government offers Government Exhibits

15   W-1712 and 1836, I believe without objection.

16           THE COURT:  Thank you.

17           Counsel?

18           MR. MERINGOLO:  No objection.

19           MS. NECHELES:  No objection.

20           THE COURT:  I'm accepting W-1712 and 1836 into

21   evidence.

22           (Government's Exhibits W-1712 and 1836 received in

23   evidence)

24           MR. BELL:  With that, we'd like to direct the members

25   of the jury to GX W-01712-T.  That corresponds to GX W-01712,

IBJKGRA6

1    just admitted.  It is a January 23rd, 2015, call beginning at

2    3:03 p.m. between Jeremy Reichberg, Mendy Chudaitov,

3    C-h-u-d-a-i-t-o-v, and an unidentified female designated within

4    the transcript as UF.  And we'd like to go ahead and play that

5    with the Court's permission.

6           THE COURT:  Thank you.

7           Please do.

8           MR. BELL:  Mr. Hamilton, please.

9           (Audio playback)

10          MR. BELL:  I'm sorry, can you pause that for one

11   moment, Mr. Hamilton.  I want to make sure we're all here.

12          Your Honor, can I assist the jurors finding --

13          THE COURT:  Thank you.  Mr. Daniels will.

14          1712-T.

15          MR. BELL:  Thank you very much.

16          THE COURT:  Thank you.

17          Counsel, you can proceed.

18          MR. BELL:  Can we start again, your Honor?

19          THE COURT:  Please do.

20          (Audio playback)

21          MR. BELL:  Thank you, your Honor.

22          Now, with the Court's permission, we'll have

23   Mr. Hamilton play W-01836.  1836 is a January 25, 2015, call

24   commencing at 5:53 p.m. between Mr. Reichberg and

25   Mr. Chudaitov.

IBJKGRA6

1        Mr. Hamilton, please go ahead.

2            (Audio playback)

3        MR. BELL:  Thank you, your Honor.

4        The government offers Government Exhibits W-02004 and

5    W-02444 pursuant to the same stipulation before.

6        THE COURT:  Thank you.

7        Counsel for Defendant Reichberg?

8        MS. NECHELES:  No objection.

9        THE COURT:  Counsel for Defendant Grant?

10       MR. MERINGOLO:  No objection.

11       THE COURT:  Thank you.

12       I'm accepting into evidence Government Exhibits

13   W-02004 and W-02444 into evidence.

14           (Government's Exhibits W-02004 and W-02444 received in

15   evidence)

16       MR. BELL:  I'd like to, with the Court's permission,

17   direct the jury's attention two tabs over, to W-02004-T, which

18   correlates with W-02004, which was just admitted.  It's a

19   January 26, 2015 call commencing at 3:35 p.m. between

20   Mr. Reichberg and Mr. Grant.

21       Assuming that everybody's there, I'd like to have

22   Mr. Hamilton play that with the Court's permission.

23       THE COURT:  Thank you.  Please proceed.

24           (Audio playback)

25           (Continued on next page)

IBJTGRA7

1          MR. BELL:  So with the Court's permission, I would

2     like to direct the jury three tabs down to 2444.  It

3     corresponds to -- well, 2444 is a January 28, 2015 conversation

4     beginning at 6:02 p.m. between the defendants Mr. Reichberg and

5     Mr. Grant.  And with the Court's permission, when we can be

6     sure the members of the jury have all found the transcript, I

7     would like to have Mr. Hamilton play that.

8          THE COURT:  Thank you.  You can proceed.

9          MR. BELL:  Mr. Hamilton.

10          (Audio recording played)

11          MR. BELL:  Your Honor, the government offers

12     Government Exhibits W02746 and 2750 pursuant to the earlier

13     referenced stipulation.

