IBKKGRA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4            v.                              16 CR 468 (GHW)

5   JAMES GRANT and JEREMY
    REICHBERG,
6
                Defendants.
7
    ------------------------------x
8
                                             November 20, 2018
9                                            10:30 a.m.

10
    Before:
11
                    HON. GREGORY H. WOODS,
12
                                             District Judge
13

14                       APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    BY:  JESSICA R. LONERGAN
17       KIMBERLY J. RAVENER
         MARTIN BELL
18       Assistant United States Attorneys

19  HAFETZ & NECHELES, LLP
         Attorneys for Defendant Reichberg
20  BY:  SUSAN R. NECHELES

21  MERINGOLO & ASSOCIATES
         Attorneys for Defendant Grant
22  BY:  JOHN MERINGOLO
         ANJELICA CAPPELLINO
23

24

25

IBKKGRA1

1              (In open court; jury not present)

2              THE COURT:  Ladies and gentlemen, welcome back.  I

3     hope that the issue that caused us to delay today went well.

4     Please let me know if anybody needs to end early.

5              Is there anything that we should take up now?  I'd

6     like to try to use our jury's time as effectively as possible.

7     The only thing I have on my list that I think we must --

8     potentially should discuss before Mr. Rechnitz's testimony is

9     the limiting instruction that I mentioned to you yesterday.

10             Is there anything else the parties think we needed to

11    take up now?  I'm particularly mindful of the jury's time in

12    this short day.

13             MS. LONERGAN:  Your Honor, may I confer with defense

14    counsel for one moment to see if we have something to discuss

15    with your Honor?

16             THE COURT:  Please do.

17             MR. BELL:  While that happens, given our late start,

18    when do you anticipate our customary break?

19             THE COURT:  I would break at the customary time unless

20    there's a strong preference to do otherwise.

21             MR. BELL:  We don't have a strong preference.  I, at

22    least, figured there was some possibility that we might do the

23    break later on the theory that the jury has eaten/rested more

24    recently, but I'm fine with the usual time.  It's just a matter

25    of planning.

IBKKGRA1

1              THE COURT:  Thank you.

2              I'd be happy to go to noon or so, if that would be

3       helpful.

4              MR. BELL:  I think we're good either way, Judge.  We

5       were more just thinking about the jury here.

6              THE COURT:  Thank you.

7              (Pause)

8              MS. LONERGAN:  Your Honor, I conferred with defense

9       counsel.  They're conferring to see if we have a quick issue to

10      raise with the Court or not.  So if you give them a second to

11      confer, then we will let you know.

12             THE COURT:  Good.  Thank you.

13             (Pause)

14             MR. MERINGOLO:  Judge, after our break, maybe we could

15      have a sidebar, if it's okay with your Honor, to have an off

16      the record.  I discussed with the prosecutor about the

17      situation that happened yesterday with --

18             THE COURT:  Yes, that would be fine.  And to the

19      extent that that affects any of our scheduling, please don't

20      hesitate to let me know.

21             MR. MERINGOLO:  Okay.

22             THE COURT:  I'll tell you this:  We can discuss it at

23      sidebar, but that kind of a issue, I think, should take

24      priority.

25             MR. MERINGOLO:  Thank you.

IBKKGRA1

1          MS. LONERGAN:  Your Honor, just so we don't need to

2     keep the Court in the dark, defense counsel had provided us

3     last night, actually in a way that was helpful, a document that

4     she seeks to show the witness today on cross, the first

5     witness, and our position was, again, as we did yesterday, that

6     we had no issue with foundational questions, but that we

7     thought it didn't need to come into evidence now, and that we

8     could litigate later relevance of whether the document should,

9     in fact, come into evidence.  So I've asked defense counsel

10     this morning the question of whether they seek to offer the

11     document today or simply ask the foundational questions, such

12     that it can be litigated later.  I think that's just what we're

13     waiting on, to see if we need to litigate whether it gets

14     admitted now.

15          THE COURT:  Thank you.

16          What's the document?

17          MS. LONERGAN:  The document -- so our first witness is

18     an individual named Boris Shamayev.  He works at a business

19     called Motion In Time, which is a -- primarily a watch store,

20     and the document is -- we are going to seek to put in some

21     receipts from Motion In Time that we say are relevant to this

22     case.  There are other Motion In Time receipts that mention

23     people whose names may be mentioned in this case, including

24     Mr. Rechnitz and personal purchases by Mr. Rechnitz, among

25     other things, and the question is, I think, that we have a --

IBKKGRA1

1    the relevance objection that we -- that we stated to the Court

2    in our briefing about two weeks ago, and it may become relevant

3    on cross, but at least as of now, I think we would have no

4    objection to relevance at this time.

5            So that's, I think, where we are on this document.

6            THE COURT:  Thank you.

7            MS. NECHELES:  Your Honor, I have just handed up what

8    has been marked as Defense Exhibit JR-9201.  These are all of

9    the invoices from Motion In Time that deal with purchases by or

10   related to Jona Rechnitz, as produced by this witness who will

11   be testifying.

12           In addition, they have credit card statements and

13   checks, and I expect this witness to testify that he keeps

14   records of all of these things, that he keeps the records of

15   the payments as well as the charges.  There are two issues

16   here -- there are several issues.  One the government is

17   alleging that one of these payments was a bribe, one of these

18   watches was a bribe, and one of these watches was given to

19   Mr. Grant.  We contend that that never happened, but it's also

20   significant that there is no payment, no credit card payment,

21   or exchange for that watch, and that, I expect, the witness to

22   say, when there is no credit card payment or exchange, that

23   means it was paid for by cash.  All of the rest, except --

24   there are only two where there is no credit card payment, and

25   those were paid for by cash, and I expect the witness to say

IBKKGRA1

1    that Jona Rechnitz normally paid by credit card, or by check,

2    or by exchanging jewelry.  So the absence of records of

3    documents in these bunch of records is significant to show, we

4    contend, that Jona Rechnitz did not pay for that exchange, you

5    know, the $800 difference in that exchange, and he's lying when

6    he says that he paid for it to give it as a bribe to Mr. Grant.

7         The second thing, the witness will testify that

8    Mr. Reichberg was present when -- many, many times, he said he

9    was always with him, so it is important for us to show, as

10   we've explained, that Mr. Rechnitz held himself out to be

11   extraordinarily wealthy.  Extraordinarily wealthy.  So the

12   meals, which the government makes a big deal about, about how

13   fancy and expensive they were, they seemed like nothing to him.

14   So these invoices are relevant to show the defendants' state of

15   mind, as is all of the very public expenditures of wealth by

16   Mr. Rechnitz, to show that -- you have to remember, there is no

17   explicit quid pro quo in this case.  The government is saying

18   that the defendants should have known this was bribes because

19   of the nature of the expenditures, that they were so large.

20   And we will be seeking -- or at least they're arguing that --

21   in part, they've argued that by putting witnesses on, that they

22   seek to contrast them.  Normal people, the government says,

23   just go out to diners and split the bill, but, here, it was so

24   expensive, all these things, we should have known that they

25   were bribes.

IBKKGRA1

1              Of course, Mr. Rechnitz held himself out to be a

2    billionaire, so we need to show that that's how he held himself

3    out, was to be a billionaire.  And these are in part of that,

4    to show that he was conspicuously spending lots and lots of

5    money on fancy jewelry, and he was doing this in front of

6    Mr. Reichberg, that he was wearing fancy watches and very

7    expensive watches.  So this is all relevant evidence to the

8    defendants' state of mind.

9              THE COURT:  Thank you.

10             To the government's question:  Is it your request to

11   put this volume of documents into evidence through this

12   witness?

13             MS. NECHELES:  Yes, I do intend to put it in today.  I

14   think he will verify that -- provide the foundational documents

15   and then be able to explain and explain his recordkeeping

16   practice, and the absence of records here, I think, is

17   important evidence.

18             THE COURT:  Thank you.

19             And this document reflects all of the transactions by

20   Mr. Rechnitz at Motion In Time?

21             MS. NECHELES:  Your Honor, my understanding -- I

22   obtained this from the government, and my understanding is that

23   the government obtained from him all of the relevant documents

24   from Motion In Time.

25             THE COURT:  Thank you.  That's fine.

IBKKGRA1

1          To the extent the objection here would be a strict

2     relevance, I think the defense has made a sufficient proffer.

3          MS. LONERGAN:  Your Honor, we disagree.  The fact --

4          THE COURT:  That's fine.  Let's proceed.

5          Is there anything else that we need to take up before

6     this witness?  It's 10:43, and the jury is waiting.  Anything

7     else that we need to take up now?  I do want to talk about the

8     limiting instruction with respect to Mr. Rechnitz, but I think

9     that we should do that during what would otherwise be break

10    time.  I want to use the jury's time effectively.

11         So, Mr. Daniels, could you please bring in the jury.

12         MR. BELL:  Judge?

13         THE COURT:  Yes.

14         MR. BELL:  I suppose it might be the most -- the best

15    way of doing this for me to let you know when it is that

16    Mr. Rechnitz is going to be asked about these other behaviors,

17    and perhaps it makes sense to cue up the instruction then as

18    opposed to just going prior to the entirety of Mr. Rechnitz's

19    testimony, which won't go there for a little while.

20         THE COURT:  That's fine.  I do, however, want to

21    solicit the parties' views regarding the proposed instruction

22    as an introduction.  I expect to propose something, which I

23    will have handed to you now, that looks very consistent with

24    the government's proposal subject to a modification proposed by

25    Ms. Necheles in her subsequent letter.  I wanted to, I hope to,

IBKKGRA1

1   talk a little bit about the other component of Ms. Necheles'

2   October 25th letter, in which she had originally offered or

3   requested that the Court exclude the statements from

4   Mr. Rechnitz that he bribed the mayor.  I understand the

5   defense has walked back from that position at this time.

6              You can bring in the jury.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Thank you.  You can be seated.

3              First, ladies and gentlemen, thank you very much for

4    your flexibility today.  I'll tell you that something arose

5    last night that was unexpected, and, as a result, we were

6    unable to begin the trial day earlier.  Mr. Daniels reached out

7    to all of you, as he could, last night.  I understand he wasn't

8    able to get a couple of you, but thank you very much for your

9    flexibility and understanding.  Again, it was an unexpected

10   event for all of us, but I hope you will accept that it was a

11   reasonable reason for us to start late today.

12             So, with that, counsel for the United States, can I

13   ask you to call your next witness?

14             MS. LONERGAN:  Your Honor, the government calls Boris

15   Shamayev.

16             THE COURT:  Thank you.

17    BORIS SHAMAYEV,

18        called as a witness by the Government,

19        having been affirmed, testified as follows:

20             THE DEPUTY CLERK:  Please spell your full name for the

21   record.

22             THE WITNESS:  B-o-r-i-s S-h-a-m-a-y-e-v.

23             THE DEPUTY CLERK:  Thank you.

24             THE COURT:  Thank you.

25             Counsel, you can inquire.

1          MS. LONERGAN:  Thank you, your Honor.

2    DIRECT EXAMINATION

3    BY MS. LONERGAN:

4    Q.  Good morning, Mr. Shamayev.

5    A.  Good morning.

6    Q.  Where do you work?

7    A.  At Motion In Time.

8    Q.  Can you describe what Motion In Time is?

9    A.  It is a watch store that buys and repairs watches, and

10   sells.

11   Q.  Does Motion In Time sell new watches or used watches?

12   A.  Used.

13   Q.  And how would you describe the watches?  Are they low end,

14   medium, high end, a combination?

15   A.  It's a combination.

16   Q.  Does Motion In Time also -- does it also repair watches?

17   A.  Yes.

18   Q.  Does Motion In Time do trades?

19   A.  Yes.

20   Q.  What sorts of things can customers trade in for watches?

21   A.  Their old watch.

22   Q.  What is your title at Motion In Time?

23   A.  Sales manager.

24   Q.  Briefly, what are some of your duties and responsibilities

25   at Motion In Time?

IBKKGRA1                    Shamayev - Direct

1    A.  I handle the buying, and the selling, and the day-to-day

2    sales aspects.

3    Q.  How long have you been working at Motion In Time?

4    A.  About 12 or 13 years.

5    Q.  In what neighborhood is Motion In Time located?

6    A.  In Midtown Manhattan.

7    Q.  In the -- sorry?

8    A.  In Midtown Manhattan.

9    Q.  Are you familiar with the term "the diamond district"?

10   A.  Yes.

11   Q.  What is the diamond district?

12   A.  It's an area in Midtown that predominantly has jewelry

13   stores and diamond dealers.

14   Q.  Is Motion In Time located in the diamond district?

15   A.  Yes.

16   Q.  You testified that Motion In Time does both watch sales and

17   watch repairs.  Does Motion In Time keep records of the sales?

18   A.  Yes.

19   Q.  What kinds of records?

20   A.  Invoices.

21   Q.  How are those invoices stored?

22   A.  In a file.

23   Q.  Are they stored in paper copies --

24   A.  Yes.

25   Q.  -- digital copies, or both?

1    A.  Definitely paper copies, sometimes both.

2    Q.  Are invoices made at approximately the time of the purchase

3    or transaction in question?

4    A.  Yes.

5    Q.  Is it part of the regular practice of Motion In Time to

6    save invoices?

7    A.  Yes.

8    Q.  Now, does Motion In Time currently keep records of watch

9    repairs and fittings?

10   A.  Yes.

11   Q.  Has Motion In Time always kept records of watch repairs and

12   fittings?

13   A.  Not really.

14   Q.  When did you start keeping those types of records?

15   A.  Recently.

16   Q.  What do you mean by "recently"?

17   A.  A few years ago.

18   Q.  Why didn't you keep records of these kinds of transactions

19   before a few years ago?

20   A.  They were smaller and not specific enough to keep a battery

21   repair of that sort, for example.

22   Q.  Why did you start keeping records of these types of

23   transactions?

24   A.  For warranties.  If clients come back, and they say I

25   repaired X, Y, and Z here, and it's not working again, and so

1    on and so forth.

2    Q.  Are you familiar with an individual named Jona Rechnitz?

3    A.  Yes.

4    Q.  How did you meet Mr. Rechnitz?

5    A.  He came to our store years ago, and he purchased a watch

6    from us.

7    Q.  Approximately when was that?

8    A.  Many years ago.  I don't remember.

9    Q.  Let's see if we can pin it down a little bit.  More than

10   five years ago?

11   A.  Yes.

12   Q.  More than ten years ago?

13   A.  I'm not sure.

14   Q.  Is it fair to say between five and ten years ago?

15   A.  Yes.

16   Q.  After that initial watch sale, did you ever see

17   Mr. Rechnitz again?

18   A.  Yes.

19   Q.  And why did you see him again?

20   A.  He purchased watches from us.

21           MS. LONERGAN:  Mr. Hamilton, can you put on the screen

22   what's in evidence as Government Exhibit 15.

23   Q.  Mr. Shamayev, do you recognize the individual in that

24   photograph?

25   A.  Yes.

1   Q.  Who is that?

2   A.  Jona Rechnitz.

3         MS. LONERGAN:  You can take that down.

4   Q.  Approximately how often did Mr. Rechnitz purchase watches

5   at Motion In Time?

6   A.  A few times a year.

7   Q.  What kind of customer did you consider Mr. Rechnitz to be?

8   A.  A good client.

9   Q.  Why would you describe him as "a good client"?

10  A.  He worked with us, and he referred clients to us and was

11  just a good client.  I don't know how to explain it.

12  Q.  Are you familiar with an individual named Jeremy Reichberg?

13  A.  Yes.

14  Q.  How did you meet Mr. Reichberg?

15  A.  From Jona.

16  Q.  Mr. Shamayev, I'd like you to look around the courtroom and

17  see if you recognize the person you know as Jeremy Reichberg is

18  in the courtroom?

19  A.  Yes.

20  Q.  Yes?

21        Can you describe where he's sitting and an item of

22  clothing he's wearing?

23  A.  He's in the back of the room, middle of the room, there.

24  Q.  Can you describe something he's wearing?

25  A.  A white shirt.

IBKKGRA1                    Shamayev - Direct

1            MS. LONERGAN:  Your Honor, let the record reflect that

2     the witness has identified Jeremy Reichberg.

3            THE COURT:  Thank you.  So noted.

4     BY MS. LONERGAN:

5     Q.  How did you treat Mr. Reichberg?

6     A.  Well.

7     Q.  Why did you treat him well?

8     A.  Because he was referred by Jona.

9     Q.  At first, what did Mr. Reichberg get from Motion In Time?

10    A.  Small repairs.

11    Q.  Did Mr. Reichberg pay for the watch repairs?

12    A.  No.

13    Q.  Who did?

14    A.  Nobody.

15    Q.  What do you mean, "nobody"?

16    A.  They weren't -- we did it complimentary.  It was more like

17    a battery change or adjusting of something, nothing that was

18    major, so we just did it as a service to -- because it was a

19    friend of Jona's, so we just didn't say anything.

20    Q.  Did Mr. Reichberg ever get anything other than watch

21    repairs at Motion In Time?

22    A.  Yes.

23    Q.  What did Mr. Reichberg get?

24    A.  He purchased a Rolex Submariner.

25    Q.  What was the value of that watch?

IBKKGRA1                     Shamayev - Direct

 1  A.  About 5,000.

 2          MS. LONERGAN:  Mr. Hamilton, can we display for the

 3  witness, the Court, and the parties Government Exhibits --

 4  first we'll do 915 and 916.  And you can maybe put them both up

 5  on the screen.

 6  BY MS. LONERGAN:

 7  Q.  Mr. Shamayev, do you see two documents on the screen in

 8  front of you?

 9  A.  Yes.

10  Q.  Do you recognize both of those documents?

11  A.  Yes.

12  Q.  In general, what are they?

13  A.  Invoices.

14  Q.  From your store?

15  A.  Yes.

16  Q.  Who prepared these invoices?

17  A.  I did.

18  Q.  When did you prepare them?

19  A.  At the time of the sale.

20  Q.  Is the sale of watches the regular business of Motion In

21  Time?

22  A.  Yes.

23  Q.  And is it the regular practice of Motion In Time to prepare

24  such invoices?

25  A.  Yes.

IBKKGRA1                    Shamayev - Direct

1          MS. LONERGAN:  Your Honor, the government offers

2     Government Exhibits 915 and 916.

3          MS. NECHELES:  No objection.

4          MR. MERINGOLO:  No objection.

5          THE COURT:  Thank you.

6          I'm accepting Government Exhibits 915 and 916 into

7     evidence.

8          You can proceed.

9          (Government's Exhibits 915 and 916 received in

10    evidence)

11         MS. LONERGAN:  Thank you.

12         Mr. Hamilton, can we display just 916 at this point.

13    Let's publish that to the jury as well.

14         Is it up on your screen?

15         Can we zoom in on the top half of that document.

16    Thank you.

17    BY MS. LONERGAN:

18    Q.  So, Mr. Shamayev, let's walk through this document.

19    There's a box, it says "Sold To" at the top, and then there are

20    a series of boxes underneath.

21    A.  Right.

22    Q.  What is the name of the person that this was sold to?

23    A.  Jeremy Reichberg.

24    Q.  And then what does it say next to that?

25    A.  "Friend of Jona Rechnitz."

IBKKGRA1                    Shamayev - Direct

1   Q.  Why did you include "Friend of Jona Rechnitz" on this?

2   A.  Because it wasn't paid, so we know how to come back to the

3   invoice.

4   Q.  We'll get to that in a second.

5           What is the date of this transaction?

6   A.  February 16.

7   Q.  And then the item number?

8   A.  16610.

9   Q.  And the description of the item?

10  A.  "Rolex Submariner Date, stainless steel on bracelet."

11  Q.  You said "on bracelet"?

12  A.  "On bracelet."

13  Q.  It says, "Black dial, 40 millimeters"; is that right?

14  A.  Yes.

15  Q.  And then it says "Amount."  And what's the amount there?

16  A.  5400.

17  Q.  Now, what does that mean, "Amount"?

18  A.  What do you mean?

19  Q.  Is that the price of the watch?

20  A.  Yes.

21          MS. LONERGAN:  Mr. Hamilton, can we scroll down?

22  Let's look at the bottom half of the page.

23  Q.  There's a box that says "Tax."  And what's the amount next

24  to that box?

25  A.  479.25.

1   Q.  Then it says "Total."

2   A.  5879.25.

3   Q.  And then is there anything in the box next to "Deposit"?

4   A.  No.

5   Q.  Why not?

6   A.  Because there was none given.

7   Q.  There's nothing in the box next to "Balance."  Why not?

8   A.  Just I guess I forgot to put it in there.

9   Q.  And then underneath, in the square box underneath, it says,

10  "Promised to pay within one week."  Why did you write that?

11  A.  Because that's what I was promised.

12  Q.  I just want to be clear:  At the time of this watch

13  purchase, did anybody pay for it?

14  A.  No.

15  Q.  So describe what happened.

16  A.  The client bought a watch, and he said that he would pay

17  for it within a week, and because of our relationship with

18  Jona, we didn't say anything, and we gave him the watch.

19  Q.  Just to be clear, when you said a client, you mean

20  Mr. Reichberg?

21  A.  Yes.

22  Q.  Did he leave with the watch that day?

23  A.  Yes.

24  Q.  Did Mr. Reichberg ever pay for that watch?

25  A.  No.

IBKKGRA1                       Shamayev - Direct

1    Q.  Did anybody ever pay for that watch?

2    A.  No.

3    Q.  Did you have any conversation with Mr. Reichberg about that

4    watch after he left with it the first day?

5    A.  I asked him when he would pay for it.

6    Q.  What did he say to you?

7    A.  I don't remember.

8    Q.  Did you do any other follow-up regarding that watch?

9    A.  No.

10   Q.  Why not?

11   A.  Because after that, there was a lot of stuff in the

12   newspaper, and I just figured that I should just forget about

13   it.

14   Q.  Did Mr. Rechnitz refer any other customers to Motion In

15   Time?

16   A.  Yes.

17   Q.  Did Mr. Reichberg ever refer any customers to you?

18   A.  No.

19   Q.  Did Mr. Rechnitz or Mr. Reichberg ever come in to Motion In

20   Time with a police officer who was wearing a uniform?

21   A.  No.

22   Q.  Did Mr. Rechnitz or Mr. Reichberg ever come in to Motion In

23   Time with someone who was not in uniform and introduce that

24   person to you as a police officer?

25   A.  No.

IBKKGRA1                     Shamayev - Direct

1    Q.   Did you have any belief that Mr. Rechnitz or Mr. Reichberg

2    knew police officers?

3    A.   Yes.

4    Q.   And why did you have that belief or understanding?

5    A.   When they would park their car outside on the street where

6    you're not allowed to park, they didn't mind, they didn't care.

7    So that was it.

8    Q.   Let's break that down.  Did you have conversations with

9    both of them about that, with one or the other?  Let's see if

10   we can be clear.

11   A.   It was not conversations; it was just kind of what I

12   understood.

13   Q.   How did you understand that?

14   A.   Because when Jona parked his car outside, and I said you're

15   going to get a ticket, move the car, park in the lot, he said

16   don't worry about it, it's okay.

17   Q.   Was Mr. Reichberg present when you had those conversations

18   with Mr. Rechnitz?

19   A.   I don't believe so.

20   Q.   Did either Mr. Rechnitz or Mr. Reichberg ever give you

21   anything associated with police officers?

22   A.   A PBA card.

23   Q.   Who gave you a PBA card?

24   A.   Mr. Reichberg.

25   Q.   What do you understand to be the purpose of a PBA card?

1   A.   It's a card that's basically if you're -- if you're given

2   it, you show it to the police officer, they can extend you a

3   courtesy.

4   Q.   Did you ever try to use the PBA card?

5   A.   Yes.

6   Q.   What happened?

7   A.   Nothing.

8   Q.   You mean nothing, you didn't get a courtesy?

9   A.   No.

10  Q.   Just I want to be clear:  There was no courtesy extended to

11  you?

12  A.   No.

13  Q.   Did you ever ask Mr. Rechnitz or Mr. Reichberg for

14  assistance in a police matter?

15  A.   Yes.

16  Q.   Who did you ask?

17  A.   Jona.  And Jeremy.

18  Q.   Okay.  So let's break that down.  Let's start with

19  Mr. Rechnitz.  What did you ask Mr. Rechnitz to help you with?

20  A.   I think I only asked Jeremy, actually.

21  Q.   Okay.  So let's move on to Mr. Reichberg, or Jeremy.

22          What did you ask Jeremy to help you with?

23  A.   I got a cell phone ticket, I believe, and I asked him if he

24  knew any lawyer or anybody that could take care of it, and he

25  said just send me the information, and I will put it on my

1   calendar.

2   Q.  Did you send information to Mr. Reichberg?

3   A.  Yes.

4   Q.  What did you send to him?

5   A.  A picture of the ticket or the notice.

6   Q.  Was that like a moving violation or a cell phone violation?

7   A.  Yeah, cell phone violation.

8   Q.  What, if anything, did Mr. Reichberg say to you after you

9   sent him information about the ticket?

10  A.  Not much other than that he will put it on his calendar and

11  he will take care of it.

12  Q.  What did you understand that to mean, that he would put it

13  on his calendar and take care of it?

14  A.  Meaning he would give it to whoever he works with to, I

15  don't know, work on it.

16  Q.  Did you ultimately let Mr. Reichberg take care of that

17  ticket for you?

18  A.  No.  A traffic attorney took care of it at the end.

19  Q.  Sorry, you said a traffic attorney?

20  A.  A traffic attorney, yes.

21  Q.  Did you pay that traffic attorney to take care of it for

22  you?

23  A.  Yes.

24          MS. LONERGAN:  Mr. Hamilton, can we display Government

25  Exhibit 915, publish that to the jury?

1    BY MS. LONERGAN:

2    Q.  Mr. Shamayev, did you participate in this transaction?

3    A.  Yes.

4    Q.  Who was in the store for this transaction?

5    A.  Jona.

6    Q.  So let's walk through the receipt again.  There's a box

7    that says "Sold To."  What's the name there?

8    A.  "Jona Rechnitz."

9    Q.  So, just to be clear, I think it says "JSR Capital,

10   Attention:  Jona Rechnitz"?

11   A.  Right.

12   Q.  Why did you write that?

13   A.  That's how we had it -- that's -- I think we had a previous

14   invoice, and that's how it was.

15   Q.  What's the address provided for the customer?

16   A.  580 Fifth Avenue, Suite 800.

17   Q.  And then the city?

18   A.  New York, New York 10036.

19   Q.  And then the telephone number?

20   A.  (212)308-2432.

21   Q.  What's the date of the purchase or transaction?

22   A.  December 24, 2013.

23   Q.  What's the item number?

24   A.  55500169.

25   Q.  What is the description of the items?

1    A.   Breitling Bentley Motors GT Chronograph, stainless steel on

2    a rubber strap.

