IBQTGRA1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,                New York, N.Y.

 4               v.                            16 CR 468 (GHW)

 5   JAMES GRANT and JEREMY
     REICHBERG,
 6
                     Defendants.
 7
     ------------------------------x
 8
                                              November 26, 2018
 9                                            9:05 a.m.

10   Before:

11
                        HON. GREGORY H. WOODS,
12
                                              District Judge
13

14                          APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  JESSICA R. LONERGAN
17        KIMBERLY J. RAVENER
          MARTIN BELL
18        Assistant United States Attorneys

19   HAFETZ & NECHELES, LLP
          Attorneys for Defendant Reichberg
20   BY:  SUSAN NECHELES

21   MERINGOLO & ASSOCIATES
          Attorneys for Defendant Grant
22   BY:  JOHN MERINGOLO
          ANJELICA CAPPELLINO
23

24

25
```

IBQTGRA1

| | |
|---|---|
| 1 | (Jury not present) |
| 2 | THE COURT:  Welcome back, counsel, from the recess. |
| 3 | Is Mr. Grant here? |
| 4 | MR. MERINGOLO:  Yes, Judge. |
| 5 | THE COURT:  I'm sorry.  So let's start. |
| 6 | I understand that the jury is not all ready to go.  I |
| 7 | assume that the witness is ready to proceed. |
| 8 | Is there any issue that any party would like to raise |
| 9 | with the Court before the jury comes in? |
| 10 | MR. BELL:  One, Judge. |
| 11 | THE COURT:  Please. |
| 12 | MR. BELL:  Over the course of the Thanksgiving break I |
| 13 | got the opportunity to read some of the coverage that we have |
| 14 | been getting in the press.  I came across an article in the |
| 15 | Staten Island Advance, which I gather has taken an interest in |
| 16 | this case because Mr. Grant hails from Staten Island.  The |
| 17 | article's lead noted that each and every day of the trial |
| 18 | Mr. Grant and Mr. Reichberg, first thing in the morning, in |
| 19 | addition to sitting next to each other, have placed, on |
| 20 | Mr. Grant's part, Rosary beads, and on Mr. Reichberg's part, a |
| 21 | holy book, on their defense table every day.  In point of fact, |
| 22 | we can observe that now. |
| 23 | It occurs to me that if it's visible to the Staten |
| 24 | Island Advance, it's likely visible to the jury as well, which |
| 25 | is problematic in a number of respects.  One of those is that |

IBQTGRA1

```
1    in addition to whatever general inherent concerns about

2    prejudice or messaging there may be that come from hey, jury,

3    look at my religious symbols, the image of them side by side, I

4    think whether it's intended to burnish the friendship narrative

5    or not, it is something that would certainly seem to have that

6    effect.

7         I'm not as much of an authority on the placard

8    situation that we had to work out last week, although

9    Wikipedia, interestingly, has since taught me the rabbi

10   depicted on this placard is someone whose image is supposed to

11   be helpful in warding away mice and rats, which frankly makes

12   me worried about the imagery more, but that's something that we

13   have dealt with.  With respect to Rosary beads, however, I do

14   have some firsthand knowledge, having been Catholic all my

15   life, albeit not the very best one, and I know that they don't

16   have to be publicly displayed in order to work.

17        I would ask that the Court just request that these

18   icons, which of course there's no problem with the defendants

19   possess, but they not be displayed in the fashion that they

20   have been displayed.  It's really improper.  It raises a number

21   of concerns I think even above and beyond the general concerns

22   that they do just because of the imagery of having these

23   symbols side by side throughout the trial.

24        THE COURT:  Thank you.  Before we take up that issue,

25   is there anything else that the parties would like to raise
```

IBQTGRA1

1    with the Court, Ms. Necheles?

2         MS. NECHELES:  Your Honor, we sent some letters.  I

3    don't know if you reviewed them.  I don't know whether they

4    will be issues for today, so don't know that they have to be

5    discussed today.  I think we have filed something very late

6    this morning or early this morning with respect -- under seal,

7    sent it to your Honor with respect to my anticipated

8    cross-examination.

9         THE COURT:  Thank you.  I have not read that.  I

10   received it but I haven't read it yet.  As you said, it came in

11   very early this morning/late last night.

12        Do we know if your cross-examination will begin today?

13        MS. NECHELES:  I don't know.

14        MR. BELL:  I'll note, your Honor, that this is

15   apparently an ex parte submission.

16        THE COURT:  Yes.

17        MR. BELL:  We haven't seen it yet.

18        With respect to timing of cross-examination, there is

19   a world in which I could finish direct today, but I don't think

20   that world is a very likely one.  Given the rate and nature of

21   the objections last Tuesday, I think we're probably going to go

22   into tomorrow a little bit.

23        THE COURT:  Fine, thank you.

24        MS. NECHELES:  And your Honor, I note that most of the

25   3500 material is handwritten, I think apparently by Mr. Bell,

IBQTGRA1

1    the vast majority of it, so it's difficult to read, very poor

2    handwriting, sorry -- and that's not meant as a slight, it's

3    just difficult to read.  But I did sort of struggle through

4    some of the new stuff last night and saw it's all over the 3500

5    material, the discussion that Mr. Bell says he inadvertently

6    elicited, but he talked about the security.  So I don't know

7    how it could have been a surprise to Mr. Bell since it's in the

8    notes repeatedly about the supposed money going back and forth.

9            I assume that Mr. Bell is not planning to go back

10   there.  It does appear to be 404(b), and it has not been

11   something that he raised with the Court previously.

12           THE COURT:  Thank you.  Counsel for the United States,

13   counsel is requesting more information about the security

14   business that Mr. Rechnitz commented on inadvertently, I think,

15   during his testimony.

16           MR. BELL:  I will note, your Honor, I think the very

17   first place in which some mention of the business appears

18   within the 3500 is actually within the typewritten 302 from

19   when Mr. Rechnitz began to cooperate with the government back

20   in I believe either May or June of 2016.

21           I noted my experience with Catholicism.

22   Unfortunately, Catholic schools haven't done much for my

23   penmanship, I apologize there, but it is easy to read in the

24   302.  Your Honor asked us to specifically confer with the

25   defense about this.  One of the reasons I haven't is because I

IBQTGRA1

1    tried to find specific formulations of what is in the 302 that

2    actually align more closely with what Mr. Rechnitz testified to

3    the other day.  But yes, the subject is mentioned.  I don't

4    think it would be much of a real surprise to anyone who

5    reviewed the 3500.  It's not my intention to go back there, I

6    will say that, your Honor --

7                THE COURT:  Thank you, that's helpful.

8                MR. BELL:  -- except to the extent that very -- the

9    existence of the security company does factor into a couple of

10   things that aren't 404(b) that are there for background which I

11   think the defense is well on notice of.  For example, there's a

12   point of in which Detective Melici, one of the circle of cops,

13   is used by Messrs. Reichberg and Rechnitz to show up at the

14   security company essentially to look like a more impressive

15   version of a security than they have so that they could

16   essentially continue the contract and justify payment.  I don't

17   see that as a prior bad act, I think that's sort of

18   demonstrative of the relationship between Melici, Reichberg and

19   Rechnitz over the course of conspiracy.

20               But with respect to the money relating to the security

21   company, we don't expect to go back there, and I think that's

22   probably the principal issue here.  It certainly was as it came

23   up in the context of Ms. Necheles' objection last Tuesday.

24               THE COURT:  Thank you.  Is that helpful, counsel?

25               MS. NECHELES:  Yes, your Honor.  I don't know exactly

IBQTGRA1

1    what that meant in terms of what he will elicit about

2    Mr. Melici that they hired him to work as a security guard for

3    one day or it was a fraudulent scheme, I object to it being a

4    fraudulent scheme.  I obviously don't have an objection to him

5    saying they hired him to work for one day as a security guard.

6            Your Honor, do you want me to address the other issue?

7            THE COURT:  I would like to first ask if Mr. Grant's

8    counsel has anything they would like to raise.  Counsel?

9            MR. MERINGOLO:  Judge, the only thing, Judge, we were

10   supposed to look through the number of disks they gave us with

11   respect to the licensing division.  Mr. Grant was unavailable

12   because of his family situation, and I was very sick.  I did

13   not look at it.  So I will try to look at it.  I will peruse

14   through it.

15           THE COURT:  Thank you.  And I hope you're feeling

16   well.

17           MR. MERINGOLO:  I'm feeling good.

18           THE COURT:  Thank you.  I'm glad to know that you're

19   feeling well now.  And please do let me know during that other,

20   I will call it sequelae of that issue, that I should address.

21           Yes, counsel, I will be happy to take up the issue.  I

22   would like to be in a position to start with the jury as soon

23   as they're ready to step out, and they're almost all here.  So

24   let's begin a conversation and I ask that the parties be

25   prepared to recommence with Mr. Rechnitz's testimony once the

IBQTGRA1

1    jury is available.

2              Please proceed, counsel.

3              MS. NECHELES:  Your Honor, I don't think it's

4    appropriate for the government to be commenting on the

5    religious briefs or religious observance of these gentleman.

6    The government last week made some sort of allegation that

7    things were being held up as some sort of shield or something.

8    Now the government says they went on the internet and they see

9    this rabbi has to do with rats.  It's an offensive and

10   obnoxious comment.  I don't understand why the prosecutor would

11   be making these kind of comments here about someone else's

12   religious artifacts.

13             They don't like that they're friends and they are

14   different from each other.  These people are under a lot of

15   stress and have chosen to do something that happens a lot.  As

16   I said before, I have seen people do this a lot.  It is

17   important to them that religious artifacts -- to the Hasidic

18   community that religious artifacts be held there, be close.  I

19   don't really understand this argument.

20             It's no surprise to the jury that Mr. Reichberg is

21   Hasidic.  So I don't know what the problem is with him having a

22   rabbi -- a picture of a rabbi or a religious book sitting in

23   front of him.

24             THE COURT:  Thank you.  I should say I think that the

25   image issue has been taken off the table.  We addressed that

IBQTGRA1

1    previously, and I don't understand that the government is

2    raising that as a concern.

3           I understand that their concern at this point is

4    twofold:  First, the presence of some religious book at the

5    defense table for Mr. Reichberg's side, and then the presence

6    of a Rosary at Mr. Grant's table.  I had not observed it during

7    the course of the trial until it was just brought to my

8    attention by the government, who, as I understand it,

9    represented it was brought out in the press.

10          So I think that the issue that I ask that you address,

11   if you can, is what I understand to be the government's request

12   that I direct that the defense, to the extent religiously

13   feasible, not publicly display those religious artifacts but

14   instead hold them close.

15          MS. NECHELES:  Your Honor, I think that your Honor is

16   really stepping into Constitutionally protected areas.  I don't

17   know why.  Your Honor didn't notice it, the government didn't

18   notice it.  It hasn't been something flashing.  I don't know

19   the government is going and reading the Staten Island press.  I

20   don't know, I never read it, but that's what they're apparently

21   spending their time doing.  I don't know why the reporter wrote

22   about that.

23          I just don't think it's been a big deal at this trial,

24   and it's clearly at the core of a Constitutionally protected

25   area.  They're not doing anything to interfere.  The government

IBQTGRA1

1    doesn't like it.  It's not their place really to be commenting

2    on this really.

3            It's like Mr. Reichberg wears a yarmulke.  That's also

4    him displaying a religious observance.  Everything about him is

5    him displaying a religious observance.  I don't really

6    understand this objection.  Mr. Grant has a Rosary beads.  He's

7    in his worst time of his life.  He thinks that's important for

8    him.  I don't know why the government would try to interfere

9    with that.

10           THE COURT:  Thank you.  Counsel.

11           MR. MERINGOLO:  Two things, your Honor.  My experience

12   with these Rosary beads on the table, I defended an alleged mob

13   boss in this courtroom about nine months ago.  He sat in the

14   first row, first seat, and displayed the Rosary beads where the

15   jury constantly looked at him and there was no issue.

16           Secondly, Mr. Grant, as the government should well

17   know, he's a very, very observant Catholic.  He has been to

18   church probably -- and we have priests on our witness list,

19   monsignors.  He's been to church virtually every Sunday for

20   close to 19 years, and they know this, how religious he has,

21   especially if they have done a proper interrogation.  This is

22   something that's been on the table since jury selection, Judge.

23   I don't believe that we should -- I don't even think the jury

24   can see it from where they're sitting.

25           THE COURT:  Thank you.  Just for the record,

IBQTGRA1

Mr. Grant's Rosary beads are a white strand about a foot and a
half long, the second table furthest from the jury box, and
they're laid out perpendicular to the table.  I can see them,
but as I said earlier, I haven't seen them previously.

          Counsel for the United States, I'm not going to direct
the defendants on the basis of this record to move their
religious tokens.  I, as I said earlier, haven't seen them
until now.  I will take a look later today and see if I can
actually observe them from the jury box.  I don't know that
they are the visible.  There's a computer screen and a number
of defendants' documents between the jury box and where
Mr. Grant's Rosary beads are, so I don't know that they're
observable.

          Counsel, can you observe them from the jury box while
seated?

          MR. BELL:  I have been in there, your Honor, and
looked at that area to get a sense myself, and the answer is
yes.  I haven't sat in every single seat.

          MR. MERINGOLO:  Judge, he just said he read it.  He
didn't sit in that jury box this morning, and he just said he
read it in the Staten Island Advance and came in to talk to
you.  So if he had seen it and saw it in the jury box prior,
then he should have said something, not what he read in the
Staten Island Advance.  We can't have all these
misrepresentations to the Court.

IBQTGRA1

1          MR. BELL:  That's great.  Judge, all I'm suggesting is

2     this:  In addition to the concerns that are attendant to these

3     issues, there's the added layer of symbolism that I mentioned

4     before that actually goes directly to the defense.

5          The defense suggests that we have an issue with the

6     defendant's friendship.  That's never been true.  We do have an

7     issue with the messaging to the jury, and it is notable that

8     Ms. Necheles and Mr. Meringolo in both their responses tiptoed

9     around the singular issue that the government is raising right

10     now, which is the display; not the use, not holding them close,

11     not any religious observe advantages.

12          To the extent that Mr. Grant and Mr. Reichberg want to

13     participate in any religious observance at all in this trying

14     time outside the presence of the jury, we welcome and encourage

15     it.  It's beautiful.  The problem is the display.  And if the

16     press has been able to see that for some time, it shouldn't be

17     terribly surprising that the jury has probably been able -- it

18     shouldn't be terribly surprising the possibility that the jury

19     has been able to see it, too.  And somewhat more cynically, I'm

20     afraid, I think that may be actually part of the purpose of the

21     precise placing.

22          Look, I ask your Honor to just sort of keep an eye on

23     this, and if your Honor wants to take a look from the jury box

24     himself later on, then that's fine as well.

25          I raised the issue just because now because our backs

1   are to counsel table because defense counsel has chosen to take

2   a single table where Grant and Reichberg can be next to each

3   other, as opposed to each of these tables, from the beginning

4   of the trial, and our backs are to them and are two things

5   away.  So obviously we have a tougher time seeing this than the

6   jury does.  And your Honor, of course, is at a different

7   vantage point than the jury as well.

8        That's all we're noting, your Honor.  I think that

9   it's of apiece with the concern that we raised earlier.  Hats

10  off, on some level it's a savvy move, but I don't think it's a

11  permissible one.

12       MS. NECHELES:  Your Honor, I'm kind of stunned.  The

13  fact that we sit together at the same table, none of this is

14  some big scheme by the defense.  We have about been working

15  together.  We sat at every court appearance exactly like we're

16  sitting now when there was no jury, exactly like we're sitting

17  now is how we sat.

18       I don't understand what the government is working

19  their way up about.  I wish I were as savvy as Mr. Bell seems

20  to think I am, but we're just trying to work together, try to

21  get this trial done and do our job.  And I don't understand

22  what the -- you see, your Honor, that we, Mr. Meringolo and I,

23  are trying to coordinate, we're trying to work together, trying

24  to move this trial along.  We have one item that shows the

25  exhibits.  I sit next to my paralegal because he's the one who

IBQTGRA1

1    knows things, then of course the next person who would sit here

2    is the client.  I just don't even understand why we're spending

3    this time on this, honestly.

4                THE COURT:  Thank you.

5                Mr. Meringolo, has Mr. Grant had the beads in the same

6    place that they are now in the course of the trial?  As I say,

7    I hadn't noticed them until today.  Were they on the other side

8    of the monitor, a bit further from the jury?

9                MR. MERINGOLO:  Since day one, they are right there.

10               THE COURT:  Thank you.  I'm not going to ask that they

11   be removed at this point.  To the extent that this becomes a

12   further issue that the government wants to brief the issue to

13   me, feel free to do so.  I'm hesitant to do so here.  This is a

14   stressful situation for both defendants.  I believe that some

15   religious succor is appropriate.  So to the extent that this

16   becomes an issue in the future, please don't hesitate to bring

17   it to my attention, counsel, but as I said, I have not observed

18   it during the course of trial and I'm not aware that the jury

19   has either.

20               I believe the jury is here, so we're prepared to

21   proceed.

22               Counsel, please bring in Mr. Rechnitz, and

23   Mr. Daniels, please bring in the jury.

24               (Jury present)

25               THE COURT:  Welcome back, ladies and gentlemen of the

IBQTGRA1                    Rechnitz - Direct

1    jury.  I hope you had a wonderful Thanksgiving holiday.  I'm

2    happy to see you back here today.

3            Counsel for the United States, could you please bring

4    in Mr. Rechnitz.

5            MR. BELL:  He's on his way in, your Honor.

6            THE COURT:  Good.  Thank you.

7            (Pause)

8            THE COURT:  Before we proceed, Mr. Rechnitz, let me

9    remind you that you remain under oath.

10           Thank you.  You may proceed, counsel.

11           MR. BELL:  Thank you, very much, your Honor.

12    JONA RECHNITZ,  (Continued)

13        having been previously affirmed, testified as follows:

14    DIRECT EXAMINATION

15    BY MR. BELL:

16    Q.  Good morning, Mr. Rechnitz.

17    A.  Good morning.

18           MR. BELL:  Mr. Hamilton, I ask you to put Government

19    Exhibit 307 back up on the screen just for a moment.  And I ask

20    you to play the first few seconds until I frantically say stop,

21    stop, stop.

22           Go ahead, sir.

23           (Video recording played)

24           MR. BELL:  Stop.

25           Few more seconds.

1          (Video recording played)

2          MR. BELL:  Stop, stop, stop.

3  Q.  Just to be clear, Mr. Rechnitz, who is that to your

4  apparent left here?

5  A.  Jeremy Reichberg.

6          THE COURT:  Just for the record, counsel, what time

7  we're stopping?

8          MR. BELL:  I stopped initially about -- I had

9  Mr. Hamilton stop initially about five seconds in, then again

10  seven seconds in to GX 307.

11          THE COURT:  Thank you.

12          MR. BELL:  And can we play, Mr. Hamilton, the last

13  minute or so of this exhibit, so I guess if you can take us to

14  the 143 mark, for the record.

15          Actually let's go back a bit further to the 115 mark,

16  perhaps.  If you could play from there, sir.

17          (Video recording played)

18          MR. BELL:  Let's pause for a moment.

19  BY MR. BELL:

20  Q.  Mr. Rechnitz, are you familiar with that individual who

21  said:  What's up, what's up, what's up?

22  A.  Yes, I am.

23  Q.  Who is that?

24  A.  Mark Shelton.

25  Q.  Who is Mark Shelton?

IBQTGRA1                         Rechnitz - Direct

1    A.  He was an officer with the NYPD who works for the chief of

2    department.

3    Q.  And what dealings did you have with Mr. Shelton?

4    A.  He would often escort us into One Police Plaza through

5    Mr. Bank's private elevator, and he was one of the drivers of

6    the chief of department.

7              MR. BELL:  Can you keep going, Mr. Hamilton.

8              (Video recording played)

9    BY MR. BELL:

10   Q.  Now you mentioned in the tape that you are going to the

11   ball dropping.  Did you in fact go to the ball drop with police

12   officials that year?

13   A.  Yes.

14   Q.  How many years did you go to the ball drop with police

15   officials, do you recall?

16   A.  Maybe one or two years.

17   Q.  Now when you did go to the ball drop, did you watch the

18   ball actually drop?

19   A.  Yes.

20   Q.  From where?

21   A.  From the front and center near the stage.

22   Q.  Now what understanding do you have, if any, of how the

23   thousands of folks around you -- what they had to do in order

24   to get to that position?

25   A.  They had to wait outside.

IBQTGRA1                          Rechnitz - Direct

1              MS. NECHELES:  Objection, your Honor.

2              MR. MERINGOLO:  Objection.

3              THE COURT:  Thank you.  Counsel, can you rephrase?

4              MR. BELL:  Sure.

5    Q.  Well, when you watched the ball drop, were you alone or

6    were there other people there?

7    A.  There were many thousands of people who had been there

8    waiting in the cold probably since the morning.

9    Q.  What did you have to do in order to get that particular

10   vantage point?

11   A.  We just had to roll in a few minutes before the ball

12   dropping with police officers.

13             MR. BELL:  And so I'm going to offer -- well, can we

14   put just on the witness's screen, Mr. Hamilton, and perhaps we

15   can split screen these, Government Exhibits 629 and 606.

16   Q.  So are you familiar with these images, sir?

17   A.  Yes, I am.

18   Q.  And how are you familiar with them?

19   A.  These are photos that I believe were taken on my phone.

20   Q.  And where were they taken and of what event?

21   A.  At Times Square by the ball dropping.

22             MR. BELL:  The government offers 629 and 606.

23             MS. NECHELES:  No objection, your Honor.

24             MR. MERINGOLO:  Your Honor, could we find out when

25   this was?

1              THE COURT:  Thank you.  Any objection to the

2    introduction, then we'll see what the other additional

3    questions come up?

4              MR. MERINGOLO:  No objection.

5              THE COURT:  Thank you.  I'm accepting 629 and 606 into

6    evidence.

7              (Government's Exhibits 606 and 629 received in

8    evidence)

9              THE COURT:  Counsel, you may proceed.

10             MR. BELL:  Thank you.

11             Mr. Hamilton, please publish to the jury just 629 for

12   the moment.

13   BY MR. BELL:

14   Q.  So what are we looking at here, Mr. Rechnitz?

15   A.  That's a photo in Times Square of me and Jeremy by the ball

16   dropping.  In the background at the top of the screen is the

17   ball lit up.

18             MR. BELL:  And can we publish 606 now, Mr. Hamilton.

19   Q.  And the lighting may not be the very best, but can you tell

20   who is depicted here?

21   A.  Yes, from left to right it's me, then Chief Michael

22   Harringon, Chief David Colon and Jeremy.

23   Q.  And do you happen to recall offhand which year this was,

24   that is to say, whether it's the same year as the video we

25   watched of you driving in or another year?

IBQTGRA1                      Rechnitz - Direct

1    A.  I'm not sure.

2              MR. BELL:  Can we take that down, please.

3              Mr. Hamilton, can you please publish 552A, which is

4    already in evidence.

5    Q.  So just before, Mr. Rechnitz, the Thanksgiving break, do

6    you recall being asked about this day when you and

7    Mr. Reichberg drove around Staten Island in Christmas hats to

8    deliver gifts to certain people, including Mr. Grant?

9    A.  Yes, sir.

10   Q.  And so what I would like to do --

11             MR. BELL:  You can take that down, Mr. Hamilton.

12   Q.  -- is direct your attention to Government Exhibit W0923.

13   It is a recorded call already in evidence.

14             MR. BELL:  And I will ask you, Mr. Hamilton, to put up

15   the coordinating transcript on the screen for the benefit of

16   the jury.  You don't need to use your binders, unless you want

17   to.

18             And just to refresh, this is a call from January 16,

19   2015, that is to say, over a year later, and could we play the

20   first two minutes or so, Mr. Hamilton.

21             (Audio recording played)

22             MR. BELL:  Could you pause for a moment.

23   Q.  By this time, January of 2015, had you already taken

24   Mr. Grant someplace for the Superbowl?

25   A.  Yes.

IBQTGRA1                    Rechnitz - Direct

1   Q.  Where was that?

2   A.  Las Vegas.

3   Q.  How had you taken him there?

4   A.  On a private jet.

5   Q.  In 2015, did you have Superbowl plans as well?

6   A.  Yes.

7   Q.  What did you do for the Superbowl in 2015?

8   A.  I went to watch the Superbowl with my friends in Vegas, but

9   I actually remember missing the game, I think it was that year,

10  because a friend of mine's child had passed away.

11  Q.  Did you make plans that year with Mr. Reichberg or

12  Mr. Grant?

13  A.  No.

14  Q.  Why not?

15  A.  Because the year before was a disaster, as far as I was

16  concerned, and I wanted to be on my own with my friends from

17  Los Angeles.

18  Q.  At this point, in January of 2015, was Mr. Banks still the

19  chief of department?

20  A.  I think so.

21          MR. BELL:  So why don't we continue with the

22  recording, Mr. Hamilton.

23          (Audio recording played)

24          MR. BELL:  Can you pause there, Mr. Hamilton.

25  Q.  Now Mr. Rechnitz, I asked you a number of questions about

1    your visit to Staten Island for Christmas of 2013.  For

2    Christmas of 2014, a few weeks before this call, did you make a

3    similar trip to Staten Island?

4    A.  No.

5    Q.  Why not?

6    A.  Because we were already dealing with higher level officers

7    than Jimmy Grant at that point and didn't feel we needed to

8    provide him with any gifts at that point.

9              MR. BELL:  Let me continue -- go ahead, Mr. Hamilton.

10             (Audio recording played)

11             MR. BELL:  Pause for a moment.

12   Q.  Reference is made here, Mr. Rechnitz, to Jona's fucking

13   application.  Had you applied to the NYPD for something at this

14   point.

15   A.  Yes, for the gun license.

16   Q.  We'll talk more about this later, but did you understand

17   Mr. Grant to have knowledge of that application?

18   A.  Yes.

19   Q.  And how did you understand that?

20   A.  From Jeremy and from Jimmy.

21   Q.  Let's keep going just a little bit further, Mr. Hamilton.

22             (Audio recording played)

23             MR. BELL:  Let's stop there, Mr. Hamilton.  Thank you.

24   Q.  So Mr. Rechnitz, let's go back to roughly Christmas of 2013

25   when you did make that trip to Staten Island.  Back when you

1    and Mr. Reichberg were doing that, what kind of an interest had

2    you and Mr. Reichberg taken in Mr. Grant's career?

3    A.   A very strong interest.

4    Q.   Why had you taken a very strong interest in his career?

5    A.   Jimmy and Jeremy had known each other for years.  Jeremy

6    said he was young at the time, I believe he was a captain, and

7    he was a rising star, and he was a guy who was a team player

8    and would get things done.

9    Q.   Did you and Mr. Reichberg take any actions to further or

10   advance Mr. Grant's career?

11   A.   Yes.

12   Q.   What did you do?

13   A.   We were influential in getting him promoted and transferred

14   to a new precinct.

15   Q.   What sorts of things did you do in order to get Mr. Grant

16   promoted?

17   A.   We spoke on several occasions to Philip Banks, the chief of

18   the department, and to Michael Harrington, his right-hand man,

19   about promoting Jimmy Grant.

20   Q.   And what sort of a response did you get over time from

21   Chief Banks?

22   A.   Chief Banks had explained to both of us that promotions

23   were up to the commissioner, but that he also had some spots

24   that he could recommend, and that eventually he had taken care

25   of it.

IBQTGRA1                        Rechnitz - Direct

1    Q.  And can you tell me, as close as you can, about what

2    Mr. Banks told you when he told you that it had been taken care

3    of?

4    A.  Yes, I remember being in the Grand Cabana Room with Jeremy

5    and Phil Banks where Philip said:  I took care of your boy,

6    he's getting promoted, the order just came in.  And then he

7    told us that we can call Jimmy and tell him, as long as Jimmy

8    did not tell anybody until he gets the official call from the

9    commissioner's office.

10   Q.  Did you in fact --

11              MR. MERINGOLO:  Your Honor, I object.  We need a time

12   frame for this.

13              THE COURT:  Thank you.  Overruled.

14              Counsel, you can proceed.

15              MR. BELL:  Thank you, your Honor.

16   BY MR. BELL:

17   Q.  At that time did you take Chief Banks up on his offer to

18   notify Jimmy Grant of his having gotten the promotion?

19   A.  Yes, we did.

20   Q.  Where were you at the time?

21   A.  We were in the Grand Cabana Room.

22   Q.  Did you call Mr. Grant?

23   A.  Yes, we did.

24   Q.  How did that conversation go?

25   A.  Very good.  We called him, we told him that he had been

IBQTGRA1                        Rechnitz - Direct

1    promoted, and we put Philip Banks on the phone with him as

2    well.

3    Q.  And did Mr. Banks, seriously or not, say anything about why

4    he had promoted Mr. Grant?

5    A.  Yes.

6    Q.  What did he say?

7    A.  He said:  I promoted you so that they stop bothering me and

8    asking me to get you promoted.

9            MR. MERINGOLO:  Objection.

10           THE COURT:  Thank you.  Overruled.  You can proceed.

11   Q.  Now what did you -- at the time that Mr. Grant got

12   promoted, what did you understand his new post to be?

13   A.  He became an inspector in the 19 Precinct.

14   Q.  What did you understand the 19 Precinct to cover?

15   A.  That's the post precinct, which is in --

16           MS. NECHELES:  Objection.

17           THE COURT:  What's the objection?

18           MS. NECHELES:  I object to the characterization, your

19   Honor.

20           THE COURT:  Thank you.  Overruled.  You can proceed.

21   A.  It's the posh precinct of the Upper East Side.  I believe

22   it covers a big chunk of midtown, I think from 59th Street up

23   to 72nd Street, but I'm not sure exactly which buildings.

24   Q.  Was Mr. Grant now covering that precinct important to you

25   and Mr. Reichberg?

IBQTGRA1                    Rechnitz - Direct

1   A.  Yes.

2   Q.  Why?

3   A.  First of all, we worked in those areas.  Second of all, we

4   now had a guy we're very close to in Manhattan.  Even though my

5   office was technically a block or two out of his precinct, it

6   was still close enough where we could call him for any issues.

7   Q.  Around the time that Jimmy Grant got promoted, how, if at

8   all, did the frequency of your asking him for favors change?

9   A.  The relationship was reignited.  There had been a period

10  where we weren't as much in contact, and from that point

11  forward we were more in touch.

12  Q.  And at around the time that Jimmy Grant got promoted, how,

13  if at all, did the frequency of your and Mr. Reichberg's

14  getting him things change?

15  A.  As well, we started to give gifts again.

16  Q.  Why did you start to give gifts to Mr. Grant again at

17  around that time?

18  A.  He was somebody who was resourceful to us at that point

19  once again.

20  Q.  Now notwithstanding Mr. Grant's new promotion to the 19th

21  Precinct, did there later come a point when your and Jeremy's

22  interest in Jimmy Grant fell off?

23  A.  Yes.

24  Q.  And why was that?

25  A.  First of all, we were involved with Phil Banks and Michael

1    Harrington, people of that sort, but there was a point where we
2    got a visit from the Internal Affairs Bureau, and there were
3    investigations before that going on with people we were dealing
4    with, and at that point got very nervous to be involved with
5    cops.
6              MR. MERINGOLO:  Your Honor, we're going to have to ask
7    for a time frame.
8              THE COURT:  You'll get the opportunity.
9              Please proceed, counsel.
10             MR. BELL:  Thank you, your Honor.
11   Q.  Let's take both of those things perhaps in turn.  First,
12   why did your growing relationship with Banks and Harrington
13   have an effect -- an adverse effect on your relationship with
14   Jimmy Grant?
15   A.  Because we were dealing with people at the high level, at
16   the top, so we didn't need to go through Jimmy to get things
17   done anymore, we were able to just get it through Mike
18   Harrington.
19   Q.  And you mentioned that you were visited by IAB as another
20   reason why the relationship fell off.  Did there come a point
21   where Phil Banks ceased to be chief of department?
22   A.  Yes.
23   Q.  Approximately when was that, do you recall?
24   A.  It was all around the same period.  I think it was -- I
25   think it was in 2015 at some point, I don't remember the exact

IBQTGRA1                         Rechnitz - Direct

1    date.

2    Q.  How did you come to learn that Chief Banks was no longer

3    going to be the chief of department?

4    A.  He told Jeremy and I that he was going to have a meeting

5    with the commissioner.  We had assumed it was to offer him a

6    big position to become the next commissioner, and we were in

7    his office waiting for him to come back, and when he came back

8    he told us that he had just resigned.

9    Q.  Were you surprised?

10   A.  I was furious.

11   Q.  Why were you furious?

12   A.  Because we had put so much time and energy and financial

13   resources into this entire police world in growing within the

14   NYPD, in Philip Banks, cultivating the relationship, and I felt

15   we were back to square one.

16   Q.  What affect, if any, did that have on your enthusiasm for

17   continuing to provide benefits to cops in order to get things

18   in return?

19   A.  I was done.  I tapped out.  I told Jeremy that's it, this

20   is embarrassing, we were on the top, now we're -- we have to

21   start from square one.  I'm done.  We put too much effort into

22   this.

23   Q.  Did Mr. Reichberg give you an indication of whether he was

24   done?

25   A.  No, he said don't worry, I know -- I'm sure I know who the

1    replacement will be at some point, which was Jimmy O'Neil.

2    Jeremy told me he knew him, he told me he's in with the

3    commissioner's office, and he has other resources and other

4    people.

5    Q.  Prior to that point, had Mr. Reichberg taken an interest in

6    getting to know Commissioner Bratton and others in his orbit?

7    A.  Yes.

8    Q.  What sort of an interest had he taken?

9    A.  It was a very small interest.  It grew after Philip Banks

10   left.  But one of the ladies who worked for Commissioner

11   Bratton was the ex to Stephen McAllister, and Jeremy had taken

12   an interest in dealing with her and getting to know her.

13   Besides that, we were always -- we were both looking for an

14   angle to get in with the commissioner's office as well.

15   Q.  Was that terribly successful prior to Phil Bank's

16   resignation?

17   A.  No.

18   Q.  I asked you a number of questions about Grant, Harrington

19   and Banks.  I want to set those aside and ask you about some

20   other officers.  Are you familiar with a David Colon?

21   A.  I am.

22   Q.  Who was David Colon?

23   A.  David Colon was a chief in NYPD.

24   Q.  And did you and Mr. Reichberg do things for Mr. Colon as

25   part of the arrangement and understanding that we have been

1    discussing?

2    A.   Yes.

3    Q.   What sorts of things did you and Mr. Reichberg do for David

4    Colon?

5    A.   First of all, his daughter had a Sweet Sixteen, so Jeremy

6    told me that Dave was looking for a place for his daughter to

7    celebrate in a safe environment, in a hotel.  And we had

8    spoken, and I ended up renting a room for his daughter's Sweet

9    Sixteen in a hotel in Manhattan.

10   Q.   What else did you do for Mr. Colon?

11   A.   His daughter was looking for a summer internship, and I

12   called a friend of mine at the time and got her a job.

13   Q.   Where did you get her a job?

14   A.   At Tommy Hilfiger's company.

15   Q.   Who is your friend?

16   A.   Tommy Hilfiger.

17   Q.   And do you recall any other examples of things that you did

18   for Mr. Colon?

19   A.   I don't recall any other specifics other than buying him a

20   Breitling watch.

21   Q.   And what can you tell us about the incident in which you

22   purchased the watch.

23   A.   I bought him and another friend, mutual friend of ours,

24   matching Breitling watches.  Dave had introduced Jeremy and I

25   to Hamlet Peralta, the fellow from the liquor business, and at

IBQTGRA1                    Rechnitz - Direct

1    that point we thought it was a good business and we were all

2    making money together, so as a nice gesture we purchased him a

3    watch.

4    Q.  What, if anything, did you and Mr. Reichberg get from Chief

5    Colon, to your knowledge?

6    A.  Not much that I could think of.

7    Q.  Did you expect that you would get more from Chief Colon

8    than you in fact did?

9    A.  Yes.

10   Q.  And what reason was there that you didn't get as much from

11   Chief Colon?

12   A.  Well, we were dealing with, again, Phil Banks, Michael

13   Harrington, Jimmy Grant, so we were pretty much covered, but

14   every time we would call Colon for something there would be

15   another excuse or story why he couldn't come through.

16           MR. BELL:  Could we put up on the witness's screen,

17   Mr. Hamilton, what's been marked for identification as

18   Government Exhibit 8.

19   Q.  Are you familiar, Mr. Rechnitz, with the individual

20   depicted here?

21   A.  Yes.

22   Q.  Who is it?

23   A.  That's Chief Colon.

24           MR. BELL:  Your Honor, the government offers

25   Government Exhibit 8 as well as Government Exhibit 8A, a face

IBQTGRA1                    Rechnitz - Direct

1    plate that says David Colon.

2              MS. NECHELES:  No objection, your Honor.

3              MR. MERINGOLO:  No objection.

4              THE COURT:  Thank you.  I'm accepting Exhibits 8 and

5    8A into evidence.  You can proceed.

6              (Government's Exhibits 8 and 8A received in evidence)

7              MR. BELL:  May we please publish Government Exhibit 8

8    to the jury?

9              THE COURT:  You may.

10   BY MR. BELL:

11   Q.  Is this Mr. Colon?

12   A.  Yes.

13             MR. BELL:  Let's take that down, and could we publish

14   just to the witness Government Exhibit 613.

15   Q.  Are you familiar with the individuals depicted here?

16   A.  Yes.

17   Q.  How are you familiar with them?

18   A.  I'm sorry, the screen just went blank.

19             (Pause)

20             THE COURT:  Counsel, do you have a hard copy?

21             MR. BELL:  I think we're back on line.

22             THE COURT:  You can proceed, counsel for the United

23   States.  Until we're able to fix this problem, could you hand

24   the witness physical copies?

25             MR. BELL:  Sure.  I think Mr. Rechnitz has a binder

IBQTGRA1                        Rechnitz - Direct

1   with most, if not all, of the stuff in it, so that might be

2   helpful as well.

3   Q.  Are you familiar with this picture, sir?

4   A.  Yes, I am.

5   Q.  How are you familiar with it?

6   A.  I believe I took it at a promotion ceremony for Dave Colon.

7   Q.  Who is depicted in the picture?

8   A.  Chief Colon and his girlfriend.

9           MR. BELL:  The government offers 613.

10          THE COURT:  Counsel?

11          MS. NECHELES:  No objection.

12          MR. MERINGOLO:  No objection.

13          THE COURT:  Thank you, I'm accepting 613 into

14   evidence.

15          (Government's Exhibit 613 received in evidence)

16          THE COURT:  Counsel, you can proceed.

17          MR. BELL:  May we briefly publish that?

18          THE COURT:  You may.

19          MR. BELL:  Thank you.

20          Let's take that down.

21   BY MR. BELL:

22   Q.  Now Mr. Rechnitz, while we're having these screen issues,

23   could I direct you to what should be in your binder as GX1016?

24   A.  Yes.

25          MR. BELL:  Meanwhile, Mr. Hamilton --

1   A.  I can see the screen in front of me, if that helps.

2   Q.  For the emails where the screen is kind of small, let's do

3   it that way.

4   A.  Okay.

5   Q.  And so are you familiar with Government Exhibit 1016?

6   A.  Yes, I am.

7   Q.  How are you familiar with this?

8   A.  This is an email that David Colon's daughter, Laura, wrote

9   to me for the internship, which I then forwarded to Tommy.  I

10  told him that it was the daughter of an NYPD chief, and he

11  wrote to me:  I'm on it, thanks.

12          MR. BELL:  Your Honor, the government offers

13  Government Exhibit 1016.

14          MS. NECHELES:  No objection.

15          MR. MERINGOLO:  No objection.

16          THE COURT:  Thank you.  I'm accepting 1016 into

17  evidence.  You can proceed.

18          (Government's Exhibit 1016 received in evidence)

19          MR. BELL:  Could we publish that to the jury, please.

20  And Mr. Hamilton, could we focus in the first instance on the

21  email below, just the bottom half.  Thank you.  Email from

22  Laura Colon, just highlight the date for me.

23          Maybe we could focus on the first paragraph.  I will

24  read, just to move things along:  Hello, Jona Rechnitz.  I

25  would like to take the opportunity to thank you in advance for

1    your referral to Tommy Hilfiger for an internship.  I will not

2    let you down as I will adhere to the highest principles and

3    work ethics.  I will am a reflection of my father as well as

4    you.  If given the opportunity to do the internship, I will be

5    sure to keep both of your reputations at a high standard.

6              Let's jump out of the blow up box and focus in on the

7    top half of the email.

8    Q.  So you then forward this and note:  Daughter of an NYPD

9    chief.  Very close friend.  Any push would be greatly

10   appreciated.  Then it's your signature.  Then Mr. Hilfiger

11   responds on March 8 at 2:33 p.m. saying:  I'm on it, thanks.

12             Copied is an individual named Sheila Cox.  Did you

13   have an understanding of who Sheila Cox was?

14   A.  Yes.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

IBQKGRA2                         Rechnitz - Direct

