IBSTGRA1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          16 CR 468 (GHW)

 5   JAMES GRANT and JEREMY
     REICHBERG,
 6
                    Defendants.
 7
     ------------------------------x
 8
                                           November 28, 2018
 9                                         9:02 a.m.

10   Before:

11
                      HON. GREGORY H. WOODS,
12
                                           District Judge
13

14                         APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  JESSICA R. LONERGAN
17        KIMBERLY J. RAVENER
          MARTIN BELL
18        Assistant United States Attorneys

19   HAFETZ & NECHELES, LLP
          Attorneys for Defendant Reichberg
20   BY:  SUSAN NECHELES

21   MERINGOLO & ASSOCIATES
          Attorneys for Defendant Grant
22   BY:  JOHN MERINGOLO
          ANJELICA CAPPELLINO
23

24

25
```

IBSTGRA1

1                (In open court, jury not present)

2                THE COURT:  Good morning.  Thank you for being here.

3     Let's begin.

4                First, are there any issues the parties would like to

5     raise with the Court before we begin?  I have a number of

6     relatively short items that I would like to take up with the

7     parties, but first is there anything that you would like to

8     raise with the Court?

9                MR. BELL:  Judge, the only thing we would like to

10    raise with the Court.  I know that Ms. Necheles, I think, wrote

11    briefly regarding the Court's proposed limiting instruction.

12    We are fine with the instruction.  I don't believe that we have

13    any major objections to Ms. Necheles' proposed --

14                Well, one moment.

15                (Pause)

16                MR. BELL:  Your Honor, I think the one issue I think

17    that we would take to Ms. Necheles' proposed changes are

18    regarding Mr. Rechnitz's motivation for his plea.  Ms. Necheles

19    has proposed essentially saying it was a personal decision

20    based on his circumstances.  I think perhaps the most

21    appropriate way to resolve the issue would be just to say it

22    was a personal decision, period, full stop.

23                THE COURT:  Thank you.  That's fine.  That's how I

24    propose to modify it in response to the letters.  Is that

25    acceptable to you, Ms. Necheles?

IBSTGRA1

1          MS. NECHELES:  Yes.  Yes, your Honor.

2          MR. MERINGOLO:  That's acceptable to us.

3          THE COURT:  Good.  That's what I propose.  I will hand

4    you a revised version of it.  The only modifications to version

5    that I sent to you is the deletion of the word "also" in the

6    carryover paragraph on what would be page 2 if there was a page

7    2, and the deletion of the words "about his own guilt," so the

8    sentence will end with the words "personal decision."

9          MR. BELL:  Judge, do you have thoughts about when you

10   want to give that instruction or if you looking for a

11   particular prompt?

12         THE COURT:  Thank you.  I welcome the parties' views.

13   I could do it at any point.

14         Counsel, do you have a view?

15         MR. BELL:  The only thing I will note, your Honor, I

16   mentioned near the outset of Mr. Rechnitz's direct there were

17   going to be two different spots where we talk about his various

18   prior bad acts in some depth.  We have already had one of those

19   in going through the Seabrook stuff and the political things.

20   There will be, I anticipate, another pocket of those towards

21   the end.  I can't recall right now whether those involve

22   Mr. Reichberg, but thematically it may be a good place.

23         I'm also happy to have that instruction read whenever

24   the Court finds it appropriate otherwise, but just to map that

25   out for your Honor's benefit in making that decision.

IBSTGRA1

1              THE COURT:  Thank you.  Does the defense have a view

2      to appropriate timing?

3              MS. NECHELES:  Your Honor, I prefer if it was just

4      given right at the start of the morning today so it's not sort

5      of tied to any particular thing but an overall charge, because

6      I think it will -- there's a lot of different testimony that I

7      think it applies to.

8              THE COURT:  Thank you.

9              Mr. Grant?

10             MR. MERINGOLO:  We agree it should happen in the

11     morning.

12             MR. BELL:  That's fine, Judge.

13             THE COURT:  Thank you.  I will administer it at the

14     outset of our day before Mr. Rechnitz begins his direct.  Thank

15     you for raising that.

16             Now with respect to what I would tell the jury about

17     our inability to proceed yesterday, my proposal would be in

18     essence to simply apologize and to say that something

19     unexpected arose that morning, that I'm trying to be very

20     conscientious of their time, and that I appreciate their good

21     will and patience and to leave it at that.  And I would tell

22     them that presumably shortly before I read the instruction.

23             What's the parties' view?

24             MR. BELL:  That sounds fine both with respect to

25     substance and timing.  I do think, your Honor, that perhaps

1    sometime before the lunch break it might be appropriate, given

2    that it's been a little bit, to remind the jury not to read

3    anything about this to the press, to avert their eyes should

4    they happen upon any coverage.  Given that there was coverage

5    of this particular incident, it might be particularly

6    problematic were they to read it.

7              THE COURT:  That's the next question I had to raise.

8    My question for the parties is if the parties are aware whether

9    this appeared in the paper version of any of the local

10   newspapers.

11             MS. NECHELES:  Yes, your Honor, the Daily News and the

12   Post.

13             THE COURT:  So I should ask them to not have the Daily

14   News and the Post in the jury room for today?

15             MS. NECHELES:  Yes, your Honor.  And I don't know if

16   it was today.  I actually don't know if it was in the paper

17   version.

18             MR. BELL:  My understanding is that it was in the

19   paper version.  I haven't seen them.

20             THE COURT:  Fine.  I will give them that instruction.

21   In particular, I will ask them, to the extent they picked up

22   the Daily News or the Post, to throw it away.

23             MR. BELL:  I think, your Honor, it ran in a bunch of

24   other papers, too.

25             Could you hold on for one moment?

IBSTGRA1

1          THE COURT:  Thank you.

2          (Pause)

3          MR. BELL:  The other thing, Judge, is that separate

4    and apart from yesterday's issues there have been stories in

5    the Post and News almost every day on this case, sometimes

6    multiple short stories.  They ought to be avoiding these in any

7    event.  I don't know what that necessarily spells in terms of

8    an instruction specific to today obviously beyond the fact that

9    it is of heightened importance to everybody.  But there has

10   been widespread coverage, and it may be most appropriate to

11   have a general instruction that they should ignore anything

12   that appears to be coverage of this trial or really any trial

13   in this courthouse.

14         THE COURT:  I will do that, and instead of telling

15   them not to look at the News or the Post, I will just ask them

16   to be particularly mindful, to extent that they have the News

17   or the Post, to avoid looking at any stories with respect to

18   trial.

19         MS. NECHELES:  Your Honor, could I also ask,

20   respectfully, I am afraid that dealing with all these

21   instructions sometimes it's hard for jurors, so I would ask in

22   addition that perhaps you tell the juries if you inadvertently

23   see something, I want you to remember that you are in this

24   courtroom, you are hearing the evidence, are the judges, and

25   newspapers can be inaccurate and have things wrong, so you

IBSTGRA1

1    should be judging this case based on what you hear in here and

2    nothing else.

3              THE COURT:  Thank you.

4              MR. BELL:  We have no objection to that, your Honor,

5    and maybe it makes sense to sort of build that in as a

6    rationale to why they shouldn't be looking at the paper in the

7    first place.  But however your Honor chooses to style it is

8    fine with us.

9              THE COURT:  Thank you.  I will try to work that

10   concept in.  If I do it inadequately, please let me know and I

11   would be happy to address it further.

12             So I will take up those issues with the jury as well

13   as the limiting instruction.

14             Ms. Necheles, as a housekeeping matter, you asked

15   earlier about the row in the back, the row between the

16   defense -- what's currently the defense table and what's been

17   reserved in the gallery.  I inquired about that.  I understand

18   that it's been reserved in part for security reasons.  I would

19   be happy to make an additional table available to you, however,

20   in the front of the bar if you would like to move forward to

21   the table to the extent there are other members of the defense

22   team that you would like to have close at hand for

23   consultation.

24             MS. NECHELES:  So your Honor, I think the distance is

25   little bit good for all of us that we have separate spaces,

IBSTGRA1

1   respectfully, so I don't really want to move forward.  But I

2   understand, your Honor.  It's just usually most cases -- I

3   understand the security thing, but usually lawyers are allowed

4   to from either side.  I have never really before heard of it

5   that defense attorneys are considered less safe than the

6   government.

7          THE COURT:  Thank you.  I'm not taking that position,

8   I'm just telling you what I heard.

9          MS. NECHELES:  I understand, but I'm a little

10  surprised by the position here.  And I do note that I sat in

11  the front row in one of the other trials through the whole

12  trial, in front of Judge Carter, and it was much smaller closer

13  courtroom and packed and an overflow room, and that was

14  generally accepted.  So I hear that there was an issue, I know

15  that they didn't want family members passing notes or stuff,

16  and I understand that.

17         THE COURT:  Thank you.  That's what I understood to

18  have been the concern.  I'm happy to make additional space for

19  the defense team so they could be in close proximity with each

20  other.

21         MS. NECHELES:  Perhaps if there are other defense

22  counsel or paralegals I could have them sit in the chairs

23  behind us.

24         THE COURT:  Yes, that would be fine.  In front of the

25  bar, that is absolutely fine.

IBSTGRA1

1          So the next thing I want to take up -- I think that

2     the jury is ready to go, so I would like to start as close to

3     on time as I can.  I think that we have done the work that I

4     wanted to do in advance.  I received the letter with respect to

5     the request that I reconsider my decision regarding the 302 and

6     notes issue.  I will take that up during our next break, and I

7     will take the opportunity then to talk briefly about the

8     defense exhibits.

9          Are we otherwise ready to proceed, counsel?

10          MS. NECHELES:  Your Honor, one housekeeping matter.

11          THE COURT:  Please.

12          MS. NECHELES:  My assistant, Mr. Willis, who is always

13     on time and earlier than I am, is stuck in terrible traffic

14     today, and there's issues with him getting through security

15     because he can't get through security, usually I need to be

16     there with a pass to get the iPad with all our exhibits on it

17     up.  So I'm hoping he will just get through, he's very

18     resourceful they know us by now down there, but he may come in

19     in the middle.  So I apologize, and I will be watching my phone

20     to see if I get any texts from him.  If I do, I will try to

21     have someone else bring the order down.

22          THE COURT:  Fine.  If you have difficulty or if he has

23     difficulty making his way through without you, please let me

24     know, and Mr. Daniels can also assist getting through with the

25     equipment.

IBSTGRA1

1          MS. NECHELES:  Okay.  Thank you, your Honor.

2          THE COURT:  Thank you.  Counsel, is Mr. Rechnitz ready

3     to proceed?  If so, I ask him to come in.

4          And Mr. Daniels, I ask you to bring the jury in.

5          MR. BELL:  I believe he's back there.  Could I have

6     Special Agent Downs go retrieve him?

7          THE COURT:  Yes, you may.

8          Mr. Daniels, while that's happening, please bring in

9     the jury.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IBSTGRA1

1          (Jury present)

2          THE COURT:  So ladies and gentlemen, let me start

3     today off with an apology.  I'm very sorry that we weren't able

4     to go forward yesterday.  Something completely unexpected arose

5     that morning.  I recognize that this is a sacrifice for all of

6     you, and I'm trying to be as considerate as possible of all of

7     your time.  You have all shown a great deal of goodwill and

8     patience throughout this process, so I thank you again for that

9     and I apologize for not being able to proceed yesterday.

10          I want to remind you of a couple of instructions that

11    I have given you already.  First, you've heard me say every day

12    multiple times you should not do any outside research regarding

13    the case or anything involved in it, and you should in

14    particular avoid any press reports about the case.  So if you

15    happen to glance across something in the local paper, please

16    just don't look at it, don't read it, and don't comment on it

17    to any of your colleagues.

18          If you do happen to inadvertently look at something

19    and some substance of it comes into your mind before you stop

20    reading, according to my instructions, remember what I told you

21    all at the outset of this trial, which is that you, ladies and

22    gentlemen of the jury, are the sole and exclusive judges of the

23    facts.  You're hearing everything that you need to hear in

24    order to decide this case based on the testimony of the

25    witnesses and the evidence that's introduced here at trial.

IBSTGRA1

1   Any news that you may see, simply put, may not be right and it

2   may not be consistent with your understanding of what is being

3   put before you.

4          So again, please avoid reading about the case in the

5   press, and remember, ultimately, that at all times you are the

6   sole and exclusive judges of the facts based solely on the

7   evidence that's presented here in the courtroom by the capable

8   counsel that you have seen practicing in front of you over the

9   course of this period of time.

10          I also thought it might be helpful for me to remind

11   you of an instruction that we heard earlier before Mr. Rechnitz

12   began his testimony, and I just want to take a moment to remind

13   you of my instruction from before Mr. Rechnitz's testimony

14   began.

15          As we foreshadowed, Mr. Rechnitz testified that he

16   engaged in certain activities separate and apart from the

17   crimes with which Mr. Grant and Mr. Reichberg are charged in

18   the indictment, and that he engaged in some of those other

19   activities with, among other people, Mr. Reichberg.  Now

20   whether you credit that testimony, whether you believe that

21   those other acts occurred, and if so, whether or not

22   Mr. Reichberg participated in them, is entirely up to you.

23   However, let me the note that Mr. Reichberg is only on trial

24   for committing the charges charged in the indictment.  Any

25   evidence that he may have participated in certain other acts

IBSTGRA1

with Mr. Rechnitz is not a substitute for proof that either
defendant committed the crimes charged in the indictment.
Mr. Rechnitz's testimony regarding those other acts was instead
offered for a limited purposes for which I will state again for
you now.

First, you may consider that testimony if you believe
it's relevant as it relates to the background and nature of the
relationship between Mr. Rechnitz and Mr. Reichberg and/or
whether Mr. Reichberg intended to bribe police officers.  There
may be other purposes for which you will be permitted to
consider that testimony.

Second, you may also consider that testimony as proof
of the defendant's motive, opportunity, intent, preparation,
common plan, knowledge, or the absence of mistake when it comes
to the crimes charged in the indictment alleged in the
indictment.

Third, you may also consider the substance of the
testimony in evaluating the credibility of Mr. Rechnitz.  You
may not use testimony concerning those other acts for any other
purpose.  In particular, you may not use the testimony as proof
that either defendant has a bad character, nor may you conclude
that either defendant is guilty of the crimes charged in the
indictment or alleged in the indictment merely because there is
testimony that he engaged in these other activities.

Whether these other activities are themselves

1    violations of any criminal law is not your concern.  They are

2    not the offenses charged in the indictment.  Whether you

3    personally approve of these other activities is likewise of no

4    concern.  Your job is to evaluate the evidence and the

5    testimony and to determine at the trial's conclusion whether

6    the government has proven each and every element of the crimes

7    alleged in the indictment and only those crimes beyond a

8    reasonable doubt.

9            Moreover, you've heard Mr. Rechnitz testify that he

10   pleaded guilty to charges arising out of the same facts of this

11   case and of other crimes.  You are instructed that you are to

12   draw no conclusions or inferences of any kind about the guilt

13   of either defendant from the fact that a prosecution witness

14   pleaded guilty to similar charges.  Mr. Rechnitz's decision to

15   plead guilty was a personal decision.  It may not be used by

16   you in any way as evidence against or unfavorable to either

17   defendant in this case.

18           Mr. Rechnitz, let me remind you that you remain under

19   oath.  Counsel for the United States, you can proceed.

20           MR. BELL:  Thank you very much, your Honor.

21    JONA RECHNITZ,  (Continued)

22        having been previously affirmed, testified as follows:

23   DIRECT EXAMINATION

24   BY MR. BELL:

25   Q.  Good morning, Mr. Rechnitz.

1   A.  Good morning.

2   Q.  When we left off the other day, I started to ask you a

3   number of questions about your trip to Las Vegas in early 2014.

4   I will get back there in just a moment, but I want to ask just

5   a couple of questions before we do.

6        First off, at the time that you pled guilty pursuant

7   to your cooperation agreement, you testified earlier that you

8   admitted to certain conduct involving Norman Seabrook.  At the

9   time that you admitted to that conduct, was it your belief that

10  you were guilty of that conduct?

11  A.  Yes.

12  Q.  And who is it that you participated in that Seabrook scheme

13  with, which is to say, who was privy to it and involved?

14  A.  Murray Huberfeld, Jeremy Reichberg and Norman Seabrook.

15  Q.  At the time that you pled guilty, did you also admit to the

16  misconduct that you have discussed over the past few days?

17  A.  Yes, I did.

18  Q.  And who was it who was involved in that conduct?

19  A.  I was, and Jeremy Reichberg.

20  Q.  And finally, at one point in your testimony the other day

21  you discussed a conversation with Ross Offinger in which you

22  and Messrs. Reichberg and Mateo asked for access and results.

23  Did you understand there to be a difference between access and

24  results?

25  A.  Yes.

IBSTGRA1                     Rechnitz - Direct

1    Q.  So what's the difference between access and results,

2    Mr. Rechnitz?

3    A.  Access is just having someone pick up a call to hear me on

4    an issue.  Results is a favorable result, having something

5    resolved to my satisfaction.

6    Q.  At the time that you contemplating getting into politics

7    with Mr. Reichberg, did you seek access, results, or both?

8    A.  Both.

9    Q.  At the time that you sought to get involved with the

10   police, did you seek access to them, results from them, or

11   both?

12   A.  Both.

13   Q.  At the time that you discussed these things with

14   Mr. Reichberg, did you discuss getting access, results or both?

15   A.  Both.

16            MR. BELL:  One moment, please.

17            THE COURT:  That's fine, please take your time.

18            (Pause)

19   Q.  So with that done, Mr. Rechnitz, I'm going return to the

20   topic of the trip to Las Vegas.  Through what company did you

21   make the travel arrangements.

22   A.  Apollo Jets.

23   Q.  Had you used them before?

24   A.  Yes, I had.

25   Q.  Just to reset the stage, who is it that you accompanied you

1    on the trip to Las Vegas?

2    A.  Marco Franco, Michael Milici, James Grant, Jeremy Reichberg

3    and Gabi Grecko.

4    Q.  Now where did the flight take off from?

5    A.  Teterboro, New Jersey.

6    Q.  Is that at Teterboro Airport?

7    A.  Yes.

8    Q.  When you got to Teterboro Airport, what sort of a mood were

9    you in?

10   A.  I wasn't feeling well.  I was not in a great -- a pissy

11   mood.

12   Q.  Why?

13   A.  First of all, I wasn't feeling well, and second of all, I

14   just wanted to get away with my friends from Los Angeles where

15   I grew up and not have Jeremy and the cops with me.  I needed a

16   break from that.

17   Q.  And why weren't you able to get that break?

18   A.  Because they came along.

19   Q.  When you got on the actual plane, what sort of a physical

20   condition were you in?

21   A.  I was not feeling well.

22   Q.  And what do you mean by you weren't feeling well?

23   A.  I had just had the flu, I was exhausted, I was on

24   medication.

25           MR. BELL:  Mr. Hamilton, could we put up on the

IBSTGRA1                        Rechnitz - Direct

1   witness's screen Government Exhibit 1008, please.

2   Q.  Are you familiar with this email communication?

3   A.  Yes, I am.

4   Q.  How familiar with it?

5   A.  It's an email I'm involved with.

6   Q.  Were you one of the recipients?

7   A.  Yes.

8            MR. BELL:  Your Honor, the government offers 1008.

9            MS. NECHELES:  No objection, your Honor.

10           MR. MERINGOLO:  No objection.

11           THE COURT:  Thank you.  I'm accepting 1008 into

12   evidence.

13           (Government's Exhibit 1008 received in evidence)

14           THE COURT:  You can proceed.

15           MR. BELL:  Can we publish, Mr. Hamilton, 1008 to the

16   jury, please.

17   BY MR. BELL:

18   Q.  So this is an email from Kelly at apollojets.com to you

19   copying other individuals at apollojets.com.  What trip did

20   this involve?

21   A.  This is the trip that we were speaking about to Las Vegas

22   for the Superbowl.

23   Q.  And the email traffic is from January 31, 2013, I may have

24   said 2014 before, does this comport with your memory of when

25   this trip happened?

IBSTGRA1                    Rechnitz - Direct

1    A.  Yes.

2            MR. BELL:  Could we go to the second page briefly,

3    Mr. Hamilton.  Could we go back to the first.

4            So the bottom half of the page, if we can focus in on

5    that.

6    Q.  So you respond tax is 2K each way, there is an attached

7    invoice to this.  Was that statement in response to the

8    invoice?

9    A.  Yes.

10   Q.  And then let's look at the remainder, Kelly responds tax is

11   7.5 percent, and then you included what appear to be certain

12   numbers and the names James Grant and Mike Milici.  Do you

13   recall why?

14   A.  Yes.  I needed -- Kelly had asked me for the names and date

15   of births of all the passengers for the manifest.

16           MR. BELL:  And then Kelly responded this is what we

17   have, please confirm.  Then can you highlight the list of

18   names, which includes yourself, Mr. Reichberg, Marco Franco,

19   Mr. Grant, Ms. Curtis and Mr. Milici.

20           We can take that down.  Thank you.

21   Q.  Now at that point, Mr. Rechnitz, at the time of the trip,

22   what did you know of the relationship between Mr. Reichberg and

23   Detective Milici?

24   A.  I knew that they were close friends and associates from

25   Borough Park.

1   Q.  How did you know that?

2   A.  From Jeremy.

3   Q.  At this point -- did there come a point, by the way, where

4   you and Jeremy took an interest in Mr. Milici's career the way

5   you had with Jimmy Grant?

6   A.  Not me.  The only conversation I ever partook in was Jeremy

7   speaking to Mike Harrington and Phil Banks about getting him

8   promoted to a different grade detective than he already was, of

9   a higher grade.

10  Q.  Did you develop an understanding of whether that in fact

11  happened?

12  A.  No.

13  Q.  Now with respect to the Gabi's presence on the flight, had

14  you arranged that?

15  A.  No.

16  Q.  What was your understanding of who had?

17  A.  Jeremy.

18  Q.  Did you pay for her services?

19  A.  No, I did not.

20  Q.  Did you have an understanding as you got on the flight of

21  who was to pay for her services?

22  A.  Yes.

23  Q.  What was your understanding?

24  A.  That Jeremy was handling that.

25  Q.  Now what happened when you got on the plane and the plane

1   took off?

2   A.   Took our seats.

3   Q.   Where did you sit?

4   A.   I sat -- when you walk onto the plane, the front left

5   there's two seats facing each other, on the right side there's

6   two seats facing each other, in the back section of the plane

7   had a couch and other two seats facing each other.  So I was in

8   the front left seat facing forward, but I also had the seat,

9   because I wasn't feeling well, so I could lay down.

10  Q.   And where do you recall the other folks -- where do you

11  recall Gabi being?

12  A.   In the back on the couch.

13  Q.   Were there people with her?

14  A.   Yes.

15  Q.   Who was with her?

16  A.   At different points it was different.  Originally Jeremy

17  and Jimmy sat on the front seat next to me, and Gabi and Marco

18  and Mike were sitting in the back.

19  Q.   Now as a general matter, what did you witness over the

20  course of the flight.?

21  A.   I witnessed Gabi in the back of the plane and Jimmy and

22  Mike in the back of the plane not fully dressed.

23  Q.   What was your understanding, as Gabi boarded the plane, of

24  why she was there?

25  A.   To service the cops.

IBSTGRA1                        Rechnitz - Direct

1    Q.  Where did you get that understanding from?

2    A.  Jeremy.

3    Q.  Did you yourself engage in any sexual activities with Gabi

4    on the way over?

5    A.  No, I did not.

6    Q.  What did you do?

7    A.  I was sleeping most of the time.  I had not been feeling

8    well.

9    Q.  What did you do once everybody got to Las Vegas?

10   A.  So first of all we checked into the hotel.  I had a large

11   two floor room at the -- I think it was at the MGM Sky Lofts,

12   and we got an extra room for Gabi and whoever would stay with

13   her.  And I ended up watching the Superbowl with my friends

14   from LA separate from everyone else who was on this trip this

15   flight.

16   Q.  About how much did the Sky Loft and the other room cost,

17   ballpark estimate?

18   A.  I'm not sure because I got a comp.

19   Q.  What does it mean to be comped?

20   A.  A casino, to attract you to come play in their casino,

21   often gives you a free room so you spend money gambling.

22   Q.  Had you had a pre-existing relationship with the MGM Grand?

23   A.  Yes.

24   Q.  Had you been comped before?

25   A.  Yes.

1   Q.  And were you comped on this trip?

2   A.  I believe so, yes.

3   Q.  In a way that covered both rooms?

4   A.  Yes.

5   Q.  Did you nevertheless pay the MGM Grand for other services

6   over the course of the trip?

7   A.  I think just tips, something that doesn't get comped they

8   charge on your credit card, maybe tips and taxes.

9   Q.  Where were you staying within the suite?

10  A.  I was upstairs in the bedroom, one of the bedrooms.

11  Q.  And had you sent the MGM Grand money in advance of the

12  trip?

13  A.  I don't remember.

14  Q.  Is that something that you had done in the past?

15  A.  Yes, so that they feel I will play with the money and comp

16  me.

17  Q.  Now from that point on, how much did you see of

18  Mr. Reichberg over the remainder of the weekend?

19  A.  Not much.

20  Q.  How much of Mr. Grant did you see over the remainder of the

21  weekend?

22  A.  Not much.

23  Q.  Were there particular points in which you interacted with

24  Mr. Reichberg and Mr. Grant?

25  A.  Yes.

IBSTGRA1                          Rechnitz - Direct

1    Q.  Tell me about those.

2    A.  The evening after the game, again I had gone to sleep, I

3    wasn't in a great mood, I wasn't feeling great.  And Jeremy

4    came upstairs to check on me and said we're downstairs hanging

5    out, you haven't hung out with us, why don't you come down.  I

6    said to Jeremy I'm not feeling well.  Then he said Jimmy's

7    going to come up also, and I remember telling him he better not

8    come upstairs, I want to sleep, everyone go out.

9    Q.  Did you spend more time with your Los Angeles friends or

10   with the folks that you had flown over with?

11   A.  The Los Angeles friends.

12   Q.  Did you watch the Superbowl?

13   A.  I did.

14   Q.  Where did you watch it?

15   A.  I watched it with my friends.

16   Q.  Meaning the Los Angeles folks?

17   A.  Yes.

18   Q.  Did you bet on the game?

19   A.  I did.

20   Q.  What kinds of bets did you place?

21   A.  Prop bets, proposition bets.

22   Q.  And for those on the jury who may be uninitiated, what's a

23   prop bet?

24   A.  A proposition bet is a very unlikely bet, so there's very

25   high odds.  The bet that I placed that year was the first score

1    of the game would be a safety, which is extremely rare.

2    Q.  How did it go?

3    A.  It worked out very well.

4    Q.  Did you bet on the first score being a safety?

5    A.  Yes.

6    Q.  Was the first score in fact a safety?

7    A.  It was.

8    Q.  About how much did that bet pay out?

9    A.  I bet a thousand dollars and I won $50,000.

10   Q.  Did you bet on other props or other -- well, did you make

11   other bets concerning the Superbowl and its various outcomes?

12   A.  Yes.

13   Q.  How did those bets work out by comparison?

14   A.  They did not work out.

15   Q.  Now did there come a point where you and the party that you

16   had come with left Las Vegas?

17   A.  Yes.

18   Q.  Did you leave by private jet?

19   A.  Yes, we did.

20   Q.  Who made the arrangements for that?

21   A.  I had.

22   Q.  Same company?

23   A.  Same company.

24   Q.  And about what time of day did that flight take off?

25   A.  I think we left in the morning after the Superbowl night.

1   Q.  Who was on that flight?

2   A.  The same passengers as came on the way.

3          MR. BELL:  So can we put up, Mr. Hamilton, just for

4   the witness, Government Exhibit 1011, please.

5   Q.  Are you familiar with this email?

6   A.  Yes, I am.

7   Q.  And how are you familiar with it?

8   A.  It's an email that was sent to me.

9          MR. BELL:  The government offers Government

10  Exhibit 1011.

11         MS. NECHELES:  No objection, your Honor.

12         MR. MERINGOLO:  No objection.

13         THE COURT:  Thank you, I'm accepting Exhibit 1011 into

14  evidence.

15         (Government's Exhibit 1011 received in evidence)

16         THE COURT:  You can proceed.

17         MR. BELL:  And let's publish that to the jury, please.

18  Q.  First, who is Michael Nizza?

19  A.  He was somebody who worked for Apollo Jets.

20  Q.  So the email from Mr. Nizza on February 3, 2013, says Hi

21  Jona, below is your itinerary for tomorrow.  We were able to

22  get kosher deli sandwiches.  Please let us know if you need us

23  to set up any transportation.  The departure time and date are

24  there from Las Vegas' McCarren International Airport, arrival

25  at Teterboro.  I want to be direct your attention to the very

1    bottom, if we can.  The passengers listed are yourself,

2    Mr. Reichberg, Mr. Franco, Mr. Grant, Ms. Curtis and

3    Mr. Milici.

4          Does that accord with your memory of who flew back

5    with you?

6    A.  Yes, sir.

7          MR. BELL:  Let's take that down.  Let's also put up

8    1013 just for the witness, please.

9    Q.  Are you familiar with this email?

10   A.  Yes.

11   Q.  And how are you familiar with it?

12   A.  It was an email sent to me from the MGM Grand.

13         MR. BELL:  The government offers 1013.

14         THE COURT:  Counsel?

15         MS. NECHELES:  No objection, your Honor.

16         MR. MERINGOLO:  No objection.

17         THE COURT:  Thank you.  I'm accepting 1013 into

18   evidence.

19         (Government's Exhibit 1013 received in evidence)

20         THE COURT:  You can proceed.

21         MR. BELL:  Thank you, your Honor.  Could we publish

22   1013, please.

23         And can we just highlight the date, the sender, which

24   is the MGM Grand Hotel, the recipient, Mr. Rechnitz, subject

25   line MGM Grand express checkout.

1          Finally, can we put Government Exhibit 930 up, please,

2     just for the witness.

3     Q.  And did you keep a ready account with the MGM Grand,

4     Mr. Rechnitz?

5     A.  Yes, a marker.

6     Q.  What's a marker?

7     A.  A marker is when the casino extends you credit based on

8     your history with them and your play, and they extend you

9     credit like a loan.  If you win, you keep the money, if you

10    lose you have to pay them back within a certain amount of time.

11    Q.  Are you able to access the information on your marker?

12    A.  I don't understand the question.

13    Q.  Sure.  Are you able to put in inquiries regarding your

14    balance with the MGM Grand at any given point?

15    A.  Yes.

16    Q.  How can you do that?

17    A.  You can reach out to your casino host or to the casino and

18    ask them.

19    Q.  Now do you recall at that moment what your balance was

20    going into the weekend?

21    A.  I do not.

22    Q.  Let me see if I can show you something that may refresh

23    your recollection.

24          MR. BELL:  Can we take a quick look at pages 2 and 36

25    the document on Mr. Rechnitz's screen.

IBSTGRA1                         Rechnitz - Direct

1            Let's start with page 2.

2    Q.  Mr. Rechnitz, does what's on your screen refresh your

3    memory to whether you sent any money ahead of your trip --

4    A.  Yes.

5    Q.  -- to the MGM?

6    A.  Yes.

7    Q.  About how much did you send?

8    A.  $100,000.

9    Q.  And for what purpose?

10   A.  Again, to get comped and to get casino play.

11           MR. BELL:  We'll take that down.  Thank you,

12   Mr. Hamilton.

13   Q.  Now after you got back, did you land at the same airport

14   you had taken off from in the New York City area?

15   A.  Yes.

16   Q.  Is that Teterboro Airport?

17   A.  Yes.

18   Q.  Once the flight landed, did you go home?

19   A.  I think so, yes.

20   Q.  How did you get out of Teterboro, do you recall.?

21   A.  Jeremy had arranged a ride for us with Nussy.

22   Q.  Is that the same Nussy Josephy that you discussed earlier

23   in your testimony?

24   A.  Yes.

25   Q.  Did you make a video recording at the time of that travel?

1    A.  Yes, I did.

2              MR. BELL:  So I would like, Mr. Hamilton, for you

3    to -- just for the witness and with no sound -- play the first

4    few seconds of Government Exhibit 308D, please.

5    Q.  Are you familiar with this video, sir?

6    A.  Yes, I am.

7    Q.  How familiar with it?

8    A.  This is a video that I recorded.

9              MR. BELL:  And your Honor, I will just offer

10   Government Exhibit 308D.

11             MS. NECHELES:  No objection.

12             MR. MERINGOLO:  No objection, your Honor.

13             THE COURT:  Thank you, I'm accepting Exhibit 308D into

14   evidence.

15             (Government's Exhibit 308D received in evidence)

16             THE COURT:  You can proceed.

17             MR. BELL:  Thank you, Judge.

18             Could we publish this to the jury and play it with

19   sound from the beginning.

20             (Video recording played)

21   Q.  Now you described taking rides with Mr. Josephy using

22   lights and sirens, was this an example of those?

23   A.  Yes.

24   Q.  And you also described a safety bet.  Is the safety bet

25   that you described in the video the same prop bet that you

IBSTGRA1                          Rechnitz - Direct

1    described having won on in Vegas?

2    A.  Yes.

3    Q.  Now did there come a time during the overall period that we

4    have discussed when you took care of additional travel

5    accommodations for Mr. Grant?

6    A.  Yes.

7    Q.  And what was it that you did for him?

8    A.  He was going to Rome with his wife on vacation, and I paid

9    for his hotel stay.

10   Q.  Before we get to the Rome hotel stay, was there ever

11   another occasion when you went on vacation with Jimmy Grant?

12   A.  Not that I could think of.

13   Q.  And when Mr. Grant said we are due for -- to go on vacation

14   again, the email that you were shown the other day, at that

15   point was the only vacation that you had taken with him the

16   trip to Las Vegas?

17   A.  Yes.

18   Q.  Now you mentioned that you paid for a hotel stay for

19   Mr. Grant in Rome.  How did you happen to learn that Mr. Grant

20   was going to Rome?

21   A.  Jeremy had told me that Jimmy was going to Rome, and that

22   one time when I was with Jimmy and Jeremy I said oh, I had

23   connections in Rome, when you go, let me know.

24   Q.  And so did you discuss Mr. Grant's travel plans with

25   Mr. Grant?

1    A.  Yes.

2    Q.  Did you also discuss them with Mr. Reichberg?

3    A.  Yes.

4    Q.  And what was the nature of the conversations that you had

5    regarding these travel plans with Mr. Reichberg?

6    A.  Jeremy said that Jimmy was expecting me and kept checking

7    in with him about my booking a hotel for him and handling the

8    payment.  I may have told Jimmy that I owned a hotel there.  I

9    think I did, as a matter of fact.  And he was expecting me to

10   take care of his stay.

11   Q.  Now to be clear, Mr. Rechnitz, did you own a hotel in Rome?

12   A.  No, I did not.

13   Q.  Why would you tell Mr. Grant that?

14   A.  To act big in front of him, I lied.

15   Q.  Did you in fact pay for that hotel stay?

16   A.  Yes, I did.

17   Q.  And how did you come to pay for that hotel stay?

18   A.  I used my hotel booking agent from Luxury Connections, Avi

19   Goldstein.

20   Q.  And what, if anything, did you ask Mr. Goldstein for?  In

21   other words, did you have particular specifications?

22   A.  I told him I wanted one of the nicest, most luxurious

23   hotels in Rome.

24   Q.  Was a hotel picked out?

25   A.  Yes.

IBSTGRA1                        Rechnitz - Direct

1  Q.  And did you let Mr. Grant know that you had in fact taken

2  care of this for him?

3  A.  Yes.

4         MR. BELL:  Can we put up just on the witness' screen

5  what's been marked for identification as Government

6  Exhibit 1085.

7         MS. NECHELES:  This is already in evidence, I think,

8  as a defense exhibit.

9         THE COURT:  Thank you.

10        MR. BELL:  If only because I'm not sure which one, I

11 offer it any way, I assume without objection.

12        THE COURT:  Counsel?

13        MS. NECHELES:  Could we approach one minute?

14        THE COURT:  Please do.

15        MS. NECHELES:  Your Honor, we don't need to approach.

16 Your Honor, I don't want to discuss this.

17        THE COURT:  Okay.  Thank you.

18        MR. BELL:  We offer 1085.

19        MS. NECHELES:  No objection, your Honor.

20        MR. MERINGOLO:  No objection.

21        THE COURT:  Thank you.  I'm accepting 1085 into

22 evidence in its unredacted form.

23        (Government's Exhibit 1085 received in evidence)

24        THE COURT:  You can proceed.

25        MR. BELL:  Thank you, Judge.

1          Could we publish 1085 to the witness, please, and

2     focus in on the top part, you email jamesjr5124@msn.com and you

3     copy Mr. Reichberg, and it's a forward that says thank you for

4     your reservation at Hotel Regina Baglioni.  And you write:

5     Most luxurious hotel in Rome.

6     Q.  First of all, who was James JR?

7     A.  That's James Grant's private email address.

8     Q.  For what reason did you tell Mr. Grant it was the most

9     luxurious hotel in room?

10    A.  So I get the credit of giving him a substantial gift.

11    Q.  And what was the purpose of giving James Grant substantial

12    gifts at this point?

13    A.  The same thing I was doing, to bribe him so that I could

14    get things in return.

15    Q.  And why did you copy Mr. Reichberg on this email?

16    A.  Again, we were a team, and Jeremy was involved in pushing

17    me to do this, and just to keep everyone in the loop.

18    Q.  What was it that you and Mr. Reichberg were a team at

19    doing?

20    A.  Again, in this instance, in giving and bestowing gifts upon

21    police officers in exchange for official action in return.

22          MR. BELL:  So Mr. Hamilton, let's pop out of that

23    blow-up window and let's focus in on the bottom email, the

24    remainder.

25    Q.  And so the forwarded email is a Luxury Connection

1  reservation dated August 8, 2013, and it's to you, and it

2  says -- has a reservation confirmation number, and it says Dear

3  Mr. Grant, James.

4          To your knowledge, who was it who had provided Luxury

5  Connections with Mr. Grant's name?

6  A.  Avi Goldstein.

7  Q.  And who had provided it to Mr. Goldstein?

8  A.  I provided the name to him.

9  Q.  There is then a reservation information with booking dates,

10 two nights, number of rooms, number of guests and checkout

11 time.  Is there price information here?

12 A.  No.

13 Q.  And was there, to your recollection, Mr. Rechnitz, a reason

14 for that?

15 A.  Yes.

16 Q.  What was the reason why you didn't send price information

17 to Mr. Grant?

18 A.  I think I removed it because I had given him the impression

19 that I got it for free.

20          MR. BELL:  We could take that down.

21 Q.  Did you tell Jimmy anything about why you were doing this

22 for him?

23 A.  I didn't specifically tell him a reason.

24 Q.  And did you and Mr. Grant speak about this trip after the

25 trip took place, that is, after Mr. Grant's stay at the hotel

IBSTGRA1                          Rechnitz - Direct

1   in Rome?

2   A.  Yes.

3   Q.  What, if anything, did you and Mr. Grant discuss?

4   A.  I remember him saying thank you, and he owed me one.

5   Q.  What did you understand that he owed me one -- Mr. Grant

6   owed you one, rather, to mean?

7   A.  He owes me one.  I did him a favor and he will get me back.

8   Q.  Was that in keeping with other things that you did for

9   Mr. Grant during this period of time?

10  A.  Yes.

11  Q.  Let's switch gears slightly.  Was there a point where you

12  came to know that Mr. Reichberg could assist people in getting

