IBTKGRA1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                 New York, N.Y.

4              v.                              16 CR 468 (GHW)

5    JAMES GRANT and JEREMY
     REICHBERG,
6
                 Defendants.
7
     ------------------------------x
8
                                               November 29, 2018
9                                              9:08 a.m.

10
     Before:
11
                      HON. GREGORY H. WOODS,
12
                                               District Judge
13

14

15                         APPEARANCES

16
     GEOFFREY S. BERMAN
17        United States Attorney for the
          Southern District of New York
18   BY:  JESSICA R. LONERGAN
          KIMBERLY J. RAVENER
19        MARTIN BELL
          Assistant United States Attorneys
20

21   HAFETZ & NECHELES, LLP
          Attorneys for Defendant Reichberg
22   BY:  SUSAN R. NECHELES

23   MERINGOLO & ASSOCIATES
          Attorneys for Defendant Grant
24   BY:  JOHN MERINGOLO
          ANJELICA CAPPELLINO
25

IBTKGRA1

1          (In open court; jury not present)

2          THE COURT:  Thank you very much.

3          Good morning.  Thank you for being here and timely

4     today.

5          I received a number of letters this morning.  I read

6     through, I think, most of them.  There are a few issues that we

7     should talk through, if we can.  I'd like to start with the

8     letter from counsel for Mr. Grant about the NYPD subpoenas.

9          First, thank you for sending this letter, and thank

10    you for working to narrow the list of potential NYPD officers

11    who might come to testify here.

12         My first question is whether you communicated about

13    this list with the NYPD.  Counsel?

14         MS. CAPPELLINO:  Your Honor, we had sent our letter to

15    the NYPD attorney last night when we filed.  We haven't heard

16    back yet because of the time, but we'll be in touch.

17         THE COURT:  Good.  Thank you.

18         I'd like to ask that you talk with them between now

19    and tomorrow at some point, if you can.  I'd like to get some

20    sense of the extent to which they continue to object to this

21    more narrow band of potential witnesses, and I may ask for more

22    information regarding the anticipated relevance of the

23    testimony of these people.  So it would be helpful for me to

24    know to what extent they still object to this slate of

25    witnesses.  They may not be in a position to send me in writing

IBTKGRA1

1    their position with respect to that issue, but for scheduling

2    purposes, for sometime early next week, to the extent that

3    there remain disputes about whether or not these people should

4    be compelled to come to trial or whether or not the subpoenas

5    should be quashed, we may need to set aside some time for what

6    would otherwise be a trial day to take up those issues.

7           So if I can ask counsel for Mr. Grant to confer with

8    counsel for the NYPD at some point after today's trial and be

9    prepared to talk to me tomorrow about their position, that

10   would be helpful, and I will set some deadlines based on that

11   information.

12          MS. CAPPELLINO:  We'll certainly do that, your Honor.

13   Thank you.

14          THE COURT:  Good.  Thank you very much.  Thank you for

15   working to narrow the list.

16          Are there any other issues that the parties would like

17   to raise?  I'd like to begin a conversation about the defense

18   exhibits.  Thank you, counsel for the United States, for your

19   commentary.

20          Is there anything else that we should talk about

21   before we begin a discussion of those issues?  First --

22          MS. LONERGAN:  No, your Honor.

23          THE COURT:  Good.  Thank you.

24          Counsel for Mr. Reichberg?

25          MS. NECHELES:  Your Honor, I'm not going to seek to

IBTKGRA1

1    put in the email from Mr. Seabrook, the one that has -- I'll

2    just seek to put in the pictures of these buildings.

3            With respect to the other evidence that I will be

4    eliciting of wealth, I will not be putting in or asking about

5    did you lie about this, I'm going to ask did you tell people

6    this, to show what he was saying about his wealth.  Because I

7    want to make it really clear:  I'm not putting this in to show

8    that he's -- his specific acts to show he's a liar.  I really

9    am focused on the state of mind, of people believing -- well,

10   now, the government has really mischaracterized my argument, I

11   think, your Honor.  I don't know how much you need to hear from

12   me on it because I think you've already heard from me on it.

13           Clearly, Mr. Rechnitz now is saying that he

14   specifically had discussions, explicit discussions, with

15   Mr. Reichberg on that he said, we are giving this to Grant,

16   explicit quid pro quo discussion.  And I will cross him on that

17   later in my cross, but, at this point, it's a step-by-step

18   process, and one piece of evidence can't prove everything in

19   the case.

20           So combined, I believe that I will have an argument to

21   make to the jury at the end of the day, based on evidence that

22   we will have elicited, that Mr. Rechnitz lied when he talked

23   about these specific discussions, and that, in fact, there were

24   no such specific discussions, there's no corroboration of that,

25   and that, instead, it was all -- I believe that there were no

IBTKGRA1

1    explicit discussions.  Given that, then it's a question of what

2    would the people believe?  What would the people who were

3    involved in this believe?  Would they believe that just because

4    I got this, it must be a bribe?  Because he's giving me so

5    much, it must be a bribe.  Sort of like one of the witnesses

6    who testified from the licensing division where the government

7    elicited his testimony that, well, you got gifts of flights and

8    meals, and you realized -- and vacations, and you came to

9    realize that was a bribe?  And he said, yes, because I put the

10   two things together, it was a fancy expensive thing, and then I

11   got asked for something.  So that is an argument that the

12   government could make, and I want to show that here, that it

13   didn't rise to that because things were not linked, and on

14   their own, they didn't seem like crazy expenditures by someone.

15   If someone gives you a million dollars, you think, wow, it's a

16   million dollars, you know, Susan Necheles gave me a million

17   dollars.  Wow, why is she doing that?  But if a person is a

18   billionaire, that's a different thing.

19              So it's not that someone who's rich can give bribes.

20   That's not at all my argument.

21              THE COURT:  Thank you.

22              Can I just ask:  My understanding is that it goes to

23   an argument of corrupt intent, and that your big-shot argument

24   goes to arguably a question of whether or not they're seeking

25   official action as opposed to just looking like big shots.

IBTKGRA1

1          MS. NECHELES:  Or big macher, as you said yesterday,

2     your Honor.

3          THE COURT:  Thank you.

4          That's why you said the government's argument is off

5     point, and that you are not asserting that a thing of value is

6     not a thing of value because it's given by a wealthy person as

7     opposed to someone of lesser means.

8          MS. NECHELES:  Thank you, your Honor.

9          THE COURT:  Thank you.

10         So, counsel for the United States, I understand that

11     the specific issue that we had teed up yesterday is not on the

12     table.  That's 2081.  Instead, counsel for Mr. Reichberg seeks

13     to bring in images of the buildings, presumably to show that

14     they are not single family residences.  I should ask for your

15     views regarding that.

16         And then I want to ask, Ms. Necheles, whether you

17     expect to get to any of the other issues that were raised in

18     the government's letter, particularly the question of whether

19     or not the tax and securities fraud theory has a good-faith

20     basis.

21         MS. NECHELES:  So I think I will get to the whole

22     lease issue, your Honor.  To be clear, this person perjured

23     himself at the first trial.  He testified directly opposite of

24     what he testified here today, and I will be asking him whether

25     he perjured himself at the first trial to hide because he had

IBTKGRA1

1    not told the government about his tax fraud.  The government's

2    right, he told them about other things, but he didn't tell them

3    about the tax fraud, and he continued to commit tax fraud after

4    he had started cooperating.

5         So I will be asking him about that.  It is certainly a

6    fair question to be asking.  It goes to directly to their

7    statements.

8         THE COURT:  Thank you.

9         Can I pause you.  I understand that you assert that

10   this goes to the issue of bias and also --

11        MS. NECHELES:  Motive.

12        THE COURT:  -- to show motive, bias here to

13   manufacture -- allegedly manufacture a story.  What's your

14   proffer regarding the basis in good faith for this line of

15   inquiry?

16        MS. NECHELES:  Okay.  So, your Honor, he has admitted

17   previously, and he admitted on direct, that he had this person,

18   Nissen, who was paying his commissions, that he was paying his

19   commissions by paying credit cards.  He did not tell that to

20   the government when he started cooperating.  That first came

21   out in the cross-examination on the first trial he testified.

22   And, in fact, when Mr. Bell asked on direct examination, did

23   you tell us this, did you -- all these things, he didn't talk

24   about the tax.  He didn't talk about, did you tell us at first

25   about the credit card, that he was paying the credit card, and

IBTKGRA1

1    he didn't tell him.  I'll go through the 302s, he didn't tell

2    them this at first, and he continued to get his credit card

3    payments paid even after he was cooperating.

4              Your Honor, when you look at the tapes and go through

5    the tapes, which I intend to do with this witness, when you go

6    through the tapes, you see that what he is talking --

7              THE COURT:  I'm sorry.  Tapes of Mr. Rechnitz?

8              MS. NECHELES:  Mr. Rechnitz at the time, after the IAB

9    comes, which the government made a big deal about it, after the

10   IAB came, you were scared, you lied to them, and you then ran

11   around telling everybody to cooperate, and you did that with

12   Mr. Reichberg, and the reason you did it was because you knew

13   you were corrupting cops.  Well, when you actually look at the

14   tapes and go through them, he's not worried about the cops.  He

15   says, I'm not worried about Peralta, or the police, or the IAB,

16   and he starts getting worried when they start going to his

17   investors, and they're talking -- and especially when they go

18   to Nissen.  And he says to a lawyer that he is talking to with

19   his father on the phone, he says, you know, this person, this

20   is extremely important to me, it's a profitable relationship

21   that I have, I've made a lot of money, and he has.  He's made

22   over $9 million from this person.  He hasn't admitted that yet,

23   but I think he will today.  He has made over $9 million in

24   commission that he didn't pay taxes on, and it continued after

25   he was cooperating.

IBTKGRA1

1         So, your Honor, I think that that is a strong motive.

2    He wanted to shut down the investigation on that.

3         THE COURT:  Thank you.

4         Counsel for the United States, do you have an argument

5    to support the contention that the theory lacks a basis, a

6    good-faith basis, given the proffer by counsel for

7    Mr. Reichberg?

8         MR. BELL:  Yes, your Honor.  For starters, I don't

9    believe that there is a basis for Ms. Necheles' statement that

10   Mr. Rechnitz perjured himself at his first trial, A, or lied to

11   the government during his proffer sessions, B.

12        The following should be understood in order to

13   appreciate the chain of facts:  Mr. Rechnitz told us

14   voluntarily, as the 302s for the May 2006 proffer sessions

15   reflected, that he was -- 2016, I'm sorry, 2016 proffer

16   sessions reflected, that he was involved with Mr. Nissen, that

17   he lured potential investors/lenders in under false pretenses,

18   and that Nissen sometimes used these investor/lender funds for

19   purposes other than -- oh, sorry, am I not coming through well,

20   Judge?

21        THE COURT:  I just asked Mr. Daniels to turn up your

22   volume.

23        MR. BELL:  Sure.

24        And that he was aware that Mr. Nissen, on a short-term

25   basis, didn't use these funds for the purposes for which the

IBTKGRA1

investors had been told.

That's all information that Mr. Rechnitz

volunteered -- volunteered -- during the very same proffer

sessions in which he told about his various illegal activities

committed with Mr. Reichberg, including with Mr. Seabrook,

including in the political realm, and including with the police

officers.

Ms. Necheles charges, in her correspondence, that

Mr. Nissen was involved in a tax fraud, securities fraud scheme

with Mr. Rechnitz, and I assume that the securities fraud

scheme has to do with the fact that National Event Company,

Mr. Nissen's company, was ultimately discovered to be a Ponzi

scheme.  The Court should appreciate the timing of that.  That

is something that the government learned about, and that we

believe, based on our investigation, Mr. Rechnitz was not aware

of until well after his cooperation commenced.  Mr. Nissen --

I'll disclose this much:  Mr. Nissen and his attorney came to

the government when, as sometimes happens with Ponzi schemes,

the roof caved in and something bad was going to happen in any

event.

My understanding -- and Mr. Rechnitz's consistent

expression to us throughout -- is that he learned about this

once that activity -- once that contact became public, and

Mr. Nissen was charged shortly thereafter.

The problem with what Ms. Necheles has said with

1    respect to tax is that Mr. Rechnitz didn't actually lie about

2    anything.  He was asked at the first trial why it was that

3    Mr. Nissen sometimes agreed to pay his credit card bill, and he

4    said, we believe accurately, that he did so in order to

5    essentially -- they arranged between themselves that

6    Mr. Nissen -- that Mr. Rechnitz would allow for some late

7    payments from Mr. Nissen, but that it was worth it in order to

8    get his credit card bill paid on that schedule, a separate

9    monthly due date schedule.

10          I want to be clear about this:  The government has no

11   reason to believe that that testimony was false.  The

12   government also believes that that is not the exclusive reason

13   why Mr. Nissen and Mr. Rechnitz agreed -- or why, rather,

14   Mr. Rechnitz was friendly to the prospect of having Mr. Nissen

15   pay him on some occasions in that way, and that he appreciated

16   that that's probably money that he wasn't going to, as a

17   practical matter, have to pay taxes on.

18          There is no inconsistency with respect to his

19   testimony.  And after that was fleshed out at the first

20   Seabrook trial, we brought that out in an even clearer fashion

21   in the second Seabrook trial.  That, too, is entirely

22   consistent with Mr. Rechnitz's testimony yesterday.

23          THE COURT:  Thank you.

24          MR. BELL:  So the notion that there is some sort of

25   perjury here is false.  I want to be clear about this.  We take

1     that very, very seriously.  Mr. Rechnitz is not to commit

2     further crimes under his cooperation agreement.  Lying under

3     oath would constitute such a crime.  This is not something that

4     we believe has actually happened.

5              But with respect to the actual good-faith argument, I

6     refer your Honor not only to the fact -- remember, we're

7     talking about a good-faith argument for making a particular

8     circuitous argument that Ms. Necheles has made.  There are two

9     issues that still, I think, ring out to undermine the notion

10    that there's any good-faith basis at all.  The first of these

11    is, again, that Mr. Rechnitz actually admitted to his

12    involvement with Jason Nissen at the same time that he admitted

13    all of this other conduct, which itself facially undermines the

14    notion that there was some sort of an attempt to use the

15    Reichberg misconduct as a smokescreen to distract from the

16    Nissen conduct.

17             But the second issue, your Honor, is that there is no

18    basis in the actual evidence that Ms. Necheles proffers that

19    leads, in a straightforward, linear fashion, to that

20    conclusion.  I was hoping that in providing a good-faith, and

21    your Honor asking for a good-faith basis this morning, that

22    there would be more.  What these are are these shards of other

23    sorts of evidence that Ms. Necheles wants to get in for other

24    reasons, cast into a particular shape that would allow her a

25    pretext to do so.  I think that your Honor has used the first

IBTKGRA1

 1    of the tools that we have asked for in order to determine what

 2    weight to give this theory and how likely this line of

 3    questioning and the evidence that purportedly comes with it

 4    should be given, given its likelihood of leading to actual

 5    probative evidence.

 6            Respectfully, Judge, it's not there.  And, as always,

 7    if Ms. Necheles wants to question Mr. Rechnitz about his

 8    conduct with Mr. Nissen, that's fine, she can do so to her

 9    heart's content.  This is something that came out on direct

10    examination, it's well within the scope, but that doesn't lead

11    to a proper evidentiary pathway to get the recordings in.

12    That's the real issue here.

13            And, your Honor, respectfully -- and I don't mean to

14    cast aspersions here -- but this sort of facially far-fetched

15    theory suggests something of a pretext for getting in evidence

16    that otherwise would not be admissible under the rules on

17    cross-examination.

18            MS. NECHELES:  Judge, can I just --

19            THE COURT:  Thank you.

20            I'm sorry.  Let me pause you just for a moment.  I do

21    want to start with the jury momentarily, so I want to address

22    the buildings and the other issue.

23            I've been focused on the broader line of

24    cross-examination regarding the alleged tax and securities

25    fraud theory.  The parties obviously know the facts of the case

IBTKGRA1

1    much better than I do, but based on the defendants' proffer

2    regarding the evidence that the defense has seen on this topic,

3    I can't conclude that the theory lacks a basis in good faith,

4    such that she cannot inquire about what is an issue that goes

5    to potential bias on behalf of the witness that might lead him

6    to manufacture evidence or to lie to the government.  I think

7    that that's a proper basis for cross-examination, and I can't

8    conclude that it lacks a good-faith basis.  And, indeed, it

9    appears, from Ms. Necheles' proffer, that there is evidence

10   that supports it.

11          So I'd like to pivot briefly to the recordings, which

12   was the focus of Mr. Bell's last set of comments, because I

13   wasn't focused on that in particular, but the government is.

14          Ms. Necheles, can you comment on those?

15          MS. NECHELES:  There are various groups of the tapes.

16   What I'm going to be dealing with today is the tapes that --

17   the government played some tapes yesterday and asked a lot of

18   questions about what was going on at the time of the IAB

19   investigation.  And I think in our letter last night, we gave

20   your Honor the citations to the pages in the record, and they

21   repeatedly asked these questions and suggested that

22   Mr. Rechnitz had lied, and that he had conspired.  That wasn't

23   a suggestion, it was outright:  Who did you do with this?

24   Mr. Reichberg.  They played part of one conversation with

25   Mr. Reichberg and didn't play another conversation.

IBTKGRA1

1          During this whole time period, there is a series of

2     conversations that go on, that go directly to the issue of

3     Mr. Reichberg's state of mind.  He's talking with his father,

4     he's talking with -- I mean Mr. Rechnitz's state of mind, which

5     is what the government asked about yesterday.  And they

6     suggested directly -- they kept eliciting this testimony.

7          THE COURT:  I'm sorry.  Just to be clear, you're

8     talking about recordings with Rechnitz, not Reichberg?

9          MS. NECHELES:  Yes, Rechnitz, not Mr. Reichberg.

10    There are two sets.  With Mr. Rechnitz, most of the tape that I

11    will seek to play are with Mr. Rechnitz where Mr. Rechnitz is

12    talking to a lot of people about what is his concern about the

13    IAB.  And I believe that these tapes show that he is not

14    concerned about the police investigation.  He tells

15    Mr. Brafman, I'm not worried about that, I don't need a lawyer.

16         THE COURT:  Thank you.

17         Counsel for the United States, what's the concern?

18    You're talking about the Rechnitz recordings, as I understand

19    it.

20         MS. LONERGAN:  Your Honor, I guess I'm a little

21    confused because, as I think as we kind of detailed in our

22    letter last night, there are still hearsay rules.  Even if

23    we're not in 608(b), there are sill hearsay rules, and even if

24    there is a purpose -- a potential purpose for the

25    cross-examination, like a strategic reason to ask certain

IBTKGRA1

questions, it doesn't obviate the need to follow the hearsay
rules.  I think Ms. Necheles had previously focused on
impeachment by contradiction.  That doesn't get anything in for
the truth.

So I think the issue would be that in order to get
these recordings in -- because I think a lot of the arguments
that Ms. Necheles has made to the Court this morning has to be
that she's seeking to offer the recordings that he made for the
truth of what was said in them, for the truth of what he was
concerned about at the time.  She says, he's going to say that
he's not concerned about the police, and she thinks she wants
to offer that for its truth, not just to contradict something
that he's saying here.

So I think that there's still a hearsay issue about
how those statements come in for their truth rather than just
to contradict his testimony, if they, in fact, do contradict
his testimony.

MS. NECHELES:  Your Honor, I'm not offering them --
I'm offering them for his state of mind.  That is a hearsay
exception.  And they put his state of mind at that time in
issue.  They couldn't have done it more clearly.  They made it
into a big deal yesterday.  They said he was concerned about
the IAB investigation because he had to hide that he was
corrupting cops.  That's why he was concerned.  And these tapes
directly contradict that.

IBTKGRA1

1              Your Honor, there's a Supreme Court case, Chambers v.

2      Mississippi, an old case, famous case, and what happens there

3      is that the government makes an argument, and the defense has

4      evidence that's hearsay that directly contradicts the

5      government's argument, but it's not allowed in because they say

6      it's not within the hearsay rule.  And the Supreme Court said,

7      you know, in a criminal case, you can't be overly technical

8      about the hearsay rules.  If something is reliable evidence,

9      and it is exculpatory, it should be coming into evidence.

10             So I believe, under the hearsay rules, this comes in,

11     but certainly the Court also has to look at whether it is

12     reliable evidence.  This is what the man was saying at the time

13     was on his mind.  I want to play these tapes to him, and he can

14     say, no, I didn't mean that.  He'll have a chance to be able to

15     explain what was going on.  I want to ask him questions about

16     these tapes.

17             In addition, I would note, your Honor --

18             THE COURT:  I'm sorry.  Can I just ask the United

19     States:  Counsel, how does your view on this issue square with

20     the position that the government took when we were talking

21     about the hearsay statement issue when we were talking about

22     the limiting instruction previously, the fact that the

23     statement was made and that particular element of it?  It was

24     the subject of some conversation.  The government took a

25     position, with respect to that anticipated evidence, that such

1    statements could come in to show the fact that the statement

2    was made, and the government took the position that the fact

3    that the statement was made was not being introduced for the

4    truth of the matter.  This is in that context.

5            How does your position here square with that position?

6            MS. LONERGAN:  One moment?

7            THE COURT:  Thank you.

8            (Pause)

9            MS. LONERGAN:  So, your Honor, we continue to adhere

10   to that is a rule.  If a statement has probative value just

11   because it was made, then that's not hearsay.  But I think that

12   the argument that Ms. Necheles has made today about how she

13   wants to use the statements on the recording is not simply for

14   the fact that he said it, but for the fact of that it is, in

15   fact, his state of mind.  It's not just that he -- I think what

16   she's saying is, it's not just -- she wants to, in fact, argue,

17   as she has said, that his state of mind was X, as it was on the

18   recordings, not Y, as it was in his testimony.

19           But that is not just the fact that the statement was

20   made.  That means that he's actually speaking the truth when he

21   says, I'm not concerned about something.  Again, if there are

22   statements that the witness makes that are relevant simply

23   because he makes them, whether or not they are true, that is

24   not a hearsay issue, your Honor.

25           THE COURT:  Thank you.

IBTKGRA1

1          Counsel for the defense, are you introducing these

2     statements to prove the truth of the matter asserted in each of

3     the statements by the witness or by Mr. Rechnitz?

4          MS. NECHELES:  Some of them, I am, your Honor.  Some

5     of them, I am saying that this was his state of mind at the

6     time.  So there are two hearsay rules I want --

7          THE COURT:  Thank you.

8          You're looking at 803(3)?

9          MS. NECHELES:  And also 803(1).

10          THE COURT:  Thank you.

11          MS. NECHELES:  He is describing what's going on then.

12          THE COURT:  Thank you.

13          Counsel for the United States, 803(3), just to be

14     clear, says that an exception to the hearsay rule is a

15     statement of the declarant's then existing state of mind...

16          Why does that not apply here, given what you just

17     described to me as being the purpose for which this is being

18     introduced?

19          MS. LONERGAN:  One moment, your Honor?

20          THE COURT:  Thank you.

21          (Pause)

22          MS. LONERGAN:  Your Honor, with respect to his -- like

23     some statements, for example, Mr. Rechnitz's statement, if he

24     says, just using an example, I'm not concerned, that may very

25     well come in under the state of mind exception.  We think,

IBTKGRA1

1    however, that these calls -- there's much more going on than

2    that, so we just need to take a more piecemeal approach.  As

3    the Court is aware from hearing many of the recordings during

4    trial, these recordings are often multiple -- they can be

5    minutes or even longer, and so it may be that there are hearsay

6    exceptions that apply to pieces of the calls, but not the calls

7    in their entirety.

8              So we, essentially, reserve some of our arguments with

9    respect to the calls in their entirety, and we can see -- I

10   think we need to see in some sense how the questioning

11   proceeds, what questions she asks, and how the

12   cross-examination proceeds.

13             THE COURT:  That's fine.

14             MS. LONERGAN:  Your Honor, I know the Court wants to

15   bring in the jury, and we do not want -- we want to be

16   efficient with the jury's time, but we do think it might make

17   sense if we could spend two minutes about the wealth argument

18   because I think it's going to cover a lot of the issues on

19   cross-examination today as well.

20             I think the issue about Mr. Rechnitz's wealth is --

21   it's not -- I think both parties are perhaps mistaking the

22   other party's argument.  I think the argument has to do with a

23   thing of value has to have -- it's not about the wealth of the

24   person who's giving the thing of value.  If I can just use a

25   real-world example for a moment, your Honor.  This morning, I

IBTKGRA1

received a gift from NYU Law School because I went and helped

out with their orientation, and it was a pen from Tiffany's,

and that's clearly a more expensive gift than I am allowed to

accept in my official position.

The fact that NYU happens to be a wealthy law school

and has a large endowment has nothing to do with whether or not

I can accept that gift, and if it was a poorer law school, that

wouldn't change that gift.  That gift has a particular value.

THE COURT:  Thank you.

I am interrupting you.  I apologize.

MS. LONERGAN:  That's fine, your Honor.  We

understand.

THE COURT:  I understand your argument, and as you can

see from the charges, I don't disagree, I think, generally with

your statement of the law.

As I understand it, the defense wants to bring in this

evidence, in part, for the same reason that the government

brought out the evidence about the diner meetings with the

first witness.  I understood -- and we discussed at sidebar

then -- that part of the reason why that came in was to show

that this is the kind of thing that friends do, cheap,

inexpensive meals.  Ms. Necheles wants to bring in the fact of

Mr. Rechnitz's wealth, in part, to show the converse of what

the government put on through the first witness; namely, that

for wealthy people, they may, as a matter of course, take

IBTKGRA1

1    people out for more expensive meals, and that that fits into

2    the kind of thing that would be perceived as friendship.

3         MS. LONERGAN:  Your Honor, I think, though, that -- I

4    understand the Court's argument, and I think that some of that

5    may be permissible, but I have two additional points to make on

6    that.

7         The first is:  Mr. Rechnitz's spending on himself and

8    on his family doesn't go to that point, in particular, if

9    there's no evidence that the defendants knew about that.  If

10   they could show that these defendants have knowledge that

11   Mr. Rechnitz spent tons of money on other friends, that may be

12   a more targeted argument, but the fact that Mr. Rechnitz

13   happens to himself fly private when he's going places with his

14   family, I just don't understand how that goes to this argument,

15   which is, is Mr. Rechnitz just a very beneficent person who

16   bestows gifts on all sorts of people.  His own personal

17   spending isn't really relevant to that.  Neither is his

18   spending on other people of which these defendants are not

19   aware.

20        So I think that there has to be that link to show --

21   for example, if Mr. Rechnitz flew to China and bought some

22   incredibly expensive gifts -- a million-dollar gift for someone

23   in China, and the defendants don't know anything about it, that

24   just can't be relevant to their state of mind, that

25   Mr. Rechnitz, outside of their sphere of knowledge, spends a

IBTKGRA1

lot of money.

    THE COURT:  Thank you.

    Counsel?

    MS. LONERGAN:  And --

    MS. NECHELES:  Your Honor, I agree that his spending

on his family, taking his sons and his children on a private

jet to Las Vegas -- I'm not asking questions about that.

    THE COURT:  Thank you.

    I'm sorry.  Counsel, are you linking this to the

events of which the defendants might somehow have some

knowledge?

    MS. NECHELES:  Some.  But, in addition, the government

elicited, on his direct examination, a lot of testimony

about -- they specifically said, did you treat other friends

that way, did you spend this kind of money on other people?

And he said:  No, I didn't.  I would not spend money like that

on friends; I only spent money like that for business.  So I

intend to put in evidence -- that will be the other evidence.

I will have two categories:  One, what the defendants knew and

the so-called coconspirators, like what he told Norman

Seabrook, or Phil Banks, or anything like that, what they call

the inner circle; and, two, to show that their argument that he

didn't spend money on other friends like this is false.  His

testimony that he didn't was false.

    THE COURT:  Thank you.

IBTKGRA1

| | |
|---|---|
| 1 | Can I ask:  The second category, I understand what it |
| 2 | is that you expect to do there, or would like to do with |
| 3 | respect to the category.  Are you planning to limit yourself to |
| 4 | inquiry about those issues, or are you also seeking to |
| 5 | introduce specific evidence with respect to -- extrinsic |
| 6 | evidence with respect to those issues? |
| 7 | MS. NECHELES:  I am seeking to put extrinsic evidence |
| 8 | in.  They put in testimony.  This goes to the heart.  This is |
| 9 | not to his credibility.  It goes to the issue in this case |
| 10 | where he says I would only pay that kind of money for a bribe. |
| 11 | Now I have to show, no, you would -- he would pay that kind of |
| 12 | money for just friendship.  So we will be putting in -- |
| 13 | THE COURT:  Understood. |
| 14 | MS. NECHELES:  Your Honor, the cite for that on the |
| 15 | direct examination -- |
| 16 | THE COURT:  I recall the testimony. |
| 17 | MS. LONERGAN:  Your Honor, if I just may raise one |
| 18 | more kind of broad argument, and then I think we can hopefully |
| 19 | bring in the jury.  I think we also need to think a little bit |
| 20 | about how much of this is permissible.  Because, for example, I |
| 21 | know a lot of this rests in testimony that we elicited from |
| 22 | Mr. Oetting, it was two lines of questioning, and they were |
| 23 | about Michael Harrington's personal experience, which really is |
| 24 | still central to this charged conspiracy, and so I think that |
| 25 | there just becomes at some point, to the extent that there is a |

IBTKGRA1

permissible purpose, once we get to the 20th photo, there may

become a cumulative or other sense of 403 arguments about --

again, there may be a probative value at some point, but at

some point, that may be outweighed by just it being cumulative.

        Also, I think that also in that inquiry goes the kind

of degree of connection to the charged conduct.  If they

believe that they can establish that Mr. Rechnitz said

something on his direct testimony that was incorrect, and it

doesn't match up with the evidence, they should do that, they

can do that, but I think it would be laudable to try to keep it

close to the facts of this case and the people in this case,

particularly if they have 18 examples, that the examples that

are closer here would mean that we can keep the testimony more

focused on the charged conduct.

        THE COURT:  Thank you.  I'll keep an eye on that.

        MS. NECHELES:  Your Honor, can I make one comment?

        THE COURT:  Please.

        MS. NECHELES:  The government called three witnesses

to testify, including one who knew nothing about the facts --

        THE COURT:  That's fine.

        MS. NECHELES:  -- about the gun licenses.

        THE COURT:  That's fine.  Thank you.

        Let's get started.  I appreciate the parties'

presentation of these issues.  It's enabled us to outline what

proper parameters are.  I'd like to begin with the jury.

1              I don't, at this point, see a basis to support the

2      objection to bringing in pictures of the buildings if it's

3      quick.  So let's begin.

4              MS. NECHELES:  And, your Honor, while we're doing the

5      cross-examination, although I don't think we'll get there

6      quickly, there are some --

7              THE COURT:  Can you please bring in the witness,

8      counsel for the United States?

9              MS. NECHELES:  There are some transcripts where I

10     recognize they were too long, so I've edited them down.  I've

11     provided the edited-down copies to the government yesterday to

12     try to hone in on what is the issues here.  I will ask that I

13     be able to pass those out to the jury at the time.  They're not

14     in our transcript book.  Unfortunately, it's not a binder that

15     we can put more things in, but I don't know we'll get there

16     before lunch.

17             THE COURT:  Can you show them on the screen,

18     Ms. Necheles?

19             MS. NECHELES:  We don't have the same capabilities

20     that the government does, I think.

21             THE COURT:  Thank you.

22             I'll ask that you try to do it in a way that is as

23     undistracting as possible.

24             MS. NECHELES:  I don't want to appear to be doing

25     something improper.  I might ask your Honor's assistance on

IBTKGRA1

1     this.

2                 THE COURT:  Thank you.

3                 We will work together.  Mr. Daniels can help.

4                 MS. NECHELES:  Thank you.

5                 THE COURT:  Mr. Daniels, please bring in the jury.

6                 MS. NECHELES:  And, your Honor, Ms. Cassidy is sitting

7     over here to assist me.

8                 THE COURT:  In front of the bar?

9                 MS. NECHELES:  Yes, in front of the bar.

10                MS. LONERGAN:  Your Honor, can we add one thing?  I

11    believe there's still a possibility of Ms. Cassidy being a

12    witness in this case, and so I think there's --

13                THE COURT:  I assume that's not happening or else

14    Ms. Necheles would not be bringing her forward.  Is that a fair

15    assumption?

16                MS. NECHELES:  Well, your Honor --

17                THE COURT:  If it's not, I may agree with the United

18    States.

19                MS. NECHELES:  So, your Honor, maybe I can have her

20    sit in the front row, if I could, because she's worked a lot

21    with me on some of these issues, and --

22                THE COURT:  That's fine.

23                MS. NECHELES:  Thank you.

24                MS. LONERGAN:  We have concerns with her consulting

25    with Ms. Cassidy in front -- the jury is still going to see it.

IBTKGRA1

1    I don't know that it really matters if it's in front of the

2    bar, behind the --

3              THE COURT:  Thank you.  I agree with that.

4              Ms. Necheles, I will ask, just in the event that you

5    are leaving open the possibility that Ms. Cassidy may testify

6    here, it may not be best for her to be so identified with the

7    defense team.  I had assumed that the request was based on a

8    decision that Ms. Cassidy would not testify here, but I see

9    that's unfounded.

10             MS. NECHELES:  Thank you.  I understand, your Honor.

11             THE COURT:  Good.  Thank you.

12             (Pause)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

IBTKGRA1                      Rechnitz - Cross

 1            (Jury present)

 2            THE COURT:  Thank you.  Ladies and gentlemen, you can

 3    be seated.

 4            First, good morning, ladies and gentlemen.  Welcome

 5    back.  Thank you very much for being here.

 6            Mr. Rechnitz, I will remind you that you remain under

 7    oath.

 8            Counsel for Mr. Reichberg, you can proceed.

 9            MS. NECHELES:  Thank you, your Honor.  Good morning.

10            THE WITNESS:  Good morning.

11     JONA RECHNITZ,

12    CROSS-EXAMINATION CONTINUED

13    BY MS. NECHELES:

14    Q.  Sir, when we left off yesterday, I was asking you about

15    whether you told Mr. Seabrook about that you owned three major

16    office buildings in New York, correct?

17    A.  That's correct.

18    Q.  Am I correct that you did, right?

19    A.  No.  I told him I owned two office buildings.

20    Q.  Well, let me see if something can refresh your

21    recollection.  If I can show you what has been marked as

22    Defendant Reichberg Exhibit JR-2081.

23            Oh, I see you told him you owned two now and you used

24    to own a third, right?

25    A.  No.  I told him I owned one and I used to own a second one.

IBTKGRA1                    Rechnitz - Cross

1  Q.  You say:  I owned 23 Wall Street/15 Broad and used to own

2  25 Broad.  Is that what you told him?

3  A.  Yes.  I said I owned 23 Wall/15 Broad, which is one

4  building with two addresses, and used to own 25 Broad.  So it's

5  two separate buildings.

6  Q.  All right.  So, sir, I want to show you what has been

7  marked as JR-12102.  Do you recognize that?

8  A.  Yes.  That's 25 Broad Street.

9        MS. NECHELES:  I offer that in evidence, your Honor.

10        MR. BELL:  No objection.

11        THE COURT:  Thank you.

12        I'm accepting JR-12102 into evidence.

13        (Defendant's Exhibit 12102 received in evidence)

14  BY MS. NECHELES:

15  Q.  That was one of the buildings --

16        MS. NECHELES:  Oh, can we show it to the jury, your

17  Honor?

18        THE COURT:  You may.

19        MS. NECHELES:  Thank you.

20  BY MS. NECHELES:

21  Q.  That was one of the buildings that you told him that you

22  owned, right?

23  A.  I told him that's the second building that I used to own,

24  yes.

25  Q.  Well, you said, I owned 23 Wall/15 Broad, right?

IBTKGRA1                         Rechnitz - Cross

1    A.  Right.

2    Q.  And used to own 25.  So that's the one -- okay.  You used

3    to own 25 Broad Street, right?

4    A.  That's right.

5    Q.  So that's 25 Broad Street?

6    A.  That's right.

7    Q.  That's the one you said you used to own, right?

8    A.  That's right.

9    Q.  And if we could -- you could take a look at what has been

10   marked as JR-12103.  Do you recognize that building?

11   A.  Yes.

12   Q.  What is that?

13   A.  That's an angle of 15 Broad/23 Wall and 35 Wall.

14           MS. NECHELES:  I offer that in evidence, your Honor.

15           MR. BELL:  We have no objection, your Honor.

16           THE COURT:  Thank you.

17           I'm accepting JR-12103.

18           (Defendant's Exhibit JR-12103 received in evidence)

19           THE COURT:  Counsel, I'll ask you to tell me if you

20   have an objection.

21           MR. MERINGOLO:  No objection.

22           THE COURT:  Thank you.

23           Please proceed.

24   BY MS. NECHELES:

25   Q.  That's the building you said you own, right?

IBTKGRA1                      Rechnitz - Cross

1    A.  Yes, the first building 15/23.

2    Q.  A picture of that, in fact, is on your website, correct?

3    A.  Yes.

4    Q.  Under the word portfolio, right?

5    A.  It used to be, yes.

6    Q.  Well, it's not anymore?

7    A.  I don't think so.

8    Q.  Are you sure about that?

9    A.  No.  No, I'm not sure.

10   Q.  You told him you owned that building, right?

11   A.  That's what I said, yes.

12   Q.  I want to show you what has been marked as JR-12104.  See

13   that?