14          THE COURT:  Thank you.  Counsel?

15          MS. NECHELES:  No objection.

16          THE COURT:  Counsel?

17          MR. MERINGOLO:  No objection.

18          THE COURT:  Thank you.  I'm accepting W02746 and

19     W02750 into evidence.

20          (Government's Exhibits W02746 and W02750 received in

21     evidence)

22          MR. BELL:  Your Honor, with your permission, I would

23     like to direct the jury's attention to the next tab, WO2746T,

24     which corresponds to 2746, just admitted, it's a January 30

25     call, 2015, which begins at 9:42 a.m. between the defendants,

IBJTGRA7

1    Mr. Grant and Mr. Reichberg, and I would like to ask

2    Mr. Hamilton to play that.

3              (Audio recording played)

4              MR. BELL:  Your Honor, with the Court's permission, I

5    would like to direct the members of the jury to the next tab,

6    W02750T that corresponds with government's W02750, which was

7    just admitted, it's a January 30, 2015 call beginning at

8    9:49 a.m. between the defendants.

9              With the Court's permission, we would like to publish

10   that now.  Thank you, Mr. Hamilton.

11             (Audio recording played)

12             MR. BELL:  The government now offers Government

13   Exhibit W03156 pursuant to same stipulation mentioned.

14             THE COURT:  Thank you.  Counsel for defendant

15   Reichberg?

16             MS. NECHELES:  No objection, your Honor.

17             MR. MERINGOLO:  No objection.

18             THE COURT:  Thank you.  I'm accepting Exhibit W03156

19   into evidence.

20             (Government's Exhibit W03156 received in evidence).

21             MR. BELL:  With the Court's permission, I would like

22   to direct the jury's attention to 3156T, which corresponds to

23   3156, just admitted.  It's a February 3rd, 2015 call beginning

24   at 1:33 p.m.  It is between Jeremy Reichberg and Boaz Gazit.

25             And Mr. Hamilton, could you go ahead and play that,

IBJTGRA7

1    please.

2              (Audio recording played)

3              MR. BELL:  Your Honor, the government offers

4    Government Exhibits W05012 and W05585 pursuant to the same

5    stipulation mentioned previously.

6              THE COURT:  Thank you.  Counsel?

7              MS. NECHELES:  No objection.

8              MR. MERINGOLO:  No objection.

9              THE COURT:  Thank you.  I'm accepting Exhibit W05012

10   and W05585 into evidence.

11             (Government's Exhibits W05012 and W05585 received in

12   evidence)

13             THE COURT:  You can proceed.

14             MR. BELL:  Your Honor, I would like to direct the jury

15   to tab W05012T.  5012 is a March 2nd, 2015 telephone

16   conversation, 11:19 a.m. when it begins, and it's between

17   Jeremy Reichberg and Michael "Mike" Milici at 917-968-7933.

18             Looks like everybody found it.  With the Court's

19   permission, I would like to have Mr. Hamilton play it.

20             You can go ahead, sir.

21             (Audio recording played)

22             MR. BELL:  At this point, your Honor, with the Court's

23   permission, I would like to direct members of the jury to tab

24   GXW05585T, 5585.  That correspond to Government Exhibit W05585,

25   which was just admitted, it is a March 4, 2015 call beginning

IBJTGRA7

1     at 5:36 p.m. between Mr. Reichberg and Michael "Mike" Milici at

2     646-208-3534.  And assuming that everybody has found tab 5585T,

3     I would like to have Mr. Hamilton play that call.

4               Go ahead, sir.

5               (Audio recording played)

6               MR. BELL:  Your Honor, could we confer with counsel

7     very briefly?

8               THE COURT:  Please do.

9               (Pause)

10              MR. BELL:  Your Honor, at this time the government

11    would offer Government Exhibit W01813.

12              THE COURT:  Thank you.  Counsel, do you have a sense

13    of how long this tape is?  I would like to find a natural

14    breaking point.

15              MR. BELL:  I think after this call would be a natural

16    breaking point, and I don't think it's very long.

17              THE COURT:  Good.  Counsel for Mr. Reichberg?

18              MS. NECHELES:  No objection, your Honor.

19              THE COURT:  Thank you.

20              MR. MERINGOLO:  No objection.

21              THE COURT:  Thank you.  I'm accepting W01813.

22              (Government's Exhibit 1813 received in evidence)

23              THE COURT:  You can proceed.

24              MR. BELL:  So W01813T is the appropriate transcript,

25    it's a January 25th, 2015 call beginning at 4:34 p.m.  The

1   listed participants are Mr. Reichberg and a police officer

2   James, last name unknown, at 718-222-7330.

3           And with the Court's permission, once everybody is at

4   the transcript, I would like to go ahead and play that call.