3    Q.   Underneath that, can you read the line where it says

4    "Traded"?

5    A.   Traded Breitling Superocean 44, stainless steel on

6    bracelet, No. 1429353.

7    Q.   There are two watches listed on this invoice.  What does

8    that mean?

9    A.   That means that he purchased one and he traded another one

10   to get it.

11   Q.   Which one was purchased, and which one was traded?

12   A.   The first line was the one purchased.  The third line was

13   the one traded.

14   Q.   I see some handwriting underneath.  Can you read that?

15        Is that your handwriting?

16   A.   Yes.

17   Q.   Can you read that to us?

18   A.   Yes.  It says, gave box papers.  BP stands for box papers.

19   And it said that he paid a difference of 800.

20   Q.   Okay.  I want to just walk through each of those.  What

21   does it mean, gave BP or box papers?

22   A.   The watch that he had that he traded in, he gave us the box

23   and papers to it.

24   Q.   And then it says:  "Paid Difference:  800"?

25   A.   Right.

1  Q.  What does that mean?

2  A.  That means that he traded -- he paid the difference to get

3  the line item number 1 versus line item number three.

4         MS. LONERGAN:  Can we scroll down, Mr. Hamilton.

5  Q.  Now, it says "Tax."  And what does it say next to "Tax"?

6  A.  71.

7  Q.  And then it says "Total."  What's next to "Total"?

8  A.  871.

9  Q.  Do you know how the $871 was paid for?

10 A.  I don't remember.

11 Q.  Do you have any credit card receipts associated with this

12 invoice?

13 A.  No.

14 Q.  Who paid the $871?

15 A.  Jona.

16 Q.  Do you know who the new Breitling was for?

17 A.  According to the invoice, Jona.

18 Q.  Do you know if he intended to keep it or to give it to

19 someone else?

20 A.  Not sure.

21 Q.  Do you know who owned the Breitling that was traded in in

22 connection with this purchase?

23 A.  No.

24         MS. LONERGAN:  One moment?

25         (Pause)

IBKKGRA1                    Shamayev - Cross

1          MS. LONERGAN:  Your Honor, no further questions.

2          THE COURT:  Thank you.

3          Counsel for Mr. Reichberg?

4          MS. NECHELES:  Thank you, your Honor.

5     CROSS-EXAMINATION

6     BY MS. NECHELES:

7     Q.  Good morning, sir.

8     A.  Good morning.

9     Q.  Jona Rechnitz was a very good customer of yours, right?

10    A.  Yes.

11    Q.  He, in fact, bought hundreds of thousands of dollars worth

12    of watches, right?

13    A.  I'm not sure of the exact amount.

14    Q.  Okay.  Well, I want to show you what has been marked as

15    Defendant Reichberg Exhibit JR-9201.

16         MS. NECHELES:  And if I could just hand it up, your

17    Honor, if I may?

18         THE COURT:  You may.

19    Q.  Sir, do you recognize those as being documents that you

20    provided to the government?

21    A.  Yes.

22    Q.  And the government asked you for your records of

23    transactions with Mr. Rechnitz?

24    A.  Yes.

25    Q.  And are those all the records of your transactions with

1    Mr. Rechnitz?

2    A.  Yes.

3    Q.  And are those records documents that you make in the

4    ordinary course -- the normal course of your business?

5    A.  Yes.

6    Q.  Do you keep them in the normal course of your business?

7    A.  Yes.

8              MS. NECHELES:  Your Honor, I offer those in evidence.

9              MS. LONERGAN:  Your Honor, objection.  May we

10   approach?

11             THE COURT:  Yes, you may.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (At the sidebar)

 2                THE COURT:  Go ahead, counsel.

 3                MS. LONERGAN:  Yes, your Honor.  We heard the proffer

 4     of relevance, but unless the defense counsel can establish that

 5     either defendant was aware of these purchases or the value of

 6     these purchases, we don't necessarily think it has the

 7     relevance that she has stated because the point is she's saying

 8     that they were aware of Mr. Rechnitz's conspicuous consumption,

 9     but she hasn't laid a foundation that they were, in fact, aware

10     of any of the purchases, the other purchases made at this

11     store.

12                MS. NECHELES:  Your Honor, I thought you ruled on

13     this.

14                THE COURT:  Thank you.

15                MS. LONERGAN:  We weren't able to be heard on this

16     previously.

17                THE COURT:  Thank you.  That's fine.

18                Counsel, why is it that you believe that this is

19     relevant under the broad standard of relevance established

20     under the rules?

21                MS. NECHELES:  Okay.  I will elicit from this witness

22     that, number one, he says that Jeremy Reichberg often came in.