```
 1    BY MR. BELL:
 2    Q.   Who was Sheila Cox?
 3    A.   Tommy's personal assistant.
 4              MR. BELL:  Let's take that down.
 5              Can we put up on the screen, just for the witness,
 6    Government Exhibit 1017.  Can we just focus on the top half
 7    that has the text on it.
 8    Q.   Are you familiar with this email?
 9    A.   I'm just reading it here.
10    Q.   Sure.
11    A.   Yes, I am.
12    Q.   How are you familiar with this email?
13    A.   It's an email that Tommy had sent to me.
14    Q.   Does it concern the internship?
15    A.   Yes.  Tommy wrote me an email saying she's onboard --
16    Q.   I won't ask you to read it right now.  I'll just ask
17    whether it concerns the internship.
18    A.   Yes.
19              MR. BELL:  Your Honor, the government offers
20    Government Exhibit 1017.
21              MS. NECHELES:  No objection.
22              MR. MERINGOLO:  No objection.
23              THE COURT:  Thank you.
24              I'm accepting 1017 into evidence.
25              You can proceed.
```

IBQKGRA2                        Rechnitz - Direct

1          (Government's Exhibit 1017 received in evidence)

2          MR. BELL:  Can we publish to the jury, Mr. Hamilton.

3    BY MR. BELL:

4    Q.  So, beginning at the very bottom, on April the 8th,

5    Mr. Hilfiger writes:  "Jona, she's onboard as a Tommy Hilfiger

6    intern."

7          You respond:  "Beautiful.  Thank you.  Her father

8    is" --

9          MR. BELL:  Whoops.  Let's just focus back in there.

10   Thank you, Mr. Hamilton.

11   Q.  "Beautiful.  Thank you.  Her father is Chief of Community

12   Affairs in the NYPD and works very hard for her future.  She's

13   a bright girl with drive.  She's on a path to success with your

14   help.  Thank you."

15         And Hilfiger responds:  "Great."

16         Why did you note there, Mr. Rechnitz, that Laura's

17   father was the Chief of Community Affairs at the NYPD?

18   A.  I didn't want him to think it was -- he was the chief of

19   the entire NYPD.

20         MR. BELL:  Can we take that down.

21         Can you put up, just for the witness, Government

22   Exhibit 1018.

23   Q.  Are you familiar with this email?

24   A.  Yes, I am.

25   Q.  Oh, just to be clear, is your screen working again?

IBQKGRA2                          Rechnitz - Direct

1    A.   Yes.

2    Q.   Terrific.

3              How are you familiar with this email exchange, sir?

4    A.   It's an email which involves me and my hotel travel agent.

5              MR. BELL:  Your Honor, the government offers 1018.

6              MS. NECHELES:  No objection.

7              MR. MERINGOLO:  No objection.

8              THE COURT:  Thank you.

9              I'm accepting 1018 into evidence.

10             You can proceed.

11             (Government's Exhibit 1018 received in evidence)

12             MR. BELL:  Thank you.

13             Can we publish that, Mr. Hamilton.

14   BY MR. BELL:

15   Q.   Let's start at the bottom half of that first page.  It

16   says:  "Reservation confirmation."

17             This is from Luxury Connections Reservations.  Who was

18   Luxury Connections?

19   A.   A friend of mine, Avi Goldstein, he's the person who made

20   all my hotel bookings.

21   Q.   It says here:  "Dear Laura Colon, we are pleased to confirm

22   your upcoming stay at the Royalton.  We will be delighted to

23   assist you."

24             And there is Laura Colon, and the email is

25   jona@jrs.cap.

1      Whose email address was that, in fact?

2  A.   The jrs.cap, it was my email address.

3  Q.   Under the credit card information, there's a number, and it

4  says:  "Cardholder:  Jona Rechnitz."

5      Did you pay for that reservation?

6  A.   Yes, I did.

7  Q.   The charge listed at the bottom is $2,149.51.

8      Does that accord with your memory of how much you

9  paid?

10  A.   Yes.

11  Q.   Now, Mr. Rechnitz, as a general matter, when you paid for

12  hotel stays for other people, did you tend to want them to know

13  how much you had paid in order to do so?

14  A.   No.

15  Q.   Why not?

16  A.   I either wanted them to think that I somehow got it for

17  free, or I was the owner of the hotel, or I traded some sort of

18  a comp for it, or I didn't want them to feel bad at the amount

19  of money that was being spent.

20  Q.   So what sorts of measures, if any, did you take in order to

21  not let the beneficiaries know about the charges?

22  A.   I would take a reservation email, just like in this case,

23  but I would take out the dollar amount, and let it either read

24  zero, or no charge, or just leave it blank.

25      MR. BELL:  Can we jump out of that box for the moment.

1    Q.  You say:  "Thank you."

2             And then Luxury Connections responds:  "Hi Jona.  It

3    is our pleasure, and thank you for choosing Luxury Connections.

4    Wishing Ms. Colon a wonderful stay at the Royalton.  Best,

5    Luxury Connections team."

6             MR. BELL:  You can take that down, Mr. Hamilton.

7    Q.  You mentioned a Breitling before that you had gotten for

8    Mr. Colon and for another individual.

9             Do you recall, roughly, how much that Breitling cost?

10   A.  I think it was somewhere between three to five thousand

11   dollars.

12   Q.  Do you recall where you got it from?

13   A.  At Motion In Time.

14   Q.  What was Motion In Time?

15   A.  A watch store in Manhattan.

16   Q.  Were you a regular customer of Motion In Time?

17   A.  Yes.

18   Q.  Who were your contact people, or who was your contact

19   person, at Motion In Time?

20   A.  A fellow by the name of Ariel and Boris.

21   Q.  Do you recall their last name?

22   A.  Shamayev.

23   Q.  And were Ariel -- how were Ariel and Boris related,

24   assuming they were?

25   A.  They were brothers.

IBQKGRA2                          Rechnitz - Direct

1   Q.  Did you deal exclusively with one of those individuals or

2   sometimes either one?

3   A.  Sometimes either one.

4           MR. BELL:  Why don't we now put up, just for the

5   witness, Government Exhibit 1019.

6   Q.  By the way, with respect to that Breitling watch, was that

7   a trade-in or a straight-up purchase?

8   A.  Straight-up purchase.

9   Q.  Now, 1019 is now on the screen.  Are you familiar with this

10  email?

11  A.  Yes, I am.

12  Q.  And how are you familiar with this email?

13  A.  It's an email that I wrote to Jeremy.

14          MR. BELL:  Your Honor, the government offers

15  Government Exhibit 1019.

16          MS. NECHELES:  No objection.

17          THE COURT:  Thank you.

18          Counsel?

19          MR. MERINGOLO:  No objection.

20          THE COURT:  Thank you.

21          I'm accepting 1019 into evidence.

22          You can proceed, counsel.

23          (Government's Exhibit 1019 received in evidence)

24          MR. BELL:  Let's publish that to the jury,

25  Mr. Hamilton.

IBQKGRA2                          Rechnitz - Direct

1    BY MR. BELL:

2    Q.  So, on June the 5th, 2013, at 11:45 a.m., you write:

3    "Colon hooked up to Jeremy."

4            What did you mean by "Colon hooked up"?

5    A.  Had purchased him a gift, a watch.

6    Q.  And then Jeremy responds:  "What did you get?"

7            Did you have discussions with Jeremy about the various

8    things that you got for Dave Colon?

9    A.  Yes.

10   Q.  Did you eventually tell Jeremy what precisely it was that

11   you got?

12   A.  Yes.

13   Q.  Did you also tell him about the hotel at the Royalton?

14   A.  Yes.

15   Q.  Did you tell Mr. Reichberg about the internship with Tommy

16   Hilfiger?

17   A.  Yes.

18   Q.  Why did you generally keep Mr. Reichberg in the loop about

19   these things?

20   A.  Well, first of all, he had approached me about Dave Zauder

21   for the hotel for the sweet sixteen, but this was something we

22   had discussed the other day.  These were shared -- anything to

23   do with me was a shared resource, and Jeremy and I were

24   partners in this scheme.  So he kept me in the loop when it

25   pertained to me, and I kept him in the loop.

IBQKGRA2                          Rechnitz - Direct

1   Q.   When you say "shared resource," what do you mean by that?

2   A.   Any benefit that would come out of my financial benefit,

3   Jeremy would benefit from as well.  He would deal with the

4   details; I would deal with the financial aspects.

5   Q.   Thank you.

6            MR. BELL:  Why don't we take that one down,

7   Mr. Hamilton.

8   Q.   I've asked you a number of questions about Chief Colon.

9   Did you also know a Chief McAllister?

10  A.   Yes.

11  Q.   Who is Steve McAllister?

12  A.   When I met him, he was an inspector in the NYPD.

13  Q.   Did that change over time?

14  A.   Yes.

15  Q.   What happened?

16  A.   He retired, and he took on a new job as the position of

17  commissioner of the Floral Park Police Department.

18  Q.   Where did you understand Floral Park to be?

19  A.   I think it's in Queens.

20  Q.   Now, while Mr. McAllister was with the NYPD, what did he do

21  for you and Jeremy that you were aware of?

22  A.   I think he was involved in help with closure of the Lincoln

23  Tunnel for my boss.  He was involved in helping get rid of

24  protesters in front of the jewelry store that my boss had

25  owned.

IBQKGRA2                          Rechnitz - Direct

1    Q.  What sorts of things did you and Mr. Reichberg do for
2    Mr. McAllister while he was with the NYPD?
3    A.  So, first of all, we had given monetary assistance to the
4    NYPD football team.
5    Q.  Was Mr. McAllister affiliated with the football team?
6    A.  Yes.  He had asked for the donations.
7         In addition to that, I had bought him a Chopard watch;
8    had given him a free diamond for his daughter who was getting
9    engaged.  And there were other jewelry and types of things that
10   we did for him as well in addition to meals that we paid for.
11   Q.  Did you continue to do things for Mr. McAllister after he
12   left the NYPD?
13   A.  Once he was in the Floral Park Police Department, yes.
14   Q.  What did you do for him?
15   A.  We took him on a trip to Miami on a private jet to watch
16   the BCS football game.  Actually, we took him back, I remember,
17   from Miami.  Also continued giving him jewelry gifts.  Gave him
18   a donation for some Nassau County golf tournament.  He asked
19   for things like that.
20   Q.  What sorts of things are you aware of that Mr. McAllister
21   did for you once he got to Floral Park?
22   A.  He had made me a clergy liaison and gave me a parking
23   placard and ID card.  He made Jeremy the chaplain of Floral
24   Park Police Department and gave him, also, a card and a parking
25   chaplaincy card.

1           MR. BELL:  Can we put up just for the witness,

2     Mr. Hamilton, what's been marked for identification as

3     Government Exhibit 1023.

4     Q.  I'll ask you to just read through that and look up when

5     you're done.

6           (Pause)

7     A.  Okay.

8     Q.  Are you familiar with this email exchange?

9     A.  Yes, I am.

10    Q.  How are you familiar with this email exchange?

11    A.  It's an email between me and Stephen McAllister.

12          MR. BELL:  Your Honor, the government offers

13    Government Exhibits 1023.

14          MS. NECHELES:  No objection.

15          MR. MERINGOLO:  No objection.

16          THE COURT:  Thank you.

17          I'm accepting 1023 into evidence.

18          You can proceed.

19          (Government's Exhibit 2023 received in evidence)

20          MR. BELL:  Can we publish that to the jury,

21    Mr. Hamilton.  And let's look at the bottom half of the page.

22    BY MR. BELL:

23    Q.  You write at the bottom:  "Hi.  I am with Jeremy now on a

24    flight.  His phone isn't working.  Sorry it is so last minute,

25    but since I will be in town tonight before my travels next

IBQKGRA2                    Rechnitz - Direct

1    week, can you arrange dinner at 7 with Chief Dunn, you, me, and

2    Jeremy.  If it is okay, we would bring Mike Harrington as well.

3    Thank you."

4           Who is Chief Dunn?

5    A.  Chief Dunn, I believe, was the head of the Port Authority.

6    Q.  What were you looking to do here?

7    A.  It was either Port Authority or highway, I don't remember

8    which one.

9           We were looking to establish a connection with Chief

10   Dunn.

11   Q.  McAllister responds:  "Jona, his schedule is planned weeks

12   in advance.  We would need to set up a future date to meet.

13   Tonight is an impossibility."

14          MR. BELL:  Can we go to the top half, please.

15   Q.  You respond:  "Okay.  Thank you.  Hope you are doing well."

16          Mr. McAllister responds:  "Always.  Thank you.  Ask

17   Jeremy status of ring."

18          Did you have an understanding of what Mr. McAllister

19   was referring to when he said "Ask Jeremy status of ring"?

20   A.  I'm not sure which ring he's referring to, but it was

21   talking about a diamond ring.

22   Q.  Were you familiar with multiple diamond rings that

23   Mr. Reichberg was helping Mr. McAllister with?

24   A.  Yes.

25   Q.  What do you recall of those?

1   A.  There was one that I had arranged, and I remember that

2   Jeremy had arranged other jewelry for him.

3            MS. NECHELES:  I just object.  I don't know what he

4   means by "arranged."

5   Q.  What do you mean by "arranged," Mr. Rechnitz?

6            THE COURT:  Thank you.

7            First, the objection is overruled, but, counsel, if

8   you'd like to inquire further, you may.

9            MR. BELL:  Sure.  I'm happy to be helpful.

10  BY MR. BELL:

11  Q.  What do you mean by "arranged," Mr. Rechnitz?

12  A.  Provided him with, sold to him.

13           MR. BELL:  So let's take that down.

14           Before we do, I'll note that the email exchange is

15  dated July the 31st of 2013.

16           Now let's take that down.  Thank you, Mr. Hamilton.

17           Mr. Hamilton, I'll ask you to put up on the witness'

18  screen what's been marked for identification as --

19  Q.  Well, first of all, are you familiar with a Detective

20  Michael Milici?

21  A.  Yes, I am.

22  Q.  How are you familiar with Mr. Milici?

23  A.  I met him through Jeremy.

24  Q.  Did there come a time where you and Jeremy did things for

25  Milici and Milici did things for you?

1   A.   Yes.

2   Q.   So what sorts of things did you do for Milici?

3   A.   We took him to a trip to Las Vegas on a private plane.  We

4   took him on a trip to the Dominican Republic on a private

5   plane.  I know that Jeremy's constantly on the phone with him

6   getting things done in his community.

7   Q.   Where did you understand -- what, if anything, did

8   Mr. Reichberg tell you about his relationship with Mr. Milici;

9   that is, its origins?

10  A.   That he had met him in the Borough Park community, that

11  they had a working relationship.

12  Q.   What, if anything, do you recall Milici doing for you and

13  Jeremy?

14  A.   I remember him providing access one time at a parade when

15  we had seen him, but other than that, I didn't have much

16  dealings with him.

17  Q.   Did you understand Mr. Reichberg to have more extensive

18  dealings with Mr. Milici than you?

19  A.   Yes.

20  Q.   How did you have that understanding?

21  A.   From Jeremy.  He had told me that.

22        MR. BELL:  I'll ask, Mr. Hamilton, for you now to put

23  up Government Exhibit 10, as identified up on the witness'

24  screen.

25  Q.   Well, let's do this one:  Who's this, sir?

IBQKGRA2                         Rechnitz - Direct

1    A.  Stephen McAllister.

2              MR. BELL:  Your Honor, the government offers

3    Government Exhibit 10 and a nameplate 10-A that says "Stephen

4    McAllister."

5              MS. NECHELES:  No objection.

6              MR. MERINGOLO:  No objection.

7              THE COURT:  Thank you.

8              I'm accepting Exhibit 10 and Exhibit 10-A into

9    evidence.

10             You can proceed.

11             (Government's Exhibits 10 and 10-A received in

12    evidence)

13             MR. BELL:  Can we publish that.

14   BY MR. BELL:

15   Q.  So this is Mr. McAllister?

16   A.  Yes.

17             MR. BELL:  Let's take that down.

18             Mr. Hamilton, I'll now ask you to publish for the

19   witness what's been marked for identification as Government

20   Exhibit 5.

21   Q.  Are you familiar with this individual?

22   A.  Yes.

23   Q.  Who is that?

24   A.  Michael Milici.

25             MR. BELL:  Your Honor, the government offers

1    Government Exhibit 5 and 5-A, a nameplate that says "Michael

2    Milici."

3              MS. NECHELES:  No objection.

4              MR. MERINGOLO:  No objection.

5              THE COURT:  Thank you.

6              I'm accepting Exhibits 5 and 5-A.

7              You can proceed.

8              (Government's Exhibits 5 and 5-A received in evidence)

9              MR. BELL:  Let's publish that, Mr. Hamilton.

10   BY MR. BELL:

11   Q.  So is this Detective Milici?

12   A.  Yes.

13             MR. BELL:  Let's take that down.

14   Q.  Did there come a point where you and Mr. Reichberg employed

15   Mr. Milici's services with respect to real estate in lower

16   Manhattan?

17   A.  Yes.

18   Q.  Can you tell us about that?

19   A.  Yes.  There were two occasions.  There was a building on

20   Wall Street, 23 Wall Street, that I had managed on behalf of

21   the ownership.  And, first of all, there was an event which

22   required armed security, so we had to pay Mike Milici as a

23   security guard for that event.

24             In addition to that, there was a security fee that the

25   management company would pay to me on a monthly basis, and this

1    security guard was an old teacher of mine, an older rabbi, who

2    I had guard the construction site, but when the building

3    ownership decided to replace me as the manager, I was afraid if

4    they would meet him, they would fire him because he didn't have

5    the qualifications as a security guard.  So Jeremy and I gave

6    Mike some money, and Mike went into the interview pretending he

7    had been the security guard on site permanently.

8    Q.  Are you familiar, from the same period of your life, with

9    an individual named Eddie Gardner?

10   A.  Yes, I am.

11   Q.  Who is Eddie Gardner?

12   A.  I had met Eddie Gardner through Jeremy.  I believe he was a

13   detective in the TARU at the NYPD.

14   Q.  What unit did you understand that to be?

15   A.  Some undercover unit in the NYPD.

16   Q.  Did you and Mr. Reichberg do certain things for Eddie

17   Gardner?

18   A.  Yes.

19   Q.  What did you do?

20   A.  We paid for meals, and we had taken him to the BCS

21   championship to Florida on our private plane and back.

22   Q.  Are you familiar with an individual named Jimmy McCarthy?

23   A.  Yes, I am.

24   Q.  Who is Jimmy McCarthy?

25   A.  I had met him through Jeremy as well.  He was a chief in

1    the NYPD in Queens.

2    Q.  What, if anything, did you do for Jimmy McCarthy?

3    A.  We took him to a -- I remember we took him to a baseball

4    game, and in addition to that, also took him to Florida on the

5    private plane for the BCS championship game.

6    Q.  What, if anything, do you recall Jimmy McCarthy doing for

7    you and/or Mr. Reichberg?

8    A.  Not much.  The only thing -- the only two things that come

9    to mind is that there was somebody who was in a holding cell in

10   a precinct in Queens, and Jeremy had called him -- we went to

11   visit the individual to try and get him out.  The other thing

12   is there was a time when we were stuck in traffic, or I was

13   stuck in traffic going to the airport, and I had called Jeremy

14   to see if he could get permission to turn on lights and sirens

15   in my car to avoid traffic, and he told me to call Chief

16   McCarthy to tell him and that he had spoken to him.

17   Q.  I'm going to ask you a few questions about that,

18   Mr. Rechnitz.

19            Over the course of your relationship with

20   Mr. Reichberg, did the term "lights and sirens" develop a

21   particular meaning?

22   A.  Yes.

23   Q.  What did lights and sirens mean?

24   A.  What it sounds like, putting on lights and sirens package

25   in the vehicle to avoid traffic.

1  Q.  Who did you know at this time who had lights and sirens

2  packages in their personal vehicles, other than police

3  officers?

4  A.  A fellow by the name of Nussy Josephy who used to drive for

5  us and for Jeremy.  I had lights and sirens in my car, which I

6  then gave to Jeremy.

7  Q.  And who was this Nussy Josephy?

8  A.  He was somebody who was associated with Jeremy, who ran a

9  lot of errands for him, and many times drive me as well, me and

10  Jeremy together.

11  Q.  Did you understand Nussy Josephy to be a police officer?

12  A.  No.

13  Q.  Did you understand Nussy Josephy to have any affiliation

14  with emergency services?

15  A.  Yes.

16  Q.  What affiliation with emergency services did Mr. Josephy

17  have?

18  A.  He was a volunteer for the Hatzolah Ambulatory Service,

19  which is a volunteer service for ambulatory services.

20  Q.  About how often did Nussy Josephy drive you and Jeremy?

21  A.  I'd say biweekly.

22  Q.  About how often did Mr. Josephy use his license and sirens

23  package while doing so?

24  A.  Very often.

25  Q.  What, if anything, would Mr. Josephy or Mr. Reichberg do in

IBQKGRA2                          Rechnitz - Direct

1   order to get permission to put on their lights and sirens --

2   the lights and sirens?

3   A.   Mr. Josephy was hesitant to do it on his own.  He would

4   call Jeremy or ask Jeremy in the car, and Jeremy would then say

5   he already got permission, or place a phone call to an officer

6   to get permission, or let them know he was using lights and

7   sirens in case he got pulled over.

8   Q.   Do you recall any of the officers that Mr. Reichberg would

9   use in order to ostensibly get permission to put lights and

10  sirens on?

11  A.   I do not.

12  Q.   Now, when this happened, would the end result be

13  Mr. Josephy turning on his lights and sirens?

14  A.   Yes.

15  Q.   How were they used?  In other words, what would he be able

16  to do?

17  A.   Cut traffic, move cars to the side.

18  Q.   Now, you mentioned that you had a lights and sirens package

19  within your vehicle at one point.  How did you come to get a

20  lights and sirens package?

21  A.   We had it installed.  I think Nussy had a place to install

22  it.  I asked Jeremy if I can get lights and sirens, and he

23  arranged to have it installed.

24  Q.   Why did you want the lights and sirens package?

25  A.   So I could avoid traffic as well.

IBQKGRA2                        Rechnitz - Direct

1    Q.  Did you -- and, to be clear, when Nussy Josephy used --
2    well, first of all, to your recollection, who used the lights
3    and sirens package more often, yourself or Mr. Josephy, when
4    you were around?
5    A.  Mr. Josephy.
6    Q.  About how often did you use that -- did Mr. Josephy use
7    that package in nonemergency situations?
8            MR. MERINGOLO:  Objection; speculation.
9            THE COURT:  Thank you.
10           Can you rephrase the question, counsel?
11           MR. BELL:  Sure.
12   BY MR. BELL:
13   Q.  How often did you observe Mr. Josephy use his lights and
14   sirens package in the way that you've described in nonemergency
15   situations?
16   A.  I think every time I was around that it was used, it was
17   never in an emergency.
18   Q.  Can you give me some examples of circumstances in which
19   Mr. Josephy, with permission, utilized the lights and sirens
20   package?
21   A.  Jeremy and I took somebody to the U.S. Open, we went lights
22   and sirens.  We went to the airport, we went lights and sirens.
23   We had to cross town, we went lights and sirens.
24   Q.  Who did you take to the U.S. Open?
25   A.  Stewart Rahr.

IBQKGRA2                           Rechnitz - Direct

 1    Q.  Who was Mr. Rahr?
 2    A.  He was a fellow I met at a Knicks game who I was in touch
 3    with.  He was giving a lot of charity out, and I wanted to
 4    impress him.
 5    Q.  Did you also know an individual named Paul Raps?
 6    A.  Yes.
 7    Q.  Who is Mr. Raps?
 8    A.  Paul Raps is a former employer of Lev Leviev, and I used to
 9    share an office space with him.
10            MR. BELL:  Can we put up on the screen, just for the
11    witness, what's been marked for identification as Government
12    Exhibit 1015.
13    Q.  Are you familiar --
14            MS. NECHELES:  Objection, your Honor.
15            THE COURT:  Thank you.
16            You can ask the question.
17    BY MR. BELL:
18    Q.  Are you familiar with this email?
19    A.  Yes, I am.
20    Q.  Who is it from, and who is it to?
21    A.  It is from Paul Raps, and it's to me, and he copied a whole
22    slew of people.
23    Q.  Can you list the people who were copied on this?
24    A.  Ilana Freider, Guy Tanne, Yaron Turgeman, and Ari Schwebel.
25    Q.  Can you tell me who each of those people is?

IBQKGRA2                          Rechnitz - Direct

1    A.   Ilana Freider was --

2              MS. NECHELES:  Objection, your Honor.

3              THE COURT:  Thank you.

4              You can answer that question.

5              THE WITNESS:  Ilana Freider was Paul Raps' personal

6    assistant, Guy Tanne was the CFO for Paul Raps, Yaron Turgeman

7    is the owner of Taly Diamonds, and Ari Schwebel was a fellow

8    who worked with me.

9              MR. BELL:  Your Honor, the government offers

10   Government Exhibit 1015.

11             MS. NECHELES:  Objection.

12             THE COURT:  Thank you.

13             Come on up.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  Thank you.

3           Counsel, there's an objection?

4           MS. NECHELES:  Yes.  It's hearsay.

5           THE COURT:  Thank you.

6           With respects to the statement in the email that

7    Jeremy had taken this person for a ride?

8           MS. NECHELES:  Yes, that they went lights and sirens.

9           THE COURT:  Thank you.

10          Counsel?

11          MR. BELL:  Okay.  We'll get at it another way.  That's

12   fine.

13          THE COURT:  Thank you.

14          MS. NECHELES:  Your Honor, when the government says

15   they'll get it in another way, to the extent that they intend

16   to elicit testimony to this, that would have the same objection

17   of hearsay.  It's not a coconspirator statement in furtherance

18   of anything.

19          THE COURT:  Thank you.

20          I'll hear any further objections.  At this point I

21   expect to sustain the objection, and counsel will move on.

22          MS. NECHELES:  Thank you.

23          (Continued on next page)

24

25

IBQKGRA2                           Rechnitz - Direct

1               (In open court)

2               THE COURT:  I'm sorry.  Thank you very much.

3               Counsel, I'm sorry for the interruption.  The

4      objection is sustained.

5               Counsel, you can proceed.

6               MR. BELL:  Is there, Mr. Hamilton, a way to take that

7      down from the witness' screen, but to leave it on mine?  Nope?

8      Yep?  Oh, great.

9      BY MR. BELL:

10     Q.  As a general matter, Mr. Rechnitz, did you discuss with

11     Mr. Reichberg the favors that -- the police favors that you got

12     for friends of yours?

13     A.  Yes.

14     Q.  Do you recall discussing with Mr. Reichberg a police escort

15     for Mr. Raps?

16     A.  Yes, I did.

17     Q.  What do you recall of that discussion with Mr. Reichberg?

18     A.  That he had arranged for Mr. Raps a police -- I don't want

19     to say police -- lights and sirens in a vehicle for Paul Raps

20     on a ride in the city.

21     Q.  Did Mr. Reichberg tell you anything about how that ride had

22     been received by Mr. Raps?

23     A.  Yes.

24     Q.  What did he tell you?

25     A.  He said that Mr. Raps was very impressed and very excited.

IBQKGRA2                         Rechnitz - Direct

1           MR. BELL:  Okay.  Let's take that down.

2           Can we please put up for the witness what has been

3    marked as Government Exhibit 1022.

4    BY MR. BELL:

5    Q.  Are you familiar with this email exchange?

6    A.  Yes, I am.

7    Q.  And how are you familiar with it?

8    A.  I am on the email with other people.

9    Q.  Who are those other people?

10   A.  Baruch Levine sent the email to me, Jeremy Reichberg, and a

11   mutual friend, Reuven Hellman.

12   Q.  Who was Mr. Hellman?

13   A.  He's a friend of mine.  He lives in the Upper West Side.

14   Q.  And who was Mr. Levine?

15   A.  He is a well-known singer in the Jewish community.

16           MR. BELL:  Your Honor, the government offers 1022.

17           MS. NECHELES:  Objection, your Honor.

18           THE COURT:  Thank you.  Sustained.

19           You can proceed.

20           MR. BELL:  Your Honor, I'd like to offer Government

21   Exhibit 1022, but redact the very top of the email, the first

22   message.  The rest of it ought to be able to overcome the

23   objection.

24           THE COURT:  Thank you.

25           Come on up.  We can talk about it briefly.

IBQKGRA2                          Rechnitz - Direct

1            (At the sidebar)

2            THE COURT:  Thank you.

3            Sorry.  First, does any of you have a copy of the

4    document here that we can refer to?

5            MR. BELL:  Yes, we can get one.  Sorry.

6            THE COURT:  Thank you.  That's fine.

7            Counsel, first, there's an objection.  What's the

8    basis?

9            MS. NECHELES:  Hearsay.

10           THE COURT:  Thank you.

11           Counsel for the United States?

12           MR. BELL:  Assuming for the moment that we redact the

13   top, the various entries in there that are from persons other

14   than Jona and Jeremy are there to provide context for what Jona

15   and Jeremy -- I think just Jona, really, acknowledge there --

16   as well as their state of mind in providing that.  So -- one

17   moment.

18           In addition to that, they're also in the mode of

19   requests and questions, which are themselves not statements,

20   and they're not offered for the truth.

21           MS. NECHELES:  Your Honor, I agree that questions are

22   not necessarily hearsay -- I mean are not offered for the

23   truth, but it seems like the bottom is not a question.

24           So the bottom one, it seems like, is Reuven Hellman

25   saying that Jona did something, and then Jona saying okay --

IBQKGRA2                          Rechnitz - Direct

1           MR. BELL:  The principal messaging from the bottom is

2     the please be in touch with him at 3:00 p.m.  The remaining

3     part of that bottom message contextualizes that.  But that's an

4     instruction, your Honor, and it's not being offered for its

5     truth, and I think, at the very least, if your Honor does feel

6     that a limiting instruction is required there that those things

7     aren't offered for the truth.  I think your Honor has done a

8     complete enough job explaining what that means, that it can be

9     done on short order here.

10          THE COURT:  What's the purpose of this document?  Can

11    you proffer why it is that you're introducing this, counsel?

12          MR. BELL:  It corroborates what I believe Mr. Rechnitz

13    is going to describe as this being an event that happened.

14    That instructions were given, that they were followed up on.

15          THE COURT:  Sorry, that Mr. Rechnitz provided

16    instructions that something occur?

17          MR. BELL:  Well, essentially that these arrangements

18    were made, that the escort was requested, that Mr. Rechnitz

19    took care of it, checked to make sure it was okay, and checked

20    to make sure that it was okay afterwards.  But it all goes to

21    corroborate what would be his oral testimony, and as compelling

22    as that's been, I'd like to be able to get in what

23    corroboration I can on it.

24          MS. NECHELES:  An escort?  It just seems like it's

25    talking about fireworks.

1          THE COURT:  Thank you.

2          Just for my benefit, what is it about this that shows

3     that this is about an escort?

4          MR. BELL:  Well, I think that -- I'm sorry.  Sure.  So

5     it's about the VIP seating, but the escort followed.

6     Mr. Rechnitz said it's about VIP seating for the fireworks.  I

7     think that Mr. Rechnitz would arrange, in what by now is

8     probably predictable fashion, how that VIP seating came to be,

9     and I think further testified that an escort happened after

10    that VIP seating.  The escort -- in order for the escort to

11    make sense, I think we have to understand what happened before.

12    This would corroborate Jona Rechnitz on that score.

13         THE COURT:  Thank you.  Counsel, any concerns about

14    the proposal that we redact the first portion of this?  I

15    understand that Mr. Rechnitz is going to testify about the

16    inquiry and then his arrangement of both VIP seating at the

17    fireworks and the escort that followed it.

18         MS. NECHELES:  Your Honor, I don't think there is a

19    corroboration exception to the hearsay rules.  I don't really

20    want to be doing this objection, except the government has been

21    hypertechnical about hearsay.  So, in some sense, I think that

22    this is kind of like, okay, he's going to testify about it, but

23    if we all understand that there's a lot of documents in this

24    case, that the government would like to put some in, we would

25    like to put some in, but if we're going to be hypertechnical on

1    both sides, then I'm going to insist on being hypertechnical,

2    but I think that this does not technically fit within any

3    hearsay exception.

4            MR. BELL:  To be clear --

5            MS. NECHELES:  I'm saying what's good for the goose is

6    good for the gander.

7            THE COURT:  I appreciate your comment, Ms. Necheles.

8            MR. BELL:  I'm not suggesting that the corroboration

9    is an exception to the hearsay rule.  The corroboration was to

10   answer your Honor's question of why we want this in, which is a

11   distinct question.  I also think that as a technical or

12   hypertechnical matter, the redaction of the top part actually

13   does solve the problem, and Ms. Necheles hasn't given us a

14   reason why it does not.  I would further say that I have no

15   problem with the rules of evidence being enforced either way.

16   That's why we're willing to do the redaction.  I think the

17   rules of evidence protect everybody.

18           THE COURT:  Thank you.  Let me just pause.

19           I'll let in this exhibit subject to the redaction of

20   the top section.  I believe the underlying section; namely, the

21   first email in the thread, is being introduced not for the

22   truth, but in order to show context for Mr. Rechnitz's later

23   response.

24           MR. BELL:  Thank you.

25           THE COURT:  Thank you.

IBQKGRA2                        Rechnitz - Direct

1           (In open court)

2           THE COURT:  Thank you.

3           Counsel, I'm sorry for the interruption.  You can

4  proceed.

5           MR. BELL:  Thank you, your Honor.

6           We would like to offer Government Exhibit 1022 as

7  marked subject to the redaction of the text in the top field.

8           THE COURT:  Thank you.

9           You can proceed.

10          I'm accepting 1022 subject to the redaction that we

11  just discussed.

12          (Government's Exhibit 1022 received in evidence)

13          MR. BELL:  Thank you very much.

14          Can we publish that to the jury.

15  BY MR. BELL:

16  Q.   Now, Mr. Rechnitz, did there come a point where you

17  arranged for VIP seating for the fireworks for some combination

18  of the people you mentioned earlier?

19  A.   Yes.

20  Q.   How did you make that arrangement?

21  A.   I had called Jeremy and put him in touch with Baruch.

22  Q.   Why did you call Jeremy for that reason?

23  A.   I discussed before, he was a detail man.  He was the one

24  with the relationship with the officers who could make that

25  arrangement.