13  approvals for gun permits?

14  A.  Yes.

15  Q.  How did you come to know this?

16  A.  Jeremy had told me that he had a connection in the pistol

17  division of the NYPD.

18  Q.  At the time what was your understanding of how getting a

19  firearm permit worked in New York City?

20  A.  I didn't know much about it at the time, I just knew that

21  there was a division in the NYPD and there's a long process to

22  get approved.

23  Q.  Was what was it that you learned that Mr. Reichberg had the

24  ability to do?

25  A.  Expedite that process.

1  Q.  And what was your understanding of how Mr. Reichberg was

2  able to expedite that process?

3  A.  He had told me that Jimmy Grant had a friend in the pistol

4  division that Jimmy connected him with, and that he would be

5  able to get approvals quickly.

6  Q.  Did there come a point where you yourself sought to get a

7  permit to hold a firearm?

8  A.  Yes.

9  Q.  Do you remember approximately when that was?

10  A.  It was during these years, I don't remember the exact year.

11  Q.  And so how did it come to be that you wanted a firearm

12  permit?

13  A.  Again, it was another thing at that point in my life that

14  would just be another thing I have other people don't have, and

15  these types of things were important to me at that time.

16  Q.  Did you understand Mr. Reichberg to be interested in the

17  same thing?

18  A.  Yes.

19  Q.  Did you apply by yourself or with somebody?

20  A.  With Jeremy.

21  Q.  And what did you do as part of that process?

22  A.  So Jeremy said that in order to cover the paperwork, to dot

23  Is and cross Ts, we need a purpose for the gun permit, so he

24  said that he and I should get added to the payroll of a diamond

25  company.

IBSTGRA1                        Rechnitz - Direct

1    Q.  Did you and Mr. Reichberg take steps to do that?

2    A.  Yes.

3    Q.  Which diamond company did you get added to the payroll of?

4    A.  Taly Diamonds.

5    Q.  Did you have a contact there?

6    A.  I did.

7    Q.  Who was the contact?

8    A.  Yaron Turgeman, T-U-R-G-E-M-A-N, Y-A-R-O-N.

9    Q.  Now Mr. Rechnitz, how did you know Yaron Turgeman?

10   A.  We shared office space, friends, did a lot of business.

11   Q.  And so what did you do in order to get yourself and to get

12   Mr. Reichberg on Mr. Turgeman's payroll?

13   A.  Spoke to Yaron, he put us in contact with his controller

14   Beatrice, and we got added to his payroll.

15   Q.  What paperwork came as a result of your being added to the

16   payroll?

17   A.  I got a pay stub on every month.  I would get paid a

18   minimum amount that he needed to pay me to keep me on the books

19   which I would later reimburse him for.

20   Q.  And approximately how often did you reimburse him?

21   A.  I think it was quarterly.

22   Q.  And about how much did you pay back a quarter?

23   A.  The full amount that he had paid me.

24   Q.  Do you recall roughly the order of magnitude of how much

25   that might have been?

1   A.  I think it was 2 to $3,000 a month.

2   Q.  Now did there come a point where you filled out an actual

3   application for a gun license?

4   A.  Yes.

5   Q.  Where did you do that?

6   A.  In my office.

7   Q.  And who else was present?

8   A.  Jeremy.

9   Q.  The what was it that you and Jeremy actually did as part of

10  that process?

11  A.  So Jeremy was filling something out online which we were

12  going to print and then have a handwritten section and sign.

13  He was asking me questions, I was giving him answers as he

14  typed them in for my application, then he printed it out for me

15  and instructed me what else to do on the application, including

16  writing in a portion, and then I signed it.

17  Q.  Now did you understand in filling out this application that

18  you were filling -- withdrawn.

19          When you filled out the application, did you

20  understand that the application was being filling out honestly?

21  A.  No, it was filled out dishonestly.

22  Q.  In what respects?

23  A.  First of all, I wasn't really an employee of the diamond

24  company, so I didn't have a safety of risk carrying diamonds.

25  Second of all, I handwrote a portion saying that the reason I

1    wanted to keep the gun application away from the public

2    databases is because I was a Westchester County chaplain, and

3    that was a farce, I wasn't really a chaplain.

4    Q.  And to be clear, did Mr. Reichberg have, to your knowledge,

5    a real job working with Taly Diamonds or Mr. Turgeman?

6    A.  No, he did not.

7    Q.  After you filled out the application, what happened next as

8    part of this process?

9    A.  So Jeremy said we're going to be called for interviews at

10   some point.  I remember one day he showed me that he got his

11   gun and he got a permit, and I asked him how did you get it, I

12   thought we were doing it together, and he said I wanted to make

13   sure it works first, now I'm going to take you downtown to get

14   it done.

15   Q.  Did there come a point where in fact Mr. Reichberg took you

16   downtown to get this done?

17   A.  Yes.

18              (Continued on next page)

19

20

21

22

23

24

25

IBSKGRA2                        Rechnitz - Direct

1    BY MR. BELL:

2    Q.   In what building did this take place?

3    A.   In One Police Plaza.

4    Q.   Were you already familiar with One Police Plaza at this

5    point?

6    A.   Yes, I was.

7    Q.   About how often were you frequenting One Police Plaza at

8    this stage?

9    A.   At some point, multiple times a week.

10   Q.   Where did you go within One Police Plaza with respect to

11   your gun license application?

12   A.   On the ground floor, there's a pistol division across from

13   the large auditorium where promotions take place.

14   Q.   To your best recollection, Mr. Rechnitz, did you go there

15   once, more than once?  How many times did you stop in as part

16   of that process?

17   A.   I went in one time.

18   Q.   Who did you go with?

19   A.   Jeremy.

20   Q.   What do you recall of that visit?

21   A.   I recall walking into the office, and the lady at the front

22   desk told us to stop and check in, and Jeremy started telling

23   her he didn't need to, that we had an appointment with -- I

24   don't remember the name of the person, one of the heads of the

25   office, and that became a little bit of a scene.  She was

1   upset, and they were kind of arguing.

2           And then the head of the office came down to come get

3   us.  I filled something out just to check the name with the

4   lady in the front, and then we walked all the way to the back

5   right corner of the office to a private office and met with the

6   individual who was taking care of my gun permit.

7   Q.  What happened during that meeting, to the extent that you

8   remember?

9   A.  He had told me he was going to put me in touch with

10  somebody just to take my fingerprints, and copy my ID, and sit

11  with me for a few moments, and that he was going to give me a

12  restricted permit, just carrying for the weekends.

13  Q.  How did you react to learning that you were in line to only

14  get a restricted permit?

15  A.  I was annoyed, knowing that Jeremy had an unrestricted, and

16  I said:  Why am I getting only a restricted?  And Jeremy, in

17  Hebrew, showed me to quiet down, and that we have to start that

18  way, and it will become unrestricted over time.

19  Q.  So did you complete that interview process?

20  A.  Yes.

21  Q.  During that visit, were you asked any questions about Taly

22  Diamonds or your job with them?

23  A.  No, I was not.

24  Q.  Did there come a time where you discussed your pending

25  license application with Mr. Grant?

1    A.  Yes.

2    Q.  What do you recall of your discussion or discussions with

3    Mr. Grant on this score?

4    A.  We had one brief conversation, that I can recall, where he

5    told me that he placed a call and that it's taken care of.

6              MR. BELL:  Why don't we do this:  Your Honor, the

7    government offers Government Exhibit -- oh, one moment, please?

8              (Pause)

9    BY MR. BELL:

10   Q.  Let me take you back, Mr. Rechnitz, to the subject of

11   Mr. Turgeman's company.  Were there other benefits to getting

12   on Mr. Turgeman's payroll for you?

13   A.  Yes.

14   Q.  What benefits?

15   A.  He had a health insurance plan because he had a company

16   with several employees, so he got a plan, a group plan, for his

17   office.

18   Q.  What interest did you have in Mr. Turgeman's company's

19   group plan?

20   A.  Once I was on the payroll, I asked him if he can add me for

21   health insurance and I would reimburse him, so he didn't have

22   to go out of pocket.

23   Q.  Did that, in fact, happen?

24   A.  Yes.

25   Q.  For about how long were you on Mr. Turgeman's company's

1   health insurance plan?

2   A.  From the time I started through, I think it was, 2016.

3   Q.  Now, did you understand, at that point, that you were going

4   to be getting health coverage based on the representation that

5   you were, in fact, working for Mr. Turgeman's diamond company?

6   A.  I didn't give it that much thought at the time, but I

7   definitely did not understand it, so I didn't give it too much

8   thought, but I definitely knew I was getting it based on being

9   one of his employees.

10  Q.  Why, Mr. Rechnitz, would you get on Mr. Turgeman's

11  company's health plan as opposed to getting health coverage

12  through your own company, JSR Capital?

13  A.  It was out of convenience.  He had a Beatrice in his

14  office.  His controller just dealt with the insurance company,

15  signed up on the plan.  It was easy, it was effortless.

16  Q.  Did you, to your understanding now, save much in the way of

17  money for having done it through Mr. Turgeman's company as

18  opposed to your own?

19  A.  No, I did not.

20  Q.  Did it, in fact, cost you more?

21          MR. MERINGOLO:  Objection.

22          THE COURT:  Thank you.

23          You can answer the question.

24          THE WITNESS:  I think the difference between Yaron's

25  company and when I went private may have been a few hundred

IBSKGRA2                          Rechnitz - Direct

1    dollars a year in savings to me once I went on my own.

2    BY MR. BELL:

3    Q.  Going back to the gun license part of the Turgeman

4    dealings, did there come a time where the NYPD actually

5    notified you that you were approved for a firearm?

6    A.  No.

7    Q.  Did there ever come a time where the NYPD notified you that

8    you had been rejected for a gun permit?

9    A.  No.

10   Q.  Did there come a point where you learned that Mr. Reichberg

11   assisted anyone else in getting a firearm?

12   A.  Yes.

13   Q.  Who?

14           MS. NECHELES:  Objection, your Honor.

15           THE COURT:  Thank you.

16           You can answer the question.

17           MS. NECHELES:  Your Honor, can we approach on this?

18           THE COURT:  Please do.

19           (Continued on next page)

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  Thank you.

3           Sorry.  Go ahead.  There's an objection?

4           MS. NECHELES:  Your Honor, I think this is beyond the

5     conspiracy now.  It's another -- now there's going to be, like,

6     alleged testimony about another bad act of Mr. Reichberg.

7     Mr. Reichberg is not alleged to have bribed anybody in the gun

8     licensing division.  Once again, we're going to have, oh, we

9     helped someone else get a license and some sort of suspicion

10    here.  It's not part of the conspiracy here, your Honor.

11          THE COURT:  Thank you.

12          Can you make a proffer, please, counsel?

13          MR. BELL:  Sure thing, your Honor.  And I respect

14    Ms. Necheles' objection, but I don't agree with it.  The issue

15    here is that, just as Mr. Reichberg was able to use Mr. Grant

16    in order to usher an official action; that is, the issuance of

17    his own gun license, the attempted issuance of Mr. Rechnitz's

18    gun license into being, so, too, were people like Mr. Rechnitz

19    able to refer other people to Mr. Reichberg for that purpose.

20    It's all of the same thing.

21          THE COURT:  I'm sorry.  Just to be clear, the

22    testimony that you're proffering is going to come from this is

23    that Mr. Reichberg asked Mr. Rechnitz to obtain a gun permit?

24          MR. BELL:  I'm sorry.  No, the other way around.  So

25    Mr. Rechnitz, I believe, introduced Mr. Reichberg to the

1    gentleman who I believe is the answer to the pending question,

2    Eli Rowe, for the exact same purpose.  So to the extent that

3    Mr. Rechnitz's application and Mr. Reichberg's application come

4    in, so, too, does Mr. Rowe's.

5              THE COURT:  Thank you.

6              Counsel?

7              MS. NECHELES:  Your Honor, I don't think there's going

8    to be any evidence, or at least the government has not

9    proffered it, that this was done through bribery.  This case is

10   about bribery; it's not about favors.

11             MR. BELL:  I want to be clear.  I'm not suggesting

12   that license division people were bribed as part of this, nor

13   have we made that suggestion with respect to the gun licenses

14   that we've already discussed.  It's the same mechanism that

15   we've discussed throughout.  If those prior ones get in, this

16   gets in, too, on the same rationale.

17             MS. NECHELES:  But the prior ones got in because it

18   was connected to Mr. Grant.  I'm not hearing the government

19   proffer that this is connected.  It was connected to supposedly

20   there's a bribe to Mr. Grant; Mr. Grant sets this up.

21             MR. BELL:  Respectfully, Mr. Rechnitz has testified

22   that the whole way that Mr. Reichberg was able to bring these

23   things into being was by virtue of his connection to Mr. Grant

24   because Grant had a guy in the licensing division.

25             THE COURT:  Thank you.

IBSKGRA2                        Rechnitz - Direct

1                 You can proceed with this line of inquiry.

2                 MR. BELL:  Thank you, your Honor.

3                 (Continued on next page)

1              (In open court)

2              THE COURT:  Thank you.

3              I'm sorry.  Mr. Bell, you can proceed.

4    BY MR. BELL:

5    Q.  I believe, Mr. Rechnitz, that the pending question was --

6    well, I'll put it this way:  Did you introduce Mr. Reichberg to

7    anyone else who later asked Mr. Reichberg for help getting a

8    gun permit?

9    A.  Yes.

10   Q.  Who was that?

11   A.  Eli Rowe.

12   Q.  Who was Eli Rowe?

13   A.  He was a friend.

14   Q.  And what did you understand Mr. Rowe's general business to

15   be?

16   A.  A company called Parameds, medical billing for companies.

17   Q.  Was Mr. Rowe successful?

18   A.  Yes.

19   Q.  When you introduced Mr. Reichberg to Mr. Rowe, was

20   Mr. Reichberg enthusiastic about meeting Mr. Rowe?

21   A.  Yes.

22   Q.  Did Mr. Reichberg communicate why to you?

23   A.  Yes.

24   Q.  And why?

25   A.  Because he was somebody with wealth and means, and he could

1    be a potential source for Jeremy to make money.

2    Q.  Now, did you ultimately refer -- did there come a time when

3    you referred Mr. Rowe to Mr. Reichberg for purposes of

4    Mr. Rowe's getting a gun license as well?

5    A.  Yes.

6    Q.  And what do you recall of that, sir?

7    A.  I remember Mr. Rowe saying that he had issues, that it

8    was -- at one point, that his gun was limited or restricted.

9    So I said:  I have a guy for you.  Let me introduce you to

10   Jeremy.  He has a guy in the pistol division, and he can get it

11   done.

12   Q.  Did you do that?

13   A.  Yes.

14   Q.  What, if anything, came of Mr. -- oh, well, withdrawn.

15          Did you discuss with Mr. Reichberg whether

16   Mr. Reichberg was going to charge Mr. Rowe for this?

17   A.  Yes.

18   Q.  And what, if anything, did you discuss with Mr. Reichberg

19   concerning that?

20   A.  I told him it was not a favor, and he can work with him

21   directly, and charge him whatever he wants.

22   Q.  So did you get an understanding after the fact from

23   Mr. Reichberg of what wound up happening there?

24   A.  No.

25   Q.  Did Mr. Reichberg and Mr. Rowe continue to maintain a

1    relationship afterwards?

2    A.   Yes.

3    Q.   Now, switching gears slightly, approximately when did you

4    begin cooperating with the government?

5    A.   In the spring of 2016.

6    Q.   Did you continue to receive health coverage through

7    Mr. Turgeman's company's health insurance for a time after that

8    point?

9    A.   Yes.

10   Q.   How did that come to be?

11   A.   I had -- before I began cooperating, I renewed my health

12   insurance plan with Taly Diamonds for a year, and that year

13   expired in the middle of my cooperation with the government.

14   So I had not really realized that I was still on that plan

15   until a notice for renewal had come, and I received a contact

16   from Beatrice asking me if I wanted to renew.

17   Q.   What was your reaction to receiving that contract from

18   Beatrice -- that contact, rather, from Beatrice?

19   A.   I immediately informed the government that I was still on

20   this plan, and that I would switch right away, and that it was

21   a mistake.

22   Q.   Now, to be clear, did you simply forget that you were on

23   health coverage in the intervening time?

24           MS. NECHELES:  Objection, your Honor.

25           THE WITNESS:  No.

1            MS. NECHELES:  Leading.

2            THE COURT:  Thank you.

3            I'll permit it.  You can proceed.

4            THE WITNESS:  I did not forget I was on health

5    coverage.  We got monthly explanation of benefit statements.

6    My kids were going to the doctors.  I didn't forget I was on

7    health coverage.  I just had not remembered that I was still on

8    that plan.

9    Q.  Now, switching gears yet again, were there occasions during

10   the period of time that we've been discussing, when you and

11   Mr. Reichberg had the relationship with these officers, when

12   you and Mr. Reichberg enlisted the officers in settling private

13   disputes?

14   A.  Yes.

15   Q.  Do you recall any of those?

16   A.  Yes.

17   Q.  Can you give me an example of a private dispute that you

18   and Mr. Reichberg had officers intervene as part of?

19   A.  Yes.  One that comes to mind is Yaron Turgeman from Taly

20   Diamonds had called me.  He was in the diamond business, and he

21   had given a stone, a diamond, on consignment, on memo, to

22   another diamond dealer.

23   Q.  What does it mean for a diamond to be given on consignment

24   or on memo?

25   A.  The way that diamond dealers sell their diamonds is either

1     to a private purchaser, a retail store, or sometimes a dealer,

2     a similar dealer has a customer they want to show the stone to.

3     So they basically loan that stone at a price to the other

4     dealer, so that he can show it to his client in the attempt --

5     in the hopes of making a sale.

6     Q.  So what happened in this instance?

7     A.  The person that he had given the stone on consignment to

8     did not return the stone when called upon.  So Yaron was upset,

9     and called me up, and said:  Can you call Jeremy, and go to one

10    of our police friends, and have him just scare the guy who's

11    holding the stone, so that he gives it back?

12    Q.  And what happened as a result of this request?

13    A.  As a result, I called Jeremy, and Jeremy spoke to Yaron

14    directly about the situation.  I was apprised throughout.  And

15    he sent over some officers to meet Yaron's brother-in-law,

16    Jordan Smith, at the office of the person who was holding

17    Yaron's stone, and it worked.  Yaron got his stone back.  The

18    guy got nervous.

19    Q.  Now, ordinarily -- well, first of all, you testified at the

20    very beginning of the trial that you have some experience in

21    the diamond business.  Did you have some experience in the

22    jewelry business at this time?

23    A.  Yes.

24    Q.  Did you have experience with disputes concerning stones

25    that go unreturned when they are given over through consignment

 1    or memo?

 2    A.   I didn't have personal experience, but I had knowledge

 3    about how the industry works.

 4               MS. NECHELES:  Objection, your Honor.  He's not an

 5    expert.

 6               THE COURT:  Thank you.

 7               MR. BELL:  I'm not seeking to qualify him, Judge.

 8               THE COURT:  Thank you.

 9               That's fine.  Counselor, rephrase the question.  I'm

10    going to strike that answer.

11               MR. BELL:  Sure thing.

12    BY MR. BELL:

13    Q.   To your understanding, Mr. Rechnitz, how do consignment

14    disputes ordinarily get settled?

15               MS. NECHELES:  Objection.

16               THE COURT:  Thank you.

17               Can you rephrase the question, counsel?

18               MR. BELL:  Sure.

19    Q.   Well, I'll do it this way:  With respect to the way in

20    which you and Jeremy had that dispute resolved, was that an --

21    did you understand, through your conversations with Jeremy,

22    that to be an ordinary way of resolving that sort of dispute?

23               MS. NECHELES:  Objection.

24               THE WITNESS:  No.

25               THE COURT:  Thank you.

1          I accept the answer.

2          THE WITNESS:  No.  He had told me that he was doing a

3    big favor for Yaron, Yaron better appreciate it, because

4    ordinarily these things don't go to the police.  It's a civil

5    issue between lawyers.

6          MR. BELL:  One moment, please.

7          (Pause)

8    BY MR. BELL:

9    Q.  I want to direct your attention specifically to Michael

10   Harrington and to Philip Banks for a bit.  I think you

11   testified earlier that you met Chief Banks shortly before he

12   became the chief of department and that your relationship

13   intensified afterwards.

14          Once Banks became chief of department, about how often

15   did you visit him?

16   A.  Sometimes several times a week, sometimes once a week.

17   Q.  Would you visit him alone or with people?

18   A.  I'd always go with Jeremy.

19   Q.  What would you and Jeremy do during these visits?

20   A.  We would bring lunch.  Jeremy would pick up the lunch from

21   Brooklyn, we'd come have lunch with him in his office.

22   Sometimes with lunch, sometimes without lunch.  We'd smoke

23   cigars in his office.

24   Q.  What kind of lunch would you bring?

25   A.  Sushi platters and other sorts of...

IBSKGRA2                         Rechnitz - Direct

1    Q.   Who would pay for those lunches?

2    A.   Jeremy.

3            MR. BELL:  Why don't we queue up, Mr. Hamilton, just

4    for the witness' screen, what's marked for identification as

5    Government Exhibit 303.  I'll ask you in a moment to play the

6    first few seconds of that without the sound.

7            But before we do:

8    BY MR. BELL:

9    Q.   You've talked about parking before.  Once you got out of

10   your vehicle, how would you ordinarily access Mr. Banks'

11   office?

12   A.   There was a private elevator.  He would send someone down,

13   usually Mike Harrington, to meet us, and there was a private

14   elevator for the commissioner and for the police chief.

15   Q.   Did you understand these to be ways of getting to Banks'

16   office available to most members of the public?

17   A.   No.

18   Q.   Did you understand them to be ways of access available to

19   most members of the police department?

20   A.   No.

21   Q.   When you go up that way, can people generally see you?

22   A.   No.  It's a way to go up being unseen, for the most part.

23   Q.   Are you familiar with the video on your screen currently?

24   A.   Yes.

25   Q.   How are you familiar with it?

IBSKGRA2                       Rechnitz - Direct

1    A.  I took it.

2              MR. BELL:  The government offers 303.

3              MS. NECHELES:  No objection, your Honor.

4              MR. MERINGOLO:  No objection.

5              THE COURT:  Thank you.

6              I'm accepting Exhibit 303 into evidence.

7              You can proceed.

8              (Government's Exhibit 303 received in evidence)

9              MR. BELL:  Thank you, your Honor.

10   BY MR. BELL:

11   Q.  Where did you take this video?

12   A.  In Chief Banks' private office at his conference table.

13             MR. BELL:  Why don't we go ahead and publish that for

14   the jury, Mr. Hamilton.  Play the video.  Thank you.

15             (Video playback)

16   Q.  So where were you there?

17   A.  In Chief Banks' private office.

18   Q.  I know we went -- that was a very short video, but who was

19   visible on that video?

20   A.  I saw Mike Harrington, Philip Banks, and Jeremy Reichberg.

21             MR. BELL:  Can we play that just one more time,

22   Mr. Hamilton, as it is very short.

23             (Video playback)

24             MR. BELL:  Why don't we stop right there.

25             THE WITNESS:  Chief Colon.

IBSKGRA2                          Rechnitz - Direct

 1    BY MR. BELL:
 2    Q.  Was that Chief Colon we passed just a moment ago?
 3    A.  Yes.
 4    Q.  Who are we looking at now?  Whoops.
 5    A.  Michael Harrington.
 6    Q.  All right.
 7          MR. BELL:  And continue to drag it, Mr. Hamilton.
 8    Thank you.
 9    Q.  We're now at the three-second mark.  Who's that?
10    A.  Philip Banks.
11          MR. BELL:  Why don't we take that down.
12    Q.  Did Chief Banks have a secretary?
13    A.  Yes.
14    Q.  Did you get to know her name?
15    A.  Yes.
16    Q.  What was her name?
17    A.  Marilyn.
18    Q.  Did you deal with Marilyn at all?
19    A.  A little bit.
20    Q.  In what ways?
21    A.  Sometimes when we went up there, I'd offer her some lunch
22    from what we brought in.  She'd come in and grab food during
23    our meeting, grab -- after we're done eating, she'd take it.  A
24    couple of times, when I called the office for Chief Banks, I
25    couldn't reach him, she picked up.  There was a time when he

1    was honored at Noble, and she coordinated our seats.  Jeremy

2    and I attended that, and I gave a contribution.

3    Q.  Now, at the time that Banks got promoted, how important

4    were the Banks' and Harrington relationships to the scheme that

5    you and Jeremy were involved with?

6    A.  That was a game changer.  It was a huge win for us.

7    Q.  Why, in particular, was Banks so important?

8    A.  He's the chief of the department, basically the CEO of a

9    company.

10   Q.  Did you ask Banks himself for many things?

11   A.  A few things.

12   Q.  What sorts of things did you ask Banks for?

13   A.  I had asked him for a parking placard for myself, I had

14   asked him to promote Jimmy Grant, and I had asked him to get my

15   assistant, Levin's brother, Kelvin, into a unit in the police

16   department that he wanted to get into.

17   Q.  What was your assistant Levin's name, full name?

18   A.  Levin Prado P-r-a-d-o.

19   Q.  And his brother's name?

20   A.  Kelvin, K-e-l-v-i-n, Prado.

21   Q.  Why don't we do it this way:  What various things did you

22   attempt to do to help Kelvin Prado with his police career over

23   the years?

24   A.  So, first of all, I had to meet with Jeremy.  Jeremy asked

25   him a lot of questions.  As a favor to me, Jeremy spoke to Mike

1    Harrington about him, as did I, and then I spoke to Philip

2    Banks about it.

3            Initially, he did not, on his first time, pass the

4    test to get into the NYPD.  So I don't remember the specifics,

5    but Jeremy met with him to try and get him in, and then, at

6    some point, once he passed the test, we got him transferred

7    into a unit that Michael Harrington's brother was in charge of.

8    Q.  Now, did Banks have a value to you and Mr. Reichberg beyond

9    the individual things that you just mentioned?

10   A.  Sure.

11   Q.  What was that value?

12   A.  Just being associated with him in the cop world, the police

13   department was huge for us, because if people associated us as

14   Banks' guys and very close to him, they would, hopefully, play

15   ball with us.  Because promotions in the police department is

16   the thing that's most on the minds of many police officers, how

17   to get promoted, how to get transferred, and when you have the

18   police of chief's ear, that's something that can be of value to

19   a police officer as well.

20   Q.  What specifically, Mr. Rechnitz, did -- what specific

21   effect did Banks have on your ability to get things from

22   Michael Harrington?

23   A.  We were part of what we called the inner circle, so Mike

24   Harrington understood that to play ball with us, and he was

25   going to take care of us.

1    Q.  What did you understand Mr. Harrington's individual

2    influence to be within the NYPD?

3    A.  Also very strong.  When he speaks, it's as if the chief of

4    department is speaking.  He's his right-hand man.

5    Q.  At the time that you and Mr. Reichberg got in with Phil

6    Banks, did you have a sense that Banks could rise still higher

7    within the department?

8    A.  Yes.

9    Q.  And what was your belief?

10   A.  We had believed and hoped that he would become the police

11   commissioner one day.

12   Q.  And when you say "we," who are you referring to there?

13   A.  Jeremy and me.

14   Q.  Did you do anything to try to make that happen, sir?

15   A.  Yes.

16   Q.  And what did you do?

17   A.  I met and emailed Mayor de Blasio several times about

18   making Phil Banks the next commissioner, we thought that he was

19   a good choice, and we had communicated that to him on several

20   occasions.

21        MR. BELL:  What I'd like to do is -- Mr. Hamilton, can

22   you put up, on the witness' screen, Government Exhibit 1038.

23   Q.  Are you familiar with this email?

24   A.  Yes, I am.

25   Q.  How are you familiar with that email?

1   A.  It's an email that Jeremy and I wrote to Bill de Blasio.

2              MR. BELL:  Your Honor, the government offers 1038.

3              MS. NECHELES:  No objection, your Honor.

4              MR. MERINGOLO:  Just one second, Judge?

5              (Pause)

6              MR. MERINGOLO:  No objection.

7              THE COURT:  Thank you.

8              I'm accepting 1038 into evidence.

9              You can proceed.

10             (Government's Exhibit 1038 received in evidence)

11             MR. BELL:  Mr. Hamilton, can we publish that, please.

12  BY MR. BELL:

13  Q.  In the top email, Mr. de Blasio replies to you, but I'd

14  like to focus on the bottom email initially.  The email is from

15  you to Bill de Blasio.  It copies Jeremy Reichberg.  The

16  subject is "Personal and Confidential."  It's dated

17  November 22nd, 2013.  I'll read, I suppose, portions of it.

18             "Dear Mayor de Blasio, thank you for your phone call

19  today."

20             MR. BELL:  You don't have to highlight this,

21  Mr. Hamilton.

22  Q.  "It means a great deal to us.  Secondly, we would like to

23  give our unbiased opinion and knowledge on a few issues that we

24  believe can be helpful for some of your upcoming decisions.

25  Please take this email as it is meant to be, good advice for

1    you from concerned community members and friends of yours:

2             One, security detail.  As you begin to choose your

3    security detail, you must realize that the members of your team

4    need to be the most trustworthy individuals surrounding you,

5    and they will always know your whereabouts.  If not chosen

6    wisely, they can talk to unions and the press, and when they

7    talk, they are a firsthand source.  Our advice to choosing the

8    right team is to reach out to Chief Banks for his advice for

9    the right team, as he will make sure you are surrounded by the

10   type of people you need around you.  We have seen instances

11   where members of security detail breach the trust of their

12   superior."

13            Why was this security detail point important to you

14   and to Mr. Reichberg?

15   A.  Phil Banks had asked me to relay that to the mayor, and he

16   said, coming from us, it's something that he probably would

17   listen to, because he knew about our close relationship with

18   Bill de Blasio, and it would also give us firsthand knowledge

19   of the mayor's schedule and where he was for the most part.

20   Q.  Item number 2 --

21            MR. BELL:  And I'd ask you to highlight this one,

22   Mr. Hamilton.

23   Q.  -- would be, "If Chief Banks were offered the position of

24   police commissioner, he would accept it.  As you know, we

25   believe he is the right fit for the job for many reasons."

1          Mr. Rechnitz, did you understand there to be an

2    opening for a police commissioner?

3    A.  Yes.

4    Q.  And what was it that led you to include this in your and

5    Jeremy's email to Mr. de Blasio?

6    A.  We were very close to Chief Banks, and we wanted him to

7    become the commissioner.

8    Q.  Why did you and Mr. Reichberg want Chief Banks to become

9    the commissioner?

10   A.  In addition to being good for the city, we had a close

11   relationship and could benefit a lot from that as well.

12   Q.  It then says, in item number 3, "If you decide to go

13   another route for the PC position" -- what does PC stand for?

14   A.  Police chief -- police commissioner.

15   Q.  -- "we highly recommend, as an insurance policy, that Chief

16   Banks remain the chief of police, not just a figurehead.  He

17   needs to provide input and run his department.  He has a plan

18   to bridge the community and crime reduction as one strategy,

19   not two issues.  In addition to being an outreach guy and

20   community guy that everyone loves, most importantly, he is a,"

21   and then there's all caps, "CRIME FIGHTER."

22          Now, how was it that you and Mr. Reichberg came to

23   include item number three?

24   A.  Phil Banks gave me the information to put in.  He told me

25   he had -- that he's a good crime fighter and that he doesn't

1   want to just be a figurehead.

2   Q.  Had Mr. Banks expressed concern to you about the

3   possibility of being moved to a figurehead position?

4   A.  Yes.

5   Q.  And what did he say to you about that?

6   A.  That he wanted to be an active police chief where the

7   commissioner allows him to run his department, and he did not

8   want to become a deputy commissioner, which ultimately he was

9   offered, because he thought that was a more ceremonial

10  position.

11  Q.  Would Mr. Banks have been as useful to you and

12  Mr. Reichberg in a ceremonial position as he would have been as

13  chief of department?

14  A.  No.

15  Q.  Why not?

16  A.  Because operationally, he wouldn't have control.  Mike

17  Harrington wouldn't have the same type of control either.

18  Q.  Item number 4, returning to the email:  "If Chief Banks

19  were merely a figurehead as chief of department, he would leave

20  gracefully and be a supporter of yours.  You don't have to

21  worry about him leaving on bad terms.  He wants to do his job

22  for you and the city, and in order to do so, he would need to

23  have his input taken seriously."

24       How did that come to be involved, Mr. Rechnitz?

25  A.  And so then Phil Banks helped me draft the letter and told

1    me to include that part.

2    Q.  I will skip the next couple of sentences.  Then it just

3    says:  "We love you.  We are proud to be your friend and are

4    excited for a better tomorrow.  Jona Rechnitz and Jeremy

5    Reichberg."

6            MR. BELL:  Let's take that down, Mr. Hamilton.

7            Can we put Government Exhibit 1039 up on the screen,

8    please.

9    BY MR. BELL:

10   Q.  Are you familiar with this email?

11   A.  Yes, I am.

12   Q.  How are you familiar with it?

13   A.  It's an exchange I had with Philip Banks.

14   Q.  I'm sorry, an exchange you had with who?

15   A.  I'm sorry.  With Bill de Blasio.

16   Q.  And what about?

17   A.  About Philip Banks.

18           MR. BELL:  The government offers 1039.

19           MS. NECHELES:  No objection.

20           MR. MERINGOLO:  No objection.

21           THE COURT:  Thank you.

22           I'm accepting Exhibit 1039 into evidence.

23           You can proceed.

24           (Government's Exhibit 1039 received in evidence)

25           MR. BELL:  Can we publish that, please.

IBSKGRA2                    Rechnitz - Direct

1    BY MR. BELL:
2    Q.  So the top email is a response from Mr. de Blasio, but
3    let's focus in first on the original message from you to
4    Mr. de Blasio.  The subject line is:  "Three Short Points on
5    PB3."
6              Who is PB3?
7    A.  Philip Banks III.
8    Q.  It's from December 1st of 2013.  You write:  "PB is a crime
9    fighter.  Phil Banks started the juvenile justice division to
10   fight gangs from community affairs.  PB was only in community
11   affairs for two years.  He's the right guy."
12             What led you to send this to Mr. de Blasio?
13   A.  This was a continued conversation from the previous email.
14   Phil Banks gave me these three points to add because he had not
15   heard anything back yet.
16   Q.  Did you discuss this correspondence with Mr. Reichberg?
17   A.  Yes.
18   Q.  Mr. de Blasio responded:  "Appreciate the input."
19             MR. BELL:  Let's take that down.
20   Q.  Did Banks actually get picked as police commissioner?
21   A.  No, he did not.
22   Q.  Who did?
23   A.  William Bratton.
24   Q.  Did you have an understanding of who Bill Bratton was?
25   A.  Yes.

IBSKGRA2                    Rechnitz - Direct

1   Q.  And who did you understand him to be at the time?

2   A.  He is a -- he was a former police commissioner, and he was

3   also the police chief in Los Angeles at one point.

4   Q.  What was the response from you and Jeremy when Bratton got

5   picked?

6   A.  While we weren't excited about it, I told him that I had a

7   connection to him.

8   Q.  And what was your connection to Mr. Bratton?

9   A.  That he was in Los Angeles, and my dad had met him

10  previously, and that his partner in his private company was a

11  former councilman in Los Angeles.

12  Q.  Was that a particularly strong connection?

13  A.  No.

14          MR. BELL:  I'd like to put up, on the witness' screen,

15  Government Exhibit 1041 as marked for identification.

16  Q.  Are you familiar with this email?

17  A.  Yes, I am.

18  Q.  How are you familiar with it?

19  A.  It's an email exchange between me and the mayor.

20          MR. BELL:  The government offers 1041.

21          MS. NECHELES:  No objection.

22          MR. MERINGOLO:  No objection.

23          THE COURT:  Thank you.

24          I'm accepting Exhibit 1041 into evidence.

25          You can proceed.

1              (Government's Exhibit 1041 received in evidence)

2              MR. BELL:  Thank you.

3              Mr. Hamilton, let's publish that to the jury.

4    BY MR. BELL:

5    Q.  Let's, once again, focus in on the original message, the

6    bottom first.  This is from you to Bill de Blasio; "Subject:

7    Congrats on Bratton."  It's December 5th, 2013.  And you say:

8    "Good decision.  Congrats on the announcement."

9              The response comes back from Bill de Blasio:  "Thanks.

10   Will be good for the city and for banks.  You'll see."

11             When you read "and for banks," who did you understand

12   that to be referring to?

13   A.  Philip Banks.

14   Q.  What comfort, if any, did you take from the substance of

15   that email?

16   A.  I did.  He understood that Philip Banks was important to

17   me, and he addressed that in the email by saying:  "Will be

18   good for banks.  You'll see," which meant that he would not

19   just be a ceremonial chief of police, but he would be happy

20   with this position.

21             MR. BELL:  Let's take that down.

22   Q.  Now, did you continue to correspond with Mayor de Blasio

23   about Phil Banks?

24   A.  Yes.

25             MR. BELL:  I'll ask, Mr. Hamilton, to put up, on the

1    witness' screen, Government Exhibit 1050.

2    BY MR. BELL:

3    Q.  Are you familiar with this email exchange?

4    A.  Yes, I am.

5    Q.  How are you familiar with it?

6    A.  It's an exchange between me and the mayor.

7            MR. BELL:  The government offers 1050.

8            MS. NECHELES:  No objection.

9            MR. MERINGOLO:  No objection.

10           THE COURT:  Thank you.

11           I'm accepting Exhibit 1050 into evidence.

12           You can proceed.

13           (Government's Exhibit 1050 received in evidence)

14           MR. BELL:  Can you publish that to the jury, please.

15   BY MR. BELL:

16   Q.  So let's focus on the original message first.  Once again,

17   this is from you to Mr. de Blasio; "Subject:  Knicks Tomorrow,"

18   on February 4, 2014.

19           At this point in February, is Mr. de Blasio the mayor?

20   A.  Yes.

21   Q.  You say to Mr. de Blasio:  "For the 2 percent chance your

22   schedule permits, and you're in the mood, care to join me in my

23   courtside seats tomorrow," and The subject line is "The

24   Knicks."

25           Mr. de Blasio responds:  "But want to profoundly thank

1    you for the help you've given lately."

2            Before we continue, did Mr. de Blasio take you up on

3    your invitation?

4    A.  No.  I think there was a previous response to that where he

5    said he would be unable to attend because he would have to pay

6    for it himself.

7    Q.  And Mr. de Blasio responds:  "But want to profoundly thank

8    you for all the help you've given lately.  It means a lot to

9    me.  And FYI, it has been an absolute pleasure getting to work

10   regularly with Chief Banks.  His future is bright."

11           Did you share this email with Mr. Reichberg?

12   A.  Yes.

13   Q.  Did you discuss it with him?

14   A.  Yes, I did.

15   Q.  What was the reaction from Jeremy and Jona as to this email

16   from Mr. de Blasio?

17   A.  We were excited.  This is the mayor of New York.  We seemed

18   like power brokers here.  We're talking at a high level from

19   the police chief and the mayor of New York.  We repeated this

20   email to Chief Banks.  We showed it to him.  It was very good.

21   Q.  I want to be clear --

22           MR. BELL:  Maybe this is -- do you want to break, your

23   Honor, at about the 45-minute mark?

24           THE COURT:  If somebody would like a break, I'd be

25   happy to take a break, otherwise I'm ready to keep on going.

1           MR. BELL:  Understood.

2           THE COURT:  Thank you.

3           MR. BELL:  I think we'll press on.  One moment?

4           THE COURT:  That's fine.

5           (Pause)

6           MR. BELL:  Your Honor, we may want to take a break in

7   about 15 minutes or so for a logistical reason, which I'll

8   explain outside the presence of the jury.

9           THE COURT:  That's fine.

10          MR. BELL:  But we don't have to do it now.

11          THE COURT:  That's fine.

12          MR. BELL:  Let's take that down and put up on the

13  witness' screen Government Exhibit 1036, please.

14  BY MR. BELL:

15  Q.  Are you familiar with this email?

16  A.  Yes, I am.

17  Q.  And how are you familiar with this email?

18  A.  I'm the sender of the email.

19          MR. BELL:  Your Honor, the government offers 1036.

20          MS. NECHELES:  No objection.

21          MR. MERINGOLO:  No objection.