14   A.  I do.

15   Q.  What's that?

16   A.  That's the same property.  That's 15 Broad/23 Wall/35 Wall.

17   It's one building that connects into another.

18           MS. NECHELES:  I offer that in evidence.

19           MR. BELL:  We have no objection, your Honor.

20           THE COURT:  Counsel?

21           MR. MERINGOLO:  No objection.

22           THE COURT:  Thank you.

23           I'm accepting JR-12104 into evidence.

24           You can proceed.

25           (Defendant's Exhibit JR-12104 received in evidence)

IBTKGRA1                    Rechnitz - Cross

1   BY MS. NECHELES:

2   Q.  So that is what you say is one building, the total

3   building, right?

4   A.  Yes.

5   Q.  They're owned by two different owners now?

6   A.  Yes.  It was separated as a condominium.

7   Q.  So when you say it's not two separate buildings, it is two

8   separate owners at this point, right?

9   A.  At this point, there's two separate owners, yes.

10  Q.  And they have two separate addresses, right?

11  A.  They have three separate addresses.

12  Q.  But you said you owned all of that, right?

13  A.  I did.

14  Q.  You testified on direct that at the time you said that,

15  really your employer owned it, right?

16  A.  That's right.

17  Q.  But that's not true, right?

18  A.  No.  What I said was my employer had owned the property,

19  and then I managed it.

20  Q.  You didn't own it when you said this, right?

21  A.  No, I did not.

22  Q.  And your employer didn't own it at that time either, right?

23  A.  My employer had owned it and then sold it, and I got the

24  management contract.

25  Q.  All right.  But that was not what you were telling

IBTKGRA1                        Rechnitz - Cross

1    Mr. Seabrook, right?

2    A.  Right.  I lied to him.

3    Q.  Am I correct that -- at this time Mr. Seabrook --

4         MS. NECHELES:  You can take that down now.  Thank you.

5    Q.  -- Mr. Seabrook was the head of the correction officers

6    union, right?

7    A.  That's right.

8    Q.  Am I correct that when you first met him, you wanted to

9    become friends with him, right?

10   A.  That's right.

11   Q.  And the reason you wanted to become friends with

12   Mr. Seabrook is so that you could have something that --

13   another thing that no one else had access to, right?

14   A.  Right.

15   Q.  And those are your words, right?

16   A.  That's right.

17   Q.  What you said is you wanted access to a thing that no one

18   else wanted to, right?

19   A.  That's right.

20   Q.  It was like you were collecting objects with people, right?

21   A.  I'm not sure I understand --

22   Q.  Well, when you said you wanted --

23   A.  -- those words.

24   Q.  -- access to things, that's like you were collecting

25   something, a thing, right?

1   A.  I'm not sure I know how to answer that.  I was not

2   collecting people, no.

3   Q.  The reason you wanted to be close to him was because it

4   would make you special, that no one else had access to him,

5   right?

6   A.  Yes.

7   Q.  So you didn't care about him, you just wanted to use his

8   status, right?

9   A.  That's right.

10  Q.  Another reason you wanted to be close to Mr. Seabrook was

11  because he was close friends with Phil Banks, right?

12  A.  Right.

13  Q.  Again, you just wanted to use him, right?

14  A.  Yes.

15  Q.  And you pretended to be his friend, right?

16  A.  That's right.

17  Q.  The inner circle was -- you have testified, was Phil Banks,

18  Seabrook, Harrington, Mr. Reichberg, and you, right?

19  A.  That's right.

20  Q.  And they were very close, right?

21  A.  Yes.

22  Q.  So when you were telling Mr. Seabrook that you owned these

23  massive buildings, you expected the inner circle to know that,

24  right?

25  A.  Yes.

IBTKGRA1                    Rechnitz - Cross

1   Q.  And that was the impression that you were trying to create,

2   right?

3   A.  Yes.

4   Q.  And if you owned those buildings, you would be a

5   billionaire, right?

6   A.  I would be a very wealthy man, yes.

7   Q.  You also told the inner circle that you owned a yacht,

8   right?

9   A.  Right.

10  Q.  And that was a total lie, also, right?

11  A.  Yes, I lied.

12  Q.  You offered them an afternoon out on the yacht, right?

13  A.  Several of them, yes.

14  Q.  And you told the company that -- and, in fact, you rented

15  the yacht, right?

16  A.  That's right.

17  Q.  And you told the company that you rented the yacht from

18  that it was very important that there not be any personal

19  photos, items, or anything else that would indicate that the

20  boat was rented, right?

21  A.  Right.

22  Q.  And the staff was to act as if you were the owner and to

23  treat you as the owner, right?

24  A.  That's correct.

25  Q.  And those were your words, right?

IBTKGRA1                    Rechnitz - Cross

1   A.  Yes.

2   Q.  And this was a total charade, right?

3   A.  That's right.

4   Q.  And it was all for the purpose of making the inner circle

5   think you were extremely wealthy, right?

6   A.  Yes, ma'am.

7   Q.  And then you hung out with Mr. Banks, Mr. Seabrook, and

8   Jeremy Reichberg on the yacht, right?

9   A.  That's right.

10  Q.  So I want to show you what has been marked as

11  Exhibit 12204, JR-12204.

12          Do you recognize that picture?

13  A.  Yes, I do.

14  Q.  What is that?

15  A.  This is a picture of the yacht.

16  Q.  And who are the people there?

17  A.  Norman Seabrook, Phil Banks, and I think some other family

18  members of theirs.

19  Q.  Is that you?

20  A.  And me, yes.

21          MS. NECHELES:  I offer that in evidence, your Honor.

22          MR. BELL:  We have no objection, your Honor.

23          THE COURT:  Thank you.

24          Counsel?

25          MR. MERINGOLO:  No objection.

IBTKGRA1                    Rechnitz - Cross

1              THE COURT:  Thank you.

2              I'm accepting JR-12204 in evidence.

3              You can proceed.

4              (Defendant's Exhibit JR-12204 received in evidence)

5              MS. NECHELES:  If we can publish that to the jury,

6    your Honor?

7              THE COURT:  You may.

8    BY MS. NECHELES:

9    Q.  That is a picture of all of you on the yacht, right?

10   A.  Most of us, yes.

11   Q.  And you are lounging around, right?

12   A.  Yes.

13   Q.  And you were acting as if you really wanted to be friends,

14   right?

15   A.  Yes.

16   Q.  Making them believe that you were their close friend,

17   right?

18   A.  With certain ones of them, I was friends, yes.

19   Q.  You spent a lot of time with these men, didn't you?

20   A.  Yes.

21   Q.  Every week, you went to dinner for hours with them, right?

22   A.  Yes.

23   Q.  And you went on trips with them where you spent a lot of

24   time with them, right?

25   A.  Yes.

IBTKGRA1                          Rechnitz - Cross

1    Q.  And you hung out with them like this on a boat, right?

2    A.  Right.

3    Q.  More than one occasion, right?

4    A.  Yes.

5    Q.  And it all looked like you were their friend, right?

6    A.  Yes.

7    Q.  I want to just show you, also, Defense Exhibit JR-12205.

8         Well, withdrawn.  I don't need to show that.

9         You also told Ross Offinger that you owned the hotel

10   that he stayed in, right, and that you were comping him a free

11   room, right?

12   A.  Yes, I lied to him.

13   Q.  He already had a hotel reservation, right?

14   A.  Yes.

15   Q.  At another hotel, right?

16   A.  That's right.

17   Q.  And he canceled that reservation to stay in the room

18   because you said it's free, it's empty anyway, right?

19   A.  I'm not sure why he decided to do what he did, but I

20   offered him to put him up in another hotel.

21   Q.  In one that you said you owned, right?

22   A.  I believe that's what I said, yes.

23   Q.  When you told the government about this at first, you

24   didn't tell them that that's what you had told Mr. Offinger,

25   did you?

IBTKGRA1                    Rechnitz - Cross

1    A.  I don't know at what point I told them that.

2    Q.  Didn't you tell them this during the proffer session, that

3    you had given a free hotel room to Mr. Offinger?

4    A.  Yes, I did.

5    Q.  And this went to the question of whether you had bribed

6    Mr. Offinger, right?

7             MR. BELL:  Objection, your Honor.

8             THE COURT:  Thank you.

9             Can you rephrase?

10   BY MS. NECHELES:

11   Q.  Well, sir, this was during a proffer session where they

12   were asking you about crimes you had committed, right?

13   A.  Yes.

14   Q.  And one of the things you were saying is that you had

15   committed -- you had bribed Mr. Offinger, right?

16   A.  I'm not sure the verbiage I used, but I told them about my

17   conduct, which was putting him up in a hotel for his personal

18   vacation.

19   Q.  Yes.  And you didn't tell them that you lied to him and

20   said it was a free room, right?

21   A.  I told them at some point.  I'm not sure when.

22   Q.  But not at first, right?

23   A.  Again, I'm not sure when I told them it, but I told them.

24   Q.  You also told -- well, you told it to them after they found

25   the email that said that, right?

IBTKGRA1                         Rechnitz - Cross

1   A.  Again --

2           MR. BELL:  Objection, your Honor.

3           THE COURT:  Thank you.

4           You can answer the question.

5           THE WITNESS:  Again, I'm not sure at what point I told

6   certain things to the government.  There's been a lot of

7   misconduct of mine.  So, you know, as it comes to my mind, I've

8   just told them the truth about what I've done.

9   BY MS. NECHELES:

10  Q.  And you told Michael Harrington that you owned a hotel, and

11  that he and his friends -- which he and his friends stayed in

12  in Chicago, and that you were comping him the room, right?

13  A.  Yes.

14  Q.  And you also told Jimmy Grant that you owned the hotel in

15  Rome where he was going to stay, right?

16  A.  I believe that's what I said, yes.

17  Q.  And you knew Mr. Grant also had -- already had a hotel

18  reservation, right?

19  A.  No.  That's false.

20  Q.  You didn't know that?

21  A.  I don't think so.  I know that I was asked by him via

22  Jeremy to pay for his hotel stay, put him up, and he was

23  expecting that.

24  Q.  Is there a text or email about that?

25  A.  I don't know.

IBTKGRA1                    Rechnitz - Cross

1    Q.  In fact, though, you pretended that it was -- you owned it,

2    right?

3    A.  I think that's correct.

4    Q.  Well, you testified to that on direct, right?

5    A.  Yes, I think that's what I said.  I think that's correct.

6    Q.  You said it was a luxurious hotel, right?

7    A.  The most luxurious hotel is, I believe, what I wrote.

8    Q.  You owned the most luxurious hotel in Rome, that's what you

9    were saying, right?

10   A.  Yes.

11   Q.  And, sir, am I also correct that you lied and planted

12   stories in newspapers to look like you were an incredibly

13   successful, lucky, and rich person?

14   A.  I don't think I planted stories to give me an image.

15   Q.  Well, let me withdraw lie.

16        Did you plant stories saying you had won a lot of

17   money at gambling and that you were giving it to charity?

18   A.  Yes.

19   Q.  You planted those stories, right?

20        MR. BELL:  Objection.

21        THE COURT:  Thank you.

22        You can answer the question.

23        THE WITNESS:  Together with an individual, yes.

24   BY MS. NECHELES:

25   Q.  Well, who was that individual?  Tell me.

IBTKGRA1                          Rechnitz - Cross

1    A.   Jeremy.

2    Q.   I see.

3         And the first story that you said that you had won all

4    this money and were giving that money to charity, these were --

5    what you said was you had won big bets when you were gambling,

6    right?  Super Bowl gambling, right?

7    A.   I had said that I had -- if I remember correctly, I had won

8    a bet, and that was the only bet I placed that year.

9    Q.   Right.  You did that twice, right?

10   A.   Actually, I won three times in a row.

11   Q.   Well, let me --

12   A.   Three years in a row.

13   Q.   Let me show you what has been marked as 12602.  And if we

14   could go to the next page, JR-12602, that is a picture of you

15   and the article in TMZ about you winning this money, right?

16   A.   Yes.

17             MS. NECHELES:  I offer that in evidence, your Honor.

18             MR. MERINGOLO:  No objection.

19             MR. BELL:  Your Honor, we object.

20             THE COURT:  Thank you.

21             Overruled.  I accept it into evidence.

22             You can proceed.

23             (Defendants' Exhibit JR-12602 received in evidence)

24             MS. NECHELES:  If we can publish that to the jury,

25   your Honor?

IBTKGRA1                        Rechnitz - Cross

1             THE COURT:  You may.

2    BY MS. NECHELES:

3    Q.  You testified on your direct examination about a safety bet

4    in winning that; am I correct?

5             MS. NECHELES:  Is this jury seeing this?

6             THE WITNESS:  Yes, ma'am.

7    Q.  And that's a picture of you holding a whole bunch of cash,

8    right?

9    A.  Yes.

10   Q.  How did TMZ get that picture?

11   A.  Jeremy took the photo, sent it to me, and I sent it in to

12   TMZ through a friend.

13   Q.  Do you have that, Jeremy sending you that picture?

14            MR. BELL:  Objection.

15            THE COURT:  Thank you.

16            You can answer the question.

17            THE WITNESS:  Pardon?

18   Q.  Do you have that text or email, Jeremy sending you that

19   picture?

20   A.  I think he took it from my phone.

21   Q.  I see.

22            And this was -- if you look on the next page, this is

23   a picture of the ticket, right?

24   A.  That's right.

25   Q.  At the MGM Grand?

IBTKGRA1                        Rechnitz - Cross

1    A.  Yes.

2    Q.  And if you zoom in, it says that was February 5th, 2012,

3    right?

4    A.  Yes.

5    Q.  That was the first time that you won on the safety, right?

6    A.  That's right.

7    Q.  That was not the year that the police went with you to Las

8    Vegas, was it?

9    A.  No.  I went in 2013 --

10   Q.  Right.

11   A.  -- to Vegas.

12   Q.  Okay.  You think that it was in 2013 that you won the

13   second time?

14   A.  I won the second time in 2013, the last core safety, and

15   in -- there were three years in a row.  The Giants, I think it

16   was Baltimore, and then I think it was a Denver game.  I won

17   that three years in a row.

18   Q.  I see.

19            MS. NECHELES:  Let's take that down, if we can.

20            And if we can look at Defense Exhibit 12603.  If we

21   could scroll down a page.  Another page.

22   Q.  That is the second article you planted in TMZ about winning

23   a safety, right?

24   A.  Yes.

25            MS. NECHELES:  I offer that in evidence, your Honor.

IBTKGRA1                      Rechnitz - Cross

1          MR. MERINGOLO:  No objection, Judge.

2          MR. BELL:  Objection; hearsay as to the text, your

3    Honor.

4          THE COURT:  Thank you.

5          Counsel?

6          MS. NECHELES:  Your Honor, I'm offering this for

7    directly contradicting his testimony just now and to show what

8    he was putting out there publicly.

9          THE COURT:  Thank you.

10         Let's talk about this.  I'm not going to accept it

11   right now, but, counsel, you may be able to take up potential

12   redactions.

13         MS. NECHELES:  All right.

14   BY MS. NECHELES:

15   Q.  Sir, if you take a look at that, does that refresh your

16   recollection that you told TMZ that this was the second time

17   that you had won this?

18   A.  I recall telling TMZ I won two years, yes.

19   Q.  In other words, you told TMZ that you had won in 2012, and

20   now in 2014, this was the second time that you had won it,

21   right?

22         MR. BELL:  Objection; hearsay as to the text, your

23   Honor.

24         THE COURT:  Thank you.

25         Counsel, can you rephrase the question?

IBTKGRA1                        Rechnitz - Cross

1    BY MS. NECHELES:

2    Q.  Well, do you recall that?

3    A.  Do I recall what?

4    Q.  That that's what you said at the time?

5    A.  I recall making a public statement that I only won twice,

6    even though I won three times.

7    Q.  And you were making a big deal about the fact -- look how

8    lucky I am -- right?

9    A.  Yes.

10   Q.  And you were saying, like, look at this, lightning struck

11   twice, I'm such a lucky guy and such a successful guy, right?

12   A.  I put it out there to show that I was giving it to charity

13   and that I won.

14   Q.  And you had another picture of you holding cash, right?

15   A.  Yes.

16   Q.  Sir, it was important for you that the whole world know

17   that you're giving it to charity, right?

18   A.  Yes.

19   Q.  Because you wanted to look like a big macher, right?

20   A.  It was more because gambling is frowned upon, so I didn't

21   want the image of a gambler because I knew that I had been

22   gambling a lot.

23   Q.  Sir, you went to Las Vegas all the time, right?

24   A.  Yes.

25   Q.  You sent millions of dollars in cash in Las Vegas, so that

1    you would look like a big macher, right?

2    A.   No.

3    Q.   You didn't send lots of money to Las Vegas?

4    A.   I think you asked did I send millions of dollars.  My

5    answer is no.

6    Q.   How much did you send?

7    A.   I would say maybe hundreds of thousands or north of a

8    million, but not millions.

9    Q.   Well, we'll get back to that.

10           You're saying, with all that going to Las Vegas, you

11   didn't want people to know you were a gambler?

12   A.   That's right.

13   Q.   So why did you plant two articles about this in the

14   newspapers?

15   A.   Because there were so many witnesses around that I won the

16   bet, my friends from L.A., I knew it would get out, so I wanted

17   to control the message.

18   Q.   Well, there are so many witnesses who saw you going

19   gambling every year, right?

20   A.   No.  It was just typically Jeremy and one other guy, Marco.

21   Q.   And am I correct that that's the only people who were

22   there?  Is that what you said?

23   A.   No.  I think what you asked me was on my other gambling

24   trips, who attended with me, so I said, for the most part, I

25   believe it was just Jeremy and Marco.  So there were not so

1   many witnesses around.

2   Q.  I see.

3         Am I correct that in one of the articles that was

4   published about this, you said that it was an annual tradition

5   that you would go and gamble with your friends in the Super

6   Bowl?

7   A.  Yes.

8   Q.  And you said it was an annual tradition that whoever won

9   would then get -- won the bets would then pay for gifts for

10  everybody else?

11  A.  Yes.

12  Q.  So when you're saying now that you didn't want people to

13  know that you gambled a lot, you told the press at the time

14  that it was an annual tradition that you went and gambled?

15  A.  That's correct.  Once a year is not a lot.

16  Q.  But you wanted people to know you did this, right?  You

17  weren't ashamed of gambling?

18  A.  I was ashamed of gambling.  I was not ashamed of going to

19  watch the Super Bowl and place bets on it.

20  Q.  When you said that -- withdrawn.

21         (Continued on next page)

22

23

24

25

IBTTGRA2                    Rechnitz - Cross

BY MS. NECHELES:

Q.  I show you what has been marked as JR4004.

     That's an email from you to Liz McKearnan at TMZ?

A.  Yes.

Q.  And attached is a photo.  You sent the photo?

A.  Yes.

     MS. NECHELES:  Your Honor, I offer that in evidence.

     MR. MERINGOLO:  No objection.

     MR. BELL:  No objection from the government, your
Honor.

     THE COURT:  Thank you.  I'm accepting JR4004.

     (Defendant's Exhibit JR4004 received in evidence)

     THE COURT:  You can proceed.

     MS. NECHELES:  If you publish the first page.

Q.  And this is the email that is -- JR4004 is the email from
you to the TMZ person, Liz McKearnan, and it attaches a photo
and it's dated Monday, February 3rd, 2014, right?

A.  Yes, ma'am.

Q.  And that's the day after the Superbowl?

A.  I believe so, yes.

Q.  And am I correct the Superbowl is almost always early
February?

A.  That's right.

Q.  And if we look at the next page.  That's the photo you
sent, right?

```
 1    A.   Yes.
 2    Q.   Are you going to say that Jeremy took it again?
 3              MR. BELL:  Objection.
 4              THE COURT:  Thank you.  Sustained.
 5    Q.   Well, did Mr. Reichberg take that?
 6    A.   No.
 7    Q.   And so even without his help, you sent this to TMZ, right?
 8    A.   That's right.
 9    Q.   And the email comes directly from you, right?
10    A.   Yes.
11    Q.   And you are posing for this picture, right?
12    A.   Yes.
13              MS. NECHELES:  And we can take that down.
14    Q.   You told all these stories about the things you supposedly
15    owned and the money you gave to charity to create an aura of
16    being an incredibly rich and successful person, right?
17    A.   Yes.
18    Q.   This was not the only story you had out there about giving
19    money to charity, right?
20    A.   Right.
21    Q.   You also caused another article to be published how you won
22    a bet with Stuart Barr and all that money was going to charity,
23    right?
24    A.   Right.
25    Q.   And that was supposedly at a Knicks game, right?
```

IBTTGRA2                          Rechnitz - Cross

1   A.  Yes.

2   Q.  Was that is true?

3   A.  Yes.

4   Q.  And you also would make very public donations of money a

5   lot to charity, right?

6   A.  Yes.

7   Q.  And you did that all so that you would be thought of as a

8   rich person to lots of people, right?

9   A.  That was one of my main motives.  I also give charity

10  because I believe in giving charity.

11  Q.  And that's part of the Jewish religion is that idea, right?

12  A.  Yes.

13  Q.  But it's part of the Jewish religion also is it should be

14  done privately, right?

15  A.  Actually no.

16  Q.  No?

17  A.  The Jewish religion has many different ways in which you

18  could give charity and many laws.

19  Q.  And you were asked on your direct examination whether

20  during this time period you had friends who were not high level

21  cops?

22  A.  Yes.

23  Q.  And you were asked whether some of these friends were

24  closer than Mr. Reichberg and the other inner circle who you

25  were bringing up to all these places and taking for meals.  Do

1    you recall those questions?

2    A.  Yes.

3    Q.  And you said yes, some of them were closer, right?

4    A.  Yes.

5    Q.  And you were asked:  Did you give your friends the same

6    kind of gifts that you gave police officers?

7            Do you recall those questions?

8    A.  Yes, I do.

9    Q.  And you said no, I did not give my friends those kinds of

10   gifts, right?

11   A.  Right.

12   Q.  So I want to take a look at the types of things you gave

13   police officers and the types of things you gave other people

14   during this time period, okay?

15   A.  Okay.

16   Q.  So you testified that you knew police officers on private

17   jets, right?

18   A.  That's right.

19   Q.  But you took other people on private jets also, right?

20   A.  That's right.

21   Q.  And so for example you took -- you often took Jeremy

22   Reichberg on private jets, right?

23   A.  Right.

24   Q.  And often there were no police officers there, right?

25   A.  Right.

IBTTGRA2                       Rechnitz - Cross

1   Q.  And Jeremy Reichberg was not a police officer, right?

2   A.  That's right.

3   Q.  He was someone who was your friend, right?

4   A.  That's right.

5   Q.  And you also took Marco Franco on private jets, right?

6   A.  That's right.

7   Q.  And Marco Franco was not a police officer, right?

8   A.  That's right.

9   Q.  He was your friend, right?

10  A.  Yes.

11  Q.  And you took Ari Schwebel often on private jets, right?

12  A.  Right.

13  Q.  And he was not a police officer, right?

14  A.  That's right.

15  Q.  He was someone who you were friends with?

16  A.  Yes.

17  Q.  And you also -- and you took many other people also, right?

18  A.  Yes.

19  Q.  And that's because if you were flying a private jet

20  somewhere, it had room for eight people, right?

21  A.  That's right.

22  Q.  It didn't cost you any more money to put another person on

23  that plane, right?

24  A.  Right.

25  Q.  So if you were going somewhere, anywhere, you might as well

IBTTGRA2                         Rechnitz - Cross

1   invite other people on the plane, right?

2   A.  No, that's not my thought process.  I was very calculating

3   on who went, I took.

4   Q.  And part of your calculation was you would take your

5   friends along, right?

6   A.  Yes.

7   Q.  And on the Las Vegas trip that you testified about you were

8   taking Marco Franco along, right?

9   A.  That's right.

10  Q.  Your friend, right?

11  A.  Yes.

12  Q.  And the people on that flight saw that, right?

13  A.  Yes.

14  Q.  And Mr. Reichberg saw you often taking friends along,

15  right?

16  A.  Yes.

17  Q.  And you also testified that sometimes you paid for police

18  officers to fly on public airplanes, right?

19  A.  Yes.

20  Q.  And you also paid for a lot of other people to fly on

21  public airplanes, right?

22  A.  That's right.

23  Q.  And for example, if we take a look at JR12804, if we look

24  at the front of that, do you recognize that to be a copy of

25  your credit card statement?

1    A.  This is it.

2              MS. NECHELES:  I offer that in evidence, your Honor.

3              MR. BELL:  Your Honor, we object to the inclusion of

4    the entire document.  We do not object to the relevant

5    portions, maybe the subject of some sort of the subsequent

6    redaction later on, but otherwise we do object to the

7    admission.

8              THE COURT:  Thank you, counsel.  We'll work on

9    redactions subsequently?

10             MS. NECHELES:  Yes, your Honor.

11             MR. BELL:  We do not know what the relevant portion

12   is.  Could we clarify on the record?

13             THE COURT:  We'll take that up at sidebar.  Please

14   proceed.

15   BY MS. NECHELES:

16   Q.  Directing your attention to page 17 --

17   A.  Yes.

18   Q.  -- do you recognize these as charges for Zachary Katz and

19   Jamie Gellman for tickets?

20   A.  Yes.

21   Q.  Who are they?

22   A.  Friends of mine.

23             MS. NECHELES:  I offer that page in evidence, your

24   Honor.

25             MR. MERINGOLO:  No objection.

1           MR. BELL:  Your Honor, those highlighted portions of

2    the page the government has no objection to.  Thank you.

3           MS. NECHELES:  And the one right below as well, your

4    Honor, I offer the page in evidence, your Honor.

5           THE COURT:  Thank you.

6           Counsel, any concerns?

7           MR. BELL:  We object to the page as a whole.

8           MS. NECHELES:  I will go through further parts of the

9    page, your Honor, I think it's all relevant.

10          THE COURT:  Thank you.  Let's take this up separately.

11   I don't think I'll have an issue admitting portions.

12          MS. NECHELES:  Could I ask the other parts and show

13   the jury to show it's relevant?

14          THE COURT:  Thank you, you can show the portions that

15   have been highlighted.

16          MS. NECHELES:  Your Honor, there are further parts I

17   would ask about.

18          THE COURT:  That's fine.

19   BY MS. NECHELES:

20   Q.  Sir, further down, there's a charge to the Mondrian Hotel,

21   is that correct?

22   A.  Yes.

23   Q.  That was for -- there's two charges, right?

24   A.  I see those charges, yes.

25   Q.  And that was for the stay for those people and yourself in

IBTTGRA2                    Rechnitz - Cross

 1   California?

 2   A.   I don't think so.  I think the flights are from Los Angeles

 3   to Vegas, but the hotel stay is in Los Angeles, so I don't

 4   think I could be in both places at once.

 5   Q.   Could be correct.

 6   A.   Pardon?

 7   Q.   You could be correct.

 8         And on 819, you had a charge -- okay, withdrawn.

 9         MS. NECHELES:  So if we could just show the top part,

10   your Honor?

11         THE COURT:  Thank you, the first three entries you

12   may, and I will accept that page subject to redaction of the

13   remainder of the page.

14         MR. BELL:  Thank you, your Honor.

15         MS. NECHELES:  Your Honor, we'll show it later.

16   BY MS. NECHELES:

17   Q.   Now you could see it.

18         Those are the charges you were talking about, those

19   highlighted portions?

20   A.   Yes, ma'am.

21   Q.   And you bought tickets for your friends to fly to Las

22   Vegas, right?

23   A.   That's right.

24   Q.   And because you were their friend, right?

25   A.   That's right.

IBTTGRA2                    Rechnitz - Cross

1    Q.  That was the kind of thing that you used to do, right?

2    A.  This is something that I did for my friends, yes.

3           MS. NECHELES:  And if we could turn to the next page

4    just for the witness for a minute.

5           Withdrawn, your Honor.

6           If I could turn to page 14 of that document to show

7    the witness.

8    Q.  And if you look, directing your attention to the middle,

9    it's another flight for Ari Schwebel, am I correct?

10   A.  That's correct.

11          MS. NECHELES:  And I offer that in evidence, your

12   Honor.

13          MR. BELL:  Your Honor, same objection as before.

14          THE COURT:  Thank you.

15          MR. BELL:  And limited in the same way as before.

16          THE COURT:  Thank you, counsel, I'm happy to accept

17   the entry.

18   BY MS. NECHELES:

19   Q.  Sir, am I correct that that was a flight to -- from

20   Atlanta, and that on the same date you had charges --

21          No, withdrawn.

22          MS. NECHELES:  We'll put that in evidence.

23          THE COURT:  Thank you.  I'm accepting into evidence

24   what I will describe as 12084A, which is that page, subject to

25   the redactions that we just discussed.

IBTTGRA2                    Rechnitz - Cross

```
 1              (Defendant's Exhibit 12084A received in evidence)
 2              THE WITNESS:  Sorry, was there a question I didn't
 3    answer?
 4              MS. NECHELES:  No.
 5              THE WITNESS:  Okay.
 6              MS. NECHELES:  If I could publish that to the jury,
 7    your Honor?
 8              THE COURT:  You may.
 9    BY MS. NECHELES:
10    Q.  And that is another time that you're flying Ari Schwebel to
11    Atlanta, right?
12    A.  No, I think Delta Airlines does a charge, it's at Atlanta,
13    and Ari was a work associate of mine, so he attended business
14    trips with me and I paid for his flights.
15    Q.  I see.  Now he's a work associate, right?
16              MR. BELL:  Objection, your Honor.
17              THE COURT:  Thank you.  Sustained.
18    Q.  Well, what --
19    A.  He's the vice president of --
20              THE COURT:  Sorry, that was sustained.  You need not
21    respond.
22    Q.  When you went to Vegas and gambled with him, was that
23    because he was a work associate?
24              MR. BELL:  Objection.
25              THE COURT:  Thank you.  You can answer the question.
```

IBTTGRA2                        Rechnitz - Cross

1    A.  It depends why we went.  We used to go every May for a real

2    estate conference called the ICSC, and I would bring him along

3    so we could work, and at night I would gamble.  I brought him

4    along several times to the Superbowl, like as a little bonus

5    for working so hard for the year, and because we were friends.

6    If I had to do go other times for business, I would bring him

7    along as well, but I paid for his travel at all times because

8    he worked for me.

9    Q.  But previously you said he was a friend and you paid for

10   his travel on pleasure trips, right?

11   A.  When you asked if he was my friend and I paid for his

12   travel, my answer was yes.

13   Q.  I want to move on.  You testified that you took police

14   officers out to dinner and to a fancy cigar bar often, right?

15   A.  Yes.

16   Q.  And that cigar bar was called the Grand Havana Club, right?

17   A.  Yes.

18   Q.  It was a very exclusive, fancy place, right?

19   A.  That's right.

20   Q.  Exclusive membership, right?

21   A.  Yes.

22   Q.  Limited to very wealthy people, right?

23   A.  I don't know people's net worth.  I know that there is a

24   membership that's required to enter.  I don't know how people

25   get approved.  They don't go through our financials, but --

IBTTGRA2                    Rechnitz - Cross

Q. You have to apply, right?

A. Yes.

Q. And you have to be sponsored to be in it?

A. Yes, you have to be recommended by a current member.

Q. And lots of celebrities go there?

A. I believe so, yes.

Q. And you wanted to be a member because there was a certain prestige to be a member and go hang out and smoke cigars there, right?

A. Yes.

Q. Sort of a men's club, right?

A. It wasn't a men's club, everybody was welcome, men, women, all sexes.

Q. But you only went there with men, right?

A. No, that's not correct.

Q. But it cost thousands of dollars to join, right?

A. I think it costs well into $2,000, membership to join, initiation fee.

Q. And every year you also have to pay thousands of dollars to be a member?

A. That's right.  There's a minimal fee.

Q. And you spent thousands of dollars on cigars and meals for friends and people other than the police officers, right?

A. I don't think I spent thousands of dollars on other people. No, that's not correct.

IBTTGRA2                         Rechnitz - Cross

1   Q.  Can we take a look at JR12804, which is the same thing we

2   have been looking at.  And I direct your attention now to page

3   14 of that, and I direct your attention to the middle, to the

4   charge on 5/17/15.

5           Do you see that?  It's a charge for the restaurant on

6   the bottom, correct?

7   A.  Where is that?

8   Q.  Bottom.

9   A.  Yes.

10  Q.  And it's close to $6,000, right?

11  A.  That's right.

12  Q.  That's for a time when you were no longer hanging out with

13  police officers, right?

14  A.  That's right.

15          MS. NECHELES:  I offer that, your Honor.

16          MR. BELL:  Your Honor, we would object for

17  foundational reasons.  I think a bit more has to be done there.

18          THE COURT:  Counsel, could you please inquire.

19  Q.  Is that for friends you were paying for?

20  A.  No, that was a work event.  That was for the ICSC

21  conference in Las Vegas, which is a real estate/shopping center

22  trip.  I was there for the conference, for work.

23  Q.  That was for -- who were you taking out for work?

24  A.  I'm just looking at the date, so it refreshes my memory

25  that's when the conference was.  I don't remember the exact

1    group of people.

2    Q.  But it was people that you were trying to impress, right?

3    A.  Yes.

4    Q.  And people who you were being friendly with, right?

5    A.  Again, I don't remember who I took, but I know myself and

6    going and treating people at the conference was important to me

7    to give the image in business that I was strong and powerful.

8    Q.  And you would be friendly with these people and take them

9    out for big fancy meals, right?

10   A.  Again, I can't answer.  I don't remember the specific meal

11   or who I took to the meal.  I just don't remember who the crowd

12   was.

13          MS. NECHELES:  I offer that in evidence, your Honor.

14          MR. MERINGOLO:  No objection.

15          MR. BELL:  Your Honor, we object on relevance and

16   foundation grounds related to the earlier articulated

17   arguments.

18          THE COURT:  Thank you.  I will accept it subject to

19   redactions as JR12084B, the single page with all else redacted.

20          You can proceed.

21          (Defendant's Exhibit JR12084B received in evidence)

22          MS. NECHELES:  Could I show that to the jury?

23          THE COURT:  You may.

24   BY MS. NECHELES:

25   Q.  And that's clearly not for police officers, that entry,

1    correct?

2    A.   Right, this was work associates.

3    Q.   It was a $6,000 meal that you were paying for, right?

4    A.   Again, I'm not sure exactly if it was a meal or if it was a

5    night out or if it was a work event.

6    Q.   And that was the kind of thing that you would pay for,

7    right?

8    A.   Yes.

9    Q.   And you would frequently pay for big events in Las Vegas or

10   elsewhere for expensive items, for nights out, right?

11   A.   Sorry, I can't hear you without the microphone.

12   Q.   I apologize.  You would frequently pay for expensive nights

13   out in Vegas or other places, right?

14   A.   Yes.

15   Q.   And that was to make a big impression, right?

16   A.   Again, there was different reasons each time.  I can't make

17   a generalization.

18   Q.   I want to direct your attention to page 16 and to the

19   middle entry, Grand Havana Room, Beverly Hills.

20          Do you see that?

21   A.   Yes.

22   Q.   And there was another -- the cigar club also had a place in

23   California, right?

24   A.   Yes.

25   Q.   And that was not for a price that you were paying to take

1    police officers there, right?

2    A.  I believe it was a contribution or donation, it says.

3    Q.  Well, that wasn't what they would bill you, your annual

4    cost, right, membership, right?

5    A.  I'm not sure.  I have been there for charity events, it may

6    have been a charity donation.

7    Q.  So you think it was a charity donation?

8    A.  I'm not saying I think, I'm saying maybe.  It may have been

9    a membership fee, it may have been a donation.

10   Q.  But sir, am I correct that you would go to Grand Havana

11   Room in Beverly Hills?

12           Let's look at the next page.

13   A.  Yes, you're correct.  The membership is for all clubs, New

14   York and Beverly Hills.

15   Q.  I direct your attention to the next page, the entry there

16   for the Grand Havana.  That's also for California, right?

17   A.  Yes.

18   Q.  And that was not for police, right?

19   A.  I don't think so.  I think the date was after I was

20   involved with cops.  It may have been my membership, it may

21   have been a donation or contribution is what its listed as.

22   Q.  But you spent another $1,200 there, right?

23   A.  Again, I don't know what the charge was.  It says

24   contribution donation, I'm going to guess it was a donation for

25   an event that I was at.

IBTTGRA2                          Rechnitz - Cross

1    Q.  For $1,200, right?

2    A.  That's right.

3    Q.  And $1,200 is the kind of donation you would give normally?

4    A.  It depends for what.  I can't generalize.  I have different

5    donations from $50 all the way to $100,000, depending on the

6    cause or the passion we have for the cause.

7    Q.  And just looking back, the other one was 9/1/15, and that

8    was for $3,900, right?

9    A.  That's right.

10   Q.  And also for Beverly Hills, California, right?

11   A.  That's right.

12   Q.  And that was after you were no longer hanging out with

13   cops, is right?

14   A.  That's right.

15   Q.  And that was the cigar bar again, right?

16   A.  Yes.

17   Q.  And you testified, sir --

18          MS. NECHELES:  We can take that down.

19   Q.  -- that you took police officers to Las Vegas, right?

20   A.  Yes.

21   Q.  And that you stayed there in a lavish hotel suite and got

22   incredible service from the hotel, right?