5           THE COURT:  Thank you.  You can proceed.

6           MR. BELL:  Mr. Hamilton.

7           (Audio recording played).

8           MR. BELL:  Your Honor, this represents a logical

9   stopping point.

10          THE COURT:  Good.  Thank you very much.

11          Ladies and gentlemen, we'll take our break for the

12  day.  During this overnight break, please don't discuss the

13  case amongst yourselves, don't communicate about it with anyone

14  else, and don't do any research about the case or anything

15  involved in it.  If you see anything in the press, please avoid

16  it.  With that, I will see you tomorrow morning.  Please be

17  here at 9:00.

18          (Jury not present)

19          THE COURT:  Counsel, and ladies and gentlemen, you can

20  be seated.

21          So first, thank you, counsel, for your work today.  We

22  did I think pretty well, with the outside example of the one

23  document that took up some time outside of the presence of the

24  jury.  To the extent that we can surface those issues early in

25  the day or during breaks, it's appreciated by me and makes the

IBJTGRA7

1    process more seamless for the Court and for the jury.  But I

2    think otherwise we were much more efficient than we have been

3    or prior days, so thank you for your work to prepare for today

4    in that regard.

5              Counsel for the United States, let me ask you, do you

6    have any additional information about the file that was the

7    subject of the outreach by an anonymous benefactor to the

8    defendants or can you provide me with an update on that, or is

9    that something that we should take up subsequently?

10             MS. RAVENER:  Give us one moment?

11             THE COURT:  Please.

12             (Pause)

13             MS. RAVENER:  Your Honor, a couple of responses.

14   First of all, so the record is clear, we did provide the

15   defendants with files that were located in Mr. Villanueva's

16   locker.  Separately, this is not one of those files, according

17   to our records.

18             This file, based on its markings, we believe appears

19   to have been produced as confidential discovery in a separate

20   case against Paul Dean, Robert Espinel and Gaetano Valastro.

21   And so based on the markings, we understand that it appears to

22   have come from a confidential discovery production made to

23   those defendants in their case.

24             THE COURT:  Thank you.  Just to complete the circle,

25   confidential discovery production by the United States, is that

1    right?

2              MS. RAVENER:  Correct, your Honor, in a case pending

3    before Judge Ramos pursuant to a protective order put in place

4    by Judge Ramos.

5              THE COURT:  Thank you.  So counsel for the defendants,

6    I would like to hear your views on this.

7              MR. MERINGOLO:  Judge, that's very concerning.

8              THE COURT:  Please.

9              MR. MERINGOLO:  It's a related case.  Paul Dean has

10   been testified about.  Mr. Villanueva was in his office.

11   Mr. Ochetal was in his office.  This is Brady, exculpatory

12   material, 3500 material.  It's in the government's office.  I

13   don't know if any of these prosecutors were on that case, but

14   if they're going to prepare to bring a licensing division --

15   two people from licensing to testify against Mr. Grant and

16   Mr. Reichberg, we should have been provided this discovery.

17             THE COURT:  Thank you.  I don't know to what extent

18   this would properly constitute 3500 materials.  At the same

19   time, I understand the defendant's question regarding whether

20   and to what extent these might be exculpatory materials.  I

21   don't have a comprehensive view on that question at this point.

22   It's one on which I will solicit the views of the parties.

23             Counsel for Mr. Reichberg, what's your view?

24             MS. NECHELES:  Your Honor, typically there's another

25   piece of paper that goes with these files which shows who

1    prepared the -- who was the intake officer.  So the question is

2    where is that paper, does that paper exist, and was Mr. Richard

3    Ochetal the person who prepared this?

4        Because if he was, then clearly we should have gotten

5    it and we should have been able to cross-examine, because this

6    is the very day that Mr. Reichberg's fingerprints are taken,

7    and Mr. Ochetal was taking someone else's fingerprints that

8    same day and they come back in two days.  And there's all this

9    testimony that he's expediting Mr. Reichberg's and it doesn't

10   come back for a month, well, I think that that would have been

11   relevant information.