23     Number two, these are watches that are being worn or jewelry

24     that is being worn, and we will establish that with

25     Mr. Rechnitz, that he was wearing these things.  These are
```

1   fancy jewelry watches that people wear.  You can infer that

2   these are the kind of things that other people would be

3   saying -- and they're worth a lot of money, Judge.  This is the

4   kind of life he was living.  I will elicit that from him.  It's

5   in the 3500 material.

6           THE COURT:  Does it also go to the nature of this

7   witness' relationship with Mr. Rechnitz and inform the jury's

8   assessment of his testimony?

9           MS. NECHELES:  Yes, your Honor.  Thank you, your

10  Honor.  And in addition, I think it goes to the issue -- they

11  have elicited this testimony -- I don't know what its relevance

12  was -- that Mr. Reichberg did not pay for a watch, and, in

13  fact, Mr. Rechnitz offered to pay for it.  And the whole

14  pattern of Mr. Rechnitz's behavior in paying for all those

15  things is relevant to that issue as well.

16          THE COURT:  Good.  Thank you.

17          Anything else, counsel for the United States?

18          MS. LONERGAN:  One moment, your Honor?

19          (Pause)

20          MS. LONERGAN:  No, your Honor.

21          THE COURT:  Thank you.

22          The objection is overruled.  I'll permit you to

23  introduce this.

24          MS. NECHELES:  Thank you, your Honor.

25          (Continued on next page)

1              (In open court)

2              THE COURT:  Thank you.

3              I'm accepting into evidence what's been marked as

4    JR-9201.

5              (Defendants' Exhibit JR-9201 received in evidence)

6              THE COURT:  Counsel, you can proceed.

7              MS. NECHELES:  Thank you.

8    BY MS. NECHELES:

9    Q.  Before I get to this actual exhibit, I wanted to ask you:

10   Mr. Rechnitz often brought Jeremy Reichberg into the store,

11   right?

12   A.  Yes.

13   Q.  So Jona Rechnitz would come in and buy a lot of jewelry,

14   right?  Or watches, correct?

15   A.  Correct.

16   Q.  You didn't sell jewelry, right?

17   A.  No, not really.

18   Q.  You were a watch store, right?

19   A.  Yes.

20   Q.  Did you sell gray goods, also?

21   A.  What does that mean?

22   Q.  You don't know what gray goods are?

23   A.  We sell preowned watches.

24   Q.  But you also sell watches that you are not licensed to

25   sell, but you buy from other people or other --

1   A.  Yes, we're not licensed to sell any watches other than

2   preowned watches.

3   Q.  Okay.  But that's a common practice, right?

4   A.  Yes.

5   Q.  That watch sellers will sell watches that maybe the dealer

6   doesn't sell to them, but other people sell?

7   A.  Yes.

8   Q.  So that was -- you had very high-end watches, right?

9   A.  Yes.

10  Q.  And because they were not from a licensed dealer, maybe you

11  can sell them at a better price --

12  A.  Yes.

13  Q.  -- than a licensed dealer could, right?

14  A.  Yes.

15  Q.  And that's a totally legitimate practice, correct?

16  A.  Yes.

17  Q.  You testified Jeremy Reichberg never spent any money in

18  your store, right?

19  A.  Very little, if any.

20  Q.  He would get some watches, minor repairs, or a battery put

21  in; is that correct?

22  A.  Yes.

23  Q.  But he never was spending money, right?

24  A.  No.

25  Q.  But Mr. Jona Rechnitz was spending a lot of money, right?

IBKKGRA1                    Shamayev - Cross

1    A.  Yes.

2    Q.  I just want --

3           MS. NECHELES:  If we could look at now Defendants'

4    Exhibit JR-9201.  If we could put that on the screen.  Now, if

5    you flip through -- yes.

6           And for the jury as well, your Honor?

7           THE COURT:  You may.

8           MS. NECHELES:  Thank you.

9    BY MS. NECHELES:

10   Q.  I want to move past the first one for a minute and go to

11   the next one, and that's a receipt for Jona Rechnitz, right,

12   for him buying a watch that cost $4,233; is that correct?

13   A.  Yes.

14   Q.  And if you go to the next page, that is the credit card

15   statement, right?

16   A.  Yes.

17   Q.  Was that your practice, you kept the records of the payment

18   along with the bills?

19   A.  Yes.

20   Q.  If you go back to the first page, with the watch, it says

21   "Fernando Mateo."  Do you see that?

22   A.  Yes.

23   Q.  And that was a watch you sold to a Fernando Mateo?

24   A.  Yes.

25   Q.  You do not have, on the next page, any record of payment?

1   A.  No, I don't see it.

2          MS. NECHELES:  Can you turn to the next page.

3   Q.  Why is that?

4   A.  I don't know.

5   Q.  Okay.  Am I correct that when things were paid in cash, you

6   would not have a record of payment?

7   A.  No.  The records invoice is there.

8   Q.  Okay.  The invoice is there?

9   A.  That is the record.

10  Q.  Okay.  But you don't have, for example, otherwise where you

11  have copies of credit cards or a check?

12  A.  Correct.

13  Q.  But when it was cashed, you would not have kept that,

14  right?

15  A.  There wouldn't be anything to keep.

16  Q.  Right, you wouldn't have it in your files, a copy of the

17  cash, you don't do that, right?

18  A.  Right.

19  Q.  And if you turn next to page 23160, that is a record of two

20  other watches that were bought by Jona Rechnitz, correct?

21  A.  Yes.

22  Q.  And there, he paid $91,000, correct?

23  A.  Correct.

24  Q.  And on the next two pages, you have -- or three pages, you

25  have his checks for that, right?

1    A.   Yeah.

2    Q.   He paid it out of his JSR Capital?

3    A.   Yes.

4    Q.   Then on the following page, on page 23164, you have a sale

5    to Mr. Rechnitz of 33,400, a watch there?

6    A.   Yes.

7    Q.   Am I correct that's in 2013?

8    A.   Yes.

9    Q.   And that was for $36,000, approximately?

10   A.   Yes.

11   Q.   And the next page, there's a check for that; am I correct?

12   A.   Yes.

13   Q.   Then going to the next page, there's another purchase in

14   December of 2013, and that is the Breitling that you testified

15   about on direct, correct?

16   A.   Yes.

17   Q.   And that was a trade-in, right?

18   A.   Yes.

19   Q.   And in exchange, there was a payment of $800, right?

20   A.   Yes.

21   Q.   And if you look on the next page, there is no credit card

22   or check associated with that payment, correct?

23   A.   Right.

24   Q.   Does that indicate to you that this was paid in cash?

25   A.   I would assume so.

IBKKGRA1                        Shamayev - Cross

1   Q.  And then if you look at the next page, you have a trade-in

2   for a watch, a Rolex watch, that was traded in for earrings,

3   right?

4   A.  Yes.

5   Q.  And the value of that was $23,000?

6   A.  Yes.

7   Q.  And then on the next page, you have two other watches

8   traded in for jewelry worth $50,000, right?

9   A.  Yes.

10  Q.  Am I correct you don't sell jewelry, right?  Is that what

11  you just testified?

12  A.  Not generally.

13  Q.  Did you go out and purchase this jewelry in order to trade

14  it for the watches?

15  A.  Most likely, yes.

16  Q.  Well, you recall doing that, right?

17  A.  Excuse me?

18  Q.  You recall doing that, right?

19  A.  I don't remember exactly where we got the earrings from

20  from the page before.

21  Q.  But was that at Mr. Rechnitz's request that you did that,

22  bought the jewelry?

23  A.  He wanted to buy a pair of earrings, so we found him a pair

24  of earrings.

25  Q.  The earrings that he wanted?

IBKKGRA1                      Shamayev - Cross

1    A.  Correct.

2    Q.  He traded his watches for that, right?

3    A.  Yes.

4    Q.  Did he tell you that -- well, withdrawn.

5          Then on the next page, you see a -- the watch that was

6    sold to Jeremy Reichberg, right?

7    A.  Right.

8    Q.  And that was the one that there's no payment record for,

9    right?

10   A.  Right.

11   Q.  It was not paid for, right?

12   A.  Right.

13   Q.  You were asked by the government whether you did any other

14   follow-up regarding that watch, other than speaking to

15   Mr. Reichberg once.  You remember that question?

16   A.  Yes.

17   Q.  You said you had not, right?

18   A.  No.  We reached out to him and asked him when he's going to

19   pay.

20   Q.  Okay.  And in addition, you reached out to Mr. Rechnitz,

21   also, right?

22   A.  I believe so.

23   Q.  Based on what -- after having done that, did you come to

24   the conclusion, belief, that Mr. Rechnitz intended to pay for

25   that watch?

IBKKGRA1                    Shamayev - Cross

1   A.  No.

2   Q.  That was not what you were told by Mr. Rechnitz?

3   A.  No.

4   Q.  I want to direct your attention to page --

5          MS. NECHELES:  Just for the witness.

6   Q.  -- 3520-14, page 5.  Do you recall telling the

7   government -- you recall being interviewed by the government

8   many times, right?

9   A.  Yes.

10  Q.  Do you recall telling the government, on April 23rd, 2018,

11  that you spoke with Mr. Rechnitz about this, and Mr. Rechnitz

12  said that he would take care of it?

13  A.  I don't remember that.

14  Q.  Does that statement refresh your recollection -- if you

15  look at that, does that refresh your recollection that you told

16  Jona about this, and Jona said he would take care of it?

17  A.  I don't remember him saying he would take care of it.

18  Q.  And you don't remember saying that to the government?

19  A.  If it's there, then I said it.

20  Q.  I'm asking if you remember.

21         THE COURT:  She's asking if you remember, not asking

22  you to look at the --

23         THE WITNESS:  I don't.

24  BY MS. NECHELES:

25  Q.  I want to just turn back -- but it was normally Jona,

1  Mr. Rechnitz, who was paying for things in the store, right?

2  A.  Yes.

3  Q.  Mr. Reichberg was never paying for anything, right?

4  A.  No.

5  Q.  And just turning back, to finish off Defense Exhibit

6  JR-9201, turning to page 23170, in March of 2016, that's

7  another watch for $35,000, correct?

8  A.  It's --

9  Q.  Approximately?

10  A.  Two watches.

11  Q.  Oh, two watches.

12        And the total is approximately 39,000, with taxes?

13  A.  Yes.

14  Q.  On the following page, there are credit card slips for

15  that, right?

16  A.  Yes.

17  Q.  And then on the final page of this, there's a copy of

18  Mr. Rechnitz's Platinum American Express card, right?

19  A.  Yes.

20  Q.  Having looked at those, does that refresh your recollection

21  that he spent hundreds of thousands -- purchased hundreds of

22  thousands of dollars of watches from you?

23  A.  Excuse me?

24  Q.  Am I correct that he purchased hundreds of thousands of

25  dollars of watches from you?

IBKKGRA1                    Shamayev - Cross

1    A.  Yes.

2    Q.  Those watches sometimes -- withdrawn.

3            Now, you testified about a PBA card -- withdrawn.

4            You told the government, also, that -- am I correct,

5    that Mr. Reichberg always paid either by check or credit card?

6    I'm sorry, Mr. Rechnitz always paid by either check or credit

7    card?

8    A.  However he paid, the invoices are there.

9    Q.  He was not someone who typically paid in cash, right?

10   A.  Right.

11   Q.  Now, you testified about a PBA card.  Do you recall that?

12   A.  Yes.

13   Q.  That was something that had been given to you by

14   Mr. Reichberg?

15   A.  Yes.

16   Q.  You said that there was no courtesy extended, correct?

17   A.  Yes.

18   Q.  What you meant by that is you showed the PBA card to a

19   police officer when you got stopped, and you got a ticket

20   anyway, right?

21   A.  Yes.

22   Q.  In fact, you knew it was completely discretionary for

23   police officers, right?

24            MS. LONERGAN:  Objection.

25            THE COURT:  Thank you.

IBKKGRA1                          Shamayev - Cross

1              You can answer the question, if you know the answer.

2              THE WITNESS:  Can you explain that again?

3    BY MS. NECHELES:

4    Q.  Okay.  In your mind, you knew it was up to the police

5    officer who stopped you whether or not they were going to give

6    you a ticket, right?

7    A.  Yes.

8    Q.  And that police officer chose to give you a ticket, right?

9    A.  Yes.

10   Q.  And then you gave some moving violation, traffic violation,

11   ticket to Mr. Reichberg for him to help you with, right?

12   A.  Yes.

13   Q.  Am I correct that your understanding was that Mr. Reichberg

14   had a lawyer who would help with this?

15   A.  Yes.

16   Q.  And that Mr. Reichberg's lawyer would work often in traffic

17   court, and Mr. Reichberg would coordinate with individuals who

18   had tickets and the lawyer?

19   A.  That, I don't know.

20              MS. LONERGAN:  Objection.

21              THE COURT:  Thank you.

22              I accept the answer.

23   BY MS. NECHELES:

24   Q.  But Mr. Reichberg actually didn't take care of the ticket,

25   right?

1   A.  No.

2   Q.  You had to hire your own lawyer to take care of it, right?

3   A.  Yes.

4   Q.  So Mr. Reichberg didn't accomplish anything for you, right?

5   A.  No.

6   Q.  No, he didn't accomplish anything?

7   A.  No.

8   Q.  The only reason you gave him attention was because

9   Mr. Rechnitz was such a good customer, right?

10  A.  Yes.

11  Q.  And he also tried to facilitate a sale of someone else to

12  buy a watch from you?

13  A.  What do you mean?

14  Q.  He tried to act as a middleman, tried to get someone else

15  to buy a watch from you; is that correct?

16  A.  Who?

17  Q.  Mr. Reichberg.

18  A.  I don't understand the question.

19  Q.  You don't recall that?

20          You also asked Mr. Reichberg for help to contact an

21  expediter or an architect; is that correct?

22  A.  Yes.

23  Q.  And nothing happened there, right?

24  A.  I actually wasn't the one that asked him.  Sorry, my father

25  was the one that asked him, and, no, nothing happened.

IBKKGRA1                    Shamayev - Cross

1    Q.  Now, there came a time when Mr. Rechnitz came into the

2    store to discuss with you, to tell you, maybe the FBI would be

3    coming to visit you, right?

4    A.  Yes.

5    Q.  And he talked to you about a Rob Astorino, right?

6    A.  Yes.

7    Q.  He suggested that something had happened with Mr. Astorino,

8    right?

9    A.  I don't -- I'm not sure.

10   Q.  When he asked you, don't you remember when Mr. Astorino got

11   a watch fitted in my office, didn't he tell you that?

12   A.  I don't remember.

13   Q.  You don't remember what he told you?

14   A.  No.  I remember a few things of what he said, but not --

15   Q.  What do you remember?

16   A.  I remember he mentioned Rob Astorino.  I remember he

17   mentioned that if somebody were to come, that I should just be

18   truthful and honest with them, and that was about it.

19   Q.  Okay.  But he was telling you about Mr. Astorino, he

20   claimed, had come into the store, right?

21   A.  Yes.

22   Q.  He claimed that your brother went to fit Mr. Astorino's

23   watch someplace, right?

24   A.  Yes.

25              MS. LONERGAN:  Objection.

IBKKGRA1                    Shamayev - Cross

1          THE COURT:  Thank you.

2          I accept the answer.

3    BY MS. NECHELES:

4    Q.  Did your brother ever go to fit Mr. Astorino's watch in

5    Mr. Rechnitz's office?

6          MS. LONERGAN:  Objection.

7          THE COURT:  Thank you.

8          Sustained.

9          MS. NECHELES:  Your Honor, can we approach?

10         THE COURT:  Please.

11         (Continued on next page)

1                    (At the sidebar)

2                    THE COURT:  Thank you.

3                    There's an objection?

4                    MS. LONERGAN:  Hearsay, your Honor.

5                    MS. NECHELES:  I don't know about hearsay, it's about

6      what happened in the store.  I should be more clear, I should

7      elicit from him, because he and his brother worked together.

8                    THE COURT:  Thank you.

9                    MS. NECHELES:  His brother fixed watches.

10                   THE COURT:  I didn't know what the foundation was for

11     this knowledge.

12                   MS. NECHELES:  I should be more clear.

13                   THE COURT:  Thank you.

14                   MS. NECHELES:  Mr. Rechnitz will claim that a

15     political bribe was paid to Mr. Astorino, and that the bribe

16     was a watch, and that the watch was fitted by this person's

17     store, his brother.

18                   THE COURT:  Thank you.

19                   Can I back up.  Do you expect that the witness'

20     testimony will be that he observed this?

21                   MS. NECHELES:  I think he will testify that that never

22     happened, that he knows from the store, he knows exactly when

23     his brother went to do fittings for -- it's a small store.  He

24     knows when his brother went to do fittings.  It's extremely

25     rare for his brother to go do fittings out of the office, it

IBKKGRA1                         Shamayev - Cross

1    only happened once and -- with respect to this, and it did not

2    happen for a fitting for Mr. Astorino.  I expect that to be his

3    testimony.

4              THE COURT:  Thank you.

5              Can I ask about the last part; namely, that the

6    fitting didn't happen?  How does that come in over the

7    government's hearsay objection?

8              MS. NECHELES:  It's not testifying about statements;

9    it's testifying about that an event didn't happen.  It's an

10   event.

11             MS. LONERGAN:  It's not an event that he witnessed.

12   All he can say is --

13             THE COURT:  His brother told him.

14             MS. NECHELES:  No.  He can say, I am in the store, I

15   worked there, I know when he goes out to do fittings, and it

16   didn't happen.

17             THE COURT:  Thank you.

18             That he did not leave to do a fitting?

19             MS. NECHELES:  For -- yes, except for once, which was

20   for a watch, a ladies' watch.

21             THE COURT:  So you expect the testimony to be I saw

22   him leave to do a fitting for Mr. Astorino once?

23             MS. NECHELES:  Right -- no, never for Mr. Astorino.

24   Mr. Rechnitz.

25             THE COURT:  For Mr. Rechnitz.  Understood.

IBKKGRA1                          Shamayev - Cross

1          MS. NECHELES:  This is the kind of thing --

2          THE COURT:  Counsel for the United States?

3          MS. LONERGAN:  I think the problem is, your Honor,

4  unless she can establish that this witness was literally

5  present in the store every single moment that his brother was

6  present, how can he say what didn't happen.  All he can say is

7  from his observations, but I think otherwise it's going to

8  elicit something that is misleading unless she can establish

9  that this Shamayev was there every single moment his brother

10  was in the store and is aware of every single time his brother

11  left the store to do a fitting.

12          THE COURT:  Thank you.

13          MS. NECHELES:  Your Honor, can I just make two points?

14          THE COURT:  Yes.

15          MS. NECHELES:  The government elicited just this type

16  of evidence when they called the guy who installed windows, and

17  he testified about what was input into the books by other

18  people in his office and what was done by other people.

19          Number two, with respect to misleading, the 3500

20  material shows that both of these people have said that this

21  never happened, the brother and this man.  It's not misleading;

22  it's actually what happened.

23          THE COURT:  Thank you.

24          Let me just pause you.  I'm happy for you to ask

25  questions.  I think you understand the government's concerns.

1              MS. NECHELES:  Yes.

2              THE COURT:  If you can lay the foundation to solicit

3    information that is within this witness' personal knowledge,

4    that's absolutely acceptable.

5              MS. NECHELES:  Okay.

6              THE COURT:  Thank you.

7              (Continued on next page)

IBKKGRA1                        Shamayev - Cross

1              (In open court)

2              THE COURT:  Thank you, counsel.  I'm sorry for the

3     interruption.  Please proceed.

4              MS. NECHELES:  Okay.

5     BY MS. NECHELES:

6     Q.  Let me back up.  Your brother works with you in Motion In

7     Time?

8     A.  Yes.

9     Q.  How big is this store?

10    A.  Not that big.

11    Q.  It's you and your brother, right?

12    A.  And my dad.

13    Q.  And your father, also.

14              And you work closely together?

15    A.  Yes.

16    Q.  Is one of the things that your brother does -- your

17    brother's name is Ariel?

18    A.  Yes.

19    Q.  And is one of the things that he does is to fit watches for

20    customers?

21    A.  Yes.

22    Q.  And that's when there are links on a watch, he can take

23    some out or put other links in; is that correct?

24    A.  Yes.

25    Q.  Does he often go to other places to do that?

1   A.  No.

2   Q.  Do you know that from your personal observation, when he

3   goes and when he doesn't?

4   A.  I don't understand.

5   Q.  How do you know he doesn't often go to other places?

6   A.  Because you need tools to do it.

7   Q.  And you work together, and you see when he's going?

8   A.  Right.

9   Q.  Did he ever go to Jona Rechnitz's office to do a fitting?

10  A.  Yes.

11          MS. LONERGAN:  Objection.

12  Q.  When was that?

13          MS. LONERGAN:  Foundation.

14          THE COURT:  Thank you.

15          You can answer the question.

16          THE WITNESS:  I'm not sure.

17  BY MS. NECHELES:

18  Q.  Was it for a man's watch or a ladies' watch?

19  A.  I'm not sure.

20          MS. LONERGAN:  Objection; foundation.

21          THE COURT:  Thank you.

22          I accept.

23  Q.  Do you recall telling the government that the only time

24  that your brother went to Mr. Rechnitz's office was to fit a

25  ladies' watch?

1    A.   I do.

2    Q.   You do recall?

3              Was that true when you said that?

4    A.   Yes.

5    Q.   So that was the only time that you recall your brother

6    going to Mr. Rechnitz's office to fit a watch, right?

7    A.   Yes.

8              (Continued on next page)

1   BY MS. NECHELES:

2   Q.  And did you -- do you have any records of any watch being

3   fitted for a Mr. Astorino?

4   A.  No.

5   Q.  And you don't have any record or recollection of your

6   brother going any other time to fit a watch, correct?

7   A.  No.

8           MS. NECHELES:  I have no further questions, your

9   Honor.

10          THE COURT:  Thank you.  Counsel for Mr. Grant?

11          MR. MERINGOLO:  Would the government pull up

12  Government Exhibit 915?

13  CROSS-EXAMINATION

14  BY MR. MERINGOLO:

15  Q.  Good morning, sir, I'm John Meringolo, I represent Jimmy

16  Grant.

17  A.  Good morning.

18  Q.  With that cell phone ticket, did you get points on your

19  license?

20  A.  I don't remember.

21  Q.  When was that?

22  A.  I don't remember.

23  Q.  We're pulling up what's in evidence 915 for you to look at.

24          Do you see that on your screen, sir?

25  A.  Yes.

IBKTGRA2                      Shamayev - Cross

1    Q.  Now that is an invoice.  And who's it sold to?

2    A.  Jona Rechnitz.

3    Q.  What was the date?

4    A.  December 24, 2013.

5    Q.  And now that was a Breitling watch traded for another

6    Breitling watch, correct?

7    A.  Yes.

8    Q.  Now how long have you been talking to the government or

9    speaking with the government?

10   A.  I don't remember.  For a while.

11   Q.  Approximately a few years, correct?

12   A.  Yes.

13   Q.  And you provided this to them, right?

14   A.  Yes.

15   Q.  Did they ever request or did you ever find what the first

16   Breitling watch -- where it was, any invoices, any bill of

17   sales, any information on that first Breitling watch?

18   A.  That wasn't sold by us.

19   Q.  But that was traded in to you, correct?

20   A.  Correct.

21   Q.  And are there serial numbers on these Breitling watches?

22   A.  Yes.

23   Q.  In the two years you've been cooperating with the

24   government --

25            MS. LONERGAN:  Objection.

IBKTGRA2                      Shamayev - Cross

1    THE COURT:  Thank you.  You can ask the question.

2    Q.  -- has anyone showed you that you watch or -- again, has

3    anyone showed that you particular watch?

4    MS. LONERGAN:  Objection, characterization.

5    THE COURT:  Thank you.  Counsel, can you rephrase the

6    question, please.

7    Q.  Have you ever seen that watch again?

8    A.  Which watch?

9    Q.  The watch that was traded in to you.

10   A.  No.

11   Q.  But in fact, you had possession of that watch, right?

12   A.  Right.

13   Q.  And do you know if it was sold to anyone or if it's still

14   in your store?

15   A.  No, no.

16   Q.  Did you turn over any information with respect to that

17   watch to the government?

18   A.  No.

19   Q.  Now once again, that was a Breitling for a Breitling,

20   correct?

21   A.  Yes.

22   Q.  And you met with the government like we discussed many

23   times, right?

24   A.  Yes.

25   Q.  And you were truthful, correct?

IBKTGRA2                        Shamayev - Cross

1   A.  Yes.

2   Q.  And when you met with the government, they were taking

3   notes down, right?

4   A.  Yes.

5   Q.  And you discussed this particular Breitling, correct?

6   A.  Yes.

7   Q.  And isn't it a fact that you said the person who came in

8   may be Hispanic with respect to this particular Breitling for

9   Breitling trade?

10  A.  I don't remember that.

11  Q.  Let me pull up 3520-10.  I'm going to direct you to the

12  bottom of the page.  Could you read the bottom of the page --

13          MS. LONERGAN:  Objection.

14  Q.  -- to yourself and see if that refreshes your recollection

15  of what you told the government.

16  A.  It does not refresh my recollection.

17  Q.  When you were talking to government, you were truthful,

18  correct?

19  A.  Yes.

20  Q.  And you do not recall telling the government that the

21  individual that -- the invoice that traded in a Breitling for a

22  Breitling may have been -- the person was maybe Hispanic, you

23  don't recall that?

24  A.  No.

25          MR. MERINGOLO:  No further questions.

IBKTGRA2                    Shamayev - Redirect

1                   THE COURT:  Thank you.

2                   Counsel for the United States?

3                   MS. LONERGAN:  Yes, briefly, your Honor.

4                   THE COURT:  Thank you.  Please proceed.

5    REDIRECT EXAMINATION

6    BY MS. LONERGAN:

7    Q.  Mr. Shamayev, do you remember on cross-examination you were

8    asked some questions about your brother -- the actions taken by

9    your brother?

10   A.  Yes.

11   Q.  Let me ask you, for the time period from say 2011 to 2016,

12   were you in the store, Motion In Time, every single day without

13   exception?

14   A.  No, I don't think so.

15   Q.  So there were days you weren't in the store?

16   A.  Sure.

17   Q.  Were there days when your brother was there and you

18   weren't?

19   A.  Yes.

20   Q.  Are you aware of every single time your brother came and

21   went to the store?

22   A.  No.

23                   MS. LONERGAN:  Mr. Hamilton, we bring up Government

24   Exhibit 915.

25   Q.  Mr. Shamayev, you were asked some questions on

IBKTGRA2                    Shamayev - Recross

1    cross-examination about this transaction as well.

2    A.  Yes.

3    Q.  Do you have any doubt in your mind about who conducted this

4    transaction with you?

5    A.  What do you mean?

6    Q.  Do you have any doubt about who came in and did this

7    Breitling trade with you?

8    A.  Jona Rechnitz is the one that did this deal.

9            MS. LONERGAN:  No further questions, your Honor.

10           THE COURT:  Thank you.  Counsel for Mr. Reichberg.

11           MS. NECHELES:  Few questions, sir.

12   RECROSS EXAMINATION

13   BY MS. NECHELES:

14   Q.  Mr. Reichberg was a really important customer for you,

15   right?

16   A.  Excuse me?

17   Q.  Mr. Rechnitz was a very important customer for you, right?

18   A.  Yes.

19           MS. LONERGAN:  Objection, scope.

20           THE COURT:  Thank you, you can answer the question.

21   A.  Yes.

22   Q.  Do you know whether your brother went on more than one

23   occasion to his office to fit a watch?

24           MS. LONERGAN:  Objection, foundation.

25           THE COURT:  Thank you.  Sustained.

IBKTGRA2                        Shamayev - Recross

1    Q.  Well, were you aware of the kind of things that were done

2    in your store on behalf or for Mr. Rechnitz even when you were

3    not there?

4                MS. LONERGAN:  Objection, hearsay.

5                THE COURT:  Thank you, you can answer that question.

6    A.  I don't know.

7    Q.  You don't know whether you were aware of that?

8    A.  I don't understand it, to be honest with you.

9    Q.  You don't understand my question?

10   A.  Right.

11   Q.  Okay.  Do you believe that -- do you know what was done was

12   sales or other services were provided to Mr. Rechnitz by people

13   who worked in your store, your brother and your father?

14               MS. LONERGAN:  Objection, calls for hearsay.

15               THE COURT:  Thank you.  I'm going to sustain the

16   objection.  The witness could answer that question, but I will

17   ask you to rephrase, counsel.

18               MS. NECHELES:  Okay.

19   Q.  Based on the importance of Mr. Rechnitz as a customer, did

20   you attempt to know what was being done on his behalf in your

21   store, what sales were being done and things being done on his

22   behalf?

23               MS. LONERGAN:  Objection, calls for hearsay.

24               THE COURT:  Thank you, sustained.

25   Q.  Sir, to the best of your knowledge, did anyone go and try

IBKTGRA2                        Shamayev - Recross

1    to fit a watch other than that lady's watch for Mr. Rechnitz?

2                MS. LONERGAN:  Objection, foundation, hearsay.

3                THE COURT:  Thank you, sustained.

4    Q.  To the best of your knowledge, do you know of it ever

5    happening?

6                MS. LONERGAN:  Objection, foundation, hearsay.

7                THE COURT:  Thank you, sustained.

8    Q.  Do you have any knowledge of -- your personal knowledge, do

9    you have any knowledge of anybody going and fitting a watch in

10   Mr. Rechnitz's store other than that one time with the lady's

11   watch?

12               MS. LONERGAN:  Objection, calls for hearsay.

13               THE COURT:  Sustained.

14   Q.  Putting aside hearsay, do you have any knowledge?

15               MS. LONERGAN:  Objection, your Honor, I don't know

16   that this witness understands putting aside hearsay.

17               THE COURT:  Thank you.  Sustained, counsel.

18               MS. NECHELES:  Your Honor, I'm trying to ask a

19   straightforward question here.

20               THE COURT:  Thank you.  You ask it properly.  You can

21   solicit the appropriate evidence.  You heard the objections.

22               MS. NECHELES:  I heard them, I don't really

23   understand.  Maybe we could approach.

24               THE COURT:  Please come up.

25               (Continued on next page)

1          (At sidebar)

2          THE COURT:  So what's the basis for this witness to

3    have an answer to that question other than through hearsay?

4          MS. NECHELES:  Through the practice of the store, your

5    Honor, through whatever records are kept.  He says tools were

6    taken out at time, he had general knowledge of what going on in

7    the store.  That's what I'm trying to ask.  What, based on your

8    knowledge -- do you know whether your brother ever did this?

9    And I think he will say no, I don't have my knowledge.

10          They have the argument that it might have happened

11   when he didn't see it, and I have the argument it's a small

12   store.  That's all I'm asking.  Based on your knowledge, did he

13   ever go -- there's records of what's done, there's like tools

14   you need to get when you are fitting it, you need to take

15   little like the new bands out, this would be -- that's what he

16   testified on direct.  I thought this would be one question,

17   actually.

18          MS. LONERGAN:  Your Honor, he testified on direct that

19   in this period of time they didn't keep records of fittings.

20   We don't think that's an appropriate foundation for his

21   knowledge.

22          MS. NECHELES:  At some point they didn't and at some

23   point they didn't.  I don't think it's clear when

24   Mr. Astorino's watch was fitted.  At some point they didn't and

25   some point they started.

1              MS. LONERGAN:  Well, then I think she could ask much

2     narrower questions, like have you seen a record of this

3     fitting, which would maybe be appropriate based on the business

4     records exception, and she could also ask what he observed.

5     But every single question that Ms. Necheles proposed calls for

6     information that he obtained from his brother or his father or

7     other hearsay sources.

8              MS. NECHELES:  Judge, I believe that in a store, in a

9     business like this, this kind of hearsay is a basis for how

10    people make decisions.  Just like every day you couldn't have

11    testimony about businesses.  And if we want to be that strict,

12    we could object to any sort of background hearsay coming in

13    unless the government establishes somebody who personally saw

14    that.

15             But even like business records come in based on just I

16    know this is the practice in my business, I didn't actually do

17    this, but someone else in my business did.  It's generally