1  Q.  So the bottom says:  Baruch might get it done by Jona

2  Rechnitz cc'd.  Got it done and arranged VIP seating for the

3  fireworks.

4          Which fireworks were these, by the way?

5  A.  July 4th.

6  Q.  You then say, up above:  "You got it."

7          MR. BELL:  Can we highlight that.

8  Q.  Mr. Levine says:  "Hi.  It's Baruch.  Just being in touch

9  re this eve.  No pressure if it's a problem."

10         Did you get back to Mr. Levine?

11  A.  Did I put him in direct touch with Jeremy?

12  Q.  And, to your understanding, was there VIP seating arranged

13  for Mr. Levine?

14  A.  Yes.

15  Q.  After the 4th of July fireworks, did you speak to Jeremy

16  about what, if anything, was arranged next?

17  A.  Yes.

18  Q.  And what, if anything, was arranged next for Mr. Levine?

19  A.  From the fireworks show, he had a lights and sirens ride

20  home from.

21  Q.  In speaking to Mr. Reichberg, what was your understanding

22  of how that lights and sirens escort had been arranged?

23  A.  I don't remember.

24          MS. NECHELES:  Objection to form.

25          THE COURT:  Thank you.

IBQKGRA2                       Rechnitz - Direct

1          Counsel, can you rephrase?

2          MR. BELL:  That's fine.

3     BY MR. BELL:

4     Q.  What was your understanding, in speaking to Mr. Reichberg,

5     about how that lights and sirens ride had been arranged?

6     A.  I do not know.

7          MR. BELL:  You can take that down, Mr. Hamilton.

8          I want to put up on the screen now what's been marked

9     for identification as Government Exhibit 308-F.  This is a

10    video.  It may be easiest logistically, as we've done before,

11    to simply offer this.  I'm happy to remind defense counsel what

12    it is.

13         MS. NECHELES:  No objection, your Honor.

14         THE COURT:  Thank you.

15         Counsel?

16         MR. MERINGOLO:  No objection.

17         THE COURT:  Good.  Thank you.

18         I'm accepting into evidence Exhibit 308-F.

19         (Government's Exhibit 308-F received in evidence)

20         THE COURT:  Counsel, can you please inquire about what

21    the nature of the record is --

22         MR. BELL:  Sure.

23    BY MR. BELL:

24    Q.  Mr. Rechnitz, I believe that on the screen right now is an

25    early frame of a video that I suspect you're familiar with.

IBQKGRA2                         Rechnitz - Direct

1   But are you familiar with this video?

2   A.  Yes.

3   Q.  How are you familiar with it?

4   A.  I'm a passenger in the vehicle, and I took the video.

5   Q.  Do you recall, roughly, what the vehicle was doing at the

6   time?

7   A.  Driving with lights and sirens.

8            MR. BELL:  So, with that, your Honor, the government

9   would seek permission to publish 308-F.

10           THE COURT:  You can proceed.

11           MR. BELL:  Thank you.

12           Mr. Hamilton, can you go ahead and play the video.

13           (Video playback)

14   BY MR. BELL:

15   Q.  So, Mr. Rechnitz, first of all, do you recall who was in

16   the vehicle with you at the time?

17   A.  Yes.

18   Q.  Who?

19   A.  Nussy Josephy.

20   Q.  Anybody else?

21   A.  I'm not sure.

22   Q.  Do you recall, on this particular occasion, how Nussy

23   Josephy got permission, to the extent that he did, to put his

24   lights and sirens on?

25   A.  Yes.

IBQKGRA2                          Rechnitz - Direct

 1   Q.  How?

 2   A.  He had called Jeremy in the car, and Jeremy said that he

 3   has him covered, and he can turn them on.

 4   Q.  Now, I notice that there are other emergency vehicles in

 5   the -- visible over the course of the video.  Did your vehicle

 6   have anything to do with them?

 7   A.  No.

 8   Q.  What actually happened that night?

 9   A.  Out of coincidence, there was an NYPD van in front of us

10   with lights and sirens on going a similar route for a portion

11   of the way.

12   Q.  And so what did -- where, generally, was this, by the way?

13   A.  Pardon?

14   Q.  Where, generally, was this?

15   A.  This was in Manhattan.

16   Q.  When you came across the emergency vehicles who happened to

17   be going the same way, what did you and Nussy do?

18   A.  We began to follow them.

19   Q.  Why?

20   A.  It would be easier with traffic to have another car with

21   us.

22   Q.  Now, you mentioned the phrase "police escort" in connection

23   with that ride as it was happening in the video.  Were there

24   occasions where you arranged actual police escorts involving

25   actual police vehicles; that is to say, police personnel and

1    police vehicles getting you, Jeremy, or persons you two know

2    from point A to point B?

3    A.  Yes.

4    Q.  Generally, how were those arrangements made, and what did

5    they involve?

6    A.  There are a couple of examples that come to mind.  There

7    was one time where my friend, Ari, his wife was on the way to

8    go to the hospital, they were expecting a baby.  I had called

9    Jimmy Grant and -- with Jeremy, and they had arranged a private

10   police escort for Ari to the hospital.

11           There was another time where a friend named Lin

12   Snider, whose husband, Ed Snider, the late Ed Snider, who was a

13   friend of mine from Philadelphia, was in town, and I had called

14   Jeremy to make arrangements to give her a private escort, I

15   think, to the airport.  There were times where I wanted to go

16   to the airport, I was tight on a flight after sabbath, and I

17   had spoken to Jeremy, and he made arrangements with Jimmy and

18   other people to take me in a police car with lights and sirens.

19   Q.  Were there times when Mr. Grant personally escorted you

20   places in his vehicle?

21   A.  Yes.

22   Q.  About how many times?

23   A.  Less than a handful.

24   Q.  What do you recall of those circumstances?

25   A.  That he would be waiting at my home after sabbath, and take

IBQKGRA2                          Rechnitz - Direct

1    me to the airport, and use lights and sirens.

2    Q.  Were there times in which Mr. Grant arranged for other

3    people to give you the same treatment?

4    A.  Yes.

5    Q.  And what do you recall of those?

6    A.  He was unable to make it.  He had a prior engagement.  He'd

7    send -- there was a guy he'd sent from his office -- from his

8    precinct to drive me.

9              MR. MERINGOLO:  I am going to object without the name

10   or the time frame, Judge.

11             THE COURT:  Thank you.

12             Overruled.

13             You can proceed.

14   BY MR. BELL:

15   Q.  How about Michael Harrington, did Michael Harrington have a

16   role in arranging escorts for you?

17   A.  Yes.

18   Q.  What role did Mr. Harrington have?

19   A.  For example, for the Lin Snider escort, I remember Jeremy

20   calling Michael Harrington and going through him.

21   Q.  So let's step back from the specific matter of these

22   escorts or the lights and sirens packages just for a moment.

23             The favors that you've described yesterday and last

24   week, are those things you would have expected to receive had

25   you not been supplying these officers with gifts during that

1  same period of time?

2  A.  No.

3  Q.  Would you have supplied those officers with those financial

4  benefits had you not expected action on their part in return?

5  A.  No.

6  Q.  Was that the case for Mr. Harrington?

7  A.  Yes.

8  Q.  Mr. Banks?

9  A.  Yes.

10  Q.  Mr. Grant?

11  A.  Yes.

12  Q.  And the other officers that we've mentioned so far?

13  A.  Yes.

14  Q.  Now, for about how long did you have this relationship with

15  Reichberg and certain members of the NYPD, from roughly when to

16  roughly when?

17  A.  From the time I met Reichberg, I think it was around 2008,

18  until Banks resigned and the IAB got involved at some point in

19  2015.

20  Q.  Did you have a written understanding with any of the

21  officers that you would give them financial benefits in

22  exchange for their action as police?

23  A.  No.

24  Q.  Was there ever a direct spoken understanding between

25  yourself and any of the officers that you would give them

IBQKGRA2                         Rechnitz - Direct

1   financial benefits in exchange for actions as police?

2   A.  No.

3   Q.  Did you, nevertheless, believe that you had such an

4   understanding with those officers?

5   A.  Yes.

6   Q.  What led you to believe that you had that understanding?

7   A.  First of all, my communications with Jeremy all the time

8   were we're going to do this, this -- I'll give you an example.

9   Jimmy Grant wanted something --

10              MR. MERINGOLO:  Objection.

11              THE COURT:  Thank you.

12              You can answer the question.

13              THE WITNESS:  For example, Jimmy Grant had wanted a

14  hotel in Rome.  I was in the car with Jeremy once when he had a

15  phone call with Jeremy, he didn't know I was sitting there, and

16  he said:  Come on, I always take care of you guys, you owe it

17  to me.  You got to get Jona to pay for the hotel.

18              And Jeremy, afterwards, said to me:  He's expecting

19  it.  You got to take care of it.  He's been good to us.  We owe

20  it to him.  So these types of conversations led me to believe

21  that.

22              In addition, I saw results as to my giving gifts and

23  getting favors in return.

24  Q.  And what did those results tell you about the nature of the

25  understanding that you and Jeremy had with these officers?

IBQKGRA2                          Rechnitz - Direct

1    A.   That we had this understanding where I would give gifts and

2    we would get things in return.

3    Q.   Did your confidence in that understanding change over time?

4    A.   Can you rephrase the question?  I'm not sure I understand

5    it.

6    Q.   Sure.

7         Did your -- well, withdrawn.

8         You testified a moment ago that this was something

9    that appeared to be working.  Was there ever a point where you

10   doubted the understanding as you continued to give things out

11   and as you continued to get favors?

12   A.   No.

13   Q.   With respect to Grant and Harrington in particular, were

14   the way in which they approached the items that they were

15   receiving -- withdrawn.

16        With respect to Grant and Harrington in particular,

17   were the ways in which they dealt with you and Jeremy, as far

18   as getting things was concerned, different?

19   A.   Yes.

20   Q.   How so?

21   A.   Mike Harrington was very shy to accept a gift even when it

22   was something we knew that he had wanted, something done to his

23   home or a hotel stay in Chicago.  He -- when I would bring it

24   up to him, he would be like, no, it's okay, you don't need to

25   do it, don't worry about it, whereas Jimmy would say thank you

1   very much.

2   Q.  With respect to Mr. Harrington and Mr. Grant, to your

3   understanding, which of them was more likely to actually ask

4   for things of value from you?

5   A.  Jimmy.  There were things that Jeremy told me he

6   specifically had asked for.

7   Q.  Can you give me some examples of those?

8   A.  Yes.  To pay for some railing in his house, to pay for some

9   window work in his house, to pay for a hotel stay in Rome, to

10  come to Las Vegas for the Super Bowl, these were things that he

11  had requested.

12          MR. BELL:  Mr. Hamilton, can you put up on the

13  witness' screen what has been marked as Government Exhibit

14  1202.

15  Q.  And, Mr. Rechnitz, I want you to look over this and just

16  look up when you're done.

17          Are you familiar with this email, sir?

18  A.  Yes, I am.

19  Q.  How are you familiar with it?

20  A.  It's an email that I had sent to Jimmy Grant and that he

21  responded to me.

22          MR. BELL:  Your Honor, the government offers

23  Government Exhibit 1202.

24          MS. NECHELES:  No objection.

25          MR. MERINGOLO:  No objection.

1          THE COURT:  Thank you.

2          I'm accepting 1202 into evidence.

3          You can proceed.

4          (Government's Exhibit 1202 received in evidence)

5          MR. BELL:  Mr. Hamilton, can you please publish that

6     to the jury.

7     BY MR. BELL:

8     Q.  This is an exchange between James Grant at his msn.com

9     address and yourself.

10         MR. BELL:  And, Mr. Hamilton, if you could highlight

11    the date as well, December the 7th, 2014.

12    Q.  Now, let's start from the bottom.  Mr. Rechnitz, you write:

13    "Inspector, meet my cousin, Daniel Bye.  Lives in the 19th

14    Precinct.  Anything he needs, please.  Thanks a million.  Enjoy

15    your vacation."

16         So a couple of things.  On that earlier email, was

17    there another recipient?

18    A.  Yes.

19    Q.  Who was that?

20    A.  Daniel.

21    Q.  And for what purpose had you connected Mr. Grant and your

22    cousin Daniel?

23    A.  So that they know each other, that he lives in his

24    community, if there's ever an issue, he can reach out directly.

25    Q.  You make reference here to the 19th PCT.  Is that, in fact,

IBQKGRA2                        Rechnitz - Direct

1    precinct?

2    A.  Yes.

3    Q.  Mr. Grant then responds only to you, and Grant says:

4    "Anything for you, and I wish I was on vacation.  Speaking of

5    vacation...we are overdue."

6            Mr. Rechnitz, what did you understand "speaking of

7    vacation...we are overdue" to mean?

8    A.  That Jimmy had wanted me and Jeremy to take him somewhere

9    on a trip.

10   Q.  Now, at that point in time, by late 2014, December of 2014,

11   had you previously taken Grant on vacations?

12   A.  To the Super Bowl.

13   Q.  Had you previously taken other officers on vacation that

14   you were aware that Mr. Grant knew about?

15   A.  Yes.

16   Q.  What sorts of trips had you arranged that you were aware

17   that Mr. Grant knew about?

18   A.  I had several trips to the Dominican Republic that he had

19   known about.

20   Q.  By the way, Mr. Rechnitz, I'll note one of the few parts of

21   this that isn't highlighted is the "Sent from my iPhone"

22   immediately under "we are overdue."  This may be, perhaps --

23           MS. NECHELES:  Your Honor, could I have questions?

24           THE COURT:  Thank you.

25           MS. NECHELES:  Not speeches.

1           THE COURT:  Counsel, you can proceed.

2           MR. BELL:  Really?

3           THE COURT:  Thank you.

4           What's your question?

5    BY MR. BELL:

6    Q.  Do you see the "Sent from my iPhone" portion?

7    A.  I do.

8    Q.  What did you understand that to mean?

9    A.  That it was an email sent from Jimmy's iPhone and not from

10   his computer.

11   Q.  I want to direct your attention to the "Sent from my

12   iPhone" beneath your signature.  What did you understand that

13   to mean?

14   A.  When I send an email from my iPhone, it automatically says

15   that, as opposed to sending it from my office computer.

16   Q.  Were those the two places from which you sent emails from

17   this account at the time; that is to say, your office computer

18   and your phone?

19   A.  Yes.

20   Q.  Where was your office computer located?

21   A.  In my actual office.

22   Q.  And so in instances in which your emails do not have sent

23   from my iPhone on them, what is your understanding of what that

24   means with respect to where they were sent from?

25   A.  That they were sent from my office, from my desktop.

1              MR. BELL:  One moment, please?

2              (Pause)

3   Q.  We may have asked you this, but where was your office

4   located at the time?

5   A.  At 580 Fifth Avenue.

6   Q.  Was that true continuously from 2008 to 2015?

7   A.  No.

8   Q.  Where else did you have an office for some portion of that?

9   A.  Initially, I had an office at 725 Fifth Avenue, I then was

10  at 580 Fifth Avenue, and then I was on 57th Street.

11  Q.  Were all of these locations in Manhattan?

12  A.  Yes.

13             MR. BELL:  You can take that down, Mr. Hamilton.

14  Thank you.

15             Can we put up Government Exhibit 1207 for the witness,

16  please.

17  Q.  I'll ask you to give this one a look over, sir.

18             (Pause)

19  A.  Okay.

20             MR. BELL:  Is there a second page, Mr. Hamilton?  Can

21  we put that up for Mr. Rechnitz?  Okay, good.  Let's go back to

22  the first page.

23  Q.  Are you familiar with this email?

24  A.  Yes, I am.

25  Q.  How are you familiar with it?

IBQKGRA2                    Rechnitz - Direct

1    A.  It's from Jimmy Grant to me.

2                MR. BELL:  Your Honor, the government offers

3    Government Exhibit 1207.

4                MS. NECHELES:  No objection.

5                MR. MERINGOLO:  No objection.

6                THE COURT:  Thank you.

7                I'm accepting 1207 into evidence.

8                You can proceed.

9                (Government's Exhibit 1207 received in evidence)

10               MR. BELL:  Let's work our way from the bottom up, so

11   can we focus on the bottom half, Mr. Hamilton.  Perfect.

12   BY MR. BELL:

13   Q.  So you email Mr. Grant, and you say:  "Love ya.  I hope all

14   is well."

15               Mr. Grant replies:  "All is well.  I miss you.  I was

16   out to eat and ran into a few guys that live in your building."

17               This was around March 27th of 2015.  I don't need your

18   actual address, Mr. Rechnitz, but in what neighborhood did you

19   live at the time?

20   A.  Upper West Side of Manhattan.

21   Q.  Was it a pretty tony part of the Upper West Side?

22   A.  Yes.

23   Q.  Mr. Rechnitz, you then respond:  "Miss you too.  Will catch

24   up soon."

25               MR. BELL:  Can we take that down.

IBQKGRA2                       Rechnitz - Direct

1              Let's look at the top half, please.

2      BY MR. BELL:

3      Q.   Mr. Grant then responds:  "Jona, who's that billionaire

4      that you got to donate money to your organization?  He sold a

5      pharmaceutical company."

6              And you respond:  "Stewart Rahr."

7              Is that the same Stewart Rahr that you mentioned a few

8      minutes ago?

9      A.   Yes.

10     Q.   And then Mr. Grant says:  "Thanks."

11             Do you recall Mr. Grant ever mentioning Mr. Rahr to

12     you again?

13     A.   No.

14     Q.   Did you have an understanding of why Mr. Grant would ask

15     who Mr. Rahr was?

16     A.   No.

17             MR. BELL:  Let's take that down.

18     Q.   By the way, you mentioned Mr. Harrington was relatively

19     reluctant to accept gifts from you and Mr. Reichberg.  Did he

20     accept them anyway?

21     A.   Yes.

22     Q.   Now, are you familiar with something called PBA cards?

23     A.   Yes, I am.

24     Q.   And what are PBA cards?

25     A.   PBA cards are plastic cards, the size of a business card,

1    issued by the Police Benevolent Association, which basically if

2    you get these cards, which are usually handed out from

3    high-level officers, they're supposed to serve as a

4    get-out-of-a-ticket-free card if you get pulled over.

5    Q.  During the time that you came to know Mr. Grant, did you

6    receive PBA cards from him?

7    A.  Yes, I did.

8    Q.  Did you further receive items that would help you customize

9    those cards?

10   A.  Yes, I did.

11   Q.  What sorts of things did you receive from Mr. Grant to that

12   end?

13   A.  He gave me a sheet of printed labels that were preprinted

14   to put on the cards by Jimmy Grant.

15   Q.  Did you make use of those cards?

16   A.  Yes, I did.

17   Q.  Did you also get cards that were customized with your name?

18   A.  Yes.

19   Q.  And how did you get those?

20   A.  Initially, Jeremy had always asked me for lists of people I

21   wanted to give cards to, and he would bring me printed cards.

22   And the last year that I was involved with police officers, I

23   had asked Mike Harrington directly and Jimmy Grant directly for

24   the names to be printed.

25             MR. BELL:  So, at this point, Mr. Hamilton, can we put

IBQKGRA2                        Rechnitz - Direct

1    up for the witness Government Exhibit 1229.

2    BY MR. BELL:

3    Q.  I want to focus your attention on the bottom email.  Are

4    you familiar with that email?

5    A.  Yes.

6    Q.  How are you familiar with that email?

7    A.  It's an email that I sent to Jimmy Grant.

8             MR. BELL:  Your Honor, the government offers

9    Government Exhibit 1229.

10             MS. NECHELES:  No objection.

11             MR. MERINGOLO:  No objection.

12             THE COURT:  Thank you.

13             I'm accepting Exhibit 1229 into evidence.

14             You can proceed.

15             (Government's Exhibit 1229 received in evidence)

16             MR. BELL:  Can we publish that to the jury, please.

17    Q.  So, beginning with the bottom email --

18             MR. BELL:  You don't have to zoom in, Mr. Hamilton.

19    Q.  -- this is an email from you to Mr. Grant dated

20    December 3rd, 2013.  The subject is "Cards - THS," thanks, with

21    three exclamation points and a bunch of names.

22             What was the purpose of this email, Mr. Rechnitz?

23    A.  To submit a list of names to Jimmy Grant for him to give me

24    printed-out personalized PBA cards.

25             MR. BELL:  I'll ask you, Mr. Hamilton, to underline --

IBQKGRA2                        Rechnitz - Direct

1   or, rather, highlight a number of names here.  Can you first
2   highlight the three Schwebels.
3   BY MR. BELL:
4   Q.  Who were the Schwebels, Mr. Rechnitz?
5   A.  They're very close friends.
6        MR. BELL:  Can you highlight Judah Wassner.
7   Q.  Who was Mr. Wassner?
8   A.  A close friend.
9   Q.  Rachel Rechnitz?
10  A.  My wife.
11  Q.  Harry Skydell and Rachel Skydell, who are they?
12  A.  Friends.
13  Q.  Paul Raps?
14  A.  Paul is who we discussed before.  I used to share an office
15  space with him.
16  Q.  Guy Tanne?
17  A.  That was a CFO for Paul Raps.
18  Q.  Yaron Turgeman?
19  A.  The owner of Taly Diamonds.
20  Q.  Ilana Freider?
21  A.  Paul Raps' personal assistant.
22  Q.  And Murray Huberfeld?
23  A.  Murray was a friend at the time who lived in the community.
24  Q.  And why did you -- you mentioned that you sought to get
25  these lists from Grant and Harrington in particular -- or

1    rather give these lists to Grant and Harrington in particular.

2    Why those two?

3    A.  These were the guys that Jeremy told me to get these cards

4    done, personalized for us.

5    Q.  Where did Grant and Harrington rank in your circle of cop

6    friends around December of 2013?

7    A.  Close contacts.

8              MR. BELL:  Let's take that down.

9    Q.  Now, Mr. Rechnitz, while you and Mr. Reichberg had this

10   relationship with these NYPD officers, were you friendly with

11   the officers that you were providing favors to?

12   A.  Yes.

13   Q.  What do you understand that term to mean, friendly?

14   A.  I liked them.  We enjoyed each other's company.

15   Q.  Would you have considered any of them to be friends at the

16   time?

17   A.  Yes.

18              (Continued on next page)

19

20

21

22

23

24

25

1    BY MR. BELL:

2    Q.  Which of those officers would you have considered to be

3    your friends?

4    A.  Jimmy Grant, Phil Banks, Mike Harrington.

5    Q.  You mentioned that you enjoyed their company, did they

6    appear to enjoy yours?

7    A.  Yes.

8    Q.  Now would you have given them the same benefits and favors

9    if you didn't expect police action in return?

10   A.  Pardon?

11   Q.  Would you have given these officers the same benefits and

12   favors that you described to us at this point if you did not

13   expect police action from them in return?

14   A.  No.

15   Q.  Why not?

16   A.  Because I wouldn't have spent all that money and time.  It

17   was I had been giving something, I'm going to give something in

18   return.

19   Q.  At this point in your life, Mr. Rechnitz, did you have

20   other friends who weren't high-level cops?

21   A.  Yes.

22   Q.  Were some of those friends closer to you than these

23   high-level cops?

24   A.  Yes.

25   Q.  Did you lavish them with the same gifts?

IBQTGRA3                         Rechnitz - Direct

1   A.  No, I did not.

2   Q.  Why not, even though they were closer to you?

3   A.  Because I viewed business and friendship differently.  Like

4   I said, I was bestowing these types of gifts with the

5   expectation of things in return.

6   Q.  Now you mentioned at one point meals.  I want to focus your

7   attention on Michael Harrington and Philip Banks.  What kinds

8   of meals -- withdrawn.

9            What sort of pattern of providing meals did you engage

10  with with Harrington and Banks between 2013 and 2014?

11  A.  Me, Jeremy, Mike, and Phil went out on a weekly basis to a

12  high end kosher steakhouse.

13  Q.  Who paid, generally?

14  A.  I did.

15  Q.  Were there occasions when you didn't pay?

16  A.  Yes.

17  Q.  Who paid then?

18  A.  Jeremy.

19  Q.  To your knowledge, did Chief Banks ever pay for these

20  meals?

21  A.  No.

22  Q.  Did Michael Harrington?

23  A.  No.

24  Q.  To your knowledge, did Banks ever offer to pay?

25  A.  No.

IBQTGRA3                          Rechnitz - Direct

1    Q.  Did Harrington ever offer to pay?

2    A.  No.

3    Q.  Were there times where you took Jimmy Grant out for meals

4    as well?

5    A.  Yes.

6    Q.  Were they nice?

7    A.  Yes.

8    Q.  Did Jeremy Grant ever offer to pay for those meals?

9    A.  No.

10   Q.  Did he ever in fact pay?

11   A.  No.

12   Q.  You mentioned having arranged and purchased travel for Phil

13   Banks.  Did Phil Banks ever return the favor?

14   A.  No.

15   Q.  You mentioned having arranged or purchased travel for

16   Grant, like the Vegas trip and the Rome hotel arrangements, did

17   Grant ever do the same for you?

18   A.  No.

19   Q.  Did he ever offer?

20   A.  No.

21   Q.  You mentioned monetary purchases, gifts that you gave to

22   Harrington and Grant, jewelry, the home improvements, the toys

23   and such, did they ever buy you expensive gifts?

24   A.  No.

25   Q.  Did they ever buy gifts for members of your family?

IBQTGRA3                        Rechnitz - Direct

1    A.   No.

2    Q.   Did they ever inquire about the possibility of buying gifts

3    for members of your family?

4    A.   No.

5    Q.   With respect to Phil Banks, I want to focus in on Banks

6    here, did there come a time when Banks was involved in

7    purchasing a gift for you?

8    A.   Yes.

9    Q.   When was that?

10   A.   After the trip to Israel.

11   Q.   What gift did he provide?

12   A.   A backgammon set.

13   Q.   To your knowledge, did he do that alone or with somebody?

14   A.   With somebody.

15   Q.   What was your understanding of why you received that gift?

16   A.   As a thank you for the trip.

17   Q.   To your understanding, which cost more, that gift or the

18   trip that you provided Chief Banks with?

19   A.   The trip.

20   Q.   Other than that gift, that backgammon set, did Banks ever

21   buy you expensive gifts?

22   A.   No.

23   Q.   Why were you willing to provide Banks, Harrington and Grant

24   with all these expensive gifts?

25   A.   Because I wanted to get things in return, which I had been.

IBQTGRA3                          Rechnitz - Direct

1   Q.  You mentioned there were occasions when Reichberg paid for

2   meals.  Under what circumstance would Reichberg pay for meals?

3   A.  If I wasn't around or if I left the meal early.

4   Q.  About how often would you say that happened over the time

5   period we talked about?

6   A.  Not often.

7   Q.  Ballpark estimate, Mr. Rechnitz, about how much would you

8   say you spent on Jimmy Grant specifically between 2008 and

9   2016?

10            MR. MERINGOLO:  Objection to ballpark.

11            THE COURT:  Thank you.  You can proceed.

12   Q.  Ballpark estimate, Mr. Rechnitz, about how much would you

13   say you spent on Jimmy Grant over that period of years?

14   A.  Tens of thousands of dollars.

15   Q.  Did you and Mr. Reichberg have a written agreement between

16   and among just yourselves concerning what it was that you were

17   doing with these officers?

18   A.  No.

19   Q.  Did you nevertheless understand that you and Mr. Reichberg

20   had the same objective with respect to being able to call the

21   officers for official action as the need came up?

22   A.  Yes.

23   Q.  How did you know that you and Mr. Reichberg had that shared

24   understanding?

25   A.  We discussed it many times.

Q.  Mr. Rechnitz, with respect to the scheme that you've
described -- withdrawn.

        At some point in your testimony last week before we
broke you mentioned the term "team player."  What did the term
"team player" mean in the context of your discussions with
Mr. Reichberg over this period of time?

A.  Somebody who we can bribe, somebody who was willing to play
ball and give us things in return.

Q.  When you and Jeremy spoke to each other, who in particular
do you recall referring to as team players?

A.  Jimmy Grant was a team player, Michael Harrington was a
team player.

Q.  Were there occasions where you and Jeremy described
officers as being not team players?

A.  Yes.

Q.  Can you give me an example of officers who you and
Mr. Reichberg discussed as not being team players?

A.  Yes, there was a chief named Jimmy Secreto, James Secreto,
who Jeremy would call up and say hey, we're in the
neighborhood, could we come by, do lunch, or invite him to
places, and every time he would get out of it and say no.

Q.  And what happened with your relationship with Mr. Secreto
as a result of his not being a team player?

A.  If we would bump into him at an event, it was cordial, that
was about it.

IBQTGRA3                          Rechnitz - Direct

1    Q.   During this period of years, did you and Mr. Reichberg

2    invite police officers to certain family events?

3    A.   Yes.

4    Q.   And so let's start with you.  What sorts of family events

5    did you invite these officers to?

6    A.   When my son was born, my son Benjamin, we had a bris, a

7    circumcision ceremony, and we invited a lot of our police

8    relationships as well as politicians.

9    Q.   What was the purpose of inviting these police and

10   politicians to your son's bris?

11   A.   First of all, it was -- I remember Jeremy saying it's

12   respectful if they were there.  I thought it was also good for

13   me and Jeremy to show the clout and power that we have in the

14   city.

15   Q.   When the officers came to your son's bris, how did they

16   come dressed?

17   A.   Many came in uniform.

18   Q.   And what, if anything, went into getting the officers to

19   come in uniform?

20   A.   I remember Jeremy being insistent that Phil Banks would

21   come in uniform, he thought that would be a sign of respect,

22   and it would be a good look for us.

23   Q.   Were there family events of Mr. Reichberg's that you

24   remember these officers coming to?

25   A.   Yes.

IBQTGRA3                        Rechnitz - Direct

1    Q.  Can you give me an example of such a family event?

2    A.  His daughter's wedding, as well as a party he had for the

3    purim holiday.

4    Q.  With respect to the purim party, who would get invited to

5    the purim party?

6    A.  Sometimes a politician as well as officers that we were

7    close to or officers that Jeremy had been dealing with at a

8    higher level.

9    Q.  And from speaking to Mr. Reichberg, what was the purpose of

10   inviting these officers and politicians to purim parties?

11   A.  To have them in his home, and again, be able to have

12   everybody see each other there.

13           MR. BELL:  Your Honor, just so I can plan here, is

14   there a particular point at which your Honor would want to take

15   our break?

16           THE COURT:  Thank you, yes, I would like to stop

17   around 11:30.

18           MR. BELL:  Excellent.  Thank you, your Honor.

19   Q.  Let's pause for a moment.  Mr. Rechnitz, you mentioned

20   during your testimony last week that in addition to the bribes

21   to police officers you were involved in other conduct that made

22   you guilty of honest services fraud conspiracy.  I want to turn

23   to that now.

24           You mentioned committing a crime involving Norman

25   Seabrook.  What was that crime?

IBQTGRA3                        Rechnitz - Direct

A.   I helped to facilitate a bribe between a hedge fund manager

and Norman Seabrook.

Q.   And who was the hedge fund manager?

A.   Murray Huberfeld.

Q.   Just to be clear, who was Norman Seabrook at that time?

A.   He was the president of the Correction Officers Benevolent

Association.

Q.   How did you come to know Mr. Seabrook?

A.   I had met him through -- with Jeremy through Phil Banks.

Q.   And who was Huberfeld to you?

A.   He was a man from the community who I was friends with.

Q.   How long had you known Mr. Huberfeld?

A.   I really had only known him a few years, but I had known

him since I was a child.  Our families knew each other.

Q.   What was your understanding of -- well, withdrawn.

         So what was the nature of the bribe arrangement that

you alluded to?  What was it that you actually set up?

A.   I set up the two parties together, Murray and Norman.

Norman had invested tens of millions of dollars of the union's

money into the hedge fund, and in return, Murray had paid him a

kickback of $60,000, which I helped pass messages along to each

other, and I actually went physically on Murray's behalf and

handed Norman the money.

Q.   Why did you involve yourself and help to facilitate this

bribe arrangement, Mr. Rechnitz?

IBQTGRA3                    Rechnitz - Direct

1   A.   To curry favor in Murray's eyes and in Norman's eyes to

2   help them out and be a big shot.

3   Q.   Let's break that down.   Why did you want to curry favor in

4   Norman Seabrook's eyes?

5   A.   He was the head of one of the most powerful unions in the

6   city.   Jeremy and I saw a lot of benefit in getting close to

7   him because he was so close to Philip Banks.   We thought he was

8   a powerful man, and eventually this sort of relationship could

9   be another thing on our checklist.

10  Q.   And why did you want to curry favor with Murray Huberfeld?

11  A.   He was an influential man in our community.   He was a big

12  shot in the community.   I had other business with him.   He was

13  a wealthy man.   And I also thought that would be a good idea.

14  Q.   Were you paid for your part in that bribe arrangement?

15  A.   No, I was not.

16  Q.   Did money change hands on your behalf as part of that bribe

17  arrangement?

18  A.   Yes.

19  Q.   So what is it that actually happened?

20  A.   As a result of the introduction in the business, Murray had

21  cut checks to charities that I directed him to for the

22  charity's benefit.

23  Q.   And did money change hands on anyone else's behalf that

24  you're aware of as a result of this arrangement?

25  A.   Yes.

IBQTGRA3                          Rechnitz - Direct

1    Q.   Whose?

2    A.   Jeremy Reichberg.

3    Q.   How did that come to be?

4    A.   Like I said, Jeremy and I were partners in all the

5    relationships that I introduced him to with police.  One of the

6    police was Norman Seabrook.  So Jeremy was to get a fee as well

7    from Murray.

8    Q.   Now did Mr. Reichberg have a relationship with

9    Mr. Huberfeld?

10   A.   Yes.

11   Q.   Did Mr. Reichberg help you maintain the relationship with

12   Mr. Seabrook?

13   A.   Yes.

14   Q.   In what ways did Mr. Reichberg help you maintain your

15   relationship with Mr. Seabrook?

16   A.   He was involved with Mr. Seabrook just like I was, with the

17   exception that this particular investment we were traveling

18   together, having meals together.  They were speaking.  I was

19   speaking to Norman, Jeremy was talking to Norman.  We would

20   hang out frequently.

21              MR. BELL:  I want to put up on the screen, just on the

22   witness's screen, what's been marked for identification as

23   Government Exhibit 1047.

24   Q.   And Mr. Rechnitz, are you familiar with this email?

25   A.   Yes, I am.

IBQTGRA3                          Rechnitz - Direct