22          THE COURT:  Thank you.

23          I'm accepting 1036 into evidence.

24          You can proceed.

25          (Government's Exhibit 1036 received in evidence)

1              MR. BELL:  Let's publish that to the jury,

2     Mr. Hamilton.

3     BY MR. BELL:

4     Q.  Are the bottom portions of the email the same as the email

5     that we just reviewed?

6     A.  Yes.

7     Q.  And so here you forward that email to Chief Banks and Chief

8     Michael Harrington -- or Mike Harrington.

9              For what purpose did you forward that email to Banks

10    and Harrington?

11    A.  Again, to show that we were a power broker, and that we

12    have his back, and that the mayor is speaking about him in a

13    positive way, we feel because of us.

14    Q.  Just to be clear, you discussed with Chief Banks the

15    concern about Mr. Banks winding up in a ceremonial or powerless

16    position.  What position did he ultimately get?

17    A.  He was chief of department and --

18    Q.  Was that a ceremonial position?

19    A.  No.

20    Q.  Was it a powerful position?

21    A.  Very much so.

22    Q.  Was it one that appealed to Chief Banks?

23    A.  Yes.

24    Q.  Was it one that was important to you and Mr. Reichberg with

25    respect to what the two of you were trying to do?

IBSKGRA2                         Rechnitz - Direct

1    A.   Yes.

2    Q.   What understanding did you have of the power that Banks and

3    Harrington had over the promotions of police officers?

4    A.   So the way it was explained to us through Phil Banks was

5    that promotions go through the police commissioner's office,

6    but the chief of department has his own recommendations of cops

7    that he can get promoted.

8    Q.   How about transfers?

9            First of all, did you understand there to be a

10   difference between promotions and transfers?

11   A.   I did not know the exact nuances of how these things

12   worked, but I believe that the chief of department was in

13   charge of transfers.

14   Q.   What's a transfer as opposed to a promotion?

15   A.   A transfer is when a police officer is transferred from a

16   different division or a different precinct.

17   Q.   Did you and Mr. Reichberg have occasion to discuss the

18   transfers of officers in the same fashion that you described

19   talking about promotions?

20   A.   Yes.

21   Q.   You mentioned Kelvin Prado earlier.  Did you do anything to

22   attempt to get Mr. Kelvin Prado transferred?

23   A.   Yes.

24   Q.   What did you do -- well, first of all, who did you speak

25   to?

1   A.  Michael Harrington, and Philip Banks, and Jeremy.

2   Q.  What was the nature of those discussions?

3   A.  Kelvin had wanted to get into the special undercover unit,

4   and Mike Harrington said that his brother was going to be in

5   charge of it, and Mike was a little annoyed we kept pushing to

6   Banks directly because Mike was trying to get his brother and

7   other people in the unit.  And Philip Banks told Mike, put him

8   in it.

9   Q.  Now, Mr. Rechnitz, if you had this line in to Philip Banks,

10  who oversaw all of the uniformed police, why would you ever

11  need any other officers?

12  A.  Because Philip Banks was not the type of person -- if I

13  said, okay, give me a police ride to the airport, a police

14  escort, or do these other things, he would not go for it.  He

15  was not the kind of person that would do these types of things,

16  these illegal activities.  He was much more --

17          MS. NECHELES:  Objection, your Honor.  I move to

18  strike that.

19          THE COURT:  Thank you.  Give me one moment, please.

20          Thank you.

21          Counsel, I'm going to ask you to rephrase the

22  question, if you would, and will grant the defendants' request.

23          MR. BELL:  Sure.

24  BY MR. BELL:

25  Q.  Mr. Rechnitz, did you understand there to still be a need

1    for other officers even if you had the relationship that you

2    had developed with Mr. Banks?

3    A.   Yes.

4    Q.   Why was that relationship so important?

5    A.   Because Philip Banks was very careful not to bend rules

6    within the NYPD as favors for us, causing official police

7    action.   We needed other officers --

8            MS. NECHELES:   Objection, your Honor.

9            THE COURT:   Thank you.

10           You can continue your answer.

11           THE WITNESS:   And we needed other officers that we

12   were dealing with, like Mike Harrington and Jimmy Grant, who we

13   knew would do these things for us.

14   Q.   Now, did Mr. Banks, nevertheless, accommodate some of your

15   requests?

16   A.   Yes.

17   Q.   Did he did so at a time when you and Mr. Reichberg were

18   providing him with various benefits?

19   A.   Yes.

20           MR. BELL:   This may be a good logical time to pause

21   just a moment, your Honor, so we can take care of that

22   logistical matter.

23           THE COURT:   That's fine.

24           So, ladies and gentlemen, we're going to take a short

25   break.   Don't discuss the case amongst yourselves, don't

IBSKGRA2                        Rechnitz - Direct

1    communicate with anyone else, and, again, don't do any research

2    on the case, and steer clear of any press regarding the case.

3              (Continued on next page)

1          (Jury not present)

2          THE COURT:  Thank you.  You can be seated.

3          So, counsel, what's the issue?

4          MR. BELL:  The logistical issue is this, your Honor:

5   We had a wire conversation that we had talked about putting in

6   the jury's binders before.  We're about to play that wire, but

7   I think in the hoopla yesterday, we hadn't gotten the chance to

8   address that particular issue.  So we'd like to have our

9   paralegals put that in now.  I've discussed it with

10  Ms. Necheles at least.  I don't think she has an objection.  I

11  haven't gotten a chance to discuss it with Mr. Grant's counsel.

12         THE COURT:  Thank you.

13         Just in terms of the amount of time that we take up,

14  I'm happy for them to ultimately have the binder.  You've also

15  been placing the transcripts on the screen.  Might that be an

16  adequate alternative, so we take up less jury time with this

17  process?

18         MR. BELL:  I think that we'll be able to do this

19  fairly quickly.  Having observed the jury while these wire

20  conversations are played, I think they've appreciated being

21  able to have a hard copy and not depend on the screen.  At

22  least some of them have.

23         THE COURT:  That's fine.

24         MR. BELL:  I would ask the Court's indulgence.

25         THE COURT:  That's fine.

1          How are we doing otherwise with respect to time, just

2     so I can think about when we'll take our lunch break?

3          MR. BELL:  Sure.  I think, your Honor, that if we

4     don't conclude Mr. Rechnitz before the lunch break, we will

5     conclude him shortly after.  I think your Honor should schedule

6     the lunch break for the ordinary time.  I don't want to disrupt

7     that schedule, and we'll work around it.

8          THE COURT:  Good.  Thank you.

9          Please let Mr. Daniels know as soon as you're ready to

10    go.  I'd like to start as soon as this mechanical process is

11    completed.

12         Anything else that we should take up before we take

13    this recess, counsel for the defendants?

14         MS. NECHELES:  No, your Honor.

15         MR. MERINGOLO:  No, Grant does not have an objection.

16         THE COURT:  Good.  Thank you very much.

17         I'll see you all shortly.

18         (Recess)

19         THE COURT:  Counsel, are we prepared?

20         MR. BELL:  We are.  Thank you, Judge.

21         THE COURT:  Good.  Thank you.

22         Mr. Daniels, please bring in the jury.

23         (Continued on next page)

24

25

1            (Jury present)

2            THE COURT:  Thank you, ladies and gentlemen.  You can

3    be seated.

4            Mr. Bell, you can proceed.

5            MR. BELL:  Thank you, your Honor.

6            At this time -- well, withdrawn.

7    BY MR. BELL:

8    Q.  Before we return to Phil Banks, a couple of questions about

9    Jimmy Grant:

10           Mr. Rechnitz, you mentioned that officers wore uniform

11   to your son's bris.  Was there another point at which either

12   you or Jeremy asked Jimmy Grant specifically to wear his

13   uniform for some private purpose?

14   A.  Yes.

15   Q.  And what can you tell us about that, sir?

16   A.  There was a problem on 47th Street, where my office is,

17   that there were retail stores that had horders, people handing

18   fliers out in front of other people's businesses.  So Jeremy

19   had gotten some calls from certain people on 47th Street, and

20   he had asked Jimmy to come down, so that the people would see

21   that he's taking care of it, because he was making money from

22   some people, charging them to get rid of the horders.  So he

23   asked Jimmy to come down, and Jimmy came to 47th Street one

24   day, and came in his police uniform, and we --

25           MR. MERINGOLO:  Objection, your Honor; time frame.

1              THE COURT:  Thank you.

2              You can proceed, counsel.

3              THE WITNESS:  -- and we walked the block with him.  So

4      he came in his police uniform, we walked the block with him,

5      and --

6      BY MR. BELL:

7      Q.   When you say "we," who walked the block with him?

8      A.   Me and Jeremy together.

9              So, first of all, the businesses were paying Jeremy.

10     We walked with Jimmy, so that he would see Jeremy had pull, and

11     he was taking care of this issue.  And for us, it was also a

12     good look for the 47th Street clientele, that they saw we had

13     this relationship, as a lot of the issues that Jeremy dealt

14     with and got paid for to help with police issues were 47th

15     Street, the people who worked there.

16             MR. BELL:  Now, at this time, your Honor, I'm going

17     to, with the Court's permission, ask the jury to retrieve their

18     binders and direct their attention to -- oh, actually, no,

19     let's do this first.  I'm sorry, I'm getting ahead of myself.

20             Your Honor, the government offers Government Exhibit

21     W-0311 pursuant to the earlier wire stipulation.

22             MS. NECHELES:  No objection.

23             MR. MERINGOLO:  No objection.

24             THE COURT:  Thank you.

25             I'm accepting W-0311 into evidence.

1          You can proceed.

2          (Government's Exhibit W-0311 received in evidence)

3          MR. BELL:  With that done, with the Court's

4    permission, I'd ask the jury to open up the binders to tab

5    311-T.  It may be tucked in right behind another tab, 311-T.

6    311-T corresponds to 311, which was just admitted.  It's a

7    January 13, 2015 call commencing at 10:30 a.m. between

8    Mr. Reichberg and Mr. Grant.

9          And I'd ask, with the Court's permission, that

10   Mr. Hamilton play that call once everybody has found the

11   transcript, 311.  We'll also have it on the screens, to the

12   extent that that helps.  May we proceed, your Honor?

13         THE COURT:  You may.

14         MR. BELL:  Let's go ahead and play 311, please.

15         (Audio playback)

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1              MR. BELL:  Thank you.

2    BY MR. BELL:

3    Q.  Mr. Rechnitz, did you happen to know what ComStat was?

4    A.  Yes.

5    Q.  What was your understanding of what ComStat was?

6    A.  ComStat is a program put together by Bill Bratton

7    introduced years ago to different commanders to track their

8    crime stats so that the city can -- in an effort to stop crime.

9    Q.  Did you develop an understanding through your friendships

10   and relationships with these various officers of how ComStat

11   worked?

12   A.  Yes.

13   Q.  And what was your understanding of how ComStat would

14   actually work when a police official has to show up there?

15   A.  An official comes, it's very nerve-wracking, where they

16   basically get grilled a lot of the time about the crimes

17   happening in their precinct.

18   Q.  Secondly, during the time that you spent with Jimmy Grant,

19   prior to the time of that call, which it is to say prior to

20   January of 2015, had you given Mr. Grant any sense of what it

21   is that you did for a living?

22   A.  Yes.

23   Q.  What had you told him?

24   A.  That I was in the real estate business.

25   Q.  Did you tell Mr. Grant that you worked for Taly Diamonds?

1    A.  No, I did not.

2    Q.  Let's put that aside and return to the subject of

3    Mr. Banks.  During the period that we have been discussing,

4    what travel did you provide to Mr. Banks?

5    A.  I provided travel to a trip to Israel with Phil, Norman

6    Seabrook, me and Jeremy, and two trips to the Dominican

7    Republic.  One of the trips was with Jeremy, Norman, me, Phil

8    and Hamlet Peralta, and the other trip was Phil, Norman, me and

9    Jeremy.  In addition, I also flew him out to Los Angeles and

10   Las Vegas on one occasion.

11   Q.  Did these trips happen before or after Banks became chief

12   of department?

13   A.  It happened afterwards.

14   Q.  Did you discuss the purpose of these trips with

15   Mr. Reichberg?

16   A.  Yes.

17   Q.  Generally speaking, what was the purpose?

18   A.  It was a way for us to further our relationship with him,

19   be the guys who got to take him away and have his undivided

20   attention.

21   Q.  You started to describe the Israel trip earlier in your

22   testimony.  At the time that you brought Chief Banks to Israel,

23   what was the importance of Bank's relationship to you and

24   Mr. Reichberg?

25   A.  The same as it had been, as we have been discussing this

1   morning.  It was very important to us to continue cultivating

2   that relationship.

3   Q.  Were pictures taken at the time of the trip?

4   A.  Yes.

5   Q.  By whom?

6   A.  We had a professional photographer I had hired.

7   Q.  And what, if anything, did you do with these pictures?

8   A.  I made a souvenir book for Norman, Phil, Jeremy, and me.

9   Q.  And when you say a souvenir book, what is that?

10  A.  A photo album.

11          MR. BELL:  Your Honor, may I approach?

12          THE COURT:  You may.

13  Q.  I'm approaching with what has been marked for

14  identification as Government Exhibit 610A.

15          Mr. Rechnitz, are you familiar with Government

16  Exhibit 610A?

17  A.  Yes, I am.

18  Q.  How are you familiar with it?

19  A.  This is the photo album that I had created and paid for.

20          MR. BELL:  Your Honor, at this time the government

21  would like to offer Government Exhibit 610A and Government

22  Exhibit 610.  Those comprise both the physical book and

23  electronic copies that will be put on the screen.

24          MS. NECHELES:  No objection.

25          MR. MERINGOLO:  No objection.

1           THE COURT:  Thank you, I'm accepting Exhibit 610A and

2      610 into evidence.

3           (Government's Exhibits 610 and 610A received in

4      evidence)

5           THE COURT:  You can proceed.

6           MR. BELL:  Your Honor, I ask before that we put what

7      is marked for identification Government Exhibit 1054 up on the

8      witness's screen.

9      Q.  Are you familiar with this email?

10     A.  Yes, I am.

11     Q.  What was the purpose of that email?

12     A.  I was asking Jeremy for passport information for Phil Banks

13     and Norman Seabrook so I can book their flights.

14          MR. BELL:  The government offers 1054.

15          MS. NECHELES:  No objection.

16          MR. MERINGOLO:  No objection.

17          THE COURT:  Thank you.  I'm accepting Exhibit 1054

18     into evidence.

19          (Government's Exhibit 1054 received in evidence)

20          THE COURT:  You can proceed.

21          MR. BELL:  Let's publish 1054 to the jury, please,

22     Mr. Hamilton, and highlight the date.

23          Let's take that down.

24          I ask you, Mr. Hamilton, to publish 610.  We're not

25     going to go through very many of these pages, but I to want to

1    touch on a few.

2    BY MR. BELL:

3    Q.  We begin with page 4, please.

4         And so what's happening here, Mr. Rechnitz?

5    A.  This was initially when we left the airport we went

6    straight to the spot in Jerusalem, a welcoming ceremony, which

7    was a view of the Temple Mount.

8         MR. BELL:  Let's go to page 8, Mr. Hamilton.

9    Q.  And what's happening here?

10   A.  We're walking through the Arab marketplace looking at

11   backgammon sets that I was purchasing for Philip.

12   Q.  Who is that in the foreground?

13   A.  The front is Phil Banks.

14   Q.  Who is that in the yellow shirt in the back with the smile?

15   A.  Norman Seabrook.

16   Q.  Could we go to page 18, please.

17        What's happening here, sir?

18   A.  This is a photo of the Western Wall.  We went there as one

19   of our stops.

20   Q.  Page 34, please.

21        What's happening here, sir?

22   A.  We went to a counterterrorism training unit and we shot

23   this gun, which is called the Tavor, one of the Israeli guns.

24   Q.  Page 37, Mr. Hamilton.

25        What's happening here, sir?

1    A.  This is where we're getting onto a helicopter to take a

2    view of Israel.

3    Q.  Page 45, please.

4         What's happening here?

5    A.  I was not there this day but this was the day where Jeremy,

6    Philip and Norman went to the Dead Sea.

7    Q.  And page 58.

8         What is happening here?

9    A.  This was a military airbase where we went to see jet

10   fighters.

11   Q.  Page 68.

12        What's happening here?

13   A.  I rented a yacht in Herzliya, a town in Israel, and we took

14   a boat ride to Tel Aviv.

15   Q.  And page 75.

16        Reference is made at the bottom to JR Productions,

17   Inc., and that's what?

18   A.  It was a cute name that we put together because Jeremy and

19   I have the same initials.

20        MR. BELL:  Let's take that down.

21   Q.  Were you familiar with an individual named Freilich?

22   A.  Named who?

23   Q.  Freilich?

24   A.  I heard the name, yes.

25   Q.  And how are you familiar with the name Freilich?

1   A.  He's one of these police buffs from Borough Park.

2   Q.  Did you discuss Mr. Freilich with Jeremy?

3   A.  Yes.

4   Q.  What was Jeremy's impression of Mr. Freilich?

5   A.  Jeremy did not like him.  He was competition.

6   Q.  When you say competition, competition for what?

7   A.  First in the community to be the guy closest to the cops.

8   Q.  Mr. Rechnitz, as part of your relationship -- rather as

9   part of your arrangement with Mr. Reichberg to cultivate

10  relationships with police officers, did you take them to

11  sporting events?

12  A.  Yes.

13  Q.  When you took them to sporting events, who generally paid?

14  A.  I did.

15  Q.  Why?

16  A.  Again, I was the person who paid and Jeremy stuck with the

17  details for most part.

18  Q.  What sort of the events did you treat the officers to?

19  A.  One event was a Yankees game, another event was we had a

20  suite for the Jets Patriots game.

21          MR. BELL:  So I'm going to ask that we put up on the

22  screen what's been marked as Government Exhibit 1043.

23  Q.  And are you familiar with that email?

24  A.  Yes.

25  Q.  How are you familiar with it?

IBSTGRA3                          Rechnitz - Direct

1   A.   I sent the email.

2   Q.   Who did you send it to?

3   A.   To Philip Banks' assistant, Marilyn.

4            MR. BELL:  Your Honor, the government offers 1043.

5            MS. NECHELES:  It's already in evidence.

6            MR. BELL:  Then let's publish it.  Thank you very

7   much.

8   Q.   So under what circumstances, Mr. Rechnitz, did you send

9   this to Ms. Ozuna, Mr. Banks' secretary?

10  A.   I treated Philip Banks to seats to the Nets game.

11           MR. BELL:  Could we go the second page and go to the

12  third page.

13  Q.   Reference is made to Section 25, Row A.  Were these good

14  seats, sir?

15  A.   Yes, they were courtside seats.

16  Q.   How much did they cost you apiece?

17  A.   Several thousand dollars each.

18           MR. BELL:  Let's take that down.

19  Q.   Did you take Jimmy Grant specifically to any sporting

20  events?

21  A.   Yes.

22  Q.   What do you recall?

23  A.   The football game, the Jets versus the Patriots.

24  Q.   So I want to direct your attention to the fall of 2013.

25  Withdrawn.  I want to direct your attention to that game.  Did

1   you take other members of the department to that same game?

2   A.  Yes.

3   Q.  What was the purpose of treating the officers at that time?

4   A.  It was a nice opportunity for Jeremy and I to have all the

5   officers under one roof, many of whom we dealt with, and called

6   it an early holiday party.

7   Q.  So what arrangements did you make in order to bring that

8   event into being?

9   A.  Well, I arranged for the purchase of a private suite at the

10  game, catering service, and special plaque awards that we would

11  be giving to several officers.

12  Q.  Did you discuss all of this with Mr. Reichberg?

13  A.  Yes.

14  Q.  Did you discuss what the purpose of all of this was?

15  A.  Yes.

16  Q.  What was the purpose?

17  A.  Again to have them all under one roof, continue treating

18  them and being big shots in front of them.

19  Q.  What was the appeal of treating them and being big shots in

20  front of them?

21  A.  So that we continue our relationship where we're giving

22  them gifts and receiving favors in return.

23  Q.  Who was the game between?

24  A.  The New York Jets and the New England Patriots.

25  Q.  Was that a significant game at the time?

1   A.  Yes.

2   Q.  And did people other than NYPD personnel attend?

3   A.  Yes.

4   Q.  Who else attended?

5   A.  Family members of Philip Banks and Norman Seabrook.

6           MR. BELL:  Mr. Hamilton, I ask you to put up on the

7   screen, as a series or one after the other, Government

8   Exhibits 619B through E.

9   Q.  Are you familiar with those images, sir?

10  A.  Yes, I am.

11  Q.  Where were those images from?

12  A.  From the game that we just spoke about.

13          MR. BELL:  The government offers Government

14  Exhibit 619B through E.

15          MS. NECHELES:  No objection, your Honor.

16          MR. MERINGOLO:  No objection.

17          THE COURT:  Thank you, I'm accepting Exhibit 619B

18  through and including E into evidence.

19          (Government's Exhibits 619B through 619E received in

20  evidence)

21          THE COURT:  You can proceed.

22  BY MR. BELL:

23  Q.  Did you bring any family members to that event,

24  Mr. Rechnitz?

25  A.  I did.

1    Q.  Who did you bring?

2    A.  My son.

3            MR. BELL:  Your Honor, we would ask to be able to

4    publish those exhibits.

5            THE COURT:  You may.

6            MR. BELL:  Mr. Hamilton, could we start with 619C.

7    Q.  And so what are we viewing here, Mr. Rechnitz?

8    A.  We called out different officers, including Jimmy Grant,

9    gave him his crystal plaque that's in his hand, said something

10   about him, and thanked him for everything.  And that's a photo

11   taken when we handed him his award.

12   Q.  619B, please.

13           What do we have here?

14   A.  This is the same thing as the previous photo but with Chief

15   David Colon.

16   Q.  619D, please.

17   A.  That's the same thing with Chief Michael Harrington.

18   Q.  And 619E.

19   A.  That's a group photo shot.

20   Q.  And can you tell us who folks here are, from left to right,

21   perhaps.

22   A.  Sure, Phil Bank's father, Phil Bank's brother, me, my son,

23   Jimmy Grant, Jeremy, Eric Rodriguez, Brian McGinn, Andrew Capul

24   and Jimmy McCarthy.

25   Q.  Did Phil Banks himself show up that day?

1    A.  No, he did not.

2    Q.  Did you have an understanding of why not?

3    A.  Yes.

4    Q.  What was your understanding?

5    A.  He was annoyed.  He said that he's not going to come with

6    other cops there, like Eric, Jimmy and Brian.

7    Q.  As a general matter, did Banks come to larger events with

8    cops beyond Mr. Harrington when you and Mr. Reichberg were

9    present?

10   A.  No, he did not.

11   Q.  Did you have an understanding of why?

12   A.  He didn't want to be at those events, thought it was

13   inappropriate for him to be there.

14          MR. BELL:  Let's take that down.

15   Q.  Do you recall about how much you paid for the

16   accommodations at the Meadowlands for the Patriots/Jets game?

17   A.  I think the suite cost me about 20 to $25,000.

18   Q.  Do you recall how you paid for that?

19   A.  I do.

20   Q.  How did you pay for that?

21   A.  I think Jason Nissen, who was my ticket broker at the time,

22   had paid for it directly and even gave his credit card for food

23   and incidentals.

24   Q.  Was there a reason for that?

25   A.  Yeah, we had a running balance where he owed me money and

IBSTGRA3                        Rechnitz - Direct

1   it was an easier way to handle it.

2   Q.  Did that come out of money that Nissen owed you at the

3   time?

4   A.  Yes.

5         MR. BELL:  Mr. Hamilton, could we put Government

6   Exhibit 1031 on the screen, please.

7         I will ask for you, Mr. Rechnitz, to take a look at

8   this first page.  And then Mr. Hamilton, I ask you to go to the

9   next page while it's on the witness's screen.

10  Q.  Are you familiar with this email, sir?

11  A.  Yes, I am.

12  Q.  How are you familiar with it?

13  A.  It's an email exchange that I sent and received.

14        MR. BELL:  Let's go back to the first page, and I will

15  offer Government Exhibit 1031.

16        MS. NECHELES:  No objection.

17        MR. MERINGOLO:  No objection.

18        THE COURT:  Thank you.  I'm accepting Exhibit 1031

19  into evidence.

20        (Government's Exhibit 1031 received in evidence)

21        THE COURT:  You may proceed.

22  BY MR. BELL:

23  Q.  This is an email, Mr. Rechnitz, that you forwarded to

24  Jeremy Reichberg on October 11, 2013, and the forwarded email

25  is between you and someone named Eric Katz.  Jona, exclamation

1   points, attached are the proofs for the awards.  Please review

2   the names and all text and let me know if you approve.  These

3   are going to be etched with no color fill.

4          What did you understand the purpose of this email to

5   be?

6   A.  This is the person who works for Promo Shop, which was the

7   company that made the individualized awards.

8   Q.  And before we go to the next page, or the attachment

9   rather, there's a message at the bottom where you say subject

10  line name Chief Dean Dmosis, so add him and four without names.

11         Who was Chief Dmosis?

12  A.  I'm not sure.  It's a name that Jeremy gave me of someone

13  who would be coming and we should make an award for.

14  Q.  Did you wind up developing a relationship with Chief Dmosis

15  in the way that you had with other individuals there?

16  A.  No.

17  Q.  Then there's add him and four without names.  Do you have a

18  recollection of what the purpose of the four without names was?

19  A.  Yes, to have four blank awards for last-minute attendees.

20  Q.  Could we go to the next page, please.

21         And so what was this?

22  A.  This was a paper proof for me to sign, the actual award,

23  this was a sample.

24  Q.  And this particular proof, does it pertain to a particular

25  recipient?

1    A.  Yes.

2    Q.  Who is that?

3    A.  Philip Banks.

4    Q.  Let's go to the next page, please.

5            Do these pertain to particular recipients?

6    A.  Yes.

7    Q.  Who?

8    A.  Andrew Capul, Timothy Beaudette and Stephen McAllister.

9    Q.  Did Timothy Beaudette attend this event?

10   A.  No.

11   Q.  Who generally was Timothy Beaudette?

12   A.  Timothy Beaudette was a precinct head.  I think he was a

13   nephew of Jimmy McCarthy, if I remember correctly, and he

14   worked in midtown.

15   Q.  Did you and Mr. Reichberg attempt to involve yourselves

16   with Mr. Beaudette in the way you had with other officers?

17   A.  Yes, we tried to.

18   Q.  Were you successful?

19   A.  No.

20   Q.  How did things work with the relationship with

21   Mr. Beaudette?

22   A.  They went sour.  He complained to Michael Harrington about

23   us, that we were dropping names, dropping Mike's name to the

24   cops and dropping his name when he sent officers to help with

25   the credit dispute.

1    Q.  Did that create difficulty for you and Mr. Reichberg?

2    A.  Yes.

3    Q.  How so?

4    A.  He was upset with us, and Mike got upset with us and we

5    could no longer deal with Timothy Beaudette.

6    Q.  You mentioned that Mr. Beaudette complained that names had

7    been dropped in connection with officers being deployed in

8    connection with a private dispute.  Do you remember that

9    dispute incident?

10   A.  I believe I do.

11   Q.  What do you recall of it?

12   A.  It had to do with something to do with horders on 47th

13   Street handing out fliers.  And then there was another time for

14   some incident where the cops came up to my office, I don't

15   remember the specifics.  And when they were in the office I

16   recall dropping Mike Harrington's name.

17   Q.  Now we'll get back there shortly, I think, but let's finish

18   with this exhibit.

19        Let's go to the next page.  Who are these four?

20   A.  Michael Harrington, James Secreto and Brian McGinn.

21   Q.  Is that the same James Secreto who you testified earlier

22   did not turn out to be a team player?

23   A.  Yes.

24   Q.  Let's go to the next page.

25        And who do we have proofs for here?

1    A.  Chief James McCarthy, Chief David Colon, and Captain James

2    Grant.

3    Q.  And the next page.

4           Who do we have here?

5    A.  Inspector Eric Rodriguez, Sheriff George Longworth, and

6    Jerry Jones.

7    Q.  Who is Jerry Jones?

8    A.  Jerry Jones is one of the owners of the Cowboys, but he did

9    not attend.  It's a nickname we used for Philip's brother

10   Terry, because he's a big Cowboys fan.

11          MR. BELL:  The next page, please.

12          And let's take that down.

13          At this time I would like to put Government

14   Exhibits 1043 and 1045 up on the witness's screen.

15   Q.  Are you familiar, sir, with these emails.

16   A.  Yes, I am.

17   Q.  How are you familiar with them?

18   A.  I sent them.

19          MR. BELL:  Your Honor, the government offers 1043 and

20   1045.

21          MS. NECHELES:  No objection.

22          MR. MERINGOLO:  No objection.

23          THE COURT:  Thank you.  I'm accepting Exhibits 1043

24   and 1045 into evidence.

25          (Government's Exhibits 1043 and 1045 received in

1   evidence)

2            THE COURT:  You can proceed.

3            MR. BELL:  Could we publish them side by side.

4   Q.  Beginning with 1043, what do we have here?

5   A.  An email with Nets tickets attached to Marilyn, Phil Bank's

6   assistant.

7   Q.  And on the right?

8   A.  An email of the tickets.  I forwarded them to Mike

9   Harrington as well.

10           MR. BELL:  Could we put up 1045, please,

11  Mr. Harrington.

12  A.  They're actually for a different game, it looks like.

13  Q.  What so date are these tickets for?

14  A.  These tickets are for January 10.

15  Q.  Can we go through the remaining pages one by one, please.

16           Did you know -- there's a name on the tickets of Mike

17  Leshinsky, did you know Mr. Leshinsky?

18  A.  No.

19  Q.  What's you understanding of how that name got here?

20  A.  There's season ticket holders who resold their tickets

21  online, so he was the holder of those seats.

22  Q.  Had you purchased these on the secondary ticket market?

23  A.  Yes.

24  Q.  What was the purpose of purchasing these tickets?

25  A.  To give them out as a gift.

IBSTGRA3                        Rechnitz - Direct

1  Q.  Did you give these out to any of the officers we have been

2  talking about?

3  A.  Yes, I don't remember which one.  I sent them to Mike, so I

4  think they were for Mike, but I can't be certain.

5  Q.  What would the purpose of giving these out to cops have

6  been?

7  A.  The same purpose, to bestow gifts upon them so I could get

8  things in rush.

9  Q.  Was Chief Harrington much of a basketball fan?

10  A.  No, more of a baseball fan.

11        MR. BELL:  Let's take that down.

12        Can we put up Government Exhibit 1056, please.  And

13  let's go to the next two pages.

14  Q.  Are you familiar with these?

15  A.  Yes, I am.

16  Q.  How are you familiar what is on the screen now?

17  A.  These are tickets that I was a partner in.

18  Q.  What do you mean you were a partner in?

19  A.  I shared season tickets with Daniel, and these are Rangers

20  playoff tickets.

21  Q.  Directing your attention to the first page, what is

22  happening here?

23  A.  I sent them as a gift for Michael Harrington.

24        MR. BELL:  Your Honor, the government offers 1056.

25        MS. NECHELES:  No objection.

1          MR. MERINGOLO:  No objection.

2          THE COURT:  Thank you.  I'm accepting Exhibit 1056

3     into evidence.

4          (Government's Exhibit 1056 received in evidence)

5          MR. BELL:  If we highlight the sender, Jona Rechnitz,

6     recipient, Chief Michael Harrington, the date, and the subject

7     line, Rangers tickets.

8          Could we go to the next page.

9     Q.  It says here 2014 playoffs.  Was there an additional value

10    to playoff tickets, in your experience, Mr. Rechnitz?

11    A.  Yes.

12    Q.  And why is that?

13    A.  In the resale market you get a lot more money for playoffs

14    then regular because the stakes are higher.

15         MR. BELL:  Let's take that down, and could we put up

16    just on the witness's screen 1058.

17    Q.  And do you recall this email?

18    A.  Yes.

19    Q.  And what's that for?

20    A.  The Rangers tickets that I sent for Mike and Jeremy to go

21    to together.

22         MR. BELL:  Your Honor, the government offers 1058.

23         MS. NECHELES:  No objection.

24         MR. MERINGOLO:  No objection.

25         THE COURT:  Thank you, I'm accepting Exhibit 1058 into

IBSTGRA3                          Rechnitz - Direct

1    evidence.

2              (Government's Exhibit 1058 received in evidence)

3              THE COURT:  You can proceed.

4              MR. BELL:  Let's publish that, Mr. Hamilton.  Can you

5    highlight, Mr. Hamilton, the to and from lines, the date, which

6    is May 24, and the body of the email, which says Mike and

7    Jeremy, are these are your seats attached.

8              Could we go to the next page.

9              Could we go to the next page.

10   Q.  Did you yourself attend this game versus the Montreal

11   Canadians?

12   A.  I went to one of the Canadians games, I don't remember

13   which.

14   Q.  Do you recall what the purpose was of providing Michael

15   Harrington with a ticket to a playoff game versus Montreal was?

16   A.  Yes, it was a very sought-after game, and I wanted to hook

17   him up with something great.

18             MR. BELL:  Let's take that down.

19   Q.  Was there a time, Mr. Rechnitz, when you came to assist

20   Mr. Harrington with hotel accommodations?

21   A.  Yes.

22   Q.  And when was that?

23   A.  I don't remember the time period.

24   Q.  Where was that?

25   A.  In Chicago.

1   Q.  And how did that come to be?

2   A.  Jeremy had told me that he was going to Chicago with his

3   brothers --

4   Q.  Sorry, let's be clear on who "he" is.  Can you use nouns?

5   A.  Jeremy told me that Mike Harrington was going to Chicago

6   with his brothers, with Mike's brothers, to see a baseball

7   game, I think the Yankees versus the Cubs.

8   Q.  How did that turn into arrangements on your part?

9   A.  They needed a place to stay, so Jeremy said that Mike

10  wanted to know if I had a place where he could stay.

11  Q.  And where, if anywhere, did those conversations between you

12  and Mr. Reichberg go?

13  A.  That I was going to book his hotel stay and pay for it.

14  Q.  Did you discuss why?

15  A.  Yes, because Mike is so good to us and we have to be good

16  to him.

17  Q.  So did you in fact do that?

18  A.  Yes.

19  Q.  How did you go about making arrangements for the hotel?

20  A.  The same way I booked other hotels, through my hotel agent,

21  Luxury Connections.

22          MR. BELL:  Your Honor, the government offers -- well,

23  let's put this on the screen.  Could we put on the witness's

24  screen 1244.

25  Q.  Are you familiar with this email?

1    A.  Yes, I am.

2    Q.  How are you familiar with it?

3    A.  It's an email reservation that I sent to Mike Harrington.

4             MR. BELL:  The government offers 1244.

5             MS. NECHELES:  No objection.

6             MR. MERINGOLO:  No objection.

7             THE COURT:  Thank you.  I'm receiving Exhibit 1244

8    into evidence.

9             (Government's Exhibit 1244 received in evidence)

10            THE COURT:  You can proceed.

11            MR. BELL:  Let's publish that.

12            This is a email from you to Chief Michael Harrington,

13   highlight the date, May 14, 2014, subject line hotel.  Can we

14   focus in now on the bottom part of the email, the forwarded

15   reservation.

16   BY MR. BELL:

17   Q.  Now the name here is Timothy Harrington, both in the

18   salutation and under guest information.

19            Who did you understand Timothy Harrington to be?

20   A.  Michael Harrington's brother.

21   Q.  The email address is yours.  Who made the arrangements?

22   A.  I did.

23   Q.  And who paid?

24   A.  I did.

25   Q.  Now under reservation information over on the right there's

IBSTGRA3                    Rechnitz - Direct

1    an entry under charge that says comp.  Were these tickets

2    comped?

3    A.  The hotel stay was not comped.

4    Q.  Sorry, the hotel stay.

5         Why does this say "comp?"

6    A.  I don't remember the exact reason, but I recall that I may

7    have told him that I got it for free on a trade, or I didn't

8    want him to see the amount and feel bad.

9    Q.  Why did you not want Mr. Harrington to see the amount?

10   A.  He was very uncomfortable accepting gifts.

11        MR. BELL:  So let's zoom out of that.

12        Could we put up just on the witness's screen 1246.

13   Q.  Are you familiar with this email?

14   A.  Yes.

15   Q.  And how are you familiar with this email?

16   A.  It's an email that Jeremy sent me.

17        MR. BELL:  Your Honor, the government offers 1246.

18        MS. NECHELES:  No objection.

19        MR. MERINGOLO:  No objection.

20        THE COURT:  Thank you, I'm accepting Exhibit 1246 into

21   evidence.

22        (Government's Exhibit 1246 received in evidence)

23        MR. BELL:  Let's publish that, Mr. Hamilton.  It's an

24   email from Mr. Rechnitz to Mr. Reichberg.  Highlight the date,

25   please, May 14, 2014.

1    Q.  At the bottom Mr. Reichberg says:  Please confirm the hotel

2    room in downtown Chicago.  Timothy Harrington.  Three rooms

3    from the 15th to the 19th, one room from the 16th, 18th.

4    Thanks.

5           What did you understand Mr. Reichberg to be doing

6    here?

7    A.  Giving me information of a hotel that he wanted me to book

8    and pay for.

9    Q.  You then respond:  I don't know why we get into these

10   situations.

11          What was behind that response?

12   A.  I was very frustrated when Jeremy initially told me about

13   Mike Harrington's hotel stay and we would be paying for it.

14   Q.  Why were you frustrated?

15   A.  I felt we are doing much, this was more money and more

16   money, so at times I would think it was too excessive.

17   Q.  Did you have further discussions with Mr. Reichberg about

18   your frustrations?

19   A.  Yes.

20   Q.  What was the nature of those discussions?

21   A.  When I told him I was frustrated he always said to me he is

22   so good to us, you got to do this for him, Mike doesn't ask for

23   much.

24          MR. BELL:  Let's take that down and put just on the

25   witness's screen 1243, please.

1    Q.  Are you familiar with this email?

2    A.  Yes, I am.

3    Q.  How are you familiar with it?

4    A.  I'm on it.  It's from me.

5          MR. BELL:  Your Honor, the government offers 1243.

6          MS. NECHELES:  No objection.

7          MR. MERINGOLO:  No objection.

8          THE COURT:  Thank you, I'm accepting Exhibit 1243 into

9    evidence.

10         (Government's Exhibit 1243 received in evidence)

11         THE COURT:  You can proceed.

12         MR. BELL:  You can publish that.

13   Q.  It's an email from you to Levin Prado in which you say:

14   New Amex.  Who is Mr. Prado?

15   A.  My assistant.

16   Q.  Could you review the first page.

17         MR. BELL:  Go to the second page.  On the second page

18   can you highlight the text from Avi up top where it says great

19   news, Eli came through nicely.  And W Chicago City Center sells

20   at 550 tax per night, he was able to bring the price down to

21   399 tax per night.

22         Zoom out of that box, please.

23         Can we go to the following page, the third page,

24   please.

25   Q.  And so just generally what is that we're looking at here,

1    Mr. Rechnitz?

2    A.  This is the reservation from Avi Goldstein, and he's

3    obtaining a signature from me and my credit card information to

4    lock in the hotel stay for Michael Harrington.

5    Q.  Other than forwarding this to Michael Harrington, when it

6    came to the Chicago hotel --

7                MS. NECHELES:  Objection.

8                MR. BELL:  I'll rephrase.

9                THE COURT:  Please do.

10   Q.  Other than forwarding the other email to Mr. Harrington,

11   Michael Harrington, did you deal directly with Mr. Harrington

12   as pertaining to Chicago trip or through Jeremy?

13   A.  Through Jeremy.

14   Q.  Did you ever receive reimbursement for this trip?

15   A.  No, I did not.

16   Q.  Did you ever come to learn that Mr. Reichberg had been

17   reimbursed for this trip?

18   A.  No.

19               MR. BELL:  Let's take that down.

20               THE COURT:  Counsel, it's about time for our lunch

21   break.  Would it this be a convenient time to break?

22               MR. BELL:  Yes, thank you.

23               THE COURT:  Thank you.  Ladies and gentlemen, we'll

24   take a lunch break, which should be a relatively short break.

25   Mr. Daniels will get you.  During this break, don't talk about

1    the case amongst yourselves, don't communicate about it with

2    anyone else, and don't do any research on the case.  I will see

3    you shortly.

4                (Jury not present)

5                THE COURT:  So counsel, we're going to take our lunch

6    recess now.  I would like to be in a position to start again

7    with the jury around 12:15, so I ask you be back around 12:10.

8                Is there anything that we should talk about before we

9    take this break?  Counsel for the United States?

10               MR. BELL:  Almost certainly not in front of the

11   witness, but generally no, not from the government.

12               THE COURT:  Thank you.

13               MS. NECHELES:  No, your Honor.

14               THE COURT:  Good.  Thank you very much.  I will see

15   you back at 12:10.  Thank you.

16               (Luncheon recess taken)

17               (Continued on next page)

18

19

20

21

22

23

24

25

IBSKGRA4