23   A.  Yes.

24   Q.  And you were being comped for all that, right?

25   A.  I believe so.

1    Q.  And that was because you had spent so much money there,

2    right?

3    A.  Yes, I had wired them before the trip, I think it was

4    $100,000.

5    Q.  And you routinely wired them large sums of money, right?

6    A.  That's right.

7    Q.  Then you gambled there, right?

8    A.  That's right.

9    Q.  And I show you what has been marked as JR4104, which the

10   government has stipulated are records of --

11          MS. NECHELES:  And if I could read the stipulation,

12   your Honor?

13          THE COURT:  Thank you.  What is the stipulation

14   number, counsel?

15          MS. NECHELES:  I'm sorry, your Honor, I'll need to

16   pull that up.

17          THE COURT:  That's fine.

18          MS. NECHELES:  Stipulation number 1716, and your

19   Honor, if I could read at that.

20          THE COURT:  Please do.

21          MS. NECHELES:  It is hereby stipulated and agreed by

22   and between the United States of America, by Geoffrey Berman,

23   United States Attorney for the Southern District of New York,

24   Martin Bell, Jessica Lonergan, Kimberly Ravener, Assistant

25   United States Attorneys, Jeremy Reichberg, by his attorney,

Susan Necheles, James Grant, by his attorneys John Meringolo
and Anjelica Cappellino, Esq., if called as a witness a
representative from MGM Grand Hotel LLC would testify as
follows:

        Documents marked with a control number within the
range Reichberg 16446 through Reichberg 18082 contain true and
correct copies of records kept by MGM Grand Hotel LLC, the
originals of which made at or near the time of the act, event
or condition recorded by or from information transmitted by a
person with knowledge that were kept in the regular course of
regularly conducted activity of MGM Grand Hotel LLC, it having
been the regular practice of MGM Grand Hotel LLC to make such
exhibits.  And Government Exhibits 928, 929 and 930 are true
and correct copies of certain documents marked with control
numbers set forth in paragraph 1A above.

        It is further stipulated and agreed that the documents
marked with control numbers set forth in paragraph 1 above
consists of the records that constitute business records
pursuant to rule 803.6 of the Federal Rules of Evidence, that
is signed by Jessica Lonergan, Susan Necheles and Anjelica
Cappellino as well.

        And your Honor, I would offer in evidence JR4104,
which are certain records from within those Bates stamped
numbers.

        MR. BELL:  Your Honor, may we confer briefly with

1    Ms. Necheles?

2              THE COURT:  Yes, you may.

3              And you are also offering, Ms. Necheles, Exhibit 1716,

4    the stipulation itself?

5              MS. NECHELES:  Yes, your Honor, thank you.

6              (Pause)

7              MR. BELL:  Thank you, your Honor.  With respect to the

8    stipulation, the government has no objection.  With respect to

9    the remaining documents, we would, with the Court's permission,

10   maintain our ability to seek appropriate redactions later on,

11   but otherwise, not object, in the same way that we have handled

12   the previous documents.  Thank you.

13             That may be sufficient, your Honor, but I did want to

14   note that.

15             MS. NECHELES:  Your Honor, for now I'm just going to

16   show him pages one and two, which I think are relevant.

17             THE COURT:  Any concerns with respect to those,

18   counsel for the United States?

19             MR. BELL:  Your Honor, no objection to the bottom half

20   of page 1, the entirety of page 2.  We understand from

21   Ms. Necheles that there will be an appropriate redaction done

22   as to the top part of the first page.

23             THE COURT:  Okay, proceed.

24             MS. NECHELES:  If I could show that to the witness and

25   the jury, your Honor.

IBTTGRA2                         Rechnitz - Cross

1          THE COURT:  I'm accepting into evidence Exhibit 1716

2     and Exhibit JR4104, subject to appropriate reactions, including

3     the one to page 1 that we just discussed.

4          Please proceed.

5          (Defendant's Exhibits 1716 and Exhibit JR4104 received

6     in evidence)

7     BY MS. NECHELES:

8     Q.  And this is an MGM -- by the stipulation, an MGM record,

9     and you see at the top it says "comps," right?

10    A.  It says comps, yes.

11    Q.  That's your name there, Jona Rechnitz, M., right?

12    A.  Yes.

13    Q.  And listed below are a bunch of comps for the dates

14    February 2nd, February 3rd and February 4th, right?

15    A.  That's what it appears to be.

16    Q.  And sir, well, you heard this is a business record from the

17    casino, right?

18    A.  Yes, I just have never seen the document before.  Trying to

19    look at it quickly.

20    Q.  And the first entry is for Skyloft room services, right?

21    A.  Skyloft room service tax is the first one that I'm looking

22    at.

23    Q.  And it lists a whole bunch of entries going down, right,

24    including rooms, right, some of them are voided, correct, if

25    you look in the one, two, three, fourth column, right?

1   A.  I'm not sure I follow.

2   Q.  Okay.  The one I referred to at first, it's the first

3   entry, if you go to the one, two, three, fourth column, it

4   actually says voided, right?

5   A.  Which charge?  Room, Skyloft room service tax?

6   Q.  Yes, says voided.

7   A.  Yes, I see voided.

8   Q.  But if you go down to -- go down that fourth column, some

9   say "system redeemed," right?

10  A.  Yes, I see that.

11  Q.  And you have an MGM room that says system redeemed, right?

12  A.  Yes.

13  Q.  Then you have further down you have other MGM rooms and

14  Skyloft room services where they say system redeemed, right?

15  A.  Yes.

16  Q.  And you have a number of room service charges, right?

17  A.  Yes.

18  Q.  And you have sports bar food, correct?

19  A.  I see that.

20  Q.  And you see also the promo chip --

21  A.  Incentive, promo chip incentive, yes.

22  Q.  If we go to the next page, everything on that page is

23  charges for that time period, for February 4th, 2013, right?

24  A.  Yes.

25  Q.  And includes spa service, right?

IBTTGRA2                     Rechnitz - Cross

1   A.  Yes, all charges.

2   Q.  And cafe, food in the cafe, right?

3   A.  Yes.

4   Q.  And everything -- and some of them are voided, correct?

5   A.  Some say voided, some say system redeemed, yes.

6   Q.  And they're all comped, right?

7   A.  Again, I don't know.

8   Q.  Okay.  Well, that's what it says.

9   A.  I do recall asking them to comp all my guests on that trip.

10  Q.  For everything?

11  A.  Jeremy, Jimmy, everyone for any food they ate, anything

12  they ordered, any messages they got should be comped.

13  Q.  Everything you did was comped, right?

14          And you bragged about that, right?

15  A.  It appears everything is comped, yes.

16  Q.  I asked if you bragged about it to the people on that trip.

17  A.  I don't remember, but it's very possible.

18  Q.  Because you wanted them to know what a big macher you were,

19  right?

20  A.  That's correct.

21  Q.  In fact, MGM Grand sent a car to pick you up from your

22  private jet?

23  A.  Yes.

24  Q.  You looked like a really big deal, right?

25  A.  Yes, ma'am.

IBTTGRA2                        Rechnitz - Cross

1   Q.  And that's exactly the impression you wanted to create,

2   right?

3   A.  That's right.

4   Q.  And you told them that you were getting comped because you

5   were such a big gambler, right?

6   A.  I don't remember the reason, but that is something that I

7   would say.

8   Q.  Because you were weren't so embarrassed about gambling at

9   that point, right?

10  A.  Not to them.

11  Q.  And you testified --

12           MS. NECHELES:  We can take that down.

13  Q.  You testified also that you sometimes gave tickets to

14  sporting events to police officers, right?

15  A.  That's right.

16  Q.  And in fact, though, you spent tens of thousands of dollars

17  on tickets that you took -- and for events that you took

18  friends and business acquaintances to, right?

19  A.  Yes.

20  Q.  And for example, you had floor seats to basketball games,

21  right?

22  A.  That's right.

23  Q.  And those were extremely prestigious, right?

24  A.  Yes.

25  Q.  And extremely expensive, right?

1   A.  Right.

2   Q.  And I just want to look at a few of those pictures of

3   those.  There is photos of all of them, right?

4           MR. BELL:  Objection, your Honor.

5           THE COURT:  Thank you.  You can answer the question.

6   A.  I'm not sure I understand.  There's photos of every Knicks

7   game.

8   Q.  And photos that are taken of your seats at every Knicks

9   game, right?

10          MR. BELL:  Objection, your Honor.

11          THE COURT:  Thank you.  You can answer the question if

12  you know the answer.

13  A.  I don't know if there is photos at every single Knicks game

14  I have been to.

15  Q.  Didn't you testify previously that there's an app -- or did

16  you tell the government there's an app which will provide a

17  photo of every game of who was there in your seats?

18  A.  I told the government that Getty Images takes photos of

19  each game, and it's possible they can see who was in my seat at

20  each game.

21  Q.  And in fact, it is possible -- you have seen the pictures

22  before, right?

23          MR. BELL:  Objection, your Honor.

24          THE COURT:  You can answer the question if you know.

25  A.  Not for every game.  I think you're asking me about every

IBTTGRA2                    Rechnitz - Cross

1  game.

2  Q.  Withdrawn every game.

3      There are photos of these, right?

4  A.  Yes.

5  Q.  And I want to direct your attention to some of them.  I

6  want to show you JR4050.  Is that a picture from a game?

7  A.  Yes, it is.

8  Q.  And that's you?

9  A.  That's me.

10 Q.  Who are you with?

11 A.  Shy Stern, and I'm giving five to Tyson Chandler.

12         MS. NECHELES:  I offer that in evidence, your Honor.

13         MR. MERINGOLO:  No objection.

14         MR. BELL:  No objection, your Honor.

15         THE COURT:  Thank you.  I'm accepting Exhibit JR4050

16 into evidence.

17         (Defendant's Exhibit JR4050 received in evidence)

18         MS. NECHELES:  And we could publish that to the jury?

19         THE COURT:  You may.

20 Q.  And sir, who was that you said you were with, your friend?

21 A.  A fellow named Shy Stern.

22 Q.  Who is he?

23 A.  Friend from Los Angeles who I had done some business with.

24 Q.  And that game and those tickets cost you thousands of

25 dollars, right?

IBTTGRA2                    Rechnitz – Cross

1  A.  $6,800.

2  Q.  $6,800 to take your friend there, right?

3  A.  That's right.

4  Q.  And if I could now take that down and I direct your

5  attention to JR4053, do you recognize that picture?

6  A.  I do.

7  Q.  What do you recognize it as?

8  A.  I'm with my wife at the game.

9  Q.  And you had four tickets, right?

10 A.  Pardon me?

11 Q.  You had four tickets?

12 A.  No, that's me and my wife, no.

13 Q.  But did you have four seat tickets?

14 A.  No, I had seats 9 and 10, 12AA, two seats.

15          MS. NECHELES:  I offer that in evidence.

16          MR. MERINGOLO:  No objection.

17          MR. BELL:  No objection.

18          THE COURT:  Thank you.  I'm accepting JR4053.

19          (Defendant's Exhibit JR4053 received in evidence)

20          MS. NECHELES:  If we could publish that to the jury.

21 Q.  That shows where your seats were, right?

22 A.  That's where my seats were that night.  I can count, if you

23 like.

24 Q.  Well, those are the seats that you had on the floor, right?

25 A.  Let me just count one second, because I swapped a lot.

```
1            No, I think I had the seats to the left of me and I
2   switched with them that evening.
3   Q.  The seats were right next to those?
4   A.  Yes.
5   Q.  And you could go to as many games as you wanted, right?
6   A.  I had tickets for half the season.
7   Q.  For half the season, the other half Jason Nissen had?
8   A.  Yes.
9   Q.  And you often gave those seats away, right?
10  A.  Which seats?
11  Q.  Your tickets, if you couldn't go you gave them to other
12  people?
13  A.  Or I sold them.  It depended what my motive was for the
14  tickets for a specific game.
15  Q.  But you would give them to people that you wanted to
16  impress, right?
17  A.  All different types of things.  I would either sell them or
18  give them to people I had done business with, or if there was a
19  special occasion for friends.  It was a substantial gift to
20  make an impression.
21  Q.  You would give them to friends, right?
22  A.  No, I would go with friends unless there was a specific
23  reason.  I can't think of any incident.
24  Q.  Well, if it were Shabbat and you had not sold them yet, you
25  would give them away?
```

IBTTGRA2                      Rechnitz - Cross

1   A.  Yes, or I would sell them, yes.

2   Q.  Or Friday afternoon --

3   A.  Right.

4   Q.  -- you would give tickets away that you hadn't sold?

5   A.  I would either sell them or give it to somebody for

6   business.

7   Q.  Just to be clear, Shabbat starts Friday evening, right?

8   A.  Right.

9   Q.  So by Friday evening -- on Friday evening you would be not

10  going out to an event, right?

11  A.  I would not go to a game on Friday evening.

12  Q.  You would go maybe to Shabbat dinner somewhere or some

13  synagogue, but you would not be going out to a party or a

14  restaurant or an event like this, correct?

15  A.  I would not be going to a basketball game on Friday night.

16  Q.  Or any sort of sporting event, right?

17  A.  I would not be on a sporting event on a Friday night.

18  Q.  So if you had tickets for a sporting event that was

19  happening on a Friday night and you hadn't sold them by the

20  afternoon, you would give them away, right?

21  A.  Or earlier, depending on.

22  Q.  And I want to show one final picture from this, and that

23  would be picture 460 -- I'm sorry, 4059.

24          Do you recognize that picture?

25  A.  I do.

IBTTGRA2                     Rechnitz - Cross

1    Q.  Who is that?

2    A.  I'm sitting there with the vice president of my company,

3    Ari Schwebel.

4              MS. NECHELES:  I offer that in evidence.

5              MR. MERINGOLO:  No objection.

6              MR. BELL:  No objection, Judge.

7              THE COURT:  Thank you.  I'm accepting 4059.  You can

8    proceed.

9              (Defendant's Exhibit 4059 received in evidence)

10             MS. NECHELES:  If we could publish that to the jury.

11             THE COURT:  You may.

12   BY MS. NECHELES:

13   Q.  And this is not a business event, right?

14   A.  It is.

15   Q.  This is a business event, going to the game?

16   A.  Yes.

17   Q.  Why?

18   A.  I would take Ari out when I figured he was working too hard

19   and it was nice to take him for a night out.  It was business

20   and friendship mixed together.

21   Q.  So it's your testimony that going to the Knicks and sitting

22   on the floor is a business event, right?

23             MR. BELL:  Objection, your Honor.

24             THE COURT:  Thank you.  You can answer the question.

25   A.  Like I said, it's mixed, business and pleasure.

IBTTGRA2                    Rechnitz - Cross

1    Q.  And sir, I want to ask, you testified that -- withdrawn.

2              But that was common.  We only looked at a few of them;

3    there were many, many, many basketball games like this, right?

4    A.  I think there was 41 or 42 home games a season.

5    Q.  And you had 20 tickets then?

6    A.  Then you take out Sabbath and holidays, yes.

7    Q.  Because for Sabbath and holidays you would give them to

8    somebody else or sell them, right?

9    A.  Or I would sell them.

10   Q.  But if it was not a good season, it might get hard to sell

11   those tickets, right?

12   A.  That's right.

13   Q.  And sir, you also took friends and associates to music

14   concerts, right -- wait, withdrawn.

15              I want to take a look at Government Exhibit 1043.

16              MS. NECHELES:  That's in evidence, if I could show it

17   to the witness and the jury, your Honor?

18              THE COURT:  You may.

19              MS. NECHELES:  Thank you.

20   Q.  Sir, you were shown this on your direct examination, is

21   that correct?

22   A.  That's correct.

23   Q.  And if we turn to next page, those were tickets to a

24   basketball game?

25   A.  That's correct.

IBTTGRA2                          Rechnitz - Cross

1   Q.  And they started Friday night at 7:30, right?

2   A.  That's correct.

3   Q.  And they were $3,000 each?

4   A.  That was the face value.  I paid less, I believe.

5   Q.  If you go back to the first page, you sent those to -- you

6   email them to Marilyn Ozuna, right?

7   A.  That's right.

8   Q.  And you testified they were really for Phil Banks, right?

9   A.  That's right.

10  Q.  And sir, it was Friday, December 27 at 2:48 p.m. that you

11  emailed those, right?

12  A.  Yes.

13  Q.  And those tickets were for Friday night, right?

14  A.  That's right.

15  Q.  And in December Shabbat starts by 5:00 p.m., right?

16  A.  Yes.

17  Q.  Earlier, maybe?

18  A.  That's right.

19  Q.  So by 2:48 you would be heading home, right, to get ready

20  for Shabbat?

21  A.  I don't know what I was doing that day.

22  Q.  In general, that would be your practice, right?

23  A.  No, I would show up usually last minute.

24  Q.  You're a last minute -- that would be your practice, would

25  be last minute?

IBTTGRA2                    Rechnitz - Cross

A.  Sorry, what?

Q.  Your practice is to get there last minute?

A.  I would generally walk in last minute for Shabbat.

Q.  But that's pretty close to last minute already to be getting done with business?

A.  No, my office was about ten minutes away from my house.

Q.  So you had about two more house to get ready?

A.  Depending when Shabbat started, I would have around two hours, approximately.

Q.  And that's when you sent those tickets to Phil Banks, right?

A.  Either I did or my assistant did from my computer, but yes.

Q.  But you couldn't use those tickets anyway at that point, right?

A.  I didn't have those seats, I bought them specially specifically for him.

Q.  You bought them specially specifically for him and you sent them at the last minute like that?

A.  Yes.

Q.  I see.  When did you buy them?

A.  I don't remember the specific occasion, but I did not have Nets tickets, so a lot of time I would offer Philip Banks, who these tickets were for, tickets to an event, and he would tell me at the last minute.  He was indecisive.  He was also a last-minute guy.

IBTTGRA2                    Rechnitz - Cross

1    Q.  You testified a few minutes ago you bought them

2    specifically for him.  You don't have a specific recollection

3    is what you're saying, right?

4    A.  I specifically recall purchasing him Nets tickets.

5    Q.  In general, you're saying?

6    A.  Of course.

7    Q.  You don't remember purchasing these?

8    A.  There was only one or two occasions when I bought him Nets

9    courtside.

10   Q.  Okay.  But you don't remember when that occurred, right?

11   A.  I remember buying him two Nets courtside tickets.

12   Q.  And it is true that this is right before Shabbat, for

13   tickets that are for Shabbat, right?

14             MR. BELL:  Objection, your Honor.

15             THE COURT:  Thank you.  You can answer the question.

16   A.  At 2:48 p.m., assuming Shabbat is starting when you said,

17   around 5:00, it's about two hours and twelve minutes before.

18   Q.  You tell me what time Shabbat usually starts in December.

19             MR. BELL:  Objection, your Honor.

20             THE COURT:  Sustained.

21   Q.  Sir, you also took friends and business associates to music

22   concerts, right?

23   A.  Yes.

24   Q.  And you spent lavishly on that, right?

25   A.  I only recall going to one concert in New York where I

IBTTGRA2                      Rechnitz - Cross

1    rented a suite for a Beyoncé concert and took friends and

2    business associates.

3    Q.  Okay.  And how much money did you spend on that?

4    A.  It was a suite.  I don't remember, but if I could recall,

5    it was probably 10 to 20,000 for a suite price.

6    Q.  I show you what has been marked as JR14027.

7         Do you recognize that?

8    A.  I do.  This is the concert I just spoke about.

9    Q.  And this is a licensing agreement with the Barclay Center,

10   right?

11   A.  That's right.

12   Q.  And that's between Barclay Center and yourself for a

13   Beyoncé concert, right?

14   A.  Yes.

15              MS. NECHELES:  I offer that in evidence, your Honor.

16              MR. MERINGOLO:  No objection.

17              MR. BELL:  No objection, your Honor.

18              THE COURT:  Thank you.  I'm accepting JR14027 into

19   evidence.

20              (Defendant's Exhibit JR14027 received in evidence)

21              THE COURT:  You can proceed.

22   BY MS. NECHELES:

23   Q.  Sir, that's for a Beyoncé concert on 12/19/2013, correct?

24   A.  Yes.

25   Q.  And that actually cost you $21,500, right?

1   A.   That's right.

2   Q.   And that, you would agree with me, is a lavish expenditure,

3   right?

4   A.   Just a request, do you mind redacting my credit card number

5   from the public?

6   Q.   I will.

7   A.   Thank you.

8   Q.   Sorry.  And you told people --

9          MS. NECHELES:  We can take that down.  Let me

10  apologize for that?

11         THE WITNESS:  Thank you.

12  Q.   You told people that you were at a Beyoncé concert, right?

13  A.   Yes.

14  Q.   And you sent emails out from the concert, right?

15  A.   Yes, and photos.

16  Q.   And you sent that, for example, to Michael Weinberger?

17  A.   Yes.

18  Q.   And you were bragging about it, right?

19  A.   I think that I was showing specific photos from the concert

20  of certain business people who were there having a good time.

21  Q.   You wanted people to know like how you were -- had this

22  awesome suite for an awesome concert, right?

23  A.   Yes.

24  Q.   Not everybody gets to do that, right?

25  A.   That's right.

IBTTGRA2                    Rechnitz - Cross

1    Q.  And you wanted people to know that you had the power and

2    ability to do that, right?

3    A.  I wouldn't use those words, I just wanted -- whoever I

4    emailed, I had a purpose for emailing them.

5    Q.  Michael Weinberger?

6    A.  Yes.

7    Q.  He was a good friend?

8    A.  Yes.

9    Q.  You wanted to impress him?

10   A.  Yes.

11   Q.  That was the kind of thing you did, right?

12   A.  Yes.

13   Q.  And when you took videos you often would send them out to

14   people, right?

15   A.  Yes.

16   Q.  And like a lot of the videos we saw played on your direct

17   examination, you took those to send out to other people, right?

18   A.  I don't think that was my purpose.

19   Q.  But you did send them out to other people, right?

20   A.  Maybe some of them, I can't --

21   Q.  Because you wanted people to see how impressive you are,

22   right?

23   A.  I had different reasons for different things.  I can't

24   generalize, I'm sorry.

25   Q.  And sir, in addition to the gambling winnings that you gave

IBTTGRA2                    Rechnitz - Cross

1    to charity, there were also Chabad dinners that you would give

2    lots of money to, right?

3    A.  Yes.

4    Q.  You were honored at a big Chabad dinner?

5    A.  I don't know.

6    Q.  Just to be clear, Chabad is an organization, a Jewish

7    organization that has a very open type of policy for synagogues

8    and accepts lots of Jews in, is that correct?

9    A.  They don't turn away any Jew.

10   Q.  And they have a big center in midtown Manhattan, right?

11   A.  Yes.

12   Q.  And you would -- you were very involved in supporting that

13   center, right?

14   A.  I still am, yes.

15   Q.  Very publicly, right?

16   A.  No.

17   Q.  Well, I am going to direct your attention then to what has

18   been marked as JR14112.

19           MS. NECHELES:  And if we could show that to the

20   witness, your Honor.

21           THE COURT:  You may.

22   Q.  Do you recognize that photo?

23   A.  It's not up on my screen.

24           MS. NECHELES:  I'm sorry.

25           THE COURT:  Thank you.  You can go ahead.

IBTTGRA2                    Rechnitz - Cross

1    A.  I do.  It's a photo of the dinner.

2              MS. NECHELES:  And if I could pass these up to your

3    Honor?

4              THE COURT:  Please do.

5              Thank you, go ahead.

6    BY MS. NECHELES:

7    Q.  And you recognize that, sir?

8    A.  Yes, I do.

9    Q.  What do you recognize it as?

10   A.  A photo of the dinner, my table.

11   Q.  And sir, that was at the Chabad dinner?

12   A.  Yes.

13             MS. NECHELES:  I offer that in evidence.

14             MR. MERINGOLO:  No objection.

15             MR. BELL:  We would object, your Honor, for relevance

16   and reasons, potentially among others.

17             THE COURT:  Thank you.  Overruled.  I'll accept

18   JR14112.  You can proceed.

19             (Defendant's Exhibit JR14112 received in evidence)

20             MS. NECHELES:  If I could show that to the jury, your

21   Honor.

22             THE COURT:  You may.

23   Q.  And sir, that's a table you took -- that's a picture of a

24   table you took at a dinner that was honoring you, right?

25   A.  No.

IBTTGRA2                    Rechnitz - Cross

1   Q.  What is it?

2   A.  I was not honored at the dinner.

3   Q.  You were not.  But were you one of the sponsors, is that

4   what it was?

5   A.  I was a big donor of the center, I still am, and it's a

6   table that I was given for the event.

7   Q.  And you took a bunch of people to that dinner, right?

8   A.  Yes, I filled the table.

9   Q.  And can you tell us who is there with you?

10  A.  Should I go left to right.

11  Q.  Okay.

12  A.  Philip Banks, Jeremy Reichberg, Ari Schwebel.

13          I'm not sure if minors are not --

14  Q.  I took the pictures of the minors out, didn't I?

15  A.  I think the two next may be.

16  Q.  Are they still in the picture?

17  A.  The woman to the right of Ari Schwebel I believe is a

18  minor.

19  Q.  Let's skip her name.

20  A.  Okay.

21  Q.  Who else is there?

22  A.  Next to her are two people that Rabbi Metzger put at my

23  table, I believe that's David Slager, I'm not sure who is next

24  to him, and next to him is Norman Seabrook, and next to him is

25  Moshe Leviev.

1    Q.  And Moshe Leviev, is that Lev Leviev?

2    A.  No.

3    Q.  That's his brother?

4    A.  Yes.

5    Q.  And those were people who you wanted to impress, right, at

6    this dinner, right?

7    A.  People I wanted to bring to the dinner, yes.

8    Q.  And you wanted to bring them because you wanted to impress,

9    and also you wanted to be -- impress others to be seen with

10   these people, right?

11   A.  I brought them to Honor Rabbi Metzger and Chabad, thinking

12   it would be good for him.

13   Q.  And you thought it would be good for him to have Phil Banks

14   and Norman Seabrook there, right?

15   A.  As well as he also had known them from previous activities

16   Jeremy and I performed.

17   Q.  Okay.  And I'm asking about your intentions, right?

18   A.  Well, it was collective, it was me and Jeremy.

19   Q.  You're saying Jeremy also decided to bring these people to

20   this event?

21   A.  Yes.

22   Q.  Did Jeremy give lots of money to Chabad?

23   A.  I'm not sure, I don't think so.

24   Q.  No, he didn't.

25           MR. BELL:  Objection, your Honor.

 1             THE COURT:  Sorry.

 2   Q.  I'm sorry, I meant that as a question.

 3             THE COURT:  Sorry, Mr. Rechnitz one moment.

 4             MS. NECHELES:  I withdraw that.

 5             THE COURT:  Could you please rephrase the question.

 6             MS. NECHELES:  Yes, I'm sorry.

 7   BY MS. NECHELES:

 8   Q.  Sir, you liked to bring Mr. Banks and Mr. Seabrook to

 9   places to be seen publicly, right?

10   A.  Again, depends.  I can't generalize.  If it would help the

11   charity, I would bring them to a charitable cause, yes.

12   Q.  And just to be clear, you knew there were photographs being

13   taken here, right?

14   A.  Yes.

15   Q.  You weren't trying to hide that you were hanging out with

16   Mr. Banks and Mr. Seabrook, right?

17   A.  Right.

18   Q.  It was a very public thing, right?

19   A.  No, it was just the people in the room.

20   Q.  That was the only time that you were in a public place that

21   photographs were being taken of the two of you -- the three of

22   you?

23   A.  The three of them.

24   Q.  You, Mr. Banks, Mr. Seabrook?

25   A.  No, I believe I also took him to another charity event to

1   help the charity.

2   Q.  And in fact, it was frequent that you would be seen

3   publicly with them, right?

4   A.  Yeah.

5   Q.  Never tried to hide your association, did you?

6   A.  No.

7   Q.  You never tried to make this a secret thing that you were

8   taking them out to all of these places, did you?

9   A.  I did not.

10         MS. NECHELES:  We can take that down.

11  Q.  It was also important to you to be part of the Simon

12  Wiesenthal Center, right?

13  A.  Yes.

14  Q.  And it was important to you because that was a very -- the

15  board of that was very prestigious, right?

16  A.  That was one of the reasons.

17  Q.  And you thought they did good things, the Simon Weisenthal

18  Center, right?

19  A.  I think they do excellent work.

20  Q.  But you also wanted to be on the board because the board

21  had people who were wealthy and important, right?

22  A.  That's right.

23  Q.  And so you had sort of fundraisers or luncheons in your

24  office for this event, for this charity, right?

25  A.  Yes.

IBTTGRA2                         Rechnitz - Cross

1    Q.   And you had a professional photographer taking pictures of

2    you there?

3    A.   Yes.

4    Q.   And I will show you what has been marked as JR14101.

5         Is that an example of one of those photographs?

6    A.   Yes, that's one of the two luncheons I had in my office.

7    Q.   You had two luncheons for this, right?

8    A.   Yes.

9              MS. NECHELES:   I offer that in evidence, your Honor.

10             MR. MERINGOLO:   No objection.

11             MR. BELL:   No objection, your Honor.

12             THE COURT:   Thank you, I'm accepting JR14101 into

13   evidence.   You can proceed.

14             (Defendant's Exhibit JR14101 received in evidence)

15   Q.   And sir, it's an extremely influential bunch there, right?

16   A.   Yes.

17   Q.   And you were the youngest person in the room, right?

18   A.   That's right.

19   Q.   And you really liked that, right?

20        You were proud that you were so young and at these big

21   events, right?

22   A.   Yes.

23   Q.   And among the people that were on that board were Tommy

24   Hilfiger, is that correct?

25   A.   He's not on the board of the Wiesenthal Center, no.

IBTTGRA2                        Rechnitz – Cross

1    Q.  You would have him at these lunches?

2    A.  He came to one of the lunches.

3    Q.  And Murray Huberfeld?

4    A.  Yes, he came to both lunches.

5    Q.  Who else was in that room?

6    A.  Guy Tanne, the CFO of Taly Diamonds that we spoke about

7    yesterday; Paul Raps, the president of the Leviev store that we

8    spoke about yesterday; Rabbi May, the executive director of the

9    Weisenthal Center; Andrew Ratner, the vice president of the

10   Feil Organization; Stuart Saft, an attorney at Holland &

11   Knight; Shimon Shkury, the owner of Ariel Properties; Ari

12   Schwebel, the vice president of JSR Capital; Tony Kurz from

13   THHG Hospitality; Rabbi Hier, the dean and founder of the Simon

14   Wiesenthal Center.

15   Q.  And why were you taking professional photographs of this?

16   A.  For the museum's benefit so they could use it in their

17   brochure.

18   Q.  Were you taking them so --

19            And you had up on the wall JSR Capital, right?

20   A.  Yes.

21   Q.  And were you doing that so that it would be known in the

22   brochure and publicly seen that this was you hosting these

23   lunches, right?

24   A.  Yes.

25   Q.  And at the second lunch you did the same thing, right?

IBTTGRA2                        Rechnitz - Cross

1     A.  Yes.

2     Q.  And I want to just direct your attention to JR14107.

3              And that is the other lunch, right?

4     A.  Yes, it is.

5              MS. NECHELES:  And I offer that in evidence, your

6     Honor.

7              MR. MERINGOLO:  No objection.

8              MR. BELL:  No objection, Judge.

9     A.  Just a correction, this is not a lunch at the Wiesenthal

10    Center.

11    Q.  What is this?

12    A.  This is the Chief Rabbi of Israel was visiting town, and we

13    decided to do a luncheon in his honor at the time.

14             THE COURT:  I'm accepting JR14107.

15             (Defendant's Exhibit JR14107 received in evidence)

16             THE COURT:  Please proceed.

17             MR. BELL:  Your Honor, regrettably, may we very

18    briefly confer on this with Ms. Necheles?

19             THE COURT:  Yes, please feel free.

20             (Pause)

21             MR. BELL:  We have no objection, Judge, thank you.

22             THE COURT:  Thank you.  Again, I'm accepting JR14107

23    into evidence.  You can proceed.

24             MS. NECHELES:  If we publish that to the jury, your

25    Honor?

IBTTGRA2                         Rechnitz - Cross

1          THE COURT:  You may.

2    BY MS. NECHELES:

3    Q.  Am I correct that, again, you were the youngest person in

4    the room?

5    A.  One of the youngest.

6    Q.  And again, there were very influential and successful men

7    in this room, right?

8    A.  Yes.

9    Q.  Tommy Hilfiger was there at this one?

10   A.  No, he was not.

11   Q.  Murray Huberfeld was there?

12   A.  Yes.

13   Q.  And other people, very wealthy people, right?

14   A.  No.

15   Q.  No?

16   A.  No.

17   Q.  Again, you had a professional photographer there?

18   A.  Yes.

19   Q.  An extremely prestigious think to have the Chief Rabbi from

20   Israel come to you?

21   A.  I believe so.

22   Q.  In your community, that's what I meant, is that correct?

23   A.  I believe anywhere.

24   Q.  And you were very proud of it, right?

25   A.  Yes.

1    Q.  And you wanted people to know about it, right?

2    A.  Yes.

3    Q.  This was not for a brochure for something, right?

4    A.  Right.

5    Q.  This was for you to put those pictures out there, right?

6    A.  No, I didn't put the pictures out, I did them to give to

7    the rabbi.

8    Q.  And you kept them, right?

9    A.  Yes.

10   Q.  And did you -- you provided these, you produced these to

11   the defense in response to subpoena requests, right?

12   A.  I don't know how they were obtained.  I didn't deal with

13   subpoenas, my attorneys did.

14   Q.  And well, sir, when you say your attorneys, you had a drop

15   box with photographs that you kept, right?

16   A.  Yes.

17   Q.  And so your attorneys would have to ask you about do you

18   have photographs in here, right?

19   A.  They asked about specific photos to produce.

20   Q.  And you produced those to your attorneys, right?

21   A.  Whatever I -- I don't know what was privileged or not, but

22   whatever was asked of me and required, I did.

23   Q.  And sir, finally, one last area, you -- in addition to all

24   of these other things, you made sure people knew that you gave

25   very lavish gifts to friends, right?

IBTTGRA2                          Rechnitz - Cross

1    A.  Again, I can't generalize.  If there's a specific example,

2    I could speak to it.

3    Q.  That was part of your practice, right?

4    A.  Again, I can't generalize.

5    Q.  Well, let me direct your attention to JR12604.

6            And directing your attention to the bottom, I want to

7    ask whether you -- am I correct that you told reporters and

8    caused an article to be published where you said that you had a

9    tradition as a big winner on Superbowl night as responsible for

10   purchasing your entire group of friends matching sports gear or

11   apparel?

12   A.  Yes, we bought sneakers.

13   Q.  I'm asking you whether you told that to be published in a

14   newspaper, right?

15   A.  I don't remember saying it.

16   Q.  Well, it doesn't refresh your recollection that you told

17   that to be publicly done?

18   A.  No.

19   Q.  Do you have any doubt that you did that?

20           MR. BELL:  Objection, your Honor.

21           THE COURT:  Thank you.  You can answer the question.

22   A.  Again, I purchased sneakers for everybody.

23   Q.  I'm asking whether you have any doubt that you caused that

24   to be published in a newspaper, that fact to be published.

25   A.  Again, I'm not sure.

1   Q.  And sir, you did in fact have that tradition, right?

2   A.  Which tradition?

3   Q.  Of going and buying sporting apparel or something for the

4   whole group, whoever -- bought it for the whole group, right?

5   A.  If I win the safety bet, the tradition was, because it

6   happened three years in a row, buy sneakers for the whole

7   group.

8   Q.  And sir, am I correct that a video was made by you and your

9   friends celebrating you having done that?

10  A.  Several videos and photos were made.

11  Q.  And I want to direct your attention to JR4007, and I want

12  to show you a little bit to see if you recognize that.

13         Do you recognize that as a video of being you and your

14  friends in the store?

15  A.  Yes, I do.

16         MS. NECHELES:  Offer that in evidence, your Honor.

17         MR. MERINGOLO:  No objection.

18         MR. BELL:  No objection.

19         THE COURT:  Thank you.  I'm accepting JR4007 into

20  evidence.

21         (Defendant's Exhibit 4007 received in evidence)

22         THE COURT:  You can proceed.

23         MS. NECHELES:  Can we publish that to the jury, your

24  Honor?

25         THE COURT:  You may.

IBTTGRA2                      Rechnitz - Cross

1          MS. NECHELES:   Thank you.

2          (Video recording played)

3    BY MS. NECHELES:

4    Q.   That was kind of video you took with your friends, right?

5    A.   That's a video I took with my friends, right.

6    Q.   And you guys were having fun, right?

7    A.   That's right.

8    Q.   And you were celebrating you won this big win, right?

9    A.   Yes.

10   Q.   And you bought all your friends sneakers, right?

11   A.   That's right.

12   Q.   And sneakers are not cheap, right?

13   A.   Depends what sneaker, what brand.  I don't know how to

14   answer that question.

15   Q.   It wasn't much for you, right?

16   A.   Again, from the winnings I made of $50,000, it was not much

17   to buy everybody sneakers.

18   Q.   Because $50,000 didn't mean so much to you, right?

19          MR. BELL:   Objection, your Honor.

20          THE COURT:   Thank you.  Sustained.

21   Q.   Well, the cost of sneakers can't mean that much to you,

22   right?

23   A.   I'll make a correction.  I said from the winnings, I meant

24   compared to the winnings I made.  I donated the 50,000 to

25   charity and paid for the sneakers.