12       If their witness was the person who was handling this

13   file and is coming in to testify about files that he's working

14   on and things that's doing wrong, and they're the one bringing

15   in all the Giglio stuff about all the bribes and things that

16   he's doing things improper on, I would have thought that we

17   should have gotten that as part of the discovery or part of the

18   Brady.  It's the files that their witness was handling -- at

19   least the ones that he's handling at the same time he's

20   expediting the fingerprints.  So I would ask that the

21   government look at and let us know about if they have that

22   other piece of paper.

23       THE COURT:  Thank you.

24       Counsel for the United States?

25       MS. NECHELES:  And I believe Ms. Ravener was the

1    prosecutor on that case.

2            MS. RAVENER:  Let me address that briefly, your Honor.

3            THE COURT:  Please.

4            MS. RAVENER:  I did not bring the charges in the Dean

5    and Espinel case.  I have inherited the matter since then and

6    have been managing it in coordination with my colleagues for

7    the past couple of months.  I did not handle any discovery.

8    I'm not familiar with the discovery independent of our review

9    right now.

10           To the point that's raised here, I don't see any basis

11   for defense counsel's position with respect to this record.  We

12   are willing to take a look and see if there's any other related

13   records around this in the manner it was produced, but standing

14   here today, I have no such information, as requested by defense

15   counsel, about this document.

16           And to be clear, the notation on it refers to a

17   different license division officer, it has the name Barbario on

18   it, and that is the name of another member of the license

19   division who was working there at the time who was not

20   Mr. Ochetal and Mr. Villanueva.

21           Your Honor, if I could briefly address the relevance

22   of this alleged document.

23           THE COURT:  Please do.  Actually let me pause you,

24   because I do need to end today's hearing more or less on time.

25   Unfortunately I have a sentencing coming up shortly.

1              I think it would be valuable for the United States to

2     respond to the basic inquiry that Ms. Necheles just posed,

3     namely to extent there's some associated document that will

4     identify the author of or the participant in the preparation of

5     this record, it would be helpful.  I'm not taking the position

6     at this point on whether or not this record is relevant or

7     constitutes Brady material.  To extent that the parties seek to

8     present arguments to the Court on that issue, you have the

9     opportunity to do that.

10             I will simply observe that someone out there thought

11    that this record was pertinent to this case, and therefore

12    reached out to Mr. Meringolo with the record.  What that says,

13    I will not conclude at this point, but presumably some person

14    in the world thought this was a valuable document that the

15    defense should have in this case.

16             So I would appreciate it if the government could take

17    up the inquiry that Ms. Necheles has requested, this is an

18    emergent issue, and having the additional information will be

19    helpful for us to evaluate it, and the extent to which there's

20    actually a problem there.

21             MR. BELL:  Judge, is the inquiry just whether there's

22    another officer listed on that sheet she made reference to or

23    whether it's Mr. Ochetal or someone else involved?

24             THE COURT:  I will expand it to say what my

25    understanding of it is the defense wants to know whether or not

IBJTGRA7

 1    the government's witnesses, Ochetal, potentially also

 2    Villanueva, were involved in the preparation or processing of

 3    the document that was provided to them by their anonymous

 4    whistleblower, using the term extremely broadly.

 5         Counsel for Mr. Reichberg, could I ask, is that an

 6    adequate summary of the request that you had made?

 7         MR. MERINGOLO:  One second, your Honor.

 8         THE COURT:  That's fine.  Please take your time.

 9         (Pause)

10         MS. NECHELES:  I guess, your Honor, the question is --

11    if Mr. Ochetal came in to testify, I would think that we would

12    have gotten the files that he testified about.  He comes in and

13    testifies I was doing things with files, I was getting bribed

14    and I was pushing people through.  I would have thought we

15    would have had those in discovery, whatever files the

16    government has that he was doing something wrong.

17         And I don't know that we got -- I mean it's appearing

18    to me that I don't know that we got that.  Certainly Rule 16

19    should cover something that's material to the defense.  If

20    someone is coming in and testifying to something, and the

21    government is eliciting that testimony on their direct about an

22    extensive -- they had extensive testimony about all the

23    bribery, all the wrongdoing, and that he never did X as quickly

24    as he did it in this case.  I would have expected if the

25    government has in its possession these files that he was

1   supposedly doing stuff on that they would have turned it over

2   to me.