18    accepted.  But okay, I will ask the kind of questions that she

19    is asking.  Did you see him, are the -- you testified there are

20    records, have you ever seen a record of this, there are tools,

21    did you ever see your brother take tools out.

22             THE COURT:  Thank you.

23             (Continued on next page)

24

25

1            (In open court)

2    BY MS. NECHELES:

3    Q.  Okay, sir, to be clear, you never saw your brother going to

4    Mr. Rechnitz's office except on that one occasion for to handle

5    a woman's watch, to fit a woman's watch, is that correct?

6    A.  Yes.

7    Q.  And when your brother would fit a watch, he needed to have

8    tools to do that, right?

9    A.  Yes.

10   Q.  And you never saw him taking the tools out to go fit a

11   watch at Mr. Rechnitz's office other than that one occasion,

12   right?

13   A.  Right.

14   Q.  And after a certain point, you started keeping receipts

15   about when there was a fitting of a watch, correct?

16   A.  Yes.

17   Q.  And there is no receipt for a fitting of a watch at

18   Mr. Rechnitz's office, correct?

19   A.  Correct.

20   Q.  And when you fit a watch, am I correct that it is the

21   practice of Motion in Time to keep the links that are taken out

22   of the watch?

23   A.  No.

24   Q.  Well, do you sometimes keep the links that are taken out of

25   the watch?

1   A.  Not unless the customer doesn't want them.

2   Q.  When the customer doesn't want the watch, doesn't want the

3   links, Motion In Time would keep the links, right?

4   A.  Yes.

5   Q.  And you maintain them, right, you keep them in case the

6   customer later wants them, right?

7   A.  No.

8   Q.  Well, didn't you supply some of those links to the

9   government, pictures of those links to the government?

10  A.  No.

11          MS. NECHELES:  One minute.

12          (Pause)

13  Q.  If could show you what has been marked as 3599-8102 and 03

14  or 02, two pages, if you look at the second page.

15          Am I correct, or maybe I'm wrong, are those links that

16  are kept by your store?

17  A.  This is not ours.

18          MS. NECHELES:  Okay.  I have no further questions.

19          THE COURT:  Thank you.  Counsel for Mr. Grant?

20  RECROSS EXAMINATION

21  BY MR. MERINGOLO:

22  Q.  You testified on redirect about the exhibit, the Breitling

23  from the Breitling, correct?

24  A.  Yes.

25  Q.  And Mr. Rechnitz over time, he purchased over a hundred

IBKTGRA2

1    thousand dollars worth of watches from you, correct?

2    A.   Yes.

3    Q.   Are you aware that every single dollar used to purchase

4    your watches was stolen money?

5              MS. LONERGAN:  Objection.

6              THE COURT:  Thank you.  Sustained.

7    Q.   To your knowledge, are you aware that every single purchase

8    was purchased with stolen money?

9              MS. LONERGAN:  Objection, your Honor.

10             THE COURT:  Sustained.

11             MS. LONERGAN:  Can you strike the question, please?

12             THE COURT:  Thank you.  That's fine, the jury is

13   aware.

14             MR. MERINGOLO:  He's aware.

15             THE COURT:  Thank you.

16             MS. LONERGAN:  Objection.  Could we also strike the

17   comment?

18             THE COURT:  Yes, we are going to strike the comment.

19             Ladies and gentlemen, as you heard me say before, the

20   questions by the lawyers are not evidence, it's only the

21   answers by the witness that are evidence, and commentary by

22   counsel is not evidence either.

23             Counsel for the United States?

24             MS. LONERGAN:  No further questions.

25             THE COURT:  Thank you very much.

1             Thank you very much, Mr. Shamayev, for your testimony,
2    you can step down.
3             So ladies and gentlemen, it's about the time for our
4    regular lunch break, so I will propose that we stop now.
5    During this short recess, please don't discuss the case amongst
6    yourselves, don't communicate with anyone else about the case,
7    and please do no research about the case.  To the extent you
8    may see any press about the case, please don't look at it.
9             I will see you back here in a little bit.
10            (Jury not present)
11            THE COURT:  So let's see if we can do a bit of work
12   before we take our recess.  I have just first again a brief
13   note about the last incident.  I would ask that counsel please
14   avoid outbursts and commentary in front of the jury and just
15   generally.  It's not appropriate.  This is the second instance
16   where that's happened.
17            MR. MERINGOLO:  Judge, may I explain?  It's in the
18   3500 material that Mr. Rechnitz used elicit funds to purchase
19   jewelry, and this is a massive amount of jewelry.  And he's
20   friends with him and he does a lot of business.  So if he's
21   aware that he's using these illicit monies, whether to launder
22   the money to buy watches and jewelry, I think it's an
23   appropriate question if he's aware of it.
24            THE COURT:  Thank you.  Understood.  It's beyond the
25   scope.  There's no clear basis presented to me to present that

IBKTGRA2

1    question at that point in the questioning.

2            What I'm referring to here is the outburst after in

3    which you said "He's aware" loud enough for me and the jury to

4    hear it.  That's simply not appropriate.

5            To the extent that this second gentle rejoinder is

6    inadequate, I would ask that you please be mindful of this

7    going forward.  If there are issues you would like to raise

8    with the Court regarding the basis for a line of inquiry or

9    concern regarding my position on an objection, you can, as

10   counsel have done freely in this case, asked for a sidebar to

11   discuss the case.  That's a perfectly legitimate approach, and

12   I'm happy to consider the arguments of the parties.  Outbursts

13   in front of the jury, however, is not effective nor

14   appropriate.  So I ask, to the extent that you have a concern,

15   please raise it with the Court so that you can discuss it in a

16   reasoned and rationale way, to the extent that that is the goal

17   of that, rather than to make some impression upon the jury or

18   others.

19           Now with respect to the next piece of testimony, I

20   understand that that's the testimony of Mr. Rechnitz.  Is that

21   correct, counsel for the United States?

22           MR. BELL:  It is, your Honor.  To be clear, we will

23   play a short series of recorded calls, but Mr. Rechnitz would

24   be our next live witness.

25           THE COURT:  Thank you.  First, I expect the parties

IBKTGRA2

1    will talk about the recordings that are at issue to float any

2    issues that you might think would come up as a result of them.

3              MS. NECHELES:  Your Honor, with respect, I have

4    informed the government that we object to one of those tapes.

5    I don't understand the relevance and it has a lot of hearsay.

6              MS. LONERGAN:  Your Honor, we think that there is

7    relevance.  We think that the arguments regarding relevance

8    will -- the Court will have more context to consider those

9    arguments later in the trial having heard additional evidence.

10   So we're just going to postpone offering that call, and then we

11   can have relevance arguments at that point when the Court will

12   have more content.

13             THE COURT:  Thank you, understand.

14             So I handed to you, counsel, the proposed -- or I

15   shouldn't say I have, my staff has during the course of this

16   morning's testimony handed to you the limiting instructions

17   with respect to Mr. Rechnitz.  Those, as I say, are based on

18   the exchange of letters earlier related to this issue.  It

19   adopts one of the proposed modifications to the anticipated

20   testimony suggested by Ms. Necheles in her letter related to

21   that instruction.

22             It didn't accept the second component of the request,

23   because as I understand the testimony, all of the requested

24   categories will likely be at issue here.  And just to remind

25   you what I'm referring to, on page 6 of the October 25 letter

IBKTGRA2

1    from Mr. Reichberg the defense requested that I strike the

2    second sentence of the third paragraph of government's

3    instruction, which states that the jury "may also consider that

4    testimony as proof of the defendant's motive, opportunity,

5    intent, preparation, common plan, knowledge or the absence of

6    mistake when it comes to the crimes alleged in the indictment,"

7    arguing that that kind of boilerplate-type instructions are

8    disfavored.

9            In the defendant's proposed instruction with respect

10   to this issue, the defendant Mr. Reichberg suggested that

11   instead simply say that this refers to -- that they can use

12   this information with respect to the determination of whether

13   Mr. Reichberg intended to make a bribe.

14           So I understand the intent question is not at issue.

15   Intent and motive are closely allied.  Therefore, I understand

16   this objection to relate to whether or not this anticipated

17   testimony will speak to opportunity, preparation, common plan,

18   knowledge or absence of mistake, and I don't see why all of

19   those categories of considerations would not be applicable

20   here.

21           Is there further argument on this point?  I read the

22   letter, but I don't understand on the basis of it why it is

23   that those categories of potential considerations aren't

24   applicable to this category of evidence.  Ms. Necheles?

25           MS. NECHELES:  Your Honor, I don't really understand

IBKTGRA2

1    how this goes to motive, opportunity.  I know that the

2    government has said absence of mistake.  I don't understand

3    that there's going to be an argument on absence of mistake.  I

4    think that -- so I think that this just all becomes a jumble.

5          I don't think that is what the government is going to

6    be arguing, putting all these words in, but I haven't really

7    heard them articulate.  The best I heard them articulate is

8    they said it was a common scheme.  I have not heard them

9    articulate at all why the Norman Seabrook testimony comes in.

10   Now what relevance Mr. Rechnitz's claim that Jeremy Reichberg

11   participated, I don't even know how he said he participated, I

12   haven't heard from the government.  So it seems like it's just

13   a jumble and I don't really know what is come it's coming in

14   for.

15         And your Honor, I also ask with respect to last

16   paragraph, the sentence that says, "In particular, you may not

17   use the testimony as proof that the defendant has a criminal

18   personality or bad character," I would ask that you not say

19   criminal personality.

20         THE COURT:  Thank you.  Counsel for the United States,

21   can you comment on the first issue, then I will ask your views

22   on the latter?

23         MR. BELL:  Could I work my way backwards, your Honor?

24         THE COURT:  Please do.

25         MR. BELL:  With respect to Ms. Necheles' proposed edit

IBKTGRA2

1   of omitting criminal personality, that's fine, if that's what

2   the defense actually wants.

3          With respect to the various 404(b) issues embedded

4   within Ms. Necheles' statement, to be clear, Judge, we think

5   that what your Honor has circulated is appropriate.  We think

6   it's an accurate statement of the law.  We think that it is

7   particularly appropriately judicious given the array of conduct

8   that we're going to be talking about here beginning today but

9   at other points in Mr. Rechnitz's testimony as well.  And it's

10  not one size fits all, but we could easily see each and every

11  one of these things applying.

12         And insofar as under 404(b) and the appropriate

13  related law, each of these is a proper basis for this sort of

14  stuff to come in.  Of course it's appropriate to note.  There

15  certainly isn't any sort of prejudice on the off chance, for

16  example, that absence of mistake does not arise.  There's no

17  prejudice for that having been mentioned as a possible basis in

18  any event.

19         More than that, Judge, Ms. Necheles, as we understand

20  it, has been arguing this morning and throughout these

21  proceedings that somehow Mr. Reichberg had no idea about what

22  was -- about the way in which -- and I think that "the pattern"

23  is how Ms. Necheles put it, in which Jona Rechnitz operated,

24  the pattern in which Jona Rechnitz lived his life.  That

25  actually seems to slot perfectly with what absence of mistake

IBKTGRA2

1    actually is.  So on that particular point, that seems to be one

2    hook in which it's appropriately kept.

3            But in any event, your Honor, the instruction to us

4    seems entirely proper.  If Ms. Necheles really wants to strike

5    out the criminal personality bit, we have no objection to that.

6    We haven't heard from Mr. Grant on that score yet.  I think the

7    one thing that I would notice just for sign posting purposes

8    is, as I proposed before, as I'm happy, as we start to get into

9    these other acts, to suggest that it may be a good time for

10   your Honor to give the instruction.

11           I will note also that we do not intend to give

12   every -- to elicit every single act that this may touch on at

13   once.  I think they will be principally in two blocks, one

14   towards the beginning of Mr. Rechnitz's testimony and one

15   towards the end.  How the Court wishes to handle that is, of

16   course, up to the Court.  It may very well be that once is

17   enough because this is going to be a fairly full-bodied

18   instruction, but I do want to note that for the Court's

19   situational awareness.

20           THE COURT:  Thank you.  It may make sense to

21   administer it more than once.

22           Counsel for Mr. Grant, any additional comments on

23   this?

24           MR. MERINGOLO:  We object to administering it more

25   than once.  And your Honor, in your instruction you keep saying

IBKTGRA2

1    acts in the indictment.  I mean PBA cards are still in the

2    indictment, Judge.  How many more witnesses do we have to have

3    come in to testify that this is a courtesy, it's given to

4    people who have committed crimes formally on the department,

5    retirees.  Currently there's 8 million PBA cards in

6    circulation.  I don't believe -- I think the government needs

7    to take a stance right now and either redact it or something.

8    I mean it's just beyond compensation.

9              THE COURT:  Thank you.  We can talk further about the

10   PBA cards and related issue in the instructions, since the

11   government notes their position on how they might clarify that

12   issue.  At the time for our charging conference I will comment

13   on that later.

14             At this point --

15             MS. NECHELES:  Your Honor --

16             THE COURT:  Yes, please, counsel.

17             MS. NECHELES:  -- actually, I mean it might make more

18   sense to frame this as the charges -- the crimes charged in the

19   indictment as opposed to the acts charged in the indictment.

20             So in the first instance when you say, "Apart from the

21   conduct with which Mr. Grant and Mr. Reichberg are charged in

22   the indictment, apart from the crimes," and then again in

23   paragraph three when you say he's only on trial for the acts in

24   the indictment, perhaps it should be crimes charged in the

25   indictment.

IBKTGRA2

1          THE COURT:  Thank you.

2          MS. NECHELES:  Thank you.

3          THE COURT:  I'm happy to make that change.

4          MS. NECHELES:  And your Honor, if we could find out

5   how long Mr. Rechnitz's testimony is expected to be, I think it

6   could also put a different light on whether this should be

7   given more than once and our preparation.

8          THE COURT:  Aggregate length, we can talk about that

9   straightly.  At this point I think I would like to do the

10  following:  First, I expect to administer this limiting

11  instruction with the modifications that we just discussed,

12  namely the modification of paragraph three changing "acts" to

13  "crimes charged," and in the penultimate paragraph to take out

14  the words "criminal personality."

15         It may be that that would be a better reference to

16  criminal propensity.  Counsel, what's your view with respect to

17  that?

18         MR. BELL:  That's fine, Judge.

19         THE COURT:  Counsel?  Counsel for Mr. Reichberg?

20         MS. NECHELES:  I hate to even suggest it to the jury.

21         THE COURT:  That's fine.  I understand the defense

22  does not wish me to say more than bad character, and I won't

23  include those words in this oral limiting instruction prior to

24  administration of the testimony.  As you know, I will

25  ultimately also give a 404(b) limiting instruction in

1     connection with the charge as a whole.

2                 MR. BELL:  Judge, could we get it on the record that

3     Mr. Grant also doesn't want that language there?

4                 THE COURT:  Thank you.  Is that correct, counsel?

5                 MR. MERINGOLO:  We do not, your Honor.

6                 THE COURT:  Thank you.  So I understand that the

7     defendants' objection, and the language proposed here may be a

8     model, but I expect the testimony that will be provided may

9     invoke all of those potential and proper categories in the

10    introduction of this evidence.  I believe it's appropriate to

11    include it, and I don't understand it to be inconsistent with

12    the law.  So counsel, thank you for that.

13                Counsel for the United States, please let me know when

14    you believe it will be appropriate for me to administer this.

15                As I said at the outset of today as we were waiting

16    for the jury to come in, in reviewing the letters on this

17    issue, I was reminded of Ms. Necheles/Mr. Reichberg's original

18    position regarding the anticipated testimony by Mr. Rechnitz

19    regarding bribery of the mayor.  We discussed this issue at

20    length.  I just want to make sure that the state of play

21    remains as I understand we left it and is not where

22    Ms. Necheles proposed on behalf of Mr. Reichberg and, as I

23    understood it, Mr. Grant in her October 25 letter, namely there

24    the defense requested that I exclude that testimony, that

25    limited element of this witness's testimony, on the basis that

IBKTGRA2

1   the defense "has no intent on crossing Rechnitz about this

2   aspect of his guilty plea."

3        Is it still the defense's position, as I understood

4   it, that this is evidence that you would like to come in, and

5   are concerned about not coming in because it would constrain

6   your ability to cross-examine the witness with respect to these

7   issues?

8        MS. NECHELES:  Your Honor, we believe that once the

9   door is opened that they gave money and they did all this stuff

10  that we will have to cross on the full scope.  So to leave out

11  the word "bribe," he's going to say we gave money, we got

12  favors, we are going to have cross in full.

13       THE COURT:  Fine.  Understood.  I will provide the

14  limiting instruction.

15       MR. BELL:  Judge, sorry could we clarify?

16       THE COURT:  That's fine.

17       MR. BELL:  Because I think that memorializing the

18  state of what the play is at this point involves a little more

19  than that.

20       We had bandied about a number of proposals, including

21  the one in which the mayoral stuff would be out entirely.  As I

22  recall, and as I believe my colleagues recall, the defense then

23  rose and quite powerfully said they want to be able to keep all

24  of that in, among other reasons, to impeach Mr. Rechnitz on it

25  because of how he represented those events to the government.

IBKTGRA2

So it's not merely a matter of the government opening the door
in some way, they're maintaining that even if the government
did not do so that they would be able to question on it.

THE COURT:  Thank you.  The record speaks for itself.
I remember now the government I think accepting a proposal in
line with the prior position expressed by Mr. Reichberg only to
see that prior position fade.  As a result, I think that the
government understandably withdrew that suggestion given that
the defense had objected to the protocol that they had
originally suggested.  In any event, the record speaks for
itself and it is in large part consistent, I believe, with your
description of it.

So there are some other issues that I do want to talk
about.  My hope is that we'll end today a little bit earlier,
so around 3:00.  That's in part because there are a number of
other pieces of business that I want to make sure that we can
accomplish today, including finishing up the expert decision.
I also expect to inquire about the records issue that we
discussed yesterday.  We also have gotten a letter from
Mr. Offinger's counsel that I would like to discuss.  Then we
also should discuss Ms. Necheles' letter from yesterday, as
well the issue that Mr. Meringolo properly points out again,
namely the PBA issue as it relates both to any constraints with
respect to whether or not that constitutes an official act and
then also as opposed to the motion to quash the defendant

IBKTGRA2

1    Grant's subpoena regarding all records of the PBA regarding

2    that issue.

3            So those are issues I would like to take up, which I

4    think we should take up at the end of the day, which means I

5    will hope to end the testimony today around 3:00.

6            MS. NECHELES:  Your Honor, one other issue --

7            THE COURT:  Please.

8            MS. NECHELES:  -- that came up during this

9    cross-examination.  There were some photographs of a watch that

10   were given to us in the 3500 material and links that were

11   removed from a watch.  And this was shown to Mr. Shamayev's

12   brother, and I don't know where these pictures came from.

13           And I think, now hearing this testimony and realizing

14   what's going on, I think that the government received this

15   watch and the pictures and the links from Mr. Rechnitz who I

16   think claims that this was removed maybe by this -- this was

17   what was done by this brother here or that these were the links

18   taken off and that the brother denied that.  If that's so,

19   that's Brady, if it's going to contradict the witness.

20           And these sort of oblique references -- I see this is

21   3599 material not 3500 where the government purports to give us

22   Brady, but this is not a Brady disclosure.  If the government

23   thinks that this is a Brady disclosure by giving us something

24   that maybe we could puzzle through and figure out maybe this

25   was told to them by the witness and it contradicts -- that

IBKTGRA2

1   other people have denied and contradicts, that's not a Brady

2   disclosure.

3           And so I'm asking that if these -- I'm asking for the

4   full story on this.  I don't think it's sufficient for the

5   government to label things as 3599 and then later be able to

6   say, as they have done many times in this trial, no, we gave

7   that to you, it was in the materials.  I don't know what this

8   means.  And if this isn't Brady material, I ask it be given as

9   a true Brady disclosure of this is something that was given to

10  us by the witness and be told what this means.

11          THE COURT:  Thank you.  Let me do this just in the

12  interest of time, I'm happy to engage further on this issue.  I

13  know that, to use the word I used yesterday, this is an

14  emergent issue in that this just occurred to the defense.  I

15  would like to encourage you to talk about this informally with

16  the United States.  To extent that you are dissatisfied with

17  how that progresses, please raise it again with the Court.  But

18  I think that you may be able to have a collegial conversation

19  about this that may make some progress, and I propose to take

20  it up after you had that, what I call an initial consultation.

21          I will see you back here in let's say 20 minutes, 25

22  minutes, with the idea that we'll start again with the jury

23  around 12:40, 12:45.  Thank you.

24          (Luncheon recess taken)

25          (Continued on next page)

                          AFTERNOON SESSION

1

2                              (12:45 p.m.)

3          THE COURT:  So counsel, are we ready to proceed?

4          MR. BELL:  We are, your Honor.

5          THE COURT:  Good.  Counsel for Mr. Reichberg?

6          MS. NECHELES:  Yes, your Honor.

7          THE COURT:  Are you ready to proceed?

8          MS. NECHELES:  Yes, your Honor.

9          MR. MERINGOLO:  Yes, Judge.

10         THE COURT:  Mr. Daniels, you can get the jury.

11             MR. BELL:  Your Honor, I will note one thing for the

12     record.

13             THE COURT:  Please.

14             MR. BELL:  The photographs that Ms. Necheles is

15     referring to were taken by the FBI of items that Mr. Astorino

16     turned over to the government.  The longer narrative or story

17     that she came up with, punctuated by "ifs," has no basis in

18     reality.  And Ms. Necheles is welcome in the future to ask us

19     about such things so as to save the Court's and everybody

20     else's time.

21             THE COURT:  Thank you for taking up that work,

22     counsel, and thank you, counsel for Mr. Reichberg, for raising

23     your concerns.

24             MS. NECHELES:  And it still is 35 -- it still is

25     Brady, your Honor, because it doesn't match the story that will

IBKTGRA2

1    be given by the witness.  And it would be easier if Brady were

2    clearly told to us instead of us trying to puzzle it through

3    the notebooks that it were given to us as 3599 as Brady.

4              MR. BELL:  It's not Brady.  We're happy to talk about

5    that after the jury has gone home.

6              THE COURT:  Thank you very much.

7              Mr. Bell, you will let me know when you think it's a

8    appropriate time for the instruction?

9              MR. BELL:  Absolutely, your Honor.  I have a place

10   set, and I will let your Honor know.

11             (Jury present)

12             THE COURT:  Thank you, ladies and gentlemen.  Welcome

13   back.

14             Mr. Bell, please proceed.

15             MR. BELL:  Thank you, your Honor, at this time the

16   government would offer Government Exhibits W0121 and 449

17   pursuant to the wiretap stipulation.  And I believe that those

18   will be without objection.

19             THE COURT:  Thank you, counsel?

20             MS. NECHELES:  No objection, your Honor.

21             MR. MERINGOLO:  No objection.

22             THE COURT:  Thank you, am accepting 121 and 449 into

23   evidence.

24             (Government's Exhibits W0121 and 449 received in

25   evidence)

1          MR. BELL:  At this time we ask, with the Court's

2     permission, for the jury to open their binders and turn to the

3     very first tab in the binder, 121T which corresponds with

4     Government Exhibit W00121, which was just admitted.

5          This is a January 12, 2015 call at 6:15 p.m.  It's

6     between Jeremy Reichberg and Chief Michael "Mike" Harrington.

7          With the Court's permission, I will have Mr. Hamilton

8     play that recording.

9          (Audio recording played)

10         MR. BELL:  Thank you.  Your Honor, with the Court's

11    permission we would direct the members of the jury to tab

12    GX00449T, 449, that corresponds to GXW00449, which was just

13    admitted, it is a January 13, 2015 call beginning at 6:23 p.m.

14    between, once again, the defendant Jeremy Reichberg and Chief

15    Michael "Mike" Harrington, and I will ask Mr. Hamilton to play

16    that call as well.

17         (Audio recording played)

18         MR. BELL:  At this time, your Honor, the government

19    would offer Government Exhibits W005051 and 5058 pursuant to

20    same stipulation and I believe without objection.

21         THE COURT:  Thank you.  Counsel for Mr. Reichberg?

22         MS. NECHELES:  No objection, your Honor.

23         MR. MERINGOLO:  No objection, Judge.

24         THE COURT:  Thank you, I'm accepting into evidence

25    W05051 and 5058.

IBKTGRA2

1            (Government's Exhibits W05051 and 5058 received in

2     evidence)

3            THE COURT:  You can proceed.

4            MR. BELL:  With the Court's permission, I direct the

5     members of the jury to the tab ending in 5051T.  This is a

6     March 3rd, 2015 call beginning at 2:25 p.m.  The participants

7     are Mr. Reichberg and Michael "Mike" Harrington.

8            I ask for Mr. Hamilton to play that.

9            (Audio recording played)

10           MR. BELL:  And with the Court's permission, I would

11    direct the jury to the tab ending in 5058T that corresponds

12    with GXW05058T, which was just admitted.  5058T.  It is a

13    March 2nd, 2015 call beginning at 2:43 p.m.  The participants

14    are Jeremy Reichberg and Michael "Mike" Harrington.

15           And I would ask that, with the Court's permission,

16    Mr. Hamilton be permitted to play this recording.

17           (Audio recording played)

18           MR. BELL:  Finally, your Honor, the government offers

19    Government Exhibit W05066 pursuant to same stipulation, and I

20    believe without objection.

21           THE COURT:  Thank you.

22           Counsel?

23           MS. NECHELES:  No objection.

24           MR. MERINGOLO:  No objection.

25           THE COURT:  Thank you.  I'm accepting into evidence

IBKTGRA2

1    Government Exhibit W0566.  Proceed.

2              (Government's Exhibit W05066 received in evidence)

3              MR. BELL:  With the Court's permission, I direct the

4    jury to the tab 5066T in your binders.  That is a March 2nd,

5    2015 call beginning at 3:19 p.m. between Mr. Reichberg,

6    Mr. Harrington, and an unidentified male designated within the

7    transcript as UM.

8              With the Court's permission, I ask that we go ahead

9    and play that call.  Mr. Hamilton.

10             (Audio recording played)

11             MR. BELL:  Thank you, your Honor.

12             With the Court's permission, the government would like

13   to call its next witness.

14             THE COURT:  Thank you.  Please proceed.

15             MR. BELL:  The government calls Jona Rechnitz.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1    JONA RECHNITZ,

2         called as a witness by the Government,

3         having been duly affirmed, testified as follows:

4              THE DEPUTY CLERK:  Please state your full name for the

5    record and spell your last name slowly.

6              THE WITNESS:  Jona Solomon Rechnitz, R-e-c-h-n-i-t-z.

7              THE COURT:  Thank you.

8              Counsel, you can inquire.

9              MR. BELL:  Thank you.

10   DIRECT EXAMINATION

11   BY MR. BELL:

12   Q.  Good afternoon, sir.

13   A.  Good afternoon.

14   Q.  Before we get started, just for purposes of clarifying one

15   issue:  Can you, once again, give us the actual pronunciation

16   of your last name?

17   A.  Rechnitz.

18   Q.  Thank you.

19         How old are you?

20   A.  I'm 35.

21   Q.  Are you married?

22   A.  Yes.

23   Q.  Do you have children?

24   A.  I do.

25   Q.  How many children do you have?

IBKKGRA3                         Rechnitz - Direct

1   A.   I have five children.

2   Q.   Where do you live?

3   A.   Los Angeles.

4   Q.   Where were you born?

5   A.   In Los Angeles.

6   Q.   What is it that you currently do for a living?

7   A.   Real estate and jewelry.

8   Q.   So, with respect to your real estate and jewelry endeavors,

9   do you work for or at a particular business?

10  A.   Yes, I do.

11  Q.   So let's take them one at a time.

12          With respect to real estate, what business do you work

13  out of?

14  A.   JSR Capital.

15  Q.   With respect to your jewelry pursuits, what business do you

16  work out of?

17  A.   Jadelle Jewelry, J-a-d-e-l-l-e.

18  Q.   So let's touch briefly on both of them.

19          You mentioned that the jewelry business is called

20  Jadelle Jewelry.  Can you tell us what kind of jewelry-related

21  work you engage in presently?

22  A.   Yes.  I sell to retail stores and private clients high-end

23  jewelry.

24  Q.   Generally, what kinds of private clients do you deal with?

25  A.   Certain athletes, celebrities, and private buyers from

IBKKGRA3                          Rechnitz - Direct

1    Beverly Hills.

2    Q.  Who do you work with as part of that business?  Is it just

3    you?

4    A.  Me and my wife, and I have a few employees.

5    Q.  Who actually owns Jadelle?

6    A.  My wife.

7    Q.  You also mentioned JSR Capital.  What kind of business is

8    JSR Capital?

9    A.  JSR Capital is a real estate company involved in the

10   investment, development, and management of real estate.

11   Q.  Whose business is JSR Capital?

12   A.  It's my business.

13   Q.  What does the JSR stand for?

14   A.  It's an acronym for my name.

15   Q.  Did you start the business yourself?

16   A.  Yes.

17   Q.  When did you start it?

18   A.  In December of 2010.

19   Q.  Have you run it continuously since then?

20   A.  Yes, I have.

21   Q.  Mr. Rechnitz, I want to direct your attention to the spring

22   of 2015, a little over three years ago.

23            Did there come a point in the spring of 2015 when you

24   were approached by law enforcement agents?

25   A.  Yes.

IBKKGRA3                          Rechnitz - Direct