```
 1   Q.  How are you familiar with this email?

 2   A.  I am on the email and I sent it to Jeremy.

 3              MR. BELL:  Your Honor, the government offers

 4   Government Exhibit 1047.

 5              MS. NECHELES:  No objection.

 6              MR. MERINGOLO:  No objection.

 7              THE COURT:  Thank you.  I'm accepting 1047.  Received.

 8              (Government's Exhibit 1047 received in evidence)

 9              MR. BELL:  Thank you.  Could you publish that for the

10   witness, please -- rather to the jury.

11              Thank you.

12   BY MR. BELL:

13   Q.  So at the very top you forward this email to Jeremy

14   Reichberg's gmail account on January 17, 2014.

15              And we'll come back to the top part in a little bit,

16   but generally speaking, are you familiar with why you forwarded

17   this email to Mr. Reichberg?

18   A.  Yes.

19   Q.  Why is that?

20   A.  Like I said, Jeremy was a partner in this and he was to be

21   getting a fee out of this, and I wanted to show him that Norman

22   had just committed to investing 7 to $10 million with the hedge

23   fund.

24   Q.  So why don't we go down to the very bottom of the page,

25   there's an email from Andrew Kaplan.  Do you have an
```

1    understanding of who Andrew Kaplan was?

2    A.   Yes.

3    Q.   Who was he?

4    A.   He worked for Platinum Partners and he was the person

5    involved in the investment.

6    Q.   And what was Platinum Partners?

7    A.   It was a hedge fund.

8    Q.   Was that the same hedge fund that you mentioned as being

9    affiliated with Mr. Huberfeld?

10   A.   Yes.

11   Q.   So that email says:  Just got off the phone with Tommy.

12   Issuing docs for Correction Officers Benevolent Association

13   pension for PPVA.  Indication of 7 to 10 million to start.

14   Trying for Feb 1 but may be March 1.  Depends on how quickly

15   their lawyers turn the docs.  Shabbat Shalom.

16        What did you understand all of that to mean,

17   Mr. Rechnitz?

18   A.   That Norman had given the green line to invest 7 to $10

19   million to the hedge fund.

20   Q.   There's a further forwarding to someone at Platinum LP

21   named Uri Landesman that says mazeltov.

22        If we go further up, Murray Huberfeld then forwards

23   that email to you.

24        And then you, if we can go further up, forward it to

25   Jeremy Reichberg, and there is a word there, Rojeeee,

1   R-O-J-E-E-E-E with three exclamation points.  What does that

2   mean, Mr. Rechnitz?

3   A.   It was a term of excitement, like yipee.

4   Q.   Why did you want to communicate excitement to Jeremy

5   Reichberg regarding COBA having decided to investment in

6   Platinum Partners?

7   A.   Because he and I were to be making money on this.

8           MR. BELL:  We can take that down, Mr. Hamilton.  Thank

9   you.

10  Q.   Now Mr. Rechnitz, to what degree did attempts to curry

11  favor with Mr. Seabrook, Mr. Huberfeld, and these cops relate

12  to a broader plan?

13  A.   They did relate to a broader plan.  The broader plan was to

14  get in with the cops, get in with the politicians.  And as

15  Jeremy said many times:  In the days of Giuliani, people made

16  millions of dollars.  My plan was to financially benefit from

17  all of this.

18  Q.   Did there come a point when you started getting involved

19  with politicians?

20  A.   Yes.

21  Q.   Approximately when?

22  A.   During the democratic primary for mayor, I think it was

23  2013.

24  Q.   And directing your attention to that time, whom did you and

25  Mr. Reichberg try to get close to?

1    A.  Bill Thompson.

2    Q.  Who was Mr. Thompson?

3    A.  He was a candidate for mayor of the City of New York.

4    Q.  Did you come to meet Mr. Thompson?

5    A.  Yes, we did.

6    Q.  How did you come to meet Mr. Thompson?

7    A.  A fellow by the name of Fernando Mateo had introduced us to

8    him.

9    Q.  Who was Mr. Mateo?

10   A.  Fernando was the owner of a cafe called La Marina, as well

11   as the former or current president of the taxi -- Hispanic taxi

12   limousine commission.

13   Q.  And how was it that you came to get in touch with

14   Mr. Thompson?

15   A.  Fernando put us in touch and made an introductory meeting

16   in my office.

17   Q.  Did you assist Mr. Thompson's campaign?

18   A.  Yes.

19   Q.  In what ways?

20   A.  We bundled a large amount of money, somewhere between 50 to

21   $100,000, in addition to me personally and my wife contributing

22   the maximum amount allowed.

23   Q.  What does "bundling" mean in the context of alleged

24   fundraising?

25   A.  When you go to friends and family or associates and ask

1   them to donate to the candidate, and you get the credit for it,

2   because you delivered the checks to candidate.

3   Q.  And what was the point of your and Jeremy's getting

4   involved with Bill Thompson?

5   A.  Again, if he would have been mayor of New York we would

6   have had an in with the mayor, and that would have been more

7   access and power for us.

8   Q.  How did that Thompson campaign work out?

9   A.  Not great.

10  Q.  Did Mr. Thompson -- what happened to Mr. Thompson in the

11  primary?

12  A.  He lost to Bill de Blasio.

13  Q.  What, if anything, did you and Mr. Reichberg do after

14  Thompson's loss to Bill de Blasio?

15  A.  We got in with Bill de Blasio.

16  Q.  How did you get in with Bill de Blasio?

17  A.  Fernando came in and told us that he had an in to de Blasio

18  through his chief fundraiser, named Ross Offinger, and that he

19  could set up a meeting for us, and that even though we had not

20  been backing him from the beginning, we would be treated as if

21  we were.

22          MR. BELL:  Before we get to Bill de Blasio, I ask,

23  Mr. Hamilton, for you to put up for the witness, and maybe side

24  by side, Government Exhibits 618 and 617.

25          So is it possible to zoom in on each of those?

1           Thank you.

2   Q.  Mr. Rechnitz, are you familiar with these images?

3   A.  Yes, I am.

4   Q.  How are you familiar with these?

5   A.  These are photos taken at Jeremy Reichberg's home at purim.

6           MR. BELL:  Your Honor, the government offers 617 and

7   618 into evidence.

8           MS. NECHELES:  No objection.

9           MR. MERINGOLO:  No objection.

10          THE COURT:  Thank you.  I'm receiving 617 and 618 into

11  evidence.

12          (Government's Exhibits 617 and 618 received in

13  evidence)

14          THE COURT:  Proceed.

15          MR. BELL:  Could we publish them both.

16  Q.  So where is this, Mr. Rechnitz?

17  A.  This is in Jeremy Reichberg's residence.

18  Q.  And so why don't we start with the photograph on the left,

19  there's a line of people there.  Are you familiar with that

20  line of people?

21  A.  Yes, I am.

22  Q.  Can you tell us who we're looking at from left to right?

23  A.  Sure, Jeremy Reichberg, Bill Thompson, Andrew Capula,

24  that's a picture of me on purim dressed up, Michael Harrington

25  and Eric Rodriguez.

1   Q.  And the picture on the right, do you see some of those same

2   individuals at the same party?

3   A.  Yes.

4           MR. BELL:  Let's take that down.

5   Q.  Now did you come to meet with Mr. Offinger at Mr. Mateo's

6   behest?

7   A.  Yes.

8   Q.  And were you able to develop a relationship with

9   Mr. Offinger?

10  A.  Yes, I was.

11  Q.  After that meeting, did you go on to raise money for Mr. de

12  Blasio?

13  A.  Yes.

14  Q.  Did you do so alone or with people?

15  A.  With Jeremy.

16  Q.  And what did you and Mr. Reichberg do for Mr. de Blasio's

17  campaign over the remainder of the campaign?

18  A.  In addition to donating the maximum allowed, my wife and I,

19  we collected and bundled for him -- I think it was $100,000.

20          MR. BELL:  And actually, your Honor, this might be a

21  logical place to take that break, unless you want to extend.

22          THE COURT:  That's fine.  So ladies and gentlemen,

23  we'll take our lunch recess now.  Please during this break, as

24  always, please don't discuss the case amongst yourselves, don't

25  communicate with anyone else, and don't do any research about

1   the case or anything involved in it.  I look forward to seeing

2   you back here shortly.  Thank you.

3                   (Jury not present)

4                   THE COURT:  Could I see you briefly at the sidebar.

5                   (At sidebar)

6                   THE COURT:  So last week we talked about whether or

7   not there's a protocol that we could or should use with respect

8   to Mr. Rechnitz.  There is a room that I identified for

9   Mr. Daniels that Mr. Rechnitz can use.  It's not the robing

10  room, but I would be happy to allow Mr. Rechnitz to use that

11  space if that's still the government's preference.

12                  MR. BELL:  It is, and we ask for Mr. Rechnitz to be

13  allowed to eat there, for the FBI to be able to bring him some

14  food.  And I think his counsel is here as well.  I think he

15  would like to eat with him.

16                  THE COURT:  That's fine from my perspective.

17                  Any other concerns?

18                  MR. MERINGOLO:  We of no objection until

19  cross-examination about that.

20                  THE COURT:  Fine.  Thank you.  So I will let

21  Mr. Rechnitz go to that space.  Mr. Daniels will show it to

22  him.  It's not, using the words of the trial, posh.

23                  MR. BELL:  Or Tony.

24                  THE COURT:  Or Tony.  So I will thank you all, and I

25  will allow Mr. Rechnitz to use that space.

1              MR. BELL:  Thank you, Judge.

2              (In open court)

3              THE COURT:  Mr. Rechnitz, you can step down.

4    Mr. Daniels can escort you to a witness room.

5              Counsel, anything else we should take up before our

6    break?  Counsel for the United States, you appear to be making

7    good progress.  What's your view?

8              MR. BELL:  I think we are, your Honor, but there's a

9    lot to talk about.  I think there is some chance that we finish

10   direct today, but think it's probably not a likely scenario.  I

11   think we'll come close if we go to 3:30, but yes, we are making

12   good progress.

13             THE COURT:  Counsel for Mr. Reichberg, anything that

14   you would like to raise before we take our lunch recess?

15             MS. NECHELES:  No, your Honor.

16             THE COURT:  Counsel for Mr. Grant?

17             MR. MERINGOLO:  No, your Honor.

18             THE COURT:  Good.  Let's plan on starting with the

19   jury at noon.  Thanks very much.

20             (Luncheon recess taken)

21             (Continued on next page)

22

23

24

25

```
 1                           AFTERNOON SESSION

 2                              12:08 PM

 3              (Trial resumed; in open court; jury not present)

 4              THE COURT:  Thank you.  You can be seated.

 5              Counsel, are you ready to proceed?  If so, I'll ask

 6    for Mr. Rechnitz to be brought in.

 7              MR. BELL:  We are, your Honor.

 8              THE COURT:  Good.  Thank you.

 9              Mr. Daniels is going to bring in Mr. Rechnitz, and

10    then he will bring in the jury immediately thereafter.

11              MS. NECHELES:  Your Honor, can we approach for one

12    minute?

13              THE COURT:  Yes.  The jury is about to come out.

14              MS. NECHELES:  It can be off the record.  It's just a

15    very personal type thing.

16              THE COURT:  Thank you.

17              Please come on up.  I understand this is a personal

18    issue.  I will accept that proffer, counsel.

19              (At the sidebar; discussion off the record)

20              (Continued on next page)

21

22

23

24

25
```

IBQKGRA4                      Rechnitz - Direct

1            (Jury present)

2            THE COURT:  Thank you, ladies and gentlemen.  You can

3    be seated.

4            Welcome back from our break, ladies and gentlemen of

5    the jury.

6            Counsel for the United States, you can continue.

7            MR. BELL:  Thank you, your Honor.

8     JONA RECHNITZ, resumed.

9    DIRECT EXAMINATION CONTINUED

10   BY MR. BELL:

11   Q.  Mr. Rechnitz, good afternoon.

12   A.  Good afternoon.

13   Q.  Just before the break, I'd asked you about contacts that

14   you and Mr. Reichberg established with then Candidate DeBlasio.

15   I want to return to that.

16            You mentioned meeting an individual named

17   Mr. Offinger.  Who did you understand Ross Offinger to be?

18   A.  The chief fundraiser for Bill de Blasio.

19   Q.  Who introduced you to him?

20   A.  Fernando Mateo.

21   Q.  At the time that you met Mr. Offinger, did you make certain

22   commitments to the de Blasio campaign?

23   A.  Yes.

24   Q.  And what do you recall committing?

25   A.  We said that we will raise $100,000 initially.

1    Q.  Was Mr. Offinger's response to this positive?

2    A.  Very.

3    Q.  At the time that you met with Mr. Offinger, first of all,

4    was there an initial meeting?

5    A.  There was.

6    Q.  Who was present for that meeting?

7    A.  Jeremy, Ross, and me.  I'm sorry, Jeremy, Ross Fernando,

8    and me.

9    Q.  At the time that you, Jeremy, and Fernando met with

10   Mr. Offinger, what did you discuss?

11   A.  That we were going to become heavy donors, but we wanted

12   access, we wanted influence, and we wanted a lot of access.

13   When we called, we wanted results.  We didn't want to be like

14   everyone else.

15   Q.  Did you indicate to Mr. Offinger what kinds of results you

16   wanted as a result of your donorship?

17   A.  Favorable results is what we were calling for.

18   Q.  When you say "favorable," from whom or in what context?

19   A.  Different departments in the city that we would be reaching

20   out to Ross about and from the mayor, his office.

21   Q.  What, if anything, did you say to Mr. Offinger about the

22   connection between the results that you expected and the

23   fundraising that you were going to do?

24   A.  That we would only be donating these funds and getting

25   involved if we were treated that way.

1   Q.  What, if anything, was Mr. Offinger's response?

2   A.  He was part of the plan.  He was fine.

3   Q.  Now, at the time that that meeting happened, just to be

4   clear, was Mr. de Blasio himself present in the room?

5   A.  No, he was not.

6   Q.  Did there come a point over the course of the remainder of

7   the campaign where you came to know Mr. de Blasio?

8   A.  Yes.

9   Q.  What kinds of communications did you have with

10  Mr. de Blasio?

11  A.  We had an initial meeting in my office, and we had a very,

12  I'd say, close relationship.  We were emailing each other, we

13  would have phone calls, I'd call him about just general issues

14  in the city, and we had emails going back and forth with one

15  another.

16  Q.  How did you get -- sorry.  How did you get Mr. de Blasio's

17  email address?

18  A.  He gave it to me on a business card.  He gave me his

19  private email address.

20  Q.  How did you get Mr. de Blasio's phone number?

21  A.  He gave it to me as well, his cell phone number.

22  Q.  Now, did de Blasio actually ask you for money over the

23  course of the remainder of the campaign?

24  A.  Throughout the campaign, he did not.

25  Q.  And did Mr. de Blasio actually discuss with you the

1    possibility of you, Mr. Reichberg, or Mr. Mateo getting results

2    of the sort that you described?

3    A.   When we had asked him about committees we wanted to be put

4    on and other things, he was for that, but we never spoke about

5    actual results through his office.

6    Q.   So after the election -- first off, how did the election

7    work out for Mr. de Blasio?

8    A.   He won.

9    Q.   Were you and Mr. Reichberg excited about that?

10   A.   Yes, very much so.

11   Q.   Why?

12   A.   Because we were very substantial donors to that point, we

13   had an in with his chief fundraiser, and we had our own

14   relationship with Bill de Blasio at that point.

15   Q.   Did you and Mr. Reichberg get appointed to any of the

16   committees or things of that sort that you had discussed with

17   Mr. de Blasio?

18   A.   Yes.

19   Q.   Tell us about that.

20   A.   He had an inaugural committee, I believe it was, that we

21   were appointed to.  I recall having a meeting in the Kramer

22   Levin offices, which is where the meeting was held, where Bill

23   de Blasio addressed the crowd of all members of that committee.

24   Q.   Once Mr. de Blasio became the mayor, did you have

25   continuing conversations with Mr. Offinger about the

1   arrangement that you had described discussing in that first

2   meeting?

3   A.   Yes.

4   Q.   Did Mr. Offinger ask you, on Mr. de Blasio's behalf, for

5   other financial contributions?

6   A.   Yes, he did.

7   Q.   For what?

8   A.   He asked for financial assistance with a project called the

9   Campaign for One New York.

10  Q.   What did you understand that to be, sir?

11  A.   Some sort of program to keep kids off the street.  For

12  afterschool programs where they would have to rent space in

13  other schools and buildings for afterschool programming.

14  Q.   Did Mr. Offinger get in touch regarding financial

15  contributions to any other causes?

16  A.   Yes.

17  Q.   What other causes?

18  A.   He had asked me to donate to keep senate in democratic

19  control.

20  Q.   Did you, in fact, donate to the Campaign for One New York?

21  A.   Yes, I did.

22  Q.   Did you, in fact, donate to the senate democrats?

23  A.   Yes, I did.

24  Q.   How much did you donate to each of those, do you recall?

25  A.   I gave $50,000 to the Campaign for One New York and

IBQKGRA4                        Rechnitz - Direct

1   $102,000 for the democratic control of the senate.

2   Q.  Now, did you have direct contact with Mr. de Blasio about

3   either of those?

4   A.  Yes, I did.

5   Q.  What was the extent of the contact that you had with

6   Mr. de Blasio?

7   A.  I had been complaining to Ross that I was not seeing proper

8   communication results when Jeremy and I were reaching out, and

9   if the mayor really wanted the money for the democratic race,

10  he should pick up the phone, and call me, and ask me himself.

11  Ross arranged that, and he told me the mayor would be calling

12  me in a few minutes, and the mayor called me in my office, and

13  I spoke to him, and he had said that it was very important work

14  and very personal to him.

15          I asked him what the maximum amount of money I was

16  allowed to give, and it came out on the call, I think it was

17  102,000.  I had originally planned on giving less, but once the

18  mayor asked, I wanted to have the effect that I'm his guy, and

19  I said, okay, I'm giving you 102,000.

20  Q.  Now, you mentioned that prior to that call, you had

21  complained to Mr. Offinger about not getting certain things

22  done.  Did you discuss those things with Mayor de Blasio --

23  A.  No.

24  Q.  -- during that call?

25  A.  No.

IBQKGRA4                          Rechnitz - Direct

1    Q.   Did you ever discuss those things with Mayor de Blasio?

2    A.   No, I did not.

3    Q.   Outside of that occasion when Mr. de Blasio personally

4    asked you to donate to the senate democrats, did Mr. de Blasio

5    personally ask you for money after being elected?

6    A.   No, he did not.

7    Q.   Now, with respect to things that you and Mr. Reichberg

8    wanted done, did you continue to discuss those things with

9    Mr. Offinger after the mayor was elected?

10   A.   Yes, we did.

11   Q.   Well, what sorts of things did you discuss with

12   Mr. Offinger?

13   A.   A lot of different private matters.  I can list a few.

14   Q.   Sure.

15   A.   My wife's cousin had a school in the East Side of New York,

16   she ran a preschool, and she received a letter before the

17   school year was expiring that she would have to vacate that

18   space.  I spoke to Jeremy about it.  He took care of the

19   details, he spoke to Ross, and I put Jeremy in touch with my

20   wife's cousin, and he fixed that issue, and she was able to

21   stay there for the remainder of the school year.

22          There was another example where I had a friend who

23   owned a building on Ocean Parkway, and it was previously

24   identified by a police precinct as a potential location for a

25   precinct, and there's some sort of law in the city that if you

1   own a build that you want to sell to somebody, but the police

2   department wants it, they get a first right.  So he wanted to

3   know -- the landlord wanted to know if the police were

4   interested in it or not, so they would not lose their potential

5   purchase.  Again, we dealt with Ross.  He put us in touch with

6   different departments to get an answer to that question.

7           I have a friend who I put in touch with Jeremy.  He

8   had a property in, I believe it was, Sunset Park, Brooklyn,

9   where there are outrageous water bills, and Jeremy spoke to

10  Ross about it, and worked with the city, and got the bill

11  lowered.

12          I had a --

13  Q.  Who was that friend?

14  A.  601 West Companies is the name of the company.

15  Q.  Was there a person attached to that company?

16  A.  Harry Skydell.

17  Q.  Please continue with your list.

18  A.  There was a -- I have a building on Madison Avenue where I

19  had a problem with the tenants with Airbnb.  Basically the

20  tenant had a lease in my property, but he was renting his

21  apartment out to strangers coming in and out of the building

22  through Airbnb, and I was getting violations even though he was

23  the one renting it out.  I spoke to Ross, I said it wasn't

24  fair, and that we needed to do something about this.  And he

25  put me in touch with different people within the City of New

IBQKGRA4                       Rechnitz - Direct

1    York.

2    Q.  Now, did you understand Mr. Ross Offinger to have a

3    position with the City of New York at the time?

4    A.  I understood him to be the fundraiser for Bill de Blasio.

5    Q.  Now, you mentioned a number of things that you did at

6    Mr. Offinger's behest for Mr. de Blasio and for causes that

7    Mr. de Blasio favored.  Did you also do things for Mr. Offinger

8    personally?

9    A.  Yes, I did.

10   Q.  And what sorts of things did you do for Mr. Offinger

11   personally?

12   A.  First of all, I took on some meetings with friends of his

13   who were trying to raise money for some of their business

14   ideas.  I did that as a favor for him.  I also paid for his

15   hotel stay at a hotel in the Dominican Republic when he went

16   with his wife.

17   Q.  By the way, while you and Mr. Reichberg were fundraising

18   for the de Blasio campaign, did you, Mr. Rechnitz, engage in

19   any violations of election law?

20   A.  Yes.

21   Q.  What were those?

22   A.  It's called straw donors.  The way the law works is anybody

23   I approach to give donations for a campaign, the money is

24   supposed to come from them, not from me.  And I illegally

25   reimbursed people who laid money out that they didn't want to

1    give, so that I can bundle enough money for the mayor.

2    Q.  Now, to your knowledge, was either Mr. Reichberg or

3    Mr. Offinger aware of this straw donation activity?

4    A.  Yes.

5    Q.  Let's start with Mr. Reichberg.  How do you know that he

6    was aware?

7    A.  I discussed all these things with him.  We were sort -- we

8    were brainstorming names of people we should go to where I

9    wouldn't have to lay out the money in addition to the ones that

10   I told him and we discussed I'd be laying money out for, and we

11   were part of it together.

12   Q.  How did you know that Mr. Offinger was aware of the straw

13   donations that you have discussed?

14   A.  He was in my office, and he came to collect checks -- he

15   was very aggressive with check collecting -- and I told him I

16   didn't have them all in, and he told me there's a deadline.  I

17   said, okay, I'll go to a few people in my office, I'll get

18   checks now, you know, I'm going to give it to them.  He got red

19   in the face, and he said, I can't hear that, just bring me the

20   checks.

21   Q.  Was anyone else present for that particular exchange

22   between yourself and Mr. Offinger?

23   A.  I'm not sure if anyone else was in the room.

24              MR. BELL:  Now, I'd like for you, Mr. Hamilton, if you

25   can, to publish just for the witness what's been marked for

IBQKGRA4                        Rechnitz - Direct

1    identification as Government Exhibit 614.

2    BY MR. BELL:

3    Q.  Mr. Rechnitz, are you familiar with this image, sir?

4    A.  Yes.

5    Q.  How are you familiar with it?

6    A.  It's a picture of in my office with me, Jeremy, and Bill

7    de Blasio.

8    Q.  Approximately when was this picture taken?

9    A.  This was the first time that we met Bill in my office.

10            MR. BELL:  The government offers 614.

11            MS. NECHELES:  No objection.

12            MR. MERINGOLO:  No objection.

13            THE COURT:  Thank you.

14            I'm accepting into evidence 614.

15            (Government's Exhibit 614 received in evidence)

16            THE COURT:  Counsel.

17            MR. BELL:  Can we please publish that to the jury?

18            And let's take that down.  Thank you, Mr. Hamilton.

19            Can we put up, just for the witness, Government

20    Exhibit 608.

21    BY MR. BELL:

22    Q.  Mr. Rechnitz, are you familiar with this picture?

23    A.  Yes, I am.

24    Q.  You're familiar with the events at which it took place?

25    A.  Yes.

IBQKGRA4                         Rechnitz - Direct

1   Q.  Where did this take place?

2   A.  Gracie Mansion.

3   Q.  And who is exhibited here?

4   A.  Jeremy, Fernando Mateo, Bill de Blasio, and I'm there.

5           MR. BELL:  The government offers 608.

6           MS. NECHELES:  No objection.

7           MR. MERINGOLO:  No objection.

8           THE COURT:  Thank you.

9           I'm accepting 608 into evidence.

10          You can proceed.

11          (Government's Exhibit 608 received in evidence)

12          MR. BELL:  Can we publish that for the jury, please.

13          Can we take that down.

14          Mr. Hamilton, can we publish, just for the witness,

15  Government Exhibit 615.

16  BY MR. BELL:

17  Q.  Are you familiar with this, Mr. Rechnitz?

18  A.  Yes, I am.

19  Q.  What is that?

20  A.  That is the business card that Bill de Blasio gave me the

21  first time we met where he handwrote his email address and cell

22  phone number for me.

23  Q.  Other than the redacted part of the phone number, is that

24  as you remember it?

25  A.  Yes.

1              MR. BELL:  The government offers 615.

2              MS. NECHELES:  No objection.

3              MR. MERINGOLO:  No objection.

4              THE COURT:  Thank you.

5              I'm accepting Exhibit 615 into evidence.

6              (Government's Exhibit 615 received in evidence)

7              MR. BELL:  Can we publish that, please, to the jury.

8              And let's take that down.

9              Can we put up on the screen, just for the witness,

10      Government Exhibit 1080.  Can we focus in just on the top half

11      for a moment.

12      BY MR. BELL:

13      Q.  Mr. Rechnitz, are you familiar with this email?

14      A.  Yes, I am.

15      Q.  And how are you familiar with it?

16      A.  I'm on the email with Jeremy and Ross.

17              MR. BELL:  Your Honor, the government offers

18      Government Exhibit 1080.

19              MS. NECHELES:  No objection.

20              MR. MERINGOLO:  No objection.

21              THE COURT:  Thank you.

22              I'm accepting Exhibit 1080 into evidence.

23              You can proceed.

24              (Government's Exhibit 1080 received in evidence)

25              MR. BELL:  Can we publish it, please?

```
 1              THE COURT:  You may.

 2              MR. BELL:  Mr. Hamilton, let's publish that to the

 3   jury, and let's first focus in on -- can you pull out of this

 4   box, please?  Can you focus in -- actually, can we go to the

 5   second page and focus in on the bottom half of this.  Yes.

 6   Thank you.

 7   BY MR. BELL:

 8   Q.  Mr. Offinger writes:  "Jona, hope you had a relaxing

 9   weekend.  Should I send something by your office tomorrow?

10   Also, could you provide employer occ info or provide us with

11   contact info, so we can follow up?"

12              This is from Mr. Offinger to you on the 6th of

13   October, 2013.

14              That's in response to your having said:  "Thank you.

15   Another 30,000 on Monday."

16              MR. BELL:  Let's zoom out.  Can we go to the top half,

17   please.

18   Q.  Mr. Offinger, working our way up, you say:  "Hi.  Let's

19   touch base in the afternoon via email."

20               Mr. Offinger says:  "Jona, let me know what time

21   works best for you.  I have events packed in pretty much from

22   4:00 p.m. on."