```
 1                      AFTERNOON SESSION

 2                          12:18 PM

 3          (Trial resumed; in open court; jury not present)

 4          THE COURT:  Thank you.  Ladies and gentlemen, you can

 5   be seated.

 6          MS. NECHELES:  Sorry, your Honor.

 7          THE COURT:  That's fine.

 8          Is there anything that any party would like to raise

 9   before we begin?  The witness is not in the box.

10          MR. BELL:  No, your Honor.

11          THE COURT:  Thank you.

12          Do you have a sense of how much longer you expect your

13   direct to last?

14          MR. BELL:  Lamentably, it's been a little harder to

15   chart and predict than I would have liked.  We will finish it

16   today.  It's hard -- we are nearing the bell lap.

17          THE COURT:  I'm sorry, nearing the what?

18          MR. BELL:  The bell lap.  My hope is that we will be

19   able to do this in the next hour-and-a-half.  I'm tempering my

20   projections some because this has gone a bit slower than I

21   expected it to.

22          THE COURT:  That's fine.

23          Counsel for defendants, do you have a sense of which

24   of the defendants is going to go first with respect to

25   cross-examination?
```

IBSKGRA4

1          MS. NECHELES:  I think I probably will.

2          THE COURT:  Thank you.

3          Is there anything else that we should take up before I

4     bring back in the jury?

5          I do want to briefly take up the issue with respect to

6     the Massey 302 and handwritten notes issue, which I'd be happy

7     to do briefly now, if there's nothing else for us to take up

8     before we bring in the jury.  Is there anything else?

9          MR. BELL:  Not from us, your Honor.

10          THE COURT:  Good.  I don't understand there to be

11     anything for the defendants either.

12          In sum, I'm going to grant the defendants' request.

13     Give me just a brief moment to explain why.

14          As the parties know, on November 13th, 2018, counsel

15     for Defendant Reichberg cross-examined Special Agent Massey.

16     See the transcript at 1231 to 36.  After laying a foundation,

17     counsel for Reichberg asked to put Massey's 302 and handwritten

18     notes into evidence.  Id at 1236.  I sustained an objection

19     from the United States, after which counsel for Defendant

20     Reichberg attempted to introduce Massey's 302 into evidence.

21     Transcript at 1236 to 37.  The government again objected, and

22     during sidebar, I sustained the objection.  See the transcript

23     at 1239 to 40.

24          Subsequently, on November 19, 2018, Defendant

25     Reichberg moved that the Court reconsider its ruling "and admit

IBSKGRA4

1   the Massey notes into evidence," Docket No. 428 at 2.  The

2   defense, I believe, correctly pointed out in their letter that

3   the plain text of Federal Rule of Evidence 803(5) permits an

4   adverse party to admit a past recollection recorded into

5   evidence as an exception to the hearsay rules.

6          One, considering that, on direct, Ms. Lonergan, after

7   laying the proper foundation, was permitted to ask Mr. Massey

8   to read his 302 report into evidence.  See 1225 and 1238.

9          I don't believe that there's a dispute that the rule's

10  foundational requirements have been satisfied.  Therefore, I'm

11  going to revisit my ruling and admit both of the documents that

12  counsel for Defendant Reichberg originally requested be

13  introduced into evidence; namely, the 302 and the notes.

14         Thank you.

15         So I will accept each of those.  Counsel, please

16  remind me at some point what the correct exhibit numbers are,

17  and I will add them to the list.

18         MS. NECHELES:  Thank you.

19         THE COURT:  Thank you.

20         Counsel, are you prepared?

21         If so, can you please bring in Mr. Rechnitz.

22         And, Mr. Daniels, can we bring in the jury?

23         MR. BELL:  That's fine, your Honor.  Thank you.

24         THE COURT:  Thank you.

25         MS. LONERGAN:  Your Honor, with respect to the Massey

IBSKGRA4

1    documents, they're 3512-01 and 3512-02.

2              THE COURT:  Thank you.

3              I'm accepting each of 3512-01 and 3512-02 into

4    evidence for the reasons that I have already described.

5              (Government's Exhibits 3512-01 and 3512-02 received in

6    evidence)

7              MS. NECHELES:  Your Honor, I'd like to mark them as

8    defense exhibits, I think --

9              THE COURT:  Thank you.

10             MS. NECHELES:  -- as opposed to 3500 material.

11             THE COURT:  Thank you.

12             I'm happy to do it either way, frankly, but given that

13   what I'm essentially trying to do here is to recreate what

14   would have happened had I ruled on your objection properly

15   originally, I propose that we enter them in evidence

16   regardless.

17             MS. NECHELES:  All right.

18             THE COURT:  You can bring in the jury, Mr. Daniels.

19             (Continued on next page)

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Thank you.

3          Ladies and gentlemen, you can be seated.

4          Mr. Bell, you can proceed.

5          MR. BELL:  Thank you, your Honor.

6    JONA RECHNITZ, resumed.

7    DIRECT EXAMINATION CONTINUED

8    Q.  Good afternoon, Mr. Rechnitz.

9    A.  Good afternoon.

10   Q.  During the period we've been talking about; that is to say,

11   the period during which you and Mr. Reichberg had these

12   arrangements and understanding with the police, did you have

13   occasion to pay a private security company?

14   A.  Yes.

15   Q.  What did you pay the private security company to do?

16   A.  To protect my children's school.

17   Q.  How did you happen upon the particular private security

18   company?

19   A.  I asked Jeremy if he knew of any security company, that our

20   school was looking for one at the time.

21   Q.  Did Mr. Reichberg come up with one?

22   A.  Yes.

23   Q.  And did he introduce you to anyone affiliated with the

24   security company?

25   A.  Yes.

1    Q.  And who was that?

2    A.  I believe it was the owner, named Richie.

3    Q.  Did you speak to Richie?

4    A.  Yes.

5    Q.  Did you make arrangements to have Richie provide security

6    to the school?

7    A.  Yes, I did.

8    Q.  At the time that you made these arrangements, did you

9    understand Richie to have anything to do with the officers that

10   you and Mr. Reichberg were otherwise involved with?

11   A.  No.

12   Q.  Under the arrangements struck with Richie's security

13   company, how much -- first of all, who was going to pay, at

14   least initially, for the security company?

15   A.  I did it as a donation to the school.

16   Q.  Approximately how much did you pay for the security company

17   and how long under those arrangements?

18   A.  I think it was several thousand dollars a month, and I

19   initially paid for the first year.

20   Q.  Do you recall what service you received for that payment?

21   Or what service, rather, the school received for that payment?

22   A.  An armed guard in front of the school.

23   Q.  Were you satisfied with the security company?

24   A.  Yes, I was.

25   Q.  As part of that process, did you connect Richie at the

OBSLGRA4                        Rechnitz - Direct

1   security company with the leadership of the school?

2   A.  Yes, I did.

3   Q.  By the way, what was the school called?  What was the name

4   of the school?

5   A.  Yeshiva Ketana.

6   Q.  Now, at the time did Mr. Reichberg tell you anything about

7   how he had come across that company?

8   A.  No.

9   Q.  Did there come a time where you were behind in payment to

10  the school; that is, when you owed -- I'm sorry, to the

11  security company; that is, when you owed the security company

12  money?

13  A.  Yes.

14  Q.  How did that come to be, and was it resolved?

15  A.  I was out of town.  I was, I think, in Los Angeles.  And I

16  had owed them about $5,000, and I had asked Jeremy to pay them

17  on my behalf.

18  Q.  To your understanding, did he do that?

19  A.  Yes.

20  Q.  Did there come a time where you ceased having

21  responsibility for paying Richie's security company?

22  A.  Yes.

23  Q.  What happened at that point?

24  A.  I put Scott Miller, the director of the school, in touch

25  with him.

1    Q.  And who took over the payment -- who, if anyone, took over

2    payments of Richie's security company?

3    A.  Scott did.

4    Q.  To your understanding, did they continue to provide

5    security to Yeshiva Ketana for some period of time?

6    A.  Yes.

7           MR. BELL:  At this time, your Honor, I'd like to offer

8    Government Exhibit W-01964 into evidence.

9           Can you, Mr. Hamilton, just put that on the witness'

10   screen and the parties'.  And for the attorneys' benefit, can

11   you go to the first -- thank you.

12          MS. NECHELES:  No objection, your Honor.

13          MR. MERINGOLO:  No objection.

14          THE COURT:  Thank you.

15          I'm accepting Exhibit W-01964.

16          You can proceed.

17          (Government's Exhibit W-01964 received in evidence)

18          MR. BELL:  Thank you, your Honor.

19          Can we publish -- well, first of all, can we direct

20   the jury's attention, in the black binders again, to Government

21   Exhibit W-1964-T.  That corresponds to Government Exhibit

22   W-01964, which was just admitted.

23          Your Honor, in a moment, with the Court's permission,

24   I'd ask to be allowed to have Mr. Hamilton play Government

25   Exhibit W-01964, a January 26, 2015 call at 1:36 p.m. between

OBSLGRA4                        Rechnitz - Direct