1    Q.   The sneakers came out of your pocket.

2    A.   Pardon?

3    Q.   The sneaker cost came out of your pocket.

4    A.   Yes.

5    Q.   But not significant, right?

6    A.   Pardon?

7    Q.   Not significant, right?

8            MR. BELL:   Objection, your Honor.

9            THE COURT:   Thank you.   You can answer the question.

10   A.   I don't remember how much it was, but every dollar counts.

11   Q.   And sir, just finally, one of the lavish gifts that you

12   gave to friends was that you paid for the Sheva Brachot for

13   Mr. Reichberg's daughter, right?

14   A.   Yes.

15   Q.   And am I correct that that -- and Sheva Brachot, that is a

16   dinner that is held after a wedding, right?

17   A.   That's right.

18   Q.   And it is a custom in the Jewish community to have -- in

19   the Orthodox community to have seven nights -- a dinner for

20   seven nights afterwards, right?

21   A.   That's right.

22   Q.   And what does Sheva Brachot mean?

23          What do those words mean?

24   A.   At the Jewish ceremony there are seven blessings that are

25   made under the chuppa, which is the tarp where the couple are

1   married, are wed, and then for seven nights there are

2   ceremonies.

3   Q.  And Sheva Brachot means seven blessings, is that correct?

4   A.  I believe so.

5   Q.  And sir, it is the custom for close friends or relatives to

6   sponsor those various dinners, right?

7   A.  That's right.

8   Q.  And you, as a close friend of Jeremy Reichberg, sponsored

9   one of these, right?

10  A.  That's right.

11  Q.  And this was in 2016, right?

12  A.  Right.

13  Q.  And that was not when you were hanging out with cops,

14  right?

15  A.  That's right.

16  Q.  And sir, I want to show you what has been marked as JR15 --

17  sorry, 51012.

18          Do you recognize that?

19  A.  I do.

20  Q.  And what is that?

21  A.  This is an invitation to the party that we were just

22  speaking of, the Sheva Brachot.

23  Q.  That is the one hosted by you?

24  A.  Yes.

25          MS. NECHELES:  I offer that in evidence, your Honor.

1          MR. MERINGOLO:  No objection.

2          MR. BELL:  With respect to relevance, your Honor, we

3    don't object, whatever the relevance is.

4          THE COURT:  That's fine.  I'm accepting JR51012 into

5    evidence.

6          (Defendant's Exhibit JR51012 received in evidence)

7          THE COURT:  You can proceed.

8    Q.  And that was the invitation that you sent out that night.

9          MS. NECHELES:  If I could show that to the jury?

10         THE COURT:  You may.

11   A.  That's the invitation sent from the list provided to me.

12   Q.  Jeremy Reichberg or the family would traditionally give a

13   list of who they wanted invited, right?

14   A.  That's what happened in this case.

15   Q.  Well, it's a celebration for the family and the child,

16   right?

17   A.  Yes.

18   Q.  So traditionally the family and the child or whoever is

19   getting married would be the one sending out or giving the list

20   of who they would like invited, right?

21   A.  I'm not sure, I haven't made a wedding, but in this

22   instance that's what happened.

23   Q.  But then in addition, you had some of your friends, right?

24   A.  Yes.

25   Q.  Ralph Herzka?

1    A.  Yes.

2    Q.  Murray Huberfeld?

3    A.  Yes.

4    Q.  Some other people?

5    A.  Yes, I had them there because they were friends of Jeremy

6    as well.

7    Q.  And sir, if we could look at also the picture of JR51004,

8    is that a picture of the place setting for that dinner?

9    A.  Yes, it is.

10              MS. NECHELES:  I offer that in evidence, your Honor.

11              MR. MERINGOLO:  No objection.

12              MR. BELL:  Sure, your Honor.

13              THE COURT:  Thank you.  Without objection, I'm

14   accepting JR51004 into evidence.

15              (Defendant's Exhibit JR51004 received in evidence)

16              THE COURT:  You can proceed.

17              MS. NECHELES:  If I could publish that to the jury.

18              THE COURT:  You may.

19   BY MS. NECHELES:

20   Q.  That's what it looked like, a place setting and how the

21   place looked, right?

22   A.  Yes.

23   Q.  Really beautiful, right?

24   A.  Yes.

25   Q.  And you spent a lot of money on this, right?

1    A.  Yes.

2    Q.  It was about 120 people there?

3    A.  Yes.

4    Q.  And you spent -- how much did you spend, sir?

5    A.  I think about $40,000.

6    Q.  It was a very expensive one-night dinner, right?

7    A.  That's right.

8    Q.  And that wasn't even the wedding, right?

9    A.  Right.

10   Q.  And you did this because you wanted to give a lavish gift

11   to Mr. Reichberg, right?

12   A.  That's false.

13   Q.  Well, you were not hanging out with police officers at that

14   point, right?

15   A.  I was not.

16   Q.  And you were not getting anything from Mr. Reichberg,

17   right?

18   A.  No, I had a different motive to do it.

19   Q.  What was your motive, sir?

20   A.  At that time Jeremy and I were not really in touch, and

21   there were rumors that he had gone to Israel and that he was

22   working with the government.  And I wanted to keep him close to

23   make sure we were coordinated at the time.  So I decided to

24   make him this party, even though we had lost touch, to keep him

25   close.

1   Q.  And you didn't tell him that, right?

2   A.  No.

3   Q.  This is sort of a bribe, you're saying, right?

4          MR. BELL:  Objection, your Honor.

5          THE COURT:  Thank you.  I sustain the objection.

6   Counsel, you can proceed.

7   Q.  You did this in order to try to entice him to be close to

8   you, you're saying, right?

9          MR. BELL:  Objection, your Honor.

10         THE COURT:  Thank you.  You can answer the question.

11  A.  I didn't want him to feel we were at odds at that point.

12  Q.  But it was more that you didn't want to feel at odds, you

13  did a lavish event to make him feel close to you, right?

14  A.  I did it so that he feels that we were good and there was

15  no friction between us.

16  Q.  You say good, you mean good friends, right?

17  A.  Yes.

18  Q.  Because that's who holds Sheva Brachot for someone, a good

19  friend or relative, right?

20  A.  Right.

21  Q.  A very close friend, right?

22  A.  No, community friend, close friends, each scenario is

23  different.

24  Q.  And so you did this extremely lavish event and you had a

25  secret alternative motive is what you're saying, right?

1    A.   Again, I just told you my motive, yes.

2    Q.   And that was secret is what I asked you.

3    A.   I did not share it with him.

4    Q.   And he had no idea, right?

5    A.   I don't know what he thought or didn't think.

6    Q.   Okay.  But to the best of your knowledge, he had no idea

7    that that was your secret intent?

8              MR. BELL:  Objection, your Honor.

9              THE COURT:  Thank you.  Sustained.

10   Q.   And sir, let's move on.

11             THE COURT:  Counsel, could I ask, it's about our lunch

12   break time.  Would this be a proper time for us to take a break

13   if you're changing topics?

14             MS. NECHELES:  There's one last question, maybe.

15             THE COURT:  Please go ahead.

16             MS. NECHELES:  Actually I withdraw that, your Honor.

17   I will finish you up after lunch because it's probably more

18   than one last question.

19             THE COURT:  If it's a short period --

20             MS. NECHELES:  I'm moving on from this topic, but

21   there's a little more that we have to do.

22             THE COURT:  That's fine.

23             So ladies and gentlemen, we'll take our lunch recess

24   now.  Don't talk to each other about the case or anyone else,

25   don't do any research, and I will see you shortly.

1           (Jury not present)

2           THE COURT:  Thank you very much, counsel, let's take

3    our lunch break.  I will ask you to be back here about five

4    minutes after the hour.  I hope we'll be able to start with the

5    jury at that time.

6           Mr. Rechnitz, during this break, as throughout your

7    cross-examination, I'm asking that you please continue not to

8    discuss the case or your testimony with anyone other than your

9    counsel.

10           THE WITNESS:  Yes, your Honor.

11           THE COURT:  Good.  Thank you all.  I will see you

12    momentarily.

13           MS. LONERGAN:  Your Honor, we have two brief points we

14    would like to raise with the Court.  I don't know if your Honor

15    wants to do it now.

16           THE COURT:  Please do.

17           MS. LONERGAN:  We think that questions about whether

18    his conduct violated some precept of Jewish law is not

19    appropriate.  There was a question about whether giving gifts

20    to charity in an open or overt way was disfavored by Jewish

21    law.  We don't see the relevance of that and don't think there

22    should be questions about essentially whether his conduct or

23    anyone's conduct violated Jewish law.  It's not really the law

24    that's going to govern these proceedings.

25           MS. NECHELES:  Your Honor, I said that in response to

1    something, and I'm perfectly willing to have that stricken.  I

2    should not have asked that.

3         THE COURT:  That's fine.  Please identify the relevant

4    portions of the transcript and we can take that out.

5         MS. LONERGAN:  Secondly, your Honor, briefly, I think

6    some of the questions on cross-examination are creating

7    somewhat of a misleading impression of the law.  Specifically,

8    as we briefed to the Court, whether an item was comped to the

9    witness or whether he otherwise couldn't make use of it doesn't

10   mean it's not a thing of value to the recipient.  If he was

11   comped a $10,000 hotel room and then he gave it to somebody,

12   that's something that still has value to the recipient.

13   Similarly, if he can't use very expensive sports tickets and

14   gives them to someone, that still has value to the recipient.

15   So we're just a little he concerned that that line of

16   questioning again crates a misleading impression of the law

17   that what is at issue is whether he spent money on something or

18   whether he could use something.

19         And so I think that this could be addressed by some

20   sort of instruction, maybe at the conclusion of his testimony,

21   that whether something has -- that you're going to give further

22   instructions on what a thing of value is, but it is not

23   relevant or it's not the entire question about whether -- to

24   determine if something is a thing of value whether this witness

25   had to pay for it, because that's not actually the relevant

1    inquiry, your Honor.

2              THE COURT:  Thank you.  If the government would like

3    to propose the text of the specific limiting instruction, I

4    will invite you to do so.  Please confer with counsel for

5    defendants about it.  I expect that there may be views by them

6    about the propriety of such an instruction at this time.

7              I'm happy to look at whatever it is the government

8    would like to propose.  A question will be whether I can

9    effectively highlight one portion of what would be a

10   comprehensive set of instructions at this stage, given what I

11   understand to be the defendant's expressed purpose for

12   introducing this evidence.

13             MS. NECHELES:  Your Honor, I can't believe -- I think

14   your Honor understands I have introduced this evidence for the

15   issue of corrupt intent.  I'm not arguing that something --

16   that a rich person can't give a bribe.  I'm not arguing that

17   because he's rich it doesn't matter.  I'm not arguing any of

18   those things.  I don't expect to argue it at the end.  That

19   would be foolish for me to argue.  Your Honor will charge at

20   the end of case, like every case.  Nobody ever charges in the

21   middle the government's theory of the case or their

22   contentions.  I don't know why this is being asked for at this

23   point, but I object to it.

24             THE COURT:  Thank you.  That's fine.

25             Counsel for the United States, if you would like to

IBTTGRA2                        Rechnitz - Cross

1   present such a proposed instruction you are welcome to do so

2   and I will consider it at that time.  At this point, however,

3   let's take our lunch break and I will see you about five

4   minutes after the hour.

5           Thank you.

6           (Luncheon recess taken)

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IBTTGRA2                        Rechnitz - Cross

                        AFTERNOON SESSION

                          (12:10 p.m.)

          THE COURT:  Are we ready to proceed, counsel?

          MR. BELL:  Not just yet, your Honor.  One issue has

come up.  Over the break defense counsel sent us a video that

they say that they're entitled to play in light of

Mr. Rechnitz's testimony to this point.  We only just watched

it because we had trouble loading it.  Mr. Willis was nice

enough to play it for us.

          The video appears to consist of Jona giving some sort

of a toast, presumably at the very event for Mr. Reichberg's

daughter that was described prior to the break.  It's unclear

both, A, what the proper relevance would be, B, how one gets

around the hearsay issues involved.  It may be that

Ms. Necheles can better articulate what this video is and what

it's permissible purpose is in a more effective way than I can

preempt it, but I wanted to note this now because we have been

trying to stay away from sidebars and the like, as I suspect

your Honor noticed, but since we don't have the jury here we

did want to raise this, particularly since -- and the one thing

that it does seem to suggest is that Mr. Rechnitz and

Mr. Reichberg were friends.  That, too, is not actually a

defense to the crimes at issue.  So we're a bit puzzled and

perhaps more so curious about what the permissible purpose of

for this would be.

IBTTGRA2                     Rechnitz - Cross

            MS. NECHELES:  So your Honor, I did not expect

Mr. Rechnitz's testimony that came at the end, but it was clear

he said this right in the beginning of my cross, he was going

to keep saying it, so I just let him say it, and it was in

light of his testimony that he was just being fraudulent here

and that he had an ulterior motive for doing all this.

            I had not been planning on playing this video.  In

fact, I just got this video.  People came up to me afterwards

to show me this video.  I believe it is relevant to show why

Mr. Reichberg would not know Mr. Rechnitz's intent.

Mr. Rechnitz testified that he had the intent to bribe people,

he has said he had repeated conversations with Mr. Reichberg,

but there's not going to be any corroboration of that.

            So what it comes down to at the end is does

Mr. Reichberg know Mr. Rechnitz's intent, his corrupt intent,

and did it share it?  And I think, in light of what was just

said here, that this is a perfect example of why he would not

know it was corrupt intent.  And I am not offering it for the

truth of it, I am offering it in light of his testimony to show

his actions and his conduct, Mr. Rechnitz's actions and conduct

during the time period.

            THE COURT:  Thank you.  Can I ask you to -- I may want

to ask just to see it after I ask if you can describe what it

is.  But first, what's the testimony that you're referring to?

My recollection of Mr. Rechnitz's testimony was, in essence,

1    that he did have this ulterior motive, that he did not

2    articulate it to Mr. Reichberg, and that he has no basis to

3    provide testimony as to what Mr. Reichberg understood because

4    he didn't express the motive.

5          What is it that the video shows with respect to that

6    testimony, assuming that's what you're referring to?

7          MS. NECHELES:  It shows how he would act when he had

8    this kind of secret ulterior motive.  He's up there giving a

9    toast, and he's lavish in his praise and talking about how back

10   the families go.

11         You would never guess from the way he is acting that

12   he is harboring this animus and he had this secret ulterior

13   motive or belief that Jeremy is cooperating with him --

14   Mr. Reichberg is cooperating with him.  And I think it goes to

15   the heart of this case of could he have been hiding his

16   supposed intent to bribe police officers?

17         They're talking about people who are very close.  The

18   government is going to argue at the end of the case these

19   people were very close, Jeremy Reichberg and Jona Rechnitz.

20   And they were very close, there's lots of evidence of that.

21   They were very close.  But this is a big example of how he

22   would hide something like that.  This is something that we had

23   never heard until he testified here today.  Nobody had a

24   notion.  I had no notion when I started my cross on this that

25   is what I was going to hear, that this was all a fraud.  It was

1      very revealing.

2              THE COURT:  Thank you.  Can I ask how long the video

3      is that you seek to put in, counsel?

4              MS. NECHELES:  One minute and 13 seconds, your Honor.

5              THE COURT:  Thank you.

6              Counsel for the United States United States

7              MR. BELL:  Yeah, that comports with our memory, your

8      Honor.

9              Regardless of -- I respect Ms. Necheles, I respect her

10     argument, it's nonetheless wrong.  To be clear, first of all,

11     there's an overgeneralization here or some sort of

12     mischaracterization with respect to Mr. Rechnitz's testimony.

13     Mr. Rechnitz didn't describe any sort of animus that he had

14     with respect to Mr. Reichberg, just that he wanted to keep him

15     close because he was concerned that Mr. Reichberg might be

16     cooperating in the fashion that he eventually did.

17             To the extent Ms. Necheles points out during this

18     toast Mr. Rechnitz makes lavish and complimentary statements

19     about the Reichbergs, that's one of the reasons why, under a

20     403 analysis, this can't come in.  And I think this is actually

21     the principal effect of putting this in, that is Mr. Rechnitz

22     getting the chance to say a lot of things about how far back

23     the families go, the Reichberg family's charity, that sort of

24     thing, and I think that your Honor probably should take the

25     minute to watch this video and appreciate why it's problematic.

1          Before I do sit down though, I say that look, we
2    actually have shown video of Mr. Rechnitz talking about his
3    intent with respect to the police officers in the presence of
4    Mr. Reichberg with Mr. Reichberg not reacting.  That actually
5    goes to the core of this same issue in a vastly less circuitous
6    way.  But this issue -- this video I think can't come in for
7    hearsay and 403 reasons.
8          Further, the existence of this toast doesn't mean that
9    Mr. Rechnitz was ever -- was denying that he and Mr. Reichberg
10   were ever friends or anything else prior that existed.  People
11   give toasts.
12          THE COURT:  Thank you.  I will see the video.
13          Can you please show it?
14          MS. NECHELES:  Yes, your Honor.  And in addition, I
15   would say that we would agree to leave off the last part, which
16   is the only part that I think might be problematic.
17          (Video recording played)
18          MS. NECHELES:  Your Honor, with respect to last part
19   of it where he says everybody knows if you have a problem you
20   can call Jeremy, I would not offer that at this time because I
21   understand the hearsay problems with that.  But I will ask him
22   whether people know whether that was something that he was
23   aware of, and whether Mr. -- because that's the central issue
24   here as well, and if he denies it, then I would seek to play
25   that to show his prior inconsistent statement, but I would not

1    put that in at this time.  At this time I'm only seeking to put

2    in his -- the video up until that point to just show how -- and

3    I don't think -- I think a lot of it is just talking about the

4    families being very close and caring for each other up to that

5    point.

6              THE COURT:  Thank you.  First, I have trouble

7    discerning what it is that the person is saying in the video.

8    It's far from clear.  This is not a professionally recorded

9    video.  There's a lot of clattering of silverware, and the

10   voice of the speaker is very indistinct.  It's hard for me to

11   make out, as I said earlier, exactly what it is what he's

12   saying.

13             Is there a transcript of what is said here?

14             MS. NECHELES:  No, I'm sorry, your Honor, we just got

15   it.  And some of it -- there's a lot of the Yiddish in here as

16   well, I don't know, Yiddish Hebrew mix.  There's a lot of time

17   he's talking about religious concepts.  We could say a lot of

18   what you're talking about are that.  But basically I think the

19   only -- I don't think I could create a transcript right now.  I

20   just got this, your Honor.

21             THE COURT:  Thank you.  Understood.  I, again, have a

22   very difficult time even hearing what it is that the witness is

23   saying in this video.  I, in the absence of a transcript, am

24   hesitant to make a ruling on whether or not this can come in

25   because I simply can't hear all of the words that he's saying,

1  and I'm afraid that there may be something that I'm not

2  perceiving in the short watching that may be inappropriate.

3        So I'm happy to permit you to inquire about this.  I

4  would be happy to consider this further with a transcript in

5  hand so I could understand what it is that is being said and

6  evaluate it, but I simply can't make out what it is that he's

7  saying here.

8        Also, for what it's worth, to the extent that the

9  purpose of this to show that Mr. Rechnitz is very deceptive and

10 it's hard to tell what he's noting when he's speaking, he's

11 reading from a piece of paper for this toast in a sort of flat

12 affect.  It's hard for me to see necessarily the video by

13 itself demonstrates that point, which is part of the reason why

14 I would like to see the words that he's speaking to help

15 understand why it's valuable for the purpose that you're

16 describing.

17       MS. NECHELES:  Your Honor, I think what I will do is

18 move on for now.  I will try to get a transcript made today or

19 this evening, then we could perhaps raise it later.

20       THE COURT:  That's fine.  And I have no concern about

21 you asking further questions about whether or not there's

22 anything that he was telegraphing that would permit

23 Mr. Reichberg to understand that he had this ulterior motive,

24 to the extent that you think that's helpful beyond the

25 questions that have already been asked.

1              MS. NECHELES:  I think I already asked that, but your

2     Honor, I will say that I don't think that the question is like

3     how he appears right there, but the whole sort of scheme that

4     he does this.  Like yes, it's written out, but he's thought

5     about that before, and he says he did the whole thing, like he

6     puts on this whole performance, and Mr. Reichberg -- nobody has

7     any idea that this is what it is.  They don't share his intent.

8              THE COURT:  Thank you.  Understood.  And again, I

9     don't mind if you ask additional questions on the topic and we

10    can evaluate further as the video comes in.

11             MS. NECHELES:  I will try to provide a transcript

12    later this evening, your Honor.

13             THE COURT:  Very good.  Let's proceed.

14             MS. NECHELES:  Thank you, your Honor.

15             MR. BELL:  Could I address something briefly?

16             THE COURT:  Please.

17             MR. BELL:  Ms. Necheles seems to describe -- I am

18    having difficulty understanding this argument, but as I take it

19    in, the video demonstrates Mr. Rechnitz's capacity to be

20    dishonest about his intentions.  In other words, it is

21    extrinsic evidence of his character for dishonesty with respect

22    to his own feelings and intentions.  As it happens, there's an

23    app for that, it's Rule 608(b).

24             THE COURT:  Thank you.

25             (Jury present)

1              THE COURT:  Counsel for Mr. Reichberg, you can

2     proceed.

3              MS. NECHELES:  Thank you, your Honor.

4     BY MS. NECHELES:

5     Q.  Sir, Mr. Reichberg, Jeremy Reichberg, did not spend the

6     kind of money that you were spending that we have been

7     discussing, right?

8     A.  Right.

9     Q.  In fact, you have -- you considered him cheap, right?

10    A.  Yes.

11    Q.  And you claim that Jeremy latched onto you when he met you,

12    right?

13    A.  I what?

14    Q.  You claim that Jeremy latched onto you when he met you,

15    right?

16    A.  Yes.

17    Q.  And he almost never paid for things, right?

18    A.  Not when I was around.

19    Q.  And in fact, there was a tape that was played where you

20    asked him to advance $5,000, right?

21    A.  Yes.

22    Q.  And he said he didn't have it, right?

23    A.  That's right.

24    Q.  And he would have to borrow it.  You asked him to borrow it

25    from someone, right?

1    A.  Yes.

2    Q.  And you testified on direct -- you were asked a question,

3    you answered that Jeremy always wanted to be around rich people

4    and liked to benefit from them financially.  Right?

5    A.  Yes.

6    Q.  And when you said this, you were really commenting on your

7    relationship with Jeremy, right?

8    A.  No.

9    Q.  Well, am I correct that he benefited financially from you,

10   right?

11   A.  Yes.

12   Q.  And you threw a beautiful Sheva Brachot for him, right?

13   A.  Right.

14   Q.  And you did other things for him, right?

15   A.  Yes.

16   Q.  Gave him gifts?

17   A.  Yes.

18   Q.  Gave him a beautiful watch?

19   A.  Yes.

20   Q.  And a Rolex, right?

21   A.  Yes.

22   Q.  And you referred very wealthy clients to him, right?

23   A.  Yes.

24   Q.  In fact, you were aware that most of his income came from

25   clients you were referring, right?

IBTTGRA2                    Rechnitz - Cross

1    A.  That's false.

2    Q.  Well, you referred Harry Skydell to him, right?

3    A.  Yes.

4    Q.  What other clients did you refer to him?

5    A.  Yes, I referred other clients.

6    Q.  What other clients?

7    A.  Many people from the community.

8    Q.  And they were wealthy people, right?

9    A.  Some were, some weren't.

10   Q.  You knew wealthy people, right?

11   A.  Yes.

12   Q.  And they would need something done and you sent them to

13   Mr. Reichberg, right?

14   A.  Right.

15   Q.  And I'm talking about situations where it was an expediting

16   matter that had to be done with the department of buildings or

17   another department like that, right?

18   A.  Right.

19   Q.  And those paid very well, right?

20   A.  Yes.

21   Q.  And you were disdainful of Mr. Reichberg for not having as

22   much money as you, weren't you?

23   A.  I was what?

24   Q.  Disdainful of him.

25   A.  I don't know what that means.

1  Q.  You looked down on him, didn't you?

2  A.  Not at all.

3  Q.  You said that earlier, your comment on your direct

4  testimony when you said he liked to be around rich people and

5  benefited financially from them, that wasn't looking down on

6  him?

7  A.  No, it's a fact.

8  Q.  Okay.  And you didn't say that because you thought poorly

9  of him and you wanted to convey that?

10  A.  No, I was answering the question that I was asked.

11  Q.  Was that part of the question, about whether he benefited

12  financially?

13          MR. BELL:  Objection.

14          THE COURT:  Thank you.  Sustained.

15  Q.  Wasn't the question just whether Mr. Reichberg knew Eli

16  Rowe?

17          MR. BELL:  Objection.

18          THE COURT:  Thank you.  You can answer that question.

19  A.  I don't remember what the exact question was, but there

20  were a series of questions, so I gave an answer based on what I

21  was asked.

22  Q.  Sir, now even though you were living lavishly during the

23  time period, 2008 through 2016, you were still committing

24  financial crimes.  You were committing financial crimes, right?

25  A.  Yes.

IBTTGRA2                    Rechnitz - Cross

1   Q.  And that includes that you cheated the insurance company,

2   right?

3   A.  Yes.

4   Q.  And you put in a claim for a watch which you had lost,

5   right?

6   A.  Yes.

7   Q.  And you testified yesterday that you think you only got

8   about $15,000, right?

9   A.  That's right.

10  Q.  But what you claimed for was 65,000, right?

11  A.  Yes, the value of the watch.

12  Q.  And that's what you were hoping to get, right?

13  A.  Right.

14  Q.  And it turns out the watch wasn't stolen or lost, right?

15  A.  That's not correct.

16  Q.  Well, you found it, didn't you?

17  A.  It turned up.  Doesn't mean it wasn't stolen and returned

18  or not lost.  It was legitimately lost.

19  Q.  It was lost in your house, right?

20  A.  Yes.

21  Q.  And what year did you put that insurance claim in?

22  A.  I don't remember the exact year.

23  Q.  Well, approximately.

24  A.  It's definitely when I knew Jeremy because he helped me

25  with the claim.

IBTTGRA2                        Rechnitz - Cross

1   Q.  So it's Jeremy's fault that you put in a false insurance

2   claim?

3            MR. BELL:  Objection.

4            THE COURT:  Thank you.  Sustained.  You can proceed.

5   Q.  Sir, you're not suggesting it's Jeremy's fault,

6   Mr. Reichberg's fault?

7            MR. BELL:  Objection.

8            THE COURT:  Thank you.  You can answer that question.

9   A.  I did not say that.  I said he helped me file a police

10  report, get a cop to take the report, and I submitted a claim.

11  Q.  So he was assisting you as a friend, right?

12  A.  Yes, he assisted me with a matter.

13  Q.  As someone that needed to file a police report, right?

14  A.  Yes.

15  Q.  That at the time you believe was an honest police report,

16  right?

17  A.  Yes.

18  Q.  So it was sometime prior to 2015, right?

19  A.  Right.

20  Q.  And sir, when did you find the watch?

21  A.  I don't remember.  Shortly after.

22  Q.  Was it before you had gotten paid by the insurance company?

23  A.  I don't remember.

24  Q.  It might have been before you had received the money from

25  the insurance company?

1    A.  It may have been.

2    Q.  But you didn't tell the insurance company?

3    A.  No, I did not.

4    Q.  And three weeks ago you paid back the insurance company the

5    $15,000, right?

6    A.  Yes.

7    Q.  And why?

8    A.  Because in a prior proceeding it was suggested to me that I

9    did not try and go and reimburse the company, and I realized

10   that so I wanted to rectify it.

11   Q.  And sir, maybe I could refresh your recollection and see

12   whether this --

13          MS. NECHELES:  If I could approach, your Honor?

14          THE COURT:  You may.

15   Q.  -- see whether this refreshes your recollection on the date

16   that you filed the police report.

17          Does that refresh your recollection that the date was

18   actually 2009?

19   A.  Yes, it does.

20          THE COURT:  Thank you.  Counsel, could we mark that

21   for identification purposes?

22          MS. NECHELES:  Yes, your Honor.

23   Q.  Could I have that back, please?

24   A.  Sure, I'm just looking.

25          MS. NECHELES:  Your Honor we, could mark this as

1    defense Exhibit JR6000.

2              THE COURT:  Thank you very much.

3              MS. NECHELES:  Thank you, your Honor.

4    BY MS. NECHELES:

5    Q.  And sir, so you're saying that because someone asked in a

6    prior proceeding you realized oh, this is a problem, I should

7    pay that back, right?

8    A.  It was suggested to me to pay it back before this

9    proceeding because it's not something that I had done

10   previously.  So I thought --

11   Q.  What was that prior proceeding?

12             MR. BELL:  Your Honor, objection.

13             Your Honor, may we have a sidebar here?

14             THE COURT:  Yes.  Sustained.

15   Q.  And when you say it was suggested to you, who suggested

16   that?

17             MR. BELL:  Objection, your Honor.

18             THE COURT:  Thank you.  Sustained.

19   Q.  And sir, was it someone other than your lawyer?  I don't

20   want to intrude on attorney-client privilege.

21             MR. BELL:  Objection, your Honor.

22             THE COURT:  Thank you.  You can answer the question.

23   A.  I think I would be breaking privilege if I answered that.

24             THE COURT:  Fine, sustained.

25             MS. NECHELES:  I will move on.

IBTTGRA2                          Rechnitz - Cross

 1           THE COURT:  Please do.

 2   BY MS. NECHELES:

 3   Q.  Sir, in addition to cheating the insurance company, you

 4   were also lying to and cheating investors, right?

 5   A.  Yes.

 6   Q.  And that was in connection with two ongoing loan schemes

 7   involving hard money, right?

 8   A.  Yes.

 9   Q.  And when I say hard money loans, you understand what that

10   means, right?

11   A.  Yes.

12   Q.  And hard loan monies -- hard money loans are loans at a

13   very high interest rate which are a little riskier than loans

14   that banks would usually take, right?

15   A.  Right.

16   Q.  And in exchange for taking on a little extra risk, the

17   lender gets a higher percentage, right?

18   A.  Right.

19   Q.  And you were doing that in connection with two different

20   individuals, Mr. Peralta and Mr. Nissen, right?

21   A.  Yes.

22   Q.  And I want to start with Mr. Peralta.  And Mr. Peralta was

23   supposedly running a wholesale liquor company, right?

24   A.  Right.

25   Q.  That's what you believed, is that correct?

1    A.  Yes.

2    Q.  And you met Mr. Peralta through David Colon, right?

3    A.  No, I met him through Jeremy who met him through David.

4    Q.  So originally Mr. Colon introduced Mr. Peralta to -- you

5    say to Mr. Reichberg, and they introduced Mr. Peralta to you,

6    right?

7    A.  Yes.

8    Q.  And Mr. Peralta needed money, he said, to finance his

9    liquor operation, right?

10   A.  Right.

11   Q.  And am I correct that Mr. Colon wanted a commission from

12   this, right?

13   A.  Not so clear.  He never asked us for a commission.

14   Q.  Isn't it correct, sir, that he asked you to pay for his

15   daughter's suite at a hotel?

16   A.  That's correct.

17   Q.  And also to give him a watch, right?

18   A.  I offered him the watch.

19   Q.  And you understood those things to be the commission that

20   you were paying for sort of finder's fee?

21   A.  No, that's not correct.

22   Q.  Well, when someone brings you a nice investment

23   opportunity, it is part of your -- the practice in the business

24   world to pay finder's fees, right?

25   A.  Depends when, when it's legal or illegal.  You can't give

1  someone money if it's illegal.  It depends on the circumstance.

2  Q.  So for example, if you're not a broker you could not get --

3  if you're not a series seven person you could not get a

4  finder's fee from a hedge fund, is that what you're saying?

5  A.  Yes.

6  Q.  But this is not that kind of matter, right?

7  A.  No, this is about a liquor company involving a police

8  officer.

9  Q.  Okay.  But at the time did you know that a police officer

10  could not get a finder's fee on something like that?

11          MR. BELL:  Objection, your Honor.

12          THE COURT:  Thank you.  You can answer the question.

13  A.  I understand it was illegal.

14  Q.  You understood at the time it was illegal for a person to

15  get a finder's fee for something like that, is that your

16  testimony?

17  A.  My understanding is it will be illegal to give a police

18  officer money.

19  Q.  Ever?

20  A.  For the introduction for the liquor.

21  Q.  So instead of giving him money, you gave him a hotel room

22  and a watch, right?

23  A.  Separate and apart from the liquor company, I paid for his

24  daughter's Sweet 16 when he asked and I gave him a watch as

25  well.

IBTTGRA2                    Rechnitz - Cross

1    Q.  And you testified before he never did anything for you,
2    right, except introduce you to Peralta, right?
3    A.  That's right.
4    Q.  And for a while you were bringing investors to invest in
5    Peralta's deal, right?
6    A.  In addition to my own and other investors, yes.
7    Q.  You invested your own money and brought other people who
8    would also make loans, right?
9    A.  Yes.
10   Q.  And those other people who you brought to this were your
11   group of friends and associates, right?
12   A.  Family and friends.
13   Q.  So they include Moshe Klein, right?
14   A.  Yes.
15   Q.  And he's a very wealthy individual who owns a diamond
16   company?
17   A.  That's right.
18   Q.  And Michael Weinberger?
19   A.  Correct.
20   Q.  Close friend of yours?
21   A.  He was.
22   Q.  And by the way, Moshe Klein is someone who you were in the
23   same office suite with, right?
24   A.  No.
25   Q.  You were not in his office suite?

1   A.  No, I never was.

2   Q.  Yaron Turgeman?

3   A.  Yes.

4   Q.  But Mr. Klein is also -- his offices were also at 580 Fifth

5   Avenue, right?

6   A.  In the same building, yes.

7   Q.  The same building that you were in?

8   A.  Yes.

9   Q.  Yaron Turgeman, did you share an office suite with him?

10  A.  At a time, yes.

11  Q.  That was 580 Fifth Avenue, right?

12  A.  Yes.

13  Q.  And 580 Fifth Avenue is in fact known as a diamond

14  building, right?

15  A.  Yes.

16  Q.  It is on the corner of 47th and 5th Avenue, right?

17  A.  Yes.

18  Q.  And 47th is the diamond street, right?

19  A.  It's the diamond district, yes.

20  Q.  When I say -- it's an extremely difficult building to get

21  into, right?

22  A.  No.

23  Q.  Well, very high security?

24  A.  Not if you have an ID, you can get right in.

25  Q.  And to get into the offices that you had, was there a

1    mantrap?

2    A.   Yes.

3    Q.   What is a mantrap?

4    A.   A mantrap is common in the diamond office.  When you walk

5    into the office it's considered like a lobby before you enter

6    the main office where someone has to buzz you in so that they

7    can control who is coming in and out of the office.

8    Q.   So to be clear, there's two doors that you have to go

9    through, right?

10   A.   Well, the front door, which is open, unlocked.

11            Again, whose office are you talking about?

12   Q.   I'm trying to explain what a mantrap is.

13   A.   Usually one door, a locked door into the office.

14   Q.   Well, isn't there a door -- usually two doors and one locks

15   behind you before the other one locks, is that correct?

16   A.   Not in all cases.

17   Q.   But that's what a mantrap is?

18   A.   Again, it's a secure -- call it like vestibule or lobby, so

19   you have to get buzzed in to enter.  It's also called a safe

20   door so no one will walk out with your diamonds.

21   Q.   And no one can bust in and steal things from the place?

22   A.   Right.

23   Q.   That's where your offices were, right, in a place where

24   people and business were diamonds, right?

25   A.   My office was in a building where most tenants were diamond

IBTTGRA2                          Rechnitz - Cross

1    dealers.

2    Q.  And in fact, you gave the impression of being in the

3    diamond business, right?

4    A.  Again, that's a generalization.  I gave the impression I'm

5    in real estate and that I dabbled in diamonds, which was the

6    case.

7    Q.  You say dabbled.  It was the case that you dabbled in

8    diamonds, right?

9    A.  Yes.

10   Q.  When you say "dabbled in diamonds," what you mean is you

11   would sell diamonds, right?

12   A.  Yeah, I would sell jewelry, diamonds, or bring in clients

13   to some of my friends who were in the business.

14   Q.  And you would get a commission when you would do that?

15   A.  Yes.

16   Q.  When you would sell them, you would take diamonds for

17   people to view?

18   A.  On occasion.

19   Q.  And would that be like on consignment; is that what you

20   would be doing, taking diamonds on consignment?

21   A.  Yes.

22   Q.  And when you would do that, would there be any written

23   documentation that you were taking them?

24   A.  Yes.

25   Q.  What would that documentation be?

IBTTGRA2                        Rechnitz - Cross

1   A.  A consignment agreement.

2   Q.  How would that be commonly referred to?

3   A.  Consignment agreement or memo.

4   Q.  A memo.  Right.  That's common in the diamond industry,

5   that things are given out on memo, right?

6   A.  Yes.

7   Q.  And that's what you would do, right?

8   A.  On occasion, yes.

9   Q.  Okay.  And when you were -- in addition, did Ari Schwebel

10  also invest with Mr. Peralta?

11  A.  Not that I'm aware of.

12  Q.  And your father-in-law, Mr. Kohn?

13  A.  Yes, he would.

14  Q.  And Mr. Reichberg did not bring any investors to invest in

15  this, did he?

16  A.  Not that I'm aware of.  Not through me.

17  Q.  And to the best of your knowledge, he didn't do it through

18  anyone else either, right?