3           And I'm kind of realizing now maybe they didn't, and

4   I'm very surprised by that.  And I would ask that they be

5   directed to do so now so that we can figure out:  Is there

6   stuff there that is problematic?  Maybe there isn't, but there

7   might be.  I would have thought that I would be able to

8   cross-examine on exactly that.

9           And especially because the government was making such

10  a big deal about how Jeremy Reichberg's was done quicker,

11  Jeremy Reichberg's was only in two months.  If they had the

12  other files that supposedly things were done wrong, I should

13  have had them to be able to analyze them and to look at them

14  and compare, and if they had other files from other people in

15  the department.  This was a big scheme that they were talking

16  about.  I would have thought that certainly that would be

17  material to the defense.

18          THE COURT:  Thank you.  I can't take a position on

19  this issue at this point.  I understand the government has done

20  some basic research regarding the provenance of that document

21  during the course of the trial day, which is appreciated.  But

22  I think that the parties and the government need to have the

23  opportunity to consider whether and to what extent that is a

24  document that should have been provided to the defense under

25  16(a)(1)(E) or otherwise.  And I can't take a position on that

IBJTGRA7

1   at this time based on the information that's been presented to

2   me to date.

3          MS. NECHELES:  Your Honor, could we ask that the

4   government also -- get an answer from the government on whether

5   there were other files in their possession that were part of

6   this so-called scheme that we were not provided with, and

7   particularly with respect to Mr. Villanueva and Mr. Ochetal who

8   actually testified here today?

9          THE COURT:  Thank you.  To be clear, my very

10  preliminary understanding of the document at issue here, namely

11  the document that was anonymously provided to Mr. Meringolo, is

12  not necessarily a record reflecting the existence of or the

13  commission of the alleged scheme.  Instead, the point that

14  makes it relevant under the defendant's perspective, as I

15  understand it, is the fact that it reflects that the

16  fingerprints were processed more promptly than the government

17  had been suggesting during their line of inquiry.  So I don't

18  know at this point that this is a document that is part of or

19  is driven by the alleged bribery scheme.

20         That said, counsel for the United States, can you

21  respond to that inquiry now?

22         MS. RAVENER:  Your Honor, we'll look at the records

23  and we'll see if we have any further information we can supply

24  about this particular document.

25         I do want to very --

IBJTGRA7

<table>
<tbody>
<tr><td>1</td><td>THE COURT:  Let me be clear, Ms. Necheles is asking a</td></tr>
</tbody>
</table>

1              THE COURT:  Let me be clear, Ms. Necheles is asking a

2     broader question at this point.  And I appreciate that you're

3     going to look at this particular record.  I understand

4     Ms. Necheles' most recent request to be, however, that the

5     United States check and confirm that there aren't additional

6     records related to the alleged bribery scheme in the licensing

7     bureau that were not delivered to the defendants to the extent

8     they were involved in the alleged conspiracy.

9              MS. RAVENER:  Your Honor, we'll get back to Court

10    about that.  But one moment.

11             Thank you.

12             (Pause)

13             MS. RAVENER:  Your Honor, we'll take a look at this

14    matter.  I just want to note very briefly that the particular

15    document that was placed before Mr. Ochetal and that is at

16    issue here clearly reflects someone who had multiple other gun

17    licenses issued.  And Mr. Ochetal, when questioned about that,

18    said that that would be very different because the prints may

19    come back at a different rate if they're already in the system

20    and have already been requested for further gun licenses.  We

21    will look into this matter and report back to the Court, but I

22    want to be clear about what exactly it is that is going on

23    here.

24             THE COURT:  Thank you.  That's helpful.  I will

25    inquire about this more tomorrow morning.  I think it's

1    reasonable to give the government the chance to find out what

2    is happening here before they comment further.

3              MS. NECHELES:  I know your Honor is in a hurry and I

4    just want to raise an issue.

5              THE COURT:  Please do.

6              MS. NECHELES:  Your Honor, I'm very, very troubled in

7    this case by what has happened here in terms of the government

8    so strenuously arguing and really sort of in ways that I think

9    is incorrect in the law that the defense essentially not be

10   able to put in any document, emails, telephone calls, to show

11   that -- under the argument these are statements of a

12   co-conspirator, and basically arguing there is no exception.