1  Q.  Whom did you understand these law enforcement agents to

2  work for at the time?

3  A.  The Internal Affairs Bureau, known as the IAB with the

4  NYPD.

5  Q.  What did you understand the IAB to be?

6  A.  The investigative unit in the NYPD that investigates dirty

7  cops.

8  Q.  Did those law enforcement agents interview you?

9  A.  Yes, they did.

10  Q.  What, generally, did they ask you about?

11  A.  They asked me about an investment that I had been involved

12  with in the liquor business, and asked me if I knew if there

13  were any cops on payroll of the liquor company or any cops that

14  had invested in the liquor company.

15  Q.  Were you fully truthful and candid in answering those

16  questions?

17  A.  No, I was not.

18  Q.  Why weren't you?

19  A.  Because I knew that I was involved in corruption of dirty

20  cops, and I had a lot to hide.

21  Q.  What kinds of things had you done with police officers that

22  you felt that you had to hide?

23  A.  I had bestowed gifts upon them, taken them for expensive

24  meals, flights, provided hotel stays for them, taken them to

25  sports games, and I had given them other sorts of gifts.

1  Q.  Had you done that for a particular purpose?

2  A.  Yes.

3  Q.  And what was the purpose of bestowing those gifts on those

4  officers?

5  A.  I was giving it to them so that I would get things in

6  return for money.

7  Q.  Generally speaking, what sorts of things?

8  A.  Private police escorts, special access at events in

9  New York, help with private disputes.

10 Q.  Now, did there come a second time, Mr. Rechnitz, when you

11 were approached by law enforcement agents?

12 A.  Yes.

13 Q.  About how long after the first time was that?

14 A.  I think it was a few months shortly after.

15 Q.  Who did you understand was questioning you at that point?

16 A.  Again, the IAB for the NYPD.

17 Q.  What sorts of things did they question you about?

18 A.  Similar types of questions, but more focused on did I know

19 any cops involved as investors of the liquor company.

20 Q.  Were you fully candid and truthful in answering the

21 questions you were asked at that point?

22 A.  No, I was not.

23 Q.  And why not, sir?

24 A.  Same reason:  I had a lot to hide, and I was trying to

25 distract them from issues I didn't want discovered.

IBKKGRA3                    Rechnitz - Direct

Q.  Now, did you at some point retain an attorney in connection
with the issues that the law enforcement officers had asked you
about?

A.  Yes.

Q.  Subsequent to that, was there a third occasion when you
were questioned by law enforcement agents, this time in the
presence of your attorney at the time?

A.  Yes.

Q.  Whom did you understand was interviewing you at that point?

A.  The FBI.

Q.  Did they ask you questions?

A.  Yes.

Q.  What did they ask you about this time?

A.  They asked me a lot more questions about certain officers,
about certain relationships I had with public officials.  They
asked me about an investment that I had with a former chief of
police.  They were asking me about Norman Seabrook, who was the
head of the prison guard union.

Q.  Were you fully honest and candid in answering those
questions?

A.  No, I was not.

Q.  Why weren't you?

A.  I had come to have an understanding that they were looking
for something which wasn't even a topic that they discussed.  I
was a bit surprised about how much they had known, and I was

1  trying to, again, hide my level of corruption that I was

2  involved with at the time.

3  Q.  Now, you mentioned your involvement with the chief of

4  police as being one of the things that you were questioned

5  about.

6          Did you have particular reasons not to be honest and

7  candid with respect to that topic?

8  A.  Yes.

9  Q.  What were those reasons?

10  A.  At the time, the chief of police had invested $250,000 with

11  me, and I had paid him half of his investment back in cash.

12  Q.  For what reason did you not -- well, first of all, who was

13  the chief of police that you were talking about?

14  A.  Philip Banks.

15  Q.  For what reasons, if any, did you not want to speak

16  honestly with the agent about Philip Banks?

17  A.  He was the chief of the department, of the NYPD, and I was

18  concerned that I had also taken him on trips and given him a

19  lot of gifts.

20  Q.  You also mentioned an individual named Norman Seabrook as

21  having come up in the questions.  Who was Norman Seabrook?

22  A.  Norman is the former head of the Correction Officers'

23  Benevolent Association.

24  Q.  What do you understand the Correction Officers' Benevolent

25  Association to be?

IBKKGRA3                        Rechnitz - Direct

A.  The prison guards union.

Q.  At the time that you were having this discussion with FBI agents, was Mr. Seabrook actually the president?

A.  Yes.

Q.  Were you honest in answering questions about Mr. Seabrook?

A.  No, I was not.

Q.  Why not?

A.  I had been involved in a bribery with Norman Seabrook.  I helped facilitate a bribe between him and a hedge fund manager, and I did not want that to come out.

Q.  Now, did there come a time, after these conversations with law enforcement, when you decided to cooperate with the government?

A.  Yes.

Q.  Approximately when was that?

A.  It was in the spring of 2016.

Q.  At that point, Mr. Rechnitz, what were some of the reasons that you decided to cooperate with the government?

A.  I felt I had to come forward and come clean, that the government had an overwhelming amount of facts relating to my illegal activities.  I -- just speaking to attorneys, we felt this was the only way, to come clean in order to move ahead.

Q.  Setting aside the conversations that you had with your attorneys, did you discuss the matter with your family?

A.  Yes, I did.

1   Q.  And how did that impact your decision to cooperate with the

2   government?

3   A.  It was important.  I went to my family, I went to a

4   rabbinic advisor, and I went to lawyers, and it was a decision

5   that the only way to move forward is to come clean, and that's

6   what I decided to do.

7   Q.  Now, after you decided to cooperate and come clean, as it

8   were, with the government, were you interviewed with law

9   enforcement agents -- interviewed by, rather, law enforcement

10  agents again?

11  A.  Yes.

12  Q.  Initially, after you started cooperating, how many times

13  did you speak to them?

14  A.  Initially, I think there were three times that we sat down

15  three full days.

16  Q.  Were you truthful with them from that point on?

17  A.  Yes.

18  Q.  Have you met with them since?

19  A.  Yes, sir.

20  Q.  I don't know that it would be quite fair to ask for a

21  precise number, but about how many times would you say since

22  then?

23  A.  Several dozen.

24  Q.  Have you been truthful with the law enforcement agents

25  since that point?

1    A.  Yes.

2    Q.  Mr. Rechnitz, are you testifying today pursuant to an

3    agreement with the government?

4    A.  Yes, I am.

5    Q.  Is that agreement oral or written?

6    A.  It is a written agreement.

7              MR. BELL:  So what I'd like to do, with Mr. Hamilton's

8    assistance and with the Court's permission, is put on the

9    witness' screen, and that of the Court, and the parties what's

10   been marked for identification as 3501-35.

11   Q.  And, Mr. Rechnitz is your screen working today?

12   A.  Yes.

13   Q.  Good.  We'll try to keep that up.

14              Are you familiar with the document before you?

15   A.  Yes, I am.

16   Q.  What is it?

17   A.  This is the agreement, my cooperation agreement, with the

18   Department of Justice from the spring of 2016 -- summer of

19   2016.

20              MR. BELL:  Mr. Hamilton, can we page through that

21   briefly until we get to the end.  Thank you.

22   Q.  And who has signed this agreement, Mr. Rechnitz?

23   A.  I have signed it, my attorneys have signed it, and the U.S.

24   Attorney's Office has signed it.

25              MR. BELL:  Your Honor, the government offers 3105-35,

1   Mr. Rechnitz's cooperation agreement, into evidence.

2              THE COURT:  Thank you.

3              MS. NECHELES:  No objection.

4              THE COURT:  3501-35?

5              MR. BELL:  Yes, your Honor, 3501-35.

6              THE COURT:  Thank you.

7              Counsel for Mr. Grant?

8              MR. MERINGOLO:  Objection.  Just a short voir dire,

9    your Honor?

10             THE COURT:  Thank you.

11             MR. MERINGOLO:  Is it okay from my seat?

12             THE COURT:  Please.

13   VOIR DIRE EXAMINATION

14   BY MR. MERINGOLO:

15   Q.  Mr. Rechnitz, it's your understanding that you aren't

16   allowed to commit crimes after you sign this agreement,

17   correct?

18             MR. BELL:  Objection.

19             THE COURT:  Sustained.

20             MR. MERINGOLO:  It's his understanding of the

21   agreement.

22             THE COURT:  You'll have the opportunity to ask

23   questions about the agreement on cross.  The voir dire is

24   directed at inquiring to the foundation as to the document

25   itself.

1              MR. MERINGOLO:  I object.

2              THE COURT:  The objection is overruled.  The document

3       is accepted into evidence.  I'm accepting 3501-35 into

4       evidence.

5              (Government's Exhibit 3501-35 received in evidence)

6              THE COURT:  You can proceed.

7              MR. BELL:  Thank you, your Honor.

8              Mr. Hamilton, can you publish page 1 of that to the

9       jury, please.  Thank you.

10             Everyone seeing it?  Thank you.

11      BY MR. BELL:

12      Q.  Now, Mr. Rechnitz, under this written agreement with the

13      government, what is it that you're expected to do?

14      A.  I'm expected to tell the truth, to provide substantial

15      assistance when called upon from the government, and not to

16      commit any further crimes.

17      Q.  When you say "tell the truth," in what context are we

18      talking about here?

19      A.  While testifying on the stand and anytime I meet with the

20      government.

21      Q.  As part of this agreement, Mr. Rechnitz, have you pled

22      guilty to any crimes?

23      A.  Yes, I have.

24      Q.  What crime is that?

25      A.  I pled guilty to honest services fraud conspiracy.

1    Q.   So, in a little while, Mr. Rechnitz, I'm going to ask you

2    to talk about some of what it was that made you guilty of that

3    crime, but for the moment, I want to stick with this agreement.

4           What's your understanding of what happens if you

5    fulfill your obligations under the agreement?

6    A.   Then I will receive what's called a 5K letter from the

7    government, which will be issued to my sentencing judge.

8    Q.   What do you understand would be the contents of that 5K

9    letter?

10   A.   It will describe my level of cooperation, in addition to

11   all of my activities.

12   Q.   The good activity and the bad activity?

13   A.   Yes.  The crimes that I have committed and the assistance

14   I've provided.

15   Q.   What do you understand that the purpose of that 5K letter

16   would be?

17   A.   It would serve as a -- hopefully as a leniency at my

18   sentencing.

19   Q.   Have you been sentenced, yet, for the crime that you pled

20   guilty to?

21   A.   No, I have not.

22   Q.   What, sir, is your understanding of the maximum possible

23   sentence that you face when you are sentenced?

24   A.   Twenty years in jail.

25   Q.   Who is it that's going to determine your sentence?

1   A.   The sentencing judge.

2   Q.   What do you understand will happen, Mr. Rechnitz, if you do

3   not fulfill your obligations under the cooperation agreement?

4   A.   Then the 5K will be ripped up, I will not receive a 5K, and

5   I can face further charges, such as obstruction of justice.

6   Q.   Would you still face the same maximum potential penalty?

7   A.   Yes.

8   Q.   What would happen if you specifically failed to fulfill

9   your obligations by failing to tell the truth in your testimony

10   today?

11   A.   I can face further charges of obstruction of justice, and I

12   will lose the benefit of the 5K letter.

13          MR. BELL:   You can take that down, Mr. Hamilton.

14   Thank you.

15   Q.   Mr. Rechnitz, I want to take a step back and ask you a

16   number of questions about your past.

17          You mentioned that you grew up in Los Angeles.  How

18   would you describe your childhood?

19   A.   Privileged.

20   Q.   What did your parents do for a living?

21   A.   My father was in real estate, and my mother was an interior

22   designer.

23   Q.   How was your relationship with your parents growing up?

24   A.   Very good, very close.

25   Q.   What was the nature of your father's real estate business?

1   A.  He had developed mostly mixed use properties, retail,

2   residential above, and some affordable housing as well.

3   Q.  As far as you knew, was he successful?

4   A.  Yes.

5   Q.  What indications did you have of that?

6   A.  People would come over to the house for him to settle

7   disputes or for advice.  He was very charitable.  I'd see our

8   family name on a lot of different schools and different -- he'd

9   get involved in -- there were family fights in Los Angeles with

10  certain families.  He'd get involved and help settle disputes,

11  things like that.

12  Q.  As a child, Mr. Rechnitz, what kind of schools did you

13  attend?

14  A.  Yeshiva day schools, private schools.

15  Q.  How far did you ultimately get in school, sir?

16  A.  I graduated college with a Bachelor's of Science in

17  business management.

18  Q.  What kind of student were you?

19  A.  Average.  Slightly above average.

20  Q.  After you graduated from college, did you take on any

21  additional educational pursuits?

22  A.  Yes.  I attended NYU's school of continuing professional

23  studies to obtain a Master's in real estate.

24  Q.  Did you complete that program?

25  A.  No, I did not.

IBKKGRA3                       Rechnitz - Direct

1    Q.  Now, did there come a time when you started working for a
2    company called Africa Israel USA?
3    A.  Yes.
4    Q.  Approximately when did you start working for Africa Israel
5    USA?
6    A.  I think it was 2006 or 2007.
7    Q.  What was Africa Israel USA, Mr. Rechnitz?
8    A.  Africa Israel USA was a real estate company.  It was the
9    U.S. arm or subsidiary of a publicly traded company in the
10   Israeli stock exchange.
11   Q.  While you were working for Africa Israel USA, where were
12   you based?
13   A.  Initially in Wall Street, and then later on, in Times
14   Square.
15   Q.  What was your first job with Africa Israel USA?
16   A.  I was an assistant to the CEO at the time.
17   Q.  Who was the CEO?
18   A.  His name is Rotem Rosen.
19   Q.  Can you spell Rotem for the court reporter?
20   A.  R-o-t-e-m.
21   Q.  What were your responsibilities when you started working
22   for Mr. Rosen?
23   A.  Anything from helping him with errands, pouring coffee,
24   driving him to attending high profile meetings, or helping him
25   analyze deals, prepare packages on the deals.  A little bit of

 1    everything.

 2    Q.  How long were you with Africa Israel USA?

 3    A.  I was there until I started my firm.  I really started

 4    January 2011 and had left in December 2010.

 5    Q.  During the time that you were with Africa Israel USA, did

 6    you advance within the organization?

 7    A.  Yes.

 8    Q.  What was your ultimate job with Africa Israel USA?

 9    A.  I was named the director of acquisitions and dispositions.

10    Q.  What did that work involve?

11    A.  I was in charge of selling off assets that were marked for

12    sale, and I was looking for new opportunities for the company

13    to purchase.

14    Q.  Now, during the time when you were with Africa Israel USA,

15    what sorts of career ambitions did you have in the longer term?

16    A.  I had very high ambitions.  I wanted to become my own

17    landlord, a big shot.  I wanted to end up owning a lot of real

18    estate in Manhattan.

19    Q.  During the time that you were with Africa Israel USA, did

20    you come to make connections that might be useful to that end?

21    A.  Yes.

22    Q.  What kinds of connections?

23    A.  I had met with various significant players in the real

24    estate world, and I made connections with bankers, financiers,

25    brokers, all sorts of people at the top of the New York City

1    real estate market.

2    Q.   Why did you eventually leave to start your own firm?

3    A.   There are a few reasons.  I saw that Africa Israel USA was

4    liquidating at the time their U.S. portfolio, and I felt it was

5    the right time and opportune time for me to go on my own, given

6    the connections I established in the company.

7    Q.   Was the new firm JSR Capital?

8    A.   Yes.

9    Q.   When JSR Capital began, what was the nature of JSR

10   Capital's primary day-to-day business?

11   A.   The primary day-to-day business was real estate

12   investments, development, and management.

13   Q.   I want to direct your attention back, Mr. Rechnitz, to the

14   early part of your time with Africa Israel USA.  At around this

15   time, did you come to know an individual named Jeremy

16   Reichberg?

17   A.   Yes, I did.

18   Q.   Who was Jeremy Reichberg?

19   A.   He was a liaison for the NYPD.

20   Q.   How did you understand Mr. Reichberg to be a liaison to the

21   NYPD?

22   A.   He told me he was, and his email signature also told me the

23   same.

24   Q.   And did Mr. Reichberg give you a sense of what that meant?

25   A.   Yes.

1   Q.  What sense did he give you of what that liaison title

2   meant?

3   A.  Well, he was a middleman between the NYPD and his

4   community.

5   Q.  Which community specifically was that?

6   A.  In Borough Park in Brooklyn.

7   Q.  When did you first meet Mr. Reichberg, roughly?

8   A.  I think it was either in 2008 or 2009.

9   Q.  How was it that you came to first meet Mr. Reichberg?

10  A.  He had come -- I had a meeting at Africa Israel with an

11  individual, and after the meeting, I walked him downstairs, and

12  I saw he was parked right in front of the building, which was a

13  no standing zone.  I asked him how he could park there, and he

14  showed me a special license plate, it says sheriff on it.  He

15  said he could park where he wants.

16        I said, how do I get one of those?  He said it takes

17  time, but if you want, there's an event a friend of mine is

18  throwing named Jeremy Reichberg at a restaurant called Mike's

19  Bistro with a lot of top NYPD brass.  I'll get you in.  It's a

20  fundraiser for the NYPD football team.  If you come and give a

21  chat --

22        MS. NECHELES:  Objection, your Honor.  Objection;

23  hearsay.  I don't know who's making the statement.

24        THE COURT:  Thank you.  Thank you, counsel.

25        Counsel, can you rephrase the question?

1              MS. NECHELES:  I move to strike it all.  I don't know

2      who made the statement.  It's all hearsay.

3              MR. BELL:  Your Honor, none of that is being offered

4      for its truth.

5              THE COURT:  Thank you.

6              MS. NECHELES:  I think it is, your Honor.

7              THE COURT:  Thank you.

8              MS. NECHELES:  I think it's all hearsay.

9              THE COURT:  I'm sorry, counsel.

10             MS. NECHELES:  Sorry.  Sorry.

11             Your Honor, can we approach for a minute?

12             THE COURT:  Thank you.

13             You may.

14             MS. NECHELES:  Thank you.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1                 (At the sidebar)

2                 THE COURT:  Thank you.

3            I'm sorry, there's an objection.  Go ahead, counsel.

4                 MS. NECHELES:  When he started testifying, I thought

5       he said, how did you meet Jeremy Reichberg, and then all of a

6       sudden, there was this conversation coming up, and I thought he

7       was saying it was Jeremy Reichberg's, but then it turned out

8       it's someone else's statement.

9                 THE COURT:  I was just scrutinizing the transcript for

10      that.  It wasn't clear to me, when he first started speaking,

11      that he was saying it was Reichberg saying it or somebody else.

12      But having scrutinized it, I think it is a series of statements

13      about Mr. Reichberg by someone else.

14            So please go ahead, counsel.  What's your view?

15                MR. BELL:  Your Honor, I'm happy to elicit the exact

16      same thing in a fashion that makes it clear that it's for the

17      effect of the listener because it's what motivated Mr. Rechnitz

18      to go to this event in the first instance.  I also think the

19      prejudice is minimal, in any event, because Mr. Rechnitz will,

20      within the next five minutes, describe this event.

21                THE COURT:  That's fine.  But if you want to do it

22      that way, it's fine.  I'll sustain the objection, strike the

23      answer, and, counsel, you can elicit it.

24                MR. BELL:  Sure.

25                (Continued on next page)

1                (In open court)

2                THE COURT:  I'm sorry.  Counsel, I apologize for the

3      interruption.  I'm sustaining the objection, and I am going to

4      strike the last response.

5                Ladies and gentlemen, I ask you to disregard the last

6      response, please.

7                Counsel for the United States, please proceed.

8      BY MR. BELL:

9      Q.  I want to direct your attention to 2007-2008.  Did you

10     have -- first of all, are you familiar with an individual named

11     Harry Jeremias?

12     A.  Yes, I am.

13     Q.  And who is Mr. Jeremias?

14     A.  He is an individual that I had met for business at Africa

15     Israel offices and a friend.

16     Q.  When you met Mr. Jeremias at Africa Israel's offices -- by

17     the way, where were those?

18     A.  In Times Square, 229 West 43rd Street.

19     Q.  Did you have occasion to walk him downstairs?

20     A.  I did.

21     Q.  When you walked him downstairs, what, if anything, did you

22     observe?

23     A.  I saw that he was parked right in front of the building,

24     and he had a special license plate with the word sheriff on it.

25     Q.  Did that sort of thing interest you at the time?

IBKKGRA3                      Rechnitz - Direct

1    A.  Very much so.

2    Q.  Why?

3    A.  Because everybody knows parking in the city is a hassle,

4    and I would have loved to be able to park where I wanted.  I

5    have to look for parking for long periods of time.

6    Q.  Did there come a point later on where you met Mr. Reichberg

7    in person for the first time?

8    A.  Yes.

9    Q.  Where was that?

10   A.  That was at a restaurant called Mike's Bistro.

11   Q.  How did you come to wind up meeting Mr. Reichberg at Mike's

12   Bistro?

13   A.  Harry Jeremias had --

14            MS. NECHELES:  Objection, your Honor.

15            THE COURT:  You can proceed.

16            THE WITNESS:  Harry Jeremias had told me that --

17            MS. NECHELES:  Objection, your Honor.

18            THE COURT:  You can proceed.

19            THE WITNESS:  Harry Jeremias had told me there was an

20   event at Mike's Bistro restaurant, which was a fundraiser for

21   the NYPD football team, and that he had introduced me to

22   Jeremy.

23            THE COURT:  Thank you.

24            Please proceed, counsel.

25

1    BY MR. BELL:

2    Q.  Did you go to that event?

3    A.  I did.

4    Q.  And what was the appeal of attending that event that

5    Mr. Jeremias told you about?

6    A.  My understanding from Harry was that --

7            MS. NECHELES:  Objection, your Honor.

8            THE COURT:  Thank you.

9            Counsel, can you rephrase?

10           MR. BELL:  Your Honor, it's effective on the listener.

11           THE COURT:  Thank you.

12           Can you rephrase, please?

13           MR. BELL:  Sure.

14   BY MR. BELL:

15   Q.  What was it you expected to be able to accomplish at the

16   event at Mike's Bistro?

17   A.  To also get a special license for parking.

18   Q.  How?

19   A.  By meeting Jeremy and donating to the football team.

20   Q.  Did there come a point where you actually attended that

21   event?

22   A.  Yes.

23   Q.  Prior to that event, did you arrange for a donation to be

24   made to the NYPD football team?

25   A.  Yes.

IBKKGRA3                         Rechnitz - Direct

1    Q.   How much?

2    A.   I think it was $5,000.

3    Q.   Prior to this point, did you have any affiliation with the

4    NYPD football team?

5    A.   None whatsoever.

6    Q.   Prior to seeing Mr. Jeremias' car, did you know that the

7    NYPD had a football team?

8    A.   No, I did not.

9    Q.   Why did you suddenly donate $5,000 to the NYPD football

10   team?

11   A.   I wanted to make a strong impact, and Harry told me that if

12   I were to give --

13            MS. NECHELES:  Objection, your Honor.

14            THE COURT:  Thank you.

15            You can proceed.

16            THE WITNESS:  And Harry had told me if I were to give

17   a big donation, it would go a long way.

18   BY MR. BELL:

19   Q.   When you got to the event at Mike's Bistro, who all did you

20   meet?

21   A.   I met with Jeremy Reichberg, Steven McAllister was there,

22   there were other cops and officers.  I don't recall everyone

23   who was there, but I believe Eddie Gardner was there, and I

24   think Jimmy Grant was there.

25   Q.   So before we get into those specific persons, what type of

IBKKGRA3                          Rechnitz - Direct

1   event was this?

2   A.  It was a dinner in a steakhouse.

3   Q.  How were you treated?

4   A.  Very well.

5   Q.  Did you have an understanding of why?

6   A.  Because I had come with money.

7   Q.  What were your first interactions with Mr. Reichberg like

8   at that event?

9   A.  Very nice.  He told me thank you for the donation, and then

10  he told me that there was a surprise for me that evening, that

11  I was going to be presented with a surprise.

12  Q.  Was there, in fact, a surprise?

13  A.  Yes.

14  Q.  What was the surprise?

15  A.  Even though it was not ready that evening, they had

16  presented one or two people with plaques from the NYPD football

17  team and told me that I had joined so last minute, but they

18  announced that they had a plaque for me, which they later

19  brought to my office.

20  Q.  You mentioned a number of individuals -- Mr. McAllister,

21  Mr. Gardner, people who you saw there that night.  Were you

22  introduced to these folks that night?

23  A.  Yes, I was.

24  Q.  Who did you understand Mr. McAllister to be?

25  A.  An inspector in the New York Police Department.

1   Q.  Who did you understand Mr. Gardner, whom you mentioned

2   before, to be?

3   A.  A detective in the New York Police Department.

4   Q.  You mentioned a Mr. Grant.  Who did you understand, at the

5   time, Mr. Grant to be?

6   A.  A captain in the NYPD.

7   Q.  Now, what, if anything, did this event -- withdrawn.

8          What kind of impression did this event leave you with

9   with respect to Mr. Reichberg?

10  A.  That he was a big shot; he was very powerful.

11  Q.  Did you go on to develop a relationship with Mr. Reichberg?

12  A.  Yes, I did.

13  Q.  What, after this event, was appealing about developing a

14  relationship with Mr. Reichberg?

15  A.  I wanted a parking placard, I wanted to know cops.  Some of

16  the things that I had seen were appealing to me.

17  Q.  Setting aside the parking placard interest, Mr. Rechnitz,

18  why did you want to get to know cops?

19  A.  Growing up, I had seen the big shots very close to

20  politicians, but I had never seen anybody close to police

21  officers, and that was appealing to me for several reasons.

22  Q.  What were those reasons?  What did you think you could do

23  with those connections?

24  A.  First of all, it could be important for my community.

25  Anything we need, I'd have direct access in terms of security.

1   Second of all, I thought it would be good for my image to be a

2   big shot in popularity and attract investors, showing that I

3   have significant connections in the police department.

4   Q.  How much did those things matter to you at that stage in

5   your career, Mr. Rechnitz?

6   A.  At that time, that was everything to me.

7   Q.  How much does it matter now?

8           MS. NECHELES:  Objection.

9           THE COURT:  Thank you.

10          You can answer the question.

11          THE WITNESS:  It really doesn't matter to me.  I've

12  learnt a lot through this.

13  BY MR. BELL:

14  Q.  Now, after the early meeting -- that first meeting with

15  Mr. Reichberg, did the two of you begin a friendship?

16  A.  Yes.

17  Q.  Did you also, Mr. Rechnitz, start a business relationship?

18  A.  Yes.

19  Q.  So I want to ask you, Mr. Rechnitz, about both of those

20  things.

21          With respect to your and Mr. Reichberg's friendship

22  activities, about how much time did you come to spend with each

23  other?

24  A.  Initially, not too much time, but as time went on, I'd say

25  we would speak almost daily.  I even gave Jeremy a spot in my

IBKKGRA3                        Rechnitz - Direct

1    office to work out of.

2    Q.  Did you get to know each other's families?

3    A.  Yes.

4    Q.  Did you spend time together?

5    A.  Yes.

6    Q.  What kinds of places did you spend time with Mr. Reichberg?

7    A.  As families or -- I didn't understand the question.  Can

8    you repeat it, please?

9    Q.  Where did you spend time with Mr. Reichberg -- it could be

10   and others, I suppose -- but generally speaking, as you became

11   closer friends.

12   A.  In the office, at restaurants, cigar lounges.

13   Q.  You also mentioned a business relationship.  What was the

14   nature of your business relationship with Mr. Reichberg?

15   A.  I ran a property on Wall Street, and Jeremy would, as a

16   courtesy to me, pass through the payment for the security guard

17   through his company, which I'd pay the security guard through,

18   and then we would keep some of the extra.  We also had an

19   understanding that any --

20            MS. NECHELES:  Objection, your Honor.

21            THE COURT:  Thank you.

22            You can proceed.

23            MS. NECHELES:  Can we approach on that, your Honor?

24            THE COURT:  You may.

25            (Continued on next page)

1          (At the sidebar)

2          THE COURT:  Yes, there's an objection?  Go ahead.

3          MS. NECHELES:  Yes, your Honor.  I believe they just

4    elicited other crime evidence, 404(b) evidence, that there was

5    never any notice of.  They just -- this witness just said that

6    they ran together -- which has nothing to do with police

7    officers -- they ran together a -- that he had a security -- he

8    ran a business on Wall Street, a building on Wall Street, and

9    as I understand what he said, it's that he had a security

10   company, and he gave the money to pass through Mr. Reichberg's

11   bank account, and that they kept some of the money together.

12   It sounds like fraud, it sounds like tax evasion.  There's

13   never been 404(b) notice on this.  I am surprised, to say the

14   least, that this just was elicited.

15          MR. BELL:  May I?

16          THE COURT:  Please.

17          MR. BELL:  This is one of the rare occasions where I

18   actually share Ms. Necheles' surprise.  I had expected that

19   answer to be somewhat more cabined and focused more on the

20   police.  Mr. Rechnitz and Mr. Reichberg had a substantial

21   number of business entanglements, and so it's not shocking that

22   this came up.  Your Honor can, I suppose, give the instruction

23   now.  I don't intend to plumb further into the security thing.

24          With respect to one item, of which Ms. Necheles does

25   have notice, because it came in through the 3500 material, and

1    it involves Detective Milici and is not itself, so far as I can

2    tell, illegal.  I don't know whether this behavior that

3    Mr. Rechnitz described actually constitutes fraud.  I'm not

4    sure that it necessarily matters.  If your Honor wants to

5    deliver the instruction now, that's fine.  I do think there

6    might be a more opportune point for it not too far into the

7    future, but I leave that to the Court.

8              MS. NECHELES:  I ask to strike it all.  This was

9    improper and should not have come in, and it can't be piecemeal

10   that we're addressing 404(b).

11             So I would ask to strike all of that.  I don't know

12   what other 404(b) evidence the government thinks was in the

13   3500 material that they haven't raised with the Court that

14   would -- Mr. Milici, I don't know what they just referred to.

15             THE COURT:  Thank you.

16             Let me see if I can frame this.  As I understand the

17   defense's concern about this is that this is 404(b) evidence

18   about which they did not previously receive notice, and that's

19   the basis for the objection and the request that I strike the

20   testimony.

21             Counsel for the United States, what's your view?

22             MR. BELL:  One moment, please.

23             (Pause)

24             MR. BELL:  Judge, we're not alleging that this is a

25   bad act.  We have noted that this is something of which we were

1    previously unaware.  I want to be clear, this isn't something

2    that we hid; this is something that I just never heard

3    Mr. Rechnitz speak of before.

4              THE COURT:  Can I propose the following:  I don't know

5    whether or not this conduct is a bad act, I don't know if it's

6    fraudulent, I don't know if it's tax evasion.  I don't think