23              And Ross follows up saying:  "Jona, hope all is well.

24   Do you have time to connect today?  If possible, I need the

25   employer occupation information, so I can start processing the
```

1   checks you gave me on Friday."

2              MR. BELL:  Can we go to the first page, please.  Can

3   we go to the bottom half.

4   BY MR. BELL:

5   Q.  "Tomorrow is perfect."

6              MR. BELL:  Can you highlight that, Mr. Hamilton.

7   Q.  Mr. Offinger says:  "Jona, I need to head out around

8   4:00 p.m. to staff a few events," and it goes on from there.

9              Mr. Rechnitz says:  "Some people slow bringing checks

10  in.  Told by Tuesday."

11             Offinger says:  "Okay.  Can you let me know how much

12  you have now."

13             And "25 on Tuesday.  Got it."

14             Mr. Offinger says:  "Do you think the full 100K

15  Fernando mentioned is realistic?  Need to get a sense for our

16  line items and our commitment sheet."

17             And then you say:  "You mean that we committed to?

18  Yes, Jeremy and I are committed."

19             And Mr. Offinger says:  "Great.  That means a lot."

20             I'll note that that top one, "Great.  That means a

21  lot," was sent on Friday, October the 11th, 2013, by

22  Mr. Offinger to you, Mr. Rechnitz, and that Mr. Reichberg is

23  copied at his Gmail address.

24             MR. BELL:  Let's take that down.

25             Can we put up on the screen now for the witness what's

1   been marked for identification as Government Exhibit 1051.

2   BY MR. BELL:

3   Q.  Are you familiar with this email?

4   A.  Just give me a moment, please.

5   Q.  Sure.

6           (Pause)

7   A.  Yes, I am.

8   Q.  How are you familiar with that?

9   A.  It's an email that I'm involved with with Fernando Mateo

10  and Jeremy Reichberg.

11          MR. BELL:  The government offers 1051.

12          MS. NECHELES:  Objection, your Honor.

13          THE COURT:  Thank you.

14          Come on up.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Thank you.

3              Does the government have a hard copy of this document

4     that we can refer to?

5              MR. BELL:  Sure.

6              THE COURT:  I'm sorry, counsel.  There's an objection?

7              MS. NECHELES:  Hearsay grounds, yes.

8              THE COURT:  And what's the nature of the hearsay

9     statement to which you're objecting?

10             MS. NECHELES:  It seems like the whole thing is here,

11    Mr. Mateo's comments.

12             THE COURT:  Thank you.

13             Counsel for the United States?

14             And I wanted to also discuss one other issue in

15    addition to this, which is why I brought you over.

16             MR. BELL:  Sure.  Your Honor, I suppose that this is

17    where the rubber meets the road with some of the other legal

18    issues that we've discussed now for some weeks.  But these --

19    Mr. Mateo is a coconspirator with respect to the de Blasio

20    conduct.  That much is clear just based on Mr. Rechnitz's

21    testimony not only here, but every other time that he's

22    testified about it.  So it comes in from a hearsay standpoint

23    on that basis.

24             In addition, a fair chunk of what Mr. Mateo is putting

25    in print here are directives, they are instructive, they are

IBQKGRA4                          Rechnitz - Direct

1    sort of do this, do that, imperative type statements, that are

2    themselves necessarily being offered for some purpose other

3    than the truth by virtue of there being that, as Ms. Necheles

4    acknowledged before.

5              THE COURT:  Thank you.  I'm sorry, let me hear from

6    counsel for defendant.  Then I do have some questions about

7    this.

8              MS. NECHELES:  I don't think that he's named as a

9    coconspirator in the bill of particulars.

10             But I agree that statements that are directives, or

11   instructions, or questions are not hearsay, but it seems like

12   part of this is hearsay.

13             THE COURT:  Thank you.

14             Which portion, counsel?  Here's a hard copy.

15             MS. NECHELES:  The bottom part, I think, or "Thanks

16   for the invite to Las Vegas and other arrangements to Miami."

17             I think the "Let's keep our unity" is...

18             THE COURT:  Thank you.

19             Counsel, I'd like to hear your response to that, and

20   then I have some other questions.

21             MR. BELL:  Of course.

22             I think the pattern of statements that Ms. Necheles

23   offers that are not instructions of some sort, sort of

24   demonstrates that the overwhelming majority of the top is, in

25   fact, stuff that comes in as not hearsay because these are

1      directions, because he is telling them to do things.

2               And I would respectfully submit that "Let's keep our

3      unity" is actually another example of this.  So that takes care

4      of the whole top message.

5               Then there is he already contacted and said, "I'm

6      happy to talk to her," but that, of course, is coming from

7      Mr. Rechnitz.

8               Down below, I suppose -- well, if nothing else, this

9      provides context for the upper statements because they are

10     talking about Senator Gillibrand, and it's very difficult to

11     explain what it is that Mateo is reacting to in this rousing

12     fashion without that having been clear.

13              But I would also offer, with respect to Ms. Necheles'

14     point, about how these aren't in the bill of particulars.

15     Yeah, bill of particulars pertain to the charged conspiracy.

16     That does not restrict us with respect to coconspirator

17     statements from an evidentiary standpoint.  This is a separate

18     conspiracy.  But, clearly, it doesn't have to have been

19     restricted or even defined for that purpose.  So all of it

20     should come in.

21              THE COURT:  Thank you.

22              This raises a broader question about the scope of the

23     evidence that the government is bringing in regarding these

24     other acts by Mr. Rechnitz, which I understood were offered as

25     both, I'll call it, to show his Giglio general absence of

1      mistake and other permitted categories of other-act evidence.

2      But as you say, it's not the charged offense, and I'm somewhat

3      concerned by the testimony that we've just heard about whether

4      the conduct that was just described is, in fact, illegal given

5      the nature of the official acts definition that I expect to be

6      proposing to the parties.

7              And I am concerned about the, I'll call it, quantity

8      of evidence that the government is putting in in order to

9      demonstrate Mr. Rechnitz's and Mr. Reichberg's participation in

10     a conspiracy that is not the charged conspiracy.  So my concern

11     about this was not so much the hearsay concern, but the scope

12     of and extent of the testimony that the government is putting

13     in at this point regarding uncharged conduct here.

14             MR. BELL:  What I can offer there, your Honor, is the

15     following:

16             First, both Ms. Necheles and Mr. Meringolo, at various

17     points in the runup to trial, indicated that they intend to

18     affirmatively disprove that these other acts actually happened.

19     I think in a world in which that wasn't the case, the showing

20     on our part with respect to these things would be somewhat more

21     modest, but we're reacting to what it is that Ms. Necheles in

22     particular has said that she intends to do.

23             I can proffer now that we don't intend to put very

24     much more in support -- documentary evidence in support of that

25     conspiracy beyond what we've already done, like we're near the

1    point where we would move on with respect to de Blasio and that

2    area of the political sector generally.  We will, as I think

3    everyone can expect at this point, touch briefly on Rob

4    Astorino, but it won't be as extensive.

5              So I hope that that says something both with respect

6    to why it is that we are doing this, because this is something

7    where -- look, different defense counsel with respect to

8    Mr. Rechnitz have taken different approaches with this.  In

9    both of the Seabrook trials, Mr. Shechtman did not -- on behalf

10   of Mr. Seabrook and Mr. Mazurek in the first trial on behalf of

11   Murray Huberfeld, made a strategic choice not to take issue

12   with whether these things happened as a means of attacking

13   Mr. Rechnitz's credibility.  As a result, the focus was

14   somewhat diminished.  We have adjusted slightly upward because

15   of what Ms. Necheles says it is that she is going to do, but we

16   don't intend to spend very much more time here.

17             THE COURT:  Thank you.

18             MS. NECHELES:  Judge, I do intend to cross extensively

19   on all of the other acts evidence.

20             THE COURT:  Understood.

21             I'll let you bring in this piece of evidence.  I don't

22   understand this is to be hearsay for the reasons that the

23   parties have articulated.  I do want to talk about a limiting

24   instruction regarding the nature of the conduct.  It's not

25   clear to me that apart from the straw donations, that the

IBQKGRA4                    Rechnitz - Direct

1    conduct that he just described engaging in with Mayor de Blasio

2    and Offinger, setting up meetings and the like, is illegal, and

3    I'm afraid that the jury may be confused about that.  So I want

4    to talk about that in a subsequent break.

5            MR. BELL:  That's fine, your Honor.  It seems to me

6    that the starting point there would be the same point that we

7    attempted to raise in the earlier instruction about how whether

8    that stuff is illegal or not is neither here, nor there for the

9    jury.

10           THE COURT:  Thank you.  We can talk about that.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IBQKGRA4                    Rechnitz - Direct

1           (In open court)

2           THE COURT:  Ladies and gentlemen, would you like to

3    take a short break just to stretch your legs?  I think I'm

4    seeing a bunch of yeses, so let's take that task.  Let's step

5    down.  Please don't discuss the case during the break, don't

6    discuss it with anyone else, and don't do any research about

7    it.

8           (Jury not present)

9           THE COURT:  Thank you.

10          We're taking a recess, and when Mr. Reichberg returns

11   returns -- I'm going to step down briefly.  I'd like to be in a

12   position to start as soon as Mr. Reichberg is available.  So no

13   more than five minutes, please.

14          Mr. Rechnitz, if you could stay in place because I

15   think this will be a short break.  If you need to use the

16   restroom, please let my deputy know.

17          MS. NECHELES:  Thank you, your Honor.

18          (Recess)

19          THE COURT:  Thank you.  You can be seated.

20          Mr. Daniels, can you please bring in the jury.

21          (Jury present)

22          THE COURT:  Thank you, ladies and gentlemen.  You can

23   be seated.

24          Thank you.  I apologize for the interruption.

25          Mr. Bell, you can proceed.

IBQKGRA4                        Rechnitz - Direct

1              MR. BELL:  Thank you, your Honor.

2              The government offers Government Exhibit 1051.

3              THE COURT:  Thank you.

4              I'm accepting Government Exhibit 1051 into evidence.

5              You can proceed.

6              (Government's Exhibit 1051 received in evidence)

7              MR. BELL:  Thank you.

8              Mr. Hamilton, I'll ask you to focus on the bottom two

9    emails first.

10   BY MR. BELL:

11   Q.  Fernando Mateo, on February 5, 2015, writes to you and

12   Jeremy: "Subject:  Ross.  Hey guys.  Hope all is well.  Thanks

13   for the invite to LV.  I have other arrangements in Miami.  If

14   you hear from Ross regarding Senator Kirsten Gillibrand, tell

15   him not now.  We will discuss moving forward.  Let's keep our

16   unity together."

17             You respond later that day:  "He already contacted me,

18   and I said I'm happy to talk to her.  Should I reverse it?"

19             MR. BELL:  Can we focus on the top message, please.

20   Q.  Mr. Mateo responds to you and to Mr. Reichberg:  "Guys, we

21   will lose respect if we don't communicate.  Tell him I'm not

22   ready yet.  They will keep asking for more and more money.

23   They must give us something first - Jeremy chaplain for NYPD,

24   total access to commissioners and deputy mayors.  We want

25   something back before we move along.  Please call him and tell

IBQKGRA4                        Rechnitz - Direct

1    him we as a team are not ready just yet, soon.  Please advise

2    on your decision.  When he contacted me, the first thing I said

3    was I will discuss with both of you."

4              Mr. Rechnitz, in 2013 and 2014 -- well, withdrawn.

5              When you first approached Mr. Offinger, how explicit

6    was the connection between what it was that you sought to give

7    and what it was that you sought to get?

8    A.  It was very explicit.

9    Q.  Did you discuss those same things with Mr. Reichberg at

10   times when Mr. Offinger wasn't there?

11   A.  Yes.

12   Q.  Was it similarly explicit, the connection between what it

13   was that you sought to get and what it was that you sought to

14   give?

15   A.  Yes.

16   Q.  Did what you sought to get include official action from

17   agencies of the City of New York?

18   A.  Yes.

19             MR. BELL:  Let's take that down.

20   Q.  Now, at the time that you were getting involved --

21             MR. BELL:  Can you put Government Exhibit 1029 just up

22   on the witness' screen, Mr. Hamilton.

23   Q.  Are you familiar with this document?

24   A.  Yes, I am.

25   Q.  What is that document?

IBQKGRA4                        Rechnitz - Direct

A.   This is a chart that Ross had filled out which contained

the people who contributed checks for the mayor of New York.

          MR. BELL:  Your Honor, I expect this is the last bit

of evidence that we'll put up on this particular subject.  The

government offers Government Exhibit 1029.

          MS. NECHELES:  No objection.

          MR. MERINGOLO:  No objection.

          THE COURT:  Thank you.

          No objection from either counsel, I accept the Exhibit

1029 into evidence.

          You can proceed.

          (Government's Exhibit 1029 received in evidence)

          MR. BELL:  Can we publish that for the jury, please.

BY MR. BELL:

Q.   So, here, Mr. Offinger writes on Friday, October the 4th of

2013 -- he writes to you, Reichberg, and Mateo with the subject

line "de Blasio Follow-Up:  "Jona and Jeremy, a pleasure

meeting you today.  I think this is the beginning of a good

friendship."

          MR. BELL:  Can you publish that, please.

Q.   "The totals from what I received today are below.  We

appreciate your support very much.  Please let me know how I

can further support your efforts on behalf of Bill and the

campaign."

          There are a number of amounts and people listed below.

IBQKGRA4                         Rechnitz - Direct

1   Are those familiar to you?

2   A.   Yes.

3   Q.   And what are those amounts, and who are those people?

4   A.   The first person is somebody Jeremy collected money from

5   for $2,000.  The next eight people, I was responsible for

6   bringing in, which all gave the maximum of 4,950.  And the last

7   person, I believe, is Jeremy's wife's cousin, who gave the

8   maximum amount of 4950.

9   Q.   Were any of the people listed on that people who worked in

10  your building or in your office?

11  A.   Yes.

12  Q.   Who?

13  A.   Paul Raps shared an office with me.  Yuron Turgeman worked

14  throughout my office in the government building, and Natalia

15  Weiss' husband, Moshe, had an office in the building as well.

16       MR. BELL:  Thank you.  You can take that down.

17  Q.   Now, at the same time that you were getting involved with

18  the Thompson and de Blasio campaigns, were you getting involved

19  with politicians outside of the city?

20  A.   Yes.

21  Q.   Who?

22  A.   Rob Astorino from Westchester County.

23  Q.   How did you come to get involved with Mr. Astorino?

24  A.   Fernando lived in Westchester County and introduced me and

25  Jeremy to him.

IBQKGRA4                         Rechnitz - Direct

1   Q.  Did you come to meet with Mr. Astorino as well?

2   A.  Yes.

3   Q.  Who was present when you met Mr. Astorino?

4   A.  Fernando, Jeremy, and me.

5   Q.  What sort of exchange did you have with Mr. Astorino?

6   A.  We met him, Fernando introduced us as powerful people who

7   contributed a lot to campaigns, and we expressed our desire to

8   help him.  I think initially I gave somewhere like $15,000,

9   which is a big amount for a county executive, and we explained

10  to him our desire to become police chaplains in Westchester

11  County, which is something Jeremy and I discussed before the

12  meeting.

13  Q.  Why were you and Jeremy interested in becoming police

14  chaplains in Westchester County?

15  A.  Because then you get a parking placard, and an ID, and a

16  badge, and it's good for breaking the rules in the city for

17  parking and other privileges, like getting pulled over.

18  Q.  Now, at the time, Mr. Rechnitz, did you have any clerical

19  or other qualifications to be a chaplain?

20  A.  No.

21  Q.  To the best of your knowledge, did Mr. Reichberg?

22  A.  No.

23  Q.  For the time, did you live in Westchester County?

24  A.  No, I did not.

25  Q.  Did you have anything to do with Westchester County?

IBQKGRA4                        Rechnitz - Direct

1   A.  No.

2   Q.  How about Mr. Reichberg?

3   A.  No.

4   Q.  Did you have any intention of actually performing

5   chaplain-type duties as a Westchester County chaplain?

6   A.  No, I did not.

7   Q.  Based on your conversations with Mr. Reichberg, did

8   Mr. Reichberg?

9   A.  No.

10  Q.  Now, did you mention this wish to become police chaplains

11  to Mr. Astorino when you met him?

12  A.  Yes, I did.

13  Q.  And did you mention the connection between that and what

14  you were willing to do for Mr. Astorino?

15  A.  Yes.

16  Q.  And what was Mr. Astorino's response?

17  A.  He had told Jeremy and I that he would reach out to his

18  police commissioner, George Longworth, and that he would be in

19  touch with Jeremy directly.

20  Q.  Did that, in fact, happen?

21  A.  Yes.

22  Q.  Did you come to know Commissioner Longworth?

23  A.  Yes.

24  Q.  Did you also come to know a brother of Commissioner

25  Longworth's?

IBQKGRA4                          Rechnitz - Direct

1    A.   Yes.

2    Q.   Who was he?

3    A.   He was in the, I guess, NYPD inner circle for Bill Bratton,

4    helping him make decisions during his transition, and he was

5    part of his team in the NYPD.

6    Q.   Did you eventually get sworn in as police chaplain?

7    A.   I think his name was Greg.

8              Pardon?

9    Q.   Okay.  Did you eventually get sworn in as a police chaplain

10   in Westchester County?

11   A.   Yes.

12   Q.   To your knowledge, did Jeremy?

13   A.   Yes.

14             MR. BELL:  I'd like to put up, just for the witness

15   right now, Government Exhibit 612.

16   Q.   Are you familiar with that image?

17   A.   Yes, I am.

18   Q.   What's happening there?

19   A.   That's this swearing-in in George Longworth's office.

20             MR. BELL:  Your Honor, the government offers 612.

21             MS. NECHELES:  No objection.

22             MR. MERINGOLO:  No objection.

23             THE COURT:  Thank you.

24             I'm accepting Exhibit 612 in evidence.

25             You can proceed.

1                (Government's Exhibit 612 received in evidence)

2                MR. BELL:  Thank you, your Honor.

3                Can we publish 612 to the jury, please.

4     BY MR. BELL:

5     Q.   So what's happening here, Mr. Rechnitz?

6     A.   This is the swearing-in ceremony Jeremy and I went to

7     become chaplains, and that's the swearing in for me.

8     Q.   Did you swear to uphold the Constitution of the State of

9     New York and certain things within Westchester County?

10               MR. MERINGOLO:  Objection.

11               THE COURT:  Thank you.

12               You can answer the question.

13               THE WITNESS:  Whatever he repeated, I said I did.

14    Q.   Did you actually do anything to live up to that oath

15    subsequently?

16    A.   No, I did not.

17    Q.   To the best of your knowledge, did Mr. Reichberg?

18    A.   No, he did not.

19               MR. BELL:  We can take that down.

20    Q.   Now, in addition to fundraising for Mr. Astorino, did you

21    do anything else for him?

22    A.   Yes.

23    Q.   What else did you do?

24    A.   I purchased a Rolex watch for him.

25    Q.   Where did you purchase the watch from?

IBQKGRA4                          Rechnitz - Direct

1    A.  I believe it was Daniela Diamonds.

2    Q.  What is Daniela Diamonds?

3    A.  It's a watch and jewelry store on 47th Street.

4    Q.  After you purchased the watch from Daniela Diamonds, did

5    you do anything else with respect to the watch?

6    A.  Yes.

7    Q.  What else did you do?

8    A.  I called Ariel from Motion In Time, who we spoke about

9    before, to come set it on his wrist and adjust it for him in my

10   office.

11   Q.  Did that, in fact, happen?

12   A.  Yes.

13   Q.  When you say "his wrist," who are you talking about?

14   A.  Rob Astorino's.

15   Q.  Was there an earlier point where you were questioned by the

16   government about where you got the watch from?

17   A.  Yes.

18   Q.  And were you confused at any point in answering that

19   question?

20   A.  Yes.

21   Q.  Why?

22   A.  I had thought that I had purchased the watch from Motion In

23   Time because I remember Ariel from Motion In Time coming to

24   adjust the watch, but I later remembered that he only came to

25   adjust it, and I purchased it from Daniela.

1  Q.  With respect to Mr. Reichberg, did you understand

2  Mr. Reichberg to have any clergy training at all?

3  A.  No.

4  Q.  Did you understand him to have ever gone to any sort of

5  rabbinical school?

6  A.  Not that I'm aware.

7  Q.  Did you ever know him to preserve -- preside, rather, over

8  any services as a rabbi?

9  A.  No.

10  Q.  In Westchester County?

11  A.  No.

12  Q.  How about in Brooklyn?

13  A.  No.

14  Q.  To your knowledge, does Mr. Reichberg have a congregation?

15  A.  No.

16  Q.  All of that aside, Mr. Rechnitz, have you heard

17  Mr. Reichberg represent himself as a rabbi?

18  A.  Yes.

19  Q.  In what contexts?

20  A.  Whenever he would call the Port Authority by JFK, he would

21  say it's Rabbi Reichberg calling from the state police.  I've

22  heard him identify himself that way, also, to officers.

23            (Continued on next page)

24

25

IBQTGRA5                         Rechnitz - Direct

1    BY MR. BELL:

2    Q.  In what context would you hear him call the Port Authority?

3    A.  In order to park and do a VIP walk-through for a friend of

4    his, or when he and I traveled, to cut the security line at

5    TSA.

6    Q.  With respect to the Westchester County position, did you in

7    fact receive a parking placard?

8    A.  Yes.

9    Q.  Did Mr. Reichberg?

10   A.  Yes.

11   Q.  Did you use it?

12   A.  Yes.

13           MR. BELL:  Mr. Hamilton, can you put Government

14   Exhibit 1072 up on the screen just for the witness, please.

15   Q.  Did there come a point where you ceased being a chaplain at

16   Westchester County?

17   A.  Yes.

18   Q.  Under what circumstances?

19   A.  Again, after the whole IAB came to visit me, I cut out

20   everything.  I don't want to be involved with anything for the

21   police at all.

22   Q.  Are you familiar with Government Exhibit 1072?

23   A.  Yes, I am.

24   Q.  How are you familiar with this communication?

25   A.  It was an email to me from George Longworth's office.

IBQTGRA5                          Rechnitz - Direct

1          MR. BELL:  Your Honor, the government offers 1072.

2          MS. NECHELES:  No objection.

3          MR. MERINGOLO:  No objection.

4          THE COURT:  Thank you.  I'm accepting 1072 into

5     evidence.  You can proceed.

6          (Government's Exhibit 1072 received in evidence)

7          MR. BELL:  Thank you, your Honor.  Mr. Hamilton, may

8     you publish that.

9     Q.  So in the middle of that first page, georgelongworth@

10    westchestergov.com writes:  A reminder, if you could get back

11    to us with your availability.

12          And you respond:  I can't make it, sorry.  Also, I'm

13    fine freeing up a spot for you if you need the chaplain spot

14    for anybody else.  I don't have time to put into this anymore.

15    Thank you.  Hope you're well.

16          Why did you send that in March of 2015?

17    A.  I knew about an investigation going on and I did not want

18    the chaplaincy, since it was a farce.

19    Q.  Now around the time that you had gotten the chaplaincy from

20    Westchester County, had you and Jeremy sought similar positions

21    elsewhere?

22    A.  Yes.

23    Q.  Where?

24    A.  In Floral Park.

25    Q.  How did that come to be?

IBQTGRA5                    Rechnitz - Direct

1    A.   Again Steve McAllister became the commissioner of the

2    Floral Park Police Department, and Jeremy said he would arrange

3    a chaplaincy for himself and a clergy liaison for me.

4    Q.   What did you understand the purpose of that to be?

5    A.   To get a parking placard and an ID.

6    Q.   What would the benefit be of having parking placards in

7    both Floral Park and Westchester County?

8    A.   Since both were outside of the city, it would be to rotate

9    the use.  The chances of a cop giving you a ticket using the

10   same placard every day when you're from out of the city is

11   greater than if you switch them around.

12   Q.   Were you and Mr. Reichberg successful in getting these

13   positions in Floral Park?

14   A.   Yes.

15   Q.   Did you get a placard?

16   A.   Yes.

17   Q.   Did you have any affiliation with Floral Park outside of

18   your relationship with Steve McAllister?

19   A.   No.

20   Q.   Did you ever assist with any religious services or clergy

21   liaison in Floral Park?

22   A.   No.

23   Q.   How many times would you say you have been to the Village

24   of Floral Park in your life?

25   A.   One time.

IBQTGRA5                          Rechnitz - Direct

1              MR. BELL:  Could we put Government Exhibit 1057 on the

2       screen for just the witness, please.

3       Q.  Are you familiar with this communication?

4       A.  I can't see the image from the attachment, so it's hard to

5       tell.

6       Q.  Setting aside the image, are you familiar with this

7       communication given the subject line and timing?

8       A.  Yes.

9       Q.  And what's your understanding of it?

10      A.  I'm asking Jeremy when my placard will be ready.

11             MR. BELL:  The government offers 1057.

12             MS. NECHELES:  No objection.

13             MR. MERINGOLO:  No objection.

14             THE COURT:  Thank you.  I'm accepting Exhibit 1057

15      into evidence.

16             (Government's Exhibit 1057 received in evidence)

17             THE COURT:  You can proceed.

18             MR. BELL:  Could we publish that to the jury, please.

19      Q.  Mr. Reichberg sent you a JPEG image.  What generally do you

20      understand that to have been?

21      A.  A photo attachment of the parking placard.

22      Q.  And your response was:  Amazing.  When will it be ready?

23             MR. BELL:  Let's take that down.

24      Q.  Did you get business cards as part of this chaplain

25      arrangement?

1    A.  For Westchester County, yes.

2    Q.  How did those work?

3    A.  Jeremy had ordered business cards for himself and for me.

4    Q.  What did you understand the purpose of the business cards

5    to be?

6    A.  To hand out to different officers, play a big shot, the

7    same thing we were doing.

8          MR. BELL:  Could we put, Mr. Hamilton, Government

9    Exhibit 1084 up just for the witness.

10   Q.  And I am going to go ahead and offer Government

11   Exhibit 1084.

12         MS. NECHELES:  No objection.

13         MR. MERINGOLO:  No objection.

14         THE COURT:  Thank you.  I'm accepting 1084 into

15   evidence.

16         (Government's Exhibit 1084 received in evidence)

17         THE COURT:  Counsel, you can proceed.

18         MR. BELL:  Thank you.

19         Mr. Hamilton, can you publish that to the jury.

20         Can you highlight Charles Alexander, the sender,

21   Jeremy Reichberg, the recipient, February 15, 2014, when it's

22   sent.

23         And let's start from the bottom, Mr. Reichberg says to

24   Mr. Alexander:  Hi, it was nice talking to you this morning.

25   These are the two chaplain cards and one board commissioner.

IBQTGRA5                    Rechnitz - Direct

1    Please put out on a layout and send back for approval.  Thank

2    you.

3              Did you understand someone to have become a board

4    commissioner as part of your arrangements, Mr. Rechnitz?

5    A.  Yes.

6    Q.  Who was that?

7    A.  Mr. Fernando Mateo.

8    Q.  And what was his work position?

9    A.  In Westchester County he was on the police board.

10   Q.  What did you understand that to be?

11   A.  Some honorary sort of sheriff position.

12             MR. BELL:  Can you highlight Jeremy Reichberg, police

13   chaplain.  Jona Rechnitz, police chaplain.  Fernando Mateo,

14   police board commissioner.

15             Then can you highlight when Mr. Alexander -- first of

16   all, can you highlight Mr. Alexander's email address and

17   highlight where he says I need to know how many stars goes on

18   each of these so I can get the badges correct.

19             Let's take that down.

20             Mr. Rechnitz, let's switch gears and go back to your

21   involvement with the New York City Police.  And what I will do

22   is I will -- let's put up on the witness's screen, and if it's

23   possible to cycle through these, Government Exhibits 601

24   through 605, one after the other for a couple of seconds each.

25   Q.  Are you familiar with these images, Mr. Rechnitz?

1   A.  Yes, I am.

2   Q.  Are you familiar with the event they depict?

3   A.  Yes, I am.

4   Q.  What's the event?

5   A.  My son's circumcision ceremony.

6   Q.  That's same ceremony you described earlier?

7   A.  Yes.

8           MR. BELL:  The government offers Government Exhibits

9   601 through 605.

10          MS. NECHELES:  No objection.

11          MR. MERINGOLO:  No objection.

12          THE COURT:  I'm accepting into evidence Government

13  Exhibits 601 through 605.

14          (Government's Exhibits 601 through 605 received in

15  evidence)

16          THE COURT:  You can proceed.

17          MR. BELL:  Thank you.

18  Q.  Please start with 602.  Who is depicted here?

19  A.  Philip Banks and me.  To the left is Detective Norville, I

20  believe.

21  Q.  And who do you understand Detective Norville to be?

22  A.  A detective who works for the chief of department's office

23  for Phil Banks and Michael Harrington.

24  Q.  And can we go to Government Exhibit 604.

25          And it may be best to do a sort of left to right here.

IBQTGRA5                          Rechnitz - Direct

1    Who do we have?

2    A.  Jeremy Reichberg, Robert Astorino, me, Michael Harrington,

3    and Philip Banks.

4    Q.  And so are these Mr. Astorino and Mr. Harrington shaking

5    hands?

6    A.  Yes.

7    Q.  Let's go to 603.  And 605.

8            And who do we have here, sir?

9    A.  This is David Colon and me.

10   Q.  And 601.

11           And who do we have here?

12   A.  Eric Rodriguez and me.

13   Q.  This is the same Eric Rodriguez who received gifts as part

14   of the Christmas of 2013 ride through Staten Island?

15   A.  Yes, sir.

16           MR. BELL:  You can take that down, Mr. Hamilton.

17   Q.  I want to direct your attention, Mr. Rechnitz, to about a

18   year ago, that is to say, October/November of 2017.  By this

19   time had you already started cooperating with the government?

20   A.  Yes.

21   Q.  Did you have an understanding at this time of whether the

22   term "corrupting" or "corruption" aptly described your

23   relationship with these officers?

24   A.  No, it did not.

25           MS. NECHELES:  Objection, your Honor.

1      MR. MERINGOLO:  Objection.

2      THE COURT:  Counsel, can you rephrase?

3      MR. BELL:  Sure.

4  Q.  Did you have an understanding, Mr. Rechnitz, of whether the

5  term "corrupting" or the term "corruption" would appropriately

6  be used to describe your relationship with these officers?

7      MS. NECHELES:  Objection.

8      MR. MERINGOLO:  Objection.

9  A.  No, I did not.

10     THE COURT:  I accept the answer.

11 A.  No, a year ago I did not.

12 Q.  What was your understanding at the time of whether those

13 were fitting terms?

14 A.  My understanding at the time was that corruption was when

15 you had an explicit understanding that I'm going to give you

16 this in return for that, a verbal understanding.  That's how I

17 understood corruption at the time.

18 Q.  Now at the time did you nevertheless understand that what

19 you did with the officers was wrong?

20 A.  Yes.

21 Q.  Now with respect to whether the terms "corruption" or

22 "corrupting" are appropriately applied, did that understanding,

23 just with respect to whether the words fit the circumstances,

24 change?

25 A.  No.

IBQTGRA5                          Rechnitz - Direct

```
 1              MR. MERINGOLO:  Objection, leading.

 2              THE COURT:  Thank you.  Overruled, you can answer.

 3         I accept the answer.

 4   A.  No, the conduct remained the same, just the way I --

 5              MS. NECHELES:  Objection, your Honor.

 6              THE COURT:  Counsel, can you ask the question again?

 7              MR. BELL:  I'm not -- okay, sure.

 8   Q.  Withdrawn.

 9         Did you have an understanding -- withdrawn.

10         A moment ago, Mr. Rechnitz, you said that you had a

11   particular view of what the term "corruption" or the term

12   "corrupting" meant.  Did that change?

13   A.  Yes.

14   Q.  How?

15   A.  Initially, prior to a year and before that, the way I

16   understood the word "corruption" was as I explained, but I know

17   that corruption is acting in a manner which I did, which is

18   where there are legal positions of power and you corrupt

19   someone by bribing them.

20   Q.  Has your understanding of what the facts actually were

21   changed at all?