```
 1   Mr. Reichberg and Mr. Rechnitz.
 2              THE COURT:  Thank you.
 3              You can proceed.
 4              MR. BELL:  Thank you, your Honor.
 5              Mr. Hamilton.
 6              (Audio playback)
 7   BY MR. BELL:
 8   Q.  So, Mr. Rechnitz, in the context of this conversation, when
 9   you say -- well, first of all, at this point, in early 2015,
10   what was the state of things between you, Mr. Reichberg, and
11   Mr. Banks?
12   A.  We were -- at this exact point, I believe it's after he
13   left the department, so it was not great.
14   Q.  When you say it's not great, what do you mean by that after
15   Banks left the department?
16   A.  We didn't have much to do with him afterwards.  There was
17   no consequence to us.
18   Q.  To the extent that you and Mr. Reichberg discussed Banks
19   not having done anything for you at that point, what did you
20   mean by that?
21   A.  No official action, no big favors, we had with other cops.
22   Q.  To the extent that you and Mike -- withdrawn.
23              To the extent that it was mentioned on the call that
24   Banks hadn't done anything for Mike, what did you understand
25   that to mean?
```

OBSLGRA4                         Rechnitz - Direct

1             First of all, who were you talking to when Mike was
2    discussed?
3    A.  I was talking to Jeremy.
4    Q.  I'm sorry.  Who were you talking about when Mike was
5    discussed?
6    A.  Michael Harrington.
7    Q.  What did it mean that Banks had not done much of anything
8    for Mike?
9    A.  He didn't get him promoted.  We had asked him to promote
10   Mike Harrington from deputy chief to a chief.
11   Q.  And at this point -- now, to be clear, Mr. Rechnitz, during
12   the time that you had had Banks in the chief of department's
13   office, was he, nevertheless, important to you and to
14   Mr. Reichberg?
15   A.  Yes.
16   Q.  During the time that Philip Banks was in the chief of
17   department's office, were you able to use his position to get
18   favors out of other officers?
19   A.  Yes.
20   Q.  Was Mike Harrington among those officers?
21   A.  Yes.
22   Q.  Was Jimmy Grant among those officers?
23   A.  Yes.
24   Q.  Were you, nevertheless, at the end of the day, disappointed
25   with the end of the Banks chapter?

OBSLGRA4                        Rechnitz - Direct

1    A.   Extremely.

2    Q.   And why?

3    A.   I felt that we had put so much effort, time, and money into

4    policing, into Phil Banks, into this entire scheme and ordeal,

5    and he just quit, he walked out, and we were left to start from

6    the beginning.

7    Q.   From your conversations with Mr. Reichberg, was

8    Mr. Reichberg disappointed that you and he had not been able to

9    get more out of Philip Banks during the time that he was in a

10   high-level position within the NYPD?

11   A.   Yes.

12   Q.   And what, if anything, did Mr. Reichberg say about that

13   disappointment?

14   A.   He was upset.  He said:  But don't worry, I'm going to get

15   the new replacement, Jimmy O'Neill, and I have connections in

16   to Bratton.  Don't worry, we're going to get in.

17   Q.   Let's take a step back.  Before the break, I asked you some

18   questions about the football game at the Meadowlands.  Did

19   there come a time where -- a few months after that when you

20   took officers on a trip to watch college football?

21   A.   Yes.

22   Q.   Where was the event, and what was the event?

23   A.   It was in Miami.  It was the BCS championship game.

24   Q.   What led to you taking the officers to that particular

25   sporting event?

OBSLGRA4                         Rechnitz - Direct

1   A.   Jeremy and I were talking that the officers were going down

2   there anyways because the team they had followed, Notre Dame,

3   was playing, so we decided we're going to make a trip out of it

4   and treat them.

5   Q.   How did you travel to the game?

6   A.   Private jet.

7   Q.   Who arranged for the private jet?

8   A.   I did.

9   Q.   Who paid for the private jet?

10  A.   I did.

11  Q.   About how much did the private jet run you on that

12  occasion?

13  A.   I think it was about $20,000 or less, roundtrip.

14  Q.   Who flew down from the New York area to the BCS National

15  Championship Game with you?

16  A.   Jeremy, Eddie Gardner, Andrew Capul and his son, and Chief

17  McCarthy, and two of his friends.

18  Q.   Just to be clear, who was Andrew Capul at the time?

19  A.   He was in the NYPD.

20  Q.   Did you also take care of accommodations while in Florida?

21  A.   Yes.

22  Q.   Where did you stay?

23  A.   At the Mondrian Hotel in South Beach.

24  Q.   What kind of establishment was the Mondrian Hotel?

25  A.   A nice hotel.

OBSLGRA4                          Rechnitz - Direct

1    Q.  Did you pay for only your own stay or other people's stay

2    at the Mondrian?

3    A.  I paid for the entire group.

4    Q.  What do you recall --

5    A.  I'm sorry.  The entire group besides the Capuls.  They were

6    not staying there.

7    Q.  What do you recall the accommodations that you arranged at

8    the Mondrian?

9    A.  It was one of the largest suites in the hotel.

10   Q.  How long did you stay at the Mondrian?

11   A.  Just that night.

12   Q.  During the course of that trip, did you meet other

13   officers?

14   A.  Yes.

15   Q.  When I say "other officers," I'll be clear:  Officers other

16   than the ones that you had actually traveled down with?

17   A.  Yes.

18   Q.  Who did you meet?

19   A.  Stephen McAllister and Brian McGinn.

20   Q.  Who was Brian McGinn?

21   A.  Brian McGinn was the inspector in the 2-0 Precinct in the

22   Upper West Side where I lived.

23   Q.  Where did you meet McAllister and McGinn?

24   A.  At the game.  We had purchased a private suite to watch the

25   game.

OBSLGRA4                          Rechnitz - Direct

1   Q.  Did you watch the game in that suite?

2   A.  Yes.

3   Q.  Who did you watch that game with?

4   A.  Everybody who came on the trip, including McGinn and

5   McAllister.

6   Q.  As part of that box, had you purchased tickets for all of

7   them?

8   A.  Yes.

9   Q.  Now, did you or Mr. Reichberg invite Grant or Harrington on

10  that trip?

11  A.  I don't remember.

12  Q.  Were they present?

13  A.  No.

14  Q.  Did you invite Philip Banks on that trip?

15  A.  I don't remember.

16  Q.  And, at that point, would you have expected Philip Banks to

17  join that particular group on that trip?

18  A.  No.

19  Q.  Why not?

20  A.  The same reason that he didn't come to the Jets-Patriots

21  game, he said this group would be beneath him, it wouldn't be

22  good for him to be with them all.

23  Q.  In addition to the accommodations at the Mondrian Hotel,

24  did you arrange for any entertainment?

25  A.  Yes.

1  Q.  What arrangement did you make with respect to

2  entertainment?

3  A.  Prostitutes.

4  Q.  Why prostitutes?

5  A.  It was to have a good time, something that people would

6  enjoy.

7  Q.  Now, at that point, Mr. Rechnitz, had you furnished

8  prostitutes for your law enforcement friends at earlier trips?

9  A.  Yes.

10  Q.  Where?

11  A.  The Dominican Republic.

12  Q.  Is this the same series of trips that you mentioned Philip

13  Banks and Jeremy Reichberg attending with you?

14  A.  Yes.

15  Q.  Had you paid for prostitutes on that occasion?

16  A.  Yes.

17  Q.  And who were the prostitutes made available for on that

18  trip?

19  A.  All of us, everybody present.

20  Q.  Now, on the occasion of the BCS championship game, who were

21  the prostitutes made available to?

22  A.  Whoever who wanted.  Everybody who was there.

23  Q.  Did you make arrangements for return travel at the end of

24  the trip?

25  A.  I did.

1    Q.  And what was the return travel?

2    A.  Also a private jet from Opa-Locka, which is the private

3    airport in Miami, back to Teterboro, New Jersey.

4    Q.  Did the people who came down with you also come back up

5    with you?

6    A.  Yes.  But, in addition, Stephen McAllister came back with

7    us.

8    Q.  How did Steve McAllister happen to return with you when he

9    hadn't come down with you?

10   A.  We told him that we had flown private.  He had gone earlier

11   to Miami for the game before we had actually gone down there,

12   so he came back and took a ride with us.

13          MR. BELL:  At this point, I'd like to put up on the

14   screen what's been marked for identification as Government

15   Exhibit 1006.

16   Q.  I'll ask you to look at the first page, then the second

17   page briefly, the third page, and the fourth.

18          Are you familiar with this email, Mr. Rechnitz?

19   A.  Yes, I am.

20   Q.  How are you familiar with it?

21   A.  I am -- I sent the email and received.

22          MR. BELL:  Your Honor, the government offers 1006.

23          MS. NECHELES:  No objection.

24          MR. MERINGOLO:  No objection.

25          THE COURT:  Thank you.

1           I'm accepting 1006 into evidence.

2           You can proceed.

3           (Government's Exhibit 1006 received in evidence)

4           MR. BELL:  Thank you.

5           Mr. Hamilton, can we publish that and put up page 1

6    for the jury.

7    BY MR. BELL:

8    Q.  So the top email is an email from Al Palagonia at Apollo

9    Jets.  Who is Al?

10   A.  The owner of Apollo Jets, which is the private jet charter

11   service I used.

12   Q.  He says:  "You're welcome.  Enjoy the game."

13          I'll direct your attention to the bottom part of the

14   email where Mr. Palagonia says:  "Tomorrow's departure is set

15   for 7:00 a.m.  Need to set that in stone now.  Can you confirm

16   7:00 a.m."  Thanks."

17          MR. BELL:  Can you go to the next page, Mr. Hamilton.

18   "Good morning, Jona," can we highlight that part?  Thank you.

19   Q.  "Your aircraft and crew are in position.  Catering should

20   be on the aircraft in the next five minutes.  We have to pay to

21   guarantee the Challenger 300 this morning, and I'm waiting for

22   my guy to get in and see if he can waive the charge."

23          What do you understand the Challenger 300 to be?

24   A.  It's a certain type of an aircraft.

25   Q.  It says:  "We will have two SUVs waiting for you when you

1    land."

2              MR. BELL:  Can we go to the next page, please.

3    Q.  Beginning halfway down the page, Michael Nizza at Apollo

4    Jets writes:  "Hi Jona.  Here is the updated itinerary.  Please

5    review and let us know if you need anything else."

6              "Jona Rechnitz's flight briefing," and then it says:

7    "Monday, January 7, 2013:  Depart 9:00 a.m. Teterboro airport;

8    arrive 11:57 a.m. Miami Opa-Locka Executive Airport."

9              MR. BELL:  Can we go to the next page.

10   Q.  Then there's a list of passengers:  Jona Rechnitz, Eliyahu

11   Hendeles, Jeremiah Reichberg, Eddie Gardner, Andrew Capul, Sr.,

12   Andrew Capul, Jr.

13             Mr. Rechnitz, who is Eliyahu Hendeles?

14   A.  A friend of mine.

15             MR. BELL:  And let's pull out of that, please.

16             Can we now put up, on the witness' screen, Government

17   Exhibit 1007.

18   Q.  Are you familiar with -- well, we'll start here, on the

19   first page, and then I'll ask for you to look at the second

20   page as well.

21   A.  Yes.

22   Q.  How are you familiar with this correspondence?

23   A.  This is an email that I sent and had received.

24             MR. BELL:  Your Honor, the government offers 1007.

25             THE COURT:  Counsel?

1              MS. NECHELES:  No objection.  Sorry.

2              MR. MERINGOLO:  No objection.

3              THE COURT:  Thank you.

4              I'm accepting 1007 into evidence.

5              You can proceed.

6              (Government's Exhibit 1007 received in evidence)

7              MR. BELL:  Mr. Hamilton, can you publish Government

8    Exhibit 1007.  It's an email from Michael Nizza.

9              Let's move down into the body of the email to the

10   second page.  Can we highlight "Tuesday, January 8, 2013,

11   depart 7:00 a.m. Miami, Florida; arrive 9:46 a.m. Teterboro,

12   New Jersey."  And the passenger list:  Jona Rechnitz, Jeremiah

13   Reichberg, Steve McAllister, Andrew Capul, Sr., Andrew

14   Capul, Jr., and Eddie Gardner.

15             Can we briefly go to the third page and just highlight

16   the part that says:  "Need two SUVs from Mondrian to plane

17   tomorrow at 6:20 a.m."

18             Let's take that down.

19   BY MR. BELL:

20   Q.  Mr. Rechnitz, did you have occasion to take officers to a

21   Yankee game?

22   A.  Yes.

23   Q.  Do you recall who the officers were?

24   A.  I remember taking Michael Harrington, I remember taking

25   Jimmy Grant, I remember taking, at one point, Chief McCarthy.

1    Q.  When you say "at one point," what do you mean by that?

2    A.  I'm not sure they were all at the same game.

3    Q.  Did you take officers to more than one Yankee game?

4    A.  Yes.

5    Q.  When you took officers to Yankee games, what kind of seats

6    did you get?

7    A.  Legends seats.

8    Q.  What are Legends seats?

9    A.  They're the best seats in the house.

10   Q.  About how much can those seats cost?

11   A.  Anywhere from 300 to a thousand dollars a ticket.

12   Q.  What was the purpose -- withdrawn.

13          Did you discuss this item with Mr. Reichberg as well?

14   A.  Yes.

15   Q.  Did you discuss the purpose of taking these officers to

16   these Yankee games and sitting in these Legends seats?

17   A.  Yes.

18   Q.  What was the purpose of that?

19   A.  To treat them to a game like other events, give them gifts,

20   so that we can keep them happy and get things in return.

21   Q.  Switching gears:  Are you familiar with something called

22   Camp Simcha?

23   A.  Yes.

24   Q.  And what, Mr. Rechnitz, was Camp Simcha?

25   A.  It's a wonderful organization that helps kids with cancer.

OBSLGRA4                          Rechnitz - Direct

1   Q.  Did you know anyone who was involved with Camp Simcha?

2   A.  Yes.

3   Q.  Who?

4   A.  Eli Rowe.

5   Q.  And how did you understand Mr. Rowe to be involved with

6   Camp Simcha?

7   A.  He volunteers and gives a lot of his time for many

8   organizations.  This was one of the ones that he gave a lot of

9   his time to.

10  Q.  Is this the same Eli Rowe that you had mentioned earlier in

11  connection with the gun license?

12  A.  Yes.

13  Q.  Did there come a point where Mr. Reichberg developed an

14  interest in Camp Simcha?

15  A.  Yes.

16  Q.  And did you discuss why with Mr. Reichberg?

17  A.  Not too much.  The discussion we had was there was an event

18  being put together, and Eli wanted something to cheer the kids

19  up and have some police sort of presence.

20  Q.  At this point, did you understand Mr. Reichberg to be

21  interested in getting to know Mr. Rowe better?

22  A.  Yes.

23  Q.  And did you have an understanding of why?

24  A.  Yes.

25  Q.  Why?

OBSLGRA4                        Rechnitz - Direct

1   A.  Eli's wealthy, and Jeremy likes to attract to people of

2   wealth, and he likes to benefit from them financially.

3   Q.  Now, did you understand Mr. -- withdrawn.

4           Was there a point at which Mr. Reichberg became

5   involved, as part of that effort, with helping to plan an event

6   for Camp Simcha?

7   A.  Yes.

8   Q.  What was that event?

9   A.  It was some event in a famous field, I think in Brooklyn,

10  where Jeremy had told me he was making arrangements for police

11  officers, something maybe to do with a boat.  I don't remember

12  the exact specifics.

13  Q.  And, to be clear, Mr. Rechnitz, did you ultimately go to

14  that event yourself?

15  A.  No, I did not.

16  Q.  Did you discuss the event afterwards with Mr. Reichberg?

17  A.  Yes.

18  Q.  What's your understanding of how the event went?

19  A.  It went very well.

20  Q.  Did you and Mr. Reichberg have occasion to discuss press

21  coverage of that same event?

22  A.  Yes.

23  Q.  How did that come up?

24  A.  Jeremy had told me that he was very upset that there was a

25  photographer from a Jewish website, and he got into a scuffle

1    with the photographer.  An argument, not a scuffle, an

2    argument, I meant.  And they had some emails going back and

3    forth as well, and they were at odds with one another.  Jeremy

4    did not want photos of the event posted publicly, and the

5    photographer wanted to post them.  He thought it would be good

6    for the organization.

7    Q.  Did Mr. Reichberg ask you for advice with respect to how to

8    handle this situation?

9    A.  Yes.

10   Q.  What did Mr. Reichberg ask you for?

11   A.  He asked me how to respond to the email, which I helped him

12   draft.

13   Q.  What was your understanding of why Mr. Reichberg did not

14   want these photographs to appear on the Jewish news website?

15   A.  There were two reasons.  One reason is Jeremy liked to be

16   under the radar in terms of publicity with photos.  And the

17   main reason that he expressed to me was, you know, cops were

18   doing this as a favor, not really as officially part of their

19   jobs, and it would expose things.

20   Q.  Did there come a point where you became familiar with

21   something called 601 Sunset LLC?

22   A.  Yes.

23   Q.  What was 601 Sunset LLC?

24   A.  It's a property in Brooklyn.

25   Q.  And how did you chance to become familiar with 601 Sunset

OBSLGRA4                          Rechnitz - Direct

1    LLC?

2    A.  I introduced the owners to Jeremy.

3    Q.  Who were the owners of 601 Sunset LLC?

4    A.  Harry Skydell and Mark Karasick.

5    Q.  Can you spell Karasick?

6    A.  K-a-r-a-s-s-i-c-k.

7    Q.  Why we're at it, let's spell Skydell.

8    A.  S-k-y-d-e-l-l.

9    Q.  And for what reason did you introduce Mr. Skydell and

10   Mr. Karasick to Mr. Reichberg?

11   A.  He had an issue.  He had just purchased a property, 601.

12   He had just purchased a property, and they had a very large

13   water bill, which we discussed the other day, and it didn't

14   make sense.  He said it was a faulty water bill, there was a

15   mistake.  And knowing my relationship in the city and Jeremy,

16   he asked me is there anything we can do to help him resolve

17   that water situation.

18           I introduced Jeremy to Mr. Skydell, I think he put him

19   in touch with other people in his company, and Jeremy was able

20   to successfully get the bill lowered.

21   Q.  Did you yourself have an active hand with the relationship

22   with Jeremy and the 601 Sunset folks after introducing them?

23   A.  No.

24   Q.  Did you, Mr. Rechnitz, ever have knowledge of Mr. Grant

25   arranging for a helicopter appearance on Mr. Reichberg's

1    behalf?

2    A.  No.

3    Q.  Are you familiar with an -- before we get there, by August

4    of 2015, were you still involved with this relationship, with

5    actively recruiting and cultivating relationships with officers

6    with Jeremy Reichberg?

7    A.  No.

8              MR. BELL:  August of 2015.

9              MS. NECHELES:  I couldn't hear the date.  Sorry.

10             MR. BELL:  Sure.  No problem.

11   BY MR. BELL:

12   Q.  Are you familiar with an entity called Meridian Capital?

13   A.  Yes.

14   Q.  How are you familiar with Meridian?

15   A.  It's a company I've done business with.

16   Q.  Do you know individual people at Meridian?

17   A.  Yes.

18   Q.  Do you know an individual named Reuven Hellman?

19   A.  Yes.

20   Q.  Who is Reuven Hellman?

21   A.  He's a friend of mine.

22   Q.  Is he affiliated with Meridian?

23   A.  He used to be.  Not anymore.

24   Q.  Did there come a point where you were involved in a favor

25   for Reuven Hellman at Meridian Capital involving the police?

OBSLGRA4                         Rechnitz - Direct

1    A.  Yes.

2    Q.  What was the favor?

3    A.  His boss had lost a watch that he just got as a gift.  He

4    had left it in a taxi or a car service, and he called me and

5    asked me if there's anything I can do to help figure out where

6    it is, maybe using police resources, such as camera systems

7    or -- to help locate or track the watch.

8    Q.  Did you do anything to follow up on that query?

9    A.  Yes.

10   Q.  What did you do?

11   A.  I introduced him to Jeremy and asked Jeremy to handle it.

12          MR. BELL:  I'd like to, Mr. Hamilton, put up for the

13   witness what's been marked for identification as Government

14   Exhibit 1025.

15   Q.  Are you familiar with this email exchange?

16   A.  Yes, I am.

17   Q.  How are you familiar with it?

18   A.  It's an email that I received.

19   Q.  And what, generally, did it concern?

20   A.  It concerned the lost watches.  And I included Fernando

21   Mateo, a mutual friend Jeremy and I had, who, as I said, was

22   the president of the taxi and limousine federation for

23   Hispanics and asked if he could help us.  In addition, it had

24   correspondence between me and Reuven Hellman discussing having

25   Jeremy review NYPD cameras.

OBSLGRA4                     Rechnitz - Direct

 1              MR. BELL:  Your Honor, the government offers 1025.

 2              MS. NECHELES:  No objection.

 3              MR. MERINGOLO:  No objection.

 4              THE COURT:  Thank you.

 5              I'm accepting Exhibit 1025 into evidence.

 6              You can proceed.

 7              (Government's Exhibit 1025 received in evidence)

 8              MR. BELL:  Mr. Hamilton, can we publish that and go to

 9     the bottom of the email on page 2.

10     BY MR. BELL:

11     Q.   Prior to this incident, Mr. Rechnitz, did Mr. Hellman know

12     Fernando Mateo?

13     A.   No.

14     Q.   Who introduced them?

15     A.   I did.

16     Q.   So there's an email here at the bottom from Mr. Hellman

17     saying:  "Fernando, good talking to you, and, of course, many

18     thanks in advance for your assistance with this matter.  The

19     relevant facts are as follows."  I'll skip the next couple of

20     parts.  "Mr. Birnbaum is looking to recover a watch that he

21     left in the care."  Well, it says "care."

22              MR. BELL:  The next message up, if we can focus on --

23     I guess that's on two different pages, Mr. Hamilton.  Well,

24     let's go to the bottom of the first page, just to show that the

25     email, the next email up, is from Fernando Mateo to Reuven

1   Hellman.  Can we go back to the top of the second page.

2   BY MR. BELL:

3   Q.  Mr. Mateo writes, copying you:  "So it was not a yellow

4   cab?  I need to know what black car company it was.  There are

5   600 services in NY.  Almost impossible to find one black car in

6   the city.  If you have any other info, please inform."

7          MR. BELL:  Can we now go back to the first page.

8   Q.  Mr. Hellman writes to you:  "No one has a way of tracking

9   unless you have the name of the company.  Livery and black cars

10  are not supposed to pick up street hails.  It's illegal.

11  That's what makes it difficult.  I need to know if he called a

12  car service."

13         Hellman responds:  "He did not call."

14         Mateo responds:  "I will never be able to contact the

15  driver.  Nine -- drivers in the city every day.  I'm very

16  sorry."

17         MR. BELL:  Let's zoom out.

18  Q.  Reuven then responds:  "This may be something for your boy

19  Jeremy," on September 12 at 11:56 p.m.

20         And then you respond:  "Yes, Jeremy will have the NYPD

21  review cameras at that time and location, but will cost Jeremy

22  10K.  Should I proceed?"  Sent from your iPhone.

23         And then Mr. Hellman responds:  "It doesn't seem to

24  make good economic sense to me.  Watch approximately 50K, but

25  even if we locate the car, the driver (a) may not have the

OBSLGRA4                        Rechnitz - Direct

1    watch, as it could have been picked up by a subsequent

2    passenger; and (b) may simply deny it.  Thoughts?"

3             MR. BELL:  Before we come out of this pullup window,

4    Mr. Hamilton:

5    BY MR. BELL:

6    Q.  Mr. Rechnitz, did you discuss this matter with Jeremy in

7    addition to emailing back and forth, as shown here?

8    A.  Yes.

9    Q.  Did Mr. Reichberg talk to you about why it would cost

10   Jeremy 10K?

11   A.  No.

12            MR. BELL:  Zoom out.  And let's take that down.

13            I'd like to put up for the witness Government Exhibit

14   1141.

15   Q.  Are you familiar with 1141?

16   A.  Yes.

17   Q.  How are you familiar with 1141?

18   A.  It's an email that I received from Reuven Hellman and

19   copied Jeremy Reichberg on.

20            MR. BELL:  The government offers 1141.

21            MS. NECHELES:  No objection.

22            MR. MERINGOLO:  No objection.

23            THE COURT:  Thank you.

24            I'm accepting 1141 into evidence.

25            You can proceed.

1             (Government's Exhibit 1141 received in evidence)

2             MR. BELL:  Can we put the first three-quarters of the

3    email in a blowup window.  Let's do the -- yep.

4    BY MR. BELL:

5    Q.  The very bottom email, is that part of the same email

6    exchange that we just read, "It doesn't seem to make good

7    economic sense to me," Mr. Rechnitz?

8    A.  Yes.

9    Q.  Is that the same -- is that from the same email that we

10   just reviewed?

11   A.  Yes.

12   Q.  The next message up is from you, and you say:  "Your call.

13   It's a time-consuming process.  If you have the chance, the

14   extra 10K might get you there."

15             And the top message from Reuven Hellman is:  "Ralph

16   gave green light for 5K.  Doable?  Don't tell Birnbaum."

17             Who did you understand Ralph to be?

18   A.  Ralph Herzka.

19   Q.  Who is he?

20   A.  The owner of Meridian.

21   Q.  How did he relate to all of this?

22   A.  He's partners with Mr. Birnbaum, whose watch was lost.

23   Q.  You then said:  "There are two guys he needs to take care

24   of to watch the footage.  He said 10K is the price."

25             In writing that, Mr. Rechnitz, when you say "There are

1   two guys he needs," who is the "he"?

2   A.   Jeremy.

3   Q.   And when you say "There are two guys he needs to take care

4   of," what did you understand "to take care of" to mean when you

5   wrote that?

6   A.   The payoff to the police officers.

7   Q.   Okay.  "He said 10K is the price."

8        Mr. Hellman responds:  "Totally not negotiating.  It

9   simply doesn't make economic sense at 10K."

10       To be clear, when you had the information that it

11   would cost $10,000 to pay these two officers, where had you

12   gotten that information from?

13  A.   From Jeremy.

14       MR. BELL:  Let's take that down.

15       Can we put up Government Exhibit 1004 just for the

16  witness.

17       Let's take that down.

18       Can you put up 1044 for the witness.

19  Q.   Are you familiar with this email?

20  A.   Yes, I am.

21  Q.   How are you familiar with it?

22  A.   It's an email that was sent to me.

23  Q.   And what, generally, did it pertain to?

24  A.   A ticket that a friend had that Jeremy was going to be

25  taking care of.

1              MR. BELL:  The government offers 1044.

2              MS. NECHELES:  No objection.

3              MR. MERINGOLO:  No objection.

4              THE COURT:  Thank you.

5              I'm accepting 1044 into evidence.

6              You can proceed.

7              (Government's Exhibit 1044 received in evidence)

8              MR. BELL:  Let's publish that, Mr. Hamilton, and let's

9      go to the second page.

10     BY MR. BELL:

11     Q.   What does the attachment appear to be?

12     A.   A notice of a suspension -- pending suspension for a

13     driver.

14             MR. BELL:  Let's go back to the first page.

15     Q.   There's an email at the bottom from an Andrew Melohn to

16     you; "Subject:  Sarah's Cell Phone Ticket."

17             Who is Andrew Melohn?

18     A.   A friend of mine.

19     Q.   You say:  "Hi Jona.  Can you forward this to Jeremy?  It's

20     the same cell phone ticket he said was taken care of, and now

21     Sara's license will be suspended as of January 6, 2014."

22             When you say -- when the email says "he said was taken

23     care of," who did you understand that to be?

24     A.   Jeremy.

25             MR. BELL:  Let's take that down.  Not the exhibit,

OBSLGRA4                    Rechnitz – Direct

1    just the blowup part.

2    BY MR. BELL:

3    Q.  The next part is an email forwarded from your assistant,

4    Levin Prado, to Jeremy Reichberg.

5              Do you understand -- copying you.  Do you understand

6    how your assistant came to forward that email to Jeremy and

7    copy you?

8    A.  Yes.

9              (Continued on next page)

IBSTGRA5                          Rechnitz - Direct

1   BY MR. BELL:

2   Q.  And how?

3   A.  It was sent to him from Mr. Malone.

4   Q.  Finally Mr. Prado writes to Mr. Reichberg, copies you,

5   subject line:  Sara's cell phone ticket.  This is today.

6        Do you know what happened with this particular ticket?

7   A.  I do not.

8   Q.  I want to direct your attention, Mr. Rechnitz, to the year

9   2014.  Was there a point in 2014 when Mr. Reichberg got sick?

10  A.  Yes.

11  Q.  What happened?

12  A.  I think he had his gallbladder removed.

13  Q.  Was he hospitalized?

14  A.  Yes.

15  Q.  Do you recall where?

16  A.  Same hospital where Joan Rivers was.  She was on the same

17  floor, but I don't remember.  I think it was Mt. Sinai.

18  Q.  Did you spend time with him while he was sick?

19  A.  Yes.

20  Q.  About how much time did you spend with him?

21  A.  He went to visit him daily.

22  Q.  While Mr. Reichberg was sick, did you get to know any of

23  his nurses?

24  A.  Yes.

25  Q.  Did you see any of those nurses after he left the hospital?

IBSTGRA5                        Rechnitz - Direct

1   A.  Yes.

2   Q.  How did you come to see that nurse after Mr. Reichberg was

3   discharged?

4   A.  When I went to visit him in his home she was there taking

5   care of him.

6   Q.  Were you surprised by that?

7   A.  No, he wasn't well.

8   Q.  Did police officers also visit Mr. Reichberg while he was

9   hospitalized?

10  A.  Yes.

11  Q.  What sort of police presence did you witness for

12  Mr. Reichberg while he was in the hospital?

13  A.  He had a police officer standing outside of his hospital

14  room.

15  Q.  And did you discuss that police officer with Mr. Reichberg?

16  A.  Yes.

17  Q.  What did he say to you about that police officer's

18  presence?

19  A.  He was excited to show me that he had respect.  Just like

20  when an officer is hurt in the line of duty, he had an officer

21  outside of his door.

22  Q.  Did he tell you how specifically he had arranged --

23  withdrawn.

24          Did he tell you how specifically that officer had been

25  arranged to stand outside his hospital room?

1    A.  He told me that Jimmy Grant had sent the officer.

2    Q.  Did you see other officers visit Mr. Reichberg at the

3    hospital while he was ill?

4    A.  Yes.

5    Q.  Who else did you see?

6    A.  Philip Banks, Michael Harrington, Jimmy Grant.

7    Q.  Now did there come a later point where you had occasion to

8    see Mr. Grant inside a hospital?

9    A.  Yes.

10   Q.  And under what circumstances?

11   A.  My cousin's father was deathly ill and he was at

12   Sloan-Kettering Hospital, and my cousin and his wife felt that

13   he was not getting the proper attention or care, that the

14   nurses and doctors were not checking on him properly throughout

15   the night.  And I called Jimmy and asked him if he knew anybody

16   at the hospital since it was in his precinct, and he said that

17   he had known the head of security and he would be happy to meet

18   me at the hospital and have a talk with him.

19   Q.  Did that happen?

20   A.  Yes.

21   Q.  And were you there -- did you meet Mr. Grant at the

22   hospital while that happened?

23   A.  Yes.

24   Q.  While you spoke to Mr. Grant, what else, if anything, did

25   you discuss?

1    A.   When I walked him out of the hospital and stood by his car
2    I explained to him that I appreciated him coming down, and the
3    reason that I had not been in touch with him for quite a while
4    was for his own good.  I was protecting him.
5    Q.   What was the state of things with you and Jimmy Grant at
6    that point?
7    A.   I had shut down virtually all police connections to that --
8              MR. MERINGOLO:  Could we get a time frame?
9              THE COURT:  You can continue, counsel for the United
10   States.
11             MR. BELL:  Thank you, your Honor.
12   Q.   Why had you shut things down at that point?
13   A.   I shut down virtually all police connections because there
14   was an active investigation going on and the Internal Affairs
15   Bureau was involved.
16   Q.   So was this some time after you were first visited by the
17   Internal Affairs Bureau in March of 2015?
18   A.   I believe so, yes.
19   Q.   Now during your interaction with Grant at this point, did
20   you get anything from him?
21   A.   I did.
22   Q.   What did you receive from Mr. Grant?
23   A.   He handed me a bunch of PBA cards with stickers to put on
24   them for friends and family of mine.
25   Q.   What was the nature of the stickers?

1    A.  They had his name and his phone number.  In case anyone

2    questioned where we got them, they could call him.

3            MR. BELL:  At this point, your Honor, the government

4    would offer Government Exhibit X03186, pursuant to the same

5    wire stipulation.  X3186.

6            And Mr. Hamilton, perhaps you could put that on the

7    screen to assist counsel.

8            MS. NECHELES:  No objection.

9            MR. MERINGOLO:  No objection.

10           THE COURT:  Thank you.  I'm accepting Exhibit X03186

11   into evidence.  You can proceed.

12           (Government's Exhibit X03186 received in evidence)

13           MR. BELL:  Mr. Hamilton, please play X3186.

14           (Audio recording played)

15           MR. BELL:  Can we go to the first page, Mr. Hamilton.

16   I think I neglected to note, as we have been doing, the date

17   and time is March 6, 2015, 10:09 a.m.

18   Q.  And at this point, Mr. Rechnitz, what was the state of

19   things with you and the officers?

20   A.  Again, I had shut them all down.  I didn't go to Jeremy's

21   annual Purim party.  I wanted to have as little to do with them

22   as possible.

23           MR. BELL:  Let's take that down.

24   Q.  Mr. Rechnitz, are you familiar with an individual named Avi

25   Hager?

 1    A.  Yes.

 2    Q.  Was he also known as Avi?

 3    A.  Yes.

 4    Q.  I think I may have conflated those names.  Was his name

 5    Avery Hager?

 6    A.  Yes.

 7    Q.  But was he, in any event, known as Avi?

 8    A.  Yes.

 9    Q.  Who was he?

10    A.  Friend of mine.

11    Q.  Do you recall ever introducing him to Mr. Reichberg?

12    A.  Yes.

13    Q.  Do you recall any favors being done for him involving the

14    police?

15    A.  I don't remember the specifics, but I think it may have

16    been something to do with a ticket, but I don't recall the

17    specifics.

18    Q.  I want to direct your attention to the point when Banks

19    resigned from the NYPD.

20            At the time that Banks resigned, what, if anything,

21    did he tell you about the circumstances of his resignation?

22    A.  He told me that the reason he was stepping down was he felt

23    that the position that he had been offered, with that option,

24    it was to become deputy commissioner, I think it's called, was

25    a very ceremonial position that only dealt with discipline, and

1    that he wouldn't be useful and he was not going to accept it.

2    He also told me that when you go to that level and become a

3    civilian position they run through disclosures and tax returns

4    and all that sort of thing, and he had some holes.

5    Q.   Now did you have an understanding of what, if anything,

6    Banks was communicating to the public about why he resigned?

7    A.   I think he just said because --

8    Q.   I'm wondering if you had an understanding of what Banks was

9    communicating to the public.

10   A.   No.

11   Q.   Now when this happened, when Banks resigned, did you and

12   Mr. Reichberg attempt to do anything about it?

13   A.   Yes.

14   Q.   What did you do?

15   A.   First we went to see Banks, spoke to him, and I asked him

16   if the mayor would reconsider putting you back, would you

17   accept it?  And he led us to believe that he would be open to

18   that.  I quickly contacted Mayor de Blasio immediately, and the

19   mayor told me I could come talk to him in person, that he was

20   at Chelsea Piers, and I could go take a walk with him.

21   Q.   Did you in fact do that?

22   A.   Yes.

23   Q.   Before we get to your conversation with Mayor de Blasio on

24   this score, how did it come to be that shortly after Banks

25   resigned Banks said that he might be willing to take the job

1  back if Mr. de Blasio let him?

2  A.  Because they called his bluff.  He thought he would get his

3  way by making a stink and saying he's going to quit.

4  Q.  What did he think that he would get by doing that?

5  A.  Stay as chief of department or potentially police

6  commissioner spot.

7  Q.  Based on your conversations with Banks, did that work?

8  A.  No.

9  Q.  Did you have that in-person conversation with Mayor de

10 Blasio?

11 A.  Yes, I did.

12 Q.  And where did that take place?

13 A.  At the Chelsea -- sorry, at the South Street Seaport.  I

14 got confused before.

15 Q.  And what, in substance, did you say to Mayor de Blasio and

16 what did he say to you?

17 A.  I asked him if he would reconsider, that Banks made a

18 mistake.  And I remember Bill was fuming that day, de Blasio.

19 He said that he embarrassed the mayor, he had high aspirations

20 for him, he was going to make him police commissioner one day,

21 and that he really made a big mistake.

22          MR. BELL:  I want to put Government Exhibit 1069 up on

23 the witness's screen.

24 Q.  Are you familiar with this email?

25 A.  Yes, I am.

IBSTGRA5                          Rechnitz - Direct

1   Q.  How are you familiar with this email?

2   A.  It's an email that I wrote to the mayor.

3              MR. BELL:  Your Honor, the government offers 1069.

4              MS. NECHELES:  No objection.

5              MR. MERINGOLO:  No objection.

6              THE COURT:  Thank you.  I'm accepting Exhibit 1069

7   into evidence.

8              (Government's Exhibit 1069 received in evidence)

9              MR. BELL:  Let's publish that to the jury, please.

10             Can you highlight the date, Mr. Hamilton, on this

11  November 3rd, 2014 email from Mr. Rechnitz to Mr. de Blasio,

12  subject line, and I will read this:  Please help, please,

13  please.  You write:  I'm in my office in a summit with

14  Fernando, Norman and Jeremy.

15  BY MR. BELL:

16  Q.  Who was Fernando?

17  A.  Fernando Mateo.

18  Q.  Who was Norman?

19  A.  Norman Seabrook.

20  Q.  Was Jeremy Mr. Reichberg?

21  A.  Yes.

22  Q.  Why had that particular group gathered?

23  A.  To discuss Phil Banks and what's next.

24  Q.  Why did Mr. Banks' resignation matter to Mr. Mateo?

25  A.  It mattered because he had a relationship with him as well.

1   Q.  Why did it matter to Mr. Seabrook?

2   A.  They were very close friends.

3   Q.  Why did it matter to you and Mr. Reichberg?

4   A.  Because that was our closest and highest level contact at

5   NYPD, and we were associated with him.  And throughout the way,

6   once we became close to him, we paid less attention to people

7   who were under him who we used to pay more attention to.

8   Q.  What did you see as the potential consequence of having

9   paid less attention to those people now that Banks had

10  resigned?

11  A.  We would have egg on our face because now we would go back

12  to them when we weren't paying attention to them throughout.

13  Q.  The email continues:  What can we do for you to refuse

14  Banks' resignation and get him back in and for Bratton to see

15  past Phil's monstrous mistake?

16          How concerned were you and Mr. Reichberg about this,

17  Mr. Rechnitz?

18  A.  Extremely.

19          MR. BELL:  Let's take that down.

20  Q.  After Banks resigned, was -- first of all, was Banks'

21  resignation ultimately accepted?

22  A.  Yes.

23  Q.  Was Banks no longer the chief of department?

24  A.  That's correct.

25  Q.  What did you expect, in the immediate aftermath of that,

1     would happen to Michael Harrington?

2     A.   That he would be transferred out of the chief of

3     department's office.

4     Q.   Would why Mr. Harrington be out of the chief of

5     department's office with of Banks' resignation?

6     A.   Because he was labeled as a Banks guy, and when a new head

7     comes in place he brings his own people typically.

8     Q.   What did Harrington's likely departure mean for what you

9     and Jeremy worked together to build?

10    A.   It was disastrous.

11    Q.   Why was it a disaster?

12    A.   Because we were losing everything at once from that office.

13    Q.   At the very beginning of your testimony you described being

14    approached by who you thought were members of the Internal

15    Affairs Bureau of the NYPD.  When that happened, did you talk

16    to Reichberg about it?

17    A.   Yes.

18    Q.   What did you say to him and what did he say to you?

19    A.   I told him that they approached me, and I explained to him

20    other people that they approached, and I wanted to know if they

21    had approached him, and we discussed exactly what I was asked

22    about.  We were trying to figure out what they were looking

23    into.

24    Q.   What was Mr. Reichberg's reaction to the substance of what

25    the IAB officers asked you about?

1   A.   Initially he didn't think it had anything to do with any of

2   our police relationships, just like I had thought.  He thought

3   it had to do with a liquor business that we, Jeremy and I, were

4   part of.

5   Q.   Did that reaction from Mr. Reichberg change as you were

6   visited more frequently by law enforcement?

7   A.   Yes.

8   Q.   How so?

9   A.   That's when we both started to panic, and he told me that

10  he didn't think that one of the officers who came to visit me

11  was actually IAB.  He was concerned, that he had thought that

12  the officer was FBI.

13  Q.   In the aftermath of your being approached with IAB, did you

14  discuss the matter with Jimmy Grant?

15  A.   No.

16  Q.   Why not?

17  A.   I was being very careful at that point.  I just wanted to

18  sever all ties to cops.

19  Q.   Now are you familiar with an individual named Mendy Rosner?

20  A.   Yes.

21  Q.   Who is Mendy Rosner?

22  A.   He's a friend of Jeremy's.  We were friendly.

23  Q.   And what did you understand the nature of the friendship

24  between Mr. Reichberg and Mr. Rosner to be?

25  A.   I think they're neighbors and close friends.

1   Q.  Did you also know an individual named Mendy Chudaitov?

2   A.  Yes.

3   Q.  Who is Mr. Chudaitov?

4   A.  He was friend of mine that I introduced to Jeremy.

5          MR. BELL:  One moment, please.

6          THE COURT:  Fine, take your time.

7          (Pause)

8          MR. BELL:  Thank you, your Honor.

9   Q.  I will now show you a number of items in a bag.  The bag is

10  labeled as Government Exhibit 1617A for identification, and it

11  should correspond with 1617, which hopefully you have in the

12  system.

13         May I approach?

14         THE COURT:  You may.

15  Q.  As a general matter, Mr. Rechnitz, are you familiar with

16  the items in Government Exhibit 1617A?

17  A.  Yes, I am.

18  Q.  Whose are they?

19  A.  Mine.

20  Q.  And how, generally, did you get these things over time?

21  A.  Yes.

22  Q.  Sorry, how generally did you get these things over time?

23  A.  I received some of them through Jeremy, some through Jimmy

24  Grant, one of them from Norman Seabrook.

25  Q.  And generally speaking, what are they?

1    A.   Parking placard, PBA cards, chaplaincy ID and badge.

2              MR. BELL:  What I would like to do, your Honor, with

3    the Court's permission, is first offer 1617A and 1617, the

4    digital version, into evidence.

5              MS. NECHELES:  No objection.

6              MR. MERINGOLO:  No objection.

7              THE COURT:  Thank you, I'm accepting 1617A and 1617

8    into evidence.

9              (Government's Exhibit 1617 and 1617A received in

10   evidence)

11             MR. BELL:  I would like also like to publish these to

12   the jury by sending around the bag, but in order to save some

13   time I would like some of these on the screen so I could

14   question the witness about them.

15             THE COURT:  You may.  Please proceed.

16             MR. BELL:  Thank you.

17             Just move the whole bag.  See what you want to see and

18   pass the bag on to the next person.

19             Thank you.

20   Q.   So can we start with page 1.

21             Are you familiar, Mr. Rechnitz, with this item?

22   A.   Yes, I am.

23   Q.   What is this?

24   A.   This is a parking placard from Westchester County.

25   Q.   How did you obtain this parking placard?

IBSTGRA5                        Rechnitz - Direct

1   A.  Yes, when I became a chaplain it was given.

2   Q.  And what, if anything, do you know about how this placard

3   was designed and produced?

4   A.  Originally the Westchester County parking placards had a

5   different style.  Jeremy had a graphic designer make it look as

6   close as possible to a NYPD parking plaque.

7   Q.  What was the purpose of that -- well, first of all, did you

8   have an understanding of the reason of that from talking to

9   Jeremy?

10  A.  Yes.

11  Q.  What was the reason?

12  A.  So we could park in the city without cops realizing we were

13  from outside of the city.

14          MR. BELL:  I should note, by the way, with the Court's

15  permission, I would like to let the jury know they could take

16  things out of the bag, but we want them to stick together and

17  be at one person at one point.

18          THE COURT:  Thank you.

19          MR. BELL:  Let's go the top of page 5, Mr. Hamilton.

20  Q.  What is this item?

21  A.  This is a clip-on badge.

22  Q.  How did you obtain it?

23  A.  Again, when I became a chaplain of Westchester County it

24  was given to me.

25  Q.  Let's go to page 47, please.

1                      And what is this, sir?

2     A.   This is a business card.

3     Q.   How was this business card assembled?

4     A.   Jeremy had printed for me as a gift.

5     Q.   And it states here Jona Rechnitz, police chaplain, and

6     there's an email address, chaplain.wcpd@gmail.com.  Was that an

7     actual Westchester County police address?

8     A.   No.

9     Q.   What do you know of that email address, sir?

10    A.   I created it.

11              MR. BELL:  Can you now go, Mr. Hamilton, to page 52.

12    Q.   Are you familiar with this item?

13    A.   Yes, I am.

14    Q.   What's that?

15    A.   This is another business card for the other chaplaincy.

16    Q.   What's your understanding of how this was created?

17    A.   Jeremy had created it and given it to me.

18    Q.   Let's go to page 9, please.

19              What is this, Mr. Rechnitz?

20    A.   This is a PBA card.

21    Q.   And I'll note that it says Captains Endowment Association.

22    Were items from the Captains Endowment Association of this sort

23    also known as PBA cards?

24    A.   Yes.

25    Q.   How did you get this Captains Endowment Association cared?

1   A.   This specific card I couldn't tell you, but I received many