19  A.  That's right.

20  Q.  And he didn't invest his own money either, did he?

21  A.  No, he did not.

22  Q.  So you were the one putting up money and bringing the

23  investors there, right?

24  A.  Yes, I was the one who paid and he was the one who dealt

25  with details.

IBTTGRA2                       Rechnitz - Cross

1    Q.  When you say "dealt with details," you were the one who was

2    often having emails with Mr. Peralta about that he had to get

3    paid -- he had to pay certain things or this is the person who

4    was going to be investing, right?

5    A.  I had emails with him.

6    Q.  And you were arranging for the investments and when they

7    should come back and how much should be paid out, right?

8    A.  I was in charge of illegal agreements.

9    Q.  You were charge of illegal agreements and in charge of the

10   finances, right?

11   A.  Yes.

12   Q.  In charge of getting money from the people, right?

13   A.  Yes.

14   Q.  And you were in charge of making sure the money got paid

15   back, right?

16   A.  No, that was on Jeremy.

17   Q.  You were in charge of setting up the dates that things

18   would get paid back, right?

19   A.  In conjunction with Jeremy, yes.

20   Q.  You would determine the terms of the loan, right?

21   A.  No.

22   Q.  Jeremy did that?

23   A.  Together we discussed them.

24   Q.  I see.

25   A.  We were partners in this.

1    Q.  It wasn't his money, it wasn't his investors, but you let

2    him determine the terms of the loan?

3               MR. BELL:  Objection.

4               THE COURT:  Thank you.  Sustained.

5    Q.  Sir, what you were saying when you say "the details" is you

6    claim Mr. Reichberg was supposed to go out and check that the

7    liquor was actually there, right?

8    A.  That was one of his responsibilities.

9    Q.  That's what you say he was supposed to do, right?

10   A.  Yes, that was one of his responsibilities.

11   Q.  And sometimes you would tell him to call Mr. Peralta or to

12   send emails to Mr. Peralta, right?

13   A.  Yes.

14   Q.  You would dictate to him what he would do, right?

15   A.  Yes, on occasion.

16   Q.  He was sort of your assistant who handled the menial

17   things, right?

18   A.  No, not at all.  He, on his own, reached out and was

19   responsible for collecting money from Mr. Peralta as well.

20   Q.  Well, according to you, Mr. Reichberg completely failed in

21   his duties to check whether there was actually liquor there,

22   right?

23   A.  Pardon?

24   Q.  According to you, Mr. Reichberg completely failed in his

25   duties to check whether there was liquor there, right?

IBTTGRA2                        Rechnitz - Cross

1    A.   I later learned that there was never a storage facility

2    that Jeremy had told me he had seen, so yes.

3    Q.   That's what you claim, he had told he had seen a storage

4    facility, and it later turns out to be all false, right?

5    A.   That's right.

6    Q.   And you claim that he was getting 50 percent of the profits

7    when you were bringing in all of the money, investing by

8    yourself, and doing all of the legal and financial aspects, but

9    he was getting 50 percent of the profits for forwarding

10   messages you dictated?

11   A.   That was not what it was for.  He did receive 50 percent of

12   the profits for bringing the opportunity.  This was, again, our

13   understanding.  And our deal was with the same thing with the

14   cops, this came through a cop, from David Colon.  I was the

15   money man and Jeremy was the detail man.  He brought the

16   opportunity to me, we were partners in any profit.  He was

17   responsible to deal with the nuances and the details, and I was

18   the money man.

19   Q.   And that's all on your word, right?

20   A.   No, that's what happened.

21   Q.   Well, we have to rely on your word for that that's what

22   happened, right?

23              MR. BELL:  Objection.

24              THE COURT:  Thank you.  Sustained.

25   Q.   Well, sir, is there any documentation of that?

1    A.   There may be text messages between me and Jeremy.

2    Q.   Have you seen them?

3    A.   No.

4    Q.   And there was no contract, right?

5    A.   No.

6    Q.   And it is customary when someone brings a deal to the table

7    for them to get a finder's fee, right?

8    A.   When there's not any illegalities involved, that's custom.

9    Q.   Was there illegalities of your investors investing in the

10   Peralta deal?

11   A.   Sorry, I misunderstood.  I thought you asked if there was

12   an understanding between me and Jeremy.

13   Q.   No, I asked you whether it is customary for when someone

14   brings a deal to the table when they have no money to invest

15   and no investors that they get a finder's fee, they don't get

16   50 percent of the deal.  Right?

17   A.   I can't generalize, I can only tell you what happened.

18   These are the facts.

19   Q.   And there came a time that you found -- when you were

20   bringing these investors in, you were the one speaking with

21   them, right?

22   A.   Yes, I dealt with the investors, they were my --

23   Q.   You were lying to the investors, right?

24   A.   Yes, I was.

25   Q.   And you were telling them that you were investing more

1   money than you were?

2   A.   That's right.

3   Q.   And that was to induce them to invest their money also,

4   right?

5   A.   Right.

6   Q.   And you were also not telling them that you were getting a

7   commission?

8   A.   That's right, I lied.

9   Q.   And there came -- because of your lies, these people

10   invested money, right?

11   A.   I think partially because of my lies they did, yes.

12   Q.   And there came a time when you found out that Peralta was a

13   Ponzi scheme, right?

14   A.   There came a time when I found out, yes.

15   Q.   You didn't know it at first, right?

16   A.   That's right.

17   Q.   And you lost some money when investing with Peralta.

18   A.   Yes.

19   Q.   But other people lost a lot more money, right?

20   A.   There was only one person who lost, yes.

21   Q.   But that one person was a good friend of yours, right?

22   A.   Yes.

23   Q.   And he lost several million dollars?

24   A.   That's right.

25   Q.   And the only persons that you reimbursed were your

1   father-in-law, right?

2   A.  That's right.

3   Q.  And another good friend who had recently lost a child,

4   right?

5   A.  That's right.

6   Q.  But your good friend Mr. Weinberger, you didn't try to

7   reimburse him, right?

8   A.  I was not able to.

9   Q.  Because you didn't have a couple million dollars to give

10  him, is this what you're saying?

11  A.  Yes.

12  Q.  You couldn't pay him back over time either?

13  A.  Again, I don't want to break privilege, I'm not in contact

14  with him right now, but it's definitely something that after

15  all this passes I will try and make it up with him.

16  Q.  We'll discuss that.

17  A.  Pardon?

18  Q.  We'll get to that, sir.

19          Now there was another hard money loan scheme that you

20  were involved in, right?

21  A.  Yes.

22  Q.  And that was Jason Nissen, right?

23  A.  Yes.

24  Q.  And Jason Nissen had a ticket broker company called

25  National Events Company, is that correct?

IBTTGRA2                      Rechnitz - Cross

1    A.   That's right.

2    Q.   And it had some other names also for the same group of

3    companies, right?

4    A.   Yes.

5    Q.   And it's referred to sometimes as Neco or NECO?

6    A.   Yes, ma'am.

7    Q.   And he would sell -- and that ticket broker company would

8    sell tickets to sporting events and concerts, right?

9    A.   Yes.

10   Q.   And you would get tickets from there sometimes, right?

11   A.   Pardon?

12   Q.   You would get tickets for yourself sometimes from there,

13   right?

14   A.   Yes.

15   Q.   Like those Knicks tickets we saw earlier, right?

16   A.   Yes.

17   Q.   That's where you got them from, right?

18   A.   Yes.

19   Q.   And you didn't pay for them, did you?

20   A.   I did.

21   Q.   He would charge it to your commissions, right?

22   A.   So I paid for it.  I had a balance with him of money he

23   owed me, and it got deducted from there.  So rather than

24   getting a check or wire, he gave me tickets in exchange one

25   year.  Another year I actually paid for them.  It depends on

IBTTGRA2                          Rechnitz - Cross

1    the year.

2    Q.  We'll get to that.  But you started financing and helping

3    Mr. Nissen finance his ticket purchases by having investors

4    loan you money -- him money, correct?

5    A.  That's right.  I brought investors to him.

6    Q.  And now on this hard money loan, Jeremy Reichberg was not

7    involved at all, right?

8    A.  Not in actual investments, just in obtaining tickets for

9    Jason for cops and other reasons.

10   Q.  Sir, you understand we're talking about the investment,

11   right?

12   A.  Yes.  I'm trying to be precise, I apologize.

13   Q.  And you want to say that Jeremy Reichberg was involved

14   somehow, right?

15            MR. BELL:  Objection.

16            THE COURT:  Sustained.

17   Q.  But he was not involved in the investment, right?

18   A.  No, he was not.

19   Q.  And sir, he didn't invest any money in it, right?

20   A.  Right.

21   Q.  He didn't bring any investors to it, right?

22   A.  That's right.

23   Q.  He didn't get any money out of it, right?

24            He didn't get any commissions from this, right?

25   A.  That's right.

1    Q.  He didn't share in your commissions, right?

2    A.  That's right.

3    Q.  And you brought investors to Neco for the time period 2011

4    to 2016, correct?

5    A.  I believe those are the years, yes.

6    Q.  And you, like with the Peralta scheme and the Nissen

7    scheme, you also lied to people to induce them to invest,

8    right?

9    A.  Again, I lied to the same person, to Michael Weinberger,

10   yes.

11   Q.  You didn't tell anybody about the commissions you were

12   making, right?

13   A.  Yes, I did.

14   Q.  You say you told people about the commissions?

15   A.  Yes.

16   Q.  Well, there were written contracts for this investment,

17   right?

18   A.  Yes, just like the liquor, written promissory notes between

19   the investor and the borrower.

20   Q.  And for every time that they would invest there would be a

21   written contract, right?

22   A.  Yes.

23   Q.  And those written contracts did not mention a commission

24   being paid to you, right?

25   A.  Right.

IBTTGRA2                        Rechnitz – Cross

1   Q.  So it's your claim you told people orally, right?

2   A.  I did.

3   Q.  And that's your claim, right, sir?

4   A.  I did.  It's a fact.

5   Q.  And there is no email showing that, right?

6   A.  I'm not sure.  There may be.

7   Q.  Have you seen any?

8   A.  Not that I could recall.

9   Q.  And it would have been easy to put the fact that you were

10  getting a commission into the contract, right?

11  A.  No, it's a promissory note, it was not a contract.  A

12  promissory note is an agreement between a borrower and the

13  lender containing the terms of their actual deal.

14  Q.  Are you saying you couldn't also put a disclosure in that

15  promissory note that you were getting a commission from that?

16          MR. BELL:  Objection, your Honor.

17          THE COURT:  Thank you.  Sustained.

18  Q.  Well, sir, am I correct, you could have put that in there,

19  right?

20  A.  I could have put anything in there, yes.

21  Q.  When you say it was a promissory note, that doesn't mean

22  you couldn't tell people about the commission in writing there,

23  right?

24          MR. BELL:  Objection, your Honor.

25          THE COURT:  Thank you.  You can answer that question.

1    A.   That's not common.

2    Q.   Sir, Mr. Nissen would pay your investors two percent per

3    month for the investment, is that correct?

4    A.   There were different rates for different investments at

5    different times, typically between two to three percent a

6    month.

7    Q.   Two percent is like the low end, right?

8    A.   Yes.

9    Q.   And the investments typically lasted 30 to 60 days, is that

10   correct?

11   A.   No.

12   Q.   Is that what you testified to previously, sir?

13   A.   Some investments were.  I think you asked me typically, so

14   the answer is no.  That was the liquor is what I testified.

15        Nissen, some investments lasted a year, some were six

16   months, some were four months, some were three months.  It

17   depended on each particular event being invested in.

18   Q.   The World Cup was the year long one, right?

19   A.   Yes.

20   Q.   Sir, do you recall that you testified at a prior proceeding

21   that with respect to Mr. Nissen that the investors would get a

22   contract for him for the purchase of these tickets and he would

23   resell them, and between 30 to 60 days later he was supposed to

24   pay back the investors with their profit?

25        MR. BELL:  Objection, move to strike.

1              THE COURT:  Thank you.  Sustained.

2              Counsel, can you rephrase?

3              MS. NECHELES:  Yes, your Honor, I will move on.

4    Q.  So sir, you say now that -- your testimony that the

5    contracts would last between three -- what would you say was

6    the typical contract?

7    A.  It depends.  Each event was different.  We went into

8    different sporting events.  So the World Cup, for example,

9    depending when someone invested, it was a year.  The US Open

10   would be anywhere from four to six months.  A Superbowl

11   investment would probably be around three months.  The NCAA or

12   March Madness or NBA All Star could be two months.  It really

13   depended on the event.

14   Q.  Let's take, for example, a three-month contract as an

15   example, because I want to talk about the numbers for a minute.

16   All right?

17   A.  Okay.

18   Q.  So for a three-month contract, if it was two percent,

19   that's two percent per month, right?

20   A.  Yes.

21   Q.  So on an annualized basis that would be 24 percent

22   interest?

23   A.  Yes.

24   Q.  And it could be as high as three percent a month, right?

25   A.  Right.

1    Q.  And that would be 36 percent interest?

2    A.  If it went the whole year it would be 36 percent, yes.

3    Q.  But that would be the interest rate, correct?

4    A.  Yes, ma'am.

5    Q.  So even if it's three months, that's the interest rate that

6    he's paying, right?

7    A.  Right.  If it went three months, he's paying nine percent.

8    Q.  But the annualized interest rate would be 36 -- between 24

9    and 36 percent, right?

10   A.  Yes.

11   Q.  So for example, when you go to a bank, you hear -- you get

12   told what the annual interest rate is, right?

13          MR. BELL:  Objection.

14          THE COURT:  Thank you.  You can answer the question.

15   A.  I think it depends on what kind of loan.  If you're going

16   for a construction loan or property purchase, a home equity

17   line, I think there's different terminologies for each type of

18   a loan.

19   Q.  But sir, you understand that people tend -- you want to

20   understand how much money is costing you, you want to think

21   about it on an annualized basis, right?

22          MR. BELL:  Objection.

23          THE COURT:  Thank you.  Sustained.

24   Q.  Okay.  But putting all that aside, the annualized interest

25   rate means how much would it cost -- if you have this two

IBTTGRA2                          Rechnitz - Cross

1   percent a month, how much would it cost you per year, right?

2            Do you understand that?

3   A.  I believe that's an annualized rate.

4   Q.  So the annualized interest rate on what you were charging

5   was between 24 and 36 percent, correct?

6   A.  In the example of two to three percent a month, that would

7   be correct.

8   Q.  That was the example you gave.  That's what you said,

9   right?

10           MR. BELL:  Objection.

11           THE COURT:  Sustained.

12  Q.  Well, am I correct that that is what was being charged?

13           MR. BELL:  Objection.

14           THE COURT:  Thank you.  You can answer.

15  A.  Again, each deal was different.  So in the case where we

16  charged two percent a month, if someone loaned money for two

17  months he would be paying four percent on the investment.  But

18  at an annualized rate, hypothetically, it would have been

19  24 percent had an investment gone for a year, which it did not.

20  Q.  And in addition to the two or three percent interest rate,

21  you also got a commission, right?

22  A.  Yes.

23  Q.  And that commission was between five and ten percent,

24  right?

25  A.  That's right.

IBTTGRA2                    Rechnitz - Cross

1   Q.  And that was on every deal, right?

2   A.  Yes.

3   Q.  And often people who invested, you have testified, would

4   roll over their money into a new deal, right?

5   A.  On occasion they would do that.

6   Q.  But even if the money got rolled over, you still -- you got

7   an additional five or ten percent of the commission, right?

8   A.  On every new investment I was paid a fee for bringing money

9   to the table.

10  Q.  That doesn't mean every new person putting money in, it

11  means every time money was put into a loan situation you got

12  five or ten percent, right?

13  A.  That's right, every new investment.

14  Q.  So for example, if $100,000 was invested in a three-month

15  deal and it kept being invested, you would get between five and

16  ten percent the first three months, right?

17  A.  Again, if $100,000 was the investment amount, assume I

18  would be paid --

19          Again, this is hypothetical, right?

20  Q.  Yes.

21  A.  -- $5,000.

22          You are asking about a three-month deal?

23  Q.  Yes.

24  A.  So I would make $5,000.  If that money was reinvested for

25  month four, I would make another $5,000.

IBTTGRA2                         Rechnitz - Cross

Q.   That's a real cost.  Mr. Nissen was paying that money out,

right?

A.   Yes, it was my fee for bringing money to the table.

Q.   And so say the interest or the commission that you were

getting was five percent on a $100,000 and it was three-month

investments.  That would mean that four times during that year

you would get paid $5,000 on that $100,000, right?

A.   Right.  If the same 100,000 is invested four times at

three-month intervals, which I can't think of an occasion that

would happen, I would make $20,000 on that investment for the

year.

Q.   And Mr. Nissen would pay 20,000 on that, right?

A.   On the four investments, yes.

Q.   In addition, he would be paying another 24 to $36,000,

right?

A.   Separate and apart from me he would be paying the investor

whatever their contract said.  So if it was two percent a month

over three months, the investor would make six percent.  If the

investor went in four times with him he would have six plus six

plus six plus six, which is 24 percent over the year.

          (Continued on next page)

IBTKGRA3                    Rechnitz - Cross

BY MS. NECHELES:

Q.  So it would cost him the $20,000 he paid you plus the
24,000 in interest or 36,000 in interest that he would pay,
right?  That's what it would cost him to borrow $100,000 for a
year under our hypothetical, correct?

A.  In your scenario, that's how the math works out, yes, but,
again, if somebody gave Mr. Nissen a hundred thousand dollars
for the entire year, I would only make $5,000.  He wouldn't
have to pay me 20.

Q.  Okay.  But we're talking about under a four-month deal,
right?

A.  I think you're talking about four three-month separate
deals.

Q.  Correct.

A.  Hypothetically, that's what would happen, yes.

Q.  And the only deal that was a yearlong deal was the World
Cup, right?

A.  I can't say that with certainty.  I just want to be
precise, but I think that's the case.

Q.  So under this scenario, what we were talking about before,
it would cost Mr. Nissen, to borrow $100,000 for a year,
between 44,000 and 56,000 dollars, that would be his cost for
borrowing $100,000 per year, right?

A.  No.  His cost would be the interest he has to pay to the
borrower, which would be 24 to 36 thousand dollars for the

IBTKGRA3                    Rechnitz - Cross

1    year.

2    Q.  Well, that would be his interest rate, right?

3    A.  Right.

4    Q.  But he's actually paying out money for your commission,

5    too, right?

6    A.  Yes, if you want to include my commission.

7    Q.  So that's his cost, that's what I'm doing, you understand

8    that, sir, right?

9    A.  Okay.  Yes.

10   Q.  His cost is between 44,000 and 56,000 a year on $100,000,

11   right?

12   A.  On $100,000, four times, that's the answer, yes.

13   Q.  So the actual cost could have been higher or it could have

14   been lower, right?

15   A.  Right.

16   Q.  But that's a tremendous amount of money to be paying out on

17   to borrow money, right?

18   A.  Yes.

19   Q.  Am I correct, sir, that Nissen turned out to be a Ponzi

20   scheme, also?

21   A.  That's right.

22   Q.  And this was the second Ponzi scheme that you had your

23   investors invest in, right?

24   A.  It was actually the third.

25   Q.  Well, I'm just talking right now about Peralta and Nissen,

IBTKGRA3                        Rechnitz - Cross

1   okay?  We'll stay with that for a minute.

2   A.  Okay.  You asked me a question.  I'm just trying to answer

3   it precisely.  It's the third Ponzi scheme that I have brought

4   money to.

5   Q.  Okay.  And, sir, what was the other one?

6   A.  Platinum Partners.

7   Q.  So that was the one you bribed someone to put money into;

8   is that correct?

9   A.  That's the one where Murray Huberfeld, Jeremy Reichberg,

10  and I were followed with a bribe with Norman Seabrook to invest

11  money into the hedge fund which ended up becoming a Ponzi.

12  Q.  All right.  We'll talk about that in a few minutes, all

13  right?  So put that to the side because that was separate,

14  right?  That was not you bringing your normal investors into

15  it, right?

16  A.  It was a different investor.

17  Q.  Okay.  You did not have your group of investors invest in

18  Platinum, right?

19  A.  No.

20  Q.  So the two Ponzi -- or the two big investments you had your

21  group of investors invest in for hard money loans was first

22  Peralta and then Nissen, right?

23  A.  That's right.

24  Q.  And they both turned out to be Ponzi schemes, right?

25  A.  Yes.

1    Q.   And you claim that with Mr. Nissen, you did not know that

2    it was a Ponzi scheme, right?

3    A.   That's right.

4    Q.   But you knew that Mr. Nissen was paying an outlandish

5    amount of money to borrow money, right?

6    A.   That's right.

7    Q.   You knew that Mr. Nissen was often late in paying back

8    money?

9    A.   That's right.

10   Q.   And he was having trouble paying back money, right?

11   A.   That's right.

12   Q.   He was having trouble paying your commissions, right?

13   A.   At times, yes.

14   Q.   And he was bouncing checks sometimes, right?

15   A.   That's right.

16   Q.   And he was giving all sorts of excuses about why he

17   couldn't pay back money, right?

18   A.   That's right.

19   Q.   And you say you were checking on it, right?

20   A.   Yes.

21   Q.   But all of those things are the hallmarks of a Ponzi

22   scheme, right?

23            MR. BELL:  Objection.

24            THE COURT:  You can respond to the question.

25            THE WITNESS:  No.  I actually trusted him.  He

1  supplied me with tax returns and --

2  BY MS. NECHELES:

3  Q.  I did not ask that.

4        THE COURT:  I'm sorry, allow the witness to finish.

5        THE WITNESS:  He supplied me with his tax returns and

6  with his booking records.  At the end I found out that he

7  falsified all the documents in his checks, and he photoshopped

8  them.  I had no way to know that.

9  Q.  Okay.  But, sir, I asked you when there are outlandish

10  interest rates failing to pay back money, using one investor's

11  money to pay another investor, those are the indicia of a Ponzi

12  scheme, right?

13  A.  Given my experience to date, that's something I would

14  answer yes today, which I would not have answered yes back

15  then.

16  Q.  Okay.  But you had already gone through a Ponzi scheme,

17  right?

18  A.  They were both at the same time.

19  Q.  And, sir, you knew that you were lying to get people to

20  invest in this Ponzi scheme, right?

21  A.  Yes.

22  Q.  And you were doing it because you were making a lot of

23  money by it, right?

24  A.  Yeah, I was greedy.

25  Q.  And your lies were quite elaborate at times, right?

IBTKGRA3                        Rechnitz - Cross

1    A.  Yes.

2    Q.  Your lies to Michael Weinberger, your good friend, were

3    very elaborate, right?

4    A.  Yes.

5    Q.  You would dictate elaborate multistep lies to put into

6    emails, you would dictate those to Mr. Nissen to send to

7    Mr. Weinberger, right?

8    A.  Yes, that's right.

9    Q.  And you did that to cause Mr. Weinberger to believe that

10   you and other people, your father-in-law, were putting money

11   into this scheme, or to Mr. Nissen's company, when you weren't,

12   right?

13   A.  That's right.  Regrettably, yes.

14   Q.  And this is a person -- Mr. Weinberger was a person who his

15   family and your family were very close, right?

16   A.  That's right.

17   Q.  You used to go away on vacation together, right?

18   A.  Yes.

19   Q.  And you spent a lot of time together, right?

20   A.  Yes.

21   Q.  But you were deceiving him about what you were doing,

22   right?

23   A.  That's right.

24   Q.  And defrauded him about your intentions, right?

25   A.  That's right.

1    Q.  He didn't know that you intended to deceive him, right?

2    A.  Right.

3    Q.  Or that you intended to make money off of him, right?

4    A.  Right.

5    Q.  He thought you were just putting him in this for

6    friendship, right?

7    A.  Yes.

8    Q.  But you were really doing it to make money for your own

9    pocket, right?

10   A.  It was out of avarice, yes.

11   Q.  You, in fact, made a lot of money on your investment with

12   Peralta, right?

13   A.  Yes.

14   Q.  How much did you make in commissions?

15   A.  I think I personally made four to five hundred thousand

16   dollars, my cut, on Peralta.

17   Q.  In the commissions?

18   A.  Yes.

19   Q.  When you say "my cut," what do you mean by that?

20   A.  Meaning Jeremy and I split the cash 50/50, so I'm just

21   calculating my actual cut.

22   Q.  Okay.  Withdrawn.

23        I was asking you about Nissen.  You knew that, right?

24   A.  No.  You said Peralta, ma'am.

25   Q.  All right.  Withdrawn.

IBTKGRA3                          Rechnitz - Cross

1         How much did you make in your commissions on Nissen?

2  A.  Oh, on Nissen?  I think I made five to six million dollars.

3  Q.  And what are you basing that on?

4  A.  I'm basing it on my memory.

5         You're asking what I think?

6  Q.  Yes.

7  A.  I think over time, looking back, that's what I made.

8  Q.  Okay.  In addition to the commissions, you received a loan

9  for a million dollars, right?

10  A.  That's right.

11  Q.  And you were supposed to pay this loan back if the

12  company -- you received a loan supposedly as an advance against

13  the company getting sold, right?

14  A.  That's right.

15  Q.  And you claim it was a loan, right?  There's a loan

16  document, right?

17  A.  There was a loan.

18  Q.  And there was zero percent interest in that line, right?

19  A.  Yes.

20  Q.  He just gave you a million dollars for you to have for five

21  years, right?

22  A.  No.  I helped him build his company up.  So the idea behind

23  the loan, which I think it may state or it may not, is that he

24  was giving me an advance against a sale of the company.  He had

25  brought in an investment fund called Falcon, who he said would

1  probably buyout the company somewhere north of a hundred

2  million dollars, and he would be giving me 10 percent of his

3  share.  So the idea discussed between Jason and I was that he

4  would advance me a million dollars against the sale because it

5  was taking longer than it should have to actually sell, and in

6  exchange, he said, we'll, for sure, be sold within five years.

7  Q.  Okay.  Sir, you got the loan two years before Falcon ever

8  came on the scene, right?

9  A.  Again, I don't know what dates they actually signed with

10 him, but he was in talks with many companies at that time.

11 Q.  When you say you helped him build the company, you charged

12 him for that, right?

13 A.  Yes.

14 Q.  You made millions of dollars off of him, right?

15 A.  Yes.

16 Q.  So you say, in addition to those millions of dollars, he

17 just gave you a loan out of gratitude that you helped build the

18 company, right?

19 A.  Well, he still needed me at that point, and I negotiated a

20 good deal for myself.

21 Q.  He needed you, and you demanded a million dollars, right?

22 A.  Again, he needed me, and I negotiated a good deal for

23 myself at the time.

24 Q.  And that was part of your requirement for you to keep

25 bringing money to him, right?

1    A.  I wouldn't call it a requirement.  I made a good

2    negotiation.

3    Q.  Okay.  And you still didn't know it was a Ponzi scheme,

4    that he was giving you a million dollars on top of your

5    commissions?

6    A.  No.  It was an advance against a future sale of the

7    company.

8    Q.  If the company was not sold within five years, you were

9    supposed to pay that back, right?

10   A.  If everything would have gone straight, yes.

11   Q.  That's not my question.

12          The question is whether you were supposed to pay it

13   back?

14          MR. BELL:  Objection, your Honor.

15          THE COURT:  I'm sorry.  Please go ahead, counsel.

16   Q.  Were you supposed to pay that loan back within five years?

17   A.  It was a five-year term if the company did not sell.

18   Q.  Okay.  And that five years has come and gone, right?

19   A.  That's right.

20   Q.  And you have not paid that money back, right?

21   A.  No, I have not.

22   Q.  At some point you say you became aware that Nissen was

23   running a Ponzi scheme, right?

24   A.  Yes.

25   Q.  And you are aware that he ended up getting prosecuted for

1    that, right?

2    A.  Yes.

3    Q.  And he pled guilty and went to jail for that?

4              MR. BELL:  Objection.

5              THE COURT:  Thank you.

6              Sustained.

7    BY MS. NECHELES:

8    Q.  Well, he's no longer in business, right?

9    A.  I don't know his current status.  I know that he pled

10   guilty to running a Ponzi scheme.

11   Q.  And he's no longer in business, right?

12   A.  Yeah, I don't know his status.  I had heard that he was

13   still trying to run a ticket business.

14   Q.  Okay.  But his company, NECO, is in bankruptcy, right?

15   A.  That's correct.

16   Q.  Am I correct that the bankruptcy trustee has sent you a

17   letter demanding that you repay the $9,341,469 that you

18   received from NECO as fraudulent conveyances and preferences;

19   am I correct?

20   A.  That's a letter they sent to my attorney, addressed to my

21   company, JSR, yes.

22   Q.  So when they sent it to your attorney, you understood that

23   they were sending it to your attorney for you, right?

24   A.  Yes.

25   Q.  And that that was the amount that they calculated that you

1   had received from NECO, right?

2   A.  I don't know how they came to that determination.  That's

3   not a number I agree with.

4   Q.  So when you say -- they wrote this letter to you on

5   June 26, 2018, right?

6   A.  Yes.

7   Q.  And it was a demand letter, right?

8   A.  I'm not sure.  I didn't look at it.

9   Q.  You didn't look at it?

10  A.  No.  I didn't even respond to it.

11  Q.  Why?

12  A.  Because it's factually incorrect, and there are reasons I

13  can't get into, which breach client-attorney privilege.

14  Q.  When you say "it's factually incorrect," you understand

15  that they asked you to come in and speak with them about it?

16  A.  Again, I don't know what the letter says, and I really

17  don't want to breach attorney-client privilege on this topic.

18  Q.  Okay.  I'm asking about you, sir.  You did not try to find

19  out what this -- how they calculated that 9,300,000 and

20  whatever, right?

21  A.  No.  No.

22  Q.  So when you say you don't know how they calculated, the

23  reason you don't know is because you didn't try to find out,

24  right?

25          MR. BELL:  Objection.

1          THE COURT:  Sustained.

2    BY MS. NECHELES:

3    Q.  Well, did you try to find out?

4    A.  Again, I can't -- this is a very uncomfortable question

5    because I don't want to breach attorney-client privilege.

6    Q.  No, I'm asking what you did.  I'm not asking what your

7    attorney told you.

8          MR. BELL:  Objection, your Honor.

9          THE COURT:  Thank you.

10         I'm sustaining the objection.

11   Q.  Did you do something -- I don't want to know what your

12   attorney told you.  I'm asking did you do something to find out

13   what that amount was for?

14         MR. BELL:  Objection, your Honor.

15         THE COURT:  Thank you.

16         Sustained.

17   Q.  All right.  Sir, but you don't know, right?  You don't know

18   as of today, right?

19   A.  Pardon?

20   Q.  You don't know, as of today, what that 9,300,000 -- well,

21   that $9,341,469 represents, right?

22   A.  No.  I don't owe them any money.

23   Q.  You think you don't owe them any money, is that your

24   story -- your testimony?

25   A.  I do not owe them money.

IBTKGRA3                          Rechnitz - Cross

1  Q.  But you obtained commissions there that you got by means of

2  fraud, right?

3  A.  Yes.

4  Q.  And people, investors, lost a lot of money, right?

5  A.  One of my investors lost money.

6  Q.  Well, a lot of other investors lost a lot of money, too,

7  right?

8  A.  Unrelated to me.

9  Q.  Some people, you had brought in, right?

10 A.  Not that I was involved with, no.

11 Q.  Well, initially, you had brought them in, right?

12 A.  Sorry.  I don't know what you're referring to.

13 Q.  Well, Mr. Turgeman, was he investing in this?

14 A.  He had invested through me for a period of time, and then

15 once I stopped doing investments with Jason, without my

16 knowledge, he directly invested with Nissen.

17 Q.  These people lost a lot of money, right?

18 A.  I don't have firsthand knowledge.  I can't answer that.

19 Q.  Mr. Weinberger, your good friend, lost millions here,

20 right?

21 A.  Yes.  He's the only investor that lost money.

22 Q.  So that's the second Ponzi scheme that you caused

23 Mr. Weinberger to lose a lot of money in by lying to him,

24 right?

25 A.  I don't want to play with words, but I didn't cause a Ponzi

IBTKGRA3                          Rechnitz - Cross

1    scheme.

2    Q.  Okay.

3    A.  It's the second investment out of the many investments

4    Weinberger had with me where it turned into a Ponzi.

5    Q.  And you previously said that you hoped some day to make it

6    good to Mr. Weinberger, right?

7    A.  Yes, I will.

8    Q.  But here you have the opportunity to do that by responding

9    to the bankruptcy trustee, who is trying to get money for the

10   investors, right?

11               MR. BELL:  Objection.

12               THE COURT:  Thank you.

13               Sustained.

14   BY MS. NECHELES:

15   Q.  Well, you could have dealt with this bankruptcy trustee,

16   which would have helped make Mr. Weinberger good, right?

17               MR. BELL:  Objection.

18               THE COURT:  Thank you.

19               Sustained.

20   Q.  Well, you didn't try to help Mr. Weinberger here, did you?

21   A.  Again, I can't answer that question.  It would breach

22   attorney-client privilege.

23   Q.  I'm not asking for you to do that, sir.  I'm just asking

24   for whether you tried to help him.

25               MR. BELL:  Objection, your Honor.

IBTKGRA3                        Rechnitz - Cross

1              THE COURT:  Thank you.

2              Sustained.

3     BY MS. NECHELES:

4     Q.  Sir, when you testified a little while ago that you

5     received 4 or 5 million dollars in commission, you knew that

6     the bankruptcy trustee had calculated a very different number,

7     about twice as much as you were saying, right?

8     A.  I think I testified --

9              MR. BELL:  Objection.

10             THE COURT:  I'm sorry, I accept the answer.

11             Continue.

12             THE WITNESS:  I think I testified a few moments ago 5

13    to $6 million, not 4 to $5 million.

14    Q.  Okay.  But you knew that the bankruptcy trustee had

15    calculated a number in excess of 9 million, right?

16             MR. BELL:  Objection; hearsay.

17             THE COURT:  Thank you.

18             You can answer the question.

19             THE WITNESS:  Are you asking that now or when I

20    estimated my numbers previously?

21    BY MS. NECHELES:

22    Q.  I'm asking when you testified in this court just a few

23    minutes ago.

24    A.  Yes, you asked me how much money I was paid in commission,

25    and I answered you truthfully, somewhere between 5 to 6 million

1    dollars.

2    Q.  You knew the bankruptcy trustee had calculated a very

3    precise number that was over $9 million, right?

4               MR. BELL:  Objection, your Honor.

5               THE COURT:  Thank you.

6               You can answer the question.

7               THE WITNESS:  I don't know if that was their

8    calculation based on just commissions or other penalties they

9    added.  I don't know what is behind that number because it's a

10   number that's far in excess of commissions I received.

11   Q.  You chose not to disclose that here, right?

12               MR. BELL:  Objection, your Honor.

13               THE COURT:  Thank you.

14               Sustained.

15   BY MS. NECHELES:

16   Q.  Sir, one of the ways -- Mr. Nissen paid your commission in

17   a variety of ways, right?

18   A.  Right.

19   Q.  And you testified on direct examination that one of the

20   ways that he paid your commission was by paying your credit

21   card, right?

22   A.  Right.

23   Q.  And he would pay -- instead of giving you a wire transfer

24   or money directly to you, he would wire transfer and pay money

25   to your credit card, right?

IBTKGRA3                    Rechnitz - Cross

1    A.  That's right.

2    Q.  You testified on direct examination that you intended not

3    to declare that income, right?

4    A.  That's right.

5    Q.  So it was being paid to your credit card, and it was your

6    intent at the time, I'm not going to pay income on that, right?

7    A.  Right.  I was going to avoid paying taxes on that income.

8    Q.  Okay.  And in addition to him doing that on your credit

9    card, you also had Mr. Nissen pay for jewelry you bought

10   sometimes, right?

11   A.  Yes.

12   Q.  And you would ask, or you would say to somebody, here --

13   you would tell Mr. Nissen, I want to buy jewelry from another

14   individual, so can you please go pay for that, right?

15   A.  On occasion, yes.

16   Q.  And that was another way that you -- and you did that

17   deliberately to avoid paying taxes on that income, right?

18   A.  Yes, ma'am.

19   Q.  And, sir, you were asked about this in prior trials, right?

20           MR. BELL:  Objection.

21           THE COURT:  Thank you.

22           Sustained.

23   BY MS. NECHELES:

24   Q.  Okay.  In prior proceedings, sir, you testified about this,

25   right?

1   A.  Yes.

2   Q.  And am I correct, sir, that in your prior proceeding, you

3   were specifically asked if the reason that your credit card was

4   paid was so that you could avoid paying taxes, and you answered

5   no?

6   A.  Is that a question?

7   Q.  Yes.

8   A.  There were a few prior proceedings.  In the first prior

9   proceeding, I was asked that question, and the way I understood

10  the question was, was that my sole motive.  I misunderstood the

11  question.  So in the second prior proceeding, when I was asked

12  that question again, I clearly answered that, yes, that was one

13  of my motives.

14          And my testimony today, just like the last proceeding,

15  is one of my motives to have my credit card paid was to avoid

16  declaring income on my taxes.

17  Q.  Okay.  Sir, so I want to be clear:  In the first

18  proceeding, you were asked the following question:  Am I

19  correct that --

20          MR. BELL:  Objection, your Honor.

21          THE COURT:  You can proceed, counsel.

22  Q.  You were asked:  "So the real reason he paid your credit

23  card bill was so that you would be able to avoid taxes?"