13             And the problem is that at the end of the day the jury

14   is going to know that the wiretaps were up for months and that

15   there's all these emails, and they will think that -- they will

16   wonder why did the defense not put in anything.  And inevitably

17   they will think because the defense had nothing to say, that we

18   had nothing that was helpful to us on the tapes, and that's

19   wrong, or in the emails.

20             It is not correct that the defense doesn't get to

21   defend itself, that we don't get to go through the tapes and

22   say this is part of the same story and it comes in as our

23   exhibit, this is part of an email that was sent which shows

24   that another email is wrong.

25             And your Honor, I am going to submit some briefing on

this, but I think that what is going on and what has started to

happen in this case is really depriving the defendants of a

fair trial because the jury is being presented with a picture,

including by not allowing me to put things in as my defense

exhibits, insisting they go in as government exhibits, really

presenting a picture that the defendants have no defense, that

nothing on the tapes is good for them, nothing in the emails.

That's just not right, your Honor.

            THE COURT:  Thank you.  Let me comment.

            MS. NECHELES:  So we would -- I will brief it, but it

is not right.  What the government keeps saying every time we

stand up is the defendants do not have a right to put these in.

We have a right to put the tapes in to show their version of

the story is not accurate.

            THE COURT:  Thank you.  Let me comment on that briefly

before we take our recess.

            And again, I know the lawyers here all know this, but

I will just repeat it.  I think that the government's arguments

rest on Rule 801, which contain a series of exclusions from the

hearsay rule, and that rule specifically provides a rule with

respect to opposing party's statements.

            So for better or worse, Congress has endorsed a rule

that permits a hearsay exclusion for statements that are

offered against an opposing party that satisfy a number of

requirements.  So the government, I think, is taking the

1    position that records that they can offer against the

2    defendants are permitted under Rule 801(d)(2) because they are

3    an opposing party's statement.  The same provision does not

4    apply to the same party's statement.

5          So that's, I think, the lynchpin of the government's

6    argument.  There may be other bases to permit the introduction

7    of documents or exhibits by the defense, but that distinction

8    and how it is that the rules deal with opposing party, as

9    opposed to same party statements, does exist in the rules, as

10   the parties know, and it does constraint how the Court views

11   evidence that is presented.

12         To the extent that there are other bases for the

13   introduction of documents which might otherwise constitute

14   hearsay, I invite clear briefing on it, and ideally in as

15   specific a manner as possible addressed to the particular

16   document so that I can evaluate it in a timely fashion, ideally

17   outside the presence of the jury.

18         I'm happy to evaluate alternative methods, but I do

19   want to make sure that all of the people here are aware of

20   bifurcation and how it is that the rules treat this hearsay

21   exclusion.

22         MS. NECHELES:  Your Honor, if I could be clear on

23   that, that is an exception to hearsay which allows for certain

24   evidence to come in.  It does not prohibit -- it's not a

25   prohibition.  It allows some things, but it does not prohibit

conduct to come in just because it is called a statement or an

email.

THE COURT:  Thank you, counsel.  I don't think anybody

disagrees with you, but the only point that I request is that,

to the extent that there is a statement that would otherwise be

hearsay, that the defense be prepared to, and that you do,

present to me the basis for its introduction, either as an

exception from the hearsay rule or otherwise, to explain why

it's non-hearsay.

MS. NECHELES:  I understand what you're saying.  I do

note that Rule 47 permits oral motions at trial, because I

could not possibly brief every exhibit.  And particularly when

you get something like this which occurs where you have a

witness and it is sort of surprising that someone would be

making this objection.  We stipulated to what it is, the

foundation for it, it's a document the government intends to

introduce.

This was a very surprising move by the government that

they should get up and argue so vociferously that the defense

cannot put in something that is not really a statement, it's an

email that's being sent forwarding another email, and which the

government keeps saying they will introduce anyway.

I submit, your Honor, the government is trying through

every way to shut down the defense, and they are succeeding at

it.  We are not able to present our defense and to show -- they

IBJTGRA7

are preventing us from putting in transcripts as defense

exhibits, they are preventing us from putting in emails that

really don't say anything, they are just forwarding something,

as some sort of argument that this is a statement of not a

co-conspirator.

Your Honor, we are being -- this kind of thing will

prevent these defendants from getting the kind of defense that

they are entitled to.  If the truth is that this was forwarded

to somebody, the truth is that that is what happened, it can't

possibly be right under the rules that the defense can't show

the truth to the jury.