7    the government knows either because you haven't heard of it

8    before.

9              MR. BELL:  Yes.

10             THE COURT:  Let me propose at this point that I will

11   sustain the objection, strike that testimony, we can come back

12   to it.  I understand Mr. Rechnitz will be on the stand for some

13   amount of time.  Perhaps we can find out whether or not this is

14   a bad act evidence at a subsequent point.

15             MR. BELL:  I'm happy to reask the question in a more

16   focused way, so as to step -- tip toe gingerly around this.

17             THE COURT:  Thank you.

18             (Continued on next page)

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Thank you.  Mr. Bell, I'm sorry for the

3      interruption.

4              I'm going to sustain the objection and strike the

5      witness' last response.

6              Ladies and gentlemen, I'm going to ask you to

7      disregard the witness' last testimony and response to the most

8      recent question posed.

9              Counsel, you can inquire.

10             MR. BELL:  Thank you, your Honor, and not at all.

11     BY MR. BELL:

12     Q.  Did you also, Mr. Rechnitz, develop a business relationship

13     with Mr. Reichberg as it pertained to members of the NYPD?

14     A.  Yes.

15     Q.  And what was it that you and Mr. Reichberg did from a

16     businesses standpoint that involved the NYPD?

17     A.  That anybody that I referred to Jeremy as a client who had

18     an issue, that Jeremy would charge for.  At certain points, we

19     would split that profit.

20     Q.  Now, what did you understand, at this point,

21     Mr. Reichberg's business to be?

22     A.  He was in the business of charging individuals who needed

23     help with the police and other sects of government.

24     Q.  I'm sorry, can you say the last part of that answer again,

25     "and other"?

1   A.  He was in the business of charging people who needed help

2   through the police, given his connections, and other sects of

3   government.

4   Q.  Over that early period, say the first year or two, of your

5   relationship with Mr. Reichberg, what did you come to learn

6   about the nature and depth of the relationships that

7   Mr. Reichberg had with NYPD police officers?

8   A.  He had tremendous connections in vast areas of policing.

9   Q.  Were you able to take advantage of those relationships

10  yourself?

11  A.  Not initially.

12  Q.  Did there come a point where you were able to take

13  advantage of those relationships?

14  A.  Yes.

15  Q.  Generally speaking, in what ways?

16  A.  I first had access with several important officers,

17  high-ranking officers, at a point in time.  I was able to call

18  them directly.  I was able to call them if there was any issue

19  for others, for the community, or for myself.

20  Q.  Who, generally speaking, introduced you to these officers?

21  A.  Jeremy.

22  Q.  Who, generally, managed the relationships with these

23  officers?

24  A.  Jeremy.

25  Q.  When you had to deal with these officers, whom did you

IBKKGRA3                      Rechnitz - Direct

1    generally go through?

2    A.  I went through Jeremy.

3    Q.  And for what reason did you go through Jeremy?

4    A.  He was the -- in our relationship, he was the guy who dealt

5    with all the police and the details, and I was the money man.

6    Q.  When you say, Mr. Rechnitz, that you were the money man,

7    what do you mean?

8    A.  I mean that when it was time to give cops gifts, or it was

9    time to do things that cost money, Jeremy would ask me for the

10   money, and he would deal with the minutia and the details with

11   the officers for any tasks at hand.

12   Q.  Can you give me a general sense of what sorts of things you

13   used your money to purchase for cops as part of this

14   arrangement?

15   A.  Yes.

16   Q.  Please do.

17   A.  I paid for a lot of expensive meals, I paid for sporting

18   event tickets, I paid for private airplanes.  I used -- I paid

19   for prostitutes for officers on occasion.  I paid for gifts

20   that we had given them for the holidays, I paid for watches,

21   jewelry, hotel stay for officers.  Basically anything that

22   would cost money, for the most part, I was the one who would

23   pay, and Jeremy would deal with the details.

24   Q.  Did Mr. Reichberg discuss with you the relationship between

25   the items that you were arranging for and paying for and the

1  favors that you and he sought from police officers?

2  A.  Yes.

3  Q.  And what was it that Mr. Reichberg would say about the

4  relationship between those two things?

5  A.  There were times when he would tell me that, you know, we

6  owe it to him -- for example, Jimmy Grant, we owe it to him,

7  he's been so good to us, he's expecting this.  I told him

8  you're going to pay for a room or I told him you were going to

9  do something for his house, you got to do it, and he's so good

10 to us, he does things whenever we call him.  He definitely

11 linked the two on many occasions.

12 Q.  Now, let's take a step back, Mr. Rechnitz.  You testified

13 that you pled guilty to conspiracy to commit honest services

14 fraud.  At the time that you pled guilty, did you admit to

15 certain conduct?

16 A.  Yes.

17 Q.  Did some of that conduct relate to the subjects of the

18 questions that law enforcement had been asking you about before

19 you started cooperating?

20 A.  Yes.

21 Q.  So let's start with the activities involving police

22 officers that we just touched on.

23        Generally speaking, what is it that you did with

24 respect to NYPD officers that made you guilty of conspiring to

25 commit honest services fraud, as you understood it?

1   A.  I bribed them.  I gave gifts in exchange for favors.

2            MR. MERINGOLO:  Objection to legal conclusion, your

3   Honor.

4            THE COURT:  Thank you.

5            I accept the answer.  You can proceed.

6   BY MR. BELL:

7   Q.  Is that a crime, Mr. Rechnitz, that you committed by

8   yourself or with people?

9   A.  With people.

10  Q.  Do you see anyone you committed that crime with in the

11  courtroom today?

12  A.  Yes.

13  Q.  Who?

14  A.  Jeremy Reichberg and Jimmy Grant.

15  Q.  So let's take them one at a time.

16           Can you identify Mr. Reichberg by a description of

17  where he is in the courtroom and what he is wearing?

18  A.  Yes.  He is sitting two seats away from Ms. Necheles.

19           MR. BELL:  May the record reflect that Mr. Rechnitz

20  has identified Mr. Reichberg?

21           THE COURT:  So noted.

22  BY MR. BELL:

23  Q.  And Mr. Grant?

24  A.  He's sitting next to Mr. Reichberg, and he just stood up.

25           MR. BELL:  And may the record reflect that the witness

1    has identified Mr. Grant?

2              THE COURT:  So noted.

3    BY MR. BELL:

4    Q.  Now, I want to ask you some questions about the scheme that

5    you just described.  We'll be doing a bit more about other

6    officers in a moment or two, but with respect to the scheme

7    that you've described, I think you described yourself and

8    Mr. Reichberg having different roles.  You described yourself

9    as the money man.  What was Mr. Reichberg?

10   A.  The detail man.  He was involved with all the details of

11   anything that I or others needed that I brought forth his way,

12   in addition to his own activities.

13   Q.  Between you and Mr. Reichberg, who communicated more with

14   the police officers regarding the various gifts?

15   A.  Jeremy did.

16   Q.  And between the two of you, who communicated more with the

17   police officers about the various favors that you were getting

18   back in return?

19   A.  Jeremy did.

20   Q.  Did you have an understanding, from speaking to Jeremy,

21   about what the purpose of all of this was from Jeremy's

22   standpoint?

23   A.  Yes.

24   Q.  What did you understand that purpose to be, from having

25   spoken to Mr. Reichberg?

1    A.   To become more influential and powerful in the NYPD, so

2    that he can make a business out of it.  Many times he said to

3    me, in the days of Giuliani, people who were close to him in

4    police made a fortune of money.

5    Q.   Now, when Mr. Reichberg made that statement to you, about

6    in the days of Giuliani, was he speaking solely about

7    police-related favors?

8    A.   No.

9    Q.   What else did you understand him to be speaking about?

10   A.   Politics.  Favors of politicians.

11   Q.   Did you understand Mr. Reichberg's business to involve

12   getting favors and action beyond the NYPD?

13   A.   Yes.

14   Q.   What else did you understand Mr. Reichberg to be able to do

15   for his various customers?

16   A.   He was able to, first of all, help them with expediting

17   issues.  For example, when a client of his was building a

18   house, he was able to expedite the entire permit process for a

19   fee.

20   Q.   Were there particular agencies of New York City which you

21   understood Mr. Reichberg to be able to help people with?

22   A.   Yes.

23   Q.   What were those agencies?

24   A.   The Department of Buildings and an agency dealing with jury

25   duty.

1    Q.  So let's touch on the Department of Buildings first.

2            What did you understand Mr. Reichberg to be able to

3    do?

4    A.  Like I said, expedite people's process.  Rather than go

5    through the normal channels, he would be able to expedite the

6    time it took to get proper permits in place.

7    Q.  Are you familiar, Mr. Rechnitz, with a person named Izzy

8    Englander?

9    A.  Yes, I am.

10   Q.  Who is he?

11   A.  He's a hedge fund manager.

12   Q.  Did you understand Mr. Englander to have a relationship

13   with Mr. Reichberg at any point?

14   A.  Yes.

15   Q.  And what was the nature of that relationship?

16   A.  Jeremy had told me that he was hired on a monthly fee to

17   expedite permits for a home that Izzy Englander had purchased.

18   Q.  You also mentioned jury duty.

19           MR. BELL:  And I think before we get into that, this

20   might be a worthwhile place, your Honor, for the instruction

21   that we discussed outside the jury's presence.

22           THE COURT:  Thank you.  I'll be happy to do so.

23           Ladies and gentlemen, the attorneys expect that

24   Mr. Rechnitz will testify that he engaged in certain activities

25   separate and apart from the conduct with which Mr. Grant and

1    Mr. Reichberg are charged in the indictment, and that he

2    engaged in some of these other activities with, among other

3    people, Mr. Reichberg.  Whether you credit that testimony --

4    that is, whether you believe that these other acts occurred,

5    and, if so, that Mr. Reichberg participated in them -- is

6    entirely up to you.  However, let me note that Mr. Reichberg is

7    only on trial for committing the crimes charged in the

8    indictment, and evidence that he may have participated in

9    certain other acts with Mr. Rechnitz is not a substitute for

10   proof that the defendants committed the crimes charged in the

11   indictment.

12        Instead, it's being offered for limited purposes,

13   which I will state for you now:

14        First, you may consider that testimony, if you believe

15   it is relevant as it relates to the background and nature of

16   the relationship between Mr. Rechnitz and Mr. Reichberg and/or

17   whether Mr. Reichberg intended to bribe police officers.  There

18   may be other purposes for which you will be permitted to

19   consider that testimony.

20        Second, you may also consider that testimony as proof

21   of the defendants' motive, opportunity, intent, preparation,

22   common plan, knowledge, or the absence of mistake when it comes

23   to the crimes charged in the indictment -- alleged in the

24   indictment.

25        Third, you may also consider the substance of the

1    testimony in evaluating the credibility of the witness,

2    Mr. Rechnitz.

3          You may not use the testimony concerning these other

4    acts for any other purpose.  In particular, you may not use the

5    testimony as proof that the defendant has a bad character, nor

6    may you conclude that Mr. Reichberg is guilty of the crimes

7    alleged in the indictment merely because there is testimony

8    that he also engaged in these other activities.  Whether these

9    other activities are themselves violations of any criminal law

10   is not your concern.  They are not the offenses charged in the

11   indictment.

12         Whether you personally approve of these other

13   activities is, likewise, of no concern.  Your job is to

14   evaluate the evidence and testimony and to determine, at the

15   trial's conclusion, whether the government has proven each and

16   every element of the crimes alleged in the indictment, and only

17   those crimes, beyond a reasonable doubt.

18         Thank you, Mr. Bell.  You can proceed.

19         MR. BELL:  Thank you, your Honor.

20   BY MR. BELL:

21   Q.  Mr. Rechnitz, immediately before that instruction, I

22   started to ask you -- I think that you had told us that

23   Mr. Reichberg was able to provide people who paid him certain

24   services with respect to jury duty.

25         What did you understand those services to be?

1    A.   That if somebody was called --

2              MR. MERINGOLO:  Objection.  That was not the

3    testimony.

4              THE COURT:  Thank you.

5              Counsel, I accept the question.  You can respond,

6    Mr. Rechnitz.

7              THE WITNESS:  That if somebody was called to jury

8    duty, and they would have to typically go, he said if I give

9    Jeremy the summons, he would fax it to his contact, and they

10   would not have to go to jury duty; they would get dismissed.

11   BY MR. BELL:

12   Q.   Did Mr. Reichberg tell you who that contact was?

13   A.   Yes.

14   Q.   What was his name?

15   A.   Dennis Quirk.

16   Q.   Did you have occasion to see this happen in action?

17   A.   Yes.

18   Q.   And tell the jury about that.

19   A.   There was a time that I had referred a friend to Jeremy who

20   did not want to go to jury duty, so he gave me a copy of the

21   summons.  I called Jeremy and told him that the jury would

22   be -- they would have to go the following day to jury duty.  So

23   Jeremy said, do me a favor, just have it faxed from your office

24   to the following man, who is Dennis Quirk, and gave me the fax

25   number, and I faxed it, and then Jeremy called to confirm that

IBKKGRA3                           Rechnitz - Direct

1   he received it, and that he would not have to attend jury duty.

2   Q.  Now, did you have occasion to send other people to

3   Mr. Reichberg for this purpose?

4   A.  Yes.

5   Q.  About how many?

6           MS. NECHELES:  Objection.  Can we just have the name

7   of the person?

8           MR. MERINGOLO:  Who were these people?

9           THE COURT:  Thank you.

10          Counsel, can you please rephrase the question?  It

11  might be helpful.

12          MS. NECHELES:  Your Honor, the previous friend.

13          THE COURT:  Thank you.

14          Counsel.

15          MR. BELL:  I'm sorry, your Honor?

16          THE COURT:  You can proceed, counsel.

17          MR. BELL:  Okay.

18  BY MR. BELL:

19  Q.  How many people did you refer to Mr. Reichberg for this

20  purpose, all told?

21  A.  A couple of people.

22  Q.  Now --

23          MS. NECHELES:  Your Honor, can we approach?

24          THE COURT:  Yes.

25          (Continued on next page)

1              (At the sidebar)

2              THE COURT:  Sorry.  The defense wants the government

3       to ask a particular question?

4              MS. NECHELES:  Yes, your Honor.  We should be -- we're

5       entitled to be able to investigate these things before we get

6       up to cross.  So he's throwing this stuff out there, and he

7       says there's a particular friend.  I'd like to know the name,

8       so at least I can try to investigate it in the next couple of

9       days and see whether I can show evidence that he's lying.

10             MR. MERINGOLO:  I don't think --

11             MS. NECHELES:  I know I could wait until cross, but

12      then I won't be able to investigate.  Then I'll have to ask for

13      an adjournment of the trial, and that seems wrong.

14             MR. MERINGOLO:  Your Honor, I believe he can't just

15      blanketly say I had three friends, I had two friends.  This is

16      404(b) evidence.  You just gave the jury an instruction.  You

17      can't start blanketing friends, friends did this and no names.

18      Where are the fax numbers?  Where is the investigation?  Where

19      is everything that we would need to go into?

20             MR. BELL:  Judge, respectfully, this is outlandish.

21      They have been on notice of this particular conduct, as your

22      Honor knows because it was briefed, for months.  If they had

23      further investigation they wanted to undertake, they could have

24      asked for it.  They have had this 3500 material on this subject

25      for months.

1              THE COURT:  That's fine.  I've heard enough.  Thank

2       you.

3              The objection is overruled.  The government's question

4       is not improper.  I understand the defense wants the government

5       to ask particular follow-up questions here, but I think that

6       the questioning at this point is within lines, and the

7       government can properly elicit the information that it deems

8       appropriate at this time.

9              MS. NECHELES:  Judge, in the 3500 material, it does

10      mention that in general he did this, but I never before saw

11      that one specific person.  And I could understand if he says I

12      don't remember anybody's name, it was just general, but now he

13      has testified there was one specific person he recalled.  Can

14      we just get the name of that person, so I can at least

15      investigate a little bit?

16             THE COURT:  Thank you.

17             At some point soon, I want to take a break.  When

18      would be an appropriate time to do that, Mr. Bell?

19             MR. BELL:  Another five minutes, your Honor.

20             THE COURT:  That's fine.

21             MR. BELL:  I'll merely note for the moment that I did

22      not imagine that when conducting this or any other examination,

23      that we were going to be taking requests.  They have

24      cross-examination as a vehicle.  They should use it.

25             THE COURT:  Thank you.  Understood.

IBKKGRA3                        Rechnitz - Direct

1              I'm overruling the objection on substantially that

2    basis.   You can proceed.

3                   (Continued on next page)

1              (In open court)

2              THE COURT:  Thank you.

3              I'm sorry, counsel.  You can proceed.

4              MR. BELL:  Thank you very much, your Honor.

5    BY MR. BELL:

6    Q.  You mentioned earlier that you and Mr. Reichberg had

7    certain financial arrangements with respect to money that would

8    come in as a result of this scheme.  Can you describe what

9    those financial arrangements were?

10   A.  Yes.  That anybody I would refer to him where there was a

11   profit to be made, Jeremy, after taking care of costs that he

12   said there were costs associated with -- for example, ticket

13   fixing, he'd have to pay people -- whatever was left over

14   beyond that cost, we would split.

15   Q.  You mentioned at one point that you let Mr. Reichberg use

16   office space.  First of all, where was your office space at the

17   time; that is to say, JSR Capital's?

18   A.  580 Fifth Avenue.

19   Q.  Was there a particular floor on that building?

20   A.  Yes.  It was in Suite 800.

21   Q.  Was there a specific period of time where you let

22   Mr. Reichberg use office space in there?

23   A.  Yes.

24   Q.  From roughly when to roughly when?

25   A.  He had been in that office prior, that building, and when

IBKKGRA3                    Rechnitz - Direct

1   he left that office, he joined my office.  I think it was 2012

2   or 2013 until 2015.

3   Q.  Now, during the time that you and Mr. Reichberg shared

4   office space, did you have occasion to observe his business

5   activities?

6   A.  Yes.

7   Q.  And what did you observe of the activities that you have

8   described so far?

9   A.  I would see clients coming in.  He would use the conference

10  room or his private office with all different sorts of

11  situations.

12  Q.  Now, were there aspects of Mr. Reichberg's business that

13  you did not know about?

14  A.  Yes.

15  Q.  Did you understand there being police favors that

16  Mr. Reichberg got people that he did not inform you of

17  directly?

18  A.  Yes.

19          MS. NECHELES:  Objection.

20          THE COURT:  Thank you.

21          I accept the answer.  You can proceed.

22  BY MR. BELL:

23  Q.  How did you become aware of that, sir?

24  A.  First of all, he had told me that he had other situations,

25  and then I had heard from sometimes people that I knew or I had

1    introduced him to that he had done things for them without my

2    knowledge.

3    Q.  Now, I want to return to the police favors aspect of

4    Mr. Reichberg's business for a moment.

5         What kinds of police favors did you understand

6    Mr. Reichberg to charge people for?  Can you give me a sense of

7    the range?

8    A.  Well, first of all, ticket fixing, the conversation he had

9    with me is it depended on someone's net worth or financial

10   status on what he would charge them per point.

11   Q.  Can you explain, just for the jury, what ticket fixing is?

12   A.  Yes.  When somebody gets a moving violation, they're

13   supposed to get points and a fine.  So what Jeremy was able to

14   do was get rid -- make sure no points would be put on a license

15   and lower the fine.

16   Q.  Were there -- setting aside ticket fixing for the moment,

17   were there other police favors that you understood

18   Mr. Reichberg to be able to get?

19   A.  Yes.

20   Q.  What sorts of other favors?

21   A.  I remember he got a call once that somebody was in a

22   holding cell in a police station, that he got out right away.

23   There were times that he had to arrange police escorts.  There

24   were times that he arranged access to the New York City

25   Marathon with VIP seating for a parent of one of the runners.

1    Things of that nature.

2              MR. BELL:  I understand, your Honor, we're going to

3    take a break in just -- a short break in just a moment.

4              Before we do, I'd ask, Mr. Hamilton, for you to

5    publish on the witness' screen and that of the parties for the

6    moment what's been marked for identification as Government

7    Exhibit 1049.

8    BY MR. BELL:

9    Q.  Mr. Rechnitz, are you familiar with this communication?

10   A.  Yes, I am.

11   Q.  And how are you familiar with it?

12   A.  It's an email that I sent to Jeremy as a forward.

13             MR. BELL:  Your Honor, I believe that this specific

14   exhibit was referenced in the email stipulation we've made

15   reference to earlier on in the case.  The government offers

16   Government Exhibit 1049.

17             THE COURT:  Thank you.

18             Counsel?

19             MS. NECHELES:  No objection, your Honor.

20             THE COURT:  Counsel for Mr. Grant?

21             MR. MERINGOLO:  No objection.

22             THE COURT:  Thank you.

23             I'm accepting Exhibit 1049 into evidence.

24             (Government's Exhibit 1049 received in evidence)

25             MR. BELL:  Mr. Hamilton, can we please publish that to

1    the jury.

2    BY MR. BELL:

3    Q.  First, let's look at the very top.  The email is from Jona

4    Rechnitz.  That is jona@jrscap.com.  Is that your email

5    address?

6    A.  Jsrcap, yes.

7    Q.  I'm sorry, jsrcap.

8         It was sent on January 21st of 2014 at 1:29 p.m., and

9    it's to Jeremy Reichberg at jreichberg@gmail.com.  And do you

10   understand that to have been Mr. Reichberg's email address?

11   A.  Yes, sir.

12   Q.  Now, there is a subject which says "Forward," and then a

13   word that looks mostly like ticket and letter, and there is

14   attachments, gaviticketletter.PDF.

15        Do you understand what the attachment was?

16   A.  Yes.

17   Q.  What was that?

18   A.  A copy of a ticket.

19   Q.  Now, at the very top, you say, "This is a charged case."

20   And the bottom has an email -- has email traffic between and

21   amongst, among other people, Gavi Wasmer.

22        Did you know Gavi Wasmer?

23   A.  Yes.

24            (Continued on next page)

25

1    BY MR. BELL:

2    Q.   Who was Gavi Wasmer?

3    A.   He's a son of my friend's.

4    Q.   And for what purpose did you send this email to

5    Mr. Reichberg?

6    A.   So that he had a copy of the ticket so that he can get it

7    dismissed, as I discussed.

8    Q.   Now you say at the very top this is a charge case.  Do you

9    recall, Mr. Rechnitz, the circumstances under which you said

10   this is a charge case?

11   A.   Yes, I do.

12   Q.   And what were those?

13   A.   Jeremy and I had recently spoken -- recent from this

14   email -- that other people I was sending him tickets for I was

15   asking favors for and they weren't paying customers, and that

16   he couldn't do things for free, that it cost him money to get

17   it done.  So I told him don't worry, this is a charge case.

18        MR. BELL:  Your Honor, this may be a good time to take

19   that quick break.

20        THE COURT:  Ladies and gentlemen, I want to take a

21   short recess just to stretch your legs.  It will be no more

22   than ten minutes long.  So during the short recess, please

23   don't discuss the case amongst yourselves, don't communicate

24   about it with anyone else, and do no research about the case or

25   anyone involved in it.  I will see you shortly.

1              (Jury not present)

2              THE COURT:  Ladies and gentlemen, I'm going to step

3      down briefly for this short break.  I do want to start with the

4      jury back in here at 2:15, so counsel that means you should be

5      back here a couple of minutes before that so we can bring them

6      in at that time.

7              Is there something that we need to raise before we

8      take our short recess?

9              MR. BELL:  No, your Honor.

10             MR. MERINGOLO:  Nothing, your Honor.  Thank you very

11     much.

12             THE COURT:  Thank you.  I will see you shortly.  Thank

13     you very much.

14             (Recess taken)

15             THE COURT:  Mr. Daniels, please bring in the jury.

16             Counsel for the United States, could you please bring

17     in the witness.

18             MR. BELL:  We're in the process, your Honor.

19             MS. NECHELES:  Your Honor, maybe we could do this at

20     sidebar.  There was --

21             MS. LONERGAN:  Let's do it at sidebar.

22             THE COURT:  Is this something that we need to do at

23     this moment, just because the jury is about to come in?

24             MS. NECHELES:  I think so.  I wanted to find some

25     information.  It appeared that --

1          MS. LONERGAN:  Susan, let's do this at sidebar.

2          THE COURT:  Come on over.

3          (At sidebar)

4          AUDIENCE MEMBER:  Judge, I'm a member of press.  On

5     behalf of the press, we would like to hear this portion if

6     there's something with the jury.

7          THE COURT:  You could send a designee up.  It's also

8     being -- the transcript is also being live streamed.

9          (Pause)

10          THE COURT:  Counsel, what's the issue?

11          MS. NECHELES:  Your Honor, as we were on break I

12     thought -- I believe that I saw the witness, his attorney, and

13     an FBI agent get on an elevator with a juror that had gone on

14     as well and they didn't get off the elevator, so I wanted to

15     inquire.  I thought the government knew about this, I guess

16     they didn't.

17          THE COURT:  Thank you.

18          Counsel for the United States?

19          MR. BELL:  We didn't know about it.  We're happy to

20     investigate to the extent necessary.  I'm happy to talk to FBI

21     folks right now.  It will take 30 seconds.

22          THE COURT:  Thank you.  Could you please inquire?

23          MR. BELL:  Sure.

24          (Pause)

25          MR. BELL:  Thank you for allowing us the opportunity

IBKTGRA4                    Rechnitz - Direct

1   to investigate.  Our understanding of what happened is this:

2   Mr. Rechnitz, members of the FBI, and I think Mr. Rechnitz's

3   counsel got on an elevator to go to another floor;

4   understandable, since I don't think this should surprise

5   anybody, it's a hostile crowd out there.

6            As they -- after they pressed the button, somebody, I

7   guess it was a juror, got on to the elevator like as the door

8   was closing.  It closed, the special agent with the FBI

9   motioned to everybody that they should not discuss anything,

10  and they did not, and then they got out on their appointed

11  floor.

12            THE COURT:  Any further concerns, counsel?

13            MS. NECHELES:  No.  I would have gotten off the

14  elevator.  I ask counsel --

15            THE COURT:  Thank you.  We can discuss that after the

16  end of the trial day.  Thank you.

17            Mr. Daniels, you can bring in the jury.

18            (Continued on next page)

19

20

21

22

23

24

25

1              (In open court)

2              (Jury present)

3              THE COURT:  Thank you, ladies and gentlemen, welcome

4    back.

5              Counsel, you can inquire.

6              MR. BELL:  Thank you.

7    BY MR. BELL:

8    Q.  Good afternoon, Mr. Rechnitz.

9    A.  Good afternoon.

10   Q.  Let's turn now to the subject of James Grant.  Who was

11   James Grant?

12   A.  He was an inspector in the NYPD.

13   Q.  How did you meet him?

14   A.  I met him through Jeremy.

15             MR. BELL:  And can we publish, Mr. Hamilton, what's

16   already in evidence, I believe, as GX1.

17             Your Honor, could we put on the witness's screen, GX1,

18   and that of the Court and the parties.

19             THE COURT:  Thank you, please do.

20   Q.  Mr. Rechnitz, do you see someone on your screen in front of

21   you?

22   A.  Yes.

23   Q.  Are you familiar with the individual depicted here?

24   A.  Yes, I am.

25   Q.  Who is that?

1   A.   James Grant.

2           MR. BELL:  Your Honor, the government offers

3   Government Exhibit 1 as well as 1A, a face plate that says

4   James Grant.

5           THE COURT:  Thank you, counsel.

6           MS. NECHELES:  No objection.

7           MR. MERINGOLO:  Objection, cumulative.  He identified

8   him in the courtroom already.

9           THE COURT:  Thank you.  Overruled.  I'm accepting

10  Exhibits 1 and 1A into evidence.  You can proceed.

11          (Government's Exhibits 1 and 1A received in evidence)

12          MR. BELL:  Could we publish that for the jury, please.

13  BY MR. BELL:

14  Q.   Now Mr. Rechnitz, you testified earlier when you met

15  Mr. Grant you understood him to be a captain of the NYPD.  Over

16  the time that you knew Mr. Grant, did his role within the NYPD

17  change?

18  A.   Yes.

19  Q.   And how did it change?

20  A.   He ended up inspector and he was promoted to the 19

21  Precinct in the Upper East Side.

22  Q.   Approximately when did that happen?

23  A.   I think it was in 2015.

24  Q.   Can you give me a sense of what kinds of favors and

25  benefits, if any, you and Mr. Reichberg conferred on James

1  Grant over the time period between 2008 and 2015?

2  A.  Yes, took him for a couple of meals, to some sporting

3  events.  I paid for his hotel stay in a luxury hotel in Rome.

4  I paid for a private airplane on a trip to Las Vegas and Jimmy

5  Grant came along.  We gave gifts to his children and to his

6  wife on Christmas, and I also gave her a watch for Jimmy.

7  Q.  What, if anything, did you and Mr. Reichberg do with

8  respect to Jimmy Grant's house?

9  A.  He had paid for some work on his railing and also I think

10  some windows.

11  Q.  Now we'll get into each of these things in due time, but

12  generally speaking, Mr. Rechnitz, why did you and Mr. Reichberg

13  provide Mr. Grant with these favors?

14  A.  He had been doing favors for us.  As Jeremy said, he was a

15  good guy and we owed it to him.  And he said that Jimmy on

16  occasion asked for certain things to be done and expected it in

17  return.

18  Q.  What sorts of things over the same period of time had Jimmy

19  Grant done for you and for Mr. Reichberg?

20  A.  Well, for me, to start with, on multiple occasions he

21  personally drove me to the airport with his lights and sirens

22  to beat traffic.  He gave us special access at certain parades

23  and we would enter.  He helped with Jeremy and I with certain

24  private disputes that people had called either me or Jeremy

25  about.  And there on one occasion he helped arrange a police

1   escort for a friend of mine who was in from Philadelphia, and

2   there were a lot of other things that he did as well.

3   Q.  Now you mentioned Mr. Grant's assisting you with private

4   disputes.  What form of assistance did Mr. Grant lend when it

5   came to these private disputes?

6   A.  He would send officers over to the scene to help sort out

7   the situation.

8          MR. MERINGOLO:  Your Honor, we object.  Could we get a

9   specific time that this happened?

10          THE COURT:  Thank you.  You will have the opportunity

11  to inquire on cross-examination.  Objection overruled.

12          You can proceed, counsel.

13          MR. BELL:  Thank you, your Honor.