22   A.  The facts did not change.  My conduct has remained the same

23   throughout, and when I initially thought that legally the

24   definition of corruption was not what I had done, I maintain --

25              MS. NECHELES:  Objection.
```

IBQTGRA5                          Rechnitz - Direct

1          THE COURT:  You can continue.

2   A.  I maintain that it's the same exact conduct then as it is

3   now.  The conduct never changed.

4   Q.  At approximately the same time a year ago, Mr. Rechnitz,

5   did you have an understanding of whether those same

6   interactions with police officers involved what's called a quid

7   pro quo?

8   A.  Again, like corruption --

9          MS. NECHELES:  Your Honor, I object.  Could we

10   approach on this?

11          THE COURT:  Yes, please come up.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Sorry, counsel, go ahead.

3          MS. NECHELES:  Your Honor, it's improper bolstering,

4     this testimony.  What Mr. Bell is doing here is he's taking

5     what he knows when he questions on cross about prior testimony

6     and trying to explain.  He knows he's not allowed to talk about

7     the person's prior testimony, so he's now trying to have the

8     person, Mr. Rechnitz, talk about like what those words meant

9     before he is even asked the other questions.  His state of mind

10    about what those words mean have no relevance to this case at

11    this moment because he hasn't been asked the prior inconsistent

12    statement.  He can do this on redirect if he wants, but for him

13    to be bolstering his testimony and advancing this sort of

14    scripted manner is really improper.

15         MR. MERINGOLO:  Your Honor, one thing, we intend to --

16    obviously because of the testimony, we intend to cross very

17    hard on this particular issue, which now there's a year, how

18    did he learn this, when it came about.  I know we can't cross

19    on what he talked about with his lawyer, but I think this opens

20    the door to a very, very vigorous cross on these issues.

21         MR. BELL:  May I?

22         THE COURT:  Please.

23         MR. BELL:  I am flummoxed by this.

24         MR. MERINGOLO:  I don't know that means, Judge, if he

25    could explain it in layman's terms.

1            MR. BELL:  I'm not flummoxed by that.  I am aware, as

2    the Court doubtless is, that this is an issue of Ms. Necheles'

3    making primarily.  Ms. Necheles has said that it is at the very

4    heart of the case what it is that Mr. Rechnitz's understanding

5    was of whether there was quid pro quo, of whether what he was

6    doing was actually corrupting these officers.  And your Honor

7    has ruled that, notwithstanding the prior inconsistent

8    statement rules or any other number of things, that if this --

9    that if the right situation is teed up, that this is something

10   that they can theoretically question about.

11           MS. NECHELES:  Your Honor, I withdraw my objection.

12   Let him do it.

13           THE COURT:  Thank you.  Counsel --

14           MR. MERINGOLO:  I don't withdraw.

15           THE COURT:  Counsel, Mr. Grant has raised a separate

16   question, which is what -- the ensuing questions about the

17   basis for his changed understanding regarding what the law is

18   and what the law means, there's both that issue, and then

19   separately whether and to what extent I should permit this

20   person to testify at length about his understanding of the

21   meaning of those legal terms.  Can you respond to each of those

22   in turn?

23           MR. BELL:  Sure.

24           MS. NECHELES:  Your Honor, I think he opened the door

25   now.  We will be crossing.  He opened the door.  He's gone

1    through this about what was your understanding then, what it is

2    now.  Obviously it's based on his discussions with the

3    government cleaning up his testimony, so we will cross on that.

4                THE COURT:  Thank you.

5                Mr. Bell will respond.

6                MR. BELL:  I appreciate that, your Honor.

7                It has always been on the table that Mr. Rechnitz can

8    be asked about his understanding of what the criminal agreement

9    was at any point, then, now, in between.  I don't see this as

10   having changed much.  What we are doing is we are asking about

11   a fixed point in time, not with respect to prior statements

12   made, because this is primarily a trial about Mr. Rechnitz's

13   understanding and not statements made, but just getting to what

14   Ms. Necheles has said countless times now is the actual heart

15   of the matter.  This is our doing it.  I don't think this opens

16   the door to much of anything.

17               THE COURT:  Counsel, do you also withdraw your

18   objection?

19               MR. MERINGOLO:  No, I do not.

20               MR. BELL:  Could we have one moment?

21               MR. MERINGOLO:  All right.  Do we get to cross or do

22   we get sustained every time?  That's the whole thing.

23               MS. NECHELES:  We can cross on that.

24               THE COURT:  Thank you.  Both parties have withdrawn

25   their objections.  You can proceed on this, counsel.

1              (In open court)

2              THE COURT:  Sorry for the interruption, Mr. Bell, you

3      can continue.

4              MR. BELL:  Thank you, your Honor.

5      BY MR. BELL:

6      Q.  So the question that had been put to you, Mr. Rechnitz, was

7      the following:  At the same time, roughly a year ago, did you

8      have an understanding of whether these interactions with police

9      officers involved what's called a quid pro quo?

10     A.  No, I did not.

11     Q.  And what was your understanding a year ago on that subject?

12     A.  Similar to corruption, I had thought that the -- I guess

13     legal definition precisely what quid pro quo was that if I

14     explicitly stated I will scratch your back if you scratch mine.

15     Q.  And has your understanding of what a quid pro quo means

16     changed?

17     A.  Yes.

18     Q.  And do you understand there to have been a quid pro quo at

19     the heart of the arrangement between you, Jeremy, and the

20     police officers?

21     A.  Yes.

22     Q.  Now Mr. Rechnitz, "quid pro quo" is a legal term.  Are you

23     a lawyer, sir?

24             MS. NECHELES:  Objection.

25             MR. MERINGOLO:  Objection, your Honor.

1              THE COURT:  Thank you.  You can answer that question.

2     A.  I'm not a lawyer.

3              THE COURT:  Thank you.  I accept the answer.

4              MS. NECHELES:  Could we strike the first part of the

5     statement?

6              THE COURT:  Counsel, can you ask the first part of

7     that question?

8              MR. BELL:  Sure.

9     Q.  Let me do this:  Are you a lawyer, Mr. Rechnitz?

10    A.  No, I am not a lawyer.

11    Q.  Did you have an understanding, based on your education, of

12    what a quid pro quo was prior to approximately a year ago?

13    A.  No, I did not understand the legal definition.

14             MR. BELL:  May we approach very briefly, your Honor?

15             THE COURT:  Yes, come on up.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              THE COURT:  Thank you.

3              MR. BELL:  So the only thing -- we contemplated this

4    somewhere in pretrial proceedings, but this may be a good time

5    for an instruction that your Honor has mentioned before that

6    the witness is not an attorney and that the jury will get legal

7    instructions from you at the end of the trial.

8              This isn't a button that we push often, but it seems

9    particularly apt here given the nature of this testimony, and I

10   think it's an appropriate statement, it's an accurate

11   instruction.  The way things work around here, this would be, I

12   think, the most apt time to mention it.  And I think it would

13   simply be that you've heard the witness refer to the term "quid

14   pro quo" and the term "corruption."  You will be getting

15   instructions on what those terms mean for purposes of your

16   deliberations from me, the Court, at the conclusion of the

17   trial, and those are the instructions you're to follow.

18             MS. NECHELES:  Your Honor, we strenuously object to

19   this.  The witness did -- when he testified previously it

20   wasn't a legal definition he was asked the following questions

21   by Mr. Bell.  He said:  What did you understand the term

22   "corrupted" to be or would mean when Mr. Schechtman asked you

23   if you thought you corrupted police officers?

24             Answer:  Like a quid pro quo, a bribe, saying, for

25   example, I will give you dollar if you want to give me a bottle

1   of wine.

2            The government wants to redefine his statement as

3   legal explanation.  He gave the answer --

4            MR. BELL:  We're not going to --

5            Judge, I'm in the middle of a statement, I ask that --

6            THE COURT:  Please proceed.

7            MS. NECHELES:  So he didn't use it that way, and

8   they're trying to bolster their argument by using your Honor,

9   by saying we would like an instruction now, right after they

10  have asked did you understand -- were you a lawyer, did you

11  understand.

12           THE COURT:  Thank you.  Let me say this, I would like

13  to keep on moving.  To the extent that there's an instruction

14  that we need to craft with respect to this issue, I would like

15  to craft it outside of the presence of the jury.

16           Is there any other issue that we should take up now

17  with the jury in the box?

18           MS. NECHELES:  I ask that the statement that was made

19  about being a legal definition by Mr. Bell, that when he said

20  quid pro quo was a legal term, that that be stricken, that

21  Mr. Bell's statement be stricken.

22           THE COURT:  I understood he had withdrawn that

23  question and then rephrased it in a series of two questions.

24           MS. NECHELES:  I didn't understand that.

25           MR. BELL:  I did.

1            MS. NECHELES:  If we make that clear on the record,

2     that part is withdrawn and stricken from the record in case

3     there's a readback ever, that that part is withdrawn and

4     stricken from the record.

5            THE COURT:  That was my understanding.  And just in

6     order to keep the flow moving, I think that the government

7     agrees with that, I agree with that, to the extent that there

8     is a request for readback, this record will establish that that

9     portion should come out.

10            MS. NECHELES:  Thank you, your Honor.

11            THE COURT:  Thank you.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Thank you.  Sorry, Mr. Bell, you can

3     proceed.

4     BY MR. BELL:

5     Q.  So setting aside the labels and the definitions,

6     Mr. Rechnitz, has your sense of the facts, of your

7     understanding with the officers, changed at all over time?

8     A.  No, the facts remain the same and my conduct remains the

9     same.

10    Q.  Is it the same as it was last year?

11    A.  Yes.

12    Q.  Is it the same as it was when you were still bribing Jimmy

13    Grant and other officers with Jeremy Reichberg?

14    A.  Yes.

15    Q.  I would like to ask you about a number of things that you

16    and Mr. Reichberg did.  I want to direct your attention back to

17    the time when you first got to know Mr. Reichberg when you were

18    working for Africa Israel.  What aspects of your job at

19    Africa-Israel, if any, made getting to know the police more

20    appealing?

21    A.  First of all, the chairman of the company, Lev Leviev, he

22    owns a diamond store on Madison Avenue, and there were

23    protestors outside of his store on Valentine's Day and other

24    weekends because they had disagreements with some of his

25    philosophies.  And I know it was a very big problem for

1    Mr. Leviev, and getting police involvement in that could only

2    be beneficial for Leviev at the time.

3           Another issue is when Mr. Leviev came to America, he

4    would come in on a private plane, and as discussed a little bit

5    earlier, we were able to provide him with a private police

6    escort to his hotel.

7    Q.  I will ask you about both of those in turn.

8           What actions, if any, did -- first of all, did you

9    take action to address the concerns about Mr. Leviev's

10   protestors?

11   A.  Yes.

12   Q.  At whose direction did you take those actions?

13   A.  Rotem Rosen, the CEO of the company.

14   Q.  What actions did you take?

15   A.  I spoke with Jeremy about what we can do about this.  He

16   came and partook in a meeting with me and Rotem and Paul Raps.

17   We then had another meeting with Stephen McAllister, and he

18   addressed the issue.

19   Q.  How did he address the issue?

20   A.  So he told us that he could take care of the problem, but

21   that we would have to donate money to the NYPD football team.

22   So I raised another $25,000.

23   Q.  Is this in addition to the 5,000 that you mentioned

24   earlier?

25   A.  Yes.

IBQTGRA5                          Rechnitz - Direct

1   Q.  Who did these additional funds come from?

2   A.  It was from KLG Jewelry, LLC.

3   Q.  What's that?

4   A.  Which was the ownership of the store, the Leviev and Klein

5   group.  And Mr. Raps arranged for the donation, in addition to

6   a check which came from Africa-Israel, which was the real

7   estate company.

8   Q.  What happened after these donations were made to the NYPD

9   football team?

10  A.  There was more of a police presence, and then eventually

11  the protestors stopped.

12          MS. NECHELES:  Could we get a date, your Honor?

13  Q.  Was Mr. McAllister --

14          THE COURT:  Sorry, overruled.

15          Counsel, can you please proceed.

16  Q.  Was Mr. McAllister still with the NYPD at the time?

17  A.  Yes.

18  Q.  Did this happen before or after the Lincoln Tunnel episode

19  that you alluded to a moment ago?

20  A.  I think it was before, but I'm not exactly sure.

21  Q.  So were you led as part of that to believe that the NYPD

22  could do anything specific in order to allay the protester

23  problem?

24  A.  Yes.

25  Q.  What?

1    A.   That Jeremy had said that maybe they didn't have the proper

2    noise permit.  They would find out.  If there was a noise

3    permit they could shut it down, or if they got rowdy, they

4    could move them over.  Then we found out they did have proper

5    permits, and it was a little more complicated than that.

6    Q.   What ultimately happened to the protestors?

7    A.   Got quiet right away.

8    Q.   Did you and Jeremy credit Steve McAllister for that?

9    A.   Yes.

10   Q.   Now I want to turn to the incident involving Lev Leviev's

11   travel that you mentioned a moment ago.  What was it that

12   actually happened here?

13   A.   Lev Leviev was coming into town, and I had seen that Jeremy

14   in fact did have pull on the NYPD.  And Jeremy and I were

15   talking, and he said that he could have a private police escort

16   for Mr. Leviev from his plane to the hotel he was staying at in

17   midtown, the Peninsula Hotel.

18   Q.   Was that appealing to you?

19   A.   Very much.

20   Q.   Why?

21   A.   This was the boss of my company, and I would look very good

22   in front of him if I pulled this off.

23   Q.   So did you take steps to make that happen?

24   A.   Yes.

25   Q.   What happened?

IBQTGRA5                    Rechnitz - Direct

1   A.  So I spoke to Rotem, the CEO of the company, and he said to

2   go forward with the plan, gave Jeremy the green light.  He went

3   ahead and made all the arrangements.

4   Q.  Were you familiar with Mr. Leviev's travel in the United

5   States prior to this particular stop in the metro area?

6   A.  No.

7   Q.  Were you particular with Mr. Rotem's travel elsewhere on

8   that same trip?

9   A.  No.

10  Q.  To your knowledge, did Mr. Leviev travel elsewhere in the

11  United States on this same trip?

12  A.  Yes.

13  Q.  Where else?

14  A.  After the New York trip he traveled to Miami and Las Vegas

15  to look at properties.

16  Q.  How do you know that, Mr. Rechnitz?

17  A.  Because I was invited to join along after putting together

18  the business trip.

19  Q.  Was that all on the same jet?

20  A.  I believe so, yes.

21  Q.  And what kind of a jet was that that Mr. Leviev would come

22  in on?

23  A.  I don't remember the exact model.

24  Q.  Do you remember if it was a -- well, was it a private jet?

25  A.  Yes, it was.

1   Q.  Did you have knowledge of whether it was Leviev's personal

2   jet or whether it was rented?

3   A.  I think he had rented it that trip because I remember

4   seeing an expense account.

5   Q.  Did a police escort in fact happen?

6   A.  Yes.

7   Q.  So I want to direct you to that day.  Did you meet

8   Mr. Leviev when he disembarked from this plane?

9   A.  Yes.

10  Q.  Where?

11  A.  We were on the tarmac at Teterboro Airport and Rotem went

12  to say hello, I waved hello, Jeremy and I were in a vehicle

13  together, and Mr. Leviev's bags got loaded and he sat inside a

14  car in front of us, which was a blue Bentley limousine.

15  Q.  Did you have an understanding of whose car that was?

16  A.  Yes.

17  Q.  Whose?

18  A.  Tamir Sapir.

19  Q.  Who is that?

20  A.  It's now Rotem's father-in-law.  It's a man that we were

21  contemplating doing business with at the time.

22  Q.  Now what happened after Mr. Leviev got in the Bentley?

23  A.  There was a -- we started exiting the airport and there was

24  a police car waiting for us.  It was in New Jersey.  And the

25  police car drove us, with lights and sirens, a car behind us

1    and a car in front of us, until the Lincoln Tunnel.

2            At the Lincoln Tunnel, Jeremy pointed out to me we're

3    going to get waved off by different police, because that was

4    the Jersey police, now the Port Authority, which controls the

5    tunnel, the entire lane, the left lane of the Lincoln Tunnel,

6    was completely available for us with no other cars.  It was

7    shut down.

8    Q.  What happened as you approached the tunnel?

9    A.  So we got waved off and we went inside the tunnel without

10   any other cars.  And when we got outside of the tunnel there

11   were NYPD cars waiting for us which led us to the Peninsula

12   Hotel.

13   Q.  Did you get waved off by Port Authority?

14   A.  Yes.

15   Q.  Where, approximately?

16   A.  Port Authority waved us by the tunnel.

17   Q.  What happened then?

18   A.  Then when the NYPD took over, they took us through the city

19   until the Peninsula Hotel.

20   Q.  Where, approximately, was that located?

21   A.  In the 50s between Fifth and Sixth.

22   Q.  What were you thinking as you were going through the

23   Lincoln Tunnel?

24   A.  This is unbelievable.  Jeremy is very powerful.

25   Q.  And did the escort have the desired effect on Mr. Rosen and

1   Mr. Leviev?

2   A.  Yes, absolutely.

3   Q.  How so?

4   A.  They were very impressed.  Lev had told me this was the

5   treatment he gets in Russia.  He was quite impressed.  And then

6   he invited me to come along on the rest of the United States

7   travel to tour properties.

8   Q.  Did you come to know whether any of the NYPD football team

9   members had connections with New Jersey law enforcement?

10  A.  Yes.

11  Q.  Who?

12  A.  Stephen McAllister.

13          MS. NECHELES:  Objection, your Honor.

14          THE COURT:  Thank you.  I accept the answer.  You can

15  proceed.

16  A.  Stephen McAllister.

17  Q.  How did you come to learn that?

18  A.  I had met in the past Gary McCarthy, who was a friend of

19  Stephen McAllister, Mike Harrington, and he was the chief of

20  police for Newark, and Joey Dunn, who I think was the head of

21  highway or Port Authority, I don't remember which exact

22  division, was a close friend of Steve McAllister, he had told

23  us.

24  Q.  Now you mentioned earlier that Reichberg had the ability to

25  speed people through at Port Authority venues.  Can you

IBQTGRA5                         Rechnitz - Direct

1    describe what that means?

2              MS. NECHELES:  Your Honor, I object to this.  This is

3    more --

4              THE COURT:  Thank you.  Would you like to come up?

5              MS. NECHELES:  Yes.

6              THE COURT:  Please come up.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  I'm sorry, counsel, go ahead.

3           MS. NECHELES:  Your Honor, this is more other act

4    evidence.  The bribery charged here is a bribery in Manhattan,

5    in New York City, they bribed New York City cops.  We have

6    Floral Park, Westchester, at least those were all part of the

7    404(b) motions, the in limine motions.  Now he wants to elicit

8    testimony about speeding people through Immigration, Customs, I

9    don't know, that is not part of the 404(b).

10          This case has become so sprawled that everything that

11   is on Rechnitz's mind apparently comes into evidence.  It has

12   no place.  We have already, as your Honor noted before, went on

13   and on about things that are not part of the charges here.

14          MR. BELL:  Your Honor, for what it's worth, we did not

15   continue to go on and on about de Blasio in which that comment

16   had originally been raised.  This is not a new 404(b) act, this

17   is the same act.  What we are attempting to do is establish the

18   depth of Mr. Reichberg's connections that made that event

19   possible.  We established the NYPD component of it, which is

20   helpful, which is a component of it.  But to be clear, we

21   weren't up on Ms. Necheles' client's phone back in 2008.  We

22   are trying to put together piecemeal on some level how that

23   event happened.  The NYPD is one component of it, but this

24   rounds out the picture.  Frankly, I'm kind of surprised the

25   defense don't want this.

1          THE COURT:  Could I pause you.  The evidence that
2    you're bringing in is related to the asserted lane closure in
3    the Lincoln Tunnel and how it is that it may have been that the
4    New Jersey Police --
5          MR. BELL:  Contributed to this.
6          THE COURT:  Right, and were inspired to do so by
7    virtue of the contribution to New York Police force's football
8    team?
9          MR. BELL:  Insofar as the testimony has shown,
10   Mr. McAllister had contacts with the New Jersey police as well.
11   Reichberg had contacts with the Port Authority Police.  I am
12   happy to not do this, I suppose, but I think that the specific
13   objection being raised is not a valid one, and it's certainly
14   not some sort of far-flung, out-of-left-field act, it all goes
15   to the same act.
16         MS. NECHELES:  He's asking about something else.  I
17   didn't understand it to be about the tunnel anymore.
18         THE COURT:  Understanding what the government's
19   proffer is, do you maintain the objection?
20         MS. NECHELES:  Are you saying that -- I thought he was
21   asking him something about Immigration or Customs, which has
22   nothing to do with Lincoln Tunnel.  I don't understand.
23         MR. BELL:  It's about having contacts within the Port
24   Authority.  Again, it is difficult for us from the outside of
25   Mr. Reichberg's criminal acts to map the entirety of how all of

1    this worked, but to the extent that Mr. Reichberg has contacts

2    within the Port Authority, which we already know is one of the

3    entities that made this escort happen, and we don't have a way

4    through Lieutenant DeMartino, who is just a foot soldier on

5    this, to trace the authority to put in hey, there's an Israeli

6    diplomat coming through, this is what we're trying to do.

7    That's the point.  But the proper point is it does all go to

8    the same point.

9              THE COURT:  So what specifically is the question that

10   you want to ask at this point to establish that, counsel for

11   the United States?

12             MR. BELL:  I have lost it up there, your Honor.  I'm

13   sorry, it's been a long day.

14             I'm just trying to measure Mr. Reichberg's connections

15   to the Port Authority as Mr. Rechnitz understood them.

16             MS. NECHELES:  Could I say something, your Honor?

17             This is the heart of the problem.  They don't have

18   evidence that this was a bribe, and so instead they're trying

19   to put in speculation:  Well, he knew this person, and that

20   person has connections with New Jersey.  It's just pure

21   speculation.  There is no evidence for this.  And that's why

22   this should all be stricken from this case and they should not

23   be able to keep sort of throwing in a mishmash in here of well,

24   he had connection over here and also had connections over here.

25   That's not evidence.  And the government can't stand up here

1     and say well, we don't have access to his phone.  If they can't

2     prove their case, then they can't prove it.  They can't just

3     put things in.

4              MR. BELL:  These are reasonable inferences, Judge.

5              THE COURT:  Is the question that you want to pose what

6     information Mr. Rechnitz has about Mr. Reichberg's connections

7     with the Port Authority that led to the closure?

8              MR. BELL:  Just his connections to the Port Authority.

9     I don't think that Mr. Rechnitz is in a position to

10    forensically trace each of those.

11             THE COURT:  So what Mr. Rechnitz knows about

12    Mr. Reichberg's connections with the Port Authority at the time

13    of the conveyance.

14             MR. BELL:  Yes.

15             MS. NECHELES:  Is it at the time?

16             MR. BELL:  Sure.

17             MS. NECHELES:  But, Judge, whatever happened in the

18    Port Authority, that would not be part of this.  So if they're

19    saying maybe Mr. Rechnitz got contacts over there, this is not

20    404(b) evidence.

21             MR. BELL:  I'll withdraw it.  Let's keep going on.

22             THE COURT:  Thank you.

23             (Continued on next page)

24

25

1          (In open court)

2          THE COURT:  Thank you, counsel.  I'm sorry for the

3    interruption.  Please proceed.

4          MR. BELL:  Thank you, your Honor.

5    BY MR. BELL:

6    Q.  You mentioned Mr. Rosen a moment ago.  Had you ever

7    arranged -- withdrawn.

8          At around the time that you worked with Mr. Rosen, did

9    you enlist the NYPD in doing any favors for Mr. Rosen?

10   A.  Yes.

11   Q.  Of what sort?

12   A.  Like his son's bris.  Jeremy had arranged for officers to

13   stand outside of the ceremony.  In addition, Jeremy had found

14   me somebody we had hired from the bags and pipes division of

15   the NYPD to play at the ceremony.

16   Q.  I would like to put up just for the witness Government

17   Exhibit 611.

18         Are you familiar with what is depicted here?

19   A.  Yes, I am.

20   Q.  How are you familiar with it?

21   A.  This is exactly what we discussed.  This is the bags and

22   pipes NYPD.  They played at the ceremony for his son's bris

23   that we paid.

24         MR. BELL:  The government offers 611.

25         MS. NECHELES:  No objection.

1              MR. MERINGOLO:  No objection.

2              THE COURT:  Thank you.  I'm accepting Government

3     Exhibit 611 into evidence.

4              (Government's Exhibit 611 received in evidence)

5              THE COURT:  You can proceed.

6              MR. BELL:  Could we publish that, Mr. Hamilton.

7              And could we take that down.

8     BY MR. BELL:

9     Q.  Now a few minutes ago, Mr. Rechnitz, I asked you a number

10    of questions about your understanding of the relationship

11    between yourself and Jeremy and the officers that you dealt

12    with over this period of time.  I want to be clear here, did

13    you and Mr. Reichberg also discuss that arrangement?

14    A.  Yes.

15    Q.  Did you discuss the understanding that you had jointly with

16    the officers?

17    A.  Could you repeat that?  I'm not sure I understand the

18    question.

19    Q.  Sure.  Did you and Mr. Reichberg discuss the understanding

20    that you've described with the officers?

21    A.  Jeremy and I have discussed it, yes.

22    Q.  And did anything about your discussions with Mr. Reichberg

23    disturb your understanding that you were giving the officers

24    things in order to get police action?

25    A.  No.

IBQTGRA5                        Rechnitz - Direct

1    Q.  Did it confirm that understanding?

2    A.  Yes.

3    Q.  In what ways?

4    A.  Many times when Jeremy said we have to give this gift or

5    that gift to an officer, he would say:  Come on, they have done

6    a lot for us, they're expecting it.  We need them, we need them

7    to stay happy.  He's a team player.

8            We were very explicit with one another on what to give

9    and when to give it.

10   Q.  You talked about team players.  Was there also a specific

11   term for officers who did not play ball, that is, who got in

12   your and Jeremy's way?

13   A.  Yes.

14   Q.  What was that term?

15   A.  Jeremy had a list on his phone which he called the black

16   and blue list.

17   Q.  What did you understand the black and blue list to be?

18   A.  Cops who had either disrespected Jeremy or caused problems

19   for him or associates of his.

20   Q.  What was the purpose of the black and blue list?

21   A.  To get these cops punished by superiors that he knew.

22   Q.  And did you -- do you recall Mr. Reichberg or yourself

23   sharing knowledge of that list with any superiors?

24   A.  Yes.

25   Q.  Who do you recall him sharing that knowledge of that list

IBQTGRA5                          Rechnitz - Direct

1   with?

2   A.  Michael Harrington.

3   Q.  I want to put up on the witness' screen Government

4   Exhibit 1021.

5            Are you familiar with this communication?

6   A.  Yes, I am.

7   Q.  How are you familiar with it?

8   A.  I had sent a photo of Jeremy black and blue list to Michael

9   Harrington.

10  Q.  And was this the response?

11  A.  Yes.

12            MR. BELL:  The government offers 1021.

13            MS. NECHELES:  No objection.

14            MR. MERINGOLO:  No objection.

15            THE COURT:  Thank you.  I'm accepting Exhibit 1021

16  into evidence.

17            (Government's Exhibit 1021 received in evidence)

18            THE COURT:  Counsel, you can proceed.

19            MR. BELL:  Could we publish that to the jury, please.

20  Q.  This is an email from Mike, mjharrington1020@gmail.com.

21  Who did you understand Mike to be?

22  A.  Michael Harrington.

23  Q.  And for a time, Mr. Rechnitz, was "Mike" actually how

24  Michael Harrington came up in your email?

25  A.  Yes.

1    Q.   Now the subject line is:  Black and blue, ha, ha, ha.

2    There's originally a photograph at the very bottom sent on

3    June 11, 2013.  Is that the photograph you described a moment

4    ago?

5    A.   Yes.

6    Q.   Harrington then responds:  What do you think?  Kelly

7    running.  And you respond:  100 percent.

8            What did that refer to?

9    A.   Running for mayor.

10   Q.   And then later on Harrington and responds:  Get Jeremy's

11   black and blue list ready.

12           What did you understand that to mean?

13   A.   That action would be taken if Kelly wins.

14   Q.   And what sort of action would be taken if Kelly wins?

15   A.   Towards the officers on Jeremy's black and blue list.

16   Q.   Why would that happen if Kelly won?

17   A.   At that time I don't remember who the connection was, but

18   somebody we were connected with, I think Norman, was very close

19   to Ray Kelly.

20           MR. BELL:  So let's take that down, Mr. Hamilton.

21   Q.   Do you recall Mr. Reichberg actually moving to get officers

22   who had crossed him or persons close to him disciplined?

23   A.   Yes.

24   Q.   About how many times would you say that happened?

25   A.   I know in terms of me happening one time that I was

1    involved with.

2    Q.  Tell us about that one time.

3    A.  Ilana Freider and Guy Tanne, who worked for Paul Raps that

4    we spoke about earlier, were -- their boss had a dispute with

5    Lev Leviev at the time, and they felt that there was an officer

6    following them wherever they were walking, and they felt

7    threatened.  And a few days later on they saw that fellow

8    working a parade in midtown and saw he was an officer and got

9    his badge number.

10            I then gave that badge number to Jeremy and Mike

11   Harrington, and Jeremy had told me that it had been taken care

12   of.

13            MR. BELL:  One moment, please.

14            (Pause)

15            MR. BELL:  So I would like to put, with Mr. Hamilton's

16   help, Government Exhibit 306 on the witness's screen.

17            Would it be possible, Mr. Hamilton, to play a little

18   of that without sound.

19   Q.  Mr. Rechnitz, as you watch this, are you familiar with this

20   video?

21   A.  Yes, I am.

22            MR. BELL:  I ask you to play the first 20 seconds of

23   it or so, then stop.

24   Q.  How are you familiar with this video?

25   A.  I took it.

1   Q.  And where were you at the time and what was the reason for

2   taking it?

3   A.  This is in a building on the Upper West Side called the

4   Apthorp in Apartment 2A, and it's a video of Jeremy

5   interviewing Ilana and Guy about what happened to them to get

6   all the details so he could deal with it.

7            MR. BELL:  The government offers Government

8   Exhibit 306.

9            MS. NECHELES:  No objection.

10           MR. MERINGOLO:  No objection.

11           THE COURT:  Thank you.  I'm accepting it Government

12  Exhibit 306 into evidence.

13           (Government's Exhibit 306 received in evidence)

14           THE COURT:  You can proceed.

15           MR. BELL:  Could we publish that to the jury,

16  Mr. Hamilton, and play from the beginning with sound.

17           (Video recording played)

18  BY MR. BELL:

19  Q.  Mr. Rechnitz, what did you understand Mr. Tanne to be

20  referring to?

21  A.  What we just discussed, I guess the off-duty cop that was

22  following him.

23  Q.  Now did Tanne or Freider provide you with any way to figure

24  out the guy's identity?

25  A.  Yes.

IBQTGRA5                        Rechnitz - Direct

1   Q.  What did they provide you with?

2   A.  Besides a photo, they had a video of him.

3           MR. BELL:  So I would ask you to put just on the

4   witness's screen what's been marked for identification as

5   Government Exhibit 302.

6           Here, too, can you play that, Mr. Hamilton, without

7   sound.

8   Q.  Are you familiar with that video?

9   A.  Yes, I am.

10  Q.  How are you familiar with it?

11  A.  Ilana Freider sent it to me.

12          MR. BELL:  The government offers 302.

13          MS. NECHELES:  No objection.

14          MR. MERINGOLO:  No objection.

15          THE COURT:  Thank you.  No objection, I'm accepting

16  302 into evidence.  You can proceed.

17          MR. BELL:  Thank you.  We can publish that to the

18  jury, please, this time with sound.

19          (Video recording played)

20  Q.  What did you and Mr. Reichberg do with the video that

21  Mr. Reichberg had recorded and this video?

22  A.  The video I recorded?

23  Q.  Sorry, the video that he recorded where Mr. Reichberg

24  conducted the interview, and this video.

25          MS. NECHELES:  Objection.

1          THE COURT:  Thank you.  Could I ask you to rephrase
2   the question?
3          MR. BELL:  Sure.
4   Q.  The last two videos that we just saw, what was done with
5   them, if you know?
6   A.  I sent them to Jeremy.
7   Q.  For what purpose?
8   A.  To try and figure out who this individual was.
9   Q.  What came of that?
10  A.  A few days later Ilana and Guy were walking in midtown past
11  some parade, some event, and they saw the man from the second
12  video with a police uniform and his badge on.  And they sent
13  the photo of that to me, which I then forwarded to Jeremy, and
14  he got Mike Harrington involved and told me that he was going
15  to have this cop disciplined.
16  Q.  And to your knowledge, did anything come of that?
17  A.  Yes.
18  Q.  What?
19  A.  I believe he was disciplined.
20  Q.  Based on what?
21  A.  What Jeremy told me.
22  Q.  Now I want to switch gears slightly, Mr. Rechnitz.  I'm
23  going to ask you some questions about the early part of your
24  relationship with Mr. Reichberg.
25          During that period of time, what, if anything, did you

1   do by way of providing NYPD officials with meals?

2   A.  In the earlier years there was a bulk group of meals, just

3   a few of them.  One was, for example, at Abigail's restaurant

4   where we went out with Stephen McAllister, some football guys

5   that he brought, and guys who helped arrange everything for the

6   protestors removal.

7   Q.  Who paid for those meals?

8   A.  That meal was either me or Paul Raps.

9   Q.  To be clear, do you recall any of the officers paying?

10  A.  No.

11  Q.  Do you recall any of the officers asking about payment?

12  A.  No, none did.

13  Q.  Was Abigail a venue on more than one occasion?

14  A.  I think there were two times that we ate there.  That's

15  where Paul liked to go.

16  Q.  Where else did you have these meals early on?

17  A.  At The Prime Grill in the old location on 49th Street

18  between Park and Madison.

19  Q.  What was the purpose of these meals from your standpoint,

20  Mr. Rechnitz?

21  A.  To treat the cops to a meal, get to know them a little

22  better, joke around.

23  Q.  Did you discuss that purpose with Mr. Reichberg?

24  A.  Yes.

25  Q.  What was the purpose of cultivating these relationships

IBQTGRA5                      Rechnitz - Direct

1   with the NYPD officers?

2   A.  Again, like discussed throughout the day, to get these

3   close relationships to get things in return, to have the image

4   of being the big shot, which it ultimately hopefully attracts

5   investors and other sorts of perks.

6           MR. BELL:  I would like to have Mr. Hamilton put up on

7   your screen, Mr. Rechnitz, Government Exhibit 625, 626, 627 and

8   628.  If we could put them up on your screen in succession.

9   Q.  Are you familiar with these images?

10  A.  Yes, I am.

11  Q.  How are you familiar with them?

12  A.  I took them.

13  Q.  And what are these images of, generally speaking?

14  A.  What we just discussed, different dinners at various

15  restaurants we just discussed with various police officers.

16          MR. BELL:  The government offers 625 through 628.

17          MS. NECHELES:  No objection.

18          MR. MERINGOLO:  Judge, I'm going to object.  The

19  witness said he took those pictures but he's in those pictures.

20          THE COURT:  Thank you.

21  Q.  Did you yourself take all the pictures, Mr. Rechnitz?

22  A.  No, but I had them all on my phone.

23  Q.  Were you in fact at all of those -- at the events depicted?

24  A.  I was at each event, yes.

25          MR. BELL:  We offer the four images.

IBQTGRA5                          Rechnitz - Direct

1              MR. MERINGOLO:  No objection.

2              THE COURT:  Thank you.  I'm accepting 625, 626, 627

3     and 628 into evidence.

4              (Government's Exhibits 625 through 628 received in

5     evidence)

6              THE COURT:  You can proceed.

7              (Continued on next page)

IBQKGRA6                          Rechnitz - Direct

1          MR. BELL:  Can we publish 625 to the jury, please.

2   BY MR. BELL:

3   Q.  Where are you -- well, where did this picture take place?

4   And who do you recognize here?

5   A.  I think that that's The Prime Grill.

6          I recognize Michael Harrington -- I'm going from left

7   up -- Michael Harrington, Stephen McAllister, Paul Raps,

8   somebody in between Paul and Jeremy Reichberg, I don't know the

9   fellow to the right of me, and me.  To the left is Chief

10  McCarthy, and the fellow to the left, I've seen him before at

11  Jeremy's Purim party, but I don't remember his name.

12  Q.  Let's look now at 626.

13         Who do we have here?

14  A.  From right to left, Jimmy Grant, Eric Rodriguez, me, Chief

15  McCarthy, and Michael Harrington.

16  Q.  Where is this?

17  A.  Outside at The Prime Grill.

18  Q.  Let's go to 627.

19         Who do we have here?

20  A.  From left to right, it's David Klein from the Leviev

21  Jewelry store, Lisa Klein, his wife, Stephen McAllister, Paul

22  Raps.  The next three people, I'm not sure.  Standing on the

23  right is Jeremy Reichberg.  Moving down is Michael Harrington,

24  Chief McCarthy, me, Jimmy Grant, and a fellow who I met before

25  through Jeremy, I don't remember his name.

IBQKGRA6                          Rechnitz - Direct