2   of them from Michael Harrington and Jimmy Grant.

3   Q.   Let's go to page 10, which I believe is the back of that

4   same card.  And what can you tell us about what appears on the

5   back of that card, Mr. Rechnitz?

6   A.   I received this from Jimmy Grant.  He had given me stickers

7   to put on my cards asking the cop who would pull us over to

8   please extend all courtesy to holder of the card, and he put

9   his name and title on it.

10  Q.   In your dealings with Mr. Grant on the subject of these PBA

11  cards, did you also get cards customized for members of your

12  family?

13  A.   Yes.

14  Q.   Who?

15  A.   Family and friends.

16  Q.   Who among your family and close friends?  Give me some

17  examples.

18  A.   I think we saw a list yesterday.  My wife.

19  Q.   Did you in fact get cards for all of those folks?

20  A.   Yes.

21  Q.   So why don't we go to page 23 of this same document.

22       What's this, sir?

23  A.   This is a card personalized to my father.

24  Q.   And your father is Robert Rechnitz?

25  A.   Yes.

IBSTGRA5                        Rechnitz - Direct

1   Q.  Where does your father live, by the way?

2   A.  Los Angeles.

3   Q.  Did you have a particular reason for wanting a card for

4   your dad even though he lives in LA?

5   A.  Just something cool to have to give to him.

6   Q.  Could we go to page 25, please.

7            And was this one just for you?

8   A.  Yes.

9   Q.  Go to page 45.

10            Who is Miki Rechnitz listed here?

11   A.  My daughter.

12   Q.  Could we go to page 41, please.

13            Listed here is a Jacqueline Kupperman.  Who is

14   Ms. Kupperman?

15   A.  My sister.

16   Q.  Could we go to the next page.  Sorry, could we go to 43.

17            Who is Alain Kupperman?

18   A.  My brother-in-law.

19   Q.  Could we go to page 51.

20            And how did you get this item, sir?

21   A.  That's a business card of Timothy Beaudette.  I don't

22   remember if I took it from his office or when Jeremy printed

23   him new cards and gave me a copy.

24   Q.  Was Mr. Reichberg in the business of printing cards for

25   active duty officers?

1   A.   As a gift he would give them nicer cards, because they have

2   to pay for upgraded cards on their own.

3   Q.   How would they be nicer?

4   A.   They had this foil shield that you can feel.

5           MR. BELL:  One moment, please.

6           (Pause)

7           MR. BELL:  I do want to physically pull out one from

8   that bag.  May I borrow it for a moment?  Thank you very much.

9           For the record, I'm holding Government Exhibit 1617A,

10  and I'm holding a folded-numerous-times piece of paper with

11  some raised elements.

12  Q.   Are you familiar with this, sir?

13  A.   Yes, I am.

14  Q.   And how are you familiar with that particular item?

15  A.   Jimmy Grant gave it to me outside of Sloan-Kettering

16  Hospital.

17  Q.   Is it the same set of stickers that you described before?

18  A.   Yes.

19  Q.   And I'll notice there don't appear to be very many actual

20  stickers on this sheet.  What happened to the rest of them?

21  A.   I put them on PBA cards.

22          MR. BELL:  Let me hand this back to you now.

23  Q.   Now Mr. Rechnitz, before we continue, I want to ask you

24  about certain other aspects of your past.

25          Prior to your coming clean and cooperating with the

IBSTGRA5                        Rechnitz - Direct

1    government, would you have considered yourself an honest man?

2    A.   No.

3    Q.   Did you lie in business?

4    A.   Yes.

5    Q.   Did you lie in your personal life?

6    A.   Yes.

7    Q.   Did you lie to potential business partners and contacts?

8    A.   Yes.

9    Q.   For what purposes?

10   A.   To benefit myself.

11   Q.   Did you lie to impress people?

12   A.   Yes.

13   Q.   In what ways did you lie to impress people?

14   A.   I overexaggerated things I owned that I did not.  I told

15   people that I owned things I did not.  I would brag about

16   things, boast about my connections.

17   Q.   Let's talk for a moment about Mr. Seabrook.  When you met

18   Mr. Seabrook, did you lie to him about your business interests?

19   A.   Yes.

20   Q.   In what way?

21   A.   When he told me his offices were near Wall Street, I told

22   him that's funny, I have a building that I own on Wall Street,

23   23 Wall Street and 25 Broad, when in fact I worked for the

24   company that owned it, I didn't own it myself.  And at that

25   point I was just a manager and no longer working for the

IBSTGRA5                         Rechnitz - Direct

1   company.

2   Q.  Did you tell Mr. Seabrook additional lies in order to

3   impress him?

4   A.  Yes.

5   Q.  What did you tell him?

6   A.  At one point I chartered a yacht a couple of times.  I told

7   him it was my own yacht.  Things of that nature.

8   Q.  What measures, if any, did you take in order to convince

9   Mr. Seabrook that it was your yacht?

10  A.  I contacted the charter company to remove any photos or any

11  evidence that it was not my own yacht.

12  Q.  You mentioned before that you were involved in a scheme to

13  get Mr. Seabrook kickbacks for investing union money in a hedge

14  fund.  Did you lie in any way to Mr. Seabrook about your

15  relationship to the hedge fund?

16  A.  Yes.

17  Q.  In what way?

18  A.  I told him that Murray Huberfeld, who owns the hedge fund,

19  was a partner of mine and that I was a partner in the fund.

20  Q.  Were you, in fact?

21  A.  No.

22  Q.  Did you have a formal relationship with the hedge fund?

23  A.  No.

24  Q.  Why did you tell Mr. Seabrook that?

25  A.  To gain his comfort to invest in that fund.

1    Q.   With respect to lies to make yourself look bigger,

2    Mr. Rechnitz, did you ever manipulate forwarded emails in order

3    to make yourself look bigger?

4    A.   Yes.

5    Q.   In what ways?

6    A.   I have doctored emails.  One time there was a friend named

7    Andrew Penson who had come to me for help with an issue he was

8    having with the City of New York with his One Vanderbilt

9    project, and while I went to bat for him with the mayor, I

10   overexaggerated and doctored a few emails to him.  When I

11   emailed the mayor about the issue, the mayor wrote back a

12   response to me, and then rather than just forwarding the

13   accurate email to Mr. Penson, I added my own language in it as

14   if I was telling the mayor off on his behalf.

15   Q.   Did Mr. Penson respond to this?

16   A.   Yes.

17   Q.   How did he respond?

18   A.   He was impressed.  He was like:  You have a lot of guts.

19   Q.   And did you -- now in manipulating these emails, how would

20   you go about manipulating the forwarded emails, the forwarded

21   correspondence between yourself and Mr. de Blasio?

22   A.   I would add language to his emails when I forwarded it to

23   Mr. Penson.

24   Q.   Other than manipulating emails through forwards, as here

25   and as when you would take language like pricing language out

1    of Luxury Connections emails, did you have the technical

2    expertise to otherwise manipulate emails?

3    A.   No.

4    Q.   Now you testified about JSR Capital's day-to-day business

5    being in real estate.  During JSR Capital's heydey, were you

6    involved in other business enterprises as well?

7    A.   Yes.

8    Q.   What sort of business enterprises?

9    A.   Hard money lending.

10   Q.   What is hard money lending?

11   A.   Hard money lending is when you loan people money at high

12   interest rates, much higher than a conventional rate you would

13   get from a bank.

14   Q.   And what is the purpose of that from the borrower's

15   standpoint?

16   A.   Well, it's a higher risk loan, so they wouldn't necessarily

17   be able to receive the funds without paying the high interest.

18   Q.   What kinds of hard money lending enterprises did you

19   yourself get involved in, Mr. Rechnitz?

20   A.   Two different businesses.  One was a fellow named Hamlet

21   Peralta who told me that he was purchasing liquor at wholesale

22   pricing and that he needed money to fulfill his orders, and he

23   would resell them sometimes six to eight weeks later for a

24   hefty profit.  And the other was a wholesale ticker broker for

25   sporting events and concerts, and that was Jason Nissen, who

1    told me he was purchasing tickets to various sporting events,

2    and I would lay the money out, and when he sold the tickets it

3    would be for large profits.

4    Q.   How did you meet Mr. Peralta?

5    A.   Jeremy introduced me to him.

6    Q.   How did you -- did you yourself invest in Mr. Peralta's

7    company, that is to say, loan him money with the expectation

8    that you would get money in return?

9    A.   Yes, I did.

10   Q.   Did you recruit other investors to Mr. Peralta's business?

11   A.   Yes, I did.

12   Q.   What sorts of other people did you recruit into

13   Mr. Peralta's scheme?

14   A.   Family of mine and friends.

15   Q.   At the time that you did this, did you expect that you and

16   the other people you were recruiting would make money?

17   A.   Yes.

18   Q.   Were you honest with people that you were recruiting at the

19   time that you recruited them into Mr. Peralta's business?

20   A.   No.

21   Q.   In what ways were you dishonest?

22   A.   I did not tell them that Jeremy and I were make a large

23   amount of commission from Mr. Peralta for bringing them in, and

24   I told them I invested more than I actually did.

25   Q.   What was the purpose of those lies?

IBSTGRA5                    Rechnitz - Direct

A.  Well, if we had told them how much money we were making,
they would have wanted more interest on their money.  And
telling a certain investor that I put in as much money as he
did gave him comfort that it was a solid investment.

Q.  You mentioned Mr. Reichberg was getting a cut in this.
What was Mr. Reichberg's role and why did he have a role in
this?

A.  So he introduced me to Mr. Peralta through an introduction
through David Colon, and --

Q.  Is the same Chief David Colon we have been discussing?

A.  Yes.

Q.  Please continue.

A.  And Jeremy's job -- again, like everything else, I was the
money man, he was the detail guy.  So I was bringing the funds,
and Jeremy was supposed to follow up and make sure we are
getting repaid in a timely fashion, he was supposed to be
dealing with Mr. Peralta, checking on the actual inventory in
the supposed warehouse in Long Island that he told me he
checked on the collateral.  So that was the partnership.  And
we agreed that we were 50/50 on any money that we made
together.

Q.  Initially, did the business go well?

A.  Yes.

Q.  Did you get returns for the amount of money that you
brought Mr. Peralta during that period of time?

1   A.  Yes.

2   Q.  Was there a point where things started going not so well?

3   A.  Yes.

4   Q.  What happened?

5   A.  Towards the end of the relationship he was not fulfilling

6   his repayment obligations, and he was given different stories

7   and excuses as to why.

8   Q.  Did you and Mr. Reichberg discuss ways in which you could

9   get money back?

10  A.  Yes.

11  Q.  Did you and Mr. Reichberg have communications with

12  Mr. Peralta about getting that money back?

13  A.  Yes.

14  Q.  Did there come a time where you and Mr. Reichberg discussed

15  getting an insurance policy on Mr. Peralta?

16  A.  Yes.

17  Q.  For what purpose?

18  A.  A life insurance policy, what is known as a key man policy,

19  which is very common practice in business when your investment

20  solely relies on one person.

21  Q.  And did you in fact get that policy?

22  A.  Yes, I did.

23  Q.  Let's put Mr. Peralta aside for the moment.

24          Mr. Nissen, who you mentioned being involved in the

25  ticket business, first, who was Mr. Nissen?

IBSTGRA5                          Rechnitz - Direct

1    A.  He was a ticket broker.

2    Q.  Did he work out of a particular entity?

3    A.  Yes.

4    Q.  What was it called?

5    A.  The National Event Company.

6    Q.  And how did you come to know Mr. Nissen?

7    A.  I had purchased tickets from his company to a Knicks

8    basketball game, and he approached me and introduced himself

9    and we started speaking, and he told me that there were good

10   investments through him.

11   Q.  Now did you recruit people to Mr. Nissen's business as

12   investors as well?

13   A.  Yes.

14   Q.  From what group or groups of people did you draw investors

15   into Ms. Nissen's business?

16   A.  Similar groups from the liquor business, family and

17   friends.

18   Q.  About how many people would you say you recruited to

19   Nissen?

20   A.  About a dozen.

21   Q.  About how many people would you say you recruited to

22   Mr. Peralta?

23   A.  I would say six to ten.

24   Q.  Now when you recruited people to Mr. Nissen's business,

25   were you at all points honest with them?

IBSTGRA5                        Rechnitz - Direct

1   A.  No.

2   Q.  In what ways were you dishonest when you recruited people

3   to Jason Nissen's business?

4   A.  I did not tell every investor that I had been receiving

5   commission for the money they invested.  And there was one

6   investor in particular that I told him I had the same amount of

7   money invested in as he.  A third example is one of the

8   investors, when I told him that he was investing in a specific

9   event, I knew that the money was not immediately going to that

10  event, rather it was going to other uses.

11  Q.  What uses did you understand those to be?

12  A.  Bills payable that Nissen had to me or to other vendors or

13  to reimburse him for the money he already laid out for that

14  specific event.

15  Q.  How did you have that understanding?

16  A.  Nissen told me.

17  Q.  On what sort of a timeline did you expect Mr. Nissen to be

18  using those monies for purposes other than what the investors

19  thought they were going to be used for?

20  A.  Imminently.

21  Q.  When you say imminently, what do you mean?

22  A.  Very shortly after.

23  Q.  Now you mentioned that there was one person in particular,

24  one specific person who you were not honest with with respect

25  to the Nissen investments.  Do you recall who that person was?

IBSTGRA5                          Rechnitz - Direct

1    A.  Yes.

2    Q.  Who was it?

3    A.  His name is Michael Weinberger.

4    Q.  Who is Mr. Weinberger?

5    A.  A friend of mine.

6    Q.  How close friends were you?

7    A.  Very close.

8    Q.  What, in fact, did you do with Mr. Weinberger that was

9    dishonest in getting involved in these deals?

10   A.  I had told him that I had the same amount of money invested

11   as he did, and I told him I had not -- I neglected to tell him

12   that I was receiving commissions and what we had just discussed

13   about the money use for his investment.

14   Q.  Mr. Rechnitz, what happened ultimately with Mr. Peralta's

15   business?

16   A.  He pled guilty to running a Ponzi scheme.

17   Q.  Was that Ponzi scheme the liquor business that you and

18   others had invested in?

19   A.  Yes.

20   Q.  Did you know that the business was a Ponzi scheme at the

21   time that you invested?

22   A.  No, I did not.

23   Q.  Did you lose money in that business?

24   A.  Yes, I did.

25   Q.  Did other people connected to you lose money as a result of

1    that Ponzi scheme?

2    A.  Yes and no.

3    Q.  When you say yes and no, what do you mean by that?

4    A.  I felt bad and reimbursed certain people so that they would

5    not be out of pocket who I know invested a lot of money into

6    this.  The only person I did not reimburse is Michael

7    Weinberger.

8    Q.  Why is that?

9    A.  I was not able to.

10   Q.  Now with respect to Mr. Nissen, how did that investment

11   work out?

12   A.  Unfortunately he also pled guilty to running a Ponzi

13   scheme.

14   Q.  Did you lose money as a result of your involvement with

15   Mr. Nissen?

16   A.  No.

17   Q.  Did persons close to you lose money as a response to the

18   involvement with Mr. Nissen?

19   A.  Yes.

20   Q.  Were you able to do anything with respect to their losses?

21   A.  No.

22   Q.  Now with respect to Mr. Nissen, were there court

23   proceedings that followed in the aftermath of Mr. Nissen's

24   arrest and the end of the Ponzi scheme?

25   A.  Yes.

1    Q.  Were there also legal proceedings with respect to

2    Mr. Peralta?

3    A.  Yes.

4    Q.  Now Mr. Rechnitz, are there certain years for which you

5    have not filed tax returns?

6    A.  Yes.

7    Q.  Which years were those?

8    A.  2015, '16 and now '17.

9    Q.  And why have you not filed tax returns for those three

10   years?

11   A.  Because my accountant --

12          MS. NECHELES:  Objection to hearsay.

13          THE COURT:  Thank you.  Counsel, can you rephrase the

14   question?

15          MR. BELL:  I'm not sure the issue is with the

16   question, your Honor, but I will try.

17   Q.  Are there reasons why you have not filed tax returns?

18   A.  Yes.

19   Q.  Have you arrived at those reasons by yourself?

20   A.  No.

21   Q.  Have you arrived at those reasons in part on the advice of

22   other professionals?

23   A.  Yes.

24   Q.  Without going into the substance of that advice, can you

25   tell me why it is that you have not filed tax returns for those

1    years?

2    A.   Yes.   I'm unable to accurately file my tax returns given

3    the complexity of these two other situations which ended up in

4    Ponzi schemes.   There are legal proceedings that are taking

5    place currently which I am awaiting the results so I could

6    accurately file my tax return.

7    Q.   Is it your intention to ultimately file tax returns as to

8    those years?

9    A.   Yes, of course.

10   Q.   When that happens, is it your understanding that you're

11   going to -- that there will be consequences for your having

12   waited this long to do so?

13   A.   Yes, I'm going to have to pay a lot of extra money in

14   interest and penalties.

15           MR. MERINGOLO:   Objection, your Honor.

16           THE COURT:   Sorry, you can answer the question.

17   Proceed.

18   A.   Yes, I'm going to have to pay a lot of extra money in

19   interest and penalties for not filing in a timely manner, but I

20   feel it's more important to do that than to put something out

21   there that's false.

22   Q.   Do you have a specific concern about what the consequences

23   of filing inaccurate tax returns might be?

24   A.   Yes.

25   Q.   What concerns do you have regarding the possibility of

1  filing inaccurate tax returns?

2  A.  Many concerns.  It's a crime, it's knowingly committing a

3  crime, and it's a breach to my cooperation agreement with the

4  U.S. Attorney's Office.

5  Q.  Now with respect to Mr. Nissen, you mentioned that

6  Mr. Nissen had paid for the box at the Patriots/Jets game.

7  Were there occasions where Mr. Nissen paid other debts of

8  yours?

9  A.  Yes.

10  Q.  Pursuant to what arrangement?

11  A.  So this is actually one of the reasons I'm unable to

12  properly file taxes.  Part of the commissions that I made from

13  Mr. Nissen were not just in the form of check or wire.  He had,

14  for example, bought the suite at the Jets game where we treated

15  the police officials and took it off the account of money he

16  owed me.  So in essence, I was the one benefiting financially

17  from that.

18       He also paid my American Express bills for a period of

19  time, which I don't have access to.  American Express has shut

20  me down and will not give me the information.  We tried to

21  pursue information of where the payments came from.

22  Q.  Do you understand American Express to be aware of the fact

23  that you have pled guilty to felonies involved in this case?

24  A.  Yes.

25  Q.  Now with respect to the arrangement that you have with

IBSTGRA5                        Rechnitz - Direct

1    Mr. Nissen, was it your understanding that there were

2    tax-related benefits to having Mr. Nissen pay some of your

3    credit cards?

4    A.   Yes.

5    Q.   What did you understand those tax-related benefits to be?

6    A.   By Mr. Nissen paying my credit card I would not have to

7    declare -- well, I would be required to declare it as income,

8    but it would be easier to avoid declaring it as income because

9    it wasn't a check sent directly to me or my company.

10   Q.   Was it your intention to avoid paying taxes on that money

11   as part of that arrangement?

12   A.   Yes, it was.

13   Q.   When you first were approached by the Internal Affairs

14   Bureau, did you take steps to try to cover up the crimes that

15   you and Mr. Reichberg had committed?

16   A.   Yes.

17   Q.   And to be clear, in addition to your crimes and those of

18   Mr. Reichberg's, whose crimes did you attempt to cover up?

19               MS. NECHELES:  Objection, your Honor.  Object to that.

20               THE COURT:  Thank you.  Can you come up, please, and

21   we can talk about this briefly.

22               (Continued on next page)

23

24

25

1          (At sidebar)

2          THE COURT:  Sorry, counsel, there's an objection?

3          MS. NECHELES:  Judge, he asked the question -- we

4     could have the question read back, I don't remember it exactly,

5     but I think that it's something like you wanted to cover up

6     your's and Mr. Reichberg's crimes.

7          THE COURT:  I think it was what other people's crimes

8     did you want to cover up.  That was my understanding of the

9     question.

10         MS. NECHELES:  He said in addition to yours and

11    Mr. Rechnitz's crimes, that you want to have them covered up.

12    You can't have him saying you intended to cover up

13    Mr. Reichberg's crimes.  He could talk about his crimes or talk

14    about the actions he took, but he can't say:  I intend to cover

15    up Mr. Reichberg's crimes.

16         THE COURT:  Thank you.  I understand.  It's the

17    characterization that you're objecting to.

18         MS. NECHELES:  Yes.

19         THE COURT:  Counsel, can you reframe the question?

20         MR. BELL:  I can, but let's be clear on some of the

21    obstacles I face in doing so.  Part of Mr. Rechnitz's Giglio is

22    that he destroyed what he understood to be evidence of criminal

23    activity as the various forces of law enforcement were closing

24    in.  A part of that action and a part of getting at the Giglio

25    is that it was in fact evidence of criminal activity.

1          THE COURT:  Thank you.  I think, as I understand the

2     defendant's objection, it's your characterizing it as his

3     criminal acts.  I don't understand the defense to be objecting

4     to questions about what he did and why he did it, I understand

5     the objection to be to the effect that you characterized it as

6     Mr. Reichberg's crimes.

7          MR. BELL:  I will do it another way.

8          MS. NECHELES:  I think he could ask:  Did you destroy

9     stuff?  Yes.  Why did you destroy?  But he can't lead him on

10    this stuff, too.  This is like such leading:  Did you try to

11    cover up Mr. Reichberg's crimes?

12         THE COURT:  Thank you.  I think Mr. Bell can proceed

13    in a way that avoids the concern.

14         Is that correct?

15         MR. BELL:  I can, your Honor.

16         MS. NECHELES:  I could use a little break, your Honor,

17    but if we're going to end --

18         MR. BELL:  Why don't we take a little break right now,

19    we are on the checkered flag, for Ms. Necheles' sake.

20         (In open court)

21         THE COURT:  So ladies and gentlemen, we'll take a

22    short break, a short mid-afternoon break and allow everybody to

23    stretch their legs.  So as Mr. Daniels takes you out, let me

24    remind you again not to talk about the case amongst yourselves,

25    not to communicate about it with anybody, and not to view

IBSTGRA5                         Rechnitz - Direct

anything about the case.

          I will see you back here shortly.

          (Jury not present)

          THE COURT:  Thank you, ladies and gentlemen.

          So ladies and gentlemen, I'm going to step down.  I

expect that this will be a short, approximately five-minute or

so, recess.  So counsel, I hope that you all be back and ready

to proceed at 2:00.

          MR. BELL:  Yes, your Honor.

          (Recess taken)

1              THE COURT:  Thank you.

2              Counsel, are you prepared?  If so, I'll ask if we can

3     bring in the witness.

4              MR. BELL:  We are.  Thank you.

5              THE COURT:  Mr. Daniels.  Mr. Daniels, can you please

6     bring in the jury.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Thank you.  You can be seated.

3              Mr. Bell, you can proceed.

4              MR. BELL:  Thank you, your Honor.

5    BY MR. BELL:

6    Q.  When you were first approached by law enforcement,

7    Mr. Rechnitz, did you take steps to try and cover up the

8    conduct of yourself and others?

9    A.  Yes.

10   Q.  What steps did you take?

11   A.  I deleted any emails pertaining to the various police

12   officers who were part of the scheme with me -- me and

13   Jeremy -- whatever I could delete concerning flights, tickets,

14   things that I knew were wrong.  And I got rid of my computer,

15   destroyed it, and got a new one.

16   Q.  Did you succeed in getting rid of all of that relevant

17   evidence?

18   A.  No.

19   Q.  Did you, later on, after you began cooperating with the

20   government, provide them with information that would tend to

21   prove that those same events that you were trying to cover up

22   happened?

23   A.  Yes.

24   Q.  Now, I'd like to -- let's do this first:  You were a real

25   estate professional for some period of time.  In order to

1   engage in that business, do you have to take an exam?

2   A.  Yes.  A salesperson license.

3   Q.  Did you obtain a salesperson license?

4   A.  I did.

5   Q.  Did you, in fact, take the exam that you're supposed to?

6   A.  No, I did not.

7   Q.  How did that happen, sir?

8   A.  I sent my assistant to take it for me.

9   Q.  Did you at one point lose a -- or misplace a watch?

10  A.  Yes.

11  Q.  About how long ago was this?

12  A.  Many years ago.

13  Q.  And what happened when -- first of all, about how valuable

14  do you currently understand the watch to have been?

15  A.  The watch was worth $60,000.  I believe that my insurance

16  policy had coverage of about $15,000 for it.

17  Q.  Did you, in fact, file a claim?

18  A.  Yes.

19  Q.  And did you, in fact, get a payout from the insurance?

20  A.  Yes, I did.

21  Q.  Did there come a time later on where you found the watch

22  again?

23  A.  Yes.

24  Q.  How did the watch happen to surface?

25  A.  I found it in the house.

1    Q.  After the watch surfaced, did a period of time pass in

2    which you did not make the insurance company aware of that

3    fact?

4    A.  Yes.

5    Q.  Have you since made the insurance company aware of that

6    fact?

7    A.  Yes, I have.

8    Q.  And what, if anything, have you done with respect to the

9    payout that you had received of $15,000?

10   A.  I returned it to Chubb Insurance.

11   Q.  When did that happen?

12   A.  Recently; in the last few weeks.

13            MR. BELL:  Now, your Honor, I'd ask the Court to

14   admonish the jury to disregard all reactions.

15            THE COURT:  Thank you.

16            Ladies and gentlemen in the gallery, please, decorum

17   is appropriate here.

18            MR. BELL:  Thank you, your Honor.

19            THE COURT:  You can proceed.

20   BY MR. BELL:

21   Q.  In addition to destroying your computer and attempting to

22   delete certain emails, did you speak to people involved in the

23   circumstances that you were trying to cover up at the time that

24   you were approached with IAB?

25   A.  Yes.

1    Q.  Who, generally, did you speak to?

2    A.  Without breaking any privilege about the attorney

3    discussions --

4    Q.  I'm not asking about attorney discussions, sir.

5    A.  -- I frequently spoke to Jeremy, to my father, and I think

6    that's about it.

7    Q.  Did you speak to people with the purpose of preventing

8    information they had from getting to law enforcement?

9    A.  Yes.

10   Q.  And who did you speak to in that vein?

11   A.  My father-in-law, friends who got visited from different

12   investigative units, Jeremy.  We were constantly coordinating

13   on what information was being asked of other people and what

14   was being shared.

15   Q.  And what was the purpose of your communications with people

16   like your father-in-law?

17   A.  He was one of my investors.  I had communications with him

18   about not discussing cash dealings that Jeremy and I had with

19   the liquor company or my father-in-law benefited as well.

20   Q.  Did there come a point where you spoke to Mr. Nissen?

21   A.  Yes.

22   Q.  How did you come to speak to Mr. Nissen about all of this?

23   A.  At one point, he came to see me.  I think my father was in

24   my apartment at the time.  And I told him not to say anything

25   about our business and to just play it cool because there were

1    visitors in his office.

2            MR. BELL:  Now, at this point, your Honor, with the

3    Court's permission -- well, first, I'd like to offer Government

4    Exhibits W-05025, W-05095, and X-03438, which are wire calls

5    pursuant to the wire stipulation.

6            Can we flip through -- thank you, Mr. Hamilton.  This

7    is 5025.  Can you flip through for the benefit of counsel.

8            Can you do the same, Mr. Hamilton, with 5095.

9            Can you do the same with X-3438, please.

10           MS. NECHELES:  No objection, your Honor.

11           MR. MERINGOLO:  No objection.

12           THE COURT:  Thank you.

13           I'm accepting into evidence W-05025, W-05095, and

14   X-03438.

15           (Government's Exhibits W-05025, W-05095, and X-03438

16   received in evidence)

17           MR. BELL:  Your Honor, with the Court's permission,

18   I'd like to direct the jury back to their black binders to tab

19   W-05025.  5025-T would be the tab.  It relates to 5025, a

20   March 2nd, 2015 conversation, at 11:28 a.m., between

21   Mr. Reichberg and Mr. Rechnitz.  W-05025.  Thank you.

22           Mr. Hamilton, can you please play that conversation.

23           (Audio playback)

24           MR. BELL:  Can we just put page 2 of that on the

25   screen, Mr. Hamilton.

1   BY MR. BELL:

2   Q.  Now, Mr. Rechnitz, why did you have this communication with

3   Jeremy about what was going on with IAB?

4   A.  To fill him in.

5   Q.  And what was the purpose of filling him in?

6   A.  We're sharing information, and he can try and figure out

7   what's going on.

8            MR. BELL:  Let's take that down.

9            Mr. Hamilton, can you play 5095, W-05095, which is a

10  March 2nd, 2015 conversation at 5:25 p.m.  The participants are

11  Mr. Reichberg, Yaron Turgeman, and Jona Rechnitz.  We'll just

12  wait for everybody to get a hold of the tabs.  5095-T.

13           Mr. Hamilton, can we play that call, please.

14           (Audio playback)

15           MR. BELL:  If we can, your Honor, have the jury turn

16  to tab X-3438.  The X tabs are at the very end of the binder

17  after all the Ws, where they should be, and it's 3438-T, which

18  corresponds to X-3438, which was just admitted.  It is a

19  March 9, 2015 call, at 4:58 p.m., between Jona Rechnitz and

20  Jeremy Reichberg.  Again, it's in the X tabs at the end,

21  X-3438.  I think we're all set.

22           Mr. Hamilton, can you play that call, please.

23           (Audio playback)

24           MR. BELL:  Mr. Hamilton, can you go back to page 2.

25  Q.  Mr. Rechnitz, you asked:  "Okay.  When are you meeting

1    them?"

2              Mr. Reichberg said:  "I'm meeting them soon.  I need

3    to call them back.  I'll meet with them in about half an hour."

4              Did you have an understanding of who that was

5    referring to?

6    A.  Yes.

7    Q.  Who?

8    A.  Internal Affairs Bureau of the NYPD, IAB.

9    Q.  What did you understand was going on there?

10   A.  They were investigating something, and they investigated

11   multiple parties, and Jeremy was going to be having a meeting

12   with them.

13   Q.  Were you concerned about what might happen during that

14   conversation?

15   A.  Yes.

16   Q.  Why?

17   A.  Because we had a lot to hide.  We were bribing cops.

18   Q.  Is there a reason why you did not talk about all of that on

19   the phone in this conversation?

20   A.  Yes.

21   Q.  Why?

22   A.  Once we realized it was an investigation, we were trying to

23   be extremely careful by phone.

24             MR. BELL:  Let's take that down.  Thank you,

25   Mr. Hamilton.

1   Q.  Mr. Rechnitz, I want to show you part of what's already

2   been admitted into evidence as Government Exhibit 1615 and

3   1615-A.  1615-A is the physical version.  What I'd like to

4   do -- these have already been admitted as portions of a stack

5   of items taken from Jeremy Reichberg's brother on the day of

6   Jeremy Reichberg's arrest.

7            MR. BELL:  And if we can, Mr. Hamilton, can we split

8   screen for 1615, pages 4 and 2.

9   Q.  Are you familiar with these items, Mr. Rechnitz?

10  A.  Yes, I am.

11  Q.  What are they?

12  A.  These articles -- I don't know if you would call them PBA

13  cards, but special privilege cards that Phil Banks gave to

14  Jeremy for he and his wife saying that they're family members

15  of his in case they get pulled over.

16  Q.  Did you get one like this, too?

17  A.  Yes, I did.

18  Q.  Did your wife?

19  A.  Yes.

20  Q.  I'm holding them here as well.

21           To your knowledge, Mr. Rechnitz, was Jeremy Reichberg,

22  in fact, an immediate family member of Chief Philip Banks III?

23  A.  No.

24  Q.  Was Rachel Reichberg an immediate family member of Chief

25  Philip Banks III?

IBSKGRA6                          Rechnitz - Direct

1    A.   No.

2    Q.   Were you?

3    A.   No.

4    Q.   Was your wife?

5    A.   No.

6            MR. BELL:   Why don't we go to page 34 of that same

7    exhibit.

8    Q.   Mr. Rechnitz, who is George Longworth?

9    A.   He was the commissioner of the Westchester County Police

10   Department.

11           MR. BELL:   Let's go to page 38.

12   Q.   This business card, among the items taken from

13   Mr. Reichberg's brother, belongs to James N. McCarthy.  Who was

14   James N. McCarthy?

15   A.   Jimmy McCarthy is the cop we spoke about.  He was a chief

16   in the police department.

17           MR. BELL:   Let's go to page 35.

18   Q.   This card belongs to an Andrew J. Capul, Inspector.  Who

19   was Andrew Capul?

20   A.   He was an inspector in the NYPD, and we spoke about him

21   earlier.

22           MR. BELL:   Let's go to page 33.

23   Q.   This one is the business card that purports to be David

24   Colon's.  Who was David Colon?

25   A.   Chief Colon was the chief in the NYPD, and we spoke about

IBSKGRA6                     Rechnitz - Direct

1   him earlier.

2             MR. BELL:  Let's go to page 20.

3   Q.  This business card, for an Eric R. Rodriguez, Deputy

4   Inspector, also appears in the stack taken from Mr. Reichberg's

5   brother.  Who was Eric R. Rodriguez?

6   A.  Eric was the inspector in the NYPD, and we spoke about him

7   earlier.

8             MR. BELL:  Let's go to page 1.

9   Q.  This business card, among the business cards taken from

10  Mr. Reichberg's brother, belonged to a Michael J. Harrington,

11  Deputy Chief.  Who was he?

12  A.  Michael Harrington was the chief in the NYPD who we spoke

13  about earlier.

14            MR. BELL:  Let's go to page 3.

15  Q.  This business card belongs to a Philip Banks III, Chief of

16  Department.  Who was he?

17  A.  He was the chief of the police department, and we spoke

18  about him earlier.

19            MR. BELL:  Let's go to page 6.

20  Q.  This business card, found in the stacks taken from

21  Mr. Reichberg's brother, belongs to a James Grant, Deputy

22  Inspector.  Mr. Rechnitz, who is Jimmy Grant?

23  A.  He was an inspector in the NYPD, and we've spoken about

24  him.

25  Q.  As to Messrs. McCarthy, Capul, Colon, Rodriguez,

IBSKGRA6                        Rechnitz - Direct

Harrington, Banks, and Grant, did you attempt to give these men

gifts and favors with the expectation of police action in

return?

A.  Yes, I did.

Q.  Did you succeed in giving certain of these men gifts and

favors in return for official action?

A.  Yes, I did.

Q.  Did those men include Jimmy Grant?

A.  Yes.

Q.  Who did you do all of this with?

A.  Jeremy Reichberg.

          MR. BELL:  Let's go to page 13.

Q.  Among the items included in the stacks taken from

Mr. Reichberg's brother is this, which purports to be a

business card for Jeremy Reichberg, Police Chaplain.

Mr. Rechnitz, in any meaningful way, was Mr. Jeremy Reichberg a

police chaplain?

          MS. NECHELES:  Objection.

          MR. MERINGOLO:  Objection.

          THE COURT:  Thank you.

          You can answer the question.

          MS. NECHELES:  Any meaningful way.

          THE COURT:  Thank you.

          Counsel, you can rephrase.

IBSKGRA6                          Rechnitz - Direct

1    BY MR. BELL:

2    Q.  Do you recall Mr. Reichberg actually performing the duties

3    of a police chaplain?

4    A.  No, I do not.

5    Q.  Do you recall him doing so with Westchester County?

6    A.  No, I do not.

7    Q.  Do you recall him doing so with Floral Park?

8    A.  Actually, in Westchester County, I do remember he, towards

9    the end, went to a ceremony.

10   Q.  Outside of that one ceremony, do you recall him acting as a

11   police chaplain in any meaningful way?

12   A.  No.

13   Q.  Do you recall him being a rabbi at all?

14   A.  No.

15   Q.  Do you recall Mr. Reichberg being a police -- sorry, a

16   state police chaplain?

17   A.  No.

18   Q.  Do you recall Mr. Reichberg being a person you bribed cops

19   with?

20   A.  Yes.

21             MR. BELL:  I have no further questions.  Thank you for

22   your time, Mr. Rechnitz.

23             THE COURT:  Thank you very much.

24             So, ladies and gentlemen of the jury, let's take a

25   very short five-minute break now before we begin with

IBSKGRA6                        Rechnitz – Direct

1    cross-examination.  During this very short break, please,

2    ladies and gentlemen, don't talk about the case, don't discuss

3    it with anyone else, and don't do any research about the case.

4    Thank you.

5            (Continued on next page)

1           (Jury not present)

2           THE COURT:  Thank you.  You can be seated.

3           Mr. Rechnitz, you can step down.

4           Before we start with cross-examination, I just want to

5     remind everyone who's in the gallery of the courtroom that this

6     is a solemn, important court proceeding.  This is not an act of

7     theater.  For the most part, you've been seated here in silence

8     with decorum and showing respect to the Court in the process.

9     That is appropriate.  However, there was a burst of laughter in

10    response to one of Mr. Rechnitz's questions -- responses

11    earlier.  That is inappropriate.  I'm very happy for the public

12    to be here, but I hope that everyone present will remember that

13    this is an important proceeding for each of the defendants

14    present and for the United States, and that this is a

15    proceeding that must be treated with decorum and respect, and

16    to the extent that any member of the public is unable to treat

17    it in that way, I will have you removed.

18           This is not, again, an act of theater, so I will not

19    tolerate outbursts, laughter, commentary toward the witness or

20    during their testimony.  To the extent that there's commentary

21    that you'd like to make, you should feel free to exit the

22    courtroom and be sure not to make it in front of the jury.

23           To the extent it's not already clear that this is a

24    situation that requires respect and decorum in its own right

25    because of the importance of the proceedings for the parties

here, please keep in mind, as well, that I and the jury am

perceiving some of the things that you do, and you should

consider to what extent your conduct is benefiting any person

who you may or may not support here.  The simplest and easiest

approach is for you not to behave in a way that is indecorous

or disrespectful to the Court or to this proceeding.

I hope I do not need to remind you of this.

Generally, this has not been an issue, but I want to remind you

of that, similarly, as the jury is entering and exiting the

courtroom, you are to stand, and you are to remain in silence

as they're doing that.  It's not an opportunity to chat.  If

you want to chat with your neighbor, please do so outside the

courtroom.

So it's time to begin with cross-examination.  I

wanted to just remind the gallery of those issues before we

began.

I also want to bring up briefly the defense exhibits

issue.  We have a letter brief from the United States.  I

received responsive briefing from each defendant on 11/18.  The

submissions by Defendant Reichberg were submitted to me

ex parte, which I believe was appropriate, and the request was

that I hold those ex parte submissions without revealing them

to the United States, for fear that they would reveal the

defendant's cross-examination strategy to the United States

prematurely.

1      Counsel for Defendant Reichberg, I believe that that

2  was an appropriate request, and I felt then in that way as

3  requested.  I wanted to ask whether at this point, it would be

4  appropriate for me to permit the United States to see those

5  documents?

6      MS. NECHELES:  Your Honor -- and I say this with all

7  respect to all of the parties here, but I have no problem with

8  the United States seeing it.  I ask that they be required to

9  hold it confidential and not discuss it with Mr. Rechnitz's

10  lawyer.  I understand his lawyer is very involved in this case,

11  as he should be.  I'm not saying this in any way critically,

12  but I do not want him being told my arguments on cross because,

13  of course, the lawyer will be talking to Mr. Rechnitz

14  overnight, and I ask that if not be filed publicly, and I ask

15  that -- and I don't think that your Honor can tell the lawyer

16  not to talk to him, it's his lawyer -- he has a right to talk

17  to his lawyer -- but I don't want what is in my letter being

18  shared with his lawyer.

19      THE COURT:  Thank you.

20      Counsel for the United States?

21      MR. BELL:  Your Honor, we have no problem not sharing

22  that with Mr. Rechnitz's lawyer.  Obviously, we're not going to

23  share that or communicate at all with Mr. Rechnitz except to

24  the extent that there is some sort of a safety issue that comes

25  up.

1          I do think that there is a separate question as to

2     whether there is a justification for withholding that

3     information from the public record.  The issue is, as your

4     Honor knows and has confronted a number of times over the

5     course -- long and winding course of this litigation, there's a

6     fairly high bar to actually keeping that stuff away from the

7     public, from the press, from members of the public generally.

8     I would expect, given that Mr. Rechnitz is something of a

9     professional at this, that he's not going to be on ECF looking

10    at anything, and I would also expect that counsel for

11    Mr. Rechnitz is not going to share anything with him from some

12    other public source.

13         But I do not think, your Honor, that given the actual

14    framework that exists for determining whether things are held

15    under seal, that there is necessarily a justification for this.

16         I will note, of course, that I'm flying somewhat blind

17    with that argument because I have not seen what it is that

18    Ms. Necheles actually filed, but insofar as Ms. Necheles'

19    representations seem mostly to deal with considerations of

20    strategy, I don't think that actually meets the mark.  And, so,

21    I'm happy not to communicate this to Mr. Rechnitz's attorney,

22    Mr. Levine.  We do not intend to communicate with Mr. Rechnitz

23    beyond just the logistics of getting him here and in that room,

24    when he's supposed to be, for the remainder of his testimony,

25    but I do think the public filing question presents another

1   issue entirely.

2          THE COURT:  Thank you.  Understood.

3          MS. NECHELES:  Your Honor, I'm not asking for it to be

4   delayed forever.  I think that Mr. Levine is here in the

5   courtroom.  I have the greatest respect for him.  I know he's a

6   very good lawyer.

7          THE COURT:  Thank you.

8          Let's do this:  Let's begin.  We'll provide it to the

9   United States, and we'll work out whatever the nature of the

10  restrictions are in order to ensure that Mr. Rechnitz is not

11  advised regarding the defense's cross-examination strategy

12  pending his cross-examination.  That is a very important goal,

13  which I think is proper.

14         Yes, counsel for Mr. Grant?

15         MR. MERINGOLO:  Judge, I don't believe we ever

16  received the check or any information that Mr. Rechnitz paid

17  back the insurance company from the watch that was discussed.

18         THE COURT:  Thank you.  Let's take that up after we

19  begin.

20         Counsel for Mr. Reichberg, I understand that you will

21  be beginning.  I hope to end shortly after 3:00 o'clock today.

22  Are we ready to proceed?

23         MR. BELL:  Your Honor, may I just ask that we have

24  that correspondence now, with that set, so that I can go

25  through my role in this cross-examination in an educated

IBSKGRA6                        Rechnitz – Direct

1    fashion?

2              THE COURT:  Thank you.

3              Yes.  Mr. Daniels will print out a copy of it.

4              MR. BELL:  Thank you, your Honor.

5              THE COURT:  Good.  Thank you.

6              Mr. Daniels, can you please bring in the jury.

7              And can you also, please, United States, bring in

8    Mr. Rechnitz.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Thank you, ladies and gentlemen.  You can

3    be seated.

4              Counsel for Mr. Reichberg, you can proceed.

5              MS. NECHELES:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MS. NECHELES:

8    Q.  Good afternoon.

9    A.  Good afternoon.

10   Q.  Mr. Rechnitz, you started cooperating with the government

11   in June of 2016, correct?

12   A.  Yes.

13   Q.  And --

14             MS. NECHELES:  If we could put up that cooperation

15   agreement, which is Government Exhibit 3501-35, on the screen,

16   your Honor?

17             THE COURT:  You may.

18   Q.  And that was the cooperation agreement, correct?

19   A.  Yes.

20   Q.  And your lawyers -- when it's addressed to "Dear Mr. Levine

21   and Ms. Birger," those are your lawyers, right?

22   A.  Mr. Levine is my current attorney, and Ms. Birger is no

23   longer my counsel.

24   Q.  But they were, at the time, both your lawyers, right?  Your

25   attorneys?

1    A.  Yes.

2    Q.  In fact, Mr. Levine is here in court with you today, right?

3    A.  Yes, ma'am.

4    Q.  He's been in court with you every time -- you've testified

5    in other proceedings as well, correct?

6    A.  No, he has not.

7    Q.  Well, no, I didn't ask you that.  I've asked you:  Did you

8    testify in other proceedings as well?

9    A.  Yes.

10   Q.  And those are other proceedings not having to do with these