24          And you answered:  "That is not correct."  Page 10 --

25  or 1403.

1            MR. BELL:  Objection, your Honor.

2            THE COURT:  Sustained.

3            MS. NECHELES:  I was telling that for the -- I'm

4     sorry, I was telling that for the prosecutor.

5            MR. BELL:  Objection.

6            THE COURT:  Sustained.

7     BY MS. NECHELES:

8     Q.  Am I correct that you were asked that question and gave

9     that answer?

10    A.  Again, I was asked the real reason, as I understood that

11    question, meaning the prime reason.  That was not the prime

12    reason.  I had a few reasons that I wanted my credit card to be

13    paid by Nissen.  One was to avoid paying taxes.  Another was

14    because it would give Nissen more time to pay me, which made

15    him happy.  I wanted to keep him happy as well.

16           So when I was asked that question, my understanding of

17    the question was that was that the prime reason, and I think I

18    answered -- I know I answered it truthfully.  In another

19    proceeding, I was asked --

20    Q.  Sir, can we --

21           MR. BELL:  Objection.

22           THE COURT:  I'm sorry.  Counsel, can you please allow

23    the witness to finish his answer?

24           MS. NECHELES:  Okay.

25           THE WITNESS:  In another proceeding, I was asked once

again in a more clear fashion, was that one of the reasons that

you got paid by credit card, and my answer then is the same as

my answer now.  I intentionally had Nissen pay my credit card,

so I could avoid paying taxes.  It's something I did knowingly.

Q.  I see.

     And, sir, let me be clear:  In the first proceeding,

you were asked by an individual whether Mr. Nissen on occasion

paid -- I'm sorry, withdrawn -- you were asked whether

Mr. Nissen would owe you money on occasion, and then he would

pay your credit card, and you said:  The reason he paid your

credit card instead was to buy him a couple of weeks, right, of

time; am I correct?

     MR. BELL:  Objection, your Honor.

     THE COURT:  Thank you.

     Sustained.

BY MS. NECHELES:

Q.  Well, did you say that it was to give him more time,

because he wanted more time?

     MR. BELL:  Objection, your Honor.

     THE COURT:  Thank you.

     Sustained.

Q.  Well, what was the reason that you are testifying now that

you said there were a couple of reasons?

     MR. BELL:  Objection; asked and answered.

     THE COURT:  Thank you.

```
 1              You can answer the question.

 2              THE WITNESS:  Again, the reason that I had Nissen pay

 3   my credit card rather than give me a check or a wire was

 4   twofold.  One reason was so that Nissen had more time to pay me

 5   the money, and I was able to still spend the money while not

 6   having it received in my account yet.  And reason B was that I

 7   would be able to avoid putting it on my tax return, since it

 8   was not a direct payment to me.

 9   BY MS. NECHELES:

10   Q.  And so you understood that there were two reasons, that's

11   what you're saying, right?

12   A.  There were two reasons.

13   Q.  And in the first trial, when you were asked about this --

14              MR. BELL:  Objection, your Honor.

15              THE COURT:  Thank you.

16              Sustained.

17   Q.  Well, sir, you testified differently in the first trial,

18   didn't you?

19              MR. BELL:  Objection.

20              THE COURT:  Thank you.

21              Sustained.

22   Q.  Well, isn't this the opposite of what you testified in the

23   first trial?

24              MR. BELL:  Objection.  Your Honor --

25              THE COURT:  Sustained.
```

1              Yes, please come on up.

2              MS. NECHELES:  I'm sorry.  Your Honor, it was a prior

3    proceeding.  A prior proceeding.

4              MR. BELL:  Objection, your Honor.

5              THE COURT:  Thank you.

6              Sustained.

7    BY MS. NECHELES:

8    Q.  Isn't this the opposite of what you testified to in the

9    prior proceeding?

10             MR. BELL:  Objection, your Honor.

11             THE COURT:  Thank you.

12             Sustained.

13   Q.  Well, did you testify -- isn't it a fact, sir, that in a

14   prior proceeding, you said that the only reason was that

15   because you had -- it was to gain three weeks' time or to buy

16   time, as you said it?

17             MR. BELL:  Objection, your Honor.

18             THE COURT:  Thank you.

19             I'll permit the answer, and hopefully we can move on.

20             THE WITNESS:  In a prior proceeding, unrelated to

21   today's proceeding --

22   Q.  Yes.

23   A.  -- I was asked, as you read back, if the primary purpose

24   was to buy more time for Nissen.  I understood that question to

25   mean the primary reason.  As I've answered, and I'm trying to

1   effectuate my answer -- maybe please tell me where I'm not --

2   is that I paid -- I had my credit card paid for two reasons.

3   Reason number one is to avoid paying taxes, not in any

4   significant order; reason number two was to buy more time for

5   Nissen to pay me while I can use the funds even though he

6   didn't lay them out.

7   Q.  All right, sir.

8            In the prior proceeding, you never said that one of

9   the reasons was to avoid paying taxes, right?

10           MR. BELL:  Objection, your Honor.

11           THE COURT:  Thank you.

12           Sustained.

13  BY MS. NECHELES:

14  Q.  Well, am I correct that the answer that you gave to your

15  question about taxes was that that was not correct?

16           MR. BELL:  Objection, your Honor.

17           THE COURT:  Thank you.

18           Sustained.

19  Q.  In that prior proceeding, did you ever admit that you were

20  not paying the credit card because you were -- withdrawn.

21           In that prior proceeding, did you ever admit that

22  Mr. Nissen was paying your credit card, at least in part, so

23  that you would not have to pay taxes?  Did you ever admit that,

24  sir?

25           MR. BELL:  Objection, your Honor.

1              THE COURT:  Thank you.

2              Sustained.

3              Let's move on, counsel.

4              MS. NECHELES:  Okay.

5    BY MS. NECHELES:

6    Q.  And, sir, did you tell the government that before you

7    started cooperating?

8    A.  Did I tell them what?

9    Q.  That you had been having Nissen pay your credit card and

10   pay other expenses in order so that you would not -- with the

11   intent that you would not pay your taxes?

12   A.  While cooperating, I told them that.

13   Q.  You told them.

14             What date did you tell them that?

15   A.  Whenever I was asked.  Whenever I'm asked something, I

16   answer it.

17   Q.  I see.

18             You say you were asked that, and you told them that,

19   right?

20   A.  No.  I'm saying -- you are asking me what dates, so I'm

21   telling you, whenever the topic came up where they brought it

22   up to me, or I brought it up to them, that would be the date

23   that it was discussed.  I don't know it by heart.

24   Q.  Okay.  Well, on several occasions, you discussed with the

25   government the Nissen investment, right?

1    A.   Yes.

2    Q.   And on those occasions, when you discussed this with the

3    government, you told them that you had not -- you had lied to

4    investors on occasion by not disclosing that you were getting a

5    commission, right?

6    A.   That's one of the things I told the government, yes.

7    Q.   And you had told the government -- you told the government

8    that you charged a -- or that you had -- you told the

9    government, in addition, that you didn't disclose -- you told

10   them that you were investing money as an investor, that you

11   were investing money when you weren't investing money, right?

12   A.   I'm sorry, you're confusing me a bit.

13   Q.   Okay.  You told them various things about what you had not

14   told investors and how you caused investors to invest money,

15   right?

16   A.   Yes.

17   Q.   But you did not tell them that you had not paid taxes on

18   income you had gotten, right?

19   A.   I did tell them that I did not file taxes from the

20   beginning.

21   Q.   You told them you hadn't filed your tax returns, right?

22   A.   Right.

23   Q.   But you did not tell them that you had caused Nissen to pay

24   your credit cards with the intent that you would not pay taxes,

25   right?

1    A.  I don't know -- I did tell them.  I don't know when I told

2    them.  When the topic came up, as everything else, I answered

3    truthfully.

4    Q.  Okay.  Sir, you're saying if they asked you specifically,

5    you told them?

6    A.  I'm not saying that.  I'm saying when the topic came up, or

7    I told them, or they asked me, I don't remember how it came up.

8    Whenever I realized that that was part of my reason, I shared

9    that with them.

10   Q.  When you say "when I realized it was part of my reason,"

11   you knew that from the moment you had him pay your credit card,

12   that one of the reasons you were doing that was because you

13   didn't want to pay taxes on that money, right?

14   A.  That's right.

15   Q.  That was your intent all along, right?

16   A.  That was one of my intentions.

17   Q.  So when you went in to tell the government about your

18   crimes, that was one of the crimes that was on your mind,

19   right?

20   A.  If it was on my mind, I would have shared it at that point.

21   Q.  Okay.  Well, sir, am I correct that you began cooperating

22   with the government in June of 2016?

23   A.  Yes.

24   Q.  But you continued to have Nissen pay your credit card bill

25   through the end of 2016, right?

1   A.  Right.

2   Q.  And the reason, as you've testified, for him paying your

3   credit card, one of the reasons was because you did not intend

4   to pay taxes on it, right?

5   A.  At a point in time, that's correct.

6   Q.  All right.  Now you're qualifying it, right?

7   A.  I don't know.  You're asking me a question.  I'm just

8   trying to give you a precise answer.

9   Q.  Well, now you say it was only at a point in time that I had

10  that intent, right?

11  A.  No.  What I'm saying is at a point in time, that was

12  correct.  There was a moment in time where I was having Nissen

13  pay credit cards, so I could intentionally not declare it on my

14  income.  The time period you're speaking about, I already knew

15  I was behind on taxes, and that was not my intention at that

16  time.

17  Q.  Well, you hadn't filed your tax returns, is what you're

18  saying, right?

19  A.  Right.  I was behind on my taxes.

20  Q.  But you didn't say to Nissen, I'm cooperating with the

21  government now, I need to do this straight, send me the money

22  direct to my bank account, did you?

23          MR. BELL:  Objection, your Honor.

24          THE COURT:  Thank you.

25          Sustained.

IBTKGRA3                          Rechnitz - Cross

1    BY MS. NECHELES:

2    Q.  Well, you did not tell Nissen to stop paying your credit

3    card, but, instead, send the money directly to your bank

4    account after you started cooperating, did you?

5            MR. BELL:  Objection, your Honor.

6            THE COURT:  Thank you.

7            You can answer the question.

8            THE WITNESS:  No.  I was not speaking to Nissen much

9    at that time.

10   Q.  Well, you continued to get investments for him and get

11   large commissions from him, right?

12   A.  Right.  While I knew -- while I believed that he was a

13   legitimate business, I continued dealing with him until I was

14   instructed not to.

15   Q.  You continued dealing with him through the end of December

16   of 2016, right?

17   A.  That's right.

18   Q.  And so that -- and he continued to pay you commissions to

19   your credit card throughout 2016, right?

20   A.  Right.  He had asked me if I can still do that with him, so

21   that he had more time to pay, and I was fine with it.

22   Q.  And you said, go ahead, why don't we go ahead and continue

23   our tax fraud, is that what you're saying?

24           MR. BELL:  Objection, your Honor.

25           THE COURT:  Sustained.

 1    BY MS. NECHELES:

 2    Q.  Well, you continued to do what you have testified was a tax

 3    fraud after you started cooperating, right?

 4              MR. BELL:  Objection, your Honor.

 5              THE COURT:  Thank you.

 6              Sustained.

 7    Q.  Well, sir, you continued to have your credit card bills

 8    paid, right?

 9    A.  Yes, I did.

10    Q.  And, sir, did you tell the government that you were doing

11    that?

12    A.  I think so.  I'm not sure.

13    Q.  You told the government in 2016 that you were continuing to

14    have Nissen pay your credit cards instead of paying you

15    directly?

16    A.  I don't think I didn't disclose it.  If I was asked, I

17    would have said it.

18    Q.  You're saying if they asked me specifically is Nissen

19    paying your credit cards, you would have told them, right?

20    A.  Absolutely.  I have to tell them everything they ask me

21    truthfully.

22    Q.  But if they didn't ask you, you might not have told them,

23    right?

24    A.  If I wasn't doing anything wrong, and there was no crime

25    involved or intent, I wouldn't tell them, no.

IBTKGRA3                         Rechnitz - Cross

1    Q.  Okay.  But this was a crime, right?

2    A.  No.

3            MR. BELL:  Objection, your Honor.

4            THE COURT:  Sustained.  I'm striking the answer.

5            You can proceed.

6    BY MS. NECHELES:

7    Q.  And, sir, throughout the time period that you were living

8    so lavishly and -- well, withdrawn.

9            Throughout the time period that you have been

10   testifying about, about paying for all these expensive items,

11   the trips, and things like that for police officers, you were

12   engaged in this tax fraud, right?

13           MR. BELL:  Objection.

14           THE COURT:  Thank you.

15           Sustained.

16   Q.  Well, sir, wasn't that the time period when you were having

17   Nissen pay your credit cards?

18           MR. BELL:  Objection.

19           THE COURT:  Thank you.

20           You can answer the question.

21           THE WITNESS:  Nissen paid my credit cards during that

22   time period.

23   Q.  Okay.  So the money that you were spending was money that

24   you were not paying taxes on, right?

25           MR. BELL:  Objection.

IBTKGRA3                          Rechnitz - Cross

1          THE COURT:  Thank you.

2          You can answer the question.

3          THE WITNESS:  It was money that I had made as income.

4   I was not committing tax fraud at the time.

5   BY MS. NECHELES:

6   Q.  But you were intending not to pay tax on it, right?

7   A.  I was intending to, but I did not.

8   Q.  You were conspiring to not pay taxes, right?

9          MR. BELL:  Objection.

10          THE COURT:  Thank you.

11          Can you rephrase the question, counsel?

12   Q.  Well, you had agreed with Mr. Nissen to set this up in that

13   manner, so you wouldn't pay taxes, that was one of the reasons,

14   right, sir?

15   A.  That's right.

16   Q.  So you understood that the money you were getting was --

17   and you believed that it was money that you weren't going to

18   pay taxes on, right?

19   A.  Again, he paid my credit card.  The money that I spent, I

20   received from income.

21   Q.  Okay.  And the agreement was, am I correct -- withdrawn.

22          The money -- the agreement was, am I correct, that he

23   would pay 80,000 a month in your credit cards?

24   A.  Again, there were different agreements at different times.

25   Q.  But at one point --

1    A.  That sounds familiar for one of the payment plans.

2    Q.  Right.  That became the agreement, that he would pay

3    $80,000 a month in credit card expenses, right?

4    A.  If he had owed me several hundred thousand dollars, I

5    allowed him to split it up over several payments.

6    Q.  And he would only pay -- it was only going to be paid

7    through credit cards, right?

8    A.  Not only.  I don't think there was any exclusive

9    arrangement to that effect.

10   Q.  And that went on for a while, right?

11   A.  Yes.

12   Q.  So all of these expenses that you were charging to credit

13   cards were items that Mr. Nissen was paying, right?

14   A.  Some of them.  Some, I paid from other sources of funds;

15   some, he paid.  I can't generalize.

16   Q.  So that was money that was coming from a Ponzi scheme that

17   you were not paying taxes on, right?

18          MR. BELL:  Objection, your Honor.

19   Q.  Or you had no intent to pay taxes on?

20          MR. BELL:  Objection.

21          THE COURT:  Thank you.

22          Can you rephrase the question, please, counsel?

23   BY MS. NECHELES:

24   Q.  Well, sir, it was money coming from Nissen, which you

25   learned was a Ponzi scheme, which you had no intent to pay

IBTKGRA3                          Rechnitz - Cross

1   taxes on, right?

2              MR. BELL:  Objection, your Honor.

3              THE COURT:  Thank you.

4              Can you rephrase?  There's a lot going on in that

5   question.

6   BY MS. NECHELES:

7   Q.  Well, sir, the money that was being paid to your credit

8   card came from Mr. Nissen, right?

9   A.  Some money paid to my credit card came from Mr. Nissen.

10  Q.  Well, 80,000 a month, right?

11  A.  Again, that sounds familiar as one of the payment plans

12  that I gave him when he owed me a substantial amount.

13  Q.  And are you testifying that generally your credit card

14  bills were more than 80,000 a month?

15             MR. BELL:  Objection.

16             THE COURT:  Thank you.

17             You can answer the question.

18             THE WITNESS:  No.  I'm telling you sometimes they

19  were, sometimes they weren't.

20  Q.  Sir, in fact, that money was coming from a Ponzi scheme,

21  right?

22  A.  As it turns out, Nissen was a Ponzi scheme and --

23  Q.  The answer is yes, right?

24             MR. BELL:  Objection, your Honor.

25             THE COURT:  I'm sorry, counsel.  Can you please let

1    the witness answer the question.

2              Go ahead.

3              THE WITNESS:  As it turns out, Nissen ended up a Ponzi

4    scheme, so funds that he paid me, I'm not sure were funds from

5    the Ponzi.  I could just tell you he ended up becoming a Ponzi

6    scheme, unfortunately.

7    BY MS. NECHELES:

8    Q.  And, sir, Mr. Nissen was not the only person you were

9    committing tax or you had this agreement with to have him pay

10   for things in a way that would avoid you paying taxes, right?

11   A.  I can't think of other scenarios other than the cash Jeremy

12   and I received from him.

13   Q.  All right, sir.  Isn't it true that you had other people

14   buy jewelry for you, and you would exchange items for that

15   jewelry?  Isn't that correct?

16   A.  It's possible.  I can't think of an example, but I'm not

17   denying that.

18   Q.  Okay.  That's a tax fraud, right?

19             MR. BELL:  Objection, your Honor.

20             THE COURT:  Thank you.

21             Sustained.

22   Q.  Well, you would do that specifically in order to avoid

23   paying taxes on an item that was sold, right?

24             MR. BELL:  Objection, your Honor.

25             MS. NECHELES:  I'm asking a question.

IBTKGRA3                          Rechnitz - Cross

1                THE COURT:  Thank you.

2                You can answer the question.

3                THE WITNESS:  Again, I don't know what you're

4     referring to, but in that scenario, it could be because of a

5     short cash flow issue.  It could be for many reasons.

6     BY MS. NECHELES:

7     Q.  All right.  I want to show you what is in evidence as

8     Defendants' Exhibit 9201, and I would direct your attention to

9     page 23168.

10                MS. NECHELES:  If we can publish that to the jury,

11    your Honor?  It's in evidence.

12                THE COURT:  You may.

13                MS. NECHELES:  Thank you.

14    BY MS. NECHELES:

15    Q.  That was the transaction you had with Motion In Time?

16    A.  Can I look at it for a moment, please?

17    Q.  Sure.

18    A.  Thank you.

19                This is a transaction from Motion In Time.  I don't

20    remember the specific transaction.

21    Q.  And, sir, Motion In Time was a watch store, right?

22    A.  Yes.

23    Q.  You bought a lot of watches, and sometimes you sold watches

24    there; is that correct?

25    A.  I bought, sold, and traded.

IBTKGRA3                        Rechnitz - Cross

Q.   Okay.  And sometimes you traded watches there, right?

A.   Yes.

Q.   When it says traded, what you mean by that is you had

purchased the watch, and now you were selling it in exchange --

but instead of getting money, you were getting other goods in

exchange, right?

A.   Well, I would have to add money as well.  I usually trade

up.

Q.   Okay, sir.  Can we answer my question?

         MR. BELL:  Objection, your Honor.

         THE COURT:  Thank you.

         Counsel, you can proceed.

BY MS. NECHELES:

Q.   All right, sir.  So my question is that when we say

exchange, what you would mean is you had purchased a watch, and

now you were selling it, but instead of getting back cash, you

would get another item, right?

A.   That would be part of the transaction.  That's not the

complete transaction.

Q.   Okay.  Well, let's look at this transaction here, 23168.

On this transaction, you received a gold and diamond bracelet

and also a Rolex in exchange for two Rolexes that you sold,

right?

A.   I don't see any bracelet.

Q.   Oh --

IBTKGRA3                     Rechnitz - Cross

A.   I purchased the Cartier Rose Gold for $25,000, and I

purchased a Rolex Day-Date II Yellow Gold President for

25,000 -- I remember that watch -- and I traded it even for a

Rolex Daytona Platinum and a Rolex Day-Date President.

Q.   When you say you traded it even, you mean you got no money,

you got no cash back, right?

A.   Again, that's what this invoice says.

Q.   Okay.  Sir, you're not saying it's a false one, are you?

          MR. BELL:  Objection, your Honor.

          THE COURT:  Thank you.

          You can answer the question.

          THE WITNESS:  I can't comment to the invoices.  I know

that this company had invoices which were produced for me

yesterday, and they were missing a lot of our purchases that

were done with cash.

BY MS. NECHELES:

Q.   Okay.  I understand that.  But this is an invoice where it

says "Traded even for," right?

A.   That's what it says.

Q.   And you received that invoice, right?

A.   No.  It's my first time seeing it.

Q.   But this was your transaction, right?

A.   Again, I don't remember this transaction.

Q.   Well, when you traded an item like this, and you got back

$50,000 in goods, that means you made $50,000 from the sale of

1    these items, right?

2    A.  No, it doesn't.  It means I traded one item for another.

3    Q.  Sir, that's called bartering, right?

4    A.  No, I don't think so.  I think it's very simple trade.  If

5    I switch my tie for someone else's tie in the room, and they're

6    of equal value, I don't see a taxable --

7                MR. MERINGOLO:  Objection.

8                THE COURT:  Thank you.

9                You can proceed.

10   A.  -- I don't see any taxable situation there.

11   Q.  Okay.  You think it's not taxable, that's your mindset, you

12   think it's not taxable when, instead of getting cash, you get

13   back goods, that that makes it nontaxable, is that your

14   testimony?

15               MR. BELL:  Objection, your Honor.

16               THE COURT:  Thank you.

17               Sustained.

18   Q.  Okay.  But that's your belief?

19               MR. BELL:  Objection, your Honor; calls for a legal

20   conclusion.

21               THE COURT:  Thank you.

22               Sustained.

23               MS. NECHELES:  I'm just trying to understand, your

24   Honor.

25               THE COURT:  Thank you.

1              If you could focus on the --

2              MS. NECHELES:  Okay.

3    BY MS. NECHELES:

4    Q.  Sir, but on occasions, you had Motion In Time go buy you

5    jewelry instead of watches, right?

6    A.  I had them do what?

7    Q.  You had them go buy jewelry, so you could exchange your

8    watches for jewelry that you wanted, right?

9    A.  There was an occasion where there was a deal on a Harry

10   Winston piece of jewelry where we had a trade involved.  I

11   don't remember the specifics.

12   Q.  Okay.  So I'll direct your attention to 23167.  On this

13   occasion, you traded a Rolex watch for some diamond earrings,

14   right?

15   A.  Again, I don't remember the specific transaction.  This is

16   not the way I remember...

17   Q.  Okay.  But Motion In Time was not a diamond earring store,

18   right?

19   A.  They were split.  They had a diamond earring and jewelry

20   counter with millions of dollars of goods for sale, as well as

21   watches.

22   Q.  It's your testimony you did not ask him to go out and

23   purchase this for you, is that what you're saying?

24   A.  I'm not saying that.

25   Q.  Okay.  You might have, right?

1    A.   Again, as I remember the transaction, they shared a retail

2    space with a jeweler, Alex B, who had jewelry just like Motion

3    In Time had watches, and I had traded one of my watches with

4    them for the jewelry piece, and they worked out the details,

5    even trade, item for item.

6    Q.   So what you're saying is that you had Motion In Time

7    purchase diamonds from another store that shared the same

8    space, so that they can exchange if for you for your watch,

9    right?

10   A.   Yes, because the jewelry company didn't want to take my

11   watch, but Motion In Time was happy to.

12   Q.   Right.  So instead of selling it to Motion In Time, you had

13   them -- and taking the cash, and going and purchase the

14   diamonds, you had them do an exchange, right?

15   A.   Again, I didn't have them do anything.  They had suggested

16   to me they would work it out, and I could just trade the watch,

17   which is what I did.

18   Q.   But, in other words, what you understood to be going on is

19   instead of Motion In Time giving you the cash for the watch,

20   they would give it to a third party, the jewelry store, and get

21   from the jewelry store diamonds, and give you the diamonds,

22   right?

23            MR. BELL:  Objection, your Honor.

24            THE COURT:  You can answer the question.

25            THE WITNESS:  Again, as I understood the transaction,

IBTKGRA3                         Rechnitz - Cross

1    is Motion In Time was going to obtain the earrings from their

2    partner in the store, and I would trade the watch to them, and

3    they would work out the details.

4    Q.  The answer to my question is yes, right?

5    A.  Yes, I think we agree.

6    Q.  Yes.  So they would go buy the watch or earrings instead of

7    giving you cash for the watch, right?

8    A.  Again, I don't know if they bought them or how they worked

9    it out.  They were partners in the space.

10   Q.  The reason for that was so that you would not get cash for

11   the watch, and it was a tax fraud, wasn't it, sir?

12            MR. BELL:  Objection, your Honor.

13            THE COURT:  Sustained.

14   BY MS. NECHELES:

15   Q.  Well, sir, was your intent, not to pay taxes?

16   A.  No.

17   Q.  Well, you understand that if you sell a watch -- withdrawn.

18            You bought many of these watches for investment

19   purposes, right?

20   A.  I bought for investments, I bought for gifts.

21   Q.  And if you sold a watch that you had purchased, if you made

22   a profit on it, you were required to pay taxes on that, right?

23            MR. BELL:  Objection, your Honor.

24            THE COURT:  Can you rephrase the question, please,

25   counsel?

IBTKGRA3                          Rechnitz - Cross

1    BY MS. NECHELES:

2    Q.  Well, you understood, did you not, that when you sold an

3    item that you had bought, and you made a profit on the sale,

4    you were required to pay taxes on that, right?

5    A.  Hypothetically, if that would have occurred, which it did

6    not occur, I would have to pay tax on any income on any gain.

7    So if I bought a watch for $25,000, and I sold it later for

8    23,000 back to Motion In Time, there's no taxable event per my

9    understanding.  In fact, there's a loss I would benefit from.

10   Q.  Right.  You totally get it, right, you understand if you

11   make a profit, you have to pay taxes; if it's a loss, you don't

12   pay taxes, right?

13             MR. BELL:  Objection, your Honor.

14             THE COURT:  Thank you.

15             You can answer the question.

16             MR. BELL:  I don't think there was one.

17             MS. NECHELES:  I believe there was.

18             THE COURT:  Counsel, you can rephrase it.

19             MS. NECHELES:  All right.

20   BY MS. NECHELES:

21   Q.  Sir, you know, based on your experience in business, that

22   if you buy an item, and you sell it -- then sell it, if you

23   make a profit, you pay taxes, and if you didn't make a profit,

24   if you make a loss, you take a loss on it, right?

25             MR. BELL:  Objection.

IBTKGRA3                          Rechnitz - Cross

1                THE COURT:  Thank you.

2                You can answer the question.

3                THE WITNESS:  Per my understanding, if I would gain

4       profit on a sale, it would be considered taxable income.

5       BY MS. NECHELES:

6       Q.  Okay.  That is true whether you get it in bartered items or

7       whether you get the money in cash from when you sell it, right?

8                MR. BELL:  Objection, your Honor.

9                THE COURT:  Thank you.

10               Sustained.

11      Q.  Well, you understood that, didn't you?

12               MR. BELL:  Objection, your Honor.

13               THE COURT:  Thank you.

14               Can you rephrase, please, counsel?

15      Q.  Okay.  Well, sir, you understand that if you make a profit,

16      you have to pay taxes on that profit, whether your profit comes

17      to you as cash or whether it comes to you as another item that

18      you get?

19               MR. BELL:  Objection, your Honor.

20               THE COURT:  Thank you.

21               You can answer the question.

22               THE WITNESS:  Again, I'm going to repeat what I've

23      said, which is if I sell something or trade something where I'm

24      gaining more value, I would have to pay tax on that extra

25      value, but that did not happen in this case.

1  BY MS. NECHELES:

2  Q.  How do you know?

3  A.  Because I remember it differently.

4  Q.  Oh, now you remember it?

5  A.  I told you that this did not seem accurate to me.  I

6  remember trading here Winston earrings as an even swap for the

7  watch.

8  Q.  And you're saying there was -- it was an even swap for the

9  watch, but that's not the issue, is it, sir?

10             MR. BELL:  Objection, your Honor.

11             THE COURT:  Sustained.

12  Q.  Well, the question is not whether it was an even swap, the

13  question is did you make a profit on the sale of the watch,

14  right?

15             MR. BELL:  Objection, your Honor.

16             THE COURT:  Sustained.

17  Q.  Well, sir, when you say it was an even swap, that means the

18  two items that you swapped for were of equal value, right?

19  A.  That's correct.

20  Q.  And that has nothing to do with whether you made a profit,

21  right?

22             MR. BELL:  Objection, your Honor.

23             THE COURT:  Thank you.

24             You can answer the question.

25             THE WITNESS:  I'm not sure I understand the question.

1    I'm getting a bit confused.

2    BY MS. NECHELES:

3    Q.   Okay.  Let's be a little simpler, and then I want to move

4    on.

5         Whether you make a profit or a loss depends on the

6    price that you paid for the item and the price you sell it for,

7    right?

8    A.   That's correct.

9    Q.   If the price you sell it for is higher than the price you

10   bought it for, you made a profit, right?

11   A.   That's my understanding.

12   Q.   And that is a totally separate question from whether, when

13   you trade in the watch, you are making an even trade, right?

14             MR. BELL:  Objection, your Honor.

15             THE COURT:  Thank you.

16             You can answer the question.

17             THE WITNESS:  I'm sorry, I'm just getting confused

18   again.  It's not coming out clear.

19   BY MS. NECHELES:

20   Q.   Okay.  So let me ask you a separate question.

21        You say it's an even trade.  What you mean by that, am

22   I correct, is that the two items that are being traded have

23   equal value, right?

24   A.   Yes.

25   Q.   So if you sell -- if you're trading a watch that's worth

IBTKGRA3                         Rechnitz - Cross

1   $100 for a pair of earrings that's worth $100, that's an even

2   trade, right?

3   A.   That's right.  It's between the two parties to determine

4   the value.

5   Q.   But that has nothing to do with whether you bought the

6   watch for $50 and made a 50-dollar profit or whether you bought

7   the watch for $150 and took a 50-dollar loss, right?

8   A.   Right.

9   Q.   The even trade has nothing to do with whether you made a

10  profit, right?

11  A.   It does.

12  Q.   Well, it has nothing to do with whether you made a profit

13  on the sale of the watch, right?

14  A.   I really don't understand you.  I'm sorry.

15  Q.   Okay.  One more time.  If you bought that watch in this

16  example for $10,000 and then traded it for an item worth

17  $23,000 -- withdrawn.

18           If you bought that watch for $10,000, and it was now

19  worth $23,000 --

20  A.   Sorry, can you repeat that?

21  Q.   Okay.  Sure.

22           Hypothetically, if you bought that Rolex watch for

23  $10,000, and it had gone up in value to $23,000, it would be an

24  even trade to trade it for diamonds that were worth $23,000,

25  correct?

1    A.  That makes sense, yes.

2    Q.  Okay.  But you would still, at the same time, have a profit

3    of $13,000, right?

4    A.  I don't believe so.  I think the current value of the watch

5    is what my watch is worth.

6    Q.  It is.  It's worth the 23,000, right?  It's worth what you

7    could sell it for, right?

8    A.  In your hypothetical scenario, if it's worth 23, and it's

9    traded for something that's 23, it's an even trade.

10   Q.  It is, correct?  Right, sir?

11   A.  I don't understand any taxable event there.

12   Q.  Okay.  I'm not asking you whether it's a taxable event.

13   I'm not asking that.  I'm saying you still made a profit,

14   right?

15           MR. BELL:  Objection, your Honor.

16           THE COURT:  Thank you.

17           I'm going to let the witness answer the question to

18   the extent that he can, and then I'd like to see if we can move

19   along.

20           THE WITNESS:  I don't think so.  The earrings could

21   have also been worth 10,000 a few years earlier.  Again, I

22   don't follow that.

23   Q.  Okay, sir.  But just -- by the way, you went to graduate

24   school for a Master's degree; is that right?

25   A.  Yes.

1            MR. BELL:  Objection, your Honor.

2            THE COURT:  Thank you.

3            You can answer the question.

4   Q.  Yes?

5            And you studied finance; am I correct?

6   A.  I took basic courses in finance.

7   Q.  And basic courses which taught you the meaning of profit

8   and loss, correct?

9   A.  Those are my accounting courses, yes.

10  Q.  And profit and loss are realized when you make a sale; is

11  that correct?

12           MR. BELL:  Objection, your Honor.

13  Q.  When there's a transaction?

14           THE COURT:  You can answer the question.

15  A.  Again, the present value of money --

16  Q.  The present value of money has nothing to do with whether

17  profit and loss is realized, correct?

18           MR. BELL:  Objection, your Honor.

19           THE COURT:  Sustained.

20  BY MS. NECHELES:

21  Q.  Well, sir, I'm not talking about present value of money.

22  I'm asking whether profit and loss are realized at a sale.  Did

23  you learn that in accounting or in graduate school?

24  A.  I don't remember learning that.

25  Q.  So you don't know whether, if you bought a watch for 10,000

IBTKGRA3                          Rechnitz - Cross

1    and sold it or traded it in for 23, whether you had a profit,

2    that's your testimony?

3    A.   That's not my testimony.  My testimony is that if I bought

4    a watch for 10,000 several years ago -- hypothetically, of

5    course -- and it's worth 23,000 today, and I trade it for

6    something of the same like value, there's no profit event that

7    has occurred.  For all I know, those earrings could have been

8    worth $8,000 five years ago.  It's what it's worth presently at

9    the present value of money.

10   Q.   I want to move on.  But am I correct, sir, you were

11   involved in a lot of tax fraud schemes for a long time?

12            MR. BELL:  Objection.

13            THE COURT:  Sustained.

14   BY MS. NECHELES:

15   Q.   Well, you were involved in -- am I correct that when you

16   were trading items and bartering, you did that with the

17   specific purpose of not paying taxes?

18   A.   You are not correct.  That is false.

19   Q.   And, sir, another crime that you committed during this time

20   period was that you had someone else take the test for a real

21   estate salesman license, correct?

22            MR. BELL:  Objection.

23            THE COURT:  Thank you.

24            Sustained.

25

IBTKGRA3                          Rechnitz - Cross

1    BY MS. NECHELES:

2    Q.  Well, did you do that?

3    A.  Yes, I sent my assistant to take my salesperson license

4    exam.

5    Q.  You sent your assistant, Ari Schwebel?

6    A.  He was not my assistant.

7    Q.  Who did you send?

8    A.  Shahar Ious.

9    Q.  When did you do that?

10   A.  My early year at Africa Israel.

11   Q.  When did you first admit this to the government?

12   A.  Again, like everything else, this has been a long process.

13   As things come to my mind or I'm asked about certain events is

14   when they come up.  I can't point to a particular date.

15   Q.  All right.  Well, you've testified in prior proceedings

16   about that you obtained a salesman's license, right?

17   A.  A salesperson license.

18   Q.  Yes.  You've testified about that, right?

19   A.  I believe so.

20   Q.  When you testified about that, you did not disclose that

21   you obtained that by having someone else take the test for you,

22   right?

23              MR. BELL:  Objection, your Honor.

24              THE COURT:  Sustained.

25

IBTKGRA3                        Rechnitz - Cross

1   BY MS. NECHELES:

2   Q.  Well, you did not testify about that before, right?

3              MR. BELL:  Objection, your Honor.

4              THE COURT:  Sustained.

5   Q.  And, sir, why did you do that?  Why did you have someone

6   else take your license?

7   A.  Just to correct an earlier answer, I think it's something I

8   told the government about from the beginning.  That may have

9   been one of my list of exclusions in my cooperation agreement.

10  I may be mistaken.

11             Number two, I did it because it's kind of like a

12  driving test, I thought it's not such a big deal, and it was

13  not a test I had to study that would actually have an effect on

14  actual business practicality, and I was lazy, so I sent him in.

15  Q.  I'm sorry.  Can you say that last part again?  You thought

16  it was like a driver's license, and what was the second part of

17  your answer?

18  A.  Where there wouldn't be a particular business practice,

19  that came more of a standardized test, just a boring type of

20  test you had to pass, and I was lazy, so I sent in my

21  assistant.

22  Q.  So it was below you to do it?

23  A.  It wasn't below me.  I was lazy.

24  Q.  It was --

25  A.  I didn't want to be bothered with it.

IBTKGRA3                    Rechnitz - Cross

1  Q.  You didn't want to be bothered to follow the requirements
2  that everybody else has to follow, right?
3  A.  Again, that's a generality.  You're generalizing in this
4  specific example.  I was lazy and didn't want to do it.
5  Q.  So you had your assistant go and do something fraudulent on
6  your behalf, right?
7  A.  That's right.
8  Q.  He was a young guy?
9  A.  Yes.
10  Q.  You put him at that kind of risk, right?
11          MR. BELL:  Objection, your Honor.
12          THE COURT:  Sustained.
13  Q.  When you said a minute ago that you think this is one of
14  the exclusions in your cooperation agreement, what you were
15  saying is that -- am I correct, that the things that you told
16  the government about in the beginning which were wrongdoing or
17  criminal acts got included in your cooperation, and you got
18  immunity for them, right?
19  A.  Yes, for certain conduct.
20  Q.  And that's for certain things -- things that were criminal,
21  right?
22          MR. BELL:  Objection, your Honor.
23  Q.  Things that you understood --
24          THE COURT:  Thank you.  I'm sorry.
25  Q.  -- to be putting you at the risk of a crime?