This is not a case where we're trying to pervert --

THE COURT:  I'm sorry, Ms. Necheles, please feel free

to take this up with someone else.  You're not persuading me at

this point.  I am very happy to -- because if you're addressing

the Court, I think you have a sense of what works with me, if

you're speaking to the gallery, please take it up with the

gallery.

MS. NECHELES:  Your Honor, I'm not.

THE COURT:  Counsel, to the extent that there's an

issue that you would like to bring to my attention, please do.

As you can see, I will take up every issue that you want to

bring to me.  I'm saying that it's important that you raise it

with me so I could make a proper decision and that is in

accordance with the rules.

IBJTGRA7

1          MS. NECHELES:  Right, your Honor.  All I'm saying is I

2     can't brief every exhibit here.  It's just not possible.  So

3     I'm doing the best I can, but I do feel that at this point that

4     I'm concerned about the government really preventing the

5     defense from showing things to the jury that are part of what

6     went on.

7          MR. BELL:  Very briefly, your Honor.

8          THE COURT:  Please.

9          MR. BELL:  One thing that we have done in our

10    communications with the defense when we have -- as we have done

11    consistently, given a couple days notice of witnesses, is give

12    them, too, some sense of our exhibits; maybe not chapter and

13    verse and exhibit number, but some sense of what they can

14    expect coming in.

15         And we asked somewhat consistently for the defense to

16    let us know, to extent that they can, if they foresee issues

17    like the one that came up today, so that if we spot an issue we

18    can raise that issue.  And that way the burden of fronting all

19    these things is not entirely on the defense.  The defense has

20    not taken us up on that invitation at any point that I could

21    think of so far in the trial.  But I will note that if they do,

22    the opportunity is that we can raise these issues as well, as

23    we would have done with what was raised today.

24         I will note further to that -- then I have one more

25    housekeeping question to raise with respect to tomorrow -- that

1    just with respect to I think the record that Ms. Necheles is

2    attempting to create here, the defense has vigorously

3    cross-examined each of our witnesses to this point, we expect

4    that they will do more.  They have the opportunity to put on a

5    case.  I expect that the cross-examination of Mr. Rechnitz,

6    thoroughness-wise if not length-wise, will be one for the

7    books, and we welcome that.  The defense has had every

8    opportunity to brief these issues, as have we.  The defense has

9    had I think a lot of leeway in asking for sidebars and raising

10   issues that should have been raised before.

11          For our part, your Honor, this is not some sort of

12   coordinated campaign for us to prevent the defense from making

13   their case.  We're just trying to, A, make ours, since it is

14   our turn to do so, and B, hold everybody to the same limits of

15   the Federal Rules of Evidence.

16          I think that your Honor is right in suggesting that,

17   to some degree, the defense right now is attempting to play to

18   some combination of the media and the Court of Appeals.  We

19   appreciate your Honor's laser-like focus on the actual issues

20   here.

21          With respect to tomorrow, we noted that we expect to

22   call Mr. Rechnitz tomorrow along with one other relatively

23   short witness who should come earlier in the day.  It would

24   help us -- we also recognize that it's the day before our

25   trial's Thanksgiving break.  Is it your Honor's intention to go

1   right until 3:30?  Because that will help us to plan what we

2   hope to accomplish for the witness.

3          To be clear, your Honor, we would prefer to do exactly

4   that, in line with what our standard practice has been, but we

5   recognize that it is a holiday.

6          THE COURT:  Thank you.  My expectation is that we will

7   go at least up until -- or I should say go up until at least

8   3:00 p.m., and I expect to go as long as 3:30, as late as 3:30.

9   I have a number of conferences later in the afternoon, as I do

10  here, and I'm working with conferences the following day.  So

11  my hope is that we will be able to get as much work done

12  tomorrow as possible.

13         MR. BELL:  Great, your Honor.  We will note on the

14  record now that we haven't gotten -- we put the defense on

15  notice of the timing of Mr. Rechnitz's testimony some days even

16  before the two-day window.  We have not yet been made aware of

17  any issues that were worth flagging ahead of time in order to

18  save time.  To the extent those come, we'll address them

19  expeditiously at night, and hopefully we'll have a productive

20  day tomorrow in the same way that we did today.