14  BY MR. BELL:

15  Q.  And to be clear, on the occasions when Mr. Grant sent

16  officers to tend to private disputes, did you understand that

17  to be above and beyond the attention that you would have

18  received or that the situation would have received as a normal

19  citizen?

20  A.  Yes.

21          MR. MERINGOLO:  Objection, your Honor.

22          THE COURT:  Thank you.  I accept the answer.  You can

23  proceed.

24  A.  Yes.

25  Q.  Thank you.  Now was Mr. Grant the only officer that you and

1    Mr. Reichberg dealt with in this fashion over this period of

2    time?

3    A.  No.

4    Q.  Can you list for the jury some of the other officers for

5    whom you recall Mr. Reichberg and yourself giving things or

6    doing things with the expectation of getting police action in

7    return?

8    A.  Michael Harrington, Philip Banks, Chief Jimmy McCarthy,

9    Eric Rodriguez, David Colon and Andrew Capul.

10   Q.  Mr. Rechnitz, did you and Mr. Reichberg focus more

11   attention on different officers at different times?

12   A.  Yes.

13   Q.  Why was that?

14   A.  Just like in any company, we wanted to deal with most

15   powerful people in the organization.  So we tried to deal with

16   the chiefs and inspectors, people at a higher level.

17   Q.  Did Mr. Reichberg have connections with chiefs and

18   inspectors?

19   A.  Yes.

20   Q.  Did the chiefs and inspectors who were at the NYPD change

21   over time?

22   A.  Yes.

23   Q.  And did you and Mr. Reichberg discuss the nature of

24   promotions at the NYPD?

25   A.  Yes.

IBKTGRA4                          Rechnitz - Direct

1    Q.   How frequently did the topic of potential or actual

2    promotions come up when you spoke?

3    A.   Promotion was a constant topic.  It's one of the biggest

4    discussed topics in cop world is who is getting promoted and

5    when.

6    Q.   Why were promotions of such importance to you and

7    Mr. Reichberg?

8    A.   Because as people switch positions, they have different

9    responsibilities.  And the higher the position, the more

10   important.  So we had relationships with higher, important

11   people in the NYPD, that was important, but to have

12   relationships with lower level cops wouldn't be as valuable to

13   us.

14   Q.   You mentioned a number of these officers, and I will ask

15   you some questions about them.  Did you know Michael

16   Harrington?

17   A.   Yes.

18           MR. BELL:  I believe this has been published.  Could

19   we publish Government Exhibit 3, please.

20   Q.   Are you familiar with this person?

21   A.   Yes, I am.

22   Q.   Who is that?

23   A.   Michael Harrington.

24   Q.   What rank did Michael Harrington have you when you met him?

25   A.   He had been an inspector.

IBKTGRA4                        Rechnitz - Direct

1   Q.   And did that rank change over the course of time that you

2   knew him?

3   A.   Yes.

4   Q.   How did it change?

5   A.   He ended up becoming a chief.

6   Q.   Now what kinds of things did you and Mr. Reichberg do for

7   or obtain for Mr. Harrington over the course of the time that

8   you knew him?

9   A.   I had footed the bill for a hotel stay for Michael

10  Harrington that he had to Chicago, took him to expensive meals

11  on a frequent basis.  I paid for gifts as well on Christmas for

12  his family and we also treated him to sporting events.

13  Q.   What kinds of things did Michael Harrington do for you and

14  Mr. Reichberg in his capacity as a police official?

15  A.   He had given officers to help settle private disputes.  He

16  had given us special access to events, fireworks for July 4th

17  and New Year's taking us up to ball.  He had given us special

18  PBA cards.  He helped us whenever called upon.

19  Q.   Were there things that Harrington did for Reichberg without

20  your direct involvement that you nevertheless observed?

21  A.   Yes.

22  Q.   Tell me about those.

23  A.   They were speaking constantly about issues Jeremy had

24  within his own community or other clients of his in the city,

25  he would call Mike up for certain officers to get involved as

1    well.

2    Q.  Did there come a time when you and Jeremy started paying

3    greater attention to Michael Harrington?

4    A.  Yes.

5    Q.  When was that?

6    A.  When he became a chief and he became the right-hand man to

7    the chief of the department, Phil Banks.

8    Q.  Who was Phil Banks?

9    A.  Phil Banks -- at the time when I when met him he was the

10   chief in the community affairs department, but he then was

11   promoted to chief of department, which was the highest ranking

12   uniformed officer in the NYPD.

13          MR. BELL:  Mr. Hamilton, could we publish GX7 to the

14   witness and to everybody.

15   Q.  Are you familiar with this individual?

16   A.  Yes, I am.

17   Q.  Who is that?

18   A.  That's Philip Banks.

19   Q.  And so about how much time passed between when you first

20   met Banks and when he became -- when he occupied the chief

21   position that he got later?

22   A.  It was shortly after, maybe within a month or two.

23   Q.  Did that affect the amount of attention that you and

24   Mr. Reichberg focused on Mr. Banks?

25   A.  Yes.

1   Q.  How?

2   A.  We were all over him.  He was now to become the chief of

3   the department, we had an in from Mike Harrington, and we

4   focused and gave a lot of attention to him.

5   Q.  What sorts of things did you and Mr. Reichberg do for Chief

6   Banks over the period of time that we have been discussing?

7   A.  We provided him with gifts, expensive meals, sports

8   tickets, flights, trips, vacations, things of that sort.

9   Q.  Can you give me a sense of what kinds of vacations and

10  trips you and Mr. Reichberg provided Chief Banks with?

11  A.  Yes, we flew with him to the Dominican Republic on two

12  trips, one time on a private airplane and one time we flew

13  commercial.

14  Q.  Where did you go in addition to -- aside from the Dominican

15  Republic?

16  A.  We also took him and Norman Seabrook on a trip to Israel.

17  Q.  How long was the trip?

18  A.  It was short of a week.

19  Q.  Can you describe what sorts of things you, Chief Banks,

20  Mr. Reichberg and Mr. Seabrook did on that trip?

21  A.  Yes, it was a trip so that he could get to know Israel, the

22  land of Israel.  He had never been there.  We did a trip -- we

23  hired a tour guide, took helicopter ride over Israel, got in a

24  boat, went to visit an Air Force base.  One day when I attended

25  business they went to Masada, which is a mountain.  We were in

1    Jerusalem for a time and went to Tel Aviv as well.

2    Q.  Who paid for that trip?

3    A.  I did.

4    Q.  How much did you pay for that trip all told?

5    A.  I think it was about $50,000.

6    Q.  Now what sorts of things did you -- withdrawn.

7         What kind of benefits did you and Mr. Reichberg get

8    from your attachment to Chief Banks?

9    A.  First of all, prestige within the department; knowing that

10   we were his guys and we were in his inner circle was definitely

11   beneficial.  When Jeremy would see a cop or pick up the phone,

12   they would treat him with a certain respect because he also had

13   the chief's ear when it came time to promotions.  We also had

14   direct access to the chief.  He would pick up his cell phone if

15   we called.  We would visit him on a frequent basis in his

16   office.  Mike Harrington would get things done for us, but

17   Chief Banks was the one who was ordering it.

18   Q.  You mentioned earlier an investment of money on Chief

19   Banks' behalf or a purported investment of money on Chief

20   Banks' behalf.  What was it that you did for Chief Banks?

21   A.  Chief Banks had been telling Jeremy and I in his office

22   that he was about to invest in a home with a man named Abe

23   Friedman.  Abe was also a, call it a police buff, somebody

24   involved with the police who Jeremy strongly disliked.  So

25   Jeremy said we can't let that money go through Abe, we have to

1    control it.  So I agreed.  Not only did I agree, I pushed him

2    to invest the money with me, even though I had nothing to

3    invest it in, so I would give him a great return so that we

4    would still be his guys who made him money.

5    Q.  Were you successful in convincing Banks to send you his

6    money?

7    A.  Yes.

8    Q.  How much money did he send you?

9    A.  $250,000.

10   Q.  And what did you tell Banks that you would do with that

11   money?

12   A.  Initially I told him I would invest it in -- there was a

13   World Cup event where I had a connection to a sports ticket

14   broker, that I would invest in tickets for the World Cup.  Then

15   I told him I would invest it in real estate and told him I

16   would put it in jewelry.  And he said:  I don't care, it's safe

17   with you, do whatever you want to do with the money.

18   Q.  What did you in fact do with the money once you received

19   it?

20   A.  Nothing.  I didn't invest it.  I used it and I returned it

21   with profit.

22   Q.  How much profit did you return on top of the $250,000?

23   A.  $25,000.

24   Q.  Why did you give Mr. Banks $25,000 in addition to returning

25   his money?

1    A.   So that he would feel really good, he will feel indebted to

2    us, and he would kind of owe us one and we would find good

3    grace in his eyes.

4    Q.   The individual you mentioned who Mr. Banks was about to get

5    involved with, this Abe Friedman, were you familiar with him

6    prior to that event taking place?

7    A.   Yes.

8    Q.   Had you discussed him with Mr. Reichberg?

9    A.   Yes, on many occasions.

10   Q.   And what generally had you and Mr. Reichberg said about

11   Mr. Friedman?

12   A.   I didn't know him too well.  I just knew from Jeremy that

13   he was somebody that Jeremy strongly disliked who had a

14   presence and power in the police department that Jeremy wanted

15   to outshine.  I think he told me once maybe they were cousins,

16   I don't remember exactly, but he had a particular dislike for

17   him and wanted to make sure that we -- we, he, was more

18   powerful in the community.

19   Q.   Did Mr. Reichberg view Mr. Freedman as a competitor?

20   A.   Yes.

21   Q.   Were there other competitors in the cop buff game, as it

22   were?

23   A.   Yes.

24   Q.   Were you familiar with an individual named Jack Meyer?

25   A.   I might have met him a few times.

1    Q.  Who was Jack Meyer?

2    A.  A nice man I met once on a flight.  He was cousins with a

3    friend of mine and he runs a very nice organization.

4    Q.  You understand Mr. Meyer to have police relationships as

5    well?

6    A.  Yes.

7    Q.  Did you and Mr. Reichberg view Mr. Meyer as a competitor?

8    A.  No.

9    Q.  Now I want to direct your attention to December 25th of

10   2013, which is to say Christmas day of that year.

11           Mr. Rechnitz, do you recall what you did that day?

12   A.  I do.

13   Q.  What did you do on Christmas of 2013?

14   A.  Jeremy and I spoke that morning about going to deliver

15   gifts to certain police officers who were with us.  I had gone

16   and sent my assistants to go buy some Nintendo games and to

17   American Girl, some doll company, we went and bought dolls.

18   Jeremy had some earrings he told me in a box, that he owned

19   some earrings that were still unsold, and I went to pick up a

20   convertible for my friend Eli Cohen, and we loaded all of the

21   gifts and we went to deliver them to Staten Island to certain

22   police officers and their families.

23   Q.  Which police officers did you and Jeremy visit on that

24   Christmas?

25   A.  Eric Rodriguez, Michael Harrington and James Grant.

IBKTGRA4                         Rechnitz - Direct

1   Q.  Who was Eric Rodriguez?

2   A.  He was a big shot cop in Brooklyn that Jeremy had dealt

3   with a lot.

4   Q.  And why those three cops, Mr. Rechnitz?

5   A.  These were the cops that Jeremy and I had decided were

6   deserving of the gifts that we should go make our rounds to

7   that have done a lot for us that year.

8   Q.  What did you understand Mr. Rodriguez's rank to be?

9   A.  Inspector.

10  Q.  Now did you and Mr. Reichberg dress for the occasion of

11  dropping off these presents?

12  A.  Yes.

13  Q.  How did you dress?

14  A.  We bought elf hats.

15  Q.  Why elf hats?

16  A.  It was Christmas day.  To make it a little more festive.

17  Q.  And you mentioned Nintendo games and you mentioned an

18  American Girls doll.  Were there other gifts that you intended

19  to drop off to any of those officers that day?

20  A.  There was also a pair of earrings that Jeremy had brought

21  for Jimmy Grant for his wife.

22  Q.  Were Harrington and Rodriguez also married?

23  A.  Yes.

24  Q.  Why the earrings for Jimmy Grant?

25  A.  That's something that Jeremy wanted to do special for him.

1   Q.  Now where did Grant Harrington and Rodriguez live?

2   A.  In Staten Island.

3   Q.  All three of them?

4   A.  Yes.

5   Q.  And you mentioned that there was a convertible.  Did you

6   take what that convertible to Staten Island that day?

7   A.  Yes.

8   Q.  What kind of a convertible was it?

9   A.  It was a black Aston Martin.

10  Q.  Is that a particularly fancy car?

11  A.  That's a very high end luxury convertible.

12  Q.  Why the convertible that day?

13  A.  To look like a big shot to the cops.

14  Q.  Did you in fact deliver gifts to Eric Rodriguez?

15  A.  Yes.

16  Q.  Did you in fact deliver gifts to Jimmy Grant?

17  A.  Yes.

18  Q.  Did you in fact deliver gifts to Michael Harrington?

19  A.  Yes.

20  Q.  Were they well received?

21  A.  Yes, they were.

22  Q.  I want to show you what's been marked for identification as

23  Government Exhibit 1042.

24          MR. BELL:  If we could show that to the witness and

25  the parties.

IBKTGRA4                          Rechnitz - Direct

1    Q.  Are you familiar with that email?

2    A.  I am.

3    Q.  When was it sent?

4    A.  The day before Christmas.

5            MR. BELL:  Your Honor, the government offers 1042.

6            MS. NECHELES:  No objection.

7            MR. MERINGOLO:  No objection.

8            THE COURT:  Thank you.  I'm accepting Exhibit 1042

9    into evidence.

10           (Government's Exhibit 1042 received in evidence)

11           THE COURT:  You can proceed.

12           MR. BELL:  May we publish that for the jury, please?

13           THE COURT:  You may.

14   BY MR. BELL:

15   Q.  So this email is from you, jona@jsrcap.com, Tuesday,

16   December 24, 9:23 a.m., to Jeremy Reichberg, and you say:  Find

17   out how old Harrington and Rodriguez kids are, please.

18           What was the purpose of sending this email?

19   A.  To find out their ages to choose which gifts we're going to

20   be giving them.

21           MR. BELL:  Thank you.  You could take that down,

22   Mr. Hamilton.

23           I now would like to publish just to the witness and

24   the parties what's been marked for identification as Government

25   Exhibit 623.

1    Q.  Are you familiar with this image?

2    A.  I am.

3    Q.  And what is depicted here?

4    A.  This is an image of Jeremy in my office wearing the

5    Christmas hat.

6    Q.  The same Christmas hat that he wore for the ride to Staten

7    Island?

8    A.  Yes.

9           MR. BELL:  Your Honor, the government offers 623.

10          MS. NECHELES:  No objection.

11          MR. MERINGOLO:  Objection.

12          THE COURT:  I'm sorry, was that objection?

13          MR. MERINGOLO:  Objection.  He testified that they had

14   elf hats, not Christmas hats.

15          THE COURT:  Thank you.  Overruled.  I'm accepting 623

16   into evidence.

17          Counsel, you can proceed.

18          MR. BELL:  Thank you, your Honor.

19          (Government's Exhibit 623 received in evidence)

20   Q.  Just for the record, Mr. Rechnitz, do you ordinarily

21   celebrate Christmas?

22   A.  No, I do not.

23   Q.  Do you have terribly much of a history with elves other

24   than acting as one for the cops on this occasion?

25   A.  No.

1   Q.  Now did you take a -- separate and apart from this picture,

2   did you take any video or picture souvenirs from that day?

3   A.  Yes.

4           MR. BELL:  And so what I would like to do -- it may be

5   easier for me just to offer this, is to offer what's been

6   marked for identification as Government Exhibit 309.  It is a

7   video.  I suspect defense counsel knows which one.  I'm happy

8   to tell them.  Anyway, the government offers 309.

9           MS. NECHELES:  No objection, your Honor.

10          MR. MERINGOLO:  No objection.

11          THE COURT:  Thank you.  Can you briefly describe what

12  this is, counsel?

13          MR. BELL:  I can, your Honor.  This is a video that I

14  believe was taken selfie style by Mr. Rechnitz on the day in

15  question.

16          THE COURT:  Thank you, I'm accepting Exhibit 309 into

17  evidence.  You can proceed.

18          (Government's Exhibit 309 received in evidence)

19          MR. BELL:  Before we publish 309, could we very

20  briefly publish GX9 just to the witness's screen.

21  Q.  Are you familiar, Mr. Rechnitz, with this individual?

22  A.  Yes, I am.

23  Q.  Who is he?

24  A.  That's Inspector Eric Rodriguez.

25  Q.  This is one of the same individuals who you visited on

1   Christmas in elf mode in 2013?

2   A.  Yes.

3          MS. NECHELES:  Your Honor, I object to leading.

4          THE COURT:  I will permit it here.

5          MR. BELL:  Thank you, your Honor.  The government

6   offers Government Exhibit 9.

7          MS. NECHELES:  No objection.

8          MR. MERINGOLO:  No objection.

9          THE COURT:  Thank you.  I'm accepting Exhibit 9 into

10  evidence.

11         (Government's Exhibit 9 received in evidence)

12         THE COURT:  Counsel, you can proceed.

13         MR. BELL:  Could we publish that, please?

14         THE COURT:  You may.

15         MR. BELL:  And take that down, Mr. Hamilton.  Thank

16  you.

17         Now Mr. Hamilton, I would ask you to publish

18  Government Exhibit 309, the video we admitted just a moment

19  ago, and I would ask you to play it, please.

20         (Video recording played)

21  BY MR. BELL:

22  Q.  Now Mr. Rechnitz, do you recall that moment?

23  A.  Yes, I do.

24  Q.  Where are you and Mr. Reichberg at the time captured in the

25  video?

1   A.   In the convertible.

2   Q.   Now you made reference to a bye-bye Abbie, who was that a

3   reference to?

4   A.   Abbie Friedman.

5   Q.   And why was it, Mr. Rechnitz, that you were saying bye-bye

6   Abbie, ho, ho, ho, at that particular moment?

7   A.   Because we were going to deliver gifts and have better

8   grace in these cops' eyes, in our opinion, than Abbie Friedman.

9   He wasn't there delivering gifts in elf hats.

10          MR. BELL:  Why don't we take that down.

11  Q.   You mentioned earlier that you as you came to know these

12  officers you came to visit Chief Banks regularly at One Police

13  Plaza?

14  A.   Yes.

15  Q.   How did you typically get to One Police Plaza during this

16  period of time?

17  A.   So Jeremy and I would drive into One Police Plaza, there

18  would be accommodations to allow us in past the frozen zone,

19  which is an area where important people park in the department.

20  And then there was this very special underground garage where

21  the chief of the department and the commissioner would park and

22  other high level individuals, and we would access and we would

23  park directly in the chief of department's spot or one of his

24  guest spots.

25  Q.   How did you get particular access to that parking spot past

IBKTGRA4                    Rechnitz - Direct

1    the frozen zone at One Police Plaza?

2    A.   Jeremy made accommodations with Chief Banks or Mike

3    Harrington.

4    Q.   Now during that holiday season did you have occasion to

5    visit One Police Plaza by car?

6    A.   Yes.

7    Q.   Did you take a video souvenir?

8    A.   Yes, I did.

9              MR. BELL:  Before we get to that, I would actually ask

10   you, Mr. Hamilton, to put on the witness's screen and that of

11   the parties what's been marked for identification as Government

12   Exhibit 607.

13   Q.   Are you familiar with this image, sir?

14   A.   Yes, I am.

15   Q.   How are you familiar with it?

16   A.   I took the photo.

17   Q.   And where did you take it?

18   A.   In the private garage we just talked about, that is the

19   Chief of Department Phil Banks' private parking spot.

20             MR. BELL:  The government offers Government

21   Exhibit 607.

22             MS. NECHELES:  Your Honor, could we get a date on

23   that?  Or could I voir dire?

24             THE COURT:  Counsel, could you please inquire, counsel

25   for the United States?

1          MR. BELL:  Sure.

2     Q.  Do you have an understanding of what precise day you

3     happened to take this picture?

4     A.  No, I do not.

5     Q.  Do you have an understanding of during what general period

6     you took this picture?

7     A.  Yes.

8     Q.  What's your best understanding of when you took about

9     picture?

10    A.  This is when Philip Banks was the chief of the department.

11    Q.  Why were you able to access this space at that time?

12    A.  Because we had the relationship with Philip Banks that gave

13    us that privilege.

14          MR. BELL:  We reoffer the exhibit.

15          THE COURT:  Thank you.  Counsel?

16          MS. NECHELES:  Could I ask a few questions about this,

17    your Honor?

18          THE COURT:  You may.

19    BY MS. NECHELES:

20    Q.  Sir, were you alone with Mr. Reichberg in that picture?

21          MR. BELL:  Objection.

22          MS. NECHELES:  That's not a -- I'm trying to place a

23    date on it.

24          THE COURT:  Thank you.  You can inquire about the

25    date, counsel.

1   BY MS. NECHELES:

2   Q.  Is that the same date of the video that you took of that

3   event as well?

4   A.  I do not know the date of this photo.

5   Q.  Do you remember taking a video of going into the police

6   garage?

7   A.  There are many photos that I took.

8   Q.  And there was one where you went into the police garage

9   with Mr. Reichberg in the evening, right?

10          MR. BELL:  Your Honor, I object to this line of

11   purported voir dire.

12          THE COURT:  Sustained.

13   BY MS. NECHELES:

14   Q.  Is that the same date?

15          MR. BELL:  Your Honor, asked and answered.

16          THE COURT:  Thank you.  Understood.

17          MS. NECHELES:  I didn't get an answer.

18          THE COURT:  I think the witness said he does not know.

19   Could you put the question?

20   BY MS. NECHELES:

21   Q.  Is that the answer, you don't know whether that was that

22   day?  That's correct?

23          THE COURT:  Thank you.  Objection, counsel?  Counsel

24   for Mr. Reichberg, any objection?

25          MS. NECHELES:  No, no objection.

1           THE COURT:  Thank you.  Counsel?

2           MR. MERINGOLO:  No objection.

3           THE COURT:  Thank you.  I'm accepting 607 into

4   evidence.

5           (Government's Exhibit 607 received in evidence)

6           THE COURT:  You can proceed.

7           MR. BELL:  Publish 607 to the jury, please.

8   BY MR. BELL:

9   Q.  What do we see here, Mr. Rechnitz?

10  A.  This is photo of Jeremy Reichberg standing in Phil Bank's

11  private parking spot in the garage.

12          MR. BELL:  Now why don't we, Mr. Hamilton, cue up

13  Government Exhibit 307.  It's a video, and logistically it

14  might be easier for us to offer it.  I believe the defense is

15  familiar with it.

16          THE COURT:  Thank you.  Can you also please reference

17  the stipulation that is referred to?

18          MR. BELL:  This is not referenced in a stipulation,

19  your Honor.

20          MS. NECHELES:  Your Honor, on that video as well could

21  I ask -- can I inquire about it, a brief voir dire?

22          THE COURT:  Thank you.  I'm happy for you to discuss

23  with counsel, if you would like.

24          MS. NECHELES:  No, I want to ask the witness a

25  question about the video itself voir dire.

1              THE COURT:  Thank you.  Counsel, I understand that you

2      want to introduce this, would you like to ask the witness some

3      questions about it?

4              MR. BELL:  Sure thing.

5              THE COURT:  Thank you.

6              MR. BELL:  Can we put 307 on the witness' screen,

7      Mr. Hamilton, not the jury's.

8              Can you play it without the sound.

9      BY MR. BELL:

10     Q.  Mr. Rechnitz, are you familiar with this video?

11     A.  Yes, I am.

12     Q.  How are you familiar with it?

13     A.  I took the video.

14     Q.  And where were you when you took the video?

15     A.  I was in the front passenger seat of the car with Jeremy.

16     Q.  And where was this video -- where did this video get

17     recorded?

18     A.  Entering One Police Plaza.  We are now approaching the

19     frozen zone.

20             MR. BELL:  Thank you.  Your Honor, the government

21     offers 307.

22             THE COURT:  Thank you.

23             Counsel?

24             MS. NECHELES:  Where was that video maintained?

25             THE COURT:  Sorry, is there --

IBKTGRA4                          Rechnitz - Direct

1              MS. NECHELES:  Could I ask a brief voir dire, your

2    Honor?

3              THE COURT:  Thank you.  That relates to the

4    foundation?

5              MS. NECHELES:  Yes, absolutely.

6              THE COURT:  Thank you, you can proceed.

7    BY MS. NECHELES:

8    Q.  Where did you keep this video before you gave it to the

9    government?

10             MR. BELL:  Objection.

11             THE COURT:  Thank you.  Sustained.

12   BY MS. NECHELES:

13   Q.  Was it on your phone?

14             MR. BELL:  Objection.

15             THE COURT:  Thank you.  Sustained.

16   Q.  Is there any metadata?

17             MR. BELL:  Objection.

18             THE COURT:  Counsel, please come forward.

19             (Continued on next page)

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  There's an objection, counsel?

3          MS. NECHELES:  I want to find -- I want to inquire

4    whether there is metadata, whether we have the original and

5    where there's metadata.  Maybe the metadata could help us

6    establish when it's from.  That's what I'm trying to find out

7    from this witness.

8          THE COURT:  Is this a document that's been produced to

9    the defense previously?

10         MS. NECHELES:  Yes, but we don't have any metadata

11   with it.

12         THE COURT:  Why are these questions relevant to

13   foundation for the admissibility of this document?

14         MS. NECHELES:  I think it goes to when it's from, and

15   if it's from a different time it's not really admissible.  When

16   is it from?  It goes to what is this document.

17         MR. BELL:  There was, your Honor, not some time ago, a

18   forum for this type of inquiry.  This is not it.  The

19   foundation, we submit, has been laid, and we again offer the

20   document.

21         THE COURT:  Thank you.

22         MS. NECHELES:  I don't know what forum.  I haven't

23   spoken to this witness, even though he knows my name.

24         THE COURT:  Thank you.  I will overrule the objection

25   to the extent there is one.  I understand the witness laid an

IBKTGRA4                        Rechnitz – Direct

1    adequate foundation for it.  I understand these questions to

2    essentially be seeking discovery regarding the maintenance of

3    this document, which I don't believe is necessary in order to

4    establish adequate foundation, which the government has done.

5            MR. BELL:  Your Honor, I may ask to go two or three

6    minutes beyond 3:00.  I know your Honor wants to stop around

7    3:00.  We will stop as close to that as we can.  There will be

8    a logical break.

9            THE COURT:  Thank you.

10           (Continued on next page)

IBKTGRA4                    Rechnitz - Direct

1              (In open court)

2              THE COURT:  So I'm accepting Exhibit 307 into

3    evidence.

4              (Government's Exhibit 307 received in evidence)

5              THE COURT:  Counsel, you can proceed.

6              MR. BELL:  Thank you.  Before we do the video, could

7    we put Government Exhibit 552A on Mr. Rechnitz's screen and

8    that of the parties'.

9    BY MR. BELL:

10   Q.  Mr. Rechnitz, are you familiar with this picture?

11   A.  Yes, I am.

12   Q.  How are you familiar with this picture?

13   A.  It's a picture of me and Jeremy.

14   Q.  Do you know when this picture was taken?

15   A.  On Christmas day in Staten Island.

16   Q.  Do you know where?

17   A.  I'm not positive.  I think I know where.

18             MR. BELL:  Your Honor, the government offers

19   Government Exhibit 552A.

20             MS. NECHELES:  No objection.

21             MR. MERINGOLO:  No objection.

22             THE COURT:  Thank you, I'm accepting Exhibit 552A into

23   evidence.

24             (Government's Exhibit 552A received in evidence)

25             MR. BELL:  Could we publish 552A, please.

BY MR. BELL:

Q.  So what do we see here, Mr. Rechnitz?

A.  It's a photo of me and Jeremy in the convertible on Staten Island on Christmas day.

Q.  And what are you in the process of doing?

A.  Delivering gifts.

Q.  To whom generally that day?

A.  Jeremy Grant, Michael Harrington and Eric Rodriguez.

        MR. BELL:  Now Mr. Hamilton, can we publish the video that was just admitted, 307, with sound.

        (Video recording played)

Q.  Mr. Rechnitz, where were you when you recorded that video?

A.  I was in the car.

Q.  I want to ask you about a number of things that were said in that video.  First, was it you who addressed Mr. Reichberg as Rabbi Reichberg?

A.  Yes.

Q.  Did you understand Jeremy to be an actual rabbi?

A.  No.

Q.  Why did you reference him as Rabbi Reichberg during that conversation?

A.  Because I was trying to do a video that we could look back at one day to show how powerful we had become, that he was going to make calls when he needed things done through the Port Authority and other scenarios and say he was Rabbi Reichberg.

1   Q.  You also said at one point when approaching personnel that

2   you should please salute us if you want to keep your job.  What

3   was that a reference to?

4   A.  That was in reference to the fact that we were guests of

5   Phil Banks, and it was an obnoxious comment that I made.

6   Q.  When you said bye-bye Abbie, this could have been you,

7   first of all, who were you referring to?

8   A.  Abbie Friedman.

9   Q.  Why did you say bye-bye Abbie Friedman, this could have

10  been you?

11  A.  I said this could have been you, and because you have a big

12  mouth.  What happened is Phil Banks told Jeremy and I that he

13  had bad mouthed Jeremy and me to Phil Banks saying that we

14  would turn our backs on him if he ever lost the position of

15  chief of department and we weren't really his friends, that

16  Abbie was.  And Phil told us about that.

17  Q.  You also said, among other things, I'm paraphrasing here,

18  welcome to 2014, this is the new way of life.  What were you

19  referring to there, Mr. Rechnitz?

20  A.  Chief Banks is now the chief of department and we had full

21  access at One Police Plaza.

22  Q.  And how Mr. Rechnitz, had you and Mr. Reichberg obtained

23  that access and that level of power?

24  A.  Through bestowing gifts on all these officers time after

25  time again.

1            MR. BELL:  Your Honor, we're at about 3:05.  That

2      festive note may be a good way for us to take our break.

3            MS. NECHELES:  Objection to the comment, your Honor.

4            THE COURT:  Thank you.  Ladies and gentlemen, you know

5      the rule about statements and questions by lawyers.  We're

6      about to have our Thanksgiving break, so first off, happy

7      Thanksgiving, everybody, I hope you have a great, long weekend.

8            It will be particularly tempting, I expect, over

9      Thanksgiving to talk about the case with your friends and

10     family, but I know that you won't because you have taken the

11     responsibilities here very seriously to date.  So I want to

12     remind you that it's important for you not to discuss the case

13     with anyone else.  Again, you can say you are a juror in a

14     criminal case, but don't talk with anybody about the rest of

15     the substance of the case.  Again, don't discuss the case

16     amongst yourselves and don't do any research about the case and

17     don't look at anything in the press that you might happen see

18     about the case.

19            We'll start again this coming Monday morning at

20     9:00 a.m., so I look forward to seeing you all then.  Have a

21     happy Thanksgiving.

22            JUROR:  You, too.

23            (Jury not present)

24            MR. BELL:  Your Honor, may we approach on one small

25     matter?

1              THE COURT:  Yes, you may.  Can I permit the witness to

2      step down?

3              MR. BELL:  No, it involves that.

4              THE COURT:  Thank you.  Please come up.

5              MR. BELL:  Thank you, your Honor.

6              (At sidebar)

7              THE COURT:  Thank you.  Go ahead, counsel.

8              MR. BELL:  Thank you, your Honor, for indulging us

9      here.

10             When Mr. Rechnitz stepped out for the earlier break he

11     got something of a collective stare down from folks there, as

12     you can imagine, along with some I think somewhat closer

13     contact; no actual physical contact, but certainly people

14     getting up in his face to a degree that would make the ordinary