```
 1   Q.  628.
 2           Is this the same --
 3   A.  Yes.
 4   Q.  -- scene as one of the pictures we've talked about before?
 5   A.  Yes.  The upper half of the table.
 6   Q.  Are these meals at which the cops paid?
 7   A.  They did not pay.
 8   Q.  As a general practice, for these meals, over this period of
 9   time, did any of the officers pay?
10   A.  No, they did not.
11           MR. BELL:  Let's take that down.
12   Q.  Are you familiar with a place called the Grand Havana Club?
13   A.  Yes, I am.
14   Q.  How are you familiar with the Grand Havana Club?
15   A.  I was a member, and it's a place where I would frequent
16   with Jeremy, Phil Banks, Mike Harrington, and Norman Seabrook.
17   Q.  What is it?
18   A.  It's a cigar club.
19   Q.  Would you take officers to the Grand Havana Club during
20   this period of time?
21   A.  Yes.
22   Q.  Would you treat them?
23   A.  Yes.
24   Q.  To what?
25   A.  Access to the club, alcohol, and cigars.
```

1             MR. BELL:  One moment?

2    Q.  With respect to the early dinners, Mr. Rechnitz, about how

3    much would you say those early dinners cost a head?

4    A.  Anywhere between 50 to 100 dollars a head.

5    Q.  Later on, when you came to have regular meals with

6    Harrington, Banks, and Reichberg, about how much did those

7    meals cost a head?

8    A.  I'd say the same, 50 to 100 dollars a head.

9    Q.  With respect to the Grand Havana Club, about how much would

10   you say you spent per officer when you brought officers there?

11   A.  It's hard to say, because I was a member, so everybody who

12   came would be granted access for free, and I would bring my own

13   cigars.  So if they had a drink, whatever the drinks cost.

14   Maybe 20, 30 dollars an officer.

15   Q.  Is that something that -- is access to the Grand Havana

16   Club something that nonmembers ordinarily can't get?

17   A.  Right.  It's exclusive.

18   Q.  Is it something that in its exclusivity, you recognize a

19   value in?

20   A.  Yes.  It costs me several thousand dollars a year.

21            MR. BELL:  One moment, please?

22            (Pause)

23   Q.  You mentioned an individual named Lin Snider.

24   A.  Yes?

25   Q.  Who was Lin Snider?

1    A.  She was the former wife of the late Ed Snider.

2    Q.  Who was Ed Snider?

3    A.  Ed was a friend.  He was the owner of the Philadelphia

4    Flyers.

5    Q.  Was Ed an important connection to you?

6    A.  Yes.

7    Q.  In what ways?

8    A.  He was an investor, he was a big philanthropist that I

9    became close to, and I thought he was someone who I'd love to

10   be able to impress.

11   Q.  Did there come a point where you provided Lin Snider with a

12   police escort?

13   A.  Yes.

14   Q.  How?

15   A.  I had called Jeremy that she wanted an escort, or I had

16   offered it to her, and he followed up with Mike Harrington and

17   sent Detective Norville to go help her out.

18          MR. BELL:  Mr. Hamilton, can you put Government

19   Exhibit 1256 up on the witness' screen, please.

20   Q.  Are you familiar with this email?

21   A.  Yes.

22   Q.  How are you familiar with this email?

23   A.  It's an email that I had sent to Lin Snider.

24   Q.  What did it concern, generally?

25   A.  Her address for the pickup that we just discussed.

IBQKGRA6                    Rechnitz - Direct

1            MR. BELL:  Your Honor, the government offers 1256.

2            MS. NECHELES:  No objection.

3            MR. MERINGOLO:  No objection.

4            THE COURT:  Thank you.

5            I'm accepting Exhibit 1256 into evidence.

6            You can proceed.

7            (Government's Exhibit 1256 received in evidence)

8            MR. BELL:  Thank you.

9            Can we publish that for the jury.  Why don't we focus

10   on the bottom two emails first.  Perfect, Mr. Hamilton.  Thank

11   you.

12   BY MR. BELL:

13   Q.  The first email at the bottom is April 30th, 2014, from

14   your JSR capital account:  "Need your address to arrange the

15   pickup."

16            A few minutes afterwards, Lin Snider responds:

17   "50 Gramercy Park North."

18            MR. BELL:  Can we go up?

19   Q.  Generally, by the way, for what reasons would Lin Snider be

20   in town?

21   A.  If there was a hockey game, if the Flyers were playing the

22   Rangers.

23   Q.  So you say:  "You're all set.  Unmarked police car will be

24   waiting for you at 6:00 p.m.  Here is my cell if there's any

25   issue."

1          Snider then says:  "Thanks.  How long will it take to
2     get there?  Think 6:15 is too late?  I'm not even at our
3     apartment yet.  I need to change and get ready."
4          You say:  "6:15 p.m. is fine.  He will get you there
5     quickly.  Black Ford Explorer, Lieutenant Norville."  And
6     there's a phone number there.
7          MR. BELL:  You can take that down.
8  Q.  So, again, who did you understand Lieutenant Norville to
9  be?
10 A.  He was a lieutenant who worked for the chief of
11 department's office.
12 Q.  How was it that he came to be providing that escort that
13 evening?
14 A.  Again, I asked Jeremy to speak to Mike Harrington and
15 arrange it, and he did.
16 Q.  What led you to believe that speaking to Jeremy would get
17 Mike Harrington to make an escort happen?
18 A.  Because that's the deal we had.  We would discuss these
19 things with each other.  He dealt with the details, and I was
20 dealing with the financial aspect of things.
21 Q.  Were you familiar with an individual named Jay Lobell?
22 A.  Yes.
23 Q.  Who is he?
24 A.  He's a friend from the Upper West Side.
25 Q.  Did Mr. Reichberg know him?

IBQKGRA6                    Rechnitz - Direct

1   A.   Through me.

2   Q.   Did there come a time when you arranged a police escort for

3   Mr. Lobell?

4   A.   Yes.

5        MR. BELL:   I'll ask Mr. Hamilton to put Government

6   Exhibit 1066 up for just the witness.

7   Q.   Are you familiar with this email?

8   A.   Yes, I am.

9        MR. BELL:   Can we go to the second page briefly,

10  Mr. Hamilton.   And the third page.

11  Q.   How are you familiar with this email?

12  A.   It's an email between me and Jay Lobell.

13       MR. BELL:   The government offers 1066.

14       MS. NECHELES:   No objection.

15       MR. MERINGOLO:   No objection.

16       THE COURT:   Thank you.

17       I'm accepting Exhibit 1066 into evidence.

18       You can proceed.

19       (Government's Exhibit 1066 received in evidence)

20       MR. BELL:   Why don't we publish that for the jury,

21  Mr. Hamilton, beginning with the third page.

22  BY MR. BELL:

23  Q.   At the very bottom, you email Jay Lobell with the subject

24  "Flight:   JFK latest 7:15 and LaGuardia 8:15.   I'll get you a

25  police escort for LGA."

1           Jay Lobell says:  "You're funny.  Isn't there a

2   JetBlue at 9:30?  I thought I took that once."

3              And then you say:  "I'll check, but serious about the

4   escort."

5           MR. BELL:  Let's take that down.  I'll note that

6   that's September 1st of 2014.

7           Let's go to page 2, please.

8   Q.  At the very bottom of the page, Mr. Lobell asks:  "Even

9   from Nassau?"

10          You say:  "Even."

11          Lobell says:  "Cool.  Will be right back to you."

12          MR. BELL:  Let's put that down.  Thank you.

13  Q.  Mr. Rechnitz, you, at 11:10 p.m., say:  "Or private.  Let

14  me price."

15          Mr. Lobell says:  "Otherwise I suspect I bag Mehlon

16  and take the 8:15.  Waste of time to get out to Atlantic Beach

17  to turn around before I get there."

18          MR. BELL:  Let's go to page 1, please.

19  Q.  There are a couple of references to excited to get this

20  done.

21          Did you have business pending with Mr. Lobell?

22  A.  Yes.

23  Q.  Is that what's being referred to here?

24  A.  Yes.

25          MR. BELL:  Let's take that down.  Sorry, just the

IBQKGRA6                          Rechnitz - Direct

1    blowup box.

2    BY MR. BELL:

3    Q.  Now, did you, in fact, to your recollection, provide

4    Mr. Lobell with an expedited ride that evening?

5    A.  I did.

6    Q.  How did you do so?

7    A.  I think Jeremy had arranged for Nussy Josephy to ride him

8    from my recollection.

9              MR. BELL:  Let's take that down.

10             Can you put 1022 up just for the witness for the

11   moment.  And let's take that down.  Thank you.

12   Q.  Now, Mr. Rechnitz, are you familiar with the term

13   "ticket-fixing"?

14   A.  Yes, I am.

15   Q.  What do you understand ticket-fixing to be?

16   A.  When somebody gets a ticket or a moving violation, with the

17   right connection, a cop can get rid of that ticket, so you

18   don't get points.

19   Q.  During the time period we have been describing, the time

20   period when you and Reichberg had this understanding, did you

21   facilitate any ticket-fixing?

22   A.  Yes.

23   Q.  How?

24   A.  I would get tickets from friends or family and give them to

25   Jeremy.

1   Q.  What was your understanding of what Mr. Reichberg did once
2   you gave him the tickets?
3   A.  That he had friends in the police department who would get
4   rid of them.
5   Q.  Now, were there ever points when Mr. Reichberg had lawyers
6   who would assist?
7   A.  Yes.
8   Q.  Was that all of the time, most of the time?  How frequent?
9   A.  No, once in a while.  In the later years of our
10  relationship, I think ticket-fixing became something that was
11  out there in the media, and, you know, it was less easy to do.
12  So he would also get lawyers involved for the cases.
13  Q.  Prior to the point where ticket-fixing became a more public
14  deal, did you understand that you were sending these people to
15  Jeremy, so that he could get people lawyers?
16  A.  No.
17  Q.  What were you sending people to Jeremy to do?
18  A.  To get the tickets eradicated, fixed.
19  Q.  You mentioned that the reason why or a reason why
20  ticket-fixing would be useful was because people might get
21  points on their license.  What are points?
22  A.  When you have points on your license, your insurance goes
23  up, and with too many points, you can get a suspended driver's
24  license.
25  Q.  Why does that matter?

1   A.  Because you won't be able to drive if you get too many

2   points, and it will become costly for insurance, the more

3   points you have.

4   Q.  So why not just pay the ticket as opposed to having

5   somebody pay a fellow like Mr. Reichberg?

6   A.  Because if you pay the ticket, you still get points.

7   Q.  Now, as part of these referrals for ticket-fixing, would

8   you have tickets actually delivered to Mr. Reichberg?

9   A.  Yes.

10  Q.  In what sorts of ways?

11  A.  Email, text message.

12  Q.  I'd like to show you --

13          MR. BELL:  If we can just put these on the witness'

14  screen, Government Exhibits 1033 -- let's just do 1033 for the

15  moment.  And then 1101.  And 1102.

16  Q.  Are you familiar with these emails, Mr. Rechnitz?

17  A.  Yes, I am.

18  Q.  How are you familiar with them?

19  A.  They're between me, and Jeremy, and the fellow who got the

20  ticket, Adam.

21  Q.  And, generally, what do they concern?

22  A.  A ticket -- a copy of the ticket, the ticket number.

23          MR. BELL:  The government offers Government Exhibits

24  1033, 1101, and 1102.

25          MS. NECHELES:  No objection.

IBQKGRA6                        Rechnitz - Direct

1              MR. MERINGOLO:  No objection.

2              THE COURT:  Thank you.

3         I'm accepting 1033, 1101, and 1102 into evidence.

4         You can proceed.

5              (Government's Exhibits 1033, 1101, and 1102 received

6    in evidence)

7              MR. BELL:  We've been going at a healthy trot, your

8    Honor.  I wonder if this would be a good time for a quick

9    stretch break for the jury?

10             THE COURT:  Fine.  I'd be happy to take a short

11   recess.

12             Ladies and gentlemen, during this case, as always,

13   don't talk about the case, don't communicate about it with

14   anyone else, and don't do any research into any of the case or

15   anyone involved in it.  I'll see you all back here shortly.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

 1                  (Jury not present)

 2                  THE COURT:  Ladies and gentlemen, you can be seated.

 3                  Mr. Bell, thank you for raising that.  Does any

 4       defendant need to be excused for a brief break?  Shall we take

 5       a break now?

 6                  MS. NECHELES:  I need to be excused.

 7                  THE COURT:  Thank you.

 8                  So let's take a short five-minute recess.  When we

 9       come back, we'll bring back the jury.  I'll see you all

10       shortly.

11                  MR. BELL:  Thank you, your Honor.

12                  (Recess)

13                  THE COURT:  Thank you.  You can be seated.

14                  Mr. Daniels, can you please bring the jury back in.

15                  Counsel, while we're waiting for the jury to come in,

16       it's my thought to end our trial day around 3:00.  Mr. Bell, if

17       you can try to aim for that time.

18                  MR. BELL:  I'll do what I can, Judge.

19                  THE COURT:  Good.  If you want to extend beyond that,

20       please let me know, but I want to try to end around then.

21                  MR. BELL:  Understood.

22                  (Continued on next page)

23

24

25

1              (Jury present)

2              THE COURT:  Thank you.  Ladies and gentlemen, you can

3    all be seated.

4              Thank you.

5              Mr. Bell, you can proceed.

6              MR. BELL:  Thank you, your Honor.

7    BY MR. BELL:

8    Q.  I believe that we just got 1033, 1101, and 1102 admitted.

9              MR. BELL:  I'd like to publish 1033 to the jury.  Can

10   we go to the second page, please.  Can we focus in on the two

11   exchanges here.

12   Q.  There's an email exchange between you and an Adam

13   Westreich.  Who is Adam Westreich?

14   A.  A friend of mine.

15   Q.  And Westreich writes, on October 22nd of 2013:  "Just got

16   ticket for an illegal right turn in Manhattan.  Know anyone?"

17             What did you understand that to be a request for?

18   A.  Ticket-fixing.

19   Q.  You then say:  "Yes.  Plead not guilty and give me letter

20   when it comes."

21             MR. BELL:  Let's take that blowup box down and go to

22   the first page and the bottom two or three volleys.

23   Q.  Westreich responds:  "Not guilty with no defense?"

24             You say:  "Wait until Friday to respond.  I'll tell

25   you what to do.  Stand by."

IBQKGRA6                          Rechnitz - Direct

1              A couple of days pass, and Mr. Westreich writes three

2     days later:  "Just following up."

3              MR. BELL:  Let's go to the top of the page.

4     Q.  "Hate to be a pain.  If nothing to be done, I'll hire an

5     attorney."

6              And instead of Mr. Westreich hiring an attorney, you

7     respond to Westreich and Reichberg:  "Jeremy, meet Adam.  He

8     has an issue to discuss with you."

9              Prior to sending that email out, had you alerted

10    Mr. Reichberg to this issue?

11    A.  Yes.

12    Q.  What had you told him?

13    A.  Yes, I told him that Adam was a friend who needed

14    assistance to get rid of his ticket, and he could be a charge

15    case, he could make money on it.

16    Q.  What did you mean by "a charge case"?

17    A.  Jeremy could charge him money for it.

18             MR. BELL:  Let's take that down, and let's go to 1101.

19    Let's focus on the top half of the page, please.

20    Q.  Westreich, as part of the same thread, says:  "Thanks,

21    Jona.  Jeremy, nice to meet you.  See attached ticket I

22    received for illegal right turn onto Madison Avenue and 37th

23    Street.  Cop didn't seem to care that I am Hatzolah EMS or that

24    I have a perfect driving record.  Is this something you can

25    help with?"

1           What is Hatzolah?

2    A.   The volunteer ambulatory service.

3    Q.   Is that the same volunteer ambulance service that Nussy

4    Josephy was affiliated with?

5    A.   Yes.

6    Q.   Jeremy responds:  "Hi.  Do you have the name of the cop?"

7           Westreich responds:  "No.  Can't make it out on the

8    ticket either.  He's from Precinct 17, and there is a badge

9    number."

10          MR. BELL:  Can we put up 1102, please.  Can we go to,

11   I guess, the top two-thirds or so, from that point up.  A

12   little over.  Thanks.

13   Q.   Westreich responds:  "Jeremy following up.  Can anything be

14   done?"

15          Westreich responds:  "Should I just assume nothing can

16   be done from your end, and I will hire an attorney?"

17          Mr. Reichberg responds:  "Sorry.  Are you available to

18   meet on Monday at 2:30 p.m., so I can discuss it with you?"

19          Did you ever hear back from Jeremy as to how this

20   went?

21   A.   No.

22          MR. BELL:  Let's take that down.

23          I want to put up for the witness Government Exhibits

24   1048 and 1065.

25   Q.   Are you familiar with these email exchanges?

IBQKGRA6                        Rechnitz - Direct

1   A.  Yes, I am.

2   Q.  Beginning with the one on the left, how are you familiar

3   with it?

4   A.  I'm in the email.

5   Q.  Who is it between?

6   A.  Shea Schwebel and myself.

7   Q.  Who is Shea Schwebel?

8   A.  A friend.

9   Q.  That's January 18th of 2014.

10          The one on the right, 1065, are you familiar with that

11  email?

12  A.  Yes.

13  Q.  Who is it to?

14  A.  Between me, Shea, and Jeremy.

15  Q.  And that is August 29, 2014.

16          MR. BELL:  Your Honor, the government offers 1048 and

17  1065.

18          MR. MERINGOLO:  No objection.

19          MS. NECHELES:  No objection.

20          Your Honor, can I just have the attachment?  1065.

21          THE COURT:  Thank you.

22          Counsel for the United States, is there an attachment?

23          MR. BELL:  These are both one-page documents.

24          THE COURT:  Thank you.

25          I'm accepting 1048 and --

1           MS. NECHELES:  Your Honor, we would object without the

2    attachments.  We would ask the attachments be included.

3           THE COURT:  Thank you.

4           MR. BELL:  May I briefly confer with Ms. Necheles and

5    potentially save us a sidebar?

6           THE COURT:  Thank you.  Please take your time.

7           MS. NECHELES:  Your Honor, we'll continue to discuss

8    this later.

9           THE COURT:  Thank you.

10          I'm accepting 1048 and 1065 into evidence.

11          You can proceed.

12          (Government's Exhibits 1048 and 1065 received in

13   evidence)

14          MR. BELL:  Thank you, your Honor.

15          Can we publish 1048 to the jury, please.  Just 1048.

16   Can we focus in on the bottom two.  Actually, the bottom three.

17   BY MR. BELL:

18   Q.  So, on January the 17th of 2014, at 9:27, Schwebel writes:

19   "Sorry to bother you with this.  Got these two notices in the

20   mail today.  Let me know if you need me to do anything.  Have a

21   good shabbos.  Shea."

22          Then there are two what appear to be attachments

23   labeled "Suspension Notice" and some numbers.

24          Do you recall what these were?

25   A.  I believe that they were suspension notices for his son who

1    got pulled over.

2    Q.  You then say:  "Perfect.  I'll handle.  Thanks."

3           And then a few hours -- well, that's at 12:25 p.m.

4    Then at 9:53 a.m., Jeremy Reichberg wrote:  "I'll handle.  Have

5    a great Shabbos."

6           Do you recall, by the way, where you were in January

7    of 2014?

8    A.  I think I was in Los Angeles.

9    Q.  Did you have an understanding of where Jeremy Reichberg

10   was?

11   A.  In New York.

12   Q.  Is there a time difference between those two locations?

13   A.  Three hours.

14          MR. BELL:  Let's put that down.  Rather, let's keep

15   the exhibit up, sorry.  Well, actually, yes, let's take the

16   whole thing down.  Thank you.

17          Can we put up 1065.  Can we focus in on the bottom

18   message, please.

19   Q.  So in this email, Shea Schwebel writes, on August 9, 2014,

20   at 4:08:  "Got this in the mail.  Hearing pushed off till

21   6/30/15."

22          There is an attachment, or at least sign of an

23   attachment, called "sheaschwebelhearingnotice.PDF."

24          What did you understand that to be, Mr. Rechnitz?

25   A.  A notice pushing off his hearing.

1    Q.  And what was the hearing related to?

2    A.  His ticket.

3            MR. BELL:  So let's jump out of that blowup box,

4    Mr. Hamilton, but keep the exhibit up, please.

5    Q.  There is an email from you to Shea Schwebel and Yirmi

6    Reichberg.  Who was Yirmi, with a Y, Reichberg?

7    A.  Jeremy.

8    Q.  That's just a smiley face.  What was the message behind

9    that smiley face?

10   A.  That he was successful in pushing off the ticket hearing.

11           MR. BELL:  Let's take that down.

12           Can we publish, just for the witness, what's been

13   marked for identification as Government Exhibits 1063 and 1090.

14   Can we focus in on the text of each.

15   Q.  Are you familiar with these emails, sir?

16   A.  Yes.

17   Q.  How are you familiar with them?

18   A.  I'm in the email.

19   Q.  Who are they with?

20   A.  A friend, Judah Wassner and Michael Wassner.

21   Q.  Are Michael and Judah Wassner related in some way?

22   A.  Father and son.

23           MR. BELL:  The government offers 1063 and 1090.

24           MS. NECHELES:  No objection.

25           THE COURT:  Thank you, counsel.

IBQKGRA6                         Rechnitz – Direct

1           MR. MERINGOLO:  No objection.

2           THE COURT:  Thank you.

3           I'm accepting 1063 and 1090 into evidence.

4           You can proceed.

5           (Government's Exhibits 1063 and 1090 received in

6    evidence)

7           MR. BELL:  Thank you.

8           Can we publish 1063 to the jury, please.  Can we just

9    focus in on the text.

10   BY MR. BELL:

11   Q.  The bottom email is between Wassner and yourself.  It says:

12   "Hey Jona.  Got pulled over by a Nazi state police on Friday

13   for passing on the right.  Totally not my fault.  Long story.

14   I'll tell you on the phone.  Is there anything you can do about

15   it?  Let me know, please, because I have to respond or appear

16   in two weeks.  Sorry to bother you.  Thanks."

17          You then forward that email to Jeremy Reichberg with a

18   message:  "To discuss."

19          What was your intention with respect to that

20   August 12, 2014 email, "To discuss"?

21   A.  For Jeremy to fix the ticket.

22   Q.  Did you ultimately discuss it with Mr. Reichberg?

23   A.  Yes.

24   Q.  What, if anything, came of it?

25   A.  I believe he was successful in getting rid of the ticket.

IBQKGRA6                          Rechnitz - Direct

1        MR. BELL:  Let's take that down, and let's look at

2   1090.

3   BY MR. BELL:

4   Q.  Are you familiar with wassnerjl@aol.com?

5   A.  Yes.

6   Q.  Whose email address is that?

7   A.  Judah Wassner.

8   Q.  This email was sent on April 7, 2013, to Jeremy Reichberg;

9   "Subject:  Status."  Wassner writes:  "Hope all is good.  I'm

10  just looking for the status of an old ticket of mine," and

11  there are some numbers.  Thanks, Judah Wassner."

12       Had you introduced Wassner to Reichberg prior to that

13  point?

14  A.  Yes.

15       MR. BELL:  Let's take that down.

16       Let's put up for the witness Government Exhibit 1092.

17  Q.  Are you familiar with this email?

18  A.  Yes, I am.

19  Q.  How are you familiar with it?

20  A.  I was involved in the case.  David Scharf reached out to me

21  to get Jeremy involved.

22       MR. BELL:  The government offers 1092.

23       MS. NECHELES:  No objection.

24       MR. MERINGOLO:  No objection.

25       THE COURT:  Thank you.

1          I'm accepting 1092 into evidence.

2          You can proceed.

3          (Government's Exhibit 1092 received in evidence)

4          MR. BELL:  Let's publish that, Mr. Hamilton.

5     BY MR. BELL:

6     Q.  Mr. Rechnitz, did you know a person named Y. David Scharf?

7     A.  Yes.

8     Q.  Who is Mr. Scharf?

9     A.  A friend and a former attorney of mine.

10    Q.  Did he practice at a law firm called Morrison Cohen LLP?

11    A.  Yes.

12    Q.  So in the below email, Mr. Scharf writes to Jeremy

13    Reichberg:  "J, the chairman of my law firm's son got clocked

14    doing 96 miles per hour on 684 by a state trooper.  Can you

15    help?"

16         Mr. Reichberg writes:  "For you, of course."

17         All of this on June 9th of 2013.

18         Did you have an understanding of Mr. Scharf and

19    Mr. Reichberg having dealings with each other?

20    A.  Just through me, yes.

21         MR. BELL:  Let's take that down.

22         Can we put up, just for the witness, Government

23    Exhibit 1106.

24    Q.  Do you know an individual named Seymour Huberfeld?

25    A.  I think it's an English name.  Huberfeld, I'm not sure.

IBQKGRA6                    Rechnitz - Direct

1   Q.  Generally, did you know the Huberfeld family?

2   A.  Yes.

3   Q.  What members of the Huberfeld family were you closest to?

4   A.  Marie and Laura, but I now realize who Seymour is.

5   Q.  And did you know him?

6   A.  Yes.

7   Q.  Was he known by other names?

8   A.  Shalom.

9   Q.  Did you have an understanding of there being a relationship

10  at this point between Mr. Reichberg and Mr. Huberfeld?

11  A.  Yes.

12  Q.  And what role, if any, did you have in bringing that

13  relationship into being?

14  A.  I introduced them.

15          MR. BELL:  The government offers 1106.

16          MS. NECHELES:  No objection.

17          MR. MERINGOLO:  No objection.

18          THE COURT:  Thank you.

19          I'm accepting Exhibit 1106 into evidence.

20          (Government's Exhibit 1106 received in evidence)

21          MR. BELL:  We're publishing that, Mr. Hamilton, to the

22  jury as it's on the screen.

23  BY MR. BELL:

24  Q.  This is an email from Seymour Huberfeld, or Shalom

25  Huberfeld, on November 5, 2013, at 6:30 p.m., to Jeremy

1    Reichberg; "Subject:  My wife's tickets."

2             Huberfeld says:  "Hearing is on November the 8th.  Are

3    you taking care of this, or does my wife need to go?"

4             Mr. Rechnitz, did you even have a role in putting

5    Seymour Huberfeld and Jeremy Reichberg together for purposes of

6    this ticket?

7    A.  No.

8    Q.  Did you understand that at times -- did you have an

9    understanding that at times persons you had introduced

10   Reichberg to would contact him without going through you?

11   A.  Yes.

12            MR. BELL:  Let's take that down.

13            At this time, the government would offer Government

14   Exhibit W-04026.  This is a wiretap conversation pursuant to

15   the wiretap stipulation.

16            THE COURT:  Thank you.

17            Counsel?

18            MS. NECHELES:  One minute, your Honor?

19            No objection, your Honor.

20            MR. MERINGOLO:  No objection, Judge.

21            THE COURT:  Thank you.

22            I'm accepting W-04026 into evidence.

23            You can proceed.

24            (Government's Exhibit W-04026 received in evidence)

25            MR. BELL:  One moment, please?

1           (Pause)

2           MR. BELL:  So with the Court's permission, I would ask

3    the jury to go back to their binders, go to tab W-04026, 4026.

4    If you're having a good time with the screens, I suppose you

5    could also just follow along with the screens.  4026-T, which

6    corresponds with 4026, just admitted.

7           With the Court's permission, I'd ask to have that call

8    played.  It's a February 24, 2015 call at 4:43 p.m. between

9    Mr. Reichberg and Mr. Rechnitz.

10   BY MR. BELL:

11   Q.  Mr. Rechnitz, you can follow along on the screen.

12          MR. BELL:  If everybody's got it -- great.

13          Go ahead, Mr. Hamilton.

14          (Audio playback)

15   Q.  So, Mr. Rechnitz, at this point, when you and Mr. Reichberg

16   are discussing lifting a suspension, and putting it back on the

17   calendar, and dollar figures, what are you discussing here?

18   A.  We're discussing a ticket for my friend's son.

19   Q.  What is it that the money that's being mentioned is for?

20   A.  To pay somebody $500 to get rid of the ticket in addition

21   to fees that have to be paid to the state.

22   Q.  What kind of somebody do you understand the somebody to be,

23   Mr. Rechnitz?

24   A.  I believe it to be somebody in the NYPD.

25          MR. BELL:  Now let's take that down.

1    Q.  In the time we have remaining, I'd like to ask you some

2    questions about some specific things that you and Mr. Reichberg

3    did for Mr. Grant.

4            Did you know where Grant lived?

5    A.  Yes.

6    Q.  Where did he live?

7    A.  Staten Island.

8    Q.  And what, if anything, were you aware of either yourself or

9    Jeremy doing with respect to Grant's house?

10   A.  We had paid for some railing work to be done on his house

11   and something to do with some windows.

12   Q.  What conversations, if any, do you recall having with

13   Mr. Reichberg about the railings?

14   A.  I remember not wanting to pay for it, it was something

15   around $6,000, and Jeremy said:  No, we got to do it for him.

16   He's been good to us, he's expecting it.  I would do it if I

17   could to it on my own.  I just don't have the money.  We got to

18   do it.  I already committed.

19   Q.  Did you lay out money for the railings?

20   A.  Yes.

21   Q.  In what form?

22   A.  I don't remember how I paid, but probably cash.  I only

23   paid for part of it.

24   Q.  Who did you understand was going to be paying for the rest?

25   A.  Jeremy.

IBQKGRA6                          Rechnitz - Direct

1    Q.  You also mentioned windows.  To what extent did you and

2    Mr. Reichberg discuss windows?

3    A.  The house that Jeremy wanted some work done for some

4    windows, and I did not want to partake in that.

5    Q.  Did Mr. Reichberg ask you to partake in that?

6    A.  Yes.

7    Q.  What, if anything, came of that?

8    A.  Nothing that I'm aware of.  I just know that the railing

9    got done.

10   Q.  Now, you testified earlier that you got James Grant an

11   upgrade on a watch.  How did you come to do that, Mr. Rechnitz?

12   A.  We had -- it had been known from Jeremy that I purchased

13   some watches for other people, so Jimmy one day came down to

14   meet us, and he said, do I know any watch store we could trade

15   a Breitling for another watch.  So as he came to the store, I

16   saw the watch he wanted to buy and what he wanted to trade in,

17   and, ultimately, he traded his watch, and I paid the difference

18   for him as a gift.

19   Q.  About what was the difference?

20   A.  Under a thousand dollars.

21        MR. BELL:  Can we put up Government Exhibit 915,

22   please, which I believe is already in evidence.

23        MR. MERINGOLO:  Judge, can we get a time frame when

24   this happened?

25        THE COURT:  Thank you.

IBQKGRA6                         Rechnitz - Direct

1          Counsel, you can proceed.

2          MR. BELL:  Thank you.

3          Can we put up Government Exhibit 915, please.

4    BY MR. BELL:

5    Q.  Let's get a time frame.  Let's focus in on the top half of

6    this.

7          Well, first of all, are you familiar with the

8    transaction memorialized in this paperwork?

9    A.  Yes.  This is the transaction we just spoke about.

10   Q.  According to this document, when did it happen?

11   A.  December 24th, 2015.

12   Q.  Does that accord with your memory?

13   A.  I don't remember exactly when it was.

14   Q.  Now, it says here -- withdrawn.

15         And so it says:  "Paid Difference:  800."

16          What do you understand that to be referring to?

17   A.  The $800 difference I just spoke about between the trade-in

18   and the new watch.

19         MR. BELL:  Can we zoom back out, Mr. Hamilton.

20   Q.  Now, I want to show you what's in evidence now -- hang on a

21   second.

22         (Counsel confer)

23         MR. BELL:  I'd like to approach the witness and hand

24   him what I believe is already in as Defense Exhibit JR-9201.

25         THE COURT:  Please proceed.

IBQKGRA6                          Rechnitz - Direct

1    BY MR. BELL:

2    Q.   Have you gotten the opportunity to review that exhibit

3    prior to your testimony right now?

4    A.   Yes.

5    Q.   That exhibit has already been entered in as a compilation

6    of records of transactions you were involved in with Motion In

7    Time.

8            To your knowledge, does that collection include every

9    transaction that you had with Motion In Time?

10   A.   No.

11   Q.   Are there transactions missing?

12   A.   Yes.

13   Q.   What transactions are missing?

14   A.   The Breitling I bought for Dave Colon, the Breitling I

15   bought for Fernando Mateo, other watches.  A Rolex, I notice,

16   is missing.

17   Q.   Generally, when you did business with Motion In Time, how

18   did you pay?

19   A.   Sometimes by check, sometimes credit card, sometimes cash.

20   Q.   Are there transactions within there -- and I'd ask you to

21   review the exhibit -- that you paid for in cash?

22   A.   Any of the ones I could recall for cash, I don't see here.

23   Q.   Thank you.

24           So just so we have an understanding of the complete

25   picture, do you recall purchasing watches or upgrades on

1   watches for officers other than David Colon and Jimmy Grant?

2   A.   Yes.

3   Q.   Who?

4   A.   Steve McAllister.

5   Q.   What did you get for Mr. McAllister?

6   A.   A Chopard watch.

7   Q.   Is that transaction in there; that is, the defense exhibit?

8   A.   I believe so.

9   Q.   Can you locate it, if it is, and just tell us what page

10   it's on?

11   A.   The second -- the second page.

12   Q.   Thank you.

13          Now, did there come a time when you took officers on a

14   private jet trip to Las Vegas?

15   A.   Yes.

16   Q.   Approximately when was that?

17   A.   For the Super Bowl in 2013.

18   Q.   In twenty what year?

19   A.   I think it was 2013 -- 2014.

20   Q.   And how did you get there?

21   A.   Private jet.

22   Q.   Who made arrangements for the private jet?

23   A.   I did.

24   Q.   About how much did it cost you?

25   A.   About 30, 35 thousand dollars.

1   Q.  Did you make the arrangement through a particular company?

2   A.  Yes.

3   Q.  What company was that?

4   A.  Apollo Jets.

5   Q.  How long were you in Vegas once you got there?

6   A.  Just for the Super Bowl, in and out, overnight.

7   Q.  Who did you take with you?

8   A.  Marco Franco, Jeremy Reichberg, Mike Milici, James Grant,

9   and Gabi Grecko.

10  Q.  Who did you understand Gabi Grecko to be?

11  A.  A prostitute.

12  Q.  And who is Marco Franco?

13  A.  A friend of mine.

14  Q.  How did Marco Franco wind up on the trip?

15  A.  I had invited him to come along.

16  Q.  How did Jeremy Reichberg and the officers come to join you

17  on that trip?

18  A.  Jeremy had told me that Jimmy Grant wanted to come on the

19  trip, he really wanted to come see the Super Bowl in Vegas with

20  us.  And I explained to Jeremy that this was a one-time a year

21  that I go and I meet from friends from L.A., it's my break to

22  get away, and I didn't want a cop or cop world with me there,

23  and that I would not be hanging out with them, and I thought it

24  was a bad idea.

25  Q.  What was the response that you got?

IBQKGRA6                    Rechnitz - Direct

1   A.  He said:  No, we're going to watch it on our own.  We won't

2   be in your way.  I already told him he can come.  Let's go,

3   come on.  So I agreed.

4   Q.  Did you, in fact, travel with Jeremy and other persons he

5   brought along?

6   A.  Yes.

7   Q.  And who did he bring along?

8   A.  Mike Milici, Gabi Grecko, and Jimmy Grant.

9   Q.  Did you know Gabi prior to your boarding the private plane?

10  A.  No.

11  Q.  Had you traveled with Mike Milici before?

12  A.  Yes.

13  Q.  Where to?

14  A.  The Dominican Republic.

15  Q.  What was your understanding of why Jimmy Grant was being

16  brought along for that trip?

17  A.  He wanted a trip to get away, and it was something as a

18  gift, to take along -- to take him along for an all expense

19  paid trip.

20  Q.  How about Milici?

21  A.  Same thing.

22  Q.  And whose idea was each of those things?

23  A.  Jeremy's.

24  Q.  Who was -- as per Marco Franco, whose idea was it to bring

25  him along?

IBQKGRA6                          Rechnitz - Direct

1    A.  Mine.

2              MR. BELL:  We are nearing a good stopping point, I

3    think.  We can ask more about the trip tomorrow.

4              THE COURT:  Good.  That's fine.

5              So, ladies and gentlemen, it's about 3:00 o'clock.

6    I'm going to propose that we end our trial day now.  During

7    this break, as always, ladies and gentlemen, please don't

8    discuss the case at all amongst yourselves, don't discuss it or

9    communicate about it with anyone else, and don't do any

10   research about the case.  To the extent you see any press about

11   the case, don't read it or pay any attention to it.

12             I'll see you all tomorrow.  Thank you very much.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (Jury not present)
 2                  THE COURT:  Thank you, ladies and gentlemen.  You can
 3     be seated.
 4                  Mr. Rechnitz, thank you for your testimony today.  You
 5     can step down.  Please be prepared to recommence tomorrow
 6     morning no later than 9:00.
 7                  So, counsel, I'd like to talk about a few things.
 8     First, are there any issues that any party would like to raise
 9     with the Court?
10                  First counsel for the United States?
11                  MR. BELL:  I don't think so, your Honor.  Oh, wait.
12                  MS. LONERGAN:  Your Honor, one moment.  If we are
13     actually going to discuss things, would it be okay for our
14     paralegals to put some transcripts into the jury's transcript
15     binders during this discussion right now?
16                  THE COURT:  Thank you.
17                  Has the defense seen them and agreed that they are
18     accurate?
19                  MS. LONERGAN:  They were produced to the defense, yes,
20     your Honor.
21                  MR. MERINGOLO:  When?
22                  MS. LONERGAN:  Your Honor, actually, we'll wait to do
23     it till tomorrow, if that's okay with the Court.
24                  THE COURT:  That's fine.  I don't mind at all you
25     taking the time.  I just want to make sure that the defense is
```

1   also in agreement that those should be made.