11   defendants, correct?

12   A.  I'm not sure how to answer that.

13   Q.  Well, those are other proceedings -- Jimmy Grant and Jeremy

14   Reichberg were not defendants in those other cases, correct?

15   A.  That's correct.

16   Q.  Okay.  And at those -- when you testified there, Ms. Birger

17   was in court with you, right?

18   A.  That's right.

19   Q.  And you've met with the government about 80 or 90 times or

20   talked with them on the phone, correct?

21   A.  I don't know how many times.

22   Q.  Well, it's been -- over two years, it's been frequent,

23   right?

24   A.  At times.

25   Q.  And in the last two months alone, you've met with them over

IBSKGRA6                        Rechnitz - Cross

1   15 times, right?

2   A.  That sounds about right.

3   Q.  And before you signed this cooperation agreement on

4   June 3rd, 2016, you had met with the government, right?

5   A.  Yes.

6   Q.  When you met with the government then, it was sort of like

7   a tryout for you, can I become a cooperator, right?

8            MR. BELL:  Objection.

9            THE COURT:  Thank you.

10           You can answer the question.

11           THE WITNESS:  I'm not sure I understand your question.

12  BY MS. NECHELES:

13  Q.  Well, you were trying to become a cooperator, right?

14  A.  I wasn't trying.  I came in to make a deal.

15  Q.  Oh, you weren't trying to become a cooperator; you just

16  walked in, you said sign me up for a deal?

17           MR. BELL:  Objection.

18           THE COURT:  Thank you.

19           You can answer the question.

20           THE WITNESS:  No.  I received a call from the U.S.

21  Attorney's Office that Jeremy had spoken to the U.S. Attorney

22  in addition to my counsel, and that you were going to -- that

23  they had a lot on us, and they were going to do a deal with one

24  of us.

25  Q.  You mean you or Jeremy Reichberg, right?

1    A.  Right.

2    Q.  That's what you mean by "one of us," right?

3    A.  That's right.

4    Q.  We'll get back to that, sir.

5         But then you went in -- well, they didn't call you

6    personally, right?

7    A.  That's right.

8    Q.  They spoke to your lawyer, right?

9    A.  That's right.

10   Q.  And, in fact, they spoke -- knew who your lawyer was

11   because your lawyer reached out to them, right?

12   A.  I'm not sure exactly how it occurred.

13   Q.  Well, your lawyer's name wasn't in any newspaper, right?

14             MR. BELL:  Objection.

15             THE COURT:  Thank you.

16             You can answer that question.

17             THE WITNESS:  Again, I'm not sure to that point, I've

18   seen his name in print.

19   BY MS. NECHELES:

20   Q.  Of course, you've seen his name in print, but with respect

21   to you being represented by him at that time in May of 2016,

22   for example?

23             MR. BELL:  Objection.

24             THE COURT:  Thank you.

25             You can answer that question.

IBSKGRA6                        Rechnitz - Cross

1              THE WITNESS:  Again, I don't remember if I saw his

2      name to that point.

3      BY MS. NECHELES:

4      Q.  In fact, you had been -- well, withdrawn.

5              So, before you started cooperating in June -- before

6      you signed this deal on June 3rd, 2016, you met in, and you met

7      with the government about four or five times, right?

8      A.  No.  I think I met them three times.

9      Q.  Well, sir, do you recall that you met with the government

10     on May 9, 2016, May 10, 2016, May 12, 2016, and May 25, 2016?

11     Is that correct, sir?

12     A.  I don't remember the exact dates, but I remember meeting

13     them to proffer over a three-day period.

14     Q.  Okay.  A proffer means -- what you mean by proffer, you

15     mean you were telling the government what information you had

16     that might be valuable to them, right?

17     A.  I was telling them about all the crimes I've committed

18     along with others that -- as I understand it, things to

19     incriminate me against anything I said.

20     Q.  Okay.  Sir, but I asked you a different question.  I asked

21     you whether you were telling them what information you had that

22     might be valuable to them.

23     A.  Yes.

24     Q.  And that's because you knew that is what they wanted to

25     hear, right?

1    A.  Yes.

2    Q.  And they told you -- the very first thing they told you was

3    you need to give us stuff that's valuable, otherwise you don't

4    get a cooperation agreement, right?

5            MR. BELL:  Objection.

6            THE COURT:  Thank you.

7            You can answer the question.

8            THE WITNESS:  That's false.  They actually told me all

9    I need to do is be candid and tell the truth.  They never --

10   BY MS. NECHELES:

11   Q.  Sir, are you certain of that?

12   A.  I'm certain.

13   Q.  Okay.  Let's look at what has been marked for

14   identification as 3501-27.

15           MS. NECHELES:  Not for the jury, for the witness only

16   and the government.

17   Q.  Do you --

18           MR. BELL:  Objection, your Honor.

19           THE COURT:  I'm sorry.  Let Ms. Necheles ask the

20   question.

21           MR. BELL:  I'm objecting to the use of this under the

22   rules, your Honor.

23           THE COURT:  Thank you.

24           Why don't we take it off the screen.  And, counsel,

25   please ask a question.

1          MS. NECHELES:  All right, sir.

2     BY MS. NECHELES:

3     Q.  Do you recall telling -- the government saying to you that

4     you have to be valuable to them?  You have to make sure that

5     you are valuable to us, do you recall that?

6     A.  No, I do not.

7     Q.  Let's see if I can refresh your recollection.

8          MS. NECHELES:  If I could show this to the witness,

9     your Honor?

10         THE COURT:  You may.

11    Q.  Am I correct you met with the government on May 9, 2016?

12    A.  Again, I don't know the dates, but I met in May.

13    Q.  When you went there, you were accompanied by three

14    lawyers -- Laura Birger, Nicholas Flath, and Alan Levine --

15    correct?

16    A.  Yes, ma'am.

17    Q.  Did you meet with them at 86 Chambers Street?

18    A.  Yes, I did.

19    Q.  Whose offices are those?

20    A.  The U.S. Attorney's Office.

21    Q.  Okay.  The first thing that happened is they discussed the

22    proffer agreement; is that correct?  Does that refresh your

23    recollection?

24    A.  No, it does not.

25    Q.  You don't -- no, it does not mean it didn't happen or they

1   didn't do that?

2           MR. BELL:  Objection, your Honor.

3           THE COURT:  Thank you.

4           Can you rephrase the question, please, counsel?

5   BY MS. NECHELES:

6   Q.  All right.  Sir, are you saying -- is it your testimony

7   they didn't do that, or are you saying that this doesn't

8   refresh your recollection?

9   A.  No, I'm saying it does not refresh my recollection.

10  Q.  Okay.  And let me ask if it refreshes your recollection

11  that after discussing the proffer agreement, that the

12  government said to you, you have to make sure that the

13  information you give is valuable to us?

14  A.  No.

15  Q.  No, it doesn't?

16  A.  I remember them telling me I have to just be truthful.

17  Q.  Okay.  Are you saying that that never happened, the

18  government never told you that?

19  A.  No.  When I signed the cooperation agreement, part of the

20  agreement says that I have to have -- assist them and give

21  valuable assistance.

22  Q.  Right, you have to give substantial assistance?

23  A.  Substantial assistance.

24  Q.  Right?

25  A.  Yes.

IBSKGRA6                         Rechnitz - Cross

Q.  And the government decides what substantial assistance is,

right?

A.  Yes.

Q.  But I want to ask you, even before you signed the

cooperation agreement, my question to you is a very specific

one:  Are you saying that the first day that you met with the

government, that they never told you that the information you

are going to give, you have to make sure that it is valuable to

us?  Is that your testimony?

A.  I'm not saying that.  I'm saying I don't recall that at

that specific meeting.

Q.  I see.  So when a minute ago -- a few minutes ago, you

testified that they never said that to you, that was

inaccurate?

           MR. BELL:  Objection, your Honor.

           THE COURT:  Thank you.

           Sustained.

BY MS. NECHELES:

Q.  So it's just that you don't remember, right?

A.  Again, I don't recall them saying that at that meeting.

Q.  Okay.  But, sir, when you have been testifying today, and

you've been saying Jeremy Reichberg told me to do that, Jeremy

Reichberg told me to do that, Jeremy Reichberg was there,

that's what you think will be valuable to the government,

right?

1    A.  No.

2              MR. BELL:  Objection.

3              THE COURT:  Thank you.

4              I'm sorry.  I accept the answer.

5              You can proceed.

6              THE WITNESS:  No.  I believe all of my testimony is

7    valuable as long as it's truthful and accurate.

8    BY MS. NECHELES:

9    Q.  But every time that you give this testimony, you have a

10   remarkable memory, don't you, sir?

11             MR. BELL:  Objection.

12             THE COURT:  Thank you.

13             Sustained.

14             Counsel, can you please rephrase?

15   Q.  Well, sir -- withdraw that.

16             You do have a remarkable memory, right?

17             MR. BELL:  Objection.

18             THE COURT:  Thank you.

19             You can answer the question.

20             THE WITNESS:  I remember certain things that other

21   people would not remember, and I don't remember certain aspects

22   that other people would.  I don't know how my memory works.

23   Q.  But you always remember Jeremy Reichberg telling you to do

24   something, right?

25             MR. BELL:  Objection.

1            THE COURT:  Thank you.

2            Sustained.

3   BY MS. NECHELES:

4   Q.  Okay.  But you remember that every time you were in a car

5   with Nussy Josephy, and he put lights and sirens on, first you

6   called Jeremy Reichberg, right?

7   A.  I remember everything I was asked, and it was answered

8   accurately.

9   Q.  That's not my question.

10  A.  And there were incidents when Nussy called Jeremy to turn

11  the lights on.

12  Q.  That was not my question.  You testified on direct, did you

13  not, that every time you were in the car that Nussy put his

14  lights on, you called Jeremy Reichberg, right?

15            MR. BELL:  Objection, your Honor.  That

16  mischaracterizes the testimony.

17            THE COURT:  Thank you.

18            Counsel, please rephrase.

19  Q.  Well, was that your testimony?

20            MR. BELL:  Objection, your Honor.

21            THE COURT:  Thank you.

22            Can you ask the question again, please, counsel.

23  Q.  Was that your testimony, that every time you were in the

24  car with Nussy Josephy, and he put lights and sirens on, first

25  you called Jeremy Reichberg to see if that was okay?

IBSKGRA6                        Rechnitz - Cross

1    A.  My testimony is not that I called Jeremy to make sure it's

2    okay each time, no.

3    Q.  That was not your testimony?

4    A.  No, ma'am.

5    Q.  What was your testimony?

6              MR. BELL:  Objection, your Honor.

7              THE COURT:  Thank you.

8              Can you ask a question?

9    BY MS. NECHELES:

10   Q.  All right.  Withdrawn.  I'm going to move on, and we'll get

11   back to that, all right?

12             Now, sir, in the beginning of your direct examination,

13   Mr. Bell asked you some questions about your background, your

14   family.  So I want to ask you some more questions about that

15   topic.

16             Now, first, with respect to your education, you

17   graduated from Yeshiva University, right?

18   A.  Yes.

19   Q.  And the word Yeshiva is a word that is used to describe

20   Jewish schools often, right?

21   A.  That's right.

22   Q.  And a lot of times, there's a lot of Jewish education that

23   goes on, reading Jewish texts, right?

24   A.  Yes.

25   Q.  But Yeshiva University is an extremely strong secular

1    school as well, right?

2    A.  Yes, I believe it's in the top 40.

3    Q.  Right.  When I say "secular," I mean non-Jewish education,

4    right?

5    A.  Yes.

6    Q.  It's a top university in this country, right?

7    A.  I believe so.

8    Q.  You believe it's in the top 40, you say?

9    A.  Yes.

10   Q.  It's one of the top ranked universities in New York City,

11   right?

12   A.  I think so.

13   Q.  So, to be clear, you got a very good university education,

14   right?

15   A.  Yes.

16   Q.  But is it your testimony that last year, you did not

17   understand what the word corruption meant?

18   A.  Yes.

19   Q.  So you went to one of the top universities in the country,

20   top in New York City, but you did not understand the word

21   corruption; is that correct?

22   A.  That's correct.

23   Q.  But you've used that word in the past, right?

24   A.  Yes.

25   Q.  And you've used it often, right?

IBSKGRA6                    Rechnitz - Cross

1    A.  I don't think I've used it often.

2    Q.  But you've used it under oath, right?

3    A.  Yes.

4    Q.  But you didn't understand what you were saying when you

5    used it?

6    A.  I misunderstood its meaning when I've used it.

7    Q.  I see.  When you say you misunderstood it, did Mr. Bell

8    tell you that?

9             MR. BELL:  Objection.

10            THE COURT:  Thank you.

11            You can answer that question.

12            THE WITNESS:  Did he tell me what?

13   BY MS. NECHELES:

14   Q.  That you misunderstood it, you used it wrong, when you

15   testified last time?

16            MR. BELL:  Objection.

17            Your Honor, can I request a sidebar?

18            THE COURT:  You may.

19            MR. BELL:  Thank you.

20            (Continued on next page)

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Thank you.

3          Sorry.  There's an objection?  Go ahead, counsel.

4          MR. BELL:  Yes, there is.  Embedded within

5     Ms. Necheles' question is a question about prior testimony.  To

6     the extent that this prior testimony is being elicited, that

7     testimony is hearsay.  The question then becomes under what

8     exemption or exception is that being applied.  We respectfully

9     submit -- I think we're close enough to 3:00, that we may be

10    able to discuss this further -- that that does not come in

11    either as a prior inconsistent statement for reasons that we've

12    noted, and given the witness' testimony, which has been

13    entirely -- well, there is no inconsistency.  I think your

14    Honor appreciates that argument by now.  It also doesn't come

15    in as prior --

16         MS. NECHELES:  Can we get back to this tomorrow?  I'll

17    move on for right now, we'll get back to it, so I can finish up

18    with --

19         MR. BELL:  I don't want to be interrupted here.  I do

20    want to put this on the record.

21         MS. NECHELES:  But I don't want to spend all this time

22    in front --

23         THE COURT:  Let's come back to it.  We will step away

24    from this now, and we can discuss it after the jury is gone.

25         MS. NECHELES:  Thank you.

IBSKGRA6                          Rechnitz - Cross

1              (In open court)

2              THE COURT:  Thank you.

3              Ms. Necheles, you can proceed.

4              MS. NECHELES:  Thank you.

5    BY MS. NECHELES:

6    Q.  For the sake of saving time for the jury, let's move on for

7    now.  I'll move on for now.

8              Sir, you also testified at the beginning of your

9    direct examination about your father and your cousin, right?

10             MR. BELL:  Objection, your Honor; mischaracterizes the

11   testimony.

12             THE COURT:  Thank you.

13             You can answer the question.

14             THE WITNESS:  I remember testifying about my father.

15   Q.  Well, let's start with your father.  Your father is a very

16   successful businessman is what you said, right?

17   A.  I said growing up, I had a privileged childhood, and that

18   he was successful, yes.

19   Q.  And he's very involved in politics, isn't he?

20   A.  He used to be, yes.

21   Q.  And, in fact, he was the national finance chair for Senator

22   Lindsey Graham's presidential campaign, right?

23             MR. BELL:  Objection, your Honor.

24             THE COURT:  Thank you.

25             You can answer the question.

1          MR. BELL:  Object to relevance, your Honor, 403.

2          THE COURT:  Thank you.

3          You can proceed.

4          THE WITNESS:  That's right.

5   BY MS. NECHELES:

6   Q.  You were asked all these questions about how you got into

7   politics, right?

8   A.  That's right.

9   Q.  And you said it was Jeremy Reichberg, right?

10  A.  That's right.

11  Q.  So I want to talk about your background and your family's

12  background in politics.  You understand that, right?

13         MR. BELL:  Objection, your Honor.

14         THE COURT:  Thank you.

15         You can answer the question.

16         THE WITNESS:  I understand.

17         THE COURT:  Thank you.

18         Please proceed, counsel.

19  Q.  Your family has a very long history of being involved in

20  politics, right?

21  A.  Yes.

22  Q.  And, in fact, your father was very involved in Israeli

23  politics, right?

24  A.  That's right.

25  Q.  As a result of all of his involvement in Israeli politics,

IBSKGRA6                         Rechnitz - Cross

1   he was very close to Benjamin Netanyahu, correct?

2   A.   That's correct.

3   Q.   And who is Benjamin Netanyahu?

4            MR. BELL:  Objection, your Honor; relevance, 403.

5            THE COURT:  Thank you.

6            I'll allow this answer.  Proceed.

7            THE WITNESS:  He's the Prime Minister of the State of

8   Israel.

9   BY MS. NECHELES:

10  Q.   And your father was -- also chaired the Iron Dome

11  Congressional Tribute in February of 2013, correct?

12  A.   Yes, that's correct.

13  Q.   What is the Iron Dome?

14           MR. BELL:  Objection, your Honor.

15           Can I have a sidebar, please?

16           THE COURT:  Yes.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  Thank you.

3           I'm sorry.  Counsel, go ahead.

4           MR. BELL:  Thank you.

5           There is an initial concern of relevance because it

6    does not necessarily follow that one's father being involved in

7    politics means that you are involved in politics more than you

8    have been.

9           MS. NECHELES:  That --

10          MR. BELL:  I'd like to finish.

11          MS. NECHELES:  I'm sorry.

12          MR. BELL:  That's the initial level of concern with

13   respect to relevance.

14          I think that Ms. Necheles can ask Mr. Rechnitz about

15   his involvement in politics and when it truly began to her

16   heart's content, but, ultimately, what this becomes is a

17   staging ground for a 403 problem, and the 403 problem is to

18   float as many political identifications out there, which may be

19   inflammatory.  We know that Israel is a topic, we know that

20   Netanyahu is a hotter topic, we know that Lindsey Graham,

21   particularly now -- and as we do this, we're doing it in late

22   2018 -- is somebody who tends to enflame passions by virtue of

23   a number of things, including the Kavanaugh hearings.  There is

24   no point for this.  And it would be one thing if these were

25   political entanglements that Mr. Rechnitz himself had, but

1    we're a degree removed only because here we're talking about

2    his dad.  What is the logical link between that and

3    Mr. Rechnitz's own political involvement?

4              THE COURT:  Thank you.

5              MS. NECHELES:  Mr. Rechnitz spoke at this luncheon.

6    He introduced Bill Thompson.  The government has suggested that

7    this all came about because of Mr. Reichberg.  He spoke, he was

8    on the dais at this conference.  It's on the Internet.  So

9    that's exactly where I'm going.

10             MR. BELL:  She should ask about the conference.  All

11   of this other stuff --

12             MS. NECHELES:  I'm going to ask about who was there

13   and what went on.  He was introduced to all of this by his

14   father, and he got involved in it, and that's how --

15             THE COURT:  Thank you.

16             I'm sorry.  I understand that the proffer by counsel

17   is that this is leading up to the specific issue that was

18   brought out during direct; namely, of the witness'

19   participation in the conference.  It sounds as though we're

20   almost there.

21             MS. NECHELES:  Yes.

22             THE COURT:  Good.

23             MR. BELL:  Your Honor, the problem is the particular

24   path that we've taken there is one that is fraught and

25   unnecessarily so.  I'd ask that we get to the point without

IBSKGRA6                         Rechnitz - Cross

1    these issues that raise 403 problems.

2              MS. NECHELES:  Judge, I would also ask not to be

3    interrupted every three minutes.

4              MR. BELL:  People can object, Susan.  You do it all

5    the time.

6              MS. NECHELES:  Not like you.

7              THE COURT:  Please go ahead.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Sorry for the interruption.

3              Ms. Necheles, please proceed.

4              MS. NECHELES:  Thank you, your Honor.

5    BY MS. NECHELES:

6    Q.  Sir, just to be clear, you spoke at this conference, right?

7    A.  Yes.

8    Q.  So before we get to what your speech was at this -- this

9    was a conference that took place in February 2013, right?

10   A.  I believe so.

11   Q.  You were explaining, what is the Iron Dome?

12   A.  Yes.

13   Q.  What is it?

14             MR. BELL:  Objection; relevance.

15             THE COURT:  Thank you.

16             You can answer the question.

17             THE WITNESS:  The Iron Dome is a product out of -- a

18   product -- a defense missile machine that when rockets are

19   shot, it can send up a -- another rocket to blow it up midair,

20   so it doesn't hurt any civilians.

21   BY MS. NECHELES:

22   Q.  Just to be clear, it's a defensive system over large parts

23   of Israel, right?

24             MR. BELL:  Objection; relevance.

25             THE COURT:  Thank you.

1              You can answer the question.

2              THE WITNESS:  Yes.

3      BY MS. NECHELES:

4      Q.  It's totally defensive, not an offensive weapon, right?

5              MR. BELL:  Objection.

6              THE COURT:  Thank you.

7              You can answers the question.

8              THE WITNESS:  That's how I understand it.

9      Q.  In fact, the point of this conference that you spoke at in

10     this luncheon was to thank senators who had been involved in

11     helping Israel develop this, right?

12     A.  To help the funding, yes.

13     Q.  Because the U.S. helped in the funding of that defensive

14     system, right?

15     A.  That's correct.

16     Q.  In fact, there were more than ten U.S. senators present at

17     this luncheon, right?

18     A.  Yes.

19     Q.  And there were many, many, many people from the House of

20     Representatives, many officials, congressmen, correct?

21     A.  Yes.

22     Q.  In fact, there was the House Foreign Affairs chair, Ed

23     Royce, right?

24     A.  Yes.

25     Q.  And you went, and you mingled, and you associated with all

1    of them, right?

2    A.   Yes.

3    Q.   And it was held at the Capitol Building in a beautiful

4    room; is that correct?

5           MR. BELL:  Objection, your Honor.

6           THE COURT:  Thank you.

7           Can you rephrase the question, please, counsel?

8    BY MS. NECHELES:

9    Q.   Was it held in the Capitol Building in D.C.?

10   A.   Yes.

11   Q.   And your father sat in the dais?

12          MR. BELL:  Objection.

13          THE COURT:  Thank you.

14          You can answer the question.

15          THE WITNESS:  Yes.

16   Q.   And a number of U.S. senators sat there?

17   A.   That's right, yes.

18   Q.   And you sat in the dais, right?

19   A.   I switched off between the dais and sitting next to Jeremy

20   at a table close by.

21   Q.   Okay.  And Jeremy never sat in the dais, right?

22          MR. BELL:  Objection.

23          THE COURT:  You can answer the question.

24          THE WITNESS:  I recall seeing photos of him at the

25   podium and the dais.  I'm not sure.

IBSKGRA6                         Rechnitz – Cross

1    BY MS. NECHELES:

2    Q.  Sir, I was asking about you, right?

3    A.  No.  You just asked me about Jeremy.

4    Q.  First, when I said you sat at the dais, you brought up

5    Jeremy, right?

6              MR. BELL:  Objection.

7              THE COURT:  Thank you.

8              You can answer the question.

9    A.  You asked me a question, I gave you an answer.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IBSTGRA7                    Cross

1    BY MS. NECHELES:

2    Q.  And you wanted to put Jeremy in that answer, right?

3          MR. BELL:  Objection, your Honor.

4          THE COURT:  That's sustained.  You can proceed,

5    counsel.

6    Q.  And so you sat at the dais, right?

7    A.  I believe so.  I went back and forth.

8    Q.  And Bill Thompson, who was at that time running for Mayor

9    of New York, also sat at the dais, right?

10   A.  Yes.

11   Q.  And you made the speech and you introduced Bill Thompson,

12   right?

13   A.  Yes.

14   Q.  How old are you now, sir?

15   A.  I'm 36 years old.

16   Q.  And at that time -- that occurred in 2013, right?

17   A.  That's correct.

18   Q.  You were 31 years old then, right?

19   A.  Yes.

20   Q.  And you were the youngest person speaking there, right?

21   A.  Yes.

22   Q.  It was a big honor for you, right?

23   A.  Yes.

24   Q.  And you got to do that because of your father, right?

25   A.  That's right.

1   Q.  And it was through your father that you saw the importance

2   of political contacts, right?

3   A.  Yes.

4   Q.  And it was because of your father's activity that you were

5   inspired to do this kind of thing, right?

6            MR. BELL:  Objection.

7   A.  No.

8            THE COURT:  I accept the answer.  You can proceed.

9   Q.  But you were trying to follow your father's footsteps, were

10  you not?

11  A.  I tried to emulate him in many ways, yes.

12  Q.  And your father was a rich person, right?

13           MR. BELL:  Objection.

14           THE COURT:  Thank you.  You can answer the question.

15  A.  Yes.

16  Q.  And you also mentioned on direct that you had another

17  relative who was involved in politics.

18  A.  I don't remember mentioning that on direct.

19  Q.  You don't remember saying that on direct examination that

20  you had another relative who was also involved in politics?

21           MR. BELL:  Objection, mischaracterizes the testimony.

22           THE COURT:  Thank you.  Could you ask another

23  question?

24  Q.  Did you have another relative who was involved in politics?

25  A.  I have several relatives involved in politics.

1    Q.  But one was extremely prominent, right?

2    A.  Yes.

3    Q.  And his name is Shlomo Rechnitz?

4    A.  That's right.

5    Q.  And he's extremely prominent in the Orthodox community,

6    right?

7    A.  Yes, he is.

8    Q.  And he's also extremely involved in politics, right?

9    A.  I don't think he's extremely involved in politics.

10   Q.  Isn't he very close to Netanyahu as well?

11           MR. BELL:  Objection, your Honor.  Same objection as

12   before.

13           THE COURT:  Thank you.  Sustained.

14   Q.  Well, he had been very involved in politics in Israel.

15           MR. BELL:  Objection.

16   A.  No.

17           THE COURT:  Thank you.  I accept that answer.  You can

18   proceed.

19   Q.  He has a lot of esteem and power, right?

20   A.  He's a very wealthy man and a very influential man.

21   Q.  And you wanted to be like your father and your cousin,

22   right?

23   A.  I would love to be like them in certain qualities, yes.

24   Q.  And one of those qualities was to be a big deal publicly,

25   right?

IBSTGRA7                          Cross

1   A.  Yes.

2   Q.  And in fact, there's a word that you have used in your

3   testimony previously, which is the word "macher," right?

4          MR. BELL:  Objection.

5          THE COURT:  Sorry, sustained.  Can you please ask the

6   question differently?  I don't recall the testimony.

7          MS. NECHELES:  In another --

8          MR. BELL:  Objection.

9          THE COURT:  Sustained.  Please rephrase the question,

10  counsel.

11  Q.  Is there a Yiddish word that refers to being a big deal?

12  A.  Yes.

13  Q.  What is that word?

14  A.  A macher.

15  Q.  M-A-C-H-E-R, is that correct?

16  A.  I think so.

17  Q.  And that's a word that you often used, right?

18         MR. BELL:  Objection.

19         THE COURT:  Thank you.  Can you rephrase the question?

20  Q.  You wanted to be a macher, right?

21  A.  That's right.

22  Q.  And sir, you testified that the time period that you were

23  hanging out with Jeremy Reichberg and police officers was

24  approximately 2008 to the end of 2015, is that correct?

25  A.  Yes.

IBSTGRA7                         Cross

1    Q.   And in during that time period it was important for you

2    that people thought of you as a macher, an extremely wealthy

3    person, right?

4    A.   That's right.

5    Q.   And you believed that if you created the appearance that

6    you were a big important person and extremely wealthy, this

7    would help you in business, right?

8    A.   That's right.

9    Q.   You were really young at this point, right?

10   A.   Yes.

11   Q.   But you wanted to be seen as really rich and really

12   important, right?

13   A.   Yes, highly successful.

14   Q.   And you decided to make everybody believe that by making

15   everybody believe you were really rich, right?

16   A.   Yes.

17   Q.   And one of the ways that you did that was you very

18   conspicuously spent lots and lots of money, correct?

19            MR. BELL:   Objection.

20            THE COURT:   Thank you.   You can answer the question.

21   A.   That's right.

22   Q.   And another way you did that was you frequently lied and

23   pretended to be even richer than you were, right?

24   A.   That's right.

25   Q.   In fact, you wanted people to think you were a billionaire,

1    right?

2    A.  I wanted people to think I was extremely wealthy.

3    Q.  A billionaire, right?

4    A.  No.

5    Q.  For example, you just testified on direct examination that

6    you told Norman Seabrook that you owned three buildings, right?

7    A.  I testified, I believe, that I told him I owned two

8    buildings on Wall Street.

9    Q.  Why don't we take a look at what has been marked as

10   JR12102, it's actually 12081.  Sorry, your Honor, 2081?

11             THE COURT:  This is for the witness and counsel?

12             MS. NECHELES:  Yes.

13   Q.  Sir, that was an email between you and Mr. Seabrook?

14             MR. BELL:  Objection, objection, objection.

15   Q.  Do you recognize that document?

16             MR. BELL:  Objection.  It's not in evidence.

17             MS. NECHELES:  I'm asking if he recognizes it.

18             THE COURT:  You can proceed.

19   Q.  Do you recognize that document?

20   A.  Yes, I do.

21   Q.  And is that an email between you and Mr. Seabrook?

22             MR. BELL:  Objection.

23             THE COURT:  Thank you.  You can answer the question.

24   A.  Yes.

25   Q.  And was that an email -- was that an email chain that you

1   sent and you received with Mr. Seabrook?

2   A.  Yes, ma'am.

3           MS. NECHELES:  Your Honor, I offer it in evidence for

4   what is said and not the truth of it.

5           THE COURT:  Thank you.

6           MR. BELL:  Objection, your Honor.

7           THE COURT:  Thank you.  So counsel, we're just at

8   about the time that I wanted to break in any event.  My

9   proposal would be that we end for the day.

10          Is this a reasonable time for us to take a break,

11  Ms. Necheles?

12          MS. NECHELES:  Yes, your Honor.

13          THE COURT:  Let's take a short recess.

14          Ladies and gentlemen, thank you again for being here

15  and giving all your attention today.  We'll start on time

16  tomorrow.  I look forward to seeing you here.  In the interim,

17  as always, don't discuss the case among yourselves, don't

18  communicate about it with anyone else, don't do any research,

19  and I will see you tomorrow.

20          (Jury not present)

21          THE COURT:  Thank you very much.

22          Mr. Rechnitz, you can step down.  I would ask, if you

23  wouldn't mind, that you and your counsel remain in the side

24  room for a moment.  We may want to discuss issues with you

25  momentarily, but for now you can step down.  Thank you.

IBSTGRA7

1              So as the witness is exiting the courtroom, counsel

2       for the United States, would you like to explain the objection

3       to this particular document?

4              MR. BELL:  This is extrinsic evidence of a collateral

5       matter being used to impeach the witness.

6              THE COURT:  I'm sorry.  Counsel, would you mind

7       placing the exhibit back up on the screen for the benefit of

8       the Court and the parties?

9              MS. NECHELES:  Yes.

10             THE COURT:  Go ahead, counsel.

11             MR. BELL:  I guess the short version would be 608(b),

12      but a slightly more extensive version would be this is

13      extrinsic evidence of a collateral matter that is being used to

14      impeach the witness's honesty.  As far as Rule 608 examples go,

15      this is textbook, and it's out.

16             Furthermore, it is cumulative.  As your Honor

17      witnessed, Mr. Rechnitz already testified that these are

18      misrepresentations that he made to Mr. Seabrook.  But I think

19      that the more cardinal thing here is this extrinsic material

20      does not come in under the very plain language of 608.

21             MS. NECHELES:  Your Honor, 608 is not as broad as the

22      government said.

23             THE COURT:  First, can I ask for a proffer regarding

24      the proper purpose for which this exhibit is to be introduced?

25             MS. NECHELES:  Yes, your Honor.  As your Honor is

aware, a strong part of my defense is that Mr. Rechnitz

pretended to be extremely wealthy and have so much money that

the amounts of money that he was spending on these so-called

bribes or gifts were insignificant.  So while the government

has made a big deal about like you spent all this money, and

they have contrasted this, they elicited testimony contrasting

that to what one of the witnesses, Richie Oetting, testified he

did with Mr. Harrington where they would go to modest

restaurants.  They said look at the fancy restaurants and the

fancy places Mr. Rechnitz was taking you.

          THE COURT:  Thank you.  Can you tell me what the

particular purpose is of this particular document?  I

understand the argument that you --

          MS. NECHELES:  He says I own 23 Wall Street, 15 Broad,

and used to own 25 Broad.  I want to show picture of those and

put those pictures in evidence, and I want this in evidence to

show that is what he said.  He said he owned two.  I want this

in evidence for the jury to see.

          And I don't think that this is duplicative because

it's an essential part of my -- I didn't say -- the government

has not been limited to just eliciting testimony.  They get to

put in documents, they get to put in pictures and tapes to

prove their case, and so can I, your Honor, to be able to prove

something as essential as this.  And I want to show those

pictures because these are enormous buildings, and someone who

IBSTGRA7

1    owns those are billionaires.

2            And your Honor, could I say one more thing?

3            THE COURT:  Yes, you may.

4            MS. NECHELES:  I want to show that he said -- he

5    testified on his direct examination that at the time he said

6    this he was working for Africa-Israel and that Africa-Israel

7    owned them.  And it's not true.  When you see the date, he

8    didn't work for Africa-Israel in 2013.  So that's another

9    reason I want to put this into evidence.  It's a lie that he

10   made.

11           MR. BELL:  So as an initial matter, I will start where

12   Ms. Necheles ended, that's just straight up a

13   mischaracterization of the tendency.

14           THE COURT:  Testimony.

15           MR. BELL:  Sorry.  I have been working on this direct

16   examination for a long time and had a physical encounter in

17   between, I'm running out of gas.

18           But what Ms. Necheles said about Mr. Rechnitz's

19   testimony with respect to this email and where he was working

20   at the time, that's just not in the record, and I would defy

21   Ms. Necheles to point to where that actually is in the record.

22           But there's a bigger issue here.  Ms. Necheles talks

23   about some sort of parity, sort of what is good for the goose

24   is good for the gander.  That's not the world in which Rule 608

25   exists.

1          THE COURT:  Thank you, understood.  Let me ask if you

2     can respond to what I understand to be Ms. Necheles' -- one of

3     Ms. Necheles' arguments, that she's not introducing this for

4     the purposes described in 608(b), in other words to attack or

5     support his character for truthfulness, but to provide

6     additional evidence related to his desire, in the words that

7     she elicited, to present himself as a macher.

8          MR. BELL:  This, your Honor, has been looming actually

9     for a little bit, and I want to offer this other commentary on

10     Ms. Necheles' proffered rationale.  And we have been building

11     to this for a while, and we at the government team have sort of

12     puzzled over how this is sort of an actual defense, because we

13     don't believe it's a legally cognizable one.  And because of

14     that, evidence relevant to this legally incognizable defense is

15     not relevant, and that is that being rich is not a defense.

16     It's not a defense to bribery.

17          What Ms. Necheles essentially put out there is well,

18     the idea is that if Mr. Rechnitz is really, really wealthy, or

19     if people think he's really wealthy, these things of value are

20     not things of value.  That is not the law.  That is an absurd

21     distortion of the law, one that would come with absurd results.

22     It would essentially mean that if you're rich enough that

23     bribery isn't a crime because stuff means less to you.  That's

24     not what controls what a thing of value is.

25          THE COURT:  Understood.  Let me pause you briefly

1    because I know you have not had the opportunity to review the

2    letter that was submitted, and I won't describe it in any

3    detail here in courtroom now.  But it's not clear to me that

4    that is necessarily the defense that is being offered, as

5    opposed to painting a comparison with the type of testimony

6    that was elicited by the government from the first witness

7    about the down-to-earth lunches that that witness engaged in

8    with his friend to strike a comparison to show such luxuries

9    are not incongruous for Mr. Rechnitz.

10           Viewed in that light, how do you view this?

11           MR. BELL:  Well, for one, it's several degrees removed

12   from this document.  I think that to the extent that

13   Ms. Necheles wants to cross-examine Mr. Rechnitz on the

14   dynamics of his friendship with other people -- as he already

15   testified to, by the way -- as contrasted with sort of Richie

16   Oetting's wholesome friendship and argue from that ultimately

17   in the fashion that she wants to, she certainly can.  It

18   doesn't get this document in, and I think that it's in part

19   because the attenuated connection.

20           I think we're still left as a default matter, your

21   Honor, with the idea that this is meant to primarily

22   demonstrate, and certainly has the primary effect of merely

23   more vividly illustrating a point that Ms. Necheles is making

24   with respect to Mr. Rechnitz's tendency for truthfulness, which

25   is clearly impermissible under Rule 608.

IBSTGRA7

1            Ms. Necheles talks about how she ought to be able to

2     put in evidence too, but Rule 608 is not a symmetrical exercise

3     by design.

4            MS. NECHELES:  Your Honor, I'm going to be putting on

5     a lot of evidence of his wealth and how he was pretending to

6     look.  Much of the evidence has nothing do with him lying.

7     This all goes to the appearance he was creating.

8            I believe that the government will sum up, in part,

9     saying look at the lavishness of what was being spent here,

10    look at how much money.  They elicited testimony:  How much

11    money did you spend?  $50,000 on that trip.  Time after time

12    they elicited that.  They will sum up saying:  Look how much

13    money.  Of course the defendants knew this was a bribe.  Of

14    course they knew it.

15           They're going to say that, your Honor, I expect, in

16    summation, so I need to say beforehand, I need to put this in

17    context, this guy was pretending to be a billionaire.

18           THE COURT:  Thank you, understood.  Let's focus on

19    this document if we can.  The government says that this is

20    extrinsic evidence to prove specific instances or the specific

21    instance of the conduct to attack his character for

22    truthfulness.  Why is that not the case?

23           MS. NECHELES:  I want to show the impression he was

24    creating to people.  He's already admitted he lied.  I don't

25    care about that.  I mean I do care, but that's not what I'm

1       putting this in for.  I don't need this to show he lied.

2                   Mr. Bell, can I finish, please?

3                   THE COURT:  Thank you.  You can be seated, Mr. Bell.

4                   MS. NECHELES:  I don't need this for that.  I need

5       this to show in October 2013 he said I own 23 Wall Street, 15

6       Broad, and used to own 25 Broad.  And what he testified -- in

7       my notes, your Honor, I don't have LiveNote, but in my notes he

8       testified he said he owned a building on Wall Street, and in

9       fact he was working for the company -- he was lying, but in

10      fact he was working for the company that owned these buildings.

11                  Now I understand he didn't use the words

12      Africa-Israel, but that was the company that had owned these

13      buildings.

14                  THE COURT:  That's fine.

15                  MS. NECHELES:  So your Honor, I want to put this in to

16      show exactly what he said and then show those buildings,

17      because this goes to him telling this to the people the

18      government is saying he wants to impress.  He's telling this to

19      Banks because Seabrook is very close to Banks.  That's what the

20      government kept eliciting, that Seabrook is close to Banks.

21                  So when he's telling it to Seabrook, I am going to ask

22      him:  You thought this was going back -- you knew he was close

23      to Banks and you knew he would be telling it to Mr. Banks and

24      to Mr. Reichberg.

25                  This goes to heart of it.  This is the impression that

1    he was creating, that he owned -- he's a billionaire.

2            THE COURT:  Understood.  I will take this up.  I want

3    to make sure that we take care of other piece of business

4    before we adjourn today, and I need to end at 3:30.

5            I want to take up the question of the treatment of

6    Ms. Necheles' letter, which I would like to talk about briefly

7    at sidebar with counsel.  Any other issues that we should talk

8    about before we adjourn or recess for the day?  I will consider

9    this exhibit and will be prepared to discuss it further first

10   thing in the morning.

11           MS. NECHELES:  Your Honor, one other issue.

12           THE COURT:  Please.

13           MS. NECHELES:  I went for 32 minutes, there were 28

14   objections.  I will never get through this cross if we can't

15   like go forward on this.  I mean I understand the government

16   will see this, my letter, tonight, but it is really, really

17   disruptive.

18           THE COURT:  Thank you.

19           MR. BELL:  Judge, we do not want to object at all.  It

20   hurts my knees and it takes up time.  If Ms. Necheles asks

21   proper questions, we won't object.  But I don't think that

22   anyone would suggest that the objections that we have made to

23   date are frivolous.

24           THE COURT:  Thank you, that's fine.  I will ask that

25   the parties again try to continue to work together with respect

1   to these issues.

2            Is there anything else that we need to talk about,

3   apart from how we handle the letter, before we take our recess

4   for the day?

5            MR. BELL:  I did want to ask, I know that your Honor

6   alluded to having Mr. Rechnitz out here again, is there a need

7   for that or is he gone?  I was confused by your earlier remark.

8            THE COURT:  Well, one of the options that your

9   commentary left open was the prospect this would be placed on

10   the public docket, and I would instruct the witness and his

11   attorney not to look at the letter.  I need him and his lawyer

12   in order to do that.

13            MR. BELL:  Understood.  That's a lapse on my part in

14   understanding, your Honor.  I think we should address that

15   issue.  We don't have any others.

16            THE COURT:  Thank you.

17            Counsel for Mr. Reichberg, anything else?

18            MS. NECHELES:  No.

19            THE COURT:  Counsel for Mr. Grant?

20            MR. MERINGOLO:  Not other than that issue.

21            THE COURT:  Good.  Come up to the sidebar, please.

22            (At sidebar)

23            THE COURT:  Thank you.  I'm sorry.  So I do want to

24   talk about how we're going to handle the letter.  I think that

25   the issues raised by Ms. Necheles' cover letter are real and I

don't want to allow the witness to be prepared to meet her

anticipated cross-examination.  I think that's an important

right for the defendant that I might trammel if I were to do

so.  As a result, I would like to talk about how it is that

we're going to handle this issue.

I agree with Mr. Bell that there is a presumption of

public access to judicial documents.  It is a judicial

document.  I read it.  The question is whether we can post this

on the public docket now subject to an instruction to the

witness and his counsel not to look at it or to look at any

press that may be sparked by it or if that would be an

effective approach.

MS. NECHELES:  Your Honor, I have to say all my

clients, they all look on public dockets.  This is like -- they

search them, they look at them.  People follow cases.  Anybody

who is following a case is reading all this stuff.  It's

accessible to everybody.  So his father, who you will hear

evidence, is extremely involved in all of this.  This is not an

honest guy.  I should not be required to rely on his honesty.

I'm just asking for a few days until we're done with the

cross-examination, and I think that the defendant's Sixth

Amendment rights, his rights of effective cross-examination,

should support that and outweigh that short delay for the

public interest.

MR. MERINGOLO:  Judge, just for the record, because we

IBSTGRA7