IBTKGRA3                        Rechnitz - Cross

1          THE COURT:  Can I just ask you to reframe the

2    question, counsel?

3          MS. NECHELES:  All right.  Sure.

4    BY MS. NECHELES:

5    Q.  The things that got included in there were things that you

6    understood were things that would put you at the risk of

7    prosecution for criminal behavior?

8          MR. BELL:  Objection, your Honor.

9          THE COURT:  You can answer that question.

10         THE WITNESS:  My understanding was that it was for

11   wrongdoing.  I don't know why certain things were included and

12   certain things weren't included.  I just know that I came clean

13   on everything, and there were certain things that ended up

14   being included in the agreement.

15   Q.  You also understood, when you would be meeting with people

16   or with the government and telling them things in proffer

17   sessions, somebody would be taking notes, right?

18   A.  I saw notes being taken.

19   Q.  And, sir, in addition to the other crimes that we've talked

20   about already, prior to the time that you decided to go in and

21   cooperate with the government, you had also been involved in

22   bribing Norman Seabrook, right?

23   A.  That's right.

24   Q.  And you --

25         THE COURT:  Ms. Necheles, can I pause you briefly.

1              Ladies and gentlemen of the jury, are you doing okay?

2    Would you like to have a break?  If you're doing fine, let's

3    keep on going.

4              Please go on, Ms. Necheles.

5    BY MS. NECHELES:

6    Q.  And you have said here, Mr. Reichberg was involved in that

7    as well, right?

8              THE WITNESS:  Judge, if your Honor doesn't mind, I'd

9    like to use the restroom.

10             THE COURT:  That's fine.

11             Let's take a short break.  Don't discuss the case

12   amongst yourselves, please don't communicate about it with

13   anyone, and do no research about the case.  I'll see you

14   shortly.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1              (Jury not present)

 2              THE COURT:  Thank you.  You can be seated.

 3              Let's take about a five-minute break.  Be prepared to

 4     start again in five minutes.

 5              Yes, Mr. Rechnitz, you can step down.

 6              Mr. Bell, feel free to raise whatever issues you'd

 7     like to raise.

 8              MR. BELL:  We have nothing, your Honor.

 9              THE COURT:  Thank you very much.

10              (Recess)

11              THE COURT:  Can we bring in the witness, please.

12              Counsel for Mr. Reichberg, one brief comment --

13              I'm sorry, can you give us one more moment, please,

14     before Mr. Rechnitz comes back in.

15              Anything else that any party would like to raise

16     before we begin again?

17              MR. BELL:  We're doing great, your Honor.  No, thanks.

18              THE COURT:  Good.  Thank you.

19              Just one brief comment, and I express at this point no

20     expertise on the issue:  I think that the real estate treatment

21     of like kind exchanges may be consistent with what Mr. Rechnitz

22     is testifying to here.  I don't know what the rule is for

23     personalty, but I just wanted to comment on that briefly.

24              MS. NECHELES:  I think it's only true, your Honor, if

25     you fall within that specific rule and regulations, and I think

1   someone like him knows it.

2              THE COURT:  Thank you.  Fine.  Good.  So let's begin.

3              MS. NECHELES:  But I'm not going back there.  I'm

4   done.

5              THE COURT:  Thank you.

6              Mr. Daniels, can you please bring in the jury.

7              And, United States, can you please bring in the

8   witness.

9              MS. NECHELES:  Your Honor, what time would you like to

10  break today?

11             THE COURT:  My hope is to stop shortly after 3:00,

12  call it 3:15, if you'd like to aim for around then.

13             MS. NECHELES:  Okay.  That's fine.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Thank you, ladies and gentlemen.  You can

3    be seated.

4          Counsel for Mr. Reichberg, you can proceed.

5          MS. NECHELES:  Thank you, your Honor.

6    BY MS. NECHELES:

7    Q.  Sir, before I move off the taxes, to be clear, you had --

8    before we move off the taxes, let me be clear, you have not

9    paid or filed any tax returns for a number of years, right?

10   A.  That's right.

11   Q.  And since, am I correct, 2014, correct?

12   A.  No.  2015.

13   Q.  What year?

14   A.  2015 for 2016.

15   Q.  So you did not file your 2015 tax returns?

16   A.  2015 and '16.

17   Q.  And 2017, did you file those?

18   A.  Right.

19   Q.  Beg your pardon?

20   A.  No, I have not filed since 2015.

21   Q.  Okay.  So there are three years of tax returns you have not

22   filed, right?

23   A.  That's right.

24   Q.  And you have not paid any estimated taxes on any of that

25   time, right?

1   A.   That's right.

2   Q.   With respect to any of the people to the Nissen bankruptcy

3   or the Peralta bankruptcy, you have not paid any money there,

4   right?

5   A.   That's false.

6   Q.   What money did you pay to those?

7   A.   I can't discuss certain legal proceedings, but I paid

8   Peralta, I made a settlement, and I cannot discuss the Nissen

9   one.  I don't want to breach privilege.

10  Q.   Well, let's talk about the Peralta one.  What did you pay?

11  A.   I made a confidential settlement.

12          THE WITNESS:  If your Honor would allow me to breach

13  confidentiality, I'll be happy to share it.

14          THE COURT:  Thank you.

15          MR. BELL:  I am going to object.

16          THE COURT:  Please proceed.  Take up another line of

17  questioning for now, and we can take this up later.

18          MS. NECHELES:  Okay.

19  BY MS. NECHELES:

20  Q.   We'll get back to that.  Let's just talk about Mr. Seabrook

21  for now.

22          In addition to those other crimes, you said you were

23  involved in bribing Norman Seabrook, and that Mr. Reichberg did

24  it with you, right?

25  A.   That's correct.

1    Q.  And what you said before, Mr. Seabrook was the head of the

2    correction officers union, right?

3    A.  Yes, ma'am.

4    Q.  It's also known as COBA, right?

5    A.  Yes.

6    Q.  And you paid a bribe to Mr. Seabrook to get him to invest

7    COBA money in a hedge fund called Platinum Partners, right?

8    A.  I helped facilitate a bribe payment.

9    Q.  Okay.  You gave him the cash, right?

10   A.  Yes, on behalf of the hedge fund manager.

11   Q.  Sir, I'm just asking you:  Did you give him the cash?

12         MR. BELL:  Objection, your Honor.

13         THE COURT:  Thank you.

14         You can answer the question.

15         THE WITNESS:  Yes, I physically handed him the cash on

16   behalf of Murray Huberfeld.

17   BY MS. NECHELES:

18   Q.  Okay.  I'm talking about you right now.  So you paid a

19   bribe, right?

20   A.  No.  I helped facilitate the bribe on behalf of him.  I'm

21   just trying to be precise.  I'm not trying to be argumentative.

22   Q.  You're trying to be precise when you won't say, yes, you

23   paid a bribe?

24         MR. BELL:  Objection, your Honor.

25         THE COURT:  Sustained.

1  Q.  Did you plead guilty to paying a bribe to Murray

2  Huberfeld -- I mean to Norman Seabrook?

3  A.  I pled guilty to honest services fraud conspiracy, and part

4  of that conduct was helping to facilitate a bribe between

5  Murray Huberfeld and Norman Seabrook.

6  Q.  So let's go and discuss what exactly happened.  Platinum

7  Partners was a hedge fund owned, in part, by Murray Huberfeld,

8  right?

9  A.  That's my understanding, yes.

10  Q.  And Mr. Huberfeld was a prominent member of your community,

11  right?

12  A.  Yes.

13  Q.  When I say "your community," you understand that I mean the

14  Modern Orthodox community, right?

15          MR. BELL:  Objection, your Honor.

16          THE COURT:  Thank you.

17          You can answer the question.

18          THE WITNESS:  No.  I understood it to be the entire

19  Jewish community.

20  BY MS. NECHELES:

21  Q.  All right.  There are different parts of the Jewish

22  community, right?

23  A.  Yes.

24          MR. BELL:  Objection, your Honor.

25          THE COURT:  I accept the answer.

IBTKGRA3                        Rechnitz - Cross

1    Q.  And there are many different parts, right?

2    A.  Yes, there are different sects to the religion.

3    Q.  And one sect is Modern Orthodox, right?

4    A.  Yes.

5    Q.  And a different sect is Hasidic, right?

6    A.  Yes.

7    Q.  All Jewish, but different practices sometimes, right?

8    A.  I think so, yes.

9    Q.  And your community, within the Jewish community, was the

10   Modern Orthodox community, correct?

11   A.  No, that's false.

12   Q.  Okay.  What was it?

13   A.  First of all, I'm not labeling people by how they look

14   outside; I believe it's what's on the inside.  I have a lot of

15   Hasidic rabbis, and I belong to the Hasidic community to a

16   rabbi known as Bubba, where he cut my son's hair, his father

17   cut my hair.  He used to stay at my parents' house in Palm

18   Springs.

19          I also belong to the Chabad community, as we discussed

20   Rabbi Metzger.  I also belong to the Yeshiva University

21   community, which is more Modern Orthodox, and I'd say we're

22   more right than modern.

23   Q.  I really am not trying to get into your religious

24   practices.  I just want to be -- the Hasidic community is a

25   somewhat more insular community, right?

IBTKGRA3                    Rechnitz - Cross

1   A.   Yes.

2   Q.   And you lived on the Upper West Side; am I correct?

3   A.   Yes.  And I prayed in a Hasidic synagogue.

4   Q.   And Murray Huberfeld lived on the Upper West Side as well,

5   correct?

6   A.   Yes.

7   Q.   And Mr. Reichberg lived in Borough Park, correct?

8   A.   Yes.

9   Q.   And he lived, and many Hasidic people live, in Borough Park

10  in Brooklyn, right?

11  A.   Yes.

12  Q.   The Hasidic community tends to have a dress style that

13  reflects certain beliefs that the Hasidic community has,

14  correct?

15  A.   Yes.

16           MR. BELL:  Objection, your Honor.

17           THE COURT:  Thank you.

18           I accept the answer.  You can proceed.

19  BY MS. NECHELES:

20  Q.   Returning to Murray Huberfeld, you wanted to get close to

21  Mr. Huberfeld because you thought it would be good for you,

22  right?

23  A.   Yes.

24  Q.   And you had known Mr. Huberfeld, am I correct, for almost

25  your whole life?

IBTKGRA3                         Rechnitz - Cross

1   A.  I knew of him.  I only knew him for a few years prior to

2   that.

3   Q.  Okay.  Your families knew each other; am I correct?

4   A.  Yes.

5   Q.  And when you had come -- you had grown up in California,

6   right?

7   A.  Yes.  In Los Angeles.

8   Q.  And when you came to New York, you came to get to know

9   Mr. Huberfeld?  That's not why you came here, but it happened

10  that you got to know Mr. Huberfeld, correct?

11  A.  As I was living in New York is when I got to know him.

12  Q.  Okay.  Am I correct that Mr. Huberfeld was an extremely

13  wealthy person?  Correct?

14  A.  That was the perception I had.

15  Q.  He owned a hedge fund that had billions of dollars invested

16  in it; am I correct?

17  A.  I think a billion dollars, yes.

18  Q.  And he was on the board of the Simon Wiesenthal Center,

19  correct?

20  A.  Yes, he was on the board of trustees.

21  Q.  And you wanted to be on the board of trustees, also, right?

22  A.  Yes.

23  Q.  And the reason you wanted to be on the board was you

24  thought it was a who's who of who's important, right?

25  A.  As I answered earlier to your question, that was one of the

1    reasons I wanted to be on, not the reason.

2    Q.  Okay.  And you thought that there was a status of being on

3    the board, you would be a big player, and it would lead to more

4    connections, and increase your reputation, right?

5    A.  That's right.

6    Q.  You thought that if you were seen to be friends with Murray

7    Huberfeld, that other rich people who were friends or did

8    business with Mr. Huberfeld would treat you as a higher caliber

9    person and want to do business with you, correct?

10   A.  That's correct.

11   Q.  So you started associating with Mr. Huberfeld, right?

12   A.  Yes.

13   Q.  You had some financial transactions with him, correct?

14   A.  Correct.

15   Q.  You helped him purchase some apartments, correct?

16   A.  Yes.

17   Q.  In Manhattan, correct?

18   A.  Yes.

19   Q.  And those were in the Apthorp building, right?

20   A.  Yes.

21   Q.  And they were apartments that you were involved in selling

22   and making a commission off of?

23   A.  Yes.

24   Q.  And that was your real estate business, not Mr. Jeremy

25   Reichberg's, correct?

```
 1    A.  What was?

 2    Q.  Being involved in selling at the Apthorp, right?

 3    A.  Right.

 4    Q.  And over time, you and Mr. Huberfeld became pretty

 5    friendly, right?

 6    A.  Right.

 7    Q.  There came a point where Mr. Huberfeld discussed with you

 8    whether you could help him find institutional investors for

 9    Platinum Partners, correct?

10    A.  Right.

11    Q.  And that was a discussion he had with you, right?

12    A.  Yes.

13    Q.  And by "institutional investors," you mean like pension

14    funds or other hedge funds that had lots of money to be

15    investing long term, right?

16    A.  He specifically mentioned pension funds or police funds

17    when he discussed it with Jeremy and I, yes.

18    Q.  Well, sir, that discussion was with you, right?

19    A.  One of them.

20    Q.  And the discussion -- you had a discussion with

21    Mr. Huberfeld where you discussed, and you sat with him, and

22    tried to come up with a list of people that you could approach

23    who might have access to institutional investors, and you could

24    help try to convince them to invest in Platinum Partners,

25    right?
```

1    A.   I remember making a list of private investors for him.  He

2    asked me to come up with a list, and I remember coming up with

3    a couple of names of more institutional-like investors.

4    Q.   The reason that you would be doing that would be to make a

5    commission on this, right?

6    A.   I was doing it to help him, so that he would be happy with

7    me, as he was contemplating doing more business with me and

8    potentially doing a loan with me on some apartments at the

9    Apthorp.

10   Q.   Okay.  But it's also true, am I correct, that when people

11   bring money or investors to a large hedge fund like that, hedge

12   funds will pay a commission if the person is a registered

13   salesperson?  Correct?

14   A.   That's my understanding.

15   Q.   And you were hoping to be able to make that commission, at

16   least in some of the times, right?

17   A.   That's right.

18   Q.   I mean, that's why you sat, and you came up with a list

19   with him, right?

20   A.   That's right.

21   Q.   And you discussed with Murray Huberfeld how you would go

22   around trying to convince people the kinds of things that you

23   could talk about about Platinum, right?

24   A.   That's right.

25   Q.   And that was money you were hoping to make for yourself,

1   right?

2   A.  That's right.

3   Q.  One of the things that Mr. Huberfeld talked to you about

4   was your contacts with people in city government and in the

5   police world, right?

6   A.  Right.

7   Q.  Those were the kind of institutional investors he thought

8   you might be able to convince to invest, right?

9   A.  Right.

10  Q.  And you told Mr. Huberfeld that you were friends with the

11  head of the corrections officers union, Norman Seabrook, right?

12  A.  Yes.

13  Q.  And you had met Mr. Seabrook in 2013, through Phil Banks,

14  right?

15  A.  Yes.

16  Q.  And at the time that you met Mr. Seabrook, you were

17  excited, right?

18  A.  Yes.

19  Q.  Now, you testified previously you thought it would be -- am

20  I correct, that you thought would be something that if you knew

21  Mr. Seabrook, you would have something that no one else had

22  access to because no one else you knew was close to the head of

23  the union for prison guards, right?

24  A.  That's right.

25  Q.  But you didn't know anybody in prison at that point, did

1    you?

2    A.  I did.

3    Q.  You did?  Who was that?

4    A.  I knew a few people in prison.

5    Q.  In New York City?

6    A.  Yes.

7    Q.  Okay.  Oh, you're talking about Mr. Peralta at a later

8    time, right?

9    A.  Besides that, I knew other people.

10   Q.  Did you think Mr. Seabrook would help you with that?

11   A.  Yes.

12   Q.  That's why you became friends with him?

13   A.  No.

14   Q.  Who were those people?

15   A.  Stewart Walmar is someone I knew in Otisville.

16   Q.  Where was Stewart Walmar in jail?

17   A.  Otisville.

18           I actually asked Norman if he can help get him better

19   accommodations.  He said that he had no jurisdiction over that

20   prison.

21           I can't think of anyone else come to mind right now.

22   Q.  So you knew someone who was in prison, a federal prison, in

23   Otisville?

24   A.  Yes.

25   Q.  But Mr. Seabrook was not the head of the corrections union

1    for federal prison anywhere, right?

2    A.   That's right.

3    Q.   You knew he was the head of the corrections union for the

4    city jails, right?

5    A.   I didn't really understand what his union covered.   I

6    thought it was all the jails in New York.

7    Q.   Well, you knew that Mr. de Blasio was his boss, right?

8    A.   Yes.

9    Q.   So you knew Mr. de Blasio was only the boss of New York

10   City, right?

11   A.   That's something I'm aware of, yes.

12   Q.   You knew it at the time, right?

13   A.   Yes.

14   Q.   He was the mayor of New York City, right?

15   A.   That's right.

16   Q.   So you're testifying that you thought Mr. de Blasio was the

17   boss of somebody who was the head of corrections for all of New

18   York State?

19   A.   Well, I didn't know if he's his direct boss.   I knew that

20   they had a lot of interaction.   I didn't get into that type of

21   thought.

22   Q.   But you told the government that when you met him, there

23   was little advantage to knowing Mr. Seabrook, right?

24   A.   That there was what?

25   Q.   Little advantage to knowing Mr. Seabrook?

1    A.   Right.

2    Q.   It wasn't like you thought you could get anything from him,

3    right?

4    A.   When I initially met him, that's correct.

5    Q.   And it was just you wanted to know him because you thought

6    that by getting to know him and becoming close with him, people

7    would think of you as an important person, right?

8    A.   That's one of the reasons I said, yes.

9    Q.   And the other reason was he was close to Mr. Banks, right?

10   A.   That's a reason as well, yes.

11   Q.   Am I correct that you had gotten to know Jeremy because you

12   wanted to use his connections to cops, so you would look like

13   an important person?

14   A.   The reason I wanted to meet Jeremy was so I could get a

15   parking placard initially, just like my friend had, and I was

16   told he is the guy who can get it done.

17   Q.   And you said you gave $5,000 to an event -- a football

18   event because you hoped to get a parking placard, right?

19   A.   That's right.

20   Q.   Instead, you got a little statue or something; is that

21   right?

22   A.   At that event, I got a plaque with my name with the NYPD

23   logo and a football.

24   Q.   For $5,000, right?

25   A.   That's one physical item that I got out of that.

IBTKGRA3                    Rechnitz - Cross

1    Q.  Okay.  That was the big surprise that you got that day,

2    wow, right?

3    A.  Besides connections and business cards --

4    Q.  That night.  Did you get --

5    A.  Yes.

6    Q.  -- connections and business cards that night?

7    A.  Yes.

8    Q.  You had met some people, right?

9    A.  Yes.

10   Q.  And then you decided to become closer to Mr. Reichberg

11   because you wanted to become closer to the cops, that's what

12   you testified, right?

13   A.  I became closer to him after I saw what he was able to do

14   with the Lincoln Tunnel.  That's when he really -- our

15   relationship started.

16   Q.  Okay.  So you were impressed with what he was able to do,

17   and you decided, wow, I want to become closer to him because

18   he's close to cops, right?

19   A.  I didn't make a conscious decision, just I'm going to get

20   closer to him.  We kind of became closer to one another.

21   Q.  Okay.  But you were using him, right?  You've said you

22   wanted to become close to him, so you could have a -- look like

23   an important person because of the connections to cops, right?

24   A.  I feel quite the opposite.  I feel I was used.

25   Q.  Well, sir, am I correct that you have said that before,

1    that you were --

2    A.  I'm sorry, I can't hear you.

3    Q.  All right.  One minute.

4         Am I correct that you testified in a prior proceeding

5    that the reason -- the appeal of getting to know Mr. Reichberg

6    better was that he had all these connections to police, and, at

7    that point, this was something that was very important to you?

8    A.  Yes, ma'am.

9         MR. BELL:  Objection.

10        THE COURT:  Thank you.

11        I accept the answer.  You can proceed.

12   BY MS. NECHELES:

13   Q.  And, sir, am I correct that it was also part of your belief

14   and your thought process that you didn't know many people who

15   had connections to police, and you thought that this would be

16   an awesome tool for you personally and for your business?  Is

17   that correct?

18   A.  Yes, ma'am.

19   Q.  So that was the reason you decided to become friendly with

20   Jeremy Reichberg, right?

21   A.  It was a reason, a benefit.  It was actually a benefit of

22   the friendship.

23   Q.  Am I correct you have testified that you wanted to get

24   close to Murray Huberfeld because he was rich and important,

25   and you thought it would make you look important, too, right?

1    A.  That was one of the appeals of having a relationship with

2    him, is what I believe I said.

3    Q.  And the same with Mr. Seabrook, right?  That's why you

4    wanted to become close to him, because it would make you look

5    important and cool, right?

6    A.  And he was very close to Philip Banks, who we were very

7    focused on getting close to.

8    Q.  And this was a pattern in your life, was it not?  You were

9    a social climber, right?

10   A.  I don't know if I would label it, but these three examples

11   are what I'm saying they are.

12   Q.  Well, it was a pattern that you would befriend people who

13   you thought would make you look important, right?

14   A.  In these scenarios, I had different objectives with each

15   relationship.

16   Q.  Well, my question is:  Did you befriend people who would

17   make you look important?

18   A.  Yes.

19   Q.  And then did you later dump them when they no longer were

20   prestigious and important?

21   A.  I wouldn't generalize that, no.

22   Q.  You did that with Phil Banks, didn't you?

23   A.  No.  If somebody did something wrong to me, we reacted.  A

24   lot of things were done wrong to me without my knowledge that I

25   later learned.

IBTKGRA3                         Rechnitz - Cross

1    Q.  All right.  We'll get back to that, sir.

2            Now, with respect to Mr. Seabrook, in order to get

3    close to him, you invited him to a police appreciation day you

4    were hosting with Jeremy Reichberg, right?

5    A.  Yes.

6    Q.  And it was something you had sent out invitations to,

7    right?

8    A.  Yes, by email.

9    Q.  And the invitations were to other police officers, right?

10   A.  Yes.

11   Q.  And you had said that -- the invitation says this was for a

12   police appreciation day, right?

13   A.  Yes.

14   Q.  You were paying for this, correct?

15   A.  Yes.

16   Q.  And you had rented out a suite at a football game, right?

17   A.  That's right.

18   Q.  When you were asked questions on direct about this football

19   game, that was what this was about, it was about an event that

20   you had hosted, right?

21   A.  It was about the football game that we hosted, yes.

22   Q.  Well, a football game for appreciation -- you didn't host

23   the football game, right?  The football game was going on?

24   A.  We hosted the suite to have all the cops.

25   Q.  And you had plaques made up for the police officers, right?

IBTKGRA3                          Rechnitz - Cross

```
 1    A.  Yes.
 2    Q.  You served food, right?
 3    A.  Yes.
 4    Q.  And there was no attempt to hide this or keep it secret,
 5    was there?
 6    A.  From the attendants?  No.  We had to invite them.
 7    Q.  Or from anybody else, right?
 8    A.  I don't think so.
 9    Q.  Well, you saw all these pictures, you took pictures of
10    this, right?
11    A.  Yes.
12    Q.  And if we could look at some of those pictures.
13              MS. NECHELES:  Your Honor, if we could show Government
14    Exhibit 619-A, which is in evidence, your Honor.
15              THE COURT:  Thank you.
16              You can proceed.
17              MR. BELL:  One moment, please, your Honor.
18              MS. NECHELES:  Is that not in evidence?  Sorry.
19              Your Honor, I believe these are in evidence, but they
20    have been marked as defense exhibits, so perhaps I can just go
21    forward and put them in evidence as defense exhibits.
22              THE COURT:  Thank you.
23              619-B through E are in.
24              MS. NECHELES:  B through E?
25              THE COURT:  Yes.
```

1           MS. NECHELES:  So 619-B.

2     BY MS. NECHELES:

3     Q.  That is a picture of you and Mr. Reichberg, and who is the

4     third person?

5     A.  Chief David Colon from the NYPD.

6     Q.  And he's posing with the little trophy that you caused to

7     be made up, right?

8     A.  That's right.

9     Q.  Having a picture taken, right?

10    A.  Yes.

11    Q.  He's not hiding from the camera, right?

12    A.  Right.

13    Q.  And is that inside the suite?

14    A.  Yes, that's in the private suite.

15    Q.  The next one is Government Exhibit 619-B -- or C.  Sorry.

16          MS. NECHELES:  If we can put that up, your Honor?

17          THE COURT:  You may.

18    Q.  And that is you, and Jeremy Reichberg, and Jimmy Grant,

19    right?

20    A.  That's right.

21    Q.  And he also is posing, right?

22    A.  Yes.

23    Q.  With a little trophy, right?

24    A.  That's right.

25    Q.  And you're taking -- someone's taking pictures, right?

IBTKGRA3                       Rechnitz - Cross

1    A.  Yes.

2    Q.  Was there a professional photographer there?

3    A.  Yes.

4    Q.  So you hired a professional photographer to come and take

5    pictures of this event, right?

6    A.  Right.

7    Q.  You didn't think you were doing anything wrong, did you?

8    A.  That's not correct.

9    Q.  Well, you think this was a bribe, is that what you're

10   saying?

11   A.  It was a very important game.  It was the Jets-Patriots.

12   If you're a football fan, you know that's a very sought after

13   game and something we wanted to hook everyone up with and be,

14   as you said, macher.

15   Q.  My question was a different one.  My question is:  Did you

16   think you were doing something wrong by taking the police to

17   this game?

18   A.  Yes.

19   Q.  And that's why you hired a professional photographer to

20   document it, right, because you wanted to make sure there was

21   evidence of your wrongdoing, right?

22   A.  No.  I knew it was wrong because Chief Secreto and Chief

23   Banks didn't want to come, or told me that they thought it

24   would be inappropriate.  I hired the photographer so we just

25   had photos of all of this.

IBTTGRA4                         Rechnitz - Cross

1    Q.  And sir, is it your custom to photograph your criminal

2    activity?

3              MR. BELL:  Objection, your Honor.

4              THE COURT:  Sustained.

5    Q.  Well, here it's your testimony you knew you were doing

6    something wrong but you hired a photographer to photograph it,

7    right?

8    A.  Yes.  Again this was part of the whole relationship, me

9    giving gifts getting things in return.  I photographed a lot of

10   other types of police escorts and things that were wrong just

11   for the hell of it.

12   Q.  And all of these police officers, high-ranking people, are

13   posing for the professional photographer, right?

14   A.  Yes, we gave a speech about them and then gave them his

15   plaque and took a photo.

16   Q.  Did anybody say:  Oh, no, don't take a picture of me, this

17   is wrongdoing.  Did anybody say that?

18   A.  I don't remember if everybody took a photo.

19   Q.  But all of these people had no problem with having their

20   picture taken there, right?

21   A.  The ones that were photographed were willing to do so.

22   Nobody forced them.

23   Q.  Right.  And you were willing to be in that picture with

24   them, right?

25   A.  That's right.

1  Q.  And if you look at the next picture, 619D, that's Michael

2  Harrington, right?

3  A.  That's right.

4  Q.  And he was the person who was in with Chief Banks, he was

5  the right-hand man, a wingman, right?

6  A.  Right.

7  Q.  And that's essentially what Mr. Harrington's job was,

8  correct, to be Mr. Banks' wingman, right?

9  A.  Yes.

10  Q.  And he had come to -- he didn't have a problem coming to

11  this, right?

12  A.  He came.  I don't know what he was thinking.

13  Q.  Smiling, right?

14  A.  In this photo he's smiling.

15  Q.  And he was very close to Mr. Reichberg, right?

16  A.  Yes.

17  Q.  And he had been close to Mr. Reichberg from long before he

18  went to the chief of police office or division, right?

19  A.  Yes.

20  Q.  And he remained close after, correct?

21  A.  I'm not sure.

22  Q.  And just focusing here for minute on Mr. Banks, Mr. Banks

23  did not like to socialize with anyone from outside his inner

24  circle, correct?

25  A.  That is my understanding.

1    Q.  You testified to that before, correct?

2    A.  I believe so.

3    Q.  And so he didn't like to go to events where there were

4    other police officers if those people were not in his inner

5    circle, right?

6    A.  That was my understanding.

7    Q.  And it was your -- you were a very close to Mr. Banks for a

8    while, right?

9    A.  Yes.

10   Q.  And you knew from him that he thought it was inappropriate

11   in his role to socialize with police officers who work for him,

12   right?

13   A.  Yes.

14   Q.  And it would look bad and make it more difficult for him to

15   do his job, correct?

16   A.  I don't know what was behind his rationale, I could only

17   tell you what he told me, that he didn't feel comfortable going

18   that day.

19   Q.  Well, he told you in general he didn't like to socialize

20   with police officers who were lower ranks, correct?

21   A.  He didn't say those words to me.

22   Q.  He didn't like to socialize with police officers who worked

23   for him, right?

24   A.  There are many officers I saw him socialize with, my guess

25   is that it was more than just the inner circle.

IBTTGRA4                         Rechnitz - Cross

1    Q.  What's who he liked to be with, right?

2    A.  Yes.

3    Q.  The inner circle.

4         That's why he didn't come to this event, right?

5    A.  I don't know why he didn't come, all I know is that he told

6    me he wasn't comfortable with coming.

7    Q.  He never told you there was something wrong with this

8    event, right?

9    A.  He told me he wasn't comfortable to come.

10   Q.  He was never comfortable to go, in general, with other

11   people outside of his inner circle, right?

12   A.  No, we went to dinner, like you showed me earlier, the

13   Chabad dinner and other events.

14   Q.  Let's talk about the Chabad dinner.  What other police

15   officers were there?

16   A.  Norman Seabrook was there.

17   Q.  That's part of his inner circle, right?

18   A.  I'm sorry, are you talking about police officers or in

19   general?

20   Q.  I'm talking police officers, sir.  You understood that

21   before, right?

22   A.  I didn't, that's why I'm asking.

23   Q.  I'm talking about police officers.  He did not like to

24   socialize with other police officers outside his inner circle,

25   right?

1    A.  No, he was very close to David Colon.  I think there's a

2    video of us smoking a cigar in his office with Dave there as

3    well.  He was very particular with who he would hang out, but I

4    don't think it had to do with other police officers.

5    Q.  Sir, if you look at the next picture, which is 619E, am I

6    correct that Mr. -- one minute.

7            Am I correct that Mr. Banks' father and his kids were

8    present?

9    A.  His father and his siblings I believe are present, I don't

10   know about his kids.

11   Q.  So he sent family members to this game, right?

12   A.  That's right.

13   Q.  So it is not your testimony that he thought there was

14   something wrong with people coming to this, correct?

15           MR. BELL:  Objection.

16           THE COURT:  Thank you.  Sustained.

17   Q.  Well, sir, I'll move on.

18           And am I correct that you brought your son to this

19   game?

20   A.  That's right.

21   Q.  And are you testifying that you brought your son to some

22   event that you knew was criminal in nature?

23   A.  I am testifying that I brought my son to an event knowing

24   it was wrong.

25   Q.  At the time you brought your son you knew it was wrong,

IBTTGRA4                         Rechnitz - Cross

1   right?

2   A.  Yes.

3   Q.  So you're sitting there smiling with him on your lap, is

4   that your testimony?

5   A.  Yes.

6   Q.  And in this picture you are all the outside of the suite or

7   still inside the suite?

8   A.  This is part of the suite.  It's a private seating area for

9   the suite.

10  Q.  Sir, that was the first event that you went to with

11  Mr. Seabrook, right, or that you had Mr. Seabrook come to,

12  correct?

13  A.  I believe so.

14  Q.  And after that initial football game --

15          MS. NECHELES:  Do you want to take that down?

16  Q.  -- you started taking Mr. Seabrook out to dinner with

17  Mr. Banks and Mr. Harrington, right?

18  A.  Jeremy and I took him out often, yes.

19  Q.  And these were very good kosher restaurants, right?

20  A.  Yes.

21  Q.  And sir, you would not eat in a non-kosher restaurant,

22  right?

23  A.  That's right.

24  Q.  So you had to go to kosher restaurant if you were going out

25  to dinner with other people, right?

IBTTGRA4                    Rechnitz - Cross

1    A.  Yes.

2    Q.  Whether or not they kept kosher, you were going only to a

3    kosher restaurant, right?

4    A.  Right.

5    Q.  Am I correct that kosher restaurants are more expensive

6    than non-kosher restaurants.

7    A.  I don't think so, no.

8    Q.  No?

9    A.  I don't think so.

10   Q.  You don't eat at non-kosher restaurants?

11   A.  I know the times I had to go to non-kosher it was also

12   expensive.

13   Q.  And these were nice restaurants, right?

14   A.  Yes.

15   Q.  And that's where you liked to eat, right?

16   A.  Yes.

17   Q.  You went there when you were not with police officers,

18   right?

19   A.  Right.

20   Q.  That's the kind of place you liked to go to, right?

21   A.  Right.

22   Q.  And there were a lot of people there in those restaurants,

23   right?

24   A.  At times, yes.

25   Q.  And a lot of people in the Orthodox community liked to go

IBTTGRA4                          Rechnitz - Cross

1   to those restaurants.  Those are nice restaurants, right?

2   A.  Right.

3   Q.  And you wanted to be seen publicly Phil Banks and

4   Mr. Seabrook, right?

5   A.  Sometimes yes, sometimes no.  There were times we wanted to

6   be seen.

7   Q.  And you did not seek to keep this secret, right?

8   A.  That's right.

9   Q.  Nothing secret about what you were doing, right?

10  A.  No, if we were eating at a public place, other people could

11  see.

12  Q.  And that was on a weekly basis, you said, right?

13  A.  Yes.

14  Q.  And so lots of people knew you were there, right?

15  A.  Yes.

16  Q.  And you testified also that you then took Mr. Seabrook on a

17  couple of trips to the Dominican Republic, right?

18  A.  Yes, we went on two trips.

19  Q.  In November and December of 2013, correct?

20  A.  That's right.

21  Q.  Once was flown on a private jet, right?

22  A.  Yes.

23  Q.  And that was the flight that Mr. Banks went on as well,

24  right?

25  A.  It was Norman, Jeremy, me, and Philip Banks.

IBTTGRA4                        Rechnitz - Cross

1   Q.  And the other time you had gone on commercial, right?

2   A.  Yes.

3   Q.  But you decided to get a private jet because you wanted to

4   impress Mr. Banks and Mr. Seabrook, right?

5   A.  Yes.

6   Q.  And you wanted to do that so that they would be your

7   friends by impressing them, right?

8   A.  Not to be my friends, I did it so that they would feel

9   close to me so that we would have a very trusting relationship

10  with one another.  And Jeremy and I definitely wanted to

11  impress them to get as close possible as we could.

12  Q.  And how do you think that by showing them that you could

13  have a private plane that that made them trust you?

14  A.  Not many people had done that for them, so they probably

15  felt special.  And my assumption was that we would have a lot

16  of quality time and they would be attracted to being close to

17  us.

18  Q.  And that was something you often did, right, you would take

19  people on a private plane to impress them?

20  A.  Yes.

21  Q.  And am I correct that you always insisted that you got one

22  type of plane, right?

23  A.  I preferred a Challenger 300 or 604.

24  Q.  And if they didn't have that and you were bringing other

25  people, you wouldn't reserve it, right?

IBTTGRA4                        Rechnitz - Cross

A.  No, it was about comfortability.

Q.  And am I correct, sir, that you told people that this plane -- that your father owned a share in this plane?

A.  That's correct.  I even told people, I think, that we owned it outright.

Q.  So it's not just that you had people thinking that you could rent a plane, it was that you owned a plane, right?

A.  Yes, I lied.

Q.  And so when you were taking people on these plane trips, they didn't think you had to pay all that money to rent it, right?

A.  I can't tell you what people think or don't think, I could just tell you that at certain times I told people I owned it, at other times I said I chartered it.  I don't know, I can't generalize.

Q.  Well, but at times you said to people that your dad owned this plane, right?

A.  There are people I said that to.

Q.  Okay.  And these trips to the Dominican Republic were very short trips, right?

A.  Yes.

Q.  And like one night, right?

A.  That's right.

Q.  You go down one day and stay and come back the next night, right?

1   A.  Yes.

2   Q.  Next morning.

3          And you would say at fancy villas or hotels?

4   A.  Yes.

5   Q.  You found very luxurious or hidden villas, right?

6   A.  It was called Eden Rock.

7   Q.  And you had to drive quite a way from the airport to get

8   there?

9   A.  Ten minutes, 15 minutes.

10  Q.  And you had your own -- it was your own villa private?

11  A.  We had a shared villa for everybody who was there,

12  including the guests.

13  Q.  You and the guests would stay in a private villa, right?

14  A.  Yes.

15  Q.  And you would get prostitutes there, right?

16  A.  Yes.

17  Q.  And you would have arranged beforehand to have these

18  prostitutes present, right?

19  A.  Yes.

20  Q.  In fact, the first time you went, you learned that

21  Mr. Peralta had connections in the Dominican Republic to get

22  prostitutes, right?