21         MS. NECHELES:  Your Honor, to be clear, I don't know

22  what Mr. Rechnitz is going to testify about.  I have no idea.

23  He testified extensively.  I have notebooks.  He has given

24  statements for over 70 interviews.  I don't know what he will

25  testify to, so I cannot raise issues that I don't know about.

IBJTGRA7

The government has not flagged for me anything that they think
might cause concern.

In addition, I cannot outline my crosses for the
government before they happen, because if I do then they
preempt and they coach the witness to testify in a different
way, and that would be depriving my client of his Sixth
Amendment rights to confront witnesses if I have to tell the
government what my cross is going to be.

And third, when the government says this is their time
to put on evidence, that's wrong.  That's totally wrong.  It is
their direct case but we get to cross-examine and put in
evidence through our cross-examination.  The government doesn't
own the witnesses, they don't own the evidence, we get to cross
on this at this point.

So it's just not true when the government keeps saying
it's their turn to do it.  It's not right.  That's not how a
criminal trial goes.  And usually, as Mr. Bell is aware, the
defense doesn't even call witnesses in most cases.  You put in
all your evidence through the government's case.  It would be
ridiculous if I had to call back each of these witnesses.  It
would double the time of the trial.  That never happens in a
criminal case, your Honor.

THE COURT:  Good.  Thank you.

Anything else before we take our recess for the day?

MR. MERINGOLO:  No, Judge.

IBJTGRA7

1                    THE COURT:  I will read the rest of my decision on the
2        expert issue tomorrow.
3                    There's a question with respect to the scope of the
4        limiting instruction that I provide regarding Mr. Rechnitz's
5        testimony.  I have a proposed version of that limiting
6        instruction that I will bring to our conference tomorrow
7        morning.  We may circulate it overnight if it would be helpful.
8                    MR. BELL:  Could you clarify what you mean by that?
9        We're not sure.
10                   THE COURT:  This is the other acts instruction.
11                   MR. BELL:  Yes.  Understood, your Honor.  Thank you.
12                   We have nothing further.  We appreciate the Court's
13       time.
14                   THE COURT:  That's fine.  Good.  Thank you all.
15                   (Adjourned to November 20, 2018 at 9:00 a.m.)
16
17
18
19
20
21
22
23
24
25

1                         INDEX OF EXAMINATION

2       Examination of:                          Page

3       RICHARD OCHETAL

4       Cross By Ms. Necheles  . . . . . . . . . . .2072

5       Cross By Mr. Meringolo . . . . . . . . . . .2088

6       Redirect By Ms. Ravener  . . . . . . . . . .2113

7       Recross By Ms. Necheles  . . . . . . . . . .2126

8       Recross By Mr. Meringolo . . . . . . . . . .2139

9       AVI GOLDSTEIN

10      Direct By Ms. Lonergan . . . . . . . . . . .2151

11      Cross By Ms. Necheles  . . . . . . . . . . .2165

12      Cross By Ms. Cappellino  . . . . . . . . . .2202

13      MICHAEL DeMARTINO

14      Direct By Mr. Bell . . . . . . . . . . . . .2209

15      Cross By Ms. Necheles  . . . . . . . . . . .2232

16      Redirect By Mr. Bell . . . . . . . . . . . .2249

17

18

19

20

21

22

23

24

25

```
1                          GOVERNMENT EXHIBITS

2    Exhibit No.                               Received

3     911 through 914 and 1225  . . . . . . . . .2155

4     923   . . . . . . . . . . . . . . . . . . .2208

5     917   . . . . . . . . . . . . . . . . . . .2219

6     W-1712 and 1836   . . . . . . . . . . . . .2252

7     W-02004 and W-02444   . . . . . . . . . . .2254

8     W02746 and W02750   . . . . . . . . . . . .2255

9     W03156   . . . . . . . . . . . . . . . . . .2256

10    W05012 and W05585   . . . . . . . . . . . .2257

11    1813    . . . . . . . . . . . . . . . . . .2258

12                          DEFENDANT EXHIBITS

13   Exhibit No.                               Received

14    JR9463    . . . . . . . . . . . . . . . . .2198

15

16

17

18

19

20

21

22

23

24

25
```