15     person uncomfortable.

16             I think Mr. Rechnitz, having been prepared by great

17     prosecutors, is immune to this stuff, but he's only human.  And

18     I ask the Court to adopt a protocol in which Mr. Rechnitz,

19     certainly at the end of the day, but potentially during these

20     breaks as well, be permitted to leave -- first meet up with the

21     FBI and head out so as to avoid incidents among others.  We

22     have done it in other cases in the past where there's been a

23     particular sensitivity, and I just don't want anything to

24     happen.

25             MS. NECHELES:  Your Honor, I would request --

1              MR. MERINGOLO:  We object to that.

2              MS. NECHELES:  I don't necessarily object, but I was

3      present --

4              MR. MERINGOLO:  Me, too.

5              MS. NECHELES:  -- and yes, people might have looked at

6      him, but no one got close to him.  He was there surrounded by

7      FBI agents and a lawyer.

8              The only thing I would object to is the breaks are

9      very short, so if we're letting him go and then we can --

10     there's already a line in the woman's bathroom, so I can't

11     really -- we can't really have this kind.

12             Now he could go maybe back into a different room,

13     that's been done during the break, or something like that.  I

14     don't care about that.

15             MR. BELL:  We'd welcome that.  I know there's a sort

16     of maze of rooms back there, or at least I have heard tell of

17     it.  If there is one available for that purpose where he, and

18     to the extent appropriate during direct, the FBI and his

19     handlers can occupy that space, then I think that would more

20     than address our concern, and we greatly appreciate it.

21             MR. MERINGOLO:  We wouldn't object to coddling him and

22     making him go in the back.

23             THE COURT:  Thank you.  I heard from my deputy about

24     what happened when Mr. Rechnitz left during the prior break.  I

25     did not observe it myself.  The gallery is full of people.

1   What was reported to me was that no one physically touched him,

2   but that people stared him down, and that at least one person

3   came physically close to him.

4           In any event, I think that a reasonable concern has

5   been expressed that would require that I put in place some kind

6   of special protocol to ensure that the witness is not

7   intimidated.  This was the subject of some conversation that we

8   had previously with respect to the placards as a hypothetical.

9   Now, unfortunately, it appears to have evolved into a partial

10  reality.

11          As a result, what I would like to do is to offer one

12  of the rooms in the back to witness here.  I allowed prostitute

13  one to do so as well because I think she needed that.  I would

14  be happy to do the same for this witness during the testimony.

15  I need to make arrangements with Mr. Daniels to implement it.

16          For purposes of now, I would propose to take a short

17  break now, allow Mr. Rechnitz to leave.  I imagine the people

18  in the gallery will stay for the remaining conversations about

19  the rest of the day.

20          MR. MERINGOLO:  Judge, I would like, if possible, to

21  talk off the record regarding Mr. Grant and his wife situation,

22  and I would ask for him to be excused also at this time.

23          THE COURT:  That's fine.

24          MR. BELL:  We have no objection to an off-the-record

25  conversation about that.  That's fine.

1          THE COURT:  Thank you.  I would be happy to do that,

2    understanding the basis for it is reasonable.

3          Do you mind if at this point I allow Mr. Rechnitz to

4    walk out?

5          MR. MERINGOLO:  No.

6          MR. BELL:  Not at all, Judge.

7          THE COURT:  I will tell him that he can step out, and

8    I assume the government will work on bringing somebody up.  And

9    counsel, you will stay here for this short off-the-record

10   commentary.

11         (In open court)

12         THE COURT:  Thank you, Mr. Rechnitz, for your

13   testimony.  You may step down and I will take up some matters

14   with counsel here at sidebar.

15         (At sidebar)

16         THE COURT:  Before we go off the record, I understand

17   this relates to --

18         MR. MERINGOLO:  Health.

19         THE COURT:  -- a health-related issue.  For that

20   reason, I believe it's appropriate to go off the record, and

21   we're going off the record now.

22         (Discussion held off the record)

23         (In open court)

24         THE COURT:  First, counsel for Mr. Grant?

25         MR. MERINGOLO:  Yes, your Honor, may Mr. Grant be

1    excused for these proceedings?  We'll waive his appearance, and

2    he consented to that.

3              THE COURT:  Counsel, for the United States any

4    concern?

5              MR. BELL:  No objection, your Honor.

6              THE COURT:  Yes, Mr. Grant is excused.  Thank you,

7    counsel.

8              MR. MERINGOLO:  Thank you, Judge.

9              THE COURT:  So there were a number of things I wanted

10   to see if we could address as quickly as we can today.  There

11   are a number of them, however.  Let's get started.

12             The first thing I wanted to ask about, if you don't

13   mind, counsel, is to inquire further about the issue raised

14   yesterday related to Mr. Meringolo's file, the file that was

15   deposited with him anonymously.

16             Any additional information or issues that the Court

17   should take up with respect to that?

18             MS. RAVENER:  Thank you for the opportunity to address

19   this, your Honor.  The government did review its records and

20   was able to confirm that the investigator for that file from

21   the license division was Police Officer Barbario and was not

22   either Mr. Villanueva or Mr. Ochetal.

23             Nonetheless, your Honor, to ensure that this does not

24   become any kind of issue in the case, today we made a

25   production to both defense counsel containing all of the

IBKTGRA4                      Rechnitz – Direct

license division files that we believe are encompassed by their

possible request, meaning the license division gun files that

we collected in the course of the bribery investigation

stemming from the misconduct of the license division, which of

course involved Mr. Villanueva and Mr. Ochetal, but also other

people who have been charged, others who have not.

        We have made that production.  To extent that the

defense seeks to review that material or utilize that material

it's now fully available to them.  We don't believe that this

is material that would have qualified under any other

categorization or that falls under any government obligation to

produce it, but we have done so nonetheless.  They now have

ample time over the holidays to review it, and should an issue

arise upon their review, we're happy to take it up at that

time.

        (Continued on next page)

IBKKGRA5

1            THE COURT:  Thank you.  Counsel for defendants, I

2    understand that you have just received this group of documents.

3    Please, as I expect you will, take the opportunity to review

4    it, and let me know if there are any concerns about it.

5            Mr. Meringolo?

6            MR. MERINGOLO:  I do.  I have them in my possession.

7    I don't know how voluminous this is, but when I get home

8    tonight I'll get to start perusing through it.  I don't know

9    how much time I'm going to be able to really focus in on this

10   but I'm --

11           THE COURT:  Thank you.  Please let me know over the

12   course of the holiday weekend if there's anything that you'd

13   like to raise.  During that period, I will be working and will

14   be happy to review any materials that you want to send to me.

15   Otherwise, I hope that we will be able to take it up on Monday

16   morning.

17           MS. NECHELES:  Your Honor, I would just note -- if I

18   could?

19           THE COURT:  Please.

20           MS. NECHELES:  -- it's six CDs of materials.  The

21   witnesses are off the stand.  I have lots of work to do in this

22   case.  I don't have the ability to go back and now review these

23   files to see whether there was anything relevant that I could

24   have used in cross-examination, particularly because I'm not

25   going to cross-examine now, so I just don't have the ability to

IBKKGRA5

1    do that.

2            THE COURT:   Thank you.

3            I hope that you will take the opportunity,

4    nonetheless, and to the extent there's a basis to request that

5    the government recall a witness or that you would like to call

6    the witness yourself, you'll have the opportunity to make that

7    application or to simply call them.

8            Let me take up now Ms. Necheles' letter to the Court

9    about the past recollection recorded issue that was submitted

10   overnight.  I'm going to solicit the government's views on that

11   request.  I don't know if you had the opportunity to consider

12   it, counsel, so I'm going to request the government's view on

13   that in a short letter brief at some point before Monday, and I

14   will rule on it orally on Monday, if you do so.

15           My one comment on this, to the extent that it's

16   helpful, is that, for this type of issue, my recollection is

17   that this specific argument for the introduction of this piece

18   of evidence wasn't presented during our sidebar.  I think it is

19   certainly helpful for me if counsel has at hand the rule or law

20   that they wish to point me to as the basis for introduction of

21   the evidence.  Here, this is an argument that I appreciate and

22   would have benefited from perhaps during the course of our

23   sidebar.

24           So I just ask that the parties, to the extent that

25   these issues are coming up on the fly, have at hand the

IBKKGRA5

1   specific citations to the Federal Rules of Evidence or

2   applicable case law that will help guide the Court's

3   decision-making and also, presumably, that drove your

4   decision-making regarding the potential introduction of

5   evidence.

6          I'm not going to ask for a specific response to that

7   letter at this point -- I want to give the government the

8   opportunity to respond in writing -- but do I expect to rule on

9   it following the government's submission of such a letter.

10          Counsel for the United States, can I ask if you expect

11   that you can submit a short response to that letter at some

12   point before Monday?

13          MS. LONERGAN:  Yes, your Honor.  Thank you very much

14   for the opportunity, and we will get you something over the

15   weekend.  We don't expect it should be long, so it should give

16   the Court ample opportunity to consider it.

17          THE COURT:  Good.  Thank you.  I look forward to that.

18          Counsel, I hope that you will discuss amongst

19   yourselves the 404(b) other bad act evidence issue that we took

20   up at sidebar earlier.  I don't want to engage in a

21   comprehensive discussion of that issue now because I understand

22   that you're all just learning a little bit about it.

23          Counsel for the United States, can I ask you to take

24   up that issue, and to discuss it with counsel for the defense,

25   in part, to understand whether or not there is an unnoticed

1    404(b) incident here that should be a topic of concern.

2              MR. BELL:  We're happy to take that up with defense

3    counsel, your Honor.

4              THE COURT:  Good.  Thank you.

5              Let me give you a brief comment about my

6    expectations -- I'm sorry this is not completely linear --

7    about proposed instructions, i.e., the jury charges here.

8              I have, and have had, a draft of the instructions that

9    I hope to circulate relatively soon.  I'm not going to wait

10   until the last day of trial to present it to the parties.  I'll

11   try to send it to you sometime relatively soon.  I may send it

12   to you over the holiday weekend.  That will give the parties a

13   substantial amount of time to consider them before we have a

14   charging conference.

15             My hope is that we will be able to do our charging

16   conference earlier than later in the course of the trial,

17   rather than right before closing arguments, in part, because I

18   think that it may help to inform our conversations about

19   things, in particular, the PBA issue, which the government

20   tied, in part, to consideration of the instructions as a whole,

21   which is part of the reason why I want to send you the charges

22   promptly, in the hope that we can address that issue and

23   potentially narrow the scope of the case.  So I'm going to try

24   to get that to you soon.

25             I don't expect myself to expressly address the PBA

IBKKGRA5

1    issue; in other words, I do not expect the charges will

2    themselves say, for example, that the parties do not -- no

3    party takes a position that the provision of the PBA card is an

4    official act or that the PBA card provision is not an official

5    act; instead, that's a topic that I expect that we will have

6    the opportunity to discuss and that I hope the parties would be

7    considering as you review the proposed instructions.

8         Again, this is not linear, but we received yesterday a

9    letter motion from counsel for Mr. Offinger, moving to quash

10   that subpoena that was issued by Mr. Grant.  That letter was

11   just submitted recently.

12        Can I ask, counsel for Mr. Grant, have you seen it?

13        MR. MERINGOLO:  I have not seen it, Judge, but it

14   would fall into the same category as making a motion or an

15   opposition to it after Mr. Grant has his testimony, similar to

16   the mayor's.

17        THE COURT:  Thank you.  Please do take a look at it.

18        MR. MERINGOLO:  Yes.

19        THE COURT:  It is substantially similar to the mayoral

20   letter.  The one distinguishing feature of which Mr. Offinger's

21   counsel points out is that he asserts that he has less

22   information about the basis for the request than the mayor may,

23   and so they've asked for me to put in place a different

24   protocol in which --

25        MR. MERINGOLO:  Okay.

IBKKGRA5

1          THE COURT:  -- he would have more than the two days

2     that I allotted for counsel for the mayor to decide the issue.

3          MR. MERINGOLO:  Got it.

4          THE COURT:  So I just highlight that point as you're

5     looking at the letter.

6          MS. NECHELES:  Your Honor, can I just point out:

7     Mr. Rechnitz has testified, at two public trials, that he

8     bribed Mr. Offinger.  So I don't really know how his lawyer

9     could say he doesn't know why Mr. Offinger would be subpoenaed

10    here.  It's in the public record, and I expect him to testify

11    about it again.  It's in the public record, and that's what

12    he's going to say.  That's why we would be seeking to call him

13    as a witness.

14          THE COURT:  Thank you.

15          The letter also says that the lawyer has tried

16    to/wants to discuss this issue directly with you,

17    Mr. Meringolo, so to the extent that you have the opportunity

18    to discuss it with him, you can.

19          MR. MERINGOLO:  I originally told him I was busy with

20    the trial.  I directed him to the transcripts of the two

21    previous cases with respect to what was testified about him.

22          THE COURT:  Can I ask you to move the microphone a

23    little closer to you.  Thank you.

24          MR. MERINGOLO:  I told counsel, directed him, to the

25    two previous transcripts that Mr. Rechnitz has testified in

1    Seabrook, United States versus Seabrook, and I told him that I

2    would discuss it with him, possibly this week but probably

3    early next week.

4            THE COURT:  Good.  Thank you.  I hope you have the

5    opportunity to raise this with him or discuss it with him.

6            I think that those are all of the things that I wanted

7    to make sure I brought up with you here now, counsel, with the

8    exception of the completion of my decision related to the

9    expert issues.

10           Now, counsel for the United States, as you'll recall,

11   as suggested by Mr. Meringolo, the protocol that we put in

12   place regarding the personnel is triggered, in part, by the

13   anticipated completion of your case, which I think is one week

14   prior to the close of your case.  I just wanted to remind you

15   of that, and to hope that you will provide the defense with an

16   appropriate notice, I'll call it, of approximately when that

17   will happen.

18           MS. LONERGAN:  Your Honor, we actually anticipated

19   this issue.  We've already spoken.  We spoke with defense

20   counsel actually last week to tell them what we've predicted,

21   and there's no reason to keep it a secret from the Court,

22   clearly.  We predict that we will likely rest, not the week

23   following Thanksgiving, but the week after --

24           THE COURT:  Thank you.  That's helpful.

25           MS. LONERGAN:  -- and potentially early that week.  So

IBKKGRA5

1    to the extent that puts in place the defense counsel deadline,

2    that's our anticipated ending.  But as the Court knows, it's

3    been difficult for us to really predict things with a great

4    deal of certainty in this trial, but that is building in the

5    best estimates that we've been able to get from defense counsel

6    about the length of their cross of Mr. Rechnitz.

7              THE COURT:  Good.  Thank you.

8              So you think that the trigger for this may be Tuesday

9    or so the week after Thanksgiving?

10             MS. LONERGAN:  I think that that's fair, your Honor.

11   Again, I think that our best estimate at this time is sometime

12   during that second week after Thanksgiving.  There's a lot of

13   flexibility and give in the seams, but that's our best estimate

14   at this point.

15             THE COURT:  Good.  Thank you.  I appreciate that.

16             MS. NECHELES:  Your Honor, if I could just ask?

17             THE COURT:  Please.

18             MS. NECHELES:  We have told the government we expect

19   that Mr. Rechnitz will be on cross for all of next week, cross

20   and redirect.  So if they're saying it's only going to be two

21   more days -- and there's never been a time in this trial where

22   we've done more than three witnesses in a day -- that would

23   seem that that would be six witnesses.  There's 28 witnesses

24   left on the government's list.  So for planning purposes, it's

25   very hard for me to know who I may need to call on my case if I

1    don't really know what the government's case is.

2            There's also probably a week's worth of tapes that

3    they have identified as playing.  So I'm a little baffled by

4    this statement that there are just going to be two more days

5    and maybe have four to six more witnesses.  So if we could get

6    some clarity on that, I think it would help us all in terms of

7    planning and figuring out what we will be doing on our defense

8    case.  We may need to call more witnesses if they're not

9    calling witnesses.

10           THE COURT:  Thank you.

11           Counsel for the United States, can you respond?

12           MS. LONERGAN:  Your Honor, in light of the holiday,

13   what I think makes the most sense is, we, on the government's

14   side, anticipate we will be working this weekend, as I'm sure

15   most of the people in this courtroom will, unfortunately, and

16   I'm trying to put together an estimate of who we have after

17   Mr. Rechnitz, that we can circulate to defense counsel, that

18   will help, I think, everyone inform this discussion.

19           THE COURT:  Thank you.  That would be helpful.

20           Anything else that we should take up before I embark

21   again on the defense expert or, I should say, Mr. Grant expert

22   decision that I began to read yesterday?  Any other issues that

23   any party would like to raise with the Court before I embark on

24   that project?

25           MS. LONERGAN:  Not from the government, your Honor.

IBKKGRA5

1        THE COURT:  Thank you.

2        Counsel for Mr. Reichberg?

3        MS. NECHELES:  None, your Honor.

4        MR. MERINGOLO:  Nothing.

5        THE COURT:  Good.  Thank you very much.

6        I apologize again, this is not linear.  I'm going to

7   begin where I began before.

8        (Pause)

9        THE COURT:  Let me say, I'm starting the decision with

10  respect to the defense experts, which I began earlier.  The

11  opinion that I'm reading into the record now relates to the

12  Defendant Grant's motion to introduce the testimony as expert

13  testimony of Rabbi Gluck and Mr. Thursland.  I will refer the

14  parties to my prior statements on the record with respect to

15  the introductory text for this decision.

16        So let me begin, picking up where I left off:

17        "In undertaking this flexible inquiry, the district

18  court must focus on the principles and methodology employed by

19  the expert, without regard to the conclusions the expert has

20  reached or the district court's belief as to the correctness of

21  those conclusions."  Amorgianos versus National Railroad

22  Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002).  But as the

23  Supreme Court has explained, "conclusions and methodology are

24  not entirely distinct from one another," and a district court

25  is not required to "admit opinion evidence that is connected to

existing data only by the ipse dixit of the expert.  A court

may conclude that there is simply too great an analytical gap

between the data and the opinion proffered."  General Electric

Company versus Joiner, 522 U.S. 136, 146 (1997).  "Thus, when

an expert opinion is based on data, a methodology or studies

that are simply inadequate to support the conclusions reached,

Daubert and Rule 702 mandate the exclusion of that unreliable

opinion testimony."  Amorgianos, 303 F.3d at 266.

          To warrant admissibility, "it is critical that an

expert's analysis be reliable at every step."  Id. at 267.  "In

deciding whether a step in an expert's analysis is unreliable,

the district court should undertake a rigorous examination of

the facts on which their expert relies, the method by which the

expert draws an opinion from those facts, and how the expert

applies the facts and methods to the case at hand."  Id

nevertheless, evidence should only be excluded "if the flaw is

large enough that the expert lacks good grounds for his or her

conclusions."  Id. (internal quotation marks and citations

omitted).

          "In fulfilling its gatekeeping role, the Court 'should

look to the standards of 401 in analyzing whether proffered

expert testimony is relevant..."  Id. at 265.  "Weighing

whether the expert testimony assists the trier of fact goes

primarily to relevance."  Falkner versus Arista Records LLC, 46

F.Supp.3d 365, 375 (SDNY 2014) (citing Daubert, 509 U.S. at

591).  Expert testimony that is "directed solely to lay matters

which a jury is capable of understanding and deciding without

the expert's help" should not be admitted.  United States

versus Mulder, 273 F.3d 91, 101 (2d Cir. 2001)(quoting United

States versus Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991).

In addition, "expert testimony, like all evidence, is

also subject to the requirements of Rule 403, which provides

that otherwise relevant evidence may be excluded of its

probative value is substantially outweighed by the danger of

unfair prejudice, confusion of the issues, or misleading the

jury.  In re Puda Coal Sec. Inc. Litig. 30 F.Supp.3d 230, 250

(SDNY 2014) (internal quotation marks omitted)(quoting Nimely

versus City of New York 414 F.3d 381, 396 (2d Cir. 2005)).

Importantly, "the proponent of expert testimony has the burden

of establishing by a preponderance of the evidence that the

admissibility requirements of Rule 702 are satisfied."  United

States versus Williams, 506 F.3d 151, 160 (2d Cir. 2007).

I've carefully considered the nature and content of

the defendants' disclosure, the timing of its submission to the

United States, and the arguments of both sides regarding this

evidence.  Based on that analysis, as I've already told the

parties, I have concluded that this proposed expert testimony

should be excluded.

First off, this disclosure was provided very late.  As

the parties know well, this trial has been deferred a number of

1    times.  Most recently, it was postponed from earlier this fall

2    to November.  Given the fact that this case has been pending

3    for so long, and that this trial date was recently adjourned, I

4    am unaware of a good justification for defendants' failure to

5    provide this disclosure earlier in the life cycle of the case,

6    and none has been provided.

7         Second, the disclosures provided here are inadequate.

8    First, the scope of the anticipated testimony is described in

9    general terms as broad categories of testimony.  As I

10   highlighted when I read the disclosures earlier, even those

11   already broad disclosures are made broader through the

12   inclusion of the words "including" and "among other things."

13   Those broad disclosures do not provide enough information about

14   their anticipated testimony for the Court or the parties,

15   principally the government, to evaluate whether the anticipated

16   testimony is well-founded, and what its basis is, or, indeed,

17   as the government argues, if it's even entirely relevant.

18        Moreover, as I noted above, or during my previous

19   reading, the disclosures do not provide the bases for any of

20   the proposed testimony.  I have read the arguments presented in

21   the November 12th letter by Defendant Grant, but rather than

22   being persuasive, it highlights the deficiency of the notice.

23   In essence, Mr. Grant argues that these witnesses know these

24   things just by virtue of their life experience, their jobs and

25   positions.  But this argument highlights the concern -- it does

IBKKGRA5

not permit an evaluate of the principles or methodology used to

reach their opinions.  Instead, I conclude that Mr. Grant

invites the Court to permit this testimony as the ipse dixit of

the expert, with no basis upon which the prosecution can

challenge the basis of the opinion.

Just to give a couple of examples of the issues here:

Rabbi Gluck is expected to testify about the "day-to-day

security-related concerns...that are specific to this

particular community."  This is, again, a very general

description of the anticipated testimony, but I cannot

ascertain what the basis is for this testimony from Rabbi Gluck

as an expert.  Is this testimony simply what he personally

thinks?  Is it based on an historical analysis of records or

other data?  Is it based on what he's heard from others in the

community?

Similar questions abound for the proposed testimony of

Lieutenant Thursland:  What's the basis for his understanding

of the procedures?  Is that basis well-founded?  Does it have

some empirical basis or foundation in written records or the

like, or is he just describing his personal practices or those

of a subset of officers in his Brooklyn precinct?

It is a freighted, considered decision for the Court

to endorse a person as an expert before the jury, to vest them

with that mantle of respect and credibility, without a

sufficient foundation to do so.  Here, Mr. Grant asks me to

1    permit testimony of these witnesses without providing that

2    third plaint required by the rule, that would provide us with

3    sufficient information to begin to probe the bases for their

4    anticipated testimony.

5          The delay in the presentation of this set of notices

6    weeks after the most recently scheduled trial date, which in

7    turn was months following the prior trial date, prejudices the

8    government.  They do not have the opportunity to prepare to

9    meet this evidence.  It also has an adverse impact on the

10   progress of the trial, because there is no time for the Court

11   to conduct a Daubert examination of the potential testimony

12   following a more fulsome disclosure by Mr. Grant.  And, again,

13   as I noted during my prior comments, Mr. Grant chose not to

14   amplify the disclosures since the date of the government's

15   November 1 motion and instead chose to stand pat with the

16   original disclosures, requiring that I rule on the request

17   based on it and the argument presented in the November 12

18   letter.

19         I've considered the range of potential options here to

20   remedy the defendant's failure to comply with the requirements

21   of Rule 16; and, unfortunately, having done so, I do not

22   believe that there is a reasonable opportunity to structure an

23   alternative solution to the exclusion of this untimely, and

24   inadequately noticed, expert testimony.  As the parties know,

25   we're in the midst of trial.  We set aside up to six weeks to

IBKKGRA5

1    complete the trial.  At this point, as the parties know, I

2    don't know if the defense will present zero witnesses or if the

3    defense will instead draw on the list of potential witnesses

4    that I understand to be 120 people long, and we're still in the

5    midst of the government's case.

6         Pausing to litigation this issue may well require that

7    we go well beyond the schedule that we informed the jurors

8    about, risking the loss of jurors.  And, again, as I consider

9    the total circumstances here, Mr. Grant's trying to present

10   this proposed disclosure for the first time so late in the life

11   history of the case is problematic and should not, in my view,

12   be rewarded.

13        In addition, I note -- indeed I stress, as the United

14   States does in its letter -- that there may be other avenues

15   for the defense to present 701 fact witnesses with knowledge of

16   information relevant to the jury.  Rather than calling these

17   witnesses as experts, a fact witness with personal knowledge of

18   relevant facts might be called to address certain of the

19   information as to which Mr. Grant seeks to introduce this

20   expert testimony.

21        I do not need to reach the 401/403 analysis with

22   respect to this testimony because my decision rests on

23   Mr. Grant's failure to comply timely with Rule 16, but I have

24   also considered the arguments presented by the United States

25   regarding whether this anticipated testimony is relevant or

IBKKGRA5

1   potentially misleading, and I believe that those arguments do

2   raise reasonable concerns.  Here, the proposed testimony

3   seems -- perhaps may be -- being proposed as substitute for

4   direct testimony about the motives and state of mind of each of

5   the defendants.  All the more reason for the Court to be

6   concerned about the introduction of it in the guise of "expert"

7   testimony.

8           Again, I emphasize that it may be that these witnesses

9   or others have personal knowledge of facts that can be the

10  subject of relevant testimony under 701, that goes to the

11  points that Mr. Grant seeks to introduce with respect to these

12  issues, but the proposed introduction of testimony by them

13  bearing the mantle of an expert should not be permitted here,

14  given the issues with respect to the disclosures that I have

15  described in a disjointed way today and in a prior today.  I

16  say "disjointed"; I mean that I have provided them in two

17  halves rather than continuously.  Hopefully, the analysis is

18  clear.

19          So, counsel, thank you very much for your patience as

20  I got through that.  I'm going to take our recess and wish you

21  all a happy Thanksgiving.  I look forward to seeing you all

22  back here on Monday.  Happy Thanksgiving, everyone.  I hope you

23  have a great holiday.  Thank you.

24          COUNSEL:  Thank you, Judge.

25          (Adjourned to November 26, 2018 at 9:00 a.m.)

1                         INDEX OF EXAMINATION

2     Examination of:                                   Page

3     BORIS SHAMAYEV

4     Direct By Ms. Lonergan . . . . . . . . . . .2291

5     Cross By Ms. Necheles  . . . . . . . . . . .2308

6     Cross By Mr. Meringolo . . . . . . . . . . .2333

7     Redirect By Ms. Lonergan . . . . . . . . . .2337

8     Recross By Ms. Necheles  . . . . . . . . . .2338

9     Recross By Mr. Meringolo . . . . . . . . . .2344

10    JONA RECHNITZ

11    Direct By Mr. Bell . . . . . . . . . . . . .2365

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        GOVERNMENT EXHIBITS

 2    Exhibit No.                                    Received

 3      915 and 916   . . . . . . . . . . . . . . .2298

 4      W0121 and 449   . . . . . . . . . . . . . .2361

 5      W05051 and 5058   . . . . . . . . . . . . .2363

 6      W05066   . . . . . . . . . . . . . . . . .2364

 7      3501-35   . . . . . . . . . . . . . . . . .2376

 8      1049   . . . . . . . . . . . . . . . . . .2415

 9      1 and 1A   . . . . . . . . . . . . . . . .2422

10      1042   . . . . . . . . . . . . . . . . . .2436

11      623   . . . . . . . . . . . . . . . . . . .2437

12      309   . . . . . . . . . . . . . . . . . . .2438

13      9   . . . . . . . . . . . . . . . . . . . .2439

14      607   . . . . . . . . . . . . . . . . . . .2444

15      307   . . . . . . . . . . . . . . . . . . .2449

16      552A   . . . . . . . . . . . . . . . . . .2449

17                        DEFENDANT EXHIBITS

18    Exhibit No.                                    Received

19      JR-9201   . . . . . . . . . . . . . . . . .2312

20

21

22

23

24

25
```