2          Counsel, any other comments or issues that you'd like

3   to bring to my attention?

4          First, counsel for Defendant Reichberg?

5          MS. NECHELES:  Your Honor, I have a little

6   housekeeping matter.

7          THE COURT:  Please proceed.

8          MS. NECHELES:  I would just request that lawyers from

9   my office or investigators be allowed to sit in the front row,

10  as traditionally the lawyers are.  For some reason, it's

11  labeled government.

12         THE COURT:  Thank you.

13         Are there additional lawyers or people working with

14  your office who would like to sit there?

15         MS. NECHELES:  Yes.

16         THE COURT:  We may be able to move you forward a

17  table.  I'll talk with the people that make dispositions of the

18  seating arrangements.

19         MS. NECHELES:  Part of the reason I would ask that for

20  the lawyers -- I understand that they didn't want family

21  members sitting there -- so that I can talk to them, if I need

22  to.

23         THE COURT:  Thank you.

24         Let me consider that issue, and I will come back to

25  you --

1             MS. NECHELES:  Thank you.

2             THE COURT:  -- on it promptly.

3             MS. NECHELES:  Lawyers or paralegals.

4             THE COURT:  Thank you.  Understood.  Again, there's an

5    extra table that's available at the front, and it may be that

6    we can move you forward, and place your legal assistants also

7    at the back table, and continue to reserve the bench in the

8    audience.

9             Counsel for Mr. Grant, any issues you'd like to raise?

10            MR. MERINGOLO:  No, nothing.

11            THE COURT:  So, counsel, just a couple of things that

12   I'd like to talk about.

13            First is the limiting instruction that I described

14   briefly at the sidebar.  We've discussed this issue previously.

15   I've now heard what I understand will be Mr. Rechnitz's

16   testimony regarding alleged -- I'll say his and Mr. Reichberg's

17   participation allegedly with Mr. Offinger and the office of the

18   mayor.  The issue that I'd like to discuss is the propriety of

19   a limiting instruction to make it clear to the jury that the

20   type of conduct that we just heard testimony about; namely,

21   campaign donations and campaign donations with some expectation

22   of that politician will help to arrange meetings and the like

23   is not itself a criminal act.

24            I don't think that that's a question, as a matter of

25   law, after McDonnell.  My concern is that the jury, having

IBQKGRA6                          Rechnitz - Direct

heard that testimony in the midst of a series of comments about

other acts, may take that conduct as itself being illegal,

improper conduct.  I described the conduct separate and apart

from the strawman donations that were described by

Mr. Rechnitz, which I understand to more clearly potentially be

a violation of law.

          But, counsel for the United States, I'd like to hear

your views.  I'm looking at the defendants' proposed limiting

instruction and Attachment B to their October 25th letter,

which specifically addresses this issue.  Now that I've heard

the testimony, I am concerned, as I said, that the jury may

take that conduct as having been illegal as opposed to not

illegal.  I'd like to take up the question of whether I should

amplify the limiting instruction that I previously provided

with respect to Mr. Rechnitz's testimony.

          (Continued on next page)

IBQTGRA7

1            MR. BELL:  Thank you, Judge.

2            Judge, our issues are the same as what they were

3   before, but I think it's important to properly appreciate

4   Mr. Rechnitz's testimony, first and foremost, particularly now

5   that it's in.

6            Let's be clear, Mr. Rechnitz testified as to having an

7   explicit understanding with Mr. Reichberg and developing an

8   explicit understanding with a representative of a future

9   political official that he would in fact get action,

10  specifically get action, not just access, action in response to

11  those campaign donations.

12           Now we recognize that this sort of quid pro quo

13  operates differently than it would, say, as to Mr. Seabrook in

14  the private honest services realm, because there are First

15  Amendment issues with the donations.  But even with those,

16  let's be clear, the question is whether or not there is an

17  explicit exchange, A, of actual official action, B, and both we

18  respectfully but strenuously submit are fulfilled by the

19  testimony.

20           Mr. Rechnitz testified as to several specific ways in

21  which he benefited in with respect to the preschool issue on

22  the Upper East Side in which the people affiliated with that

23  preschool were involved with an issue of whether or not they

24  would have to close, per direction of the city, that Ross

25  Offinger fixed that issue.  The water bill being lowered, which

IBQTGRA7

1    is about as official an action as you can have, for the Sunset

2    Park property that Mr. Rechnitz described, is something that he

3    also specifically described.

4              THE COURT:  Just to pause you --

5              MR. BELL:  Sure.

6              THE COURT:  -- with respect to the preschool issue,

7    Mr. Rechnitz testified that the preschool was allowed to stay

8    in the space.

9              With respect to the others, my recollection of the

10   testimony was that Mr. Rechnitz stated that Ross put the

11   relevant people in touch with the departments to get an answer

12   regarding various issues.  He responded in that way with

13   respect to the history of the series of issues that were

14   described.

15             MR. BELL:  That was true, your Honor, with respect to

16   Ocean Parkway property, another area that Rechnitz talked about

17   in that same litany, but the testimony involving lowering the

18   water bill is not only unequivocal in terms of his actually

19   getting a result, but unequivocal in terms of whether that

20   constitutes an act.

21             Moreover, even before you get to the ways in which

22   Mr. Rechnitz and persons associated with him were able to cash

23   in as a result of that arrangement, you have still got the

24   issue of conspiracy.  And if the conspiracy exists, if the

25   agreement exists where we are going to get actual results on

IBQTGRA7

1   the official action front as a result of the donations that

2   we're making, then we're still stuck in the exact same place

3   that we were, which is even understanding the more stringent

4   limitations as they apply to political donations, how is this

5   not illegal?  Even post *McDonald*, how is that not illegal?

6          The solution to us --

7          THE COURT:  Counsel, so it's clear to the United

8   States Attorney's Office, I don't understand in this instance

9   why it is that the government seeks to put on evidence here of

10  these uncharged acts in this case with respect to this conduct.

11  And the issue here, as I understand it, is that the government

12  wishes to put on evidence that this set of conduct is itself

13  illegal and violates the law.  If you're not taking that

14  position, it's not clear to me why it is that the kind of

15  limiting instruction described by the defendants in the

16  Attachment B to the original letters, is inappropriate here in

17  order to eliminate possible confusion by the jury since you're

18  not asking them to find that this conduct was itself illegal.

19         MR. BELL:  There are a couple of reasons, your Honor.

20  One of them is something that we have done our part to try to

21  dance elegantly around but is still an issue, and it's an issue

22  that we fronted to the Court before, which is that this is

23  conduct that Mr. Rechnitz admitted to as part of his guilty

24  plea.

25         There is the still-lingering concern that what will

happen now is on cross-examination either Ms. Necheles or

Mr. Meringolo or both are going to essentially ask a line of

questioning that will suggest that Mr. Rechnitz, in his zeal to

please the government, pled guilty to things that weren't

actually crimes.  If we're foregoing that sort of testimony

entirely, and if we can get that representation from the

defense, then it's a slightly different issue.  But these are

things that he pled guilty to.  And if they are going to elicit

that fact on cross, then it's still a problem, and whether or

not that is still legal still matters.

        In addition to that, the reasons why we wanted to go

into this de Blasio or this political world generally concern

the fact that all of this was happening in the way that we

described sort of apiece.  But we had very little choice but to

go in greater depth here once the defense said that no matter

what they would bring this stuff out for impeachment purposes

because they don't believe it actually happened or they intend

to prove that it didn't actually happened.

        We have reached a point, your Honor, where, as a

result of the defense proposal, we were going to just excise

that whole thing.  That's not something that we can't do.  But

more importance than that, on a very basis level, these are

offenses that Jona Rechnitz committed.  These are offenses that

he understood to be offenses at the time that he gave his

guilty plea, and nothing within the analysis that we have

IBQTGRA7

gotten from the defense nor in what he has told us so far does
anything dislodge that, so it would be legal error to tell the
jury otherwise.

We can certainly tell the jury exactly what it was
that the government has proposed from the very beginning:  One,
that Mr. Reichberg is not on trial for this conduct, that no
one is on trial for that conduct; two, that it is not their
concern whether it's against the law or not.

We're not putting it in to establish that it is
illegal as a matter of law.  We're putting it in for the
reasons that I just enumerated.  And for those reasons, our
instruction, as originally proposed, seems by far the more
correct way to go about doing this.

To have a pronouncement from your Honor that this
conduct is legal, I think would be, A, very probably wrong as a
factual matter, B, open the door to a confusing issue involving
Jona Rechnitz's plea allocution, which is exactly what we
feared would happen before and part of the reason why we were
willing to adopt that carved out solution, and C, would also
like needlessly delve into an issue that need not be the jury's
concern.  The jury can determine whether Mr. Reichberg and
Mr. Grant committed the charges in the superseding indictment
without making a determination as to whether their political
ventures were illegal or not.  The important thing, I think, is
that they happened.

IBQTGRA7

```
 1              THE COURT:  Thank you.  Fine.
 2              Counsel?
 3              MS. NECHELES:  Your Honor, I don't want to go back
 4    through old history, but I believe that the government never
 5    came to us with a proposal that they were going to leave the
 6    mayor stuff out.
 7              Putting that aside, we do intend to cross on the
 8    substance of this to show that none of these favors that we
 9    supposedly got were favors that were given by anybody.  We will
10    show exactly how they -- Mr. Reichberg accomplished these
11    things, none of which was calling up Ross Offinger.
12              Your Honor, there was a year-long investigation into
13    all of this by this office.  They decided not to indict
14    anybody.  There's a reason they decided not to indict anybody.
15    Everybody in the mayor's office and in all these divisions said
16    this didn't happen.  It didn't happen the way the government is
17    trying to portray it here, the way that Mr. Rechnitz -- there's
18    a reason that Mr. Reichberg was never indicted for bribing the
19    mayor.  There's a reason the mayor wasn't indicted and
20    Mr. Offinger wasn't indicted.  If they believed his testimony
21    and if they had supporting evidence, all of these people would
22    be indicted.
23              It's particularly pernicious because they put things
24    like the Fernando Mateo stuff in.  And even if you believe the
25    Fernando Mateo stuff, it's not a crime to say I want to be
```

IBQTGRA7

1    appointed to a committee, which is not a government committee,

2    if I give you this money.  It's not a crime, but it sounds like

3    a crime because it's all so murky.  It's not an official act to

4    get promoted, to get appointed to your transition committee or

5    your inaugural committee.  It's not a crime.  But how does the

6    jury know that if they're not being told that it's not a crime?

7            As your Honor pointed out, the only one that there's

8    even a colorable claim, colorable, is with respect to the

9    school.  And even that claim it seems to come down to yes, he

10   got -- he called people to get this, to have him meet with them

11   and to get action, but not that he told somebody you need to do

12   this.  And the reason there is no evidence that he told

13   somebody you need to do this is because it didn't happen.  All

14   these people have been interviewed by the government and they

15   know it didn't happen.

16           So we do ask, we continue to ask that they be told

17   that this is not a crime, what is being described here.  It

18   certainly is really troubling, because what the government does

19   is they put somebody on the stand like this to basically

20   bolster their argument there was criminality done here.  He

21   testified I did this crime and I pled guilty to it, so you know

22   it's a crime, and I did it with Jeremy Reichberg.

23           And they're asking your Honor to basically go along

24   with that when there is real questions about whether there was

25   a crime.  They're saying you can't interfere with that, Judge,

IBQTGRA7

1   that would interfere with the cross.  But they're bolstering

2   this.  They're bolstering it by having somebody who is in their

3   power testify.  They didn't have to elicit this testimony at

4   all.  They could have left this out, but they wouldn't go

5   there, so now they want to bolster it.

6           But I don't think it is a crime, your Honor.  We said

7   it repeatedly.  I do not believe it's a crime.  I believe this

8   person pled guilty before *McDonald* came down.  The evidence

9   that he is describing is stuff that maybe prior to *McDonald*

10  someone would have been convicted on, but afterwards, to say

11  that Fernando Mateo said that I want to be on a committee and

12  I'm going to give a lot of money and it's not a government

13  committee, it's a private committee, that's not a crime.

14  That's how people got on those committees was by giving a lot

15  of money.

16          In addition, your Honor, when the government talks

17  about a conspiracy, this stuff is really confusing, the

18  election law stuff, but I don't believe that if Fernando Mateo

19  and Jeremy and Jona got -- oh, this is what we want and they

20  never say it, that doesn't make it a crime, because that would

21  miss part of the elements of a conspiracy.  They have to

22  actually tell it to the person, to the campaign official.  They

23  can't just think oh, we're going to give this money and we

24  expect this in return, because that's not a crime.  That

25  doesn't have -- you're not conspiring to do all the elements.

IBQTGRA7

1    They have to conspire to actually tell the mayor or the city

2    official we're giving this money to enable to get it.

3         And there's no -- I mean he said that happened, but

4    what he says is we said we're giving you this money in order to

5    get somebody to meet with us or to give us results.  What's

6    results?  Like getting an answer on things is results.  And you

7    will see that a lot of these he got a no answer.

8         When the government elicited from this person I wanted

9    to be on the committee, and he testified I wanted to be on the

10   committee and I got on the committee, that's not what the

11   evidence will show.  It will show he didn't get on the

12   committee.  Time after time it's like that, so we have to fight

13   all this.  But it's not a crime for him to have thought I want

14   them to do this, to have this expectation, I want to get

15   results and give campaign money.  That's exactly, I think, what

16   *McDonald* says.

17        THE COURT:  Thank you.

18        Counsel for Mr. Grant?

19        MR. MERINGOLO:  Nothing.

20        THE COURT:  Thank you.

21        Counsel for the United States?

22        MR. BELL:  Judge, there are a number of statements

23   that Ms. Necheles made that are simply wrong, and it's

24   important to correct the record as to these.

25        Number one, Ms. Necheles has absolutely no insight

IBQTGRA7

whatsoever as to why the government did or did not charge

anyone as a result of its wide-ranging investigation into Mayor

de Blasio's fund raising practices, an investigation that went

well beyond Messrs. Reichberg and Rechnitz.  She doesn't.  She

can claim to, and she takes -- it's not an infrequent thing for

Ms. Necheles to say this is why the government doesn't do this,

this is why.  She doesn't know.

         MS. NECHELES:  Your Honor, could I ask again that

Mr. Bell not make personal attacks?

         THE COURT:  Sorry, please, Ms. Necheles, allow

Mr. Bell to complete his comment.

         MR. BELL:  Thank you.  It's not a personal attack if

I'm commenting on what she claims to know and what she can't

and she doesn't.  It's not some sort of commentary on whether

or not that action is in fact illegal.  The fact of the matter

is that the United States Attorney's Office declines to

prosecute individuals and entities for a wealth of reasons

beyond simply whether the requisite elements exist.

         Number two, Ms. Necheles on a number of occasions

mischaracterized what the official action supposedly here would

have been not only to the conspiracy that existed as to -- or

the agreement that existed as to how Mr. Rechnitz and

Mr. Reichberg would treat their fund raising with the mayor and

whether they would get a result, but also with respect to that

Fernando Mateo email.

IBQTGRA7

1          Let's start with that email, which in addition to

2    being -- in addition to involving getting placed on a committee

3    where Ms. Necheles cherry picked the most post-*McDonald*

4    friendly item there, they also talk about the actual

5    appointment of police chaplains by the city, which is official

6    action post-*McDonald*, which has always been official action,

7    which was official action at the time of Mr. Rechnitz's plea.

8          And so it is a fascinating thing that every time this

9    thing has got to be argued Ms. Necheles mischaracterizes the

10   record as to what the agreement was, and now as to what

11   Mr. Rechnitz's testimony and the other evidence was on that

12   score.

13         She also says that there is some sort of requirement

14   that Mr. -- that the would-be recipient of the political

15   largess, de Blasio or Offinger or whoever, has to be an active

16   member of the conspiracy.  There is no law to that effect.  If

17   Mr. Reichberg and Mr. Rechnitz got together and said hey, let's

18   bribe the mayor, let's commit honest services fraud, and it

19   never goes beyond there but they take the requisite steps to do

20   so, it's still a crime as to Mr. Rechnitz and still a crime as

21   to Mr. Reichberg.

22         So look, the other idea -- I'm running -- I can't

23   count the falsehoods that came out of that statement, but one

24   of them, the last important one that I want to address, your

25   Honor, is that it's the government who is fueling this voyage

IBQTGRA7

into the political activity.  To be clear, we offered to take
this stuff out.  We offered to sign onto a defense proposal
that they then reneged on in order to take this stuff out.  The
defense has said we intend to offer all of this stuff for
impeachment and other purposes.  There's not much we can really
do at that point.  And moreover, that stuff again comes in as
background, but in the way that Giglio customarily does.

          None of what Ms. Necheles says does anything to
undercut the government's concerns about the fact that this is
all conduct that Mr. Rechnitz allocuted to as part of his
guilty plea.  None of this does anything to undermine the
crystal clear testimony post-lunch of Mr. Rechnitz today that
he and Reichberg spoke to Ross Offinger and explicitly,
explicitly linked the benefits that they expected to receive --
not yet specified, not yet known, but benefits of actual
action -- with the fund raising work that they were going to
do.

          And so again, even post-*McDonald* and even in a world
where the First Amendment mandates that these crimes related to
political donations are viewed through a somewhat narrower
lens, you're still looking at conduct that is legally
problematic.

          What Ms. Necheles hasn't said at any point when we
first raised this prior to trial, or in raising this today, is
why it is that the jury has to adjudicate that those things are

IBQTGRA7

actually crimes.  They don't.  The limiting instruction that we
have proposed from the very beginning is an entirely
appropriate starting and stopping point for their
considerations because they are being charged with determining
whether those things were legal.

          MS. NECHELES:  Your Honor, I don't want to repeat
stuff, but I do want to say that with respect to chaplain
position, I don't believe that post-*McDonald* that that would be
a crime.  I believe that appointing someone to a ceremonial
position which carries no salary is not clearly an official act
under *McDonald*.

          When you describe an official act under *McDonald*, it's
not anything that an official does, it involves a controversy,
a decision that needs to be made, all that language in
*McDonald*.  I mean we're going to have to discuss this in this
case with respect to how getting someone into a parade is an
official act.  It's not an act that an official does, it's an
act that has been described by the Supreme Court to
circumscribe, and so I don't think that appointing somebody to
a ceremonial position is necessarily an official act.

          But the problem here is -- and I don't think that we
need to litigate it here, actually, because it's so off the
beaten path.  We're not even charged with this as a crime.  The
problem is the government is telling the jury that we committed
a crime by having --

IBQTGRA7

1              Don't shake your head, Mr. Bell, please.

2              -- by having the witness testify that I pled guilty to

3        this criminal act.  This is a criminal act.  I pled guilty to

4        it in front of a judge in this courthouse and Mr. Reichberg did

5        this criminal act with me.  Of course they're telling him that

6        it's a crime.

7              THE COURT:  Thank you.  Understood.  You haven't yet

8        seen my proposed instructions.  I suspect that will you soon.

9        Among them I believe is a customary instruction that those

10       witnesses, such as Mr. Rechnitz, who pleaded guilty to an

11       offense, that that is not something that the jury can, I will

12       say consider for the truth of the underlying conduct, namely I

13       will be saying that the reasons that any person pleads guilty

14       to a crime are personal to them.  I will show you that proposed

15       instruction perhaps sooner than later so that you can see that.

16             I have heard your arguments.  Thank you, counsel, for

17       reviewing these issues again.  I think it may be appropriate

18       for me to come back to the limiting instruction that I provided

19       earlier.  I accept the government's arguments that I cannot

20       conclude definitively on the basis of the testimony that I have

21       heard now that the conduct at issue here is not a sufficient

22       basis for a finding of criminal liability.  So I am again

23       hesitant to provide such an instruction, but I will want to

24       return to the instruction I provided earlier and I may suggest

25       providing a short version of the instruction that I described

IBQTGRA7

1    earlier about the effect of guilty pleas.

2              MR. BELL:  Your Honor, could we note one thing with

3    respect to the guilty plea --

4              THE COURT:  Please.

5              MR. BELL:  -- that's important, because there was one

6    other thing that Ms. Necheles said that needed to be addressed

7    for the record, and specifically so that your Honor can fashion

8    an appropriate instruction.

9              We did not today ask Mr. Necheles -- sorry, ask

10   Mr. Rechnitz about whether he allocated to the de Blasio

11   conduct as part of his guilty plea.  Ms. Necheles said earlier

12   that we did.  We didn't.  So to the extent that your Honor

13   needs to have those facts in order to fashion an appropriate

14   instruction or to avoid going somewhere where we don't need to

15   go, it's important that that be noted, because that's how that

16   actually turned out.  That is the one area, your Honor, where

17   we deliberately tiptoed around following our lengthy back and

18   forth on this issue.

19             THE COURT:  Thank you.  I did note that, and I also

20   noted the relatively limited scope of the testimony that you

21   elicited regarding Mayor de Blasio during the direct.

22             MS. NECHELES:  Your Honor I believe he testified

23   previously, I believe, that -- I mean he testified in his

24   allocution, he says a public official.  I believe he's

25   testifying that that was de Blasio, and I'm going to ask him

1    that you have testified -- I'm going to check this prior

2    testimony, but I thought that was his testimony, and I'm going

3    to ask him because his testimony today makes that a ridiculous

4    plea.

5           MR. BELL:  Your Honor, if they do elicit that, that is

6    a strategic choice, the ramifications of which the defense is

7    going to have to live with.  But I think it would behoove all

8    of us, the parties, the Court, to think about what precise

9    Pandora's box that would open up --

10          THE COURT:  That's fine.

11          MR. BELL:  -- and the overwhelming likelihood of jury

12   confusion, among other issues, if that is something that

13   actually has to be litigated through the witness, as it were.

14          THE COURT:  That's fine.

15          MS. NECHELES:  Your Honor, I don't understand that.

16          THE COURT:  I will ask that the parties discuss

17   exactly the depth of Pandora's box after the end of today's

18   trial day.  Perhaps, counsel for the United States, you can

19   elucidate your comments for defense counsel so that they can

20   make appropriate strategic decisions based on your insight.

21          Counsel, I'm going to end the trial day now.  I would

22   like to ask counsel for the United States how much longer you

23   anticipate for Mr. Rechnitz's direct testimony tomorrow.

24          MR. BELL:  Again we make assumptions about objections

25   and the like.  I think it will be a couple more hours.  It will

IBQTGRA7

1    end tomorrow.  It should end tomorrow morning.

2              THE COURT:  Good.

3              MR. BELL:  But I expect that it will probably be a

4    couple of hours or so.

5              There is one more matter that I want to put on the

6    record.

7              THE COURT:  That's fine.

8              MR. BELL:  Thank you, your Honor.

9              I went back at Mr. Daniels' invitation to speak to the

10   witness who had been troubled by something.  It actually

11   confirmed something that I noticed while examining him.

12   There's at least one individual, who Mr. Rechnitz knows and who

13   I would be happy to name, to the extent that it helps, in the

14   gallery who has been particularly aggressive in, well,

15   interacting with the witness as he testifies, which on its own

16   seems wholly appropriate.

17             THE COURT:  I'm sorry, inappropriate?

18             MR. BELL:  Wholly inappropriate, yes.  It was an

19   important syllable.

20             Mouthing the word "liar" in response to question after

21   question, responding audibly with sort of like grunts and

22   noises in response to those things.

23             I would ask that -- and this has happened before when

24   Mr. Rechnitz has testified in prior proceedings involving I

25   think members in the community with lot of people who care

about him.  This is an open courtroom.  We cherish that.  It's
something very crucial under our system of justice and under
the Constitution.  At the same time, intimidation of that or
any sort is wholly inappropriate.

          At a minimum, I would ask that the Court admonish the
jury not to react audibly, not to -- sorry, the gallery,
rather, not the jury, the jury has been great -- members of the
gallery not to send any sort of a message to the witness,
either through mouthing things, either to reacting in audible
ways to portions of his testimony.  I have heard what appears
to be heckling, and that shouldn't be so.  And this is, I
think, the most sensitive part of the trial when it comes to
those issues.

          I have a particular appreciation of precisely what it
has taken for Mr. Rechnitz to come to the point where he can
cooperate.  As he testified to, he needed rabbinical permission
in order to come and testify, and the blowback that he's gotten
from the community is real and has taken a number of forms.

          To compound those issues, along with the general
stress of being a cooperating witness facing quite a lot of
potential prison time, with that sort of wholly inappropriate
interaction is just something that shouldn't stand, and we ask
that your Honor admonish the gallery.  And also to the extent
that your Honor can from that particular point, keep watch.

          I will note that the individual has apparently been

IBQTGRA7

1    seated behind the Reichberg family for much of the proceedings

2    today and much of the proceedings on Tuesday where he, I think,

3    could relatively easily be seen.  But it has to stop, your

4    Honor.

5              THE COURT:  Thank you.

6              MS. NECHELES:  Your Honor, I haven't heard anything.

7    I have the cautioned everybody to be careful because I have

8    noticed in the 3500 material that Mr. Rechnitz complained every

9    week that someone had said something about him, someone looked

10   at him the wrong way.  This is a man who has been very liberal

11   in complaining about other people; somebody posted something

12   online, he got a phone call, somebody said something to

13   somebody else at a wedding.  This is a man who yesterday --

14   last week sent things directly accusing a person here of well,

15   look, I found online that he's part of a group that -- so I

16   have not heard anybody.  I have told everybody be really

17   careful because this guy is dangerous.  He will get you in

18   trouble.  He accuses everybody of wrongdoing all the time.  I

19   think that people understand that.

20             And I will say something else.  This is not

21   Mr. Rechnitz's community.  So to the extent that the government

22   stands up there and says he's worried because he may have

23   people in this community who disapprove of him, I don't believe

24   he cares about this community.  It's not his community.  And

25   it's a community that is often disdained by other Jews, that

1   Jews like Mr. Rechnitz often think poorly of this community.

2          So it's not just because he's a Jew he supports this

3   community, it's actually a community that has lots of hatred

4   from other Jews.  So I don't know what he thinks he's seeing.

5   I know it is stressful to have to testify like this.  It is a

6   difficult thing, I'm not taking that away, but I certainly have

7   not heard anything.  And I'm sure your Honor will admonish the

8   gallery that they should not say anything, not make any faces.

9   I ask that Mr. Bell do the same, that he not make faces, and

10  that we all will move forward in that way.

11         THE COURT:  Fine.  Let me take a few of those comments

12  in turn.

13         First, I have not heard what I will describe as a

14  commotion during the course of the witness's testimony.  I did

15  not perceive what Mr. Rechnitz perceived, but nor am I looking

16  at the gallery constantly.  I will look more.  And I'm going to

17  ask Mr. Daniels and the security officers to police the conduct

18  of the members of the gallery more carefully.

19         Inappropriate displays here in the courtroom are not

20  acceptable.  Simply put, this is a place of decorum.  It's not

21  an opportunity to intimidate witnesses, it is not a place to

22  disrespect the proceedings as a whole.  Counsel for each of the

23  defendants can advise members of the gallery whether they

24  believe that such conduct is appreciated and viewed positively

25  by the jury, who also have the opportunity to observe the

gallery.  It may be that such an appropriate and rude conduct
will be viewed poorly by all who perceive it.  So I fully
expect that going forward there will be no improper conduct.
If there is, I will not hesitate to ask for a person who
engages in it to be removed from the courtroom.

So I hope that this is not a concern in the future.
As I said, I did not observe this particular conduct and I do
not know to what extent Mr. Rechnitz is particularly sensitive
to these issues, but as a general matter, the prospect of
intimidation of a witness by a member of the gallery is
extremely troubling to the Court, as I expect it would be for
any member of our public.

So thank you for raising that issue, counsel.  I'm not
going to ask you to identify the person to me, but please do
identify the person to Mr. Daniels, and I will ask that
Mr. Daniels keep a closer eye for certain misconduct by that
person going forward, and will also bring it to the attention
of court security officers who are generally present here in
the court during the court day.

So I look forward to seeing you tomorrow.

Counsel for the United States, thank you for what you
have anticipated for the testimony tomorrow.  Anything else
that we should discuss before we take our recess, counsel for
the United States?

MR. BELL:  No, your Honor, only to note with respect

IBQTGRA7

1    to the issue raised by whether chaplaincies are official acts,

2    the Second Circuit has spoken on something relatively similar

3    or somewhat similar in the course of its *Sheldon Silver* ruling,

4    which was I think was the Circuit's first real post-*McDonald*

5    treatment of the official acts issue.

6         Among the things that the Circuit blessed for

7    treatment on the retrial -- which, of course, has now

8    happened -- was Silver's making a commendation happen for the

9    doctor involved, Dr. Taub -- or proclamation, commendation,

10   whatever they're called, the little thing that they hold up in

11   the Wizard of Oz when the witch is dead, I don't know what

12   they're called precisely.  But the analysis behind that

13   particular item, your Honor, may be particularly helpful in

14   engaging the chaplaincy issue in the context that your Honor

15   mentioned.

16            THE COURT:  Thank you, I will review that.

17            Anything else, counsel for Mr. Reichberg?

18            MS. NECHELES:  No.

19            THE COURT:  Counsel for Mr. Grant?

20            MR. MERINGOLO:  No, Judge.

21            THE COURT:  Thank you.  I will see you tomorrow

22   morning.

23            (Adjourned to November 27, 2018, at 9:00 a.m.)

24

25

```
 1                         INDEX OF EXAMINATION

 2    Examination of:                           Page

 3    JONA RECHNITZ

 4    Direct By Mr. Bell . . . . . . . . . . . . . .2492

 5                        GOVERNMENT EXHIBITS

 6    Exhibit No.                               Received

 7     606 and 629   . . . . . . . . . . . . . . .2496

 8     8 and 8A    . . . . . . . . . . . . . . . .2509

 9     613   . . . . . . . . . . . . . . . . . . .2510

10     1016  . . . . . . . . . . . . . . . . . . .2511

11     1017  . . . . . . . . . . . . . . . . . . .2514

12     1018  . . . . . . . . . . . . . . . . . . .2515

13     1019  . . . . . . . . . . . . . . . . . . .2518

14     2023  . . . . . . . . . . . . . . . . . . .2522

15     10 and 10-A  . . . . . . . . . . . . . . . .2526

16     5 and 5-A   . . . . . . . . . . . . . . . . .2527

17     1022  . . . . . . . . . . . . . . . . . . .2542

18     308-F   . . . . . . . . . . . . . . . . . . .2544

19     1202  . . . . . . . . . . . . . . . . . . .2553

20     1207  . . . . . . . . . . . . . . . . . . .2557

21     1229  . . . . . . . . . . . . . . . . . . .2560

22     1047  . . . . . . . . . . . . . . . . . . .2574

23     617 and 618  . . . . . . . . . . . . . . . .2579

24     614   . . . . . . . . . . . . . . . . . . .2594

25     608   . . . . . . . . . . . . . . . . . . .2595
```

1    615    . . . . . . . . . . . . . . . . .2596

2    1080   . . . . . . . . . . . . . . . . .2596

3    1051   . . . . . . . . . . . . . . . . .2607

4    1029   . . . . . . . . . . . . . . . . .2609

5    612    . . . . . . . . . . . . . . . . .2614

6    1072   . . . . . . . . . . . . . . . . .2618

7    1057   . . . . . . . . . . . . . . . . .2620

8    1084   . . . . . . . . . . . . . . . . .2621

9    601 through 605   . . . . . . . . . . .2623

10   611    . . . . . . . . . . . . . . . . .2650

11   1021   . . . . . . . . . . . . . . . . .2652

12   306    . . . . . . . . . . . . . . . . .2655

13   625 through 628   . . . . . . . . . . .2660

14   1256   . . . . . . . . . . . . . . . . .2665

15   1066   . . . . . . . . . . . . . . . . .2667

16   1033, 1101, and 1102   . . . . . . . . . .2672

17   1048 and 1065   . . . . . . . . . . . . .2678

18   1063 and 1090   . . . . . . . . . . . . .2681

19   1092   . . . . . . . . . . . . . . . . .2683

20   1106   . . . . . . . . . . . . . . . . .2684

21   W-04026   . . . . . . . . . . . . . . . .2685

22

23

24

25