```
 1   have a joint defense, we object to it going on the public

 2   record, also.

 3              THE COURT:  Thank you, counsel.

 4              MR. BELL:  Thank you, Mr. Meringolo.

 5              So there are a couple of things here that I think we

 6   ought to walk through, because this is potentially, on both

 7   sides, somewhat prickly territory.

 8              I think that your Honor may want to first make a

 9   record as to both generally, and in the immediate term -- that

10   is to say, the next few days -- whether this meets the actual

11   criteria in place for something to be sealed.  As I mentioned

12   before, we believe that it does not, but your Honor has had an

13   opportunity to engage in the substance of the letter, we have

14   not.

15              The second issue I think is this:  Because something

16   like the order that you contemplate may touch upon Mr. Levine's

17   rights, it may make sense for Mr. Levine to be a party to this

18   conversation to the extent that we're trying to craft a

19   solution.  I know that he's here.  I think that it makes sense

20   to bring him out, and to do so in a way such that we don't get

21   into the substance, obviously, of what the letter is.  But I

22   think that he may want to be heard as well, and I think that he

23   probably should be.

24              MS. NECHELES:  Your Honor, I would object to an order

25   that says that it should be publicly put in the public and that
```

1    just he would not speak about it with his client or something

2    like that.  But if you were to order that, I think you would

3    have to speak to him, because I believe that in a prior case he

4    has taken the position he has the right to speak to his client.

5    And I don't want to speak for him, but I think it would be

6    improper to put it in the public anyway.  But yes, I agree, if

7    you were to be considering ordering that, of course he should

8    have the chance to address it.

9             MR. BELL:  And because I don't want speak for

10   Mr. Levine any more than Ms. Necheles does, I think it may make

11   sense for him to join our conversation.  And having listened to

12   Mr. Levine, perhaps that will give us a chance to formulate a

13   more --

14            MS. NECHELES:  I don't think it's needed unless you

15   are planning to put it in the public record.  If you are, then

16   that's a different situation, but if you're not --

17            THE COURT:  Thank you.  I think I will defer decision

18   about whether or not this needs to be posted at this time.

19            I will bring the witness back in and instruct him not

20   to discuss this case with anyone other than his counsel, and

21   whether I need to have this document posted in the near term is

22   something that I will take under advisement.

23            MS. NECHELES:  Your Honor, could I ask the government

24   be instructed not to speak with Mr. Levine either during the

25   next couple of days during our cross-examination?

IBSTGRA7

```
 1              MR. BELL:  We will be speak to Mr. Levine but not
 2    about this and not about the substance.  We want to make sure
 3    Mr. Rechnitz actually gets here.  We lost enough time as it is.
 4              I do think, your Honor -- and I stress this -- the
 5    presumption of public records and the issues implicated and
 6    animated by it, they kick in now, as I understood -- as I
 7    understand them, and so I appreciate your Honor's desire to
 8    defer making a decision for that reason, but I do understand
 9    this to be a live issue as it affects -- potentially affects
10    public rights.
11              MS. NECHELES:  Your Honor, could I say something else?
12    It's not really the government's place to be arguing this.
13              THE COURT:  Thank you.  I have had the same thought,
14    but they nonetheless did and are continuing to do so.
15              MS. NECHELES:  The press is very able.
16              MR. BELL:  The press is also not here, your Honor.
17    But I note this because we, by default, wind up being the
18    general people responsible for the entirety of the record.
19    That record could potentially involve intervenors from the
20    press.  Mr. Reilly was here today, who is among the most active
21    members of the press to date.
22              And so we're trying to protect the record because we
23    have a job to do.  I haven't formulated a position yet on the
24    government's part, but I am noting the issue because it is a
25    live one, and I lament that it may be one that we're ultimately
```

IBSTGRA7

1    responsible for in some form, as tends to happen around here.

2             MS. NECHELES:  Your Honor, it doesn't affect the

3    defendants' rights to a fair trial.  It would not be an issue

4    on appeal.  So when the government is saying they're

5    responsible for what happens, they're not responsible for that.

6             THE COURT:  Counsel, I may continue to reserve on

7    this.

8             Counsel for defendant, what I may ask from you is an

9    extensive proffer regarding the bases that you believe overcome

10   the presumption of public access to this judicial document that

11   I can uses as a basis for a decision tomorrow on the issue.

12            MS. NECHELES:  Okay.  I will see if I can find

13   something.

14            THE COURT:  Thank you.

15            MR. BELL:  Thank you, Judge.

16            (In open court)

17            THE COURT:  Counsel for the United States, could we

18   bring Mr. Rechnitz.  I want to advise him not to discuss this

19   case.

20            MR. BELL:  Judge, Special Agent Downs is here.  I will

21   send him back with your Honor's permission.

22            THE COURT:  Please do.

23            (Witness present)

24            THE COURT:  Thank you, Mr. Rechnitz.  Welcome back.

25            I wanted to order you during this break, while you're

IBSTGRA7

1    under cross-examination, not to discuss this case, your

2    testimony, or the subject matter of your testimony with anyone,

3    excluding for these purposes your counsel.  But apart from

4    that, I'm directing you not to discuss this case or your

5    testimony with anyone, including, most particularly, counsel

6    for the United States, with the exception of any scheduling

7    matters, which I expect they will discuss with your counsel in

8    any event.

9            With that, you can step down for the day.  Thank you

10   for your testimony.

11           THE WITNESS:  Okay, your Honor.

12           (Witness not present)

13           THE COURT:  So counsel, one other thing that

14   Mr. Daniels has just handed me, I have a note from one of our

15   jurors, which I will mark as Court Exhibit A, and I will

16   provide it to the lawyers to look at, if you would like to.

17           It reads as follows:  Dear Judge Woods,

18           In planning for the next few weeks, is it prudent to

19   buy a monthly pass for Metro-North for month of December?  It's

20   $311, which is cheaper than weekly rate of $99.50.

21           Are there any expected holidays from Court schedule

22   with Christmas, et cetera?

23           Thank you, Juror.

24           So I wanted to let you know that I received this and

25   to give you the opportunity to review it.  It does raise the

question of what our anticipated schedule will be.  I'm not
going to ask you to comment on it broadly now, but I will have
to take that up tomorrow morning.

        As you know, my hope had been that following
Mr. Rechnitz's direct that the defense would be in a position
to give me more information about what you expect in terms of
the witnesses who are subject to the subpoenas that have been
served I think by defendant Grant so that I can determine how
it is that we'll resolve those, and only for that purpose.

        So counsel, I expect to ask essentially that question,
just for scheduling purposes, to the extent that you can
provide me any feedback now, just so I can schedule any future
proceedings with respect to those subpoenas and pending motions
to quash.

        MS. NECHELES:  Your Honor, we have been thinking about
this.  In part it depends on how many more witnesses the
government actually intends to call and who.

        THE COURT:  You don't need to respond now, but I will
let you think about it.

        MS. NECHELES:  But I can't respond in the morning
either because the government now has 28 more witnesses on
their list.  I don't believe they're calling them all, but
depending on who they omit, I may have to call some of those
witnesses.

        THE COURT:  That's fine.  You can discuss the

IBSTGRA7

1    fundamental issue in the meantime.

2            Thank you all for your work today.  I think we got a

3    lot accomplished today, and I appreciate the work that you guys

4    have been doing.

5            I will see you all in the morning.

6            MR. BELL:  Thank you very much, your Honor.

7            (Adjourned to November 29, 2018, at 9:00 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    JONA RECHNITZ

 4    Direct By Mr. Bell . . . . . . . . . . . . .2813

 5    Cross By Ms. Necheles  . . . . . . . . . . .3000

 6                          GOVERNMENT EXHIBITS

 7    Exhibit No.                               Received

 8      1008   . . . . . . . . . . . . . . . . . .2817

 9      1011   . . . . . . . . . . . . . . . . . .2825

10      1013   . . . . . . . . . . . . . . . . . .2826

11      308D   . . . . . . . . . . . . . . . . . .2829

12      1085   . . . . . . . . . . . . . . . . . .2832

13      303  . . . . . . . . . . . . . . . . . . .2856

14      1038   . . . . . . . . . . . . . . . . . .2861

15      1039   . . . . . . . . . . . . . . . . . .2865

16      1041   . . . . . . . . . . . . . . . . . .2868

17      1050   . . . . . . . . . . . . . . . . . .2869

18      1036   . . . . . . . . . . . . . . . . . .2871

19      W-0311   . . . . . . . . . . . . . . . . .2881

20      1054   . . . . . . . . . . . . . . . . . .2885

21      619B through 619E  . . . . . . . . . . . .2891

22      1031   . . . . . . . . . . . . . . . . . .2894

23      1043 and 1045  . . . . . . . . . . . . . .2898

24      1056   . . . . . . . . . . . . . . . . . .2901

25      1058   . . . . . . . . . . . . . . . . . .2902
```

1    1244    . . . . . . . . . . . . . . . . .2904

2    1246    . . . . . . . . . . . . . . . . .2905

3    1243    . . . . . . . . . . . . . . . . .2907

4    3512-01 and 3512-02   . . . . . . . . . . .2913

5    W-01964   . . . . . . . . . . . . . . . .2917

6    1006    . . . . . . . . . . . . . . . . .2926

7    1007    . . . . . . . . . . . . . . . . .2928

8    1025    . . . . . . . . . . . . . . . . .2936

9    1141    . . . . . . . . . . . . . . . . .2939

10   1044    . . . . . . . . . . . . . . . . .2941

11   X03186    . . . . . . . . . . . . . . . .2947

12   1069    . . . . . . . . . . . . . . . . .2951

13   1617 and 1617A    . . . . . . . . . . . .2956

14   W-05025, W-05095, and X-03438    . . . . . .2985

15

16

17

18

19

20

21

22

23

24

25