23  A.  Yes.

24  Q.  And so you got the contact information from him, right?

25  A.  No.

IBTTGRA4                         Rechnitz - Cross

Q.   No?  Did you tell -- did you state previously that you got
the contact information and arranged for and paid for
prostitutes?

A.   I think that I arranged it through him on the second trip.

Q.   And you did not tell Mr. Banks or Mr. Seabrook that the
women were paid for, right?

A.   That's not the kind of thing you have to say.  They didn't
pick them up in a bar.

Q.   And sir, am I correct that you often had prostitutes come
to your parties?

A.   No.

Q.   Well, you had a party at a hotel in New York City sometime
before the Superbowl trip to Las Vegas and you paid Mr. Franco
to pay for prostitutes.

A.   That's not true.

Q.   You didn't tell that to the government?

A.   No.

Q.   Did you make -- did you say on a previous date --

         Do you recall meeting with the government in May of
2016 with your attorney present?

A.   I had many meetings, I don't know which date.

Q.   Do you recall telling the government that -- the date is
May 12, 2014 -- 2016, and do you recall telling the government
that there was a party in a Manhattan hotel, maybe the
Royalton, sometime before the Vegas trip, and that you paid for

1    prostitutes, and you think that you had paid Marco Franco who

2    paid the prostitutes.

3              Do you recall telling that to the government?

4    A.  No, I think that's a mix of a couple of things that I told

5    him, that I put Laura Colon in the Royalton, and that maybe

6    Marco or Jeremy paid for prostitutes in Vegas.

7    Q.  So you're saying that you never said that?

8    A.  No.

9    Q.  And am I correct that you also went on a trip to Florida in

10   2000 -- by the way, Marco Franco is your friend, right?

11   A.  Yes, he is.

12   Q.  And you also went on a trip to Florida in 2013 to see the

13   BCS championship game, right?

14   A.  Yes, we flew down, cops on the plane, me, Jeremy, Capul.

15   We talked about it yesterday.

16   Q.  And sir, when you were there you threw a party with food,

17   alcohol and prostitutes, right?

18   A.  Yes.

19   Q.  And you paid for that, right?

20   A.  Yes.

21   Q.  And you paid for the prostitutes there and coordinated

22   them, right?

23   A.  I did not coordinate.

24   Q.  Well, did you tell the government --

25   A.  Maybe I misunderstood coordinate to be direct.

IBTTGRA4                         Rechnitz - Cross

Q.  I don't mean direct, coordinated, obtaining them for that.

A.  Yes.

Q.  How did you do that?

A.  There was a contact of someone I knew there who I called,

and he knew someone who -- someone who got women for the cops.

Q.  On all the Dominican Republic trips you had prostitutes

there, right?

A.  Yes.

Q.  And you had a lot of prostitutes there, right?

A.  That's right.

Q.  And you took videos of them, right?

A.  No.

Q.  Well, there came a time when you destroyed the videos of

the Dominican Republic trip, right?

A.  That's not true.

Q.  You never destroyed the videos of the Dominican Republic

trips?

A.  No, there were some videos left.

Q.  You destroyed some of them, didn't you?

A.  No.

Q.  We'll get back to that.

        And on all of the trips to the Dominican Republic, you

were the one who arranged for and paid for the prostitutes,

right?

A.  For the most part, yes.

1    Q.  In fact, wasn't the whole point of going overnight to the

2    Dominican Republic on this big trip was so that you could hang

3    out with these prostitutes?

4    A.  No.  Jeremy and I had had a lot of discussions before

5    booking such a trip.  It was a very big expense.  We had a

6    motive each time.  And it was to treat the cops, and we were

7    getting things in return.  This is what we were doing, we were

8    giving them gifts with the expectation of things in return.

9    Q.  And you're saying that's what happened each time you and

10   Jeremy went to the Dominican Republic to treat the cops, and

11   before you went you had a discussion:  Oh, let's get

12   prostitutes, that will be good.  And that's why you went and

13   got prostitutes?

14   A.  We actually spoke very specifically about all the events.

15   This was an ongoing relationship.  This was an ongoing

16   relationship where we would do things, we would discuss them

17   before, because they're not cheap expenses, and we wanted to

18   figure out how to get the most bang for our buck.

19   Q.  You wanted to make sure at that all this money that you

20   were spending on flying down there, renting a villa, getting

21   cars, you brought security also, right?

22   A.  Yes.

23   Q.  And that's security was Mike Milici?

24   A.  Yes.

25   Q.  And you wanted to make sure that after doing all of that

1    you got the best bang for your buck, right?

2    A.   Absolutely.

3    Q.   But the first time you went you didn't have any police with

4    you, did you?

5    A.   The first time we went was another business reason of ours.

6    We went with Hamlet Peralta, who we were making a lot of money

7    with.  Like I was saying, there was different motivations for

8    different types of gifts.  As Jeremy did, I viewed these cops

9    as a business.  Just like we viewed Hamlet Peralta for the

10   first trip, we were going to spoil him.  Hamlet was bringing a

11   service of money, we were spending money keeping him happy.

12   The cops we took was to impress them, get close to them, to get

13   things in return from them.

14   Q.   Sir, with Hamlet Peralta, when you say he was making you

15   money, you were bringing him money in exchange for that, right?

16   A.   I brought him investors --

17   Q.   Okay.

18   A.   -- and he brought Jeremy and I commissions in the hundreds

19   of thousands of dollars.

20   Q.   And it turned out to be a Ponzi scheme, right?

21   A.   Yes.

22   Q.   And now you say that also -- that you also had to give him

23   prostitutes, is that what you're saying?

24   A.   Pardon?

25   Q.   You're saying now you also had to give him prostitutes?

IBTTGRA4                    Rechnitz - Cross

A.  No, he arranged it on the first trip.

Q.  And you went up and you paid for it, right?

A.  Not on the first trip.  Once Jeremy and I were with Hamlet
on the first trip, this was the experience we had, so we wanted
to give that to the cops.

Q.  And am I correct that after you started cooperating there
came a time where it appeared to you that there would be a
newspaper article -- you learned that there would be a
newspaper article about the prostitute on the Las Vegas trip,
am I correct?

A.  Yes.

Q.  Yes?

A.  Yes, Sean Cohen, who is no longer with the New York Post,
had called.  He had called my wife to say that they are running
an article, do we have a comment.

Q.  And you and your father had hired a publicist or a PR
person, right?

A.  We did not, and I don't want to breach attorney-client
privilege.

Q.  Well, you and your father were reaching out directly to the
PR person, right?

A.  Yes.

Q.  And in those direct conversations you were saying this is
the most important thing in the world, it cannot get out that I
was with a prostitute, right?

IBTTGRA4                        Rechnitz - Cross

1  A.  I don't know what I wrote, but it was very disturbing at

2  the time.

3  Q.  Well, and you were -- that was one of the most important

4  things to you at that point was that the world not know that

5  you had been with prostitutes, right?

6  A.  Yes.

7  Q.  And?

8  A.  Not just me, but Jeremy as well, because we were associated

9  with one another.

10  Q.  But at that point you decided to cooperate against

11  Mr. Reichberg, right?

12  A.  I decided to cooperate for the government, not that I was

13  trying to work against Jeremy.

14  Q.  But you were testifying against him, right?

15  A.  I am --

16          MR. BELL:  Objection.

17          THE COURT:  Sustained.  I'm striking the answer.  You

18  can proceed.

19  Q.  And sir, is it your testimony that when you hired the PR

20  person and you sought to get them to quash that story and you

21  were so upset, it was in part because you were worried about

22  Mr. Reichberg's reputation, is that what you're saying?

23  A.  Again, I did not hire and I can't breach attorney-client

24  privilege.

25  Q.  When you were contacting personally, and having your father

1   personally contact this PR person to try to get them to squash

2   the article, was that -- is it your testimony it was because

3   you were concerned about Mr. Reichberg's reputation?

4   A.  I was concerned about mine, and if they had written about

5   me or Jeremy any of the truth of things that occurred, it would

6   be humiliating.

7   Q.  And it was -- this was the issue, that it was such concern

8   to you that you then had hired a publicist, right?

9             MR. BELL:  Objection.

10  Q.  Well, this was the issue that was of such concern to you

11  that you were reaching out to a publicist to get it squashed,

12  right?

13  A.  Again, it was something which was of utmost concern to me,

14  and it was the first time I considered getting a publicist

15  involved.

16  Q.  And sir, am I correct that because this is of such an

17  embarrassing and shameful nature to you, you have always said

18  somebody else did this?

19            MR. BELL:  Objection.

20            THE COURT:  Sustained.

21  Q.  Well, that's what you say, somebody else did this, right?

22            MR. BELL:  Objection.

23            THE COURT:  Sustained.

24  Q.  Well, sir, am I correct that the first time that you went

25  and spoke with the government you said that someone other than

IBTTGRA4                        Rechnitz - Cross

1  Mr. Reichberg arranged for the prostitute on the Las Vegas

2  trip?

3  A.   I think I said it was either Jeremy or Marco at the time.

4  Q.   But since then you have become convinced it was

5  Mr. Reichberg, right?

6  A.   Yes, he did.

7  Q.   And you had met Gabi Grecko before, right?

8  A.   No, I did not.

9  Q.   And I want to move on from the prostitute and back to

10 discussing Mr. Seabrook.

11         Now you got -- one of the trips that you went to Las

12 Vegas on was in December of 2013, right?  I don't mean --

13 withdrawn.

14         One of the trips that you went to the Dominican

15 Republic with Mr. Seabrook was in December 2013, right?

16 A.   That's right.

17 Q.   And on that trip you and Mr. Seabrook were spending time

18 alone together, right?

19 A.   Yes.

20 Q.   And you were in a bedroom, or where were you together?

21 A.   He was in his room when we decided to have the talk.

22 Q.   You were alone privately in his room and having a talk,

23 right?

24 A.   Right.

25 Q.   And he had no shirt on?

1  A.  That's right.  He had a shirt, he just showed me a tattoo

2  of his dog on his chest.

3  Q.  And he had been drinking, right?

4  A.  Yes.

5  Q.  He was a little drunk, right?

6  A.  That's right.

7  Q.  And he was telling you about his life, right?

8  A.  Parts about his life, yes.

9  Q.  And he thought you guys were close at that time, right?

10 A.  Yes.

11 Q.  And so he was sharing some of his feelings about his life,

12 right?

13 A.  Yes.

14 Q.  And talking about how hard it was to be a black man in

15 America, right?

16 A.  Yes.

17 Q.  And in addition, he was saying telling you about some of

18 his money troubles, right?

19 A.  Right.

20 Q.  And then you decided to offer him a bribe, right?

21 A.  Yes.

22 Q.  So you took -- he was telling you all this because he

23 thought he was your friend, right?

24          MR. BELL:  Objection, your Honor.

25          THE COURT:  Sustained.

IBTTGRA4                          Rechnitz - Cross

1   Q.  Was that your understanding of why he was telling you these

2   things?

3            MR. BELL:  Objection, relevance.

4            THE COURT:  Thank you.  Can you reframe the question,

5   counsel?

6   Q.  Sir, when he was sharing these very personal things, it was

7   after you and he had established a relationship of friendship,

8   right?

9   A.  Friendship and comfortability.

10  Q.  And at that point you decided to offer him a bribe, right?

11  A.  Yes.

12  Q.  And it was your idea, right?

13  A.  Yes.

14  Q.  You hadn't talked about it with anybody before, right?

15  A.  I had discussed the idea with Murray at one point before

16  the trip, and Jeremy, and this was the right time to strike.

17  Q.  You never before said that you discussed this before then

18  with Mr. Reichberg, have you?

19  A.  I think I have when I have been asked.

20  Q.  You never said that to the government before, have you?

21  A.  I have.

22  Q.  And you testified about this bribe offer before and you

23  never mentioned Mr. Reichberg, right?

24  A.  I sure have.

25  Q.  Well, you never said that before you made this bribe offer

IBTTGRA4                        Rechnitz - Cross

1    you had discussed it with Mr. Reichberg, right?

2    A.  I have.  I have said that many times.

3    Q.  You said that in your testimony under oath?

4         MR. BELL:  Objection.

5         THE COURT:  Sustained.

6    Q.  Well, you've testified about this in two prior proceedings,

7    right?

8    A.  Yes.

9         MR. BELL:  Objection.

10        THE COURT:  I accept the answer.

11   Q.  And you never said in those two prior proceedings that

12   before you made this bribe offer you discussed it with

13   Mr. Reichberg, right?

14        MR. BELL:  Objection.

15        THE COURT:  Sustained.

16   Q.  And other than your testimony, there's no document or video

17   or anything like that, right?

18        MR. BELL:  Objection.

19        THE COURT:  Thank you.  You can answer the question to

20   the extent you know the answer.

21   A.  I'm not sure.  There may be.

22   Q.  You think there might be a video or document?

23   A.  There could be footage from the room, there could be text

24   messages.  There's a lot of independent evidence that I'm not

25   privy too.

1    Q.  But you have never seen one, right?

2    A.  No.

3    Q.  And sir, when you offered this bribe to Mr. Seabrook, you

4    told him that you were part owner of Platinum Partners, right?

5    A.  That's right.

6    Q.  And you were not, right?

7    A.  No, I lied.

8    Q.  And you lied about that.

9         And that was a hedge fund that was worth a billion

10   dollars, you said, right?

11   A.  Yes.

12   Q.  And when you lied about this to him, this was to lure him

13   into accepting the bribe, right?

14   A.  Yes, I wanted to lure him in and I wanted to bribe him.

15   Q.  You wanted to make him feel comfortable with you, right?

16   A.  That's right.

17   Q.  And to trust you, right?

18   A.  Right.

19   Q.  That's why you developed the trip and you were up there in

20   his room drinking with him and comforting him and listening to

21   his secrets, right?

22   A.  Yes.

23   Q.  To lure him in and make him comfortable with you, right?

24   A.  That's right.

25   Q.  And that was you alone, right?

IBTTGRA4                        Rechnitz - Cross

1  A.  At that time it was me and him in the room.

2  Q.  And that's because Mr. Seabrook really trusted you, right?

3            MR. BELL:  Objection.

4            THE COURT:  Sustained.

5  Q.  Well, did Mr. -- well, withdrawn.

6            Did Mr. Seabrook tell you not to tell Jeremy about

7  this bribe?

8  A.  Yes.

9  Q.  And he told you, am I correct, that Mr. Reichberg was not

10  like you and Mr. Seabrook and he did not want him knowing about

11  this, right?

12  A.  Yes, he told me he didn't trust him.

13  Q.  He didn't trust him to keep something like this quiet,

14  right?

15  A.  I don't know what he meant, but he said he couldn't trust

16  him.

17  Q.  But he trusted you, right?

18  A.  That's right.

19  Q.  And he didn't know that you had alternative motives for all

20  of this, right?

21            MR. BELL:  Objection.

22            THE COURT:  Sustained.

23  Q.  Well, when he trusted you, you have testified already that

24  you were trying to lure him into something and had taken

25  certain actions to try to lure him into something, right?

IBTTGRA4                          Rechnitz - Cross

1    A.  Yes.

2    Q.  And he didn't realize that in his closeness with you,

3    right?

4            MR. BELL:  Objection.

5    A.  I can't speak --

6            THE COURT:  Sorry, that's sustained.

7            You can proceed.

8    Q.  Now you said he didn't trust Mr. Reichberg.  Mr. Reichberg

9    likes to exaggerate things, right?

10           MR. BELL:  Objection.

11   Q.  To your knowledge?

12           THE COURT:  Can you rephrase the question, counsel?

13   Q.  You said Mr. Seabrook didn't trust Mr. Reichberg, right?

14   A.  He told me that he didn't trust him for this specific.

15   Q.  Okay.  Well, Mr. Reichberg, you are aware, often says he

16   will get something accomplished and it's not true, right?

17   A.  No, I think he procrastinates a lot.

18   Q.  And you have said before that he's like 95 percent of a

19   bullshitter I think is the term you used.

20           MR. BELL:  Objection.

21   Q.  Is that correct?

22           THE COURT:  Thank you.  Can you rephrase the question,

23   counsel?

24   Q.  You said before that Mr. Reichberg -- isn't it correct that

25   you view Mr. Reichberg as someone who often says things that

IBTTGRA4                          Rechnitz - Cross

1    are not truthful or are not going to happen?

2    A.  Yes.

3    Q.  And am I correct that you think that the vast majority of

4    time that Mr. Reichberg says something he's exaggerating or

5    saying he is going to do something, that will not happen,

6    correct?

7    A.  I may have said that.  I don't recall saying that.

8    Q.  But that was your opinion, right, of him?

9    A.  No, I wouldn't say 95 percent, it may have been at a

10   specific moment when I said that.  There are certain things

11   that he says where my gut tells me to believe him and certain

12   things when I feel he's not being straight.  When he's talking

13   about taking care of tickets or telling me someone will show up

14   for a police escort through the Lincoln Tunnel, I believe him,

15   and he delivers.

16   Q.  We'll get there.

17              MR. BELL:  Objection.

18              THE COURT:  Let the witness finish his answer.

19   A.  When he says he will be there at 5 o'clock, everyone knows

20   it's 9:30.

21   Q.  We'll get to the tickets and the Lincoln Tunnel, but right

22   now I'm talking about Mr. Seabrook.  Do you understand that?

23              MR. BELL:  Objection.

24              THE COURT:  Thank you.  There's no question pending.

25   Please proceed.

IBTTGRA4                    Rechnitz - Cross

Q.  Sir, when Mr. Seabrook said he did not want Jeremy to know
about this, you agreed with Mr. Seabrook that you would not
tell Jeremy, right?

A.  I told Norman I would not tell Jeremy.

Q.  That was an agreement that you made with Mr. Seabrook, that
you would not tell Jeremy, right?

A.  Yes, I told him not to worry, I will not tell Jeremy.

Q.  And in fact, sir, you told the government that you did not
tell Mr. Reichberg about the investment deal between COBA and
Platinum at first, right?

A.  I told them after I had already spoken to Murray.  I told
him well before the actual investment took place.

Q.  Well, you said --

          THE COURT:  Sorry, counsel, could you ask what COBA
is?

Q.  Sir, you understand COBA to be the Corrections --

A.  Officers Benevolent Association.

Q.  -- Officers Benevolent Association.

          THE COURT:  Thank you.

Q.  And he found out eventually, right?

A.  Yeah, Murray and I told him.

Q.  And but again -- withdrawn.

          So in fact isn't what Mr. Seabrook said to you, you
have said, is that Mr. Seabrook said about Mr. Reichberg:  I
don't know if I can fuck with him.  He's not like me and you.

IBTTGRA4                          Rechnitz - Cross

1           Right?

2    A.   Yes.

3    Q.   So he wasn't saying he couldn't trust him, he was saying he

4    is not dishonest like you, right?

5           MR. BELL:  Objection, your Honor.

6           THE COURT:  Sustained.

7    Q.   Well, is that what you understood him to be meaning?

8           MR. BELL:  Objection, your Honor.

9           THE COURT:  Thank you.  You can answer the question.

10   A.   I understood Norman to say that he didn't trust him.

11   Q.   And now when you return to the trip -- from the trip,

12   according to you, you went to Mr. Huberfeld and then negotiated

13   a bribe with him, right?

14   A.   I negotiated on his behalf.  I was a messenger between both

15   parties who were negotiating with one another.

16   Q.   So you went back and forth.  It's your testimony that you

17   went back and forth, according to you, between Mr. Huberfeld

18   and Mr. Seabrook, right?

19   A.   Yes.

20   Q.   And Mr. Reichberg is not in any of those meetings, right?

21   A.   Correct, Norman did not want him to know.

22   Q.   And in fact, at some point you reached an agreement, right?

23   A.   They reached an agreement, yes.

24   Q.   For how much would be paid for how much of an investment?

25   A.   That's right.

IBTTGRA4                          Rechnitz - Cross

1    Q.  That's what the agreement was about, correct?

2    A.  The agreement was how much Norman would be paid and how

3    much Jeremy would be paid and how much I would be paid.

4    Q.  Well, the agreement with Mr. Seabrook was not about how

5    much Jeremy would be paid, right?

6    A.  I thought you asked me the agreement on what would be paid.

7    Q.  Okay.  So I'm talking about the agreement that you reached

8    with Mr. Seabrook and Mr. Huberfeld, right?

9            MR. BELL:  Objection, your Honor, that's --

10            THE COURT:  Please rephrase the question.

11   Q.  There was an agreement on how much money Mr. Huberfeld --

12   or Mr. Seabrook could cause to be invested in Platinum Partners

13   and how much money he would get paid by Platinum Partners as a

14   bribe for investing that money, right?

15   A.  There was a formula and a calculation based on an example

16   of an investment of what Mr. Seabrook would receive for

17   directing the funds to Platinum.

18   Q.  And that's an agreement, right?

19   A.  Yes.

20   Q.  And so the answer to my question was yes?

21            MR. BELL:  Objection.

22   A.  Yeah, a non-written --

23            THE COURT:  I accept the answer.

24   Q.  And then it had to go through a process of getting

25   approval -- this investment had to go through a process of

IBTTGRA4

1   getting approval by the union board, correct?

2   A.  I believe so.

3   Q.  And so there was a whole process to be shepherded through

4   to make sure this actually occurred, right?

5   A.  I believe so.  I was not part of that process.

6   Q.  Well, you received emails about that process, right?

7   A.  I received emails coordinating meetings, but I don't know

8   what approval process in the board was necessary.

9   Q.  Okay.  And --

10  A.  Or required.

11  Q.  And I want to show you what has been marked as JR36019.

12          THE COURT:  Counsel, I'm going to be looking for a

13  time to break sometime soon.  If you could let me know when

14  would be an appropriate time.

15          MS. NECHELES:  We can do this now.

16          THE COURT:  Good thank you.

17          So ladies and gentlemen, it's about time for us to end

18  our day.  First, as always, thank you very much for being here

19  and all your attention.  I very much appreciate it, as do the

20  parties.  Please, during this recess, don't talk about the case

21  with anyone or yourselves, each other, and also don't research

22  the case or anything involved in it, and steer clear of any

23  news that you may happen to see about the case.

24          Thank you.  See you tomorrow morning.

25          (Jury not present)

IBTTGRA4

```
1              THE COURT:  Mr. Rechnitz, you are excused.  As before,
2      please don't discuss this case or your testimony with any
3      person during this recess apart from your counsel and the
4      government with respect to any scheduling matters only.
5              THE WITNESS:  Yes, your Honor.
6              THE COURT:  Good.  Thank you.  Counsel, as
7      Mr. Rechnitz is making his way out, are there any issues that
8      you would like to take up?
9              I have a short list of things that I would like to
10     make sure that we have the opportunity to address.  The first
11     two are the redactions to 12602 and 12603, they have been
12     accepted into evidence, 12602 subject to anticipated
13     redactions, I have not yet accepted 12603 with the expectation
14     that the parties would be talking about redactions.
15             Could I ask the parties to take up that issue between
16     now and tomorrow morning so that the properly marked redacted
17     versions of those documents will be available?
18             MS. NECHELES:  Yes, your Honor.
19             THE COURT:  Good.  I also ask that the defense prepare
20     marked versions of each of the redacted exhibits that we
21     discussed earlier today, which were the subparts of
22     Mr. Rechnitz's credit card statements, 12084A and B, and then
23     also what was ultimately marked as 12084, which was the
24     singular page with the top three entries and the other
25     components of the page redacted.
```

IBTTGRA4

1            Counsel for the defense is also going to work on the

2       transcript of this video, to the extent that you still wish to

3       introduce it, and I'll review the text of that overnight.

4            There was some questioning about a Peralta settlement

5       agreement, which I understood the witness was uncomfortable

6       responding to.  I did not order him to respond because I don't

7       know the parameters of that issue.

8            Counsel, is there anything that I can or should know

9       about that at this point?  My proposal would be for there to be

10      some conference with perhaps his counsel to understand what the

11      nature of the privilege is, the confidentiality of that

12      information is so I could evaluate whether or not the

13      questioning should be forestalled.

14            MR. BELL:  Could we have one moment, your Honor?

15            THE COURT:  Please do.  Take your time.

16            (Pause)

17            MR. BELL:  Your Honor, it may be, as an initial

18      matter, appropriate for your Honor to inquire or to request a

19      proffer of relevance as to this testimony, as it eluded us at

20      the front table.

21            The secondary inquiry that may be helpful and may

22      shorten this is an inquiry to counsel for defendant Reichberg

23      as to whether this is something that they look to -- that

24      they're going to look to go back into.  I actually was of the

25      impression that topically we moved on.  I'm not sure that

IBTTGRA4

1   Ms. Necheles sees a profit in returning to this.

2            MS. NECHELES:  Your Honor, I'm sorry, I really can't

3   hear a lot of what he says.

4            MR. BELL:  I'm sorry.

5            THE COURT:  I don't think it's you, I think that the

6   volume on your microphone is still low.

7            MR. BELL:  I have only got an on or off switch.

8            I will say it again, if it's helpful.

9            THE COURT:  Please do.

10           MR. BELL:  I was saying in the first instance it might

11  be helpful for your Honor to request a proffer of the relevance

12  of this testimony, as it eluded us, at the very least.

13           And secondly, it may be helpful for your Honor to ask

14  whether this is terrain in which Ms. Necheles seeks do wander

15  again.  I was of the impression that she moved on, and also of

16  the impression this was not terribly profitable ground in any

17  event.  If she does not seek to go back there again, it may not

18  be something that we need to inquire.

19           The only thing that I would add to that, your Honor,

20  is what I understand from the witness -- and this is not inside

21  information, this is just my sitting here and viewing this --

22  was an expression of the sentiment that he could not properly

23  answer that question without with wading into areas of

24  privilege that he's not prepared to navigate himself.  And I do

25  tend to think that if we could find some sort of solution that

IBTTGRA4

1    does not involve further complicating that for him, given the

2    concerns at stake, we're probably all better off.

3             THE COURT:  Thank you.  Counsel for defendant, the

4    gating question for defendant Reichberg, the gating question is

5    whether or not this is an issue that you expect to return to.

6    If so, the secondary question is the government's asked for a

7    proffer on relevance.

8             MS. NECHELES:  Your Honor, I did think I was going to

9    return, but I was frankly surprised by the answer.  The

10   relevance was this is a person who said many times on direct

11   examination I'm a changed person now, money no longer matters

12   to me.  He had defrauded people out of substantial amounts of

13   money, not paid his taxes, and there's people -- bankruptcy

14   proceedings going on, people out of money, and I thought he was

15   going to say he hasn't paid anything.  Now it turns out he paid

16   something, and yeah, I would like to know what that is.  And I

17   think that what he is saying is not that it's privileged, that

18   he entered into a settlement agreement that has a

19   confidentiality aspect.

20            THE COURT:  Thank you.  That last part was consistent

21   with my understanding of his testimony; not that it was

22   privileged, but rather subject to some kind of confidentiality

23   undertaking that I was reluctant to overcome at that point in

24   time.

25            I think it might be most efficient, if there are no

IBTTGRA4

1    objections to this approach, for counsel to discuss this with

2    counsel for Mr. Rechnitz and understand what the nature of the

3    issue so that either a solution could be worked out amicably or

4    so the Court could evaluate whether the confidentiality

5    overtaking is one that can or should be overcome here.

6            MR. BELL:  I note for the record, just because this

7    may complicate the proceedings, as your Honor knows,

8    Mr. Rechnitz -- the composition of Mr. Rechnitz's counsel has

9    changed recently.  Ms. Berger I think had been most acutely

10   involved in the day-to-day representation of Mr. Rechnitz.  To

11   the extent that Mr. Levine needs to speak to his client in

12   order to get us information about this, I assume that that's

13   okay.

14           THE COURT:  Thank you.  I have no issue with that.  I

15   expect that's necessary.

16           Counsel for defendants, do either of you have a

17   concern about that?

18           MS. NECHELES:  I have no issue.

19           MR. MERINGOLO:  No issue.

20           THE COURT:  Good.  Please do coordinate with

21   Mr. Levine.  Let me know whether or not a resolution of this

22   issue can be reached between counsel, and if not, I will be

23   prepared to discuss the parameters of the issue perhaps with

24   the benefit of both counsel for Mr. Rechnitz tomorrow.

25           So one of the other issues that I wanted to talk about

IBTTGRA4

with respect to witnesses, in addition to the police officers,
were other potential defense witnesses.  We put in place a
protocol that was triggered by the one week to close of the
government's testimony.  We anticipated that date would be
around Tuesday of this week, but we had our day of rest earlier
this week.  Should I think of this as the week from the
government rest date such that the protocol that we discussed
earlier is now triggered?

MS. LONERGAN:  Yes, your Honor.  We believe that it
is -- I mean of course we make no promises, but that it is fair
to anticipate that it's possible that we can rest by the close
of next week.

THE COURT:  Good.  Thank you.  Now with respect to the
police officers, we've done that.

The second part --

MS. LONERGAN:  Your Honor, may I just --

THE COURT:  Please.

MS. LONERGAN:  On the police officers, I had
correspondence from the NYPD earlier today.  They believe that
your Honor previously set in place a schedule where they were
supposed to respond within 48 hours.  They're wondering if that
is still in place or just what the deadline would be for their
written response, because they're just trying to coordinate
that.

THE COURT:  Thank you.  That's fine.  That is exactly

IBTTGRA4

what is required by my November 6 order, and I don't expect to
deviate from that.  My preference, however, which I was
communicating this morning, is that the parties work as hard as
possible to resolve these discovery-related disputes among
themselves.  My hope was that the conversation that counsel for
Mr. Grant would engage in with the NYPD might narrow the
issues.

The way that it's just been described to me assumes
that every issue will be litigated and that every issue will be
brought to the Court.  That's not always the most efficient.
So my hope is that a conversation will happen and then any
submission to the Court will happen still on the time frame
that I originally established.

MS. LONERGAN:  Your Honor, to be clear, this is not
assuming that they're going to have objections, I don't know
their position, so don't want to speak for them, but just so I
can accurately represent to them the Court's wishes with
respect to timing, my understanding is that this letter by
Mr. Grant was filed -- Mr. Grant's counsel was filed yesterday,
so any written response by the NYPD would be due tomorrow.  Is
that correct?

THE COURT:  That is correct.  To the extent that I
understand from the communications that the defense will have
with the NYPD overnight that there may be some benefit to
pushing back that briefing schedule, I would be happy to

entertain a potential deferral of that briefly so the parties

could work through the issues and to narrow those presented to

the court.  My strong preference is for the parties to amicably

resolve the issues, and if that would help the process I would

entertain the request tomorrow morning to extent that deadline.

MS. LONERGAN:  Understood, your Honor.  Thank you.

MS. NECHELES:  Your Honor, with respect to timing of

the trial, I'm kind of trying to make plans myself.  I have

some surgery, minor, that I want to schedule, and I'm kind of

surprised by it, and I want to know that I can rely on this.

There's 28 witnesses still on the witness list, and some of

them are quite substantial.

I'm surprised by the idea that we will essentially not

be calling any more witnesses, because I think that

Mr. Rechnitz is -- I mean for sure -- I believe I will finish

crossing him on Monday, and then I don't know how long

Mr. Meringolo will go.  I assume there will be some redirect,

maybe some recross, so maybe he gets off the witness stand

around Tuesday or Wednesday at the earliest.

And so I guess what the government is saying is

they're not calling any more witnesses.  And that surprises me,

because there are elements of this case that they have spoken

about, and certainly one entire charge that they have not had

witnesses.  But if they are not calling anyone else, that's

fine.

IBTTGRA4

1          But I would then need to know that, because part of

2     what I do in planning a case is to figure out who they're

3     putting on so I can cross-examine about stuff, and then if they

4     don't put those people on I need to arrange for some witnesses

5     maybe to put some evidence in.  But I need to subpoena people.

6          It's very difficult to know when I have a witness list

7     that they assured me is a real witness list and it has 28

8     people left on it, and now I'm hearing the government plans to

9     rest next week, and I just can't see how this witness finishes

10    before Tuesday or Wednesday.  So if we could get some clarity,

11    it would be helpful.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

IBTKGRA5

1          MS. LONERGAN:  Your Honor, first of all, before

2    Thanksgiving, we issued a revised witness list, which had fewer

3    than 28 individuals on it.  I think it was closer to 20.

4          THE COURT:  Can I ask you to move the microphone a

5    little closer to you.

6          MS. LONERGAN:  Yes.  Can I just try this microphone.

7    No, I can't.

8          Before Thanksgiving, we issued a revised witness list

9    that had fewer than 28 individuals on it.  I think it was

10   closer to 20.  As defense counsel well knows, we have been

11   working with them to reduce that number even further, by

12   entering into stipulations.

13         We also anticipate a long cross; however, a number of

14   our remaining witnesses are short.  We are not stating here

15   today that we are not calling any more witnesses.  That is

16   clearly not the case.

17         Look, I said, I think it is possible that we end on

18   Friday.  It is also possible we extend into the next week, but

19   the issue is, we don't want things to go much faster than we

20   expect and to be caught unawares.  If the Court wishes to set,

21   rather than tomorrow, Monday as the one week out, that's fine

22   as well, your Honor.

23         But just to be clear, I think we just want to make it

24   clear that we are working -- we know this trial has gone

25   slower, I think, than at least the government anticipated -- we

IBTKGRA5

1    are working to streamline our proof.  We are, of course, aware

2    of the elements of each of the charges that we have to prove,

3    and so we are taking that into account, but our intention is,

4    as much as possible, to streamline our remaining presentation.

5    That's why we have been engaging almost every night, for the

6    past week and a half, with defense counsel in trying to enter

7    into numerous remaining stipulations, so that we can use the

8    jury's time most efficiently.

9         THE COURT:  Good.  Thank you.

10        To the extent that there are topics that the parties

11   can agree to through stipulation that will reduce the number of

12   live witnesses, I encourage you to take those opportunities, to

13   spare the jury's and the parties' time.

14        MS. NECHELES:  We have worked very hard to do that,

15   and will do that, but I think that would still leave 20

16   witnesses, and we just ask that we be told who the witnesses

17   will be, because it's hard to --

18        THE COURT:  That's fine.

19        MS. NECHELES:  -- say that there are 20 witnesses or

20   so left on this witness list -- and it's really going to be a

21   week?  I'm going to be subpoenaing people and telling them to

22   disrupt their schedules, and then it might not actually -- some

23   of these are state agencies I might be subpoenaing.  It is

24   something that I think I need to figure out what's going on.

25        THE COURT:  Thank you.  I'll ask the parties to confer

IBTKGRA5

1     after I leave the bench.

2                Anything else that we need to talk about before we

3     take our recess for the day, counsel for the United States?

4                MS. LONERGAN:  Your Honor, I think only what time

5     we're ending tomorrow, because I know that's been a little bit

6     of a changing target, as the days get shorter.

7                THE COURT:  Thank you.

8                My hope was that we could adhere to the 2:00 p.m. that

9     we used, I think it's two weeks ago now, but please let me

10    know, counsel, if that timing does not work well now, with the

11    shortening days.

12               MS. NECHELES:  Your Honor, I think the only problem

13    is, I think now Shabbos starts 40 minutes earlier or like maybe

14    half an hour earlier than it did two weeks ago because the days

15    are still getting shorter, and the traffic has gotten really

16    bad.  So I think we're concerned about the 2:00 o'clock, as I

17    anticipate the witness will be -- maybe he won't be, I don't

18    know.

19               THE COURT:  Thank you.  Let's look at 1:30.  But,

20    counsel for the defense, as before, I'll continue to look to

21    you, since it's your examination at this point, to the extent

22    that there is additional work that you can get done after that,

23    I will take the cue from you, on behalf of Mr. Reichberg, to

24    ensure that he is able to comply with his obligations.

25               MS. NECHELES:  Thank you, your Honor.

IBTKGRA5

1              THE COURT:  Good.  Thank you.

2              Anything else for Mr. Grant?

3              MR. MERINGOLO:  No.  Thank you, your Honor.

4              THE COURT:  Good.  Thank you, all.  I'll see you

5    tomorrow morning.

6              (Adjourned to November 30, 2018 at 9:00 a.m.)

7                          *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2  Examination of:                          Page

 3   JONA RECHNITZ

 4  Cross By Ms. Necheles  . . . . . . . . . . .3079

 5                    DEFENDANT EXHIBITS

 6  Exhibit No.                              Received

 7  12102   . . . . . . . . . . . . . . . . .3080

 8  JR-12103   . . . . . . . . . . . . . . . .3081

 9  JR-12104   . . . . . . . . . . . . . . . .3082

10  JR-12204   . . . . . . . . . . . . . . . .3088

11  JR-12602   . . . . . . . . . . . . . . . .3093

12  JR4004   . . . . . . . . . . . . . . . . .3100

13  12084A   . . . . . . . . . . . . . . . . .3110

14  JR12084B   . . . . . . . . . . . . . . . .3114

15  1716 and Exhibit JR4104   . . . . . . . . .3121

16  JR4050   . . . . . . . . . . . . . . . . .3126

17  JR4053   . . . . . . . . . . . . . . . . .3127

18  4059   . . . . . . . . . . . . . . . . . .3130

19  JR14027   . . . . . . . . . . . . . . . . .3135

20  JR14112   . . . . . . . . . . . . . . . . .3139

21  JR14101   . . . . . . . . . . . . . . . . .3144

22  JR14107   . . . . . . . . . . . . . . . . .3146

23  4007   . . . . . . . . . . . . . . . . . .3150

24  JR51012   . . . . . . . . . . . . . . . . .3154

25  JR51004   . . . . . . . . . . . . . . . . .3155
```